# **<u>Exhibit G</u>**

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **In re Grand Jury Subpoenas** | ) | GJ No. 16-04 |
| **16-04-108,** | ) | February 9, 2018 |
| _____ | ) | 2:30 p.m. |

**BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**MOTION HEARING**

**APPEARANCES:**
For the Government:
    U.S. Attorney's Office
    By:  **Dominic William Lanza,** Esq.
        **Kevin M. Rapp,** Esq.
    40 North Central Avenue, Suite 1800
    Phoenix, Arizona 85004

    U.S. Department of Justice:
    By:  **Reginald E. Jones,** Esq.
    1400 New York Avenue NW Suite 600
    Washington, DC 20530

For Backpage:
    Davis Wright Tremaine
    By:  **Zana Z. Bugaighis,** Esq.
    1201 Third Avenue, Suite 2200
    Seattle, Washington 98101

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1          (Proceedings begin at 2:30 p.m.)

2          THE CLERK:  In the matter of the Grand Jury 16-4, on

3     for a motion hearing.

4          Will the parties please announce?

5          MR. LANZA:  Good afternoon, Your Honor, Dominic Lanza          14:31:06

6     with Reggie Jones and Kevin Rapp on behalf of the United

7     States.

8          THE COURT:  Good afternoon.

9          MS. BUGAIGHIS:  Good afternoon, Your Honor, Zana

10     Bugaighis on behalf of Backpage.          14:31:13

11          THE COURT:  Good afternoon.

12          All right.  I have -- I've read the motion, the

13     response and the reply.  I've looked at some, not all of the

14     attachments.  I have read the *Graf* case and the *Beiter* or

15     Beater case, B-E-I-T-E-R.  And *Graf* is G-R-A-F.  So I          14:32:17

16     understand the issues that have been presented by the parties.

17          This is the Government's motion.  Why don't we get

18     your comments, Mr. Lanza, in light of the briefing that's been

19     completed.

20          MR. LANZA:  Thank you, Your Honor.          14:32:35

21          I'll start first with the public relations firms.

22          I think the way to think about this issue is, the

23     general rule, the presumption in the Ninth Circuit everywhere

24     is that generally when there's a attorney/client privilege

25     between a corporation and its outside counsel, the sharing of          14:32:48

1   privileged information with a third party destroys the

2   privilege.

3          Now, there are exceptions to that.  There's this

4   developing body of law that suggests there are certain very

5   narrow factual circumstances where, even though the disclosure

6   of privileged information goes to a third-party consultant, if

7   there's specific things about the nature of that consultant's

8   relationship with counsel and the client, there's a way to

9   thread that needle and have that not effectuate a waiver of the

10  privilege.

11         But I think, when canvassing all the law on this, two

12  principles emerge.

13         The first is that this is a very fact-intensive test.

14  The evidentiary burden always falls on the party claiming an

15  attorney/client privilege to submit evidence to meet their

16  burden.  But in this area, because this is such an exception to

17  a widely-held rule, because it requires so many specific

18  factual showings, that the proponent really needs to come

19  forward with affidavits, with contracts, to give the Court a

20  very well-developed sense of exactly what the relationship was

21  between these parties.  How big the firms were, what their role

22  was, what exactly they were doing, who hired them, whether they

23  exercised independent judgment.  A host of different factors

24  that come out time and again from the cases.

25         The other principle that emerges is that there's

14:33:01

14:33:19

14:33:33

14:33:52

14:34:07

1    actually two different that are analytically pretty distinct

2    tests that a party that's trying to claim privilege as to a

3    third-party consultant can travel under.

4         One of them is called the *Kovel* theory and the other

5    one is the functional equivalent.  *Kovel*, in a nutshell, is                14:34:23

6    that the outside attorneys had to hire a specialist to educate

7    the attorneys about some specific PR-related function that was

8    so intertwined with the legal representation that the attorneys

9    really needed to rely on these people to do their job better.

10         You know, the sort of concept is the same way that if       14:34:42

11   documents need to be translated, when you bring in a

12   translator, they may not be the client or the attorney.  There

13   are certain specialized services that in the right

14   circumstances the attorneys just need this help in order to do

15   their job correctly.                                                          14:34:55

16         And so that's one band of cases where there hasn't

17   been found to be a waiver with PR firms, is where the outside

18   counsel hired the firm in order to help counsel do its job

19   better.

20         The Martha Stewart case, also known as *In re Grand*         14:35:07

21   *Jury Subpoenas* is sort of one of the quintessential examples of

22   that one.

23         The other theory, which is just totally different

24   analytically, is the functional equivalent theory.  And that's

25   that the third-party consultant wasn't hired by the attorneys               14:35:19

1    to help the attorneys, they were actually essentially the same

2    thing as an employee of the company.  And even though they

3    might seem like an outside consultant or an independent

4    contractor on paper, when you really look at what they do on

5    day-to-day basis, there's no distinction between what they do          14:35:37

6    and a full-blown employee of the company.

7           So where are we here in this motion?

8           Backpage has elected to go down solely on this

9    functional equivalent theory and it hasn't submitted any

10   evidence.  And I think that we should prevail for both of those       14:35:51

11   reasons, but I really can't get past the lack of evidence here.

12          When you look at the key cases that they rely on, the

13   Court's read *Beiter*, they submitted all sorts of affidavits in

14   that case to really prove up exactly what this relationship was

15   like.  And you see these courts time and again, the few courts        14:36:08

16   that have ruled for the privileged proponent, have emphasized

17   how they were only able to get there because they had such a

18   well-developed evidentiary record.

19          And in contrast, a couple of the cases we've cited

20   where courts have rejected privileged claims, they've gone out        14:36:22

21   of their way -- you know, there's a case cited on page 6 of our

22   reply, the *Energy Capital* case, that I think in sort of common

23   sense language hits the nail right on the head where they say,

24   you know, it's possible to have the privilege extend to

25   third-party consultants, but it's really unusual.  And the            14:36:42

6

1    party that wants to travel on this unusual ground really needs

2    to prove it up and submit all the evidence to get there.  And

3    when they fail to do that, they just lose for that reason.

4          So here Backpage, we've been pleading for four months

5    for them to turn over the contracts that were used to hire                14:36:58

6    Sitrick, JMS, and Culloton Strategies.

7          Parenthetically, for Backpage to have put these

8    documents on their privilege log in the first place years ago,

9    they ought to have done this analysis and convinced themself

10   there was a good-faith basis for invoking this very narrow                 14:37:16

11   exception.

12         Nevertheless, we've been asking all this time.  They

13   haven't turned them over.  They didn't turn them over during

14   the meet and confer process.  And then surprisingly, they

15   didn't even turn them over as evidence in support of their                 14:37:28

16   motion here.

17         So the Court is just left with a barren record about

18   anything about the specifics of these relationships.  And when

19   you're the privileged claimant that have the burden, that's a

20   big problem.                                                               14:37:40

21         But stepping aside from that, the other reason why

22   with respect to the public relations firms I think we should

23   prevail, when you -- I think there's a certain irony to their

24   reliance on *Beiter*, because it shows factual circumstances that

25   are just so dramatically different from what we have here.                 14:37:56

1        *Beiter* was this case where you've got a two-person

2    closely-held partnership that doesn't even have employees, it's

3    this sort of single-purpose vehicle just set up to develop a

4    parcel of land.  They executed an independent contractor

5    agreement with this third party, but he is the closest thing      14:38:13

6    you could have to an employee.  He works out of their office.

7    He has an equity stake in the partnership.  He's there every

8    day.  This is basically what he does with 100 percent of his

9    time to the point that two or three years later they actually

10   tear up the independent consultant agreement and hire him as an   14:38:30

11   employee.

12        I can see why under those circumstances, which I would

13   add the parties established through affidavits and contracts

14   and a rich evidentiary showing at the hearing, you might

15   consider that type of person a functional employee even though   14:38:43

16   on paper they were characterized as an independent contractor.

17        Similarly, in *Graf*, it's the founder of the company

18   that's the face of the company.  And the only reason they

19   pretend that he's an independent contractor is because there's

20   this cease and desist order from the State of California that     14:39:00

21   says you can't work in the insurance industry.  So they say,

22   okay, we won't employ him, we'll just pretend that he's an

23   independent contractor.

24        Again, those are very extreme and unusual facts.  And

25   with the appropriate evidentiary record you can see how we'll     14:39:13

1      treat that person as the functional equivalent of an employee.

2              This case couldn't be more different.  Backpage, at

3      the time these PR firms we believe were hired -- and, again,

4      how to we know when they were hired?  There's no evidence --

5      had at least 70 plus employees in the U.S., 50 contractors in          14:39:31

6      India.  They had offices in Phoenix and Dallas.  They're

7      earning tens of millions of dollars a year.  They have, as

8      we've established through our reply, in-house people issuing

9      press releases, drafting editorials, going on CNN to do

10     PR-related things.                                                      14:39:51

11             And on top of all of that, they engage these three big

12     PR firms.  This isn't like the consultant in *Beiter* who was

13     just one guy, who this is what he did with 100 percent of his

14     time is work for the company.

15             I would note, one of the firms is Sitrick & Company.           14:40:06

16     How to we know that Sitrick is a big PR firm with a lot of

17     different clients?  It's because in the *O'Hara* case that we

18     cited, which is another case where a court found that a

19     disclosure to a PR firm resulted in a waiver, Sitrick was the

20     PR firm in that case too.                                              14:40:23

21             These are big firms with clients all over the place.

22     They happen to be providing consulting services to another huge

23     company.  That is just so far afield from what a functional

24     equivalent could possibly be under *Beiter* and *Graf*, that for

25     those two reasons we'd ask the Court to find that Backpage            14:40:38

1  hadn't met its burden and that they should be ordered to

2  disclose all of the PR firm related documents that are on their

3  log.

4          I'm happy now to go into SSP Blue and Duff & Phelps.

5  Or if you think it's better to go one at a time, whatever you          14:40:54

6  want.

7          THE COURT:  No, go ahead.

8          MR. LANZA:  With respect to SSP Blue, I think this is

9  the closest one of the three on the record.

10          The principal of SSP Blue, Mr. Nigam, is an attorney,          14:41:06

11  he was a former AUSA.  And Backpage has asserted in their

12  privilege log that the documents they've withheld contain

13  privileged information.

14          But this isn't a -- this case is still closer because

15  SSP Blue is engaging in unusual functions that sure seem to          14:41:28

16  blur the line between business functions and legal advice.

17  It's not registered as a law firm.  It doesn't hold itself out

18  as a law firm.  When you look at the things it advertises and

19  touts on its website, it's all business advice.  It's

20  e-security, it's privacy, it's crisis management.  It's -- you          14:41:44

21  know, I can't remember the exact word, but it's sort of

22  leveraging its relationships to set up meetings.

23          We actually -- one of the things that's come out in

24  this case is it appears that Mr. Nigam used his contacts as a

25  former DOJ employee to set up a meeting between Backpage and          14:42:01

1    the National Center for -- NCMEC, the Center For Abused

2    Children, which that's not legal services, that's using

3    relationships and leveraging business things.  That's not the

4    same type of behavior that would ordinarily be treated as legal

5    advice.                                                              14:42:18

6              So we've identified a good body of case law suggesting

7    that when there are -- it's not just a fishing expedition, but

8    when there are articulable reasons that are grounded in good

9    faith and actual things that are out there in the record that

10   make the party opposing the privilege claim suspect that this       14:42:38

11   may not have been legal advice, that again you go back to the

12   attorney/client privilege is a privilege that the proponent who

13   wants to invoke has the burden of establishing.  And it's meant

14   to be construed narrowly, because it's in derogation of the

15   Grand Jury's right to know what the facts are and get to a          14:42:59

16   search for the truth.

17             And so here, the record is murky on exactly what

18   Mr. Nigam was doing.  And we think that Backpage could have

19   easily cleared this up by, for example, coming forward with

20   their retainer agreement that they actually used to hire            14:43:16

21   SSP Blue.  That's the step that was noted in some of the cases

22   we've cited.  That should say pretty much what he was retained

23   to do.

24             It's -- we think it was their burden to do that.  We

25   asked for it for three months during the meet and confer           14:43:29

1   process.  Had they just produced it to us and it looked like he

2   was providing legal services, we very well may not have even

3   moved on this ground.  But the fact that they won't produce it

4   when they're the privileged proponent, they just haven't met

5   their burden here.                                              14:43:45

6          So I do think this is a closer call than the PR firms,

7   but I think the Court would be fair based on how this record's

8   developed and why we're here today to say that they were the

9   privileged proponent, they had the burden of showing that

10  Mr. Nigam was providing legal advice, and because they declined  14:44:01

11  to submit any affidavits to prove that up or declined to submit

12  the retainer agreement, they haven't met their burden.  And

13  that could be the end of it and you could rule in our favor.

14         But I also think it would be reasonable for the Court

15  to think that that is a -- even though fair and legally          14:44:16

16  defensible, perhaps harsh outcome, and at a minimum the Court

17  could conduct its own in camera review of all or some of the

18  documents to assure itself or get its own view on whether or

19  not these withheld documents actually contain privileged

20  material.                                                        14:44:35

21         And I guess one final point on that, why I think that

22  it's fair to us to have some skepticism here and to ask them to

23  meet their burden.  You know, what led up to us getting here?

24  We wrote this e-mail to Backpage in October raising questions

25  about their privilege log.  And when they looked at it, even     14:44:52

1    though they really kind of gave us the run around on some

2    things, I think it's telling that when we just pointed out some

3    flaws in their privilege log they acknowledged that 150 e-mails

4    right off the bat were improperly put on there.  And these were

5    e-mails that really aren't even defensible to have been in                14:45:10

6    there in the first place.

7          The type of stuff they initially had on the privilege

8    log, which they didn't give Congress and initially tried to not

9    give us, are things such as e-mails that their PR firm

10   forwarded to a 1400-member law enforcement list serve.  I would        14:45:24

11   suggest that that doesn't suggest that a lot of care and

12   precision went into the formulation of the privilege log in the

13   first instance.  And that further underscores why we think it's

14   not enough for them to say, Mr. Nigam is an attorney, take our

15   word for it and we don't need to prove it up under these              14:45:42

16   circumstances.

17         Finally, to Duff & Phelps, you know, where do we

18   start?  The baseline principle is, when material that may be

19   privileged between a corporate client and its attorney gets

20   turned over to a third party, that's a waiver unless the              14:45:57

21   privilege proponent can first articulate one of these two

22   tests, *Kovel* or the functional equivalent, and then come

23   forward with a bunch of evidence to show how it really fits

24   here.

25         They didn't put forth any evidence yet again here.              14:46:10

13

```
1    And instead, all they've done is assert that this should remain

2    privileged because Duff & Phelps, it appears from their briefs,

3    was retained by their outside counsel to provide advice

4    concerning complex regulatory matters.

5           We don't have any evidence of that.  And I would note      14:46:29

6    that the one piece of evidence we submitted in our reply

7    suggests that Duff & Phelps was just a regular old investment

8    bank.  They were out there helping to -- in the process to spin

9    off Backpage from Village Voice Media by findings folks who

10   might be willing to make this big loan and provide money in the    14:46:47

11   spinoff process.

12          That is very different from some investment bank that

13   a law firm privately hires just so that the law firm can get

14   advice on how regulatory matters works.  And at a minimum, it

15   was their burden to show that that was the actual relationship     14:47:03

16   between Duff & Phelps and their outside counsel, and they

17   didn't meet it.

18          So for those reasons, I think that the Duff & Phelps

19   is more like the PR firms, they had a clear burden and they

20   didn't meet it.                                                    14:47:15

21          THE COURT:  Okay.  Thank you.

22          Tell me your name again, I'm sorry, I missed it the

23   first time.

24          MS. BUGAIGHIS:  Zana Bugaighis, Your Honor.

25          THE COURT:  And how do you spell it, the last name?         14:47:23
```

UNITED STATES DISTRICT COURT

1          MS. BUGAIGHIS:  B-U-G-A-I-G-H-I-S.

2          THE COURT:  And it's pronounced?

3          MS. BUGAIGHIS:  Bughaigis, Your Honor.

4          THE COURT:  Bughaigis?

5          MS. BUGAIGHIS:  Bughaigis.                          14:47:38

6          THE COURT:  All right.  Go ahead.

7          MS. BUGAIGHIS:  Your Honor, I'm going to start with

8    the PR firm issue.

9          The Government starts off attacking -- well, Backpage

10   believes that its privilege log and the publically-available     14:48:00

11   information regarding the legal and political climate towards

12   Backpage in the time period in question, 2010 to 2012,

13   demonstrates that Backpage hired the PR firms for a legal

14   purpose.

15         At the time Backpage had no in-house PR department,       14:48:20

16   which the Government does not refute.  Backpage had a pressing

17   need to neutralize public opinion in order to avoid certain law

18   enforcement scrutiny and public prosecution.

19         The consultants worked with Backpage to develop

20   strategies and approaches in the face of threats from State     14:48:40

21   attorneys, private litigants, and legislative officials.

22         Under the Ninth Circuit Backpage's work with these

23   public relations consultants remains privileged because it was

24   done so in conjunction with attorneys.

25         The Government points to Backpage's evidentiary          14:49:00

```
 1    burden.  But it fails to note that this is a criminal
 2    prosecution.  This is not a civil case, Your Honor.  The
 3    Government points almost exclusively to civil cases.  This is a
 4    case that involves Fifth Amendment rights against prosecution.
 5    The Government is not only seeking to prosecute Backpage, but      14:49:21
 6    also multiple of its employees.  This is not a case where the
 7    burden is on the criminal defendant to come forward in
 8    violation of its own Fifth Amendment rights and present the
 9    evidence that the Government is seeking.  The defendant,
10    Backpage, has no obligation to provide evidence that will be      14:49:41
11    used against it in a criminal prosecution.
12            Instead, Your Honor, we believe that our privilege log
13    and the public information available, some of which the
14    Government has pointed to, provides the basis on which you can
15    find the public -- the PR consultants worked as functional       14:49:58
16    equivalents in this context.
17            I also want to note that -- two things.
18            One, the Government's motion to compel made improper
19    generalized unsupported challenges.  On reply the Government
20    attempts to dial this back by shifting completely its legal      14:50:17
21    theory and providing some documents.  But it didn't provide
22    those in its motion to compel, and it only provided them on
23    reply, in which case Backpage did not have the opportunity to
24    respond.
25            So if Your Honor requests or feels that it needs more     14:50:32
```

1    evidence, we would request that Your Honor ask Backpage to make

2    that showing.

3            Additionally, we feel that the Government is narrowly

4    construing or even misrepresenting the case law regarding what

5    may be a functional equivalent and how these tests are laid out          14:50:55

6    in the case law.

7            Your Honor, the Government states there are two tests,

8    the *Kovel* analysis and the *Graf* analysis, of functional

9    equivalent.  But it's really, Your Honor, it's kind of a

10   sliding scale or continuum.  There's also -- the Government          14:51:09

11   says that *In re Grand Jury* is the quintessential *Kovel*

12   representation.  But *In re Grand Jury*, which we think is most

13   analogous to the facts here regarding Backpage's PR consultants

14   is not analyzed under *Kovel* or under the *Graf* functional

15   equivalent test.  Instead it states its own test for when          14:51:33

16   courts may find PR firms to be included within the privilege.

17           And, Your Honor, we believe that Backpage meets its

18   burden under *Graf* and under the *Grand Jury Subpoenas*' test for

19   finding that these PR consultants come within the privilege,

20   and privileged communications, including these consultants,          14:51:56

21   remain privileged.

22           In *In re Grand Jury Subpoenas* the Court held that

23   confidential communications between lawyers and public

24   relations consultants hired by the lawyers to assist them in

25   dealing with the media in cases such as this, that are made for          14:52:10

1    the purpose of giving or receiving advice directed at handling

2    the client's legal problems, are protected by the

3    attorney/client privilege.

4        That test is even broader than *Kovel* or *Graf*.  It

5    states, if these attorneys are necessary to the legal                14:52:27

6    strategy -- or these PR consultants are necessary to the legal

7    strategy and work closely with the attorneys in effectuating

8    that strategy, the communications remain privileged.

9        Your Honor, I don't believe that there can be any

10   dispute regarding the climate that Backpage faced in 2010            14:52:50

11   through 2012.  This climate had just forced Craigslist to shut

12   its doors, and immediately the scrutiny turned to Backpage.

13   And Backpage was forced to suddenly address this challenge, and

14   it lacked the internal resources to do it.

15       The Government states that Backpage is this huge                  14:53:21

16   corporation with 120 employees, but the fact is -- and the

17   Government knows that the majority of those employees were

18   moderators who were hired to review ads and try to make sure

19   that the information being posted publically was legal and was

20   compliant with Backpage rules and regulations.                       14:53:37

21       In fact, the Backpage governance, the management,

22   numbered in less than a dozen.  And within that dozen people

23   there were no PR consultants, there were no PR department.  The

24   fact is the Government's pointed to a couple documents that

25   show that Backpage used its in-house counsel as its              14:53:57

1    spokesperson on some occasions, and that just goes to show how

2    necessarily intwined the legal issues were with the PR issues

3    that Backpage faced.  And goes to show the need to hire expert

4    public relation consultants.

5           This was not -- this was a situation, such as that         14:54:22

6    faced in *Grand Jury Subpoenas* where the need for public

7    relations consultants was great, and the need for experts was

8    great.

9           I think *In re Grand Jury Subpoenas* said it best, and

10   we quoted it in our brief.  But questions as to whether the      14:54:45

11   client should speak to the media at all, whether to do so

12   directly or through representatives, whether and to what extent

13   comment on specific allegations, and a host of others can be

14   decided without careful legal input only at the client's

15   extreme peril.  Dealing with the media in a high profile case     14:55:06

16   probably is not a matter for amateurs.  Target and her lawyers

17   can not be faulted for concluding that professional public

18   relations advice was needed.

19          And that was necessary here to develop and pursue a

20   coordinated approach for Backpage to respond to legal threats     14:55:22

21   and public accusations by Government officials.  Backpage knew

22   that every statement it made would be scrutinized by officials

23   and law enforcement that were seeking to pursue the website.

24   And indeed they were.  And we've seen these statements, news

25   articles come against Backpage time and time again in civil       14:55:39

1  lawsuits, in Grand Jury investigations, in the Senate report.

2  These public statements by Backpage were scrutinized and used

3  against it.

4       Not only that, Backpage had to use its PR consultants

5  to attempt to neutralize the environment surrounding the media

6  portrayal that it was implicated in sex trafficking.  Without

7  some kind of other side to that story that Backpage needed to

8  portray, that it needed to put forth First Amendment

9  considerations and Section 230 grounds, without that Backpage

10  would have faced even greater scrutiny from public officials

11  which lead to law enforcement prosecution.

12       Your Honor, we think the *In re Grand Jury Subpoenas*

13  provides the most perilous circumstances in which Backpage

14  finds itself.  In that case the target, Martha Stewart, found

15  herself facing a criminal prosecution, and she hire -- her

16  attorneys hired a PR firm on her behalf to try to color public

17  opinion and to avoid an Indictment.

18       And that's precisely what happened here.  And these PR

19  professionals were hired for their expertise to work in

20  conjunction with Backpage's attorneys to avoid further legal

21  detriment to the client.

22       There was no allegation here that Backpage used these

23  PR firms for any purpose other than for a legal need.  Backpage

24  didn't use PR professionals to advertise its services in any

25  other capacity.  These professionals were used specifically to

1    address media scrutiny regarding the Backpage legal

2    considerations.

3            The DOJ does not deny that the communications were

4    made in confidence.  Every single communication on that

5    privilege log was with an attorney and a PR professional.        14:58:09

6            Although the Government claims that Backpage has not

7    been circumspect in making its privileged determinations, I

8    think that the fact that Backpage counsel produced those 153

9    communications shows the opposite.

10           Prior Backpage counsel made the initial determinations    14:58:36

11   regarding privilege.  I think that reasonable minds can differ

12   on those.  But Backpage -- when the Government brought this

13   information to Backpage's attention, Backpage undertook a

14   careful review of every single document line by line and made

15   careful privileged determinations and released 153 documents.    14:58:54

16           But every single document that remains on the

17   privilege log includes an attorney -- with respect to the PR

18   professionals includes an attorney, and demonstrates a close

19   and continuous working relationship between Backpage and -- the

20   PR consultants with Backpage's legal counsel.                     14:59:11

21           The DOJ points to press releases and statements made

22   by Backpage public relations consultants on its behalf showing

23   these PR professionals were in the public making statements on

24   behalf of Backpage necessitating the need for consultation with

25   Backpage's legal counsel because they were making independent    14:59:33

1    statements and decisions regarding PR strategy.  And they were

2    finally doing a crucial job necessary to avoid any further law

3    enforcement scrutiny.

4         The Government states -- says that these PR

5    professionals were not integrated into Backpage such that they          14:59:55

6    were employees, but they were in the essence that Backpage was

7    relying on them as its own employees.  Backpage lacked an

8    internal PR department, and so it relied on these professionals

9    as if they were Backpage employees, it incorporated into

10   discussions with its principals and its legal counsel to make           15:00:16

11   decisions on behalf of the company.  They acted as the

12   spokespeople for the company in order to do that.  They

13   performed an internal function and were relied on as if they

14   were employees.

15        Additionally, some aspects of the test to which the                15:00:30

16   Government points to, especially in its reply, it states that

17   this test is reserved -- the functional equivalent test is

18   reserved for a small company.  That's just not true.  *Hadijh v.*

19   *Evenflo* -- Evenflo, a large corporation, makes car seats and

20   bouncy seats for babies, a large corporation, engaged a PR firm         15:01:00

21   when it didn't have the internal resources to have its own

22   public relations when it needed experts.  And the Court there

23   found that the PR firm was functionally equivalent and upheld

24   the privilege, because it performed an internal function for

25   which Evenflo had a need.                                               15:01:25

UNITED STATES DISTRICT COURT

1        The Government also makes a 180 between its motion and

2   its reply stating -- it stated in its motion that it believed

3   that Backpage did not -- that Backpage directly hired these PR

4   consultants and said that was a basis on which to deny

5   privilege.  When Backpage said in its opposition that its legal          15:02:02

6   counsel hired these PR consultants, the Government made a 180

7   in its reply and said, now that Backpage legal counsel hired

8   these consultants, these consultants cannot be functionally

9   equivalent.

10       One, that shows that the Government is acting on pure          15:02:21

11  speculation here.  It doesn't know.  And it's speculating and

12  attempting to get this Court to move to have an in camera

13  review based on pure speculation.

14       Two, it's misunderstanding the tests and the

15  functional equivalent test.  Neither one of those tests rose or     15:02:43

16  fell or who hired the PR consultants.  That the PR consultants

17  were hired by attorneys goes to show that the PR consultants

18  were hired for a specific legal need and served a legal

19  purpose.  But that fact doesn't -- had the PR consultants been

20  hired by the actual client, the target, such as in the Martha          15:03:13

21  Stewart case, that fact was underscored by the Court in *In re*

22  *Grand Jury* because it was stated that the PR consultants were

23  not hired for a general PR relations purpose.  They weren't

24  hired to be just public relations consultants for the company.

25       Here we don't have that distinction.  The PR          15:03:38

1  consultants were hired by the law firms.  And the Government

2  tries to use that fact to say that they then cannot be

3  functionally equivalent to employees.

4          However, the law firms themselves are agents of

5  the -- of Backpage.  The fact that they hired legal            15:03:58

6  professionals to be agents of Backpage does not make them any

7  less functionally equivalent.  We're not saying that the PR

8  consultants were employees of Backpage, we're saying that they

9  were functionally equivalent to employees.  They were agents,

10 and they can be functionally equivalent, especially if they    15:04:16

11 were hired for specific legal need.

12         Finally, that Backpage had in-house counsel that it

13 used as spokespeople from time to time only serves to

14 underscore that in-house counsel was the one coordinating the

15 legal strategy with the PR strategy, and underscores the point  15:04:50

16 that we're making, that Backpage needed to hire experts in the

17 PR field because of the onslaught of legal scrutiny.

18         So as to SSP Blue, Your Honor, it's almost

19 inconceivable that the Government can admit that Backpage had

20 an attorney and claims privilege, admit that Government        15:05:23

21 investigators interviewed the attorney and the attorney

22 confirmed that he was working as an attorney for Backpage, that

23 this is a former federal prosecutor, and persists nonetheless

24 in demanding these communications by saying that maybe he

25 wasn't based on a present day search of his website.            15:05:45

1          There is a standard in the Ninth Circuit for when even

2     these documents are subject to an in camera review.  And under

3     *In re Grand Jury* investigation a privilege log satisfies

4     Backpage's prima facie burden if it identifies the attorney and

5     the client, the nature of the document, the persons who sent or          15:06:11

6     received the documents, all persons who knew about the document

7     and the date it was generated.  Backpage has more than met that

8     burden.  In fact, it also includes information on the subject

9     matter of each document, the occupation of the authors of the

10    document, and all recipients of the document.          15:06:29

11          The Government says that affidavits are necessary in

12    order to meet that burden, and that's just not what the case

13    law holds.

14          The case *In re Grand Jury* investigations mentions that

15    an affidavit had been provided, but only with respect to the          15:06:48

16    fact that that affidavit cleared up any remaining questions

17    regarding to whom the documents were shown or intended to be

18    shown.  That was the only purpose in which the Court relied on

19    that affidavit.  And here there are no questions regarding who

20    the documents were shown or intended to be shown.  It's not the          15:07:10

21    DOJ's basis for attacking the privilege here.

22          And we believe at this point the burden shifts to the

23    DOJ, and they just haven't met it.  They cite this test about a

24    factual basis sufficient to support a reasonable good faith

25    belief that an in camera inspection may reveal information that          15:07:27

1    the material is not privileged on reply.

2          This test comes from *United States v. Zolin,* which

3    sets forth the standard for a court to determine the

4    applicability of the crime fraud exception before making an in

5    camera review.                                              15:07:47

6          But even under the standard, they have not shown a

7    factual basis sufficient to support a reasonable good faith

8    belief.  They've shown rampant speculation at best.  They've

9    searched on the website and pulled down a few documents stating

10   that much of that information seems like it could be business   15:08:04

11   rather than legal advice.

12         They state that Mr. Nigam made an introduction to

13   NCMEC, and they claim that this shows that Mr. Nigam is not

14   working in a legal function.  But *In re Grand Jury Subpoenas*

15   cited to the Supreme Court, to a plurality opinion by          15:08:28

16   Mr. Justice Kennedy in *Gentile v. State Bar of Nevada* that

17   explained that the role of an attorney is not so narrow as to

18   argue in front of a court or to advise a client.

19         Justice Kennedy said an attorney's duties do not begin

20   inside the courtroom door.  He or she cannot ignore the        15:08:55

21   practical implications of a legal proceeding for the client.

22   Just as an attorney may recommend a plea bargain or civil

23   settlement to avoid the adverse consequences of a possible loss

24   after trial, so too an attorney may take reasonable steps to

25   defend a client's reputation and reduce the adverse            15:09:16

1  consequences of Indictment, especially in the face of a

2  prosecution deemed unjust or commenced with improper motives.

3  A defense attorney my pursue lawful strategies to obtain

4  dismissal of Indictment or reduction of charges, including an

5  attempt to demonstrate in the court of public opinion that the        15:09:32

6  client does not deserve to be tried.

7          We think that the Government proffer for why to invade

8  the attorney/client privilege of Backpage and Mr. Nigam and his

9  firm is improper, that they've not met their burden, and that

10  it is rampant speculation.        15:09:54

11          As to Duff & Phelps, Your Honor, Duff & Phelps, we're

12  talking about one e-mail and one attachment.  And Duff & Phelps

13  were financial advisors to Backpage that assisted counsel in a

14  corporate restructuring.

15          The Government attaches to its reply only a        15:10:25

16  member -- a confidential information memorandum that was

17  delivered to a number of limited parties who might be

18  interested in providing funding for Backpage.  This document

19  was not withheld.  It was produced.  And -- however, the facts

20  that went into creating this document, the consultations        15:10:45

21  between Backpage attorneys and Duff & Phelps and company

22  principals that went into creating that document, that

23  information is privileged.  That information falls under the

24  *Kovel* test.  It falls into the course of an agent assisting

25  counsel in advising regarding legal risks to the company.        15:11:12

1          And we assert that the information that went into the

2    preparation of the confidential legal -- the confidential

3    information memorandum remains privileged with Duff & Phelps.

4          Thank you, Your Honor.

5          THE COURT:  All right.  Thanks.                    15:11:36

6          Mr. Lanza, I've got a pretty good sense of what you'd

7    say in response to all of those points.  Let me give you both

8    my thoughts and allow you to react.

9          With respect to the public relation firm issue,

10   Miss Bugaighis, you started with a Fifth Amendment argument.   15:12:00

11   There was no mention of the Fifth Amendment in your response to

12   the Government's motion, that I can recall.  Is that an

13   argument somehow different from the functional equivalent or

14   the *In re Grand Jury* arguments that you've made?

15         MS. BUGAIGHIS:  Your Honor, we didn't make that        15:12:16

16   argument in opposition because in the Government's initial

17   motion they had put forth this *Kovel* test claiming that

18   Backpage cannot rely on its translator.  We didn't feel it

19   necessary to move in our opposition because they had not

20   highlighted the burden that they believed that Backpage faced.  15:12:36

21   They did that only in reply.

22         THE COURT:  Are you arguing that production of

23   nonprivileged documents, if I find them nonprivileged, would be

24   a violation of your protection against self-incrimination?

25   What's the argument that you're making?                    15:12:55

1          MS. BUGAIGHIS:  No, Your Honor, I'm arguing that the

2     evidentiary burden for bringing fourth evidence in this context

3     in opposition to a motion to compel privileged information,

4     unlike the civil context where we could have Backpage or any

5     number of its employees provide a declaration stating the            15:13:16

6     purpose of the PR professionals or how they were used or

7     integrated into Backpage, is not possible or necessary in the

8     criminal context where providing that kind of declaration from

9     Backpage or its principals would be -- would require them to

10    invoke their Fifth Amendment rights.                                 15:13:44

11         THE COURT:  Have you got any case for that

12    proposition?  Namely that the person asserting a privilege in a

13    criminal context has a different or less burden than a person

14    asserting it in a civil context?

15         MS. BUGAIGHIS:  Not in this context, Your Honor.  I          15:13:58

16    looked and did not find any criminal cases that addressed the

17    burden for a functional equivalent test in the criminal

18    context.

19              There were two cases that were criminal cases that --

20         THE COURT:  The one you've relied on, the Martha           15:14:22

21    Stewart case, was a criminal case; right?

22         MS. BUGAIGHIS:  You are correct, that was a criminal

23    case.  And in re *Graf* was also a criminal case.  And in both

24    those cases there had been prior evidentiary -- there had been

25    an evidentiary hearing in *Graf*.  And *In re Grand Jury Subpoenas*     15:14:35

1    the Grand Jury had previously called a witness, the PR

2    professional.

3              THE COURT:  Well, are you suggesting that if I

4    conclude that Backpage needs to provide evidentiary support for

5    the various factual assertions it's made about the role of          15:14:54

6    these PR firms, Backpage is going to invoke the Fifth

7    Amendment?

8              MS. BUGAIGHIS:  Your Honor, if you rule that Backpage

9    needs to provide further evidentiary support, Backpage would

10   proffer the declarations from the PR professionals.                  15:15:12

11             THE COURT:  All right.  Thank you for your responses.

12             My conclusion with respect to the PR firm issue is

13   that I cannot conclude that Backpage has met its burden of

14   showing either that the PR firms were the functional equivalent

15   of Backpage employees, as required by *Graf*, or that they were     15:15:45

16   filling the role described for the PR firms in the *In re Grand

17   Jury* case without some evidentiary support.  There's nothing in

18   the response that establishes that other than plain assertions.

19             The Ninth Circuit law is clear in *Graf*, which is a

20   criminal case, that the burden is on the person asserting the       15:16:08

21   privilege to establish the privilege.  And there just isn't any

22   evidence at all that's submitted with the response.

23             So I think there needs to be that evidence before I

24   can sustain the privilege.  And we'll talk in a minute about

25   when and how we get that produced.                                   15:16:26

1          I think it's clear that it's the functional

2     equivalent's argument that Backpage relied on its response and

3     then also in the *In re Grand Jury* case, so that will be the

4     focus.  But there's no evidence.  And Backpage clearly has the

5     burden, in my view.                                          15:16:47

6          With respect to SSP Blue, Backpage is correct that the

7     Ninth Circuit *In re Grand Jury* case, which is at 974 F.2d 1068,

8     says that a privilege log establishes a prima facie case of a

9     right to a privilege.  But as we all know, a prima facie case

10    can be called into question by evidence from the other side.   15:17:16

11         The Government has come forward with evidence that

12    Mr. Nigam, N-I-G-A-M, engages in a lot of nonlegal functions in

13    the operation of SSP Blue.  I think that is enough to shift the

14    burden back to Backpage to come forward with some evidence that

15    he was functioning as a lawyer in the work that he did with     15:17:38

16    respect to these 350 e-mails.  So it's essentially the same

17    conclusion that I reach with respect to the PR firms.

18         With regard to Duff & Phelps, it boils down to the

19    same issue.  There are assertions about their role,

20    characterizations about their role, but no evidence.  And       15:17:57

21    although there's an assertion that -- in the privileged log

22    that it's privileged, that to me isn't the same as making an

23    assertion when there's a lawyer involved.

24         I understood *In re Grand Jury*, the Ninth Circuit case,

25    to be saying if you have a lawyer in the communication, the log  15:18:17

1    creates a prima facia case of privilege.  But when it's a

2    nonlawyer, I don't think merely putting it on a log establishes

3    that.  I think the burden is on Backpage to come forward with

4    some evidence that Duff & Phelps was acting in a way that was

5    necessary to the rendering of legal advice, which is the way          15:18:34

6    that the *Yasmin* court characterized it that was cited by the

7    parties.

8            So my view is that there needs to be evidence on all

9    three categories provided by Backpage to support its

10   characterization of what was happening when these                     15:18:51

11   communications occurred.

12           I think that was evident with the motion being filed,

13   but Backpage chose not to submit it.  There were requests made

14   before the motion was filed for it, and Backpage chose not to

15   provide that to the Government.                                        15:19:12

16           So I understand why the Government is asking me to

17   simply rule that Backpage has not met its burden and enter an

18   order compelling.  But I don't think I should do that without

19   giving Backpage one other opportunity to come forward with the

20   evidence that will establish the privilege.                           15:19:28

21           Part of the problem I have is that starting on the

22   12th of March I am basically fully booked until the end of May.

23   And so if we're going to get this matter decided, we need to do

24   it in the next couple of weeks, or otherwise it gets bumped to

25   the Summer, and I don't want to do that.                              15:19:50

1        So my intention would be -- and this is what I'm

2   interested in the responses to -- to require that Backpage

3   submit whatever evidence it chooses to, and I understand if you

4   want to get it from the PR firms, in the form of declarations

5   or affidavits or such other evidence as you think you ought to          15:20:06

6   submit to substantiate the factual arguments that have been

7   made with respect to the role of the PR firms, the role of SSP

8   Blue, the role of Duff & Phelps, and then give the Government

9   an opportunity to respond to whatever the submission is.

10       If that's going to happen and us get a decision                     15:20:26

11  by -- well, before March 12th, there's not a lot of time.  And

12  that's what I wanted to raise with you all.

13       I suppose another alternative would be me to ask

14  another judge to do it if you think it will take longer.  I've

15  never done that, I've never given an issue to another judge,            15:20:44

16  and I'm not of a mind to because they're all plenty busy.

17       So I guess I'm interested in your thoughts.  And,

18  Miss Bugaighis, particularly whether you have thoughts about

19  that schedule and the kind of material you can pull together to

20  submit to me.                                                           15:21:01

21       MS. BUGAIGHIS:  Your Honor, just looking at the

22  calendar, I don't know how much time that provides.

23       THE COURT:  I mean, what we could do is something

24  like, give you until -- well, we could give you two weeks until

25  the 23rd.  I don't know if that's enough time to pull it               15:21:27

1    together.  And then get the response from the Government the

2    next week.  I could look at it.  If I think we need a hearing,

3    we could try to set it the week of March 5th.  Or otherwise I

4    might be able to just rule.

5             Is that enough time or do you think you'll need more          15:21:41

6    time, Miss Bughaigis, to pull this together?

7             MS. BUGAIGHIS:  Your Honor, I think we can do it.

8             THE COURT:  Okay.  Thank you.

9             Mr. Lanza, do you have thoughts on all of this?

10            MR. LANZA:  Thank you, Judge.                                   15:21:53

11            I'm just trying to -- so what do you anticipate then

12    submitting on February 23rd?  Is it just affidavits or is it

13    another -- I think that it should just be limited to whatever

14    evidence they want, they submit.  I don't think we need another

15    round of briefing or case citations.                                   15:22:09

16            THE COURT:  I really don't want another round of

17    briefing.  I think we've framed the issues.  I understand the

18    arguments.  I think -- I need to find out if there's facts to

19    support the position that Backpage is taking.  And the idea

20    would be to come forward with those facts.                             15:22:21

21            I don't want to foreclose Backpage from submitting a

22    short memo, a three- or four-page memo, sort of explaining

23    things if they think they need to.  But we don't need to go

24    through the briefing and citing of cases again.

25            MS. BUGAIGHIS:  Your Honor, I would ask that Backpage          15:22:36

UNITED STATES DISTRICT COURT

1   be allowed to submit a memorandum, if the Government is going

2   to submit a memorandum in opposition.

3           THE COURT:  That would be right after you've heard

4   from them; right?  You're not suggesting with your affidavit,

5   you mean after you've received their memorandum?                    15:22:52

6           MS. BUGAIGHIS:  That would be preferred, Your Honor.

7           THE COURT:  Right.

8           All right.  So assuming they submit whatever evidence

9   they want to submit with a short explanation, three or four

10  pages, but not rebriefing, that would be the idea by the 23rd.      15:23:07

11          MR. LANZA:  Okay.  And then by --

12          THE COURT:  Well, then I'm thinking by probably

13  Thursday, March 1st, to get the Government's comments on that

14  evidence.

15          MR. LANZA:  Okay.                                           15:23:27

16          THE COURT:  Because I will try -- the week of the 5th

17  is not great either.  But I would try to look at it quickly, in

18  part to decide whether we need to have a hearing, in which

19  event we'd do it the next week, the week of the 5th.

20          I suppose I could even, Miss Bugaighis, look at it and      15:23:45

21  tell you whether you need to file a response.  I wouldn't do it

22  if I'm going to -- I wouldn't deny you that opportunity if I'm

23  going to rule against you.  But I'm just trying to think of how

24  we get this work done.

25          MS. BUGAIGHIS:  Thank you, Your Honor.                      15:24:03

1          THE COURT:  So this is what I suggest:  The additional
2    evidence by the 23rd, the Government response by March 1st.
3       (Discussion off the record between the Court and courtroom
4    deputy.)
5          THE COURT:  Well, I think what we need to do is this:    15:24:57
6    I have no time on the 2nd.  I'm in a hearing all day.  I think
7    what we ought to do is get your response in, Mr. Lanza, on the
8    1st.  I'll look at it on Saturday the 3rd, and I'll do a text
9    only order, which I can do, which will come out to you all --
10          THE CLERK:  It's a Grand Jury matter.                   15:25:23
11          THE COURT:  Oh, I can't do it in a Grand Jury matter,
12    can I?
13          Well, I will then have an order ready to come out
14    Monday morning saying whether or not I think we need a hearing
15    the week of the 5th.  And saying whether I think Backpage needs  15:25:35
16    to respond to the Government's memorandum.
17          And if so, what I'll do is we'll probably call you and
18    try to find the best time, figure out timing.  Because as I
19    say, the following week, starting on Monday, there's nothing
20    available for weeks after that.                                15:25:58
21          Does that make sense?
22          MR. LANZA:  Yes, Your Honor.
23          MS. BUGAIGHIS:  Yes, Your Honor.
24          THE COURT:  Okay.
25          MR. LANZA:  I just want to be clear.  It may be         15:26:06

```
 1    possible that -- I'm just trying to anticipate -- that when we
 2    see the evidence they've submitted, the submission we have on
 3    March 1st isn't just limited to discussion, but it also -- we
 4    might need to submit some countervailing evidence that we're
 5    aware of at that point.                                           15:26:22
 6          THE COURT:  Yeah.  I understand that.  And I'll
 7    certainly give Backpage a chance to respond if you're going to
 8    do that.
 9          MR. LANZA:  Okay.
10          THE COURT:  Okay.  That's our plan.  Thank you.            15:26:29
11          MR. LANZA:  Thank you, Your Honor.
12          MS. BUGAIGHIS:  Thank you, Your Honor.
13       (Proceedings concluded at 3:26 p.m.)
14
15                              -oOo-
16
17
18
19
20
21
22
23
24
25
```

1

2

3

4                    C E R T I F I C A T E

5

6          I, CANDY L. POTTER, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 27th day of February,

15   2018.

16

17

18

19                         s/Candy L. Potter_____
                           Candy L. Potter, RMR, CRR

20

21

22

23

24

25