ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR-18-422-PHX-SPL (BSB) |
|---|---|
| Plaintiff, | **UNITED STATES' REPLY IN SUPPORT OF MOTION TO RESOLVE ATTORNEY-CLIENT PRIVILEGE ISSUES AND RESPONSE TO CROSS-MOTION TO OBTAIN DISCOVERY AND ADDRESS PRIVILEGE ISSUES** |
| v. | |
| Michael Lacey, et al., | |
| Defendants. | |

## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants Lacey and Larkin advance two primary arguments in an attempt to convince the Court that Carl Ferrer—as Backpage's CEO and 100% owner—does not have authority to waive the company's attorney-client privilege. The first argument is facially wrong and the second strains credulity.

First, for communications that occurred before April 2015, Defendants argue that Ferrer lacked authority to waive the company's attorney-client privilege because he was

1    only an employee before the sale and his purchase of the company "did not vest him with

2    authority he did not have before."  CR 226 at 22.  That argument is wrong.  It is hornbook

3    law that "when control of a corporation passes to new management, the authority to assert

4    and waive the corporation's attorney-client privilege passes as well."  *Commodity Futures*

5    *Trading Comm'n v. Weintruab*, 471 U.S. 343, 349 (1985).  Moreover, the very cases cited

6    in Defendants' brief (*Polycast* and *Glidden*) recognize that this authority extends to

7    communications that occurred before the sale.  Put simply, Ferrer possesses the authority

8    to waive the attorney-client privilege and he's exercised it.  CR 195-3.  All communications

9    between Backpage and its attorneys that occurred before April 2015 are, therefore, not

10   subject to a privilege and the prosecution team should be permitted to review those

11   documents immediately.

12        Defendants' second argument relates to communications that occurred after

13   Backpage's sale.  Here, Defendants make an opaque argument about the relationship

14   between Backpage and several of the individual Defendants and various oral and written

15   agreements that were purportedly entered into by those parties.  Their argument boils down

16   to this: from the moment Backpage was sold by Lacey and Larkin to Ferrer, the parties

17   "recognized the importance of having joint representation" and entered into an oral

18   agreement to be represented jointly in all issues that involved Backpage.  CR 226 at 13.

19   This purported oral agreement, they continue, was then memorialized some 20 months later

20   "so that all dealings and communications from April 22, 2015 and afterward were

21   encompassed and protected by the parties' joint privilege undertakings."  *Id.*  Defendants

22   do not limit the scope of this supposed joint representation agreement to any specific

23   attorneys or subject matter, but rather argue that it applies broadly *to any communications*

24   between Backpage and *any attorneys* from April 22, 2015 through April 2018.  *Id.* at 14.

25   The government believes this argument is not only convenient but also unlikely to

26   withstand scrutiny, especially considering that the burden to prove a privilege rests with

27   Lacey and Larkin.  The government, however, is unable to fully respond because the actual

28   written agreements were filed *in camera*.

The government currently has 10,733 documents segregated for filter review from compliance of the two search warrants discussed in its motion.  Out of those documents, only 1,328 are communications that occurred after Ferrer purchased Backpage in April 2015.  Accordingly, the Court can, and should, issue an order finding that Backpage—through Ferrer—has waived the attorney-client privilege for all communications that occurred before April 2015, which would permit the government to review 9,405 of the segregated documents.  Further, based on Judge Campbell's waiver ruling, the Court can conclude that the subject matters of ad moderation and acknowledgment of the prevalence of prostitution ads on the Backpage website have both been waived.  Any communications about either one of those two subjects are not privileged and should also be disclosed to the government.  For the remaining 1,328 documents, Lacey and Larkin must specifically demonstrate what privileges apply and why they have not been waived.  Even if Defendants are able to demonstrate that certain documents are privileged, case law suggests that when a joint privilege is shared between individuals and a corporation the corporation can unilaterally waive the privilege over the individual's objection.  If, however, the Court finds there are privileged documents that the corporation cannot unilaterally waive, the filter team would produce those specific documents to both Defendants and the Court to permit further litigation.

## ARGUMENT

A.    <u>Ferrer Had Authority To Waive Backpage's Corporate Attorney-Client Privilege</u>

Since 2015, Carl Ferrer has been the CEO and 100% owner of Backpage.com, LLC.  In April 2018, Ferrer executed a written waiver of Backpage's corporate attorney-client privilege.  CR 195-3.  The issue before the Court is whether Ferrer had authority to execute such a waiver over the objection of Backpage's former owners and managers (*i.e.,* Defendants Lacey and Larkin).

The answer to this question is a resounding yes.  As the United States showed in its motion (*see* CR 195 at 10-11), the Supreme Court (*Weintraub*) and Ninth Circuit (*Graf*) have long recognized the authority of a corporation's current owners and managers to

1    execute privilege waivers in these circumstances.  Put simply, "[d]isplaced managers may

2    not assert the privilege over the wishes of current managers, even as to statements that the

3    former might have made to counsel concerning matters within the scope of their corporate

4    duties."  *Weintraub*, 471 U.S. at 349.

5          Notwithstanding the clarity of the law in this area, Lacey and Larkin ask the Court

6    to disregard Ferrer's waiver.  *See* CR 226 at 15-18.  As explained below, their arguments

7    with respect to all communications pre-sale are unavailing and much more is required for

8    Defendants to support their contention that privileges still exist for all post-sale

9    communications.

10         1.    **Ferrer Did Not Need To Obtain The Consent of Backpage's Former
11               Parent Company Before Waiving Backpage's Corporate Attorney-
               Client Privilege For All Pre-Sale Communications**

12         Lacey and Larkin's first argument is that, because Backpage was a wholly-owned

13   subsidiary of various parent companies (referred to collectively, for sake of simplicity, as

14   Village Voice Media Holdings ("VVMH")) until 2015, and because the privilege waiver

15   would encompass communications predating the 2015 sale, Ferrer cannot waive

16   Backpage's privilege without the joint consent of its former parent, VVMH.  *See* CR 226

17   at 16-17 ("For the period before the 2015 sale, it is clear that Backpage.com (as a

18   subsidiary) . . . had no separate authority to control or waive privileges. . . .  Thus, . . . his

19   purchase of Backpage.com in April of that year did not vest him with authority he did not

20   have before."); s*ee also id.* at 18 ("[Ferrer] has no authority otherwise to waive privileges

21   as to VVHM . . . .").

22         This argument is easily rejected.  In fact, it is directly contradicted by the two cases

23   (*Polycast* and *Glidden*) cited in the opposition brief.  In *Polycast Tech. Corp. v. Uniroyal,*

24   *Inc.*, 125 F.R.D. 47 (S.D.N.Y. 1989), a parent company (Uniroyal) once owned a subsidiary

25   (Uniroyal Plastics) but later sold the subsidiary to a new owner (Polycast).  *Id.* at 48.  After

26   a post-sale dispute arose, the buyer propounded a discovery request seeking certain

27   documents describing pre-sale communications between the parent's general counsel and

28   the subsidiary's vice president.  *Id.* at 49-50.  When the parent refused to produce this

material on attorney-client privilege grounds, the district court intervened to address "[t]he issue . . . of control over a corporate subsidiary's attorney-client privilege after the subsidiary is sold." *Id.* at 49. The court concluded that, although the parent still retained an interest in the privileged communications, the new buyer possessed the unilateral right to waive the privilege: "*Because . . . the privilege is jointly held by Polycast and Uniroyal, and because Polycast acquired control over Plastics' privilege rights when it purchased the company, Polycast and Plastics' new management may now waive the privilege at their discretion*." *Id.* at 51 (emphasis added).

Meanwhile, in *Glidden Co. v. Jandernoa*, 173 F.R.D. 459 (W.D. Mich. 1997), a parent company (Grow) once owned a wholly-owned subsidiary (Perrigo), but the subsidiary was spun off into a new company (also called Perrigo) via a management buyout. *Id.* at 464. Afterward, the parent sued the new company for fraud. *Id.* During discovery, the parent sought various pre-buyout communications between the subsidiary and its lawyers, but the new company opposed this request under the theory that "the attorney-client privilege belonging to [the subsidiary] passed to the present Perrigo . . . by operation of merger, and that the attorney-client privilege now belongs to . . . Perrigo." *Id.* at 470. The district court disagreed and ordered the new company to produce the requested documents. Notably, the court recognized that, under *Weintraub*, "*[a]s the surviving entity after a merger . . . , Perrigo does indeed have the authority to assert or waive the attorney-client privilege*." *Id.* at 472 (emphasis added). Nevertheless, the court held that, because "[t]he universal rule of law . . . is that the parent and subsidiary share a community of interest, such that the parent (as well as the subsidiary) is the 'client' for purposes of the attorney-client privilege," the new company couldn't invoke the privilege as a *shield* against the former parent. *Id.* at 472-73. Thus, the court concluded: "Perrigo Company had no reasonable expectation that it could keep anything secret from its parent corporation. As long as Perrigo was a wholly owned subsidiary of Grow, Perrigo's officers had no legal ability to resist disclosure to Grow of any of Perrigo's records, including its attorney-client communications." *Id.* at 473.

Notably, the *Polycast* and *Glidden* courts each cited an earlier decision—*Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 689 F. Supp. 841 (N.D Ill. 1988)—in support of their privilege analyses.  In that case, a parent company (Baxter) once owned a subsidiary (Medcom, Inc.) but later sold the subsidiary to a new owner (Medcom Holding).  *Id.* at 842.  The issue presented was whether the new owner could, over the objection of the parent, waive the attorney-client privilege as to pre-sale communications involving the subsidiary.  *Id.* at 842-44.  The court held the new owner *could* effectuate such a unilateral waiver:  "Medcom Holding controls Medcom Inc.'s privilege with respect to attorney-client communications occurring prior to or relating to the sale of Medcom, Inc.  Therefore, Baxter's objections . . . are without merit."  *Id.* at 844.  The court further noted that this outcome was consistent with *Weintraub*, which "expressly included takeovers and mergers in its finding that new corporate managers may waive the attorney-client privilege as to communications of prior management."  *Id.*; *see also. id.* at 842-43 ("[P]arties who negotiate a corporate acquisition should expect that the privileges of the acquired corporation would be incidents of the sale. . . .  Because Medcom, Inc. was a party to the communications in issue, it was reasonable to assume that successor management of Medcom, Inc. would control the attorney-client privilege.").

The bottom line is that *Polycast, Glidden*, and *Medcom* all recognize that, once a subsidiary has been sold or spun off from a parent company, the new owners of the subsidiary may waive the corporate attorney-client privilege without the consent of (and even over the objection of) the parent.  Lacey and Larkin thus cannot prevent Ferrer from waiving the attorney-client privilege as to all communications that occurred before April 2015.

2.   **Defendants' "Joint Representation" And "Joint Defense" Arguments, Which Could Apply Only To Post-April 2015 Documents, Are Opaque And Imprecise**

Defendants assert that, the moment they sold Backpage to Ferrer in April 2015, all parties orally entered into a "joint representation" agreement that prevents Ferrer from executing a privilege waiver without their consent.  *See* CR 226 at 7-8, 17-18.  This

supposed oral agreement, they contend, was then purportedly memorialized in subsequent written agreements.

The government cannot speak directly to what the written agreements say, because Defendants have filed all such agreements *in camera*.  CR 180 at 12.  In previous filings, however, Defendants have referenced the following:

(1)     an engagement agreement between Davis Wright Tremaine LLP ("DWT") and Ferrer, Larkin, and Lacey (dated December 12, 2016);

(2)     a Common Interest and Litigation Management Agreement (the "Common Interest Agreement") (dated December 31, 2016), executed by the three individuals on behalf of themselves and the companies they control; and

(3)     a joint defense agreement ("JDA") entered into June 2017 that Ferrer, Larkin, and Lacey and others signed (but which DWT apparently did not sign).

CR 180 at 12-13.

As far as the government can discern, these are all the agreements that form the basis for Defendants' argument that, post-April 2015, Backpage held joint privileges with Lacey and Larkin for *all communications with any attorneys*.  In an effort to address this argument, the government breaks down Defendants' claims with respect to (a) joint representation and (b) the JDA and the Common Interest Agreement, and discusses each in turn.

a.     The Purported Joint Representation Agreements

Defendants argue that Backpage, under Ferrer's ownership, has always had agreements with Lacey and Larkin for joint representation.  To support this argument, Defendants suggest that DWT entered into "joint representation agreements" with the parties, but fail to point to any other agreements between and among Lacey, Larkin, and Backpage.  Defendants bear the burden of "establishing the relationship *and* the privileged nature of the communication."  *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (citations omitted) (emphasis in original).  Mere conclusory statements about privileges are not sufficient.  Thus, even assuming Defendants' contention about DWT's joint

representation is correct, then all communications between Backpage and *any attorneys other than DWT* that occurred after the April 2015 sale would not be subject to any attorney-client privilege.[1]   Accordingly, the 1,328 documents that represent post-April 2015 potentially privileged material would further be reduced by eliminating all communications from any attorneys other than DWT.

Moreover, even if Backpage had entered into oral agreements for joint representation with every attorney it engaged after April 2015, Defendants are incorrect in their assertion that the company would have needed to secure their consent before waiving the attorney-client privilege.  The First Circuit has held that, when an individual corporate officer and a corporation are jointly represented by the same attorney, the corporation can unilaterally waive the privilege over the individual officer's objection: "[W]e hold that a corporation may unilaterally waive the attorney-client privilege with respect to any communications made by a corporate officer in his corporate capacity, notwithstanding the existence of an individual attorney-client relationship between him and the corporation's counsel." *In re Grand Jury Subpoena*, 274 F.3d 563, 573 (1st Cir. 2001).  Admittedly, the Ninth Circuit, in *Ruehle*, acknowledged the First Circuit's approach on this issue but declined to say whether it was adopting it.  583 F.3d at 608 n.7 ("[W]e need not reach and decide in this case whether our circuit should adopt the rule of [the First Circuit]: that the corporation, without consent of an executive asserting privilege, can waive the attorney-client privilege in a dual-representation context where the subject matter of the waiver concerns matters of interest to the corporation.").  Nevertheless, the existing case law significantly undermines Defendants' theory as to the significance of the supposed oral joint representation that was executed following the April 2015 sale.

---

[1] The government recognizes some communications with attorneys other than DWT may theoretically be subject to a privilege under the JDA or the Common Interest Agreement, which the government addresses below.

b.      The JDA and the Common Interest Agreement

The privileges arising from a joint-defense agreement differ from those arising from attorney-client communications.  As one court has explained, "the joint defense privilege differs sufficiently from the attorney-client privilege in both purpose and scope that the two should be viewed as entirely separate doctrines." *United States v. Stepney*, 246 F. Supp. 1069, 1073 (N.D. Cal. 2003).  In broad terms, the joint-defense privilege is an extension of the attorney-client privilege that permits parties who are represented by separate counsel to share certain types of privileged information with each other confidentially. *Id.* at 1086 ("Each defendant entering into a joint defense agreement already has a representative, fully and confidentially informed of the client's situation.  The joint defense privilege allows defendants to share information . . . ."); *see also In re Pacific Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012) ("Rather than a separate privilege, the 'common interest' or 'joint defense' rule is an exception to ordinary waiver that allows attorneys for different clients pursuing a common legal strategy to communicate with each other."); *Waller v. Fin. Corp. of Am.*, 828 F.2d 579, 583 n.7 (9th Cir. 1987) ("The joint defense privilege . . . is an extension of the attorney client privilege . . . [under which] 'communications by a client to his own lawyer remain privileged when the lawyer subsequently shares them with co-defendants for purposes of a common defense.'") (citation omitted).

Here, the United States is not suggesting that Ferrer can unilaterally waive any *joint-defense* privileges that may exist between him, Lacey, and Larkin.  To the contrary, the United States previously sent a letter to defense counsel drawing a distinction between the joint-defense and attorney-client privileges and making clear that it was not seeking access to any materials that might be covered by a joint-defense privilege. *See* Exhibit A (May 3 letter to defense counsel).

Nevertheless, it is highly unlikely that any of the documents currently segregated in the government's filter review contain material covered by the joint-defense privilege. Indeed, the filter team has confirmed that *none* of the segregated documents involves

1  communications from December 2016 or later.  This is relevant because Ferrer, Lacey, and
2  Larkin didn't enter into a joint-defense agreement until late December 2016.[2]

3       In *In re Grand Jury Subpoena*, 415 F.3d 333 (4th Cir. 2005), the Fourth Circuit
4  encountered a similar issue.  There, AOL Time Warner ("AOL") began conducting an
5  internal investigation in March 2001 and had its outside counsel, as part of the
6  investigation, interview several AOL employees, including Wakeford.  *Id.* at 335-36.  In
7  November 2001, the SEC opened an investigation into AOL.  *Id.* at 336.  Soon afterward,
8  AOL and Wakeford entered into an "oral 'common interest agreement,'" which they later
9  memorialized in writing.  *Id.*  Several years later, the grand jury issued a subpoena to AOL
10 for the memorandum summarizing its outside counsel's interview with Wakeford.  *Id.* at
11 337.  AOL agreed to waive its corporate attorney-client privilege and produce the
12 memorandum but Wakeford intervened to oppose the request, arguing that the
13 memorandum was covered by the joint-defense privilege and that AOL couldn't waive that
14 privilege unilaterally.  *Id.*  The district court rejected this argument, holding that
15 "Wakeford's interviews were not privileged because . . . Wakeford's common interest with
16 AOL postdated the March-June 2001 interviews" (*id.*), and the Fourth Circuit affirmed,
17 concluding that "[b]ecause there is no evidence that Wakeford and AOL shared a common
18 interest before December 2001, we find no error in the district court's conclusion that
19 Wakeford had no joint defense privilege before that time."  *Id.* at 341.  So, too, here—all
20 of the segregated documents involve communications that predate the execution of

---

22  [2]  In their opposition brief, Lacey and Larkin seem to suggest they entered into an
23 "oral" joint-defense agreement with Ferrer and Backpage at some unspecified date and
   simply "memorialized" this agreement in writing in December 2016.  *See* CR 226 at 17
24 n.19.  The Court should reject this claim.  The United States doesn't dispute that it's
   possible to enter into an oral joint-defense agreement, *see United States v. Gonzalez*, 669
25 F.3d 974 (9th Cir. 2012), but the party claiming the existence of such agreement bears the
26 burden of proving it.  Here, Lacey and Larkin have failed to meet that burden.  And, in any
   event, the criminal lawsuit in California against Lacey, Larkin, and Ferrer wasn't initiated
27 until October 2016, and there is no evidence suggesting that any sort of joint-defense
28 agreement, oral or otherwise, existed before then.

- 10 -

Defendants' joint defense agreement with Ferrer.

B.    Judge Campbell's Ruling Was Broad, Based On Backpage's Privilege Log

Between 2010 and 2016, Backpage repeatedly divulged privileged information to third parties, including three different public relations firms and an investment bank.  In a thorough ruling issued in April 2018, Judge Campbell ruled that Backpage had waived its privilege by failing to maintain the confidentiality of these communications.  CR 195-8.  Accordingly, Judge Campbell ordered Backpage to produce a particular set of documents—which were responsive to a grand jury subpoena and which Backpage had previously attempted to withhold on privilege grounds—to the prosecution.

In its motion, the United States showed that Judge Campbell's ruling has important ramifications with respect to the issues now before the Court (*i.e.,* the extent to which Backpage has waived its attorney-client privilege and how to complete the review of approximately 10,000 other documents that were obtained via search warrant).  Specifically, the United States showed that (1) under Ninth Circuit law, Backpage should be deemed to have waived the privilege as to any "subject matter" addressed in the privileged documents that were previously disseminated to the PR firms and the investment bank, (2) two of the "subject matters" that were addressed in those documents were ad moderation and whether/how to acknowledge the prevalence of prostitution ads on the Backpage website, and (3) the 10,000 segregated documents may therefore be disclosed to the prosecution team if they touch upon the same "subject matters."  *See* CR 195 at 11-12; *see also Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010) ("Disclosing a privileged communication or raising a claim that requires disclosure of a protected communication results in waiver as to all other communications on the same subject."); *United States v. Plache*, 913 F.2d, 1375, 1380 (9th Cir. 1990) ("[T]he district court properly found that Plache voluntarily disclosed his privileged attorney communication, thereby waiving the privilege on all other communications on the same subject.").

In their opposition brief, Defendants urge the Court to disregard Judge Campbell's

ruling and find that has no bearing on the current issues.  *See* CR 226 at 18-19.  Although Defendants do not appear to dispute the legal principle underlying the United States' position (*i.e.,* intentionally disclosing a privileged communication results in waiver as to all other communications touching upon the same subject matter), they fault the United States for taking an "absurdly broad" view of the subject matters that were actually discussed in the set of documents that Judge Campbell required Backpage to produce.  *Id.* at 19.  Defendants do not, however, attempt to provide their own definition of the subject matters at issue.  Instead, they conclude by accusing the United States of attempting to "morph Judge Campbell's ruling into a blanket privilege waiver."  *Id.*

These arguments lack merit.  As an initial matter, the United States has never argued that Judge Campbell's ruling should result in a "blanket privilege waiver" as to all issues.  To the contrary, the United States made clear in its motion that Judge Campbell's ruling should only result in a finding of a subject matter waiver as to the particular topics addressed in the PR firm and investment bank documents.

On the merits, it is obvious that one of the "subject matters" addressed in the PR firm documents was the subject of ad moderation.  Indeed, Backpage's own privilege logs—which Backpage used to justify its initial refusal to produce the PR-firm documents, and which were provided to Judge Campbell as part of the subpoena litigation—concede this point.  For example, Backpage initially sought to withhold the document enclosed as Exhibit B on the ground that it "*contain[ed] legal advice from outside counsel Hemanshu Nigam, Esq. regarding ad moderation*."  *See* Exhibit C (JMS privilege log, with relevant entry highlighted at top of page six) (emphasis added).  As the Court can see, the document itself is a detailed memo from Backpage's outside counsel containing legal advice about ad moderation, including advice about how to review the content of ads (Section 1), how to review the images appearing within ads (Section 2), how to enable users to report illegal ads (Section 3), how to "create and enforce guidelines for adult forums prohibiting prostitution" and other topics (Section 4), and legal advice concerning "age related restrictions and safety" (Section 5).  Similarly, Backpage initially sought to withhold the

document enclosed as Exhibit D on the ground that it "*contain[ed] legal advice from outside counsel Edward E. McNally, Esq. regarding ad moderation*." *See* Exhibit E (Culloton privilege log, with relevant entry highlighted in the middle of page two) (emphasis added). The document itself is an email chain addressing how to deal with the fact that Backpage advertisements were appearing on a prostitution-related blog that "pimps use . . . as a resource to identify trends, hotspots and stay current on laws and law enforcement authority." *See* Exhibit D at 4. After Backpage's public relations consultants warned that such advertisements were "a BIG problem," because "law enforcement may perceive BP [Backpage] to be playing to the pimp audience," Backpage's principals and outside counsel discussed strategies for removing the ads. *Id.* at 1-4.

These documents are just of the tip of the iceberg in terms of the ad moderation-related documents that were disclosed by Backpage pursuant to Judge Campbell's ruling. For example, Backpage initially sought to withhold the document enclosed as Exhibit F on the ground that it "contain[ed] legal advice from outside counsel Hemanshu Nigam, Esq. regarding safety and security policies." *See* Exhibit C (JMS privilege log, with relevant entry highlighted in middle of page one). In fact, the document is a detailed three-page spreadsheet from Backpage's outside counsel containing legal advice about certain "action items" to pursue. One such item, listed in the category of "Finding Illegal Ads," warned that "'New In Town' terminology is often used by pimps who shuttle children to different locations where they do not know anyone and cannot get help." Another item, also listed in the category of "Finding Illegal Ads," recommended that Backpage should "[d]etermine if there is a way to figure out if a [credit] card being used is prepaid; this could be one indicator (of many) . . . as a potential trafficking ad." And yet another recommendation, under the category of "Finding Illegal Ads," was to "[c]reate a way to figure out if one phone number is being used on numerous different ads . . . [because] this could indicate a prostitution situation or a human trafficking situation." It is accurate—and not "absurdly broad"—to characterize this document as containing legal advice on the subject matters of ad moderation and whether/how to acknowledge the

prevalence of prostitution ads on the Backpage website. Similarly, Backpage initially sought to withhold the document enclosed as Exhibit G on the ground that it "contain[ed] legal advice from outside counsel regarding proposed policy changes." *See* Exhibit C (JMS privilege log, with relevant entry highlighted on bottom of page six). In fact, the document is a detailed five-page spreadsheet from Backpage's outside counsel addressing such topics as "Finalize policy on acceptable conduct" (which was accompanied by the note "List of prostitution-related terms banned from site; additional content rules pending"), "Finalize policy on whether unacceptable content is removed from ads or if the entire ad is deleted," and "Remove return of results when certain keywords are used (on the front end) that indicate illegal activity (i.e., rape, incest, Lolita, etc.)."

For these reasons, the Court should find that, separate and apart from the broader privilege waiver discussed in Section A of this reply, Backpage has waived the privilege as to the subject matters of ad moderation and whether/how to acknowledge the prevalence of prostitution ads on the Backpage website.

C.   The *J.S.* Waiver Ruling

The government believes that its arguments in Section A and B are sufficient to establish that Backpage's attorney-client privilege has been waived for the vast majority of the 10,733 documents currently segregated in its filter review. The issue raised by the *J.S.* waiver ruling provides a closer call. The government has been unable to find any case that stands for the proposition that a settlement is the same as "abandon[ing] the claim that gives rise to the waiver condition." *Bittaker v. Woodford*, 331 F.3d 715, 721 (9th Cir. 2003). But, likewise, the government hasn't found cases that hold a settlement is insufficient to cure an implied-waiver finding.[3]

---

[3]   Backpage's decision to use its general counsel—Elizabeth McDougall—as a corporate spokesperson in a civil lawsuit demonstrates that her position with the company went beyond simply providing legal advice. In any event, Defendants do not claim there are any joint representation agreements that involve Elizabeth McDougall, therefore her communications are no longer privileged.

1   D.    Government's Use Of A Filter Team Is Proper

2          Lacey and Larkin criticize the government's use of a filter team in this matter.  Their

3   complaints fit into four categories: (1) courts have expressed doubts about the use of filter

4   teams; (2) the government should not "take matters into its own hands" by implementing

5   filter teams without judicial approval; (3) the government used an incomplete list of

6   attorneys' names when segregating documents for review; and (4) the government's filter

7   review must have been inadequate because the California Attorney General's Office

8   ("AGO") segregated over 64,000 documents while the government's review only set aside

9   10,733.  Each of these complaints is unfounded.

10          First, while Lacey and Larkin identify a handful of district court decisions that have

11  expressed doubts about filter teams, there are many additional cases upholding and

12  approving the validity of filter teams.  *See, e.g., United States v. Loughner*, 782 F. Supp.

13  2d 829, 833 (D. Ariz. 2011) ("The Court approves the Government's use of a filter team to

14  screen BOP's records for possible privilege issues."); *Hicks v. Bush*, 452 F. Supp. 2d 88,

15  103 (D.D.C. 2006) (granting government's motion to authorize filter-team review and

16  explaining that there was "[n]o practical and effective alternative to the Filter Team. . . .

17  Neither review by special masters nor pre-screening by counsel for the detainees could be

18  accomplished in a reasonable amount of time."); *In re Search of 5444 Westheimer Road,*

19  *Suite 1570, Houston, Texas, on May 4, 2006,* 2006 WL 1881370, *2 (S.D. Tex. July 6,

20  2006) (noting that "[o]ther courts have upheld the use of taint team procedures" and

21  authorizing "the Government to commence reviewing the materials through use of the

22  proposed taint team procedure"); *United States v. Grant*, 2004 WL 1171258, *3 (S.D.N.Y.

23  May 25, 2004) (same).  As one court has put it: "The use of a taint team is a proper, fair

24  and acceptable method of protecting privileged communications when a search involves

25  property of an attorney." *United States v. Triumph Capital Group, Inc.,* 211 F.R.D. 31, 43

26  (D. Conn. 2002).

27          Second, this is not a case where the government unilaterally chose to use a filter

28  team.  To the contrary, the government sought and obtained permission from two different

magistrate judges before doing so. *See* CR 195-1, 195-2. The case cited by Defendants—*United States v. Neill*, 952 F. Supp. 834 (D.D.C. 1997)—dealt with a situation where no court had issued an order approving the filter team review.

Third, Lacey and Larkin state the government has woefully under-segregated the documents for filter team review. That, again, is false. The government used the attached list (Exhibit H) with over 265 search terms to determine what documents may need further review, which include search terms that would identify communications from all attorneys listed in Defendants' response. *Compare* Exhibit H *with* CR 226 at 12 n.14. This list led to 10,733 potentially privileged documents.

Fourth, and finally, it is incorrect to conclude—as Defendants do—that the federal filter team's efforts must have been inadequate because it didn't segregate as many documents as the AGO's filter team. In fact, federal authorities didn't take possession of the 64,000 documents that the AGO had previously culled. The 10,733 documents at issue here are *additional* documents that the federal filter team segregated for further review.[4]

## CONCLUSION

The record is clear that the privilege has been waived for all of Backpage's attorney-client communications before April 2015. The authority to waive the privilege transferred to Carl Ferrer when he purchased the company and he has exercised that right. Additionally, Backpage waived its privilege as to the subject matter of many of those documents by sharing privileged materials with third-party public relations firms and an investment bank. The practical impact of an order on this issue would be to permit 9,405 out of the 10,733 documents that have been segregated for filter review—all of the communications that occurred before April 2015—to be immediately turned over to the

---

[4] Defendants use their response brief to raise, again, the issue of disclosure of the government's communications with Ferrer. CR 226 at 23-24. The government responded to this argument previously (CR 216). Further disclosure from the government is neither necessary nor relevant for the Court to determine whether Backpage's attorney-client privilege has been waived. As discussed above, however, the Court may require further disclosure from Defendants before it can rule on Defendants' claim of joint privilege with respect to Backpage's post-sale communications.

1   prosecution team.

2          Defendants' assertion that privilege attaches to all communications between

3   Backpage and all of the company's attorneys after April 2015 is dubious.  As an initial

4   matter, between April 2015 and December 2016, any communications between Backpage

5   and any attorneys that had not been engaged in joint representation with the individual

6   Defendants (i.e., all lawyers and law firms other than DWT) should also be provided to the

7   prosecution team.  For all remaining documents, Defendants must specifically demonstrate

8   the privileges that apply and why they have not been waived.  Even if Defendants are able

9   to demonstrate that certain documents are privileged, case law suggests that when a joint

10  privilege is shared between individuals and a corporation the corporation can unilaterally

11  waive the privilege over the individual's objection.  In the end, if the Court finds that

12  privileged documents remain, the government would propose that the filter team produce

13  those specific documents to both Defendants and the Court to permit further litigation.

14          Respectfully submitted this 17th day of August, 2018.

15                                          ELIZABETH A. STRANGE
                                            First Assistant United States Attorney
16                                          District of Arizona

17                                          */s Andrew C. Stone*
                                            KEVIN M. RAPP
18                                          MARGARET PERLMETER
                                            PETER S. KOZINETS
19                                          ANDREW C. STONE
                                            JOHN J. KUCERA
20                                          Assistant U.S. Attorneys

21                                          BRIAN BENCZKOWSKI
                                            Assistant Attorney General
22                                          Criminal Division, U.S. Department of Justice

23                                          REGINALD E. JONES
                                            Senior Trial Attorney
24                                          U.S. Department of Justice, Criminal Division
                                            Child Exploitation and Obscenity Section
25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>Certificate of Service</u>**

I hereby certify that on this date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants: Anne Chapman, Erin McCampbell, Gregory Zamora, James Grant, Larry Debus, Lawrence Kazan, Lee Stein, Paul Cambria, Robert Corn-Revere, Ronald London, Janey Henze Cook, John Littrell, Kenneth Miller, Thomas Bienart, Jr., Bruce Feder, Michael Kimerer, Rhonda Neff, KC Maxwell, David Wakukawa, Michael Piccarreta, Stephen Weiss.

*<u>s/Rose Marie Trandicosta</u>*
U.S. Attorney's Office