Thomas H. Bienert, Jr. (CA State Bar No. 135311, admitted *pro hac vice*)
Whitney Z. Bernstein (CA State Bar No. 304917, admitted *pro hac vice*)
BIENERT, MILLER & KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone:    (949) 369-3700
Facsimile:    (949) 369-3701
Email:        tbienert@bmkattorneys.com
              wbernstein@bmkattorneys.com
*Counsel for James Larkin*

Paul J. Cambria, Jr. (NY State Bar No. 15873, admitted *pro hac vice*)
Erin McCampbell (NY State Bar No. 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone:    (716) 849-1333
Facsimile:    (716) 855-1580
Email: pcambria@lglaw.com
              emccampbell@lglaw.com
*Counsel for Defendant Michael Lacey*


Additional counsel listed on next page

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-18-00422-PHX-SMB |
|---|---|
| Plaintiff. | **DEFENDANTS' JOINT STATUS REPORT FOR APRIL 23, 2019 STATUS HEARING** |
| v. | |
| Michael Lacey, *et al.*, | |
| Defendants. | |

James C. Grant (WA State Bar No. 14358, admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1201 Third Ave, Suite 2200
Seattle, Washington 98101
Telephone:     (206) 757-8096
Facsimile:     (206) 757-7096
Email:         jimgrant@dwt.com
*Counsel for Michael Lacey and James Larkin*

Robert Corn-Revere (DC Bar No. 375415, admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave. NW, Suite 800
Washington, D.C. 20006
Telephone:     (202) 973-4225
Facsimile:     (206) 973-4499
Email:         bobcornrevere@dwt.com
*Counsel for Michael Lacey and James Larkin*

Bruce Feder (AZ State Bar No. 004832)
FEDER LAW OFFICE, P.A.
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone:     (602) 257-0135
Email:         bf@federlawpa.com
*Counsel for Defendant Scott Spear*

Gary S. Lincenberg (CA State Bar No. 123058, admitted *pro hac vice*)
Ariel A. Neuman (CA State Bar No. 241594, admitted *pro hac vice*)
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, CA 90067-2561
Telephone:     (310) 201-2100
Facsimile:     (310) 201-2110
Email:         glincenberg@birdmarella.com
               aneuman@birdmarella.com
*Counsel for John Brunst*

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................1

II.     PROCEDURAL HISTORY REGARDING DISCOVERY .........................4

III.    THE GOVERNMENT HAS NOT FULFILLED ITS DISCOVERY
        OBLIGATIONS......................................................................................5

        A.      DISCOVERY PRODUCED TO DATE IS INADEQUATE........................5

        B.      SIGNIFICANT DISCOVERY HAS NOT YET BEEN PRODUCED........8

                1.      The Government Has Not Produced the Backpage Servers ................8

                2.      The Government Has Not Provided Key *Jencks* and Impeachment
                        Materials..............................................................................10

IV.     GOVERNMENT'S DISRUPTIONS TO DEFENSE PREPARATION ...............11

        A.      THE GOVERNMENT SOUGHT TO DENY DEFENDANTS LONG-
                TIME FIRST AMENDMENT COUNSEL ......................................11

        B.      THE GOVERNMENT IS REPEATEDLY OBTAINING AND
                SEEKING TO REVIEW ATTORNEY CLIENT INFORMATION........11

        C.      THE GOVERNMENT HAS ILLEGALLY SEIZED DEFENDANTS
                ASSETS AND ATTORNEYS FEES .............................................12

                1.      Initial Seizure of Defendants' Assets....................................12

                2.      Subsequent Seizure of Attorney IOLTA Accounts.............................13

                3.      The Government's Seizures are Indefensible.......................................14

V.      OUTSTANDING MOTIONS .................................................................16

VI.     ADDITIONAL MOTION PRACTICE ....................................................17

VII.    CONCLUSION ....................................................................................17

1
<u>DEFENDANTS' JOINT STATUS REPORT</u>

2
I.    <u>INTRODUCTION</u>

3
    Defendants Larkin, Lacey, Brunst, and Spear ("Defendants") formerly owned Backpage.com

4
("Backpage"), an online classified advertising website.[1]  Backpage published millions of classified ads

5
each month, in a wide range of categories, including employment ads, housing and real estate ads,

6
ads for cars and other personal property for sale, dating ads, and ads for adult services.[2]  Defendants

7
sold Backpage to one of the government's cooperating witnesses (Carl Ferrer) in April 2015.

8
    The government's case against Defendants seeks to hold them criminally responsible for adult

9
ads posted by third-party users on Backpage, with the government alleging Defendants knew that

10
most (if not all) adult ads on Backpage related to unlawful activities by users of the site (with that

11
knowledge based in part on Backpage's cooperation with law enforcement in the prosecution of

12
some users of the site).  The indictment does not allege that Defendants ever saw the adult ads

13
identified in the indictment, that Defendants knew those ads related to unlawful activity, or that

14
Defendants decided Backpage would run those ads to facilitate the unlawful activities of the users

15
posting those ads—nor could it.  Not only were most of the ads identified in the indictment placed

16
*after* Defendants sold Backpage, but Defendants *never* were involved in the day-to-day operations of

17
the website, such as deciding whether specific ads (whether adult or otherwise) would be permitted

18
to run.

19
    Although the indictment identifies 51 specific adult ads, the indictment is not premised on

20
those ads *per se*, but on the premise that Backpage "facilitated" prostitution crimes generally through

21
its operation and overall editorial policies.  The indictment fails to allege the necessary *mens rea* as to

22
any specific acts, including as to the 51 adult ads.  As the government has acknowledged in other

23
cases, the government must prove not just that Defendants knew that particular adult ads were for

24
prostitution and ran them anyway, but also that Defendants had the specific intent to facilitate the

25

26
[1]  Defendants Padilla and Vaught are former employees of Backpage.

27
[2]  The adult services section had subcategories including "escorts, body rubs, strippers and strip

28
clubs, dom[ination] and fetish, ts (transsexual escorts), male escorts, phone [sex], and adult jobs (jobs related to services offered in other adult categories . . . ."  *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015).  Defendants will refer to dating ads and adult services ads, collectively, as "adult ads."

particular acts of prostitution relating to those specific ads.  For instance, in *Woodhull Freedom Foundation v. United States*, the government argued that, for prosecutions under the Travel Act, the prosecutor must prove "not simply that the defendant was aware of a potential result of the criminal offense, but instead that the defendant intended to 'explicitly further[]' a specified unlawful act." *Woodhull Freedom Foundation v. United States*, 334 F.Supp.3d 185, 199-201 (D.D.C. 2018).  The court agreed with the government and held that the Travel Act applies only to "specific unlawful acts with respect to a particular individual, not the broad subject matter of prostitution." *Id.*[3]  Here, however, the government seeks to do exactly what it acknowledged it could not do in *Woodhull*—basing its indictment on allegations that Defendants had a generalized knowledge of ads relating to unlawful activities on Backpage, not that Defendants had specific knowledge about specific ads or that they intended to facilitate specific unlawful acts.

The flaws in the government's aggressive and unprecedented prosecution will be the subject of an upcoming motion to dismiss the superseding indictment, but the flaws infect the entirety of this case, including the government's discovery and disclosure obligations discussed below.  Ignoring the need to prove "specific unlawful acts with respect to particular individual" and premising the indictment on the erroneous view that criminality can be based on "the broad subject matter of prostitution," the government contends, among other things:

- all of the tens of millions of adult ads run on Backpage over its 14-year history are at issue;
- all editorial decisions (and discussions) relating to which adult ads would be permitted to run on the site and which would not (whether broad policy decisions or the decisions to run or delete particular ads) are at issue;
- all of Backpage's marketing strategies aimed at increasing the number of adult ads on the website (including ads in foreign countries) are at issue; and
- Defendants' after-the-fact knowledge of unlawful acts related to Backpage ads is at issue.

---

[3]  The government's admissions, and the court's holding, in *Woodhull* comport with the Ninth Circuit's interpretation of the Travel Act.  *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974) (dismissing indictment under the Travel Act against a manufacturer of gambling devices because the "intent to facilitate a criminal venture" under the Travel Act requires the government to show "that the manufacturer in some significant manner associated himself with the purchaser's criminal venture for the purpose of its advancement;" allegations that the manufacturer shipped gambling devices to the purchaser knowing the purchaser would violate state law by possessing the devices was insufficient).

Having staked out this ground, the government then dumped millions of documents related to the foregoing on Defendants, patting itself on the back for its prompt disclosures, while drowning Defendants in an ocean of (likely irrelevant) disclosures.

The government has suggested that Defendants should know what is in these nearly eleven million pages of disclosures—as many of them were produced by Backpage—but the government conveniently fails to note that *all* the documents produced by Backpage were collected and produced by Backpage *after* Defendants sold the business to the government's cooperating witness. Mr. Ferrer may know what's in those documents, but Defendants do not. Defendants have poked around in the millions of documents to try to get an understanding of what is there, but what they've found is millions of pages of random, disorganized, and redundant documents, with the government's so-called "indexes" providing little or no guidance. Defendants have spent quite a bit of time in these disclosure haystacks, but have yet to find any needles.

Moreover, the government's back-patting about its disclosures appears to be designed to distract from what it has *not* produced. For example, the government has produced some of Mr. Ferrer's email that it seized from Google, but only recently has offered to provide Defendants access to emails from Backpage's email server and from an online email backup service used by Backpage. Defendants expect the government's upcoming production of these emails will be millions of pages of documents. Defendants also believe the government has substantial amounts of *Brady* material, and have identified the type of *Brady* material they believe the government has, but the government has yet to identify any. The government also has yet to identify any *Jencks* Act information regarding its key cooperator, Backpage owner and CEO Carl Ferrer, or others. And, while attempting to make the universe of Backpage documents pertinent, the government has made it next to impossible to review those documents, by tearing apart Backpage's computer systems so they no longer are functional, making it at best extremely difficult, if not impossible, to effectively review that data. The government now acknowledges that it controls over 100 Backpage servers, with over 500 *terabytes* of data—a data collection that utterly dwarfs the more than ten million pages produced to date. The government has yet to produce most of this data—none of which will operate as a functional database as it did prior to the government's dismantling and seizures—and the

government has yet to provide a master list of what is on the servers.

At the same time, the government has engaged in a pattern of obstructing Defendants' relationship with counsel of choice, and obstructing defense counsel, including by making illegal seizures aimed at depriving Defendants of the assets they need to defend the case (while also repeatedly seeking to evade judicial review of its improper tactics until after the trial in this case).  As a result of the government's tactics, Defendants have not been able to adequately prepare for trial and Defendants do not expect to be able to adequately prepare for trial in January 2020.  Defendants submit that the Court should address with the government the dates by which it will actually comply with its discovery obligations, allow time for the Ninth Circuit Court of Appeals and the Central District of California to address Defendants' pending challenges to the government's improper seizures, schedule a status conference after those have occurred, and thereafter set an appropriate new trial date that allows Defendants to adequately prepare for trial.

II.   PROCEDURAL HISTORY REGARDING DISCOVERY

Defendants were arraigned on the indictment in this matter on April 6 & 9, 2018.  On April 24, 2018, the parties proposed a scheduling order to govern the case (Doc. 121), which the Court adopted on April 30, 3018 (Docs. 127 & 131).[4]  At that time, the Court set a trial date of January 15, 2020, based on the expectation that the parties would meet the following case schedule and deadlines (among others):

| | |
|---|---|
| Government Initial Compliance with Rule 16 Discovery | Dec. 3, 2018 |
| Government Initial Expert Disclosure | Dec. 14, 2018 |
| Production of *Jencks* material and witness impeachment material, if not produced sooner | Feb. 25, 2019 |
| Substantive Motions Deadline | July 15, 2019 |

Doc. 131.

The government thus far has made discovery productions between May 24, 2018 and April 11, 2019.  *See* Discovery Production Chart Prepared by Defendants, attached as Exhibit A.  The

---

[4] The government brought a Superseding Indictment on July 25, 2018.  The Scheduling Order remained the same, as it envisioned the government returning a Superseding Indictment by July 30, 2018.  Doc. 131.

government has acknowledged possession of at least 46 Backpage servers that have not been imaged or produced to the Defendants, and is in the process of obtaining approximately 60 additional servers, which will thereafter have to be produced to the Defendants.

III.   **THE GOVERNMENT HAS NOT FULFILLED ITS DISCOVERY OBLIGATIONS**

   A.   **DISCOVERY PRODUCED TO DATE IS INADEQUATE**

The scheduling order required the government to make materially complete Rule 16 discovery by December 3, 2018.  Doc. 131.  The government has made ten discovery productions up through its last production on April 11, 2019.  To date, it has produced over 10,800,000 pages and dozens of hours of audio and video recordings, plus one copy of portions of hard drives from five imaged Backpage servers, comprised of approximately 60 *terabytes* of data.[5]  *See* Ex. A.

Much of the production has been late.  Since the December 3, 2018 Rule 16 deadline in the Scheduling Order, the government has produced 136,750 pages and nearly 38 hours of recordings; much of that information was available long before it was produced.  In its February 22, 2019 production, the government produced recorded statements of two defendants from April 2018, discovery which was clearly in the government's possession for almost a year before it was produced.  Despite requests by Defendants, the government failed to make available defendant Larkin's computer and phone taken from him when arrested in April 2018, until March 18, 2019.  Further, as recently as April 11, 2019, the government made another production of over 66,000 pages, which contained numerous files flagged as containing viruses and malware requiring that they be quarantined to avoid corrupting counsel's networks.  *See* Exhibit B.  Defendants cannot even access this late-produced discovery.

A significant volume of documents was produced before the December 3 deadline, but in

---

[5]  These 60 terabytes of data occupy over 50 hard drives. It takes somewhere between 40 to 100 hours to forensically analyze one hard drive; to analyze just these five servers is expected to take over 2,200 hours. Further, although it is not possible to directly translate terabytes to a number of documents, the range typically is 5,000 documents per gigabyte to 25,000 documents per gigabyte— with 10,000 documents per gigabyte being the accepted norm. David Degnan, Accounting for the Costs of Electronic Discovery, *Minnesota Journal of Law, Science & Technology*, 2011, Vol. 12:1, p. 163. Even using the 5,000 documents per gigabyte figure, with 60 *terabytes* of data, the server data can be presumed to include at least 300,000,000 documents.

ways that made it difficult or impossible to use. For example, the government produced millions of pages of documents in a format designed for use in a specialized computer database, such as Relativity. To review this volume of documents, Defendants need access to a Relativity vendor and the funds to pay for uploading, processing and hosting these vast amounts of data, which can then be searched by defense counsel based on search terms. The cost to Defendants for using Relativity will be several million dollars. *See, e.g.*, Doc. 443 at n.3. As set forth below, Defendants had the funds to engage a Relativity vendor, but the government improperly seized those funds, leaving Defendants no ability to review the discovery the government produced in Relativity. Without access to Relativity, Defendants can only review the discovery one page at a time, an impossible task to do timely with the millions of pages of discovery in play.

The government also failed to produce documents with appropriate indexes. Although the government claims to have indexed the documents, the government's "indices" typically do not give specific identification as to what the production contains, such that focused review can occur. For example, in one production, the government "indexed" over one million pages of documents simply as "USAO 108 Subpoena" without any further identification or indexing. *See* Ex. A. (The subpoena itself had only three document requests, so it likewise provides no guidance.) This is similar for the rest of the government's productions. *Id.* Defendants are therefore forced to peruse huge volumes of documents and hope to wander upon something relevant. And spot page-by-page searches reveal that Defendants cannot simply skim voluminous productions that appear immaterial, as isolated emails that appear relevant are sprinkled among large volumes of documents that are not.

Finally, the government's production thus far does not seem to include significant discovery required under Rule 16, including: full copies of Defendant's emails from servers, Backpage's email, *Brady*, *Giglio*, and *Jencks* Act materials, and reasonable identification of items the government intends to use in its case in chief at trial.

Even if somehow the government has interspersed such materials without identification in the millions of pages of discovery noted above, it still has not provided appropriate discovery. It would be improper for the government to obscure obligated discovery materials in massive productions. The government's refusal and failure to itemize or index any of the nearly eleven

million pages of discovery or to identify any *Brady* material is especially obstructionist against the backdrop of the government's tactical seizures of all funds earmarked for defense of the case, including attorney's trust accounts.  The government is in a good position to itemize and identify these materials since it has been investigating this case for over five years and is certainly aware of *Brady/Giglio* materials it has that contradict or undermine its positions and are not helpful to its case.

Defendants previously moved for the itemization of *Brady/Giglio* materials when the government had made just three discovery production.  *See* Doc. 273, with Joinders at Docs. 275-279.  At a hearing on the motion on October 5, 2018, the government said that "it's a little unclear what the exculpatory material would look like." *See* Reporter's Transcript, October 5, 2018 Hearing, at 101.  The government then said that, putting aside the issue of the First Amendment, "what is at issue in this case…is a factual issue. Did [Defendants] know that the vast majority of these advertisements that went up on this Web site were for prostitution." *Id.* at 102.  The government said it was disclosing documents supporting its allegations, but "with respect to *Brady* or exculpatory, we're unsure what that would look like." *Id.*  The Court asked if the government's position was that it did not know if any *Brady* or *Giglio* materials exists, and the government responded: "we don't know." *Id.* at 103-04.  The government went on to assure the Court that it would turn over any *Brady*/Giglio materials to the Defendants immediately after learning of it.  *See* Reporter's Transcript, October 5, 2018 Hearing, at 104.  The Court's order denying Defendants' motion for itemization specifically "notes that at the October 5th hearing the government stipulated that it will turn over any *Brady/Giglio* material that it comes across in the future to the Defendants within 10 days. The court implores the Government to abide by this stipulation, without an order from the court." Doc. 399 at 5-6.  After the hearing, counsel for Padilla even sent the government follow up correspondence laying out specific examples of evidence that would constitute *Brady/Giglio* materials in this case.  *See* Exhibit C.  However, despite all of this, the government has not produced any *Brady/Giglio* materials.  Given the current volume of discovery, this Court should specifically order the government to identify and itemize not only its voluminous discovery productions but also particularly identify documents it intends to use in its case in chief, as well as any *Brady* materials.

B.   SIGNIFICANT DISCOVERY HAS NOT YET BEEN PRODUCED

As noted above, the government should produce full copies of Defendants' emails, Backpage's emails, all *Brady*, *Giglio*, and *Jencks* Act materials, and the items it intends to use in its case in chief.  Additionally, the government has yet to produce voluminous and significant discovery that is central to defense preparation of the case.

1.   The Government Has Not Produced the Backpage Servers

Defendants understand that Backpage kept much of its business information on servers, including key information like emails, financial information, payment processing data,[6] and ads and the history of particular ads.  On March 7, 2019, the government represented to the defense that it had 46 Backpage servers in its possession obtained from (i) Amsterdam, Netherlands, (ii) Tucson, Arizona, and (iii) Dallas, Texas.  The government also represented that it was awaiting receipt of 60 additional servers from Amsterdam through the MLAT process.  *See* Exhibit D.  In March the government made available for pickup hard drives from 5 servers, which occupies more than 50 hard-drives and 60 terabytes of data, and is expected to take at least 2,200 hours to forensically review and analyze. The government did not image and produce any other servers, instead offering it would make these servers "available for inspection" by the defense at an FBI data center in Pocatello, Idaho. The government also claimed that once it receives the 60 additional servers from Amsterdam through the MLAT process, those servers, too, will be "available for inspection" by the defense in Pocatello, Idaho.  *Id.*  Last week, the government modified this information, saying that it actually has 39 servers located in Phoenix and 14 servers located in Pocatello, and would make them "available" for defense review at FBI facilities in those respective states.  *See* Exhibit E.  The government has refused to provide the defense complete forensic images of each of the servers in its possession.

---

[6] Given the money laundering charges in the Superseding Indictment, the payment processing data is critical Rule 16 discovery. While the government previously thought the payment processing servers were in Dallas, upon retrieving five servers from Dallas, it learned that the payment processing data was not there. Accordingly, the government now represents to the Defendants that the payment processing servers are forthcoming with the 60 outstanding servers whose date of arrival remains unknown.

In addition to requiring defense counsel to travel to Arizona and Idaho to review the servers, the government is further requiring that the defense provide names, dates of birth, and social security numbers of members of the defense team who will participate in the review and inspection of the servers. And as a condition precedent to viewing the "available" hard drives and servers, the government is requiring each person to submit to and pass an FBI background check. The government also apparently intends to have members of the prosecution team present while the defense conducts its review and inspection of the hard drives and servers to oversee and "facilitate" the process.

The government's willingness to make servers "available" to the defense for inspection and copying with these conditions, including out-of-district travel to a government facility and a review subject to government oversight, is unreasonable and improperly hinders the defense. Given the large number of servers and the large volume of data they contain, as well as the fact that the government apparently does not have a master list describing the data contained on each server, the defense anticipates that the review and inspection process will be time consuming and require lengthy forensic and other analysis. The defense is also informed that it could take up to several weeks to image a single server. Moreover, having members of the government present while the defense conducts its review and inspection would necessarily reveal to the government the defenses' strategy and mental impressions, which must be protected. The "review and inspection" process proposed by the government is not simply feasible.

The Court should require the government to provide the defense with imaged copies of each of the servers in its possession, custody, or control, for it to comply with its Rule 16 obligations. Courts have regularly required the government to provide imaged copies of data to the defense, rather than simply making the data available for review and inspection, to satisfy Rule 16. *See, e.g.*, *United States v. Cadet*, 423 F.Supp.2d 1 (E.D.N.Y. 2006) (finding government's proposal to allow the defense to inspect material at government facility, on government computer, subject to government supervision, insufficient; government required to produce copies of computer files at issue to the defense); *United States v. Aldeen*, No. CR-06-31, 2006 WL 752821 (E.D.N.Y. March 22, 2006) (requiring the government to provide the defense a copy of the hard drive to be inspected where,

among other factors, the type of analysis planned by the defense team was complex and would be burdensome to perform at government office, the government would have unfair access to defense work product, and the defense team would bear the cost of transportation to and from the government facility and for those who needed access); *United States v. Hill*, 322 F.Supp.2d 1081 (C.D. Cal. 2004) (concluding that defendant would be "seriously prejudiced" absent production by the government to defendant of mirror image copies of computer data, where defendant's counsel represented that an in-depth analysis of data was required for issues relevant to both guilt and sentencing, and requiring out-of-state members of defense team to travel to government facility for review and inspection would be "unreasonably burdensome"); *United States v. Frabizio*, 341 F.Supp.2d 47 (D. Mass. 2004); *United States v. Kirzhner*, No. 02-CR-38, slip op. (E.D.N.Y. June 14, 2002).[7]

2.    The Government Has Not Provided Key *Jencks* and Impeachment Materials

The government's deadline to produce *Jencks* and impeachment materials was February 25, 2019.  Doc. 131.  The government has not met that deadline.  Indeed, it has failed to provide *Jencks* and impeachment information regarding the primary cooperating witness in the case, owner and CEO of Backpage Carl Ferrer.  Without any notice to Defendants, the government moved *in camera* to withhold Carl Ferrer's *Jencks* materials.  As soon as Defendants learned of the government's *in camera* filing, Defendants opposed the government's *in camera* motion and incorporate its arguments herein.  *See* Motion in Opposition to Government's Motion to Defer Disclosure of Carl Ferrer's *Jencks* Act Statements and Objections to In Camera Filing of the Same, and Request for Disclosure of the Same (Doc. 477; Joinders at Docs. 486, 487, 488, 489, 490).  Defendants cannot meaningfully investigate and prepare the defense without information about the key cooperating witness, Carl Ferrer.

Moreover, despite providing a witness list containing over 100 witnesses, *see, e.g.*, Doc. 511, the government has not provided *Jencks* materials for all of them.  Defendants have not been able to

---

[7] Note that these cases pre-dated the enactment of 18 U.S.C. § 3509, which courts have applied as a statutory exception to Rule 16 limiting the government's ability to produce copies of certain contraband material to the defense, so long as the government gives the defendant "ample opportunity" to review the material. This statutory exception is inapplicable in this case.

find any materials in the discovery for numerous witnesses, including: M.G., former CFO of Backpage.com; various Backpage.com moderators (e.g. J.D., B.P., C.P., and D.B.); and various law enforcement (e.g. D.S., Q.T. J.H., D.E., S.C. M.D., J.R., M.R., Detective D.G., Di.G., D.M.G., T.M.).[8]  Defendants need all *Jencks* Act and impeachment materials in order to properly prepare the case.

IV.   GOVERNMENT'S DISRUPTIONS TO DEFENSE PREPARATION

Instead of properly fulfilling discovery obligations to the defense, the government has spent its time repeatedly taking steps to put defense counsel in difficult positions, to deprive Defendants of counsel of choice, and to preclude the defense from focusing on the substance of the case.

A.   THE GOVERNMENT SOUGHT TO DENY DEFENDANTS LONG-TIME FIRST AMENDMENT COUNSEL

The government first sought to remove Defendants' long term First Amendment counsel, Davis Wright Tremaine LLP ("DWT"), which had repeatedly and successfully represented Defendants, their entities, and their employees in multiple lawsuits and prosecutions making similar allegations to the instant Indictment.  The government filed a motion to disqualify DWT on April 25, 2018 (Doc. 118), Defendants filed oppositions in June 2018 (Docs. 174, 176, 177, 178, 180, 181), the court held a hearing on the issue on October 5, 2018, and the Court thereafter denied the government's motion (Doc. 338).  Notwithstanding this ruling, a motion to disqualify DWT on the same grounds is still pending in a related California state prosecution.

B.   THE GOVERNMENT IS REPEATEDLY OBTAINING AND SEEKING TO REVIEW ATTORNEY CLIENT INFORMATION

The government has also taken the unusual and questionable steps of using grand jury and trial subpoenas to repeatedly obtain defense counsel's attorney-client trust account banking records for all clients, not just those in this case.  The government then disclosed this client financial information for these counsel to all counsel in the case.  This conduct not only raises ethical and procedural concerns, but places certain defense counsel in a difficult position as it relates to all of

---

[8]   For purposes of this motion, Defendants use initials for these witnesses.  The government clearly should know who they are, since they are in the government's Witness List, but should the Court or government want them identified by name, Defendants will supplement.

their clients, not just those in this case.  These actions will be the subject of a separately filed motion.

The government has also repeatedly sought to invade defendants' attorney-client privileges and work product protections.  The government moved for an order allowing it to review *all* privileged communications within the materials it has collected by warrants and other process, but the Court denied that motion, holding that Ferrer could not waive privilege protections held by Defendants.  (Doc. 345.)  The government then sought "clarification" that it could continue to review privileged materials through use of a "taint team," which the Court allowed (Doc. 452), although it has not addressed Defendants' request for clarification that the "taint" team must identify to Defendants any documents it proposes to disclose to the prosecution team, so that Defendants may have an opportunity to object (as is customary, *see* Docs. 452, 479-1).

At the same time, the government also sought to compel Defendants to produce their privileged joint representation agreements, which the Court also rejected (Doc. 441), but Defendants have reason to believe the government has been coordinating with Ferrer and/or plaintiff's counsel in civil cases to obtain access to these agreements, notwithstanding the Court's ruling.  Defendants have learned that the government's cooperating witness Ferrer now is seeking in a separate civil case in Texas to make the same documents public records, even though Ferrer already has access to the documents.  This appears to be an attempt to end run this Court's decision denying the government access to the documents.

C.     THE GOVERNMENT HAS ILLEGALLY SEIZED DEFENDANTS ASSETS AND ATTORNEYS FEES

Additionally, the government has engaged in a seemingly endless series of seizures of assets of the Defendants, as well as attorney IOLTA account funds deposited before the indictment to provide defense fees and costs.  It has continually avoided addressing Defendants' challenges to these illegal pre-trial seizures, making contradictory arguments to different courts as part of a pattern of delaying substantive addressment of its conduct and continuing to deprive Defendants of assets and attorneys' fees.

1.     Initial Seizure of Defendants' Assets

From late March 2018 through November 2018, the government seized tens of millions of

dollars of assets from Defendants, through presentation to judges in the Central District of California of over 20 *ex parte* seizure warrants.  In essence, the government alleged that the assets derived from Backpage, which the government argued made them illegal proceeds.  Upon learning of the seizures, Defendants challenged them as improper, filing a motion in the Central District seeking to vacate the government's seizures as impermissible under the First, Fourth, Fifth, and Sixth Amendments, and noting that the supporting affidavits for the warrants contained material misstatements and omissions amply sufficient to also vacate the warrants under *Franks v. Delaware*, 438 U.S. 154 (1978). The government responded, not by defending the legality of its seizures, but by seeking a stay of all proceedings as to the civil seizures and forfeiture actions, asserting that challenges to the warrants should be heard in the District of Arizona.  The Central District Court accepted the government's position and, on October 23, 2018, stayed all proceedings concerning the challenged seizure warrants and civil forfeiture actions, stating that there was "no reason" challenges to the seizures and the warrants "could not be brought in the [Arizona] criminal action."  *In the Matter of the Seizure of Any and All Funds Held in Republic Bank of Arizona Account(s) XXXX1889, XXXX2592, XXXX1938, XXXX2912, and XXXX2500*, No. 2:18-cv-06742-RGK-PJW, *et al.* (Doc. 85) ("*In re Funds in Republic Bank*").

Defendant appealed the stay and the illegality of the seizures to the Ninth Circuit Court of Appeals.  After multiple filings by the government trying to convince the Circuit not to hear and/or delay the appeal, the Ninth Circuit ordered the government to file an Answering Brief by May 1, 2019, and indicated there would be no further continuances.  The Ninth Circuit also ordered the matter for expedited oral argument in July 2019.

2.     Subsequent Seizure of Attorney IOLTA Accounts

One week after the district court's stay ruling in the CDCA, in late October 2018 the government filed applications in the CDCA for another round of 12 warrants, this time primarily to seize funds from IOLTA trust accounts held by counsel for representation in this case and other related matters.  The government obtained these warrants based on affidavits that were near carbon copies of those submitted for the prior warrants, repeating the same misstatements and omissions, and without any mention of the prior challenges.  Defendants immediately moved to stay this second

round of seizures, this time following the government's earlier suggestion that its warrants should be challenged in this district; Defendants moved in this district that the recent seizures violated the First, Fourth and Fifth Amendments, as well as the Sixth Amendment because the government seized attorney retainers. The government again failed to respond to the motions substantively, and only put forth procedural arguments; but this time the government responded that it was improper for the court in this district to address the seizure warrants because they were issued by the CDCA. In an oral ruling on November 16, the Arizona federal court (Judge Logan) declined to rule on the propriety of the government's seizure warrants on the basis that such challenges should be heard in "the rendering court," *i.e.*, in the CDCA.

In late November 2018, Defendants then went back to the CDCA and challenged the second round of warrants there. The court there received briefing from the parties, with the government yet again raising procedural arguments but not addressing Defendants' substantive positions that the seizures were illegal. The court in the CDCA ordered further briefing by late December and early January, and indicated that it would issue a ruling. It has yet to issue its ruling.

### 3.   The Government's Seizures are Indefensible

Despite the many motions by Defendants, the government has yet to substantively defend the legality of its pre-trial seizures. That is because it can't, because the law is clear when it comes to addressing seizure of proceeds from a publisher, like Backpage.

First, the government may not effect seizures of assets derived from publishing activities that are presumptively protected by the First Amendment without an adversary hearing in which the government proves that the material at issue is unprotected. In *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989), the Supreme Court invalidated a section of the Indiana RICO law that authorized pretrial seizure of assets "subject to forfeiture" upon a showing of probable cause that the assets were "used in the course of, intended for use in the course of, derived from, or realized through . . . racketeering activity." *Id.* at 51. Even though the defendant in that case had 39 prior convictions for violating the state's obscenity laws, and even assuming the materials seized ultimately would be forfeitable upon conviction, the Court held "the seizure at issue here is unconstitutional." *Id.* at 65. Consistent with long-established principles that heightened protections apply when the government

takes actions that may burden or suppress speech, the Court held that a showing of probable cause is not sufficient to effect seizures.  *Id.* at 66 ("mere probable cause to believe a legal violation has transpired is not adequate to remove books or films from circulation").

The Ninth Circuit followed and extended *Fort Wayne Books* in invalidating the pretrial forfeiture provisions of the federal RICO statute (18 U.S.C. § 1963(d)) in *Adult Video Ass'n v. Barr*, 960 F.2d 781 (9th Cir. 1992), *readopted after rehearing*, *Adult Video Ass'n v. Reno*, 41 F.3d 503 (9th Cir. 1994).  Finding the RICO provision for pretrial seizures unconstitutional on its face as to publishers' or distributors' assets, the Ninth Circuit reiterated that it is not enough for the government to show probable cause to support a forfeiture order.  960 F.2d at 788.  "The First Amendment will not tolerate such seizures until the government's reasons for seizure weather the crucible of an adversary hearing."  *Id.*

Here, the government seized assets pre-trial based on nothing more than probable cause. And the government's rationale for doing so is entirely premised on its allegations that the targeted assets came from publishing activities, *i.e.*, Backpage's provision of a website where individual users could post ads and communicate with others.  The government's seizure efforts continue to violate fundamental First Amendment law.

The government's seizure efforts also violated Fourth and Fifth Amendment principles. Even assuming the government could seize publishing proceeds based on a showing of probable cause (which it cannot do), the government's applications and the supporting affidavits used for the seizures are rife with material misstatements and omissions.  In short, the affidavits said nothing about the 11 prior rulings of courts in cases involving Backpage holding that ads on Backpage were presumptively protected speech under the First Amendment, government authorities may not justify actions by offering broad-brush opinions that all ads related to unlawful conduct, and earning revenues from user payments for ads is a legal activity.  The affidavit also mischaracterized Backpage internal emails, selectively quoting from them when a reading of the actual email did not say what was represented.  Remarkably, when seeking the second round of seizure warrants, the government never even informed the new judges of Defendants' prior challenges, raising additional issues about the government's compliance with its duty of candor in *ex parte* proceedings before the Court.

Because the government's second round of seizures targeted attorney retainers, they additionally infringe Sixth Amendment rights of Movants to have counsel of their choice and use funds to which they are entitled for that purpose.  The "Sixth Amendment right to counsel of choice … commands, not that a trial be fair, but that a particular guarantee of fairness be provided – to wit, that the accused be defended by the counsel he believes to be best." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006).  Erroneous denial of the right to counsel of choice is structural error and requires automatic reversal, even in the absence of any prejudice.  *Id.* at 148.  A defendant in a criminal case is entitled to use "untainted" assets for his defense.  *See Luis v. United States*, 136 S. Ct. 1083 (2016).  Given the First Amendment principles discussed above, the government cannot presume that proceeds from publishing are unlawful or "tainted," and a probable cause finding is insufficient to satisfy the government's burden of proof.  *See id.* at 1088 ("the pretrial restraint of legitimate untainted assets needed to retain counsel of choice violates the Sixth Amendment").  Thus, the government's efforts to seize attorney retainer accounts cannot stand under the Sixth Amendment, because funds earmarked for legal defense are untainted and available in this context until the government *proves* otherwise.  *See also Luis*, 136 S. Ct. at 1093 (that funds may be found forfeitable to the government at some point does not outweigh a defendant's constitutional right to use assets to which he is entitled to fund counsel of choice).

In short, the government has consciously worked to improperly deprive Defendants of assets and fees made available to them to defend this case.  Such actions are improper.  *See United States v. Stein,* 435 F. Supp. 2d 330, 372 (S.D.N.Y. 2006) (dismissing indictment where government sought to influence a company to preclude payment of employees' counsel fees fees), *aff'd*, 541 F.3d 130 (2d Cir. 2008); Motion to Dismiss (Doc. 456) (government's interference with payment of counsel warrants dismissal of the case).

V.    OUTSTANDING MOTIONS

The following motions are briefed and awaiting a ruling from the Court (or hearing date):

1. Motion for Further Clarification Re Order Allowing the Government to Continue Review of Privileged Communications (Doc. 452, filed Feb. 5, 2019; Government Opposition at Doc. 462; Reply ISO at Docs. 478-1 & 479-1)

2. Motion for Designation of 39 Documents Subject to This Court's Destruction Order to be Preserved (Doc. 453, filed Feb. 6, 2019; Government Opposition at Doc. 466; Reply ISO at Doc. 468)

3. Motion to Dismiss due to Government Interference with Right to Counsel and Request for Disclosure or, in the alternative, Motion to Withdraw (Doc. 456, filed Feb. 11, 2019; Joinders at Docs. 463, 4654, 465, 467; Government Opposition at Doc. 476; Reply ISO at Doc. 507)

4. Opposition to Government Motion to Defer Disclosure of Ferrer *Jencks* Statements (Doc. 471) and Objection to In Camera Filing of the Same, and Request for Disclosure of the Same (Doc. 477, filed Feb. 27, 2019)

5. Motion for Extension of Time to Comply with Initial Expert Notice Disclosure Deadline (Doc. 498, filed March 12, 2019)

6. Motion for Hearing on Motion to Dismiss due to Government Interference with Right to Counsel and Request for Disclosure or, in the alternative, Motion to Withdraw (Doc. 501, filed March 15, 2019)

7. Mr. Lacey's Motion to Modify Conditions of Release (Doc. 503, filed March 19, 2019; Government Opposition at Doc. 516; Reply ISO at Doc. 522) (hearing on this Motion is scheduled for April 23, 2019, *see* Doc. 526)

VI.   <u>ADDITIONAL MOTION PRACTICE</u>

Defendants anticipate significant additional motions before trial, including but not limited to motions: for discovery violations, to dismiss (on different grounds than the current pending Motion to Dismiss, Doc. 456), for bill of particulars, for suppression of evidence, and for spoliation of evidence.  Defendants' motion practice has been delayed and impacted by the inability to adequately review discovery, and the need to address significant side issues, like the government's improper pre-trial seizures depriving them of assets and designated attorney's fees.

VII.   <u>CONCLUSION</u>

At the upcoming status hearing, Defendants respectfully request that this Court: address the government's delinquent discovery compliance; order the government to meet its obligations in a timely manner; order the government to produce the outstanding 106 servers in a timely manner; and hear argument and/or rule on the outstanding motions.  Given the severely incomplete state of discovery, Defendants request that the Court issue a new scheduling order and revisit the viability of the upcoming deadlines and jury trial date.  Finally, Defendants request that the Court set another status hearing approximately four months from now when the pending related litigation in the Ninth Circuit Court of Appeals and the Central District of California may be decided.

Respectfully submitted,

Dated: April 17, 2019

BIENERT, MILLER & KATZMAN, PLC
s/ Thomas H. Bienert, Jr.
Thomas H. Bienert
Whitney Z. Bernstein
Attorneys for James Larkin

LIPSITZ GREEN SCIME CAMBRIA LLP
s/ Paul J. Cambria, Jr.
Paul J. Cambria, Jr.
Erin McCampbell
Attorneys for Michael Lacey

DAVIS WRIGHT TREMAINE LLP
s/ James C. Grant
James C. Grant
Robert Corn-Revere
Attorneys for James Larkin and Michael Lacey

BIRD MARELLA BOXER WOLPERT NESSIM
DROOKS LINCENBERG AND RHOW
s/ Gary S. Lincenberg
Gary S. Lincenberg
Ariel A. Neuman
Attorneys for John Brunst

FEDER LAW OFFICE, P.A.
s/ Bruce Feder
Bruce Feder
Attorneys for Scott Spear

DEFENDANTS' JOINT STATUS REPORT FOR APRIL 23, 2019 STATUS HEARING

**CERTIFICATE OF SERVICE**

I certify that on this 17th day of April 2019, I electronically transmitted a PDF version of this document to the Clerk of the Court, using the CM/ECF System, for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants listed below.

*/s/ Garrison M. Giali*
Garrison M. Giali

Anne Michelle Chapman, anne@mscclaw.com

Erin E. McCampbell, emccampbell@lglaw.com

Anthony R. Bisconti, tbisconti@bmkattorneys.com

Ariel A. Neuman, aan@birdmarella.com

Bruce S. Feder, bf@federlawpa.com

James C. Grant, jimgrant@dwt.com

Lee David Stein, lee@mscclaw.com

Paul J. Cambria, pcambria@lglaw.com

Robert Corn-Revere, bobcornever@dwt.com

Ronald Gary London, ronnielondon@dwt.com

Janey Henze Cook, janey@henzecookmurphy.com

John Lewis Littrell, jlittrell@bmkattorneys.com

Seetha Ramachandran, Seetha.Ramachandran@srz.com

Thomas H. Bienert, Jr. tbienert@bmkattorneys.com

Whitney Z. Bernstein, wbernstein@bmkattorneys.com

Gary S. Lincenberg, glincenberg@birdmarella.com

Gopi K. Panchapakesan, gpanchapakesan@birdmarella.com

Michael D. Kimerer, mdk@kimerer.com

Rhonda Elaine Neff, rneff@kimerer.com

Michael L. Piccarreta, mlp@pd-law.com

Stephen M. Weiss, sweiss@karpweiss.com

John Jacob Kucera, john.kucera@usdoj.gov

Kevin M. Rapp, Kevin.Rapp@usdoj.com

Margaret Wu Perlmeter, Margaret.perlmeter@usdoj.gov

Reginald E. Jones, reginald.jones4@usdoj.gov

Peter Shawn Kozinets, Peter.Kozinets@usdoj.gov

Andrew C. Stone, andrew.stone@usdoj.gov