Jessica Ring Amunson (*pro hac vice*)
Tassity Johnson (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
1099 New York Avenue NW Ste 900
Washington, DC 20001
jamunson@jenner.com
tjohnson@jenner.com
*Attorneys for the DKT Liberty Project,
Cato Institute, and Reason Foundation*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America,<br><br>                                Plaintiff,<br><br>v.<br><br>Michael Lacey, *et al.*,<br><br>                                Defendants. | No.  CR-18-422-PHX-SRB<br><br>**BRIEF OF *AMICI CURIAE* THE DKT LIBERTY PROJECT, CATO INSTITUTE, AND REASON FOUNDATION IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT** |

The DKT Liberty Project, Cato Institute, and Reason Foundation, by and through counsel, submit this Brief as *Amici Curiae* in support of the Defendants' Motion to Dismiss the Indictment. *Amici* are nonprofit organizations dedicated to protecting individual liberties, and especially those liberties guaranteed by the Constitution of the United States, against all forms of government interference. *Amici* have a particular interest in this case because the government's indictment threatens to silence Defendants for offering a forum for protected sexually oriented speech, by simply assuming, without establishing, that the First Amendment does not protect the speech on Backpage.com. The government's prosecution of Defendants as publishers of third-party speech poses a grave threat to individual liberty and the rights guaranteed by the First Amendment. *Amici* submit that their expressed views may assist the Court in its task of deciding Defendants' Motion to Dismiss the Indictment.

## I. INTRODUCTION

This case presents questions of critical importance under the First Amendment that are of great concern to *Amici*. The Supreme Court has held that the Constitution presumptively protects *all* speech from government infringement. The burden for rebutting that presumptive protection rests with the government. It is a heavy burden, as it must be to safeguard the protections of the First Amendment. As a consequence, the government may not prosecute a speaker for his or her speech unless and until the government establishes that the speech is *not* protected. To ensure a robust, thriving marketplace of ideas, this presumption must reach even unpopular speech, such as the sexually oriented speech featured in advertisements on Backpage.com. The indictment, however, turns this basic presumption on its head by simply *assuming* the illegality of the speech on Backpage.com solely because it looks like speech that might concern illegal conduct.

*Amici* write to amplify the danger that the government's inversion of the constitutional presumption protecting speech poses to free expression. The government has indicted Defendants, exposing them to costly prosecution and potential prison sentences and fines, on nothing more than the government's spurious assumption that third-party speech on Backpage.com that *resembled* unlawful speech *was* unlawful speech. The government, moreover, has charged Defendants with criminal liability for speech engaged in by third-party advertisers on Backpage.com without alleging that Defendants had anything more than general knowledge of the alleged unlawfulness of such speech. Absent a meaningful judicial check on the government here, nothing can stop it from prosecuting other speakers by shifting its burden to rebut the First Amendment's presumptive protection of speech to the speakers themselves, or from prosecuting publishers for their generic knowledge of third-party misconduct. Though the government will certainly argue that it has met its minimal standards for pleading an indictment, judicial vigilance should be at its height when the First Amendment is at stake. Perhaps no act of government is more inimical to free and open expression than

prosecution—and thus the possible loss of liberty and property—for simply offering a forum for speech.

Unfortunately, the government's conduct here is not new. The history of government efforts to suppress and censor disfavored speakers, particularly speakers who offer sexually oriented expressive materials, is long. Along with overseeing censorship boards and organizing adult bookstore raids, the government has previously mounted a multistate prosecutorial campaign designed to intimidate the adult entertainment industry—including the founder of one of the *Amici*—into silence. *See United States v. PHE, Inc.*, 965 F.2d 848 (10th Cir. 1992). Throughout this history, however, the government's efforts to silence these speakers largely have been thwarted by the Supreme Court's clear instruction on the breadth of the First Amendment and the limits of government censorship over protected speech. This Court should follow the Supreme Court's instruction and dismiss the indictment as an unconstitutional intrusion on Defendants' First Amendment rights.

## II. THE FIRST AMENDMENT PRESUMPTIVELY PROTECTS THE SPEECH AT ISSUE.

As detailed by Defendants, the indictment's many allegations all rest on the same erroneous assumption: that advertisements that include sexually oriented depictions and descriptions are advertisements for illegal sexual activity. *See* Defs.' Mot. to Dismiss Indictment at 16-17 & n.16, *United States v. Lacey*, No. CR-18-422-PHX-SMB (D. Ariz. Apr. 22, 2019), ECF No. 539 (noting the government's characterization of Backpage.com adult section advertisements as "obviously for" and "indicative of" illegal prostitution without any showing that the advertisements actually are for illegal prostitution). By equating "adult" services with prostitution, the indictment presumes that advertisements in the adult or escort categories on Backpage.com are illegal and unprotected by the First Amendment simply because they *look like* advertisements for illegal prostitution. That presumption is exactly backwards. Backpage.com's advertisements, and the website more generally, are plainly speech. *See Backpage.com, LLC v. Dart*, 807 F.3d 229, 230-31, 234

3

(7th Cir. 2015), *cert. denied*, 137 S. Ct. 46 (2016) (holding that Backpage.com was "an avenue of expression of ideas and opinions" protected by the First Amendment, including its "classified ads for 'adult' services."). Accordingly, the government's prosecution of Defendants, based on their publication of third-party advertisements on Backpage.com, is presumptively unconstitutional. The First Amendment protects all speech from content-based government proscription—even speech that *looks like* it *might* be unprotected—unless and until the government proves that the speech *actually* is unprotected, or that the proscription can survive strict scrutiny. *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002) ("The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse."); *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 816-17 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) ("The First Amendment presumptively places [content-based burdens on speech] beyond the power of the government.").

The First Amendment presumptively shields popular and unpopular speech alike from government censorship. "The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it." *United States v. Stevens*, 559 U.S. 460, 470 (2010); *see also, e.g.*, *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017) ("[T]he Government's disapproval of a subset of messages it finds offensive . . . is the essence of viewpoint discrimination."); *Ashcroft*, 535 U.S. at 245 ("It is . . . well established that speech may not be prohibited because it concerns subjects offending our sensibilities."); *Playboy Entm't Grp.*, 529 U.S. at 813 ("Where the designed benefit of a content-based speech restriction is to shield the

sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists. We are expected to protect our own sensibilities simply by averting our eyes." (internal quotation marks and alterations omitted)); *id.* at 826 ("The history of the law of free expression is one of vindication in cases involving speech that many citizens may find shabby, offensive, or even ugly."); *see also Perez v. Ledesma*, 401 U.S. 82, 117 n.10 (1971) (Brennan, J., concurring and dissenting in part) ("The deterrence emanating from the existence of a [criminal] statute purporting to prohibit constitutionally protected expression is itself plainly inconsistent with the First Amendment . . . which was intended to protect vigorous, robust, and unpopular speech without a threat of punishment under state law." (internal citations omitted)).

The First Amendment's presumptive protection of unpopular speech applies with full force to sexually oriented expression. *See Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) ("Sexual expression which is indecent but not obscene is protected by the First Amendment."); *see also Playboy Entm't Grp.*, 529 U.S. at 816-17 (applying presumption to regulation targeting sexually oriented television channels).  As the Court observed in construing a statute that prohibited traffic of "visual depiction[s]" of minors engaged in sexually explicit conduct, "[p]ersons do not harbor settled expectations that the contents of magazines and film are generally subject to stringent public regulation. In fact, First Amendment constraints presuppose the opposite view." *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 65-66, 71-72 (1994). This presumption also applies to the Internet, and applies to protect even sexually oriented expression that *looks like* it *might* be tied to illegal conduct. The "prospect of crime" arising from sexually oriented speech, or the "mere tendency" of such speech "to encourage unlawful acts," cannot "justify laws suppressing protected speech." *Ashcroft*, 535 U.S. at 245, 253.  Nor can the government prohibit sexually oriented speech simply "because it increases the chance an unlawful act will be committed at some indefinite future time." *Id.* at 253 (internal quotation marks omitted). Because sexually oriented speech is presumptively protected,

it can be restricted only if the government first establishes that the speech falls within the narrowly and carefully circumscribed categories of unprotected speech, or that the restriction is narrowly tailored to promote a compelling state interest. *Sable*, 492 U.S. at 126; *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963) ("[R]egulation by the States of obscenity [must] conform to procedures that will ensure against the curtailment of constitutionally protected expression, which is often separated from obscenity only by a dim and uncertain line.").

The government must overcome this heavy burden before it may regulate sexually oriented speech because there is no margin for error in such regulation, especially when, as here, the speakers are at peril of losing their liberty and property for exercising their right to publish constitutionally protected expression. *See Ashcroft*, 535 U.S. at 244 ("[A] law imposing criminal penalties on protected speech is a stark example of speech suppression."). The line between sexually oriented speech that is legal and "unconditionally guaranteed," and sexually oriented speech that "may legitimately be regulated, suppressed, or punished," must be "finely drawn" because "[e]rror in marking that line exacts an extraordinary cost." *Playboy Entm't Grp.*, 529 U.S. at 817 (internal quotation marks omitted). That cost is the "abridgment of the right of the public in a free society to unobstructed circulation" of constitutionally protected expression. *A Quantity of Copies of Books v. Kansas*, 378 U.S. 205, 213 (1964). The Supreme Court has drawn such fine lines to cordon unprotected from protected sexually oriented speech because the unpopularity of the latter can make it especially vulnerable to unconstitutional government encroachment, pursued under the misguided aegis of moral authority. The Constitution, however, "no more enforces a relativistic philosophy or moral nihilism than it does any other point of view. The Constitution exists precisely so that opinions and judgments, including esthetic and moral judgments about art and literature, can be formed, tested, and expressed. What the Constitution says is that these judgments are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority." *Playboy Entm't Grp.*, 529 U.S. at 818.

### III. THE FIRST AMENDMENT DEMANDS THAT THE GOVERNMENT PROVE DEFENDANTS' KNOWING PUBLICATION OF SPECIFIC UNPROTECTED SPEECH.

As established above, "sensitive tools," *Bantam Books*, 372 U.S. at 66 (quotation marks and alteration omitted), must be used to separate legitimate sexually oriented speech—which must be protected from all but the most compelling and narrowly tailored restrictions—from illegitimate sexually oriented speech that may be outlawed without threat to free expression. "[T]o avoid the hazard of self-censorship of constitutionally protected material" posed by criminal statutes that target unprotected speech, *Mishkin v. State of New York*, 383 U.S. 502, 511 (1966), the Supreme Court has recognized scienter as one such "sensitive tool." In *Smith v. California*, 361 U.S. 147 (1959), the Court considered a local ordinance that made it unlawful "for any person to have in his possession any obscene or indecent writing or book" in any bookstore, but did not require that a bookseller have any knowledge of the obscene or indecent contents of the writing or book. *Id.* at 148-49 (quotation marks and alterations omitted). The ordinance, the Court observed, imposed strict liability on booksellers for having obscene books on their shelves; thus, a bookseller with no knowledge of a given book's obscene or indecent contents could still be ensnared by the ordinance and subject to penalty. *Id.* at 150.

The Court held that the Constitution could not tolerate strict liability in an ordinance regulating speech, because the ordinance had "the collateral effect of inhibiting the freedom of expression, by making the individual the more reluctant to exercise it." *Id.* at 150-51. The Constitution's guarantees of free speech placed the ordinance in a category apart from strict liability criminal statutes for food and drug regulations; unlike food or drug distributors, booksellers possessed a constitutional right to distribute their wares without regulation. *Id.* at 152-53. The booksellers' exercise of that right redounded to the benefit of the public more broadly by affording the public access to all constitutionally protected materials. *Id.* at 153. The absence of scienter in the ordinance, however, incented booksellers to sell only those books they had personally inspected,

7

severely attenuating the ability of booksellers and their patrons to engage in the marketplace of ideas. *Id.* "The bookseller's self-censorship, compelled by the State," the Court wrote, "would be a censorship affecting the whole public," reaching books both protected and unprotected. *Id.* at 154. The State could not indirectly erode the public's right to free expression—by coercing booksellers to act as censor boards, scrutinizing every book in their shops for obscenity, or risk criminal penalty—any more than it could directly. *Id.*; *see also United Mine Workers of Am. v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967) ("The First Amendment would . . . be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed that prohibits free speech . . . ."). The ordinance, then, could only constitutionally apply to those booksellers who sold obscene books with full knowledge of their obscenity. The possibility that booksellers might "falsely disclaim knowledge" or "falsely deny reason to suspect" the obscenity of books in their possession as a defense did not persuade the Court to dispense with the requirement for scienter in the ordinance, given how grave and insidious a threat the ordinance without scienter posed to a freethinking society. *Smith*, 361 U.S. at 154.

Over thirty years after *Smith*, to guard against government infringement of constitutionally protected speech, the Court again affirmed that scienter is a necessary element in criminal statutes that prohibit sexually oriented speech. In *X-Citement Video*, the Court construed a statute that prohibited interstate transportation, shipping, receipt, distribution, and reproduction of visual depictions of minors engaged in sexually explicit conduct. 513 U.S. at 65-66. The statute, as written, required that an offender knowingly traffic in those visual depictions. *Id.* at 68. But the "most natural grammatical reading" of the statute, and the one adopted by the Ninth Circuit, did not require that the offender know the age of the minors depicted, or the sexually explicit nature of the depictions. *Id.* at 68-69. Despite the consistency of this construction with the statute's plain language, the Court declined to affirm it "because of the respective presumptions that some form of

scienter is to be implied in a criminal statute even if not expressed, and that a statute is to be construed where fairly possible so as to avoid substantial constitutional questions." *Id.*

Absent a scienter requirement for the age-of-minority and sexually-explicit-conduct elements, the Court found, the statute produced "absurd" results by sweeping within its ambit "actors who had no idea that they were even dealing with sexually explicit material." *Id.* at 69. Such results could not be reconciled with the Court's practice of reading "broadly applicable scienter requirements" into statutes silent on scienter, the harsh penalties of prison time and substantial fines for violating the statute, or the First Amendment's presumption that expressive material—including the visual depictions at issue in the statute—would not be subject to "stringent public regulation." *Id.* at 70-72. A scienter requirement, moreover, had to apply to the age-of-minority element because the "age of the performers" depicted was the "crucial element separating" sexually explicit expression protected by the First Amendment from "wrongful conduct." *Id.* at 72-73. A statute "completely bereft of a scienter requirement" on the age of the performers would thus have "raise[d] serious constitutional doubts." *Id.* at 78.

Like the statute in *X-Citement Video*, the instant indictment—which alleges only Defendants' general awareness that allegedly illegal activity was being advertised on Backpage.com—raises "serious constitutional doubts." *Id.* But unlike the statute there, the indictment cannot be read to avoid such unconstitutionality.[1] Under the government's theory of the case set forth in the indictment, the only distinction between protected sexually oriented speech and the unlawful speech Defendants are alleged to have promoted is Defendants' purported ambient awareness of the speech's general unlawfulness. *See* Defs.' Mot. to Dismiss Indictment at 31-34. And Defendants' purported ambient awareness is almost entirely based on claims that other people said the advertisements were illegal, ranging from State Attorneys General, the Senate Permanent

---

[1] For all of the reasons explained by Defendants, the Indictment fails not only as a constitutional matter but also as a statutory matter, because it fails to allege the requisite specific intent required for a prosecution under the Travel Act or the federal money laundering statute. *See* Defs.' Mot. to Dismiss Indictment at 26-37.

9

Select Committee on Intelligence, Sheriff Dart (and others like him), and CNN. The government seems to believe that if everyone says you are publishing unprotected speech, then you must "know" it and therefore must lose your constitutional protections. But the scienter demanded by the Constitution for speech-related prosecutions is specific knowledge and intent. *Id.* at 13. The indictment does not allege that Defendants were *specifically* aware that any of the advertisements on Backpage.com were illegal, or that Defendants *intended* to further any illegality—only that third parties posting on Backpage.com may have intended to promote illegal activity through their advertisements. Because the Constitution does not demand "omniscience" from Defendants of the content or intention of third-party speakers posting on Backpage.com, *Smith*, 361 U.S. at 153, the government may not impose criminal liability on Defendants for their general knowledge of third-party speaker misconduct. The indictment, then, cannot stand.

### IV. THE GOVERNMENT HAS ABANDONED THE PRESUMPTION OF CONSTITUTIONALITY AND THE REQUISITE SCIENTER HERE TO SILENCE UNPOPULAR SEXUALLY ORIENTED SPEECH.

This case is simply the latest chapter in a long history of government attempts to suppress and censor disfavored speakers, especially those disfavored for offering sexually oriented expressive materials. For decades, the government has been trying to silence these disfavored speakers by abusing its prosecutorial powers to drive the speakers out of "polite" society. However, the Supreme Court has long recognized that such attempts are invidious to the First Amendment and has erected extensive bulwarks to protect against them. *See, e.g.*, *Ashcroft*, 535 U.S. at 250 (finding law criminally prohibiting non-obscene sexually explicit images that appear to depict minors but were produced without using real children unconstitutional); *Playboy Entm't Grp.*, 529 U.S. at 812-14 (finding blanket law requiring cable television operators to block signals for channels dedicated to non-obscene sexually oriented programming during set time periods unconstitutional); *Reno v. ACLU*, 521 U.S. 844, 870-79 (1997) (finding law criminally prohibiting transmission

of non-obscene "indecent" communications to persons under age 18 unconstitutional); *X-Citement Video*, 513 U.S. at 70-73, 78 (requiring scienter in law criminally prohibiting traffic in sexually explicit depictions of children); *Sable Communications*, 492 U.S. at 126-28 (finding statute imposing blanket ban on "indecent" but non-obscene "dial-a-porn" telephone messages unconstitutional); *Smith*, 361 U.S. at 152-54 (requiring scienter in law criminally prohibiting possession of obscene books).[2]

Despite the Supreme Court's clear instruction on the breadth of sexually oriented speech protected by the First Amendment, the government's overzealous and overbroad efforts to prosecute those who offer a forum for protected sexually oriented speech continues. In recent years, the campaign against Backpage.com and its publishers—and particularly the government's decision to indict Defendants for offering a forum for protected speech without even attempting to show that Defendants specifically and intentionally published unprotected speech—is reminiscent of the government's "Project PostPorn" campaign in the 1980s targeting *Amicus* The DKT Liberty Project's founder, among others. As detailed in *United States v. PHE*, the government in the 1980s undertook a "coordinated, nationwide prosecution strategy against companies that sold obscene materials" aimed at driving the adult entertainment industry to extinction by undermining its profitability. 965 F.2d at 850. In executing this "strategy," prosecutors

---

[2] *See also Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 63, 65-66 (1989) (finding seizure of thousands of adult bookstores' "presumptively protected books and films," without adversarial hearing, unconstitutional); *Lee Art Theatre, Inc. v. Virginia*, 392 U.S. 636, 636-67 (1968) (finding seizure of films for alleged obscenity, without adversarial hearing, unconstitutional); *Dombrowski v. Pfister*, 380 U.S. 479, 493-94 (1975) (finding law permitting criminal prosecution for "subversive activities" chilling of protected speech and unconstitutionally overbroad); *A Quantity of Copies of Books*, 378 U.S. at 207, 210-11 (finding seizure of thousands of novels for burning or other destruction due to alleged obscenity, without adversarial hearing, unconstitutional); *Bantam Books*, 372 U.S. at 61-63, 64, 70-71 (finding obscenity commission's practice of notifying book distributors of "objectionable" material within their books, alluding to prosecution in their notice, and circulating lists of "objectionable" publications to local police departments, unconstitutional); *Marcus v. Search Warrant*, 367 U.S. 717, 723, 731-33 (1961) (finding seizure of tens of thousands of copies of publications for destruction due to alleged obscenity, without adversarial hearing, unconstitutional).

attempted to extort plea agreements from defendants by threatening them with "multiple prosecutions" if they did not cease distribution "of all sexually oriented materials, not simply those that were obscene"—prosecutions that would bankrupt the defendants. *Id.* at 851. The prosecutors made these threats with full knowledge that, if the defendants took the plea, they would be required to "stop sending material that was protected by the First Amendment." *Id.* Defendants did not take the plea; as a consequence, they were subjected to costly prosecutions, "intrusive and intimidating" investigations, and "harass[ing]" subpoenas—all in an effort to stop defendants from distributing materials that the government knew were, in part, constitutionally protected. *Id.* at 851-52 (quotation marks omitted). Following the Supreme Court's instruction that "[t]he First Amendment bars a criminal prosecution where the proceeding is motivated by the improper purpose of interfering with the defendant's constitutionally protected speech," a federal appellate court halted the government's many abuses of prosecutorial power by ordering remand. *Id*. at 849, 860-61.

The campaign against Defendants for their publication of Backpage.com is quite similar. Backpage.com has been repeatedly subjected to prosecutorial attempts to impose criminal liability for what courts have repeatedly recognized is constitutionally protected expression. *See* Defs.' Mot. to Dismiss Indictment at 4-8, 17-18. The government's attempt here to prosecute Defendants for publishing Backpage.com, by pursing a theory of criminal liability that defies constitutional limits on its prosecutorial powers, is simply one more attempt to erode the First Amendment's carefully erected bulwarks around free expression. *See Bantam Books*, 372 U.S. at 66-67. This Court should not countenance this attempt.

## V.   CONCLUSION

For the forgoing reasons, *Amici* respectfully request that this Court grant Defendants' Motion to Dismiss the Indictment.

DATED this 28th day of May, 2019.

JENNER & BLOCK LLP

By:/s/ Jessica Ring Amunson
Jessica Ring Amunson (*pro hac vice*)
　*Counsel of Record*
Tassity Johnson (*pro hac vice* forthcoming)
1099 New York Ave., NW, Suite 900
Washington, DC  20001

*Attorneys for The DKT Liberty Project, Cato Institute, and Reason Foundation*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

s/ Jessica Ring Amunson