# Exhibit B



May 23, 2019

**Via E-Mail**

Reginald E. Jones
Assistant U.S. Attorney
E-Mail:  reginald.jones4@usdoj.gov

Kevin Rapp
Assistant U.S. Attorney
E-Mail:  kevin.rapp@usdoj.gov

    Re:    ***United States v. Lacey, et al.*, No. 18-CR-00422-PHX-SMB**

Dear Counsel:

In the April 23, 2019 status conference, you represented that the government will provide data from the Backpage.com servers and systems upon Defendants' request regarding what they need.  *See* 4/23/19 Hearing Transcript at 24 ("Your Honor, but we went a step further. We said, hey, can you articulate to us what else on these servers that you would like extracted and we can look for it and provide it to you."); *see id.* at 25 ("We've asked them repeatedly, hey, is there anything that we haven't provided[?]"); *see also* 5/10/19 Letter from R. Jones at 2 ("What the government has repeatedly asked Defendants … is to provide it specific server data … that you believe is material to your defense.").

We appreciate the government's position, as Defendants need to obtain specific materials the government believes supports its charges as well as exculpatory information in the government's possession.  This is particularly important here, because the government alone has the information technology ("I.T.") systems, servers, and databases that ran the Backpage.com website.  The government's case ultimately must be premised on actual ads and data, not generalized characterizations or selected out-of-context quotes from emails.  At the same time, Defendants are entitled to obtain and present evidence about what Backpage.com actually did regarding publication, blocking, editing, or other moderation of third-party ads, and who was involved (and not involved) in these activities.  Indeed, we believe the evidence of Backpage.com's *actual practices* – in screening and blocking ads, in cooperating with law enforcement, and in other respects – is exculpatory information the government is required to produce under *Brady v. Maryland*, 373 U.S. 83 (1963).

What Defendants most need is access to the Backpage.com I.T. systems, servers, and databases, functioning as they existed at the time of the government's seizures.  As you know, the Backpage.com systems contained and connected a number of different servers



May 23, 2019
Page 2

and databases, which, along with operating and administrative software, enabled the functionality and user-interface of the website and allowed for payment processing, moderation, administrative, and other tasks. The I.T. systems, servers, and databases, as they existed, enabled review, collection, and analyses of data in numerous ways and with relative ease. Obtaining access to the functioning version of the date-of-seizure Backpage.com website and systems is crucial, as Defendants need the ability to query the systems to search for information pertinent to their defense.

More generally, and in accordance with the government's commitment to extract and provide data from the Backpage.com servers and systems as articulated by Defendants, we provide the following list of data and information Defendants request and need. We think the importance of this information is apparent and disagree with the government's assertions that Defendants must prove materiality in order for the government to produce data and information it holds. *See, e.g.*, 4/23/19 Trans. at 25 (Mr. Jones asserting that Defendants should be required to show materiality).[1] Nonetheless, to avoid objections or further back-and-forth that would delay Defendants from obtaining the information they need, we have included brief explanations of some of the ways the requests are material to the defense of the charges the government has lodged.

Under Rule 16 of the Federal Rules of Criminal Procedure, the government must disclose any information that "is material to preparing the defense." The Ninth Circuit has continuously and repeatedly emphasized that "Rule 16 . . . grants defendants a broad right to discovery." *See United States v. Doe*, 705 F.3d 1134, 1150 (9th Cir. 2013); *United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010) (same). Information is material if it is relevant to a possible defense, *id.*, and includes both inculpatory and exculpatory information, *United States v. Muniz-Jaquez*, 718 F.3d 1180, 1183 (9th Cir. 2013) ("Information that is not exculpatory or impeaching may still be relevant to developing a possible defense."). Even information that merely "causes a defendant to completely abandon a planned defense and take an entirely different path" must be disclosed under Rule 16's broad discovery right. *United States v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013) (internal quotation marks omitted). As the Ninth Circuit held in *United States v. Soto-Zuniga*, "[t]he test is not whether the discovery is admissible at trial, but whether the discovery may assist [the defendant] in formulating a defense." 837 F.3d 992, 1003 (9th Cir. 2016). In *Soto-Zuniga*, the Ninth Circuit also reiterated that "it behooves the government to interpret the disclosure requirement broadly and turn over whatever evidence it has pertaining to the case." *Id.* (quoting *Hernandez-Meza*, 720 F.3d at 768) (internal quotations omitted).

---

[1] These requests are without prejudice and in addition to other requests Defendants have made for complete production of the Backpage servers, *Brady* and *Jencks* materials, and other information.



May 23, 2019
Page 3

Accordingly, and mindful of footnote 1, Defendants request and need:

**A. Backpage.com Website Generally**

1. Full read-only access to the Backpage.com I.T. systems, servers, and databases, as they existed and functioned on the date of the government's seizures, with accompanying software and interconnections to enable queries, searches, collection, and analyses of data.

    *Explanation*: As noted above, this is Defendants' highest priority in terms of data disclosures from the government.

2. Data reflecting, by month, the numbers of ads run on Backpage.com within each category of the website (*e.g.*, "buy/sell/trade," "jobs," "rentals," "adult," etc.) and for each subcategory within the "adult" category (*e.g.*, "escorts," "massage," "dating," etc.).[2]

3. Data reflecting total revenues, by month, for ads within each category and subcategory of the Backpage.com website.

    *Explanation*: Defendants seek this data to show that Backpage.com was a general purpose classified ad website, only a fraction of ads were posted in the adult categories, and the site earned many millions of dollars from non-adult ads.

4. All ads Backpage.com reported to the National Center for Missing and Exploited Children (NCMEC) or other law enforcement (along with all administrative data and information regarding such ads) and data reflecting the numbers of ads reported, by month.

    *Explanation*: The government has alleged that Backpage.com's referrals to NCMEC were "artificially limit[ed]" and not made in good faith. *See* Superseding Indictment (referred to herein as the "Indictment" and cited as "SI") ¶ 14. Defendants need to obtain all such referrals to demonstrate how extensive Backpage.com's efforts were. Defendants also believe the government is aware that NCMEC complained that Backpage.com was making too many

---

[2] All of the requests set forth in this letter encompass all data within Backpage.com's databases and systems as they existed at the time of the government's seizures and wherever located, including servers and systems hosted by Backpage.com affiliates or vendors, such as DesertNet (including data and communications from Mantis), Amazon Web Services, or others. They cover the whole of the period of time for which the government has asserted charges, 2004 - April 2018, and any and all such data within the Backpage.com databases and systems.



> referrals, and data of the numbers of referrals by month will show Backpage.com's response to NCMEC's request to limit referrals.

5. All documents and data reflecting Backpage.com's cooperation with law enforcement authorities in investigations or prosecutions, including (a) responses to subpoenas, warrants, and/or other government requests about ads or users; (b) communications relating to such responses; and (c) testimony or other evidence provided by Backpage.com personnel in criminal proceedings or trials.

*Explanation*: Defendants believe the government is aware that law enforcement authorities repeatedly commended Backpage.com for its cooperation and assistance in investigations and prosecutions and for blocking (or not blocking) ads and users at the request of authorities (including, *e.g.*, a May 2011 commendation by FBI Director Robert S. Mueller, and scores of other communications from DOJ thanking Backpage.com or its personnel for their support and assistance). Defendants seek this information, as well, to respond to the government's accusations that testimony of Backpage.com personnel supporting law enforcement allegedly reflected knowing participation in prostitution activities of users. *See* SI ¶¶ 71, 92.

6. All documents quoted or mentioned in the Indictment, identifying the paragraphs in the Indictment where each document is quoted or mentioned, and providing all other communications relating to each such document (*e.g.*, all emails in a chain).

*Explanation*: Defendants asked for this information in my April 25, 2019 letter, and the government responded by providing document Bates ranges of over 2,200 pages of materials without any indication of which paragraphs of the Indictment refer to which documents. *See* 5/10/19 Letter from R. Jones, at 1. As noted before, searching through thousands of pages of documents to attempt to line them up to the allegations in the Indictment is an arduous, burdensome, and time-consuming task that Defendants should not have to do, because it is information known to the government, which could be readily disclosed.

**B. Moderation**

7. Data reflecting the numbers of ads, by category and month, that Backpage.com blocked or prevented from running (whether before or after the ads went live on the website) and the reasons the ads were blocked or prevented from running.



8. Data reflecting the numbers of ads, by category and month, for which Backpage.com revised or edited any text in an ad, identifying the numbers of ads revised/edited by (a) automated filters and (b) human moderators.

9. Data reflecting the numbers of ads, by category and month, that Backpage.com edited to remove images, identifying the number of ads with images removed by (a) automated filters and (b) human moderators.

10. Data reflecting the numbers of ads, by category and month, that Backpage.com edited in a manner other than as set forth in categories 7 and 8 above (*e.g.*, to remove links to potential malware or spam), identifying the number of ads edited by (a) automated filters and (b) human moderators

*Explanation*: It is important to show Backpage.com's actual moderation practices to respond to and rebut mischaracterizations (*i.e.*, to show that Backpage actually blocked and removed tens of millions of ads; did not edit ads to promote any illegal conduct; enforced the website's terms of use; and undertook screening and removal practices customary among websites).

The government has alleged that Backpage.com routinely edited ads to remove terms so as to facilitate prostitution. *See* SI ¶¶ 11, 68. Defendants believe the data regarding Backpage.com's actual practices will reflect that this is patently false. For example, Defendants believe the data concerning Backpage.com's actual practices will reflect that the website blocked and removed approximately 1,000,000 ads per month in all categories for a variety of different reasons (*e.g.*, violations of the site's terms of use, offensive content, possible malware, spam, scams, etc.). Defendants also believe the government is aware that, to the extent ads on Backpage.com were "edited" to remove text, this occurred only for a brief period, ending many years before the indictment. Defendants also believe the data will show that such editing occurred almost entirely through use of automated filters – which are commonly used by websites – and, after automated filtering, Backpage had additional layers of review by human moderators to determine if ads should be blocked or removed altogether.

11. All ads the government alleges Backpage.com revised to "remov[e] particular terms that were indicative of prostitution," SI ¶ 68, including all administrative data and information regarding such ads, and identifying (a) the ads as they were submitted by users; (b) the ads as they ran on the website; (c) the specific edits made to the ads; (d) how and/or by whom each ad was edited; (e) all data about whether each ad was blocked or removed; and (f) the dates of the ads.



12. All iterations of lists of prohibited terms or phrases for ads on Backpage.com in a complete and searchable format (*i.e.*, spreadsheets as they existed on the systems and not merely images of spreadsheets) including the dates each list was in effect and how the list was applied to different categories on the website (*e.g.,* the differences in standards for ads posted by users in the dating subcategory as opposed to the escort subcategory).

*Explanation*: Defendants believe the government is aware that Backpage.com's policies and instructions to moderators – at all times – were to block and remove any ads that offered sex for money. It is unclear what the government may believe are terms "indicative of prostitution," as alleged in the Indictment. To be able to respond to the government's claim that Backpage.com allegedly edited ads to promote or facilitate specific instances of advertised prostitution, Defendants need to see all ads the government contends are evidence of such instances. In addition, Defendants seek evidence reflecting that Backpage.com's screening searched for more than 26,000 terms, phrases, URLs, and addresses and blocked over 1,000,000 user submissions per month as a result. *See Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 814 (M.D. Tenn. 2013).

13. All ads the government alleges Backpage.com edited to remove terms such as "Lolita," "New In Town," "young," "amber alert," "teen," "fresh," "tight," "high school," "rape," "teenage," "little girl,", "innocent," or "school girl" including all administrative data and information regarding such ads, and identifying (a) the ads as they were submitted by users; (b) the ads as they ran on the website; (c) the specific edits made to the ads; (d) how and/or by whom each ad was edited; (e) all data about whether each ad was blocked or removed; and (f) the dates of the ads.

*Explanation:* The government has alleged that Backpage.com omitted these terms from user-submitted ads to promote known instances of sex trafficking. *See, e.g.*, SI ¶¶ 13, 85, 95, 104, 116 *see also* 4/23/19 Hearing Transcript at 65 (AUSA Rapp stating, "They don't respond to our arguments about the moderation practices where they removed terms indicative of child sex trafficking, like Lolita, Amber Alert, Sweet Young Thing, New in Town, and then continue to post the ads. They don't respond to that."). Defendants are not aware of any instances when this occurred, and therefore need to obtain all ads the government contends were so edited, as well as all other information about such ads (*e.g.*, the context of the terms as used in given ads, whether the ads were blocked or removed entirely by human moderators, and whether the ads were reported to NCMEC or law enforcement authorities).



C. **"Aggregation"**

14. All ads that the government alleges concerned prostitution and were posted on Backpage.com through the process of "aggregation," *see* SI ¶¶ 35-44, including all administrative data and information regarding such ads, identifying (a) the websites on which the ads previously appeared; (b) the ads as they appeared on the other websites and on Backpage.com, respectively; (c) the categories/subcategories in which the ads ran on Backpage.com; and (d) the dates of the ads.

*Explanation*: Defendants believe the government is aware that Backpage.com employed "aggregation" efforts (*i.e.*, contacting individuals who had posted ads on other websites such as Craigslist.org to ask if they wanted to run the same ads on Backpage.com) in the adult categories in the United States only for a short time early in the website's history and ceased this marketing effort for the adult categories on its U.S. website many years ago. *See, e.g.*, SI ¶¶ 37-42 (alluding to emails about aggregation only in 2007-2008). Defendants further believe the ads posted to Backpage.com through these efforts were primarily located via Google searches.

15. Data reflecting the numbers of ads, by category and month, that Backpage.com posted through the process of "aggregation."

16. All data and documents reflecting that, in such aggregation efforts, "Backpage employees … identif[ied] prostitutes advertising," SI ¶ 36, and each ad posted on Backpage.com through "aggregation" that the government alleges was, on its face, an ad for prostitution.

*Explanation*: Defendants believe the government is aware that Backpage.com personnel solicited ads of many types, including for jobs, therapeutic massage, sporting goods, local places, and pet sales, as well as (for a period of time many years ago) escort ads. These efforts were similar to marketing done for newspaper classified advertising sales for many years. Defendants also believe the government is aware that Backpage.com's policies for these marketing efforts forbade soliciting any ads that appeared to be for illegal or improper services and that the actual ads posted will reflect that this policy was followed.

D. **"Reciprocal Link and Affiliate Programs"**

17. All banner ads or other ads run by Backpage.com on theeroticreview.com, and documents and data reflecting the dates of each such ad.



18. All banner ads or other ads run by theeroticreview.com on Backpage.com, and documents and data reflecting the dates of each such ad.

19. All contracts or agreements between Backpage.com and theeroticreview.com (whether directly or through affiliated entities) referring or relating to "a reciprocal link program" or a "business arrangement."  *See* SI ¶¶ 45, 46.

20. All documents reflecting that any Defendant had knowledge that theeroticreview.com was a notorious "prostitution website."  *See* SI ¶ 54.

*Explanation*:  The government alleges Backpage.com entered into a "business arrangement with [theeroticreview.com to] post reciprocal ads on each other's websites," SI ¶ 45, but has not identified or provided any documents reflecting what the supposed agreed arrangement was, or what ads actually appeared on the respective websites.  Defendants also believe the government is aware – and data from the website will reflect – that such arrangements for banner ads were discontinued many years ago.  *See, e.g.*, SI ¶¶ 48-52 (reflecting that alleged arrangements were in place in 2007-2008).  The government also has not provided any data or information for the period when the banner ads appeared reflecting that any Defendant had any knowledge that theeroticreview.com supposedly was a known "prostitution website."

21. All data and documents reflecting Backpage.com policies and practices to preclude or block references to theeroticreview.com in user-submitted ads, including all ads Backpage.com blocked or removed on this basis.

22. All ads posted on Backpage.com that contained references to theeroticreview.com and that the government contends related to unlawful prostitution, including all administrative data and information regarding such ads and identifying (a) the categories/subcategories in which the ads ran on Backpage.com; (b) the content on theeroticreview.com to which the ads referred; and (c) the dates of the ads.

*Explanation*:  The Indictment alludes generally to banner ads run by theeroticreview.com and Backpage.com in 2007-2008, but does not mention Backpage.com's policies and practices disallowing references to theeroticreview.com in user-submitted ads, which Defendants believe were imposed and in effect from 2011 onward.

23. All documents reflecting that the individual "known as 'Dollar Bill'" was "known to be involved in the prostitution industry," SI ¶ 59, and (a) who affiliated with



Backpage.com the government alleges knew of this (and when); (b) who had dealings with "Dollar Bill" (and when); and (c) whether any Defendant ever had any dealings or involvement with "Dollar Bill."

24. All ads posted on Backpage.com by "Dollar Bill," including all administrative data and information regarding such ads, and identifying (a) the categories/subcategories in which the ads ran on Backpage.com; and (b) the dates of the ads.

25. All ads posted on Backpage.com by "Dollar Bill" that Backpage.com blocked or removed, including all administrative data and information regarding such ads, and identifying (a) when and why the ads were blocked or removed; (b) whether and when they were restored or reposted; (c) who was responsible or involved in blocking, removing, restoring, or reposting the ads; and (d) whether each Defendant had any knowledge or awareness of or involvement with the ads.

*Explanation*: The Indictment alludes to "Dollar Bill," but offers no basis for asserting that he was "known to be involved in the prostitution industry," SI ¶ 59, much less any showing that any Defendant had any knowledge or awareness of this. *See* SI ¶¶ 59-67 (alleging that Ferrer had all contacts and dealings with "Dollar Bill"). In terms of fact allegations, the indictment only mentions that Backpage.com blocked or removed ads posted by "Dollar Bill," *see* SI ¶¶ 61, 64, 66, 67, not that Backpage.com knew of, promoted, or allowed any improper content. Defendants believe that data and documents concerning actual practices will reflect that "Dollar Bill" posted ads for massage businesses, and that Backpage.com enforced its terms of use and policies regarding ads posted by "Dollar Bill" as it did for other users.

### E. Ads That Are Alleged Predicates for Charges

26. All ads from Backpage.com's systems and databases that are or relate to the alleged "victims" identified in the Indictment, *see* SI ¶¶ 160-176, 201, including all ads submitted by, on behalf of, or for the individuals referenced in the ads (collectively, the "alleged victim ads").

*Explanation*: The government has asserted that it has produced the alleged victim ads from Backpage.com's databases and systems. *See* 4/23/19 Trans. at 23 ("we have also extracted, you know, all of the ads that were on Backpage.com and given them to the defendants"); *id.* at 24 (we [have] given them the ads that were referenced in our superseding indictment"). In fact, however, the ads produced by the government apparently come



from the Internet Archive Wayback Machine (https://archive.org), *see, e.g.*, DOJ-BP-0004719487, or are merely captures of the text from ads (but not the ads as they appeared on the website), *see, e.g.*, DOJ-BP-0004719353, or appear to be image copies of subpoena responses provided by Backpage.com, *see, e.g.*, DOJ-BP-0004719354-69. On March 15, 2019, the government provided a disk purportedly containing "sample ads," but which actually consisted of spreadsheets with some information about given ads (but not the text of the ads), and a separate collection of images from ads. This information is grossly incomplete and provided in a format that is all but useless. To be clear, Defendants seek the alleged victim ads and related ads as they appeared in Backpage.com's systems and databases when they were operational, along with all administrative data and information about the ads (discussed further below).

27. All ads posted using the same (a) email addresses; (b) IP addresses; (c) telephone numbers; (d) credit card numbers; (e) images; or (f) other identifying cross-references associated with the alleged victim ads (referred to here as "related ads").

*Explanation*: As Defendants believe the government is aware, Backpage.com routinely identified these categories of information from its systems and databases in response to law enforcement subpoenas (ordinarily responding in less than 24 hours), and used the information to block and remove ads as requested by law enforcement authorities (or to maintain ads on the website when requested by law enforcement). Defendants need to obtain this information about the alleged victim ads and related ads to address the government's accusations about the ads (*e.g.*, to show that the ads were not facially unlawful) and to show how Backpage.com actually dealt with the ads.

28. All administrative data and information regarding the alleged victim ads and related ads, including (a) credit card and/or other payment information; (b) editing or revision of ads by users; (c) editing or revision of ads by Backpage.com automated filters or moderators (and whether such revisions ever happened); (d) whether such ads were posted on Backpage.com through "aggregation" efforts; (e) all persons who reviewed, moderated, approved, revised or blocked such ads; (f) blocking or removal of any such ad by Backpage.com; (g) reporting of any such ad to NCMEC or law enforcement authorities; and (h) all cooperation of and information provided by Backpage.com to law enforcement or other authorities related to such ads and the individuals involved with the ads.



> *Explanation*: This too is information available in Backpage.com's systems and databases, which Backpage.com often collected and provided in response to requests from law enforcement authorities. To be clear, Defendants seek all data and information in Backpage.com's systems and databases including in the "object editor," "adref," and "cardref" portions of the systems (*i.e.*, reflecting all actions taken with regard to ads, payment information, and all other backend data collected and retained by Backpage.com about ads). Defendants strongly suspect that none of the alleged victim ads were edited by Backpage.com and none were posted through "aggregation" efforts. Defendants further believe Backpage.com cooperated with law enforcement with respect to some or many of the alleged victim ads and/or blocked or removed the ads or users. Defendants also seek information about review and moderation of the alleged victim ads and related ads to show that Defendants had no involvement.

29. For each ad on Backpage.com that the government alleges provides a basis for criminal charges against any Defendant, provide (a) all data and information regarding all persons who reviewed or moderated such ads, and any data or information reflecting whether any Defendant (b) saw the ad before publication; (c) approved the ad for publication; (c) edited or revised the ad before publication; or (d) saw the ad or had any knowledge of it before the government disclosed the original indictment on or about April 6, 2019.

> *Explanation*: Defendants believe the government is aware that Defendants had no knowledge or awareness of or involvement with any of any of the third-party ads on Backpage.com that the Indictment alleges as the bases for charges against Defendants. Administrative data about the ads from Backpage.com's systems and databases will reflect this.

\* \* \* \* \*

Given the case schedule as it stands, it is important for Defendants to obtain this data and information as soon as possible. We recognize that extracting and providing some of the categories of data may take more time than others, and we are willing to discuss prioritizing the list. Also, if the government can provide prompt access to a functioning version of the Backpage.com systems and databases, we may be able to limit certain of categories of data to be extracted. In all events, however, we need to move forward to obtain the actual data and information about the Backpage.com website and its operations, and we therefore ask for a response to these requests by May 24, 2019.



May 23, 2019
Page 12

Very truly yours,

**BIENERT KATZMAN, PC**

*Whitney Bernstein*

Whitney Z. Bernstein
Thomas H. Bienert, Jr.

# Whitney Bernstein

| | |
|---|---|
| **From:** | Whitney Bernstein |
| **Sent:** | Thursday, May 23, 2019 9:32 PM |
| **To:** | Rapp, Kevin (USAAZ); Jones, Reginald (CRM) |
| **Cc:** | Tom Bienert; Toni Thomas |
| **Subject:** | RE: 18cr0422-PHX-SMB Letter re Disclosure of Data |

Hi – We request the information by May 31, 2019, not by tomorrow. Apologies for that typo and thank you again for your prompt attention to this matter.

Thank you,

Whitney

**Whitney Z. Bernstein** | Attorney
Bienert | Katzman PC
Tel.: (949) 369-3700
www.bienertkatzman.com

---

**From:** Whitney Bernstein
**Sent:** Thursday, May 23, 2019 7:23 PM
**To:** Rapp, Kevin (USAAZ) <Kevin.Rapp@usdoj.gov>; Jones, Reginald (CRM) <Reginald.Jones4@usdoj.gov>
**Cc:** Tom Bienert <tbienert@bienertkatzman.com>; Toni Thomas <tthomas@bienertkatzman.com>
**Subject:** 18cr0422-PHX-SMB Letter re Disclosure of Data

Hi Kevin and Reggie,

Please see attached.

Best,

Whitney

**Whitney Z. Bernstein**
**Attorney**

Bienert | Katzman PC
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Main (949) 369-3700
Website: www.bienertkatzman.com

*Please note my new email address: **wbernstein@bienertkatzman.com**



1

The foregoing message is confidential and intended for the designated recipient only.  The foregoing information may be protected by attorney-client and/or work product privileges.  Accordingly, if you have received this message in error, please contact BIENERT | KATZMAN PC at (949) 369-3700 immediately, and delete the message without reviewing, copying, or making further use of the information contained herein.