MICHAEL BAILEY
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>     v.<br><br>Michael Lacey, et al.,<br><br>                    Defendants. | CR-18-422-PHX-SMB<br><br>**UNITED STATES' RESPONSE TO MOTION TO COMPEL DISCOVERY [CR 643]**<br><br>**Oral Argument:**<br>**Sept. 13, 2019, 11:00 a.m.** |

## INTRODUCTION

In the nearly 16 months since indictment, the government has taken numerous steps to provide Defendants with early and broad Rule 16 discovery, including the production of more than 7.8 million documents in searchable electronic format. To facilitate Defendants' review of this evidence, the government has: (1) provided indices with descriptions

identifying the sources of produced items and Bates number references to allow Defendants to focus their review; (2) disclosed a subset of "hot" documents that support the allegations in the indictment; (3) disclosed subsets of "hot" documents to various defense counsel regarding the allegations contained in the indictment against their respective clients; (4) produced ads concerning victims in the indictment; (5) made available a Department of Justice (DOJ) discovery specialist to assist with technical questions; (6) provided a preliminary witness and exhibit list more than 13 months prior to trial; (7) disclosed a large portion of *Jencks* statements more than a year before trial; and (8) offered to meet with counsel for a number of Defendants to discuss the government's theory of the case, key evidence, and the allegations against Defendants in great detail.

The government has also exceeded its Rule 16 discovery obligations in its handling of any potentially material Backpage.com server data in its possession. Although Defendants—who owned and operated Backpage for most of its 14-year existence—were undoubtedly aware of the nature of the content hosted on Backpage's servers, the government provided Defendants with: (1) documents specifically describing the function of Backpage.com servers; (2) copies of all of the ads and images that were on Backpage.com at the time the website shutdown in April 2018; (3) copies of Backpage.com ads (and underlying data) associated with Counts 2-51 in the superseding indictment as those ads (and underlying data) appear in the server data; and (4) email data on the Backpage.com servers. The government is currently imaging payment processing transactional data from the Backpage.com servers and will make that data available to Defendants as soon as the imaging process is complete. The government has also informed Defendants that it would provide them with exhibits of any of the aforementioned server data it might utilize at trial.

Notwithstanding these efforts, Defendants have filed a motion to compel that asserts two baseless demands: (1) the government produce Backpage server data in Defendants' preferred format—a format the government neither has nor can obtain for its own case preparation; and (2) the government affirmatively search discovery to single out every

piece of potentially exculpatory evidence.  In essence, Defendants request the Court compel the government to conduct *Defendants'* investigation (to include analyzing Defendants' evidence) and prepare Defendants' defense for trial.  Yet, courts have repeatedly held that the government is not obliged to produce discovery to Defendants in a format that the government does not have, nor is it compelled to point Defendants to potentially exculpatory evidence within a larger mass of disclosed evidence.  Defendants seek to impose burdens on the government that are far outside the normal practice in this district, inconsistent with national e-discovery protocols, and well exceed what the law requires.  Their motion should be denied.

## ARGUMENT

### I. THE GOVERNMENT HAS FULLY COMPLIED WITH ITS RULE 16 DISCOVERY OBLIGATIONS AND THE ESI PROTOCOL.

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure addresses the discovery of documents and tangible objects in criminal cases.  Rule 16(a)(1)(E) provides that on a defendant's request, the government must permit the defendant to inspect . . . data, . . . tangible objects, . . . or copies or portions of any of these items, if the item is within the government's possession, custody, or control" and "the item is material to preparing the defense."  *United States v. Clegg,* 740 F.2d 16, 18 (9th Cir. 1984); *see also United States v. Santiago*, 46 F.3d 885, 893 (9th Cir. 1995); *United States v. Jordan*, 316 F.3d 1215 (11th Cir. 2003).

In 2012, the Administrative Office of the U.S. Courts published "Recommendations for Electronically Stored Information (ESI) Discovery Production in Federal Criminal Cases" (commonly referred to as the "ESI Protocol"), available at http://www.uscourts.gov/sites/default/files/finalesiprotocolbookmarked.pdf.  The ESI protocol states that (1) the parties should meet at the outset of the case to "discuss what formats of production are possible and appropriate. . . .  Any format selected for producing discovery should maintain the ESI's integrity, allow for reasonable usability, and reasonably limit costs, and, if possible, conform to industry standards for the format"; and

(2) that "[w]hen producing ESI discovery, a party should not be required to take on substantial additional processing or formatting conversion costs and burdens beyond what the party has already done or would do for its own case preparation or discovery production." ESI Protocol, Introduction at 1-2 (summarizing Principles 4 and 5). The ESI Protocol also suggests that, even if a case involves millions of pages of discovery, the government does not have any special *Brady* obligations so long as it produces the ESI in a searchable format, provides a table of contents, and produces a subset of "hot" documents." ESI Protocol, Strategies at 2 & n.1.

The government has far exceeded its Rule 16 obligations and has complied with the ESI Protocol in this case. To start, although Rule 16 only requires that the government permit Defendants to inspect and copy discovery material to preparing their defense, the government has spent a significant amount of time and expense to produce discovery to Defendants in the agreed-upon, electronic, searchable, industry-standard format. Moreover, the government created indices denoting the source from which discovery was obtained to assist Defendants in navigating these materials. Furthermore, the government provided the vast majority of discovery (approximately 90%) to Defendants two years in advance of trial, produced subsets of "hot" documents that support the allegations in the superseding indictment, and provided counsel for a number of Defendants with subsets of "hot" documents specifically related to the allegations in the superseding indictment against their respective clients. (*See* CR 444; Exhibits D-I.) The government has also offered to meet and met with several Defendants to discuss its theory of the case and the allegations against Defendants in detail. *Id.* Additionally, on February 22, 2019 (more than 14 months before trial), the government provided Defendants a large portion of *Jencks* statements. (*See* CR 524; Exhibit A.)

Moreover, on April 1, 2019 (more than 13 months before trial), the government provided Defendants a preliminary witness and exhibit list that it has continued to update and periodically disclose. (*See* CR 511.) A vast majority of the government's exhibits are documents Backpage disclosed to the Senate Permanent Subcommittee in 2016 as part of

the Senate's investigation into Backpage[1], and were subsequently compelled by this Court to be produced to the government in September 2017 as part of the USAO 108 grand jury subpoena litigation. (*See* CR 444, Exhibit B.) Defendants' attempt to write-off the government's re-production of these trial exhibits by asserting "Defendants are not Backpage" and "Defendants did not produce these documents nor can the government avoid its discovery obligations by pretending otherwise" is ineffective. (Mot. at 17.) First, more than a year ago, the government disclosed to Defendants all documents Backpage produced in September 2017. Second, as the government emphasized in its January 18, 2019 and April 16, 2019 status reports (CRs 444 and 524), and its May 31, 2019 email and June 3, 2019 letter to Defendants (May 31, 2019 email, Exhibit A; June 3, 2019 letter, CR 643-3), these documents were Bates labeled and produced to the government by Davis Wright Tremaine (DWT)—the same law firm (and firm counsel) that represented Backpage in connection with its compelled production of these documents to the Senate and Arizona grand jury, and the same law firm (and law firm counsel) jointly representing Defendants Lacey and Larkin in this case. The government does not think it presumptuous to believe DWT is aware of these documents and in a position to discuss their contents with other defense counsel in this case, particularly in light of the fact that most defense counsel are actively engaged in a joint defense agreement.

**II. THE GOVERNMENT PRODUCED MATERIAL BACKPAGE SERVER DATA TO DEFENDANTS IN THE SAME MANNER IT WAS RECEIVED BY THE GOVERNMENT.**

The United States Supreme Court has interpreted "material to preparing the defense" to solely involve "the defendants' response to the Government's case in chief." *United States v. Armstrong*, 517 U.S. 456, 462 (1996). Thus, "[w]hile it might be argued that as a general matter, the concept of a 'defense' includes any claim that is a 'sword,' challenging the prosecution's conduct of the case, the term may encompass only the

---

[1] Declaration of Breena Ross, *Senate Permanent Subcommittee on Investigations v. Carl Ferrer*, Misc. No. 1:16-mc-00625-RMC (D.D.C. Nov. 30, 2016).

narrower class of 'shield' claims, which refute the Government's arguments that the defendant committed the crime charged." *Id.* As the moving party, Defendants bear the burden of showing the elements of Rule 16 (possession and materiality). *See United States v. Goris*, 2017 WL 5663479, at *45 (1st Cir. Nov. 27, 2017). A showing of materiality requires "some indication" that pretrial disclosure of the information sought "would have enabled the defendant significantly to alter the quantum of proof in his favor." *Id.* A general description of the item will not suffice; neither will a conclusory argument that the requested item is material to the defense. *See United States v. Cadet*, 727 F.2d 1453, 1466 (9th Cir. 1984); *United States v. Carrasquillo-Plaza*, 873 F.2d 10, 12-13 (1st Cir. 1989).

### A. Government's Production of Server Data

The government's May 31, 2019 status report specifically described the roles of the servers that hosted the Backpage.com website. (*See* CR 626-4 at 11.) As detailed in this report, on March 8, 2019, the government provided Defendants with copies of the master database servers and image servers (*i.e.*, all of the ads and images that were on Backpage.com at the time the website was seized and shutdown). (*See* CR 626 at 3; 626-4 at 22.) Therefore, Defendants' assertion that "the government does not provide copies of the ads about which it complains—but merely offers its characterizations of ads on Backpage.com and practices of the website" is incorrect. (Mot. at 15.) While the government had hoped to preserve the servers in the Amsterdam Switch data center to improve the possibility of being able to more easily search and display ads as they would have appeared when the Backpage.com site was active, when the Dutch authorities became aware of the allegations contained in the indictment (CR 3), they refused the government's request to keep the servers live and demanded they be shut down. (*See* CR 626-4 at 8.) On March 7, 2019, the government made available to Defendants an imaged copy of the servers containing Backpage email data seized from Dallas, Texas.[2] *Id.* Moreover, the

---

[2] This email data was produced to Defendants in load-ready file format that is searchable.

government is currently imaging the payment processing island server that stored all credit card, bitcoin and money order transactions, and the internal applications servers that presented data to Backpage employees and related companies. (*See* CR 626-4 at 16-17.) The government will make this data available to Defendants when processing is complete.[3] That production will complete the government's disclosure of any potentially material server data.

Additionally, Defendants' demand for server data in a "functional format" is unavailing (Mot. at 14-15.) Defendants have had access to all of the ads and images on Backpage at the time the website was seized and shutdown in the same format they were received by the government for months now. That format is "functional." Moreover, on March 15, 2019, the government went a step further to assist Defendants' review of this ad and image data by providing them with underlying data pertaining to all of the ads (and related ads) referenced in the superseding indictment. (*See* CR 524, Exhibit K.) Among other things, this underlying data included ad poster name, ad poster email address, ad post identification number, the date ad was posted, and whether the ad was paid. This disclosure was in addition to the government's previous disclosure of victim ads referenced in the superseding indictment obtained from subpoenas to Backpage in various federal, state, and local sex trafficking investigations. (*See* November 30, 2018 discovery transmittal letter, Exhibit B.) Thus, Defendants' contention that they have to perform a "complicated search through millions of records" to obtain backend administrative data regarding an ad is inaccurate. (Mot. at 7.)

Additionally, Defendants' claim that certain ad data could have been accessed "by clicking a hyperlink" before the website was seized and shutdown is inconsequential. (Mot. at 6-7.) Defendants have the server data in a functional format. While this format

---

[3] The government indicated in its May 31, 2019 status memo and at the June 23, 2019 status conference that it believed imaging of the payment processing data would be completed by July 15, 2019 (*see, e.g.,* CR 626 at 4); however, the imaging process will require a few additional weeks. The government will notify the court when this data has been made available to Defendants.

may not be their preferred format for receiving this data, the government has no duty to produce discovery in a format it does not have (nor can obtain in this case). *See United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011) ("Having turned over the underlying data, the prosecutors had no duty to go further and conduct the defense's investigation for it."); *see also United States v. Budovsky*, 2016 WL 386133, at *12 (S.D.N.Y. 2016) ("There is no basis to find here that the government was obliged to produce the discovery to defense in a format that the government did not have."); ESI Protocol Principle 5 ("When producing ESI, a party should not be required to take on substantial additional processing or formatting costs and burdens beyond what the party has already done or would do for its own case preparation or discovery production.").

### B. Defendants' Request for Immaterial and Redundant Server Data Should be Denied or in the Alternative, Defendants Should be Ordered to Bear the Production Cost.

Although the government provided Defendants with materials specifically describing the function of the Backpage.com servers, copies of all ads, images, and emails on Backpage.com at the time the website was shutdown, and will provide them with payment processing data, they still request the government image and produce copies of all remaining server data in its possession. (*See* CR 627 at 6.) They make this demand for irrelevant server data while asserting that it would take 8-16 months of full-time work to examine the potentially relevant server data currently in their possession. "Barring technical issues and assuming that these five servers were imaged correctly with no errors, Defendants understand that it would take a forensic expert approximately 1,380-2,760 hours (8-16 months of full-time work) and untold cost to forensically analyze the data contained on the 56 hard drives alone." (CR 627 at 8.) Given Defendants' timeframe for analyzing the potentially relevant server data currently in their possession, it is unclear why they would request copies of extraneous server data other than as a trial delay tactic.

In any event, circuit courts have consistently held that requests for discovery must be reasonable and not place undue burden on the government. The discovery motion could

very well be viewed as a "fishing expedition," in the hope that some favorable evidence would turn up.  Such "general descriptions of the materials sought and conclusory arguments as to their materiality have been rejected repeatedly as insufficient under Rule 16(b)." *See United States v. Marshall*, 532 F.2d 1279, 1285 (9th Cir. 1976) (internal quotations omitted).  The reasonableness requirement of the Rule demands that "a request for documents must not be unduly burdensome to the Government, and, equally important, must be framed in sufficiently specific terms to show the Government what it must produce." *United States v. Ross*, 511 F.2d 757, 763 (5th Cir. 1975).

Here, like *Marshall*, Defendants' request for the government to image and produce irrelevant server data would be nothing less than a fishing expedition—that is even if they could review these tens of millions of immaterial records in the months leading up to trial.  As articulated in the government's May 31, 2019 status report, because of the high degree of redundancy built into the Backpage servers, copying immaterial and redundant server data would be an unduly burdensome and very expensive undertaking, not to mention a waste of limited resources.  (*See* CR 626-4 at 6-7.)

For example, the government's computer forensics experts estimate that imaging the remaining approximately 650 terabytes of immaterial server data would cost approximately $250,000.  This estimate includes the cost of purchasing storage equipment to process this large amount of data.   Moreover, it would take approximately six months for the government to image this extraneous server data and make copies available to Defendants.  Given the undue burden and expense of imaging the nearly 650 terabytes of immaterial data—data Defendants admit they could not come close to analyzing prior to trial given their 8-16 month timeframe to analyze the 56 hard drives currently in their possession—their demand for imaged copies of the remaining server data should be denied.

However, as an alternative, if the Court consents, the government would be willing to image the remaining immaterial server data at Defendants' expense.  Although Rule 16 only requires the government make discovery available to Defendants to inspect and copy, the government has produced all discovery and potentially material server data in the case

to Defendants at its own expense. Consequently, if Defendants want the 650 terabytes of immaterial server data, they (not the government) should bear the production cost.

### III. BRADY DOES NOT REQUIRE THE GOVERNMENT CULL THROUGH DISCOVERY TO SINGLE OUT POTENTIALLY EXCULPATORY EVIDENCE.

Despite the government providing Rule 16 discovery and any server data that could remotely be material to assist Defendants in preparing their defense, Defendants continue to make unreasonable demands for additional materials about Backpage's moderation practices, certain victim ads, the Backpage website generally, Backpage's aggregation practices, and Backpage's involvement in reciprocal link programs. (Mot. at 15-25.) In asserting their demands, they contend that "the government's counsel said plainly and repeatedly that they would extract and provide data and information from Backpage's servers if only Defendants would identify what they need," but "the government has refused to produce anything." (Mot. at 12-13.)

As expressed in the government's May 10, 2019 letter to Defendants, what the government has repeatedly asked them is to identify material server data that the government has not produced besides the millions of ads, images, and emails that have been previously produced and payment processing data that will be produced when the imaging process is complete. (*See* May 10, 2019 letter, Exhibit C.) Defendants failed to identify any additional material server data, all the while complaining that "searching through thousands of pages of [hot] documents to attempt to line them up to the allegations in the indictment is an arduous, burdensome, and time-consuming task that [they] should not have to do." (CR 643-2 at 5.) Yet, they expect the government to cull through discovery to identify materials that may be helpful to its defense, placing the government in the untenable position of having to prepare both sides of the case at once. This is a demand courts (including the district court in this case) have rejected. (*See* Judge Logan's October 15, 2018 Order Denying Defendants' Motion for Itemization of Brady/Giglio Material; CR 339 at 5 ("The government is under no general obligation to identify *Brady*

or *Giglio* material within voluminous discovery); *Rhoades v. Henry,* 638 F.3d 1027, 1039 and n.12 (9th Cir. 2011) (the government is not "obliged to sift fastidiously" through millions of pages (whether paper or electronic)); *United States v. Warshak*, 631 F.3d 266, 297 (6th Cir. 2010). The government is "under no duty to direct a defendant to exculpatory evidence [of which it is unaware] within a larger mass of disclosed evidence." *United States v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009).

As articulated above, the government is neither responsible for preparing Defendants' defense nor in a better position than Defendants to identify exculpatory material. Nevertheless, a review of the "hot" documents provided in the case details much of what Defendants demand the government cull through discovery to locate.

### A. The Government's "Hot" Documents Provide Extensive Insight Into Backpage's Moderation Practices.

Paragraphs 68-152 of the superseding indictment detail Backpage's moderation practices and are corroborated by "hot" documents provided to Defendants in the case. (*See* CR 230 at 16-37.) For instance, paragraph 78 of the superseding indictment alleges that on October 16, 2010, former Backpage Operations Manager Defendant [Andrew] Padilla sent an email with two attachments to a large group of Backpage employees on how to moderate ads. The aforementioned email and attachments were sent as part of the government's July 19, 2018 "hot" document production to Defendants. (*See* DOJ-BP-0004601386, DOJ-BP-0004602109, and DOJ-BP-0004601051.)

Similarly, paragraph 100-101 of the superseding indictment alleges that on April 27, 2011, Defendants [Michael] Lacey and [Scott] Spear received a set of recommended action items from a firm Backpage had hired to assist it with "internet safety" issues. Among other action items, the firm warned Lacey, Spear, and other Backpage personnel that certain terminology was often used by pimps who shuttle children to different locations where they do not know anyone and cannot get help. Backpage disregarded these recommendations by continuing to publish ads that contained this terminology. Documents corroborating these allegations were sent as part of the government's

September 24, 2018, "hot" document production to Defendants. (*See* DOJ-BP-0004602509-DOJ-BP-4602512.)

These are merely two of numerous "hot" documents about Backpage's moderation practices that support the allegations contained in the superseding indictment. Consequently, not only has the government provided Defendants millions of pages of discovery that includes the requested "data from Backpage's systems to show the website's actual [moderation] practices," (Mot. at 15) it has given them more than 2,200 "hot" documents that detail Backpage's moderation practices.

Additionally, Defendant's citation to language included in a search warrant affidavit as evidence that the government has not complied with its discovery obligations is baseless. (Mot. at 3-4 and 16.) Specifically, Defendants assert that "in [the government's] April 2018 search warrant application …, the government represented that these servers contain current and historical content of the ads that were posted on Backpage …all versions of an advertisement …, it was on that basis the magistrate judge granted the government's application to seize the servers." (Mot. at 3-4.)   Not only is this assertion inaccurate, it is beside the point.  While the Fourth Amendment requires a factual showing sufficient to comprise probable cause to issue a search warrant, this does not mean that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge. *Aguilar v. Texas*, 378 U.S. 108, 114-115 (1964) ("A warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter"); *see also United States v. Leon*, 468 U.S. 897, 922 (1984) ("finding officers' reliance on warrant was objectively reasonable"; the "judge was not misled by information in the affidavit, he did not abandon his judicial role, and the affidavit was certainly not lacking probable cause as to render belief in its existence unreasonable").  Here, certainly Defendants do not contend the magistrate lacked probable cause to issue the warrant—a warrant that included as an attachment a 61-page indictment issued just a week before by

an Arizona grand jury charging Defendants with 93 counts of conspiracy, facilitating prostitution and money laundering for their work at Backpage.com. (*See* CR 3.) Not to mention the fact that Backpage's co-founder and CEO as well as several Backpage-related corporate entities had pleaded guilty to conspiring to facilitate prostitution and money laundering just days before the warrant was issued. 2:18-cr-00464, CR 7, April 5, 2018 (D. Arizona 2018); 2:18-cr-000465, CR 8, April 5, 2018 (D. Arizona 2018).

More importantly, the government's compliance with its Rule 16 obligations (the subject of this motion) is not premised on language included in a search warrant. While the government may have had a good-faith belief at the time the warrant affidavit was drafted that the server data would contain "all versions of an advertisement," as plainly articulated in the government's May 31, 2019 status report, there was no "versioning" built into Backpage's databases—meaning changed text in an ad would not have a version saved from before the change. Thus, the changed text would be the new data. (*See* CR 626-4 at 13.) Additionally, Defendants' citation to bits and pieces of this section in the government's status report asserting that "[the government] confirmed that the databases contained all underlying data relating to a given ad, including: any 'filters that were applied to ads,' '[m]oderation changes or actions that would apply to all ads,' moderator action logs, '[i]mages that were deleted by a moderator,' and the original versions of ads posted to Backpage.com"—while conveniently failing to reference the lack of "versioning" built into Backpage's databases—very obviously mischaracterizes this section of the government's status report. (Mot. at 4.) The bottom line is that the government cannot create data Defendants contend may be useful to their defense, nor do the rules require the government to do so. Defendants have been provided all Rule 16 discovery in the government's possession regarding Backpage's moderation practices.[4] It is the Defendants

---

[4] As per the Scheduling Order, any additional records obtained during pre-trial preparation shall be disclosed to Defendants as soon as possible. (CR 121, p.1 at 27-28 ("If additional records are discovered by, or disclosed to, the government during pre-trial preparation or otherwise, pursuant to Rule 16(c), Fed. R. Crim. P., the government shall promptly disclose any additional documentary evidence or materials to the defense as soon as practicable

responsibility—not the government's—to analyze this evidence and prepare their case for trial.

### B.  Defendants Have Been Provided Victim Ads Referenced in the Superseding Indictment.

The government has fully complied with its discovery obligations as it relates to victim ads. As previously stated, not only did the government specifically identify and provide Defendants victim ads referenced in the superseding indictment nearly eight months ago, it has also provided Defendants with victim ads (including underlying ad data) as they appear in the Backpage server data. (*Supra* at 7.) Thus, Defendants' assertion that the government "think[s] it is sufficient to produce some copies of these [victim] ads but not the underlying data about the ads or other related ads or Backpage's actual actions concerning the ads" lacks merit. (Mot. at 11.)

Defendants' citation to a May 1, 2018 letter from former attorney for Defendant Padilla (Mot. Exhibit F) asserting "[they] raised concerns about the need to preserve the Backpage systems and data intact three weeks after this case began" is also unavailing. (Mot. at 21.) The government has preserved and produced all discovery (including victim ads) to Defendants in the same condition it was "seized and received by the government," and has "take[n] all steps to maintain its integrity." (Mot. at Exhibit F.) As the letter correctly indicates, the government produced discovery to Defendants in the same condition it was seized and received, which is the government's standard practice. (*Id.*) What Defendants are demanding the government do now is modify or convert the server data to a format preferable to them. The government is not required (nor can it in this case) produce discovery to Defendants in a format it does not possess. The primary point here is that the government provided Defendants with Rule 16 discovery (to include victim ads referenced in the superseding indictment) in the same format it was received.

---

after such disclosure or discovery occurs.").)

### C. The Government Has Produced Discovery in its Possession Regarding the Backpage.com Website.

The government has provided Defendants all Rule 16 discovery and server data in its possession regarding the Backpage.com website that is material to preparing their defense. These materials include Defendants' demands for "ads and ad revenue as a whole," information regarding "Backpage's referrals to NCMEC," and "Backpage's purported "cooperation with law enforcement." (Mot. at 18-19.) Not only has the government provided more than 10 million pages of discovery with accompanying indices to Defendants about the Backpage website, it has gone to great lengths to ensure that these materials were organized and searchable. The 90-page superseding indictment, the more than 2,200 "hot" documents, and *Jencks* statements disclosed to Defendants also provide an abundance of information about the Backpage website. Again, what Defendants are requesting is that the government cull through discovery and pull out information they consider helpful to their defense, a demand the law does not require.

### D. The Government Has Produced Discovery in its Possession Regarding Backpage's Aggregation Practices and Reciprocal Link Program.

Defendants have been provided discovery regarding Backpage's aggregation practices and reciprocal link agreements. For example, among other things, on September 24, 2018, the government disclosed to Defendants 400 pages of Backpage meeting agendas that give insight into Backpage's aggregation practices. (*See* September 24, 2018 discovery transmittal letter, Exhibit D.) *Jencks* statements from former Sales and Marketing Director Dan Hyer (disclosed to Defendants more than 14 months before trial) also detail Backpage's aggregation and content creation practices. (*See* CR 524, Exhibit A.) Also, the government's January 23, 2019 response to Defendants' January 18, 2019 joint status report (CR 443) provides evidence of Backpage's relationships with certain prostitution websites. (*See* CR 446 at 11-12; 446-1 at 40-62, 65-69, and 70-72.) Additionally, the "hot" documents provide emails and supporting materials regarding Backpage's ongoing relationships with prostitution websites, to include The Erotic Review.

## CONCLUSION

Based on the foregoing, the Motion to Compel Discovery (CR 643) should be denied.

Respectfully submitted this 15th day of July, 2019.

> BRIAN BENCZKOWSKI
> Assistant Attorney General
> Criminal Division, U.S. Department of Justice
>
> *s/Reginald E. Jones*
> REGINALD E. JONES
> Senior Trial Attorney
> U.S. Department of Justice, Criminal Division
> Child Exploitation and Obscenity Section
>
> MICHAEL BAILEY
> United States Attorney
> District of Arizona
>
> KEVIN M. RAPP
> MARGARET PERLMETER
> PETER S. KOZINETS
> ANDREW C. STONE
> JOHN J. KUCERA
> Assistant U.S. Attorneys

# **CERTIFICATE OF SERVICE**

I hereby certify that on July 15, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Angela Schuetta*
Angela Schuetta
U.S. Attorney's Office