**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | CR-18-0422-PHX-SMB |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | October 25, 2019 |
| Michael Lacey, | ) | 1:01 p.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE SUSAN M. BRNOVICH, JUDGE**


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**CONTINUED EVIDENTIARY HEARING ON MOTION TO COMPEL**

**(Pages 266 - 444)**


Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2   FOR THE GOVERNMENT

3           U.S. ATTORNEY'S OFFICE
            By:  **Mr. Kevin M. Rapp**
4                **Mr. Andrew C. Stone**
                 **Ms. Margaret Wu Perlmeter**
5                **Mr. Peter Kozinets**
            40 North Central Avenue, Suite 1200
6           Phoenix, Arizona 85004

7           U.S. ATTORNEY'S OFFICE
            By:  **Mr. Reginald E. Jones**
8           1400 New York Avenue, NW, Suite 600
            Washington, D.C. 20530

9

10  FOR THE DEFENDANT LACEY AND LARKIN:

11          DAVIS WRIGHT TREMAINE, LLP
            By:  **Mr. James C. Grant**
12          950 5th Avenue, Suite 3300
            Seattle, Washington 98104

13

14          BIENERT MILLER & KATZMAN, PLC
            By:  **Mr. Thomas Henry Bienert, Jr.**
15               **Ms. Whitney Z. Bernstein**
            903 Calle Amanecer, Suite 350
16          San Clemente, California 92673

17  FOR THE DEFENDANT SPEAR:

18          FEDER LAW OFFICE, PA
            By:  **Mr. Bruce S. Feder**
19          2930 East Camelback Road, Suite 160
            Phoenix, Arizona 85016

20

21

22

23

24

25

1    FOR THE DEFENDANT BRUNST:

2              BIRD MARELLA BOXER WOLPERT NESSIM
               DROOKS LINCENBERG & RHOW, PC
3              By:  **Mr. Ariel Neuman**
               1875 Century Park E Suite 2300
4              Los Angeles, CA 90067

5    FOR THE DEFENDANT PADILLA AND VAUGHT:

6              DAVID EISENBERG, PLC
               By:  **Mr. David S. Eisenberg**
7              3550 North Central Avenue, Suite 1155
               Phoenix, Arizona 85012

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

WITNESS                                                    PAGE

MATTHEW FROST
          Continued Cross-Examination by
                Ms. Bernstein                              271
          Cross-Examination by Mr. Neuman                  299
          Redirect Examination by Ms. Perlmeter            310

RICHARD ROBINSON
          Direct Examination by Mr. Bienert                334
          Cross-Examination by Mr. Rapp                    361
          Redirect Examination by Mr. Bienert              367

TAMI LOEHRS
          Direct Examination by Ms. Bernstein              369
          Cross-Examination by Mr. Rapp                    408

**P R O C E E D I N G S**

1

2      COURTROOM DEPUTY:  Criminal case 2018-422, United

3  States of America versus Michael Lacey and others, on for a

4  continued evidentiary hearing.

5      MS. PERLMETER:  Good afternoon, Your Honor.  Peggy

6  Perlmeter, Kevin Rapp, Andrew Stone, Peter Kozinets, and

7  Reginald Jones on behalf of the United States.

8      MS. BERNSTEIN:  Good morning, Your Honor.  Whitney

9  Bernstein, specially appearing on behalf of Michael --

10  specially appearing on behalf of Paul Cambria for Michael

11  Lacey.

12      Also, Whitney Bernstein and Tom Bienert on behalf of

13  Mr. Larkin.

14      Both Mr. Lacey and Mr. Larkin are present in court.

15      MR. NEUMAN:  Good morning, Your Honor.  Ariel Neuman

16  on behalf of Mr. Brunst, who is present in court.

17      MR. FEDER:  Bruce Feder on behalf of Mr. Spears, who

18  is also present.

19      MR. GRANT:  Good afternoon, Your Honor.  Jim Grant on

20  behalf of Mr. Larkin and Mr. Lacey.

21      MR. EISENBERG:  Good afternoon, Your Honor.  David

22  Eisenberg on behalf of Andrew Padilla who is present in the

23  courtroom.

24      Also, I'm going to stand in for Joy Bertrand who

25  represents Joye Vaught.  She is not present and we would waive

```
1    her presence.

2              THE COURT:  Okay.

3              MR. EISENBERG:  Thank you.

4              THE COURT:  And we're set for a continued evidentiary

5    hearing.

6              Is the witness ready?

7              Sir, you're still under oath from the last hearing.

8    Do you understand?

9              THE WITNESS:  Yes.

10             THE COURT:  Okay.

11                    CONTINUED CROSS-EXAMINATION

12   BY MS. BERNSTEIN:

13   Q.  Good afternoon, Mr. Frost.

14   A.  Good afternoon.

15   Q.  In the intervening three weeks since we last had this

16   hearing, what have you done to prepare since you were last

17   here?

18   A.  I met with the prosecutor team yesterday, also did searches

19   in the databases for ads reported to NCMEC.

20   Q.  I'm sorry.  You met with the prosecutors yesterday?

21   A.  Correct.

22   Q.  And what was the second part of what you said?

23   A.  I also did searches in the Backpage databases for ads that

24   have been reported to NCMEC.

25   Q.  And how long did you meet yesterday?
```

1    A.  Several hours met in the morning, took a lunch break, and

2    resumed in the afternoon.

3    Q.  Other than that, did you speak with the prosecutors in

4    between last time you were here and yesterday?

5    A.  Um, we had a phone call or two, conference call discussing

6    stuff.

7    Q.  Did you also speak with Mr. Gerken?

8    A.  I have not spoke with him, no.

9    Q.  Since -- not since your last hearing?

10   A.  Correct.

11   Q.  Did you review any additional discovery before this

12   hearing?

13   A.  I reviewed items that have been provided to me from the

14   defense.

15   Q.  What items are those?

16   A.  Some additional e-mails, information on ZFS, Z pools,

17   information on forensic practices.

18   Q.  Did you review the e-mails that the government recently

19   produced to defense counsel, as well, of yours?

20   A.  I scanned them, yes.

21   Q.  Did you review any other notes?

22   A.  I don't believe so.

23   Q.  Did you review your transcript?

24   A.  Yes, I did.

25   Q.  Anything else?

1    A.  I don't think so.

2    Q.  And let me go back.  Other than speaking to the prosecutors

3    on a phone call or two and meeting with them for what sounds

4    like it was all day yesterday, did you communicate via e-mail

5    in between last hearing and now?

6    A.  There were a couple e-mails sent out for calendar invites

7    for the conference call.

8    Q.  But you were careful to not put anything substantive in

9    writing?

10   A.  I may have replied.  So they send e-mails, and I said, yes,

11   I'll be there, things like that.

12   Q.  No substantive conversations since your last testimony in

13   writing?

14   A.  Not in e-mail, no.

15   Q.  I have just a handful of questions for you from your prior

16   testimony that I wanted to clear up.

17          You previously testified that the operating system of

18   the Backpage.com systems was FreeBSD, correct?

19   A.  Yes.

20   Q.  And the database was MySQL, M-y-S-Q-L?

21   A.  Um, it was MariaDB.

22   Q.  I'm sorry?

23   A.  I believe it was MariaDB they were using on their servers.

24   I use MySQL.

25   Q.  What was on their servers?

1   A.   MariaDB.

2   Q.   Maria, as in a name, D, as in dog, B, as in boy?

3   A.   Yes, which is a SQL database.

4   Q.   And that is the database that was functioning on

5   Backpage.com, as far as you know?

6   A.   Yes.

7   Q.   Okay.  And the file system that was functioning on

8   Backpage.com was ZFS?

9   A.   Yes.

10   Q.   And what Web server was being used to run the functioning

11   systems?

12   A.   I don't know.

13   Q.   At no point in time have you learned that information?

14   A.   Correct.

15   Q.   What content management system was used to operate the

16   functioning systems?

17   A.   I haven't reviewed any content management systems.

18   Q.   And do you know what the database format was that was used

19   across all functioning systems?

20   A.   The format being a SQL database.

21   Q.   SQL database?

22   A.   Yes.  Are you referring to the -- the structure database is

23   a SQL database.

24   Q.   Okay.  Thank you.  And on what day did you extract --

25   strike that.

```
 1              When you were last here, we went through a

 2   demonstrative of the systems that you extracted and created

 3   from the Backpage.com data that was in your possession,

 4   correct?

 5   A.  Yes.

 6   Q.  And what day did you extract the data that you then used to

 7   create your relational database?  Do you recall?

 8   A.  I don't recall the specific day I extracted that data.

 9   Q.  How about roughly?

10   A.  2018 timeframe after I arrived back from Amsterdam.

11   Q.  You extracted it in 2018 sometime after you arrived back

12   from Amsterdam.  And you went to Amsterdam in June 2018?

13   A.  Yes.

14   Q.  Okay.  So is it fair to say that you extracted the data

15   sometime in the summer of 2018?

16   A.  Yes.

17   Q.  Would there be a recording of this so that you would be

18   able, at some point, to provide a precise date?

19   A.  The date and timestamps on all the database extractions

20   would say the day I extracted them.

21   Q.  And in summer of 2018 did you extract -- or strike that.

22              In summer of 2018 you extracted the master database,

23   correct, from the Backpage.com systems?

24   A.  There wasn't a database labeled master.  There was a

25   central database that I extracted.
```

1    Q.  What other databases did you extract?

2    A.  All of the marketplace databases.

3    Q.  And how many were those?

4    A.  Like, over a hundred, I don't remember the precise number,

5    as well as the image databases.

6    Q.  Anything else?

7    A.  That I extracted?

8    Q.  Yes.

9    A.  Um, I've extracted numerous ads from those databases.

10   Q.  So I'm just trying to go on a macro level.  You took out a

11   central database and over 100 marketplace databases.  Were

12   there any other large categories of databases that you

13   extracted in summer of 2018?

14   A.  The image databases.

15   Q.  Anything else?

16   A.  I don't believe so.

17   Q.  Okay.  In the past year you've testified in federal court

18   twice in individual prosecutions about Backpage ads, correct?

19   A.  Yes.

20   Q.  One in Maryland and one in New York?

21   A.  Correct.

22   Q.  And, in those cases, you had extracted information and you

23   had assembled it in a way that mimicked the way an ad appeared

24   when it was live on the Web site, correct?

25   A.  I extracted the information from the database.  And then in

1   New York we assembled the data extracted from the database and

2   put it in a format where the information that would have

3   appeared on the ad was in one location with the images, the

4   title, the header, the advertisement, phone number, posting ID.

5   In Maryland I did not do that.

6   Q.  And when you did that in New York, you had to assemble it

7   into a format where all of that was in one location because

8   your disparate tables and charts do not remotely resemble the

9   way an ad appeared when it was live on the Web site?

10  A.  Yes.  We put all the information in one location.

11  Q.  And your disparate tables and columns and charts,

12  similarly, do not resemble the way the administrative data

13  appeared in the object editor live on the Web site; is that

14  right?

15  A.  The spreadsheets looked differently, yes, but the data,

16  again, is the same.

17  Q.  I'm sorry, they are the same?

18  A.  The data would be the same.  The fields from the object

19  editor, I extracted the information that would have been in

20  those fields.  And much more information was provided than what

21  the object editor provided.  But, yes, when you looked at them,

22  they were in the exact same format.

23  Q.  Well, when you testified in New York, you didn't just give

24  them a 600-page spreadsheet dump, right, you just said that you

25  had to put it into a format so that it was all in one location?

1   A.  I had spreadsheets and then we compiled some ads into one

2   location.

3   Q.  Okay.  And so your -- what -- the way you extract data, if

4   we don't go to that second step of whatever assembly you're

5   doing to make it look presentable, it does not look the way it

6   looked on the Web site; is that correct?

7   A.  If you're referencing how an ad would look when I pull up

8   an ad, yes.  If you're referring, if you look at the database

9   that Backpage had, how data would look, then the data would

10  look the same as a spreadsheet.

11  Q.  No.  I'm referencing an ad and I'm referring an object

12  editor.  And those are two separate things, so I'm going to ask

13  you specific questions so the record is clear.

14          The ads require -- in order for your information to

15  mimic the way it appeared when the Web site was live, it

16  requires some assembly on your part; is that correct?

17  A.  Yes.

18  Q.  And in order for the information you extract to mimic what

19  the object editor looked like, that, similarly, requires some

20  assembly on your part; is that correct?

21  A.  Yes.  If you want it to look exactly how the object editor

22  looks.

23  Q.  Well, remotely close to how the object editor looked?

24  A.  Remotely -- yes, they're different.  The spreadsheet is

25  different than the object editor.

1   Q.  I want to talk briefly about the servers in Amsterdam.

2          The Amsterdam and the Tucson servers were,

3   essentially, identical?

4   A.  Yes.  I was informed they were duplicate sites.

5   Q.  And the Tucson servers were all seized, I think you said,

6   before you came into this case?

7   A.  Correct.

8   Q.  And when you came into this case, you hoped that you could

9   just leave the Amsterdam servers intact and just take them

10  offline, correct?

11  A.  Yes.

12  Q.  You testified last time that you hoped to keep them online

13  and just remotely access them?

14  A.  Yes.

15  Q.  Because the Tucson servers were so voluminous and difficult

16  to put back together and assemble?

17  A.  Yes.  There were lots of servers.  It was a big puzzle.

18  Q.  I'm sorry?

19  A.  It was a large puzzle, I would say.

20  Q.  In fact, you tried to virtualize those puzzle pieces to

21  bring Backpage into a functioning environment, and you were not

22  able to?

23  A.  Yes.

24  Q.  It was possible for you, when you came into the case in

25  late April, May, 2018, to access the Amsterdam servers through

1    root login, correct?

2    A.  Yes.

3    Q.  And can you explain what root login means?

4    A.  A root login for a Unix server would be the user that has

5    privileges to access everything on the server.

6    Q.  And you had this root login information by the time -- the

7    government had this root login information by the time you came

8    onto the case, correct?

9    A.  Yes.

10   Q.  And through root login, you can, from Pocatello or from

11   anywhere, go into the entire Amsterdam system and see it as it

12   was configured?

13   A.  Um, no.  When I came in, the servers in Amsterdam had all

14   been powered down and the power cords had been removed so they

15   weren't accessible from anywhere but the data center at that

16   time, as in physically walking up to the server, powering it

17   back on and logging in.

18   Q.  So when you went to Amsterdam in June, you had to power all

19   of the servers back on?

20   A.  If -- so we didn't power all the servers back on, but they

21   were --

22   Q.  I apologize.  I'm having a hard time hearing you.

23        You said you did power all the servers back on?

24   A.  We did not.

25   Q.  You did not.  Okay.

1   A.  The powers were off.  We powered on nine of the ones, the

2   ones we seized -- I'm sorry, the ones the Dutch National Police

3   seized, the Dutch National Police powered them on while I was

4   there, and we logged in to verify the -- what was contained in

5   those servers.

6   Q.  So in June of 2018 the Dutch National Police powered on

7   nine servers that you had identified for them?

8   A.  Yes.

9   Q.  You previously testified that you had asked the Dutch to

10  keep the systems live but they wouldn't.  And I'm paraphrasing,

11  but is that accurate?

12  A.  Yes.

13  Q.  And when you learned that the Dutch would not keep the

14  systems live, as you had hoped, at that time, did you record

15  the different IP addresses that were assigned to the different

16  servers?

17  A.  We did not.

18  Q.  Did you note the interrelationships of the various system

19  components?

20  A.  No, we did not.

21  Q.  And so you've mentioned in some of your correspondence that

22  you were going to need to, quote, boot the systems live and

23  extract the data.  Do you remember that?

24  A.  Yes.

25  Q.  Did you do that?

1    A.   Yes.

2    Q.   And with what servers did you do that?

3    A.   A master database server and an image server.

4    Q.   How many servers are those, just two, or did -- were there

5    more?

6    A.   Two servers.

7    Q.   And I think you mentioned that one of the things you did to

8    prepare for this hearing was review some of the documents the

9    defense sent over?

10   A.   Yes.

11   Q.   And some of that included, like, a law enforcement manual

12   on best practices?

13   A.   Yes.

14   Q.   Okay.  Have you seen that before?

15   A.   I have not.

16   Q.   Had you ever reviewed that before yesterday?

17   A.   Not that specific document, no.

18   Q.   Okay.  Have you been trained on those basic principles?

19   A.   Yes.

20   Q.   And so I want to talk quickly about evidence acquisition.

21   A.   Uh-huh.

22   Q.   You're familiar with that concept?

23   A.   Yes.

24   Q.   And you would agree that evidence acquisition, the goal is

25   to acquire the original digital evidence in a manner that

1    protects and preserves it?

2    A.  Yes.

3    Q.  One thing you're supposed to do, if you are acquiring the

4    original digital evidence in a manner that protects and

5    preserves it, is document the hardware and software

6    configuration of the examiner system.  Did you do this?

7    A.  Again, documenting the hardware, yes.  I documented the

8    servers, the information, the model, et cetera.  And then I

9    took -- I used tools to extract information about those

10   systems.

11   Q.  Did you document the software configuration of the systems

12   before you extracted?

13   A.  No, not before I imaged them, no, I didn't document the

14   software configuration.  That would have been internal to the

15   operating system that we spoke of earlier, FreeBSD.  So I

16   wanted to preserve what was on the hard drives originally,

17   taking duplicate -- forensic duplicates or copying the hard

18   drives themselves to preserve them.

19   Q.  Right.  And before you took that forensic duplicate, did

20   you document the software configuration of the original drives?

21   A.  The software configuration would be on the inside of the

22   system.  When we're talking about hardware, that's just the

23   physical hardware.  So you can't get to the inside until you've

24   got access to the inside.  So we're just talking -- imaging was

25   the physical drives, the actual hard drives.  So, no, I -- I

1  didn't document what was on the inside prior to making copies

2  of the physical hardware.

3  Q.  Okay.  So I think I heard, no, you did not document the

4  software configuration, is that fair, before you imaged them?

5  A.  Correct.

6  Q.  Okay.  Did you document the internal storage devices and

7  hardware configuration?

8  A.  Um, by documenting the internal -- I guess I don't know

9  what you're referencing there exactly.

10  Q.  The drive condition, the make, model, geometry, size,

11  jumper settings, location, drive interface, any of that

12  information, did you document it?

13  A.  Some of that information is captured in the tool I use.

14  Again, jumper settings, these hard drives don't have jumpers.

15  That's an outdated terminology for an ID drive.  These are SCSI

16  drives.  And SCSI drives, the system tells me information about

17  it without documenting it manually.

18  Q.  When you were acquiring the data, did you retrieve

19  configuration information from the system through controlled

20  boots?

21  A.  I -- using a controlled boot disk, again, if you're

22  referencing -- I used a boot disk to boot up the system in a

23  read only format, and then I recorded date and timestamps for

24  the physical system, and then time recorded on my cell phone.

25  Q.  So you did record the date and timestamps, but did you

UNITED STATES DISTRICT COURT

1    record the configuration information?

2    A.   There was one system that had a, I believe a battery, like

3    a CMOS battery that was not a full charge as yet.  I took a

4    picture of that screen.

5    Q.   Beyond that, did you record the configuration information?

6    A.   Um, no, but the, I guess -- imaging is separate.  So

7    imaging, which I have completed, is separate from the full

8    examination.  If you're asking if I completed all my work, no,

9    I have not, but to image the drives, yes, I did.  That's a

10   different procedure and process.

11   Q.   And then the law enforcement manual also advises that

12   exceptional circumstances may result in a decision to not

13   remove storage devices from the subject system.

14        Are you familiar with those exceptional circumstances

15   that may result in a decision to not remove the storage devices

16   from the subject system?

17   A.   Again, depends on the system, depends on lots of variables.

18   These systems are very complex.  I believe -- is the guide

19   you're referencing the 2004 version?

20   Q.   I believe so.

21   A.   Yeah.  So it's -- it's possible that's old and outdated.

22   With newer technologies, you might be able to move things.

23   Again, it's a case-by-case scenario on how you would image or

24   extract the data.

25   Q.   Well, in this case, did you come across any exceptional

1    circumstances that maybe would have counseled for a decision to

2    not remove the storage devices from the system, such as RAIDs,

3    or hardware dependency?  Did you encounter any of that here?

4    A.  No, not that I know of.

5    Q.  You assisted the agents and the prosecutors in writing the

6    MLAT to get the Dutch servers; is that correct?

7    A.  I don't know if I assisted in writing the MLATs.  They --

8    they may have asked me some questions and I provided answers to

9    questions about maybe servers or foreign interaction.  I don't

10   recall exactly.  I may have counseled on how I would like to

11   proceed when we go over there.  I'm not sure what went into the

12   MLAT when it was finished from what I said.

13   Q.  Sure.  I didn't mean to suggest that you wrote it, but that

14   you were part of the process in the creation of that MLAT.  You

15   had the information that they needed to put into the MLAT and

16   you provided it to them?

17   A.  Again, there was also multiple MLATs.  I don't know how --

18   which one you're referring to specifically.  At some point in

19   the process, I was asked information and I provided information

20   of how I would like to proceed.

21   Q.  How many MLATs were there?

22   A.  I think maybe eight, or maybe there was one MLAT and there

23   were supplemental MLATs that followed on.  I don't know if

24   that's a separate MLAT or it's a supplement.  I don't know what

25   the legal terminology of that.

1    Q.  So maybe one MLAT and seven supplements?

2    A.  That's possible, yes.

3    Q.  You were only involved in some of those?

4    A.  Correct.

5    Q.  Which ones?

6    A.  I believe the final supplement I was part of, because I was

7    the last one, when we went over, and maybe one prior.  We went

8    in June two years, 2018 and 2019, I would have been part of

9    those MLATs in some way, possibly.

10   Q.  And the search warrant was first executed in the

11   Netherlands on June 7th of 2018.  Do you remember that?

12   A.  The MLAT with the Dutch National Police, yes.

13   Q.  And you were there as well?

14   A.  Yes.

15   Q.  And you provided the root logins and the passwords that we

16   talked about a little bit earlier, correct?

17   A.  Um, I believe an e-mail was forwarded to the Dutch National

18   Police that contained the password information.  I don't

19   believe I passed that information along.

20   Q.  And on July 31st of 2018, the U.S. Legal Attaché received

21   nine servers that you had asked for when you went there in June

22   of 2018?

23   A.  Yes.

24   Q.  But there were many more than nine servers, right?

25   A.  Yes, there were.

1    Q.  And I think we just said you were there on June 17th of

2    2018.  Was that -- do you agree with that date?

3    A.  I thought it was June -- earlier in June.  2018 or 2019?

4    Q.  Right now I'm on 2018.  If you want to look at Exhibit 137

5    that's in front of you.

6    A.  I don't see a 130 --

7         Yes.

8    Q.  Does that refresh your recollection that you were in

9    Amsterdam on June 7th of 2018?

10   A.  Yes.  I believe you said June 18th or 19th just now, but,

11   yes, June 7th it looks -- it appears.

12   Q.  I'm sorry?

13   A.  Your original question was, I believe, June 18th or 19th,

14   and I said I believe it was earlier.  This says it was

15   June 7th.

16   Q.  Okay.  That's fine.

17        And on June 7th of 2018, you identified the nine

18   servers from Amsterdam that you wanted at that time, correct?

19   A.  Yes.

20   Q.  Did you ask the colocation to boot up the servers at that

21   point, to power them up?

22   A.  We didn't ask the colocation to do anything.  We were

23   working just with the Dutch National Police.

24   Q.  You received those nine servers -- or, excuse me, the Legal

25   Attaché received those nine servers on July 31st of 2018,

1    correct?

2    A.  Yes.

3    Q.  And I think you just said that those nine do not represent

4    the entire world of servers that existed in Amsterdam, right?

5    A.  Yes, that is correct.

6    Q.  And so a year later, on June 11th of 2019, 14 months after

7    the indictment in this case, you received and packaged 36 more

8    servers from Amsterdam at the U.S. Embassy; is that right?

9    A.  I don't recall the exact number, but, yes, it was 30-plus

10   servers.

11   Q.  If you can look at Exhibit 131 which is in front of you.

12   A.  Yes.

13   Q.  And so on June 11th of 2019, 14 months after the indictment

14   in this case, you received and packaged 36 more servers from

15   Amsterdam at the U.S. Embassy in the Netherlands?

16   A.  Yes.

17   Q.  And then two days later, on June 13th of 2019, you packaged

18   14 -- excuse me, you packaged 11 more servers; is that correct?

19          And if you need to refresh, it's at Exhibit 142.

20   A.  Yes.

21   Q.  So June 2018 you identified nine servers which you receive

22   in July of 2018?

23   A.  Yes.

24   Q.  June 11, 2019, you received 36 more servers?

25   A.  Yes.

1   Q.   June 13th of 2019, you package 11 more servers?

2   A.   Yes.

3   Q.   And so that's a total of 56 servers from Amsterdam?

4   A.   Yes, if that math adds up.

5   Q.   But you've made the defense copies of only five servers; is

6   that right?

7   A.   Yes.

8   Q.   You have not produced everything that the government has

9   seized?

10   A.   Um, me, personally, no, but, again, there was other

11   examiners that imaged servers from Amsterdam that I believe

12   have been provided.

13   Q.   Your testimony is that we've been provided with everything

14   that's been seized from Amsterdam?

15   A.   Just additional servers that were in Amsterdam, some of

16   those had been imaged.  I believe five or six servers were

17   imaged and provided.

18   Q.   The government has not provided us with everything that has

19   been seized from Amsterdam; is that correct?

20   A.   Not everything that has been seized, you are correct.

21   Q.   The government has not provided everything that's been

22   seized from Tucson?

23   A.   Correct.

24   Q.   You have not even reviewed everything that the government

25   has seized from Amsterdam?

1  A.  Correct.

2  Q.  How many servers has the government seized in total?

3  A.  It's over a hundred.  I don't know the exact count.

4  Q.  And that's from Tucson, Amsterdam, and Dallas?

5  A.  Yes.

6  Q.  Anywhere else?

7  A.  Not that I know of.

8  Q.  And, to date, the defense has been provided with five,

9  purportedly, imaged servers?

10  A.  Again, the five servers I created, yes.  I know there were

11  additional servers provided.  There was a spreadsheet that we

12  received from you guys that listed some of those additional

13  servers that have been imaged and provided to you, to the

14  defense.

15  Q.  Does that include four servers that I received in a paper

16  bag when I was at the Phoenix FBI in April of 2019?

17          MS. PERLMETER:  Objection.  Calls for speculation.  He

18  wasn't there.

19          THE COURT:  The objection is sustained.

20  BY MS. BERNSTEIN:

21  Q.  Has the defense been provided with more than ten servers

22  from the government?

23  A.  So I only know which ones I imaged and provided.  And,

24  again, that was the five we spoke of earlier.

25  Q.  But you reviewed a spreadsheet that gave you information

1    that others have been provided?

2    A.  Yes, other servers, some personal computers, things like

3    that have been provided.

4    Q.  Would you agree that it's not more than ten servers?

5    A.  It's 10 or 11, maybe.

6    Q.  Out of over a hundred that the government has seized?

7    A.  Yes.  Um, also we heard testimony before that some of those

8    servers weren't even powered on or connected to the data

9    center.  So when you asked if I haven't reviewed all of them,

10   there are servers that, again, weren't powered on, weren't

11   connected, had never been used.  A bunch of the ones from

12   Amsterdam you're referencing have no digital storage.  There

13   was no hard drives in them.  So, no, you can't review a server

14   that has no digital storage in it, nor do we provide that also.

15           So, yes, again, out of those 100-plus, five have been

16   imaged that were identified as the main servers that contain

17   all the data for the marketplace databases and ads.  Of those

18   hundred servers we just talked about, some of them had zero

19   storage, and those have not been provided.

20   Q.  Ninety-five of them had zero storage and have not been

21   provided?

22   A.  Again, some of them.

23   Q.  Is it close to 95?

24   A.  I don't know the exact count.

25   Q.  Would you put it at 1, 2, 3, 4?  Would you put it at 91,

1    '2, '3, '4?

2    A.  Probably 10 to 25 of those servers.

3    Q.  Okay.  You don't have a master list of all of the servers

4    either, do you?

5    A.  I don't.  We have a list of all the servers we have seized

6    in different formats, as you pointed out, here's 36, here's 11.

7    Q.  There is no master list that exists of every single server

8    that existed on the Backpage.com systems in Tucson, Dallas,

9    Phoenix, Amsterdam; is that right?

10   A.  Correct.

11   Q.  And nor do you have a list of every single server that

12   existed in all four of those previous locations and where they

13   were seized from?

14   A.  I don't have that list, no.

15   Q.  Does someone have that list?

16   A.  I don't know if someone else has made the list.  Again, I

17   wasn't in the Tucson data center.  So if all the servers there

18   were cataloged, inventoried, then, yes, we have some sort of a

19   list from all the servers from the Tucson data center search.

20   Again, I wasn't part of that.  For Amsterdam, we have a list of

21   all the servers we seized from Amsterdam received from

22   Amsterdam.

23   Q.  But you have imaged and been responsible for the servers

24   from Tucson, right?

25   A.  Two of the servers from Tucson are in my custody in

1    Pocatello FBI.

2    Q.  Only two servers from Tucson ever made it to Pocatello to

3    your custody?

4    A.  Correct.

5    Q.  And the rest of them have been remaining in Phoenix?

6    A.  Yes.  They're in evidence control in Phoenix.

7    Q.  And you've had nothing to do with the rest of those?

8    A.  Again, so previously I discussed when I went to Phoenix and

9    previewed some of those servers with forensic tools, identified

10   database and image servers, those two were shipped to Pocatello

11   for me to image and examine.  The other ones stayed in Phoenix.

12   Q.  Well, when I'm asking you if there is a list, a master list

13   of servers, what their role was, where they were seized from,

14   serial number, et cetera, you're not aware of that list,

15   correct?

16   A.  Not a master list, no.

17   Q.  And I think you just testified that some of it's not in

18   your custody and control because some of it remains in Phoenix?

19   A.  Correct.

20   Q.  And you're not responsible for that information either?

21   A.  I have only been assigned to examine servers that were

22   shipped to Pocatello.

23   Q.  So who is assigned to handle the rest of the servers?

24   A.  I don't know.

25   Q.  So you're not in charge of all the ESI in this case?

1   A.  Correct.

2   Q.  Who is?

3   A.  I guess the FBI and the case agents wherever they assign.

4   So FBI seizes servers, then they're assigned an examiner.  If I

5   get assigned a server or servers, then they would come to me

6   and I would examine them.  As far as who controls and contains

7   all the rest of them, that's not to my purview nor decision to

8   make.

9   Q.  So how many have you been assigned to?

10  A.  I believe it's 14 or 15.

11  Q.  And you don't know who is assigned to the other 85 servers?

12  A.  I know some of them.  The ones that were imaged in

13  Quantico, Virginia, I know the examiner that was assigned those

14  servers.

15  Q.  How many was that?

16  A.  The last batch of servers we received from Amsterdam were

17  shipped to Quantico, Virginia, that's where they reside.  There

18  were, again, the five or six that were imaged and provided, and

19  the other ones have not been.  And, again, of those 36, some of

20  those contain no hard drive nor no digital storage devices at

21  all.

22  Q.  But they're not under your purview?  You're not responsible

23  for them?  You don't have information about them?

24  A.  Correct.

25  Q.  You just know that some of them don't have hard drives?

1    A.  Yes, because I packaged them and was in the process when we

2    packaged them for shipping.

3    Q.  Do you have a list of all 106 servers and each role that

4    the server played in the Backpage.com systems?

5    A.  I do not.

6    Q.  Do you have a list of all 106 servers and their serial

7    numbers?

8    A.  I have -- I personally have a list of all the servers that

9    were assigned to me.  Again, we have a list of serial numbers

10   of all the ones from Amsterdam that you pointed out here, the

11   11 and the 36.  If you're saying is there one specific list

12   that contains all those serial numbers, there isn't one that I

13   know of.

14   Q.  So there was a huge system and it's just been far flung

15   amongst various offices and you don't know anything beyond the

16   14 that are in your custody and control?

17   A.  Again, beyond what I've stated about collecting, seizing

18   them with the assistance of the Dutch National Police and the

19   Amsterdam servers, I was there for the seizure of all those

20   servers and the collection.  The Tucson servers, I have only

21   reviewed the nine or so that I had from the Tucson search.

22   Q.  So if I want to know the role or the serial number or the

23   1B number or any vital information from the other 85 servers

24   plus that are not in your custody and control, that's not

25   information you have; is that correct?

1    A.  Correct.  I would have to ask somebody else for that

2    information.

3    Q.  But you don't know who you would ask for that?

4    A.  I would ask the case agents.

5    Q.  And by the case agents, you mean Ms. Tolhurst or

6    Ms. Fryberger; is that right?

7    A.  Yes.

8    Q.  Your information about the roles of the servers that you

9    are aware of, that came from Wil Gerken; is that correct?

10   A.  Wil Gerken and Chris Kempel.

11   Q.  And they told you that they did not have a current list of

12   all servers?

13   A.  Correct.

14   Q.  They told you they did not have a definitive list of all

15   servers?

16   A.  Correct.

17   Q.  That the databases and groupings changed over time?

18   A.  It's possible they said that, yes.

19   Q.  Mr. Gerken told you that he could not confirm the

20   information that he had was complete, but he recommended that

21   you ask the data center in Amsterdam to provide a list of all

22   service tags?

23   A.  Yes.  Yes, and we did that.

24   Q.  As you sit here today -- strike that.

25           At one point you asked Mr. Gerken which server the

1    subpoenaed data was on.  Do you remember that?

2    A.  Yes.

3    Q.  And the subpoenaed data is information that Backpage

4    regularly and voluntarily provided in response to law

5    enforcement subpoenas?

6    A.  That's what I was informed, yes.

7    Q.  What server was that data on?

8    A.  I don't remember off the top of my head.

9    Q.  Did you forensically image that server?

10   A.  I have not.

11   Q.  So nor have you created or extracted the relational

12   database of that server?

13   A.  If there is a database, again, I don't know what structure

14   or how they're storing that data.

15   Q.  But you haven't imaged that drive -- or that server, excuse

16   me?

17   A.  Correct.

18   Q.  And you don't have a system in Mint or HeidiSQL to go

19   through that information?

20   A.  Correct.

21   Q.  You decided which servers were necessary to copy?

22   A.  Yes, based on the information from Wil Gerken and Chris

23   Kempel.

24   Q.  The information that they told you was changing,

25   incomplete, and not definitive?

1    A.  Yes.  Again, I was specifically requesting information

2    about the ads and the images because that's what I was trying

3    to get access to, the ads from Backpage.

4    Q.  And they told you that they did not have definitive,

5    complete information and that databases and groupings changed

6    over time?

7    A.  Yes.  And they also stated there were master databases,

8    slave databases which identified and extracted from.

9    Q.  And you exclusively determined which servers you were going

10   to copy and image?

11   A.  Yes.

12             MS. BERNSTEIN:  Okay.  Thank you.

13             MR. NEUMAN:  Can I ask some questions, Your Honor?

14             THE COURT:  All right.

15                         CROSS-EXAMINATION

16   BY MR. NEUMAN:

17   Q.  Good afternoon, Mr. Frost.

18   A.  Good afternoon.

19   Q.  So I just want to walk through this process.  You come into

20   the case, you look at what was seized in Tucson, and I think

21   you've characterized it today even as it was a big puzzle,

22   right?

23   A.  Yes.

24   Q.  And that's because, as the government said in its filing,

25   Document 759 at page 9, the IP addresses of the different

1  servers had not been retained and the organization and

2  interrelationship of the system components had not been

3  retained, right?

4  A.  Correct.

5  Q.  And nobody had, for instance, as you just talked about, had

6  gone in and left the servers up, imaged them, put them in and

7  taken them offline, off the internet, but imaged them on site

8  and left them there so that data could be collected, right?

9  A.  Like I said, I was in Amsterdam and --

10 Q.  No.  I'm talking about Tucson.  You walk into the case --

11 A.  They had not been imaged live on scene, again, yes.

12 Q.  And are you aware that the government has in other cases

13 left servers and databases intact, imaged them on site, and

14 gone away and thereby not destroyed the data?  Are you aware of

15 cases where that's been done?

16 A.  Yes, it's done in the past.  But if you're inferring we

17 destroyed the data, I would disagree with that statement.

18 Q.  Okay.  But, for instance, are you familiar with the

19 Megaupload case?

20 A.  Yes, I am familiar with Megaupload.

21 Q.  And in Megaupload, the government had a search warrant,

22 there were over 1,100 servers involved in that case.  And I'm

23 reading from a government submission there that says, the

24 government did not seize any of the upload servers, instead

25 copied certain data from the servers and essentially took them

```
 1    offline while the government was there so they could be imaged,
 2    but then left the servers on the premises, right?  Are you
 3    familiar with that?
 4    A.  Yes.
 5    Q.  All right.  That's not what happened here, right?
 6    A.  Yes.  Again, different case, probably apples and oranges.
 7    I'm not sure the circumstances around that case and why that
 8    decision was made.  Again, I wasn't part of the decision in
 9    Tucson as to take them offline.
10    Q.  Understood, you were not involved in Tucson.  My point and
11    question for you is you don't know of any reason why that could
12    not have been done in Tucson, correct, to your knowledge?
13    A.  In Tucson, yes, it was possible, but, again, there is lease
14    arrangements and paying for the servers to stay online.
15    Q.  I get all the possibilities.  I'm asking what you know.
16    Okay?
17    A.  Technologically, yes, it's possible.
18    Q.  And then you do come into the case, and there is this
19    interaction with the Dutch police about you don't want to deal
20    with the puzzle in Tucson, you want to use the, essentially,
21    what we're talking about here, a read only version accessed
22    through this encrypted network to Amsterdam, right?
23    A.  Yes.
24    Q.  And they won't let you.  That was your testimony, correct?
25    A.  Correct, they said they couldn't keep them there.
```

1    Q.  And then that's -- and they say, essentially, we got to

2    take these down, right?  We want to give you the servers

3    through the MLAT process.  Let's work together to make sure you

4    can get what you need, correct?

5    A.  Yes.

6    Q.  At that point, again, now you are involved, but you don't

7    get or gather the IP addresses of the different servers, right,

8    in Amsterdam, do you?

9    A.  Yes.  Again, they were powered down, so an IP address --

10   you can't pull an IP address from a dead machine unless it was

11   statically assigned and then you can get it later anyway.  So

12   if it's a static IP address, then I can collect that at any

13   time.  If it's a dynamic IP address, that means it's handed out

14   based on when the server comes online.  And there is a system

15   that passes out the IP addresses, and those IP addresses could

16   be changing, then there would be no need to collect it from a

17   system that's already shut down.

18   Q.  Okay.  So it is your testimony that when you got to

19   Amsterdam, it would have been impossible to obtain the IP

20   addresses and obtain the organization and interrelationship of

21   the various system components such that you could have taken

22   all that information, taken all the servers, brought them back

23   to the United States and, essentially, put that system back

24   together?  Is that your testimony, that it was impossible?

25   A.  No, I didn't say it was impossible.  I said collecting the

1    IP address of a dead system is unnecessary, because it's

2    already been turned off and I can collect the IP address later.

3    Q.  Okay.

4    A.  Again, which servers were connected to which switch, at

5    that time, again, we were working under the Dutch authorities

6    to seize those servers, and we are not allowed to take pictures

7    in there of what the servers are connected to.  We just

8    unracked those servers, we -- the Dutch unracked the servers,

9    put them on a cart and they seized them.

10   Q.  Did you ask Mr. Gerken about the organization and inter --

11   at the time for the -- to -- for the organization and

12   interrelationship of the various system components so that you

13   could document it and then put the system back together in the

14   United States?

15   A.  Yes.  I believe I -- well, I know I e-mailed Wil Gerken,

16   asking if he had a network diagram, network map, something that

17   would show us how all the systems were organized, and he said

18   he did not have one of those.

19   Q.  So now we've got a puzzle from Tucson and a puzzle from

20   Amsterdam, essentially, right?

21   A.  Yes.

22   Q.  That's where you're left, and then we have this system that

23   you showed us last time you were here that you sort of created

24   to access the data, right?

25   A.  The, um -- created the system, yes, I had a SQL server that

UNITED STATES DISTRICT COURT

```
1    I connected to to access a SQL dump of a database for
2    Washington, D.C.
3    Q.  Right.  And sort of a -- I would refer to it sort of as a
4    bootstrap way of accessing the data.  It would have been ideal
5    to be looking at a read only version of the Web site.  You're
6    coming into the case late, that's not available to you, so you
7    create this system to access the data, right?
8    A.  Yes, as I have in many other cases --
9    Q.  Understood.
10   A.  -- when a system is offline, you make uploads.  There is
11   also lots of instances where the government seizes a computer,
12   shuts them down, we extract the databases and work with the
13   data on the back end.
14   Q.  Right.  But in this case we're talking about, among other
15   things, advertisement that this new, what I call the bootstrap
16   version, you have to bootstrap to even get those
17   advertisements, right?  You have to, as you testified, compile
18   this data into a version for your testimony in New York, that's
19   not even a real version of the ad, it's something you have now
20   created, right?
21   A.  Correct.  It would be similar to taking a cell phone where
22   the text messages are on the cell phone -- a cell phone saves
23   text messages in a SQL live database.  So a database extraction
24   of a cell phone is very similar to a server with a SQL
25   database.  You extract the data, you dump the cell phone text
```

1   messages, get what you want, then you use a program to put

2   those text messages in a viewable format.  They're not the

3   exact same text messages that appeared on an iPhone or a

4   Samsung phone, the, you know, colors are different, but you

5   have flags of when it was sent, who it was sent to, what phone

6   number.  Again, the information is the same, so it's common

7   practice forensics to do this work just like I did it.

8   Q.  And the data associated with a Backpage ad is far more

9   voluminous than the data associated with a simple text message,

10  right?  You have all this data, you have all the administrative

11  data, you have the reporting to NCMEC, which I know you went

12  back and looked at, all of that data is associated with the ads

13  on Backpage?  The text message sort of has the:  To; from; and

14  what the subject -- and what the content of the text message

15  is, right?

16  A.  Attachments, multimedia messages.  Again, there is multiple

17  layers, but the process is the same.

18  Q.  So you go through that process -- and did you bring it

19  today, by the way?

20  A.  Yes, I have the same laptop as I had before.

21  Q.  So you still have the Washington, D.C., system that you

22  brought up last time?

23  A.  Correct.

24  Q.  Okay.  Now, last time -- I went through the transcript --

25  and you had steps to count how many automobile ads were in

1    Washington.

2            Do you remember going through that with the

3    prosecutor?

4    A.  Yes.

5    Q.  And, by my count, you had multiple steps.  You had to

6    connect to a virtual machine, go to your special Washington,

7    D.C., database, go to a section table, click data, find object

8    ID, copy the object ID, put it into a query field, insert some

9    sort of code that you knew to run the query, and then you got

10   the number of automobile ads, right?

11   A.  Correct.  Yeah, same --

12   Q.  Did I describe the process correctly?

13   A.  Yes.  Again, so there is a process to go through a phone,

14   extract text message from a phone --

15   Q.  No.  I'm -- let me -- I'm not trying go backwards.  I want

16   to keep going forward.  We don't have a lot of time today.

17   Okay?  I'm going -- trying to get to something.  I have a

18   question for you.  Okay?

19            So that's how you were able to, for Washington, D.C.,

20   determine the number of automobile ads, right?

21   A.  Yes, it was.

22   Q.  That process.  All right.

23            And you have to go through that process to see the

24   total number of job ads in Washington, D.C., right?

25   A.  Yes.

1   Q.  And so if -- and you talked, I think -- you said there is

2   about a hundred different -- over a hundred different

3   marketplaces, right?

4   A.  Yes.

5   Q.  I had, in my head, 400 from some document I saw.  Does that

6   sound potentially right?

7   A.  I don't think it's 400.  If we're talking about just United

8   States marketplaces, then that is even a smaller number.

9   Q.  So it's one per city, essentially, or one per geographic

10  area?

11  A.  One per major area, Washington, D.C.; Phoenix.

12  Q.  All right.  So for these hundred different, approximately,

13  hundred different areas, to figure out the total number of ads

14  that are not even adult ads, forget prostitution, not even

15  adult ads, I have to go through that process for each type of

16  ad and for each of those marketplaces, right?

17  A.  Yes, or you could create a script that would do all that at

18  once.

19  Q.  Okay.  Whereas before, if I had a read only version, I

20  could actually show, for instance, a jury how many ads there

21  are for jobs, or how many ads there are for automobiles, I

22  could actually click through those ads, right, pretty simply?

23  A.  You'd likely have to go to the marketplace still and click

24  through every marketplace, so this marketplace has this many

25  automobiles; this marketplace has this many automobiles.

1    Q.  Right.  And I wouldn't have to recreate those ads, I could

2    actually just pull them up on the screen right here, right?

3    A.  Yes.

4    Q.  Okay.  Do you know -- I mean, when we looked at the

5    Washington, D.C., marketplace, my recollection is it was

6    something like ten percent of the ads were in the adult

7    category.  Does that sound about right to you?

8    A.  It's -- the adult category, if we're talking just adult

9    entertainment, it was 54 percent.  If we're talking adult ads

10   and dating, then it's 88 percent.

11   Q.  Let me ask you one last area of questions.

12           The payment processing island, are you familiar with

13   that?

14   A.  Yes.

15   Q.  And that's, essentially, the set of databases out there

16   that connect the payment structure, I'll call it, of Backpage,

17   to the advertisement structure of databases; is that right?

18   A.  Yes.

19   Q.  Okay.  And so your system that you've created is not

20   connected to the payment -- payment processing island system,

21   right?

22   A.  Correct, it's not connected.

23   Q.  All right.  So if I want to see the payment information for

24   a particular ad that, let's say, you pulled up on your system,

25   I can't go -- I can't link, let's say, to that information on

1    the payment processing island database, right?

2    A.  Not on the payment processing, but you could go to the

3    invoices table and pull the invoices for those ads

4    specifically.

5    Q.  If I wanted to see how it was paid, for instance, because

6    that's one of the allegations in this case is about how things

7    were paid for, bitcoin, prepaid Visas, whatever, that I have to

8    go to the payment processing island, right?

9    A.  Yes.

10   Q.  So right now, even with the system you've created, it's not

11   possible for me to link an ad to the method of payment without

12   going through a number of complicated steps that you haven't

13   demonstrated here in court, correct?

14   A.  Yes, beyond the invoice pays, the card reference, the

15   information stored in the invoice itself.

16   Q.  I understand that.  But the answer to my question is, yes,

17   correct?

18   A.  That I haven't connected those two, the payment processing

19   island and the database, no.

20   Q.  And so the method of payment is not necessarily apparent

21   from what you have created, right?

22   A.  Again, it's information in the invoice field.

23        MR. NEUMAN:  I have nothing further.  Thank you, Your

24   Honor.

25        THE COURT:  Redirect.

1          MS. PERLMETER:  May I approach the clerk?  I want to

2    retrieve the Defense Exhibits 103 and 121.

3          May I give them to the witness?

4          THE COURT:  Traci will take them.

5                      REDIRECT EXAMINATION

6    BY MS. PERLMETER:

7    Q.  All right.  Thank you, Mr. Frost.  I just wanted to ask you

8    a few questions before we move on to the servers.

9          When defense counsel asked you if you had a chance to

10   review the defense production yesterday, did you actually

11   review it this morning?

12   A.  Um, I received an e-mail last night that had some of it and

13   then I finished this morning.

14   Q.  And was it roughly 300 pages?

15   A.  I didn't count the pages, but there was a lot.

16   Q.  And did it come through in the late evening hours of last

17   night around nine or ten p.m.?

18   A.  Yes.

19   Q.  And did you start reading at that point and then continue

20   reading and reviewing this morning?

21   A.  Yes.  I didn't get the e-mail until actually around

22   11 o'clock is when I started looking at it.

23   Q.  And in terms of conversations with the prosecution between

24   October 3rd and today, you discussed how you -- how we

25   discussed going over NCMEC related ads?

1    A.   Yes.

2    Q.   Did we also discuss ads related to the moderation process?

3    A.   Yes.

4    Q.   And then we had a couple of phone conference -- the

5    government and you had a couple of phone conferences in between

6    October 3rd and today; is that correct?

7    A.   Yes.

8    Q.   Okay.  Now, you were asked about whether or not you had a

9    list of all the serial numbers, service tags, and the role for

10   all of the servers that exist in the Backpage case; is that

11   right?

12   A.   Yes.

13   Q.   Okay.  Did you ask Wil Gerken at the onset of this

14   investigation whether or not such a schematic existed?

15   A.   Yes, I did.

16   Q.   And what did he tell you?

17   A.   He said he didn't have one.

18   Q.   So in terms of the FBI, does the FBI maintain a list of all

19   of the servers and pieces of evidence that they have seized in

20   this case?

21   A.   Yes, the FBI does have a list.

22   Q.   And as it relates to servers, are they identified by either

23   Tucson or Amsterdam and by their make, model, and serial

24   number?

25   A.   Um, on the list, yes, I mean, there are serial numbers,

1  identifying numbers categorized for each piece of digital

2  evidence that was seized.

3  Q.  So those are maintained in evidence logs and in chain of

4  custody documents?

5  A.  Yes.

6  Q.  In terms of the numbers of servers, you mentioned that some

7  of the servers were not even powered on and were not connected

8  at the time of the seizure?

9  A.  Yes.

10  Q.  And is that related to the servers that were in Tucson and

11  Amsterdam or both?

12  A.  I only saw pictures of the Tucson search where there was

13  servers that were sitting there not connected to anything.  In

14  Amsterdam, everything was racked, powered off, but that's where

15  the servers had -- some of them had no storage.

16  Q.  So there were empty servers with no disks inside?

17  A.  Yes.

18  Q.  How did you decide which servers -- other than being

19  assigned by the case agents in this case, how are you -- how

20  did you determine which servers would be most prudent to image

21  in this case?

22  A.  We -- again, I started looking for the -- the servers

23  containing the images and ads for the Backpage ads, and I had

24  requested information from Wil Gerken to guide me towards the

25  database servers -- the database server and image server as the

1   two primary servers.

2   Q.  So did you rely in part on information provided to you by

3   Wil Gerken as to what he thought would be the most -- which

4   servers would have the most information?

5   A.  Yes.

6   Q.  And so he identified for you the master base -- the master

7   database server, as well as the images server?

8   A.  Correct.

9   Q.  And that is what you imaged?

10  A.  Yes.

11  Q.  And are those the servers that have been produced to the

12  defense?

13  A.  Yes, from both Tucson and Amsterdam.

14  Q.  Okay.  Were you also informed by Mr. Gerken that -- that

15  Backpage maintained numerous redundant copies of the master

16  base -- the master database server, as well as the images

17  server?

18  A.  Correct.

19  Q.  And did that play into the decision making process on

20  whether or not it would be prudent to copy servers that were

21  identical to the servers that you copied already?

22          MS. BERNSTEIN:  Objection, Your Honor.  Leading.

23          THE COURT:  The objection is overruled.

24          THE WITNESS:  Yes.  There was certain servers that I

25  didn't image or examine because I was informed they were

1   duplicates.

2   BY MS. PERLMETER:

3   Q.  You were asked about whether or not you observed any

4   indications not to remove hard drives from their storage

5   systems and you were asked about RAIDs.  Are there RAIDs

6   applicable in this case?

7   A.  I haven't identified any, no.

8   Q.  And in relationship to whether or not how that affects

9   interconnectivity, the order in which things were stored or

10  unplugged and shut down, does that have any impact on your

11  ability to access the database servers and the images servers

12  here?

13  A.  No, it does not.

14  Q.  Why not?

15  A.  Um, because the -- all the information on the database

16  server is contained solely in the database server.  I don't

17  have to access any additional servers to put all the

18  information from the database for an ad together.

19  Q.  You were asked today, as well as on October 3rd, about

20  spreadsheets that you have created, reports that you have

21  created related to the servers that you imaged in this case; is

22  that right?

23  A.  Yes.

24  Q.  Okay.  Now, when you created these spreadsheets, is the

25  information contained in the spreadsheets the data that is

1   present on the Backpage servers?

2   A.  Yes.

3   Q.  For example, did you extract the information from the

4   servers and put it into the spreadsheet or your report?

5   A.  Yes.

6   Q.  So is it fair to say that you created a report but it was

7   based on the information contained within these servers?

8   A.  Yes.

9   Q.  So I just want to make it clear, you didn't make up

10  information or make up data and then insert it into random

11  spreadsheets?

12  A.  Correct.

13  Q.  You were asked about the tools that you use to image the

14  server; is that right?

15  A.  Yes.

16  Q.  Did you use -- so, first of all, is AccessData a company

17  that created the Forensic Toolkit, FTK Imager, and other tools

18  like the AD Lab?

19  A.  Yes.

20  Q.  So, in this case, did you use the AccessData Command Line

21  Imager to image the servers that you imaged?

22  A.  Yes.

23  Q.  Is it also -- is AccessData Command Line Imager also

24  referred to as FTK Command Line Imager, there is version 3.1.1?

25  A.  Yes.

1    Q.  Is it also referred to AccessData Imager 3, FTK Imager?

2    A.  Yes.

3    Q.  But if you want -- if one wanted to be completely accurate

4    and complete and formal, you would call it AccessData Command

5    Line Imager?

6    A.  Yes.

7    Q.  And feel free to correct me if I have misstated something.

8    Okay?

9         So you were present on October 3rd when Patrick Cullen

10   testified?

11   A.  Yes, I was.

12   Q.  So he discussed a little bit about how FTK Imager doesn't

13   work with Linux systems, not completely.  Do you agree with

14   that?

15   A.  Yes.

16   Q.  Can you explain how the -- how FTK Imager can sometimes

17   work with Linux systems but not completely?

18   A.  Yes.  So if you're talking -- FTK Imager is a tool that can

19   be used to image -- again, FTK Imager, broad terms, speaking

20   about the tool created by AccessData.  There are different

21   versions for Linux or Windows.  The tool can be used to image a

22   physical hard drive.

23        Now, if the physical hard drive contains a file system

24   that FTK Imager cannot read, then you wouldn't see any data, or

25   it's possible the tool could see some of the data, like it

1  might tell you it's in the EXT4 file system, but it wouldn't be

2  able to interpret all the data correctly.  You would get

3  negative values for file size, which a file cap is a negative

4  size if it's -- if it's a file, it's got a, either a zero or a

5  positive file size, therefore, the tool would interpret that

6  data correctly if it's trying to read the file system that was

7  contained inside of a hard drive, whereas it's really good at

8  reading Windows file systems, NTFS, FAT32, et cetera.

9  Q.  Okay.  So let me know if I have this correct.  FTK Imager

10  has a couple of purposes, one of which is to make an image of a

11  hard drive or a server?

12  A.  Yes.

13  Q.  And another purpose would be to read or view the

14  information contained within the image or within the server or

15  hard drive?

16  A.  Yes.  Either the actual physical hard drive you could look

17  at, or the image copy that had been created.

18  Q.  Okay.  So as far as a Linux system is concerned, FTK Imager

19  can be used to image it, but it may not be the best tool to

20  view the information contained within?

21  A.  Correct.

22  Q.  So if once you use -- once the image is created, what would

23  you use to then view the information contained in a Linux

24  server?

25  A.  I would use Linux tools that can interpret an EXT4 file

1    system.

2    Q.  Okay.  And then I want to get to your specific tools in a

3    little bit, but after you create an image of a -- of a digital

4    device, do you -- how do you then verify that it is an accurate

5    image and a complete one?

6    A.  Yes.  The FTK Imager command imager creates the forensic

7    copy or duplicate and then it creates a hash value for the

8    original and for the image copy, and it can -- verifies that

9    those two images are correct, and then it records that

10   verification that the duplicate or the forensic copy matches

11   the original.

12   Q.  And did you do that verification for the image -- for the

13   servers that you imaged?

14   A.  Yes, the images of the hard drive from the servers.

15   Q.  And they were -- they correctly matched?

16   A.  Yes.  All of them hash verified and matched the hash

17   values.

18   Q.  And is that something that a third person could then fact

19   check you on to see if the hash values matched?

20   A.  Yes.  Anyone that I send the imaged copy to could then load

21   that image in FTK Imager or a similar product that would read

22   the image file, and they could then hash verify and verify the

23   copy I created is the same that matched the original hash value

24   and all the information stored in the text log file.

25   Q.  So after the image is created and hash verified, let's talk

1    about the tools that you use to view the contents of a server

2    or a hard drive.

3           In this specific case, it sounds like you used some

4    Linux based tools; is that right?

5    A.  Yes.

6    Q.  And what were they?

7    A.  Once the images were created, I used a tool called Xmount,

8    losetup, Kpartx, and ZFS Tools to access the data inside

9    those --

10          MR. NEUMAN:  Your Honor, I'm going to object.  This is

11   just a rehash of the direct exam in terms of the process that

12   he went through.

13          THE COURT:  The objection is sustained.

14          MS. PERLMETER:  Okay.

15   BY MS. PERLMETER:

16   Q.  You were asked to talk about whether or not you knew how

17   ads were reported to NCMEC.  Do you remember that?

18   A.  Yes.

19   Q.  And back on October 3rd you -- you testified that you

20   hadn't been asked to do it before and you weren't quite sure

21   how that may be done?

22   A.  Correct.

23   Q.  Have you since had time to -- to research and write queries

24   to kind of figure out whether or not that information is

25   contained in the database that was seized?

1    A.  Yes.

2    Q.  Okay.  To assist you in that task, were you given three ads

3    that were reported by Backpage to NCMEC?

4    A.  Yes.

5    Q.  And then did you take those ads that you were provided and

6    work backwards to see if the information contained on the ad

7    was also on -- in the database?

8    A.  Yes.

9    Q.  Okay.

10          MS. PERLMETER:  May I approach the witness?

11          THE COURT:  Yes.

12   BY MS. PERLMETER:

13   Q.  I'd like you to take a look, please, at Exhibits 10, 12,

14   and 13.

15          Let me know when you're finished reviewing those three

16   ads.

17   A.  Done.

18   Q.  Are those the three ads that were provided to you to assist

19   you in determining the information that may be contained in the

20   database about ads in NCMEC?

21   A.  Yes.

22   Q.  Okay.

23          MS. PERLMETER:  The government moves Exhibits Number

24   10, 12, and 13, into evidence.

25          THE COURT:  Is there any objection?

1        MS. BERNSTEIN:  Yes, Your Honor.  I'm not sure who

2   provided these to Mr. Frost or if these have ever been provided

3   previously to defense counsel, where they came from, no

4   information about these.

5        THE COURT:  Okay.  For purposes of this hearing,

6   Exhibits 10, 12, and 13 will be admitted.

7   BY MS. PERLMETER:

8   Q.  So once you received the ads, did you do a search for

9   NCMEC?

10  A.  Yes, I did.

11  Q.  Was it like a word search?

12  A.  Yes.  I searched the raw database dump for the term NCMEC.

13  Q.  Okay.  So is it similar to, like, a control find?

14  A.  Yes.

15  Q.  And what happened?

16  A.  I found several references to NCMEC located in the Phoenix

17  database specifically, because these were Phoenix ads.

18  Q.  So these three ads happened to come from the Phoenix

19  database?

20  A.  Yes, they did.

21  Q.  And then you received information -- you found flags?

22  A.  I found hits with the term NCMEC, and then object IDs.  I

23  then located the object ID that matched the posting ID of the

24  object ID for the ads that I had been provided.

25  Q.  Okay.  So you -- you found hits for NCMEC, you found object

1    IDs, and what did -- and then you found the posting ID?

2    A.  Yes.  So the -- I found the posting ID and then a table on

3    the back -- the Phoenix database with a flag called violation

4    and it was reported to NCMEC.  And then the posting ID for the

5    three ads, I was able to locate posting ID, flagged, violation

6    that is stated, reported to NCMEC.

7    Q.  Okay.  And what did you do next?

8    A.  I informed the case agents that I had located those in the

9    database.

10    Q.  Now, so the information contained in the ads that you were

11    provided, Exhibits Number 10, 12, and 13, did you find the

12    information about those ads contained within the databases?

13    A.  Yes.

14    Q.  Okay.  Now, can you turn on your computer and replicate

15    what you did in the Washington, D.C., database, because we

16    don't have the Phoenix database today, right?

17    A.  Correct.

18    Q.  Okay.  So let's -- I'd like you to run a search for NCMEC,

19    a word search like you just discussed, in the Washington, D.C.,

20    database.

21           MS. PERLMETER:  Traci, can you turn the TV on, please.

22           COURTROOM DEPUTY:  Uh-huh.

23           THE WITNESS:  Are we ready?

24    BY MS. PERLMETER:

25    Q.  Let's wait until -- okay.

1          Yes.

2    A.   Okay.  So once I did that text search for the term NCMEC, I

3    located it in a table labeled ad, dollar sign, violation flag.

4    Q.   Actually, can you even go a step back.  Could you do the

5    actual word search?

6    A.   Certainly.

7          Yes.  So here I'm searching using grep to find the

8    term NCMEC in the IAD database SQL file and I'm -- dump it out

9    to violation NCMEC.

10   Q.   And then right now -- so you typed in the query and we're

11   waiting for the computer to return a response?

12   A.   Yes.  There is the command I ran up there and it just

13   finished, it returned my prompt.

14   Q.   Okay.

15   A.   So now we can go review the text file I created where it

16   dumped the output to.

17          So here's the -- so here the term, I located NCMEC

18   inside the Washington, D.C., marketplace database.

19          You'll see several numbers here in this column.

20          And then this column here, status, reported to NCMEC.

21   And there --

22   Q.   So above -- above that at the very top it also says,

23   violation flag, it says, inappropriate content, over posted,

24   wrong category, spam, et cetera.

25          How -- how did that information populate when you ran

1    a word search for NCMEC?

2    A.  So the -- the grep search that I conducted just goes

3    through the, again, the text base file, the SQL dump, looks for

4    every time there is a term NCMEC.  Then it goes backwards and

5    gives me a couple lines before the first hit and then the

6    information before that, so this is the information on the

7    database that comes right before the first hit for NCMEC.

8    Q.  So with this text report reported to NCMEC, where does that

9    direct you to look back on the database?

10   A.  Again, so the violation flag, I looked for that inside the

11   database.

12          So then we go to the database here and we see under

13   ad, dollar sign, violation flag, we see the violation flag

14   right there, and the length set right here.

15          This column we see the flags that were mentioned,

16   imperfect content, over posted, wrong category, et cetera.

17          And then we see reported to NCMEC right there as one

18   of the possible flags for the violation field inside the

19   database.

20   Q.  Okay.  So within the violation flag database, there are --

21   or there can be entries for inappropriate content, over posted,

22   wrong category, spam, ghosted, strip term from ad, violated

23   terms of use, edit lockout, no HTML, no SMS sent, reported to

24   COTN, reported to NCMEC, term alert, and proxy?

25   A.  Yes.

1    Q.  Now, Mr. Frost, I'd like to put on the Elmo Exhibit Number

2    121, or Defense Exhibit Number 121.

3    A.  Yes, I have a copy here.

4    Q.  Okay.  I'm zooming out.

5            This is page 4 of 5.  Do you recognize this as the

6    object editor for a Backpage ad?

7    A.  The 121 I have is four pages.

8    Q.  Okay.  At the very top of the page that's on the Elmo, does

9    it say Document 643 --

10   A.  Oh.

11   Q.  -- page 4 of 5?

12   A.  Yes.

13   Q.  And just by looking at this -- this piece of paper, do you

14   recognize it as an example of an object editor from a Backpage

15   ad?

16   A.  Yes.

17   Q.  Now, if I focus your attention on the violations section,

18   do you see that?

19   A.  Yes, I do.

20   Q.  Okay.  So is the information contained within violations,

21   and then further violations flag, the same information that you

22   were able to find in the database?

23   A.  Yes.  Violation flags correspond with the database by the

24   same table.

25   Q.  So in the object editor, are there -- in the violation flag

1    section, are there places where one can check the box for

2    inappropriate content, over posted, wrong category, spam,

3    ghosted, strip term from ad, violated terms of use, edit

4    lockout, and all of the other categories that I related a few

5    moments ago?

6    A.  Yes.  I don't know if you can check the flag in object

7    editor, or whether it's pulling information about a specific ad

8    and the flag was set for report to NCMEC, as we see here, and

9    that flag had been set inside the database so it was just

10   pulling that information into this interface.

11   Q.  Okay.  So, fair enough, so the information contained in the

12   violator flag -- violation flag is consistent with the

13   information that you found in the database?

14   A.  Yes.

15   Q.  Now, were you also asked on October 3rd to describe how one

16   might be able to figure out if an ad had been moderated?

17   A.  Yes.

18   Q.  Okay.  And to -- were you also provided an ad to assist you

19   in working backwards to see if you could figure that out?

20   A.  Yes, I was.

21   Q.  Okay.  Exhibit 11, and if you could review that, please.

22   A.  Yes.

23   Q.  Is that the ad that you were provided to see if you could

24   work backwards to find information about how the database may

25   contain information about moderated ads?

1    A.  Yes.

2    Q.  And is that particular ad actually the ad in the -- for

3    count 20 in the -- in the superseding indictment that

4    references the victim that was murdered as a result of her ad

5    being placed on Backpage?

6              MS. BERNSTEIN:  Objection, Your Honor.

7              THE COURT:  The objection is sustained.

8    BY MS. PERLMETER:

9    Q.  Is that ad from count 20 of the superseding indictment?

10   A.  Yes.

11   Q.  Okay.  And what did you do with that ad?  How did you work

12   backwards to kind of see if there was any information that may

13   assist you in figuring out if that ad had been moderated?

14   A.  Um, the -- I studied the information in the administrative

15   data, keyed in on the deleted images, administrator only, and

16   deleted by BP 26.

17             MS. PERLMETER:  May I retrieve the exhibit from the

18   witness?

19             THE COURT:  Yes.

20   BY MS. PERLMETER:

21   Q.  Okay.  I'm putting up Exhibit 11.

22             Mr. Frost, is this the portion of the ad that you were

23   focused on, where it says, deleted images, administrators only,

24   deleted by BP 26?

25   A.  Yes.

1   Q.  Okay.  And then how did -- taking this information, did you

2   go -- what did you do to see if there was related information

3   in the database concerning this data?

4   A.  I searched for information in the ad, going to columns

5   associated with the ads, and located a column for the moderator

6   column.  And there was a column and, again, there was deleted

7   by.  There was -- in the images table there is a column for

8   moderated -- something moderation log, one of those two terms,

9   I can't remember exactly, and then there is a deleted column or

10  something like that.  And if it is deleted, there was a yes, it

11  was deleted, so I'd know if an ad -- or an image has been

12  deleted from the ad.  And then there was the BP and the

13  corresponding number to whatever that represents that the ad

14  had been deleted by BP.

15  Q.  Okay.

16          MS. PERLMETER:  I move Exhibit Number 11 into

17  evidence, please.

18          MS. BERNSTEIN:  I'm sorry, I didn't hear that.

19          THE COURT:  She moved for Exhibit 11.

20          MS. BERNSTEIN:  Into evidence.  It's the same

21  foundational and authentication objections that have been

22  raised already.

23          THE COURT:  The objection is overruled.  Exhibit 11

24  will be admitted.

25

1    BY MS. PERLMETER:

2    Q.  So did you find in this ad information related to

3    moderation log, as well as moderated removed?

4    A.  Um, yes, but I probably need to clarify.  So I was looking

5    for information associated with this on ads in general.  This

6    specific ad, I didn't look at this specific ad individually.

7    Q.  Okay.

8    A.  Just ads in general at the column that would display

9    information in a similar nature.

10   Q.  Okay.  But you found some links to fields or tables

11   entitled, moderation log and moderated removed?

12   A.  Yes.

13   Q.  Okay.  Can we go in the Washington, D.C., database and can

14   you point us -- point us to where that information may be and

15   what it would -- may look like?

16   A.  Certainly.

17        Again, so this is referring to an image, so the image

18   table with the data.

19        Over here, these are all the images associated with

20   ads.

21        Scroll all the way over.  Here's the moderator removed

22   column and moderation log.

23        As you scroll down, here's one, yes, that's been

24   removed, BP 17.  Here's another two, yes, yes, two have been

25   removed, Meyers BP 15.

1          And then going on there is, of course, examples of

2    moderated ad where it's deleted, moderator removed for the

3    image, and then the log associated with it.

4    Q.  So if one were seeking information about moderation or

5    moderated logs, it would be -- here's one place where one could

6    go to search for information?

7    A.  Yes.

8    Q.  Okay.  Now, you were also asked about the automotive ads

9    that you pulled up back on October 3rd.

10         Do you remember that?

11   A.  Yes.

12   Q.  I think the question was whether or not automotive ads was

13   ten percent of the ads in the Washington, D.C., database?

14   A.  Something like that.

15   Q.  Let's go -- let's clear out of here, go back to the

16   Washington, D.C., database, and tell us how many total ads

17   existed in IAD when it was seized on April 5th of last year.

18   A.  This is selecting all ads from the IAD database.

19   Q.  So please write the query that would get you the

20   information about total ads in IAD.

21   A.  That's the query right there, select star.  So select all

22   from ad, give me every ad.

23         There is a timer counting how long the query is

24   taking.

25         And there they are, so total ads, 373,221.

1   Q.  And back on October 3rd, did you testify that there were

2   2,883 automotive ads in IAD?

3   A.  Yes.

4   Q.  And then did you rerun that query yesterday to make sure

5   that it was consistent?

6   A.  Yes.

7   Q.  So does that mean it's -- for automotive ads in IAD, as of

8   April 5th of last year, was that roughly less than one percent

9   of the total ads in the IAD database?

10  A.  Yes, it was less than one percent.  I believe, it was

11  700ths.

12  Q.  And then you asked -- you testified on cross-examination

13  about adult entertainment and dating ads.

14  A.  Yes.

15  Q.  Okay.  How many adult entertainment ads existed on IAD on

16  April 5th?

17  A.  I would have to pull up the section for --

18          Adult entertainment is here.  So it's 4381 would be

19  the object ID.  So query for, so I started from ad where

20  section --

21  Q.  So did you just write a query asking where -- asking for

22  the number of total ads in IAD?

23  A.  Yes.  So give me all ads where the section equals adult

24  entertainment, and it's 202,028.

25  Q.  And then can you also show us how you would write a query

1   for the number of ads that appear in dating as of April 5th.

2   A.  Dating section, dating would be 4383.  So I select star

3   from ad where section equals 4383.  Running that query for

4   dating.

5   Q.  And while we're waiting for the computer to populate, are

6   these queries being entered into the HeidiSQL?

7   A.  Yes.  And that number is 126,537.

8   Q.  Okay.  So when you add the number of adult entertainment

9   ads with the number of dating ads that were appearing in IAD as

10  of April 5th, does it come to roughly 88 percent of the total

11  ads appearing in that marketplace?

12  A.  Yes, it's 88 percent.

13  Q.  Now, back in -- back on October 3rd, were you present and

14  able to hear the testimony of Mr. Gerken?

15  A.  Yes, I was.

16  Q.  And did Mr. Gerken explain the types of programming that

17  one might need to be conversant in to be able to run these

18  types of searches?

19  A.  Yes.

20  Q.  And did he explain that one would need to be conversant in

21  FreeBSD operating system --

22          MR. NEUMAN:  Objection, Your Honor.  Just rehashing

23  the testimony again.  Misstating the testimony.  She shouldn't

24  be testifying about what he testified about.  She can ask him

25  if he has an opinion or something, but this is going on.

1          THE COURT:  That objection for leading is sustained.

2     BY MS. PERLMETER:

3     Q.  Did you review the transcript of the testimony from

4     October 3rd?

5     A.  Yes, I did.

6     Q.  Okay.  Was Mr. Gerken's word of choice conversant?

7          And I refer counsel to page 82 of the trial

8     transcript.

9          Is that your recollection?

10    A.  Yes.

11    Q.  And do you agree with his statements, the three things that

12    he listed that one would need to be conversant in to be able to

13    run these kinds of searches?

14    A.  Yes.

15    Q.  And that would be the operating system FreeBSD, the file

16    system ZFS, and the SQL system?

17    A.  Yes.  Yes.

18    Q.  You were asked a lot of questions about interconnectivity

19    and IP addresses on cross-examination.  How has that affected

20    your ability to run these SQL queries and access that ad

21    information and correlate the information between the database

22    server and the images server?

23    A.  It has not.  I'm able to query them all without knowing the

24    IP addresses.

25    Q.  I didn't hear your last sentence.

1    A.  Yes.  I can query everything in the databases without

2    knowing which servers were assigned to what IP addresses.

3              MS. PERLMETER:  Nothing further, Your Honor.

4              THE COURT:  All right.  You may step down.

5              Is that the government's last witness?

6              MR. STONE:  Yes, Your Honor.

7              THE COURT:  Okay.  We're going to take a short recess,

8    then we'll hear from the defense witness, so ten minutes.

9              (Recess taken, 2:31 p.m. - 2:42 p.m.)

10             MR. BIENERT:  May I proceed, Your Honor?

11             THE COURT:  Yes.

12             MR. BIENERT:  Your Honor, at this point the defense

13   would call Agent Robinson.

14             THE COURT:  Okay.

15                       RICHARD ROBINSON,

16   called as a witness herein, having been first duly sworn, was

17   examined and testified as follows:

18                       DIRECT EXAMINATION

19   BY MR. BIENERT:

20   Q.  Agent Robinson, my name is Thomas Bienert and I represent

21   defendant James Lacey.

22   A.  Hello.

23   Q.  So you're an IRS CID agent?

24   A.  Yes.

25   Q.  What does that mean?

A.  It means I am an IRS agent who investigates criminal

violations, including tax violations, money laundering,

financial fraud.

Q.  How long have you been doing that?

A.  For 15 years.

Q.  I'm sorry?

A.  Fifteen years.

Q.  Okay.  And I assume you started training at Glynco and then

you started working and got training on and off along the way?

A.  That's correct.

Q.  Okay.  And am I correct that you have been working on this

case since 2016?

A.  Yes.

Q.  So you're in your third year of working the Backpage case,

right?

A.  Yes.

Q.  And during the time, the three years that you've worked

this case, have you been working other cases or exclusively

this one?

A.  There were other cases also.

Q.  Has this case occupied the bulk of your time, caseload

wise?

A.  Most recently, yes.

Q.  How many other cases have you worked in your career in this

17 years, I think you said?

1   A.  I have had -- I would be estimating, um, but I've had

2   contact with, perhaps, 20 cases.

3   Q.  And you have had training, correct, sir, in collection of

4   evidence for a criminal case?

5   A.  Yes.

6   Q.  And is it true that part of your training is to focus on

7   collecting evidence that might be used by either side of the

8   case, the prosecution or the defense, as part of preparing the

9   case for what could be a trial in a courtroom like this one?

10  A.  Yes.

11  Q.  Does your training entail that it is part of your job to

12  collect evidence that might want to be used or reviewed by the

13  defense just as much as you collect evidence that might want to

14  be used by the prosecution?

15  A.  Yes.

16  Q.  In other words, your job is to collect evidence that might

17  prove your case, but also if there is evidence that you would

18  understand the defense might want to evaluate to see if it

19  might disprove the case, right?

20  A.  Fair.

21  Q.  And so this case was indicted in late March 2018; is that

22  right?

23  A.  Yes.

24  Q.  And you were part of the team at that point, correct?

25  A.  I was.

1   Q.  And is it fair to say you were generally knowledgeable

2   about the allegations in the indictment?

3   A.  Yes.

4   Q.  You also -- there have been many interviews of the

5   cooperator, Carl Ferrer, since on or about April 5, 2018,

6   right?

7   A.  Yes.

8   Q.  Is it true that you were part of most, if not all, of those

9   interviews?

10  A.  It is.

11  Q.  And, in fact, are you actually the author of the MOIs, or

12  memorandum of interviews, taken of Mr. Ferrer?

13          MR. RAPP:  Objection.  Relevance to this line of

14  questioning.

15          MR. BIENERT:  It's relevant to show what his knowledge

16  base was, Your Honor, on April 6th when he did the search.

17          THE COURT:  The search of what?

18          MR. BIENERT:  I'm sorry?

19          THE COURT:  The search of what?

20          MR. BIENERT:  The search of the servers.  It was

21  April 6, 2018, when all the servers in question were seized.

22          THE COURT:  Okay.  The objection is overruled.

23          THE WITNESS:  I did author those memos.

24  BY MR. BIENERT:

25  Q.  Now, obviously, you have been sitting here in the hearing

1   today, right?

2   A.  Yes.

3   Q.  And have you been present at most of the hearings in the

4   case?

5   A.  Yes.

6   Q.  So you know that the topic we're talking about is the

7   server, or what we'll call the database, and what is or isn't

8   on it, and what access the defense does or doesn't have to it

9   is the topic for this hearing?

10  A.  Yes.

11  Q.  Okay.  Would you agree with me, sir, that based on the

12  understanding you have of the Backpage case, the indictment in

13  this case, that numbers of ads in any particular category could

14  be relevant and important in assessing the merits of the case?

15  A.  Yes.

16              MR. RAPP:  Objection.  Leading.

17              THE COURT:  The objection is overruled.

18              THE WITNESS:  Yes.

19  BY MR. BIENERT:

20  Q.  In fact, you just heard your government counsel was asking

21  questions of the last witness, your colleague, about numbers of

22  certain types of ads, right?

23  A.  Correct.

24  Q.  And is it true, sir, that there are 50 ads that are named

25  in the indictment, or examples of things in the indictment that

1    use 50 different ads as part of the indictment?

2    A.  That sounds right.  I don't remember their exact number.

3    Q.  In your investigation of this case, do you have an

4    estimate -- strike that.

5         Is it true, sir, that the allegations in the case go

6    all the way back to 2004 up through the date of the indictment

7    in 2018?

8    A.  Yes.

9    Q.  And is it true, sir, that the span of time of the 50 ads in

10   the indictment go from 2013 until January 2018?

11   A.  I -- I don't recall the exact dates but that sounds right.

12   Q.  And, by the way, I have exhibits in front of you.  And at

13   some point I can direct you to the indictment if you ever need

14   to.

15   A.  Okay.  Thank you.

16   Q.  Do you have an estimate of how many ads would have been on

17   Backpage's Web site, let's just take the time of the 50 ads in

18   the indictment, in the six years from 2013 to 2018?

19   A.  I don't, offhand.

20   Q.  Is it accurate that it would be many, many millions?

21   A.  That sounds fair.

22   Q.  And so one of the things that, as a trained investigator,

23   you look for in determining intent or knowledge is when

24   something that you see looks like it could be wrong or

25   criminal, how often is it happening relative to the numbers of

1    the other incidents of the same thing, right?

2           MR. RAPP:  I'm going to object to that as vague and

3    confusing.

4           THE COURT:  The objection is sustained.

5    BY MR. BIENERT:

6    Q.  The number of ads that are in the indictment, sir, are less

7    than a hundredth of a percent of the number of ads that you

8    understand Backpage was running during the time referenced in

9    the indictment?

10   A.  That sounds like a fair estimate, yes.

11   Q.  And is it your understanding that with the Backpage system

12   that was in place on April 6, 2018, when you and your

13   colleagues went and seized the system, would allow someone

14   looking at that operating system to review, for example, how

15   many ads there were over a particular course of time?

16   A.  I actually don't know what all capabilities could be

17   researched within the system.

18   Q.  Well, at the time of the search, you not only -- you were a

19   criminal investigative agent working on the criminal case,

20   right?

21   A.  Yes.

22   Q.  But you're also a specialized agent, in that you have

23   computer technical training, right?

24   A.  Yes.  Yes.

25   Q.  In fact, you've taken classes, and you note in, for

1   example, the declaration you filed in this case, that you are

2   one of the IRS's experts in dealing in computer and electronic

3   evidence?

4   A.  Specialist, yes.

5   Q.  Did you take it upon yourself before being part of the

6   search on April 6, 2018, to learn what capabilities there were

7   or weren't on the existing system that was running here in the

8   Phoenix area?

9   A.  Within a fairly limited scope, perhaps, yes.

10  Q.  Well, but it sounds like one of the things you did not look

11  into was whether or not one could use the system to get big

12  general numbers of how many ads there might be -- how many ads

13  there may be in a particular category or the like?

14  A.  Right, particularly, as a -- you -- normal user of the

15  site, I don't know that you would be able to do that.

16  Q.  You also understood, is it true, that among the allegations

17  in the indictment, was that Backpage was trafficking in

18  underage persons, children, right?

19  A.  I believe that's in the indictment, yeah.

20  Q.  And you understood from your investigation before you went

21  to the search, April of 2000 and -- April 6, 2018, that among

22  the things that could be noted and looked for on the system

23  were instances when Backpage was making referrals to, for

24  example, NCMEC, which is an organization trying to stop

25  exploitation of children, or law enforcement, true?

1    A.   True.

2          MR. BIENERT:  Your Honor, I want to make a reference

3    to what is in the Carl Ferrer report that this person authored

4    on April 5th, the day before the search.  I think I should be

5    able to reference it, but it is in that report that's under

6    seal.  It relates to the subject I just said about reporting to

7    NCMEC.

8          THE COURT:  I guess I am unclear as to why that needs

9    to be done at this hearing.

10         MR. BIENERT:  Well, I think it needs to be done

11   because there are parts of the system we don't have in evidence

12   yet, the degree to which what could be reviewed and researched

13   that was relevant to the specific allegations in the

14   indictment, which, of course, is why we're here, because we

15   have to defend those allegations.  And so I would submit that

16   issues and topics that, to this witness's knowledge, would be

17   in the database, are relevant to the reason we're here, namely,

18   to show why we should have access to the working database to

19   get those things.

20         THE COURT:  So unless you want me to clear the

21   courtroom, is there a way you can ask that question generally?

22         MR. BIENERT:  I think I can.

23         THE COURT:  Okay.

24   BY MR. BIENERT:

25   Q.  Did you have an understanding from Mr. Ferrer that there

1  was reporting done by Backpage to NCMEC?

2  A.  Yes.

3  Q.  And did he tell you that he was proud of that?

4  A.  Yes.

5  Q.  So as of April 5th, the day before the searches, you knew

6  that the system would have information relating to Backpage

7  trying to help stop underage sex, correct?

8  A.  That's -- that's one way you could put it, yes.

9  Q.  Well, the indictment alleges that Backpage and its

10  defendants were trying to promote underage sex, right?

11  A.  That's also paraphrasing.  I'm not --

12  Q.  So let me ask it this way.

13  A.  I don't know that it uses those exact words.

14  Q.  On April 6, 2018, when you were standing around the lobby

15  of the DesertNet location where you seized the servers, you

16  knew from the day before, as well as your two years of

17  investigation on the case, that evidence that indicated that

18  Backpage was actually trying to stop underage sex would be

19  relevant to the case?

20        MR. RAPP:  I'm going to object that he's leading his

21  own witness, number one.

22        Second, it's not clear what the relevance of this is

23  to the servers.

24        THE COURT:  The objection is sustained.

25

1   BY MR. BIENERT:

2   Q.  Similarly, sir, you understand that the indictment makes

3   reference to the Erotic Review?

4   A.  Yes.

5   Q.  Did you have an understanding that Backpage's network or

6   server system, allegedly, would have instances of ads that tied

7   into Erotic Review banners?

8   A.  Or at least did at one time.

9   Q.  That's right.

10          And is it true, sir, did you have an understanding

11  that the Erotic Review didn't solely have things on it that

12  would be illegal adult entertainment, but contained aspects of

13  it that would be legal adult entertainment?

14  A.  I don't think I have that much specific understanding of

15  the Erotic Review, no.

16  Q.  At the time that you were doing the search and seized the

17  servers, did -- whether there were or weren't evidence relating

18  to the Erotic Review, did that factor at all in any of your

19  decision making that day?

20  A.  That's very specific and I don't know that that would have

21  been something that crossed my mind on that day.

22  Q.  Now, let's talk about the topic escort.  You're familiar

23  with that topic, right?

24  A.  The topic of escorts?

25  Q.  Yeah.

1    A.   From this case?

2    Q.   Yes.

3    A.   Sure.

4    Q.   And you have an understanding -- is escort services and

5    advertising legal?

6              MR. RAPP:   I'm going to, again, object to the

7    relevance of this for this limited hearing.

8              THE COURT:   The objection is sustained.

9              MR. BIENERT:   Your Honor, may I at least note -- and

10   this is where maybe I can put an exhibit in front of the

11   witness.   This would be the four exhibits that I handed to

12   defense counsel, and there is a copy in front of Your Honor,

13   but it's Exhibits 194 to 1 -- I'm sorry, it's 192 to 195.   I

14   would proffer that these are ads retrieved during lunch here in

15   Phoenix on the internet.   And I would submit that this whole

16   topic is extremely relevant, because the allegations in the

17   indictment are that virtually every ad was illegal on Backpage.

18   And we -- since that's a primary accusation, defendants are

19   entitled to be able to explore the degree to which the volume

20   on Backpage were escort ads, legal ads.   So I'm entitled to

21   explore with this witness the degree to which escort ads can

22   look a lot like the ones you're -- that I'm using as

23   demonstratives.

24             THE COURT:   Okay.   Whether or not they look alike

25   isn't relevant to this hearing.   Whether or not you can search

1  for them, find them, have access to the information on them is.

2          MR. BIENERT:  And I'm sometimes the slowest bulb in

3  the room, but I'm trying to make sure I understand the

4  distinction between those two.

5          THE COURT:  Well, you're asking him for legal

6  conclusions about whether an escort ad crosses the line, that

7  type of stuff, that's --

8          MR. BIENERT:  I'll try to make it about the servers.

9          THE COURT:  Okay.

10  BY MR. BIENERT:

11  Q.  Sir, at the time you were standing there in the lobby

12  getting ready to do the searches, you knew and had an

13  understanding that there are certain types of adult advertising

14  that are legal, such as escort ads, that category, right?

15  A.  That can be legal, yes.

16  Q.  And you knew that one area where the Backpage servers would

17  be significant in this case is the degree to which ads on the

18  servers look like escort ads versus something that was a

19  prostitution ad, true?

20  A.  Could you ask that again, sorry.

21  Q.  Sure.

22  A.  I got a little lost.

23  Q.  Let me say it this way.  You understand that the indictment

24  alleges that virtually every ad on Backpage was illegal?

25  A.  I don't know that it alleges exactly that, but certainly it

1    alleges that there were ads that advertised for illegal

2    services.

3    Q.  If you look at Exhibit 158, which is in front of you, sir,

4    and go to page 4.  If you look at paragraph 14.

5           Is it true that the indictment alleges that, quote,

6    virtually every dollar flowing into Backpage's coffers

7    represents the proceeds of illegal activity, period, unquote?

8    A.  It says virtually every dollar, yes.

9    Q.  And this was the indictment that you were aware of the week

10   before the search?

11   A.  Yes.

12   Q.  And to the degree that the bulk of ads were escort, or

13   could have been, that could be legal activity, right?

14   A.  Were there legal ads on Backpage, is that what you're

15   asking?

16   Q.  Well, how about I ask it.  You don't know whether the

17   server ads configured and running on April 6, 2018, had legal

18   escort ads on it because you haven't reviewed the content of

19   the server, right?

20   A.  I have not reviewed the content of that server personally,

21   no.

22   Q.  And you agree, sir, with me, that, given the allegations in

23   this case, that that would be something that the defense would

24   want to look for in addressing the merits of the case?

25   A.  Except that there was no escort section, as I understand

1    it, at that point in time, yes.

2    Q.  Do you dispute that the defense could look for escort ads?

3           MR. RAPP:  Object.  First, he's just leading his own

4    witness.

5           THE COURT:  Objection sustained.

6    BY MR. BIENERT:

7    Q.  Is it true, sir, that when trying to figure out whether or

8    not a particular person advertising on Backpage was doing

9    illegal prostitution or underage prostitution or sex, that the

10   history contained on the server system would show a bunch of

11   different factors that would be relevant to someone

12   investigating the degree to which Backpage knew a particular ad

13   or advertiser was acting illegally?

14          MR. RAPP:  Same objection, and relevance.

15          THE COURT:  The objection is overruled.

16          THE WITNESS:  Was there data within the data -- or

17   within the Web site that would be relevant to such an

18   investigation?

19   BY MR. BIENERT:

20   Q.  Right.

21   A.  Yes.

22   Q.  So, for example, if one of the ads alleged in the complaint

23   as illegal, if that same advertiser turned out they had 15

24   other ads, those ads could be viewed to get a better handle on

25   who this person was and what type of work they were

1   advertising, right?

2   A.  I believe so, yes.

3   Q.  And if there was an issue over whether or not someone was

4   or wasn't under age, looking at other ads by the same person

5   would give other photographs to help determine whether the

6   person looked under age or not, true?

7   A.  Potentially so.

8   Q.  And is it true, sir, that some escort services right here

9   in Phoenix are not only legal but they're licensed by the city

10  or the county?

11  A.  I understand that is the case.

12  Q.  Is it true, sir, that looking at the Backpage system, one

13  could see some ads that would actually indicate an escort

14  licensed entity that would tell someone, on the ad at least,

15  that they were licensed by the city or county?

16  A.  I believe there were ads like that too.

17  Q.  Separate and apart from what looking at the ads and the

18  histories and the related ads say about the advertiser, of

19  course, the ads say a lot about the people within Backpage who

20  worked on a particular ad or an advertiser's ads, true?

21  A.  People who worked on a particular ad?

22  Q.  Moderators.

23  A.  Okay.  Who moderated the ads.  Okay.

24  Q.  And it would not only just say that someone did or didn't

25  moderate if that happened, but it would actually say which

UNITED STATES DISTRICT COURT

1    person the moderator was based on a code?

2    A.  I have seen some indications of that, yes.

3    Q.  And so, for example, if defense counsel were trying to

4    investigate some of, like, the 50 ads to compare them with the

5    millions of ads to get a perspective, one could look for

6    patterns as to whether a particular moderator seemed to be

7    moderating more or less than was acceptable?

8    A.  I think that capacity was there too.

9    Q.  Is it also true that there are advertisers who might

10   actually do both prostitution and legal escort?

11   A.  It's possible.

12   Q.  So the fact that someone might be willing on one occasion,

13   or some unknown or known occasion, to engage in prostitution,

14   doesn't mean that same person wouldn't also engage in legal

15   escort services?

16   A.  It could happen.

17   Q.  And escort ads can reference money for a set period of

18   time, right?

19   A.  Can reference what, sorry?

20   Q.  Money.

21   A.  Oh, money.

22   Q.  My escort services are $50 an hour.

23   A.  Certainly.

24   Q.  They can include risqué pictures of women or men in the

25   state of undress or scantily clad, right?

1    A.  They could.

2    Q.  And taking the flip side, ads can actually legally talk

3    about sex if they don't ask for money, true?

4    A.  Um, I suppose there is some context involved that would

5    matter, but it can -- can have, such as a personal ad, that may

6    talk about sex?

7    Q.  Right.

8    A.  Certainly.

9    Q.  Is it reality, sir, that the devil is in the details of any

10   particular ad?

11   A.  That's -- that's one way you could characterize it.

12   Q.  Now, shifting gears.  Is it true, sir, that a whole other

13   big ticket section of this case is about money, how money was

14   paid and what was done with that money in the indictment?

15   A.  Yes.  That's part of the indictment.

16   Q.  And the working Backpage system would also have indicate --

17   strike that -- have information about different payment methods

18   by particular advertisers, true?

19   A.  Yes.

20   Q.  Would indicate whether they paid at all, right?  Not all

21   ads were paid for?

22   A.  Right.

23   Q.  It would indicate what types of payment they made, correct?

24   A.  Yes.

25   Q.  It would indicate whether they were told to only make

1   payments and in a certain form, like bitcoin or something as

2   alleged in the indictment, or weren't told any conditions on

3   how they could pay?

4   A.  That part I don't know.

5   Q.  So at the time that you were standing ready to seize the

6   DesertNet servers, all of this information that we just went

7   over was stuff that was known to you as of that time based on

8   your two years at that time of investigating this case, true?

9   A.  That I -- I believe there was that information on the

10  servers, sure.

11  Q.  And of the search team there, is it true that you were the

12  only agent who had the combination of factual knowledge, having

13  worked on the case, and technical knowledge as a computer

14  specialist?

15  A.  I would be the only person who fit that description, I

16  think.

17  Q.  Because we heard from, I think it's Mr. --

18  A.  Cullen.

19  Q.  -- is it Mr. Cullen?  He was part of the search team,

20  right?

21  A.  Yes.

22  Q.  But he was flown in just to do the search and did not have

23  the wealth of information you did, right?

24  A.  That's fair.

25  Q.  And then we have other people, I think, for example, Agent

1   Fryberg -- Fryberger, if I'm saying it right?

2   A.   Fryberger would not have been in Tucson with me.

3   Q.   Okay.

4   A.   I don't believe.

5   Q.   Bottom line is other agents would know the facts but they

6   didn't have the technical skills you did?

7   A.   Correct.

8   Q.   And when you all got to the setting -- and what was the

9   name of the place where it was?  I know it wasn't DesertNet.

10  A.   It was Login Data Center.

11  Q.   Login Data Center, which had DesertNet's space which was

12  housing Backpage servers.  Is that basically what --

13  A.   That's pretty fair, yeah.

14  Q.   So when you all got there -- first of all, it's a closed

15  facility where you don't access without being let in or some

16  sort of a gate code, right?

17  A.   Right.

18  Q.   Then once you're inside where the servers are is in a cage

19  area that's locked inside the locked building, right?

20  A.   Yes.

21  Q.   And when you all got there, you all didn't feel the need to

22  do the search right away because you all waited for an

23  hour-and-a-half for Mr. Gerken to come, right?

24  A.   Yes.

25  Q.   Well, do you have a memory, as you sit here now, of going

1   to the facility, identifying yourself, saying you're doing a

2   search, but then waiting until others arrived to help you with

3   the search?

4   A.  Yes.

5   Q.  And Mr. Gerken was one of those people, right?

6   A.  He was.

7   Q.  Did you talk to Mr. Gerken about whether the system had any

8   of the capabilities that I just discussed with you here?

9   A.  I don't believe -- no, I don't think any of those questions

10  came up in our discussion.

11  Q.  Why did you not seek to get diagrams, information, or the

12  like to preserve the system in an operating capacity?

13  A.  I believe I may have asked for a diagram that day, I know I

14  certainly did later, and was told that there was no such

15  diagram.

16  Q.  Mr. Gerken was the guy who basically made the system,

17  right?

18  A.  That's my understanding.

19  Q.  And you said in your declaration, for example, that you

20  believe he is the person who was most knowledgeable of that

21  system, right?

22  A.  That's correct.

23  Q.  And you were there with him and he was being cooperative,

24  true?

25  A.  Yes.

1    Q.  So you guys cart everything off on April 6th, and then you

2    heard other testimony about where different portions of it went

3    or were stored.  You were here for all that, right?

4    A.  I was here.

5    Q.  Did your expertise -- strike that.

6         Did you use your expertise at all when you were at the

7    facility seizing the servers on April 6, 2018?

8    A.  Certainly in the sense of gauging what was there and what

9    -- I relied some on the expertise of Agent Cullen.  And I was

10   aware that in a situation such as that, the thing to do is to

11   call the network administrator who understands the system much

12   better than you do.

13   Q.  Once he was there and they were identified for you which

14   servers were the Backpage servers, you had them disconnected

15   and you and other agents or people working with the search team

16   basically carried the components out and left the premises with

17   them, true?

18   A.  After the system was shut down, yes.

19   Q.  And by shut down, that's an -- I'm sorry?

20   A.  That -- no, that's --

21   Q.  I thought I heard someone talking.

22        By shut down, you mean an orderly sequencing of

23   turning the systems off?

24   A.  Yes.

25   Q.  But what you didn't do is go around and take pictures or

1    get information about which wires were connected to what and

2    how the various components work with each other and need to be

3    connected so it will work again?

4    A.   Those -- we did take pictures, but did we note which wires

5    were connected to what, no.

6    Q.   Now, that was in April of 2018.  And, obviously, the

7    government has had possession of those servers ever since then,

8    true?

9    A.   True.

10   Q.   Is it true, sir, that you didn't have any involvement with

11   Mr. Gerken until -- since that time until May of this year?

12   A.   From April of last year to at least April of this year?

13   Q.   Yes, sir.

14   A.   That sounds correct, yes.

15   Q.   So for over a month after seizing the items, you did not

16   interact with Mr. Gerken to try to do anything to help

17   understand how the system worked or could be put back together,

18   true?

19   A.   That's true.

20   Q.   Now, you indicated that you had been present for court

21   proceedings in this case over the period of time, right?

22   A.   Yes.

23   Q.   And that would be -- some of the proceedings were in front

24   of Judge Logan, and some of the proceedings were in front of

25   Judge Brnovich, right?

1  A.  That's correct.

2  Q.  Is it true, sir, that well before April of 2019, you knew

3  that the defense was saying we need the servers in operational

4  form?

5  A.  I believe that was said, yes.

6  Q.  In fact, that was said going all the way back to May of

7  2018, right?

8  A.  I don't recall when it was first said, but that could very

9  well be the case.

10  Q.  You knew, sir, that at least for many months prior to May

11  of this year, the defense was saying, we can't work or

12  investigate this case without a functioning Backpage system,

13  right?

14  A.  I believe it was said several times, yes.

15  Q.  But, sir, you never reached out to Mr. Gerken to try to

16  figure out how this system worked and whether it could be

17  resurrected until May of this year, true?

18  A.  I didn't, no.

19  Q.  Why did you start reaching out in May of this year to see

20  if he could help you understand if the system could be

21  resurrected and how?

22  A.  I was directed to.

23  Q.  You were directed to because Her Honor, Judge Brnovich, in

24  late April told the government she wanted a status of the

25  server system, right?

UNITED STATES DISTRICT COURT

1    A.  Yes.

2    Q.  And so it wasn't until Her Honor said I need this done,

3    that you reached out to Mr. Gerken?

4    A.  That I did?

5    Q.  Yes.

6    A.  Yes.

7    Q.  Now, sir, if we go back to the indictment -- and if you

8    want, you can direct yourself to pages -- page 31 of the

9    indictment -- I'm sorry, I take that back, page 42.

10            And if you'll just scan the page 42 to 47, there is a

11   chart that lists each of the 50 ads that is referenced in the

12   indictment as allegedly being illegal ads, right?

13   A.  Or promoting the carrying on of unlawful activity.

14   Q.  Yes, sir.

15   A.  Yes.

16   Q.  Is that right?

17   A.  Yes.

18   Q.  And, sir, if we look, they're in chronological order.  And

19   is it true that the first ad named in the indictment was from

20   September 10, 2013 --

21            MR. RAPP:  Objection.  Relevance.

22            THE COURT:  The objection is overruled.

23   BY MR. BIENERT:

24   Q.  Right?

25   A.  September 10, 2013.

1    Q.  And the last ad on page 47 is on February 6, 2018, right?

2    A.  Yes, that's what it says.

3    Q.  And if you look at that same page, if you go up page 47,

4    you have to get to count number 44 of the 50 before you even

5    get to an ad that's in the same calendar year that you did the

6    searches?

7    A.  Yes.

8    Q.  And the last ad of the few that are in calendar year 2018

9    was already two months old as of the date that you guys did the

10   search on April 6th, true?

11   A.  Yes.

12   Q.  Now, the indictment had already happened -- this document

13   that I'm looking at was already indicted a good week before the

14   searches, right?

15   A.  I believe so.

16   Q.  You didn't need these ads or the data related to them on

17   the Backpage server system for this indictment to happen, true?

18   A.  I don't think I understand the question.

19   Q.  Well, the indictment already happened, so when you went to

20   seize those servers on April 6th, you weren't seizing those

21   servers to see if you could investigate these ads to figure out

22   if they would give you probable cause to go to the grand jury

23   for an indictment, were you?

24   A.  You mean because we had already done that?

25   Q.  Right.

1    A.  Yes.

2    Q.  And because the ads, in questioning the indictment, they're

3    not from April 6, 2018, they're all from months, if not years,

4    before the search where you seized the servers, right?

5    A.  Yes.

6    Q.  The truth is, sir, the only people who needed access to the

7    servers to try to evaluate the ads is the defense?

8    A.  Is that a question?

9    Q.  Yeah.

10   A.  Oh.  I -- I -- you could characterize it that way.  We had

11   interest in getting access to the data that was in the server

12   too.

13   Q.  You also had an interest in obtaining and preserving

14   evidence that the defense would need to defend itself, right?

15   A.  Yes.

16   Q.  And that's something that you learned all the way back to

17   your first year of training in Glynco, Georgia, to be an IRS

18   CID agent?

19   A.  Okay.

20   Q.  Is that yes or no?  If I'm wrong, tell me I'm wrong.

21   A.  I don't recall that exact thing, but I -- that principle is

22   a fair principle.

23   Q.  And it's fair to say that when you stood there on April 6th

24   seizing these items under color of your authority, you knew

25   that that was something that you should do?

1    A.  Preserve evidence?

2    Q.  Yeah, for the defense.

3    A.  Yes.

4          MR. BIENERT:  All right.  That's all I have.

5          THE COURT:  Did anybody else over there have any

6    questions for this witness?

7          (No response.)

8          THE COURT:  Okay.  Cross.

9                    CROSS-EXAMINATION

10   BY MR. RAPP:

11   Q.  Agent Robinson, a lot of the ads that are in the indictment

12   came from cases related to the victim, correct?

13   A.  That's my understanding, yes.

14   Q.  In other words, there might have been a murder case in some

15   other district or state, and agents that you worked with

16   reached out to the prosecution in that case and obtained the

17   ads, correct?

18   A.  Yes, that happened.

19   Q.  As a matter of fact, they talked about Carl Ferrer, but

20   Carl Ferrer and others in Backpage actually would testify in

21   these human trafficking cases, prostitution cases, murder

22   cases, to authenticate those ads, correct?

23   A.  Yes, that also happened.

24   Q.  So those ads just didn't simply come off the servers, those

25   ads were related to criminal cases, correct?

1   A.   Correct.

2   Q.   And some of those ads came from civil cases, right?

3   A.   Yes.

4   Q.   In other words, underage trafficking victims were suing

5   Backpage for running a criminal enterprise, right?

6   A.   Yes.

7   Q.   And agents that you were associated with reached out to

8   those civil cases and obtained the ads from those attorneys in

9   those cases, correct?

10  A.   Yes.

11  Q.   And, on top of that, the actual victims in those criminal

12  and civil cases, they authenticated their own ads, correct?

13  A.   Yes.

14  Q.   And some -- and many of those ads are in the indictment,

15  right?

16  A.   Right.

17  Q.   Now, with respect to the Erotic Review, you knew, based on

18  your investigation, that the Backpage had a financial

19  relationship with the Erotic Review, correct?

20  A.   Yes.

21  Q.   And the Erotic Review was this sort of a Yelp review for

22  prostitution for -- for -- for prostitutes that Johns could go

23  to and get a review of a particular prostitute, right?

24        MR. BIENERT:  Objection.  Foundation.  He said he

25  wasn't familiar enough to testify about it.

1          THE COURT:  The objection is sustained.

2  BY MR. RAPP:

3  Q.  Based on your investigation, what is the Erotic Review?

4          MR. BIENERT:  Your Honor, he told me he didn't know

5  enough to answer my questions.  I asked him about the Erotic

6  Review.

7          THE COURT:  I don't think you asked him generally.

8  The objection is overruled.

9  BY MR. RAPP:

10  Q.  What do you know about the Erotic Review?

11  A.  That it is a review site and that it has reviews for

12  specific services.

13  Q.  And, as a matter of fact, did you actually, during the

14  course of your investigation, did you see the ads that were --

15  or the reviews, rather, that were posted on the Erotic Review?

16  A.  I saw some, yes.

17  Q.  And did you know, based upon your investigation, that there

18  was a reciprocal link relationship between Backpage and the

19  Erotic Review?

20          MR. BIENERT:  I'm going to object as irrelevant to the

21  issue of whether defense is entitled to investigate the

22  charges.  These are their allegations, I understand that.

23  We're here to see whether we can investigate all those

24  allegations.

25          THE COURT:  The objection is overruled.

UNITED STATES DISTRICT COURT

1        THE WITNESS:  Say again, sir.

2   BY MR. RAPP:

3   Q.  Yeah.  Did you understand that there was this reciprocal

4   link relationship between the Erotic Review and Backpage,

5   correct?

6   A.  I understood there was one, yes.

7   Q.  And you actually just testified that at some point that

8   financial relationship came to an end, correct?

9   A.  Yes.

10  Q.  But are you also aware that Backpage continued to allow

11  posters to put their numerical links in the ads so that people

12  reviewing Backpage could still find them on the Erotic Review?

13  Did you know that?

14  A.  I understand that happened.

15        MR. BIENERT:  Objection.

16        THE COURT:  The objection is sustained.

17  BY MR. RAPP:

18  Q.  Now, with respect to NCMEC, there has been quite a bit of

19  testimony about the fact that the defense desperately would

20  like to find the NCMEC referrals that are contained on the Web

21  site, correct?

22        MR. BIENERT:  Objection.  Argumentative.

23        THE COURT:  The objection is overruled.

24        THE WITNESS:  Correct.

25

```
1    BY MR. RAPP:

2    Q.  Right?

3           And you know, from your investigation, that NCMEC

4    catalogs every referral to their cyber tip line, correct?

5    A.  Yes.

6    Q.  And so if you really wanted to find the referrals to NCMEC,

7    you would just simply take a subpoena and go to NCMEC and they

8    would provide you every referral that Backpage has made since

9    2004, right?

10   A.  That's what I would --

11          MR. BIENERT:  Objection.  Foundation.

12          THE COURT:  The objection is overruled.

13   BY MR. RAPP:

14   Q.  Now, let's just quickly talk about the moderation here.

15          You've interviewed quite a few moderators in the

16   course of this investigation, right?

17   A.  A few, yes.

18   Q.  Well, you have -- other agents have reviewed the

19   moderators, right?

20   A.  Yes.

21   Q.  And many of those moderators have acknowledged that they

22   were running a prostitution Web site, correct?

23   A.  Correct.

24   Q.  And those moderate -- and those moderators, you know, are

25   going to testify in this court, right?
```

1    A.  That's my understanding.

2    Q.  And those -- just so they -- the Court understands the

3    moderation process, the moderators would strip out offending

4    words that are indicative of not only prostitution but child

5    sex trafficking and then continue to post the ad, correct?

6    A.  At one point in time, I understand that happened.

7    Q.  Correct.

8            So -- but the moderators in this case were looking at

9    literally hundreds of ads a day, correct?

10   A.  I believe so.

11   Q.  And many of those moderators did not, to put it mildly,

12   have the training or expertise to determine whether or not a

13   particular ad involved somebody who was under age, correct?

14           MR. BIENERT:  Objection.  Foundation and hearsay, Your

15   Honor.

16           THE COURT:  The objection is sustained.

17   BY MR. RAPP:

18   Q.  Well, did you -- in the moderators that you interviewed,

19   were you able to assess their training in -- and determining

20   whether or not a photo of somebody on Backpage was, in fact,

21   under 18?

22           MR. BIENERT:  Same objections, Your Honor.

23           MR. FEDER:  Relevance too.

24           THE COURT:  The objection is sustained.

25

1    BY MR. RAPP:

2    Q.  Now, lastly, there is a bunch of questions about your

3    knowledge on April 6th, correct?

4    A.  Yes.

5    Q.  Based upon your discussions with Mr. Ferrer on April 5th,

6    correct?

7    A.  Right.

8    Q.  And you -- you were part of a meeting with Mr. Ferrer on

9    April 5th, right?

10   A.  Yes.

11   Q.  Is that the first time you actually met with him and took

12   information from him?

13   A.  Yes, it was.

14   Q.  And so -- but that was just the start of your, what we like

15   to call, proffer meetings with Mr. Ferrer, correct?

16   A.  Correct.

17   Q.  And you were still sort of -- were you, at the time, sort

18   of assessing his credibility and the information that he was

19   providing, correct?

20   A.  Yes.

21   Q.  And then on the next day, April 6th, you were part of the

22   search, correct?

23   A.  Yes.

24           MR. RAPP:  All right.  I don't have anything further.

25           MR. BIENERT:  One follow up on the civil case comment.

UNITED STATES DISTRICT COURT

```
1              THE COURT:  Okay.
2                       REDIRECT EXAMINATION
3  BY MR. BIENERT:
4  Q.  Sir, you were asked about what happened in civil cases.
5  And you're generally aware that there were several civil cases
6  where allegations were made similar to what's in the indictment
7  but in a civil context, right?
8  A.  Yes.
9  Q.  Is it true, sir, that on several of those cases, the cases
10 were dismissed after Backpage was able to use the system to
11 find evidence --
12             MR. RAPP:  Objection.  This is beyond the --
13 objection.  This is beyond the scope of my cross-examination.
14             MR. BIENERT:  He asked about his knowledge on civil
15 cases and it's directly relevant to this.
16             THE COURT:  Can you finish your question --
17             MR. BIENERT:  Yes.  Thank you.
18             THE COURT:  -- and then I'll rule on the objection.
19 BY MR. BIENERT:
20 Q.  Is it true, sir, that in several of the civil cases it was
21 Backpage's able -- ability to retrieve documents from its
22 server system that undermined the claim in the civil complaint
23 leading to the dismissal of the complaint?
24             THE COURT:  The objection is overruled.
25             If you know.
```

```
 1              THE WITNESS:  I am not aware of that causal link

 2   between finding those documents and the case being dismissed.

 3              MR. BIENERT:  All right.  That's all I have, Your

 4   Honor.  Thank you.

 5              THE COURT:  All right.  You may step down.

 6              Your next witness.

 7              MS. BERNSTEIN:  Your Honor, the defense calls Tami

 8   Loehrs.

 9                        TAMI LOEHRS,

10   called as a witness herein, having been first duly sworn, was

11   examined and testified as follows:

12                      DIRECT EXAMINATION

13   BY MS. BERNSTEIN:

14   Q.  Good afternoon.

15   A.  Good afternoon.

16   Q.  What is your current occupation?

17   A.  I am a digital forensics expert and I own a forensics

18   company here in Phoenix.

19   Q.  And can you take us through your educational background,

20   please.

21   A.  I have a Bachelor of Science in Information Systems.

22   Q.  And what is your experience with computers?

23   A.  I was raised around computers.  I have been working with

24   computers since I was little.  When I started my business in

25   1999, I was building entire systems for companies, I was
```

1  building networks, individual computers, servers, I pulled

2  cable through the ceiling and built the entire network from the

3  ground up, I maintained them, troubleshooted them.  I had a Web

4  server in Tucson where I hosted Web servers for my clients.  I

5  designed Web sites.  Pretty much if it had something to do with

6  computers, I had my hands in it.

7  Q.  Do you hold any licenses as well?

8  A.  I do.  I have a State of Arizona Private Investigator

9  Agency license, which requires 6,000 hours of experience, and

10  then I can license other investigators.

11  Q.  And beyond your experience and that license, do you have

12  any specialized training in the field of computer forensics?

13  A.  I do.  I have hundreds of hours over the last 20 years from

14  various organizations and agencies.  I have four certifications

15  in the industry, two are software based, so that ENCE and the

16  ACE are certifications given by EnCase and by AccessData, one

17  of the tools that we heard about.  The other two certifications

18  are industry standard, CHFI, which is a certified hacking

19  forensic investigator, and CCFE, which is a certified computer

20  forensic examiner.

21  Q.  And beyond your experience, your licenses and those

22  specialized trainings and certifications, does that qualify you

23  to know what is -- excuse me.  Strike that.

24       Those certifications that you just mentioned, what is

25  required to obtain and maintain those?

1    A.  You have to take a written test.  Um, some of them like

2    EnCase required training in the beginning, so I had to take

3    their training, then you have to pass their written test.

4    After that there is a practical test, and you have to pass that

5    by, I think, it's like 80 percent, and then every couple of

6    years you have to maintain your education in those areas to

7    keep your certification.

8    Q.  How long have you been conducting computer forensic

9    examinations?

10   A.  Twenty years.

11   Q.  And how many cases have you handled where you have

12   conducted computer forensic exams?

13   A.  Over a thousand.

14   Q.  And where have these cases occurred?

15   A.  All over the United States and internationally.

16   Q.  Both state and federal court?

17   A.  Oh, yeah.

18   Q.  How many forensic examinations have you specifically

19   conducted?

20   A.  Thousands.

21   Q.  How many pieces of evidence have you forensically acquired

22   that you have -- where you have made a forensic image of an

23   original?

24   A.  Well over a thousand.

25   Q.  And how many forensic images have you received from other

1    people, from other agencies or other individuals of acquired

2    evidence that you have reviewed?

3    A.   Again, thousands.

4    Q.   What types of evidence items have you personally acquired

5    and examined?

6    A.   I have acquired regular desktop computers, entire servers,

7    cell phones, removable storage media, gaming systems,

8    surveillance systems, dash cameras inside of police cars.  If

9    it has data on it, I have analyzed it, acquired it, had

10   something to do with it.

11   Q.   What operating systems specifically have you acquired and

12   examined before?

13   A.   Windows, and, again, multiple versions of Windows, from 98

14   on, um, multiple versions of Mac, multiple versions of Linux,

15   IOS, android, and then a multitude of proprietary systems that

16   come with things like surveillance systems and gaming systems,

17   those are proprietary.

18   Q.   Have you ever been hired to acquire and analyze computer

19   systems, complex systems that involve multiple servers?

20   A.   Yes, I have.

21   Q.   And what types of complex systems have you been responsible

22   for acquiring and imaging?

23   A.   Hospital systems, law enforcement systems, systems that --

24   like, county systems that include everything, law enforcement,

25   fire, like the whole county is on the computer system, law

1    firms, insurance companies, other businesses.

2    Q.  These systems require very specialized attention to detail

3    due to the complexity and the sensitive nature involved?

4    A.  They do, yes.

5    Q.  Have you ever testified in court before?

6    A.  A few times, I think 128 now.

7    Q.  In 128 times of testifying, have you ever had any bad

8    opinions written about your work?

9    A.  Oh, sure.  There is -- there is three bad opinions out

10   there that I am aware of, two from approximately 2011.  I have

11   been challenging law enforcement software, they have some

12   proprietary software that they use to get search warrants, and

13   I have been challenging that for about ten years.  It's a very

14   contentious issue.  And I have had a couple of bad opinions on

15   my testimony on those particular cases.

16   Q.  And those three opinions were during hearings where you're

17   challenging law enforcement's proprietary software?

18   A.  Correct.

19   Q.  Have you worked on other cases where you've challenged law

20   enforcement software beyond those three?

21   A.  Yeah.  I think now I've filed affidavits and testified in

22   about 80 of those.

23   Q.  And did the judges in those cases have any negative

24   opinions of your work?

25   A.  No.  In fact, I've gotten some very positive opinions and

1    am actually testing law enforcement software in Phoenix.

2    Q.  Was there a recent opinion in U.S. v. Black where the court

3    found your testimony credible with regard to the government

4    destroying evidence?

5    A.  Yes, they did.  And I have that evidence in my lab right

6    now and I am examining it.

7    Q.  What is the status of that case?

8    A.  They're still waiting for my results and I'm still waiting

9    for some information from them.

10   Q.  Have you had positive opinions about your work in this

11   courthouse?

12   A.  Yes, many.

13   Q.  And so in over the 1,000 cases you have worked on that

14   don't involve challenging proprietary undercover software, are

15   there any negative opinions that have been written about your

16   forensic work?

17   A.  Not that I am aware of, no.

18   Q.  Is your education, experience, presentations and testifying

19   experience detailed in your CV?

20   A.  Yes.

21   Q.  And in front of you is what's marked as Exhibit 125.

22   A.  No.  I have 185.

23           I have 183, 184, and 185, and 125.

24   Q.  Is that your CV?

25   A.  That is.

```
 1              MS. BERNSTEIN:  And I would represent that I
 2   previously sent this to the government.  We had noted that it
 3   was attached to a filing.  It wasn't attached to a filing, it
 4   was sent to the government on September 30th, and I would move
 5   it into evidence at this time.
 6              THE COURT:  Any objection?
 7              MR. RAPP:  Yeah, we object.  It's a hearsay document.
 8              THE COURT:  Okay.  Technically it is hearsay, but for
 9   purposes of this hearing, I will admit it, 125.
10   BY MS. BERNSTEIN:
11   Q.  Have you ever been tendered as an expert before?
12   A.  Yes.
13   Q.  Have you ever been rejected as an expert before?
14   A.  Not that I am aware of.
15              MS. BERNSTEIN:  Your Honor, at this time I would also
16   tender her as an expert, as a computer forensic expert.
17              THE COURT:  You may proceed.
18   BY MS. BERNSTEIN:
19   Q.  In your training and successful completion of numerous
20   certifications as a digital forensic expert, are you aware of
21   any industry standards and best practices for the preservation
22   and acquisition of digital evidence?
23   A.  Yes, there is many.
24   Q.  What is the importance of those industry standards?
25   A.  We have to have industry standards so that we're all using
```

1    the same methodologies and the same tools, that those

2    methodologies can be recreated, tested, verified, that our

3    results come out the same so we're all doing the same thing.

4    Q.  Who creates those standards?

5    A.  There is a number of different agencies, um, some of the

6    biggest, NIST, the National Institute of Standards in

7    Technology, there is the Scientific Working Group on Digital

8    Evidence, that's another large group, there is SNDS, IEC,

9    Department of Justice, off the top of my head.

10   Q.  Are the standards that are set forth by each of those

11   individual organizations similar?

12   A.  Yeah.  And many of them are the same, yes.

13   Q.  In all of the forensic training and certifications you've

14   obtained, are you taught to follow those standards and common

15   principles?

16   A.  Yes.

17   Q.  According to your experience as a digital forensic expert,

18   what is the first thing that a digital forensic expert --

19   examiner, excuse me, must do when preserving data, whether

20   that's one computer, one cell phone, or an entire complex

21   system?

22   A.  Assessment.  You have to assess the situation.

23   Q.  What do you mean by assessment?

24   A.  So when I go into a situation, I have to -- I have to know

25   the case and I have to know what I am -- what I am acquiring.

1   So if I walk into, say, a person's home, and there is one

2   desktop computer, there is no network, I know that if it's a

3   standard Dell computer with a hard drive, I can just pull that

4   hard drive out and image it.  It's running Windows.  It's going

5   to be super simple.

6        If it's a Mac computer, I probably can't remove that

7   hard drive because you void the warranties and some hard drives

8   you can't get out of Mac, so I know that there is a different

9   way that I have to acquire it.  Fairly simple assessment.

10        If I go into a business that has multiple servers,

11  it's a completely different world.  Now I have to think about

12  how many servers, how they're configured, whether they're --

13  they're obviously going to be on a network, how many networks,

14  there may be multiple networks, how all of that talks to each

15  other.  There is a lot of different things that I have to

16  consider when assessing that system.  I'll probably have to

17  bring in help.  I would need people who know the system.  I

18  might need other experts to help me forensically acquire it and

19  understand what I'm doing.  And I have to decide on what

20  methodologies we would use and what industry standard tools we

21  would want to use.

22  Q.  Are there standards regarding tools as well?

23  A.  There are.

24  Q.  And why are there standards regarding tools?

25  A.  Because, again, our tools have to be validated and tested

1    by our peers.  So I can't just create my own tool and say, you

2    know, here's my own forensic tool.  You don't know how that

3    tool works, it hasn't been tested and validated.  You may not

4    get the same results, and I can't prove that the results from

5    my tool are accurate and reliable unless it's an industry

6    standard tool.

7    Q.  And you heard testimony from both Agent Cullen and

8    Mr. Frost today and on October 3rd that they utilized

9    proprietary tools on a boot CD from the FBI to acquire evidence

10   in this case?

11   A.  Yes.

12   Q.  Do you have any knowledge of these tools, how they

13   function, whether or not they work with other industry standard

14   tools?

15   A.  I have no idea.

16   Q.  Do you have access to that FBI's boot CD that they have

17   used to get all the data in this case?

18   A.  No, I do not.

19   Q.  Do you have any way to test or validate the tools that they

20   have used?

21   A.  No, I don't.

22   Q.  Is that forensically sound?

23   A.  No, it's not.  Again, I can't -- I can't prove that the

24   results are accurate and reliable and I don't know what these

25   tools are.

1   Q.  And so that was in regards to assessment, right?

2   A.  Correct.

3   Q.  What do you do after an assessment?

4   A.  So after I have figured out what I'm going to do with a

5   system, before I touch it, I document everything.  So we would

6   go through the system and take, not only photographs of how the

7   entire system looks, but we take detailed photographs of, like,

8   the backs of the computers, so we can see exactly what cables

9   are plugged in, how the cables are connected to different other

10  computers or routers, so we know what the communication is

11  like.

12       Um, we're going to boot those computers into the BIOS,

13  so that's the motherboard on the computer.  And that will tell

14  us how the computer is configured, how all the hard drives are

15  configured in the computer, whether or not there is encryption

16  on the computer, whether a password is required for certain

17  things, um, how other servers may talk to them, that may be in

18  there as well, the date and the time.  There is a lot of

19  information in the BIOS that will tell us a lot about that

20  system.  And then we'll take photographs of those BIOS screens

21  so we can document exactly what those configuration settings

22  are.

23       We will do diagrams and schematics.  If it's, again,

24  if it's a large network, if diagrams and schematics aren't

25  available, then we will have to draw them.  We'll have to get

1   people who are knowledgeable to tell us how are these computers

2   communicating with each other.  Again, IP addresses.  Are these

3   all on site IP addresses?  What IP address is set for each

4   computer?  How do they communicate with each other?  What are

5   their responsibilities?  How long have they been in service?

6   Do I have a computer that is only a year old and not in my

7   window of, you know, what I'm looking for?  Do I have an old

8   computer sitting there that is not turned on?  We need to know

9   all of that, so we document everything.

10  Q.  And that's industry standard?

11  A.  Industry standard.

12  Q.  After you have documented everything, what would be the

13  next step?

14  A.  Then it's time to acquire.  Once you've assessed it,

15  document it, now I need to acquire the system.

16  Q.  And so, again, based on your experience, certifications,

17  training, and application of applying these industry standards,

18  what is the most important consideration with acquisition?

19  A.  Data is incredibly fragile and volatile, and if you do one

20  wrong thing, that data can be rendered completely useless, you

21  can destroy it, so you have to be very, very careful about how

22  you're going to acquire that data.

23  Q.  Okay.  And can you walk me through the steps that you would

24  have taken to acquire the servers in this case.

25  A.  The servers in this case were, I mean, obviously,

1    incredibly complex.  They were in multiple racks.  They were

2    running a Web site.  The first thing I would have done is

3    disconnect, basically, the wire to the outside, so take it off

4    the internet so that it can't be accessed publically.  Leave

5    them up and running.  And, again, getting help from

6    administration.  We learned that Mr. Gerken could have put that

7    system in a read only state in a number of hours.  I would have

8    immediately done that, put it in read only state so that it's

9    preserved, no one can get to it.

10         Then I would have to decide how to acquire it.  And,

11   again, these are, what I recently learned, are FreeBSD systems,

12   which are very complex.  You have systems talking to each

13   other, so you've got data that's being spread like this

14   throughout the system.  So I can't just take a hard drive out

15   of that and image it, it will not work, period.  Will not work.

16   I have to take a logical image.

17         So for each server I have to leave it up and running,

18   use my forensic software to make an image of that server in its

19   live state.  Once I have that live image, I would verify it

20   with a hash value, make sure that my image is forensically

21   sound, then I would pull it into my forensic software, open it

22   and make sure that I have readable data that matches the

23   server.  If that works for one server, I have to now do that

24   for every single server and then try to put the system back

25   together.

1          If I'm able to do that, then we could take the system

2     out of read only and take it down.  But this particular system

3     will not work if you just image the hard drive separately.

4     Q.  And the information you just testified to about the systems

5     being complex and in various racks, what is the basis for that

6     information?

7     A.  Well, I have been asking for the operating system since I

8     got involved on this because I didn't know what these systems

9     were running.  And that's very important, as a forensic expert,

10    I have to know what data I'm getting.  And I learned at the

11    last hearing that it was FreeBSD.  I knew it was a Linux-based

12    system.  I didn't know which Linux-based system.

13         So I went out and researched it, got some white

14    papers, called AccessData, talked to them about imaging

15    FreeBSD, um, actually spoke to my son who is a software guy,

16    who is a programmer and knows the system very well, got some

17    information that this system can't be imaged that way.

18    Q.  I want to show you what's been marked as Exhibit 128.

19         Do you have that up there?

20    A.  I do not.

21    Q.  And if you're looking at Exhibit 128, what is that?

22    A.  It's a fairly basic network diagram I actually pulled from

23    the internet so I wouldn't have to do one myself just to kind

24    of explain a system.

25    Q.  It's a schematic of a system?

1  A.  Yes.

2         MS. BERNSTEIN:  Could we publish the Elmo, please.

3  BY MS. BERNSTEIN:

4  Q.  And this is not the Backpage system?

5  A.  No.  This is a fairly simple diagram, actually.

6  Q.  And --

7         MR. RAPP:  Excuse me, I have an objection on

8  foundation and relevance.

9         THE COURT:  Okay.  Well, she hasn't moved to admit it

10  yet, but she can publish it.  We're not in front of a jury.

11         So go ahead.

12  BY MS. BERNSTEIN:

13  Q.  How would you take a system like this offline?

14  A.  Um, see that little router right here, the little Cisco

15  router?

16  Q.  And I think you can actually mark on your screen.

17  A.  Oh, I guess I knew that.

18         Right there.  I would disconnect that.

19  Q.  I'm sorry, you would disconnect that?

20  A.  I would disconnect that.

21  Q.  Okay.  And what additional steps would then be required to

22  make this hypothetical system read only?

23  A.  Well, that cuts it off from the internet and makes it

24  nonpublic.  To make a system like this read only, you would

25  need the administrator to tell you how to do that.  But, again,

1   that comes from the expertise of the person who designed the

2   system.  Mr. Gerken would know how to make this system read

3   only.  You don't touch anything.  You cut it off at that router

4   and then you make that entire system read only while you figure

5   out how to acquire it.

6   Q.  And that would have maintained viable forensic images?

7   A.  Absolutely.  Well, it would have maintained a preserved

8   system, correct.

9   Q.  And, theoretically, that would also have maintained the

10  administrative functionality that the defendants have been

11  asking for in this case?

12  A.  Absolutely.

13  Q.  I want to talk about how you first came to be involved in

14  this case.

15          When were you first contacted?

16  A.  Um, March of this year.

17  Q.  And, I'm sorry, I want to back up.

18          MS. BERNSTEIN:  Can this be admitted for demonstrative

19  purposes, Your Honor?  I don't think it has much substantive

20  value.

21          THE COURT:  Does the government want me to note your

22  objection?

23          MR. RAPP:  I would just renew my objection.  I don't

24  know what the relevance and the foundation as it relates to

25  this case.

1          THE COURT:  Okay.  The objection is overruled for

2  demonstrative purposes.

3  BY MS. BERNSTEIN:

4  Q.  And, I'm sorry, when were you first contacted in this case?

5  A.  March of this year.

6  Q.  March of -- March 2019?

7  A.  2019, yes.

8  Q.  And by whom?

9  A.  Mr. Feder.

10  Q.  And what did he ask you at that time?

11  A.  He called and said that he had -- or e-mailed and said that

12  he had a case involving, it was like a server farm that had

13  been taken down, and had received some boxes of hard drives

14  from the government and needed to know what was on them.

15  Q.  And what did you do?

16  A.  So I went to his office.  I told him that I would just go

17  over there and take a sampling of them, so I went to his

18  office.  There were three boxes with 56 hard drives.  Um, they

19  weren't all in the same format.  They weren't all labeled the

20  same, so I kind of took a sampling from each set that looked

21  similar using my forensic laptop.  And I just started looking

22  through some of the drives to see what was on them.

23          Some of them were readable, some of them were not.

24  Some of them had standard forensic images, some of them did

25  not.  I knew that the hard drives were formatted as a Linux

1    operating system, or a Linux file system, so I knew I needed to

2    take them back to my lab to do some more work with it, but I

3    could generally see what was there, but there was no

4    consistency.  It was all kinds of different stuff.

5    Q.  And that was before you were retained by the defendants?

6    A.  Correct.

7    Q.  And when were you retained?

8    A.  I was then retained, I believe, in April.

9    Q.  And when you were retained, what was your role in this case

10   to be?

11   A.  My role was to take the data that was provided by the

12   government and see what was there and try to make it into a

13   readable, usable format for the defense.

14   Q.  You're not a database expert?

15   A.  No, I'm not.

16   Q.  And you were never retained to create MySQL databases?

17   A.  No.

18   Q.  You were asked to just confirm that the information we got

19   from the government were valid forensic images?

20   A.  Correct.

21   Q.  And that would have been the first step in many, as we've

22   seen over the course of two days of testimony, in creating the

23   systems as Mr. Frost has done, correct?

24   A.  Yes, that is the first step.

25   Q.  And when you were retained and asked to just confirm that

1    we had valid images, how were you planning to do that?

2    A.  How was I planning to --

3    Q.  Just to check on the validity of the images, would that

4    have been a simple process?  What was involved in that process?

5    A.  Oh, no, it would have been a -- based on the preview of the

6    drives and the number of the drives, it was going to be a very

7    lengthy process.  I was going to bring all the drives back to

8    my lab where I had all of my equipment, different tools,

9    different software, and then start going through those drives

10   to see which were valid forensic images, which images I could

11   recreate, and just try to get that data back.

12   Q.  And in April of 2019, did you have enough information about

13   the servers to do that?

14   A.  No.  I -- so when I get a forensic image, all I'm seeing is

15   like an E01 file, it's just a file with a number.  And there is

16   a bunch of those files and you can't see anything with them

17   until you bring them into your forensic software.

18          For me to bring them in accurately, I need to know

19   what's in them.  I don't know what's been imaged.  At this

20   point I have no idea if they've imaged a Windows server or a

21   Linux server, or I have no idea what's inside of them, so I

22   needed more information about how these -- what was on these

23   servers, what -- what this data was, what types of operating

24   systems they were, and how some of these images were created,

25   because a lot of them were not standard images.

UNITED STATES DISTRICT COURT

1    Q.  You did not have that information in April of 2019?

2    A.  I did not.

3    Q.  At any point since April of 2019, have you learned that --

4    all of that relevant information?

5    A.  I learned the most information at the last hearing that --

6    that's the -- that actually finally gave me a general idea of

7    what was going on here.

8    Q.  Okay.  So back to April of 2019.  At that time, were you

9    asked to go to Idaho to review the servers there so that you

10   could get some additional information?

11   A.  Yes.

12   Q.  And that was the Pocatello FBI data center?

13   A.  Yes.

14   Q.  And what were you expecting to do in Idaho?

15   A.  So we were -- me and you were going to go to Idaho and I

16   was going to be able to boot the servers up so I could do that,

17   go into the BIOS, look at the BIOS, see how the -- you know,

18   how each server was configured, take photographs of them, look

19   at the hard drives, see how each hard drive was configured in

20   the server, learn about the operating systems and what types of

21   software were being used on them so I would have an idea of

22   what's inside those forensic images that had been given to me.

23   Q.  And that process would have been under the FBI

24   surveillance.  We weren't going to take them and go somewhere;

25   is that correct?

UNITED STATES DISTRICT COURT

1  A.  No, it was at the FBI with everyone there.

2  Q.  Okay.  Because it's not a meaningful inspection to look at

3  the outside of servers?

4  A.  No, anymore than you could look at a thumb drive and tell

5  me what's on it.

6  Q.  So do you recall when you flew to Idaho?

7  A.  Um, I think that was also in April.

8  Q.  And what happened when we got there?

9  A.  They said you can't bring anything in, so I wasn't able to

10  bring in any equipment.  I wasn't able to bring in my phone to

11  even take a picture.  I wasn't allowed to turn the servers on.

12  I was literally allowed to look at them and write down serial

13  numbers.

14  Q.  Was that helpful in understanding the 56 hard drives in the

15  boxes that you picked up from Mr. Feder?

16  A.  No.  The only thing I was able to do was actually look at

17  the hard drives and see what size they were on the outside and

18  add those up and say, well, this server has 60 gigs of

19  information or 60 terabytes or whatever.  That's all I could

20  do.

21  Q.  And then about a week later did you conduct a similar view

22  of servers at the Phoenix FBI facility?

23  A.  Yes.  Yes.

24  Q.  And what were you able to do in Phoenix?

25  A.  The exact same thing.

1   Q.  No physical access?

2   A.  No.

3   Q.  No pictures?

4   A.  Other than, again, touching the hard drives and -- and

5   being able to see that it's a two terabyte hard drive, that was

6   it.

7   Q.  No equipment?

8   A.  Nope.

9   Q.  No pictures?

10  A.  Nope.

11  Q.  And during that visit, did I also receive a paper bag with

12  four hard drives from the FBI?

13  A.  Yes.

14  Q.  And I provided that bag to you?

15  A.  You did.

16  Q.  And you prepared a chain of custody and took it to your

17  lab?

18  A.  Yes.

19  Q.  And after visiting Idaho and Phoenix, did I ask you to

20  prepare a memorandum?

21  A.  You did.

22  Q.  And, at that time, do you recall how many servers you had

23  had the ability to examine relative to how many servers we had

24  learned existed?

25  A.  There were, I think, over 30 at the Phoenix location that

```
 1   we looked at.  I'm not sure the numbers of -- the actual
 2   numbers of the servers that we looked at both in Pocatello and
 3   Phoenix.
 4   Q.  And the 56 hard drives that you had, how many servers did
 5   you understand that to represent?
 6   A.  The 56 hard drives represented five servers.
 7   Q.  Just five?
 8   A.  Correct.
 9   Q.  And do you recall the total terabyte of data that was
10   across those five servers, 56 hard drives?
11   A.  It's a lot, I don't recall, 60-something maybe.
12   Q.  Sixty-nine?
13   A.  Sixty-nine.
14   Q.  Is that right?
15   A.  That sounds about right, yeah.
16   Q.  Do you recall when you actually picked up the 56 hard
17   drives from Mr. Feder's office and began your review?
18   A.  That was sometime in May, mid May, I think, like, the 17th
19   or something.
20   Q.  And at that point you had the 56 hard drives plus the four
21   that we had received from the Phoenix FBI visit?
22   A.  Correct.
23   Q.  Okay.  At any point did you have information about the data
24   on those servers?
25   A.  No.
```

1    Q.   Photographs of any boot screens?

2    A.   No.

3    Q.   How they were configured?

4    A.   No.

5    Q.   What operating systems they were running?

6    A.   No.

7    Q.   Whether there was any encryption?

8    A.   No.

9    Q.   How they were forensically imaged?

10   A.   No.

11   Q.   Did you need that information to understand the data that

12   was on those 60 hard drives?

13   A.   Yes, I did.

14   Q.   And, just to be clear, those 60 hard drives that you

15   reviewed did not represent the entirety of the Backpage.com

16   systems; is that correct?

17   A.   No, it was a very, very small -- my understanding is there

18   is over 100 servers, 106, and that was five of them.

19   Q.   And as a computer forensic expert asked to review evidence

20   in this case, would you want to know the entire world of

21   evidence that was out there relative to what you had in your

22   possession?

23   A.   Absolutely.  Just based on my experience on other cases, I

24   have been told, oh, well, those computers aren't necessary.

25   There is nothing of evidentiary value on those.  You don't need

1    this.  And then when we make sure that we get them and we

2    analyze them, sometimes we had found the exculpatory

3    information.  We have found backup information nobody knew was

4    there.  I need every piece of the evidence so that -- that we

5    can make that decision whether or not they're relevant and

6    what's going to work.

7    Q.  So prior to your review of the hard drives, do you recall

8    what discovery you had reviewed?

9    A.  I reviewed -- there was some communications back and forth

10   between the parties from, like, between March and -- or

11   December and March.  Um, I reviewed some chain of custody

12   forms.  I reviewed the indictment.  And then there were some

13   briefs that had been filed that had a bunch of information

14   about what was going on.

15   Q.  And I don't want to belabor this point, but, again,

16   everything -- or, rather, nothing you reviewed gave you any

17   information about how the servers were configured?

18   A.  Nothing.  No.

19   Q.  Did you prepare a spreadsheet summarizing your review of

20   the hard drives?

21   A.  I did.

22   Q.  Can you please look at what's been marked Exhibit 123?

23   A.  Yes.

24   Q.  Do you recognize that?

25   A.  Yes, that's the spreadsheet I prepared.

```
1    Q.  Is that a fair and accurate depiction of your review notes
2    of the 60 hard drives?
3    A.  Yes.
4         MS. BERNSTEIN:  I would move to admit Exhibit 123 at
5    this time.
6         MR. RAPP:  Okay.  So this doesn't have a Bates number
7    on it.  We have some spreadsheets that do have Bates numbers on
8    it.  If you could just tell us which one this matches up to.
9         MS. BERNSTEIN:  It matches Exhibit 53, which we
10   provided to you in advance of the October 3rd hearing.  This is
11   -- I can represent that it's the same information, I just tried
12   to make the font a little bit bigger to help me.
13        MR. RAPP:  Can we see your -- can we see the exhibit
14   list from October 3rd?  I need the exhibit list from
15   October 3rd.  We're not finding an Exhibit 53.
16        MS. BERNSTEIN:  It was the discovery that we had sent
17   you.
18        (An off-the-record discussion was held between
19   counsel.)
20        MR. RAPP:  We don't know where this document came
21   from.  We don't know if we've been provided this document
22   because it doesn't have a Bates number on it.
23        THE COURT:  And your statement, I believe off the
24   record when you were talking to him, was that you provided it
25   before the October 3rd hearing?
```

UNITED STATES DISTRICT COURT

```
 1          MS. BERNSTEIN:  Yes, Your Honor.  We provided a lot of
 2    Rule 26.2 material to the government in advance of October 3rd.
 3    This was one of them.  This was file 53.  I believe at that
 4    time it was Bates stamped T Loehrs Evidentiary Hearing 53, or
 5    something of that nature.  It was specifically e-mailed to
 6    counsel prior to the October 3rd hearing.  This is that -- this
 7    is that spreadsheet except I just tried to make the font a
 8    little bit bigger.
 9          THE COURT:  Okay.  You can go ahead and continue with
10    your questions.
11          MS. BERNSTEIN:  I'm sorry?
12          THE COURT:  You can continue with your questions about
13    it.
14          MS. BERNSTEIN:  Thank you.
15    BY MS. BERNSTEIN:
16    Q.  Looking at Exhibit 123, can you go through this and just
17    explain what the columns are?
18    A.  Yes.  So the first column, which is kind of folded over
19    there -- and you actually can't see the headings.  Mine has
20    headings.  The first column is the date that I received the
21    evidence.  And I think this is also -- yeah, it's multiple
22    pages.  There we go.
23          Date that I received the evidence.  Then the second
24    column, some of the hard drives had a specimen ID and some of
25    them did not, so in -- in some of that column, the specimen ID,
```

1    I just gave it an ID, which is like ED01 through ED04.  And

2    then there is an item number.  Some of them had item numbers,

3    some of them did not.  The item number actually matches up to

4    the FBI chain of custody forms.  And that's the item number of

5    the server itself.

6    Q.  And is that -- sorry to interrupt.  Is that just a

7    meaningful naming convention or just how the FBI has assigned

8    the servers?

9    A.  These are just numbers that the FBI put on there because I

10   had to try to put together some of that to figure out where

11   some of this came from.

12         Then the evidence drive itself with the -- the make

13   and the size of it; the format, um, of the forensic image on

14   the drive, if I was able to tell; the examiner who created the

15   forensic image; then there is a description of what I was

16   seeing on the drive; and then my notes about what I needed to

17   do and, you know, whether or not it was a valid forensic image

18   or whether it needed more work.

19   Q.  And starting with the four hard drives that you received

20   from Phoenix, those are reflected toward the bottom of this

21   evidence chart?

22   A.  Correct.

23   Q.  And how did you identify those drives?

24   A.  So, again, these didn't have actual specimen numbers on

25   them, so I just called them ED01 for evidence drive 01 through

1     evidence drive 04.

2     Q.  And so looking at ED01, when were the forensic images on

3     ED01 created?

4     A.  They were actually created, I think in, like -- between

5     September and November of 2018, each one was a little --

6     they're -- a couple in September, a couple in October, a couple

7     in November.

8     Q.  And who was the examiner that created ED01?

9     A.  Agent Cullen.

10    Q.  Did you have any problem accessing any of that -- any of

11    his forensic images on ED01?

12    A.  No.  All of those forensic images worked.

13    Q.  Moving below that to ED02.

14    A.  Yes.

15    Q.  What was on that drive?

16    A.  There were forensic images for a bunch of different items

17    on there.  Um, again, they have another number, which is the

18    QPX numbers, which are different than the item numbers.  Some

19    of those were servers from, I think, Dallas, I'm not sure.

20    Some of them were personal machines.  I think there is some

21    Apple MacBooks on there, some removable storage media.

22              Sorry, I should put that up here.  It's hard for me to

23    see.

24    Q.  Is it fair to say that you were able to access the images

25    on ED02 with your industry standard forensic tools?

1  A.  All of them were industry standard forensic images, and I

2  was able to access all of them, except one, I think, had an

3  error.  When I tried to bring it into my forensic software, it

4  said it was an invalid file.

5  Q.  Moving below that to ED03, what was on that drive?

6  A.  That drive only had one forensic image for QPX 503, and

7  that was a, um, I think just a bunch of e-mails, like, forensic

8  image of some folders with e-mail.  It wasn't a forensic image

9  of a machine, it was just an image of some folders with e-mail,

10  it looked like.

11  Q.  And you were able to see that with your industry standard

12  forensic tools as well?

13  A.  Yes.

14  Q.  And who was the examiner that generated ED03?

15  A.  Agent Cullen.

16  Q.  And was there an ED04?

17  A.  Yes.

18  Q.  What was on that drive?

19  A.  So that drive had an Apple plan capsule.  Again, standard

20  forensic images for an Apple plan capsule, a C gate drive,

21  another MacBook and a Dell All-in-One.

22  Q.  And who were the examiners that created ED04?

23  A.  Agent Cullen and then somebody with initials KDH.

24  Q.  And you're able to tell who the forensic examiner was,

25  because when you can get into a file, it tells you who examined

1    it; is that correct?

2    A.  Well, actually, all of these drives had acquisition logs,

3    so it wasn't just a standard image, but it came with

4    acquisition logs that told me when it was -- when it was

5    actually imaged and who imaged it and some description of what

6    was being imaged.

7    Q.  Let's move to the 56 hard drives that you obtained from

8    Mr. Feder's office.  Starting at the top of the evidence chart.

9    A.  Yes.

10   Q.  What does the specimen number mean?

11   A.  Again, each -- my understanding is that each hard drive

12   within a server was removed from that server and imaged

13   individually and then given a specimen number.  That's my

14   understanding.

15          Um, and then, because you can see, you have all these

16   different specimen numbers and they're all coming from one

17   server, the 1B 60.

18   Q.  And 1B 60, how did you identify that number?

19   A.  Um, that was on the chain of custody forms for the FBI, and

20   it said that it was the Dell PowerEdge that had the master

21   database.

22   Q.  What did you learn from reviewing 1B 60?

23   A.  Um, it -- there were a bunch of folders in it.  It wasn't a

24   standard image that I could see.  Um, there were a bunch of

25   folders.  I knew it was a Linux-based system and I would need

1    to try more to go see it, but it wasn't a standard forensic

2    image that I could just bring in with my tools.

3    Q.  What forensic software did you use to view 1B 60?

4    A.  I started with all of these and viewed them with FTK

5    Imager, because I knew FTK Imager had been used because it was

6    in the acquisition logs that Cullen had provided.  And it's

7    actually a pretty good tool for viewing.  So I viewed it in FTK

8    Imager, but then I tried three different versions of EnCase, 6,

9    7, and 8, because all of those actually will read Linux

10   systems.

11           I used a Linux specific tool called Autopsy, it's part

12   of the Sleuth Kit, which is a very robust Linux tool that reads

13   Linux file systems, so I tried opening it in that.  I used

14   X-Ways, which is another industry standard forensic tool, and I

15   used in FTK, not just FTK Imager, but FTK, because the forensic

16   tool is different than the imager.

17   Q.  And FTK and FTK Imager, is that the same software you heard

18   Mr. Frost testify that he used to image the drive?

19   A.  FTK Imager was used to image them, AccessData is the

20   company and FTK is the forensic tool.

21   Q.  And you heard Mr. Frost say that he -- that the image he

22   created verified successfully?

23   A.  Correct.

24   Q.  And what does that mean, to verify successfully?

25   A.  All that means is if your forensic tool takes a bit-for-bit

1    copy of a hard drive and it's successful in copying that, you

2    will get a verification hash.  So if your data on that hard

3    drive is garbage, you've just successfully verified garbage.

4    Q.  So an image can be verified and still not work?

5    A.  Oh, absolutely.  You don't know if an image actually works

6    until you bring it into your forensic software.  Just looking

7    at a hash match doesn't tell you that you have a good forensic

8    image, it just means the tool ran correctly.  It doesn't mean

9    the data was imaged correctly.

10   Q.  Did you also hear Agent Cullen's testimony on October 3rd

11   that FTK Imager does not support the FreeBSD operating system?

12   A.  I did.

13   Q.  If FTK does not support FreeBSD, could that result in this

14   data being unreadable?

15   A.  Absolutely.

16   Q.  Did you also hear Mr. Frost testify on October 3rd that

17   there was no encryption?

18   A.  I did.

19   Q.  What is encryption?

20   A.  So encryption is basically taking your data and scrambling

21   it so nobody can read it until you've decrypted it.  Some

22   encryption you can see, other encryption can be hidden, but you

23   have -- it scrambles your data so you can't read it.

24   Q.  And what would happen if you imaged an encrypted hard

25   drive?

```
 1    A.  Again, you would have either an empty hard drive because it
 2    hasn't been decrypted, or you would have a bunch of data that
 3    is unrecognizable.  It would still be scrambled.  Again, you've
 4    just imaged garbage.
 5    Q.  Did you hear Mr. Frost's testimony on October 3rd that he
 6    was unaware of any encryption?
 7    A.  I did.
 8    Q.  Did you review any information that contradicts this?
 9    A.  Yes, I did.
10    Q.  And what was --
11    A.  Again, I believe that was right before the hearing.  I
12    think that was in the -- all the e-mails that were disclosed
13    before the hearing.
14    Q.  Okay.  So I'm going to direct you to what's in front of you
15    as 183, 184, and 185.
16    A.  Yes.
17    Q.  And on 183, it's a little bit hard to read, but do you see
18    that that's an e-mail that contains two attachments?
19    A.  Um, yeah, it looks like a string of e-mails.
20    Q.  I'm sorry, yes, but at the top where it indicates that
21    there were attachments to the e-mail?
22    A.  Oh, I see.  Yes, sorry.
23    Q.  And I guess, more helpfully, what are the Bates stamps that
24    you see on 183?
25    A.  Ferrer, F-E-R-R-E-R, Jencks, underscore, 000001 through 3.
```

1    Q.  And then Exhibit 184, what Bates stamp did the government

2    put on that exhibit?

3    A.  Um, and then that's number 4.

4    Q.  And how about Exhibit 185?

5    A.  That is number 5.

6    Q.  And are these the e-mails and the attachments that you

7    reviewed to learn about the encryption on the systems?

8    A.  Yes.

9         MS. BERNSTEIN:  I would move these into evidence at

10   this time.

11        MR. RAPP:  No objection.

12        THE COURT:  183 through 185 will be admitted.

13   BY MS. BERNSTEIN:

14   Q.  Looking at Exhibit 184.

15   A.  Yes.

16   Q.  In the third column down -- or, excuse me, the third full

17   paragraph down.

18   A.  Yes.

19   Q.  Does that indicate that the system had some degree of

20   encryption?

21   A.  Yes.  It says that the servers were equipped with self-

22   encrypting drives, and as long as it was in the chassis that it

23   came in, it automatic -- it would automatically decrypt, but

24   once you remove it, it is encrypted.

25   Q.  And what's the chassis?

1    A.  The server.  So -- so that's why you can't take these out.

2    You have a box with hard drives all installed that all depend

3    on each other.  And if they're self-encrypting, they're fine

4    once they're in there, you boot the server and do your thing,

5    but as soon as you pull it out, you've just -- you've just

6    scrambled all the data.

7    Q.  Beyond FTK Imager and EnCase and Autopsy and the other

8    programs that you specified earlier, did you use anything else

9    to try and access the data?

10   A.  I did.  I actually tried to -- I used an Ubuntu system on

11   -- through my Windows computer I installed a virtual machine

12   and put Ubuntu in it and tried to review it that way, still

13   couldn't get anything.  And then after the hearing when I

14   learned that it was FreeBSD, again, that's when I called

15   AccessData and actually installed FreeBSD on another virtual

16   machine and tried to actually use FreeBSD to access the drives

17   and I couldn't do it.

18   Q.  And, again, this is just to access the drives, this is not

19   to create a database; is that right?

20   A.  I'm just trying to open these forensic images.  And, again,

21   not all of them show as forensic images.  Some of them do, some

22   of them show as E01s, but the others just show as garbage, so I

23   was just trying to find something to read this data.

24   Q.  Were you able to use any programs to access data in an

25   understandable format?

1    A.  I was not.

2    Q.  And I think you have indicated that some of the drives did

3    have forensic images on them?

4    A.  Correct.

5    Q.  But you have not been able to look at the images that have

6    been provided on every single drive?

7    A.  No.

8    Q.  And the tools you use are industry standard?

9    A.  They're the best tools in the industry, yes.

10   Q.  You have successfully used them before to look at evidence

11   from the FBI?

12   A.  Hundreds and hundreds of times, yes.

13   Q.  On your spreadsheet, which is Exhibit 123, the next item

14   number below 1B 60 which we were just discussing --

15   A.  Yes.

16   Q.  -- is 1B 211.

17   A.  Yes.

18   Q.  Can you walk me through your attempts to access that data.

19   A.  Yes.  So 1B -- these particular drives, each drive actually

20   had an E01, which is an industry standard forensic image.  FTK

21   Imager will make an E01, and that's what most forensic images

22   come in.  That is an actual EnCase image, so using EnCase to

23   open an E01 is the industry standard.

24        When I attempted to do that, it came -- it was in --

25   it was an invalid evidence file and --

1    Q.  What does that mean?

2    A.  So it could mean a lot of things.  It could be that the --

3    the process became corrupted when it was being imaged.  It

4    could be that it was done with a tool that isn't recognizing

5    it.  There could be a lot of reasons.  But when I looked at the

6    E01s on the drive -- so a copy, a forensic image of a hard

7    drive is going to have, like, could have 20, 30, maybe 50 E01

8    files that all make up that one drive.  Every single E01 file

9    is identical in size until you get to the very last one,

10   because the very last one is probably not going to be exactly

11   the same size.

12          As I looked through the E01s, they were all the same

13   size for a while, and then they were size zero, size zero, size

14   zero, then a huge file, and then size zero, size zero.  That

15   right there is a red flag that this is not a valid -- something

16   happened.  That is not a valid file.  EnCase will not open

17   that.  No forensic tool will open that no matter how hard you

18   try.

19   Q.  And could that be the result of encryption?

20   A.  Could be encryption, it could be corruption in the way it

21   was done.  It could be -- he testified -- Mr. Frost testified

22   that he imaged to a network, that should never be done, because

23   when you're imaging, every single bit has to be perfect as

24   you're imaging.  You have to go drive-to-drive.  If you go up

25   onto a network and that network blips for a second, your image

1    could be ruined.  And so it could be any one of these things.

2    What I know is that my tools absolutely cannot open them.

3    Doesn't work.

4    Q.  So -- and I think you're getting to this, but what did you

5    conclude after all of your research and testing of these hard

6    drives?

7    A.  Well, I -- again, I called AccessData and I said, does your

8    tool image FreeBSD?  And they said it is not validated to image

9    FreeBSD.  And when I read the white papers and started

10   researching what this actual system is, you cannot image it

11   this way.  So that's probably why -- it probably has a lot to

12   do with everything, the way it was imaged, the tool that was

13   used, the fact that there was encryption.

14   Q.  And I want to briefly touch on what's been referred to

15   during testimony as the payment processing island.

16   A.  Yes.

17   Q.  So did you conduct any similar analysis of any other drives

18   beyond the 60 that we've been discussing?

19   A.  I did receive some additional drives in, I believe it was,

20   August, and, again, they were in the same format.

21   Q.  And do you recall how big these drives were?

22   A.  I believe it was two 10 terabyte drives, if I am not

23   mistaken.

24   Q.  And what did you do after receiving those?

25   A.  Again, same thing, tried to preview them to see if they

1    were in industry standard formats, and they were kind of the

2    same.

3    Q.  You were similarly unable to see anything?

4    A.  Correct.  And I have -- I have not done more in-depth work

5    with those.  I just looked at them, and, yeah, same type of

6    thing.

7    Q.  In addition to those two 10 terabyte hard drives comprising

8    a payment processing island, sometime later did you get other

9    evidence that is connected to those drives?

10   A.  I believe we received a CD or a DVD at our office.

11   Q.  You submitted a declaration to this court on August 5th of

12   2019?

13   A.  Yes.

14   Q.  And what did you conclude at that time about the data that

15   had been produced?

16   A.  This data -- I can't do anything with this.  I can't --

17   even if I could open one forensic image, there is no way that

18   this is ever going to be usable in any format.

19   Q.  And after listening to a day-and-a-half of testimony on the

20   matter, has your opinion changed?

21   A.  No.  It actually makes me feel better because now I

22   understand why I'm not able to get into any of this.

23            MS. BERNSTEIN:  Thank you.

24            THE COURT:  Did anybody else have any questions on

25   direct?

1          (No response.)

2          THE COURT:  Okay.  Cross.

3                    CROSS-EXAMINATION

4    BY MR. RAPP:

5    Q.  So, Ms. Loehrs, let's talk about these negative, in your

6    words, these negative opinions that courts have had from you.

7    Just to be clear, it's actually the judges that have made an

8    assessment of your credibility.  Would you agree with me there?

9    A.  It's their opinion.

10   Q.  So let's start back in 2012.  Do you recall this case,

11   Certantes-Perez?

12   A.  Cervantes, yes.

13   Q.  Well, I think it's actually Certantes, Gustavo Certantes-

14   Perez, Westlaw 6155914.

15   A.  I mean, he was a client and his name was Cervantes, but --

16   Q.  Okay.  But you have read that decision, fair?

17   A.  Yes.

18   Q.  Okay.  And, in that decision, the court -- and let's be

19   clear, you -- you provided testimony in that case not unlike

20   the testimony you have provided in this case, computer

21   forensics, right?

22   A.  Yes.

23   Q.  And in that case the judge said, Ms. Loehrs' testimony,

24   however, contains logical gaps, legal conclusions that are

25   highly likely to confuse and mislead the jury, true?  Yes or

1   no?

2   A.  That's what it says.

3   Q.  Ms. Loehrs' opinion about what does or does not constitute

4   evidence is a legal opinion and inadmissible, true?

5   A.  Sure.

6   Q.  But the conclusion urged by Ms. Loehrs is unsound and very

7   misleading in this particular case, correct?

8   A.  Sure.

9   Q.  Ms. Loehrs may not render an opinion regarding what is or

10  is not evidence of knowing receipt and possession.  This is an

11  inadmissible legal opinion, correct?

12  A.  That's absolutely correct.

13  Q.  Ms. Loehrs may not testify about her inability to put a

14  person at the keyboard when pornography was accessed or the

15  implications of her inability, right?

16  A.  That's what is in there.

17  Q.  This imprecise statement urges a false conclusion based

18  upon incomplete research, right?

19  A.  Okay.

20  Q.  Well, you read the decision, right?  Correct?

21  A.  Well, that's an opinion.

22  Q.  Yes or no?  Did you read the decision?

23  A.  I read it.  Yes, I did.

24  Q.  Okay.  If offered by an expert witness, this statement

25  would likely mislead the jury, correct?

1   A.   Sure.

2   Q.   And you have, no doubt, read the case in Robert Dean Moran,

3   right?

4   A.   Yes.

5   Q.   2012?

6   A.   Yep.

7   Q.   Right across the street here in Superior Court, right?

8   A.   Yep.  Yep.

9   Q.   Ms. Loehrs also could not explain her own testing methods

10  based on her screen shots she provided, right?

11  A.   That's what it says.

12  Q.   She even referred to one of the screen shots as the wrong

13  screen shot, right?

14  A.   Okay.

15  Q.   Overall, she provided screen -- she provided testing screen

16  captures to this court that were inaccurate, incomplete, and

17  thus misleading, as they did not fully set forth in detail the

18  testing she asserts as her -- supports her contention that

19  there are flaws within the program or recreate and explain

20  through her screen shots she provided, right?

21  A.   I don't even understand that.

22  Q.   Well, you read it, right?

23  A.   I read it.  I don't understand that sentence.

24  Q.   Ms. Loehrs not only fails to provide sufficient testing

25  methods, she then testifies and calls into question whether or

1   not the detectives had sufficient probable cause to execute a

2   search warrant, right?

3   A.   Yep.

4   Q.   Ms. Loehrs ultimately conceded that the sworn statements in

5   her affidavit -- not unlike the declaration you gave in this

6   case -- in that court about a Victoria Smith article do not

7   support the arguments she claimed, right?  That's what the

8   judge wrote?

9   A.   That's what the judge wrote.

10   Q.   2013, United States versus Thomas, Westlaw 6000484.  You

11   read this case?

12   A.   Absolutely.

13   Q.   The most troubling aspect of Ms. Loehrs' expert opinions in

14   this case is her reliance on her work in other cases, which was

15   either disproved or rejected, right?

16   A.   That's her opinion.

17   Q.   Ms. Loehrs testified that she had not read the Moran

18   court's opinion, although it was provided to the attorneys who

19   called her as a witness in this case.  Do you remember that,

20   right?

21   A.   Yes.  It was provided to the attorneys.

22   Q.   The Court finds that Ms. Loehrs' claim, in this respect,

23   either incredible or reflective of a lack of concern regarding

24   the reliability of the opinions she is offering under oath,

25   right?

1   A.  That's an opinion.

2   Q.  The judge goes on in Thomas to say, many of the opinions

3   advanced by Ms. Loehrs in the Neale and Liekert cases were the

4   same opinions she advanced in Moran.  The Moran court squarely

5   rejected these opinions finding that Ms. Loehrs could not

6   explain her own testing methods based on her screen shots she

7   provided.  And that, and I quote, overall, Ms. Loehrs provided

8   screen -- testing screen captures to this court that were

9   inaccurate, incomplete, and thus misleading, as they did not

10  fully set forth in detail the testing she asserts, right?

11  A.  That's what's written.

12  Q.  The Moran court, as Thomas comments, further rejected

13  Ms. Loehrs' testimony that an SHA slash 1 value, or hash value

14  of an image was not reliable, and thus dangerous for a

15  detective to use as the basis for probable cause, and

16  specifically rejected her conclusion that a single source

17  download was required to establish probable cause, correct?

18  A.  Again, I'm -- I am not sure I even followed that, but --

19  Q.  But you read these decisions?

20  A.  I have read all of these.

21  Q.  And Ms. Bernstein asked you, there is a few negative

22  decisions out there on you, right?

23  A.  Of course.

24  Q.  And you -- you are aware of these because, as the Moran

25  court said, you -- you actually went back and looked at these

1    opinions because you're going to be testifying in other state

2    and federal courts, right?

3    A.   Sure.

4    Q.   In light of the Moran court's rejection -- and this is in

5    this Thomas case -- Ms. Loehrs' expert opinions, she should not

6    have relied on Moran testing in this case.  On balance,

7    Ms. Loehrs provided little, if any, credible or reliable

8    testimony to support her expert opinions in this case.

9    Accordingly, the court does not rely on her opinions in

10   reaching its conclusion, right?

11   A.   That's what -- that's what's written.

12   Q.   So before I get to 2015, you have actually worked for a

13   number of these law firms that are representing the Backpage

14   defendants, right?

15   A.   No.  I've worked with thousands of attorneys all over the

16   world, yes.

17   Q.   Right.  But, specifically, you have -- you have worked with

18   Mr. Bienert's firm on several occasions, right?

19   A.   Um, I am actually not sure that I've worked for his firm.

20   I have never worked with him or Ms. Bernstein.

21   Q.   Well, you worked for his firm, right?

22   A.   Oh, I -- um, I believe that was -- yes, I believe so, on a

23   case that got dismissed in Orange County, yes.

24   Q.   Well, a couple cases, correct?

25   A.   I'm actually not aware of more than one, but if you tell

1   me, I'm sure it's on my CV.

2   Q.  Let me just look at Exhibit -- Government's 27.  And this

3   is -- this is actually a case that you and I had together.

4   This is in front of Judge Humetewa back in 2014.

5          You filed this -- you filed this list of all these

6   cases that you worked on, right?

7   A.  Well, I keep a running list of every case I've ever worked

8   on, correct.

9   Q.  Right.  And, in this case, this Mr. James Riddet, you see

10  that there at 358?

11  A.  I'm very familiar with him.  I actually did not realize he

12  was at the same firm.

13  Q.  Okay.  Well, he eventually goes to Mr. -- Mr. Bienert's

14  firm, right?

15  A.  Again, I didn't -- I didn't connect that, but, yes, I've

16  worked with Mr. Riddet on a couple of cases.

17  Q.  Okay.  And so these attorneys are well aware of you, right?

18  A.  I'm sure lots of attorneys are well aware of me.

19  Q.  And some of the cases that I have read, they would be

20  familiar with, wouldn't they?

21  A.  I would think.  You would have to ask them.

22  Q.  2015, U.S. versus Pirosko.  Do you remember this case?

23  A.  Um, no, because I actually didn't work on that case.  I

24  have never worked on that case.

25  Q.  More importantly, Crowe's reliance on Loehrs's affidavit

1    appears to have been a mistake.  In fact, in a subsequent case,

2    the district court considered and completely discredited

3    Loehrs's statements.

4              MS. BERNSTEIN:  Objection, Your Honor.  Foundation.

5              THE COURT:  The objection is sustained.

6    BY MR. RAPP:

7    Q.  U.S. versus Mitchell.  Do you remember that case?

8    A.  Not specifically, no.

9    Q.  It's a reported case, 128 F. Supp. 3d 1266.  During direct

10   and cross-examination, Ms. Loehrs acknowledged that several of

11   the statements included in her first declaration were incorrect

12   because she conducts many exams at off-site locations and she

13   had confused her site visit in this case with a separate visit

14   to San Francisco for a different case.

15   A.  I do remember that, yes.

16   Q.  And during cross-examination, Loehrs again acknowledged the

17   discrepancies in her first declaration saying, I confuse one

18   facility with another.

19              Do you recall that?

20   A.  I do.  I mentioned a window that wasn't there in that

21   facility.

22   Q.  And in that same case, Ms. Loehrs testified, and give me

23   about a hundred more hours and I may be able to prove it, the

24   it being the fact that child pornography on petitioner's

25   computer had been placed there by someone other than the

1    petitioner.  Ms. Loehrs' statement is, at best, speculation.

2         You remember that from the Thomas case?

3    A.  I thought we were talking about Mitchell.  I'm sorry.

4    Q.  Excuse me, maybe it's my mistake.  I'm going to get to the

5    Thomas case.  Mitchell.

6    A.  I don't specifically recall that, but, yeah, that sounds

7    accurate, I would need hundreds of hours.

8    Q.  So -- and you've worked with Mr. Cambria's firm as well?

9    A.  I have, yes.

10   Q.  And they would -- they would know about these decisions,

11   right?

12   A.  I believe so.  I believe that was another case that was

13   dismissed.

14   Q.  Any -- any attorney would stick it -- your name in Westlaw

15   and they would come up with all these decisions regarding how

16   other judges have viewed your testimony?

17        MS. BERNSTEIN:  Objection, Your Honor.

18   BY MR. RAPP:

19   Q.  Right?

20        MS. BERNSTEIN:  I don't think this witness is

21   qualified to say what other attorneys are doing.  I don't think

22   there is a foundation for her to answer that question.

23        THE COURT:  Sustained as to foundation.

24   BY MR. RAPP:

25   Q.  Well, you're a private investigator, right?

1   A.  I am.

2   Q.  And -- and you would be concerned, working on behalf of a

3   firm, about the expert that you would hire in any case, right?

4   A.  Would I be?

5   Q.  Wouldn't you be concerned about their qualifications?

6   A.  Their qualifications, yes, but every expert is going to

7   have bad opinions.  You can't please everybody.

8   Q.  You have a few here, don't you, where courts have

9   specifically found you to be misleading and not credible,

10  correct?

11  A.  That is true.

12  Q.  So the attorney that you had first had contact with is, I

13  presume, from your testimony, is Mr. Feder; is that right?

14  A.  That's correct.

15  Q.  And what did Mr. Feder tell you that they, the Backpage

16  defendants, were retaining you to do?

17  A.  He -- he didn't.  He only contacted me and said, hey, we've

18  been dumped with all this data from the government.  We don't

19  know what it is.  Can you come take a look at it, because I

20  have worked on many cases with Mr. Feder, and I said sure.

21  Q.  What cases have you worked with Mr. Feder on, by the way?

22  A.  I couldn't state them specifically but they're in there.

23  Q.  I can't seem to find any of those on the list, but okay.

24          So Mr. Feder calls you, you come out and you pick up

25  these hard drives, right?

UNITED STATES DISTRICT COURT

1    A.  No.  I just went to his office and sampled them in his

2    conference room.

3    Q.  So did Mr. Feder share with you a conference call the

4    Backpage -- well, first of all, how much are you paid to -- to

5    engage -- how much did they pay you to engage you in whatever

6    it is that Mr. Feder was asking you to do?  How much were you

7    paid?

8    A.  My firm is 250 an hour, and we get paid by the hour to do

9    forensics.

10   Q.  So thus far how much have you been paid?

11   A.  I would have to look at my invoices.

12   Q.  Oh, just ballpark it for us.

13   A.  15,000.

14   Q.  15,000.  All right.  And did Mr. Feder, or any of the

15   Backpage attorneys, for that matter, share with you the

16   conference call that we -- the -- the Backpage defendants'

17   attorneys had with the prosecution team on February 19th of

18   2019?

19   A.  I don't know specifically.

20   Q.  Well, do you recall any of them saying, Ms. Loehrs, we have

21   had a conversation with the Backpage prosecution team, and --

22   and, indeed, Mr. Frost was on that call, and did any of them

23   tell you exactly what Mr. Frost told them they would need, what

24   servers or what devices you would need to search the data on

25   the hard drives?  Did they share that with you?

1    A.   They shared all kinds of information.

2    Q.   I know, but did they share the February 19th call with you?

3    A.   Well, again, I don't know the information that they shared

4    with me, where it came from, if it came from a document, if it

5    came from a conference call in February or March, I don't know.

6    Q.   Well, you were retained in March of 2019?

7    A.   I was retained in April.

8    Q.   You -- your first contact was in March of 2019, right?

9    A.   I viewed the drives at no charge in March and I was

10   retained in April.

11   Q.   Okay.  And do you recall any of them mentioning that they

12   had a conversation with the prosecution team in February?

13   A.   Yeah, they had conversations all the time.

14   Q.   But, specifically, did they tell you that they had a

15   conversation with Mr. Frost?

16   A.   I don't recall that specifically.

17   Q.   Okay.  When you were -- well, so you don't recall them

18   telling you that, on that call, that they would need the

19   FreeBSD to access the data?  Do you recall that?

20   A.   No.  Nobody ever told me FreeBSD.

21   Q.   Do you recall when you were up at Pocatello?

22   A.   Yes.

23   Q.   Did you ever have a discussion with any of the IT

24   supervisors there about what you would need to use to access

25   the data?

1    A.   Um, I don't remember what our discussions were.  That's

2    what I was there to do was to figure out that information.

3    Q.   But did you -- did you ask them, what am I going to need to

4    access the data?

5    A.   I don't know if I specifically asked them that question,

6    but that's what we were there to discuss.  I was there to look

7    at the servers to figure out what was on them.  And there was a

8    bunch of us there.  I don't remember all the conversation that

9    occurred, but I didn't get any information that I needed while

10   I was there.

11   Q.   You certainly recognize that this was a Linux operating

12   system?

13   A.   Oh, yeah, I knew that from the get-go.

14   Q.   And you knew that your Window-based systems would not

15   function in a Linux-based operating system?

16   A.   Well, that's not true, because all of our forensic tools

17   run on Windows.  You don't have to have a Linux system.  In

18   fact, Mr. Frost gave an example today up on the screen in the

19   courtroom where he was showing us his MySQL database from these

20   FreeBSD servers and he was on a Windows computer.  He was using

21   Linux and Windows.  You don't have to be on a Linux computer to

22   read a Linux file system.  You have to have the proper tools

23   and you have to have the right equipment, but just because you

24   have a Windows machine doesn't mean that's all I can see is

25   Windows, so that's a misconception.

1  Q.  Well, did you use SQL to review it?

2  A.  You can't use SQL to review a forensic image.  SQL is for a

3  database.  I'm just trying to read the forensic images.  SQL

4  wouldn't do me any good.

5  Q.  Were you -- I take it from your testimony that you were

6  specifically not hired to recreate this Web site?

7  A.  I was hired to take the data provided by the government and

8  make it readable and usable, if possible.

9  Q.  And -- and, in fact, your declaration suggests that you

10  were going to be the one to look for information to either

11  disprove or prove the allegations in the indictment?

12  A.  No, I don't believe that was my job was to prove or

13  disprove the allegations.  What I do is once I take that data

14  from a forensic format into a readable format that they can

15  use, I can forensically run searches for them, I can export out

16  data, or I can recreate an entire system, whatever is needed so

17  that they can provide their defense.

18  Q.  But if -- if I understand you correctly, you were going to

19  be part of that.  You were going to be asked to run searches

20  and find certain information?

21  A.  I don't think we ever got there.  We never got to that

22  point.  I was just trying to give them readable data.  That was

23  my -- that was step one, can you get us readable, usable data.

24  Q.  Did you -- once you were having difficulty in April of

25  2019, did you make any effort to call Mr. Gerken and -- and

1  discuss with him what was needed to access the data?

2  A.  I didn't even --

3         MS. BERNSTEIN:  And just -- objection.  Clarification.

4  Mr. Rapp said April of 2018 and I think he means '19.

5  BY MR. RAPP:

6  Q.  2019, did you make any effort?

7  A.  I did not call Mr. Gerken, no.  I don't even think I knew

8  who Mr. Gerken was.

9  Q.  Well, did you ask the defense?

10  A.  Who somebody was that I didn't know?  No.  I -- I told them

11  the information I needed.  And my job as the expert is to tell

12  the attorneys what I -- what I need to get.

13  Q.  But did you ask the defense, hey, who was running these

14  servers?  I need to talk to them so that I can figure out how

15  to access this data.

16  A.  I said, hey, this is the information I need to access this

17  data.

18  Q.  All right.  So you -- so you didn't make any effort to try

19  to talk to Mr. Gerken?

20  A.  No, sir.  That is not my job.

21  Q.  Did you -- maybe you didn't know who Mr. Gerken was in

22  April of 2019, but -- but subsequent to -- to April, did you

23  make any effort to talk to Mr. Gerken?

24  A.  No.  I did not contact him by myself, no.

25  Q.  Did you make any effort to talk to Mr. Frost?

```
1    A.  Um, I think the only time I spoke with Mr. Frost was in

2    Pocatello.

3    Q.  Now -- well, let me just ask you.  Since October 3rd, did

4    you make any effort to, after observing in court Mr. --

5    Mr. Frost's searching -- the search that he conducted on the

6    stand, did you make any effort to do the same?

7    A.  To go into a SQL database?

8    Q.  Yes.

9    A.  No.  That is not my expertise, that is not my job, and I

10   had no reason to do that.

11   Q.  But you -- your answer presumes that there is somebody who

12   is a -- has an expertise in SQL database, right?

13   A.  Oh, sure.  There is experts in everything.

14   Q.  Right.  And if -- if the defense had found an expert in the

15   SQL database, that person could have assisted in conducting a

16   search, right?

17   A.  Only if the data we had I could make readable and give to

18   them and say, now you guys can get a SQL expert, but we didn't

19   even get beyond step one getting them readable data, so, no,

20   there is nothing to do.

21   Q.  And your -- your opinion is that you couldn't find readable

22   data because the forensic tools that you were using couldn't

23   access the data in this Linux operating system, right?

24   A.  No.  My opinion is based on using numerous industry

25   standard tools that read Linux systems, calling AccessData and
```

```
1    asking them, can this even be done?
2    Q.  Who did you -- who did you talk to at AccessData?
3              MR. NEUMAN:  I object.  He keeps interrupting the
4    witness.  She should be allowed to finish her answers and then
5    he can ask the next question.
6              THE COURT:  Your objection is noted.
7              What's the next question?
8    BY MR. RAPP:
9    Q.  Who did you talk to at AccessData?
10   A.  I have a printed chat with him on my computer.  I don't
11   remember his name, but I have it.
12   Q.  So you had one of those chat exchanges with this person?
13   A.  Correct.
14   Q.  And you had that on your computer?
15   A.  Yes.
16   Q.  And did you tell the defense about this chat that you had
17   and did you provide them copies of that exchange?
18   A.  No, but I can.
19   Q.  Would you do that?
20   A.  Sure.
21   Q.  And I would make a 26.2 request for those -- for that
22   exchange.
23              What else did you review related to this case?  Did
24   you -- well, let me ask you.  Did you review any reports of any
25   of the moderators in this case?
```

1    A.   Moderators?

2    Q.   Moderators just to figure out the moderation process.

3    A.   I don't even know what you're talking about.

4    Q.   All right.  Well, you were here for the testimony, correct?

5    A.   Moderator reports, I have never heard of moderator report.

6    I know that there are moderators that work for Backpage and

7    they were involved in some other cases, but I've never heard of

8    any reports.

9    Q.   All right.  The defense never shared with you any of the

10   interviews of the moderators?

11   A.   That wouldn't be relevant to my work, no.

12   Q.   Well, wouldn't it explain how the moderation process worked

13   and what you would expect to see when you were searching the

14   database?

15   A.   Again, I think you're misunderstanding.  I am not searching

16   any database.  I am only trying -- I am a digital forensic

17   expert.  I'm not a database expert, a MySQL expert.  I'm trying

18   to take forensic images and make them readable for the defense.

19   That's all.

20   Q.   But you did not put as your role in this case to find

21   information that would either prove or disprove the allegations

22   in the indictment?

23   A.   Right, meaning I'm going to give them data that they can

24   then go through.  If they needed assistance going through that

25   data at some point, that is something that I could do with my

1    forensic tools, but we never got there.  My role was -- would

2    never be to create some SQL database because that is not my

3    expertise.

4    Q.  All right.  So let's talk about the -- the servers.  You

5    take the view that they should not have shut down the servers

6    upon the search?

7    A.  Absolutely.  I never would have done that.

8    Q.  Do you -- you acknowledge, though, that the simple act of

9    powering down a server incorrectly may forever alter and

10   destroy the integrity of the data?  You acknowledge that in

11   your declaration, correct?

12   A.  That is correct.

13   Q.  You certainly agree that Mr. Gerken executed the soft

14   shutdown appropriately?

15   A.  I -- I know that the soft shutdown was done and that's an

16   appropriate way.

17   Q.  And you agree that the soft shutdown by DesertNet for the

18   Tucson servers and remotely for the Dutch servers was the

19   appropriate way to proceed, right?

20   A.  I think a soft shutdown would be the appropriate way to

21   shut those down.

22   Q.  And you agree that the physical hard drives in Tucson were

23   not dismantled until the system was properly shut down?  Do you

24   agree with that?

25   A.  I have -- I have no idea.  I don't know how anything was

1    dismantled.  I wasn't there.

2    Q.  Other than calling this Access between October 3rd and to

3    date, did you consult with anybody else?

4    A.  Yes, I -- I think I testified to that.  I found white

5    papers.

6    Q.  Okay.  What are -- what white papers did you find?

7    A.  White papers are scientific journals where they write, so

8    we test and validate software, or they -- and in this case it

9    was white papers, scientific papers on FreeBSD and the

10   implications of forensics and why forensic analysis of those

11   has to take very special precautions because of the type of

12   file system it is.

13           I consulted, again, he's my son, but he is a

14   programmer that works with this particular language and knows

15   what he's doing.

16   Q.  Well, what's his background?

17   A.  He has a degree from Eller in -- it's not information

18   systems, it's the more scientific computer degree.  He has a

19   computer degree and he works for USAA doing all their, um, big

20   data centers.  So he builds huge data centers.  He's a

21   programmer.  They've actually patented his software so he knows

22   what he's doing, so I discussed with him.

23   Q.  Did you discuss with anybody else outside your family?

24   A.  Again, called AccessData, read white papers, but, no, I

25   didn't have any conversations with anybody outside.

1   Q.  You can't access and review this data, correct?

2   A.  Correct.

3   Q.  How can you conclude that it is unusable if you, yourself,

4   are not able to access and -- and review it?

5   A.  Because a forensic image is just that, it's a forensic

6   image.  If your software won't open a forensic image because

7   it's damaged, nobody can open that forensic image.  It's not

8   about I can't open it.  I would be more than happy to give this

9   drive to any expert in the country and say, here, try to open

10  that.  It's not going to open.

11  Q.  But did you do that?

12  A.  Huh?

13  Q.  Did you do that?

14  A.  Did I go hire other experts?

15  Q.  Yes.

16  A.  No, I did not.  I don't need to.

17  Q.  Did you tell the defense that you, yourself, are unable to

18  access this data?

19  A.  They know this data cannot be accessed.

20  Q.  They only know it can't be accessed because of you,

21  correct?

22          MS. BERNSTEIN:  Your Honor, I object to whatever is

23  sitting up on the screen that we have had no discussion of

24  whatsoever.

25          THE COURT:  What is this?

1          MR. RAPP:  Well, let's go ahead and discuss it.

2    BY MR. RAPP:

3    Q.  This is an e-mail from you sent to the defense on March 27,

4    2019?

5    A.  Right.

6    Q.  This is given to us by the defense, right?

7    A.  Correct.

8    Q.  And who are you sending this to?

9    A.  This was sent -- again, this is, um, in March when my -- my

10   very first review where I just went to his office with my

11   mobile laptop and Windows tools and I noticed that the drives

12   were -- they had the EFI file system --

13   Q.  Ma'am, that's not my question.

14   A.  Oh, I'm sorry.

15   Q.  Who did you send the e-mail to?

16   A.  I don't know.  It's blacked out.  It was the attorneys.

17   Q.  So all the attorneys in this case?

18   A.  I don't know which -- it looks like it went to 1, 2, 3, 4.

19   Q.  All right.

20   A.  So whoever those four people were.

21   Q.  And you tell them all the drives I examined are formatted

22   with the EFI file system, which is often used by Linux and also

23   common with servers, right?

24   A.  Yes.

25   Q.  And since that is not a Windows-based file system, which is

1    what most of your forensic tools are able to access, some of

2    the drives appeared are -- are as unallocated space only, that

3    is no data was present on the drive, right?

4    A.  Correct.

5    Q.  With the proper forensic tools, which were not with me

6    yesterday, I believe we will be able to properly see the data

7    on the servers?

8    A.  Right.  Again, I didn't have those tools with me.  This was

9    in March when I went at no charge just to do a quick review,

10   but once I brought them back to my lab, we had all the tools we

11   need and most of them run on a Windows system.

12   Q.  Further, we need to know exactly how the server was

13   configured, i.e., rate, so we can tell our forensic software to

14   put it all back together.  Without that information, the data

15   on the drives will not be accessible by any tool.

16   A.  Correct.

17   Q.  Now, let's go to the bottom.  I would ask for additional

18   information from the government, such as forensic reports

19   documenting the imaging process, right?

20   A.  Yep.

21   Q.  And did -- did the defense tell you that they had already

22   had this conversation with the prosecution?  Did they ever

23   relate that to you?

24   A.  Yes.  They gave me the only forensic reports they had and

25   it wasn't those --

1  Q.  No, no.  I'm talking about the conference call that we had

2  on February 19, 2019.  Did they tell you about that?

3          MS. BERNSTEIN:  Objection.  Asked and answered.  She

4  has repeatedly stated that she does not recall.

5          THE COURT:  The objection is sustained.

6  BY MR. RAPP:

7  Q.  I can certainly assist in recreating a discovery request

8  once I know what you have already received.

9          Okay.  What did you do to assist these attorneys in

10  preparing some type of a discovery request that would help you

11  understand how to access the data?

12  A.  I explained over and over the information that I needed,

13  and they kept sending me stuff that the government sent them,

14  and they said, is this it?  Is this it?  And I said, no, that's

15  not it.  Here's -- we asked for detailed photographs and I got

16  photographs of the servers in Pocatello sitting on desks.  I

17  kept asking for the information and they kept trying to give me

18  what the government was sending them, but none of that was what

19  I needed.

20  Q.  But, in fairness, you don't know what they were asking of

21  the government, right?

22  A.  Well, no, I am not working at their office, that's correct.

23  Q.  You don't know what conversations they had with Mr. Frost

24  or others that was telling them what tools they needed to

25  access this data?

1             MS. BERNSTEIN:  Objection.  Asked and answered.

2             THE COURT:  The objection is sustained.

3             MR. RAPP:  Let's look at this, for the record, and

4   admit Government's 31, which is the e-mail sent by Ms. Loehrs

5   to, I guess, the defense team on March 27, 2019.  This is

6   actually Bates stamped and provided by the defense Loehrs 1.

7   I'd move to admit that.

8             THE COURT:  Is there any objection?

9             MS. BERNSTEIN:  No objection.

10            MR. NEUMAN:  I just object to the characterization of

11  it being sent to the defendants' team.  I, for instance, did

12  not receive this e-mail, but no objection to the admission.

13            THE COURT:  Okay.  Exhibit 31 will be admitted.

14  BY MR. RAPP:

15  Q.  So going to Exhibit 32, this is another e-mail you sent to

16  the -- well, who -- who were you dealing with on the defense

17  team?  I think that's important to know.  Who were you talking

18  to and sending these e-mails to trying to get information?

19  A.  My main communication was with Ms. Bernstein.

20  Q.  Ms. Bernstein.  Is there anybody else?

21  A.  Again, the e-mails, if I would reply and multiple people

22  would be on them, I would reply to everybody, so I don't know

23  who is on every e-mail, but Ms. Bernstein was the main contact

24  that I would e-mail.

25  Q.  This is another one where you recognize that this is a

1    Linux server, right?

2    A.   Correct.

3    Q.   And in this one you say, most importantly, you will notice

4    the modified date on the data is 11-14-2018, after the date of

5    seizure, and, therefore, the evidence is not forensically sound

6    because they have actually modified the data.

7         Do you see that?

8    A.   Yes.

9    Q.   And do you still -- do you still share that view?

10   A.   I honestly don't know.  I haven't gone back and looked at

11   it.  I just -- I saw a modified date, and typically on data

12   that you get, the forensic image is the date it was seized so

13   nobody has touched it afterwards, but I haven't done any kind

14   of analysis into that.

15   Q.   But you would -- you would agree that if they did the

16   forensic image after the date of seizure, which was April 6,

17   2018, that this date would be the date that they made the

18   image, right?

19   A.   No, this wasn't an image date.  That was part of the

20   problem.  This wasn't an actual image.

21   Q.   Well, what was this?

22   A.   This was one of the drives that I got that had garbage on

23   it.

24   Q.   But this wasn't -- you didn't view this as them making an

25   image of the -- the hard drive?

1  A.  No.  Again, the hard drive didn't have -- this wasn't one

2  of the drives with an actual forensic image, it was just a

3  drive with some data and it had a modified date in November of

4  2018, that's all.

5  Q.  You didn't view this as a container of an image file?

6  A.  Again, I haven't gone back and done any analysis with that

7  specific notation.  That was early on.

8  Q.  All right.

9        MR. RAPP:  I'd move to admit Government's 32.

10       THE COURT:  Any objection?

11       MS. BERNSTEIN:  No objection.

12       THE COURT:  Thirty-two will be admitted.

13 BY MR. RAPP:

14 Q.  And going to Government's 35, this is an e-mail sent on

15 July 1st of 2019.  You see that there?

16 A.  Yes.

17 Q.  I got through the last box this weekend and now I'm copying

18 the forensic images from multiple drives onto a single drive so

19 I can bring them into my forensic software, right?

20 A.  Yes.

21 Q.  Okay.  What is your forensic software?

22 A.  I have multiple types of forensic software.  I use EnCase,

23 versions 6, 7, and 8, I use FTK, I use X-Ways.

24 Q.  SQL?

25 A.  That's not forensic software.  That is not a forensic tool.

1   Q.  Did you use a -- a -- a forensic tool that is compatible

2   with a Linux operating system?

3   A.  Every single forensic tool that I just said is compatible

4   with Linux.  I have viewed Linux drives on them.  I have imaged

5   Linux drives with those tools.  They are forensic tools that

6   run on Windows that read Mac systems, Windows systems, Linux

7   systems, yes.

8          MR. RAPP:  For the record, I would move in

9   Government's 35.

10          MS. BERNSTEIN:  No objection.

11          THE COURT:  Thirty-five will be admitted.

12  BY MR. RAPP:

13  Q.  Government's 34, so this one is July 8th of 2019.  And here

14  you're waiting for your next phone conference to continue work.

15  Did you have that phone conference?

16  A.  I'm sure.  We have had many since July.

17  Q.  And on that phone conference, did the defense relate to you

18  any information that the Backpage prosecution team had related

19  to them about how to access this data?

20  A.  Again, I have told you everything that they've related.

21  They didn't relate anything that would help me access this

22  data.

23  Q.  You would agree, would you not, that if you can't access

24  this data from the hard drive in this case, you certainly would

25  be able to access it from some type of other available source?

1          I'm showing you Government's 23.  Do you recognize

2    that?

3    A.   Yeah.

4    Q.   That's a PowerPoint --

5    A.   That is a long time ago.

6    Q.   But you agree this is a PowerPoint that you -- right?

7    A.   That -- I don't know what that -- that's not a PowerPoint

8    presentation, that I know of.

9    Q.   This isn't your PowerPoint presentation?

10   A.   Well, this isn't PowerPoint.  This is -- I mean, that looks

11   like a copy of -- that could be a PowerPoint.

12   Q.   Okay.

13   A.   It could be some other presentation.  I have no idea.

14   Q.   Well, let's see if you take issue with any of the

15   information.

16          You -- you would agree that the, at least the face

17   sheet, this is you, right, your phone number?  No question?

18   A.   Absolutely.  That's from -- I mean, Law2000 hasn't been

19   around in, I think, 15 years.

20   Q.   Okay.  But the principles that you set forth in this are

21   still accurate.  Would you agree with me there?

22          MS. BERNSTEIN:  Objection.  Foundation.  I think she

23   said she doesn't know what this is and he hasn't shown it to

24   her.

25          THE COURT:  The objection is overruled to that

1  question.

2          THE WITNESS:  Once I see it, I'll let you know --

3  like, I agree with what's highlighted right there, examination

4  and analysis of data by persons with proper experience and

5  training.  Absolutely.

6  BY MR. RAPP:

7  Q.  Right.

8          THE COURT:  Counsel, I'm going to stop you because

9  it's five o'clock.  We'd have to take a break --

10         MR. RAPP:  All right.

11         THE COURT:  -- anyway if we were going to continue, so

12 we'll talk about how we're going to continue.

13         You can step down.

14         Is this, Loehrs, your last witness?

15         MS. BERNSTEIN:  Yes, Your Honor.

16         THE COURT:  Okay.  So we need another hour.

17         MS. BERNSTEIN:  I don't know how much more Mr. Rapp

18 has.

19         THE COURT:  I don't suppose you all can come back on

20 Monday morning?

21         MR. RAPP:  The government can.

22         THE COURT:  Wait, did you say can or can't?  I thought

23 you said can.

24         MR. RAPP:  I said I can, C-A-N.

25         THE COURT:  Okay.  Thank you.

```
 1              MS. BERNSTEIN:  Your Honor, the witness cannot.

 2              THE COURT:  Okay.  So let's start with the next time

 3    the witness is available.

 4              MS. BERNSTEIN:  We're just consulting calendars, Your

 5    Honor.

 6              THE COURT:  Yeah.

 7              MS. BERNSTEIN:  Your Honor, Monday the 4th is the

 8    first day that Ms. Loehrs is available.

 9              MR. NEUMAN:  I don't think we heard how much more

10    cross there is.  That might inform how long we need.

11              THE COURT:  Okay.  That week I'm not available, so the

12    next time I would be available is after that.

13              I'm not going to hold you to it, but got an idea?

14              MR. RAPP:  Less than an hour.

15              THE COURT:  Okay.  And then so -- so maybe we should

16    block 90 minutes.

17              MS. BERNSTEIN:  And, Your Honor, you're out until the

18    12th; is that right?

19              THE COURT:  Yes.

20              Oh, wait, I'm sorry.  And then I'm not available on

21    the 13th, 14th, 15th, and then we're starting trial.

22              We did have a trial clear up the 19th, 20th, 21st,

23    22nd of November.

24              MS. BERNSTEIN:  So we're at the week of November 25th?

25              THE COURT:  No, 19th.
```

1          MS. BERNSTEIN:  November 19th.

2          THE COURT:  I am available on the 27th as well.

3          MS. BERNSTEIN:  Your Honor, the 19th and 20th do work

4   for the witness.  I can just represent to the Court that I'm

5   not available again until -- if we've already pushed ourselves

6   to the 19th, I'm not available until December 2nd.

7          Your Honor, if there is only an hour left, could we

8   just do one more hour today, by any chance?

9          THE COURT:  I was not planning on that.  I haven't

10   consulted with the staff to see if they're available.

11          All right.  Let's take a break and you look at your

12   calendars.

13          December 2nd I am free all morning.  It's open.

14          MS. BERNSTEIN:  That appears to work for the witness,

15   as well as for me.  I don't know about anyone else.

16          MR. RAPP:  That works for the government as well.

17          MS. BERNSTEIN:  It is our strong preference -- this is

18   an issue that we've been at for the better part of a year.  It

19   is our strong preference to not delay one hour of testimony for

20   another two months or --

21          THE COURT:  I agree.

22          MS. BERNSTEIN:  -- a month-and-a-half at this point.

23          THE COURT:  Okay.  We'll come back in five minutes.

24          MR. BIENERT:  Your Honor, can I just ask -- it can be

25   off the record -- but when we're talking about the scheduling,

```
 1   just you let us know what you envision.  Obviously, we finish
 2   the testimony hopefully within an hour, do you envision us
 3   arguing things then or do you think you want us to have --
 4   like, brief things after or come back and argue?
 5             THE COURT:  No.  If we're staying, it would only be to
 6   finish the testimony.
 7             MR. BIENERT:  Okay.
 8             THE COURT:  And I would rule without further argument
 9   based on -- because the pleadings have the arguments.
10             MR. BIENERT:  Okay.
11             THE COURT:  Okay.
12             (Court stands in recess, 5:06 p.m. - 5:15 p.m.)
13             THE COURT:  So we're back on the record.
14             We've discussed the schedule and we're going to reset
15   it until December 2nd at 8:30, that way I'm going to have the
16   morning to you, that's it.  If it's not done, I guess that's
17   it.  So we're at recess on that.
18             But, Mr. Eisenberg, I just need to talk to you for a
19   minute.
20             I got e-mails from -- I guess there was an issue with
21   the understanding regarding budget for travel.  Have you
22   figured that out or do we need to have a discussion?
23             MR. EISENBERG:  Your Honor, this is -- it's a sealed
24   matter because of the budget, but I think I can answer your
25   question.
```

1           I think --

2           THE COURT:  I didn't want to get into the specifics

3    but --

4           MR. EISENBERG:  I think we got it figured out.  I

5    talked with Ms. Naegele about it and it really is a matter for

6    the CJA budget unit to get approval from Your Honor with

7    respect to -- for two nights of lodging.

8           And the other issue is a travel between the airport

9    and here or his home in the Dallas area, Dallas Fort Worth

10   Airport.  So that part I think is something that might be

11   subject to discussion between yourself and Ms. Naegele.

12          THE COURT:  Okay.

13          MR. EISENBERG:  But I told her what my view is.

14          THE COURT:  Okay.

15          MR. EISENBERG:  Thank you.

16          MR. NEUMAN:  Your Honor, before we go off the record,

17   just one last thing.

18          Mr. Rapp just mentioned a possible rebuttal witness.

19   I would just note we were supposed to go first.  We, as a

20   courtesy, said, okay, the government goes first.  That sort of

21   ended up with us getting less examination time.  They got

22   redirect, we didn't get a re-cross.

23          I'm going to object to them calling any further

24   witnesses as rebuttal witnesses.  We're going out of order,

25   unless we get one chance then, potentially, if we need to, to

1    call a rebuttal rebuttal, because it's -- the order is getting

2    jumbled because of our courtesy to the government, so I just

3    raise it for Your Honor's consideration.

4              THE COURT:  Okay.

5              MR. NEUMAN:  Thank you.

6              (Proceedings concluded at 5:18 p.m.)

7                        *          *          *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, CHRISTINE M. COALY, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of

6   Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion of

9   the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 30th day of October,

13  2019.

14

15

16
                   /s/ Christine M. Coaly
17                 Christine M. Coaly, RMR, CRR

18

19

20

21

22

23

24

25