MICHAEL BAILEY
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1200
Los Angeles, CA 90012
Telephone (213) 894-3391

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>Michael Lacey, et al.,<br><br>　　　　Defendants. | No. CR-18-422-PHX-SMB<br><br>**UNITED STATES' RESPONSE TO DEFENDANTS' MOTION TO SUPPRESS THE DATTO WARRANT**<br>**(Doc. 827)** |

The United States responds to Defendants' Motion to Suppress (Doc. 827) and respectfully requests this Court deny Defendants' motion and request for a *Franks* hearing because (1) the motion was untimely filed, without leave or permission from the Court, (2) four of the six defendants joining in this motion do not have standing to challenge it, and

- 1 -

(3) because the warrant comports with the requirements under the Fourth Amendment. Additionally, Defendants have failed to preliminarily demonstrate that the affidavit contains any false statements to warrant a *Franks* hearing. *Franks v. Delaware,* 438 U.S. 154 (1978).

**PRELIMINARY STATEMENT**

On December 23, 2019, approximately nine weeks after the substantive motions deadline, Defendants' filed their Motion to Suppress the "Datto warrant." (Doc. 827). The motion was signed by counsel for Defendants Lacey, Larkin, Spear, Vaught, and Padilla and later joined by Defendant Brunst (Doc. 835.) Because this motion comes after the substantive motions deadline without the Court granting leave or permitting an extension of time to file this motion, the motion is untimely and need not be considered by the Court. Fed. R. Crim. P. 12(c). *See also United States v. McMillian,* 786 F.3d 630, 636 (7th Cir. 2015) (a criminal defendant forfeits an argument if he negligently fails to assert a right in a timely fashion). Defendants are subject to a due diligence standard. *United States v. Ruhe,* 191 F.3d 376, 386 (4th Cir. 1991). Even if the defendant did not know all of the information establishing the basis for a claim, the court will not excuse a forfeiture if the defendant, by due diligence, could have or should have discovered the basis for the claim. *Id.* As Defendants have conceded, they were in possession of the Datto warrant prior to the substantive motions deadline. Additionally, the government made the data from the Datto warrant available to all Defendants seven months prior.

Next, even if Defendants' Motion is to be considered, Defendants Lacey, Larkin, Spear and Brunst lack standing to challenge the Datto warrant. Datto was a cloud service that provided companies with backup and recovery cloud service data. (Doc. 827-2, ¶ II(2).) This warrant authorized the search for all emails associated with 26 email accounts. Nine of the 26 email accounts were believed to belong to Carl Ferrer, Daniel Hyer, and Defendants Padilla and Vaught. The remaining 17 email accounts were believed to be accounts for Backpage employees or employees for a specific Backpage related entity. Because this warrant did not involve the search of any email accounts belonging to

Defendants Lacey, Larkin, Brunst or Spear, they do not have standing to challenge it. *See United States v. Lifshitz*, 369 F.3d 173, 190 (2nd Cir. 2004) (individuals may not enjoy an expectation of privacy in transmissions over the Internet or email that have already arrived at the recipient); *see also United States v. Lustyi*k, 57 F. Supp.3d 213, 223 (S.D.N.Y. 2014) (a person has no expectation of privacy in another person's email account). Although Defendants claim to have an expectation of privacy in their email, regardless of whether their email account was a target in the warrant or because their email was seized due to their communication with a targeted email account, they have failed to cite a case in support of their theory.

Finally, the Datto warrant is valid. It was properly presented to a neutral and detached magistrate judge, with probable cause, describing in particularity the place to be searched (Datto), and particularly described the person or things to be seized (26 email accounts). The application for this warrant was accompanied by an eleven-page affidavit of Special Agent (SA) Robinson, along with the 100 count superseding indictment. Defendants' Motion to Suppress and request for a *Franks* hearing should be denied.

## **MEMORANDOM OF POINTS AND AUTHORITIES**

### I. INTRODUCTION

In 2016, a federal grand jury in Arizona began investigating the website www.backpage.com along with its owners, principals, and employees for violations of federal criminal statutes. In April 2018, a federal grand jury in Arizona returned an indictment against Defendants in the instant case. During the course of the investigation, the government applied for, and obtained evidence through several search and seizure warrants, including the Datto warrant. Defendants previously filed Motions to Suppress several of these warrants. (Doc. 775, 778, and 786.) The arguments set forth in Defendants' Motion to Suppress the Datto warrant are virtually identical to the arguments set forth previously. Accordingly, the government incorporates by reference its

Consolidated Response to Defendants' Motions to Suppress (Doc. 811.)  Relevant case activities are as follows:

### a. The Indictment.

On March 28, 2018, an Arizona federal grand jury charged Backpage's owners, principals, and employees with conspiracy, violations of the Travel Act, and money laundering, and included criminal forfeiture allegations.  (Doc. 3.)

### b. Carl Ferrer and Backpage Plead Guilty to Conspiracy.

On April 5, 2018, Backpage and its CEO and 100% owner, Carl Ferrer, pleaded guilty to conspiracy, admitted the great majority of Backpage's paid ads were for prostitution, consented to shut down the Backpage website, and forfeited all assets traceable to or involved in the crimes.  (CR18-464-PHX-SMB, Doc. 7.)  Also on April 5, 2018, Mr. Ferrer, as the 100% owner and CEO of Backpage, pleaded guilty to a money laundering conspiracy on behalf of Backpage and its corporate entities: Backpage.com LLC; Website Technologies LLC; Posting Solutions LLC; Amstel River Holdings, LLC; Ad Tech BV PA; and UGC Tech Group BV.  (CR18-465-PHX-SMB, Doc. 8-1 through 8-6.)

### c. The Superseding Indictment

On July 25, 2018, an Arizona federal grand jury returned a 100 count superseding indictment charging Defendants Lacey, Larkin, Brunst, Spear, Padilla, Vaught and Hyer with conspiracy, violations of the Travel Act, and money laundering.  (Doc. 230.)

### d. Daniel Hyer Pleads Guilty to Conspiracy.

On August 17, 2018, Daniel Hyer, Backpage's Sales and Marketing Director, pleaded guilty to conspiracy and admitted that one of his primary responsibilities was to increase the number of ads posted in Backpage, a process referred to by Backpage as "preboarding" or "aggregation," where they would identify "escort" and "adult" ads on other websites and invite them to post ads on Backpage's website in hopes of securing their future business.  (Doc. 271.)  Mr. Hyer admitted knowing that the majority of ads that he and others at Backpage were creating through aggregation were actually offering illegal

prostitution services and that his efforts, along with others at Backpage, resulted in large revenue and website traffic growth for Backpage. *Id.*

### e. 18-8364 MB – Datto Warrant.

On August 31, 2018, United States Magistrate Judge John Z. Boyle granted the government's application and authorized the search of Datto, Inc, for the contents of 26 email accounts related to Backpage and Backpage related entities.  Datto is a cloud service that provides companies with a way to backup and recover cloud service data.  This warrant sought emails and correspondence that involved Defendants and related to backpage.com, the sale of backpage.com, client payment information, aggregation (the Dallas Plan), moderation, The Erotic Review, and bank statements and financial records for Lacey and Larkin.

### f. Disclosure of the Datto Warrant

On March 18, 2019, the government informed Defendants that the data from the Datto warrant was available. (Exhibit A, March 18, 2019 email from Reginald Jones with attached correspondence.)  Defendants arranged to pick up the data on April 23, 2019, and it was hand-delivered to counsel for Mr. Larkin on that date. (Exhibit B, Signed Property Receipt.)  Seven months after disclosure was made available and one week prior to the substantive motions deadline, on October 11, 2018, counsel for Mr. Lacey emailed the government seeking a copy of the Datto warrant.  The government responded within minutes, attaching a courtesy copy of the Datto warrant along with its Bates numbers.  (Doc. 811-1.) Counsel for Lacey now claim they never received the government's email and that it must have been rejected by the firm's server security service or quarantined for containing a potential threat.  (Doc. 827 at 6, Doc. 827-3.)

Interestingly, the government has communicated with Mr. Lacey's counsel at the same email addresses, both before and after the October 11 email without issue.  The government's October 11 email was from the counsel's Department of Justice email account, in direct response to defense counsel's email, contained the same subject line, and referenced the same words and topics discussed by the defense.   Additionally, the

government did not receive any error or undeliverable notices after this message was sent. Even assuming that the government's October 11 email was never received; defense counsel made no effort to follow up with the government to obtain another copy of this warrant, despite the upcoming substantive motions deadline. Instead, Defendants elected to do nothing but declare in a separate motion that it was "reserving [its] right to challenge…upon receipt and review" a warrant that it already had.[1] (Doc. 778, 827 at 7.)

## II.  ARGUMENT

### a.  The Meaning of Probable Cause.

A successful application and affidavit to search a person or property requires probable cause. Probable cause requires only a reasonable belief that a subject has committed a crime, which reflects a balance between the privacy interests of individuals and the community's need for protection from criminal activity. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, have no place in a judge's decision on whether there is a probability of criminal activity. *Illinois v. Gates*, 462 U.S. 213, 235 (1983); *see also United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (finding "*Gates* itself marked a return to the 'totality of the circumstances' test and emphasized that probable cause means 'fair probability,' not certainty or even a preponderance of the evidence"). Once a search warrant is approved, a judge's determination of probable cause is entitled to great deference. *Id.* at 236; *United States v. Reeves*, 210 F.3d 1041, 1046 (9th Cir. 2000). In fact, even in cases where probable cause is doubtful or marginal, preference is to be accorded to warrants. *United States v. Ventresca*, 380 U.S. 102, 109 (1965).

The Fourth Amendment requires that no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched

---

[1] Defendants concede knowledge of the Datto warrant's existence, but claim they could not locate it. Indeed, Defendants were informed of the warrant's existence, by the very latest, in March 2019 when the government advised the data was ready for pick up. Additionally, Defendants agree they received the warrant application on September 23, 2019, as part of a larger disclosure. (Doc. 827 at 6.) A simple keyword search for "Datto" or "Backupify" in the Relativity database would have quickly produced the warrant.

and the person or things to be seized. U.S. Const. amend. IV. Governing case law describes this requirement as one of "specificity" and cases have distinguished its "two aspects" as particularity and breadth. *United States v. SDI Future Health Inc*., 568 F.3d 684, 702 (9th Cir. 2009). Particularity is the requirement that the warrant must clearly state what is sought; breadth deals with the requirement that limits the scope of the warrant to the probable cause that served as the basis for the warrant. *Id.* Defendants present three arguments as to how the magistrate judge erred in approving the Datto warrant. First, Defendants argue the warrant lacks probable cause because the affidavit contains "no factual information" that would allow a magistrate to make a neutral and detached probable cause determination. (Doc. 827 at 8.) Second, Defendants argue the warrant is insufficiently particular and overbroad. *Id.* Third, Defendants argue the warrant contains material omissions and misrepresentations, which entitles them to a *Franks* hearing. *Id.* It is important to note, however, that while Defendants challenge some aspects of the Datto warrant, they do not challenge the fact that this warrant application was properly sworn, nor do they contest that this warrant described with particularity the specific location to be searched.

### b. The Federal Magistrate Judge Correctly Found Probable Cause for the Datto Warrant.

Defendants recycle the same arguments in challenging the Datto warrant as they have in their previous motions challenging four other warrants obtained by the government. First, Defendants argue it was improper for the magistrate judge to consider the superseding indictment and that the affidavit improperly summarized and incorporated the superseding indictment instead of outlining facts known to the affiant[2]. (Doc. 827 at 9.) Second, Defendants argue the affidavit lacked probable cause because it did not contain facts showing Defendants had the "heightened scienter" or knowingly and intentionally promoted or facilitated a business enterprise involving prostitution, to establish violations of the Travel Act. (Doc. 827 at 10-11.) Third, Defendants argue the affidavit does not

---

[2] Defendants refer to the indictment in their motion but the superseding indictment was charging instrument at the time of the Datto warrant was authorized.

- 7 -

provide any factual information showing how two lawful marketing techniques, "aggregation and affiliation" served as the basis for criminal acts. (Doc. 827 at 11.) Finally, Defendants argue the affidavit does not explain how the 26 email accounts subject to the warrant contained evidence of criminality. (Doc. 827 at 11.) Many of these claims are foreclosed by previous Court Orders and should be summarily denied. (Doc. 793, 840.) But should the Court revisit the issues again, each of the claims are without merit.

### i. Carl Ferrer, Daniel Hyer, and Backpage Pleaded Guilty to Conspiracy; Ferrer's and Hyer's Admissions Are Contained Within the Affidavit for the Datto Warrant.

Special Agent (SA) Richard Robinson was the affiant for the Datto warrant and he included the factual basis from Ferrer's and Hyer's plea agreements in his affidavit. (Doc. 827-2 ¶ IV(2).) Ferrer admitted that he originally co-founded the website with Lacey and Larkin and conspired with Lacey, Larkin, Spear, Brunst, Padilla and Vaught, among others, to find ways to knowingly facilitate the state law prostitution crimes being committed by the website's customers and to engage in various money laundering offenses. *Id.* Ferrer admitted he worked with his co-conspirators to create "moderation" processes where terms and photos particularly indicative of prostitution would be removed or edited before the ad was published. Ferrer admitted this was intended merely to create a veneer of deniability for Backpage and did not change the illegal services being offered in the ad. *Id.*

Additionally, Ferrer admitted conspiring with all Defendants to engage in money laundering offenses. *Id.* Because banks and credit card companies over time refused to do business with Backpage, Ferrer stated "I worked with my co-conspirators to find ways to fool credit card companies into believing that Backpage associated charges were being incurred on different websites, to route Backpage-related payments and proceeds through back accounts held in the name of seemingly unconnected entities…and to use cryptocurrency-processing companies…for similar purposes." *Id.* Ferrer, as CEO of Backpage, also entered corporate guilty pleas on behalf of Backpage.com LLC, Website Technologies LLC, Posting Solutions LLC, Amstel River Holdings LLC, Ad Tech BV,

and UGC Tech Group CV. *Id.* Website Technologies LLC owned and operated the Backpage website as well as all corporate assets and property owned by the other corporations that pleaded guilty. *Id.* Amstel River Holdings LLC was the parent company and its subsidiaries were created in part to secure banking solutions to process payments on behalf of Backpage. *Id.*

Similarly, Daniel Hyer admitted developing a process called "preboarding" or "aggregation" where Backpage would identify and reach out to customers posting "adult" and "escort" ads on other websites and create ads for them on Backpage, in hopes of securing their future business. (Doc. 827-2, ¶ IV(4).) Hyer admitted knowing the majority of the ads created through the aggregation process were offering illegal prostitution services. *Id.* Over time, Hyer become involved (along with Ferrer, Padilla and Vaught) in Backpage's efforts to "moderate" the contents of the escort and adult ads; knew the removal of explicit words and pictures did nothing to change the underlying nature of what was being offered—illegal prostitution services. *Id.* Finally, Hyer also admitted that he and other Backpage employees were deluged with near-constant reminders of the reality of what [the website] was offering, including daily "Google alerts" summarizing new prostitution-related stories about Backpage that kept appearing in the news. *Id.*

The admissions provided by co-conspirators Carl Ferrer and Daniel Hyer, are sufficient in and of themselves to establish probable cause for the Datto warrant. But, in addition, the application also included facts from SA Robinson's knowledge of the investigation. Taken together, it's clear that Magistrate Judge Boyle correctly found sufficient probable cause to authorize the warrant.

### ii. Reviewing the Indictment Alongside an Affidavit in an Application for a Search Warrant is Permissible.

Defendants' arguments that the Datto warrant is insufficient because the affidavit summarized and incorporated the superseding indictment rather than outlining facts to establish probable cause is foreclosed by *United States v. Seybold*, 726 F.2d 502, 504 (9th Cir. 1984). The Ninth Circuit in *Seybold* held that a judge may consider the information

1  contained in an indictment in making a probable cause determination. *Id.* at 504 (citing
2  *United States v. Ellsworth*, 647 F.2d 957, 963 (9th Cir. 1981)). In *Seybold*, a special agent
3  of the Drug Enforcement Administration (DEA) applied to a federal magistrate judge for a
4  warrant authorizing the search of Seybold's residence two days after a grand jury indicted
5  Seybold for drug trafficking offenses. *Id*. at 502. The judge authorized the application,
6  which included a seven-page affidavit and incorporated a copy of the indictment, and
7  issued the warrant. *Id*. at 503. The Ninth Circuit found that a judge would understand that
8  a grand jury's determination—the fact that there was sufficient evidence to indict an
9  individual may not necessarily mean that evidence of that person's guilt would likely be
10 found in his residence—and determined that the judge could apply his independent
11 judgment to determine whether probable cause exists. *Id*. at 505.

12 Here, the government proceeded in a similar manner. In his sworn affidavit, SA
13 Robinson incorporated by reference the superseding indictment in the application to the
14 magistrate judge. But in addition to the superseding indictment, the affidavit itself
15 presented sufficient facts (including admissions made by Ferrer and Hyer in their written
16 plea agreements) that would allow the judge to determine that there was a fair probability
17 of finding evidence of conspiracy, money laundering, and Travel Act violations in the 26
18 email counts saved on Datto's cloud servers.

19 Defendants' reliance on *United States v. Rubio*, 727 F.2d 786 (9th Cir. 1983) is
20 misplaced and out of context. In *Rubio*, the Ninth Circuit held, as it did in *Ellsworth*, that
21 while the indictment can be considered along with other facts by a magistrate in
22 determining probable cause, it is not, by itself, an adequate substitute for articulable facts
23 in the warrant affidavit. *Id.* Here, in its application for a warrant to obtain data stored by
24 Datto, the government acted consistent with *Seybold,* and as approved by *Rubio* and
25 *Ellsworth*, with an affidavit from an agent containing facts about the case to establish
26 probable cause accompanied by the indictment.

27 In his eleven-page affidavit for the Datto Warrant, SA Robinson described his and
28 other agents' review of interviews and documents, including emails that led him to believe

the emails retained by Datto cloud service would contain evidence of conspiracy, money laundering and Travel Act violations. Specifically, SA Robinson described Backpage's development of a plan called "aggregation" or the "Dallas Plan," where Backpage representatives would reach out to customers of competing websites and offer them free ads on Backpage, in an effort to increase users and ad revenue; the thought was that the recipients of free ads would eventually become paying customers. (Doc. 827-2, ¶ 5.) This "Dallas Plan" was successful and contributed greatly to Backpage's early growth and success. *Id.*

SA Robinson stated beginning around 2007 or 2008, Backpage began "affiliate programs" a marketing technique designed to increase Backpage's user base. *Id.* At one point, Backpage was making referral payments of approximately $500,000 per year. *Id.* SA Robinson also explained other business strategies employed by Backpage specifically intended to promote and facilitate prostitution. For example, Backpage had a reciprocal link agreement with The Erotic Review ("TER"), a website that allowed customers to post explicit reviews of their prostitutes. Backpage paid tens of thousands of dollars to TER in exchange for assistance in getting TER's customers to use Backpage. *Id.*

SA Robinson stated extensive analysis of Backpage's operations, revenue streams and future value preceded the 2015 sale of Backpage from companies controlled primarily by Lacey and Larkin to companies legally controlled by Ferrer and noted that Larkin continued to exercised substantial control and oversight over Backpage and Ferrer even after the sale was complete. *Id.* SA Robinson also explained that Backpage.com used partner sites like MobilePosting.com or Easypost.com to allow its customers to post ads and pay for ads in a way that kept financial institutions from knowing that the transaction was for the purchase of a Backpage ad. *Id.* Backpage customers would purchase and post ads on the partner sites knowing that their ads would also appear on Backpage. Backpage received the majority of the revenue derived from these types of ads and the partner site would keep a small percentage for their service. *Id.*

Thus, the affidavit contained sufficient facts from which the magistrate judge could conclude that under the totality of the circumstances there was a fair probability that evidence of money laundering, conspiracy, and Travel Act would be present in the data of 26 email accounts held at Datto.

### iii. The Warrant Application Does Not Need to Establish a Heightened Scienter or the Facilitation/Promotion of a Business Enterprise Before a Finding of Probable Cause Can be Found.

Defendants argue the warrant application lacks probable cause because the affidavit failed to include a heightened scienter or facts showing how Defendants knowingly facilitated or participated in a business enterprise involving prostitution. (Doc. 827 at 10.) Defendants have raised these arguments in other pleadings and the Court has denied their motions. Specifically, this Court has found "Defendants' arguments that the First Amendment demands a scienter requirement beyond specific intent to promote prostitution are unavailing." (Doc. 793 at 23.) Moreover, the heightened standard and additional facts Defendants argue are required run contrary to *Gates*, where probable cause was defined as a "fair probability," without any consideration of any standard of proof. *Gates*, 462 U.S. at 235.

Defendants also argue the warrant application does not contain facts showing they knowingly and intentionally promoted and facilitated a "business enterprise" involving prostitution. This argument is part of a Motion to Dismiss the Indictment Based on Failure to Allege Necessary Elements of the Travel Act. (Doc. 746). This argument is not applicable here, as warrants require only a finding of probable cause—a reasonable belief that a subject has committed a crime. *Pringle*, 540 U.S. at 371. Furthermore, courts are to interpret warrants in a commonsense rather than in a hyper-technical manner.. *Ventresca*, 380 U.S. at 109. Even if this case were marginal (it isn't), the Supreme Court has made clear its preference not to invalidate warrants. *Id.*

### iv. SA Robinson's Affidavit Sets Forth Facts Showing How Backpage's and Defendants' Actions Were For Criminal Purposes and How Their Email Accounts Contain Evidence of Their Crimes.

1    Defendants claim the Datto warrant fails to provide factual information indicating
2 that Defendants were involved in or facilitating criminal activity. (Doc. 827 at 11.) Their
3 position is based upon Defendants' fundamental failure and complete unwillingness to
4 acknowledge or appreciate that their conduct is or could be criminal conduct. While
5 moderation, aggregation, or the use of reciprocal and affiliate links could all be lawful
6 practices, Backpage's use of these techniques were for the purposes of promoting and
7 facilitating prostitution for financial gain—in violation of the law.
8    According to Ferrer and Hyer, Backpage engaged in moderation to remove only the
9 most offensive or explicit conduct before allowing the ad to go live, which they admitted
10 did nothing to change the underlying purpose of the ad—usually to offer prostitution
11 services.  In efforts to grow Backpage, Ferrer and Hyer discussed aggregation and how
12 they attempted to steal customers from competing websites and offered them free ads on
13 Backpage in hopes they would become future paying customers. Hyer discussed affiliate
14 and reciprocal links with TER, where a prostitute's reviews could be linked to her
15 Backpage ad. And as time went on, Ferrer and Hyer explained how they helped Backpage
16 develop a complicated banking process in an effort to deceive banks and credit card
17 companies that were reluctant to serve Backpage customers. SA Robinson stated he
18 reviewed interviews, documents, and email correspondence in addition to conducting and
19 reviewing an extensive analysis of Backpage's operations, revenue streams and future
20 value that show Lacey and Larkin remained very much involved with Backpage, even after
21 they sold it to Ferrer.

22     **c.     The Warrants Detailed the Items to be Seized and the Items Seized Are Evidence of the Crimes.**
23
24    Defendants argue the warrants do not clearly state what is to be searched and seized
25 and that the items seized exceeded the scope of the probable cause. While a warrant must
26 make clear to the executing officer exactly what is authorized to search for and seize, the
27 level of detail necessary in a warrant is related to the particular circumstances and the
28 nature of the evidence sought. *SDI Future Health Inc.*, 568 F.3d at 702; *United States v.*

*Adjani*, 452 F.3d 1140, 1147 (9th Cir. 2006).  The search and seizure of large quantities of material is justified if the material is within the scope of the probable cause underlying the warrant.  *Id.* at 684, *United States v. Hayes*, 794 F.2d 1348, 1355 (9th Cir. 1986).  Here, the warrant sought and Magistrate Judge Boyle authorized, the seizure of the 26 accounts identified in Attachment A and all content associated with those accounts from 2004 through 2018.  (Doc. 827-1.)  The warrant application is clear as to the information being sought from Datto.

### d. Defendants Have Failed to Make the Substantial Preliminary Showing Necessary to Obtain a *Franks* Hearing.

To challenge the validity of a warrant affidavit, a defendant must make a substantial preliminary showing that (1) the affiant officer intentionally or recklessly made false or misleading statements or omissions in support of the warrant, and (2) the false or misleading statements or omissions were material, *i.e.*, necessary to finding probable cause. *United States v. Norris*, 942 F.3d 902, (9th Cir. 2019), (citing *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017)).  If a defendant satisfies both prongs, he or she is entitled to an evidentiary hearing.  *Franks*, 438 U.S. at 172.  But to mandate an evidentiary hearing, the challenger's attack [on the affidavit] must be more than conclusory and must be supported by more than a mere desire to cross-examine.  *Id.* at 171.  On the other hand, a defendant's substantial preliminary showing of recklessness or deliberate falsity is of no consequence and requires no hearing "when material that is the subject of the alleged falsity or reckless disregard is set to one side [and] there remains sufficient content in the warrant affidavit to support a finding of probable cause." *Id*.  Additionally, evidence obtained from a warrant should not be suppressed so long as the officer was objectively reasonable and acted with good-faith reliance on the judge's finding of probable cause.  *United States v. Leon*, 468 U.S. 897, 899 (1984).

Defendants argue the Datto warrant contains misleading statements or omissions because it: (1) failed to discuss cases where Backpage has defeated civil claims or successfully challenged state legislative or law enforcement actions; (2) failed to inform

the magistrate judge that violations of the Travel Act require a heightened proof of scienter; and (3) failed to disclose how not all advertisements for sex are advertisements for illegal sex, and improperly equated "erotic" and "adult services" with prostitution (Doc. 827 at 15-16.)

To meet *Franks'* first prong, Defendants must make specific allegations of deliberate falsehoods or demonstrate the affiant's reckless disregard for the truth, accompanied by an offer of proof—negligence is not enough. *Franks*, 438 U.S. at 171. Alternatively, Defendants must show the affiant(s) deliberately or recklessly omitted material information. *United States v. Tham*, 960 F.2d 1391, 1395 (9th Cir. 1991). Defendants have failed to meet this prong.

### i.   No Need to Cite to Inapposite Case Law

Defendants argue a *Franks* hearing is appropriate because the government failed to include in its affidavit that the First Amendment protects online classified advertising sites like Backpage. (Doc. 827 at 15.) This is an argument that has been soundly rejected by the Court. (Doc. 793 at 13.) In its Order denying Defendants' motion to dismiss, the Court held: "this case, however, does not concern civil liability, and the CDA has 'no effect' on any other Federal criminal statute." (Doc. 793 at 13.) This argument has also been similarly rejected in the civil forfeiture proceedings before U.S. District Court Judge R. Gary Klausner in the Central District of California. On December 20, 2019, Judge Klausner rejected a similar request for a *Franks* hearing and found that the government was not required to disclose cases where Backpage had escaped liability primarily due to Section 230 of the Communications Decency Act. (Exhibit C, December 20, 2019 Order in 18-cv-06742-RGK-PJW, CDCA)[3].

Interestingly, Defendants failed to mention Judge Klausner's Order when they filed the instant motion three days later. In both cases, Defendants' motions list several cases

---

[3] Four of the defendants in the instant case, Defendants Larkin, Lacey, Brunst and Spear are currently pursuing an appeal of Judge Klausner's Order, which also address a variety of civil forfeiture issues.

- 15 -

where they were successful in civil or state court—none of which involved federal criminal charges. As Defendants are well aware, Section 230 of the Communication Decency Act (CDA) simply does not apply to federal criminal prosecutions. 47 U.S.C. § 230(e)(1); (*see also* Doc. 840).

### ii. A *Franks* Hearing is Not Necessary Because Heightened Scienter is Not Required

Next, Defendants again persist in their mistaken argument that facilitating crimes of prostitution requires a heightened scienter. (Doc. 827 at 16.) As this Court has previously found "Defendants' arguments that the First Amendment demands a scienter requirement beyond specific intent to promote prostitution are unavailing." (Doc. 793 at 18, 23; Doc. 840.)

### iii. Nearly All or Most Ads Are for Prostitution

While the government fully expects its witnesses will testify at trial that the overwhelming majority of the ads posted in the "adult" or "escort" section of Backpage were ads for illegal prostitution, it did not unequivocally equate "adult" or "escort" to prostitution in the warrant application, as Defendants complain. (Doc. 827 at 16.) In actuality, Carl Ferrer stated, "the great majority of ads are ads for prostitution services" and Backpage derived the "great majority" of its income from those ads. (Doc. 827-2, ¶ IV(2).) Similarly, Daniel Hyer stated, "many of the ads created through aggregation offered illegal prostitution services." (Doc. 827-2, ¶ IV(4).) Accordingly, there are no false, misleading, or omitted facts here that would trigger a *Franks* hearing.

In sum, Defendants fail to cite any *Franks* violations based on (1) an affiant's failure to present a legal analysis of reported case law or (2) an affiant's failure to discuss a particular *mens rea* not applicable to the offense. They have failed to submit an affidavit or present any offer of proof in support of their allegations. *Franks*, 438 U.S. at 171. Most notably, the affidavit here contained the factual admissions of two co-conspirators: Carl Ferrer and Daniel Hyer. Defendants completely fail to address or even acknowledge their admissions in their motion.

But even if Defendants' positions were included or if the superseding indictment was omitted, the Datto warrant application includes an affidavit containing substantial independent evidence supporting probable cause. Defendants have failed to make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the warrant affidavit and that the allegedly false statement was necessary for a finding of probable cause. Defendants' assertions here are merely conclusory and not supported by any offer of proof. The Court should deny Defendants' request for a *Franks* hearing.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Suppress (Doc. 827) and request for a *Franks* hearing should be denied.

Respectfully submitted this 21st day of January, 2020.

MICHAEL BAILEY
United States Attorney
District of Arizona

*s/ Margaret Perlmeter*

KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW C. STONE
Assistant U.S. Attorneys

JOHN J. KUCERA
Special Assistant U.S. Attorney

BRIAN BENCZKOWSKI
Assistant Attorney General
U.S. Department of Justice
Criminal Division, U.S. Department of Justice

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Margaret Perlmeter*
Margaret Perlmeter
U.S. Attorney's Office