# EXHIBIT

# A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WOODHULL FREEDOM FOUNDATION, )
HUMAN RIGHTS WATCH, ERIC KOSZYK, )
JESSE MALEY, a/k/a ALEX ANDREWS, and )
THE INTERNET ARCHIVE, )
)
          Plaintiffs, ) Case No. _____
)
v. )
)
THE UNITED STATES OF AMERICA )
and JEFFERSON B. SESSIONS, in his )
official capacity as ATTORNEY GENERAL )
OF THE UNITED STATES, )
)
          Defendants. )

## DECLARATION OF DR. ALEXANDRA LUTNICK

Pursuant to 28 U.S.C. § 1746, I, ALEXANDRA LUTNICK, PhD, hereby declare as follows:

1. I am a senior research scientist for the Behavioral and Urban Health Program in RTI International's Behavioral Health and Criminal Justice Research Division, and an adjunct professor at the University of California, Berkeley. I have personal knowledge of the matters stated in this declaration. If called upon to do so, I am competent to testify to all matters set forth herein.

2. I have extensive experience developing and conducting mixed-methods research with marginalized populations such as drug users, the homeless, sex workers, and trafficked persons. My research focus includes community-based participatory methods, the sex industry,

///

///

trafficking, substance use, and criminalization. I have authored and coauthored many publications, including articles in the *Journal of Urban Health, Children and Youth Services Review, Journal of Social Work Practice in the Addictions, American Journal of Epidemiology, Reproductive Health Matters*, and *Sexually Transmitted Infections*. I have been an invited speaker for many conferences, including the Freedom Network Annual Conference, the National Harm Reduction Conference, and the International AIDS Conference. My book, *Domestic Minor Sex Trafficking: Beyond Victims and Villains*, was published in early 2016 by Columbia University Press.

3. I received a PhD in Social Welfare from the University of California, Berkeley, an MA in Sexuality Studies from San Francisco State University, and a BA in sociology from the University of San Francisco.

4. I am currently the Principal Investigator of a National Institute of Justice funded evaluation of the Mayor's Task Force on Anti-Human Trafficking in San Francisco. Our researcher-survivor led evaluation is documenting essential task force elements and identifying indicators and criteria for successful task force implementation and outcomes. We are also developing guidance on how to forge researcher-survivor partnerships.

5. I am also currently the Senior Advisor to the Evaluation of the National Human Trafficking Hotline Program, funded by the Office of Planning, Research, and Evaluation within the U.S. Department of Health and Human Services Administration for Children and Families. The objectives of the evaluation are to provide significant information about the processes and outcomes of the NHTH program, as well as the circumstances surrounding human trafficking, victims, and service provider and law enforcement responses.

6. From 2009 to 2013, I was a research public health analyst on the Evaluation of

2

Services for Domestic Minor victims of Human Trafficking, an evaluation funded by the U.S. Department of Justice. The evaluation documented components of program implementation in three programs serving domestic minor victims of human trafficking. It sought to identify promising practices for service delivery programs for domestic minor victims of human trafficking and inform delivery of current and future efforts by youth-serving agencies, law enforcement, and others. As director of the San Francisco site, I worked collaboratively with the other project staff and the project director to create a unified evaluation plan for all three sites, implement that plan, and analyze and disseminate the findings.

7. My roles in other studies and evaluations, additional professional activities and affiliations, and professional publications, are detailed in my curriculum vitae, attached hereto as Exhibit A.

8. I have served as an expert witness regarding prostitution and human trafficking in cases in Monterey County (2018), Solano County (2017), and Santa Clara County (2017), all in California state courts.

9. I am aware of the law recently passed by Congress and signed by President Trump, the Allow States and Victims to Fight Online Sex Trafficking Act (H.R. 1865) ("FOSTA"). I closely followed the law as it was being debated in the U.S. Senate and House of Representatives.

10. FOSTA is based on erroneous factual assumptions. It falsely conflates prostitution and other forms of sex work with sex trafficking. Because it misdiagnoses the problem, the law will increase the risks of harm and exploitation associated with sex work and will hinder the efforts of law enforcement and private watchdogs to identify trafficking victims and prosecute traffickers.

11. Although I strongly support prosecuting sex traffickers and those who collaborate with them, shutting down websites that people use to advertise sexual services is extremely harmful to people experiencing trafficking in the sex industry. It will also be detrimental to people engaging in sex work, whether by choice or circumstance.

12. One of the most noticeable and serious harms is the disappearance of online forums, including, but not limited to, classified-ad-style websites, that people in the sex industry used to stay safe. By listing their sex work services online, sex workers were able to screen clients, protect their identities, and arrange safe meeting places.

13. With the disappearance of these sites because of FOSTA, sex workers and people being trafficked in the sex industry have been pushed in to street-based sex work, which is far more dangerous. Street-based sex workers are far more likely to experience violence or exploitation. This is equally true for those who voluntarily enter the sex industry as well as for those forced into it by force, fraud, or coercion. Street-based sex work also increases marginalization and isolation, which in turn increases violence, and diminishes a sex worker's ability to reach out for help when needed.

14. The 2017 study, "Craigslist's Effect on Violence Against Women," illustrates the importance of online advertising to keeping sex workers off the streets and safer. The authors of the study looked at the effect of Craigslist's "erotic services" section on the safety of women. They found a 17.4% reduction in the female homicide rate following the introduction of "erotic services." The authors suggest this reduction in female violence "was the result of street prostitutes moving indoors and matching more efficiently with safer clients." (http://gregoryjdeangelo.com/workingpapers/Craigslist5.0.pdf)

15. The loss of online advertising platforms also drives sex workers to third party

controllers, such as pimps, thus also greatly exacerbating the risks of violence and exploitation.

16. The loss of online classified advertising sites also deprives law enforcement of an important tool for fighting human trafficking, by making it more difficult to both locate potential victims of trafficking and to build cases against traffickers.

17. From a law enforcement perspective, online profiles make it far easier to identify trafficking victims than when they are working on the street. A 2016 State Department report found that being able to access sites like Backpage, the number of identified victims of sex trafficking increased over a seven-year period from fewer than 31,000 to nearly 78,000. Having online advertising venues makes it easier to screen ads for potential trafficking. For example, a lot of law enforcement agencies scrub online ads looking for indicators of trafficking, such as pictures of people who look underage. Responsible website administration can also make trafficking more visible, which can lead to increased identification. Internet sites also provide a digital footprint that law enforcement can use to investigate trafficking into the sex trade, and to locate trafficking victims. U.S. Department of State, Trafficking in Persons Report. (2016) (https://www.state.gov/j/tip/rls/tiprpt/2016/index.htm).

18. According to published reports, police involved in anti-trafficking enforcement have observed a drop-off in leads and a conspicuous increase in street prostitution since online advertising sites have gone dark. (https://www.nytimes.com/2017/03/11/us/backpage-ads-sex-trafficking.html).

19. Online profiles similarly assist prosecutors because they often allow them to link phone numbers from people being charged with trafficking to other online ads (thus identifying more potential victims).

20. In addition to advertising, those in and adjacent to the sex industry used their own

and third-party websites to post bad date lists – typically user-generated lists of clients with whom sex workers are warned not to engage – and to distribute occupational health and safety information, to link to health service providers and other community resources.

21. Shutting down websites will not eradicate sex trafficking or sex work. Instead it will make things more dangerous for victims of trafficking and for sex workers. Shutting down websites affects the most marginalized people in the sex industry, including those being trafficked.

22. The best way to protect sex workers from both physical harm and exploitation is for sex-workers to develop, run, or maintain online advertising forums. *See* Jana, S., B. Dey, S. Reza-Paul, and R. Steen. 2013. Combating human trafficking in the sex trade: Can sex workers do it better? *Journal of Public Health* (Oxford) 36 (4): 622–628. Unfortunately, FOSTA makes it impossible to operate such forums.

23. I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct to the best of my knowledge.

Executed on this 27th day of June 2018 at Berkeley, California.

*alix lutnick*
Alexandra Lutnick, PhD