Gary S. Lincenberg *(admitted pro hac vice)*
  glincenberg@birdmarella.com
Ariel A. Neuman *(admitted pro hac vice)*
  aneuman@birdmarella.com
Gopi K. Panchapakesan *(admitted pro hac vice)*
  gpanchapakesan@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant John Brunst

Thomas H. Bienert, Jr. *(admitted pro hac vice)*
  tbienert@bienertkatzman.com
Whitney Z. Bernstein *(admitted pro hac vice)*
  wbernstein@bienertkatzman.com
BIENERT KATZMAN, PC
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Telephone: (949) 369-3700
Facsimile: (949) 369-3701

Attorneys for Defendant James Larkin

*[Additional counsel listed on next page]*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CASE NO. 2:18-cr-00422-004-PHX-SMB |
| Plaintiff, | **DEFENDANTS' OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE DEFENDANTS' NOTICED EXPERTS** |
| vs. | |
| Michael Lacey, et al., | (Oral Argument Requested) |
| Defendants. | |

3647691.1

Paul J. Cambria, Jr. *(admitted pro hac vice)*
    pcambria@lglaw.com
Erin McCampbell *(admitted pro hac vice)*
    emccampbell@lglaw.com
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile: (716) 855-1580

Attorneys for Defendant Michael Lacey

Bruce Feder (AZ Bar No. 004832)
    bf@federlawpa.com
FEDER LAW OFFICE, P.A.
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: (602) 257-0135

Attorney for Defendant Scott Spear

David Eisenberg (AZ Bar No. 017218)
    david@deisenbergplc.com
DAVID EISENBERG PLC
3550 N. Central Ave., Suite 1155
Phoenix, Arizona 85012
Telephone: (602) 237-5076
Facsimile: (602) 314-6273

Attorney for Defendant Andrew Padilla

Joy Malby Bertrand (AZ Bar No. 024181)
    joy.bertrand@gmail.com
JOY BERTRAND ESQ LLC
P.O. Box 2734
Scottsdale, Arizona 85252
Telephone: (602)374-5321
Facsimile: (480)361-4694

Attorney for Defendant Joye Vaught

DEFENDANTS' OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE*
TO PRECLUDE DEFENDANTS' NOTICED EXPERTS

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ........................................................................................ 1

II.   ARGUMENT ............................................................................................... 1

    A.    Defendants' Expert Disclosures Comply with the Federal Rules. .................. 1

    B.    Defendants' Experts' Anticipated Testimony Is Directly Relevant to
        the Charges in This Case. ...................................................................... 2

        1.    Roman Weil ...................................................................................... 2

            a.    Functions of a CFO in the Corporate Setting ........................... 3

            b.    Loan Covenants Typically Included in a Seller-Financed
                Sale ................................................................................ 6

        2.    Alexandra Levy, Dr. Alexandra Lutnick, and Dr. Kimberly
           Mehlman-Orozco ............................................................................... 6

        3.    Eric Goldman ................................................................................... 9

        4.    Bates Butler .................................................................................... 10

        5.    William Norman .............................................................................. 12

III.  CONCLUSION ......................................................................................... 12

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

4

**Cases**

5
*In re Dwight's Piano Co.*
   2009 WL 29880 (S.D. Ohio Jan. 5, 2009) ........................................................ 4

6

7
*In re Safety-Kleen Corp. Rollins Shareholders Litig.*
   2004 WL 5504972 (D.S.C. Aug. 30, 2004) ...................................................... 4

8
*Pereira v. Cogan*
9
   281 B.R. 194 (S.D.N.Y. 2002) .......................................................................... 4

10
*United States v. Brooks*
11
   2010 WL 291769 (E.D.N.Y. Jan. 11, 2010) .................................................... 4

12
*United States v. Coleman*
   584 F.3d 1121 (8th Cir. Cir. 2009) .................................................................. 11

13

14
*United States v. Davis*
   457 F.3d 817 (8th Cir. 2006)............................................................................ 11

15
*United States v. Forbes, et al.*
16
   2004 WL 3737583 (D.Conn.) ............................................................................ 4

17
*United States v. Heine*
18
   2017 WL 449632 (D. Or. Feb. 2, 2017)............................................................ 3

19
**Statutes**

20
Communications Decency Act § 230 ............................................................ 9, 10

21
**Other Authorities**

22
Fed. R. Crim. Proc.
23
   16(a)(1)(G) ........................................................................................................ 1
   16(b)(1)(c) ........................................................................................................ 1
24
   26.2 ............................................................................................................... 2, 3

25

26

27

28

# I.   __INTRODUCTION__

The government's motion *in limine* to preclude Defendants' experts from testifying seeks to deny Defendants the ability to mount a defense and rebut the anticipated testimony of the government's proposed experts.  Contrary to the government's assertion, Defendants' expert disclosures fully comply with the Federal Rules of Criminal Procedure and intentionally match the format of the government's expert disclosures, which were filed first.  If any party should be required to supplement its disclosures at this stage of the case, it should be the government.  Further, as explained in more detail below, the proposed testimony of each of Defendants' experts is directly relevant to the indictment's charges and will rebut the anticipated testimony of the government's experts.  To disallow Defendants from presenting such testimony would be to deny them a constitutionally fair trial.  The government's motion should be denied.

# II.   __ARGUMENT__

## A.   **Defendants' Expert Disclosures Comply with the Federal Rules.**

Federal Rule of Criminal Procedure 16(b)(1)(c) provides that a defendant's expert disclosures must "describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  This matches the government's expert disclosure obligations.  Fed. R. Crim. Proc. 16(a)(1)(G).  There is no requirement that a party produce an expert report or otherwise script out its experts' anticipated testimony.  Defendants' expert disclosures (Dkts. 500 and 538) amply comply with Rule 16, and match the government's disclosures, which were filed first (Dkt. 422).  As to each disclosed expert, Defendants have summarized the witness's anticipated testimony, the bases for that testimony, and the witness's qualifications.  Attached to the disclosures are curriculum vitae for each of the experts, which identify their relevant experience, research areas, and publications.

It is hard to understand the government's complaint given its own expert disclosures.  *See* Dkt. 422.  Defendants' disclosures intentionally track the approach taken by the government (*i.e.*, a brief summary of the anticipated testimony, followed by

DEFENDANTS' OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE*
TO PRECLUDE DEFENDANTS' NOTICED EXPERTS

a statement that the expert's testimony will be based on the expert's "education, training, and experience").  There is no basis for a defendant to be held to a higher standard of disclosure than the government in a criminal prosecution where the government bears the burdens of proof and seeks to deprives Defendants of their liberty.  That is particularly the case here considering that at the time Defendants made their expert disclosures, they did not have the benefit of the over 15 productions (containing hundreds of thousands of pages of discovery, including over 14,000 pages produced just last week) that the government has made since that point (and that Defendants are still in the process of reviewing), productions that the government was obligated to make by December 2018.  Dkt. 131.  Further, the precise scope of Defendants' experts' testimony will depend on the evidence that is presented during the government's case-in-chief.  If any party should be required to supplement their expert disclosures at this stage of the case, it is the government.

Nor is the government's objection that Defendants have not produced any Rule 26.2 statements well-founded.  At present, Defendants are unaware of any statements of their proposed experts that would qualify for production under Rule 26.2.  To the extent Defendants discover the existence of any such statements, they will produce them in accordance with the Rule.

**B.    Defendants' Experts' Anticipated Testimony Is Directly Relevant to the Charges in This Case.**

The government does not assert that Defendants' proposed experts are unqualified to provide their anticipated testimony, but rather that their anticipated testimony is irrelevant.  In fact, as discussed below, the anticipated testimony of each of Defendants' proposed experts is directly relevant to the charges against which Defendants must defend, and in many instances, precisely relates to and answers the anticipated testimony of the government's proposed experts.

**1.    Roman Weil**

Roman Weil, Ph.D., CPA, is one of the country's foremost experts on issues of corporate governance and the roles of officers within complex organizations.  He is

a professor emeritus at the University of Chicago's Booth School of Business, has held professorships at a number of the country's most prestigious universities, has taught several courses concerning the responsibilities of Chief Financial Officers (CFOs), and has provided trial testimony in numerous cases in federal court.  *See* Dkt. 500 at 16-30. Dr. Weil intends to provide testimony on two topics:  "(1) the functions that a [CFO] performs in a corporate setting, including what is and is not required of a CFO in assessing allegations that a company or one of its subsidiaries has engaged in unlawful conduct; and (2) the loan covenants that are typically included in a seller-financed sale."  Dkt. 500 at 4-5.  The government only challenges the relevance of the first topic; it does not claim that Dr. Weil is not qualified to offer either of these opinions, and it does not challenge the relevance of the second topic.  Dkt. 905 at 4-5.  Yet, strangely in light of that position, and without argument or support, it claims that Dr. Weil should be entirely excluded as a witness.  *Id*.

### a.      Functions of a CFO in the Corporate Setting

With respect to the first topic—the role of a CFO in a corporate setting—Dr. Weil's anticipated testimony is directly relevant to the defense of Defendant John Brunst, who served as the CFO of the parent entity that ultimately held Backpage.  Contrary to the picture the government tries to paint in the indictment, Backpage was one of numerous subsidiaries of a media conglomerate that, during the relevant time period, held over a dozen newspapers around the country, and had several shareholders, including large financial institutions and private equity firms.  Exh. A.  The role of each corporate officer within the context of such a large media conglomerate is not within the knowledge of the average juror, and expert testimony on this topic is routinely permitted by courts around the country.  *See, e.g.*, *United States v. Heine*, 2017 WL 449632, at *10 (D. Or. Feb. 2, 2017) (in a case involving a bank, allowing "expert testimony regarding [. . .] the norms of corporate governance (including the role of a Chief Financial Officer and other persons in management positions), [and the defendant's] specific responsibilities and the responsibilities of other bank officers given the bank's 'organizational structure,' and [the

expert's] opinion that [the defendant's] performance as Chief Financial Officer was 'consistent with professional standards for a person in her position under the circumstances'"); *United States v. Brooks*, 2010 WL 291769, at *4 (E.D.N.Y. Jan. 11, 2010) (Noting that "[c]ourts generally permit expert corporate governance testimony [. . . ] explaining general corporate governance concepts, such as setting forth the respective roles of a corporation's directors and officers, the nature of an officer's fiduciary duties to the corporation, or the concept of parent-subsidiary corporate separateness," and, as an example, "a corporate governance expert can explain what a CEO does"); *In re Dwight's Piano Co.*, 2009 WL 29880, at *3 (S.D. Ohio Jan. 5, 2009) (allowing expert testimony on "general corporate governance structure, the role of officers and directors, and general examples of what [the expert] believes are good corporate practices in conformance with industry custom"); *In re Safety-Kleen Corp. Rollins Shareholders Litig.*, 2004 WL 5504972, at *1-2 (D.S.C. Aug. 30, 2004) (allowing expert testimony on "general corporate governance structure; role of officers, directors, and audit committee members; and general examples of what the experts believe are good corporate practices in conformance with industry custom").  Indeed, "[t]here is no disagreement that experts may testify as to the customary practices in a profession or industry."  *Pereira v. Cogan*, 281 B.R. 194, 200 (S.D.N.Y. 2002).

The role of a CFO within a complex organization such as the one at issue here is unique and comes with certain specialized roles and responsibilities, which are not within the general knowledge of jurors.  For example, Dr. Weil has previously testified that:

> A chief financial officer worries about the accounting, the debits and credits, typically handled by the controller. The CFO worries about how do we raise new funds . . . .  The CFO worries about relations with financial analysts community, what kind of earnings advice, if any, shall a company give. [The CFO also asks] how should the company make its capital investments.

*See United States v. Forbes, et al.*, 2004 WL 3737583 (D. Conn.).

Here, Dr. Weil will testify that a CFO of a media conglomerate of this size with this many subsidiaries is required to oversee and coordinate, among other things, shareholder

relationships, outside investments, the raising of funds, lending relationships, and the payment of taxes and assessing the tax implications of the sale and acquisition of business units.  An average juror would not know this.  He will also explain that the role is limited in certain respects, in that the CFO is permitted to, and typically does, rely on others to fulfill their respective roles within the complex organization.  An average juror would be unaware that it is not the role of a CFO to assess or respond to allegations that one of the numerous subsidiary companies within the parent-company portfolio has engaged in illegal conduct.  Rather, as Dr. Weil will testify, it is appropriate for a CFO to rely on others within an organization, such as the General Counsel, or on published court opinions, in gaining comfort regarding the legality of a company's activities.  In these regards, Dr. Weil's testimony would help the trier of fact to understand the evidence.  *See* Fed. R. Evid. 702(a).

Further, it is clear that the government intends to try to prove its allegations against Brunst by pointing to printed agendas of meetings at which Brunst was allegedly present, and emails on which he was copied (indeed, most of the purported "hot" documents provided by the government to counsel for Brunst consist of just that).  *See, e.g.*, Dkt. 230 at ¶¶ 42, 49, 135, 155, 180.  Dr. Weil's anticipated testimony will provide necessary context regarding Brunst's activities in this respect.  For example, merely because Brunst, the CFO of a large media conglomerate, was present at a meeting or copied on an email, does not mean that it was Brunst's role within the organization to pay attention to or understand the details of what was allegedly discussed, or to carry out any proposals that were allegedly discussed.  Dr. Weil's testimony will explain the role of a CFO at company meetings, what information is and is not important for a CFO to grasp in order to fulfill the job functions, and the fact that CFOs are regularly present at meetings during which other company business is discussed that has no bearing whatsoever on the CFO's day-to-day responsibilities.  As the charges against Brunst require a showing of specific intent, the context Dr. Weil intends to provide is critical to the jury's understanding of the alleged conduct on the part of Brunst that forms the basis for these charges.  Contrary to the

government's assertion, Dr. Weil will not opine on Brunst's state of mind.  Dr. Weil is, however, entitled to provide testimony that tends to disprove the allegations that Brunst intended to facilitate a business enterprise involved in prostitution.  *See* Fed. R. Evid. 702, 704(a).

### b.    Loan Covenants Typically Included in a Seller-Financed Sale

The government does not challenge the second aspect of Dr. Weil's anticipated testimony: the loan covenants that are typically included in a seller-financed sale.  The proposed expert testimony is relevant to explaining how seller-financed sales work, and the covenants that are typically included in such transactions; neither topic is within the knowledge of the average juror and would thus assist the trier of fact in understanding the evidence.  Fed. R. Evid. 702.  The testimony is necessary to rebut the government's allegations that, based on the seller-financed sale of Backpage in 2015, some of the Defendants, including Brunst, "retained a significant financial interest in Backpage" (Dkt. 230 at ¶ 30) and "retained significant operational control over Backpage."  *Id.* at ¶ 31.  Dr. Weil's testimony will place the relevant covenants into context and explain that there is nothing unusual about their inclusion in the transaction here.

### 2.    Alexandra Levy, Dr. Alexandra Lutnick, and Dr. Kimberly Mehlman-Orozco

The government's objection to the anticipated expert testimony of Levy, Dr. Lutnick, and Dr. Mehlman-Orozco is completely unfounded, particularly considering the expert testimony the government seeks to introduce in its case-in-chief.  In the government's initial expert disclosures (Dkt. 422), it identified *seven* experts (in addition to "rebuttal experts," Dkt. 638) who intend to testify regarding, among other topics:

- How human trafficking "occurs through online media, such as social networking websites, applications, and the internet in general."  Dkt. 422 at 4.

- Contrasting how "different prostitution websites (including craigslist and

backpage) operated and how they responded to law enforcement." *Id.* at 4.

- "[T]he role that Backpage played in the victimization of [Dr. Cooper's] patients and clients." *Id.* at 6.

- "[T]he role the internet and Backpage played in [Hardie's] knowledge and understanding of human trafficking and how Backpage became part of the law enforcement investigations for human trafficking over the years." *Id.* at 7.

- "[T]he role of the internet and technology in human trafficking." *Id.* at 8.

- "[T]he role the internet and Backpage ha[ve] played in human trafficking." *Id.*

- "[T]he role Backpage has played in causing trauma to victims trafficked through its website." *Id.* at 8-9.

Defendants have moved to exclude this evidence as irrelevant to the charges in this case, and incorporate the arguments made in that motion here.  Dkt. 928.

Indeed, the government's motion here actually supports Defendants' request that this evidence be excluded.  That is, the government argues that Defendants' proposed expert testimony is not relevant because Backpage pled guilty and its corporate activities are therefore not at issue.  Dkt. 905 at 5-6.  The government goes on to say that it intends to prove its case by presenting evidence of "an array of internal business practices conducted by Defendants to increase the volume of prostitution ads."  Dkt. 905 at 6:3-5.  Yet the vast majority of the government's witnesses, including all of the experts that Defendants have moved to exclude, have no personal knowledge whatsoever about Defendants' internal business practices, or their individual actions in that regard.  Indeed, the government estimates a 12-week case-in-chief with over 100 witnesses, including **ten** irrelevant sex trafficking experts (including rebuttal experts), as well as numerous lay witnesses who have no personal knowledge regarding Defendants or their business practices.  Defendants have moved to exclude all of this testimony, and the government seems to concede that Defendants' motions should be granted.  *See* Dkts. 921, 928

1   (Defendants motions *in limine* to preclude such evidence).  If Defendants' motions are

2   granted, and the government is precluded from presenting such irrelevant, inflammatory,

3   unduly prejudicial, and time-wasting testimony, then Defendants will revisit their expert

4   designations accordingly.  But for now, Defendants must plan to address the government's

5   anticipated trial presentation.[1]

6          The government cannot have it both ways.  On the one hand, it seeks to introduce

7   general evidence regarding the Backpage website, yet on the other, seeks to preclude

8   Defendants from rebutting such evidence.  It is utterly disingenuous to claim that the

9   expert testimony of Levy, Dr. Lutnick, and Dr. Mehlman-Orozco is somehow irrelevant in

10  light of the evidence the government wants to introduce.  How can the government seek to

11  introduce testimony regarding the manner in which trafficking allegedly takes place over

12  the internet and Backpage's purported role in such activities, yet seek to preclude

13  Defendants from presenting expert testimony regarding "the practices of Backpage,

14  Craigslist, Facebook, Google, and other internet providers" as they pertain to alleged

15  prostitution?  Dkt. 500 at 5-6.  How can the government seek to introduce testimony that

16  seeks to contrast how different websites that allegedly hosted prostitution ads operated and

17  responded to law enforcement, yet argue that Defendants should not be allowed to present

18  expert testimony regarding "the utility of online commercial advertisements to law

19  enforcement in identifying and rescuing victims of sex trafficking?"  *Id.*  To allow the

20  government to have it both ways would be to deny Defendants due process.

21         Further, the government's reliance on this Court's Order denying one of

22  Defendants' motions to dismiss is unavailing.  Dkt. 905 at 6 (citing Dkt. 793 at 13-14).  In

23  making certain observations about the nature of Backpage's alleged business practices as

24  compared to other websites, the Court was required to accept the indictment's allegations

25

26  [1]   The Court's recent Order (Dkt. 946 at 13) provides further support for the exclusion of
27  the government's evidence, as it now confines the government's case to the 50 ads charged
    in Counts 2 through 51, rather than the boundless conspiracy the government seeks to
28  prove.

DEFENDANTS' OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE*
TO PRECLUDE DEFENDANTS' NOTICED EXPERTS

as true.  The Court's Order obviously does not bar Defendants from presenting evidence at trial that rebuts the indictment's characterizations of Backpage's business practices.

Likewise, the government's citation to Facebook's "Community Standards" policy as support for the notion that Facebook "never engaged in the same insidious business practices as Backpage" and "implemented true content moderation" cuts the other way.  *Id.* at 6 n.2.  Indeed, Backpage, as the government well knows, had robust Terms of Use that prohibited third parties from posting ads containing illegal content and regularly cooperated with law enforcement to rid the site of any such content.  If it is the government's aim to present purported expert testimony regarding the manner in which other websites have addressed ads and posts that contained allegedly illegal content, Defendants' experts must be allowed to rebut such testimony and address how Backpage's practices fared in comparison.

The government should be held to its word, and its trial plan should be circumscribed to preclude all of the irrelevant and unduly prejudicial evidence that it seeks to present.  If the Court so orders, Defendants will revisit their approach to this trial (and the government's case-in-chief may conclude in less than twelve weeks).  But so long as the government is permitted to present such broad-stroke evidence regarding, among other things, Backpage, the internet, other websites, unrelated law enforcement investigations, and sex trafficking, Defendants must be permitted to offer evidence to rebut that presentation.

### 3. Eric Goldman

Professor Goldman is one of the country's foremost experts on internet law and how internet service providers such as Google, Facebook, Twitter, and others, as well as Backpage, have attempted to regulate third-party content posted on their sites.  *See* Dkt. 538 at 2-3.  He will discuss the challenges involved in dealing with third-party content (including through moderation practices), as well as the history and rationale behind Section 230 of the Communications Decency Act (CDA).  These complex issues are far beyond the understanding of an average juror.  *See* Fed. R. Evid. 702.

3647691.1

9

The government does not challenge the vast majority of the topics with respect to which Professor Goldman will provide expert testimony, including the following:

- "Virtually every Internet service moderates content to some degree.  It is virtually impossible to sustain an Internet service for very long without moderating content."  Dkt. 538 at 3.
- The variety of moderation practices across the internet.  *Id.* at 4.
- The benefits of content moderation.  *Id.*
- The impossible task that internet service providers have in moderating third-party content, including that "Internet services often lack sufficient context about the user-submitted content to evaluate its legality."  *Id.* at 5.

Rather, the government objects only to Professor Goldman's anticipated testimony regarding Section 230 of the CDA.  To be clear, Defendants do not intend to elicit a legal conclusion from Professor Goldman regarding Section 230 or whether it bars the government's charges here.  Rather, Professor Goldman will testify about the effect that Section 230 has had on the moderation of third-party content on the internet.  This testimony will place Backpage's moderation efforts and the rationale behind those efforts in context.  Professor Goldman will testify that the moderation practices that the government has alleged are nefarious and show an intent on the part of Defendants to facilitate a business enterprise involved in prostitution were instead the very type of practices that are commonplace on the internet and are incentivized by Congress and Section 230.  Further, as numerous internet service providers, including Backpage, have relied on Section 230 in formulating their business practices and avoiding liability, Professor Goldman's testimony is relevant to Defendants' state of mind.  *See Lucky Break Wishbone Corp. v. Sears Roebuck & Co.*, 373 F. App'x 752, 755 (9th Cir. 2010) ("'[A] witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms.'") (quoting *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004)); Fed. R. Evid. 704.

### 4.      Bates Butler

Bates Butler is a former United States Attorney for the District of Arizona, was an

10

AUSA in the same office, and is now a prominent criminal defense lawyer practicing primarily in the Tucson area.  He will testify about prosecution practices with regard to cooperating witnesses, and the promised benefits that a cooperator expects even when the cooperator can testify that, as a formality, no promises have been made.  He will also testify to the normal procedure by which cooperators enter into agreements with the government.  This is relevant here because the government's assertions regarding its interactions with Carl Ferrer are so unusual: it claims that prosecutors and law enforcement agents never had contact with Mr. Ferrer or his attorneys until *after* Ferrer had entered state and federal cooperation plea agreements, privilege waivers, and extensive forfeiture agreements regarding the property of Ferrer, his family, and recently divorced spouse.  *See The Effects of Accomplice Witnesses and Jailhouse Informants on Jury Decision Making*, 32 Law & Hum. Behav. 137, 148 (2008) (attached as Exh. B) (noting that while some courts have instituted safeguards to protect against unreliable testimony from cooperating witnesses, these "safeguards will be effective only if jurors can perceive the enormous incentive to fabricate evidence in exchange for leniency and differentiate between honest and dishonest witnesses").

The government argues that an Eighth Circuit case, *United States v. Davis*, 457 F.3d 817 (8th Cir. 2006), precludes such testimony because it held that jurors can understand that cooperators "might have an incentive to incriminate the" defendant.  Dkt. 905 at 4. First, that is not the testimony that Defendants intend to elicit from Mr. Butler.  As described above, he will not testify about the fact that a cooperator may be biased, but will instead testify to exactly how the cooperation works in practice—the "winks and nods" that are inherent in the process despite the ability of a cooperator to say that no promises have been made, and the normal process by which the government evaluates and chooses its cooperators.  Second, *Davis* is neither binding nor conclusory.  Indeed, the same Eighth Circuit, just three years later and while discussing *Davis*, "decline[d] to address whether such testimony could *ever* assist a jury."  *United States v. Coleman*, 584 F.3d 1121, 1126 (8th Cir. Cir. 2009) (emphasis added).

1   In the present case, expected to be lengthy and confusing, with the anticipated

2   government effort to elicit substantial amounts of improper prejudicial evidence, an expert

3   who can illuminate intricacies and machinations involved in the presentation of

4   cooperating witnesses should be allowed.

5   **5.   William Norman**

6   In addition to managing his law practice and serving as an adjunct professor,

7   Mr. Norman is a well-regarded expert on the formation of offshore trusts and international

8   taxation planning and compliance.  With respect to the international concealment money

9   laundering charge found in Count 100, he should be permitted to testify about the fact that

10   offshore trusts are a lawful investment vehicle and that such trusts would be an ill-advised

11   investment vehicle for the concealment of assets because such trusts are subjected to

12   rigorous reporting requirements.

13   The government claims that this testimony is not relevant because it has *alleged* that

14   Mr. Lacey funded the offshore trust at least in part with money traceable to Backpage and

15   that Mr. Lacey purportedly said that he wanted to "put some assets in place[s] where . . .

16   government parties . . . cannot access my accounts."  Dkt. 905 at 8.   These mere

17   allegations that the government hopes to prove are not a basis to preclude Mr. Norman's

18   testimony.  Indeed, Mr. Norman's testimony is relevant to whether there was any intent or

19   effort to conceal assets through the formation of an offshore trust, which is an element of

20   international concealment money laundering as charged under 18 U.S.C. §

21   1956(a)(2)(B)(i).

22   **III.   CONCLUSION**

23   For the foregoing reasons, Defendants respectfully request that the Court deny the

24   government's motion.  To the extent the Court finds Defendants' expert disclosures to be

25   deficient, it should afford Defendants an opportunity to remedy their disclosures.  With

26   trial still three months away, the government would suffer no prejudice by virtue of such

27   an order.  Further, the government should be required to remedy their expert disclosures

28   (on which Defendants' disclosures are modeled) in accordance with any order the Court

3647691.1

12

1   might issue.

2

3         *Pursuant to the District's Electronic Case Filing Administrative Policies and*

4   *Procedures Manual (January 2020) § II (C) (3), Ariel A. Neuman herby attests that all*

5   *other signatories listed, and on whose behalf this filing is submitted, concur in the filing's*

6   *content and have authorized its filing.*

7

8   DATED:  May 8, 2020          Respectfully submitted,

9                                Gary S. Lincenberg
10                               Ariel A. Neuman
                                 Gopi K. Panchapakesan
11                               Bird, Marella, Boxer, Wolpert, Nessim,
                                 Drooks, Lincenberg & Rhow, P.C.
12

13                               By:  ___/s/ Ariel A. Neuman___
14                                         Ariel A. Neuman
15                                  Attorneys for Defendant John Brunst

16

17  DATED:  May 8, 2020          Thomas H. Bienert Jr.
                                 Whitney Z. Bernstein
18                               Bienert | Katzman PC

19

20                               By:  ___/s/ Thomas H. Bienert, Jr.___
                                          Thomas H. Bienert Jr.
21                                  Attorneys for Defendant James Larkin

22

23  DATED:  May 8, 2020          Paul J. Cambria
                                 Erin McCampbell
24                               Lipsitz Green Scime Cambria LLP

25

26                               By:  ___/s/ Paul J. Cambria___
                                          Paul J. Cambria
27                                  Attorneys for Defendant Michael Lacey

28

DEFENDANTS' OPPOSITION TO GOVERNMENT'S MOTION *IN LIMINE*
TO PRECLUDE DEFENDANTS' NOTICED EXPERTS

DATED:  May 8, 2020              Feder Law Office, P.A.


                                 By:      /s/ Bruce S. Feder
                                 _____
                                         Bruce S. Feder
                                 Attorney for Defendant Scott Spear

DATED:  May 8, 2020              The Law Office of David Eisenberg, PLC


                                 By:      /s/ David Eisenberg
                                 _____
                                         David Eisenberg
                                 Attorney for Defendant Andrew Padilla

DATED:  May 8, 2020              Joy Bertrand Esq. LLC


                                 By:      /s/ Joy Malby Bertrand
                                 _____
                                         Joy Malby Bertrand
                                 Attorney for Defendant Joye Vaught

1

## <u>CERTIFICATE OF SERVICE</u>

2

     I hereby certify that on May 8, 2020, I served the attached document by email on the following, who are registered participants of the CM/ECF System:

3

| | |
|---|---|
| Andrew C. Stone | andrew.stone@usdoj.gov |
| Anthony Ray Bisconti | tbisconti@bmkattorneys.com |
| Bruce S. Feder | bf@federlawpa.com |
| David S. Eisenberg | david@deisenbergplc.com |
| Erin E. McCampbell | emccampbell@lglaw.com |
| James C. Grant | jimgrant@dwt.com |
| John Jacob Kucera | john.kucera@usdoj.gov |
| John Lewis Littrell | jlittrell@bmkattorneys.com |
| Joy Malby Bertrand | joyous@mailbag.com |
| Kevin M. Rapp | kevin.rapp@usdoj.gov |
| Margaret Wu Perlmeter | margaret.perlmeter@usdoj.gov |
| Michael D. Kimerer | mdk@kimerer.com |
| Paul John Cambria, Jr. | pcambria@lglaw.com |
| Peter Shawn Kozinets | peter.kozinets@usdoj.gov |
| Reginald E. Jones | reginald.jones4@usdoj.gov |
| Rhonda Elaine Neff | rneff@kimerer.com |
| Robert Corn-Revere | bobcornrevere@dwt.com |
| Ronald Gary London | ronnielondon@dwt.com |
| Seetha Ramachandran | sramachandran@proskauer.com |
| Thomas Henry Bienert, Jr. | tbienert@bienertkatzman.com |
| Whitney Z. Bernstein | wbernstein@bienertkatzman.com |

4

5

6

7

8

9

10

11

12

13

14

15

               */s/ Ariel A. Neuman*

16

               Ariel A. Neuman

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# VILLAGE VOICE MEDIA HOLDINGS, LLC
## & AFFILIATES STRUCTURE AS OF 1-1-11



WPO

Goldman Sachs

Trimarate CIBC

Others

28.695303%

42.740074%

24.217/51%

4.534152%

**Village Voice Media, LLC**

100%

**City Press Publishing, Inc. (C-corp)**

Jim Larkin

Mike Lacey

Scott Spear

Jed Brunst

Troy Larkin QSST

Ramon Larkin QSST

45.120597%

4.093693%

5.665213%

1.180737%

1.180737%

42.759063%

100%

**Appendix A**

**New Times, Inc. (S-Corp)**

100%

Alta has option to convert debt into 14.15% interest in LLC

**New Times Holdings, LLC**

62%

38%

**Appendix B**

100%

**Lancero Assoc., LLC**

**Village Voice Media Holdings, LLC**

100%

1% GP

**Houston Press, LP**

99% LP

1% GP

**Dallas Observer, LP**

99% LP

**New Times Media, LLC**

100%

160%

100%

100%

100%

100%

100%

100%

100%

100%

100%

100%

100%

1% GP

**SF Weekly, LP**

99% LP

**Phoenix New Times, LLC**

**Denver Westword, LLC**

**Miami New Times, LLC**

**Cleveland Scene, LLC (Inactive)**

**Back Page.com, LLC**

**Village Voice, LLC**

**City Pages, LLC**

1% GP

**East Bay Express LP (Inactive)**

99% LP

**Riverfront Times, LLC**

**New Times BPB, LLC**

**Kansas City Pitch, LLC**

**Voice Media Group LLC ((formerly Ruxton Group, LLC)**

**Seattle Weekly, LLC**

**City Press, LLC**

(Minneapolis)

.01% GP

**LA Weekly, LP**

99.99% LP

(Nashville)

(Inactive)

.01% GP

**OC Weekly, LP**

99.99% LP

**January 2011**

DEFENSE 006065

# EXHIBIT B

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/6137138

# The effects of accomplice witnesses and jailhouse informants on jury decision making

**Article** *in* Law and Human Behavior · May 2008

DOI: 10.1007/s10979-007-9100-1 · Source: PubMed

CITATIONS
51

READS
282

5 authors, including:



Jeffrey S Neuschatz
University of Alabama in Huntsville
62 PUBLICATIONS  1,903 CITATIONS

SEE PROFILE

Deah S Quinlivan
Florida Southern College
12 PUBLICATIONS  308 CITATIONS

SEE PROFILE

Jessica K Swanner
Iowa State University
11 PUBLICATIONS  164 CITATIONS

SEE PROFILE

Christian A. Meissner
Iowa State University
107 PUBLICATIONS  6,111 CITATIONS

SEE PROFILE

Some of the authors of this publication are also working on these related projects:

Racial Bias in Mock Juror Decision-Making: A Meta-Analytic Review of Defendant Treatment View project

Race and Eyewitness Memory View project

Law Hum Behav
DOI 10.1007/s10979-007-9100-1

ORIGINAL ARTICLE

# The Effects of Accomplice Witnesses and Jailhouse Informants on Jury Decision Making

Jeffrey S. Neuschatz · Deah S. Lawson ·
Jessica K. Swanner · Christian A. Meissner ·
Joseph S. Neuschatz

© American Psychology-Law Society/Division 41 of the American Psychological Association 2007

**Abstract** The present study presents one of the first investigations of the effects of accomplice witnesses and jailhouse informants on jury decision-making. Across two experiments, participants read a trial transcript that included either a secondary confession from an accomplice witness, a jailhouse informant, a member of the community or a no confession control. In half of the experimental trial transcripts, the participants were made aware that the cooperating witness providing the secondary confession was given an incentive to testify. The results of both experiments revealed that information about the cooperating witness' incentive (e.g., leniency or reward) did not affect participants' verdict decisions. In Experiment 2, participant jurors appeared to commit the fundamental attribution error, as they attributed the motivation of the accomplice witness and jailhouse informant almost exclusively to personal factors as opposed to situational factors. Furthermore, both experiments revealed that mock jurors voted guilty significantly more often when there was a confession relative to a no confession control condition. The implications of the use of accomplice witness and jailhouse informant testimony are discussed.

**Keywords** Confessions · Jury decision making · Jailhouse informants · Accomplice witnesses

J. S. Neuschatz (✉) · D. S. Lawson · J. K. Swanner
Department of Psychology, The University of Alabama in
Huntsville, Morton Hall 321, Huntsville, AL 35899, USA
e-mail: neuschaj@email.uah.edu

C. A. Meissner
The University of Texas El Paso, El Paso, TX, USA

J. S. Neuschatz
Roger Williams University, Bristol, RI, USA

On June 10, 2003, Rick Walker was released from prison after serving 12 years for a murder that he did not commit. In 1991, the state convicted Walker of brutally murdering his ex-fiancée Lisa Hopewell. The primary evidence used for his conviction was testimony provided by two witnesses—the first was an accomplice witness whose fingerprints were found at the crime scene and the second was a witness that Walker claimed was his alibi; however, the witness testified instead that Walker was an accomplice to the murder. Both received an incentive to testify; however, the state did not release this information to the defense attorneys during the trial, thereby limiting the defense's ability to effectively cross-examine the witnesses. Eventually, DNA evidence exonerated Walker and proved he did not help the accomplice witness who testified in the case. Without the help of a clever law student, Allison Tucher, Walker would have spent the rest of his life in prison for a murder he did not commit. The most disconcerting aspect of the case is that two witnesses who were provided incentives to testify and had been motivated to fabricate evidence in order to receive leniency were successful in persuading the jurors of Walker's culpability. This case exemplifies the potentially prejudicial and unreliable nature of testimony that is obtained through plea agreements from accomplices and informants.

Since the introduction of plea-bargained testimony, many accomplice witnesses and jailhouse informants have come forward with information that has led to the conviction of innocent suspects. The plea bargain becomes an incentive that can mean freedom and/or a reduced sentence for those informants who wish to cooperate, creating an enticement to fabricate evidence. Accomplice witnesses and jailhouse informants belong to a specific subset of witnesses known as cooperating witnesses (see Cassidy 2004). An *accomplice witness* is one that through

his/her own admission has participated in a crime and is willing to testify regarding the role of the co-conspirator. In contrast, a *jailhouse informant* is a cooperating witness who provides testimony about his/her knowledge of a crime based on information obtained while incarcerated. Often, the testimony provided by these cooperating witnesses includes information garnered through conversations with the accused, which can include a purported confession to the crime. This type of confession provided by a cooperating witness will be referred to as a *secondary confession* in order to distinguish it from a primary confession that is obtained directly from the suspect by police investigators.

Within the context of psychological research, many studies have examined the effects of primary confession evidence on judicial decision-making (Kassin and Wrightsman 1980, 1981; Kassin and Sukel 1997); however, to date there has been no psychological research examining the effects of secondary confessions. The paucity of psychological research on secondary confessions from a cooperating witness is remarkable for several reasons. First, the courts frequently rely upon accomplice witnesses and jailhouse informants for prosecutorial information (Mazur 2002). The actual frequency of such testimony is impossible to estimate because informants and accomplices are only revealed when they testify in court; however, legal experts argue that the inclusion of such testimony is common practice in high stakes capital cases (Rappold 2005). Reliance on evidence from accomplices and informants is especially likely when there is little other evidence to support the prosecution's case (Cassidy 2004). Prosecutors know that obtaining this type of information will increase the strength of their case and make a conviction more likely.

The Northwestern School of Law Center on Wrongful Convictions has identified testimony from jailhouse informants as one of the leading causes of wrongful convictions in capital cases. In fact, since the reinstatement of capital punishment, in 51 of the 111 death row exonerations (46%), convictions were based, at least in part, on testimony from cooperating witnesses. These numbers are almost certainly an underestimation given the magnitude of cooperating witness testimony, yet they further underscore the unreliable nature of informant testimony.

Information from cooperating witnesses is often provided in exchange for a plea bargain or some other incentive. As one can imagine, this kind of inducement creates a situation that is highly conducive to evidence fabrication on the part of the cooperating witness. In fact, in an investigation encompassing interviews and documentary evidence from defense attorneys, prosecutors, correction personnel and informants, the Los Angeles grand jury commission concluded that given the fact that lying informants are rarely, if ever prosecuted, informants have much to gain and little to lose by testifying falsely (Bloom 2002).

While the Supreme Court has recognized the prejudicial and unreliable nature of evidence created through bartered testimony, it has consistently held that safeguards are in place to protect the rights of the accused (Giglio v. United States 1972; United States v. Singleton 1998). In Giglio vs. United States (1972), the court indicated that any incentive or deal that a cooperating witness receives in return for testimony must be disclosed to the defense under the Confrontation Clause of the Sixth Amendment (Cassidy 2004). This clause is supposed to protect the rights of the accused by allowing effective cross-examination of the cooperating witness and by permitting the jury to consider the motivations of the witness; however, the protection this safeguard is supposed to provide to the accused could be illusory. There are cases in which a district attorney or investigator simply implied that if the cooperating witness would testify that he or she would receive an incentive in exchange for his or her testimony. For example, the district attorney or investigating officer may say things in private conversation with the informant such as, "if you help us out we will take care of you" or they may wink or nod at the informant in a manner that suggests the witness will receive something in return for the testimony (Mazur 2002). There have also been cases in which the prosecuting lawyer or the investigating officer had a reputation for reducing sentences for informants who testify (Bloom 2002). This person is often informally referred to as the "Juice Man" by jailhouse informants. In this way, the prosecution is not explicitly stating what incentive, if any, will be given in exchange for the testimony, but the social situation may be such that the informants know they will receive some form of incentive for their testimony. The ramifications are such that implied leniency creates a form of exchange the state does not have to disclose to the defense. Therefore, the jurors may not be able to scrutinize the reliability of a cooperating witness efficiently (Mazur 2002).

Further complicating the problems with the coercive nature of bartered testimony is psychological research indicating that not only are mock jurors unable to detect the coercive nature of confession testimony, but they also give undue weight to confession evidence when rendering guilt decisions (Kassin and Neumann 1997). Kassin and colleagues have consistently demonstrated the persuasive effects that coerced confessions can have on judicial decision-making. For example, Kassin and Wrightsman (1980, 1981) found that mock jurors rightly disregarded confessions that had been elicited via negative pressure (threats of worse treatment and/or harsher punishment); however, jurors failed to fully disregard confessions elicited via positive pressure (promises of better treatment

and/or leniency). These effects were demonstrated even when participants acknowledged that the suspect had been coerced into confessing and judicial instructions to disregard the confession had been presented. This is particularly relevant to the present study because if people have difficultly realizing the effect that the blatant positive pressure has on a person's behavior, they may also fail to note the effect that an implied incentive may have on an informant's behavior.

One possible explanation for the superficial examination by jurors of confession evidence is the fundamental attribution error (Kassin and Sukel 1997). The fundamental attribution error is the tendency for individuals to attribute the behavior of others to dispositional factors while diminishing the contribution of the situation or context (Kassin and Gudjonsson 2005). Regardless of the coercive nature of the interview, mock jurors in prior studies (Kassin and Gudjonsson 2005) attributed the confession to the fact that the defendant committed the crime because "only a guilty person would confess to such a crime" regardless of the situational pressure under which the confession occurred. The same logic can be applied to the testimony of cooperating witnesses—mock jurors may presuppose that accomplice witnesses and jailhouse informants offer their testimony as atonement rather than deducing that the testimony may be motivated by a self-serving incentive. Thus, jurors may accept the testimony without considering the other motives of the cooperating witness or the situational inducements of an incentive.

The use of cooperating witnesses creates a substantial problem for the criminal justice system. Testimony given in conjunction with an incentive creates a situation in which the motivation of the cooperating witness is to procure the best deal by pleasing the prosecution even if this means fabricating evidence. If jurors cannot perceive the difference between an honest and a dishonest cooperating witness there is grave potential for such testimony to lead to wrongful convictions of the innocent. The goals of the present study were to examine whether mock jurors can effectively differentiate between the sources of a secondary confession, and to determine whether information that the secondary confession was garnered in exchange for an incentive would affect mock juror verdicts.

This effect was examined in the current studies by using both college and community samples. Given that the vast majority of psychological studies employ college students as participants, researchers over the years have criticized the results as failing to represent the general population (Shultz 1969; Dill 1964; Oakes 1972; Sears 1986; Wiek 1967). Thus, it is important to employ community as well as college samples. As Bornstein (1999) has indicated, the external results of jury simulation research is a particularly important issue considering the infrequency with which

college students serve as jurors and that the goal of this research, in some sense, is to directly influence the criminal justice system. Generally, researchers argue that college students are typically younger, more susceptible to authority and more homogenous than non-college students (Sears 1986). In a meta-analysis conducted by Peterson (2001), there was a demonstrable difference in effect sizes between the two samples. However, the author expresses caution in interpreting the results in that substantial differences were found in only 48% of the studies. Thus, further research appears necessary to understand any differences between college and non-college sample responses.

Based on prior psychological research, three predictions were made with regard to secondary confessions. First, it is clear from the literature on confessions that jurors perceive confession evidence to be extremely compelling and that participants' verdict decisions are influenced by confession evidence even when they recognize that the confession has been coerced (e.g., Kassin and Sukel 1997). To the extent that jurors assign a similar status to secondary confessions it was expected that mock jurors would vote guilty more often in all conditions in which a secondary confession was provided relative to a no-confession control condition. Second, to the extent that jurors commit the fundamental attribution error when evaluating cooperating witnesses who present secondary confession evidence, it was expected that conviction rates would not vary as a function of incentive. Rather the cooperating witness' testimony would be taken at face value regardless of the circumstances under which it was collected. Third, consistent with prior mock juror research we predicted that the pattern of results with the community sample would show fewer guilty verdicts compared to the college sample.

## Experiment 1

Method

### Participants

A total of 345 college and community members participated in this experiment. The college sample consisted of 168 undergraduate psychology students from a southeastern university. Participants received course credit for participation. Demographic data was collected for both the college and community samples; however, some participants chose not to provide this information. The average age of the college participants was 20.36 ($N = 165$). There were 120 women and 45 men who reported gender. Of the 146 college participants who reported their ethnicity, 97 self-identified as Caucasian, 35 as African American, 5 as

Asian, and 9 as "other". The community sample consisted of 177 participants with the constraint that the participants had to be eligible to vote and could not be students from the University of Alabama in Huntsville. The average age of the community participants was 42.03 ($N = 163$). There were 104 women and 67 men who reported gender. Self-report of ethnicity in 118 participants included 85 self-identified as Caucasian, 25 as African American, 2 as Asian, 3 as Hispanic, and 3 as "other". The average years of education completed for the community sample was 15.59 ($N = 161$). All participants were randomly assigned to one of the seven experimental conditions with each session containing small groups of participants of six or less. All participants were treated according to ethical guidelines of the American Psychological Association (APA).

### Design

The experiment conformed to a 3 (Witness: *Accomplice, Jailhouse, Civic Duty*) × 2 (Incentive: *No Incentive, Incentive*) × 2 (Sample: *College, Community*) between participants factorial design. A *No-Witness/No-Incentive Control Condition* was also included for comparison purposes. The dependent measures of interest included verdict (guilty or not guilty) and participants' self-reported confidence in their verdict decision. Participants also completed a questionnaire containing items that queried their views on a burden of proof item, the likelihood that the defendant committed the crime, and a true/false recognition test about the material in the trial transcript. In addition, participants completed questions regarding their perceptions of the cooperating witnesses' truthfulness, interest in justice and interest in serving their own self.

### Materials

*Trial transcript* The trial transcript was an abbreviated version of *State of Arkansas vs. Echols and Baldwin*. The control transcript was six pages in length and the experimental transcripts were eight pages. The names of the individuals and locations were altered to prevent priming in participants who may have had prior knowledge of this case. The transcript contained opening and closing statements in addition to the testimony of two witnesses in the control transcript. More specifically, one witness for the state presented fiber evidence and the other presented knife evidence. The only difference between the control trial transcripts and the experimental trial transcripts was that the experimental transcripts also had a cooperating witness who provided a secondary confession. In all conditions Brandon Chase, a 22-year old male, was on trial for the murders of three 8-year-old boys: Doug Raplee, Shane Gavin and James Debolt. The prosecution presented

evidence that a knife had been found in a lake behind the defendant's residence and that fiber evidence was recovered that was "microscopically similar" to a bathrobe found at the defendant's residence. The defense argued that the prosecution's evidence was largely circumstantial and that there was no actual evidence linking Brandon Chase to the crime.

*Witness manipulation* The critical evidence manipulated in the trial transcript was the secondary confession evidence given by the cooperating witness, Seth Rogers. For all witness types, Seth Rogers testified that the defendant, Brandon Chase, confessed to him that he did indeed kill the three boys. In the *accomplice witness* condition, Seth Rogers is a friend of Brandon Chase who testifies that Brandon called him and asked him to come to the murder scene, upon which he confessed to murdering the victims and asked the witness to help dispose of the bodies. In the *Jailhouse Witness* condition, Seth Rogers is a convicted criminal in a correctional facility who testified that while in a correctional facility with Brandon Chase, the defendant confessed to him about killing the three boys. In the *Civic Duty Witness* condition, Seth Rogers is a classmate who testified that Chase confessed to killing the three boys during a card game. In the *Incentive* conditions, both the accomplice witness and jailhouse witness also testified that they received a reduced sentence in exchange for their testimony, while the civic duty witness testified that he received a monetary reward in exchange for testifying. Seth Rogers did not testify in the *no-witness control condition*.

*Questionnaire* The dependent measures were typed on three separate pages but were presented one page at a time and in the same order for each participant. The first page of the questionnaire included a verdict decision (guilty or not guilty), a 10-point confidence rating (1-not at all confident, 10-very confident) and a percentage estimate of the likelihood that the defendant actually committed the crime (0 *no likelihood* to 100-*high likelihood*). The second page contained four questions regarding participants' attributions of the cooperating witness who provided the secondary confession, including his trustworthiness, his interest in serving justice, his interest in seeking the truth, and the extent to which he was perceived as serving his own self-interests. All of these questions were assessed on a 10-point Likert-type scale (1 = *not at all* to 10 = *extremely*). The third page was a 12 question memory test about details of the trial.

### Procedure

Participants arrived at the experimental session and were assigned seating in the experimental room to ensure that they could not influence one another's responses. They were then asked to complete an informed consent and

The Effects of Accomplice

provide demographic information that included their name, age, ethnicity, level of education and profession. Afterwards, participants were instructed to imagine that they were jurors in a trial and were told to pay close attention to the details of the trial transcript they were about to review because their memory would be later tested and they would not be able to look back at the trial transcript. A trial transcript was randomly selected and handed to each participant. Participants were instructed to sit quietly after reading the trial transcript. They were also provided with a manila folder in which to put the trial transcript and each completed questionnaire. They were informed that they would not be allowed to go back to any sheet already placed into the folder. Every participant completed each step in the procedure before the experimenter proceeded to the next step. After all participants finished reading the trial transcript, the first questionnaire was administered. The questionnaire asked for a verdict of *Guilty* or *Not Guilty*, a Likert measure of their confidence in their verdict decision, and their likelihood rating that the defendant committed the crime. Next, they provided ratings on a Likert-scale as to the secondary witness' interest in truth, his trustworthiness, his interest in justice, and his own self-interests. Finally, they completed a true-false memory questionnaire. After completing all questionnaires, the experimenter debriefed all of the participants.

## Results and Discussion

### Manipulation Checks

In order to determine whether participants read the transcript, the 12 true-false questions regarding details of the trial transcript were analyzed. In every condition, participants averaged 10.37 out of 12 correct on the true/false recognition test. This is significantly greater than chance-level performance or 6 out 12, $t(344) = 65.73$, $p < .01$. A 3 (Witness Type: *Accomplice, Jailhouse, Civic Duty*) × 2 (Incentive: *Incentive, No Incentive*) × 2 (Sample: *College, Community*) factorial ANOVA conducted on the recognition accuracy scores revealed no significant differences on the true-false performance of participants. Furthermore, none of the experimental groups differed from the control group in terms of their average score on the true-false questions.

### Verdicts

A $3 \times 2 \times 2 \times 2$ hierarchical loglinear analysis (HILOG) was performed to examine the influence of Witness (*Accomplice, Jailhouse, Civic Duty*), Incentive (*Incentive, No Incentive*) and Sample (*College, Community*) on participants' Verdict decisions (*Guilt, Not Guilty*). Results

indicated a significant Witness × Verdict interaction, $\chi^2$ (2) = 13.19, $p < .01$, $v = .14$, such that participants in the *Civic Duty* condition voted guilty more often then either the *Accomplice Witness* or *Jailhouse Confession* conditions. Importantly there was no main effect, $\chi^2$s (1) = .30, *ns*, $v = .03$,[1] or any interaction with the Incentive Condition, $\chi^2$s > 1.93, *ns*, $vs < .05$. Finally, participants in the experimental conditions voted guilty significantly more often than those in no-witness control condition, $\chi^2$s (2) > 12.00, $ps < .01$, $vs < .29$. There was also a significant Sample × Verdict interaction, $\chi^2$ (1) = 10.61, $p < .01$, $v = .13$, such that conviction rates were higher in the college sample relative to the community sample; however, Sample did not interact with any of the experimental manipulations.

### Likelihood of Commission

Aside from providing verdict decisions, participants also estimated their perceived likelihood that it was the defendant who committed the crime (0 = *no likelihood* and 100 = *high likelihood*). A 3 (Witness Type: *Accomplice, Jailhouse, Civic Duty*) × 2 (Incentive: *Incentive, No Incentive*) × 2 (Sample: *College, Community*) factorial ANOVA was conducted on the likelihood estimates. The overall likelihood that the defendant committed the crime was 67.31%. Consistent with the verdict analysis, a significant main effect of Witness Type was observed on the likelihood estimates, $F(2, 281) = 2.91$, $MSE = 572$, $p < .05$, $\eta_p^2 = .02$. Planned follow-up tests revealed that participants viewed the defendant as significantly less likely to have committed the crime in the *Accomplice Witness* condition when compared with the *Civic Duty* condition, $t(1,195) > 2.40$, $p < .01$, $ds > .11$. Furthermore, likelihood estimates in each witness type differed significantly from the no-witness control condition, $ts(281) > 3.70$, $ps < .01$, $ds > .21$.[2] A significant effect of Sample was again found, $F(2, 281) = 4.16$, $MSE = 572$, $p < .05$, $\eta_p^2 = .01$, as the

---

[1] The power to detect this very small effect of incentive was admittedly low (1 − β = .10). One alternative explanation that could account for why participant juror verdicts decisions were not influenced by incentive may be that they did not remember there was an incentive. To address this question 28 additional participants participated in the *Jailhouse Incentive Type* and were asked to indicate in a free recall test whether there was there an incentive. If the participants said there was then they were asked to indicate what the incentive was. Of the 28 additional participants 17 or 61% voted guilty (approximating well the percentage reported for this condition in Experiment 1). Importantly, all but three participants remembered the incentive and were able to recall details about the incentive. Thus, we do not believe that the pattern of results reported in The College Sample can be attributed to the fact that participants simply failed to remember that there was an incentive.

[2] Here again, power to detect the small effect of Incentive was admittedly low (1 − β = .21).

college sample ($M = 73.5$, $SD = 22.55$) expressed significantly greater likelihood estimates than did the community sample, ($M = 67.79$, $SD = 25.81$). No significant differences between the *Incentive* and *No Incentive* conditions were found, $F (1, 281) = 1.22$, $MSE = 572$, *ns*, $\eta_p^2 = .004$, nor any higher-order interactions, $Fs (2,281) < .079$, $MSE = 572$, *ns*, $\eta_p^2 < .001$.

*Witness Ratings*

A multivariate analysis of variance (MANOVA) was also conducted to assess the effect of the Sample, Witness, and Incentive manipulations on participants' ratings of the witness' truthfulness, trustworthiness, interest in serving justice, and interest in serving his own interests. The results of this analysis revealed a significant main effect of Witness Type, $F (8, 565) = 6.96$, $p < .01$, $\eta_p^2 = .091$, and Incentive, $F (4, 277) = 4.60$, $p < .01$, $\eta_p^2 = .063$. The interaction was also significant, $F (8, 565) = 2.78$, $p < .0$, $\eta_p^2 = .039$. No other significant effects, including those involving the Sample variable, were observed. Univariate tests confirmed a main effect of Witness Type on each rating, $Fs (1,291) > 13.27$, $ps < .01$, $\eta_p^2 > .086$. Tukey's HSD follow-up tests revealed that the main effect of Witness Type resulted from participants rating the *Civic Duty* witness as significantly more trustworthy, truthful, interested in serving justice and less interested in serving his own interests than either the *Jailhouse* or *Accomplice Witnesse*s. The main effect for Incentive, $F (1,291) = 14.70$, $p < .01$, $\eta_p^2 > .050$, and the Witness × Incentive interaction, $F (2,291) = 9.47$, $p < .01$, $\eta_p^2 > .063$, were only significant for the attribute of serving own interest. Witnesses who received an incentive were rated by participants as more interested in serving their own interests compared to witnesses who did not receive an incentive—although this effect did not translate into differential verdicts as previously discussed. Univariate follow-up tests on the interaction revealed that the difference in participants' perceptions of the witness's interest in serving his own self-interest were greatest in the *Accomplice Witness* condition.

*Summary of Findings*

Overall, the results of Experiment 1 illustrate several important and novel findings. First, both college and community samples demonstrated that conviction rates were unaffected by the explicit provision of information indicating that the witness received an incentive to testify. Second, and consistent with the research on confession evidence in the courtroom (Kassin and Neumann 1997; Kassin and Sukel 1997; Kassin and Wrightsman 1980, 1981), the presence of a confession, albeit a secondary confession, had a significant influence on mock juror

conviction rates. More specifically, in every witness type and across both college and community samples, mock jurors convicted significantly more often when there was a secondary confession provided by a cooperating witness than when no such witness had testified. Third, the only significant difference between the two samples was that the conviction rates were much higher in the college sample. Fourth, the civic duty witness was rated as being more trustworthy, truthful, interested in serving justice, and less interested in serving his own needs when compared with other witnesses. Consistent with these ratings, participants in this condition voted guilty more often than did participants in the other conditions (Table 1).

It appears that the present results are quite consistent with the fundamental attribution error (Kassin and Gudjonsson 2005; Ross 1977). According to the fundamental attribution hypothesis, perceivers will ignore the contextual and situational factors in favor of a dispositional attribution. In application to a jury situation, jurors should perceive a witness' behavior as influenced by personal factors rather than situational demands. Even though the witness in the incentive condition had an enormous motivation to fabricate evidence (having been provided a situational incentive to testify), jurors appeared to ignore this information and render verdicts that were not significantly different across the *Incentive* and *No Incentive* conditions. The participants may not have recognized or considered the impact that an incentive might have on behavior and/or the willingness to provide accurate and truthful information. Furthermore, participants did not have significantly different ratings of truthfulness or trustworthiness across the *Incentive* and *No Incentive* conditions. Thus, participants appeared to diminish the contextual influence of the incentive in favor of the dispositional attributions of trustworthiness and truthfulness in accepting the testimony at face value.

Alternatively, the null results could have occurred because (a) participants failed to notice the incentive manipulation when it was provided or (b) participants assumed that both the *Accomplice Witness* and *Jailhouse Informant* were receiving an incentive, even if an incentive was not explicitly described. In Experiment 2, we tested these possibilities by asking participants to indicate whether the witness was provided an incentive and what the incentive was. Additionally, to assess the underlying causes behind participants' verdict decision, we asked respondents to indicate why the cooperating witness came forward with the secondary confession evidence.

## Experiment 2

Experiment 2 was conducted to assess whether the results of Experiment 1 were due to the fundamental attribution

The Effects of Accomplice

**Table 1** Means and standard errors for the conviction rates attributes and likelihood scores for Experiment 1

|  | Conviction rate | Trust | Truth | Justice | Own interest | Likelihood of guilt |
|---|---|---|---|---|---|---|
| College sample |  |  |  |  |  |  |
| *Accomplice* |  |  |  |  |  |  |
| No incentive | 66.67(9.8) | 5.04(.53) | 5.17(.52) | 5.12(.58) | 7.75(.55) | 71.04(4.51) |
| Incentive | 62.50(10.1) | 5.50(.52) | 5.46(.53) | 4.46(.46) | 8.00(.48) | 65.62(5.44) |
| Total | 64.58(4.83) | 5.27(.37) | 5.31(.37) | 4.79(.37) | 7.87(.36) | |
| *Jailhouse* |  |  |  |  |  |  |
| No incentive | 70.83(9.5) | 5.37(.38) | 6.08(.41) | 6.33(.49) | 5.54(.55) | 73.17(3.73) |
| Incentive | 62.50(10.1) | 5.87(.42) | 6.00(.43) | 5.67(.41) | 7.21(.50) | 65.42(4.80) |
| Total | 66.67(4.76) | 5.62(.28) | 6.04(.29) | 6.00(.32) | 6.37(.39) | |
| *Civic duty* |  |  |  |  |  |  |
| No incentive | 91.67(5.8) | 6.92(.31) | 7.62(.35) | 7.87(.36) | 5.21(.63) | 82.42(4.13) |
| Incentive | 87.50(10.3) | 6.83(.49) | 7.04(.49) | 6.87(.52) | 5.67(.49) | 83.33(3.84) |
| Total | 89.58(3.09) | 6.87(.29) | 7.33(.30) | 7.37(.32) | 5.44(.40) | |
| *Control* | 37.5(10.1) |  |  |  |  | 52.08(5.48) |
| Community sample |  |  |  |  |  |  |
| *Accomplice* |  |  |  |  |  |  |
| No incentive | 47.83(10.7) | 4.00(.51) | 4.61(.54) | 3.91(.56) | 8.43(.48) | 61.30(5.23) |
| Incentive | 66.67(8.3) | 5.85(.48) | 5.20(.53) | 5.24(.56) | 7.52(.46) | 67.12(5.15) |
| Total | 56.82(5.03) | 4.44(.35) | 4.90(.38) | 4.58(.37) | 7.98(.33) | 64.21(3.73) |
| *Jailhouse* |  |  |  |  |  |  |
| No incentive | 53.85(10.0) | 5.11(.48) | 4.82(.49) | 5.12(.53) | 5.08(.46) | 76.38(5.05) |
| Incentive | 50.00(9.6) | 4.57(.46) | 4.61(.55) | 4.96(.51) | 8.89(.49) | 69.41(4.96) |
| Total | 52.37(5.01) | 4.84(.33) | 4.93(.36) | 5.04(.37) | 6.98(.32) | 72.89(3.54) |
| *Civic duty* |  |  |  |  |  |  |
| No incentive | 58.33(10.3) | 6.92(.50) | 6.75(.54) | 6.54(.55) | 5.21(.47) | 68.83(5.26) |
| Incentive | 58.33(10.3) | 5.79(.50) | 6.00(.54) | 5.89(.55) | 6.63(.47) | 67.12(5.26) |
| Total | 58.3(5.63) | 6.35(.35) | 6.37(.38) | 6.20(.37) | 5.92(.33) | 66.29(3.73) |
| *Control* | 23.53(6.0) |  |  |  |  | 44.07(5.09) |

error or whether the participants more simply failed to notice the incentive manipulation. Three changes were made to test these possibilities. First, all participants in the experimental conditions were asked whether the witness was provided an incentive for the testimony, and they were further asked to indicate what the incentive was. Thus, if participants accurately reported regarding the incentive manipulation, then the alternative hypothesis that participants did not notice the incentive could be ruled out as an explanation of the Experiment 1 results. Second, all witnesses in the experimental conditions were asked to indicate why the cooperating witness would come forward with the secondary confession evidence. This question should allow for the assessment of the fundamental attribution error hypothesis. That is, if the results are due to the fundamental attribution error then it was expected that participants in all conditions should attribute the secondary confession to personal aspects of the cooperating witnesses such as his honesty, trustworthiness or feelings of guilt,

rather than to situational demands such as receiving an incentive.

Finally, to ensure that participants do not assume an incentive in the *No Incentive* condition, we included a new condition, *No Incentive Explicit*, in which the witness is specifically asked during the trial whether he received a monetary award (*Civic Duty*) or a decrease in his sentence (*Accomplice Witness, Jailhouse*) in exchange for the testimony. The witness in the explicit conditions indicated that no incentive was given, thus disambiguating the notion of an incentive.

Method

*Participants*

A total of 248 college students volunteered to participate in this study in exchange for course credit. Demographic data was collected; however, some participants chose not to

provide this information. The average age of the participants was 20.75 ($N = 248$). There were 168 women and 80 men. In term of the racial composition of the sample, 76 participants identified themselves as Caucasian, 45 as African American, 5 as Asian, 2 as Bi-Racial, 1 as Native American, 4 as Hispanic and 12 as Other. All participants met Alabama juror eligibility requirements of either being a registered voter or having a current driver's license. Each participant was randomly assigned to one of the nine experimental conditions or the control condition. Participants were tested in small groups of up to six people and worked independently. All participants were treated according to ethical guidelines of the American Psychological Association (APA).

### Design

The experiment conformed to a 3 (Witness: *Accomplice, Jailhouse, Civic Duty*) × 3 (Incentive: *No Incentive, No Incentive Explicit, Incentive*) between participants factorial design. As was the case in Experiment 1, a *No Witness Control* condition was also included for comparison purposes. The primary dependent measure of interest was the verdict decision. Participants also completed a questionnaire containing items that queried their views on a burden of proof item, the likelihood that the defendant committed the crime, and a true-false recognition test about the material in the trial transcript. In addition, participants completed questions regarding their perceptions of the cooperating witness' truthfulness, interest in justice, and interest in serving himself.

### Materials and Procedures

*Trial Transcript* The trial transcripts were the same as those used in Experiment 1 with two exceptions. First, the specific incentive was stated in the trial transcript. More specifically, in the *Civic Duty Incentive* condition, the trial transcript was adapted so that the witness was asked if they had received a $10,000 reward for their testimony, to which they respond, "Yes sir, I did". In both the *Jailhouse Informant* and the *Accomplice Incentive* conditions, the trial transcript was adapted so that the witness was asked if he had received 5 years off his sentence, to which he responded, "Yes sir, I did". Second, for the new *No Incentive Explicit* condition, the witness was asked if he had received an incentive for their testimony to which he replied, "No Sir, I did not".

*Questionnaire* The questionnaire was the same as in Experiment 1, with the addition of three new questions. The first question asked the participant to speculate as to why the cooperating witness came forward with the secondary confession testimony. The second question asked

the participants if the witness received an incentive for the testimony. If the participant responded yes to the second question, they were asked to indicate what the incentive was.

*Procedure* The procedure for Experiment 2 followed precisely those employed in Experiment 1.

### Results and Discussion

#### Manipulation Checks

Similar to Experiment 1, participants were very accurate in answering questions about the trial transcript with the mean recognition accuracy rates in each condition greater than 79% (approximately 9.48 out of 12 correct answers). As was the case in Experiment 1, memory performance was significantly greater than chance or 6 out 12, $t (344) = 46.96$, $p < .01$, $d = 2.98$. A 3 (Witness Type: *Accomplice, Jailhouse, Civic Duty*) × 3 (Incentive: *Incentive, No Incentive, No Incentive Explicit*) factorial ANOVA conducted on the true-false recognition scores revealed no significant effects. Furthermore, none of the experimental groups significantly differed from the *No-Witness* control condition in terms of their recall of the facts of the trial transcript. In addition, all participants in the *Incentive* condition were asked if an incentive had been provided to the witness and (if so) what it was. Overall, 72 of 76 participants in the incentive condition indicated that the witness was provided with an incentive and participants correctly indicated what the incentive was. The four participants that did not indicate that the witness received an incentive simply left both questions blank. Based on these data we are confident that participants attended appropriately to the incentive manipulation. Therefore, the verdict data cannot be attributed to the fact that participants simply did not realize that the witness was paid or provided a sentence reduction for his testimony. Finally, no participants in the *No Incentive* condition indicated that witness was provided an incentive.

#### Verdict

The primary dependent measure of interest was the impact that the source of the secondary confession and the incentive would have on verdict decisions. Collapsing across all experimental conditions, the total conviction rate was 70.86% with 180 of 254 individuals voting guilty. A 3 × 3 × 2 hierarchical loglinear analysis (HILOG) was performed to examine the influence of witness type (*Accomplice, Jailhouse* or *Civic Duty*) and incentive (*Incentive, No incentive, or No Incentive Explicit*) on participants' verdict decisions (*Guilty, Not Guilty*). Consistent

The Effects of Accomplice

with Experiment 1 neither the Incentive × Verdict, $\chi^2$ (2) = 2.39, $ns$, $v = .10^2$, the *Witness × Incentive × Verdict* interaction, $\chi^2$ (4) = 3.69, $ns$, $v = .07$, nor the *Witness × Verdict* Interaction, $\chi^2$ (2) = .05, $ns$, $v = .03$, were significant. Additionally, participants in all witness types voted guilty significantly more often than those in the *No Witness* control condition, $\chi^2$s (2) > 3.92, $ps < .04$, $vs = .29$. Table 2 provides the percentage of guilt verdicts across the levels of Witness type and Incentive.

### Likelihood of Commission

Aside from providing verdict decisions, participants also estimated their perceived likelihood that it was the defendant who committed the crime (0 = *no likelihood* and 100 = *high likelihood*), A 3 (Witness Type: *Accomplice, Jailhouse, Civic Duty*) × 2 (Incentive: *Incentive, No Incentive, No Incentive Explicit*) factorial ANOVA was conducted on the likelihood estimates. The overall likelihood that the defendant committed the crime was 73.34%. Consistent with the verdict measure, no significant effects of Witness condition, $F$ (2,218) = 1.92, $ns$, $\eta_p^2 = .017$, Incentive, $F$ (2,218) = .208, $ns$, $\eta_p^2 = .002$, or Witness × Incentive interaction, $F$ (4,218) = 1.84, $ns$, $\eta_p^2 = .033$, were found in the data. However, planned comparisons demonstrated that all Witness conditions significantly differed from the *No-Witness Control* condition, $ts$(242) > 2.02, $p < .05$, $ds > .11$. Once again, the presence of a secondary confession provided by a cooperating witness significantly increased participants' perceptions of guilt relative to the absence of this testimony.

### Witness Ratings

A multivariate analysis of variance (MANOVA) was conducted to assess the effect of Witness Type and Incentive on participants' ratings of the witness' truthfulness, trustworthiness, interest in serving justice and interest in serving his own interests. Both the main effects of Witness type, $F$ (8, 428) = 2.93, $p < .01$, $\eta_p^2 = .095$, and Incentive were significant, $F$ (8, 428) = 5.30, $p < .01$, $\eta_p^2 = .055$. The interaction was not significant, $F$ (16, 864) = 1.21, $ns$, $\eta_p^2 = .022$. With regard to the interest in serving justice, planned follow-up tests revealed that participants rated witnesses who received an incentive as significantly *less* interested in serving justice when compared with witnesses who were not provided an incentive, $ts$ (218) > 2.30, $ps < .02$, $ds = .47$, in return for their testimony. Similarly, participants rated the witness who received an incentive as more interested in his self-interest than the witness who was not getting an incentive in exchange for his testimony, $its$(218) > 4.57, $ps < .01$. Furthermore, the *Accomplice Witness* was also rated as being more concerned about his own self-interest than *Jailhouse Informant*, $t$ (218) = 3, 57, $p < .01$, $d = .34$ or *Civic Duty Witness*, $t$ (218) = 2.31, $p < .02$, $d = .44$. It is important to note that even though the witness was receiving an incentive, participants did not significantly differentiate between the witness' truthfulness or trustworthiness compared to the witness who was not receiving an incentive. In addition, even though the witness was provided an incentive was rated as being more concerned about his own self interest and less interested in justice,

**Table 2** Means and standard errors for the conviction rates attributes and likelihood scores for Experiment 2

|  | Conviction rate | Trust | Truth | Justice | Own interest | Likelihood of guilt |
|---|---|---|---|---|---|---|
| *Accomplice* | | | | | | |
| No Incentive | 68.00 (9.52) | 5.84 (.57) | 6.36 (.62) | 5.68 (.59) | 7.60 (.58) | 74.32 (4.22) |
| No incentive explicit | 80.77 (7.88) | 5.96 (.49) | 6.15 (.56) | 5.58 (.58) | 7.77 (.43) | 77.38 (3.54) |
| Incentive | 88.00 (6.63) | 5.84 (.42) | 9.88 (3.82) | 5.60 (.50) | 6.08 (.61) | 77.44 (2.94) |
| Total | 78.95 (4.71) | 5.88 (.28) | 7.45 (1.29) | 2.78 (.32) | 7.16 (.33) | 76.38 (2.06) |
| *Jailhouse* | | | | | | |
| No incentive | 76.92 (8.43) | 5.92 (.36) | 6.77 (.46) | 6.46 (.45) | 5.00 (.47) | 78.62 (3.33) |
| No incentive explicit | 65.38 (9.51) | 4.88 (.41) | 4.85 (.53) | 4.76 (.54) | 8.46 (.36) | 65.38 (5.53) |
| Incentive | 84.00 (7.48) | 5.64 (.47) | 6.72 (.43) | 6.72 (.41) | 5.08 (.59) | 77.72 (3.90) |
| Total | 75.32 (4.95) | 5.48 (.24) | 6.10 (.29) | 2.48 (.29) | 6.19 (.32) | 73.91 (2.58) |
| *Civic duty* | | | | | | |
| No incentive | 66.67 (9.83) | 7.00 (.42) | 7.38 (.47) | 7.17 (.46) | 5.13 (.65) | 67.83 (5.18) |
| No incentive explicit | 72.00 (9.17) | 5.76 (.47) | 6.20 (.49) | 5.92 (.49) | 7.04 (.39) | 73.48 (4.31) |
| Incentive | 68.00 (9.52) | 5.64 (.45) | 5.84 (.50) | 6.60 (.49) | 4.72 (.53) | 67.60 (4.57) |
| Total | 68.92 (5.42) | 6.12 (.26) | 6.46 (.29) | 2.42 (.28) | 5.64 (.32) | 69.63 (2.69) |
| *Control* | 40.00 (10) | | | | | 55.24 (22.5) |

these attributions did not significantly influence guilt ratings or perceptions of culpability.

*Attribution Responses*

Participants answered an open-ended question regarding why the witness would come forward and testify. In order to assess participants' response to this question, independent raters were asked to indicate if the motivation of the witness was due to a situational factor (e.g., he was getting an incentive), a personal factor (e.g., he felt guilty), both, or neither. All the raters were provided with a sheet that classified types of answers with designations for situational (e.g. incentive, time off sentence, monetary reward) and personal (e.g. he felt guilty, he was a good person, he believed it was the right thing to do in the situation). The raters agreed on their ratings 92% of the time. A third rater settled the 19 disagreements. To check the reliability of the raters we calculated Cohen's Kappa (k) which is measure of agreement among raters. Kappa ranges from 0 to 1, with 0 representing no agreement among the raters and 1 representing perfect agreement. Kappa for these raters was .74, which represents a high agreement among the raters' choices. In order to assess whether the results were due to the fundamental attribution error, ratings that were attributed to personal factors were scored as 1. If the raters said both personal and situational, the response was scored as 2 whereas situational attributions were scored as 3 (Table 3).

It is clear from the data that participants were committing the fundamental attribution error; out of 227 witnesses,

173 or 73% indicated that the witness came forward due to personal factors as opposed to the situation. Given the low frequency counts for the situational and situational + personal attribution categories, we combined these two categories in an attempt to assess the influence of the manipulations on attributions of witness behavior (personal vs. other). Consistent with the fundamental attribution error, no significant relationship between participants' attributions of witness behavior were observed as a function of the *Incentive vs. No incentive* manipulation, $\chi^2$ (1) = 1.49, *ns*, *v* = .04. It appears that participants were committing the fundamental attribution error by ignoring the situation and overwhelmingly attributing the witness's behavior to personal factors.

**General Discussion**

Overall, the results can be simply summarized. First, juror conviction rates were unaffected by whether or not the cooperating witness received an incentive in exchange for his testimony—despite the fact that participants perceived the witnesses who received incentives as less interested in serving justice and more interested in serving self-interests. This was true for both Experiment 1 and Experiment 2. It is clear from Experiment 2 that participants were aware of the incentive as they were able to identify what the incentive was with high accuracy (over 90%). Thus, participants were cognizant of the fact that the witness in the incentive condition was receiving some form of compensation for his testimony, whether it be money or a reduced sentence, but this still did not affect the verdict decisions. Furthermore, having the defense directly asks about the incentive and the witness explicitly stating that he did receive an incentive had no effect on verdict decisions. Second, the presence of a secondary confession provided by a cooperating witness had a strong influence on conviction rates when compared with the absence of such testimony. This finding replicates prior research on the power of primary confession evidence in the courtroom (Kassin and Wrightsman 1981; Kassin and McNall 1991; Kassin and Sukel 1997). Third, the results appear to be consistent with the fundamental attribution error.

According to the fundamental attribution error hypothesis, perceivers overly cite internal motivation for behaviors without considering external factors in the environment (Kassin and Gudjonsson 2005; Ross 1977). In the current study, support for the fundamental attribution error occurred in that 85% of individuals attributed the witness' testimony to personal characteristics (i.e., felt guilty, feeling sorry for the family, etc.) or both personal and situational factors compared to 15% that attributed the witness' testimony to situational factors (i.e., reward,

**Table 3** Frequencies of the attributions per experimental condition

|  | Personal | Situational | Both | Total |
|---|---|---|---|---|
| *Accomplice* |  |  |  |  |
| No incentive | 19 | 5 | 1 | 25 |
| No incentive explicit | 20 | 4 | 1 | 25 |
| Incentive | 16 | 5 | 5 | 26 |
| Total | 55 | 14 | 7 |  |
| *Jailhouse* |  |  |  |  |
| No incentive | 25 | 0 | 1 | 26 |
| No incentive explicit | 19 | 4 | 2 | 25 |
| Incentive | 14 | 10 | 2 | 26 |
| Total | 58 | 14 | 5 |  |
| *Civic duty* |  |  |  |  |
| No incentive | 21 | 3 | 0 | 24 |
| No incentive explicit | 22 | 2 | 1 | 25 |
| Incentive | 17 | 1 | 7 | 25 |
| Total | 60 | 6 | 8 |  |
| Overall Total | 173 | 34 | 20 | 227 |

reduced sentence, etc.). Even though the witness in the incentive condition had an enormous motivation to fabricate testimony having been provided a situational incentive to testify, jurors were able to ignore this and vote guilty so that there were no significant differences between the incentive and no incentive conditions. Participants in this study were able to diminish the contextual influence of the incentive in favor of the dispositional attributions of trustworthiness and truthfulness in order to accept the testimony at face value. However, it is possible that future research could address the fundamental attribution error by including a condition that uses the two-step attribution model (Gilbert and Malone 1995). It is possible, according to this literature, that giving participants the resources and motivation that allow them to consider the incentive more carefully might moderate the non-significant effects of incentive seen in the present study. We have started by incorporating a former jailhouse informant as an expert witness for the defense to evaluate whether an expert for the defense will make mock jurors more sensitive to the effect of incentives on rewards.

An alternative explanation of the results may involve cognitive consistency. Cognitive consistency theory posits that people desire a state of balance in order to ease cognitive processing (Simon and Holyoak 2002). Considering that the participants completed their verdicts before they made their attributions, it is possible that this influenced their attributional ratings. Thus, in order to ease cognitive processing by retaining a state of balance, participants who voted guilty would then have to justify their verdict by indicating that the witness was honest and truthful. If this were the case then there should be differences in the attributions for people who voted guilty and not guilty in the witness type. In order to test this theory, we conducted an independent samples t-test between participants who voted guilty and not guilty for both samples in Experiment 1. The results seem to support the theory for cognitive consistency in that there were significant differences for truth, $t (294) = 11.03$, $p < .05$, and trust, $t (294) = 11.03$, $p < .05$, such that the ratings were higher for both truthfulness and trustworthiness for participants who voted guilty. The patterns of results were the same when both samples were analyzed separately. Future research should counterbalance the presentation of the verdict and the attributional questions for a more valid test of the cognitive consistency hypothesis.

One aspect of the findings that deserves mention is the effect of secondary confession evidence on jury decision-making. It is clear from these experiments and Kassin's prior research (Kassin and Gudjonsson 2005; Kassin and Neumann 1997) that mock jurors perceive primary confession evidence to be one of the most persuasive and compelling forms of evidence. In the present experiments, a secondary confession increased conviction rates in every condition relative to the *No-witness Control*. There are a few things to note about this finding. First, the secondary confession evidence was just that, secondhand information. The witness was not privy to the crime but was just reporting what he was told by the defendant. This was true even in the accomplice witness condition in that the witness did not see the defendant kill the boys. It is possible that the defendant did not commit the crime, but rather was covering for someone close to him. Therefore, the testimony by the accomplice witness can still be considered as a secondary confession. Second, the secondary confession evidence was presented in an extremely weak case as evidenced by the fact that in the control condition, participants voted guilty only 26% of the time (38% of College Sample and 14% of Community Sample). Third, when we asked participants what factors influenced their verdict, the modal response for participants who voted guilty in the both experiments (76% of College Sample and 66% of Community Sample) was the secondary confession evidence. These results are consistent with Kassin and Sukel (1997) who reported that mock jurors could not discount primary confession evidence when the confession was inherently biased and even when the judge had admonished them to do so.

Another issue that deserves mention is the lack of effect of Witness Condition in Experiment 2. In Experiment 1 participants in the civic duty condition voted guilty more often than in the other witness conditions. Close inspection of that data reveals that this effect is due in large part to the high number of guilty verdicts for the college sample in Experiment 1 ($M = 89.58$) which were much higher than guilty verdicts in either the community sample ($M = 58.30$) or the college sample in Experiment 2 ($M = 68.92$). It is unclear why college participants voted guilty more often than in the community sample. However, the data does support previous research by Sears (1986) that college students tend to be younger and are also more susceptible to information given to them by an authority figure (i.e. the court). These results do not distract from the major finding of the paper which is that incentive in no way influenced verdicts. This pattern was clear in both experiments.

There are some limitations of this study that are important to note. First, the results may have been different if the defense had addressed the incentive earlier in the trial transcript. In a real case, the defense attorney might be more persistent in ensuring that the jurors paid attention to the incentive and the effect the incentive may have on a person's testimony. In future studies, trial transcripts could include a more thorough cross-examination of the witness and details in the judges' instructions that alert the participants to the potential impact of the incentive on the witness. We have already begun this important work.

Another possible limitation is that the control trial transcript contained less evidence than that of the other trial transcripts (i.e., no secondary confession was provided by a cooperating witness). It is possible that the differences in the verdicts may have been due to the addition of this evidence rather than to the manipulation (i.e. secondary confession). However, given prior research that demonstrates the power of primary confession evidence, the results are likely to have been the same regardless of this limitation. It may also be possible that the attribution questions were affected by the verdict, given that the verdict was taken before the attributions were made. In future research, it may be important to address the possibility that these responses were simply matched to the verdict by varying the order in which the verdict and attributions were made. This design would allow for a test of cognitive consistency and may give insight into the role of the fundamental attribution error on verdicts.

## Practical Implications

The argument for the use of jailhouse informants and accomplice witnesses is that the statements from these witnesses may be the most solid evidence that the prosecution has in the case. This makes the accomplice witness necessary in the legal system and creates a policy conundrum of sorts because sometimes incentives are needed in order to make a witness come forward with truthful information. While this argument has some merit, it could be possible for the system to incorporate policies that allow the witnesses to be utilized and still protect the rights of the accused.

Presently the use of a cooperating witness creates an enormous problem for the criminal justice system because it can generate a situation in which the motivation of the witness is to procure the best deal by pleasing the prosecution, even if this means fabricating evidence (Bloom 2002). In response to the unreliable nature of testimony from informants, several courts and lawmakers have taken measures to protect the accused. In Illinois, for example, if a jailhouse informant is presented in a capital case, the judge must conduct a pretrial interview to determine the reliability of the testimony. In California, judges now instruct the jury to carefully scrutinize the testimony and consider how much the testimony from the informant might have been influenced by promises of leniency. Similar instructions have been adopted in Oklahoma, Mississippi, Montana, and Louisiana. However, these safeguards will be effective only if jurors can perceive the enormous incentive to fabricate evidence in exchange for leniency and differentiate between honest and dishonest witnesses. While evidence from prior research demonstrates that judicial instructions might have some potential regarding eyewitness identifications (Cutler et al. 1990;

Greene 1988; Katzev and Wishart 1985), the effect that judicial instructions have on secondary confessions from cooperating witnesses is yet to be determined. To the extent that judicial safeguards are ineffective, then the practice of using accomplices and informants may continue to lead to many wrongful convictions of innocent persons. Future research needs to determine the efficacy of such safeguards.

**Acknowledgements**  The authors give thanks to Aurora Torres and Michael P. Toglia for helpful comments on earlier versions of this manuscript. Grateful appreciation is also expressed to Adam Shipley, Michelle Davis, Daniel Neuschatz, Anita Quinlivan, and Christy Gray for their assistance during the data collection phase of this experiment.

## References

Bloom, R. M. (2002). *Ratting: The use and abuse of informants in the American justice system*. Westport, CT: Praeger Publishers.

Bornstein, B. H. (1999). The ecological validity of jury simulations: Is the jury still out? *Law and Human Behavior, 23*, 75–91.

Cassidy, R. M. (2004). Soft words of hope: "Giglio, accomplice witnesses, and the problem of implied inducements. *North Western University Law Review, 98*, 1–43.

Cutler, B. L., Dexter, H. R., & Penrod, S. D. (1990). Nonadversarial methods for sensitizing jurors to eyewitness evidence. *Journal of Applied Social Psychology, 20*, 1197–1207.

Dill, W. R. (1964). Desegregation or Integration? Comments about Contemporary Research on Organizations. In W. W. Cooper et al. (Ed.), *New perspectives in organization research* (pp. 39–52). New York: Wiley.

*Giglio v. United States*, 405 US 150 (1972) 405 US 150.

Gilbert, D. T., & Malone, P. S. (1995). The correspondence bias. *Psychological Bulletin, 117*, 21–38.

Greene, E. (1988). Judge's instruction on eyewitness testimony: Evaluation and revision. *Journal of Applied Social Psychology, 18*, 252–276.

Kassin, S. M., & Gudjonsson G. (2005). The psychology of confession evidence: A review of the literature and issues. *Psychological Science in the Public Interest, 5*, 33–67.

Kassin, S. M., & McNall, K. (1991). Police interrogations & confessions: Communicating promises and threats by pragmatic implication. *Law and Human Behavior, 15*, 233–251.

Kassin, S. M., & Neumann, K. (1997). On the power of confession evidence: An experimental test of the "fundamental difference" hypothesis. *Law and Human Behavior, 21*, 469–484.

Kassin, S. M., & Sukel, H. (1997). Coerced confessions and the jury: An experimental test of the "harmless error" rule. *Law and Human Behavior, 21*, 27–46.

Kassin, S. M., & Wrightsman, L. S. (1980). Prior confessions and mock juror verdicts. *Journal of Applied Social Psychology, 10*, 133–146.

Kassin, S. M., & Wrightsman, L. S. (1981). Coerced confessions, judicial instruction, and mock juror verdicts. *Journal of Applied Social Psychology, 11*, 489–506.

Katzev, R. D., & Wishart, S. S. (1985). The impact of judicial commentary concerning eyewitness identifications on jury decision making. *Journal of Criminal Law & Criminology, 76*, 733–745.

Mazur, E. P (2002). Rational expectations of leniency: Implicit plea agreements and the prosecutor's role as a minister of justice. *Duke Law Journal, 51*, 1333.

Oakes, W. (1972). External validity and the use of real people as subjects. *American Psychologist, 27*(October), 959–962.

Peterson, R. A. (2001). On the use of college students in social science research: Insights from a second-order meta-analysis. *Journal of Consumer Research, 28*, 450–461.

Rappold, S. (2005). Jailhouse informers: A risky bet. *The Gazette* Nov 20.

Ross, L. (1977). The intuitive psychologist and his shortcomings: Distortions in the attribution process. *Advances in Experimental Social Psychology, 10*, 174–221.

Schultz, D. P. (1969) The human subject in psychological research. *Psychological Bulletin, 72*(September), 214–228.

Sears, D. O. (1986). College sophomores in the laboratory: Influences of a narrow data base on social psychology's view of human nature. *Journal of Personality and Social Psychology, 51*(September), 515–530.

Simon, D., & Holyoak, K. J. (2002). Structural dynamics of cognition: From consistency theories to constraint satisfaction. *Personality and Social Psychology Review, 6*, 283–294.

*United States v. Singleton*, 144 F.3d 1343 (10th Cir. 1998).

Weick, K. E. (1967). Organizations in the Laboratory. In V. H. Vroom (Ed.), *Methods of organizational research* (pp. 1–56). Pittsburgh: University of Pittsburgh Press.