MICHAEL BAILEY
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1200
Los Angeles, CA 90012
Telephone (213) 894-3391

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>v.<br><br>Michael Lacey, et al.,<br><br>    Defendants. | No. CR-18-00422-PHX-SMB<br><br>**RESPONSE TO DEFENDANTS' MOTION TO DISMISS BASED ON OUTRAGEOUS GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE [DOC. 940]**<br><br>[REDACTED FOR PUBLIC DISCLOSURE] |

Undeterred by losing five prior motions to dismiss, and based on materials they've had for the better part of a year, Defendants now seek dismissal for a sixth time—asserting a claim of "outrageous government misconduct." Long on hyperbole, short on substance, Defendants' latest effort boils down to the notion that the government improperly learned from CEO Carl Ferrer that Backpage had invoked First Amendment, *mens rea* and Communications Decency Act (CDA) theories to rationalize the country's largest online marketplace for prostitution solicitations—the same theories that Backpage previously disclosed in courts around the country. This motion is unavailing for several reasons.

First, while Defendants complain that Backpage's CEO Carl Ferrer provided the government with privileged communications, the examples provided by Defendants do not involve typical privileged material, *i.e.*, emails, memoranda, recordings or other items revealing the substance of confidential communications between an attorney and client. (Doc. 940 at 11-12.) Rather, they are Ferrer's memories of Backpage's known business practices and public legal strategy. Defendants fail to establish the privileged nature of the statements identified in their Motion, which is their burden under federal law.

Second, these statements cannot be privileged because they have not remained confidential. Even if Defendants hadn't publicly asserted the same legal theories in scores of cases throughout the country over the last decade, Defendants revealed these theories in this case in their earliest filings. (*See, e.g.*, Docs. 23 and 26.) Simply put, it was no secret that Defendants would rely on First Amendment, *mens rea*, and CDA arguments to defend their operation of a website whose revenue-generating business model was overwhelmingly based on advertising the sale of adults and children for sex.

Third, even if these statements might once have been privileged, Ferrer, as Backpage's CEO, waived the privilege on behalf of the company. Defendants— Backpage's *former* owners, managers, and employees—have no authority to prevent that waiver. Defendants rely on Judge Logan's previous order as the "clearest evidence" of the government's misconduct. (Doc. 940 at 15.) Defendants, however, exaggerate the scope of Judge Logan's order, which "decline[d] to address the issue of whether Ferrer had

authority to waive Backpage's corporate attorney-client privilege" and instead made clear the ruling was "for the limited purpose of addressing the Government's access to the privileged emails" at issue in the government's motion. (Doc. 345 at 4.) Ferrer possessed the ability to waive privilege on Backpage's behalf and he has exercised that right.

Fourth, Defendants are unable to articulate any prejudice they have suffered. Ferrer's statements did not concern privileged trial strategy information. Accordingly, the burden does not shift to the government, but remains with Defendants to demonstrate prejudice. Defendants fail to articulate any prejudice here.

The government did not violate Defendants' Fifth and Sixth Amendment rights by "invading" attorney-client privileges. With no rights violated, Defendants' argument that the government engaged in outrageous conduct fails. Without any misconduct, Defendants' request for dismissal, or any other remedy, has no basis in fact. Defendants' motion should be denied.

## I.   RELEVANT FACTUAL BACKGROUND

### A.   Carl Ferrer Waived Backpage's Corporate Attorney-Client Privilege; Judge Logan's Limited Order

On April 5, 2018, Carl Ferrer executed a written waiver of the corporate attorney-client privilege held by Backpage.com LLC and various other Backpage-related entities. (Doc. 195-3.) Based on that waiver, among other reasons, the government sought an order from the Court confirming that Backpage's corporate attorney-client privilege had been waived and therefore the prosecution team could gain access to the emails and other communications that were in the filter team's possession. (Doc. 195 at 13.) On October 18, 2018, after further briefing (Docs. 235, 269, 324), the Court denied the government's motion in a limited order. (Doc. 345.)

The Court relied on the validity of a Joint Defense Agreement ("JDA") that "established joint-defense privileges" and "demonstrate[d] that the emails themselves are protected from disclosure." (*Id.* at 4.) Specifically, Judge Logan held: "for the limited purpose of addressing the Government's access to the privileged emails at issue, the Court

finds that the Government cannot use Ferrer's written waiver of attorney-client privilege to circumvent the terms of the JDA." (*Id.*)  Judge Logan added: "At this time, the Court declines to address the issue of whether Ferrer had the authority to waive Backpage's corporate attorney-client privilege based on the Defendants' argument that the attorney-client privilege was owned and later shared with Village Voice Media Holdings, LLC." (*Id.* at 4, n.4.)  The corporate waiver of Backpage's attorney-client privilege is an open issue in this matter.

### B. Defendants Filed This Motion Eight Months After Receiving Ferrer's MOIs And Six Months After The Substantive Motions Deadline

The government produced Ferrer's Memoranda of Interviews (MOIs) in August 2019. (Doc. 730.)  Two months later, Defendants filed nine substantive motions on October 18, 2019, the substantive motion deadline. (Doc. 664; *see* Docs. 775, 777, 778, 781, 782, 783, 784, 785, 786.)  One of those motions was a joint motion to dismiss the indictment in which Defendants argued the superseding indictment "should be dismissed for gross abuse of the grand jury process." (Doc. 782 at 6.)  That motion attached and relied heavily on Ferrer's MOIs to argue that Ferrer contradicted many of the statements included in the charging documents. (*Id.* at 9-11; Doc. 780.)  On January 9, 2020, the Court denied Defendants' motion. (Doc. 844.)  In their motion *in limine* to preclude certain expert testimony of Quoc Thai, filed several weeks ago, Defendants again attached Ferrer's MOIs. (Doc. 909 at Exs. B & C.)

In the instant motion, Defendants claim: "[W]hen the government finally provided its [MOIs] from the Ferrer interviews, the government's repeated invasions of Defendants' privileged communications became clear." (Doc. 940 at 10.)  All of this begs the question—if the serious allegations of misconduct now leveled by Defendants were so "clear" eight months ago, why wait until now to file this sixth motion to dismiss?

### C. Defendants' Examples Of "Privileged Communications"

Defendants cite 19 specific paragraphs among the 185-pages of Ferrer's MOIs that they believe demonstrate "repeated invasions of Defendants' privileged

- 3 -

communications."[1] (Doc. 940 at 10-12.) Defendants did not quote directly from the MOIs, but instead paraphrased Ferrer's statements. (*Id.*) However, to properly evaluate Defendants' claims, the actual statements should be reviewed. To assist in this review, the government groups the statements into the following categories, and quotes the full MOI paragraphs cited by Defendants, as follows:

  1. First Amendment, *Mens Rea*, or CDA Theories



---

[1] Defendants suggest that there are "many dozen" invasions into privileged communications beyond the "few examples" discussed in their motion. (Doc. 940 at 10.) Should Defendants raise new examples in their reply brief, the Court need not consider them. *United States v. Puchi*, 441 F.2d 697, 703 (9th Cir. 1971) (new point raised in reply brief need not be considered by the Court); *cf. Potter v. Dist. of Columbia,* 558 F.3d 542, 553 (D.C. Cir. 2009) (courts will not "hunt[ ] for truffles buried . . . the record") (citations and internal quotation marks omitted). In addition to being contrary to case law, if Defendants believed other invasions rose to the level of "outrageous conduct," they should have included them in their motion to permit the government a fair opportunity to respond.



- 
- 
- 

2. "Escort" Ads and Moderation

-

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

[2] This bracketed language appears in the MOI.

[redacted]

3. <u>Backpage's Sale to Ferrer</u>

- [redacted]

4. <u>Backpage's Decision to Accept Gift Cards</u>

- [redacted]

5. <u>National Center for Missing and Exploited Children (NCMEC)</u>

- [redacted]

6.   Continuing Operations Abroad

In total, seven out of the 19 paragraphs discuss the First Amendment, *mens rea*, and the CDA; eight of these paragraphs relate to escort ad moderation; and the final four touch on Backpage's sale, decision to accept gift cards, interactions with NCMEC, and a theoretical plan to continue operations abroad.

## II.   LAW AND ARGUMENT

### A.   Defendants Fail To Establish that Any Identified MOI Statements Are Privileged, And Have Waived Any Privilege Through Public Disclosures

The attorney-client privilege protects "[u]nder certain circumstances" confidential communications between clients and their attorneys. *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126 (9th Cir. 2012) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). Because this privilege "contravene[s] the fundamental principle that the public has a right to every man's evidence," the Ninth Circuit construes it narrowly. *Id.* (citations and quotations omitted); *United States v. Ruehle*, 583 F.3d 600, 609 (9th Cir. 2009) ("As the party asserting the privilege, Ruehle was obliged by federal law to establish the privileged nature of the communications and, if necessary, to segregate the privileged information from the non-privileged information.").

Courts have recognized several ways by which parties may waive the privilege. *In re Pac. Pictures Corp.*, 679 F.3d at 1126. "An express waiver occurs when a party discloses privileged information to a third party who is not bound by the privilege, or

otherwise shows disregard for the privilege by making the information public." *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003). It is well-understood that the mere fact that a person is a lawyer does not lay a cloak of privilege upon everything that lawyer prepares, sees, or hears. *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996). The party asserting privilege has the burden of showing that the privilege has not been waived. *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002).[3]

Here, Defendants have failed to carry their burden. *Ruehle*, 583 F.3d at 609. Defendants make "no effort to identify with particularity" how Ferrer's statements are privileged, let alone how any of his above-identified statements divulged the substance of any confidential attorney-client communications. Defendants fail to answer the most basic questions about why they believe Ferrer's statements are privileged, including: (1) "Which attorney was representing which party when the communications were made?"; (2) "Was it a privileged communication because of the JDA or for some other reason?"; (3) "Was the attorney a party to the JDA, if not, how is the statement privileged?"; and (4) "Did the statement reflect legal or business advice?" None of these questions is discussed, much less answered; rather, Defendants argue the Court can deem these statements privileged by simply reviewing the MOIs. (Doc. 940 at 7.) Defendants have made the same mistake as the trial court in *Ruehle* by "invert[ing] the burden of proof, improperly placing the onus on the government to show what information was not privileged." 583 F.3d at 609.

Even if Defendants established Ferrer's memories are privileged, it's clear that confidentiality has not been maintained. Indeed, from the earliest days of this case, Defendants have trumpeted their previous successes in defending their operation of Backpage based on the First Amendment, the CDA and *mens rea* in briefing before this Court. (*See, e.g.,* Doc. 23 at 2-4, 11-12; Doc. 26 at 1-2, 4-5, 10-11; Doc. 183 at 7-9; Doc.

---

[3] *See also, e.g.*, *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 and n.2 (9th Cir. 1992) (privilege proponent must demonstrate the following "eight essential elements: '(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.'" (citations omitted).

503 at 5-7; Doc. 561 at 15-19; Doc. 783, *passim*.) To the extent any of Carl Ferrer's memories about what occurred at Backpage years ago could be considered privileged, that privilege has been waived.

1. Public Disclosure of First Amendment, *Mens Rea* and CDA Theories

Defendants' legal defenses to civil and criminal liability are no secret. Defendants have publicly disclosed their defense theories regarding Backpage's operations, including reliance on the First Amendment, the CDA, and not possessing criminal intent, in a multitude of ways. First, Defendants made all these arguments in previous cases. *See, e.g., M.A. ex rel. P.K v. Vill. Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011) (ruling Backpage immune under the CDA and finding the company did not have *mens rea* to commit federal crimes); *J.S. v. Vill. Voice Media Holdings, L.L.C.*, 359 P.3d 714, 717 (Wash. 2015) (Washington Supreme Court upholding trial court's denial of Backpage's motion to dismiss noting "[t]his case turns on whether Backpage merely hosted the advertisements that featured J.S., in which case Backpage is protected by CDA immunity, or whether Backpage also helped develop the content of those advertisements, in which case Backpage is not protected by CDA immunity"); *Doe ex rel. Roe v. Backpage.com*, LLC, 104 F. Supp. 3d 149, 161 n.9 (D. Mass. 2015) (Backpage argued they did not possess the requisite *mens rea* "to make out a case under 18 U.S.C. § 1595"); *People v. Ferrer*, 2016 WL 7237305, at *2 (Cal. Super. Ct. Dec. 9, 2016) ("Defendants [including Lacey and Larkin] claim that the complaint and prosecution are: barred by the First Amendment, legally deficient under [the CDA], and devoid of any facts that constitute public offenses under the criminal statutes."); *People v. Ferrer*, No. 16FE024013 (Cal. Super. Ct. Aug. 23, 2017).[4]

Second, Defendants have repeatedly advanced these theories in this case, including in their very first filings in this matter. (Doc. 23 at 3-4 ("the government's underlying assumptions have been repeatedly litigated, and in each case, rejected on First Amendment

---

[4] This decision is unpublished, but Defendants attached it to a previous motion to dismiss. (Doc. 541-1.)

grounds"); Doc. 26 (same).) Third, Defendants' public disclosures have not been limited to court filings. For years, Don Bennett Moon publicly discussed the theories that Defendants now label as "privileged."[5] For example, in a memorandum to NCMEC staff in 2013, Moon wrote about Backpage's vigorous defense of "First Amendment rights," "immunity from civil claims under the [CDA]," the importance of and legal protection for anonymous internet speech, and the legality of accepting "gift or prepaid cards." (Memo. from Moon to John D. Ryan & Staca Shehan at 5-9, 14-15, attached as Ex. A.) Indeed, nearly every "privileged" communication identified by Defendants is discussed in this memorandum to a third party. (*See, e.g., id.* at 13-14 (opining on "user age and identification verifications regulations" and procedures).)

### 2. Public Disclosure of Ad Moderation Policy

The other chief category identified by Defendants as "privileged" relates to ad moderation, including Ferrer's reference to the company's receipt of an attorney memorandum on the subject. Ferrer's MOIs state that in ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ (2/5/19 MOI ¶¶ 80(a)-(b) (Ex. 15)); *see also* (4/17/18 MOI ¶ 7(c) (Ex. 10).) When a document is widely-circulated within a corporation, it loses any attorney-client protection, even if based on advice of counsel. *Sherwood v. BNSF Ry. Co.*, 325 F.R.D. 652, 661 (D. Idaho 2018) ("A corporation's legal compliance policy that serves as a reference or instructional guide to corporate employees is primarily a 'business' policy rather than a 'legal' policy, even if based on the advice of counsel."); *Stevens v. Corelogic, Inc.*, 2016 WL 397936, at *4 (S.D. Cal. Feb. 2, 2016) (documents that are shared "widely within the corporation" are not protected by the attorney-client privilege). Ferrer's recollections of these practices, which were circulated as "company policy" to Backpage's moderators, are not protected by the attorney-client privilege.

### 3. Defendants' Remaining Examples Aren't Privileged

---

[5] The government discussed Moon's role with Backpage in a previous motion. (Doc. 929 at 5.)

The few examples provided by Defendants that do not fit into either of the two categories discussed above also are not privileged.  Defendants point to statements made by Ferrer about shutting down Backpage's escort section.  (Ex. 11 at ¶ 143.)  Ferrer mentioned that he discussed this idea with Defendants Larkin and Brunst, along with several attorneys and that everyone agreed with the idea.  This isn't privileged. Ferrer wasn't seeking legal advice; he was making a business decision as Backpage's CEO. Moreover, Ferrer's recollection, as reflected in the MOIs, does not reveal the substance of any specific legal advice or analysis he might have received regarding this "idea."

Similarly, the paragraphs cited by Defendants that discuss Hemanshu Nigam are not privileged. (Ex. 14 at ¶¶ 23-24.)  The first paragraph states, ▓▓▓▓ ▓▓▓▓ (*Id.* at ¶ 23.) This isn't a "confidential communication."  It's not even a communication.  The next paragraph suggests that ▓▓▓▓ ▓▓▓▓ (*Id.* at ¶ 24.) Backpage's decision to remove The Erotic Review links is not privileged.  Ferrer's discussion does not reveal the basis for Mr. Nigam's recommendation, just a conclusion that Backpage adopted as a business decision.  Indeed, Defendant Padilla communicated this decision to Backpage employees stating the company's "internet safety experts" made the suggestion.  (Feb. 18, 2011 email from A. Padilla, attached as Ex. B.)  Further, this decision was shared in an email with a third-party public relations consultant (who appears to have had input in the decision). (Doc. 269-6 at 4) (listed under The Erotic Review category, "Inform moderators that all ID numbers that are not clearly marked as massage license authentication numbers should be removed upon discovery."); (*see also* Doc. 230 ¶ 100.)

The final two examples do not require much explanation.  First, Defendants claim Moon's presentation of an agreement for Ferrer to sign constituted a privileged communication.  (Doc. 940 at 11 (citing Ex. 10 at ¶ 45).)  But Ferrer makes clear Moon represented the sellers in the company's sales transaction, so no privilege could attach in

any communications between the two on this issue.[6] (Ex. 10 at ¶ 45.) Finally, Defendants argue Ferrer's discussion about Backpage moving operations to Europe was privileged. (Doc. 940 at 11 (citing Ex. 13 at ¶ 81).) A communication, however, cannot be privileged when there's no discussion between an attorney and her client. *Ruehle*, 583 F.3d at 607.

### B.    Carl Ferrer Waived Backpage's Attorney-Client Privilege

Carl Ferrer has the authority as Backpage's CEO to waive the company's attorney-client privilege. *See generally Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 349 (1985) ("[W]hen control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well. New managers . . . may waive the attorney-client privilege with respect to communications made by former officers and directors. Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties.").

The government has raised this issue previously, but the Court has not ruled on it. (Doc. 345 at 4, n.4.) Defendants counter this axiom by claiming that after Ferrer purchased Backpage, "he, Larkin, Lacey, and their respective companies entered into agreements providing that they would be represented jointly and would share privileges." (Doc. 235 at 7.) Defendants argue that this "joint representation" prevents the new owner of a company (Ferrer) from sharing *any* information stretching back to the company's inception, without consent from the sellers. This expansive interpretation flies in the face of controlling law that the attorney-client privilege "ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *Ruehle*, 583 F.3d at 607. If it were true that a company's sellers could prevent the buyers from disclosing any corporate privileged statements without the seller's consent, this tactic would be used liberally in sales transactions. When individuals sell a company, they lose the ability to prevent the new ownership from waiving the company's privilege as to previous

---

[6] Defendants provide no further explanation about how a conversation with opposing counsel could be considered privileged.

communications.[7]

### C.     Defendants Suffered No Constitutional Violations

Defendants argue that the government's "interference" with their attorney-client privilege violated their rights under the Fifth and Sixth Amendments. The governmental misconduct required to establish a due process violation under the Fifth Amendment must be so outrageous as to shock the conscience of the court. *United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027, 1048–49 (D. Nev. 2006) (citations omitted). Cases in which courts have found a due process violation justifying dismissal of an indictment or barring further prosecution are extremely limited. *Id.* (citing *Rochin v. California*, 342 U.S. 165 (1952)). This constitutional defense is reserved for "only the most intolerable government conduct." *Id.* (citing *United States v. Voigt*, 89 F.3d 1050, 1065 (3rd Cir. 1996)).

Similarly, the Sixth Amendment is violated "only when the government's action substantially prejudices the defendant." *United States v. Green*, 962 F.2d 938, 941 (9th Cir. 1992) (quotations and citations omitted); *see also United States v. Rogers*, 751 F.2d 1074, 1077 (9th Cir. 1985) (indictment may not be dismissed for government interference with the attorney-client relationship absent prejudice to defendant). In *Green*, the Ninth Circuit noted that defendant had not expressly argued he was prejudiced and found that "[a]lthough a defense strategy was revealed to the prosecutor, there is no indication that Green's ability to defend himself was impaired or that the government was able to utilize the information in any way." *Id.*

To justify dismissal, Defendants must meet a high bar. Defendants must show that law enforcement's conduct is "'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) (quoting *United States v. Russell*, 411 U.S. 423, 431-32 (1973)). Defendants raising such claims must meet an "extremely high standard."

---

[7] Defendants' "joint representation" argument could only apply to future privileged communications. Defendants concede that Ferrer did not have any "joint representation" agreements with Defendants before the sale. (Doc. 235 at 7.)

- 14 -

*United States v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir. 1993). Dismissal is "limited to extreme cases" in which the defendant can demonstrate that the government's conduct "violates fundamental fairness" and is "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011) (quoting *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991) (internal quotation marks omitted)). Accordingly, the "doctrine of outrageous government misconduct, although often invoked by defendants, is rarely applied by the courts." *SDI Future Health, Inc.*, 464 F. Supp. 2d at 1049.

Defendants fail to demonstrate the government's conduct shocked the conscience or violated fundamental fairness. At each interview, the government admonished Ferrer to avoid divulging joint defense privileged information. (4/5/18 MOI at 1-2 (Ex. 9); 4/17/18 MOI at 1 (Ex. 10); 5/10/18 MOI at 1 (Ex. 11); 7/26/18 MOI at 1 (Ex. 13); 12/14/18 MOI at 1 (Ex. 14); 2/5/19 MOI at 1 (Ex. 15); 5/13/19 MOI at 1 (Ex. 16).) While Defendants assert the MOI of the July 23, 2018 interview did not reflect the admonition (Mot. at 15, citing Ex. 12), the Motion fails to identify any allegedly privileged statements from that interview. (*Cf.* Mot. at 11-12.) Defendants next argue that, despite giving Ferrer these admonitions, "the government thereafter repeatedly questioned Ferrer, and elicited information from him, about communications with and advice of counsel." (Mot. at 9, n.3.) Yet, apart from making this overarching allegation, Defendants fail to detail any instances in the record where the government "repeatedly questioned" Ferrer about or "elicited" any privileged communications. Moreover, Defendants have failed to show that any statements identified in their Motion are privileged, much less that Defendants suffered prejudice so manifest that it has impaired their ability to defend themselves. Without any constitutional violations (and, as shown below, without any prejudice), Defendants' requests for dismissal or other remedies also fail.

### D. Defendants Do Not And Cannot Articulate Prejudice Suffered

Defendants rely almost exclusively on *United States v. Danielson* to support their argument that they suffered prejudice. 325 F.3d 1054 (9th Cir. 2003), as amended (May

19, 2003); (Mot. at 15-17, 22.) That case, however, is inapposite. In *Danielson*, the government improperly "obtained information about Danielson's trial strategy." *Id*. at 1067. The government "deliberately and affirmatively took steps, while Danielson was represented by counsel, that resulted in the prosecution team's obtaining privileged information about Danielson's trial strategy." *Id.* at 1059. Specifically, the government used an informant to record conversations with defendant about his trial strategy, including his plan to testify in his own defense and what arguments he would raise to counter the criminal charges. *Id.* at 1067. *Danielson* articulated the standard of what constitutes prejudice, and who has the burden of proof, "in a trial strategy case." *Id.* at 1070. The court ruled that "once the government has improperly interfered with the attorney-client relationship and thereby obtained *privileged trial strategy information*, the prosecutor has the 'heavy burden' of showing non-use." *Id.* at 1072 (emphasis added).

Critically, *Danielson* recognized that no prejudice exists if the defense has already revealed its trial strategy. The court wrote: "In [*United States v.*] *Irwin* [612 F.2d 1182, 1189 (9th Cir. 1980)], for example, we found no prejudice arising out of the prosecution's learning the defendant's trial strategy because . . . '[d]efense counsel had [already] revealed the nature of the defense in his initial conference with the prosecutor.'" 325 F.3d at 1070.

No matter how the Court views the Ferrer statements Defendants identified, there is no question that the statements do not involve Defendants' "privileged trial strategy information." First, Defendants learned about Ferrer's cooperation with the government almost immediately after their arrests. (Docs. 118-1 & 118-2.) Ferrer never had the opportunity to learn about Defendants' trial strategy. Without knowledge of trial strategy, no disclosure could occur. Second, the issues that troubled the *Danielson* court, including, disclosure of defendant's trial witnesses, non-public defenses to charges, and whether defendant would exercise his right to testify, are entirely absent here. 325 F.3d at 1067. The legal theories that Ferrer alluded to formed the cornerstone of Backpage's (and Defendants') publicly-filed defenses to civil and criminal litigation long predating this case. Defendants re-disclosed those defenses to the government in their earliest filings in

this prosecution, on April 9, 2018.  (*See* Docs. 23 and 26.)  Third, as shown above, Ferrer waived any conceivable privilege that could have still attached to that information.

Accordingly, the burden of proving prejudice remains with Defendants.  Defendants offer no specifics on the prejudice they suffered, choosing to argue generally that "the government now has deep insights into the defense's strategy and thinking, which it can use to guide its prosecution of this matter and to evaluate and prepare for any defense Defendants may put on."  (Doc. 940 at 17.)  Yet, the notion that Defendants would assert First Amendment, *mens rea* and CDA-based theories simply wasn't a secret, let alone a source of "deep insight" into Defendants' anticipated "trial strategy."  The Ninth Circuit has made clear that a defendant suffers no prejudice, even if the government improperly obtained his trial strategy, if he previously revealed the nature of his trial strategy.  *Irwin*, 612 F.2d at 1189; *see also Green*, 962 F.2d at 941; *SDI Future Health, Inc.*, 464 F. Supp. 2d at 1048.  Defendants' claim of prejudice doesn't reflect reality.

Moreover, in the years since their arrests in this case, Defendants have filed six motions to dismiss, including motions based on the First Amendment and *mens rea* (Doc. 561); the Communications Decency Act (Doc. 783); grand jury abuse (Doc. 782); the Fifth and Sixth Amendments (Doc. 456); and failure to allege necessary elements of the Travel Act (Doc. 746).  These motions also contain all the "privileged" trial strategies Ferrer purportedly identified.  Defendants' ability to defend themselves at trial has not been impaired.  *Green*, 962 F.2d at 941.

### III. CONCLUSION

The government did not violate Defendants' attorney-client privileges.  It follows that without any intrusion of these privileges, no constitutional violations occurred, and the government could not have acted outrageously.  The record is also devoid of any prejudice, substantial or otherwise.  Defendants' sixth motion to dismiss should be denied.

Respectfully submitted this 5th day of June, 2020.

MICHAEL BAILEY
United States Attorney
District of Arizona

*s/ Andrew C. Stone*
KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW C. STONE
Assistant U.S. Attorneys

JOHN J. KUCERA
Special Assistant U.S. Attorney

BRIAN BENCZKOWSKI
Assistant Attorney General
U.S. Department of Justice
Criminal Division, U.S. Department of Justice

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

**CERTIFICATE OF SERVICE**

I hereby certify that on this same date, June 5, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Zachry Stoebe*
Zachry Stoebe
U.S. Attorney's Office