1  Thomas H. Bienert, Jr. *(admitted pro hac vice)*
       tbienert@bmkattorneys.com
2  Whitney Z. Bernstein *(admitted pro hac vice)*
       wbernstein@bmkattorneys.com
3  BIENERT | KATZMAN, PC
   903 Calle Amanecer, Suite 350
4  San Clemente, CA 92673
   Telephone: (949) 369-3700
5  Facsimile: (949) 369-3701
   *Attorneys for James Larkin*
6
   Paul J. Cambria, Jr. *(admitted pro hac vice)*
7      pcambria@lglaw.com
   Erin McCampbell *(admitted pro hac vice)*
8      emccampbell@lglaw.com
   LIPSITZ GREEN SCIME CAMBRIA LLP
9  42 Delaware Avenue, Suite 120
   Buffalo, New York 14202
10 Telephone: (716) 849-1333
   Facsimile: (716) 855-1580
11 *Attorneys for Michael Lacey*

12 Additional counsel listed on next page

13

14                   **UNITED STATES DISTRICT COURT**

15                    **FOR THE DISTRICT OF ARIZONA**

16

17 United States of America,                CASE NO. 2:18-cr-00422-PHX-SMB

18              Plaintiff,                   **DEFENDANTS LACEY, LARKIN,
                                             BRUNST, AND SPEAR'S REPLY IN
19     vs.                                   SUPPORT OF MOTION TO DISMISS
                                             BASED ON OUTRAGEOUS
20 Michael Lacey, *et al.*,                  GOVERNMENT MISCONDUCT
                                             INVADING ATTORNEY-CLIENT
21              Defendants.                  PRIVILEGE**

22                                           **[ORAL ARGUMENT REQUESTED]**

23                                           Assigned to Hon. Susan M. Brnovich
                                             Courtroom 506
24
                                             Trial Date:        August 17, 2020
25

26

27

28

Gary S. Lincenberg (admitted pro hac vice)
    glincenberg@birdmarella.com
Ariel A. Neuman *(admitted pro hac vice)*
    aneuman@birdmarella.com
Gopi K. Panchapakesan *(admitted pro hac vice)*
    gpanchapakesan@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110
*Attorneys for John Brunst*

Bruce Feder (AZ Bar No. 004832)
    bf@federlawpa.com
FEDER LAW OFFICE, P.A.
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: (602) 257-0135
*Attorney for Scott Spear*

I.      **INTRODUCTION**[1]

The government does not dispute: (1) the lawyers whose communications and advice are at issue represented Defendants and/or their companies (and, in some cases, also Backpage); (2) the government repeatedly interrogated Ferrer about communications with those lawyers despite being informed repeatedly, by letters and court filings, that neither Backpage nor Ferrer could waive the privilege as to those lawyers; (3) at the same time it was interrogating Ferrer, the government sought Court approval to access Defendants' privileged communications with those same lawyers (among others) based on Ferrer's purported written waiver of privilege and on various other waiver theories (Dkt. 195); (4) during the hearing on the government's motions, when Defendants expressed concern that the government might already be invading the very same privileges through its questioning of Ferrer, the government withheld from the Court that it was already doing so; (5) Judge Logan rejected the government's waiver theories, holding that Defendants' joint representation and joint defense agreements with Backpage are "valid and enforceable" (Dkt. 338 ("Logan Order I") at 6) and that "the Government cannot use Ferrer's written waiver of attorney-client privilege to circumvent the terms of the JDA" (Dkt. 345 ("Logan Order II") at 4-7); and (6) despite that ruling, the government nonetheless intentionally continued to question Ferrer about communications with Defendants' lawyers for another six months.

The Response instead is just a thinly-veiled request for reconsideration of Judge Logan's orders, combined with baseless theories of waiver, such as that taking a position in litigation or correspondence waives the attorney-client privilege (without explaining why the government failed to assert those theories two years ago in its failed waiver motion). These theories are combined with the equally baseless claim that the government interrogated Ferrer only about non-privileged communications with counsel. Incredibly, the government even argues that Ferrer's statements do not reveal privileged communications because he merely shared his "memories" of privileged

---

[1] On June 10, 2020, the Court vacated the oral argument that had been set on June 19, 2020, for this motion. Dkt. 1017. The Court did so shortly after Defendants' request to hold the argument via video conference in light of the ongoing COVID-19 pandemic. Defendants object to the cancellation of the oral argument and request that it be rescheduled for a video conference hearing consistent with General Order 20-26 (May 28, 2020).

1  communications, rather than sharing emails or memoranda.  Resp. at 1, 9.

2      Defendants made a *prima facie* showing that the government intentionally invaded their

3  privileged communications, as required under *United States v. Danielson*, 325 F.3d 1054, 1071 (9th Cir.

4  2003), as amended (May 19, 2003).  Having done so, "the burden shifts to the government to show

5  that there has been . . . no prejudice to the defendant[] as a result of these communications."  *Id.* at

6  1071.  The government bears a "heavy burden."  *Id.* at 1072.  The government's attempt to parse

7  what it calls "typical privileged material, *i.e.* emails, memoranda, recordings or other items revealing

8  the substance of confidential communications between and attorney and client," versus Ferrer's

9  unrecorded oral statements about such communications, has no basis in law.  Resp. at 1.  The same

10  is true of the government's attempt to argue Judge Logan's order was "limited" and prevented the

11  government from accessing only privileged *written* communications, but not privileged *oral*

12  communications.  Resp. at 2.  Indeed, the government's choice to invade Defendants' privileges orally,

13  so the only records of its invasions would be its own self-serving MOIs, just underscores the need

14  for heightened judicial scrutiny and putting the government to the "heavy burden" of proving

15  Defendants were not prejudiced.  The Court should exercise both its role as guardian of a defendant's

16  constitutional rights as well as its inherent supervisory powers to send a strong message that such

17  misconduct will not be tolerated.

18  **II.**    **ARGUMENT**

19      **A.**    **The Government Intentionally Obtained Defendants' Privileged Communications.**

20

21      The government argues that Ferrer's statements cannot be deemed to reveal privileged

22  communications because Defendants did not sufficiently identify the basis for the privilege, citing

23  *United States v. Ruehle*, 583 F.3d 600 (9th Cir. 2009).  Resp. at 9.  *Ruehle* was an options backdating case

24  in which Broadcom's CFO claimed that his communications with company counsel were privileged.

25  The court held that the CFO's communications were not privileged because they were for the purpose

26  of disclosure to the company's outside auditors and therefore were not "made in confidence."  *Id.* at

27  609.  There is no parallel to the present case.  The Ferrer MOIs reveal that the government elicited

28  privileged communications clearly made in confidence, some to assess the propriety of business

1   conduct and others in anticipation of negotiations with adversaries or in anticipation of (extensive)

2   litigation.  *See* Under Seal and In Camera Declaration of James C. Grant, Dkt. 180-1 at ¶¶ 3-21 ("Grant

3   Decl."); Under Seal and In Camera Declaration of James Larkin ("Larkin Decl.").

4        Citing to *Ruehle*, the government argues that Defendants fail to answer four key questions to

5   establish privilege: (1) "Which attorney was representing which party when the communications were

6   made?'" (2) "Was it a privileged communication because of the JDA or some other reason?"; (3)

7   "Was the attorney a party to the JDA, if not, how is the statement privileged?"; and (4) "Did the

8   statement reflect legal or business advice?"  Resp. at 9.  In fact, these questions have been answered

9   repeatedly.  First, the MOIs set forth the attorneys involved, the topics raised and advice given, and

10  the questions posed and practices analyzed.  The Motion noted that all of these attorneys "were

11  Defendant's lawyers who were in a joint defense arrangement with Ferrer/Backpage or were both

12  Defendants' counsel and Backpage's counsel" subject to a joint representation agreement.  Mot. at 9;

13  *see also* Dkt. 226; Grant Decl. at ¶¶ 3-21.  It also explained, at length (as did Dkt. 226), that Ferrer

14  could not waive the privilege as to any of these communications because of the joint representation

15  and common interest agreements, as previously determined by Judge Logan.  *Id.*; *see also* Larkin Decl.

16        Second, the government has previously recognized that communications with these lawyers

17  were at least potentially privileged such that the prosecution team could not access them at their

18  whim, and, when it suited the government's purpose, it has acknowledged that these lawyers

19  represented Defendants or their companies.  S*ee*, *e.g.*, Dkt. 524 at 4 (Filter Team would filter potentially

20  privileged documents to look for each of these lawyers' names); Dkt. 195 at 4 ("Steve Suskin, an

21  attorney who served . . . as counsel to Village Voice Media Holdings"); Dkt. 925 at 2 ("Moon also

22  had a personal attorney-client relationship with Defendants Lacey and Larkin."), at 4 ("Defendants

23  hired McDougall as general counsel in February 2012"), at 6 (arguing statements by Attorneys Suskin,

24  Fifer, and Nigam are Defendants' authorized admissions).

25        Third, the nineteen examples of privilege invasions set forth in Defendants' motion answer

26  these questions on their face.  The examples identified the attorneys involved, the topics on which

27  legal advice was provided, and the advice given.  For instance, the Motion showed that the

28  government interrogated Ferrer about ████████████████████████████████

1 ██████████████████████████ (4/17/18 MOI (Ex. 10) ¶ 7; 2/5/19 MOI

2 (Ex. 15) ¶ 80).  The MOIs showed that the government questioned Ferrer about those legal

3 memoranda and the substance of the advice Defendants' counsel gave.  The Motion and MOIs

4 showed numerous instances where the government interrogated Ferrer about the legal advice

5 provided by specific lawyers on topics such as: █████████████████████████

6 ████████████████████████████████████████████████████

7 ██████████████ *See* Motion at 6-7; Resp. at 4-8.

8   Likewise, the cited discussions with attorney ████████ are privileged.  Judge

9 Campbell already ruled that communications with ████ could not be accessed by the government.

10 Dkt. 916-3 at 12-13.  The government now argues that Ferrer's statement – ████████████

11 █████████████ (Ex. 14 ¶ 23) – does not reveal a communication with an attorney.

12 Resp. at 12.  This is baseless.  Ferrer could only relate knowledge imparted by ████████ if there

13 was a communication with him.  Factual discussions with an attorney related to legal advice are

14 privileged.  *Upjohn Co. v. United States*, 449. U.S. 383, 389-90 (1981); *United States v. Chen*, 99 F.3d 1495,

15 1499-1500 (9th Cir. 1996).  Moreover, the MOI goes on to describe ████████████████

16 ██████████ obviously, recommendations are made through communications.  The fact that the

17 MOI "does not reveal the basis" for the recommendation (Resp. at 12) is irrelevant.  Legal advice

18 given by a lawyer is privileged, and an invasion occurs when that advice is revealed, even if all of the

19 analysis underlying that advice is not.[3]

20

[2] The government's distinction between "legal or business" advice sets up a false dichotomy.  The
21 attorney-client privilege covers a lawyer's "advice regarding the client's business affairs."  *United States*
22 *v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996).  There is no question that such is the case with the
 attorneys at issue here.   Thus, Ferrer's communications with lawyers about ███████████
23 ██████████████████ (5/10/18 MOI ¶ 143 (Ex. 11)) – are clearly privileged.  The MOIs make
24 clear that Ferrer told the government exactly what the attorneys advised.  Likewise, communications
 with Defendants' counsel about ████████████████████████████
25 ██████████ (7/26/18 MOI ¶ 81 (Ex. 13)) also were privileged communications.

26 [3] Perhaps recognizing this, the government pulls a bait-and-switch by arguing that "the decision"
27 resulting from that recommendation/demand is not privileged, and that the decision was shared with
 others.  Resp. at 12 (citing Gov. Ex. B).  But, of course, Defendants do not complain that Ferrer was
28 questioned about the decision that was shared, but about the privilege invasion.

The government suggests it questioned Ferrer only about Backpage's "known business practices and public legal strategy," *id.* at 1, but that suggestion is belied by the MOIs, which show repeatedly questioning of Ferrer about legal advice.  Legal advice is privileged, even if it relates to "known business practices and public legal strategy."  *See Upjohn*, 449. U.S. at 389-90; *Chen*, 99 F.3d at 1501.  The Motion and MOIs make clear that the government invaded Defendants' privileges, while targeting legal advice underpinning key issues the government claims created criminal liability for Defendants, making the government's conduct particularly pernicious.

### B.  The Government Violated and Cannot Re-litigate Judge Logan's Order.

The government claims it could question Ferrer about communications with Defendants' lawyers because Ferrer waived Backpage's privilege.  The government made the very same argument before (Dkt. 195 at 10), and Judge Logan rejected it and held that the government could not rely on Ferrer's purported waiver.  Logan Order II.  Judge Logan ruled that Ferrer could not waive privilege without the consent of all parties to the joint representations and joint defense agreements (*i.e.* Defendants and their companies)—and he did not have that consent.  Therefore, Judge Logan ruled that the parties' agreements "*prevent Ferrer from waiving Backpage's attorney-client privilege.*"  *Id.*

The government acknowledges its prior attempt to argue the very same theory it advances here, and Judge Logan's rejection of that attempt, but claims the Court issued only a "limited order." Resp. at 2.  The government's claim is apparently meant to suggest the Logan Order II applied only to written communications (Resp. at 2), though the government makes no substantive argument on this point (*see id.* at 13).  Perhaps obviously, Judge Logan's ruling that the parties' joint representation and defense agreements were valid and precluded Ferrer from waiving privileges applies with equal force to all attorney-client communications in whatever form, whether written or oral.  Indeed, in the government's motion that Judge Logan denied, it specifically sought access to emails with *the very same* attorneys about whom they subsequently questioned Ferrer.  (Dkt 195 at 4.)  Thus, the government clearly knew it was not permitted to invade these privileged communications based on Ferrer's purported waiver.

Judge Logan's rejection of that motion meant that the government could not go into communications with these lawyers, period.  In fact, Judge Logan concluded that, under the joint

representation agreements Ferrer and Backpage entered into, Ferrer could not waive privileges as to any of the attorneys at issue without the consent of the other jointly represented parties (including Messrs. Larkin and Lacey).[4]  For this reason, Judge Logan found it unnecessary to reach Defendants' additional arguments that Ferrer as the acquiring party had no right to waive privileges as to third parties, because such privileges were jointly held with the selling companies.  Logan Order II at 4, n.4.  This is the law of the case.  *See* Dkt. 226 at 16-18.  Ferrer's purported waiver was insufficient to give the government access to the privileged communications, and there is no cause to re-litigate it.[5]

The government began its interviews of Ferrer by inappropriately and unilaterally invading Defendants' privileges without a court order allowing the invasion.  *United States v. Pederson*, 2014 WL 3871197 (D. Or. Aug. 6, 2014) ("It should go without saying that, regardless of the content, private communications between a defendant and his or her defense team should be treated as privileged unless otherwise ordered by the court.").  It then showed that it did so intentionally, when it flouted Judge Logan's order and continued to invade the privilege again and again.  Indeed, the government does not deny that it made no changes to its interview practices *vis-à-vis* Ferrer even after Judge Logan's order issued.[6]   The government's continued invasion of Defendants' privileged communications after the Court ruled it could not access them was contemptuous and inexcusable,

---

[4] Judge Logan already rejected the government's argument that the joint representation agreement was only "forward looking" (Resp. at 14) when he ruled that it applied to *all* communications with these lawyers.  Logan Order II.

[5] For the same reason, the government's argument that attorney ███████ conversations with Ferrer during the sale of Backpage were not privileged is incorrect.  Moreover, as Defendants previously explained (Dkt. 226 at 4-5, 16-18) and Judge Logan accepted, communications with attorneys – even during the sale – were subject to the same restrictions under the Common Interest Agreement; Ferrer could not unilaterally waive those privileges.  Thus, while the government argues that "no privilege could" cover such communications (Resp. 12-13), in fact, Judge Logan held exactly the opposite (Logan Order II).

[6] The government asserts it "admonished Ferrer to avoid divulging joint defense privileged information" (Resp. at 15), as if that somehow overrides Defendants' challenges about what actually happened in the interviews, *i.e.*, the government's queries and discussions with Ferrer about obvious attorney-client communications.  A lip-service admonishment to a cooperator bent on pleasing the government cannot excuse subsequent, blatant privilege invasions, especially when the invasions were so clear and continued even after Judge Logan ruled that the government could not undertake such invasions.

REPLY IN SUPPORT OF MOTION TO DISMISS BASED ON OUTRAGEOUS GOVERNMENT MISCONDUCT

1   made even worse by the fact that, during the hearing before Judge Logan on October 5, 2018 (Dkt.

2   348 at 91-92), the government intentionally sat silent when the question arose of whether the

3   government already was accessing through its interviews of Ferrer the very same privileged

4   information it sought permission from the Court to invade.

5       **C.**    **Defendants Did Not Waive Privilege By Litigation, Memos, or Policies.**

6          The government claims Defendants waived the attorney-client privilege by taking successful

7   legal positions in court to defeat claims parallel to those the government has asserted here and by

8   asserting legal positions in this case.  Resp. at 1, 10, 11.  The government also asserts that letters or

9   memoranda to third parties, and company policies, effectuated a similar waiver.  Resp. at 11 (citing

10  Gov Ex. A; 2/15/19 MOI ¶¶ 80(a)-(b) (Ex. 15); and 4/17/18 MOI ¶ 7(c) (Ex. 10)).[7]  The government

11  offers no authority for its positions, because there is none.[8]  The government improperly conflates

12  private attorney-client communications with an attorney's public arguments or the other publicly-

13  stated positions of a company; neither waives the privilege as to attorney-client communications and

14  work product simply because they relate to those positions.  If the government was correct, and the

15  assertion of a legal position in litigation (or in public statements) effected a waiver of all underlying

16  privileged communications, then Defendants would be entitled to obtain all internal DOJ

17  communications about the government's positions and theories reflected in the indictment, in the

18  scores of pleadings in this case and related cases, and in public statements about those cases.  Indeed,

19  if the government was correct, the attorney-client privilege would be decimated, as acting on most

20  legal advice would result in a waiver of the privilege.  That is not the law.  Clients often consult with

21  attorneys to decide on positions to take in litigation or in other public fora.  The attorney-client

22

23  [7] Government Ex. A is a letter from attorney ███████ to NCMEC.  Nowhere in attorney ███

24  letter does he disclose what he discussed with his clients, what those clients told him, and the legal
    advice that resulted.  Instead, he advocates legal positions in an attempt to persuade NCMEC.

25  Likewise, in regard to the circulated policy, it is not the attorney memorandum that was circulated
    widely, but a policy document that contained one point that was also in the attorney memorandum.

26  [8] In support of the assertion that circulating a policy waives the privilege, the government cites two

27  cases that hold that a company policy is not privileged.  Resp. at 11.  These cases are irrelevant; it is
    the government's admitted discussion with Ferrer of the privileged attorney communications, not the

28  company policy, that was improper.

privilege and the work product doctrine are intended "to encourage full and frank communications." *Upjohn Co. v. United States*, 449. U.S. 383, 389-90. The government's position that taking a public position waives the privilege and lays bare all attorney communications on the subject is nonsense.[9]

## C.    The Government Cannot Escape Its "Heavy" Burden to Prove Lack of Prejudice or Shift that Burden to Defendants.

The government seeks to flip its burden to the defense, arguing Defendants have not "proven" prejudice. The great difficulty for any defendant to prove prejudice in a scenario such as this is exactly why the Ninth Circuit puts the "heavy" burden of proving a lack of prejudice on the government. *Danielson*, 345 F.3d at 1071-72.[10]

The claim that Ferrer was not familiar with Defendants' trial strategy because he began cooperating shortly *after* the case was indicted (Resp. at 16) is disingenuous. Backpage was the target of legal claims and attacks for more than a decade. Village Voice Media Holdings, LLC ("VVMH") and Backpage engaged and worked with lawyers to defend the website and uphold speech and publisher's rights, successfully defending numerous cases. Throughout this time, Backpage consulted lawyers about moderation, website practices, disclosures, and positions to prevent and preclude improper third-party content. VVMH, Backpage, Ferrer, Larkin, and Lacey also dealt with and defended criminal accusations. In 2012, the government commenced a grand jury investigation in

---

[9] *See, e.g.* Cardiac *Pacemakers, Inc. v. St. Jude Med., Inc.*, 2001 WL 699889, at *1 (S.D. Ind. Apr. 26, 2001) ("Defendants seem to be arguing that when a lawyer talks with an adverse party about an issue, that conversation might have 'divulged the content' of the lawyer's private, privileged documents on the same subject so as to waive applicable privileges. That theory is a non-starter. Acceptance of the theory would destroy both privileges. … [I]t is not unusual for a client to hope its lawyers will communicate on its behalf with adverse parties concerning the subject of the representation. That's usually the point of the representation.") (citing *Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.*, 62 F.R.D. 454, 458 (N.D.Ill.1974) (rejecting a similar waiver argument)); *see also Am. Optical Corp. v. Medtronic, Inc.*, 56 F.R.D. 426, 431-32 (D. Mass. 1972) (taking "positions on legal issues [] during negotiations," "like litigation itself," does not "waive the attorney client privilege") (citing *I.B.M. Corp. v. Sperry Rand Corp.*, 44 F.R.D. 10, 13, and 13,n. 2 (D. Del. 1968).)

[10] The government argues that *Danielson* is limited to privileged trial strategy information. Resp. at 15-17. While *Danielson* dealt with trial strategy information, the process it lays out for evaluating prejudice resulting from privilege invasions is by no means limited to it. Additionally, the government *concedes* the privileged communications identified by Defendants dealt with trial strategy by arguing the privilege was waived by Defendants exposing their strategy through filings in this and other cases.

1    the W.D. Washington, which ended in early 2013 when the federal court there quashed the grand

2    jury's subpoenas and expressed grave concerns about the government's effort to pursue charges based

3    on a novel and unprecedented theory of vicarious website liability.  In that proceeding, VVMH and

4    Backpage demonstrated that the government's attack on Backpage and its owners had debilitating

5    flaws, given the website's extensive efforts to prevent improper content, the website's unparalleled

6    cooperation with law enforcement, and the burdens the government would face in prosecuting an

7    online publisher of third-party speech.  Having failed in Washington, the government instead

8    proceeded with the same prosecution theory in Arizona, so Ferrer was privy to several years of legal

9    work preparing for the potential of an indictment that issued in Arizona.  Moreover, in 2017, Larkin,

10    Lacey, and Ferrer obtained dismissal of two prosecutions by the California A.G. (brought in

11    conjunction with the government), with each court rejecting all charges that Backpage/Larkin, Lacey,

12    and Ferrer facilitated or promoted prostitution (or engaged in money laundering on that basis) by

13    publishing third-party ads.  *People v. Ferrer*, 2016 WL 7237305 (Sup. Ct. Sacramento Cty. Dec. 9, 2016);

14    *People v. Ferrer*, No. 16FE024013 (Sup. Ct. Sacramento Cty. Aug. 23, 2017).

15       Thus, by 2018, when the government started interviewing Ferrer about privileged

16    communications, he had been involved in privileged discussions regarding strategies for the defense

17    of Backpage, its executives, and its owners for a decade.  Knowing those strategies had been

18    successful in the past, and that its case had serious flaws, the government intentionally invaded these

19    areas with Ferrer to learn specifically what advice was given by counsel and what practices were

20    discussed with counsel.  The government sought to elicit from Ferrer ways to override the actions

21    taken by the website and Defendants that previously failed to establish to criminal liability.

22       The prejudice to Defendants is manifest.  Knowing the fundamental flaws of their prosecution

23    in light of Backpage's actual practices and the numerous court decisions involving Backpage, the

24    government set out to probe attorney-client communications, and actions in response to attorney

25    advice, to try to find ways to attack or undermine anticipated defenses.  If allowed, this would be an

26    incredibly powerful–and prejudicial–tactic for the government.  Particularly where, as here, the central

27    issues in the case involved extensive input from counsel, it would be extraordinarily prejudicial to a

28    defendant if the government can invade privileges at will to fish out potential areas of attack.

In any event, *Danielson* instructs exactly how the Court should deal with a situation like this: hold an evidentiary hearing and put the government to its "heavy burden." *Danielson*, 345 F.3d at 1071-72. Such a hearing would flesh out the specific questions asked of Ferrer and the specific answers given. It would allow the Court to gather details relating to Ferrer's answers – including when and why these attorney communications took place. It would allow the Court to explore how and why the government continued to invade the privilege even after Judge Logan's ruling, and determine the appropriate remedy.

## III. THE GOVERNMENT'S BROADER PATTERN OF INVASIONS

While the government claims that Defendants delayed in filing this Motion, if anything, Defendants were forced to file it before Defendants were able to fully address the broader pattern of the government's disdain for the attorney-client privilege. What is nonetheless clear is that the government appears to be violating Filter Team protocols and using the Filter Team to signal areas for the prosecution team to explore. Some of this requires further discovery that the government has been reticent to provide. While Defendants had hoped to gather a complete record of this pattern of misconduct prior to filing this Motion, the government's delay in providing discovery, coupled with the pending trial date, left Defendants no choice but to present the issue to the Court at this time.

As just one other example, the Court need look no further than the government's misrepresentations to this Court on April 23, 2019. At that time, the Court considered, *inter alia*, Defendants' concern that the Filter Team would unilaterally decide that potentially privileged documents (*i.e.* those with "hits" on terms indicating privilege) were not privileged. The prosecutors assured the Court that the Filter Team would not turn over potentially privileged documents to the Prosecution Team without getting either Defendants' agreement or a Court order. Based on the government's representation, the Court denied Defendants' then-pending motion to modify the Filter Team protocol. *See* Doc. 577, pp. 5-13. Yet, as Defendants just recently learned, *three weeks after the April 2019 hearing*, the prosecutors issued a written protocol to the Filter Team allowing the Filter Team to do exactly what it told the Court *would not happen*, *i.e.*, allowing the Filter Team to give the prosecution team documents that "hit" for privilege but which the Filter Team unilaterally determined were not privileged, without notice to Defendants or the Court. Exhibit A, May 15, 2019 Filter Team

Memo (filed under seal).  As Defendants also just learned, apparently following that protocol, the Filter Team gave the prosecution team 955 emails sent to/from Defendants' counsel – including emails marked "ATTORNEY-CLIENT PRIVILEGED" – without telling Defendants or the Court.

This separate invasion of Defendants' privileges shows the government's invasion of Defendants' privileges with Ferrer was no accident or oversight but part of a broader pattern of misconduct.  The government has a serious problem with candor to the Court, with candor to Defendants, and with knowingly and intentionally invading Defendants' privileges.  The government's conduct has been, by any definition, outrageous.  Defendants will raise the additional points with the Court soon.

## III.    CONCLUSION

The government repeatedly and intentionally invaded Defendants' privileges, even after Judge Logan rejected the waivers on which the government purportedly relied to justify its conduct.  The government never told Judge Logan that, at the very time he was considering the purported waivers, the prosecutors were already using them as a basis to elicit privileged communications from Ferrer.  Now, confronted with its repeated and brazen violations of Defendants' privileges and the Court's orders, the government tries to defend itself with positions that have no bases in law or fact.  The Court should reject the government's baseless excuses for its serious misconduct and, if it is not prepared to dismiss the case entirely, order an evidentiary hearing as contemplated by *Danielson*.

DATED:  June 15, 2020                         Thomas H. Bienert, Jr.
                                              Whitney Z. Bernstein
                                              BIENERT | KATZMAN PC

                                              By:   _____*s/Whitney Z. Bernstein*_____
                                                        Whitney Z. Bernstein
                                                    Attorneys for Defendant James Larkin

*Pursuant to the District's Electronic Case Filing Administrative Policies and Procedures Manual (May. 2020) § II (C) (3), Whitney Z. Bernstein, hereby attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized its filing.*

REPLY IN SUPPORT OF MOTION TO DISMISS BASED ON OUTRAGEOUS GOVERNMENT MISCONDUCT

DATED:  June 15, 2020

Paul J. Cambria, Jr.
Erin McCampbell
LIPSITZ GREEN SCIME CAMBRIA LLP

By:    _____s/ Paul J. Cambria, Jr._____
            Paul J. Cambria, Jr.
       Attorneys for Defendant Michael Lacey

DATED:  June 15, 2020

Gary S. Lincenberg
Ariel A. Neuman
Gopi K. Panchapakesan
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.

By:    _____s/ Gary S. Lincenberg_____
            Gary S. Lincenberg
       Attorneys for Defendant John Brunst

DATED:  June 15, 2020

FEDER LAW OFFICE, P.A.

By:    _____s/ Bruce Feder_____
            Bruce Feder
       Attorneys for Defendant Scott Spear

1

**CERTIFICATE OF SERVICE**

2        I hereby certify that on June 15, 2020, I electronically transmitted the attached document to

3   the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic

4   Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

5

6                                      */s/ Toni Thomas*
                                      Toni Thomas

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28