**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-00422-001-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Michael Lacey, et al. | |
| Defendant. | |

The Court is in receipt of Defendants' Motion in Limine to Preclude Certain Expert Testimony of Quoc Thai, (Doc. 909), to which the Government responded. (Doc. 952.) Defendants requested oral argument, but the Court declines to hold oral argument on the motion, finding that it is unnecessary. The Court has considered the pleadings and the applicable law and now issues the following ruling.

## I.   BACKGROUND

On July 25, 2018, a federal grand jury returned a one hundred count superseding indictment against several of the Defendants in this case alleging that the Defendants engaged in various crimes related to the operation of the website Backpage.com ("Backpage"), including conspiracy to violate the Travel Act, substantive Travel Act violations, conspiracy to commit money laundering, and substantive counts of money laundering. (Doc. 230.) Defendants bring this motion to move the Court in limine for an order precluding the admission of certain expert testimony from Special Agent Quoc Thai that the Government seeks to offer at trial. According to the Government's Initial Expert

Disclosures, "Special Agent Thai will testify about (1) the financial structure of Backpage and its various corporate entities and (2) Backpage's use of various payment systems to include virtual currency." (Doc. 422 at 2.) With regard to the details of his testimony, the Government stated:

> Special Agent Thai will explain the how the financial records show the flow of funds to and from various entities and financial institutions over the past decade, and how the funds were expended and transferred from Backpage accounts domestically and internationally. Special Agent Thai will also testify about: (1) centralized and decentralized virtual currencies (i.e., bitcoin, bitcoin cash); (2) the sale or exchange of virtual currencies; (3) the use of virtual currencies to pay for goods or services: (4) the anonymity the use of virtual currency provides; (5) the mechanics of transferring virtual currency from wallet to wallet or person to person; (6) the identification of origination and destination addresses through analysis of the blockchain code; (7) the price fluctuation over time of virtual currency, and the conversion and exchange of virtual currency to a "fiat money system" or "fiat currency system" or simply put, regular currency. Special Agent Thai will explain Backpage's use of virtual currency and how the money flowed through its various domestic and international entities. Additionally, Special Agent Thai will explain Backpage's use of third-party payment processors, who processed and received customer payments originating from virtual currency payments, credit card payments, check & money order payments, and gift card payments. Special Agent Thai will further explain how these payments flo [sic] from purchasers of Backpage advertisements and follow their flow to the accounts and purchase of assets by Backpage and Backpage officers and owners.

(Doc. 422 at 2-3.) While Defendants concede that Agent Thai "may serve as a summary witness with respect to the financial transactions underlying the indictment's money laundering counts," they argue the remainder of his testimony should be excluded. (Doc. 909 at 1-2.)

Defendants argue Agent Thai's testimony should be precluded for several reasons. First, Defendants argue that any of Agent Thai's testimony "purporting to explain the motivation for a financial transaction, or opinion that the transactions are consistent with money laundering or other criminal conduct" should be excluded because such testimony

"impermissibly impinge[s] on the jury's function to determine whether Defendants had the requisite state of mind." (*Id.* at 1.) Second, Defendants argue Agent Thai's testimony is "problematic" because he also served as a case agent in the investigation of the Defendants and was present at the interviews of two cooperating witnesses. (*Id.* at 1-2.) Defendant suggests this fact means "Thai's purported independent information is inextricably intertwined with information he learned from Ferrer and Hyer[,]" and that the effect of such testimony would circumvent the rules of hearsay. (*Id.* at 2.) Third, Defendants argue that the Court should categorically disallow expert testimony regarding virtual currency. (*Id.* at 7.) As grounds, Defendants argue that none of the indictment's counts involve transactions of virtual currency, and that the "only possible purpose for such testimony would be to distinguish virtual currency from other forms of payment, so as to create the impermissible inference…that its use is associated with criminality." (*Id.*)

## II.   LEGAL STANDARD

"Under Rule 702, an expert may offer 'scientific, technical, or other specialized knowledge' if it 'will assist the trier of fact to understand the evidence,' provided the testimony rests on 'sufficient facts or data' and 'reliable principles and methods,' and 'the witness has reliably applied the principles and methods to the facts of the case.'" *Merritt v. Arizona*, No. CV-17-04540-PHX-DGC, 2020 U.S. Dist. LEXIS 196989, at 4* (D. Ariz. Oct. 22, 2020) (quoting Fed. R. Evid. 702(a)-(d)). "The proponent of expert testimony has the ultimate burden of showing that the proposed testimony is admissible." *Id.* (citing *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996)). The admissibility of expert testimony is a preliminary question the Court must decide under Federal Rule of Evidence 104(a); the Court must find the testimony admissible by a preponderance of the evidence. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993); *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). In a criminal case, even when an expert is properly qualified to give an opinion, the expert "must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.

Those matters are for the trier of fact alone." Fed. R. Evid. 704(b)

Like all other evidence, the admissibility of expert testimony must run the gamut of Rule 401 and Rule 403. *See, e.g.*, *United States v. Hankey*, 203 F.3d 1160, 1167, 1171-72 (9th Cir. 2000) (discussing Rule 401 and Rule 403 in conjunction with the admissibility of expert testimony). "Evidence may not be admitted at trial unless it is relevant, as defined by Rule 401 of the Federal Rules of Evidence." *United States v. Vellejo*, 237 F.3d 1008, 1015 (9th Cir. 2001). "Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* (citing Fed. R. Evid. 401). "Relevance is not a strict test." *United States EEOC v. Placer ARC*, 147 F. Supp. 3d 1053, 1062 (C.D. Cal. 2015) (quoting *United States v. Miranda-Uriarte*, 649 F.2d 1345, 1353 (9th Cir. 1981)). "As the words 'any tendency' suggest, it is typically quite a 'low bar to the admissibility of evidence.'" *Id.* (quoting *Capitol Specialty Ins. Corp. v. Beach Eatery & Surf Bar, LLC*, 36 F. Supp. 3d 1026, 1037 (E.D. Wash. 2014)). Further, under Rule 403 "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. When evidence is minimally relevant, it is likely to be minimally probative as well. *United States v. Wiggan*, 700 F.3d 1204, 1213 (9th Cir. 2012). Excluding otherwise relevant evidence under Rule 403 is "an extraordinary remedy to be used sparingly." *United States v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995) (quotation marks and citations omitted).

## III.   ANALYSIS

### A. Agent Thai's Opinions Supporting the Defendants' Mental State

Defendants first argue that Agent Thai should not be permitted to testify regarding the purpose of various Backpage financial transactions. (Doc. 909 at 8.) That is, Defendants argue that Agent Thai should not be allowed to opine that certain transactions were "unusual," or "consistent with money-laundering strategies," and that Agent Thai should

not be allowed to affirmatively argue that a given transaction's purpose was to "conceal" funds or "fool" credit card companies. (*Id*. at 8-9.) According to Defendants, such testimony would in essence offer an opinion on the ultimate issue of the Defendants' mental state in making certain transactions. (*Id*. at 9); *see also* Fed. R. Evid. 704(b). Defendants further argue that such testimony would also not be based upon any expertise of the witness, but would in reality simply be Agent Thai's recitation of information learned from the Government's cooperating witnesses, a violation of the rule against hearsay. (*Id*.) Finally, in a single paragraph, Defendants allege that Agent Thai's role as an IRS agent does not qualify him to opine on the purpose of the relevant transactions. (*Id*. at 10.)

i.   *Rule 704(b): Opinion on an Ultimate Issue*

Under Federal Rule of Evidence 704(b), "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." However, "Rule 704(b) does not bar testimony supporting an inference or conclusion that a defendant does or does not have the requisite mental state, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony." *United States v. Hayat*, 710 F.3d 875, 901-02 (9th Cir. 2013) (quoting *United States v. Younger*, 398 F.3d 1179, 1189 (9th Cir. 2005)). For example, "[g]overnment experts may 'testify as to the general practices of criminals to establish the defendants' modus operandi' which 'helps the jury to understand complex criminal activities, and alerts it to the possibility that combinations of seemingly innocuous events may indicate criminal behavior.'" *United States v. Freeman*, 498 F.3d 893, 906 (9th Cir. 2007) (quoting *United States v. Valencia Amezcua*, 278 F.3d 901, 908-09 (9th Cir. 2002)). In light of this, courts have routinely drawn the distinction between an expert's testimony as what facts might generally infer about a typical person's mental state, and testimony that directly opines about the mental state of the *particular defendant* on trial. *See, e.g., United States v. Anchrum*, 590 F.3d 795, 804-05 (9th Cir. 2009); *Freeman*, 498 F.3d at 906; *Younger*, 398

F.3d at 1189-90 ("the expert never directly commented on *defendant's* mental state, and the jury could have accepted his testimony and still infer that defendant was atypical." (emphasis in original)); *United States v. Gonzales*, 307 F.3d 906, 911-12 (9th Cir. 2002) ("[the expert] never directly and unequivocally testified…that [the defendant] had the intent to distribute. Rather, he indicated his firm conviction that a "person" possessing the evidence in question would, in fact, possess the drugs for the purpose of distributing.").

In light of the above, it is abundantly clear that in the Ninth Circuit Rule 704(b) does not prohibit a witness from testifying about the "unusual" nature of transactions or whether such transactions are "consistent with" money laundering or even from addressing the mental state of the typical person who makes similar hypothetical transactions as long as the expert witness does not cross the line into opining as to the actual mental state of the particular defendants on trial. *See, e.g.*, *Freeman*, 498 F.3d at 906. The Court notes that Defendants are correct to assert that any such opinion must be based on Agent Thai's objective expertise. Agent Thai may not simply recite hearsay statements of the Government's cooperating witnesses.

ii.    *Hearsay Issue*

The resolution of the issue above also disposes of Defendants' hearsay objection. Defendants have argued that if Agent Thai testifies as to the Defendants' actual state of mind or to the purpose for which Defendants made specific transactions, he will not be relying on his expertise or training, but will simply be parroting or repeating information he was told by the Government's cooperating witnesses. As the Court has explained above, Agent Thai will be constrained from opining directly on the actual mental state of these particular Defendants making these particular transactions. So, he will not be simply reciting the cooperating witnesses' statements as to their mental state.

iii.    *Rule 702: Qualification as an Expert*

Finally, Defendants argue that Agent Thai is not qualified to speak as an expert in this case. Defendants argue that "nothing in Thai's background suggests he would be qualified to determine the purpose of any of the relevant transactions." (Doc. 909 at 10.)

- 6 -

Defendants also argue that usually IRS agents provide expert testimony regarding tax implications of a defendant's transactions which is not at issue here. (*Id*.) First, the Court notes that under Rule 702 the Court's gatekeeping role examines whether *this* particular witness has the requisite expertise to testify on a given subject. So, any argument about what IRS agents are "usually" experts in does not control the Court's analysis one way or another. Second, the Court notes that Agent Thai's CV indicates he has been a member of the IRS Criminal Investigation ("IRS-CI") unit for many years and has personally been involved in "numerous significant investigations" of "money laundering, …cybercrime and digital currency cases." (Doc. 422-3.) His credentials also seem to show he is an expert in virtual currency. (*Id*.) Further, it appears that since the Government's original disclosure of Agent Thai's CV in 2018, he has since taken on a position as a money laundering expert for USPIS. (Doc. 952 at 3.) As such, the Court will not preclude Agent Thai from testifying as an expert in this case.

**B. Expert Testimony Regarding Virtual Currency**

Defendants next argue that even if Agent Thai were allowed to give limited expert testimony, the Court should preclude any testimony on the subject of virtual currency. They argue that the issue of virtual currency is not connected to the case at all because "the indictment does not allege a scheme in which Defendants converted fiat money into virtual currency…in order to conceal the true source of funds [and] …[n]one of the transactions that form the basis of the indictment's money laundering counts involved virtual currency." (Doc. 909 at 6.) Defendants further allege the testimony is irrelevant because none of the Defendants are alleged to have personally owned any Bitcoin. (*Id*. at 7.) Finally, the Defendants allege that allowing expert testimony explaining virtual currency will compel the jury to infer that the use of online currency is uniquely tied to illegal transactions. (*Id*.)

i.   *Relevance and Helpfulness*

As a threshold requirement of Rule 702, a witness is only allowed to testify as an expert if the Court determines "the expert's…specialized knowledge will help the trier of fact to understand the evidence or to determine a fact at issue." Fed. R. Evid. 702(a). In the

present case, the Government has charged the Defendants not only with specific counts on money laundering and violations of the Travel Act, but also with conspiracy to commit money laundering and conspiracy to violate the Travel Act by facilitating a business enterprise involving prostitution. (Doc. 230 at 49, 55-56.)

The Superseding Indictment specifically alleges that when several major credit card companies stopped doing business with the Defendants', citing Defendants' illegal activities, part of Defendants' response was to utilize digital currency. (Doc. 230 at ¶ 182.) The Superseding Indictment also alleges that Defendants' specifically advised customers who posted ads that they could circumvent the credit card companies' embargo by mailing money orders and checks made out to a different company or by "posting with alternative payment methods such as Bitcoin." (*Id.* at 185.) The Superseding Indictment further claims that Backpage "furthered its money laundering efforts through the use of bitcoin processing companies," and "utilized companies such as CoinBase, GoCoin, Paxful, Kraken, and Crypto Capital to receive payments from customers and/or route money through the accounts of related companies." (*Id.* at 193.) Further, the government alleges there is documentary evidence of Defendants' employees brainstorming ways to obfuscate transactions in which their customers paid them to post advertisements by having customers "buy [Bitcoin] from our seller account . . . giving said bitcoin to our catch-all wallet elsewhere (instead of to user), simultaneously adding credits/purchasing paid ad or upsells." (*Id.* at 194.) The government also alleges that post-2015, the use of Bitcoin and virtual currency became a key part of Backpage's financial structure and business model with that section of its revenue expanding from approximately $35,000.00 a month in June of 2015 to at least $1,700,000.00 a month from December 2015 onward. (Doc. 952 at 6.) The evidence is likely directly relevant to the conspiracy charges in the case since it details alleged efforts by Defendants to obfuscate payment for illegal activities.

In addition to the allegations in the Superseding Indictment, the Government anticipates that Agent Thai will testify as to the rapid growth Backpage experienced with Bitcoin exchangers. For example, between January 2015 and June 2015, records reflect

that Backpage had monthly transactions with a Bitcoin exchanger of between around $13,000 and $35,000. After the credit card companies stopped accepting charges on Backpage.com, however, the monthly amount dramatically increased. In July 2015, the monthly cash transactions on the same Bitcoin exchanger increased to around $234,000; in August 2015, it doubled to around $468,000. In October 2015, it increased to over $1.1 million, and between December 2015 and May 2017, the monthly ranges were between $1.7 million and $3.5 million. In other words, starting in mid-2015, a significant part of Backpage's revenue flowed through digital currency. Accordingly, without testimony related to digital currency, the jury would only hear part of the story about the company's finances. A jury is entitled to know the circumstances and background of a criminal charge. *United States v. Daly*, 974 F.2d 1215, 1217 (9th Cir. 1992) (The jury "cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge."). Expert testimony regarding digital currency is relevant to the Government's case against Defendants.

ii.     *Inference of Criminality*

Defendants also argue that the Government's expert testimony regarding virtual currency should be barred because it would impermissibly compel the inference that Defendants engaged in illegal conduct. As such, the Defendants argue the Government should not be allowed to present testimony that "the use of virtual currency has been found to be associated with money laundering, that there is a degree of anonymity associated with its use, that certain "darknet" websites engaged in its use, or…that no legitimate enterprise would accept its use." (Doc. 909 at 13.) Defendants argue such statements will both impermissibly compel the jury to infer criminality based on mere usage of virtual currency, and further argues such testimony would have no factual basis.

The Court will not categorically bar expert testimony on the subject of virtual currency. Defendants' fears that certain statements or claims of the witness might have "no factual basis" are premature.  The Court need simply note that it will require the testimony of the Government's expert to be "expert testimony," which will of course require it be

- 9 -

1    based on sufficient facts or data. Fed. R. Evid. 702(b). Defendants are welcome to object

2    at trial to the specific statements they believe transgress the boundaries of Agent Thai's

3    "expertise."

4    iii.    *Prejudice*

5              The Defendants finally argue that any testimony regarding virtual currency should

6    be excluded under Federal Rule of Evidence 403. (Doc. 909 at 14.) Defendants' argument

7    is that any expert testimony on the subject of virtual currency has little probative value and

8    would be substantially prejudicial. To show the prejudicial nature of such testimony,

9    Defendants assert that "one can easily imagine a situation in which a juror who has never

10   heard of or used virtual currency wrongly concludes, based solely on the evidence of a

11   Government expert, that the use of virtual currency is an indica of illegal conduct." (*Id.*)

12   Defendant's further point out that the Government will not be offering expert testimony on

13   credit card payments or any other form of payment other than virtual currency, and argue

14   that "[t]herefore the only purpose of offering expert testimony on virtual currencies is to

15   unfairly and inappropriately taint payments involving such currencies [by] implying they

16   are obviously criminal." (*Id.*)

17            There is one thing Defendants have pointed out that the Court does agree with, "one

18   can easily imagine a situation in which a juror…has never heard of or used virtual

19   currency[.]" (*Id.*) This of course supplies a very good reason why the average juror might

20   benefit from an expert's explanation of what virtual currency is and how it works. The

21   same cannot reasonably be said for the use of credit cars, prepaid gift cards, or other forms

22   of payment that are more commonly used by the average juror. As far as the probative

23   value of testimony explaining virtual currency, the Court notes that while the Defendants

24   argue virtual currency was never a large source of their revenue, the Government contests

25   this claim. The Superseding Indictment contains numerous specific allegations regarding

26   the Defendants' use of virtual currency in the course of their conspiracy to violate the

27   Travel Act and their conspiracy to commit money laundering. (Doc. 952 at 6-7.)

28   Defendants are also free to cross examen the witness about the legitimate and growing use

of virtual currency which would mitigate their concerns. Accordingly, the Court finds that the probative value of the proposed expert testimony is not substantially outweighed by its potential prejudicial effect.

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendants' Motion in Limine to Preclude Certain Expert Testimony of Quoc Thai, (Doc. 909), **is denied**.

Dated this 28th day of May, 2021.

Honorable Susan M. Brnovich
United States District Judge