GLENN B. McCORMICK
Acting United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

DAN G. BOYLE (N.Y. Bar No. 5216825, daniel.boyle2@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1400
Los Angeles, CA 90012
Telephone (213) 894-2426

KENNETH POLITE
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-422-PHX-SMB |
| Plaintiff, | |
| v. | **UNITED STATES' RESPONSE TO DEFENDANTS' MOTION FOR ACQUITAL OR MISTRIAL**<br>**(Doc. 1272)** |
| Michael Lacey, et al., | |
| Defendants. | |

**Preliminary Statement**

Defendants seek an acquittal or mistrial based on an opening statement that largely previewed the trial evidence that supports the allegations in the Superseding Indictment (Doc. 230, SI). Allegations that Defendants have known for over three years. Allegations that this Court has already found "show Defendants had a specific intent to promote prostitution." (Doc. 793 at 19.) The question before the jury will be whether the evidence supports the United States' allegations and proves guilt beyond a reasonable doubt.

In response to the United States' preview of the evidence, Defendants argue they can't "un-ring this bell." (Sept. 3, 2021 Trial Transcript (Tr.) at 59:19.) But that "bell" will be continually rung throughout the United States' case-in-chief. Indeed, that "bell" summarizes several significant pieces of evidence against Defendants—including Defendants' deliberate execution of several prostitution-marketing strategies purposefully designed to increase their website's revenues and facilitate their customers' prostitution businesses. These strategies, all detailed in the opening statement, included content aggregation (publishing free prostitution ads in attempt to capture new business), reciprocal link agreements (including a longstanding relationship with the explicit prostitution review website The Erotic Review, which for years served as the number one source of outside referrals for Backpage), paying commissions or offering discounts to high-volume prostitution advertisers (super-posters or super-affiliates like Dollar Bill, New York Platinum, and Sean Kim), "moderation" (which sanitized overly-blatant prostitution ads without changing the true meaning of what they offered for sale), and money laundering schemes designed to conceal the true source of Backpage's revenues and fool financial institutions. (*See generally* Tr. at 13-55.)

Throughout the last three years of intense pretrial litigation, Defendants never seriously addressed any evidence concerning their prostitution-marketing strategies. In the instant motion, Defendants studiously avoid discussing this evidence. Rather, Defendants continue to take the exceedingly narrow view that they can only be liable if they had specific knowledge of each individual ad. (*See, e.g.*, Mot. at 1.) Defendants are wrong.

The trial evidence will show that Defendants worked together (and conspired with others) to facilitate prostitution by publishing the ads in Counts 2-51 and similar ads. And if a Defendant may not have personally been aware of the specifics of each ad or may not have been personally involved in the ad's publication process (Backpage employed dozens of low-level moderators to individually review ads before publication), it was reasonably foreseeable—in light of the policies and strategies Defendants deliberately implemented as part of the conspiracy charged in Count 1—that such violations would be committed in furtherance of the conspiracy. The Court's prior Orders—and its Preliminary Jury Instructions—recognize that Defendants can be found guilty under precisely this theory. (*See* Doc. 793 at 14-20; Doc. 946 at 11-16; Preliminary Jury Instructions at 3-4.)

Defendants may not like the evidence, but that doesn't change the testimony and exhibits that will be presented over the next two months. Defendants know this. That's one of the reasons why the docket includes over 1200 pretrial filings. The Court has made rulings on the admissible evidence. Both sides had motions granted and denied on a variety of evidentiary issues. Neither side is permitted to introduce all the evidence it, he, or she, believes to be helpful to their respective cases. All parties now must try this case under these rulings. Relitigating every previous issue is neither permitted nor practical.

As explained below, Defendants' various grounds for seeking an acquittal or mistrial lack merit, and Defendants' motion should be denied.

## **Argument**

**I.    An Opening Statement Does Not Require a Comprehensive Count-by-Count Summary of Anticipated Evidence.**

Defendants assert that if the opening statement does not relate the evidence to each and every charge in the SI, the United States has waived its right to proceed and an acquittal or mistrial should result. (Tr. 82 at 4-10, 17-20; Tr. 84 at 3-4; Mot. at 13-14.) Particularly in a case like this—which involves a 92-page SI charging 100 counts concerning a multi-defendant conspiracy that spanned 14 years—Defendants are wrong. In a case of this

magnitude, summarizing the evidence on all charged counts in a two-hour opening statement is neither practical nor required.

The Federal Rules of Criminal Procedure do not require or even mention opening statements. *Compare* Fed. R. Crim. P. 29.1 (addressing closing arguments); *see* LRCiv. 39.1(b) (any party may decline to make an opening statement). The purpose of the opening statement "is to state what evidence will be presented and to make it easier for jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole." *Testa v. Village of Mundelein, III.*, 89 F.3d 443, 446 (7th Cir. 1996) (citing *United States v. Dinitz*, 424 U.S. 600, 612 (1976) (Burger, C.J., concurring)); *see United States v. Stanfield*, 521 F.2d 1221, 1225 (9th Cir. 1975) (opening statement "has the practical purpose of directing the attention of the jurors to the nuances of the proposed evidence in such a way as to make the usual piecemeal presentation of the testimony more understandable as it is received").

The prosecutor is not required in an opening statement to recite the evidence he intends to offer to establish every element of each offense that a defendant is charged with in the indictment. *United States v. Graham*, 146 F.3d 6, 10 (1st Cir. 1998); *see also United States v. Ingraldi*, 793 F.2d 408, 414 (1st Cir. 1986) ("[A] defendant has no right to have the government outline in detail in its opening all the evidence it intends to introduce. An opening statement is not evidence and it is usually left to the prosecutor to decide how elaborate it will be. Indeed, there is no obligation on the part of the government to make an opening statement at all . . . ."). *Cf. Rose v. United States*, 149 F.2d 755, 758 (9th Cir. 1945) (affirming the denial of motion to dismiss based on allegedly insufficient evidence summarized in an opening statement; such a motion may be granted only when the opening statement affirmatively shows the government has no cause of action, and only after the prosecutor is given an opportunity to correct or supplement). The Court should reject Defendants' broad claim that an acquittal or mistrial should be declared simply because the opening statement did not provide an outline sufficiently acceptable to Defendants.

## II. Defendants' Argument on Specific Intent Is Unavailing.

Defendants claim "the single biggest issue" with the United States' opening statement relates to *mens rea*. (Tr. 78 at 1-7; see also Mot. at 1, 8-9, 11-12.) Defendant Larkin's counsel stated:

> But [the United States] never said, and I'm going to show you that they had specific knowledge and intent of this ad right here, it's count 22 in the indictment, and they purposefully let it be published so they could help this prostitute's business venture. That's what you have said the case should be.

(Tr. 78 at 12-16.)

This misstates the law. This is an issue the parties have litigated, and the Court has decided. In one of Defendants' motions to dismiss, they made the same claim, arguing that "[e]ven if the defendants knew of any particular business enterprise engaged in prostitution offenses in violation of state law, they could not have specifically intended to promote such a business enterprise . . . without knowing about a particular ad and having some role in the publication of the ad—and the Superseding Indictment contains no such allegation with respect to Mr. Brunst or any of the other defendants." (Doc. 746 at 15.)

The Court denied Defendants' motion and specifically found that—based on the SI's allegations—"each Defendant had the requisite specific intent to promote an unlawful activity in violation of the Travel Act on fifty occasions." (Doc. 946 at 15, citing Doc. 793 at 15.) In a previous Order, the Court held: "The alleged facts in the SI, taken as true, establish defendants had the specific intent to promote prostitution in violation of the Travel Act." (Doc. 793 at 20.) In that Order, the Court walked Defendants through all the allegations in the SI, finding Defendants' "conspiracy was successful and resulted in the fifty ads for prostitution that now make up fifty counts of violating the Travel Act." (Doc. 793 at 19-20; *see also* Doc. 946 at 16 ("The SI plainly alleges Defendants specifically intended to facilitate prostitution businesses by publishing the ads.").)

The Court has now, on several occasions, informed Defendants that—if proven true—the allegations in the SI are sufficient to prove Defendants' guilt of the crimes charged. (Doc. 793 at 19-20; Doc. 946 at 15-16.) These allegations relate to prostitution-

marketing "strategies Backpage used to attract more prostitution ads." (Doc. 793 at 4.) The United States focused on these "strategies" in its opening statement. First, the prosecution discussed "content aggregation." (Tr. at 13:16-15:20; *see* Tr. at 14:23-25 ("[C]reating prostitution ads on Backpage with the content aggregation process was successful in generating revenue for the company.").)  Next, the United States outlined Defendants' reciprocal link agreement with The Erotic Review. (Tr. at 16:15-19:6.) "Evidence will show that The Erotic Review is the prostitution review site where buyers of sex could rate their experiences with prostitutes, including their sexual encounters with them." (Tr. at 16:20-23.) "[F]or the month of January 2009, evidence will show that The Erotic Review was responsible for more than 500,000 visits to Backpage." (Tr. at 18:15-17.) The United States then discussed Defendants' relationships with super affiliates. (Tr. at 19:7-20:10.) "Evidence will show that a super poster or a super affiliate were individuals who owned local prostitution businesses, and in some cases, evidence will show, paid hundreds of thousands of dollars in order to promote their prostitution businesses in the adult services section Backpage.com." (Tr. at 19:14-19.) Finally, the United States discussed Defendants' moderation practices. (Tr. at 20:11-27:19.) "[L]et's look at a few e-mails and documents, internal documents that show that instead of preventing these ads from being posted on Backpage.com, they were instructed by these defendants to conceal the fact that prostitution ads were rampant on Backpage." (Tr. at 20:23-21:2.)

These are all "strategies Backpage used to attract more prostitution ads." (Doc. 793 at 4.) This Court has found that if the government can produce evidence proving these prostitution-marketing strategies beyond a reasonable doubt, then it will have proven "Defendants specifically intended to facilitate prostitution business by publishing the ads." (Doc. 946 at 16.) The United States recognizes that it must demonstrate each of the six Defendants had specific intent to facilitate the promotion of the prostitution business enterprises[1] listed in Counts 2-51, but, as the Court has ruled, it may do so through evidence

---

[1] Defendants, yet again, focus too narrowly on the phrase "business enterprises." The Court has already ruled that "business enterprises" simply means "showing 'a continuous course of criminal conduct.'" (Doc. 946 at 10) (citations omitted.) And proving

related to Defendants' participation in planning and/or carrying out these internal strategies. (Doc. 793 at 19-20; Doc. 946 at 15-16.)

Moreover, specific intent can be inferred from numerous additional facts the prosecution highlighted for the jury in the opening statement.[2] These include, *inter alia*:

---

a "continuous course of conduct" isn't a high bar. (Doc. 946 at 11, n.1) (citing *United States v. Monu*, 782 F.2d 1209, 1211 (4th Cir. 1986) (reasoning that a "triple beam balance scale" was sufficient to "indicate[] that [the defendant's] receipt of the heroin as part of an ongoing enterprise, rather than an isolated instance of criminal conduct"); *United States v. Tavelman*, 650 F.2d 1133, 1140 (9th Cir. 1981) ("Considering the quantity of cocaine involved in the prior transaction proved at trial, the jury could reasonably find a continuous course of criminal activity.").) "Neither evidence of large-scale operations nor long-term duration is required to support a Travel Act conviction. Instead, what must be shown is evidence of a continuous enterprise and one act in interstate commerce in furtherance of that enterprise." *Tavelman*, 650 F.2d at 1140.

[2] As the United States has explained elsewhere:

[T]here are many independent ways of proving that a seller of goods or services (including a website operator) intended to facilitate unlawful activity. *See, e.g., People v. Lauria*, 59 Cal. Rptr. 628, 632-33 (Cal. Ct. App. 1967) (a seller's intent to facilitate prostitution may be inferred from, *inter alia*: (1) "proof . . . of inflated charges" for goods or services used for prostitution; (2) "evidence of any unusual volume of business with prostitutes," such as where "sales for illegal use amount to a high proportion of the seller's total business"; or (3) sales that "serve no other purpose than to advertise the professional services of the prostitutes"); Wayne R. LaFave, 2 *Substantive Criminal Law* (SUBCRL) § 12.2(c)(3), Providing goods or services, (3d ed., Oct. 2020 update) (intent may also be inferred from "the fact that the seller has made inflated charges, that he has supplied goods or services which have no legitimate use, [] that the sales to the illegal operation have become the dominant proportion of the seller's business," or the seller's use of deceptive or "secretive" tactics). . . . Moreover, no inference of intent is needed in cases involving "[d]irect evidence of participation, such as advice from the supplier of legal goods or services to the user of those goods or services on their use for illegal purposes." *Lauria*, 59 Cal. Rptr. at 632.

Furthermore, a website operator may be found to have the requisite intent when the defendant's website was designed or tailored to further illegal activity. *See, e.g., United States v. Ulbricht*, 31 F. Supp. 3d 540, 556 (S.D.N.Y. 2014) ("The Indictment does not allege that Ulbricht is criminally liable simply because he is alleged to have launched a website that was—unknown to and unplanned by him—used for illicit transactions. . . . Rather, Ulbricht is alleged to have knowingly and intentionally constructed and operated an expansive black market for selling and purchasing narcotics and malicious software and for laundering money. This separates Ulbricht's alleged conduct from the mass of others whose websites may—without their planning or expectation—be used for unlawful purposes.")[.]

(Doc. 1216-3 at 200-201.)

- Defendants' website generated the overwhelming majority of its revenue—approximately 94%—from the sale of prostitution ads, including fees charged for upgrades that increased the ads' visibility (*e.g.*, Tr. at 9:8-10:1; Tr. at 12:11-23; 24:5-10; Tr. at 30:9-20).
- Defendants devised a number of deceptive business strategies, including moderation (Tr. at 20:18-18 (moderation was designed "to conceal the fact that prostitution ads were rampant all over the website" without changing the true nature of what was being offered)), hiding facts about their prostitution-facilitation business practices from third parties like NCMEC and the media (*e.g.*, Tr. at 33:22-24, 35:22-36:2), and money laundering and other strategies that concealed the source of their revenues or were calculated to fool financial institutions (*e.g.*, Tr. at 47:16-48:4).
- Defendants allowed a known prostitute, Licks Alot, to continue to advertise on Backpage, and gave her free upgrades after she complained that certain images and text had been deleted from her ads. (Tr. at 34:15-35:5.)
- Defendants published numerous "GFE" (Girlfriend Experience) ads, which they knew advertised sex-for-money. (Tr. at 10:9-18, 27:20-28:11.)[3]

In addition, there is another available path for this jury to find each individual Defendant guilty—*Pinkerton* liability. This Court has already instructed the jury that it may find a given defendant guilty of the Travel Act as charged in Counts 2-51 if the United States has proved each of the following elements beyond a reasonable doubt:

>First, a member of the conspiracy committed the Travel Act offense as alleged in that count;
>
>Second, the person was a member of the conspiracy charged in Count 1 of the indictment;
>
>Third, the person committed the Travel Act offense alleged in furtherance of the conspiracy;

---

[3] Counts 27-51 of the SI all involve GFE ads. (Doc. 230 at 53-55.)

>       Fourth, the defendant was a member of the same conspiracy at the time the offense charged in Counts 2-51 was committed; and
>
>       Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

(Preliminary Jury Instructions at 4.)

As this Court has recognized, the SI "alleges Defendants conspired with third parties, such as P.R. and Dollar Bill, to promote prostitution and edited other prostitution ads to 'conceal their true nature.'" (Doc. 793 at 18.) The government anticipates the evidence will show, and it will argue during its closing, that each Defendant is guilty of all fifty Travel Act counts because they were conspiring with the pimps and prostitutes who posted the ads referenced in Counts 2-51. Moreover, the evidence will show that Defendants conspired with other Backpage officers and employees, including Carl Ferrer and Dan Hyer, and with Backpage (a co-conspirator in its own right), in publishing the subject ads. (*Cf.* Doc. 1212 at 3 ("[T]he Court finds that there is sufficient evidence to conclude that the government will be able to prove the existence of a conspiracy between Backpage, Carl Ferrer, Dan Hyer and each of the individual Defendants in this case at trial.").) The jury will have an opportunity to determine if the United States carried its burden on these charges. Defendants' attempted re-argument of these issues, which have already been extensively litigated in this case, is without merit.

### III. Defendants' Rule 404(b) Assertions Miss the Mark.

Defendants assert that evidence presented during the United States' opening statement involved ads and other images of "uncharged conduct" subject to Fed. R. Evid. 404(b)(3). (*See* Mot. at 10-11.) This assertion is unavailing for several reasons.

First, the United States disclosed all of the exhibits featured in its opening statement PowerPoint to the Defendants 24 hours in advance, as the Court directed. The PowerPoint included screen shots and images from the video of the Sacramento portion of the Backpage website created by California Department of Justice Special Agent Supervisor

Brian Fichtner on March 6, 2015 (Exhibit 489-a). Defendants and the Court have seen this recording, and the Court has already deemed the video relevant and admissible. (Doc. 1212 at 18 ("The Court finds that the video may be admitted at trial if Agent Fichtner is able to lay the proper foundation at trial. The video is highly relevant to the charged crimes.").) In addition to screen shots from that video, the opening statement included, *inter alia*, the following previously-disclosed exhibits:

- Ads associated with the following charged counts in the SI, or ads otherwise discussed in the SI, including:

    o Exhibit 1632 (Count 2 ad)

    o Exhibit 214-a (Count 5 ad)

    o Exhibit 1735 (Count 31 ad)

    o Exhibit 1724 (Count 34 ad)

    o Exhibit 1725 (Count 35 ad)

    o Exhibit 93-a (Licks Alot ad referenced in SI ¶ 91).

- Other images (Exhibits 58-a and 103-a) consisting of attachments to emails that Defendants sent and received during the conspiracy.

These exhibits may be admitted at trial as proof related to the charged Travel Act conspiracy and/or to the individual Travel Act counts referenced above, and the United States had a good faith basis for using these exhibits during its opening statement. The Ninth Circuit has recognized that two categories of evidence can be "inextricably intertwined" with charges such that a Rule 404(b) analysis is not necessary: "First, evidence of prior acts may be admitted if the evidence 'constitutes a part of the transaction that serves as the basis for the criminal charge.' Second, prior act evidence may be admitted 'when it was necessary to do so in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime.'" *United States v. DeGeorge*, 380 F.3d 1203, 1220 (9th Cir. 2004) (citations omitted).

Regarding the first category, "'[t]he policies underlying rule 404(b) are inapplicable when offenses committed as part of a single criminal episode become other acts simply

because the defendant 'is indicted for less than all of his actions.'" *United States v. Vizcarra–Martinez*, 66 F.3d 1006, 1012 (9th Cir. 1995) (citation omitted); *see also United States v. Williams,* 989 F.2d 1061, 1070 (9th Cir. 1993) ("Evidence should not be considered 'other crimes' evidence when the evidence concerning the other act and the evidence concerning the crime charged are inextricably intertwined."); *United States v. Gilmore*, 811 F. App'x 997, 999 (9th Cir. 2020) ("the district court did not abuse its discretion in refusing to suppress as trial evidence the methamphetamine found in appellant's pocket, finding that it was inextricably intertwined with the methamphetamine in the spare tire"). Regarding the second category, the Ninth Circuit has long recognized "it is obviously necessary in certain cases for the government to explain either the circumstances under which particular evidence was obtained or the events surrounding the commission of the crime." *Vizcarra–Martinez*, 66 F.3d at 1012.

Here, the ads and other images at issue all constitute intrinsic evidence of the crimes charged, and thus Rule 404(b) doesn't apply. The ads referenced above correlate to specific charged counts, are discussed in the SI in connection with Defendants' efforts to facilitate their customers' prostitution enterprises, or appear in the Fichtner video showing how the Sacramento section of the Backpage website appeared in March 2015. These ads were published on Defendants' website during the course of the charged conspiracy from 2004 to 2018. The images are part of the scheme to facilitate prostitution charged under the Travel Act and are decidedly relevant to the charged conspiracy. The ads that correspond to specific counts are likewise relevant, probative evidence of the charged conduct. The emails and attachments that detail aspects of Defendants' "moderation" practices likewise show that Defendants' publicly-touted efforts to filter out illegal content was a fiction. (*See* Doc. 516-1.) They do not relate to "other acts."

And even if these images, emails and attachments do not qualify for admission as intrinsic evidence, their admission is necessary to permit the prosecution to offer a coherent and comprehensible story regarding Defendants' commission of the charged offenses. These materials are part and parcel of the narrative showing that Defendants deliberately

pursued numerous business strategies in an attempt to corner the market for online prostitution ads in the United States. That narrative that counters Defendants' assertion (made to courts, public safety organizations, governmental bodies, media entities and others over the last decade) that Backpage merely served as a passive host of third-party content, and that the use of Backpage for criminal purposes occurred by pure happenstance.

In short, these materials are relevant, referenced in the SI, and included on the United States' exhibit list, and they were disclosed to Defendants in discovery. The United States intends to seek their admission at trial. For all these reasons, Defendants' Rule 404(b) objections are misplaced.

## IV. Defendants' Arguments re Defendant Lacey's Statement Are Unavailing.

On Friday afternoon, Defendants complained that the United States failed to disclose witness Nacole Svendgard's statement about Defendant Michael Lacey as "something they planned to use." (Tr. 72:23-25.) The United States produced the statement. (Doc. 1267 at Exs. C, D, G.) Nothing more is required. This issue, like many of Defendants' other complaints, has already been litigated. Judge Logan denied Defendants' Motion for Itemization of *Brady/Giglio* Material. (Motion at Doc. 273; Order at Doc. 339.) In that motion, Defendants made the exact argument they repeat here—specifically, that the United States was obligated to provide an itemized list of *Brady* material, because without it "Defendants will not have equal access to discovery." (Doc. 339 at 2.) The Court denied the motion, finding that "the Government is under no general obligation to identify *Brady* or *Giglio* material within voluminous discovery." (*Id.* at 5.) Here, Ms. Svendgard's statement is neither *Brady* nor *Giglio*, but was disclosed in accordance with Rule 16.[4]

---

[4] After losing their request for the United States to itemize *Brady* and *Giglio* materials, Defendants now want to expand this (non-existent) duty for the United States to itemize Rule 16 discovery. Rule 16(a)(1)(B) obligates the United States to "disclose . . . any relevant statement by the defendant." That's what the United States did. (Doc. 1267 at Exs. C, D, G.) Any argument that the prosecution needed to itemize this statement or somehow call it to Defendants' attention beyond disclosure isn't supported by the Rule or the law of the case.

- 11 -

After reviewing the United States' recent filing, Defendants now change their argument to complain that the government distorted the evidence. Defendants rely on the 302 to suggest that Lacey's statement was actually directed to reporters, rather than Ms. Svendgard. (Mot. at 16.) The United States believes in good faith that Ms. Svendgard will testify consistently with how it characterized Lacey's statement in the opening. Of course, Defendants are free to cross examine Ms. Svendgard on this issue.[5]

## V. The Prosecution Did Not Comment on Defendants' Right to Remain Silent.

Defendants' assertion that the prosecution's reference to the June 2011 meeting between Backpage representatives and the Washington Attorney General's Office improperly commented on their right to remain silent lacks merit. (*See* Mot. at 5-6, 16-17.) "It is well established that the privilege against self-incrimination prohibits a prosecutor from commenting on a defendant's failure to testify." *United States v. Castillo,* 866 F.2d 1071, 1083 (9th Cir. 1988) (citing *Griffin v. California,* 380 U.S. 609, 615 (1965)). While a prosecutor's direct comment about the defendant's failure to testify always violates *Griffin,* a prosecutor's indirect comment violates *Griffin* only "if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987). And, even where a *Griffin* error is established, the error is harmless unless the offending comments are "extensive, [ ] an inference of guilt from silence is stressed to the jury as a basis for the conviction, and [ ] there is evidence that could have supported acquittal." *Hovey v. Ayers,* 458 F.3d 892, 912 (9th Cir. 2006).

---

[5] Defendants also complain about a late disclosure. (Mot. at 16.) First, Defendants received this disclosure on June 25, 2021—over two months before trial commenced. (Doc. 1267-7.) Second, as Defendants noted, the United States discovery in this case involved millions of pages (Tr. 83:20-24), and only a tiny percentage of that discovery was produced in the months leading up to trial. Third, since July 1, 2021, Defendants have disclosed nearly 18,000 pages of discovery to the government—a number that far exceeds the United States' discovery during the same time period. Fourth, on August 28, 2021, Defendants disclosed about 50 new witnesses. As previously noted, Defendants have not confirmed compliance with their obligations under Rule 26.2 for any of these newly disclosed witnesses. (Doc. 1258 at 3, nn 1-2.)

Here, no *Griffin* error occurred. The prosecution never commented on Defendants' right to remain silent. Rather, the complained-of portion of the opening statement was a reference to evidence that the United States plans to introduce regarding a meeting between Backpage representatives and the Washington Attorney General's Office in June 2011. (*See* 9/3/21 RT at 70:22-71:3.) Then-Assistant Washington Attorney General (now Professor) Paula Selis is expected to testify consistently with her account of the meeting as reflected in Paragraph 105 of the Superseding Indictment, her declaration in *Backpage.com, LLC. v. McKenna*, 2:12-cv-954 (W.D. Wash.), and her FBI 302 interview memorandum. (Doc. 230 ¶105; Doc. 1267, Exs. A-B.) As Prof. Selis averred in her declaration, the meeting was held at Backpage's request, and Backpage's representatives at the meeting included Don Bennett Moon, an attorney and member of the board of directors for Village Voice Media, Backpage.com's parent company, and Carl Ferrer, Backpage's then-Vice President of Sales and Marketing. (Doc. 1267, Ex. B, ¶ 2.) The purpose of the meeting—which Backpage had requested—was to discuss Backpage's escort advertising. (Doc. 1267, Ex. B, ¶ 2.)[6]

The prosecutor's opening statement fairly and accurately related the substance of Prof. Selis's account of the meeting—namely, that when confronted about whether escort ads on Backpage offered the sale of sex for money, Moon turned to Ferrer and said "Don't deny the undeniable." (Doc. 1267, Ex. B, ¶ 3.) Moon thereafter didn't deny that Backpage's escort ads were for prostitution, but instead attempted to turn the discussion to whether the First Amendment and the Communications Decency Act protected Backpage from liability. (Doc. 1267, Ex. B, ¶¶ 3-4.)

The jury would not naturally and necessarily perceive the prosecutor's follow-up statement—that "these defendants can't deny that they knew that the vast majority of the

---

[6] The United States anticipates, in good faith and consistent with the Court's Order requiring additional foundation (Doc. 1162 at 2-3), that the trial evidence will show that Moon participated in the meeting as an authorized agent for Backpage. That evidence is supported by Prof. Selis' declaration, which states that Backpage requested the meeting, the representatives that Backpage sent to the meeting included Moon and Ferrer, and the purpose of the Backpage-requested meeting was to discuss Backpage's escort advertising. (Doc. 1267, Ex. B, ¶ 2.)

1    ads on Backpage.com were nothing less than prostitution ads"—as a comment on
2    Defendants' right to remain silent. Rather, as shown by the above context, the prosecutor's
3    statement commented on Backpage's admission, made through Moon's statements
4    described above, regarding the well-known fact that Defendants' website advertised
5    prostitution. The statement reflected the prosecutor's description of the anticipated trial
6    evidence, including that Defendants had notice and knowledge of that fact.

Even assuming that the prosecution indirectly commented on Defendants' right to remain silent, the comment was not extensive and no reasonable juror would have understood the prosecutor's opening statement to mean that the jury should infer guilt based on whether Defendants ultimately choose to testify. The complained of comments consist of an isolated portion of the prosecution's nearly two-hour opening statement, compromising half-a-page of 57 transcript pages. (*See* Tr. at 40:12-24.) Moreover, the opening statement nowhere states, let alone "stress[es] to the jury," that an inference of guilt from silence should be drawn. *Hovey,* 458 F.3d at 912.

This is particularly true where, as here, the Court has clearly instructed that the opening statements are not evidence. (Preliminary Jury Instructions at 16); *see also United States v. Charlnoes*, 617 F. App'x 839, 840 (9th Cir. 2015) (even if the prosecutor's comment during opening statement that defendant "decided that he would take the risk" of smuggling was improper, it was harmless in light of the strength of the evidence and jury instructions not to consider opening statements as evidence); *United States v. Tam*, 240 F.3d 797, 802 (9th Cir. 2001) ("The district court cured any potential error by telling the jury that the burden of proof was on the government and that the defendant need not call any witnesses or produce any evidence. Thus, even if the prosecution's comments were improper, the defendants suffered no prejudice as a result.").

If, despite the foregoing, the Court believes the opening statement involved any conceivable risk of error on this point, the Court could issue a further instruction reminding the jury that what counsel says is not evidence, Defendants have a constitutional right to remain silent, Defendants need not call any witnesses or produce any evidence, and the

1 burden of proof always remains with the Government. *See, e.g., United States v. Cardenas–Mendoza,* 579 F.3d 1024, 1030 (9th Cir. 2009) (stating that "[a] curative instruction may obviate the impact of the government's [opening] statements, as juries are assumed to follow the court's instructions"); *Rodriguez v. Morris*, CV-19-04957-PHX-GMS, 2021 WL 1986472, at *14-16 (D. Ariz. May 18, 2021) (approving curative instruction regarding government's burden).

**VI.   Defendants' Remaining Assertions Are Unavailing.**

<u>References to underage victims or "sex trafficking" (Mot. at 3-5)</u>: The Court issued a pretrial ruling addressing this issue, finding that "[s]ex trafficking and child sex trafficking are, by definition, both forms of prostitution," and "[e]vidence that tends to prove that Defendants were aware that Backpage.com was being used to facilitate sex trafficking and child sex trafficking are extremely probative to show notice to Defendants that the website was being used for illegal purposes"—including facilitation of prostitution. (Doc. 1156 at 3.)  The Court policed this issue during the opening statement, and sustained and overruled Defendants' objections as they were made. (*See, e.g.,* Tr. at 5:13, 29:16, 33:11, 45:1, 57:5.)  When Defendants raised this issue at the end of Friday's proceedings, the Court responded: "I've already ruled on that.  And the government didn't cross the line on that issue, in my mind, because they didn't go into any of the details.  It was merely the fact that this happened." (Tr. at 70:2-6.)

The Court's analysis was correct, and Defendants should not be allowed to continually relitigate this issue.  The SI references numerous victims who were advertised on Backpage while underaged.  (SI ¶¶ 120, 123-25, 163, 164, 167, 169, 172.)  Moreover, the SI describes numerous instances of criticism Backpage received regarding publication of ads featuring underage victims, safety measures it was advised to adopt but refused to implement, and numerous child prostitution terms that moderators were directed to strip from ads before publication. (*See, e.g*., SI ¶¶ 13-14, 85, 89, 95, 100-01, 104, 116, 127, 131, 134, 136, 140, 144, 151.)  Numerous previously-disclosed trial exhibits discuss the victim mentioned at the beginning of the opening statement—a victim who previously sued

Backpage. (Exs. 617, 619, 620, 906, 906-a, 906-b, 929, 930, 931, 1019, 1051, 1058, 1058a.) And the end of the opening statement referenced Nacole Svendgard (Tr. at 56:18-22), whose daughter, J.S., was one of three minor victims who sued Backpage and its parent company before Defendants were indicted in this case. After the Washington Supreme Court held that the plaintiffs had "alleged sufficient facts that, if proved, would show that the defendants helped to produce the illegal content and therefore are subject to liability under state law," *J.S. v. Village Voice Media Holdings, L.L.C.*, 359 P.3d 714, 715 (Wash. 2015), the lawsuit was resolved by settlement.

The publication of these victims' ads occurred as part of the conspiracy charged in Count 1 (and therefore are intrinsic evidence falling outside of Rule 404(b)), and references to these ads and victims are necessary to provide a complete and comprehensible narrative regarding the charged conduct.

"Conflating of escorts and prostitutes" (Mot. at 6): This complaint is a nonstarter. The evidence at trial will demonstrate that the 50 ads associated with the substantive Travel Act counts, along with the other Backpage ads discussed in the superseding indictment, were not advertisements for sale of an "escort," rather they were prostitution solicitations. If, at the close of the evidence, Defendants believe the evidence demonstrates that the identified ads were actually legal "escort" ads, they will be free to argue that point to the jury. This is yet another issue that has already been litigated. (Docs. 1171, 1176, 1211.)

At trial, the government anticipates introducing testimony from numerous witnesses regarding Backpage's "adult" and "escort" sections, including that Backpage's "escort" webpages included page after page of prostitution solicitations. Moreover, Backpage.com, LLC pleaded guilty in 2018 and admitted it "derived the great majority of its revenue from fees charged in return for publishing advertisements for 'adult' and 'escort' services," and "[t]he great majority of these advertisements are, in fact, advertisements for prostitution services." (*United States v. Backpage.com, LLC*, CR-18-465-PHX-SMB, Doc. 8-2 at 11.) Backpage's then-CEO, Carl Ferrer, also pleaded guilty and admitted the great majority of Backpage's "adult" and "escort" ads were for prostitution. (*United States v.* Ferrer, CR-

18-464-PHX-SMB, Doc. 7-2 at 13.)  The government anticipates the trial evidence will conform to these statements and demonstrate legitimate escort services are rare.

<u>Claim that "Adult" revenue was from prostitution advertising (Mot. at 10)</u>: Defendants admit that "[t]he overwhelming majority of the millions upon millions of ads posted on Backpage.com during its 14-year existence are legal escort ads . . . ." (Mot. at 7.)  The United States agrees with this statement, except that it contends—and believes in good faith that the trial evidence will prove—that Backpage's "escort" ads were prostitution ads.  Moreover, the evidence will show that Backpage derived the lion's share of its revenues from the sale of these ads and associated upgrades.

<u>Definition of "Prostitution" (Mot. at 6-7)</u>:  Defendants' argument that the United States provided an erroneous prostitution definition is also unavailing.  The United States referred to prostitution as "sexual services for money, a crime in all 50 states." (Doc. 1272-1 at 5.)  First, the Court will instruct the jury on the appropriate state prostitution crimes associated with the 50 Travel Act counts.  If the United States had attempted to instruct the jury on these crimes during the opening it would have added 30-45 additional minutes.  (*See* Doc. 1216-3 at 91-99.)  Second, 37 of the 50 state prostitution crimes implicated by the Travel Act counts use the term "sexual conduct" to define prostitution.  (*Id*.) (Massachusetts, Washington, Arizona, New York, Texas, Ohio, and Nevada.)  That term is defined slightly differently by each of the various states, but describes the proscribed prostitution acts.  The other state statutes all provide similar definitions.  The United States suspects Defendants would have made the same objection if the opening statement replaced "services" with "conduct," but in any event, it wasn't misleading.  And, if the jurors have lingering questions, those will be answered by the detailed jury instructions the Court will provide to the jury before they are permitted to deliberate about Defendants' guilt.

### **Conclusion**

For the foregoing reasons, Defendants' Motion for Acquittal or Mistrial (Doc. 1272) should be denied.

Respectfully submitted this 7th day of September, 2021.

GLENN B. McCORMICK
Acting United States Attorney
District of Arizona

*s/ Andrew C. Stone*
KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW C. STONE
Assistant U.S. Attorneys

DAN G. BOYLE
Special Assistant U.S. Attorney

KENNETH POLITE
Assistant Attorney General
U.S. Department of Justice
Criminal Division, U.S. Department of Justice

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

## CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/Andrew C. Stone*
U.S. Attorney's Office