## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. CR-18-0422-PHX-SMB |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | September 3, 2021 |
| Michael Lacey, | ) | 1:15 p.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

BEFORE:   THE HONORABLE SUSAN M. BRNOVICH, JUDGE

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

### TRIAL - DAY 3 - P.M. SESSION

Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                          **A P P E A R A N C E S**

2    For the Government:

3
        U.S. ATTORNEY'S OFFICE
4       By:  **Mr. Peter S. Kozinets**
                **Mr. Kevin M. Rapp**
5               **Ms. Margaret Wu Perlmeter**
                **Mr. Andrew C. Stone**
6       40 North Central Avenue, Suite 1200
        Phoenix, Arizona 85004
7

8       U.S. DEPARTMENT OF JUSTICE
        By:  **Mr. Reginald E. Jones**
9       1400 New York Avenue, NW, Suite 600
        Washington, DC 20530
10

11      U.S. ATTORNEY'S OFFICE
        By:  **Mr. Daniel G. Boyle**
12      312 North Spring Street
        Los Angeles, California 90012
13

14   For the Defendant Lacey:

15
        LIPSITZ GREEN SCIME CAMBRIA
16      By:  **Mr. Paul J. Cambria, Jr.**
                **Ms. Erin E. McCampbell-Paris**
17      42 Delaware Avenue, Suite 120
        Buffalo, NY 14202
18

19   For the Defendant Larkin:

20
        BIENERT KATZMAN
21      By:  **Mr. Thomas H. Bienert, Jr.**
                **Ms. Whitney Z. Bernstein**
        903 Calle Amanecer, Suite 350
22      San Clemente, CA 92673

23

24

25

```
 1   For the Defendant Spear:

 2       FEDER LAW OFFICE
         By:  Mr. Bruce S. Feder
 3       2930 East Camelback Road, Suite 160
         Phoenix, AZ 85016
 4

 5   For the Defendant Brunst:

 6       BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
         LINCENBERG & RHOW
 7       By:  Mr. Gopi K. Panchapakesan
         1875 Century Park E, Suite 2300
 8       Los Angeles, CA 90067

 9

10   For the Defendant Padilla:

11       DAVID EISENBERG, PLC
         By:  Mr. David S. Eisenberg
12       3550 North Central Avenue, Suite 1155
         Phoenix, AZ 85012

13

14   For the Defendant Vaught:

15       JOY BERTRAND, LLC
         By:  Ms. Joy M. Bertrand
16       P.O. Box 2734
         Scottsdale, AZ 85252

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1          **P R O C E E D I N G S**

2          THE COURT:  Please be seated.

3          And we are back on the record with the jury present.

4          Mr. Jones, your opening.

5          MR. JONES:  Thank you, Your Honor.

6          Her 14-year-old daughter had been missing for more

7    than six months.  After months of posting missing person

8    flyers, as well as physically searching for her daughter, upon

9    the recommendation of a neighbor, the mother, Mrs. Pride, began

10   to search for her daughter online.

11         And in searching for her daughter online, she came

12   across an advertisement in the adult services section of the

13   website Backpage.com that showed an image of her daughter.  It

14   was apparent by looking at the Backpage ad that her 14-year-old

15   daughter was offering sexual services in exchange for money.

16         Upon locating her daughter's ad on Backpage.com, the

17   mother immediately contacts the police who open an

18   investigation.  But police aren't moving quickly enough for the

19   mother, so out of desperation, she contacts the number listed

20   in her daughter's Backpage ad and attempts to buy sex with her.

21         Upon contacting the number listed in her daughter's

22   Backpage ad, a woman, whose voice Ms. Pride didn't recognize,

23   answers the call, and asked her how many folks were going to be

24   having sex with the girl, and she needed payment in cash.  The

25   mother responded that two folks were going to be having sex

1    with the girl and she was willing to pay in cash.

2            At this point, the woman on the other end of the line

3    who, evidence will show, was the 14-year-old girl's pimp,

4    instructed the mother that she could meet her daughter at a

5    local bus station, keep her for approximately two hours for

6    $250.

7            Soon thereafter, the mother arrives at the bus

8    station, and she hides in between cars to ensure she isn't

9    being followed.  When her daughter arrives, she jumps out from

10   in between the cars and approaches her.  Upon realizing that it

11   is her mom, the 14-year-old girl drops down to her knees --

12           MR. BIENERT:  Objection, Your Honor, Rule 401 and 403.

13           THE COURT:  The objection is sustained.

14           MR. JONES:  Ladies and gentlemen of the jury, what I

15   just shared with you is just one example, one of numerous

16   examples you will hear about by the close of this trial of

17   women and children being sold for sex on the website

18   Backpage.com, a website these six defendants ran with the

19   intent to promote and facilitate prostitution.  And when the

20   United States refers to prostitution throughout the course of

21   this trial, we mean sexual services in exchange for money, a

22   crime in all 50 states.

23           And the evidence will show that Backpage.com didn't

24   just promote, and these defendants didn't just promote by

25   running Backpage.com, adult prostitution, but Backpage.com

1    served as a platform where countless women and children were

2    sold for sex.

3            You're probably asking how?  How could these

4    defendants create and run this website for nearly 14 years

5    knowing that they were facilitating this illegal conduct?

6    Well, they ran it through deception and concealing the truth.

7            You're also likely asking why?  Why would these

8    defendants want to create and run this website, a website where

9    countless women and children were sold for sex?  Greed.

10   Evidence will show that Backpage.com generated hundreds of

11   millions of dollars during its years of operation, which in

12   turn meant millions of dollars in many of these defendants'

13   pockets.

14           Now let's talk about what was Backpage.com.

15   Backpage.com was a classified advertising website where you

16   could offer various goods and services for sale.  I'm sure some

17   of you have heard of the classified advertising website

18   Craigslist.  Well, similar to Craigslist, for example, if you

19   have a sofa in your home, you wanted to offer it for sale, you

20   could take a photo of that sofa, place it on Backpage and offer

21   it for sale.  But, ladies and gentlemen of the jury, evidence

22   will show that the vast majority of these folks visiting

23   Backpage.com weren't looking to buy themselves a sofa.

24   Backpage.com was the internet's leading hub, leading website

25   for prostitution.  At its peak, it operated in more than 400

1    cities here in the U.S.

2         Some of you have a good understanding of how the

3    website operated and how you could post ads on Backpage.  I

4    want to show you some clips done by a recording from supervisor

5    Special Agent Brian Fichtner of the California Department of

6    Justice as part of his 2015 undercover investigation into

7    Backpage.

8         And as part of Agent Fichtner's undercover

9    investigation of Backpage, he posted two fake ads on the

10   website, one offering a sofa for sale, and the other ad

11   offering so-called escort services.

12        What you're looking at on your screen now is the --

13   Agent Fichtner typed in Backpage Sacramento.  I mentioned that

14   Backpage operated in more than 400 cities here in the U.S.

15   Agent Fichtner was based out of Sacramento, California, which

16   is where his undercover investigation took place.

17        What you're looking at now is the homepage of

18   Backpage, local places, community, buy, sell, trade, where you

19   can buy, sell appliances, auto parts, and furniture.  In the

20   middle you see rentals and real estate, where you can offer

21   various condos or apartments for sale.  And then to the right

22   you see the adult services of the website, escorts, body rubs,

23   male escorts, and adult jobs.

24        What you're looking at now is various titles of ads in

25   the so-called Sacramento escort section of Backpage from

1    March 2015.  Let's look at a few of these ads a bit closer.

2            Young, sexy, still in town, enjoy some tytee time.

3    Best lips in the city.  Exotic freak.  Gone in an hour.  $60

4    for a quick special.

5            $60, 100, $180 hot hottie special.  Sweet sexy green-

6    eyed beauty.  Ask about my two girl shows.  And, thirsty, come

7    drink my water.  Fine too.

8            And this is the advertisement where we just looked at

9    some of the titles, exotic freak, gone in an hour.  And you see

10   the images associated with that advertisement, as well as the

11   text.

12           As far as the text, you see ebony out and in calls.

13   Ladies and gentlemen of the jury, evidence will show that in

14   the prostitution industry, an out call is a -- it's when that

15   buyer of sex, he -- the prostitute goes to his location for --

16   to engage in sexual services for money, and an in call is where

17   the buyer of sex goes to the prostitute that provides the

18   hotel, motel room, or house to engage in sex for money.

19           Sweet, sexy green-eyed beauty, and images associated

20   with this ad in the so-called escort section of Backpage

21   Sacramento.  Hey, I'm Jessica.  I'm the hottie you will be

22   hooking up with tonight, and the images associated with

23   Jessica's ad.

24           And what you're looking at here is how you would write

25   an ad to be posted on Backpage.com.  You see place for the

1    title, descriptions we just looked at, you know, in calls and

2    out calls, descriptions of that.  There is also a place for

3    age.  And then there is also, shows you you can input your

4    e-mail address where, the evidence will show, a buyer looking

5    for sexual services for money can contact you via e-mail or

6    telephone.  You see here it costs $10 in March of 2015 to post

7    a so-called escort ad in Backpage Sacramento's escort section.

8         The page you're looking at now you see the browse

9    menu, you can attach images to your ad.  We looked at some of

10   these images in the escort section of Backpage Sacramento.  And

11   at the bottom you see upgrade.  Evidence will show that because

12   of the vast array of prostitution ads on Backpage, individuals

13   could pay extra to have their ads moved to the top.  We looked

14   at some of the titles.

15        So you wanted to have your ad moved to the top every

16   so often to increase the visibility of your ad, the likelihood

17   of folks looking for sex for money could contact you, you could

18   pay for all the reposts.

19        Similar to this, you see sponsor ads.  Sponsor ads

20   were also -- cost extra.  You could pay for that upgrade where

21   your ad would be posted to the right of the page and

22   highlighted in yellow, again, increasing the visibility of the

23   ads.

24        Evidence will show that Backpage generated a large

25   amount of their revenue based on charging these individuals to

1    post their prostitution ads, charging them for upgrades.

2         And what you're looking at now is the payment screen

3    where you could input your credit card information and post

4    your ad to be published on Backpage.com.

5         Ladies and gentlemen, these are some of the images

6    associated with the so-called Sacramento escort section of

7    Backpage.

8         Again, additional images.  Additional images.

9         The image you're looking at now, no GFE, ladies and

10   gentlemen of the jury, evidence will show that, in the

11   prostitution industry, GFE is a sex-for-money code word that

12   means girlfriend experience.  What girlfriend experience means,

13   evidence will show, that in addition to having sexual services

14   in exchange for money with a buyer, that prostitute, that the

15   buyer would also engage in emotional intimacy, French kissing

16   and the like.  Evidence will show that these defendants became

17   aware that GFE was a sex-for-money code word, but continued to

18   allow ads with GFE to be posted on Backpage.com.

19        This image you're looking at now, no GFE, just means

20   this prostitute, this provider is only offering sex for money

21   with no girlfriend experience.

22        Additional image Backpage Sacramento.  Here not even

23   attempting to hide what's being offered for sale.

24        What you're looking at here is the Sacramento

25   furniture for sale section.  You see for Friday, March 6th, one

1   ad for furniture, $150 sofa for sale.  Ladies and gentlemen of

2   the jury, evidence will show that that one furniture ad was the

3   fake ad Agent Fichtner posted as part of his undercover

4   investigation of Backpage.  One ad for furniture.  You looked

5   at the vast amount of prostitution ads in the Sacramento escort

6   section of Backpage.

7         Now that you have an idea of how the website operated,

8   how it was laid out, and how you could post ads in the adult

9   services section of the website, as evidence will show, were

10  nothing less than prostitution ads, and these defendants,

11  knowing this, took steps to facilitate the prostitution crimes

12  being committed by folks who were posting these ads on

13  Backpage.

14        Speaking of defendants, let's talk about each one of

15  them briefly individually.

16        Defendant Michael Lacey, creator and cofounder of

17  Backpage, and at times owned a 45 percent interest in the

18  company.

19        Defendant Jim Larkin, also a creator and cofounder of

20  Backpage, and at times owned a 43 percent interest in the

21  company.

22        Defendant Jed Brunst, former chief financial officer

23  of Backpage, and at times owned a six percent interest in the

24  company.

25        Defendant Scott Spear, former executive vice president

1   of Backpage, and at times owned a four percent interest in the

2   company.

3          And the final two defendants, defendant Andrew

4   Padilla, former operations manager at Backpage, and his

5   assistant, Joye Vaught, assistant operations manager at

6   Backpage.

7          Two individuals who aren't on trial, but you'll also

8   hear played significant roles in operating Backpage during this

9   14 years of existence, are former CEO and cofounder Carl

10  Ferrer, and sales and marketing director Dan Hyer.

11         You'll hear from both Ferrer and Hyer during this

12  trial.  They were cooperating witnesses with the government.

13  Ferrer and Hyer will tell you that the vast majority of

14  advertisements in the adult section of Backpage.com were

15  nothing less than prostitution ads.  And, knowing this, they

16  conspired, they agreed with these defendants to facilitate the

17  prostitution crimes being committed by folks who were posting

18  ads on the website.  Why?  Greed.

19         Evidence will show that Backpage generated hundreds of

20  millions of dollars during its years of operation, the vast

21  majority of which came from fees they were charging to post

22  their prostitution ads on the website, which meant tens of

23  millions of dollars to many of these defendants' pockets.

24         Now, let's talk about how Backpage was started and

25  grew to be the internet's leading forum for prostitution.  In

or around 1970, defendants Lacey and Larkin founded alternative newspapers here in Phoenix, Arizona.  And over the years, they acquired additional alternative newspapers under the entities New Times Media and Village Voice Media.  Evidence will show that the defendants Brunst and Spear were executives at these entities.

In or around 1996, former CEO Carl Ferrer was hired by Village Voice Media as a classified advertising director, and in or around 1998, Dan Hyer was hired as an account executive.

In or around the year 2000, with the rise of the internet, in particular the classified advertising website Craigslist.com began to cut in on Village Voice Media's print classified advertising business.  So in order to respond to this threat, defendants Lacey, Larkin, and Carl Ferrer created Backpage.com in 2004.

In between 2004 and 2010 when Craigslist shut down its adult services section, Craigslist was Backpage's biggest competition when it came to prostitution ads.  In fact, evidence will show that these defendants engaged in a process they called internally as content aggregation in the early years in order to, evidence will show, grow the prostitution ads on Backpage.

And what this content aggregation process entailed was going on other prostitution websites, mainly the erotic services section of Craigslist, taking prostitution ads off

1    Craigslist and recreating those same prostitution ads on

2    Backpage in order to grow the content on the site in the early

3    years.

4         And you'll hear from former sales and marketing

5    director Dan Hyer.  He will tell you that the goal in the early

6    years was to increase the content on the site, because if you

7    increase the content, you increase the customers to

8    Backpage.com.

9         An example of how the content aggregation process

10   worked.  This is an e-mail exchange between Carl Ferrer, Dan

11   Hyer, and defendant Scott Spear, where they talk about

12   following the guidelines to secure content on Backpage.

13        Script.  Hi.  I saw your ad on the internet.  Have you

14   ever tried posting it on Backpage.com?  I can post your ad

15   today so that you can try out our site.  It costs you nothing.

16   I do all the work here.  Can I have your e-mail address,

17   please?

18        And, ladies and gentlemen, you'll hear from Dan Hyer

19   that in the early years these defendants didn't even contact

20   customers and get their permission before taking the

21   prostitution ads off Craigslist and recreating those same

22   prostitution ads on Backpage.

23        And this creating prostitution ads on Backpage with

24   the content aggregation process was successful in generating

25   revenue for the company.  In fact, a couple months after they

1    exchanged this e-mail, these defendants met to discuss

2    Backpage-related developments.  And part of the agenda item for

3    that meeting included how the Dallas section of Backpage, where

4    Hyer was based, how it grew to more than $40,000 in revenue a

5    month.  And next agenda item, creating adult content online, in

6    other words, creating prostitution ads on Backpage through the

7    content aggregation process.

8         This e-mail you're looking at now is an e-mail in

9    November of 2008 defendant Larkin sends to Carl Ferrer

10   congratulating Ferrer on Backpage having its best month ever in

11   terms of revenue.  To which Carl Ferrer replies, Hyer has done

12   an awesome job with his marketing.  Ladies and gentlemen, that

13   awesome job Hyer was doing was creating prostitution ads on

14   Backpage through the content aggregation process.

15        And you'll hear that in fall of 2010 when Craigslist

16   shut down its adult services section of its website, these

17   defendants didn't need to aggregate content in the U.S.

18   anymore, because evidence will show that overnight the folks

19   who were posting their prostitution ads on Craigslist, migrated

20   to posting those same prostitution ads on Backpage.

21        But that didn't end anything.  Evidence will show that

22   even after Craigslist shut down its site, these defendants

23   engaged in content aggregation overseas in order to grow and

24   expand their criminal enterprises overseas, hiring individuals,

25   contractors overseas called content aggregators who would visit

1    prostitution websites overseas, take prostitution ads off of

2    those websites --

3              MR. FEDER:  Objection.  Relevance.

4              MR. JONES:  -- create the same ads on Backpage --

5              THE COURT:  Your objection is overruled.

6              Go ahead.

7              MR. JONES:  -- creating those same ads on Backpage in

8    order to grow and expand their criminal enterprises and their

9    businesses overseas.

10             But, ladies and gentlemen of the jury, evidence will

11   show that creating prostitution ads on Backpage through the

12   content aggregation process was just the tip of the iceberg in

13   deceptive strategies and schemes these defendants devised to

14   grow and expand their criminal enterprises.

15             Beginning in around 2007, and continuing until at

16   least 2010, these defendants engaged in business arrangements

17   with other prostitution websites which they called reciprocal

18   link agreements.  One website you'll hear that the defendants

19   had a reciprocal link agreement with was the prostitution

20   review site The Erotic Review.  Evidence will show that The

21   Erotic Review is the prostitution review site where buyers of

22   sex could rate their experiences with prostitutes, including

23   their sexual encounters with them.

24             Evidence will show that these defendants have a

25   reciprocal link agreement with Erotic Review, where if someone

1    was on The Erotic Review looking at a prostitute's profile,

2    they could click on a link which would take them to that

3    prostitute's advertisement, take them to the prostitute's

4    prostitution ad on Backpage.com.  And, similar to this, if an

5    individual was on Backpage looking at the adult services

6    section looking at a prostitution ad, they could click on a

7    link which would take them to that prostitute's profile on The

8    Erotic Review.

9          An example of how this worked.  This document you're

10   looking at now is an example of a review on the prostitution

11   review site Erotic Review.  Alica's profile, TER, The Erotic

12   Review, and the link is how do you know.  And then you see the

13   ID number, the ad website, Backpage, female escorts, you see

14   general information.  And you see the types of services Alica

15   offers:  Sex, blow job, touch pussy, cum in mouth, lick pussy,

16   anal, full, no rush sex.

17         Ladies and gentlemen, evidence will show that the

18   individual on the Erotic Review looking at the profile for

19   Alica, they could click on that ad website link which would

20   take them to Alica's prostitution ad on Backpage.com.  And,

21   ladies and gentlemen, these defendants were well aware of

22   Backpage's relationship with The Erotic Review, and were

23   even -- even generating Google analytics reports that showed

24   how successful the Erotic Review was in referring customers to

25   Backpage.

1          What a Google analytics report is, if I'm Nike.com and

2    I'm trying to advertise in the New Times Air Jordans, I can

3    advertise on Facebook or Google, so if a person goes to

4    Facebook and they click on that Nike Jordan ad, it will take

5    them to Nike.com and they can purchase those shoes.  Nike, in

6    turn, could generate a report that shows which websites it was

7    advertising the Nike Air Jordans on was referring the most

8    business to Nike.com.

9          Or similar to this, evidence will show that these

10   defendants generated Google analytics reports to show which

11   websites were referring the most business to Backpage.  Ladies

12   and gentlemen of the jury, the number one source of referral

13   was the prostitution review site The Erotic Review.

14         In fact, this Google analytics report you're looking

15   at now, for the month of January 2009, evidence will show that

16   The Erotic Review was responsible for more than 500,000 visits

17   to Backpage.  In other words, more than half a million folks

18   who were on The Erotic Review looking at profiles like Alica's,

19   clicked on that ad link to take them to that prostitution ad on

20   Backpage.com.

21         And, ladies and gentlemen of the jury, these

22   defendants were well aware that The Erotic Review was a

23   prostitution website.  In fact, what you're looking at now is

24   an e-mail defendant Larkin sends defendant Spear and Carl

25   Ferrer in 2009 telling them about an article that discussed a

1  recent prostitution bust here in Phoenix, Arizona, where 48

2  individuals had been arrested for solicitation of prostitution.

3  The article went on to note that many of the folks charged have

4  provided reviews of their encounters with prostitutes on the

5  website The Erotic Review, a website the article described as a

6  prostitution website.

7       Ladies and gentlemen of the jury, in addition to

8  creating prostitution ads on Backpage through the content

9  aggregation process, and intentionally soliciting prostitution-

10  related business from prostitution review sites like The Erotic

11  Review, evidence will show that these defendants also have

12  relationships with individuals they call internally as super

13  posters, or super affiliates.

14       Evidence will show that a super poster or a super

15  affiliate were individuals who owned local prostitution

16  businesses, and in some cases, evidence will show, paid

17  hundreds of thousands of dollars in order to promote their

18  prostitution businesses in the adult services section of

19  Backpage.com.  You'll hear about some of these super posters,

20  Dollar Bill, New York Platinum, and Sean Kim, throughout the

21  course of this trial.

22       This e-mail you're looking at here is sales and

23  marketing director responding to super poster Sean Kim's

24  complaint that another super poster was getting a higher

25  discount than him.  Evidence will show that because these super

posters were paying hundreds of thousands of dollars to post

ads on Backpage, they received a discount on their ad fees.

So this super poster is complaining that another super

poster is getting a higher discount than him.  To which Dan

Hyer responds that we just cut you a check for $20,000, and if

someone is getting a bigger discount, please tell us who.

Ladies and gentlemen of the jury, Dan Hyer will tell

you that in order for super poster Sean Kim to be cut a check

for $20,000, he had to have posted at least $200,000 worth of

prostitution ads in the adult services section of Backpage.com.

So in addition to creating prostitution ads on

Backpage with the content aggregation process, the reciprocal

link agreements with websites like Erotic Review, the

intentionally promoting the prostitution businesses of super

posters like Sean Kim, evidence will show that these defendants

also devised deceptive strategies in an attempt to conceal the

fact that prostitution ads were rampant all over the website by

using both computer filters as well as human moderators.

And you'll hear the term moderators used frequently

throughout the course of this trial.  And what a moderator was

was a former Backpage employee whose job was supposed to be

preventing illegal ads, preventing prostitution ads from being

posted on Backpage.com, but let's look at a few e-mails and

documents, internal documents that show that instead of

preventing these ads from being posted on Backpage.com, they

1   were instructed by these defendants to conceal the fact that

2   prostitution ads were rampant on Backpage.

3          This document you're looking at here is an exchange

4   between defendants Spear and Carl Ferrer in 2007 discussing how

5   to instruct these moderators to moderate content on Backpage.

6   Edit ads for explicit sexual content.  Do not include any

7   verbiage that has suck your or lick your.  You may edit the ad

8   to read, I enjoy oral, but do not include the vulgar language.

9   He goes on to tell them to take out anything questionable.

10         Now, ladies and gentlemen of the jury, stripping out

11  or taking out suck your or lick your and then posting the

12  sanitized version of the advertisement on Backpage.com did

13  nothing to change the true nature of what was being offered.

14  It was still a prostitution ad.

15         This document you're looking at here is an exchange

16  between Carl Ferrer and staff in April of 2008 where Ferrer is

17  instructing staff that he's under pressure to clean up the

18  adult services section here in Phoenix, but he is unwilling to

19  delete any, what evidence would show, are prostitution ads,

20  because it would put Backpage in an uncompetitive position with

21  Craigslist -- this is before Craigslist shut down its adult

22  section in 2010 -- and also will result in considerable loss of

23  revenue.

24         So he instructs the moderators to ad these terms to

25  the filter where they will be stripped or removed instead of

1    the version of advertisement posted on the website:  Pop, cum,

2    oral, back door, full service and blow.  Again, ladies and

3    gentlemen, stripping out these terms, posting the sanitized

4    version of the advertisement on Backpage.com did nothing to

5    change the true nature of what was being offered.  Still a

6    prostitution ad.

7            Evidence will also show that on September 5th, 2010,

8    Carl Ferrer, defendant Andrew Padilla, as well as Hyer,

9    exchanged e-mails about needing to clean up the website because

10   of the many new users that are going to be checking out

11   Backpage.com.

12           Andrew Padilla responds that these words you're

13   looking at now were currently being filtered, in other words,

14   stripped from ads, and the sanitized version posted on the

15   website:  Barely legal, holes, cum, pussy, fuck, cunt, blow.

16   Again, stripping these words out and posting the sanitized

17   version of the advertisement on Backpage.com, again, ladies and

18   gentlemen of the jury, did nothing to change the true nature of

19   what was being offered.  It was still a prostitution

20   advertisement.

21           You want to know why Carl Ferrer was instructing them

22   that the website needed to be as clean as possible when many

23   new users checked out the site?  Well, evidence will show, a

24   few days prior to him sending that e-mail, Craigslist had shut

25   down its adult services section, which I stated before meant

1  overnight those who are posting their prostitution ads on

2  Craigslist migrated to posting those same prostitution ads on

3  Backpage, which represented a tremendous revenue growth for the

4  defendants.  However, it also meant that all eyes from law

5  enforcement, the public, and crimes against children

6  organizations were going to be focused on these defendants.

7  And, ladies and gentlemen of the jury, that is exactly what

8  happened.

9        Less than two weeks after Ferrer sends that e-mail,

10  and Padilla talking about stripping out these terms, the

11  National Association of Attorneys General, an organization made

12  up of every state attorney general here in our nation, all 50

13  sent these defendants a letter signed by 21 states attorney

14  generals.  They sent it to Samuel Fifer, who, evidence will

15  show, is the defendants' public relations representative,

16  telling these defendants pointblank that ads for prostitution,

17  including ads trafficking children, are rampant, are all over

18  Backpage.  And in light of Craigslist's decision to shut down

19  its adult services section of its website, and because these

20  defendants cannot or will not adequately screen for these ads,

21  they should shut down the adult services section of the

22  website.

23        The AGs, attorneys generals, went on to tell them that

24  they understood that this will result in considerable loss of

25  revenue for these defendants, but they reiterate to them that

1      no amount of revenue, no amount of revenue could justify the

2      scourge of illegal prostitution and the misery of the women and

3      children who will continue to be victimized by the ads posted

4      on Backpage.com.

5             And speaking of revenue, evidence will show that

6      during the time of this letter at the end of 2010, these

7      defendants were generating -- Backpage was generating

8      $30 million a year in revenue, the vast majority of which, more

9      than 94 percent, from fees they were charging customers to post

10     their prostitution ads on the website.

11            So while they were telling the AGs and others that

12     they were doing everything they could to prevent these ads from

13     being posted on the website, let's look at a few more of the

14     e-mails to show that, in fact, they were doing quite the

15     opposite.

16            This e-mail you're looking at here is from defendant

17     Andrew Padilla, the operations manager, that he and defendant

18     Joye Vaught send the moderation staff a couple weeks after this

19     AGs' letter urging them to shut down the website, threatening

20     to --

21            MS. BERTRAND:  Objection.  Misstates the document.

22            MR. JONES:  -- fire --

23            THE COURT:  The objection is sustained.

24            MR. JONES:  -- threatening -- Padilla threatening to

25     fire any moderator who acknowledges that a customer is a

1    prostitute.  And defendant Vaught is also copied on this

2    e-mail.  Leaving notes on our site that imply that we are aware

3    of prostitution or in any position to define it is enough to

4    lose your job.  He goes on to tell them, if you don't agree

5    with what I'm saying, you need to find another job.

6        Evidence will also show a couple weeks after Padilla

7    sends this e-mail, he sends moderation staff another e-mail,

8    again, to which defendant Vaught, as well as Carl Ferrer and

9    Hyer, were copied on.  In this e-mail he tells moderation

10   staff -- he includes a PowerPoint attachment, as well as an

11   Excel spreadsheet.  And in this PowerPoint he lists 37 images

12   and instructs staff that if an image had approved next to it,

13   those images were all okay to be posted in the adult services

14   section of Backpage.com.

15       He then instructs staff if an image had a fail next to

16   it, don't fail the ad if it -- if somebody posted an ad with an

17   image that had fail next to it, simply strip out the image and

18   post the sanitized version of that ad on Backpage.com.  And

19   then he tells them to only remove the entire ad if an image had

20   graphic sex act next to it.  Let's look at a few of these

21   images.

22       Approved.  Topless is okay.

23       Legs spread is okay but genitalia is covered by

24   clothing, so an ad -- an image included like this were okay to

25   be posted in the adult section of Backpage.com.

1          Approve.  Female frontal nudity with legs spread but

2     not extremely spread.  Another image like this okayed to be

3     posted in the adult services section of Backpage.com.

4          Fail.  Hand too far past waistband of panties.  Now,

5     again, ladies and gentlemen of the jury, fail didn't mean if an

6     individual posted an ad with an image like this to fail the ad.

7     Fail meant strip out that image and post the sanitized version

8     of that advertisement on Backpage.com.  Again, changing nothing

9     about the true nature of what was being offered.  Still a

10    prostitution ad.

11         Approve.  Mouth on own breast is okay.  Another image

12    okay to be posted in the adult services section of Backpage.

13         Approve.  Rear shots okay.

14         This rear shot, more graphic than the previous slide,

15    but the amount of nudity is still okay.

16         Approve.  Transparent wet panties okay.  Again,

17    another image, now this image okay to be posted in the adult

18    section of Backpage.com.

19         Fail.  Exposed anus.  Now, ladies and gentlemen of the

20    jury, again, if an individual posted an ad with an exposed anus

21    like this, evidence will show, that that ad wouldn't fail, it

22    wouldn't be prevented from being posted on Backpage, but these

23    defendants instructed moderation staff to strip out that image

24    and post the sanitized version of that ad on Backpage.  Again

25    here, changing nothing about the true nature of what was being

1    offered here.

2         Fail.  Using toy in a sexual manner.  Again, image

3    stripped out, sanitized version of the ad posted on

4    Backpage.com.  And he tells them to only remove the entire ad

5    for graphic sex act.

6         But that's not it, ladies and gentlemen of the jury.

7    Padilla goes on in this e-mail to instruct staff.  He tells

8    them that, images aside, it's the text, it's the words in the

9    ads that's killing us with the AGs, the attorney generals.  A

10   couple weeks after the AGs had just sent them this letter

11   urging them to shut down the website because of the

12   trafficking, the prostitution taking place in there, so he

13   tells staff, try to ban or strip out these terms from ads

14   before posting the sanitized version of the advertisement on

15   the website.

16        Ladies and gentlemen, stripping out any of these

17   terms:  Pegging, pussy, quicky, rape, rimming, did nothing to

18   change the true nature of what was being offered.  It was still

19   a prostitution ad.

20        These defendants knew, they knew that the vast

21   majority of advertisements on Backpage.com were prostitution.

22   Sometimes it's all about the journey and the destination --

23   destination.  Erectile dysfunction, GFE provider.  I don't care

24   for reviews, but they insist on leaving them anyway.  You can

25   find a few current reviews on The Erotic Review and the ID

1     number associated with that advertisement.

2          I love men.  I'm a GFE.  Out call and in call, with

3     the exception of in call.

4          Stacked college co-ed with the best mouth ever, GFE,

5     and the prices associated with her time.  Ladies and gentlemen,

6     these defendants knew that these were prostitution ads, but

7     they didn't shut down the website.  They didn't try to prevent

8     these ads from being posted on the website.  Why?  Greed.  They

9     were generating -- the vast majority of the revenue came from

10    fees they were charging customers to post these prostitution

11    ads on the website.

12         A couple months after Padilla sends out that e-mail,

13    the PowerPoint and the Excel document, these defendants,

14    evidence will show, that staff were told that the website

15    needed deep cleaning because the news media outlet CNN was

16    getting ready to run a broadcast about children being sold for

17    sex on Backpage.com.

18         That's right, ladies and gentlemen, it wasn't just

19    crimes against children organizations, the public, and law

20    enforcement, but news media outlet also put these defendants on

21    notice --

22         MR. BIENERT:  Objection, Your Honor.  Rule 401, 403.

23         THE COURT:  The objection is overruled.

24         MR. JONES:  -- put these defendants on notice, as one

25    letter told them pointblank, that Backpage was a hub for

1    prostitution.  But the thing is, these deep cleaning, these

2    stripping out words and images indicative of prostitution and

3    posting the sanitized version of the advertisement on the

4    website, it still didn't work to clean up the website.

5           One organization that you'll also hear about that put

6    these defendants on notice that they were promoting

7    prostitution, including prostitution of children by running

8    Backpage.com, was the National Center for Missing and Exploited

9    Children, or NCMEC.  NCMEC is a nonprofit organization based in

10   Washington, D.C., whose mission is to find missing and

11   exploited children, reduce the sexual exploitation of

12   children --

13          MR. BIENERT:  Objection, Your Honor.

14          MR. JONES:  -- and prevent the victimization of

15   children.

16          THE COURT:  The objection is overruled.

17          MR. JONES:  Since 1996, NCMEC has served as a

18   clearinghouse, a central location where crimes against children

19   can be reported, where cyber tips can be reported.

20          And what a cyber tip is, is suppose you're on the

21   internet and you come across a website where you suspect a

22   child is exploited.  You could submit that information to NCMEC

23   via the 800 number, it's often done online now, you know, where

24   you found this image, the date and location, NCMEC will

25   disseminate that information to law enforcement who will

1      further conduct an investigation.

2            Well, ladies and gentlemen, the evidence will show

3      that more than 70 percent of all child sex trafficking cyber

4      tips reported to NCMEC involved Backpage.com, the website these

5      defendants ran.  And because of it, NCMEC met with these

6      defendants to try to work with them to implement safety

7      measures to reduce or eradicate children from being sold for

8      sex on the website.

9            But while they were asserting to NCMEC and others that

10     they were doing all they could to prevent the illegal ads from

11     being posted on the website, evidence will show that these

12     defendants' main concern was making money.  And, boy, evidence

13     will show the money began to roll in about this time.  Evidence

14     will show that these defendants were often given revenue

15     reports, Larkin, Brunst, Spear, and others, showing how much

16     revenue Backpage is generating, also what sections of Backpage

17     was generating the most revenue.  And, ladies and gentlemen of

18     the jury, the vast majority of revenue Backpage was generating,

19     more than 94 percent, came from fees they were charging

20     customers to post prostitution ads.

21           For example, this pie chart you're looking at here

22     shows Backpage revenue from October 2010 to December 2010, the

23     first three months post Craigslist shutting down their adult

24     services section.  As you can see, Backpage generated

25     $8.5 million during this three-month period of time, the vast

1    majority, more than 94 percent, came from fees they were

2    charging customers to post these prostitution ads on the

3    website.

4           So while they were asserting that they were doing all

5    they could to prevent these ads from being posted on the

6    website, the proof is in the pudding.  They were devising these

7    deceptive strategies to conceal the fact that prostitution ads

8    were rampant on the website because of greed.

9           I mentioned just briefly that CNN was getting ready to

10   run a report about children being sold for sex on the website.

11   Well, evidence will show before CNN ran this broadcast, they

12   contacted the defendants through their representative,

13   defendants Lacey and Larkin specifically, and asked them if

14   they wanted to comment on this troubling issue.

15          And the evidence will show that these defendants,

16   through their PR representative, sent CNN a quote that Backpage

17   is steadfast in its opposition of its website being used for

18   criminal activity, and they also included a so-called safety

19   and security background, which included recent so-called safety

20   measures that they had implemented to ensure or attempt to

21   prevent illegal ads from being posted on the website, including

22   a new no nudity policy.

23          Well, ladies and gentlemen of the jury, evidence will

24   show after a week, after they responded to CNN with that quote

25   and that new no nudity policy, defendants sent staff an e-mail

1   entitled, Stricter Guidelines for Nudity, this e-mail exchange

2   between Padilla, Ferrer, and also the manager of the moderation

3   staff.  In it Padilla tells them that now breast must be

4   covered with clothing and thongs can't be below the butt crack.

5   He tells them that if images are posted like this, these are

6   terms of use violations on Backpage.

7          But he goes on and tells staff to don't remove ads if

8   an individual posts an ad with their breast uncovered and

9   thongs below the butt crack, but he tells them to strip out the

10  image and post the sanitized version of the advertisement on

11  Backpage.com.  And he goes on at the end to tell them, nudity

12  violations will always be a part of this business.  Deception.

13  Concealing the truth.  And a week after they had just sent CNN

14  this so-called no nudity policy they had implemented.

15         Evidence will show a week after Padilla sends this

16  e-mail, CNN runs the broadcast entitled, Selling the Girl Next

17  Door, that talked about children as young as 13 being

18  trafficked on Backpage.  You will hear evidence that these

19  defendants discussed that broadcast in person, as well as

20  e-mails, Lacey, Larkin, and others at Backpage.

21         You'll also hear that a week after CNN aired this

22  broadcast, these defendants, through their PR representative,

23  sent CNN a cease and desist letter demanding that they not

24  re-air the broadcast.  They also told CNN that Backpage was

25  steadfast in its opposition of its website being used for

1    criminal activity, including prostitution.

2            They also, in essence, challenged CNN to find any ad

3    on Backpage that could be an indicator of a child being sold

4    for sex.  And, ladies and gentlemen of the jury, you will hear

5    from a senior vice president at CNN.  He'll tell you that they

6    took Backpage and these defendants, they took these defendants

7    up on that challenge, and for one day pulled more than 12,000

8    ads that they indicated to these defendants could be indicators

9    of a child being sold for sex.

10           MR. BIENERT:  Objection.  Rule 401, Rule 403.

11           THE COURT:  The objection is overruled.

12           MR. JONES:  And they included the words like:

13   Schoolgirl, young, fresh, teenage, tight.  CNN also told these

14   defendants, they gave them examples of recent arrests all

15   around the country of pimps and traffickers who had been

16   arrested and prosecuted for selling children for sex through

17   ads placed on Backpage.com.

18           CNN also told these defendants in this letter that

19   many of the ads on Backpage included the ID number in links to

20   the prostitution review site The Erotic Review, which was

21   another strong indicator that the ads were for prostitution.

22   But, of course, they didn't tell CNN that they had a reciprocal

23   link agreement with the prostitution review site The Erotic

24   Review.  Deception.  Concealing the truth.

25           What you'll also hear, ladies and gentlemen of the

1    jury, that a week after CNN sent them that letter, they sent

2    moderation staff another e-mail.  This exchange between

3    defendant Padilla, Vaught is also copied on this e-mail,

4    defendant Vaught, as well as the moderation team manager.  And

5    they tell them that, effective immediately, any variation of

6    TER, The Erotic Review, is banned on Backpage.  But, ladies and

7    gentlemen of the jury, they don't tell them that if an

8    individual posted an ad with Erotic Review, to fail or prevent

9    that ad from being posted on the website.  They simply tell

10   them to strip out TER, Erotic Review, and post the sanitized

11   version of that on the website, changing nothing about the true

12   nature of what was being offered.  It was still a prostitution

13   ad, a week after CNN had just told them about the ads with The

14   Erotic Review.  Deception.  Concealing the truth.

15        You'll also hear that these defendants apologize to

16   customers for having to remove images and text associated with

17   their ads.

18        This ad you're looking at here, evidence will show a

19   user that went by the name of Licks a Lot contacted Backpage's

20   staff in February 2011 complaining that she was tired of

21   spending her hard earned money posting ads on Backpage.com only

22   to have her text and her images removed from her ads.

23        Ladies and gentlemen of the jury, these defendants

24   didn't prevent Licks a Lot's ads from being posted on the

25   website, in fact, guaranteed low mileage, boys, nice, round,

1    firm bottom, and the two images associated with this ad,

2    evidence will show that they apologized to Licks a Lot that her

3    images and texts had been deleted, allowed this ad to remain on

4    Backpage.com, and even gave Licks a Lot free upgrades, free

5    moves to the top in sponsor ads for all of her trouble.

6         I mentioned earlier that these defendants met with

7    National Center for Missing and Exploited Children who were

8    trying to work with them to implement measures to reduce or

9    prevent children from being trafficked on their site.  Well,

10   the evidence will show that on March 1st, 2011, defendant

11   Lacey, Larkin, Spear, Carl Ferrer, and others at Backpage met

12   with the National Center for Missing and Exploited Children.

13   But before this meeting, evidence will show that at defendants

14   Larkin and Carl Ferrer's request, defendant Padilla pulled more

15   than 600 terms that were currently being filtered or stripped

16   from ads, a week before meeting with the National Center for

17   Missing and Exploited Children.

18        And you will hear that they met with NCMEC, and during

19   this meeting, NCMEC showed these defendants images of known

20   missing children, and then those same children posted in ads in

21   the adult services section of the Backpage.com.

22        NCMEC also showed these defendants images of known

23   missing children, and then profiles of these children on the

24   prostitution review site The Erotic Review, but, again, like

25   CNN, they didn't tell NCMEC they had had a reciprocal link

1   agreement with The Erotic Review.  Deception.  Concealing the

2   truth.

3          You'll also hear that later that day these defendants

4   also met with Polaris Project, another anti-human trafficking

5   organization based in Washington, D.C., whose mission is to

6   prevent women and children from being sold for sex.  And you'll

7   hear from a representative from Polaris during the course of

8   this trial.  He'll tell you that during this meeting with

9   Larkin, Spear, Ferrer, and others at Backpage, that Polaris

10  spread out Backpage ads across the table and went ad for ad

11  giving these defendants instances, indicators of women and

12  children being sold for sex.

13         But approximately nine days after meeting with

14  National Center for Missing and Exploited Children and Polaris,

15  evidence will show that these defendants met to discuss

16  Backpage related developments.  And a part of the agenda items

17  for the meeting included how they could be more flexible and

18  allow more coded terms.  You'll also see about a week after

19  that meeting Padilla sends moderation staff, sends an e-mail to

20  defendant Vaught and moderation manager Monita Mohan entitled

21  Relaxed Image Standards.  And he tells them that the first and

22  last image you're looking at, that these images were okay to be

23  posted in the adult services section of Backpage.com.

24         And the evidence will show for the second and third

25  image, staff were instructed to strip out the image and post

1    the sanitized version of the advertisement on Backpage.com,

2    again, changing nothing about the true nature of what was being

3    offered.

4            Also, the day before Padilla sends this e-mail,

5    defendant Vaught also sends staff an e-mail entitled Adult

6    Moderation.  And she tells staff that we're going to allow

7    users to post pictures with their hands near their crotch

8    again.  And she goes on to tell them that we still want to

9    delete the pictures where they have their hands in their

10   panties.  Again, ladies and gentlemen, a perfect example of how

11   these defendants are trying to do everything they could to keep

12   law enforcement, crimes against children, and others off their

13   backs, while not upsetting their customers, because that's

14   where the vast majority of the revenue Backpage was generating

15   were coming from, fees they were charging customers to post

16   these prostitution ads on the website.

17           And deleting pictures, deleting images, the individual

18   who posted with hands inside their panties, did nothing to

19   change the true nature of what was being offered.  It was still

20   a prostitution advertisement.  Defendant Vaught knew that, as

21   well as her other five coconspirators.  In knowing this, they

22   intentionally facilitated the prostitution crime being

23   committed by folks who were posting these ads on the website.

24   And why?  Greed.

25           Evidence will also show that because of the mounting

pressure these defendants were receiving from the public and these crimes against children organizations and others, they hired individuals they called internet safety experts, in a so-called attempt to work with them to reduce or eliminate prostitution ads, ads offering sex for money, from being posted on their website, as well as the trafficking of children.

Ladies and gentlemen of the jury, evidence will show that these defendants didn't even implement the safety measures recommended to them by their own internet safety experts.  For example, this document you're looking at here was sent to defendant Larkin, Spear, and others at Backpage from their safety experts telling them that the phrase new in town was often used by pimps who shuttle children to locations where they don't know anyone and can't get help.

Evidence will also show that these defendants were told that the phrase AMBER Alert, that's right, the national child abduction phrase, to be on the lookout for this phrase because it also could be an indicator of a child being sold for sex.  But, ladies and gentlemen of the jury, evidence will show that even after being told this, these defendants continued to allow ads with new in town to be posted on the website.  And the evidence will show that AMBER Alert was simply added to the strip term from ad filter.  So if a user or somebody posted an ad that included AMBER Alert, the AMBER Alert would be stripped from the ad, and the sanitized version of the advertisement

1   posted on Backpage.com, changing nothing about the true nature

2   of what was being offered.

3        These defendants were also told by their internet

4   safety experts to determine if a user was using the same credit

5   card or the same phone number to post multiple ads in the adult

6   services section of Backpage, because this could also be an

7   indicator of a prostitution or human trafficking situation.

8   But even after being told this, they continued to allow users

9   to post multiple ads with the same credit card, as well as post

10  multiple ads using the same phone number.

11       You'll also hear that during this time these

12  defendants exchanged e-mails, defendant Larkin and others at

13  Backpage, including former CEO Carl Ferrer, about implementing

14  age verification.  So before posting an ad in the adult

15  services section of Backpage, you have to input your -- verify

16  with your driver's license or some other type of identification

17  information.  Ladies and gentlemen of the jury, evidence will

18  show that although age verification would have only cost

19  between 79 and 99 cents a query, these defendants determined

20  that it wasn't cost effective to implement.

21       Now, let's look at the revenue they were generating

22  during this time, July 2011 where they're exchanging e-mails

23  about implementing age verification.  Backpage had generated

24  $40 million a year -- $40 million in just a nine-month period

25  of time, from October when Craigslist shut down to that next

1    July, $40 million, 94 percent from fees they were charging

2    customers to post prostitution ads on their website, but they

3    didn't even want to pay 79 or 99 cents a query to implement age

4    verification.   Greed.

5           You'll also hear that these defendants met with --

6    continued to meet with states attorney generals who put them on

7    notice that they were promoting prostitution by running

8    Backpage.com.

9           You'll hear that in one meeting with the Washington

10   State Attorney General's Office, you'll hear from a Washington

11   state representative, you'll hear from Professor Paula Selis.

12   Professor Selis will tell you that she asked a Backpage

13   representative during this meeting, she asked them pointblank,

14   you mean to tell me that the folks contacting individuals in

15   the adult services section of Backpage, the women that they're

16   contacting are offering to go out for coffee?   To which she'll

17   tell you the Backpage representative told her, we can't deny

18   the undeniable.

19          That's right, ladies and gentlemen, these defendants

20   can't deny that they knew that the vast majority of the ads on

21   Backpage.com were nothing less than prostitution ads.   And

22   knowing this, they intentionally facilitated the prostitution

23   crimes being committed by folks who were posting these ads on

24   the website because of greed.

25          You'll also hear during this time these defendants

1    continued to brag about Backpage's contribution to the

2    prostitution industry.  This document you're looking at here is

3    an excerpt from a draft editorial entitled Backpage Understood.

4    In it defendant Lacey states, eliminating our adult advertising

5    will in no way eliminate or even reduce the incidents of

6    prostitution in this country.

7          He goes on to say, for the very first time, the oldest

8    profession in the world has transparency, recordkeeping, and

9    safeguards.

10         Ladies and gentlemen, the evidence will show that

11   defendant Lacey sends this draft editorial to defendant Larkin,

12   who forwards it on to former CEO Carl Ferrer.  And Larkin tells

13   Ferrer, he says, Carl Ferrer, I want you to think about any of

14   the information, any of the information Lacey just sent him

15   being made public.  We need to stay away from the very idea of

16   editing the posts, as you know.  Deception.  Concealing the

17   truth.

18         You'll hear that Carl Ferrer removed Lacey's comments

19   about bragging about Backpage's contributions to the

20   prostitution industry before finalizing that document.

21         Evidence will also show that in August of 2011 the

22   National Association of Attorneys General, I told you they sent

23   them -- the defendants a letter signed by 21 AGs in September

24   2010.  Well, in 2011 they sent these defendants another letter,

25   this time signed by every attorney general in the state -- in

1    the United States, all 50, telling these defendants pointblank

2    that naked persons in provacative positions are featured in

3    nearly every ad on Backpage.

4            The AGs go on to tell these defendants that it doesn't

5    take forensic training to know that these are prostitution ads.

6    They also tell them that this hub for illegal services has

7    proven particularly enticing for those seeking to sexually

8    exploit minors.  But even after this letter signed by every

9    attorney general in the state -- in the United States, they

10   still didn't shut down the website.  Why?  Greed.  By the end

11   of 2011, evidence will show Backpage had generated nearly

12   $60 million, more than 94 percent from fees they were charging

13   customers to post prostitution ads on the website.

14           Evidence will also show that in January of 2012 Auburn

15   Theological Seminary, a faith-based organization based out of

16   New York City, who have met in person with defendant Larkin, as

17   well as defendant Lacey, to try to work with them to implement

18   safety measures to reduce or eliminate children and women from

19   being sold for sex on Backpage, but after still finding the

20   same ads on Backpage, they sent Lacey and Larkin a seven-page

21   letter specifically addressed to them telling them that a

22   cursory, a brief review of Backpage shows customers selling

23   sex.

24           They also went on to give these defendants examples of

25   children as young as 12 being sold for sex, and pimps and

1    traffickers convicted through ads placed on Backpage.com.

2         A couple of months after this e-mail, evidence will

3    show, in April 2012, a mother contacted Backpage staff and told

4    them that a 17-year-old minor who had an ad posted in the

5    escort section of Backpage.com was trying to recruit her

6    15-year-old daughter into prostitution.  And the evidence will

7    show these defendants, defendant Padilla, told staff that we

8    can't do anything -- don't do anything about this ad because

9    she didn't claim her own daughter is being depicted in the ad.

10         You'll also hear that that same month another mother

11   contacted Backpage staff and included a link to her daughter's

12   ad on the -- on the website called Backpagepics.com.  And she

13   tells staff that the link included images of her daughter who

14   had been drugged and taken against her will, and urged Backpage

15   to shut down, take down those ads.  To which the response for

16   her was that, we don't own Backpagepics.com so we can't do

17   anything about that.

18         Well, ladies and gentlemen of the jury, evidence will

19   show that this same mother contacted Backpage a few days later,

20   again, this time with her daughter's -- a link to her

21   daughter's ad on the website Backpage.com, a website these

22   defendants ran, urging them to take down the ads of her

23   daughter who had been drugged and taken against her will.

24   Nothing happened.  The mother again the next day, and finally

25   the ads were taken down.  The evidence will show that this

1   e-mail exchange was ultimately forwarded from Carl Ferrer to

2   defendant Larkin, to which Larkin replied, CF, Carl Ferrer,

3   that's a good, solid response.

4           Now, ladies and gentlemen of the jury, you'll hear

5   from victims during the course of this trial.  They'll tell you

6   how Backpage made it easy to sell them for sex.  They'll also

7   tell you how everybody in the prostitution industry knew that

8   Backpage was a website to visit to connect with folks offering

9   sexual services in exchange for money.

10          They'll also tell you about how their pimps and

11  traffickers took photos of them and placed those photos in ads

12  and posted them on Backpage.com offering them for sex.

13          They'll also talk to you about some of the code words

14  used in the prostitution industry, as well as how important the

15  upgrades, the move-to-the-tops in the sponsor ads were, because

16  of the prevalence of prostitution ads on Backpage.

17          You see, evidence will show that this case isn't just

18  about these defendants generating tens of millions of dollars

19  off facilitating prostitution.  The lives of countless women

20  and children have been forever changed by their running

21  Backpage.com for 14 years.

22          You'll hear -- you'll hear from that mother of that

23  14-year-old who had to attempt to buy sex with her daughter to

24  rescue her from being sold for sex.

25          MR. BIENERT:  Objection, Your Honor, 401, 403.

1          THE COURT:  The objection is overruled.

2          MR. JONES:  You'll hear from a father who had to

3    contact Backpage staff to urge them to take down ads of his

4    daughter.  And you'll also hear, you'll hear that these

5    defendants likely submitted thousands of cyber tip reports to

6    NCMEC about a possible trafficking occurring on Backpage.

7    You'll hear that they were sometimes quick to respond to law

8    enforcement requests for information to further trafficking

9    investigations, and also that they prevailed in some court

10   hearings and proceedings in regards to Backpage.

11          But, ladies and gentlemen of the jury, evidence will

12   show the courts, if NCMEC, if the law enforcement, if they only

13   knew, if they only knew what we know now about how these

14   defendants were creating prostitution ads on Backpage and the

15   content aggregation process; how they were intentionally

16   soliciting prostitution-related business from prostitution

17   review sites like The Erotic Review; how they were

18   intentionally promoting the prostitution businesses of these

19   super posters like Sean Kim; how they were constantly changing;

20   how they were instructing staff to moderate these ads based on

21   the pressure they were receiving from the public; how they were

22   about to strip terms from ads, because if they only knew.  Why?

23   Greed.

24          You'll hear from -- you'll hear from Destiny and

25   Naomi.  Naomi here, Naomi who was sold for sex beginning at the

1    age of 14, she'll tell you that her traffickers told her

2    pointblank that they were using prepaid cards to post ads of

3    her on Backpage, cards you could buy from CVS or Walgreens,

4    because they didn't -- they couldn't be tracked.  They didn't

5    allow them to be tracked, or didn't link back to any bank

6    account information as identifying them as the ones posting her

7    on Backpage offering her for sex.

8          These NCMEC, their own internet safety experts urged

9    them to implement not allowing customers to pay -- to post with

10   these prepaid cards.

11         You'll also hear from Destiny who was trafficked at

12   the age of 15.  Destiny will tell you that if you attempted to

13   post an ad on Backpage with an age under the age of 18, you

14   simply get an oops message and allowed to post that same ad by

15   indicating that you were 18 or older.

16         The defendants, they didn't stop allowing these

17   customers to pay with these prepaid cards, they didn't

18   implement age verification, something NCMEC and others had

19   urged them to do, they didn't shut down the website.  Why?

20   Greed.

21         By the end of 2012, they had generated $80 million a

22   year, more than 94 percent from fees they were charging

23   customers to post these prostitution ads on the website.

24   That's why they didn't shut it down.

25         You will also hear evidence that beginning in 2013

banks and credit card companies began to put these defendants

on notice that they -- what they understood their customers to

be using their cards to post for illegal services, in other

words, prostitution ads on Backpage.  In fact, in August of

2013, Chase Bank, one of the largest financial institutions

here in the country, sent Backpage staff an e-mail telling

them -- telling them that beginning this month -- beginning

September 1st, 2013, Chase was no longer accepting transactions

from Backpage due to their involvement in human trafficking.

And you will hear, evidence will show that this e-mail

from Chase Bank was forwarded to defendant -- was sent to Carl

Ferrer and Dan Hyer, who forwarded and sent this Chase Bank

e-mail to defendants Larkin, Brunst, and Scott Spear.  And

Ferrer told them that I think our problem may get larger on

Sunday -- Sunday, September 1st.

And you will hear their response of these banks and

credit card companies, stop processing Backpage associated

payments.  These defendants devised deceptive strategies to

fool credit card companies into thinking their charges weren't

-- their customers' charges weren't related to Backpage by

creating seemingly unrelated entities.

A couple you'll hear about throughout the course of

this trial, Website Technologies, as well as Posting Solutions.

Ladies and gentlemen of the jury, evidence will show that

Website Technologies and Posting Solutions was simply

1   Backpage.com disguised under a different name.  Deception.

2   Concealing the truth.  And it worked.  Fooling credit card

3   companies into thinking their charges weren't associated with

4   Backpage, it worked.

5          By the end of 2013, evidence will show that Backpage

6   had generated nearly $113 million from that year alone, the

7   vast majority of which came from fees they were charging

8   customers to post these prostitution ads on the website, more

9   than 94 percent.

10          You'll also hear -- let's look at defendants'

11   individual incomes for 2013 from -- that they reported to

12   Medalist Holdings, which is a parent company for Backpage.

13   Defendant Lacey made nearly $39 million for 2013 alone;

14   defendant Larkin, nearly 38 million for 2013 alone; defendant

15   Brunst, more than $6 million; and defendant Spear, nearly 3

16   million for just 2013 alone.

17          Evidence will also show in 2014 these defendants

18   continued to be put on notice as one payment processing company

19   told them that they understood their customers to be using

20   their credit cards to post prostitution ads on their website on

21   Backpage.

22          You'll also hear that in April of 2014 U.S. Bank,

23   another large financial institution here in the U.S., sent

24   these defendants a letter addressed specifically to former CFO

25   Jed Brunst, telling them, please be advised that we have

1    elected to close your account with us.

2         Evidence will also show the next day defendant Brunst

3    sends this letter -- attaches this letter by U.S. Bank in an

4    e-mail to Carl Ferrer, Scott Spear, and others, telling them

5    that May 1st we will be completely out of U.S. Bank.  We'll

6    move all of our banking under Website Technologies at BMO.

7    Ladies and gentlemen of the jury, Website Technologies was

8    simply Backpage.com disguised as a different name.  Deception.

9    Concealing the truth.

10        You'll also hear in 2014 that these defendants

11   continued to meet to discuss Backpage developments, how to grow

12   the site.  And one of the agenda items for this meeting

13   included that Backpage was able to grow because Craigslist shut

14   down its adult erotic services section, and they were allowing

15   customers to post on Backpage without leaving any meaningful

16   identification.  In other words, they could pay with these

17   prepaid cards.

18        You'll also hear that they continued to instruct staff

19   on how to moderate these ads.  This e-mail you're looking at

20   here from defendant Vaught sent in April of 2014 where she

21   tells staff that if they come across an add in the adult

22   section of Backpage that included a link to a sex-for-money

23   website, to strip out the link and post a sanitized version of

24   the advertisement on Backpage.com.  Again, changing nothing

25   about the true nature of what was being offered.  It was still

1    a prostitution ad.  Oh, she tells them, don't bother removing

2    it from the current ad.  Deception.  Concealing the truth.

3            Also around this time the National Center for Missing

4    and Exploited Children served these defendants with a brief

5    criticizing their efforts to eradicate children from being sold

6    on the website.  And, ladies and gentlemen of the jury, NCMEC

7    didn't know what we've discussed and what the evidence will

8    show in this case, but they were exactly right.  They didn't

9    have all the internal documents and e-mails, the evidence to

10   show, but they were exactly right in 2014 when they told these

11   defendants pointblank that the unpleasant reality is that

12   Backpage publicizes carefully selected operational processes as

13   a subterfuge, as a means of deception and trickery to avoid

14   increased scrutiny, while providing traffickers with easy

15   access to an online venue to sell children for sex.

16           NCMEC didn't have all this stuff, but they knew then

17   what the evidence would show.  Why?  They still didn't shut

18   down the website even after this brief being served to them by

19   NCMEC.  Why?  Greed.  By the end of 2014, Backpage had

20   generated nearly $135 million, the vast majority of which,

21   94 percent came from fees they were charging customers to post

22   prostitution ads on the website.

23           And let's look at some of these defendants' individual

24   income for 2014.  Defendant Lacey for one year alone for the

25   parent company of Backpage made more than $50 million;

1    defendant Larkin, nearly 50 million; defendant Brunst, more

2    than 10 million; and Spear, more than $4.3 million for this one

3    year alone.

4           You'll also hear that in 2014 defendants Lacey,

5    Larkin, Brunst, and Spear, they entered into a so-called letter

6    of intent to sell Backpage for $600 million.  And I say so-

7    called sale, because, ladies and gentlemen, it was a sham.  It

8    was bogus.  The sale, it wasn't a sale.  Evidence will show, in

9    fact, after this so-called sale was complete in April 2015,

10   these four defendants maintained significant financial and

11   operational control over Backpage, including they're entitled

12   to payouts on any future loans, a 30 percent participation in

13   any future sale of Backpage above the purchase price.

14          They were also -- ladies and gentlemen of the jury,

15   evidence will show that this sham of a sale that I mentioned

16   was these defendants loaning former CEO Carl Ferrer, they

17   loaned him the $600 million to purchase Backpage.  And in doing

18   so, Carl Ferrer couldn't sell Backpage without these

19   defendants' permission, but, ladies and gentlemen of the jury,

20   he couldn't even hire an accountant without these four

21   defendants' permission.

22          They also had to approve the annual budget and

23   business plan, and had full access to all of Backpage's books

24   and records, as well as full access to all of Backpage's bank

25   accounts even after this so-called sham of a sale was completed

1   in April 2015.

2          You'll also hear that in April 2015 the financial

3   institution Mastercard, again, a large financial institution

4   here in the U.S., sent Backpage an e-mail, sent them a letter

5   telling them that beginning May 1st that Mastercard might stop

6   processing Backpage associated payments, in other words, they

7   might stop allowing customers that used that Mastercard to post

8   in the adult services section of Backpage.

9          In response, evidence will show that Carl Ferrer sent

10  former CFO and defendant Jed Brunst an e-mail telling him that

11  we should route all the Mastercard transactions through an

12  international bank so we can fool Mastercard into thinking that

13  the customers' charges weren't related to Backpage.  To which

14  defendant Brunst replied, regarding MC, Mastercard, didn't we

15  go down the Mauritius path, the bank in East Africa, didn't we

16  go down that path once, and the banks have the same issue with

17  our content.

18         That's right, ladies and gentlemen, wasn't just the

19  international -- wasn't just the U.S. banks that had a problem

20  with their content, the international banks, evidence will

21  show, also didn't want to do business with Backpage out of

22  concerns that their customers were using their cards for

23  illegality.

24         Evidence will show that by the end of 2000 -- the

25  summer of 2015, Visa, Mastercard, and Amex had stopped

1    processing Backpage associated payments.  In other words, the

2    customers weren't allowed to pay to post prostitution ads using

3    their Visa, Amex, or Mastercard.

4          And you will hear that these defendants referred to

5    this time at Backpage as credit card Armageddon.  And because

6    of credit card Armageddon, Visa, Mastercard, Amex pulling out,

7    evidence will show that these defendants stopped charging

8    customers to post their prostitution ads on Backpage, and now

9    only charged them for upgrades.  We talked about the move to

10   the top, as well as the sponsor ads.

11         In order to pay for these upgrades, evidence will show

12   that, led by Carl Ferrer, as well as former CFO Jed Brunst,

13   they created these alternative payment methods where customers

14   could pay using bitcoin credits, as well as checks and money

15   orders.

16         This document you're looking at now is a Backpage

17   staff member, an e-mail a Backpage staff member sent a customer

18   complaining that she is unable to use her credit card to post

19   in the adult services section of Backpage.  And the staff

20   member tells this customer, this e-mail sent to defendant

21   Vaught, if you would like to pay for upgrades, we can only

22   accept checks or money orders made out to Posting Solutions.

23         The staff goes on in this e-mail to state, please do

24   not make your payments out to Backpage, as we will no longer be

25   able to accept them.  Deception.  Concealing the truth.  And it

1   worked.

2        Evidence will show these defendants -- millions in

3   checks and money orders were sent and deposited into the bank

4   accounts.  This image you're looking at now is at Backpage.

5   You see all the checks and money orders the customers had sent.

6   These checks and money orders, evidence will show, were

7   deposited into accounts in the name -- millions of dollars into

8   the name of Posting Solutions.  Posting Solutions, again,

9   Backpage disguised as a different name.

10       Same thing with bitcoin.  Evidence will show that

11  individuals who paid for the -- paid for their upgrades and

12  moved to the top of their prostitution ads that paid by

13  bitcoin, this was deposited into Website Technologies' account.

14  And the evidence will show this money that was deposited into

15  Posting Solutions and Website Technologies, evidence will show

16  this money was funneled to other bank accounts, including

17  Serious Properties, to further conceal the fact that Backpage

18  was involved in the transaction.

19       But guess what the evidence will show were the

20  authorized signers on the Serious Properties account, defendant

21  Brunst and Spear.  And the evidence will show that once this

22  money reached Serious Property, it was funneled back out to

23  defendants as well as Backpage.  And it worked.

24       By the end of 2015, let's look at the defendants'

25  individual income, even after Visa, Mastercard, and Amex had

1     stopped processing Backpage associated payments, defendant

2     Lacey in 2015 still made nearly $26 million for this one year

3     alone; defendant Larkin, nearly 24 million; defendant Brunst,

4     3.8 million, nearly 4 million; and defendant Spear, 2.8 million

5     for 2015 alone.

6          Evidence will show that these defendants continued, in

7     2016, fooling credit card companies into thinking their charges

8     weren't associated with Backpage, and allowing customers to pay

9     with bitcoin, money orders, and checks.  By the end of 2015 --

10    2016, Backpage had generated more than $128 million a year.

11    Evidence will show, ladies and gentlemen, the vast majority of

12    which, 94 percent came from fees they were charging customers

13    to post these for these upgrades, the move-to-the-tops for

14    their prostitution ads.

15         Now, let's look at defendant Lacey's and Larkin's

16    Backpage distributions for just this one year alone, between

17    January 2016 and January 2017, defendant Lacey, more than 30

18    million in Backpage distributions, and defendant Larkin, the

19    evidence will show, and his family, more than $28 million for

20    this one year alone.

21         You'll also hear evidence that in January 2017,

22    following a 17-month investigation, the U.S. Senate issued a

23    report on Backpage.  And the day this report was issued, these

24    defendants stopped allowing customers to post ads in the adult

25    services section of Backpage.  But that didn't change anything.

1    They simply allowed customers to move from posting these

2    prostitution ads in the adult services section of the site to

3    posting these same prostitution ads in the personal section of

4    Backpage where they remain until the website was seized and

5    shut down by the United States in April 2018.

6         By the end of 2017, evidence will show that Backpage

7    had generated more than $135 million a year, the vast majority

8    of which came from fees they were charging to post and pay for

9    these prostitution ads even after the U.S. Senate's report in

10   January of 2017.  And in 2018, the first few months of 2018

11   before the website was seized and shut down, more than 26 --

12   nearly $26 million.

13        Ladies and gentlemen of the jury, I'll end my opening

14   statement like I began when I told you about a mother,

15   Mrs. Pride, that you'll hear from, who had to attempt to buy

16   sex with her daughter in order to rescue her from being sold

17   for sex through ads through Backpage.

18        And I'll end by telling you about another mother that

19   you'll hear from throughout the course of this trial, Nacole

20   Svengard.  Nacole will tell you that after her daughter's

21   trafficker had been arrested and convicted for selling her for

22   sex through ads placed on Backpage, Nacole went -- this mother

23   went on a mission to shut down Backpage.  And this mission led

24   her to meet with the mayor and the attorney general --

25        MR. BIENERT:  Objection, Your Honor.  Relevance.

1          MR. JONES:  -- the National Center --

2          THE COURT:  Counsel.

3          MR. BIENERT:  Your Honor, it also calls for hearsay.

4          THE COURT:  Well, it's not hearsay, but the 403

5     objection is sustained, and relevance.

6          MR. JONES:  Nacole will also tell you that outside of

7     the chambers of the U.S. Senate, she crossed paths with

8     defendant Michael Lacey.  And defendant Lacey told her,

9     pointblank, that if these yahoos would keep their fucking mouth

10    shut, we wouldn't have all these issues.  Ladies and gentlemen

11    of the jury, thankfully, these mothers, NCMEC, Auburn

12    Theological Seminary, the U.S. Senate, these entities and

13    individuals, thankfully, they didn't keep their mouth shut, and

14    because of it, Backpage.com is shut down.

15         And the government submits that after all the evidence

16    is presented to you in this trial, that you find these

17    defendants, hold these defendants accountable for their

18    criminal conduct in running this website for nearly 14 years.

19    The government submits that you find each six of these

20    defendants guilty.

21         Thank you.

22         THE COURT:  Okay.  We're going to take a 15-minute

23    recess.  If you need more time to make sure you all get a

24    restroom break, of course we'll wait, but as soon as you're

25    ready, we'll come back in.

1           (Recess taken, 3:08 p.m. - 3:26 p.m.)

2           THE COURT:  Okay.  I understand someone wanted to talk

3    to me before we brought the jury back in.

4           MR. CAMBRIA:  Afternoon, Your Honor.

5           Your Honor, at this time, I would move for a

6    declaration of a mistrial on several grounds.

7           First of all, the basic child theme throughout this

8    summation, number of things about children being trafficked, he

9    starts his -- his opening with a child situation, he ends it

10   with a child situation, continues to talk about children being

11   trafficked when there is no such charge.

12          The next thing is a 404(b)(3) violation.  Each one of

13   those uncharged pictures or ads that he showed in his

14   presentation, what constituted wrongful act under 404(b)(3), of

15   which we should have had knowledge under subdivision 3 and

16   notice, and we were not given any of that.

17          The other thing that I base this on is he made a

18   comment at one time, these defendants can't deny, which has

19   been a fairly hot topic with the jury during selection.

20          The other thing that's troublesome is that when he

21   talked about the attorney generals' letter, he said, and all 50

22   attorney generals signed it.  And that is an issue that I

23   thought the Court had discussed and was put to bed and would

24   not be mentioned, but to say all 50 signed it, we have a lot of

25   smart people on this jury.  We have people with post-grad

1    degrees and so on, and -- and someone there may very well think

2    that one of the signators was your husband.  And I just think

3    that, you know -- and how does that get any better?  You say,

4    oh, my husband didn't sign that.  I mean, this just makes it

5    worse.  I was surprised to hear that.  And I think it's

6    unfortunate, but that, in connection with the other things,

7    especially the 404(b)(3) and the comment on silence and the

8    right to silence, is a problem.

9          MR. BIENERT:  If I can add one more, that is what

10   jumps out at me the most, Your Honor has acknowledged several

11   times, this is a specific-intent crime.

12         Your Honor has even said several times, when we have

13   raised things about our concern that they're trying to make

14   this general, or they're trying to make this about, quote,

15   prostitution in general, you flat out said in various prior

16   hearings, no, this isn't about just prostitution in general,

17   it's about whether they can prove specific intent on the 50 ads

18   charged.

19         We can't un-ring this bell.  What Mr. Jones did -- I

20   mean, literally the entire opening was saying, these people

21   were repeatedly told that they, in general, had prostitution on

22   their site.  They were repeatedly told after the fact that they

23   had children who had been identified as already having been

24   peddled, or they had women who did prostitution and were

25   trafficked all after the fact.

1          What's amazing to me, he didn't show them one ad, not

2     one, that he claimed any defendant had any knowledge of before

3     it went out, because they don't have that evidence.  And so

4     what he has done here that has irreparably tainted this jury

5     and is a clear error, is he basically said this is a general

6     intent crime.  You just need to find out that they know

7     generally, because all of these do-gooders are telling them

8     that you -- you're hurting children, you've got prostitution,

9     therefore, they knew enough.  And they are now supposed to, in

10    advance, identify each and every potential criminal as opposed

11    to the legal escort ads.

12          Number one, that's impossible to do.  Number two, it

13    absolutely violates the law that this is specific intent.

14    Number three, it violates what you have said repeatedly.  This

15    isn't about just saying they're promoting prostitution.  It's

16    about 50 specific ads and particular business enterprises.  He

17    did none of that.

18          And I haven't -- other than, frankly, telling you --

19    telling the jurors what I'm telling you, Your Honor, which, of

20    course, is saying, become a lawyer and a judge all at once,

21    ladies and gentlemen of the jury, which we know they can't, I

22    have no way of addressing this.

23          So, unfortunately, after all this time and effort, I'm

24    standing here thinking, this is all totally egregious, because

25    these people have been told, convict our guys, didn't identify

1   a single one of them for a single one of the 50 ads, not one.

2   It's outrageous.

3          And we have been screaming, as Your Honor has said in

4   denying some motions we made, this is obvious.  We knew all

5   along that your position is this is protected, it can't be

6   general.  No, they got -- they're going to get their day in

7   court to show the specific counts in this indictment.  It's not

8   what he did.

9          So on all the -- for all the reasons Mr. Cambria said,

10  and especially he has now tainted the jury with the general

11  intent presentation, we move for mistrial.

12         THE COURT:  Let me ask you something though before I

13  hear.

14         With respect to that issue, so this is not argument

15  so --

16         MR. BIENERT:  You know, Your Honor, I get it, but you

17  can't cure this by saying, ladies and gentlemen, what the

18  lawyers say isn't argument, you're going to hear -- and the

19  reason is because he literally, and very persuasive -- I'll

20  compliment him on a nice presentation -- the problem was it was

21  just -- it was deceptive, to use his word, because that's not

22  how the law works.  And what he did was he repeatedly -- I

23  counted -- I think I was up to 48 times that he said child

24  trafficking.  And after you rejected my objections, I think

25  five times in a row, I said, all right, I'm not getting up

1    again.  But we talked about this being a problem.  We've all

2    acknowledged, although he doesn't want to, this isn't a child

3    trafficking case.

4            So you can't un-ring this bell.  You can't tell these

5    guys, forget about this persuasive piece that Mr. Jones just

6    told you about all the women and children who have been hurt

7    because of these guys, when they never identified a single one

8    that anybody knew about.

9            THE COURT:  Okay.

10           MR. LINCENBERG:  Your Honor, I'd like to add two

11   points.  First, you know, the emotional highlight at the

12   beginning and the end where we're talking about a mother and

13   children and their -- their quest to protect their children,

14   they're listed as witnesses.  They're not the subjects of any

15   of the 50 counts in the case.

16           And, you know, when the Court says, well, but --

17           THE COURT:  Is it their daughters?

18           MR. LINCENBERG:  No, they're not the subject of any

19   counts.  My understanding is they're not the subjects of any of

20   the 50 counts.

21           And, you know, when the Court makes the comment to

22   Mr. Bienert that, well, it's opening statement, you know, I

23   mean, in a California state civil case they would call it a

24   nonsuit, you know, the -- an opening statement is not

25   irrelevant.  It's very important.  This is indelibly impressed

1    in the minds of jurors, and it was blatant mis -- blatant cause

2    for a mistrial.

3            The last point I want to make, and I think it's

4    secondary to the earlier points, so I don't want to detract

5    from them, but it's still important and it was still improper,

6    was the references to CNN.  You know, it's this effort to say

7    -- it's this effort to throw mud that because so and so accused

8    you, because the state attorney general wrote you a letter, or

9    this organization, or CNN.  You know, if -- if CNN said

10   President Trump should be impeached, and they started listing,

11   well, because he uses prostitutes like Stormy Daniels, and he

12   engages in tax evasion and bribery, et cetera, and if President

13   Trump doesn't respond to that, is that admissible evidence in

14   an impeachment trial that he did not respond to something?  And

15   it -- it really, in a context of a criminal trial where we're

16   sitting here, it's sort of a ruse to go over the line and --

17   and sort of comment on this idea that defendants are not

18   responding to accusations.

19           It's a clever way to plan this idea of not responding.

20   It's an -- and it's impermissible.  I mean, are we now left in

21   a situation where somebody is going to come in from CNN and we

22   should start cross examining them on, let's say, dozens of

23   stories they've done where they've accused people of things

24   that were incorrect in the end.  Sometimes they may be correct,

25   sometimes incorrect.  It creates this whole sideshow that's

```
1    improper.
2              THE COURT:  Okay.  I'm sorry.  You're getting far off
3    from the point as it relates to the opening statement.  I
4    understand what your concern is about cross-examination, but --
5              MR. LINCENBERG:  So forget about the cross-
6    examination, it's --
7              THE COURT:  Yeah.
8              MR. LINCENBERG:  My main point is the impropriety of
9    using that for the reasons I stated.
10             THE COURT:  Okay.  Thank you.  I have a line, a line
11   behind you of people.
12             MS. BERTRAND:  Good afternoon, Your Honor.
13             THE COURT:  Good afternoon.
14             MS. BERTRAND:  We also move for a mistrial and note
15   that no one wants to do this case twice, but we have a real
16   problem with the government's argument.  And I'm going to call
17   it argument, it wasn't a statement.
18             The reference to sexual services for money as the
19   working definition that the government has now told us to use,
20   and has told these jurors to use, is flat wrong, and has not
21   only now raised an issue of a mistrial, but also renews our
22   concern about what the grand jury was instructed in this
23   matter.
24             If the government used that same definition of sexual
25   services for money, which, by the by, has no basis in law, then
```

1    that grand jury was mis-instructed.  They now have told us,

2    just like they told us, what, two hearings ago, that's their

3    definition -- three hearings ago -- and it's a real problem.

4    Because just because things are sexual or sexy or titillating

5    does not constitute prostitution.  Here's some examples.

6         I was stupid enough to incur over a hundred thousand

7    dollars in law school debt only to learn in this case I could

8    have been getting paid to have my feet rubbed.  There is maid

9    services here in the valley that have scantily dressed or

10   undressed women come clean your house.  Again, weird, but not

11   sex, not intercourse, not someone's something going into

12   someone's something else.  That's sex, and that's prostitution.

13        If this government has used this outrageously

14   overbroad definition for prostitution, they misguided the grand

15   jury, they've misguided this petit jury, and we have a

16   mistrial.

17        THE COURT:  I am not equating sexual services with

18   foot rubs.  I'm not seeing your --

19        MS. BERTRAND:  It's actually --

20        THE COURT:  -- connection.

21        MS. BERTRAND:  Yeah, it's actually part of the adult

22   services sections where women -- and there is all kinds of sex

23   work.  There is --

24        THE COURT:  So that's adult services.

25        MS. BERTRAND:  Uh-huh, in a very sexual, stimulating

1    way.  I'll give the example of the women who come clean house

2    scantily clad or naked, that's not advertised with Merry Maids,

3    it's advertised in the adult sections and it's sexual.  It

4    might be, for some people, very exciting.

5            THE COURT:  Okay.

6            MS. BERTRAND:  But it is not prostitution.  And for

7    them to continue to use this sexual services for money

8    definition is misconduct and it is the basis for a mistrial.

9    At the least, it is a basis to review the grand jury

10   instructions that this government gave the grand jury.

11           THE COURT:  Okay.  Thank you.

12           MR. FEDER:  Let's talk about a few more 404(b) issues.

13           I objected to the one, it was overruled.  They brought

14   up the inter -- the international aspect of Backpage, which, of

15   course, has absolutely nothing to do with this case, because

16   some of the -- the -- even prostitution is legal, for instance,

17   in Holland, but they brought it up anyhow, for reasons unknown.

18   I don't know if they've got any evidence that they plan to

19   present, but it's obviously 404(b), and it's improper, and it's

20   another basis for a mistrial.

21           Similarly, they brought up the Senate Subcommittee.

22   Are we going to get into the Senate Subcommittee, the PSI

23   report?  They've listed nothing that I know of from the PSI

24   report, but they brought it up anyhow right at the end.

25           Kind of a little bit going back to the fact that they

1   didn't mention one of the 50 ads.  They also didn't mention one

2   of those 50 ads having any money associated with it to justify

3   the money laundering charges.  Why, because it doesn't fit into

4   the narrative that they wanted to push to this jury, which is

5   just to talk about general intent prostitution, and mostly

6   child prostitution, and child -- you know, child facilitation,

7   unfortunate, and a lot of stuff that's not in the evidence, a

8   lot of stuff that shouldn't -- that, obviously, shouldn't be a

9   part of this case, has never been noticed in this case, and all

10  to inflame this jury on issues that this Court has written and

11  talked about is improper.

12          THE COURT:  Is there anybody else?

13          MR. CAMBRIA:  Sorry, but one more thing.  They never

14  noticed this so-called statement on the part of my client

15  either even though we requested them.

16          THE COURT:  Okay.  From the government.

17          MR. JONES:  Your Honor, I don't quite know how to

18  respond to this.

19          The Court has instructed the jury, as it pertains to

20  opening statements, you know, they objected.  You know, they

21  were given the government's PowerPoint a couple days before the

22  opening.  We listed the exhibits that we were going to

23  reference.  We did all we could to do that.  They -- they stood

24  here for nearly an hour before the opening objecting before I

25  even had given it, and then now they're objecting again, Your

1   Honor, about some of the same things that the Court has already

2   ruled on.

3          You know, the child sex trafficking, the Court

4   instructed the defendants that they wanted to -- if they felt

5   the government was getting out of line, they wanted to object,

6   they could, and -- and they did, and Your Honor sustained and

7   overruled some of those objections.

8          You know, Bruce's point that we brought up the Senate

9   PSI report, first of all, that's listed on our exhibit list.

10  Second of all, I merely mentioned that the CSI issued their

11  report.  I didn't go into any of the details of the report.  I

12  just said they issued their report in January 2017, and the --

13  and they stopped accepting ads in adult and they moved to

14  personals.

15         You know, Mr. Cambria's statement about none of the

16  ads are referenced in the indictment, several of the ads in my

17  PowerPoint are charged counts.  And, again, Mr. Cambria had my

18  PowerPoint two -- two days ago, Your Honor.  And so if he had,

19  you know, an issue with the ads or what they were, he could

20  have -- could have -- should have brought that up with myself

21  or the Court before post opening statements.

22         And, you know, I don't -- you know, even with the

23  notice letters, the two AG letters, Your Honor, these are

24  things that have already been litigated, you know, and the

25  Court have ruled that they were admissible to show notice, you

1    know.

2              And, again, these defendants -- and it looks like

3    they're -- will attempt to do this the entire trial, Your

4    Honor -- but relitigate issues that we spent the last three

5    years litigating.  And we are at trial now and the government

6    is allowed to give its opening statement, just like Mr. Bienert

7    and all these other five defendants are able to give their

8    opening statements, you know.

9              And so we feel like -- is there a specific thing out

10   of everything you just heard, Your Honor, you'd like the

11   government to address, because there is so much?

12             THE COURT:  Yes.

13             MR. JONES:  Okay.

14             THE COURT:  So one is their -- what they're defining

15   as 404(b), and why that's not 404(b) that required notice.

16             MR. JONES:  We charged conspiracy from 2004 to 2018,

17   and everything before that -- I mean, everything that

18   encompasses that, Your Honor, is not 404(b).  You know, they've

19   been aware of that, of what we charged since April 2018.  We

20   charged conspiracy that began in 2004 and in or around

21   April 2018.

22             THE COURT:  So it's your position that it's intrinsic

23   evidence and not 404(b)?

24             MR. JONES:  Correct.  Correct, Your Honor.  It's

25   closely related to the offense, correct.  It's a part of the

1    conspiracy, Your Honor.

2         THE COURT:  The second thing is -- well, first, with

3    respect to the comments about children trafficking, I've

4    already ruled on that.  And the government didn't cross the

5    line on that issue, in my mind, because they didn't go into any

6    of the details.  It was merely the fact that this happened.

7         The next thing I want a response from you about is the

8    comment about the attorney generals, because their concern is

9    -- well, I'm sure they have concerns about the content of the

10   letter -- but their concern is that you've now associated that

11   somehow with my husband.

12        MR. JONES:  Your Honor, we'll show both of those

13   letters, the 2010 and the 2011 AG letter.  They'll come in as

14   part of our trial through witnesses.  And so the jury will know

15   who the Arizona Attorney General was during the time those

16   letters were sent, so it will address that concern.  Each

17   attorney general that signed that letter, they'll be shown

18   that.

19        THE COURT:  Let's see, and then the next one is their

20   argument that you have now commented on the defendants' right

21   to remain silent when you said these defendants can't deny.

22        MR. JONES:  That was a reference to they can't deny

23   the undeniable.  We'll have a witness to come in who has

24   firsthand knowledge of that, and that's what a Backpage

25   representative told her, and that was my reference to that.

1    And she'll testify at trial, Your Honor.

2         THE COURT:  And refresh my memory on who that was.

3         MR. JONES:  Professor Paula Selis.

4         THE COURT:  And with respect to your definition of

5    prostitution, which, honestly, I don't recall you saying that

6    this is the legal definition, that you phrased it in a general

7    sense, but -- so I'd have to look back at that -- but what is

8    your response to their argument that you have -- well, they

9    actually accused you of misconduct by doing that.

10         MR. JONES:  Again, I mean, the judge will instruct the

11    jury on -- on the law in this case, Your Honor.  And, you know,

12    my reference to, you know, prostitution is sex for money, I

13    don't see how that in any way -- I didn't mention any type --

14    that it was a legal definition.  It was just part of my opening

15    statements.  And if they want to rebut that, they could do so,

16    you know, during trial, but that is certainly not misconduct on

17    the government's part for -- for making that statement.

18         THE COURT:  Okay.  And then the last thing is from

19    Mr. Cambria who says that you never provided notice of the

20    statement his client made.

21         MR. RAPP:  I'm happy to respond to that.

22         Well, first of all, there will be a lot of

23    statements --

24         THE COURT:  I can't hear you.

25         MR. RAPP:  Just as a general proposition, there will

1  be a lot of statements from these defendants that will come

2  from witnesses that they don't necessarily have notice of, and

3  I don't know what our obligation is.  But we do have an

4  obligation if they gave a statement in response to

5  interrogation, but that's not the case here.

6         They did get the report from the 302 from -- that is

7  an interview of Nacole Svengard where she relates to running

8  into Mr. Lacey at the Senate Subcommittee and making that --

9  him making that statement to her.

10        THE COURT:  So that statement is in the 302?

11        MR. RAPP:  The statement is in the 302, yes.  And I'll

12  tell you what we'll do, we'll be happy to send that to

13  Mr. Cambria this weekend so he can have that, if he hasn't

14  looked at it in discovery.

15        THE COURT:  Okay.

16        MR. CAMBRIA:  May I?

17        THE COURT:  Yes.

18        MR. CAMBRIA:  As to the last issue, they're obligated

19  to give us notice when we ask for it, we did and they didn't.

20        As to the 404(b), he never answered --

21        THE COURT:  Wait.  He just said he gave it to you in

22  the 302.

23        MR. CAMBRIA:  No.  He said it's in the 302, but no

24  indication that it was something they planned to use.  That's

25  what we asked.

1              The other situation, the 404(b) --

2              THE COURT:  Okay.  What rule says that they have to do

3      that?

4              MR. CAMBRIA:  It's 16, Your Honor.

5              MS. BERNSTEIN:  It's Rule 16(b)(1), Your Honor.

6              THE COURT:  Go ahead.

7              MR. CAMBRIA:  Yes.  On the 404(b), his response is

8      that's part of the conspiracy.  It doesn't matter what it's

9      part of.  Subdivision 3 requires advance notice so that we can

10     deal with it.  And there was no such advance notice.  And the

11     way he presented it to everyone was in like:  Each one of these

12     is a violation too.  So that's exactly what 404(b) is all

13     about.  So now he's showed all those pictures to them,

14     basically telling them that these are all -- you know, more

15     violations, and that's a classic violation of 404(b), classic

16     violation.  And he didn't give us notice.

17             If we didn't give him notice, I'm sure we'd be hearing

18     about it.  He did not give us notice.  And his response is, oh,

19     it's part of the charge.  Still, we're required to get notice.

20             MS. BERNSTEIN:  And, Your Honor, I've just been

21     feeling left out, so I'd like to pile on, if I can.

22             THE COURT:  Okay.

23             MS. BERNSTEIN:  The first thing I would add to the

24     record is that I believe Mr. Jones's response to the -- to the

25     burden shifting in his opening statement by saying that we will

1   not be able to deny that we intentionally facilitated

2   prostitution, that was never a comment that was made to

3   Ms. Selis.  The comment that was made to Ms. Selis was by a

4   representative of Backpage who said, we can't deny the

5   undeniable.  I don't even know if that's true, but that's what

6   the allegation has been.

7       We did extensive pretrial litigation with Your Honor

8   when the government filed this motion to admit every statement

9   under the sun by every person under the sun who ever heard from

10  any of these people sitting here.  And we told Your Honor at

11  that point that this was not contemplated by the rules of

12  evidence, that it was prejudicial, that it was -- violated 401,

13  violated 403.  And Your Honor's ruling on that motion was to

14  say that you would not pretrial admit any of that, you would

15  wait until trial until it came out.

16      Mr. Jones manipulated the statement that he is going

17  to elicit from Ms. Selis, or that someone is going to elicit

18  from Ms. Selis.  She did not say -- no one ever said to her

19  that our clients intentionally facilitated prostitution and

20  they cannot deny that.  It is extreme dangerous burden

21  shifting.

22      THE COURT:  Okay.

23      MS. BERNSTEIN:  My second point -- if I can put this

24  up on the Elmo.  I'm curious.  This was one of Mr. Jones's

25  slides, adult versus non-adult.  And I want to know if

1   everything in the adult section, if he contends and believes

2   that to be prostitution, because I don't even think that's the

3   government's contention.

4          And, finally, while Your Honor was running through

5   things with Mr. Jones, his entire 200-minute presentation was

6   inverting the standard here, was making this a general intent

7   crime in direct and stark contrast to your rulings when you've

8   denied every motion we have brought on the topic.  So I don't

9   know what the government's response is to that either, but I

10  did want to bring that back up.

11         Thank you.

12         THE COURT:  Well, okay.  Ms. Bertrand is standing

13  behind you.

14         MS. BERTRAND:  The government's response to us saying

15  they continue to mis-define what is prostitution under any

16  jurisdiction, not to mention the independent jurisdictions in

17  which each of these ads was placed, was to say just give the

18  jury an instruction.  So they -- that, to me, is a concession

19  that they misstated the law, they misrepresented it to this

20  petit jury.  And based on the government's statements in this

21  case over the summer, where, when challenged on this issue

22  before, said prostitution is sex for money, without defining

23  sex, without defining services, and that is a fundamental

24  misrepresentation of the law.  They can't take it back.

25         THE COURT:  Except that this is a general opening

1    statement.  If he had said this in closing arguments, this is

2    the definition of prostitution, and this is how we proved that

3    there was sexual services and for money, that would be an

4    issue, but to incorporate into a relatively short statement for

5    all of the evidence that they expect based on what they showed,

6    I don't see how it's a misrepresentation.

7            MS. BERTRAND:  It's a flat out misrepresentation of

8    what the law is.  And, more importantly, it is consistent with

9    what the defense says likely was told to the grand jury as an

10   instruction for what is prostitution.  The government

11   ferociously defended that request to either show us -- show us

12   what you told the grand jury this is.

13           THE COURT:  Okay.  So, counsel, how long do you think

14   your opening is?

15           MR. BIENERT:  I really don't time them out, but I've

16   got to think it's an hour-and-a-half.

17           THE COURT:  All right.  So we're going to recess.

18           What?

19           MR. BIENERT:  Well, we're in a Hobson's choice here,

20   Your Honor, because obviously we feel strongly about this, but

21   as bad as it is now, if these jurors go home and percolate,

22   Saturday, Sunday, Monday, Tuesday, for five days after this

23   grossly inappropriate opening that basically mischaracterized

24   the law --

25           THE COURT:  Well, so I can -- we can start now if you

1  want, I just didn't think you would want to be interrupted.

2          MR. BIENERT:  I'll be honest, I don't know the

3  standard.  I mean, the truth is, this should be a mistrial and

4  we should get that.

5          THE COURT:  Well, these are serious allegations, so

6  there is a couple things I want to look at before I rule on it.

7          MR. BIENERT:  Okay.  But may I do this, I was -- can I

8  have five minutes to confer with everyone about whether, with

9  our mistrial in place, I don't want to have this be some

10  waiver --

11          THE COURT:  No, no.

12          MR. BIENERT:  -- do I go ahead and just spend the last

13  hour, so at least I've gotten something out, to try to talk

14  about this or not.

15          THE COURT:  Sure.  Take five minutes.

16          MR. BIENERT:  And I do want to just say this, because

17  when you were questioning Mr. Jones, you, as always, very

18  organized, but you never asked him at all about what, in my

19  mind, is the biggest problem, mainly what he repeatedly said,

20  which is that the reason our clients had knowledge and notice

21  and are guilty is because of people anecdotally telling them

22  these things are happening.  And he never ever, not once, said,

23  and here's a specific count where we're going to show you that

24  one or some combination or all of these defendants knew it was

25  an illegal prostitution ad before it was published.

1          And, you know, obviously, we've had our disagreements

2     on the law with Your Honor, but the one area where we go home

3     -- and we got our heads down because we think -- we think she's

4     got the law wrong, she's seeing it different than us -- but the

5     one area we've always said to each other, but she recognizes

6     that they have to prove the 50 counts.  You've said that at

7     least twice in transcripts that we have.

8          And what he just -- he didn't do any of that.  And so,

9     to me, in the many problems here, the single biggest issue is

10    he told this jury, you can and should find them guilty because,

11    in general, bad things happen to some people who are on

12    Backpage.  But he never said, and I'm going to show you that

13    they had specific knowledge and intent of this ad right here,

14    it's count 22 in the indictment, and they purposefully let it

15    be published so they could help this prostitute's business

16    venture.  That's what you have said the case should be.

17         And, frankly, while we've been skeptical, because

18    every word that has come out of Mr. Rapp's mouth, Mr. Jones's

19    mouth, and the reason we've been so fighting over it -- and in

20    fairness to you, you don't hear all the evidence or see it like

21    we do -- what we're seeing over and over again is these guys

22    aren't planning on proving individual counts.  They're just

23    going to go in and say, the Senate said this is bad, a church

24    group said this is bad, a bunch of AGs said this is bad.

25         You know what's interesting, Your Honor, one of the

1   greatest tells of all, which -- at least for me -- when he

2   talked about the 50 attorney generals -- attorneys general, he

3   literally used the word, they urged Backpage to stop.

4   Attorneys general don't urge, they -- they enforce the law.

5   The reason they urged is every single law enforcement person

6   with authority to charge, or every judge who has ever seen this

7   case until now right here in this court, has recognized that

8   you can't convict these guys just because you hear anecdotally

9   that bad things are happening.

10          THE COURT:  Okay.

11          MR. BIENERT:  And that's what he told them, he's

12   saying you can.  And the jury has heard it.  They can't un-ring

13   that.  And it's just fundamentally wrong.

14          The indictment is wrong.  It's just an invalid

15   indictment.  We shouldn't even be here.  But more -- well, I'm

16   not going to say more importantly -- equally importantly, what

17   he just said is just grossly wrong under the law.  And he never

18   even addressed it and you didn't ask about it.

19          So I'm confused by what you're saying the standard is,

20   because, in my mind, what he is trying to do here is

21   inconsistent with what even you've said the standard is on

22   multiple times.  And I would be curious to see how he tells us

23   he's demonstrated that this isn't a general intent crime.

24          THE COURT:  Does he have to demonstrate that in

25   opening statements?

UNITED STATES DISTRICT COURT

```
 1              MR. BIENERT:  Absolutely, that's the legal standard.

 2              As it is, you know, Your Honor, we're sitting here

 3    with our hands tied behind our back because you haven't given a

 4    First Amendment instruction.  That's your call, we think it's

 5    clear error, but we already have that.

 6              But now in addition to that, we've got a bunch of

 7    people told, you know, if a bunch of people who are anti --

 8    I'll call it adult sex or any kind of sex -- tell you stop, and

 9    you don't, you get hauled into court.

10              You know, it's funny, I thought Mr. Lincenberg's thing

11    about Trump was such a great analogy, because, the truth is,

12    since he's such a lightning rod, if the standard for whether

13    Mr. Trump could or couldn't be prosecuted was based on what CNN

14    or the paper or people are saying he did that's illegal, the

15    guy would have been prosecuted ten times over, but it's not the

16    standard.  But that's what they're making the standard here.

17    In other words, this whole case -- they're bringing in CNN.

18    How many trials do -- I have been doing this 35 years --

19              THE COURT:  Okay.  Can I hear Mr. Jones respond --

20              MR. BIENERT:  Sure.

21              THE COURT:  -- to that.

22              MR. JONES:  One thing Mr. Bienert failed to mention,

23    Your Honor, the first 40 or 45 minutes of my opening statement

24    talked about how these defendants were engaging in content

25    aggregation by creating prostitution ads on Backpage, how they
```

1  have -- how they're intentionally facilitating prostitution by

2  business arrangements with prostitution review sites like The

3  Erotic Review.

4         The government also talked extensively about the super

5  posters, how defendants were intentionally promoting the

6  prostitution businesses of super posters as well.  I mean, he

7  mentions none of that when he talks about this general intent,

8  Your Honor.  You know, that -- those are instances of these

9  defendants specifically intending to promote prostitution

10  through running Backpage.  And that was the first 40 or

11  45 minutes of my opening statement.

12         Moderation as well.  We went through that, so --

13         MR. BIENERT:  And I'll just say, Your Honor, that

14  violates your, this isn't about general prostitution, ruling.

15         THE COURT:  Yeah.

16         MR. BIENERT:  That's exactly what he just described.

17  It's got to -- it's got to be he's going to prove that my

18  client specifically intended to help prostitute Sally Smith and

19  the Smith Prostitution business, and he knew that she was

20  advertising and he said, all right, I'm going to help you out.

21  That's what he has to do.  He hasn't even tried to do that and

22  he's polluted the jury against us.

23         THE COURT:  Okay.  So take a few minutes, because I

24  need to know if you want to do your opening or not.

25         MR. EISENBERG:  Your Honor, excuse me, I haven't had a

1    chance to speak.  I don't mean to be hiding.

2         I join my colleagues in the motion to dismiss the

3    indictment, but I will add one thing that I don't think we've

4    really considered, and that is whether the government has

5    waived its right to go forward by not expressing the connection

6    between what it seeks to prove in all of the counts that have

7    been charged in this case, because, as we have said, there is

8    no connection between what Mr. Jones has said and any of those

9    counts, so therefore they have waived their right to go

10   forward.

11        THE COURT:  Well, what do you mean by they've waived

12   the right to go forward?

13        MR. EISENBERG:  They have an obligation in their

14   opening statement to relate the government's evidence to the

15   charges.  And those -- there are some 52 substantive charges

16   here.  That's not just an idle comment.

17        I don't have the legal research on it, but my

18   understanding of what an opening statement is designed to do is

19   to link the charges through the evidence that the government

20   seeks to present to the jury.

21        THE COURT:  Okay.  But what do you mean by they waive

22   the right?

23        MR. EISENBERG:  Well, if they haven't done it in their

24   opening, then they can't go forward, therefore, the case --

25        THE COURT:  Ever?

```
 1              MR. EISENBERG:  Yes, Your Honor.

 2              THE COURT:  Or it's cause for a mistrial?

 3              MR. EISENBERG:  I'm sorry, mistrial.

 4              THE COURT:  Okay.  Thank you.

 5              MR. BIENERT:  Your Honor, I think what we think should

 6    happen is we would ask that we get an expedited transcript.  We

 7    would want to review the transcript and file a written motion.

 8              THE COURT:  So we -- your request is that you not

 9    start your opening?

10              MR. BIENERT:  Correct.

11              THE COURT:  Okay.  Also, in addition to the

12    transcript, I want from the government the information about

13    this statement about, we can't deny the undeniable, whatever

14    you disclosed to the defense, I guess you can provide it.

15              You can provide it.

16              And I want that tonight so.  As well as since I'm

17    getting information, the 302 from the -- the woman, the mother

18    that heard the statement from Mr. Lacey, and if you can tell me

19    when it was disclosed to them.

20              MR. CAMBRIA:  Could I comment on that, Judge?

21    Remember we have somewhere around 11 million documents that

22    were disclosed to us.  And to say that they discharged their

23    duty under Rule 16 by now saying, oh, it was one of those 11

24    million documents, I don't think cuts it.

25              THE COURT:  Okay.
```

1          MR. CAMBRIA:  The other thing is I think what

2    Mr. Eisenberg was talking about is that there are cases that

3    say that if a prima facie case was not made out in the opening,

4    the charge could be dismissed.  And they, at no time, talked

5    about the 50 ads that you said in your decision are the ones

6    that they have to show specific knowledge of, and that they

7    then furthered a business enterprise with.

8          THE COURT:  Okay.  So the two things I asked for was

9    the statement from the professor and the statement from the

10   mother, and then I'll order the transcript, an expedited

11   transcript.

12         And we're coming back on Wednesday, right, because

13   Monday is a holiday, Tuesday is a holiday, Wednesday.  So if

14   you're going to --

15         Let me ask you this, because I don't know, from your

16   perspective, when you electronically file something, can you do

17   that on a holiday?

18         MR. STONE:  Yes.

19         THE COURT:  Okay.  So if you're going to file

20   something, I need it on Monday so I can -- I mean, I'll start

21   looking at the issues.  I know what the issues are.  The

22   government knows what the issues are.

23         MR. BIENERT:  And, obviously, because -- I will say

24   this.  I assume -- I mean, we've been pretty good here, we've

25   got pretty lengthy statements.  I'm assuming that because we're

UNITED STATES DISTRICT COURT

1    doing it quickly, I don't think we have to necessarily restate

2    every single thing we've said.  I assume Your Honor will have

3    the transcript and incorporate a lot of that.  It will allow us

4    to do a shorter --

5                THE COURT:  Yes.

6                MR. BIENERT:  -- brief, to get kind of the down and

7    dirty to you.

8                THE COURT:  Yes.  I'll have the transcript.  I assume

9    you'll have the transcript.

10               MR. BIENERT:  Yes, Your Honor.

11               THE COURT:  Okay.  I'm just going to have Elaine tell

12   the jury that we're recessing.

13               And, Elaine, they have the calendar that says we're

14   coming back on Tuesday, so make sure they know.

15               COURTROOM DEPUTY:  They asked me about getting a copy.

16   Can I just print them a new copy or --

17               (An off-the-record discussion was held between the

18   Court and the courtroom deputy.)

19               THE COURT:  We're at recess.  Because my office is

20   upstairs, I'm doing some work with Elaine here, so feel free to

21   get up.

22               (Proceedings concluded at 4:10 p.m.)

23                         *         *         *

24

25

1                    C E R T I F I C A T E

2

3          I, CHRISTINE M. COALY, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of

6   Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion of

9   the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 4th day of September,

13  2021.

14

15

16

17                    /s/ Christine M. Coaly_____
                      Christine M. Coaly, RMR, CRR

18

19

20

21

22

23

24

25