Thomas H. Bienert, Jr. (CA Bar No.135311, *admitted pro hac vice*)
Whitney Z. Bernstein (CA Bar No. 304917, *admitted pro hac vice*)
BIENERT KATZMAN LITTRELL WILLIAMS LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Facsimile: (949) 369-3701
tbienert@bklwlaw.com
wbernstein@bklwlaw.com
*Attorneys for James Larkin*

Paul J. Cambria, Jr. (NY Bar No. 1430909, *admitted pro hac vice*)
Erin McCampbell (NY Bar. No 4480166, *admitted pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile: (716) 855-1580
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Michael Lacey*

Additional counsel listed on next page

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | Case No. 2:18-cr-00422-PHX-DJH |
| Plaintiff, | **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS WITH PREJUDICE** |
| vs. | |
| Michael Lacey, *et al.*, | (Oral argument and evidentiary hearing requested) |
| Defendants. | |

Gary S. Lincenberg (CA Bar No. 123058, *admitted pro hac vice*)
Ariel A. Neuman (CA Bar No. 241594, *admitted pro hac vice*)
Gopi K. Panchapakesan (CA Bar No. 279856, *admitted pro hac vice*)
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW PC
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110
glincenberg@birdmarella.com
aneuman@birdmarella.com
gpanchapakesan@birdmarella.com
*Attorneys for John Brunst*

Bruce Feder (AZ Bar No. 004832)
FEDER LAW OFFICE PA
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: (602) 257-0135
bf@federlawpa.com
*Attorney for Scott Spear*

David Eisenberg (AZ Bar No. 017218)
DAVID EISENBERG PLC
3550 N. Central Ave., Suite 1155
Phoenix, Arizona 85012
Telephone: (602) 237-5076
Facsimile: (602) 314-6273
david@deisenbergplc.com
*Attorney for Andrew Padilla*

Joy Malby Bertrand (AZ Bar No. 024181)
JOY BERTRAND ESQ LLC
P.O. Box 2734
Scottsdale, Arizona 85252
Telephone: (602)374-5321
Facsimile: (480)361-4694
joy.bertrand@gmail.com
*Attorney for Joye Vaught*

# TABLE OF CONTENTS

I.    INTRODUCTION. ..................................................................................................... 1

    A.    Factual Background ........................................................................................ 2

    B.    Legal Background ........................................................................................... 6

II.   THE COURT SHOULD DISMISS THE INDICTMENT WITH PREJUDICE
    UNDER THE DOUBLE JEOPARDY CLAUSE. ................................................ 9

    A.    Judge Brnovich declared a mistrial *because of* the government's *purposeful*
        *conduct* and did not make any findings under *Kennedy*. ................................... 10

    B.    The government's other arguments are similarly unavailing. ........................ 11

    C.    Defendants have asserted a more than colorable double jeopardy claim.... 13

III.  THE COURT SHOULD DISMISS THE INDICTMENT WITH PREJUDICE
    UNDER ITS SUPERVISORY AUTHORITY. .......................................................... 14

    A.    The government admits to withholding obvious Rule 16 and *Brady* material.
         ......................................................................................................................... 16

    B.    The government's justification of its invasions of Defendants' privileges
        with Ferrer is manifestly hypocritical. ........................................................... 17

    C.    The government's invasions of Defendants' privileges with respect to nearly
        1,000 emails shows a broad pattern of misconduct........................................ 19

IV.   THE COURT SHOULD DISMISS THE INDICTMENT WITH PREJUDICE
    UNDER THE DUE PROCESS CLAUSE. ............................................................ 22

V.    CONCLUSION........................................................................................................ 22

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Arizona v. Washington*,
   434 U.S. 497 (1978)...................................................................................................12

*Bartnicki v. Vopper*,
   532 U.S. 514, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001) ........................................8

*Bursey v. United States*,
   466 F.2d 1059 (9th Cir. 1972).................................................................................9

*Carriger v. Stewart*,
   132 F.3d 463 (9th Cir. 1997).................................................................................16

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
   868 F.3d 104 (2d Cir. 2017)...................................................................................8

*Chaplinsky v. New Hampshire*,
   315 U.S. 568 (1942)................................................................................................9

*Greater Philadelphia Chamber of Com. v. City of Philadelphia*,
   949 F.3d 116 (3d Cir. 2020)...................................................................................8

*IMDB.com Inc. v. Bacerra*,
   962 F.3d 1111 (9th Cir. 2020).................................................................................8

*McKenna*,
   881 F. Supp. 2d.............................................................................................2, 3, 9

*Metro Lights, L.L.C. v. City of Los Angeles*,
   551 F.3d 898 (9th Cir. 2009)..................................................................................7

*Oregon v. Kennedy*,
   456 U.S. 667 (1982)............................................................................................9, 12

*Pittsburgh Press Co. v. Human Relations Comm'n*,
   413 U.S. 376 (1973).............................................................................................6, 7

*Richardson v. United States*,
   468 U.S. 317 (1984)..............................................................................................13

*United States v. Alvarez-Moreno,*
  657 F.3d 896 (9th Cir. 2011) ........................................................................................ 13

*United States v. Bhatia,*
  No. CR 05-0334 SBA, 2007 WL 2795066 (N.D. Cal. Sept. 26, 2007) .......................... 13

*United States v. Bundy,*
  968 F.3d 1019 (9th Cir. 2020) ...................................................................................... 17

*United States v. Kojayan,*
  8 F.3d 1315 (9th Cir. 1993) ............................................................................. 14, 15, 22

*United States v. Lopez-Avila,*
  678 F.3d 955 (9th Cir. 2012) ................................................................................. 14, 15

*United States v. Lum,*
  944 F.2d 642 (9th Cir. 1991) ........................................................................................ 11

*United States v. Martin,*
  561 F.2d 135 (8th Cir. 1977) .......................................................................................... 9

*United States v Pederson,*
  2014 WL 3871197 (D. Or. Aug. 6, 2014) ..................................................................... 21

*Valle Del Sol Inc. v. Whiting,*
  709 F.3d 808 (9th Cir. 2013) ..................................................................................... 7, 8

**Statutes**

A.R.S. § 9-500.10 ............................................................................................................. 2

A.R.S. § 13-1422 .............................................................................................................. 2

# I.     INTRODUCTION.

In the face of damning admissions from one of its key witnesses, a California DOJ agent, that the hundreds of Backpage.com ads he reviewed in effect were protected speech under the First Amendment, the government had no option but to goad Defendants into moving for a mistrial. Agent Fichtner was supposed to testify that the ads he reviewed "were nothing less than prostitution ads." Exh. E at 7-11.[1] Instead, he testified that the ads were lawful on their face, he could not tell whether they advertised prostitution, and he made no arrests based on the ads (and is not aware of any law enforcement officer making arrests based on the ads). *See, e.g.*, Exhs. J, K. With the core of the government's case eviscerated by the conclusion of its first witness' testimony, the government doubled down and goaded a mistrial through repeated inflammatory testimony about rape and child sex trafficking that violated multiple Court orders. If there ever was a case of "goading" under *Oregon v. Kennedy*, this is it.

Alternatively, the Court should dismiss the indictment under its supervisory powers. The government admits it has not turned over a highly relevant and exculpatory attorney opinion letter provided by Arnold & Porter to a prospective third-party purchaser of Backpage regarding the legality of the business. Dkt. 1395 ("Opp.") at 26-27. That is the tip of the iceberg here, as the government continues to deny the obvious relevance of a prior federal investigation that resulted in a decision not to prosecute Backpage just six years before this prosecution was brought, without ever certifying that it has produced all of the factual materials underlying that investigation.

The government also continues to sweep under the rug its admitted, serial privilege invasions during its interviews of the government's key cooperating witness, Carl Ferrer. The government cannot escape its tacit admission on the eve of trial (in seeking to preclude Defendants from putting on the very attorney advice that the government previously claimed was non-privileged) that the questions it asked Ferrer directly called for information that, on its face, is privileged. This Court's supervisory powers exist precisely to address this type of pattern of government misconduct and to deter the government from engaging in such conduct again in the future.

---

[1]     "Exh." Refers to the exhibits attached to Defendants' Motion to Dismiss at Dkt. 1355.

1    Because this motion was filed prior to Judge Brnovich's recusal and the Court does not

2 have the benefit of being familiar with the nearly four years of history preceding Defendants'

3 motion dismiss, Defendants initially will provide some context regarding the government's charges

4 so the Court can better understand how the government's case foundered, why the government

5 would want to cause a mistrial, and how the government's trial misconduct is part of a long pattern

6 of misconduct.

7    **A.    Factual Background**

8    On March 28, 2018, Defendants were indicted on Travel Act charges tied to fifty specific

9 adult-oriented ads that had run on Backpage.com, related money laundering counts, and related

10 conspiracy charges.  Each of the fifty charged ads was either a dating ad, an ad for massage services,

11 or an ad for escort services—with dating, massage services, and escort services all being lawful

12 activities.[2]

13    Backpage.com was the second largest classified advertising website on the internet.  *See*

14 *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1266 (W.D. Wash. 2012).  During the fourteen

15 years it operated, the site hosted hundreds of millions of ads posted by third parties, including

16 many millions of adult-oriented ads.  *Id.*  Similar to craigslist.com (the largest classified ad website

17 on the Internet), most ads on Backpage were free.  *Id.*  Also like craigslist, Backpage generally

18 required the payment of a small fee (between $7.00 and $12.00) for adult-oriented ads.  Some of

19 the fifty charged ads were paid ads, but others were free ads that generated no revenue for

20 Backpage.  Backpage's aggregate revenues from the publication of the fifty charged ads probably

21 were at most between $500.00 and $1,000.00.

22

23

---

24 [2]    The government erroneously told Judge Brnovich that escort services were unlawful
virtually everywhere in the United States (Dkt. 1171-1 at 15 ("I think escort is sort of a
25 misnomer…. because it suggests that escort services is somewhat legal.  And, as we know, it's only
legal in a very a small county in Nevada, so it's really prostitution services…")), **but that is not**
26 **true**.  *E.g.*, *McKenna*, 881 F. Supp. 2d at 1282 ("numerous states license, tax and otherwise regulate
escort services as legitimate businesses"); A.R.S. § 9-500.10 (regulating escort advertising); A.R.S.
27 § 13-1422 (regulating adult oriented businesses, including escorts).   Judge Brnovich, too,
understood escort services to be lawful. Dkt. 1171-1 at 15-16 ("I did think there was a distinction
28 between escort services and prostitution services, so I guess that's the main thing, or one of the
issues involved in the case…").

From the many millions of adult-oriented classified ads that ran on Backpage in its fourteen years of operation, the government identified and charged just **one ad** that expressly offered sex in exchange for money.  Dkt. 230, ¶ 201, Count 23.  That solitary ad was a free ad, which generated absolutely no revenue for Backpage.  None of the forty-nine other charged ads expressly offered sex in exchange for money, nor did any other Backpage ad the government identified in its disclosures to the defense.  That is because, as the government knows, Backpage **never** allowed ads offering sex in exchange for money on its website.

Undeterred by the fact that Backpage never permitted ads proposing facially unlawful transactions, the government premised its prosecution on its claim that many Backpage ads contained terms or images that were "indicative" of prostitution, which it claimed made them "obvious" prostitution ads.  *E.g.*, Superseding Indictment ¶ 160 ("Victim 1's Backpage ads often included words and phrases that were indicative of prostitution").[3]  The government took the same tack in its unprecedented seizures of virtually all of Defendants' assets (*see* Dkt. 1366), where its affiant, Postal Inspector Lyndon A. Versoza, acknowledged the "seemingly innocuous language" in Backpage ads, but claimed the "otherwise neutral or innocuous terms" in Backpage ads actually were a "coded language for sex trafficking and prostitution."[4]  Inspector Versoza also claimed, based on his "training and experience," that images in Backpage ads such as "a picture of a

---

[3]     *See also* ¶¶ 34 ("ads … [had] terms and pictures that were particularly indicative of prostitution"); 68 ("particular terms that were indicative of prostitution"); 75 ("terms indicative of prostitution"); 78 ("50 terms [] all of which were indicative of prostitution"); 87 ("lengthy list of terms that were indicative of prostitution"); 91 ("ad [] was obviously for prostitution"); 95 ("660 words or phrases that are indicative of prostitution"); 96 ("The ad was obviously for prostitution"); 107 ("phrases … indicative of prostitution"); 128 ("words and phrases that are indicative of prostitution"); 132 ("a woman who was obviously posting prostitution ads") (first bullet point); 143 ("long list of terms that are indicative of prostitution"); 161 (Victim 2's ads "also contained words and phrases indicative of prostitution"); 164 ("Victim 5's Backpage ads included words and phrases that were indicative of prostitution"); 167 ("Victim 8's … ads on Backpage [] included words and phrases that were indicative of prostitution"); 170 (Victim 11's "Backpage ads contained words and phrases indicative of prostitution").

[4]     Even if Postal Inspector Versoza expressed his opinions about coded language in good faith, he could not know whether his speculations were correct. *McKenna*, 881 F. Supp. 2d at 1279 ("[W]here an online service provider publishes advertisements that employ coded language, a reasonable person could believe that facts exist that do not in fact exist: an advertisement for escort services may be just that…. [I]f the offer is implicit, how can a third party ascertain that which is being offered before the transaction is consummated?").

woman's cleavage," women "wearing lingerie" and "posing in sexual positions," and images of "naked buttocks" also were "typical of ads for prostitution."[5]  Dkt. 1366-16, ¶¶ 31-32.

At trial, the government planned to follow a similar tack: a) calling dozens of witnesses to express the view that *anyone* could tell that most or all adult ads on Backpage were posted by parties engaged in prostitution; b) calling dozens more witnesses to present heart-wrenching testimony about various tragedies that befell young women who, voluntarily or involuntarily, were involved in prostitution and at one point or another had an ad on Backpage, including showing images of individuals untethered to the indictment's fifty ads; and c) presenting evidence that Defendants knew, from Backpage's assistance to law enforcement and from politicians, law enforcement officers, and religious leaders calling on Backpage to censor adult advertising because of the criminal activities of some advertisers on the site, that Backpage knowingly "facilitated prostitution" by publishing dating, massage, and escort ads.[6]  *See, e.g.,* Dkt. 954 (government arguing that a letter from Auburn Seminary's president is "relevant and highly probative of Defendants' knowledge about whether the vast majority of Backpage's ads were for prostitution"); Exh. E at 28 ("[T]he news media outlet CNN was getting ready to run a broadcast about children being sold for sex on Backpage.com."); *id.* at 62 (noting that the photos of mothers and their children shown during the government's opening are not associated with any of the fifty ads in the indictment).  Indeed, in its opening statement, the government sought to use Backpage's right to hire attorneys to investigate and respond to these claims to impermissibly prejudice the jury against Defendants.  *See id.* at 23 (referring to Samuel Fifer, a partner and media law expert at Dentons who dealt with the National Association of Attorneys General on behalf of Backpage, as a "public

---

[5]    The government's claimed ability to identify women as prostitutes based on cleavage, lingerie, provocative poses, and naked buttocks is extraordinary, given how commonplace those are today, both on the Internet and in society in general.

[6]    The government repeatedly suggests that a Travel Act violation can be predicated on Defendants' "facilitating prostitution." This is wrong. The Travel Act requires, and Judge Brnovich has already ruled, that a Travel Act violation requires specific intent to facilitate a business enterprise involved in prostitution offenses and cannot be predicated on facilitating prostitution in the abstract. *See* Dkt. 946 ("[Defendants] were not indicted for facilitating the amorphous notion of 'prostitution.'  They were indicted for facilitating (via publishing ads) on fifty distinct occasions where prostitutes, prostitution-related businesses, or other groups were involved in the business of prostitution."); Ex. S (12/04/20 Hr. Tr.) at 38 ("[T]his case is not about Backpage. Backpage was prosecuted in a separate case . . . . This case is about these individual defendants and whether they had specific knowledge of these ads as facilitating illegal activity.").

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

relations representative"); *id.* at 32 (impugning Defendants for sending a "cease and desist letter" to CNN, again, disparagingly referring to Backpage's attorney as a "PR representative").

Commencing with its opening statement and continuing through its first several witnesses at trial, the government clearly headed its prosecution down that road.  And from the outset, that road proved rather rocky.  First, the government nearly caused a mistrial during its opening statement, which was a parade of horribles about human trafficking destroying the lives of women and children, contrasted with the significant profits Backpage generated, and with virtually no mention of the charged counts nor any linkage of any Defendant to any charged count.  Then Judge Brnovich seriously limited the testimony the government was permitted to elicit from those advertised on Backpage and their relatives—so the government could elicit the heart-wrenching testimony it needed to inflame the jury only by repeatedly flouting the Court's rulings.  Then the government's lead witness, Special Agent Supervisor Fichtner, completely undermined the government's core theory of the case.  Indeed, during its opening, the government promised the jury that Agent Fichtner would identify the ads he reviewed as express prostitution ads.  Exh. E at 7-11 (arguing that the "evidence will show" the Fichtner-reviewed ads "were nothing less than prostitution ads.").  But that accusation also fell apart.  After Fichtner showed the jury hundreds of Backpage ads, with Fichtner and the government suggesting to the jury that all those ads were obvious prostitution ads, Fichtner was forced on cross-examination to admit that:

a) many adult activities involving sexual activities and money *are legal*;

b) the ads he reviewed were all *facially lawful*;

c) he *could not determine* whether any of the hundreds of ads he showed the jury related to lawful activity or unlawful activity; and

d) he had *never arrested* a person for a prostitution offense based only on the content of a Backpage adult ad and he *knew of no law enforcement officer who had done so*.

*See, e.g.*, Exhs. J, K.  Put differently, Fichtner testified that experienced law enforcement officers could not look at the content of Backpage adult ads and know whether the posters of those ads were engaged in lawful or unlawful activities, while the government's theory was grounded on convincing the jury *anyone could tell* that most or all Backpage adult ads were *obvious* ads for

prostitution, so by publishing those ads Defendants *had* to have intended to facilitate prostitution.

Fichtner's admissions on cross-examination were devastating to the government's case and would become even more so if Judge Brnovich ultimately instructed the jury that Backpage adult ads were presumptively protected by the First Amendment, as Defendants expected her to do, for the reasons discussed below.[7]

## B.    Legal Background

From the outset, this prosecution has been premised on the government's contention that the First Amendment did not protect Backpage's publication of dating ads, massage ads, and escorts ads, because those ads were associated with prostitution, even if the ads did not expressly propose acts of prostitution.  For example, in briefing addressing jury instructions shortly before the trial commenced, the government argued: "Simply put, prostitution advertising and soliciting are forms of commercial speech that are not constitutionally protected. *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973)."  Dkt. 1216-3 at 161.

The defense reply, filed two weeks before the trial commenced, unveiled two fundamental flaws in the government's position.  Dkt. 1222-2 at 2-11.  First, the government was conflating facially unlawful speech (which generally is *not* protected by the First Amendment) with facially lawful speech (which *is* presumptively protected by the First Amendment).  Second, numerous courts, including the Ninth Circuit, have held that the publication of facially lawful speech, even if associated with unlawful activity, is presumptively protected by the First Amendment.

In reaching its erroneous position, the government misinterpreted *Pittsburgh Press*, a decision involving facially unlawful speech in the employment context.  There, the City of Pittsburgh prohibited the publication of "help wanted" classified ads in sex-designated columns and the Pittsburgh Press newspaper violated the ordinance by publishing discriminatory "help wanted" ads in categories such as "'Jobs—Male Interest,' 'Jobs—Female Interest,' and 'Male-Female.'" *Pittsburgh Press*, 413 U.S. at 377-79.  The Supreme Court held that "[a]ny First Amendment interest which might be served by advertising an ordinary commercial proposal ... is altogether absent when

---

[7]    The government and Defendants had briefed the issue of jury instructions, but Judge Brnovich had not yet ruled on the jury instructions by the time she declared a mistrial. *See* Dkts. 1199, 1216, 1222, 1236, 1242.

1  the commercial activity itself is illegal and the restriction on advertising is incidental to a valid

2  limitation on economic activity." *Id.* at 388-89.

3       The Supreme Court's holding in *Pittsburgh Press* went no farther than saying the First

4  Amendment does not protect the publication of classified ads that are, on their face, *per se*

5  unlawful—whether an ad expressing a *per se* unlawful sex preference in employment, an ad

6  proposing a *per se* unlawful "sale of narcotics," or an ad "soliciting prostitutes" (which would be *per*

7  *se* unlawful in most of the United States).[8]  Notably, the Supreme Court did not hold, nor even

8  suggest, that a newspaper could be forbidden from publishing ***facially lawful*** "help wanted" ads,

9  even if the employers posting those ads refused to hire women who responded to the ads.  Yet that

10  is exactly how the government characterizes *Pittsburgh Press* when arguing that the First Amendment

11  affords no protection to facially lawful adult ads that might be associated with prostitution.

12       That government's flawed characterization of *Pittsburgh Press* has been roundly and

13  repeatedly rejected by the courts—including by the Ninth Circuit.[9]  In *Metro Lights, L.L.C. v. City*

14  *of Los Angeles*, 551 F.3d 898, 904 n7 (9th Cir. 2009), the Ninth Circuit narrowly construed the

15  language, "related to unlawful activity," from *Central Hudson* as meaning "whether the goods or

16  services the party advertises are illegal"—not whether an ad for a lawful service was placed by

17  someone who might be engaged in unlawful activity:

18         *Central Hudson* asks if the commercial speech is 'related to unlawful activity.'  ***Thus,***
   ***in the context of advertising, one must ask whether the goods or services the***
19  ***party advertises are illegal***.

20  *Id.* (emphasis added; internal citations omitted).  Four years later, in *Valle Del Sol Inc. v. Whiting*, 709

21  F.3d 808, 822 (9th Cir. 2013), the Ninth Circuit construed the holdings of *Pittsburgh Press* and *Central*

22

---

23  [8]     The Supreme Court's exact words were: "We have no doubt that a newspaper
24  constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting
   prostitutes. Nor would the result be different if the nature of the transaction were indicated by
   placement under columns captioned 'Narcotics for Sale' and 'Prostitutes Wanted' rather than
25  stated within the four corners of the advertisement.... We hold only that the Commission's
   modified order, narrowly drawn to prohibit placement in sex-designated columns of
26  advertisements for nonexempt job opportunities, does not infringe the First Amendment rights of
   Pittsburgh Press." *Pittsburgh Press*, 413 U.S. at 388, 391.

27  [9]     The government is wrong to claim that "Defendants cite no contrary Ninth Circuit
   authority" to *Pittsburgh Press*.  Defendants cited each of the Ninth Circuit cases discussed below, as
28  well as out-of circuit authority, in its briefing on the jury instructions (Dkt. 1222-2 at 2-11), and
   the Ninth Circuit's *Valle de Sol* case in its motion.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

*Hudson* in exactly the same manner:

> *Central Hudson's* legality requirement [] has traditionally focused on the content of affected speech—***i.e., whether the speech proposes an illegal transaction***—instead of whether the speech is ***associated with unlawful activity***.

*Valle Del Sol*, 709 F.3d at 822 (emphasis added). Just last year, the Ninth Circuit again held the same:

> *Pittsburgh Press* implicates only those instances when the state restricts ***speech that itself proposes an illegal transaction***…. SAG's interpretation of *Pittsburgh Press* would require this court to permit the restriction not only of speech that proposes an illegal activity ***but also facially inoffensive speech that a third-party might use to facilitate its own illegal conduct***. But as the Supreme Court has noted, 'it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party.' *Bartnicki v. Vopper*, 532 U.S. 514, 529–30, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001) … Rather than restrict truthful speech, the typical 'method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it.' *Bartnicki*, 532 U.S. at 529, 121 S.Ct. 1753.

*IMDB.com Inc. v. Becerra*, 962 F.3d 1111, 1123 (9th Cir. 2020) (emphasis added). *Accord, e.g., Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 114 (2d Cir. 2017) ("[T]he First Amendment offers no protection to speech that proposes a commercial transaction if consummation of that transaction would ***necessarily*** constitute an illegal act. However, if, as here, there are plausible ways to complete a proposed transaction lawfully, speech proposing that transaction 'concerns lawful activity' and is therefore protected commercial speech.") (emphasis in original) (citing *Valle Del Sol Inc.*, 709 F.3d at 821); *Greater Philadelphia Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 142 & n.170 (3d Cir. 2020) ("commercial speech should not lose the protection of the First Amendment simply because a legislature has prohibited one of many uses of the regulated speech," unlike restricting "advertising of the sale of cocaine, for example, [which] would present a speech restriction that ***always*** and ***only*** related to illegal activity because there are no other legal uses/purposes behind the sale of cocaine") (emphasis in original).

Judge Brnovich had not ruled on jury instructions when she granted a mistrial, but there was a substantial likelihood that the jury instructions would have a) instructed the jury to presume that all adult ads on Backpage were lawful and b) instructed the jury that the government had the burden, on an ad-by-ad basis, to prove otherwise. That was a burden the government was not prepared to meet with its parade of witnesses who would testify that anyone could tell, just by looking, that the adult ads on Backpage were associated with prostitution, even though the ads

offered facially lawful dating, massages, and escort services, as Fichtner conceded.

Moreover, even if the government had been able to prove that some specific Backpage customers posted adult ads to promote their unlawful activities, the government also would have had the insuperable burden, for each such ad, to prove that each defendant took some action to publish the ad with the specific intent to facilitate the unlawful conduct. *Bursey v. United States*, 466 F.2d 1059, 1087 (9th Cir. 1972) ("Printing, publishing, or distributing the speech [] is not criminal unless the persons who did these acts had the ***specific intent required by the statutes*** which were the basis of the investigation … The act of printing, publishing, or distributing the speech [] supplies no basis for an inference that the act was done with the proscribed intent.") (emphasis added); *McKenna*, 881 F. Supp. 2d at 1281 ("The third-party publication of offers to engage in illegal transactions does not fall within 'well-defined and narrowly limited classes of speech' that fall outside of First Amendment protection.") (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)).

## II.   THE COURT SHOULD DISMISS THE INDICTMENT WITH PREJUDICE UNDER THE DOUBLE JEOPARDY CLAUSE.

Not once does the government expressly deny its intent to cause a mistrial, and it offers no persuasive, objective evidence that, in the face of repeated, clear orders regarding the scope of the trial, its intentions were pure.  Instead, the government defends its misconduct during trial, points to a comment Judge Brnovich made during the Court's declaration of mistrial that cannot possibly be interpreted as a non-intentionality finding under *Kennedy* (a comment inconsistent with her objective findings explaining why she declared a mistrial), presents a warped and hyperbolic view of the strength of its case, and expresses disappointment that the Court declared a mistrial, while blaming the mistrial on its own witnesses.  Opp. at 16-21.  The government's position is indefensible.

Defendants' motion to dismiss is before this Court, not Judge Brnovich, and this Court must review the "objective facts and circumstances of the case" to determine whether the government's misconduct at trial triggers the Double Jeopardy Clause.  *See Oregon v. Kennedy*, 456 U.S. 667, 675 (1982) (plurality opinion).  The record speaks for itself.  The government's "sequence of overreaching," including continuously putting "irrelevant and highly prejudicial material" before

the jury, is objective proof of the prosecution's intent to goad the defense into a mistrial. *See Kennedy*, 456 U.S. at 680 (Powell., J., concurring); *United States v. Martin*, 561 F.2d 135, 139-40 (8th Cir. 1977). The government's purposeful conduct caused Judge Brnovich to declare the foreseeable mistrial. The constitutional consequence under the Double Jeopardy Clause not only protects Defendants' rights but also prevents the government from avoiding all accountability and simply retrying its case.

> **A.    Judge Brnovich declared a mistrial *because of* the government's *purposeful conduct* and did not make any findings under *Kennedy*.**

This Court need only read Judge Brnovich's declaration of a mistrial (Exh. M at 4-5) to know two determinative facts: (1) she declared a mistrial ***because of*** the government's ***purposeful conduct***; and (2) she ***did not make any finding under Kennedy***. The government's argument that the mistrial "was largely based on concerns about 'cumulative' child sex trafficking references" instead of the government's sequence of overreaching by repeatedly putting irrelevant and highly prejudicial material before the jury (Opp. at 14) is ***unsupported*** by Judge Brnovich's clear and concise ruling (Exh. M at 4-5). Moreover, to the extent the mistrial was based on any cumulative problem, that was ***only because the government repeatedly violated the Court's orders***, creating any such cumulative effect.

Judge Brnovich's declaration of a mistrial focused on the government's purposeful actions. Exh. M at 4 ("I, at the beginning of this case, gave the government some leeway … ***Yet in the opening, and with every witness thereafter***, it seems, ***the government has abused that leeway***.") (emphasis added); *id.* ("The government, as prosecutors, are held to a higher standard, and ***their goal is not to win at any cost, but to win by the rules***, to see that justice is done.") (emphasis added). She went on to catalogue "just [] a few examples" of misconduct – by no means an exhaustive list – from the few days of the government's case-in-chief. *E.g.*, *id.* at 4-5 ("There was an order that the government stay away from the day in the life of a prostitute or victim. With Jessika Svendgard, ***the government solicited answers*** that went into the abuse by her trafficker … Also, with Jessika Svendgard, ***the government emphasized*** the 105 days over, and over, and over again. She also talked about being raped more than once, which raises a whole new emotional

response from people.") (emphasis added).   Judge Brnovich concluded her brief remarks by making clear there were other instances of the government violating the Court's orders and presenting irrelevant and highly prejudicial testimony.  *Id.* at 5 ("And I believe there were other witnesses that also talked about the reputation of Backpage untethered from communications with the defendants [in violation of the Court's order].").

The government's opposition ***ignores all of this***.  Instead, the government myopically clings to Judge Brnovich's final comment (Ex. M at 5 ("So although I don't see any of these as intentional misconduct…")).  To begin, Judge Brnovich made no finding under *Kennedy*.  She clearly was focused on each individual act of misconduct, not whether the government's misconduct as a whole proved the government sought to goad a mistrial.  Indeed, the remark was not a determination of intent under *Kennedy*'s standard versus commenting, for example, that she did not believe that the government had acted unethically.  Second, the remark was wholly inconsistent with Judge Brnovich's objective findings and stated bases for the mistrial.  The government cites *United States v. Lun* to suggest this Court should give deference to Judge Brnovich's comment, when *Lun* involved a district court that continuously presided over a trial, a declaration of a mistrial, and a denial of a motion to dismiss.  944 F.2d 642, 644 (9th Cir. 1991).  As this Court must now evaluate the record and make determinations based on the parties' briefs and the applicable legal standard, it should not merely defer to Judge Brnovich's non-finding.

## B.  The government's other arguments are similarly unavailing.

Further, the government erroneously claims that its opposition to the mistrial obviates the Double Jeopardy Clause.  Opp. at 16.  But opposing a mistrial is not proof of the government's intent; hopeless opposition to a mistrial based on manifest misconduct is not a sincere objection.[10]

Similarly, the government tries to minimize the devastating effect of Agent Fichtner's testimony by suggesting it would have called other witnesses to rehabilitate its case.  Opp. at 19.  But the government cannot deny that Fichtner's testimony shows that the ads he reviewed are

---

[10]     Defendants, too, wish the government had not torpedoed the trial after Defendants spent significant time and expense preparing for trial, including sizeable non-recoupable costs such as pre-paid housing for three months, as well as engaging a jury consultant and trial tech.  But after repeated, inflammatory references to child sex trafficking and rape, Defendants had no choice but to move for a mistrial after the jury had been irretrievably tainted by the government's misdeeds.

presumptively protected speech under the First Amendment and those ads are legally indistinguishable from 49 of the 50 charged ads.

Tellingly, at trial, the government followed Agent Fichtner's devastating testimony with the testimony of Dr. Cooper, whose testimony the government advanced with a last-minute change to its previously declared order of witnesses.  The government then purposefully elicited inflammatory testimony from Dr. Cooper – testimony regarding underage individuals and child sex trafficking – that it *knew*, *in light of the Court's prior orders*, would cause Defendants to move for a mistrial.  The devastating cross-examination of Agent Fichtner gave the government ample reason to want a do-over with a different jury.

Finally, the government's claim that its purported prejudice from a mistrial caused by its own actions means the Double Jeopardy Clause does not apply here is meritless.  Purported prejudice from a delay is especially baseless as this trial began *17 years* after the government claims Defendants' criminal conduct began (and, after a thorough investigation, the government previously *declined* to prosecute Backpage in 2012 based largely on the same facts underlying this prosecution (*see* Dkts. 1281, 1332).  Defendants gain no measureable benefit from having seen a few witnesses from the government's 70+ witness list.[11]

The government quotes Justice Stevens' concurring opinion in *Kennedy*, but ignores his explanation of why the prejudice suffered by the defense from a second trial is "grossly unfair":

> It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk than an innocent defendant may be convicted. The danger of such unfairness to the defendant exists whenever a trial is aborted before it is completed. Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial.

*Kennedy*, 456 U.S. at 682 n.6 (Stevens, J., concurring) (quoting *Arizona v. Washington*, 434 U.S. 497, 502 (1978)).

The natural and probable consequences of the government's repetitive misconduct was a mistrial.  The government cannot commit purposeful misconduct and simply get a second bite at

---

[11]    The government also wrongly says the defense sought several continuances, without noting that these continuances were due to, *inter alia*, COVID-19 and undersigned counsel's parental leave.

1   the apple when the Court declares a mistrial because of that misconduct.  The Double Jeopardy

2   Clause requires dismissal of the case with prejudice.

3       **C.   Defendants have asserted a more than colorable double jeopardy claim.**

4       The government asks the Court to find Defendants' double jeopardy claim is frivolous,

5   based solely on Judge Brnovich's comment that she did not believe the government's individual

6   instances of misconduct were intentional.[12]  But Defendants' double jeopardy claim was not before

7   Judge Brnovich.  In any event, the government is wrong to equate intentionality with colorability.

8   Tellingly, the government cites no case demonstrating that the two concepts are the same (nor

9   does it cite any case in which a district court found a double jeopardy claim to be frivolous).

10      Defendants' double jeopardy claim, which is based on clear and repeated violations of

11  Court orders, certainly is much stronger than the "lenient standard" the Ninth Circuit applies in

12  determining the colorability of double jeopardy claims, under which even a "weak" claim is

13  colorable.  *United States v. Bhatia*, No. CR 05-0334 SBA, 2007 WL 2795066, at *2 (N.D. Cal. Sept.

14  26, 2007).  Defendants' double jeopardy claim cannot be "summarily dismiss[ed]," nor does the

15  government make such a claim.  *United States v. Alvarez-Moreno*, 657 F.3d 896, 899 (9th Cir. 2011).

16  The one case cited by the government is readily distinguishable, as its holding was limited to double

17  jeopardy claims following a hung jury, whereas, here, there are claims of *Brady* violations as well as

18  repeated government misconduct at trial underpinning the Court's declaration of a mistrial.

19  *Richardson v. United States*, 468 U.S. 317, 322 (1984).  Indeed, in *United States v. Avenatti*, Case No.19-

20  061-JVS (C.D. Cal.), the government recently litigated and lost this issue in connection with the

21  denial and appeal of a motion to dismiss in connection with *Brady* violations at trial.  *See* Ex. T

22  (order denying motion to dismiss); Ex. U (order divesting jurisdiction pending appeal over

23  government objection).  Judge Selna specifically found that the government's conduct was not

24  intentional and that there was no "goading" under *Kennedy* (Ex. T at 4) – yet those findings were

25  not enough (contrary to what the government argues here) to maintain jurisdiction over the case

26  pending an interlocutory appeal (Ex. U).  The Court should not accept the government's invitation

27

28  _____
[12]    What the government does not tell the Court is that it seeks this finding now to avoid this Court divesting itself of jurisdiction (as it must) to the extent Defendants seek an interlocutory appeal of a denial of their motion.

to contravene established law regarding the colorabilty of double jeopardy claims.

## III.   THE COURT SHOULD DISMISS THE INDICTMENT WITH PREJUDICE UNDER ITS SUPERVISORY AUTHORITY.

The government has repeatedly failed to play by the rules – federal prosecutors are "held to a higher standard, and their goal is not to win at any cost, but to win by the rules." Exh. M at 4. The Court's admonishment in declaring a mistrial echoes the holdings of *Lopez-Avila* and *Kojayan*, both of which ultimately resulted in district courts dismissing indictments under their supervisory powers. *See United States v. Lopez-Avila*, 678 F.3d 955, 964-65 (9th Cir. 2012); *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993). The government attempts to distinguish the cases cited by Defendants by stating the obvious – that the government misconduct here does not align exactly with the government misconduct in those cases. But that misses the point, as no misconduct case is exactly like another. The point is that there are rules – like the attorney-client privilege, Rule 16, and *Brady*, as well as rules that courts impose before and during trial regarding the admissibility of evidence – and the government broke all of them here. Short of dismissal, the government will not be deterred from engaging in such misconduct in the future.

Indeed, the government's lack of contrition here countenances in favor of dismissal. Instead of taking ownership for the rehearsed testimony of its witnesses (most notably, Dr. Cooper, a professional witness who regularly testifies for the government in child sex trafficking cases (Exh. L at 54)), the government's response was to blame its witnesses. *See* Opp. at 17 ("the question did not ask if she was 'raped'"); *id.* at 18 ("despite these efforts, Dr. Cooper testified that the 'overwhelming majority' of victims she had evaluated were minors 'sold on Backpage.'"). Dr. Cooper, *a regular government witness*,[13] is a self-professed "developmental

---

[13]      The government knew exactly what it was doing when it put Dr. Cooper on the stand. The government regularly calls Dr. Cooper to testify broadly for the government regarding the very topics the Court held were off limits, and yet the government did nothing to limit her testimony here, despite her history and despite the Court's order. *See, e.g., United States v. D'Ambrosio*, No. 1:15-CR-003, 2016 WL 1385281, at *2 (M.D. Pa. Apr. 7, 2016), *aff'd and remanded sub nom. United States v. Delgado*, 677 F. App'x 84 (3d Cir. 2017) ("Here, Dr. Cooper's testimony does not relate to the elements of the prostitution-related offenses with which Defendants are charged…. We see no way in which Dr. Cooper's general testimony about the 'culture of pimping, the nature of enterprises associated with sex trafficking, victim vulnerabilities, the health care problems of victims, the barriers to exiting, and multiple aspects of offender dynamics' has any tendency to

1   and forensic *pediatrician*"[14] who, *after sidebars limiting the scope of her testimony and the*

2   *sustaining of defense objections*, was asked open-ended questions like "describe ... the nature

3   of ... your work with victims," to which Dr. Cooper predictably responded in narrative fashion,

4   stating that she dealt with the exploitation of minor sex trafficking victims, a topic the Court held

5   was off limits.  Exh. L at 14-15 (emphasis added).  Then, after the Court told the government that

6   it was "getting close to a 403 violation" and that it needed "to direct [its] witness a little bit, because

7   *she could very well go off on a tangent*," Dr. Cooper testified that "there has been no age

8   verification for *minor victims* who have been sold online" (*id.* at 28-29 (emphasis added)) and

9   "*the majority* of victims that I have evaluated who have been sold on Backpage *were underage*

10   *minors*" (*id.* at 39 (emphasis added)).  The government's failure to take responsibility for its actions

11   warrants dismissal.  *See Kojayan*, 8 F.3d at 1323 ("While the government's supplemental brief

12   contains various references to the 'regrettable and inappropriate' nature of the incident … it shows

13   no appreciation of the seriousness of the misconduct, no hint of contrition …. Acceptance of

14   responsibility this is not.");[15] *Lopez-Avila*, 678 F.3d at 965 ("When a prosecutor steps over the

15   boundaries of proper conduct and into unethical territory, the government has a duty to own up

16   to it and to give assurances that it will not happen again. Yet, we cannot find a single hint of

17   appreciation of the seriousness of the misconduct within the pages of the government's brief on

18   appeal. Instead, the government attempts to shift blame by stating that 'the prosecutor gave the

19   defense counsel an opportunity to stop the offending question before the prosecutor asked it …'").

20   To the extent there is a factual dispute about the government's intent in examining these witnesses,

21   the way courts deal with such issues is through an evidentiary hearing.

22          Further, as set forth below, the government's fast-and-loose approach to the attorney-client

23

24   make it more or less probable that Defendants themselves transported minors in interstate
     commerce for the purpose of a commercial sex act.")

25

26   [14]    Defendants mention Dr. Cooper's status as a pediatrician not as "conspiracy theorizing run
     amok" (Opp. at 19) but because she is an expert who specializes in treating *children who have*
27   *been victims of child sex trafficking* and the government *knew* that asking her open-ended
     questions about her experience would elicit answers discussing *child sex trafficking*—a topic the
     Court had instructed the government to avoid.

28   [15]    Here, the government does not even admit the "regrettable and inappropriate" nature of
     the testimony it elicited from its own witnesses. *Kojayan*, 8 F.3d at 1323.

1   privilege and its discovery obligations also warrant dismissal of the indictment with prejudice.

2   **A.      The government admits to withholding obvious Rule 16 and *Brady* material.**

3       The government is wrong to assert that the issues raised by Defendants regarding the

4   government's prior investigation of Backpage have been litigated before.  Judge Logan dealt only

5   with the question of whether *legal memos* generated by the government regarding its decision

6   not to prosecute Backpage could be clawed back; the instant motion concerns the disclosure of

7   the underlying *facts*, discussed in the legal memos, that led to the government's decision.  *See* Dkt.

8   1281; Dkt. 449 (concluding only that "the mental impressions and legal analysis from attorneys

9   that are not involved in this case" cannot be considered "exculpatory evidence.").  Moreover, this

10  case has changed dramatically in the nearly three years since Judge Logan issued his Order.  Since

11  then, the government has produced some, but not all, of the factual materials underlying that prior

12  investigation, a tacit admission that such materials are relevant.  *See Carriger v. Stewart*, 132 F.3d 463,

13  481 (9th Cir. 1997) ("We have held that the government cannot satisfy its Brady obligation to

14  disclose exculpatory evidence by making some evidence available and claiming the rest would be

15  cumulative.") (internal citations omitted).  Further, the government intends to call at trial FBI

16  Agent Steven Vienneau, the *lead agent* assigned to that prior years-long investigation of Backpage,

17  yet the government has only produced *nine pages* of discovery in connection with his work.  (And

18  if this case indeed were, as the government contends, "wholly separate" from the government's

19  prior investigation (Opp. at 22), then why call the lead agent from that investigation?).

20      Critically, the government's response supports Defendants' position.  The government

21  *admits* that it has withheld a non-privileged attorney opinion letter provided to a prospective

22  third-party purchaser of Backpage regarding whether a publisher of adult ads could have criminal

23  liability for publishing ads that might be associated with criminal activity.  The government jumps

24  through hoops to explain its lack of disclosure, claiming that the memo was written by a summer

25  associate at Arnold & Porter and that the government need not disclose the actual memo because

26  Defendants have somehow "known the memorandum's material substance for three years," when,

27  as the government well knows, Defendants have never seen the opinion letter.  Opp. at 27; *see*

28  *Banks v. Dretke*, 540 U.S.668, 696 (2004) (rejecting the idea that the government, when caught, may

blame a defendant for its own failures to comply with its discovery obligations, and holding that "[a] rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process"). These are not serious responses to a very serious issue. A non-privileged memorandum written by one of the most respected law firms in the country regarding whether *this* publisher of adult ads could have criminal liability for publishing ads that might be associated with criminal activity on its face is discoverable both under Rule 16 and *Brady*.[16]

### B.   The government's justification of its invasions of Defendants' privileges with Ferrer is manifestly hypocritical.

The history of the government's misconduct here is clear. The government interviewed Ferrer regarding privileged material and then sought an order from Judge Logan seeking to review privileged communications (without telling Judge Logan that it was already doing so), but the government's request was denied, and it nevertheless continued to interview Ferrer about privileged material. Defendants moved to dismiss based on these privilege invasions, and Judge Brnovich denied the motion (in the defense's view, erroneously). Defendants then provided reciprocal discovery in advance of trial regarding advice provided by attorneys concerning the legality of Backpage's operations, as the Court held (and the government argued) such material was not privileged. The government responded by saying such material is privileged on its face, an admission that directly contradicts the position it took in opposing Defendants' original motion regarding the government's privilege invasions during its interviews of Ferrer.

That is why Defendants renewed their underlying motion to dismiss and raise the issue here to demonstrate a pattern of government misconduct warranting dismissal. *See* Dkts. 942, 1022, 1238.[17] To be clear, this is a distinct basis upon which the Court should dismiss the indictment

---

[16]     The government claims the memo is irrelevant because it does not address purported "prostitution marketing strategies" (Opp. at 29 n.6), but evidence does not lose its status as *Brady* material just because the government has grounds to argue the significance of the evidence to the jury. *United States v. Bundy*, 968 F.3d 1019, 1033 (9th Cir. 2020). The question is whether the evidence is favorable to the defense. *Id.* Moreover, Defendants' knowledge of the existence of the memo does not undo the prejudice to Defendants from the government's failure to produce it, as they know nothing about the specifics of the memo or what it says. *Id.*

[17]     At the hearing on the original motion to dismiss, the government boldly claimed that the attorney advice it asked Ferrer about was in the public domain, yet in seeking to preclude Defendants from relying on such advice at trial, argued that the reference to subjects like the First

under its supervisory powers, separate and apart from the Double Jeopardy Clause.   The government points to *one memorandum* that the defense disclosed in discovery in advance of trial, a 2009 memorandum that was shared with a bank with whom Backpage did business, implicitly claiming that because it was shared with a third party, *all* of the legal advice that Defendants subsequently were provided over the years and *all* of the privileged material Ferrer was asked about by the government are *not privileged*.  Dkt 1395 at 29 ("Defendants disclosed to third parties a legal memorandum that discusses, in detail, all of their legal theories—the same theories that were at issue in their prior motion to dismiss on privilege issues that Judge Brnovich denied.").  But this absurd position finds no support in the law, nor does the government even attempt to support it.  First, the disclosure of one legal memo written more than a decade ago (that it appears Ferrer was not asked about) does not waive the privilege as to the subsequent legal advice and memos from other lawyers that he was directly asked about.  Second, the government's *own prior conduct* belies the position it now takes.  The government previously shared its legal theories about why Backpage was not engaged in criminal conduct and could not be prosecuted with a third party.  In a January 30, 2012, e-mail that Ernie Allen, the former president and CEO of the National Center for Missing & Exploited Children ("NCMEC") and a key government witness, wrote to several third parties, including government expert Dr. Cooper, Allen writes:

> In my meeting with the *Attorney General*, I argued that while they might have civil immunity, I didn't understand how that protected them from *criminal prosecution*. I argued that they were *facilitating a criminal enterprise*, a federal crime. Several weeks later, *the AG sent prosecutors from his Criminal Division along with several FBI agents to NCMEC to meet with me. What they said was that they didn't think that Backpage's actions rose to the level of criminal culpability*. They warned users about misuse of the site, made people click on answers promising not to do anything wrong, etc. *DOJ felt that their activities did not generate the requisite "intent" to hold them criminally accountable*. Clearly, I don't agree.

Ex. V (emphasis added).

To summarize, in a non-privileged conversation, Attorney General Eric Holder told Ernie Allen that Backpage was not subject to criminal liability, and that conversation then was followed

---

Amendment and CDA alone render memos providing such advice on their face privileged. *E.g.* Dkt. 1234 at 2.

by a non-privileged meeting between Allen and several prosecutors from DOJ's Criminal Division and several FBI agents who reiterated the same message.[18]  The logical extension of the argument the government now makes regarding a legal memo Backpage provided to a bank is that the meetings between the government and Ernie Allen in 2012 waived the government's privileges as to the government's prior and subsequent investigations in their entirety.[19]  In short, the government seeks to impose a separate standard on Defendants regarding the privileges they hold, an obvious double standard that the Court should not endorse.[20]

### C.      The government's invasions of Defendants' privileges with respect to nearly 1,000 emails shows a broad pattern of misconduct.

In direct violation of the Court-approved filter team protocol and in direct violation of its express and unambiguous representations to Judge Brnovich that led her to deny Defendants' motion to clarify the filter team protocol, in December 2019, the prosecution obtained 955 emails involving Defendants' counsel, and said nothing to the Court.  The government merely quibbles about whether it was 966 emails or 955 emails (Opp. at 32), but ***does not dispute*** that: a) the filter team produced nearly 1,000 emails to it in December 2019, b) those emails all involved communications with Defendants' counsel, c) Defendants had not agreed those emails were not privileged, and d) the Court had not authorized the prosecution team to access the nearly 1,000 attorney emails.

---

[18]    This e-mail also belies the government's claim that the factual materials underlying the government's prior investigation of Backpage are not relevant or exculpatory.

[19]    To be clear, this e-mail and its contents are admissible, as they (i) are party admissions, (ii) reflect Allen's state of mind, and (iii) are not privileged. The government cannot now argue that NCMEC was a government actor or agent with whom it maintained the privilege. In opposing Defendants' *Brady* request concerning, among other things, NCMEC's communications regarding the potential criminal prosecution of Backpage, the government responded that "NCMEC [Does] Not Function As [An] Arm[] Of the Government" and that "NCMEC is a Private Organization." Dkts. 777 at 11, 810 at 4-9. (The Court took the government's representations as true in denying Defendants' motion, *see* Dkt. 1028).

[20]    And if that were not enough, in opposing Defendants' original motion to dismiss regarding the government's privilege invasions, the government asserted that Defendants had waived the privilege as to the subjects the government questioned Ferrer about because those subjects were discussed with none other than NCMEC. Dkt. 1000 at 11 ("Defendants' public disclosures have not been limited to court filings . . . For example, in a memorandum to NCMEC staff in 2013," a Backpage attorney wrote about the First Amendment and Communications Decency Act). According to the government, that communication waives the privilege as to advice provided by attorneys to Backpage, but a similar communication between the government and NCMEC does not waive the privilege as to advice that the government's attorneys provided to it.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

1   Rather, the government suggests an April 2018 ruling by Judge Campbell had already

2   determined the nearly 1,000 emails were not privileged, claimed "the prosecution team only

3   received documents that had been appropriate determined by the filter team to be non-privileged,"

4   and claimed Judge Brnovich already rejected Defendants' argument that the government violated

5   the filter protocol order.  *Id.*  Each of those claims is demonstrably false.

6   On January 8, 2018, the government moved to compel the production of

7   that had been withheld on the grounds of attorney-

8   client privilege.  Ex. W at 6 (filed under seal).  As is pertinent here, the government sought to

9   compel the production of                                                            . with each

10  document identified in a spreadsheet attached to the motion:

11

12

13

14  *Id.* at 9.  On April 2, 2018, Judge Campbell denied the motion as to more than        documents, but

15  granted it as to the       documents involving the three public relations firms:

16

17          The government's motion to compel is granted in part and denied in part. Backpage
            shall produce the Culloton Strategies, Sitrick & Company, JMS Public Relations …
            documents to the government by April 16, 2018.

18

19  Ex. X at 14 (filed under seal).

20          Two months later, the government moved in this case to dispense with the need to use a

21  filter team altogether.  Dkt. 195.  Although the government now claims that Judge Campbell

22  sweepingly ruled that "any communications between Backpage's attorneys and PR firms weren't

23  privileged," that is not true.  Opp. at 31.  The government knows that is not true because its motion

24  to dispense with the filter team admitted Judge Campbell's order applied *only to the 232 specific*

25  *emails the government sought in its motion to compel*, while arguing Judge Logan should

26  leverage Judge Campbell's earlier ruling into a complete waiver of Backpage's attorney client

27  privilege:

28          Judge Campbell already has determined that Backpage waived its corporate attorney-
            client privilege by voluntarily sharing hundreds of privileged communications with
            third-party public relations firms and investment banks. Moreover, although *the*

*only remedy the United States sought* during the previous proceeding (before Judge Campbell) *was the disclosure of those particular emails*, the law in the Ninth Circuit is that "voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such communications on the same subject."

Dkt. 195 at 12 (emphasis added).  Judge Logan subsequently denied the United States' motion, holding:

> The Court declines to construe the terms of the Campbell Order to allow a broad subject-matter privilege waiver of the contents of the remaining emails. It is clear to the Court that *the terms of the Campbell Order were limited to determining whether Backpage waived attorney-client privilege in emails shared with specified third-party entities*.

Dkt. 345 at 5 (emphasis added).

The government now argues the nearly 1,000 emails privileged or potentially privileged emails it obtained in violation of the filter protocol "involved [a] communication with a third party, similar to the Judge Campbell order from April 2018 that found that privilege did not attach . . ." Opp. at 32.  Regardless of whether the emails were "similar" because they included third parties, they were *not the same emails* Judge Campbell addressed in his April 2018 order and, critically, *many of the nearly 1,000 emails involved parties other than those involved in the separate set of 232 emails*. Yet the prosecution team obtained the emails and said nothing.[21]

The prosecution team also represented to this Court that it "received only documents that had been appropriately determined by the filter team to be non-privileged." Opp. at 32.  That too is false.  Any documents with "hits" on attorney names were prohibited to the prosecution team unless the defense agreed or the Court so ordered.  Dkt. 577 at 9-10.  But all of the nearly 1,000 emails had "hits" on attorney names and the defense never agreed the emails were unprivileged and the Court never ordered their production.  Regardless of whether the prosecution team thought the nearly 1,000 emails were not privileged, the prosecution team had no right to have

---

[21]    The government suggests the Court should disregard the *Pederson* decision because the government's misconduct was different and greater in that case, *United States v Pederson*, 2014 WL 3871197 (D. Or. Aug. 6, 2014), but Defendants cited *Pederson* only for the basic proposition that "the government has a duty to disclose the receipt of a defendant's attorney-client communications." *Id.* Moreover, contrary to the government's suggestion, a prosecutor's ethical and constitutional obligations do not wax and wane with the level of his or her misconduct.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

them unless it first made and won that argument[22]—and it clearly knew that was the case just months after this issue was hashed out before Judge Brnovich.[23]

## IV. THE COURT SHOULD DISMISS THE INDICTMENT WITH PREJUDICE UNDER THE DUE PROCESS CLAUSE.

The government's response boils down to the argument that worse misconduct has occurred, so the government should get a free pass on its actions in this case.  But the government has no meaningful response to its years-long approach of overreaching, abusing the Court's leeway, and trying to win at all costs.  Exh. M at 4.  In defense of its discovery violations and privilege invasions, the government misleadingly suggests to this Court that the issues have been decided "diametrically to the contrary" by other judges (Opp. at 22), though that is not the case, as explained above (*supra* at 15-21).  The government's years-long conduct leading up to and throughout trial in this case is grossly shocking and outrageous, has severely prejudiced Defendants, and must be sanctioned to "assur[e] that the circumstances that gave rise to the misconduct won't be repeated in other cases."  *Kojayan*, 8 F.3d at 1324.

## V. CONCLUSION.

Under the Double Jeopardy Clause, the court's supervisory authority, and the Due Process Clause, the Court should dismiss the indictment with prejudice.  Defendants reiterate their request for an evidentiary hearing.  In response to a motion that concerns the government's state of mind, the government provides no declarations as to its intent, but instead offers mere conclusory statements that it did not intend to goad a mistrial.  Defendants therefore should be entitled to examine the four witnesses who testified and the prosecutors who examined them so that there is a clear record of the government's intent.

---

[22]    Indeed, the government took the same tack with its privilege invasions with Ferrer, first invading the privilege and then filing a motion seeking permission to do so—which was denied.

[23]    The government suggests that Judge Brnovich rejected Defendants' privilege invasion claims when she rejected a motion to dismiss based on the government's interrogation of Carl Ferrer over his communications with Defendants' counsel.  That too is untrue.  That motion was *not* premised on the government accessing the nearly 1,000 emails in violation of the Court-ordered filter protocol and Judge Brnovich's order did not even mention the separate privilege invasion involving the nearly 1,000 emails when ruling on the Ferrer privilege invasion motion.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

RESPECTFULLY SUBMITTED this 30th day of November 2021,

                BIENERT KATZMAN LITTRELL
                WILLIAMS LLP
                *s/ Whitney Z. Bernstein*
                Thomas H. Bienert, Jr.
                Whitney Z. Bernstein
                Attorneys for James Larkin

*Pursuant to the District's Electronic Case Filing Administrative Policies and Procedures Manual (Oct. 2020) § II(C)(3), Whitney Z. Bernstein hereby attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized its filing.*

                LIPSITZ GREEN SCIME CAMBRIA LLP
                *s/ Paul J. Cambria, Jr.*
                Paul J. Cambria, Jr.
                Erin McCampbell Paris
                Attorneys for Michael Lacey

                BIRD MARELLA BOXER WOLPERT
                NESSIM DROOKS LINCENBERG AND
                RHOW PC
                *s/ Gary S. Lincenberg*
                Gary S. Lincenberg
                Ariel A. Neuman
                Gopi K. Panchapakesan
                Attorneys for John Brunst

                FEDER LAW OFFICE PA
                *s/ Bruce Feder*
                Bruce Feder
                Attorneys for Scott Spear

                DAVID EISENBERG PLC
                *s/ David Eisenberg*
                David Eisenberg
                Attorneys for Andrew Padilla

                JOY BERTRAND ESQ LLC
                *s/ Joy Bertrand*
                Joy Bertrand
                Attorneys for Joye Vaught

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on November 30, 2021, I electronically transmitted the attached

3 document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice

4 of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of

5 record.

6

7               */s/ Toni Thomas*
Toni Thomas

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28