UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,    )
                             )
              Plaintiff,     )  NO. 2:18-cr-00422-DJH
v.                           )
                             )  Phoenix, Arizona
Michael Lacey, et al.,       )  September 20, 2023
                             )  9:12 a.m.
              Defendants.    )
_____)


BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

EXCERPTED TESTIMONY OF CARL FERRER

JURY TRIAL DAY 9
A.M. SESSION


Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251


Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

```
 1                    A P P E A R A N C E S

 2   For the Plaintiff:
          UNITED STATES ATTORNEY'S OFFICE
 3        By:  Kevin M. Rapp, Esq.
               Andrew C. Stone, Esq.
 4             Peter Shawn Kozinets, Esq.
               Margaret Wu Perlmeter, Esq.
 5        40 North Central Avenue, Suite 1800
          Phoenix, Arizona 85004-4408
 6

 7   For the Defendant Michael Lacey:
          LIPTSUTZ GREEN SCIME CAMBRIA, LLP
 8        By:  Paul J. Cambria, Jr. Esq.
          42 Delaware Avenue, Suite 120
 9        Buffalo, New York  14202

10   For the Defendant Andrew Padilla:
          DAVID EISENBERG, PLC
11        By:  David S. Eisenberg, Esq.
          3550 North Central Avenue, Suite 1155
12        Phoenix, Arizona 85012

13   For the Defendant Scott Spear:
          KESSLER LAW OFFICE
14        By:  Eric Walter Kessler, Esq.
          6720 North Scottsdale Road, Suite 210
15        Scottsdale, Arizona 85253
          - and -
16        FEDER LAW OFFICE, PA
          By:  Bruce S. Feder, Esq.
17        2930 East Camelback Road, Suite 160
          Phoenix, Arizona 85016
18

19   For the Defendant John Brunst:
          BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
20        By: Gary S. Lincenberg, Esq.
               Gopi K. Panchapakesan, Esq.
21        1875 Century Park E, Suite 2300
          Los Angeles, California 90067
22

23   For the Defendant Joye Vaught:
          JOY BERTRAND, ESQ, LLC
24        By:  Joy Malby Bertrand, Esq.
          P.O. Box 2734
25        Scottsdale, Arizona 85252-2734
```

UNITED STATES DISTRICT COURT

1                                    *I N D E X*

2

3    <u>**GOVERNMENT WITNESS:**</u>                                       **PAGE**

4    <u>CARL FERRER</u>
     Continued Direct Examination by Mr. Rapp...................8

5

6                              *E X H I B I T S*

7    <u>**EXHIBITS**</u>                                            <u>**RECEIVED**</u>

8    <u>NO.</u>     <u>DESCRIPTION</u>

9    156     Mohan email to Vaught, 07/03/2012,                    22
             DOJ-BP-0000029933
10
     157     Email from Mohan to Padilla, Vaught                   24
11           (with attachment), 07/09/2012,
             DOJ-BP-0000000441
12
     157a    Attachment.  Spreadsheet with list of code            24
13           words, DOJ-BP-0000000442

14   1202    Email from Ferrer to Padilla, "Juvenile               29
             Prostitution Ad", 05/11/2012, DOJ-BP-0001126261
15
     1204    Email from Ferrer to Padilla, "Fwd: Identified        31
16           Prostitution Ads on Backpage", 06/28/2012,
             DOJ-BP-0000029078 - DOJ-BP-0000029079
17
     1207    Email from Padilla to Ferrer, "Re: Prostitution       33
18           Ads Depicting a Child", 11/14/2012,
             DOJ-BP-0000888474 - DOJ-BP-0000888475
19
     1208    Email from Padilla to Ferrer, "Re: Prostitution       37
20           Ads Depicting a Child", 11/15/2012,
             DOJ-BP-0000000174 - DOJ-BP-0000000175
21
     1922    Email to Spear, "Analytics backpage.com               44
22           20120529", 05/30/2012, DOJ-BP-0004814366

23   1922b   Version of Exh 1922-a, Pages 1-2 only,                44
             DOJ-BP-0004814367
24

25

1                          *INDEX OF EXHIBITS CONT'D*

2     __EXHIBITS__                                           __RECEIVED__

3     __NO.__      __DESCRIPTION__

4     31        Email from Larkin to Spear, Brunst, and          46
                Ferrer, 07/27/2012, DOJ-BP-0004602746
5
      335       Email from Ferrer to Larkin, attaching          51
6               page view and revenue reports, 09/18/2012
                DOJ-BP-0004809310
7
      335b      Attachment.  Spreadsheet titled Revenue        51
8               By Category 091012-091612, DOJ-BP-0004809313

9     342       Email from Ferrer to Brunst, Larkin,            55
                Attaching revenue report, 08/06/2012
10              DOJ-BP-0004809504

11    342a      Attachment. PDF titled backpage.com            55
                DOJ-BP-0004809505
12
      1664      Email from Ferrer to Larkin, Spear, Brunst,     59
13              "Nov stats", 12/02/2012, DOJ-BP-0002724405

14    1664a     Attachment, "backpage.com_nov"                  59
                DOJ-BP-0002724406 - DOJ-BP-0002724409
15
      355       Email from Ferrer to Larkin, Brunst,            64
16              attaching revenue report and ad count,
                12/22/2012 DOJ-BP-0004809751
17
      355b      PDF of Exhibit 355-a; Attachment.               64
18              Spreadsheet titled Monthly Revenue & Ad
                Count report by Section and Category,
19              DOJ-BP-0004809752

20

21

22

23

24

25

                        UNITED STATES DISTRICT COURT

1          ***P R O C E E D I N G S***

2     *(Whereupon the proceedings began at 9:12 a.m.)*

3          COURTROOM DEPUTY:  All rise, court is now in

4     session.

**09:12a** 5          THE COURT:  All right, please be seated.

6          Good morning, everyone.  Well, it appears that we

7     also have a delayed juror.  She, essentially, missed her alarm

8     this morning.  So she's about an hour away.  So we will be

9     delayed roughly until about 10:15.

**09:12a** 10          We'll let you know.  Don't go anywhere.  We'll let

11    you know as soon as she arrives and then we can proceed.  I

12    should let you know I will once again inquire of the jury if

13    they can stay a little bit longer on Friday.  As well, I will

14    give them a heads up on Thursday that I'm going to inquire if

**09:12a** 15    next week we can begin at 8:45 because we will be out on

16    Friday due to the necessity to use the ceremonial courtroom;

17    and so if we can begin at 8:45 and go until 4:30, that should

18    give us a little bit of makeup time.  But in any event, don't

19    go far.  We'll let you know when the juror arrives.

**09:13a** 20          MS. BERTRAND:  Your Honor, how -- how late is the

21    Court considering going on Friday?

22          THE COURT:  About -- well, my understanding is one

23    of the jurors is still reporting to work and has to leave here

24    so that she can --

**09:13a** 25          MS. BERTRAND:  Oh, my gosh.

1    THE COURT:  -- he or she can make it in at 2:00

2  o'clock.  So we can't go much farther beyond 12:30, 12:45 at

3  the latest.

4    MS. BERTRAND:  All right, thank you.

09:13a  5    THE COURT:  Yes.

6    MR. BERRY:  Your Honor, bringing up the ceremonial

7  courtroom issue for next week, do we need to do something with

8  all these boxes in preparation of that?

9    THE COURT:  My understanding is that you can store

09:13a 10  your materials in the second floor conference room that you're

11  using for the defense team.

12    You, obviously, have an office here; and I think we

13  just need all of the tables to be cleared because they are

14  going to be removed for seating purposes and I think we -- we

09:14a 15  are going to store the exhibits ourselves.

16    MR. BERRY:  Okay.

17    THE COURT:  These exhibits that are in front of the

18  bench here.

19    MR. BERRY:  So we'll just take our stuff, court --

09:14a 20    THE COURT:  So just take your items that are on your

21  respective desks and tables out of the courtroom.

22    MR. BERRY:  Okay.

23    THE COURT:  Then my understanding is they'll

24  re-situate the courtroom on Monday.

09:14a 25    MR. BERRY:  Thank you.

UNITED STATES DISTRICT COURT

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 09:14a | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:21a | 10 |

1    THE COURT:  All right.  So we will stay nearby, and

2  we'll let you know as soon as that juror arrives.

3    MS. BERTRAND:  Your Honor, can we go to our work

4  room and maybe get an e-mail from the Court?

**09:14a**  5    THE COURT:  Yes, yes.

6    MS. BERTRAND:  Okay, thank you.

7    COURTROOM DEPUTY:  All rise.

8    (Off the record at 9:14 a.m.)

9    (Back on the record at 10:21 a.m.)

**10:21a** 10    COURTROOM DEPUTY:  All rise, court is now in

11  session.

12    THE COURT:  All right, please be seated.

13    It appears that we do have all our jurors present.

14  Just so you know, I'm intending to just forge ahead just until

**10:22a** 15  the noon hour so we won't have a morning break, and so we'll

16  bring in the jurors.

17    Would you have the witness back on the stand,

18  please.

19    (Jury in at 10:22 a.m.)

**10:23a** 20    THE COURT:  All right.  Please be seated,  and the

21  record will reflect the presence of the jury.  The witness is

22  on the stand, and let me just say to the Members of the Jury,

23  obviously, we're getting a late start and so we're going to

24  forge ahead close to the noon hour.

**10:23a** 25    Of course, I don't want to hold anyone hostage.  If

```
  1   anyone's feeling uncomfortable, again, as I mentioned before,

  2   just raise your hand and say, "I need a break," if that's the

  3   case, but we'll try to maximize the use of our time this

  4   morning.

10:24a  5        With that, Mr. Rapp, you may continue.

  6        MR. RAPP:  Thank you.

  7             CONTINUED DIRECT EXAMINATION

  8   BY MR. RAPP:

  9   Q.   Good morning, Mr. Ferrer.

10:24a 10  A.   Good morning.

 11   Q.   When we were --

 12        MR. RAPP:  I don't believe this is in evidence, but

 13   if you could leave it on my screen.  Thank you.

 14        COURTROOM DEPUTY:  One second.  This thing is

10:24a 15  frozen, one second.  Bear with me.

 16        MR. RAPP:  I'm showing for the witness' eyes only

 17   United States 156.

 18        MS. BERTRAND:  Our screens are not --

 19        THE COURT:  Yeah, mine is not.  It's coming up.

10:24a 20        MS. BERTRAND:  Okay.

 21        COURTROOM DEPUTY:  Judge, this is not working.  It

 22   says "off," but when I push it, it turns everything on.

 23        THE COURT:  Can you do it one more time?

 24        COURTROOM DEPUTY:  So everything is turning on.

10:25a 25        Can I turn it off really quick and then restart it?
```

```
 1              THE COURT:  Yes, yes.

 2              We're going to have to reboot.

 3              MR. RAPP:  In the interest of time, Judge, I'm just

 4   going to go to an area where I'm not talking exhibits, if

 5   that's okay?

 6              THE COURT:  That's fine.  That would be preferable,

 7   Mr. Rapp, thank you.

 8              MR. RAPP:  So let's skip over the exhibits we were

 9   going to look at.

10   BY MR. RAPP:

11   Q.   During this time period were you -- in 2012 were you

12   having meetings with NCMEC?

13   A.   Yes, we were.

14   Q.   All right.  How long did those meetings go on?

15   A.   They went on for about at least four or five monthly

16   meetings and then they ended.

17   Q.   Do you recall what year the meetings with NCMEC ended?

18   A.   Sometime in 2012.

19   Q.   Sometime in 2012?

20   A.   Yes.

21   Q.   All right.  During those meetings, did NCMEC -- did a

22   representative from NCMEC make any recommendations about

23   things that Backpage could implement on their site?

24              MS. BERTRAND:  Objection, leading.

25              THE COURT:  Sustained.
```

(Time stamps in left margin: 10:25a at line 5, 10:26a at line 10, 10:26a at line 15, 10:26a at line 20, 10:27a at line 25)

UNITED STATES DISTRICT COURT

1    BY MR. RAPP:

2    Q.   All right.   What did -- during those meetings what did --

3    what did NCMEC notice you of?

4           MS. BERTRAND:   Same objection.

10:27a  5           MR. CAMBRIA:   Hearsay.

6           MS. BERTRAND:    And hearsay.

7           THE COURT:   Sustained.

8    BY MR. RAPP:

9    Q.   During the meetings you had with NCMEC, were there --

10:27a 10   after the meetings were there discussions with upper

11   management and ownership about anything NCMEC was telling you?

12          MS. BERTRAND:   Objection, leading.

13          MR. PANCHAPAKESAN:   Vague as to "upper management."

14          MS. BERTRAND:   Vague as to "upper management" and

10:27a 15   hearsay.

16          THE COURT:   Sustained.

17   BY MR. RAPP:

18   Q.   Did you have discussions with upper management after you

19   had meetings with NCMEC?

10:27a 20          MS. BERTRAND:   Objection.   Same objection, vague as

21   to "upper management."

22          THE COURT:   Sustained.

23   BY MR. RAPP:

24   Q.   Is there anybody specifically you discussed the meetings

10:28a 25   with NCMEC with after you had the meetings?

```
        1   A.   Yes.

        2   Q.   Who?

        3   A.   Scott Spear, Jim Larkin.

        4   Q.   All right.  Did you convey to Scott Spear and Jim Larkin
10:28a  5   any of the recommendations that NCMEC was making regarding

        6   Backpage?

        7            MS. BERTRAND:  Objection, leading.  Calls for

        8   hearsay within hearsay.

        9            THE COURT:  Overruled.
10:28a 10            THE WITNESS:  Yes.

       11   BY MR. RAPP:

       12   Q.   Can you identify one of the recommendations from NCMEC

       13   that you discussed with Mr. Larkin and Mr. Spear?

       14   A.   That they wanted us to not take prepaid cards anymore.
10:28a 15   Q.   All right.  And what, if any, reaction or direction did

       16   Mr. Spear and Mr. Larkin give you in response to that

       17   recommendation by NCMEC?

       18            MS. BERTRAND:  Objection, leading.

       19            THE COURT:  Overruled.
10:29a 20            THE WITNESS:  We ignored that recommendation and

       21   then focused on other items.

       22   BY MR. RAPP:

       23   Q.   All right.  Why did you ignore the recommendation

       24   regarding prepaid cards?
10:29a 25   A.   Because 70 percent of our transactions was coming from
```

```
 1   prepaid cards.
 2   Q.   All right.  Do you know why NCMEC -- was there any
 3   explanation from NCMEC as to why they didn't want you to take
 4   prepaid cards?
 5            MS. BERTRAND:  Objection, hearsay.
 6            THE COURT:  Sustained.
 7   BY MR. RAPP:
 8   Q.   Well, let me just ask you.  What -- you've testified to
 9   the revenue, but was there any other reason why you didn't
10   want to not accept prepaid cards?
11            MR. FEDER:  Relevance, 403.
12            THE COURT:  Overruled.
13            THE WITNESS:  It was apparent our users liked
14   prepaid cards.  You could pick them up at 7-Elevens and if you
15   -- if at a 7-Eleven you didn't have a bank account, you could
16   just buy a gift card.  So -- and it offered a level of -- and
17   it -- you could be more anonymous.
18   BY MR. RAPP:
19   Q.   Okay.  And why was being anonymous -- why would that be
20   important at all?
21            MS. BERTRAND:  Objection, calls for speculation.
22            THE COURT:  Sustained.
23   BY MR. RAPP:
24   Q.   Was there any discussion with Mr. Spear or Larkin about
25   the anonymity that prepaid cards gave your customers?
```

10:29a    5
10:29a   10
10:30a   15
10:30a   20
10:30a   25

1          MS. BERTRAND:  Objection.  Leading, hearsay.

2          THE COURT:  Sustained.

3          MR. FEDER:  Also compound.

4          THE COURT:  Overruled as to compound, sustained as

10:30a  5  to leading.

6  BY MR. RAPP:

7  A.   Was there -- in addition to -- other than just revenue,

8  was there any other reason why -- in your discussions with

9  Mr. Spear and Larkin why you didn't want to discontinue the

10:31a 10  use of prepaid cards?

11          MS. BERTRAND:  Objection, leading.

12          THE COURT:  Overruled.  I'll overrule that.

13          THE WITNESS:  The discussion was that people used

14  prepaid cards because we were successful in reaching users

10:31a 15  that were unbanked.  So these users may not have bank

16  accounts, and it's a way that they can participate in

17  e-commerce and post ads, pay for ads without having a bank

18  account.

19          MR. RAPP:  All right.

10:32a 20  BY MR. RAPP:

21  Q.   Was there another recommendation that NCMEC made to you

22  during these meetings that you discussed with Mr. Spear and

23  Mr. Larkin?

24          MS. BERTRAND:  Objection, leading and hearsay within

10:32a 25  hearsay.

1       MR. FEDER:  Also, if there could be a

2  distinguishment between -- unless all of the conversations

3  were between Mr. Spear and Mr. Larkin.

4       THE COURT:  Sustained.

10:32a  5       MR. RAPP:   All right.

6  BY MR. RAPP:

7  Q.   Let's just start, was there another recommendation they

8  made?

9       MS. BERTRAND:  Objection, hearsay.

10:32a 10  BY MR. RAPP:

11  Q.   What -- let me ask when you --

12       THE COURT:  Sustained.

13  BY MR. RAPP:

14  Q.   When they made a recommendation, did you communicate that

10:32a 15  recommendation to either Mr. Spear or Mr. Larkin?

16       MS. BERTRAND:  Objection, hearsay.

17       THE COURT:  Overruled.

18       THE WITNESS:  Yes.

19  BY MR. RAPP:

10:32a 20  Q.   What was that other recommendation that you communicated

21  to Mr. Spear or Mr. Larkin?

22       THE COURT:  Well, I think the prior objection was

23  with regard to who specifically; and you're asking a somewhat

24  compound question about either Mr. Spear or Mr. Larkin.

10:33a 25       So I think he has to identify one or the other or

1    both, and you have to tailor your question in that way.

2            MR. RAPP:   All right.

3    BY MR. RAPP:

4    Q.   The recommendations that you received from -- from the

10:33a  5    NCMEC meetings, did you -- who did you communicate those to?

6    A.   At these NCMEC meetings I had a VP board member with me

7    or on the phone with me, Don Moon, and then Liz McDougall; and

8    after these meetings I would have conversations with Scott

9    Spear and Jim Larkin, but I can't say which one I was talking

10:34a  10   to at any particular time about any event 'cuz I just gave

11   summaries of the meetings with NCMEC whenever I had a chance

12   to talk to them.

13   Q.   Why did you give summaries to Mr. Larkin and Mr. Spear?

14           MR. FEDER:   Same objection, compound.

10:34a  15           THE COURT:   Overruled.

16           THE WITNESS:   They're my bosses.

17           MR. RAPP:   All right, okay.

18   BY MR. RAPP:

19   Q.   Do you recall another recommendation that NCMEC made to

10:34a  20   you?  Let's just start with Mr. Spear.  Did you communicate

21   another recommendation NCMEC made to you to Mr. Spear?

22           MS. BERTRAND:   Objection, hearsay.

23           THE COURT:   Overruled.

24           THE WITNESS:   NCMEC made a lot of recommendations so

10:34a  25   I'm trying to -- you're asking me to tailor which

```
 1  recommendation I briefed Spear with or Jim Larkin and I'm --
 2  I'm kind of challenged with that.
 3          MR. RAPP:  Okay, let me see if I can help you.
 4  BY MR. RAPP:
 5  Q.  You've just testified about a recommendation they made
 6  with regard to prepaid cards.  Did they make any
 7  recommendation whatsoever about posting ads?
 8          MR. FEDER:  Leading.
 9          THE COURT:  Sustained.
10  BY MR. RAPP:
11  Q.  What other recommendation did they make --
12          MS. BERTRAND:  Hearsay, objection.
13          MR. RAPP:  -- that you communicated to Mr. Spear?
14          MS. BERTRAND:  Same objection.
15          THE COURT:  Overruled as to the last question.
16          THE WITNESS:  I would communicate their
17  recommendations that we provide more data when there was a
18  NCMEC report.  Like they wanted to know additional ads by
19  users --
20  BY MR. RAPP:
21  Q.  Let me just stop you on the additional ads.
22      The additional ads recommendation, did you communicate
23  that to Mr. Spear?
24          MS. BERTRAND:  Objection, leading.
25          THE WITNESS:  I can't be sure if it's Mr. --
```

10:35a (line 5)
10:35a (line 10)
10:35a (line 15)
10:35a (line 20)
10:36a (line 25)

1          THE COURT:  Wait, wait, wait.  Let me rule on the

2    objection.

3          Overruled, you can answer.

4          THE WITNESS:  I can't be sure if it's Mr. Spear or

10:36a 5  Mr. Larkin at the time.

6          MR. RAPP:  All right.

7          THE WITNESS:  It's like one of the two or both.

8    BY MR. RAPP:

9    Q.   All right.  But what's the recommendation regarding ads?

10:36a 10         MS. BERTRAND:  Objection, hearsay.

11         THE COURT:  Overruled.

12         THE WITNESS:  When we'd send a cyber tip report, we

13   would only -- the report -- this is a report to NCMEC that

14   someone looks under age.  We'd only send the one ad.  We would

10:36a 15 not send every ad by that user, and in this case --

16   BY MR. RAPP:

17   Q.   Can I just stop you.  Can you explain that to the jury,

18   what we're talking about here?

19   A.   So if a -- we're making a cyber tip report and we see

10:37a 20 someone that appears to be under eighteen, we would go ahead

21   and send just that ad in the cyber tip report.

22         Now, we could have sent all ads by the user.  So if the

23   user had twelve other ads or they're posted in other cities we

24   could have sent all ads by the user, but we only sent the

10:37a 25 single ad.  We waited to get a subpoena, and then when we

 1  received the subpoena from law enforcement then we would send

 2  all ads.

 3  Q.   All right.  Let me -- let me just ask you:  Did you

 4  implement any of the recommendations NCMEC made to you?

10:37a  5           MS. BERTRAND:  Objection.  Leading, vague as to

 6  "recommendations."

 7           THE COURT:  Overruled.

 8           THE WITNESS:  We implemented the recommendations

 9  that wouldn't impact revenue negatively.  It was a slow dance,

10:38a  10  little things.

11  BY MR. RAPP:

12  Q.   You've made that comment previously in your testimony.

13       What did you mean about "slow dance" with respect to your

14  meetings with NCMEC?

10:38a  15  A.   We just engage them in a conversation, do those tasks

16  that will not impact revenue negatively.  So the tasks we

17  would do, they had a database of problematic URLs.  We could

18  scan the site to see if those URLs were on there.

19       They had a database of child porn images and hash and we

10:38a  20  could make sure that those didn't appear on the site, but none

21  of those would really impact the revenue in the adult section.

22  Q.   All right.  Did there come a point where the meetings

23  stopped with NCMEC?

24  A.   Yes.

10:39a  25  Q.   Do you recall when that was?

1  A.   I believe June -- mid -- midsummer 2012.  June 2012, I

2  believe.

3  Q.   Okay.  You discussed a -- you have testified to a meeting

4  in March of 2011.  Do you recall that testimony?

10:39a  5  A.   Yes.

6  Q.   Do you recall just testifying to that?

7  A.   Yes, yes.

8  Q.   Do you recall who the CEO or the president of NCMEC was

9  at the time?

10:39a 10  A.   Yes.

11  Q.   Who was that?

12  A.   Ernie Allen.

13  Q.   And when the -- the meetings ceased with NCMEC, was

14  Mr. Allen still the president of NCMEC?

10:40a 15            MS. BERTRAND:  Objection, leading.

16            THE COURT:  Overruled.

17            THE WITNESS:  No, he wasn't.

18  BY MR. RAPP:

19  Q.   Do -- do you know who was?

10:40a 20  A.   Yes, there was someone new, John Ryan.

21  Q.   All right.  At the time that the meetings ceased with

22  NCMEC, was Mr. John Ryan, was he the president of NCMEC?

23  A.   Yes, I believe so.  I don't know his exact title, but he

24  was the new CEO.

10:40a 25  Q.   All right.  And did -- was it communicated to you by

```
 1   anyone within Backpage that you were no longer going to meet

 2   with NCMEC?

 3           MS. BERTRAND:  Objection.  Leading, hearsay.

 4           THE COURT:  Overruled, he can answer whether or not

 5   someone communicated with him.

 6           MR. RAPP:  That is a "yes" or "no."

 7           THE WITNESS:  Yes.

 8   BY MR. RAPP:

 9   Q.  Who was that person?

10   A.  Board member Don Moon.

11   Q.  All right.  And what did he -- did he give you a reason

12   as to why the meetings were no longer going to go on with

13   NCMEC?

14   A.  He said we had come to an impasse.  They were asking

15   us --

16           MR. FEDER:  Objection, hearsay and beyond the scope

17   of the question.

18           THE COURT:  Overruled.

19   BY MR. RAPP:

20   Q.  What'd he say?

21   A.  He said we had come to an impasse with NCMEC, that we're

22   not gonna take down the adult section and we're not -- that

23   they're demanding us to do too many things.

24   Q.  All right.  Now, at this point when the meetings with

25   NCMEC had ceased, what was the status of the safety and
```

10:41a  (line 5)
10:41a  (line 10)
10:41a  (line 15)
10:41a  (line 20)
10:42a  (line 25)

```
         1   security consultant, Hemu Nigam, with SSP Blue at this point?

         2   A.   He's not active.  I don't believe he's with the company

         3   any longer.

         4   Q.   All right.  When you say "the company," do you mean his

10:42a   5   company or what company?

         6   A.   Oh, I mean he's no longer under contract with Backpage.

         7   Q.   All right.

         8        MR. RAPP:  Madam clerk, how are we doing on the --

         9        COURTROOM DEPUTY:  It's working.

10:42a  10   BY MR. RAPP:

        11   Q.   I'm showing you 156 on your screen there.

        12        Do you see that?

        13   A.   Yes.

        14   Q.   What is it?

10:42a  15   A.   It's an e-mail from Monita Mohan to Andrew Padilla and

        16   Joye Vaught.

        17   Q.   Do you recognize Monita Mohan's e-mail address?

        18   A.   Yes.

        19   Q.   And you exchanged e-mails with Ms. Mohan during a certain

10:43a  20   time period in 2011 and '12?

        21   A.   I had, but I was mainly copied on e-mails.

        22   Q.   All right.  Who would she -- do you know who she would

        23   e-mail when you were copied?

        24   A.   She would communicate with Andrew Padilla or Joye Vaught.

10:43a  25   Q.   All right.
```

```
 1              MR. RAPP:  Move to admit 156.

 2              MS. BERTRAND:  Objection, hearsay.

 3              THE COURT:  Overruled, it may be admitted.

 4              MR. RAPP:  And request permission to publish, Your

10:43a  5   Honor.

 6              THE COURT:  Yes, it may be published.

 7              MR. RAPP:  Thank you.

 8              (Exhibit No. 156 admitted in to Evidence.)

 9   BY MR. RAPP:

10:43a 10   Q.   What does Ms. Mohan tell Mr. Padilla and Ms. Vaught?

11   A.   Please approve these words for removal/editing.

12        Do you want me to read the whole e-mail?

13   Q.   If you would.

14   A.   "Hi Andrew and Joye

10:44a 15        Please approve these words for editing/removal.

16        1.  Lick my kitty:  Sucking pussy" --

17              MR. FEDER:  Objection, speaks for itself.

18              MS. BERTRAND:  There's no reason to read these in.

19              THE COURT:  Well, I guess you can display it.  I

10:44a 20   think it's before the jury.  They can take a moment to read it

21   for themselves if they wish to do that.

22   BY MR. RAPP:

23   Q.   In the interest of time, I'm happy to do that but can you

24   tell -- while the -- while the jury's reading the e-mail, can

10:44a 25   you tell us why it is, based upon your position at Backpage,
```

1  why Monita Mohan is sending this e-mail to Mr. Padilla and

2  Ms. Vaught?

3          MS. BERTRAND:  Objection, calls for speculation.

4  He's not cc'd on this e-mail so he can't say why she's doing

10:45a  5  something.

6          THE COURT:  Well, he can answer based on his

7  position.

8  BY MR. RAPP:

9  Q.  Well, did Mr. Padilla and Ms. Vaught, do they answer to

10:45a  10  you?

11  A.  Yes, they do.

12  Q.  And can you explain why they're the ones that are

13  exchanging e-mails with the El Camino, the India-based

14  moderation company?

10:45a  15  A.  Yes, they are focused on getting rid of terms that are

16  indicative of sex for money.

17  Q.  All right.  Okay, let's look at 157.

18          THE COURT:  Well, let me just inquire of the jurors.

19          Did everyone have a chance to at least read through

10:45a  20  the e-mail?

21          Okay, I see nodding heads all around.

22          Okay, move forward.

23          MR. RAPP:  Thank you, your Honor.

24  BY MR. RAPP:

10:46a  25  Q.  Do you see this e-mail?

1  A.   Yes.

2  Q.   Is this a similar e-mail to -- a similar e-mail exchange

3  like the one contained in United States 156?

4          MS. BERTRAND:  Objection, leading.

10:46a  5          THE COURT:  Overruled.

6          THE WITNESS:  Yes, it is.

7  BY MR. RAPP:

8  Q.   All right.  Is this from Monita Mohan to -- who's it to?

9  A.   The e-mail is to Andrew Padilla and Joye Vaught.

10:46a  10  Q.   All right.  And let's look at 157a, and do you recognize

11  the attachment in 157?

12  A.   Yes.

13  Q.   And can you just -- without saying what the contents are,

14  can you describe it?

10:46a  15  A.   It's a list of terms that should be banned that are

16  indicative of sex for money or prostitution.

17          MR. RAPP:  Move to admit 157 and 157a.

18          MS. BERTRAND:  Objection as to 157a, lack of

19  foundation.

10:47a  20          THE COURT:  Overruled, it may be admitted and

21  published.

22          MR. RAPP:  And request permission to publish, Your

23  Honor.

24          THE COURT:  Yes.

10:47a  25          *(Exhibit Nos. 157 and 157a admitted in to Evidence.)*

1  BY MR. RAPP:

2  Q.    And what does Ms. Mohan say to Mr. Padilla and

3  Ms. Vaught?

4  A.    "Hi Andrew and Joye

10:47a  5        Please confirm if you would like us to delete the ads

6  with these words.

7        Best Monita."

8  Q.    And then looking at 157a, is this list of words similar

9  to other lists of -- of words that we have looked at

10:47a 10  previously in other exhibits?

11  A.    Yes, it is.

12  Q.    And are all of these words in some fashion indicative of

13  some kind of a sexual act?

14          MS. BERTRAND:   Objection, calls for speculation.

10:48a 15          THE COURT:   Sustained.

16  BY MR. RAPP:

17  Q.    Well, how do you know -- don't speculate.

18        How do you know that these are words indicative of sexual

19  acts?

10:48a 20  A.    Because their definition is about a sexual act --

21  Q.    All right.

22  A.    -- for the purpose of sites that have prostitution ads.

23  Q.    Well, let's just -- this goes on for several pages.

24  Let's just go back --

10:49a 25  A.    And I want to just clarify something.  Not all terms are

indicative of sexual acts. There are a couple in there that are not, like "young."

Q. Okay, fair enough. But these are words that -- are these gonna be words that are -- that will be banned from postings?

10:49a A. Yes.

Q. And then what happens when they're banned from the posting?

A. Well, there's a variety of actions that could happen. It could give them a -- it could be stripped out or it could be banned, and I think at this time the terms are banned so that they get a message and then they're able to just post again by changing that word.

10:49a

Q. Okay. Let's go on to another area. You recall in 10 -- Exhibit 104, let's see if I can find that quickly for you.

10:50a Do you recall a recommendation from the security officer -- the safety and security that you meet with an individual by the name of Byron Fassett?

MS. BERTRAND: Objection, leading.

THE COURT: Sustained. And it's a confusing question, Mr. Rapp. You started talking about 104 and then you switched to a different topic so. . .

10:50a

MR. RAPP: All right, let me see if I can clear this up.

BY MR. RAPP:

10:50a Q. Do you remember -- did you meet with Byron Fassett?

1   A.   Yes, I did.

2   Q.   After meeting with -- is it Sergeant Fassett?

3   A.   Yes, it is.

4   Q.   Did you receive things from him?

10:51a   5   A.   He began sending me e-mails, yes.

6   Q.   All right.  Let's look at Exhibit 1202 for the witness'

7   eyes only.  Do you see that on your screen?

8   A.   I do.

9   Q.   And is this an e-mail you received from Mr. -- from

10:51a  10   Sergeant Fassett?

11   A.   Yes, it is.

12   Q.   All right.  And what was the purpose of this relationship

13   that you had with Sergeant Fassett where he would send you

14   certain e-mails?  What information was he giving you?

10:51a  15          MS. BERTRAND:  Objection, vague as to "information"

16   and hearsay.

17          THE COURT:  Well, that's a compound question.

18          MR. RAPP:  Let me see if I can clear this up.

19   BY MR. RAPP:

10:52a  20   Q.   Do you -- do you recognize this e-mail?

21   A.   Yes, I do.

22   Q.   How do you recognize it?

23   A.   Because I received e-mails regularly from Byron Fassett.

24   Q.   All right.  And -- and did you exchange e-mails with him

10:52a  25   periodically?

1  A.   Yes, after we met in person we exchanged e-mails.

2  Q.   And is his e-mail address on here?

3  A.   Yes, it is.

4  Q.   All right.

10:52a  5           MR. RAPP:  Move to admit 1202.

6           MR. CAMBRIA:  Objection, foundation.

7           MS. BERTRAND:  Objection, hearsay and relevance

8  under 401 and 403.

9           THE COURT:  I think just foundation for the exhibit

10:52a 10  itself, Mr. Rapp.  I don't know what the date is.  I mean, I

11  don't know what the context is.  I mean, I think you just have

12  to lay the foundation for the exhibit and ask him about it.

13           MR. RAPP:  All right.

14  BY MR. RAPP:

10:53a 15  Q.   What's the date you received this -- this e-mail?

16  A.   May 11th, 2012.

17  Q.   All right.  And is this after you had met with him?

18  A.   Yes, it is.

19  Q.   All right.

10:53a 20           MR. RAPP:  Move to admit 1202.

21           MS. BERTRAND:  Objection.  Same objections as to

22  hearsay, 401 and 403.

23           THE COURT:  Overruled as to each.

24           MR. CAMBRIA:  And foundation.

10:53a 25           MR. RAPP:  And request permission to publish.

```
 1              THE COURT:  Yes, it may be published.

 2              (Exhibit No. 1202 admitted in to Evidence.)

 3    BY MR. RAPP:

 4    Q.   And so down at the bottom what is the -- without reading

10:53a 5   the whole thing in the interest of time, what is the subject

 6    of the posting that he is sending you?

 7    A.   "Juvenile Prostitution Ad."

 8    Q.   And then once you receive that, do you send that to

 9    Mr. Padilla?

10:54a 10  A.   Yes.

11    Q.   All right.  And why are you sending it to Mr. Padilla?

12    A.   I'm giving him instructions to archive and 404 these ads,

13    subpoena's coming.

14    Q.   All right.  And then can you remind us what "404" means?

10:54a 15  A.   It just means to remove the ad so it doesn't appear

16    on-line and the search engines will not index it.

17    Q.   All right.  Now, let's look at 1204 for the witness' eyes

18    only.  Is this a similar ad?

19    A.   Yes, it is.

10:54a 20  Q.   And is it an ad that --

21              THE COURT:  Mr. Rapp, let me stop you there.  I

22    don't see an ad.  I see an e-mail.  I don't know what you're

23    referring to.

24              MR. RAPP:  Yeah.

10:55a 25  BY MR. RAPP:
```

1  Q.   Is this an e-mail from Mr. Fassett, Sergeant Fassett?

2  A.   Is this an e-mail, yes, it is.

3  Q.   And is he -- is he -- is the e-mail -- does it include an

4  ad?

10:55a  5  A.   It does.

6  Q.   All right.  And is this in June of 2012?

7  A.   June 28th, 2012.

8  Q.   All right.  And is this e-mail -- let's look at the

9  second page.  Oops.

10:55a 10     So does the second page have information on it that you

11  can identify?

12  A.   Yes, posting IDs.

13  Q.   All right.  And how is it, sir, that you can identify the

14  posting IDs?

10:56a 15  A.   Every ad has a unique posting ID.  That posting ID's also

16  in the URL of the ad.  We're able to find ads based on posting

17  IDs if we know the city.

18  Q.   All right.  And posting IDs on Backpage?

19  A.   Yes.

10:56a 20  Q.   All right.

21         MR. RAPP:  Move to admit 1204.

22         MS. BERTRAND:  Objection.  Hearsay, lack of

23  foundation, relevance under 401 and 403.

24         THE COURT:  Overruled.

10:56a 25         MR. RAPP:  Move to admit and also request permission

 1    to publish.

 2              THE COURT:  It may be admitted and it may be

 3    published.

 4              (Exhibit No. 1204 admitted in to Evidence.)

10:56a  5    BY MR. RAPP:

 6    Q.    All right.  And without reading the entirety of this, can

 7    you just sort of summarize what he's giving you?

 8    A.    He's telling us that 22 of the ads listed below resulted

 9    in an arrest for prostitution.

10:57a 10   Q.    All right.  And then going on to the second page -- and I

11    believe you were referencing this -- can you explain to the

12    jury what these numbers indicate?

13    A.    So every ad in the city will have a unique ID, and so

14    the posting ID appears in the URL but you'll also see it in

10:57a 15   the body copy of the ad near the bottom.  So we're able to

16    find these ads using these posting IDs.

17    Q.    All right.  And, similarly, do you give this -- do you

18    send this to anybody?

19    A.    Yes, I send it to Andrew Padilla.

10:58a 20   Q.    All right.  Let's look at 1207.  Is this yet another

21    e-mail from Mr. -- from Sergeant Fassett?

22              MS. BERTRAND:  Objection, cumulative.

23              THE COURT:  Well, it's actually -- Mr. -- I guess

24    that's what confused me about your last exhibit, Mr. Rapp.

10:58a 25             MR. RAPP:  Yes, ma'am.

CARL FERRER - CONT'D DIRECT EXAMINATION BY MR. RAPP     32

```
 1              THE COURT:  The e-mail at the header is not from
 2   Sergeant Fassett.  It's from Mr. Ferrer.
 3              MR. RAPP:  Well --
 4              THE COURT:  It's forwarding an e-mail.
10:58a 5        MR. RAPP:  All right, so let's see if I can address
 6   that.
 7   BY MR. RAPP:
 8   Q.   Can you look at the bottom here on 1207?
 9   A.   Yes.
10:59a 10  Q.   Do you see down here -- down below, does it indicate who
11   is on this e-mail string?
12   A.   Yes.
13   Q.   Who is it?
14   A.   Byron Fassett is e-mailing me on November 14th, 2012.
10:59a 15  Q.   All right.  And this actually is a -- there's actually
16   two pages to this e-mail, and does it have his signature line
17   on it?
18   A.   It does.
19   Q.   And when you receive this, do you send this to somebody
10:59a 20  eventually?
21   A.   I do.
22   Q.   Who do you send it to?
23   A.   I sent it to Andrew --
24   Q.   All right.
11:00a 25  A.   -- Padilla.
```

```
 1  Q.    Okay.

 2              MR. RAPP:  Move to admit.

 3              MS. BERTRAND:  Objection, Your Honor.  As to the

 4  lower part pertaining to Mr. Fassett, the e-mail address is

 5  not on there.  It's simply text.  There's no links.

 6              THE COURT:  Overruled.  He's testified previously

 7  that he received other e-mails from that same individual, so

 8  overruled.  What exhibit was that again, Mr. Rapp?

 9              MR. RAPP:  1207 for the record.

10              THE COURT:  It may be admitted and published.

11              MR. RAPP:  Thank you.

12              (Exhibit No. 1207 admitted in to Evidence.)

13  BY MR. RAPP:

14  Q.    And so is this -- this is what we've been discussing.  Is

15  this this two-page e-mail from -- from Sergeant Fassett and

16  what is he alerting you here to?

17  A.    "The below listed Backpage ad has been identified as ad

18  for prostitution and/or Child Sex Trafficking.  The young girl

19  depicted" -- I can't quite -- "young girl depicted in the

20  listed ad has been identified as a child" who's been

21  "compelled to engage in prostitution."

22  Q.    And that was sent to you to have that ad removed --

23  A.    It is.

24  Q.    -- and Mr. Padilla?

25  A.    I'm having Andrew Padilla remove the ad.
```

11:00a (line 5)
11:00a (line 10)
11:00a (line 15)
11:01a (line 20)
11:01a (line 25)

1   Q.   And does Mr. Padilla respond to you?

2   A.   He does.  He confirms, "This is done."

3   Q.   All right.  And last, let's look at 1208.

4        Is this yet another e-mail from Sergeant Fassett to you

11:02a  5   that you forward to Andrew Padilla?

6   A.   Yes, it is.

7              MR. RAPP:  Move to admit 1208.

8              MS. BERTRAND:  Objection, Your Honor.  Foundation as

9   to where it was forwarded.  We only have the Carl Ferrer

11:02a 10   e-mail address going to some random place and 401, 403, 404(b)

11   and cumulative.

12              THE COURT:  Well, sustained as to foundation with

13   regard to this exhibit.  It's a different -- different e-mail,

14   different addresses.

11:02a 15              MR. RAPP:  All right, let's have a look here.

16   BY MR. RAPP:

17   Q.   Is your e-mail on there?

18   A.   Yes, it is.

19   Q.   Is Mr. Padilla's e-mail on there?

11:02a 20   A.   Yes, it is.

21   Q.   Is this in November of 2012?

22   A.   It's November 15th, 2012.

23   Q.   And does it have a subject?

24   A.   Yes, "Prostitution Ads on Backpage.com."

11:03a 25              MR. RAPP:  Move to admit 1208.

1        MS. BERTRAND:  Your Honor, same objection.  There's

2   no indication in this document how Mr. Padilla, if at all,

3   received this; and at this point it looks cobbled together.

4        There's no continuity between Mr. Fassett,

11:03a  5   Mr. Ferrer, and the top half of the first page and then

6   Mr. Padilla.

7        THE COURT:  It's a fair point with regard to

8   foundation and this particular exhibit.

9        Mr. Rapp, why don't you ask -- just ask him is he

11:03a 10  familiar with it?  What is it?  What did he do with it?

11       MR. RAPP:  Well, certainly.

12  BY MR. RAPP:

13  Q.   What did you do with this -- this e-mail when you

14  received it from Sergeant Fassett?

11:04a 15  A.   Well, I received it.  It was sent to me at 11:18 a.m.  I

16  then responded at 12:30 p.m. on the same day and then I then

17  forwarded -- I then sent it -- we need these ads removed at

18  12:31 p.m.  At 2:50 p.m. I also say we should also ban the

19  user because we really don't want this user to post any more

11:04a 20  ever again, not just remove the ads; and then at 4:53 p.m.

21  November 15th Andrew Padilla tells me, "this is done by the

22  way."

23  Q.   All right.  Just to respond to the concern about this

24  being cobbled together, do you know who -- where this e-mail

11:05a 25  came from?

1    A.    It came from the Arizona Grand Jury and the PSI.

2    Q.    And I believe you testified yesterday that was the United

3    States Senate?

4    A.    Yes.

11:05a  5    Q.    You -- are you aware of whether or not both of those

6    investigative bodies asked for e-mails from Backpage?

7               MR. FEDER:  Leading.

8               THE COURT:  Sustained.

9    BY MR. RAPP:

11:05a  10   Q.    Do you know if they asked for e-mails from Backpage?

11              MR. FEDER:  Leading and also relevance, 403,

12   hearsay.

13              THE COURT:  I think there's a valid 401 objection,

14   but I also think it's, again, one of these compound questions.

11:05a  15   You're asking about two separate, different bodies and

16   cobbling the request together.  So I think the foundation

17   needs to be laid, Mr. Rapp.

18   BY MR. RAPP:

19   Q.    Were you required to give e-mails to two investigative

11:06a  20   bodies?

21   A.    Yes, I was.

22   Q.    Is one of them the Arizona --

23              THE COURT:  I can't hear you.

24   BY MR. RAPP:

11:06a  25   Q.    Is one of them the Arizona Grand Jury?

1  A.    Yes.

2  Q.    Is one of them United States Senate?

3  A.    Yes.

4  Q.    And, sir, how do you know that?

11:06a  5  A.    Because I was subpoenaed for those documents and involved

6  in delivering those documents.

7  Q.    All right.  And is this one of those documents?

8  A.    Yes.

9        MR. RAPP:  Move to admit 1208.

11:06a 10        MS. BERTRAND:  Objection, Your Honor.  The existence

11  of Bates stamps at the bottom of a document doesn't create the

12  foundation to authenticate a document where we don't have the

13  actual where the e-mail is going from Mr. Ferrer.

14        THE COURT:  Overruled.

11:06a 15        MR. RAPP:  Goes to the weight.

16        THE COURT:  Overruled.

17        MR. RAPP:  Move to admit, request permission to

18  publish.

19        THE COURT:  Admitted and permission to publish.

11:07a 20        (Exhibit No. 1208 admitted in to Evidence.)

21  BY MR. RAPP:

22  Q.    All right.  Is this the -- below is -- down here, is this

23  the e-mail sent by Sergeant Fassett?

24  A.    Yes, it is.

11:07a 25  Q.    Is this the same type of an e-mail that he -- that we've

```
  1    looked at in Exhibits 1202, 1204 and 1207?
  2            MS. BERTRAND:  Objection, leading.  The document
  3    speaks for itself.
  4            THE COURT:  Sustained.
11:07a  5  BY MR. RAPP:
  6    Q.   Have you seen an e-mail like this before?
  7    A.   Yes, he sent the -- a couple now.
  8    Q.   All right.  And do you -- what do you do with this
  9    e-mail?
11:07a 10          MS. BERTRAND:  Objection, asked and answered.
 11            THE COURT:  Sustained.
 12    BY MR. RAPP:
 13    Q.   Do you give this e-mail to anybody?
 14            MS. BERTRAND:  Same objection.
11:08a 15          THE COURT:  Well, we're talking about 1208, right?
 16    Is that --
 17            MR. RAPP:  Yes.
 18            THE COURT:  Overruled.
 19            THE WITNESS:  I -- I forward Sergeant Fassett's
11:08a 20  e-mail to Andrew Padilla, and he knows because of the history
 21    of this relationship with Sergeant Fassett that we're just
 22    gonna remove these ads.
 23            MR. RAPP:  All right.
 24            All right, let's move on to -- to another exhibit.
11:08a 25          Let's look at 1922.
```

1          MS. BERTRAND:  I'm sorry, what was the exhibit
2    number?
3          MR. RAPP:  1922.
4          MS. BERTRAND:  Thank you.
11:09a 5   BY MR. RAPP:
6    Q.   So how is -- we are now in May of 2012.  How is the
7    revenue for Backpage during this time period?
8    A.   It's hitting all-time high records.
9    Q.   And how are the alternative newspapers that Mr. Lacey,
11:09a 10  Mr. Spear and Mr. Brunst own?  How are they doing?
11   A.   They're not doing well.  They continue to decline.  It's
12   a national -- it's an industry-wide phenomenon, like it's
13   happening to all newspapers.
14   Q.   During this year time period do they do anything with
11:09a 15  those newspapers?
16   A.   Yes, they do.
17   Q.   What do they do with them?
18   A.   They sell them to a employee-led management group.  That
19   means employees who are working for the company are taking it
11:10a 20  over.
21   Q.   And if you know, do they have any further involvement in
22   the newspapers?
23   A.   They appear to separate themselves from the papers.  I
24   recall seeing press releases where they talked about how they
11:10a 25  were -- they were done with the papers and there was new blood

```
 1   taking over.

 2   Q.   All right.  So do you know if Backpage is the only

 3   company that they own?

 4            MS. BERTRAND:  Objection, vague as to "they."

 5            THE COURT:  Sustained.

 6            MR. RAPP:  Well, let's take them individually.

 7   BY MR. RAPP:

 8   Q.   What does the chief financial officer for Village Voice

 9   Media and Backpage, what is his position now after they sell

10   the newspapers?

11            MR. PANCHAPAKESAN:  Objection.  Foundation,

12   speculation.

13            THE COURT:  Sustained.

14   BY MR. RAPP:

15   Q.   Do you know?  Do you know what his position is?

16   A.   He's the CFO of Backpage now and only Backpage.

17   Q.   How do you know that?

18   A.   Because the newspapers are gone.  They're under a new

19   management group because they needed to separate themselves

20   from Backpage.  Backpage was too toxic.  It was leading to the

21   papers getting boycotts so --

22            MR. FEDER:  Objection, goes beyond the scope.

23            THE COURT:  Sustained.

24   BY MR. RAPP:

25   Q.   Why did they have to separate themselves from the
```

11:10a (line 5)
11:11a (line 10)
11:11a (line 15)
11:11a (line 20)
11:11a (line 25)

1    newspaper?

2    A.   They had to separate themselves from the newspaper

3    because --

4              MR. FEDER:  401, 403.

11:11a  5              THE COURT:  Overruled.

6              MR. PANCHAPAKESAN:  It also lacks foundation.

7              THE WITNESS:  -- because they wanted to keep

8    Backpage.

9              THE COURT:  Let me late rule on that objection.

11:11a 10              It's overruled.

11              THE WITNESS:  They wanted to keep Backpage.com.  You

12    couldn't have both.  It was hurting the newspapers.

13    BY MR. RAPP:

14    Q.   All right.  When you say "it was hurting the newspapers,"

11:12a 15    what do you mean?  What do you mean it was hurting the

16    newspapers?

17    A.   There was bad press.  There was calls for boycotting

18    Village Voice Media newspapers because of Backpage.

19    Q.   All right.  And how do you know that?  How do you know

11:12a 20    that there were boycotts?  What's your basis?

21              MR. FEDER:  401, 403, hearsay.

22              THE COURT:  Overruled.

23              THE WITNESS:  Well, it was in the media, but there

24    was even a press release from the new owners of the papers

11:12a 25    expressing how Backpage had been a problem for them with the

1  papers so. . .

2  BY MR. RAPP:

3  Q.   After that happens, does Backpage stay here in Phoenix?

4  A.   No, we are soon to be evicted.

11:12a  5  Q.   What do you mean by that, you are soon to be evicted?

6  A.   We needed to separate Backpage from the company.  So the

7  Backpage office could no longer be at the building at 1201

8  East Jefferson Street.

9  Q.   Just down the street, down Jefferson here, right?

11:13a  10  A.   Correct, correct.

11  Q.   So where did you go in Phoenix?  Did you find another

12  building in Phoenix?

13  A.   Scott Spear was tasked with trying to find us another

14  location, but it was going poorly.  We seemed to be too toxic

11:13a  15  to even get a lease.

16  Q.   All right.  And did you have discussions with Mr. Spear

17  about that fact?

18  A.   Yes.

19  Q.   Okay.  So what happened?

11:13a  20  A.   We came up -- we, Scott Spear and I, decided that we just

21  didn't need an office in Phoenix.

22  Q.   Okay.

23  A.   We just would have people work from home and then

24  transfer key employees to Dallas and operate out of Dallas

11:14a  25  because Dallas -- we're working out of that newspaper office

1    and we had lots of space, and that newspaper office didn't

2    want to work with us so they moved to a different floor in the

3    building and we kept -- took over their whole lease.

4    Q.   All right.  And did you stay in that building from 2012

11:14a  5    to 2018?

6    A.   No, we only stayed in that building until the landlord

7    locked us out in 2016 due to a search warrant on the property.

8             MR. FEDER:  Objection, hearsay, 401, 403, move to

9    strike.

11:14a 10             THE COURT:  Well --

11             MR. FEDER:  Beyond the scope, also.

12             THE COURT:  I will partially sustain the objection

13   just in terms of responsiveness.  The Court -- I'm sorry, the

14   jury will disregard everything after "the landlord locked us

11:15a 15   out in 2016."

16   BY MR. RAPP:

17   Q.   All right.  Let's look at 1922.  What is 1922?

18   A.   It's a analytics report -- daily report, I believe, to

19   Scott Spear.

11:15a 20   Q.   All right.  Is this similar to the Google Analytics

21   reports that we've looked at previously?

22             MS. BERTRAND:  Objection, leading.

23             THE COURT:  Sustained.

24   BY MR. RAPP:

11:15a 25   Q.   Have you seen reports like this?

1    A.   Yes.

2    Q.   All right.  And let's look at 1922b.  Is this -- what is

3    1922b?

4    A.   It's a Google Analytics report showing the referrals and

**11:15a**  5    the traffic to the site.

6    Q.   All right.

7         MR. RAPP:  Move to admit 1922 and 1922b.

8         MS. BERTRAND:  Objection.  Lack of foundation,

9    hearsay.

**11:16a**  10        THE COURT:  Overruled.

11        MR. RAPP:  And request permission to publish it.

12        THE COURT:  It may be admitted and published.

13        MR. RAPP:  Thank you.

14        (Exhibit Nos. 1922 and 1922b admitted in to

**11:16a**  15   Evidence.)

16   BY MR. RAPP:

17   Q.   And so can you just explain some of the information on

18   this transmission e-mail?

19   A.   So the report is coming from backpage.analytics@gmail.

**11:16a**  20   It's an automatic report that Google Analytics is kicking out.

21   It's being sent to Scott Spear, and it's a daily report so

22   it's sent to him each day.  You can tell the day because of

23   the number, 2012, May 29th.

24   Q.   All right.  And then looking at b, what does this report

**11:17a**  25   tell you?

1    A.    This report shows that the top three referring sites

2    are -- to Backpage.com are prostitution review sites.

3    Q.    All right.  And for what time period is it?

4    A.    May 29th, 2012.

11:17a  5    Q.    Is that -- that's one day?

6    A.    Yes.

7    Q.    And how many visits for the site are there?

8    A.    It's kinda hard to tell from that because it's on a

9    graph.  Can you shrink that -- there we go.  It's better to

11:17a  10   look at the site usage.

11   Q.    All right.

12   A.    So the visits 2,066,031 in a single day.

13   Q.    All right.  Let's look at Exhibit 31 for your eyes only.

14         Do you recognize this exhibit?

11:18a  15   A.    Yes, I do.

16   Q.    Do you recognize who this exhibit is from?

17   A.    It's from Jim Larkin.

18   Q.    And who is he sending it to?

19   A.    He's sending it to Carl Ferrer, Scott Spear and Jed

11:18a  20   Brunst.

21   Q.    And when was this e-mail -- when was it sent?

22   A.    It was sent Wednesday, August 1st at 10:00 a.m.

23   Q.    All right.  And what is the context of this e-mail?

24   A.    So this e-mail's an agenda of items that we're gonna

11:18a  25   discuss regarding Backpage.

CARL FERRER - CONT'D DIRECT EXAMINATION BY MR. RAPP          46

1          MR. RAPP:  Move to admit Exhibit 31 and request

2     permission to publish.

3          THE COURT:  Yes, it may be admitted and published.

4          *(Exhibit No. 31 admitted in to Evidence.)*

11:19a  5   BY MR. RAPP:

6     Q.   All right.  What does Mr. Larkin tell you and Mr. Brunst

7     and Mr. Spear?

8     A.   "Carl, Jed and Scott:  These are the topics I would like

9     to begin to cover in our discussion 10:00 am Wednesday in

11:19a 10   Phoenix.

11          Carl, will you please add any items you, Jed or Scott

12     Spear might have to discuss and fix an agenda?

13          I'm willing to address this in any way necessary and

14     would like to begin a regular monthly meeting schedule."

11:19a 15          Jim Larkin.

16     Q.   In No. 1 what is the first agenda topic that Mr. Larkin

17     wants to discuss?

18     A.   "management information metrics/analytics-what are we

19     measuring, what are we comparing it against? and review

11:20a 20   current management reports."

21     Q.   And what did you take that to mean?

22     A.   This is the -- gonna be the ad count, the page views, the

23     revenue and the traffic and how we're gonna compare it and so

24     he wants to get these reports -- he wants to know how to use

11:20a 25   them and what other detail would be important for managing the

1    business.

2    Q.   All right.  And then No. 2, what is -- what is the second

3    agenda item?

4    A.   The second agenda item is, "fallback business plan

11:20a  5    scenarios in 2013 if business interrupted."

6    Q.   What did you take that to mean?

7    A.   We're under a lot of pressure from different groups and

8    the media.  We're under investigation, that we're wondering

9    what is our business plan in the event that we have to turn

11:21a 10   off the adult section.

11   Q.   All right.  And then No. 3?

12   A.   "personnel and office leases and space consolidation."

13   Q.   What'd you take that to mean?

14   A.   This is where Backpage in Dallas is gonna take over the

11:21a 15   office lease for the newspaper and take over a large space --

16   a really large office.

17   Q.   All right.  And then jumping to six, what does he -- what

18   is this agenda item?

19   A.   "further security/safety/user experience technology

11:22a 20   enhancements."

21   Q.   What did you take that to mean in terms of what you were

22   going to discuss?

23   A.   So I'm gonna provide a list of things that we can do to

24   grow revenue, make it easier to do NCMEC reports or reply to

11:22a 25   subpoenas, and really focus on also growing revenue.

1   Q.   All right.  And the reference to "user experience," what

2   did you take that to mean?

3   A.   The world's changing at this time in 2012.  People are no

4   longer using desktop computers as often.  They're using their

**11:22a**  5   mobile phones.  So we're changing the site so that it's more

6   mobile friendly so you can look at content much easier on a

7   mobile phone.

8   Q.   Does that include the female escort section?

9   A.   It's almost entirely engineered to benefit the female

**11:23a** 10   escort section because the emphasis is on images.

11   Q.   All right.  And then looking at No. 7, what is that

12   agenda item?

13   A.   Despite that we've been told to block -- well, it's

14   "prepaid credit cards" and we're told not to take them anymore

**11:23a** 15   by different NGOs, but we're having a problem with them

16   working and we want to make sure that we can continue to make

17   them work.

18   Q.   Okay.  And why would -- why was that an important item to

19   discuss?

**11:23a** 20   A.   Well, we only have one processor, Litle, that's able to

21   handle prepaid credit cards.  So we have all our eggs in one

22   basket called Litle.

23   Q.   All right.  And Litle -- what does Litle do for you

24   again?

**11:24a** 25   A.   Litle is the credit card processor.

CARL FERRER - CONT'D DIRECT EXAMINATION BY MR. RAPP        49

1   Q.   All right.  And then let's jump to ten.  What is ten?

2   What agenda item is that?

3   A.   It's "age verification tools update."

4   Q.   All right.  And what is the subject matter of that

11:24a  5   discussion?

6   A.   We're looking for any tools that wouldn't disrupt the

7   user experience that might work for age, and we've done some

8   beta testing with Aristotle but it's just not -- it's clunky.

9   It's not working well, and there's a decision to not pursue

11:25a  10   Aristotle anymore.

11   Q.   Who was that decision made by?

12   A.   Well, it was communicated to me by Village Voice Media

13   Director Don Moon.

14   Q.   All right.

11:25a  15   A.   Or I should say board member, board member.

16   Q.   All right.  And just so the jury understands, Aristotle

17   is what?

18   A.   Aristotle was an age verification company that we had

19   contracted with.

11:25a  20   Q.   All right.  Let's look at 335.  Do you see that on your

21   screen?

22   A.   Yes.

23   Q.   And what is it?

24   A.   It's an e-mail from me to Jim Larkin on Tuesday,

11:26a  25   September 18th, 2012.

CARL FERRER - CONT'D DIRECT EXAMINATION BY MR. RAPP

1   Q.   All right.  And what is the subject of this e-mail?

2   A.   It's a report on the revenue.

3   Q.   All right.  And is there some attachments to this?

4   A.   There is.  There's a large number of attachments with

11:26a  5   different reports.

6   Q.   All right.  So let's look at 335b.  Do you see that

7   there?

8   A.   Yes.

9   Q.   Do you recognize it?

11:26a  10   A.   I do.

11   Q.   What is it?

12   A.   This is a breakdown of the revenue by category for -- for

13   a week.

14   Q.   All right.  And is this a multiple-page document,

11:27a  15   attachment, with a breakdown of revenue?

16   A.   Yes, by -- by all categories and then subtotaled by

17   section.

18   Q.   Okay.  And the above exchange, I think you had testified

19   is between you and Mr. Larkin, but who else receives these

11:27a  20   attachments?

21   A.   So those attachments are going to Dan Hyer, Andrew

22   Padilla, Beth Cook at Village Voice Media, myself, Jed Brunst

23   at Village Voice Media, Scott Spear at Village Voice Media,

24   Tamara Nikel and Jim Larkin.

11:27a  25   Q.   All right.

1    MR. RAPP:  Move to admit 335 and 335b.

2    THE COURT:  Yes, 335 and 335b may be admitted and

3  published.

4    MR. RAPP:  Thank you, your Honor.

11:28a  5    (Exhibit Nos. 335 and 335b admitted in to Evidence.)

6  BY MR. RAPP:

7  Q.   And so just starting up here, what do you tell

8  Mr. Larkin?

9  A.   I write to Mr. Larkin, "Well, I must be the biggest sand

11:28a 10  bagger ever.  I thought the week was soft but it was pretty

11  good.

12    Best news is the number of transactions increasing.

13    That shows revenue growth is independent of rate."

14  Q.   Can you explain to the jury in the context of this --

11:28a 15  this e-mail with the attachments what are you talking about

16  when you say sandbagging?

17  A.   Sandbagging is -- Scott Spear would accuse me of

18  sandbagging because he would want aggressive budgets and then

19  I would try to say, "No, how about three percent, five

11:28a 20  percent?"  He would say "25 percent."

21    So I'd be accused of sandbagging, which means projecting

22  a lower -- trying to get a lower number in the budget and then

23  exceeding it.

24  Q.   All right.  So just does the -- the attachments, does it

11:29a 25  sort of explain what you're talking about with Mr. Larkin?

1   A.   It does.

2   Q.   So looking at 335b and just starting up here, can you

3   explain these rows and columns for the jury?

4   A.   Yes.  I think the easiest is to say this is all adult,

11:29a  5   and for that week the site generated $1,862,264 in net revenue

6   after refunds; and what's interesting is that in the number

7   one category is this second circle, which is female escorts

8   and that's 1,381,820.  In this -- in this single week there's

9   172,985 paid ads posted.

11:30a  10   Q.   All right.  But you had -- Backpage had other categories,

11   right?

12   A.   Yes.

13   Q.   So let's look at the other categories.  Like, for

14   example, automotive.  How did automotive do?

11:30a  15   A.   Automotive generated $591.40.

16   Q.   Okay.  Well, how about all these other categories?

17   A.   So the buy/sell/trade category was 6,955.07.

18   Q.   So just going back to 335, did the owners, Mr. Spear and

19   Mr. Brunst, did they receive these reports?

11:31a  20   A.   Yes, they did.

21   Q.   All right, let's look at another one.

22        And, also, did Mr. Padilla receive these reports?

23   A.   Yes, he did.

24   Q.   Let's look at 342.  What is this?

11:32a  25   A.   This is an e-mail from Carl Ferrer to Jed Brunst and Jim

1   Larkin.  Subject line, "Over 50% of our revenue is 'move to

2   the top' buys," and it's sent on August 6th, 2012.

3           MR. RAPP:  Move to admit and request permission to

4   publish.

11:32a 5        MS. BERTRAND:  Objection.  Foundation, hearsay, and

6   the concern is what's going on with the top of this?  It's

7   confusing as to who this was received from and sent to if you

8   look at the very top of the document.

9           THE COURT:  Overruled as to that and I -- it might

11:33a 10  be confusing.  So maybe Mr. Rapp can lay some foundation for

11  the appearance of the exhibit.

12          MR. RAPP:  Okay.  Let me -- let me just look at the

13  attachment first.  Maybe we can do this all together.

14  BY MR. RAPP:

11:33a 15  Q.   Let's look at 342a.  Do you see that on your screen, sir?

16  A.   I do.

17  Q.   Can you tell what this is?

18  A.   This is another report for a week in 2012 that breaks

19  down the revenue by category, by section.

11:33a 20  Q.   Okay.  And so going back to 342 --

21          MR. RAPP:  I don't -- I'm not sure I understand the

22  objection.  Is this --

23          THE COURT:  When you blew it up, it doesn't show

24  that very top header.

11:34a 25          MR. RAPP:  Let me see.  Oh, you mean --

CARL FERRER - CONT'D DIRECT EXAMINATION BY MR. RAPP      54

```
 1              MS. BERTRAND:  Uh-huh, that is what I mean.
 2              MR. RAPP:  -- up here.  Let me ask Mr. Ferrer.
 3    BY MR. RAPP:
 4    Q.   Do you have any idea what that -- the name up there at
11:34a  5    the top is?
 6    A.   I -- I don't.  I speculate, but not certain.
 7    Q.   All right.  We don't want you to speculate, but do you
 8    remember sending this e-mail?
 9    A.   I do remember sending this e-mail and the content of the
11:34a 10    e-mail 'cuz it really captures what's going on with the
11    business.  Like I said, it's insightful.
12    Q.   All right.
13              MR. RAPP:  Move to admit 342 and 342a.
14              MS. BERTRAND:  Same objection given that header on
11:35a 15    this document.
16              THE COURT:  I think he's laid sufficient foundation
17    for the e-mail that he drafted, overruled; but perhaps
18    Mr. Rapp can make sure that he reviews those exhibits so that
19    there's not confusing information on it.
11:35a 20              MR. RAPP:  We're on it.
21              All right, request permission to publish.
22              THE COURT:  Yes, it may be published.
23              MR. RAPP:  Thank you.
24              THE COURT:  They are admitted and can be published.
11:35a 25              COURTROOM DEPUTY:  Both 342 and 342a?
```

```
 1              THE COURT:  Yes.

 2              (Exhibit Nos. 342 and 342a admitted in to Evidence.)

 3     BY MR. RAPP:

 4     Q.   All right.  What do you tell Mr. Brunst in this e-mail?

11:35a  5   A.   "Over 50% of our revenue is 'move to the top' buys."

 6          "Move to the top is over 50%of our revenue.  Optimization

 7     in this area seems key.  I attached a pdf of the past" week's

 8     -- "past week (gross revenue.)  Our annual run rate on

 9     postings is now 43.8 million when you include the work we are

11:36a 10  doing in feeds.

11          Badoo uses a 'move to the top' strategy similar to

12     backpage."

13     Q.   Can you explain that?

14     A.   Badoo is a competitor coming out of Europe.

11:36a 15  Q.   All right.

16     A.   "You could pay a dollar or a euro to 'rise up' the search

17     results, and so attract greater attention.  You could pay

18     again to have your profile photo more widely visible across

19     the site.  He introduced virtual gifts to buy for your

11:36a 20  prospective date."  No one is pushing you to spend money, but

21     if you want to attract more users, you have to pay, he

22     explains.  You can pay to advertise yourself.  "If you want

23     something to go faster, you pay.  And some people pay tens of

24     times every day to rise up."

11:37a 25  Q.   Okay.
```

1    A.    And I pulled that from the -- an article that ran in the

2    *Wired* UK magazine.

3    Q.    What -- what are you -- what point are you trying to

4    communicate to Mr. Brunst here?

11:37a  5    A.    That we have a feature that's very similar called "move

6    to the top," and that it's the majority of our revenue in

7    "move to the top."

8          And "move to the top" means if your ad isn't getting any

9    phone calls, you don't have to post a new ad.  You go to your

11:37a 10   same ad and then you just pay again, and it goes right to the

11   top of the listings.

12   Q.    All right.  I'm now showing you on the screen 342a.

13         You see that?

14   A.    I do.

11:38a 15   Q.    And then you've been talking about move to the top here.

16         Can you interpret this for the jury?

17   A.    So out of the $1,871,987 in ads for this particular week

18   in the adult section in revenue, 1.2 million -- $1,263,484 is

19   in move to the top.

11:38a 20   Q.    All right.  And then let's just look at the other

21   categories.  Let's, for example, look at automotive.

22         Can you -- can you explain the comparison between

23   automotive, for example, and adult?

24   A.    Yes.  If you look at automotive it's 1,323; and if you

11:39a 25   look at move to the top, it's zero.  It's zero because people,

1   even if they were legitimately selling cars, you know, they

2   don't need to move their ad up to the top like three times a

3   day or four times a day, like in the adult section.

4   Q.   Okay.  And then looking at other categories, all these

**11:39a**   5   other categories, how do they compare to adult?

6   A.   Well, there's not much revenue.  This is in the

7   buy/sell/trade section.  It's $18,953.  In comparison to the

8   1.8 million in adult, it's insignificant.

9   Q.   All right.  Let's look --

**11:40a**  10   A.   There's one other thing I should point.

11   Q.   All right.

12   A.   'Cuz I mentioned feeds in the e-mail and imported --

13   these are imported ads.

14   Q.   Can you explain to the jury what "imported ads" are?

**11:40a**  15   A.   Oops, I made a mistake.  That, actually, in

16   buy/sell/trade wouldn't work.  That's under -- these are new

17   ads in buy/sell/trade.

18   Q.   Let me go to Page 2.  Is there anything there that --

19   A.   Yes, there's two things interesting.  In the job section

**11:40a**  20   we generate $3,000 in revenue that week, and we imported

21   262,000 ads as feeds from other websites.  So there's no human

22   being actually making that posting.

23   Q.   Okay.  Can you explain that to the jury?

24   A.   So you take the feed from another website.  They export

**11:41a**  25   the data and they put it into a file, and then we had hired

```
 1   somebody to manage feeds; and the purpose of the feeds is to

 2   get some content into these other categories that have little

 3   or no content.

 4   Q.   Does it cost you to get these feeds?

 5   A.   The feeds are free.  We have to make a -- we have to pay

 6   a developer to normalize the feeds so that they could be

 7   imported.

 8   Q.   So when you're looking at the revenue that's generated,

 9   is there some cost that needs to be backed out of that to get

10   the feeds?

11   A.   Well, there's no revenue generated from the feeds, and

12   it's actually costing us five grand a month to normalize the

13   feeds to import them correctly.

14   Q.   I see, all right.  Let's look at 1664, speaking of feeds.

15        What is this?

16   A.   It's an e-mail from me to Jim Larkin, Scott Spear, Jed

17   Brunst.

18   Q.   All right.  Is there -- let's look at the attachment

19   1664a.  Do you see that?

20   A.   It's a -- it's another what we called statistics report

21   breaking down the revenue by category and section.

22   Q.   All right.  And so fair to say this is a multiple-page

23   report?

24   A.   Yes.

25   Q.   All right.
```

11:41a (line 5)
11:42a (line 10)
11:42a (line 15)
11:42a (line 20)
11:43a (line 25)

1        MR. RAPP:  Move to admit 1664 and 1664a.

2        THE COURT:  Yes, they may be admitted and published.

3        *(Exhibit Nos. 1664 and 1664a admitted in to*

4   *Evidence.)*

11:43a  5   BY MR. RAPP:

6   Q.   Now, why are you sending this to Scott Spear and Jed

7   Brunst?

8   A.   I was asked in our management meetings to send reports

9   that would show different metrics in comparison and understand

11:43a 10   where the revenue's coming from.

11   Q.   All right.  And what message are you conveying here?

12   What do you tell them here in this e-mail with the attachment?

13   A.   You'll -- I'm sending them the Backpage November report.

14        "You'll see in this report that feeds are way up

11:44a 15   (imported free ads 1,007,778.)

16        We better understand how to secure and utilize this

17   content."

18   Q.   What do you mean by that?

19   A.   Well, we're able to find the feeds.  We're able to import

11:44a 20   the feeds, and we're able to get our numbers up in our other

21   categories so that the site has this veneer of a general

22   classified site.  The ad count number is always -- it's near

23   the category on the home page of Backpage.com.  So we can't

24   show low numbers there.  We got to artificially inflate with

11:44a 25   feeds.

CARL FERRER - CONT'D DIRECT EXAMINATION BY MR. RAPP          60

 1   Q.   All right.  Let's look at the attachments.  So what do
 2   the -- what do the attachments show?
 3   A.   Well, this is the entire month and it shows that adult
 4   generated 7,754,492 of which moved to the top was $5,439,166;
 5   and what's really interesting here is that move to the top was
 6   done 555,327 times in the month of November.  So you can see
 7   it's a frequently-used tool.
 8   Q.   All right.  And then what does this attachment tell
 9   Mr. Spear and Mr. Brunst about the female escort category
10   within the adult category?
11   A.   Tells them that female escorts generated 5,759,378 of
12   which the majority of that is moved to the top and it was --
13   moved to the top was done 401,817 times in the female escort
14   section in the month of November.
15   Q.   Okay.  And then just looking -- let's just take, oh, I
16   don't know, automotive.  How does automotive compare?
17   A.   Automotive generated $4,342.72.  We did get one moved to
18   the top -- or we got seven moved to the top sales for $27.00,
19   and the imported feeds are 242,739.
20   Q.   And then these other buy/sell/trade categories, how did
21   they compare to the adult category in particular, the female
22   escorts?
23   A.   The revenue's insignificant by comparison.
24   Q.   All right.  Let's look at 355.
25        What is this?

11:45a appears at line 5
11:46a appears at line 10
11:46a appears at line 15
11:47a appears at line 20
11:48a appears at line 25

1    A.   This is an e-mail from myself to Jim Larkin, Jed Brunst,

2    Scott Spear.  It's sent Saturday, December 22nd, 2012.

3    Q.   All right.  And why are you sending this to Mr. Brunst

4    and Mr. Spear?

11:48a  5    A.   The subject line is, "Fwd:  revenue & ad count charts,"

6    and there's some attachments that I'm sending him.

7    Q.   All right.  And let's look at 355b, and what does this

8    show?

9    A.   Well, this is showing the revenue by month, by section

11:49a 10    and -- that's it.  It also shows the paid ads.

11    Q.   All right.

12            MR. RAPP:  Move to admit 355 and 355b.

13            MR. PANCHAPAKESAN:  Objection, cumulative.

14            MS. BERTRAND:  Objection to foundation.  Even if the

11:49a 15    Government attempts to redact it, it still creates a

16    foundation issue.

17            THE COURT:  I guess lay some more foundation and

18    perhaps include the distinction between this and the prior

19    e-mails.

11:49a 20            MR. RAPP:  Oh, all right.

21    BY MR. RAPP:

22    Q.   Let's look at -- well, let's just look at the chart and

23    I'll -- so the previous charts cover what type of a time

24    period, if you recall?

11:50a 25    A.   Like a month or a week in the previous charts.

1  Q.   All right.  And is this chart different in any respect?

2  A.   This chart is different.  It's complicated.  I was asked

3  to make this chart.

4  Q.   Who were you asked by?

11:50a 5  A.   I was asked by -- it's either Jim Larkin or Jed Brunst, I

6  believe.

7  Q.   All right.  And does it provide a comparison of

8  categories over a longer time period?

9        MS. BERTRAND:  Objection, leading.

11:50a 10        THE COURT:  Sustained.

11  BY MR. RAPP:

12  Q.   What's the time period that this covers with -- with

13  respect to the revenue for the individual categories?

14  A.   The revenue's by sections and it goes from October 10th

11:51a 15  through November 12th -- I mean -- let me say that again.

16        October 2010 through November 2012.

17  Q.   And the previous -- just so we're clear, the previous

18  charts that we looked at, did they cover a number of years?

19  A.   No.

11:51a 20        MS. BERTRAND:  Objection, leading.

21        THE COURT:  Well, he can explain what the difference

22  between the two exhibits are; and without Mr. Rapp leading

23  him, Mr. Rapp can ask him to do so.

24  BY MR. RAPP:

11:51a 25  Q.   What's the difference between the previous charts

1  attached to the e-mails and this chart?

2  A.   The previous reports that we looked at were monthly or by

3  week.  This report gives you the full view from October 2010

4  through November 2012.

11:52a  5           MR. RAPP:  Move to admit 355 and 355b.

6           MS. BERTRAND:  Objection, foundation as to the data

7  underlying the creation of this chart.

8           THE COURT:  Sustained.

9  BY MR. RAPP:

11:52a  10  Q.   How did you -- how did you create this chart?  Where did

11  you get the data?

12  A.   So we had Andrea Sennet run all those same monthly

13  reports that you saw.  She ran them and then took that data

14  from those reports and created a spreadsheet so that we could

11:52a  15  see a month-to-month layout annually and make the report just

16  easier to understand.

17       So Andrea Sennet made it.  I'm familiar with Andrea

18  Sennet.  She works -- she worked in the Dallas office.  She

19  was tasked with running those reports.

11:52a  20  Q.   And the actual underlying data, how is -- where was it

21  located?  How was it obtained?

22  A.   It's stored on the Backpage servers.  It's -- there was

23  an administrative feature for running reports that would pull

24  the data directly from the Backpage servers.

11:53a  25           MR. RAPP:  Move to admit 355, 355b.

1      MS. BERTRAND:  Same objection, 901 and not disclosed

2  under Rule 16 as to the data.

3      THE COURT:  Overruled as to all the objections.

4      It may be admitted and published.

11:53a  5      MR. RAPP:  Thank you, your Honor.

6      *(Exhibit Nos. 355 and 355b admitted in to Evidence.)*

7      THE COURT:  Are you going to take some time with

8  this exhibit, Mr. Rapp?

9      MR. RAPP:  I believe I could do this quickly.

11:53a 10  BY MR. RAPP:

11  Q.   So just so we understand who this went to, this is from

12  you?

13  A.   Yes.

14  Q.   And do you send it to Mr. Brunst and Mr. Spear?

11:54a 15  A.   I do.

16  Q.   And why do you send it to them?

17  A.   One or all three of them asked for these reports.

18  Q.   All right.  And all three of these individuals, are they

19  owners of Backpage?

11:54a 20  A.   Yes.

21  Q.   And then looking at 355b, I promise to do this quickly.

22      So I'll put that on one side and then can you interpret

23  the yearly revenue in the adult and compare it to these other

24  categories?

11:55a 25  A.   I can compare the monthly revenue over a period of time.

1    So, for example, in October -- I'm up in here.  Under

2  adult entertainment in 2010 we're running 1,172,000 in

3  October, and if you just follow down each it grows by month.

4  You can see that it goes from three million to four million to

11:55a 5  five million to six million to seven million to approximately

6  eight million in 2012.  So that's -- that's adult revenue per

7  month.

8    Now, the other categories, they -- they don't have that

9  kind of growth.  I'll use jobs, and in "jobs" we've got

11:56a 10  24,000, 19,000, 21,000.  It actually goes the other way.  It's

11  going down.  So "jobs" revenue by month just continues to go

12  down.

13  Q.  All right.  One last question:  What do you attribute --

14    THE COURT:  I can't hear you.

11:56a 15  BY MR. RAPP:

16  Q.  What do you attribute in your capacity at Backpage during

17  this time period to the growth in the adult section compared

18  to the other sections?

19  A.  Two things.  We're not a job site and, second of all,

11:56a 20  moderation is not having an impact on revenue growth.

21  Q.  What do you mean it's "not having an impact on revenue

22  growth"?

23  A.  Users are able to self-censor their content and they're

24  continuing to post.  Despite all the blocks or images being

11:57a 25  removed, they adapt and they continue to post, especially in

```
 1   the female escort section.
 2   Q.   All right.
 3              MR. RAPP:  That's all I have before lunch.
 4              THE COURT:  All right.  Members of the Jury, we are
 5   at the noon hour so let's take our lunch break.
 6              Do be ready in the jury room to -- I'd say five
 7   minutes 'til the hour so that we can begin promptly at 1:00.
 8   And so just remember the admonition, but have an enjoyable
 9   lunch.  Please all rise for the jury.
10              (11:57 jury out.)
11              THE COURT:  All right, we will stand in recess.
12              (Lunch recess taken at 11:58 a.m.)
13   (Whereupon the proceedings adjourned at 11:58 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

1           *REPORTER'S CERTIFICATION*

2

3                    I, TERI VERES, do hereby certify that I am duly

4      appointed and qualified to act as Official Court Reporter for

5      the United States District Court for the District of Arizona.

6                    I FURTHER CERTIFY that the foregoing pages

7      constitute a full, true, and accurate transcript of all of

8      that portion of the proceedings contained herein, had in the

9      above-entitled cause on the date specified therein, and that

10     said transcript was prepared under my direction and control.

11                   DATED at Phoenix, Arizona, this 20th of

12     September, 2023.

13
                                      _____s/Teri Veres_____
14                                    TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25