2:18-cr-00422-DJH, September 20, 2023 P.M.

1              **UNITED STATES DISTRICT COURT**

2              **FOR THE DISTRICT OF ARIZONA**

3                    _____

4

**United States of America**,          )
5                                        )
                          Plaintiff,     )
6     vs.                                )
                                         )  2:18-cr-00422-DJH
7     **Michael Lacey, et al.**,         )
                                         )
8                          Defendants.   )
                                         )  September 20, 2023
9     _____  )  1:04 p.m.

10

11

12         **BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**

13              <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

14                   JURY TRIAL - DAY 9 P.M.

15

16

17

18

19

20

21    Official Court Reporter:
      **Elaine Cropper, RDR, CRR, CCP**
22    Sandra Day O'Connor U.S. Courthouse, Suite 312
      401 West Washington Street, SPC 35
23    Phoenix, Arizona  85003-2151
      elaine_cropper@azd.uscourts.gov
24
      Proceedings Reported by Stenographic Court Reporter
25    Transcript Prepared by Computer-Aided Transcription

                   United States District Court

2:18-cr-00422-DJH, September 20, 2023 P.M.

1                          **I N D E X**

2                            **TESTIMONY**

3      **WITNESS**                    **Direct   Cross   Redirect   Recross**

4      Government's

5       CARL FERRER                       7

6

7                        **E X H I B I T S**

8      Number                                    Ident  Rec'd

9      173     Email notification from Chase Bank no       19     20
               longer accepting transactions due to
10             human trafficking to Larkin, Spear,
               Brunst, Hyer, Ferrer, 08/30/2013
11
12     175     Email from Ferrer to Larkin, Spear,         37     43
               Brunst, 11/06/2013

13     177     Emails between Brunst, Spear, and           71     71
               others re Website Technologies,
14             03/10/2014

15     178     Email from Brunst to Ferrer, Spear and      72     72
               other attaching letter
16
       178a    Attachment. Letter from US Bank to          73     74
17             Brunst closing account, 04/02/2014

18     181     Email from Vaught to Moderators,            76     80
               Padilla, 04/24/2014
19
       212     Victim #5 – Backpage Ad, 09/10/2013         51     54
20
       212a    Victim #5 Backpage Ad, page 2              51     54
21
       214     Victim #8 – Backpage Ads                    58     61
22
       214a    Victim #8 – Backpage Ads                    58     61
23
       614     Email from Ferrer to Spear, "Call to         8
24             discuss content", 11/10/2010, DOJEmail
               from Ferrer to Spear, "Call to discuss
25             content", 11/10/2010,
               DOJ-BP-0002126357 - DOJ-BP-0002126358

                      United States District Court

2:18-cr-00422-DJH, September 20, 2023 P.M.

**E X H I B I T S** (Continued)

| Number | | Ident | Rec'd |
|--------|--|-------|-------|
| 752 | Email from Ferrer to Brunst, Larkin and Spear, "EMP Transaction Summary", 10/24/2013, | 31 | 32 |
| 763 | Email from Brunst to Ferrer and Larkin, "Comments on long term biz plans", 05/06/2014, | 74 | 74 |
| 869 | Email from Ferrer, "Werther / PrivatBank", 01/22/2014 | 69 | 69 |
| 872 | Email from Brunst, "…corp docs for PostFaster LLC", 10/01/2014 | 95 | 96 |
| 1049 | Email to Ferrer and Brunst, "Latest PPT", 06/23/2014, | 81 | |
| 1049b | Presentation; Backpage.com June 2014; 17 Pages | 82 | 83 |
| 1092 | Email from Ferrer, "Netcash part 2", 09/06/2013 | 13 | 17 |
| 1110 | Email to Larkin, Spear, Brunst, "Yesterday-update", 09/06/2013 | 22 | 22 |
| 1111 | Email to Larkin, Spear, Brunst, "Friday- 413k Gross", 09/07/2013 | 29 | 30 |
| 1116 | Email to Spear, "Agenda- Business plan discussion", 12/01/2013 | 44 | 45 |
| 1116a | Attachment, "Business_plan_2014", | 44 | 45 |
| 1120 | Email to Brunst, Spear, Larkin, "Chase is blocking JetPay", 08/20/2014 | 90 | 91 |
| 1122 | Emails from Ferrer, Brunst, "Stripe, Inc. confirmed on Visa/MC approved PSP lists", 01/08/2015 | 98 | 98 |
| 1124 | Email to Brunst, "Nathan goals for 2015", 01/22/2015 | 102 | 103 |
| 1665 | Email from Ferrer to Spear, "Budget 2013", 02/19/2013 | 9 | 10 |

2:18-cr-00422-DJH, September 20, 2023 P.M.

1

### E X H I B I T S (Continued)

2

| Number | | Ident | Rec'd |
|---|---|---|---|
| 1665a | Attachment,<br>"backpage.com_predidents_day" | 12 | 12 |
| 1816 | Emails from Vaught to moderator,<br>"spacecoast.bakpage.com Report Ad to<br>NCMEC," 07/11/2013 | 48 | 48 |
| 1909a | Redacted version of Exh 1909 | 66 | 67 |
| 1925 | Email from Brunst to Ferrer, Larkin,<br>Spear, "Re: Google Analytics Premium",<br>12/04/2013 | 46 | 46 |
| 1984 | Google Analytics Report showing<br>Referrals to Backpage.com from top 10<br>referring sites covering 06/01/2014 –<br>06/30/2014 | 87 | 87 |
| 1989 | Google Analytics Report showing<br>Referrals to Backpage.com from top 10<br>referring sites covering 03/01/2014 –<br>03/31/2014 | 89 | 89 |

15

### RECESSES

16

| | Page | Line |
|---|---|---|
| (Recess at 2:46; resumed at 3:07.) | 63 | 25 |
| (Recess at 4:11; resumed at 4:17.) | 95 | 6 |

United States District Court

2:18-cr-00422-DJH, September 20, 2023 P.M.

1                       **A P P E A R A N C E S**

2

For the Government:
3               **KEVIN M. RAPP, ESQ.**
                **PETER S. KOZINETS, ESQ.**
4               **ANDREW C. STONE, ESQ.**
                **MARGARET WU PERLMETER, ESQ.**
5               U.S. Attorney's Office
                40 N, Central Ave., Ste. 1800
6               Phoenix, AZ  85004-4408
                kevin.rapp@usdoj.gov
7               peter.kozinets@usdoj.gov
                andrew.stone@usdoj.gov
8               margaret.perlmeter@usdoj.gov

9               **AUSTIN M. BERRY, ESQ.**
                U.S. Department of Justice
10              Child Exploitation and Obscenity Section
                1301 New York Ave., NW, 11th Fl.
11              Washington, D.C.  20005
                austin.berry2@usdoj.gov

12

                **DAN G. BOYLE, ESQ.**
13              Special Assistant U.S. Attorney
                312 N. Spring St., Ste. 1400
14              Los Angeles, CA  90012
                daniel.boyle2@usdoj.gov

15

16      For the Defendant Michael Lacey:
                **PAUL J. CAMBRIA, JR., ESQ.**
17              Lipsitz Green Scime Cambria, L.L.P.
                42 Delaware Ave., Ste. 120
18              Buffdalo, NY  14202
                pcambria@lglaw.com

19

20      For the Defendant Scott Spear:
                **BRUCE S. FEDER, ESQ.**
21              Feder Law Office, P.A.
                2390 E. Camelback Road, Ste. 160
22              Phoenix, AZ  85016
                bf@federlawpa.com

23

                **ERIC W. KESSLER, ESQ.**
24              Kessler Law Office
                6720 N. Scottsdale Rd., Ste. 210
25              Scottsdale, AZ  85253
                eric.kesslerlaw@gmail.com

                     United States District Court

2:18-cr-00422-DJH, September 20, 2023 P.M.

1              **A P P E A R A N C E S** (Continued)

2

For the Defendant John Brunst:

3          **GOPI K.  PANCHAPAKESAN, ESQ.**
           **GARY S. LINCENBERG, ESQ.**

4          Bird Marella Boxer Wolpert Nessim Drooks
Lincenberg & Rhow, P.C.

5          1875 Century Park E. Ste. 2300
           Los Angeles, CA  90067

6          gpanchapakesan@birdmarella.com
           glincenberg@birdmarella.com

7

For the Defendant Andrew Padilla:

8          **DAVID S. EISENBERG, ESQ.**
           David Eisenberg, P.C.

9          3550 N. Central Ave., Ste. 1155
           Phoenix, AZ  85012

10         david@deisenbergplc.com

11   For the Defendant Joye Vaught:
           **JOY MALBY BERTRAND, ESQ.**

12         Joy Bertrand, Esq., L.L.C.
           P.O. Box 2734

13         Scottsdale, AZ  85252-2734
           joy@joybertrandlaw.com

14

15

16

17

18

19

20

21

22

23

24

25

                  United States District Court

CARL FERRER - Direct

# **P R O C E E D I N G**

1

2          (Court was called to order by the courtroom deputy.)

3          (Proceedings begin at 1:04.)

4          THE COURT:  All right.  Please be seated.  We'll go

5     check on the jury.                                          01:04:46

6          All rise for the jury.

7          (Jury enters at 1:06.)

8          THE COURT:  All right.  Please be seated.

9          The record will reflect the presence of our jurors

10    and the witnesses on the witness stand.                     01:06:52

11          Mr. Rapp, please continue.

12          MR. RAPP:  Thank you, Your Honor.

13          (CARL FERRER, a witness herein, was previously duly

14    sworn or affirmed.)

15                  **DIRECT EXAMINATION** (Continued)            01:06:56

16    BY MR. RAPP:

17    Q.   Mr. Ferrer, in 2012 did you have a conversation with

18    Mr. Spear about the Adult category?

19    A.   Yes, I did.

20    Q.   Where did that conversation take place?                01:07:21

21    A.   It occurred in his office and at a bar a couple of blocks

22    from the -- from the office on Jefferson Street.

23    Q.   All right.  What did you and Mr. Spear discuss about the

24    Adult category?

25    A.   At that time, we were under some pressure and we discussed 01:07:42

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | we thought it was over, that we were going to shut down the | 01:07:49 |
| 2 | Adult section and the site would not be able to survive. | |
| 3 | Q.   Was the Adult category shut down in 2012? | |
| 4 | A.   It was not. | |
| 5 | Q.   In 2012 did you have any issues with your processing? | 01:08:16 |
| 6 | A.   In 2012 did we have any issues with our processor? | |
| 7 | Q.   Yes. | |
| 8 | A.   I think -- I thought it started 2013, our credit card | |
| 9 | processor issues. | |
| 10 | Q.   All right.  Let's talk about that.  Who is your processor? | 01:08:34 |
| 11 | A.   The credit card processor that we had at the time was | |
| 12 | Litle. | |
| 13 | Q.   And just as a reminder, 614 is already in evidence. | |
| 14 | MR. RAPP:  I would ask that that be republished. | |
| 15 | COURTROOM DEPUTY:  Can I publish? | 01:09:18 |
| 16 | THE COURT:  Yes. | |
| 17 | It's in evidence, isn't it? | |
| 18 | BY MR. RAPP: | |
| 19 | Q.   Do you recall we talked about this email.  Did it have to | |
| 20 | do with Litle? | 01:09:32 |
| 21 | A.   Oh.  Yes, it did. | |
| 22 | Q.   And when was this? | |
| 23 | A.   It was November 10, 2010. | |
| 24 | Q.   But jumping forward to 2013, what, if anything, happened | |
| 25 | to your credit card processing regarding Litle? | 01:09:52 |

United States District Court

CARL FERRER - Direct

1  A.   In 2013 Litle told us they were going to terminate the

2  processing agreement.

3  Q.   All right.  And so what issue, if any, did that create for

4  Backpage.com?

5         MR. FEDER:  Objection.  Hearsay.  401.  403.

6         THE COURT:  Overruled.

7         THE WITNESS:  It's an existential threat.  I mean, if

8  we don't have credit card processing, we'll go out of business.

9  BY MR. RAPP:

10 Q.   Why would you go out of business if you didn't have credit

11 card processing?

12 A.   Because the revenues generated almost entirely from

13 e-commerce and we really weren't aware of alternate payment

14 channels that would be a substitute for credit cards.

15 Q.   All right.  Let me show you 1665.  What is this?

16 A.   This is an email from me to Scott Spear on February 19,

17 2013.  The subject is the budget and I'm sending an attachment

18 Backpage.com President's Day PDF.

19 Q.   And let's look at 1665.  And do you recognize that as

20 well?

21 A.   Yes.  This is the usual statistical report that breaks

22 down the revenue by category and section.  On Monday, February

23 18.

24         MR. RAPP:  Move to admit 1665 and 1665a.

25         MS. BERTRAND:  Objection.  Foundation.

United States District Court

01:09:59

01:10:22

01:10:34

01:10:53

01:11:45

01:12:04

10

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | THE COURT:  Lay some more foundation, Mr. Rapp. | 01:12:08 |
| 2 | BY MR. RAPP: | |
| 3 | Q.   Mr. Ferrer, did you send Mr. Spear an email in February of | |
| 4 | 2013? | |
| 5 | A.   Yes. | 01:12:22 |
| 6 | Q.   Do you recognize your email address? | |
| 7 | A.   I do. | |
| 8 | Q.   Do you recognize his email address? | |
| 9 | A.   I do.   I recognize Scott Spear's email address. | |
| 10 | Q.   Is this the same email address that has been on a number | 01:12:33 |
| 11 | of emails that we have looked at previously in your testimony? | |
| 12 | A.   Yes, it is. | |
| 13 | Q.   Is the subject matter the budget for 2013? | |
| 14 | A.   Yes, it is it's about the budget and it's about revenue | |
| 15 | for President's Day. | 01:12:59 |
| 16 | Q.   All right. | |
| 17 | MR. RAPP:  Move to admit 1665. | |
| 18 | THE COURT:  It may be admitted and published. | |
| 19 | MR. RAPP:  Thank you. | |
| 20 | (Exhibit Number 1665 was admitted into evidence.) | 01:13:09 |
| 21 | BY MR. RAPP: | |
| 22 | Q.   Why are you sending this email to Mr. Spear? | |
| 23 | A.   I think it's easier for me to read it. | |
| 24 | Q.   What are you telling Mr. Spear here?  Why don't you read | |
| 25 | it? | 01:13:36 |

United States District Court

CARL FERRER - Direct

A.    "I was going to give the accountants a budget and          01:13:36
financials orientation.  Do you have the latest version?

       "Also, do we have the financials for...2013?"

Q.    Why are you asking Mr. Spear for financials for 2013?

A.    Because he signs off on the finals of the financials.      01:13:52
When I say "financials," I mean the P&L.

Q.    And P&L is?

A.    Profit and loss statement.

Q.    And then what else do you tell him about the revenue?

A.    I tell him, "President's Day. down about $30k from typical  01:14:10
Monday.  Auto repost hit record though.  See attached."

Q.    And then what else do you tell him?

A.    "To improve revenue, customer retention and stop
chargebacks, we are going to try to settle on the weekends.
This way customers charge will appear on statement for the day  01:14:33
the customer ran ad.  It's an experiment to see if it helps."

Q.    What do you mean by this?  What are you telling him?

A.    When we were taking credit card charges we were batching
them.  We would hold them for 24 hours, remove any fraud and
spam and then submit them.  What I'm telling him is sometimes   01:14:56
we wait a couple of days, it changes the date that somebody --
that would appear on their credit card statement.  So if we
start settling on weekends, we can eliminate that problem.

Q.    And what about charge-backs, what's the issue with
charge-backs, if any?                                          01:15:20

CARL FERRER - Direct

1    A.   Charge-backs are just a huge priority for us because if we    01:15:21

2    go over half a percent with MasterCard you go on probation.

3    You could lose your merchant account if you get too many

4    charge-backs, so that's what this task is focused on, reducing

5    charge-backs.    01:15:42

6    Q.   All right.  And then just quickly looking at 1665a.  What

7    is this?

8    A.   I'm sending the revenue.

9         MR. RAPP:  I think I moved 1665a and I would request

10   permission to publish.    01:16:01

11        THE COURT:  Yes.  I provided the permission to

12   publish both.

13        (Exhibit Number 1665a was admitted into evidence.)

14        COURTROOM DEPUTY:  They are both admitted.

15        THE COURT:  Yes.  I admitted them and ordered that    01:16:18

16   they be published.

17   BY MR. RAPP:

18   Q.   Okay.  What's the -- can you interpret the bottom line

19   figure of this chart for a single day?

20   A.   Yes.  The revenue on President's Day, which is a holiday,    01:16:28

21   was $253,768 and that is for the Adult Entertainment section.

22   Q.   And what is the -- what category in Adult generates the

23   vast majority of that -- or --

24   A.   Female Escorts.

25   Q.   All right.  And then comparing this one other category,    01:16:54

United States District Court

CARL FERRER - Direct

1   how does it compare to Automotive?                                       01:17:08

2   A.   In Automotive we ran $119.92.

3   Q.   All right.  Looking at 1092 for your eyes only, what is

4   this?

5   A.   We're in the process of losing Litle so this is an email   01:17:36

6   are to Scott Spear from Carl Ferrer and the subject is NetCash.

7   It's a solution to replace Litle and that's what I'm discussing

8   in this email and it was sent on September 6, 2013.

9   Q.   In looking at Mr. Spear and Mr. Brunst's emails, is this

10  the same email that you've been -- email address that you've    01:18:10

11  been exchanging with them up to this point?

12  A.   It's not the same email address.  They have changed email

13  addresses.

14  Q.   Do you know why?

15  A.   They set up a company called Cereus Properties when they   01:18:25

16  sold Village Voice Media and so now their email addresses will

17  have the Cereus Properties' domain.

18  Q.   All right.  And is Mr. Spear working at this point after

19  the sale of the newspapers, is he working in his -- at

20  Backpage.com?                                                    01:18:49

21  A.   Yes.

22  Q.   And what's his role.

23  A.   He is my supervisor.

24  Q.   And what about Mr. Brunst, is he working as the Chief

25  Financial Officer for Backpage.com in 2013?                     01:19:01

CARL FERRER - Direct

1   A.   Yes.                                                              01:19:09

2   Q.   Do you know why they do not have an @backpage.com email

3   address?

4   A.   Yes, I know why.

5   Q.   Why is that?                                                      01:19:19

6   A.   Reputational risk.

7   Q.   All right.  And what do you mean by "reputational risk"?

8   A.   Having the email address Backpage.com, if you Google it,

9   it's just a train wreck of different arrests and prostitution.

10  Q.   Okay.  All right.  And is that the reason why they did not       01:19:37

11  take a Backpage.com email address?

12          MR. FEDER:  Calls for hearsay and speculation.

13          THE COURT:  Sustained.

14  BY MR. RAPP:

15  Q.   Do you know why?                                                 01:19:54

16          MR. FEDER:  Same.

17          THE COURT:  Sustained.

18  BY MR. RAPP:

19  Q.   In any event, is this the email address going forward that

20  you exchange emails with them?                                        01:20:03

21  A.   Yes, it is.

22  Q.   And at this point, had Litle completely stopped conducting

23  credit card transactions for you?

24  A.   We were able to negotiate a graduated termination so it

25  would be decreasing in increments.  We would only be able to          01:20:28

United States District Court

15

CARL FERRER - Direct

| | |
|---|---|
| 1  send them limited numbers of processing and then it would be | 01:20:31 |
| 2  completely ended in 2013. | |
| 3  Q.   So what are you -- first, what are you trying to do to -- | |
| 4  in responses to that? | |
| 5  A.   So I'm working with a consultant and working closing with | 01:20:50 |
| 6  Jed Brunst and Scott Spear and Jim Larkin to secure credit card | |
| 7  processing from Europe. | |
| 8  Q.   And do you know why you had to go to Europe to secure | |
| 9  credit card processing? | |
| 10  A.   Yes, I know why. | 01:21:11 |
| 11  Q.   Why? | |
| 12  A.   It's common for sites that have reputational risk | |
| 13  problems, that's how it's defined in the industry, to not use | |
| 14  U.S. VISA and MasterCard when they get blocked.  They go to | |
| 15  Europe and they use European banks and then you tend to use | 01:21:28 |
| 16  holding companies that sound more innocuous and then you kind | |
| 17  of low balance across many processors and banks so you don't | |
| 18  hit the radar screen. | |
| 19  Q.   All right.  When you say "innocuous," what do you mean by | |
| 20  that? | 01:21:55 |
| 21  A.   Well, we would open up companies like Classified | |
| 22  Solutions, Payment Solutions, just general-sounding companies | |
| 23  that you don't know really -- they don't say Backpage. | |
| 24  Q.   All right.  And did you use the name Backpage when you | |
| 25  were seeking this credit card processing in Europe? | 01:22:16 |

CARL FERRER - Direct

| | |
|---|---|
| 1 | A.   Well, on the application form you do have to disclose it |
| 2 | but you put in holding companies that own it.  And you're |
| 3 | working with European banks so they have an expectation that so |
| 4 | many transactions will be coming from Europe and that these are |
| 5 | for European transactions.  But of course our European business |
| 6 | was just in the infancy so most of the transactions were U.S. |
| 7 | Q.   All right.  And then going back to 1692, does this email |
| 8 | change with you and Mr. Spear and Mr. Brunst -- I'm sorry. |
| 9 | 1092.  Thank you.  This 1092 on your screen, sir, does this, |
| 10 | does this have anything to do with your efforts to get European |
| 11 | banking? |
| 12 | MR. FEDER:  Leading. |
| 13 | THE WITNESS:  Yes.  It does. |
| 14 | THE COURT:  Wait, wait. |
| 15 | Was there an objection? |
| 16 | MR. FEDER:  Me.  Leading. |
| 17 | THE COURT:  Sustained. |
| 18 | BY MR. RAPP: |
| 19 | Q.   What does the exchange have to do with? |
| 20 | A.   So this exchange is me sending an agreement to Spear to |
| 21 | vet and Scott Spear takes forever to vet these agreements.  And |
| 22 | so I'm trying to cajole him into vetting the agreement quickly |
| 23 | and let's get it signed because I can't sign the agreements. |
| 24 | Q.   Why can't you sign the agreements? |
| 25 | A.   Because I'm not the owner.  And then I also had given them |

01:22:26

01:22:45

01:23:22

01:23:33

01:23:41

01:24:01

United States District Court

CARL FERRER - Direct

1    an update on the rates as they are compared to CCBill.  They        01:24:13

2    had asked me to try to get credit card processing from CCBill,

3    which is a credit card processing company for mainly porn sites

4    here in Phoenix, Arizona.

5    Q.   It's based here in Phoenix?                                    01:24:31

6    A.    (Witness nods head).

7              MR. RAPP:  Move to admit 1092.

8              THE COURT:  Just 1092?

9              MR. RAPP:  Yes, ma'am.

10             THE COURT:  Yes.  It is admitted.                         01:24:42

11             (Exhibit Number 1092 was admitted into evidence.)

12             THE COURT:  And it may be published.

13   BY MR. RAPP:

14   Q.   So in response to this email below here, does this cause

15   you to send the email to Mr. Spear and Mr. Brunst?                 01:24:58

16   A.   Yes, it does.

17   Q.   What is this person down here telling you that causes you

18   to inform Mr. Spear and Mr. Brunst?

19   A.   The consultant states, "From NetCash:  also forgot to

20   mention in my email they will get all of our products with one    01:25:23

21   integration this includes US ACH click and buy pay with cash EU

22   debit and SOFORT.  Those buttons are not on the sample join

23   page I sent you because we just finished the integration and

24   will be live later next week.

25             "Let me know if they have any questions.  My best,       01:25:46

United States District Court

CARL FERRER - Direct

1   Peter."                                                                          01:25:49

2   Q.   Can you interpret what you understood that to mean?

3   A.   So Peter of NetCash, I would even have a conversation with

4   Peter and he's just talking about more of these little

5   European-like payment channels that we can use.   SOFORT is like   01:26:02

6   one of them.

7   Q.   All right.   And then what do you tell Mr. Spear and

8   Mr. Brunst?

9   A.   "Scott, here's the NetCash agreement to be vetted.   What

10  better way to spend football weekend than reading agreements.     01:26:22

11       "I like NetCash.   Welcome to Cyprus."

12  Q.   Let me just stop you there.   What do you mean by "welcome

13  to Cyprus"?

14  A.   NetCash is based in Cyprus.

15  Q.   All right.   Go on.                                            01:26:36

16  A.   "I did negotiate the rates to comparable to ccBill.   I

17  need at least two 3rd party processors (ccBill and netcash)."

18  Q.   Can you explain why you need at least two third-party

19  processors?

20  A.   If it's one thing we've learned after losing Litle is you    01:26:55

21  can't put all your eggs in one basket when it comes to

22  processing.

23  Q.   What do you mean by that?

24  A.   You need many banks and processors because you could lose

25  them at any time.                                                  01:27:09

United States District Court

CARL FERRER - Direct

1   Q.   And then what else do you say?                              01:27:15

2   A.   "Next week, our goal it to have ccBill submitted to them

3   and to have NetCash agreement done by the end of the week."

4   Q.   All right.  Now moving on to 173, do you recognize this

5   email?                                                           01:27:42

6   A.   Yes, I do.

7   Q.   What is it?

8   A.   This email is from Carl Ferrer, myself, to Jim Larkin, Jed

9   Brunst, Scott Spear.

10  Q.   And what's the subject of it?                               01:27:56

11  A.   The subject line is Chase Transactions on Backpage.com.

12  Q.   And what below causes you to send this to Mr. Brunst and

13  Mr. Spear?

14  A.   I'm sending this email to Mr. Brunst and Mr. Spear because

15  we have a huge critical problem.  Chase Bank is blocking any     01:28:22

16  cards that occur from Backpage.com.  So we're losing Chase

17  cards and Chase -- so many people have Chase cards.  We're

18  getting flooded in Support.

19  Q.   All right.

20          MR. RAPP:  Move to admit 173.                            01:28:44

21          MR. PANCHAPAKESAN:  Objection.  The bottom email

22  contains multiple levels of hearsay and the notice element of

23  it is irrelevant and prejudicial.

24          THE COURT:  Overruled.

25          MR. RAPP:  Request permission to publish.                01:29:13

CARL FERRER - Direct

1    THE COURT:  Yes, it may be published.                    01:29:15

2    COURTROOM DEPUTY:  And it's admitted?

3    THE COURT:  It is admitted.  It may be published.

4    MR. RAPP:  Thank you.

5    (Exhibit Number 173 was admitted into evidence.)         01:29:21

6  BY MR. RAPP:

7  Q.   And so what is this -- what are they telling you -- can

8  you read the bottom part of this that is forwarded to you?  Can

9  you read it out loud?

10 A.   Yep.  "On the payment page user will get the error.       01:29:45

11 Payment status:  Declined.  I called Chase and spoke to a

12 representative about my card being declined on BP."  That means

13 Backpage.  "The representative offered to bring a fraud

14 management rep in on a three way call to discuss the reason.  I

15 was put on hold and the rep came back, apologized, and said she  01:30:08

16 wasn't going to put the fraud management rep on conference

17 call, but she did talk with them.  They notified the rep that ,

18 'beginning this month, September, Chase was no longer accepting

19 transactions from Backpage.com d,ue to their involvement in

20 human trafficking.'  I told her the ad was for antiques for     01:30:29

21 sale, and the rep apologized again, and repeated the above.  I

22 said thank you for your help and ended the call."

23 Q.   And then what do you communicate to Mr. Brunst and

24 Mr. Spear?

25 A.   I said "I think our problem may get larger on Susnday,     01:30:51

CARL FERRER - Direct

1   Sept 1."                                                          01:30:55

2   Q.   Let me stop you there.  Why did you think the problem was

3   going to get larger on September 1?

4   A.   Because it was just starting on August 30, 2013, and I

5   personally checked with my Chase card to see if I would be      01:31:09

6   declined and I was and I called Chase and got the same answer.

7   Q.   All right.  And then what is the next thing that you tell

8   Mr. Brunst and Mr. Spear?

9   A.   "I think our problem may get larger on Sunday, Sept 1.  We

10  are preparing to give users free ads if they complain while we  01:31:34

11  wait on directing transactions to another processor (that will

12  take one week to go live with EMP and another week to program a

13  redirect based on Chase bin)".

14  Q.   So there's a lot of tech in there.  Can you explain that

15  sentence to the jury?                                            01:31:57

16  A.   That's pretty technical.  It's -- we are looking to --

17  through our European processor, which is called EMP, we are

18  going to direct any Chase credit card to that processor and

19  then that processor will use a different billing descriptor

20  that won't say Backpage.com on it.  So Chase won't know or       01:32:21

21  Chase won't figure it out for a while and the transaction will

22  go through.

23  Q.   And when you say you're going to change the billing

24  descriptor, what does that mean?

25  A.   The billing descriptor, another jargon in the industry,     01:32:40

United States District Court

CARL FERRER - Direct

1   that's when the -- what appears on your credit card statement.   01:32:44

2   So if you bought an ad on Backpage prior to August 30 and you

3   had a Chase card, it would say Backpage.com in the billing

4   descriptor.  But when we get moved to emerchantpay, EMP, it's

5   going to say a different billing descriptor like Classified   01:33:06

6   Solutions.  It won't say Backpage.

7   Q.   And why don't you want it to say Backpage?

8   A.   So that the transaction will go through.

9   Q.   Let's look at 1110.  What is this?

10  A.   So this is an email where I give them an update,   01:33:36

11  especially as it is about payments and the Chase transactions

12  not going through.  It's from me.  It's sent on September 6,

13  2013.  It's sent to Jim Larkin, Scott Spear, Jed Brunst and the

14  subject line, Yesterday-Update.

15  Q.   And is this the context of this email, is it along the   01:34:04

16  same lines about banking that we've been discussing in the

17  previous emails?

18  A.    It's about revenue and banking -- and credit card

19  transactions.

20          MR. RAPP:  Move to admit 1110 and publish.   01:34:22

21          THE COURT:  Yes.  It may be admitted and published.

22          (Exhibit Number 1110 was admitted into evidence.)

23  BY MR. RAPP:

24  Q.   What are you telling Mr. Spear and Mr. Brunst in this

25  email, if you can read it?   01:34:44

CARL FERRER - Direct

1    A.    Well, I lead with good news.                              01:34:46

2    Q.    What's the good news?

3    A.    Good employee.  You don't just deliver problems, you

4    deliver good news.  Revenue is a --

5            MS. BERTRAND:  Objection.  Move to strike.             01:34:57

6    Nonresponsive.

7            THE COURT:  Sustained.  The last comment will be

8    disregarded by the jury.

9    BY MR. RAPP:

10   Q.    Why are you delivering good news?                        01:35:05

11   A.    Because we've had so much bad news that I want to lead

12   this agenda with good news.  I say it's a pretty good day.

13   Q.    And so what's a pretty good day about it?

14   A.    Revenue hit a record of 386 despite having problems with

15   Chase credit cards.                                            01:35:28

16   Q.    Is that revenue for a single day?

17   A.    Yes.  That's $386,000 a single day.

18   Q.    All right.  And then what do you tell them?

19   A.    "Do NOT Honors (3,000 failures by mainly Chase and Rush

20   Cards).  This really bugs me from a user experience.  The only  01:35:50

21   solution is complainers get a free promo code."

22   Q.    All right.  Can you explain what you meant by "user

23   experience"?

24   A.    When they attempt to make a purchase, they get just a

25   general decline error.  They think the problem is with their    01:36:05

United States District Court

24

CARL FERRER - Direct

1   bank.  They call their bank.  The bank informs them that, no,          01:36:09

2   you can't spend money with Backpage.com.  That's a problem for

3   the user experience and it reduces approval rate and it reduces

4   revenue.

5   Q.   And then this reference to a promo code, what is that all         01:36:27

6   about?

7   A.   We are very customer service friendly and if users having

8   a problem with payments, we give them a promo code so that they

9   can just post for free.

10  Q.   And do you recall the email exchange and postings               01:36:40

11  involving a person identified as Pamela Robinson?

12  A.   Yes.

13  Q.   Did you give that person a promo code?

14  A.   Yes, I did.

15  Q.   All right.  And now number three?                               01:37:02

16  A.   "Approval rate is back up to 74% as users re-route or get

17  a free promo code from us.  Our goal should be 85%."

18  Q.   And what does all of that mean?

19  A.   The approval rate is the number of approved transactions

20  divided by the total number of transactions so that, you know,    01:37:24

21  74 percent of people who attempt to pay for their ad, the

22  transaction goes through.

23  Q.   And then number four?

24  A.   "EMP configuration," that's emerchantpay.  "All yesterday

25  was spent with 3 developers debugging a serious problem where     01:37:48

CARL FERRER - Direct

1    some users could see other users tokens.  It was a very high        01:37:52

2    stress day.  It turns out the problem was Desert Net.  No

3    credit card numbers were disclosed and it impacted just a

4    handful of users.  Problem fixed.

5            "Testing with EMP.  Gift cards will always fail."          01:38:08

6    Q.    Let me stop you there.  Do you know why gift cards will

7    always fail with emerchant processing, EMP?

8    A.    I do.

9    Q.    Why is that?

10   A.    If you buy a gift card, and you look at the back of the      01:38:26

11   gift card, you'll see where it says U.S. only.  So if you are

12   running a transaction that's being routed to the European bank,

13   it's going to fail all right.

14   Q.    And then if you could go on.

15   A.    "Master cards will always fail since they have a high        01:38:48

16   fraud alerts about foreign acquirers."

17   Q.    And then the next one?

18   A.    "Chase visa/debit cards will work."

19   Q.    And then go on?

20   A.    "There is nothing sexy about being chased to an offshore     01:39:05

21   processing."

22   Q.    What did you mean by that?

23   A.    Our approval rate with Litle used to be so high and it was

24   so easy and trouble-free to deal with a U.S. Bank and a U.S.

25   processor.  It's just a pain in the neck dealing with European    01:39:24

United States District Court

CARL FERRER - Direct

1   banks and processing.                                              01:39:29

2   Q.   And with Litle, could you use gift cards?

3   A.   Yes.

4   Q.   And then what do you say here?

5   A.   "ccBIll.  I need approval that ccBill is not going to do      01:39:42

6   everything we want, just most of it.  Given current rate of

7   paperwork, it will 2 or 3 more weeks.  I;m beginning to think

8   this is too long and am exploring a faster option like

9   BitCoin."

10  Q.   And can you explain why bitcoin would be a faster option?    01:40:05

11  A.   Because there's a really no KYC or limited KYC to sign up.

12  There's limited paperwork.

13  Q.   And what is KYC?

14  A.   When you sign up for banks and credit card processors

15  there's just an enormous amount of applications you have to        01:40:24

16  fill out and paperwork.

17  Q.   And with bitcoin, is that the case that you know?

18  A.   Well, you can bypass it entirely if you -- and this is

19  what we ended up doing, setting it up so we held the bitcoin.

20  So there was no third party involved.  But at this time we're      01:40:45

21  using I think Coinbase.  Later we would use a company called

22  GoCoin.

23  Q.   And are these bitcoin companies?

24  A.   Yes, they are.  They are bitcoin companies that were

25  handling processing on, like, transactions on sites.              01:41:07

United States District Court

CARL FERRER - Direct

1  Q.   And just so the jury is clear, are you being paid by the        01:41:13

2  processor in bitcoin or is the person posting the ad paying in

3  bitcoin?

4  A.   When?  At what period of time?

5  Q.   Well, I'm talking about at this period of time.                  01:41:34

6  A.   At this time the bitcoin is going from the customer to

7  Coinbase and then from Coinbase to Backpage.

8          Later bitcoin would go from the person paying for the

9  ad to Backpage servers and be captured.

10 Q.   All right.  And if the processing as you described is            01:42:02

11 occurring in European banks -- and I believe you -- in one of

12 these emails you said, "Welcome to Cyprus," how would the money

13 end up coming back to the accounts in the United States for the

14 owners?

15 A.   Yes.                                                             01:42:29

16          MR. PANCHAPAKESAN:  Lacks foundation.

17          THE COURT:  He can answer if he knows.

18 BY MR. RAPP:

19 Q.   How do you know?

20 A.   I do know.  It depends on the bank and the processor.            01:42:38

21 With emerchantpay they would collect a processing fee and then

22 they would send the funds to our bank account.  They will

23 capture the revenue.  But we ended up having three banks with

24 emerchantpay and some banks will send the revenue directly to

25 Backpage banks.                                                       01:43:17

United States District Court

CARL FERRER - Direct

1  Q.   All right.   And then from the Backpage banks, what would          01:43:18

2  happen to the money?

3  A.   At what time?   At this --

4  Q.   This time, if you know.

5  A.   So at this time it would go to Cereus Properties' bank          01:43:30

6  account.

7  Q.   And who were the controllers of the Cereus Properties bank

8  account, if you know?

9  A.   Well, let's see.   This is 2013 so the funds are actually I

10 think going to BMO which I think that is under Website          01:43:48

11 Technologies and then those funds are getting swept out by

12 Cereus Properties.

13 Q.   Why is the BMO account called Website Technologies?

14            MR. PANCHAPAKESAN:   I'm sorry.   I can't hear

15 Mr. Rapp.          01:44:11

16            THE COURT:   Mr. Rapp, you need to use the microphone.

17 BY MR. RAPP:

18 Q.   Why is the BMO account called Website Technologies?

19 A.   I believe I suggested that name.   Jed Brunst had asked for

20 different names.   We needed a name other than Backpage and we          01:44:23

21 had picked a name like Digital Contents Solutions.   We picked a

22 name and it turned out we couldn't use that name and then we

23 chose website -- well, Brunst asked me for names and I

24 suggested Website Technologies and that's the name that we

25 ended up using.          01:44:45

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Q.   All right.  And then the last sentence here? | 01:44:53 |
| 2 | A.   "BitCoin I can add much quicker.  We just need users to | |
| 3 | link their Chase debit cards to cards to BitCoin." | |
| 4 | Q.   And what does that mean? | |
| 5 | A.   Well, I think that means that they are going to have to -- | 01:45:16 |
| 6 | I don't know what it means. | |
| 7 | Q.   All right.  That's fair.  But do you want during 2013 to | |
| 8 | pass along information about banking to Mr. Spear and | |
| 9 | Mr. Brunst? | |
| 10 | A.   I do.  This is my new job description. | 01:45:40 |
| 11 | Q.   And what do you mean by that?  What do you mean that's | |
| 12 | your new job description? | |
| 13 | A.   Really not dealing with moderation.  The entire focus of | |
| 14 | the company going forward is banking, is trying to get | |
| 15 | payments, ways for users to be able to pay for ads and then | 01:45:57 |
| 16 | find treasury banking solutions. | |
| 17 | Q.   Okay.  And could you just explain why you need to get | |
| 18 | treasury banking solutions? | |
| 19 | A.   So later we would have treasury bank problems, that is, we | |
| 20 | couldn't even find a bank account to do payroll with or deposit | 01:46:15 |
| 21 | money orders or credit card settlements. | |
| 22 | Q.   All right.  Let's look at 1111.  Do you recognize this | |
| 23 | email? | |
| 24 | A.   Yes, I do. | |
| 25 | Q.   How do you recognize it? | 01:46:42 |

United States District Court

CARL FERRER - Direct

A.    Emails from Carl Ferrer.  It's to Jim Larkin, Scott Spear

and Jed Brunst.  The subject line is:  Friday 413k gross.  I'm

sending another daily status report.

Q.    And is this in September of 2013?

A.    It is September 7 of 2013.  I'm giving an update on the

number of credit card or the card holder blocks and what it's

costing us in revenue.

        MR. RAPP:  Move to admit 1111 and request permission

to publish.

        THE COURT:  Yes.  It may be admitted and published.

        (Exhibit Number 1111 was admitted into evidence.)

BY MR. RAPP:

Q.    And what are you telling Mr. Spear and Mr. Brunst?

A.    "Not a bad day, $413,292.07."

Q.    Is that revenue for what time frame is that revenue for?

A.    It's a single day, September 6, 2013.

Q.    And then what do you tell him?

A.    "Still cardholder blocks are costing us 10 to 20k a day.

So, when we finally get these solution(s) in place, we will

have a much improved user experience and be a better company

for it."

Q.    Let me stop you there.  What did you mean by that?

A.    We have a bad user experience when you can't pay for an

ad.  We're getting lots of complaints in Support.

Q.    And then what do you say to him?

United States District Court

31

CARL FERRER - Direct

1  A.   "Next week, we'll add in a bin recorder for do not honors.    01:48:37

2  In a few days, we will have a good list of problem bins

3  identified and that will help suggest MID routing."

4  Q.   Can you interpret that for the jury?  What did you mean by

5  that?                                                              01:48:53

6  A.   So we are going to capture every time a credit card fails

7  and we're going to be able to identify the bank that it's

8  failing at and that will give us a list of where we need to

9  direct that bank -- that problem bank's transactions to, which

10 MID -- and a MID is just code for the payment processor          01:49:15

11 which -- where are you going to send it?  To Europe, to U.S.?

12 Q.   All right.  Now looking at 752.  Do you recognize this?

13 A.   I do.

14 Q.   What is it?

15 A.   The email is to Jed Brunst, Jim Larkin, Scott Spear, from    01:49:44

16 myself on October 24, 2013.  It's an EMP, which is the credit

17 card processor that we just started, transaction summary for

18 October 9, 2013.

19 Q.   All right.  And let's look at the second page.  And do you

20 receive some information that causes you to forward this          01:50:19

21 information up to Mr. Brunst and Mr. Spear?

22 A.   I do.  I have a report from Stephan.  Stephan works for me

23 in Dallas and he's analyzing the transactions by the new

24 processor emerchantpay.

25 Q.   And are these -- what are those transactions based on?      01:50:41

United States District Court

CARL FERRER - Direct

1   What's the source of those transactions?                          01:50:44

2   A.   Well, those transactions are from using the new processor,

3   emerchantpay, so we're really curious, well, how's it working?

4   What's the approval rate?  How many declines?  What's the total

5   revenue that we sent them?                                         01:51:03

6   Q.   All right.

7           MR. RAPP:  Move to admit 752.

8           THE COURT:  Yes.  It may be admitted and published.

9           (Exhibit Number 752 was admitted into evidence.)

10  BY MR. RAPP:                                                       01:51:19

11  Q.   And so just to look at page two, is this the information

12  that you were referring to that you send to Mr. Brunst?

13  A.   Yes.

14  Q.   All right.  And can you tell us what this information is

15  here?  Let me just highlight it because I know it's a little       01:51:35

16  bit busy.

17  A.   It's stating on October 9, 2013 we sent them 12,924

18  transactions.  We got an approval of 9867 transactions.  So

19  it's approval rate of 76.35 percent.  The decline was 3057,

20  that means the decline rate is 23.65 percent.  So the total        01:52:08

21  revenue was $87,164.80.

22  Q.   So that total revenue, for what time period would that

23  revenue be for?

24  A.   That is October 9, that's a single day.

25  Q.   All right.  And then looking at the first page, do you        01:52:34

United States District Court

CARL FERRER - Direct

1   send this to Mr. Brunst?                                                01:52:44

2   A.    Yes, I do.

3   Q.    And then what does Mr. Brunst say to you?

4   A.    "Wow.  $87K in one day.  This would say we are running

5   500K a week thru them.  Are these all Chase cards?"              01:53:02

6   Q.    And then what do you say to him?

7   A.    "Yes, we are near our quota with EMP and they are a good

8   processor/partner."

9   Q.    What do you mean by "we are near our quota"?

10  A.    We just started by emerchantpay so we've got some sort of   01:53:34

11  probationary -- probationary transaction limits with them.

12  Q.    All right.  And then what does Mr. Brunst say in response?

13  A.    "Good news today.  I got the ccbill contract signed by our

14  Dutch director and will have it over to Paul by Monday.  ccbill

15  will be another good option for us."                             01:54:04

16  Q.    What did you take to mean "I got the ccbill contract

17  signed by our Dutch director and will have it over to Paul by

18  Monday," what did you take that to mean?

19          MR. FEDER:  Objection.  401, 403.  Hearsay.

20          THE COURT:  Overruled.                                    01:54:25

21          THE WITNESS:  The Dutch director is like a management

22  company that holds the company called Payment Solutions that

23  Jed Brunst started.  So CCBill wanted to have the Dutch

24  director sign it as opposed to Jed so we sent it there.

25  \\\

United States District Court

CARL FERRER - Direct

BY MR. RAPP:                                                          01:54:50

Q.   Do you know why that's the case?

A.   I think it's to make everything look like it's European.

Q.   And then what are you telling Mr. Brunst and Mr. Spear in

this email?                                                          01:55:18

A.   "Excellent news on ccBill.

          "Update from Trent at Jetpay.

          "The big issue right now is Esquire is changing their

charter which in turn changes their auditing."

Q.   Can I just stop you there?  What is Esquire?                    01:55:33

A.   So Esquire is a domestic bank that is in the U.S.  When I

say domestic, I mean U.S.  So that it could handle gift cards.

It's really a priority that we find a U.S. Bank.

Q.   All right.  And was there any effort to try to get Esquire

to be a bank that would process domestically for Backpage?          01:55:57

A.   We submitted an application.  It was going through their

compliance.

Q.   Let me stop you.  Who is "we"?

A.   Oh.  Yes.  We.  So there was an application signed by one

of the owners.  I'm not sure which one.  I couldn't sign it.        01:56:15

Q.   Why didn't you sign it?

A.   Why --

Q.   Why did you not sign the application?

A.   Because the UBO, or ultimate beneficiary owner, needs to

sign it.                                                             01:56:31

United States District Court

CARL FERRER - Direct

1   Q.   All right.  And how did that go?                          01:56:32

2   A.   With Esquire?

3   Q.   Yes.

4   A.   I thought we were close and then a disaster happened.

5   Q.   What was the disaster that -- did the disaster that you're   01:56:45

6   referring to, did it cause Esquire to not become Backpage's

7   processor?

8   A.   Yes.  They had seen the news stories about many Johns

9   being arrested I think in Long Island and that news story had a

10  title "Flush the Johns" and then the pictures of all of Johns   01:57:17

11  that were arrested from Backpage sting ads.

12  Q.   And how did you learn that that caused Esquire to not go

13  forward with processing?

14          MR. FEDER:  Hearsay 401.  403.

15          THE COURT:  Sustained.                                 01:57:42

16  BY MR. RAPP:

17  Q.   How was this communicated to you?

18          MR. FEDER:  Same objections.

19          THE COURT:  Sustained.

20  BY MR. RAPP:                                                    01:57:47

21  Q.   Did you receive some type of a news alert regarding what

22  you've just described, the "Flush the Johns"?

23          MR. FEDER:  Leading and same objections.

24          THE COURT:  Sustained.

25  \\\

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | BY MR. RAPP: | 01:58:03 |

1  BY MR. RAPP:

2  Q.   How did you know?  How did you learn this?

3            MR. FEDER:  Same.

4            THE COURT:  Overruled.

5            THE WITNESS:  Trent at JetPay told me.  He has a          01:58:07

6  close relationship with the compliance officer at Esquire Bank.

7  BY MR. RAPP:

8  Q.   All right.  So starting here, can you read the remainder

9  of this?

10  A.   "So the OCC is in there looking at them big time as this    01:58:33

11  is the first audit by the OCC."

12  Q.   What is the OCC, Mr. Ferrer?

13  A.   You know, I can't -- it's an organization that monitors an

14  audits banks.

15            MR. FEDER:  Speculation.                                 01:58:54

16            THE COURT:  Overruled.

17            THE WITNESS:  But I can't think of the -- is it

18  Office of -- I can't think of the name but I'm familiar with

19  it.

20  BY MR. RAPP:                                                       01:59:05

21  Q.   Do you know if it's a governmental agency?

22  A.   It's a bank regulatory agency.

23  Q.   All right.  In any event, how does this go on?

24  A.   "So the OCC is in there looking at them big time as this

25  is the first audit by the OCC.  It was absolutely a             01:59:25

United States District Court

CARL FERRER - Direct

1    reputational issue.  Basically they would not put it in writing    01:59:28
2    but said 'oh found ads for BJ's on the site, etc.'  We never
3    found any of that, sure we saw the difficulties and fetish ads
4    but nothing 'yelling prostitution.'  So my guess is they don't
5    want the OCC to see it."                                          01:59:51
6    Q.   All right.  And then what else are you communicating to
7    Mr. Spear and Mr. Brunst?
8    A.   I'm communicating this update from Trent.  "The 2nd bank
9    was very receptive and the credit manager already said yes.
10   However, because of the size they have to go to committee and    02:00:10
11   he said his only concern with reputational.  Nothing on the
12   business.  I had Jeff deal with the 2nd bank and the next
13   committee meeting is this coming Tuesday."
14   Q.   All right.  And then the third point.
15   A.   "Discussed non-adult with Esquire and they said 'yes,' but   02:00:31
16   how much volume is non-adult?"
17   Q.   This is a question posed by -- you are communicating from
18   Trent Voight to Mr. Spear and Mr. Brunst?
19   A.   Yes.  This is an update from Trent.
20   Q.   All right.  And then what would be the non-adult volume?     02:00:51
21   A.   It would not be very much but we would still attempt to
22   get a non-adult processing agreement from Esquire because we're
23   desperate.
24   Q.   All right.  Let's look at 175.
25            Do you recognize this?                                   02:01:37

United States District Court

38
CARL FERRER - Direct

1   A.   Yes, I do.                                              02:01:38

2   Q.   What is it?

3   A.   It's an email from Carl Ferrer to James Larkin, Scott

4   Spear, Jed Brunst, on November 6, 2013, with the subject

5   options for the future of Backpage.                         02:01:54

6   Q.   And why are you forwarding this to Mr. Spear and

7   Mr. Brunst?

8   A.   I am forwarding them the consultant's recommendations on

9   how we handle credit card transactions in the future.

10  Q.   All right.  And what does the handling credit card -- what  02:02:16

11  is the recommendation for handling credit card transactions in

12  the future?

13  A.   We're going to be load balancing across many banks with

14  different billing descriptors and just trying to reduce our

15  exposure.                                                   02:02:39

16  Q.   Let me just unpack that.  What is load balance with

17  different descriptors?  Why are you getting that as a

18  recommendation?

19  A.   If you have a lot of transactions, it hits a certain

20  threshold that automatically triggers a MasterCard and VISA   02:02:56

21  review.  So the consultant's recommending to come under those

22  thresholds by just very -- adding a lot of banks, distributing

23  those transactions so that you can stay under that threshold.

24       Now, she's also recommending to use different URLs

25  and obviously different billing descriptors that we are using.  02:03:22

United States District Court

CARL FERRER - Direct

1  Q.   Why do you believe she's recommending that to you?                    02:03:27

2              MR. FEDER:  401.  403, hearsay.

3              THE COURT:  Sustained.

4  BY MR. RAPP:

5  Q.   Well, let's just take descriptors.  Why would there be          02:03:41

6  different descriptors?

7              MR. FEDER:  Same and 404(b).

8              THE COURT:  Sustained.

9  BY MR. RAPP:

10 Q.   Why are you pursuing having different descriptors rather         02:03:53

11 than using Backpage as the descriptor?

12             MR. FEDER:  Same.  404(b).

13             THE COURT:  Overruled.

14             THE WITNESS:  It's the same thing as, like, getting

15 around those Chase Bank transactions.  If you have a different        02:04:09

16 billing descriptor, it's just more difficult for them to figure

17 out where is this transaction coming from?  So we used many

18 different billing descriptors and they were just -- they were

19 vague.

20 BY MR. RAPP:                                                          02:04:28

21 Q.   Why were they vague?

22             MR. FEDER:  Same objections.  404(b), too.

23             THE COURT:  Sustained.

24 BY MR. RAPP:

25 Q.   Why would you want to be vague about Backpage receiving          02:04:42

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | revenue?  Why would you want to be vague about that? | 02:04:49 |
| 2 | MR. FEDER:  Same.  404(b). | |
| 3 | THE COURT:  Overruled. | |
| 4 | THE WITNESS:  Because banks will suspend your | |
| 5 | merchant agreement and we've learned from Litle that you're | 02:04:58 |
| 6 | managing reputational risk so you want to have fewer | |
| 7 | transactions with more banks, vary the billing descriptors. | |
| 8 | And if you do lose one, you don't lose them all.  This is that | |
| 9 | same analogy I said about we didn't want to put -- the company | |
| 10 | did not want to put all of our credit card processing ever | 02:05:23 |
| 11 | again with just one company like Litle.  That is why Jim | |
| 12 | Larkin, even Michael Lacey and Jed Brunst signed multiple | |
| 13 | credit card processing agreements. | |
| 14 | BY MR. RAPP: | |
| 15 | Q.   And what about the URLs? | 02:05:46 |
| 16 | A.   We didn't pursue that idea right away.  We waited a while | |
| 17 | but then we added PostFaster, so the company built PostFaster | |
| 18 | and that would be a non-adult version of Backpage that we would | |
| 19 | attempt to secure credit card processing. | |
| 20 | Q.   And just so we're clear, did that processing handle the | 02:06:08 |
| 21 | non-adult categories of Backpage that we've been looking at in | |
| 22 | these various exhibits? | |
| 23 | A.   Yes.  The company had all of this just the non-adult | |
| 24 | categories and Backpage appear under a totally different domain | |
| 25 | called PostFaster and then there was an option to make your | 02:06:27 |

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | payments there on PostFaster.  Now, we tried to secure domestic | 02:06:30 |
| 2 | banking or PostFaster but the U.S. banks could see through it. | |
| 3 | THE COURT:  I'm sorry.  Can I ask just a point of | |
| 4 | clarification?  Are you saying PostFaster or PostMaster? | |
| 5 | THE WITNESS:  PostFaster.  I'm sorry.  I'll try to be | 02:06:50 |
| 6 | more clear. | |
| 7 | THE COURT:  Thank you. | |
| 8 | BY MR. RAPP: | |
| 9 | Q.   I'm not sure if the jury completely understands this, | |
| 10 | though. | 02:07:06 |
| 11 | Could you -- at this time when you had PostFaster, | |
| 12 | could you use -- could you pay for on ad in the Female Escort | |
| 13 | section with PostFaster? | |
| 14 | MR. FEDER:  Objection.  Leading. | |
| 15 | THE COURT:  Overruled. | 02:07:29 |
| 16 | THE WITNESS:  Not right away.  When we had -- | |
| 17 | MR. FEDER:  It was a yes-or-no answer.  Going beyond | |
| 18 | the scope. | |
| 19 | THE COURT:  Sustained. | |
| 20 | Just answer the question if it calls for a "Yes" or | 02:07:38 |
| 21 | "No." | |
| 22 | BY MR. RAPP: | |
| 23 | Q.   Could you do it at this time period, 2013? | |
| 24 | A.   The answer isn't "Yes" or "No" if it's based on a time | |
| 25 | frame. | 02:07:48 |

United States District Court

CARL FERRER - Direct

1  Q.   All right.  Let's just talk about this time frame in 2013.  `02:07:50`

2  A.   So in this time in 2013, we hook up to stripe, Jed Brunst

3  signs that agreement and then stripe just immediately drops us.

4  They figure it out.

5          MR. FEDER:  Nonresponsive.  Move to strike.  `02:08:06`

6          MR. RAPP:  It's very responsive.

7          THE COURT:  Overruled.

8  BY MR. RAPP:

9  Q.   So explain what stripe is?

10 A.   So stripe is another credit card processing company that  `02:08:25`

11 is really easy to hook up and it's very popular now, huge

12 company.  And so we had signed up to just get credit card

13 processing under PostFaster.

14 Q.   And then going back to my question, in 2013, were you able

15 to pay for a posting in the Female Escort section with  `02:08:49`

16 PostFaster as the processor?

17 A.   Not until 2014, no.

18 Q.   Once you got into 2014, could you pay for an ad in the

19 Female Escort section and process it through PostFaster?

20 A.   In fact, I misspoke.  It's actually late 2015, early 2016  `02:09:21`

21 you could buy credits on PostFaster and then use those credits

22 to pay for an ad in the Female Escorts.

23 Q.   And then going to 175, is this in part why you are

24 communicating this information to Mr. Spear and Mr. Brunst

25 regarding the processing that is being explained to you?  `02:09:57`

United States District Court

43

CARL FERRER - Direct

1   A.   Yes.   This is, as I say in the email, it's a to-do list to   02:10:03

2   protect EU processing and I'm sending it to Jim Larkin, Scott

3   Spear, and Jed Brunst.   It's a to-do list.

4                MR. RAPP:   Move to admit 175.

5                THE COURT:   It may be admitted.   02:10:22

6                MR. FEDER:   Irrelevant.   401.   403.   Hearsay.

7                THE COURT:   Overruled.

8                MR. FEDER:   Thanks.

9                (Exhibit Number 175 was admitted into evidence.)

10  BY MR. RAPP:   02:10:38

11  Q.   So what we have been discussing, do you forward this up to

12  Mr. Spear and Mr. Brunst?

13  A.   Yes.

14  Q.   And when you say this is a to-do list, can you summarize

15  what it is that you have to do to obtain European processing?   02:10:56

16  A.   Do you want me to just summarize it?

17  Q.   If you can.

18  A.   If you go here, it shows the current Corp. that we're

19  using for emerchantpay, Classified Solutions, LTD, and the

20  consultant is saying that this one processor, emerchantpay,   02:11:29

21  that's EMP, can get us multiple banks.   We're also spreading

22  transactions across another bank called -- we will continue to

23  give Borgun the majority of the volume.

24  Q.   And where is Borgun located?

25  A.   So Borgun is in Iceland.   02:12:01

United States District Court

CARL FERRER - Direct

1   Q.   And why are you pursuing a bank located in Iceland?          02:12:11

2            MR. FEDER:  Same.

3            THE COURT:  Overruled.

4            THE WITNESS:  We will go anywhere to find a bank to

5   take us.  We are not picky about their geographic location.       02:12:24

6   Emerchantpay is in Bulgaria.

7   BY MR. RAPP:

8   Q.   All right.  Okay.  Let's look at 1116 and 1116a.  What is

9   1116.  What is it?

10  A.   It's an email from Carl Ferrer to                            02:13:12

11  scottspear@cereusproperties.com and its subject is:  Agenda

12  Business Plan Discussion.  I send a Business Plan.doc, Business

13  Plan 2014.doc.

14  Q.   And is this sent in December of 2013?

15  A.   Yes, it is.  It's budget time.                               02:13:38

16  Q.   Budget time.  And 1116a, what, basically, is this?

17  A.   That's the budget meeting and the agenda of items that

18  we're going to walk through during this meeting with Jim Larkin

19  and Jed Brunst.

20  Q.   All right.                                                   02:14:07

21           MR. RAPP:  And move to admit 1116 and 1116a.

22           MR. FEDER:  Same.

23           THE COURT:  Overruled.

24           They may be admitted and published.

25           (Exhibit Numbers 1116 and 1116a were admitted into      02:14:15

CARL FERRER - Direct

1  evidence.)                                                    02:14:15

2  BY MR. RAPP:

3  Q.   What are you either telling or asking Mr. Spear in this

4  email?

5          MR. FEDER:  Speaks for itself.  It speaks for itself, 02:14:29

6  the document.

7  BY MR. RAPP:

8  Q.   Can you read it?

9          THE COURT:  I guess the jury can take a moment to

10 review it.                                                    02:14:39

11 BY MR. RAPP:

12 Q.   Well, it's pretty brief.

13         THE COURT:  Well, Mr. Rapp, I said the jury can

14 review it.

15         MR. RAPP:  All right.                                 02:14:47

16 BY MR. RAPP:

17 Q.   Did you find out at some point here what the gross revenue

18 for Backpage.com was in 2013?

19 A.   Yes.

20 Q.   What was it?                                             02:15:09

21 A.   About 120 million.

22 Q.   All right.  And then looking at 1116a, what is this?

23 A.   So this is the agenda of the budget meeting and it starts

24 with a review of the business plan and the overall 2014 goals.

25 Q.   And then just drawing your attention to F, what does that 02:15:44

CARL FERRER - Direct

1   say?                                                          02:15:50

2   A.   "Diversify payment channels."

3   Q.   What did that agenda item mean?

4   A.   Well, it's on the agenda item -- it's on the agenda so

5   that we have an agreement that we're going to make this one of   02:16:04

6   the priority tasks in 2014.

7   Q.   All right.  Let's look at 1925.  Do you recognize this

8   email?

9   A.   Yes, I do.

10  Q.   How do you recognize it?                                 02:16:32

11  A.   This email is the result of page views growing so much on

12  Backpage.com that Google Analytics wants to charge us a premium

13  and I have to get approval from Jed Brunst.

14  Q.   Is that what causes you to forward -- do you get some type

15  of an email from somebody from Google Analytics?             02:16:54

16  A.   Well, from one of their -- what do you want to call them?

17  One of their preferred partners for Google Analytics, correct.

18  They send me the email.  I send it to James Larkin, Scott

19  Spear, and Jed Brunst.

20  Q.   Okay.                                                    02:17:18

21          MR. RAPP:  Move to admit 1925.

22          THE COURT:  Yes.  It may be admitted and published.

23          (Exhibit Number 1925 was admitted into evidence.)

24  BY MR. RAPP:

25  Q.   And what does Mr. Brunst say to you?                     02:17:33

United States District Court

47

CARL FERRER - Direct

1    A.    "Carl, it would be helpful if your certified google          02:17:36
2    specialist could put into a simple bullet point form the real
3    world information he can get from this (that he doesnt now get)
4    and how it will be used in the business to drive revenue.
5    Thanks."                                                          02:17:54
6    Q.    What did you take that to mean?
7    A.    Since Google Analytics wants to charge us $150,000
8    annually, what are we going to get for that payment that will
9    allow us to grow the business further?
10   Q.    Did you have to pay previously?  We've looked at some        02:18:17
11   Google Analytic reports during your testimony.  Did you have to
12   pay for these Google Analytics reports you were getting?
13   A.    We didn't have to pay before but now that the site is
14   doing billions of page views per month, we've hit a threshold
15   to where, you know, Google wants to get -- shake us down for      02:18:36
16   $150,000 and we have no choice to pay because we've got to
17   understand where the traffic is coming from, where is it's
18   growing, what cities, what categories so that we can make
19   business plans around that.
20   Q.    In 2013, how many cities in the United States did you have   02:18:55
21   a presence in by this point?
22   A.    I would say around 400 cities in the U.S.
23   Q.    And meanwhile, are you continuing to do moderation?
24         MS. BERTRAND:  Objection.  Leading.
25         THE COURT:  Overruled.                                       02:19:19

CARL FERRER - Direct

1          THE WITNESS:  We are but it's really on the back

2    burner.

3    BY MR. RAPP:

4    Q.   Why is it on the back burner?

5    A.   Because the barn is on fire.  We're payments.  We're got

6    to figure out credit card payments.  That's the -- that's an

7    all hands on deck.

8    Q.   All right.  Let's look at 1816.  Do you recognize the

9    email address on this email?

10   A.   Yes.

11   Q.   And whose email address is this?

12   A.   The email is from Joye Vaught at Backpage.

13   Q.   All right.  Do you recognize the name of the person that

14   she's exchanging an email with?

15   A.   Yes.  I do.  Jessica Bowers.

16   Q.   And how do you know her?

17   A.   She's one of the moderators that reports to Joye and

18   Andrew.

19   Q.   All right.

20          MR. RAPP:  Move to admit 1816.

21          THE COURT:  Yes.  It may be admitted.

22          (Exhibit Number 1816 was admitted into evidence.)

23   BY MR. RAPP:

24   Q.   All right.  Just starting on page three, what is the

25   information here?  Can you interpret this information?

02:19:20

02:19:26

02:20:02

02:20:21

02:20:37

02:20:54

CARL FERRER - Direct

A.   So this is an email that is sent to record a NCMEC report    02:21:00
and it provides the link to the ad that only an administrator
can see and it gives them some tools to edit or delete the ad.

Q.   All right.  And then just going to page two, I realize
this doesn't say much but can you interpret what is on this    02:21:30
page?

        MS. BERTRAND:  Objection.  Lacks foundation as to
what is to be interpreted.

        THE COURT:  If he can.

BY MR. RAPP:    02:21:40

Q.   Can you?

A.   Yes, I can.

Q.   All right.

A.   It's seven images.  Because the URL is not working they
are not coming through.    02:21:51

Q.   I see.  And you're familiar with that, looking at this
document?

A.   Yes.

Q.   And then going to 1816-1, what does this say?

A.   So this is the standard confirmation email that is made    02:22:13
when a NCMEC report is made.  So it states, "The following ad
was just reported to the NCMEC by bp84.

        "Ad status:  Live.

        "Violations:  Inappropriate Content and Reported to
NCMEC.    02:22:36

United States District Court

CARL FERRER - Direct

1          "Additional info:  Backpage.com moderator, bp84,          02:22:39

2   feels the person in this ad looks young."

3   Q.   And then does that get forwarded to Joye Vaught?

4   A.   Yes, it does.

5   Q.   And what does Joye Vaught tell bp84?                        02:23:04

6          MS. BERTRAND:  Objection, Your Honor.  The jurors are

7   able to read.

8          THE COURT:  Sustained.

9   BY MR. RAPP:

10  Q.   And then what does Jessica Bowers say back to Joye Vaught?  02:23:24

11         MS. BERTRAND:  Same objection.

12         THE COURT:  Sustained.

13         MR. RAPP:  The record has to reflect what it says.

14         THE COURT:  The jurors can read the email.  Why don't

15  you give them a moment to read the email?                       02:23:37

16         MR. RAPP:  But the record doesn't have the record --

17         MS. BERTRAND:  The record has the exhibit in it so

18  the record does reflect what was said in the exhibit.  We don't

19  need Mr. Ferrer to read to them.

20         THE COURT:  Mr. Rapp, you can have them take their       02:23:49

21  time to read the exhibit.

22         MR. RAPP:  All right.

23         THE COURT:  Just make it large enough so that

24  everyone can read it.

25         MS. BERTRAND:  And in its entirety, not just the         02:24:03

United States District Court

CARL FERRER - Direct

1   excerpts, please.                                                    02:24:06

2           THE COURT:  And members of the jury, take your time

3   reading the content in the email and then just simply look up

4   and I'll know that you're done.

5           MS. BERTRAND:  Your Honor, I would ask that the jury    02:24:33

6   just be allowed to read the email and not highlighted excerpts

7   per the Government.

8           THE COURT:  Yes, Ms. Bertrand.

9           Let me say to Mr. Rapp, you need not highlight only

10  specific portions.  They can read the entire email in its       02:24:48

11  entirety.  I think you manipulated the page so that some of it

12  is blocked out.

13          MR. RAPP:  Well, . . .

14          All right.

15          THE COURT:  Well, some jurors are still reading, Mr.     02:25:34

16  Rapp.

17          MR. RAPP:  That's the issue with doing it --

18  BY MR. RAPP:

19  Q.   All right.  I will go on to another area.

20          Now, Mr. Ferrer, have you, in preparation for your      02:26:23

21  testimony, have you looked at certain postings on Backpage?

22  A.   Yes, I've looked at postings on Backpage, select ones.

23  Q.   All right.  I'm showing you Exhibit 212 for your eyes

24  only, and 212a.  Do you recognize 212 and 212a?

25  A.   Yes, I do.                                                  02:27:05

CARL FERRER - Direct

1    Q.    How is it that you recognize it?                          02:27:06

2    A.    This is the time when we were moving to a mobile phone

3    experience so the page is built for a mobile phone view.

4              THE COURT:  Before you go any further, Mr. Rapp, I

5    only have a 212.  I'm sorry.  I'm in the wrong category.  212,   02:27:27

6    okay.

7    BY MR. RAPP:

8    Q.    So you were explaining.

9    A.    So on a mobile view, you have a very small screen so you

10   get rid of a lot of things.  You make the headers -- get rid of 02:27:44

11   the headers or get rid of -- make the logos very small and make

12   it all about the content, which is images and texts.  So this

13   ad is how the site looked with a mobile phone view.

14   Q.    But how do you know this is from Backpage?

15   A.    I worked with Rock Cunningham in Dallas to design this    02:28:11

16   look.  We made a lot of wire frames.  Then I approved the wire

17   frames and then we launched this mobile view of postings.

18              And it's got the typical Backpage stamps which is the

19   posting ID.  It's got a location.  The poster's age at the

20   bottom.  Way below the other ads by user, users and instead of  02:28:40

21   having the bread crumb trail on top, which helps guide users in

22   terms of navigation, it's down at the bottom.

23   Q.    And is that also the case with 212a?

24   A.    Yes, that's the case with 212a and you'll notice, too,

25   that there's no logo on the page and that was a pretty          02:29:06

CARL FERRER - Direct

1    substantial change.                                                    02:29:09

2    Q.    Why is that a substantial change?

3    A.    Because the logo takes up so much space on mobile phones

4    that the company determined the user experience experts that I

5    hired said we don't need the logo.  People want to look at the      02:29:24

6    text and the images, not the Backpage logo.

7    Q.    All right.

8              MR. RAPP:  Move to admit 212 and 212a.

9              MR. FEDER:  Foundation.

10             MS. BERTRAND:  Foundation.  Relevance, hearsay.            02:29:37

11             THE COURT:  Well, lay more foundation, Mr. Rapp.

12   Overruled as to relevance.

13   BY MR. RAPP:

14   Q.    When was this posted?  Can you tell by looking at this?

15   A.    So this ad was posted on Tuesday, September 10, 2013 p.m.      02:29:53

16   Q.    All right.  And let's just look at a couple of other areas

17   here.  Does it have -- for example, up here where I have put a

18   box around it, how do you know that that is something from

19   Backpage?

20   A.    So the upper right-hand corner has the report ad button       02:30:20

21   which is standard on Backpage ads.

22   Q.    All right.  And then I put a box on another area that says

23   "click here."  How do you know that's a Backpage?

24   A.    "Click here" is also just a standard Backpage so that you

25   can use the anonymous email.  And once again, I tell you that       02:30:41

United States District Court

54
CARL FERRER - Direct

1  I'm very familiar with this development and how this ad looks          02:30:46
2  because we are very focused in trying to increase our page
3  views and mobile and it went to nearly 90 percent.  So if we
4  make the site look better on a mobile phone like this page
5  does, then we'll get a lot more page views.                           02:31:05
6  Q.   On the mobile phone, how many images would be allowed in a
7  posting?
8  A.   At this time in 2013 it changed.  I think we were at four
9  but eventually it would go to eight and 12, maybe more.
10 Q.   All right.                                                       02:31:27
11          MR. RAPP:  Move to admit 212 and 212a.
12          MS. BERTRAND:  Objection.  Hearsay.  I proffer to the
13 Court this is actually being offered for the truth of the
14 matter asserted.  Lack of foundation.
15          THE COURT:  Overruled as to both.                            02:31:42
16          It may be admitted and it may be published.
17          (Exhibit Numbers 212 and 212a were admitted into
18 evidence.)
19 BY MR. RAPP:
20 Q.   So on your screen is 212.  And this is what we were             02:31:51
21 talking about.  This an ad that, from what you can tell here,
22 was posted on a mobile device such as a cell phone?
23 A.   I would correct that to being viewed on a mobile device,
24 on a cell phone.
25 Q.   All right.  And then 212a, is this the same?                    02:32:17

United States District Court

CARL FERRER - Direct

```
 1    A.    Yes.                                                      02:32:27

 2              MS. BERTRAND:  Objection.  Duplicative if they are

 3    the same.

 4              THE COURT:  Sustained.

 5              MS. BERTRAND:  Move to strike the second.             02:32:39

 6              THE COURT:  Unless Mr. Rapp can lay foundation for

 7    the differences.

 8    BY MR. RAPP:

 9    Q.    Well, let me ask you, what's the difference between 212

10    and 212a?                                                       02:32:54

11              MS. BERTRAND:  Your Honor.  Objection.  Asked and

12    answered.  He just said they are the same.

13              THE COURT:  Well, overruled.  Mr. Ferrer can answer

14    that if he has an answer for it.

15              THE WITNESS:  So I believe 212 is just the -- so this 02:33:10

16    is 212.  This is the top of the ad showing the images.

17              THE COURT:  Mr. Rapp, it's not yet admitted.

18              COURTROOM DEPUTY:  212 is.

19              MR. RAPP:  We're looking at 212 right now.

20    BY MR. RAPP:                                                    02:33:33

21    Q.    And then let me show you 212a.

22    A.    And then 212a is the bottom half of the ad so you would

23    have to scroll down.  It's the same ad.

24    Q.    All right.  And on 212a, does it have text?

25    A.    Yes, on 212a, that's where the text of the ad is.        02:33:54
```

United States District Court

CARL FERRER - Direct

1   Q.   And, for example, does this tell you what the market it            02:34:04

2   was in?

3              MR. EISENBERG:  Objection, Your Honor.  This is not

4   yet in evidence.

5              MR. RAPP:  It's actually being displayed right now.        02:34:12

6   You can take it off.

7              COURTROOM DEPUTY:  It's 212a.

8              THE COURT:  And 212 and 212a, it was admitted.

9              MR. RAPP:  Yes.  And I request permission to publish

10  it.                                                                   02:34:24

11             THE COURT:  Yes.

12             MR. RAPP:  All right.

13             THE COURT:  The objection was duplicative and that is

14  the area that is being covered now.

15             MR. EISENBERG:  I understand.  I understand.               02:34:32

16  BY MR. RAPP:

17  Q.   All right.  And so just quickly, is there -- can you read

18  some of the terms here?

19             MS. BERTRAND:  Your Honor, again, the jury is

20  perfectly capable of reading.                                        02:34:45

21             THE COURT:  Well, the question before the witness is

22  whether or not there's a distinction between the two and that

23  is the query that Mr. Rapp is engaged in.

24             And at this point the Court will overrule the

25  duplicative objection.                                               02:35:05

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | All right.  Mr. Rapp, you may continue. | 02:35:06 |
| 2 | MR. RAPP:  Thank you. | |
| 3 | BY MR. RAPP: | |
| 4 | Q.   So let's just put them side by side and we can maybe clear | |
| 5 | up some of the confusion here. | 02:35:12 |
| 6 | Can you tell if this is the same ad? | |
| 7 | A.   Yes, it's the same ad. | |
| 8 | Q.   All right.  And does this contain -- is there text -- does | |
| 9 | the text contain references to incalls and outcalls? | |
| 10 | MS. BERTRAND:  Objection.  Leading. | 02:35:49 |
| 11 | THE COURT:  Sustained. | |
| 12 | BY MR. RAPP: | |
| 13 | Q.   Can you go ahead and just read what the text is? | |
| 14 | MS. BERTRAND:  Objection to reading. | |
| 15 | THE COURT:  Overruled. | 02:35:56 |
| 16 | THE WITNESS:  "Our dazzling smile & stunning | |
| 17 | personality will keep you coming back for more.  We keep | |
| 18 | ourselves well manicured, hygienically correct & always classy! | |
| 19 | Doin incalls and outcalls.  2 girl for 1 or 2 girl special. | |
| 20 | Call or text us five0eight-nine33-eight52one." | 02:36:17 |
| 21 | BY MR. RAPP: | |
| 22 | Q.   Do you have any explanation as to why they write out the | |
| 23 | phone number here? | |
| 24 | MS. BERTRAND:  Objection.  Calls for speculation. | |
| 25 | THE COURT:  Sustained. | 02:36:32 |

United States District Court

CARL FERRER - Direct

BY MR. RAPP:

Q.   Did you run into the spelling out of phone numbers in other postings?

A.   Yes, many times.

Q.   And through the moderation process, did you determine why it was that a poster would spell out the phone number?

MS. BERTRAND:   Objection.   Leading.

THE COURT:   Overruled.

THE WITNESS:   We did.   If we were banning the user for a phone number, they would misspell the phone number or they would hide it like this.   But we also saw it used by many customers who were I think seeking anonymity.

MS. BERTRAND:   Objection.   Move to strike the still speculation.

THE COURT:   Overruled.

BY MR. RAPP:

Q.   And then for the witness's eyes only let's look at Exhibit 214 and let's look at the second page of 214.   Do you recognize this exhibit in 214?

A.   Yes.

Q.   And is this Exhibit 214, is it different from, at least cosmetically, than the exhibit we just looked at in 212 and 212a?

MR. EISENBERG:   Objection.   Confusing terms of cosmetically.

United States District Court

CARL FERRER - Direct

1        THE COURT:  Sustained.

2        Rephrase.

3   BY MR. RAPP:

4   Q.   How is this -- is this a posting on Backpage?

5        MS. BERTRAND:  Objection.  Vague as to "this" if it's

6   this document.  This document is not the actual posting.

7        THE COURT:  Well, I think Mr. Rapp is inquiring about

8   Exhibit 214.

9        MS. BERTRAND:  Right.

10       THE COURT:  Am I missing something?

11       MS. BERTRAND:  Right.  We just had a conversation

12  where he's -- my objection is this:  He just referred to

13  Exhibit 214 but the witness has testified that the presentation

14  is not the actual posting; that the presentation is different.

15  And one of the pages that the Government clicked on, it's not

16  currently before the Court, showed what looked to be what is

17  not posted and so it is vague as to what is the posting versus

18  another view of the material.

19       THE COURT:  Well, Mr. Rapp, why don't you lay some

20  foundation for the exhibit, ask very short questions so that

21  Mr. Ferrer can describe what -- if he knows what this exhibit

22  is in reference to.

23       MR. RAPP:  All right.

24  BY MR. RAPP:

25  Q.   Can you identify 214?

United States District Court

60

CARL FERRER - Direct

1   A.   Yes, I can.                                                      02:39:28

2   Q.   What is 214?

3   A.   214 is the administrative view of a posting in the Boston

4   Escort Section of Backpage.  And by administrative view, that

5   means we're showing the email address, the payment information,   02:39:44

6   and other information gathered in even what we called Object

7   Editor.  It's all kind of an internal printout of an ad in

8   admin view.

9   Q.   And can you distinguish between an administrative view and

10  the view that we just saw in 212 and 212a, what's the            02:40:08

11  difference?

12  A.   212a was a view from a mobile phone.  This would be

13  viewed -- this would be a view from a desktop computer that was

14  looking at the ad with somebody having admin access at Backpage

15  and then making a PDF of that data.                              02:40:30

16  Q.   All right.

17          MR. RAPP:  Move to admit --  let me just see if we

18  can -- let's look also.

19  BY MR. RAPP:

20  Q.   Let's look also at 214a as well.  Is 214a also an          02:40:46

21  administrative -- a posting that has administrative data?

22  A.   Yes.

23  Q.   All right.  And just so we're clear here, do they have

24  different dates on them?  And I know you can't see it so let me

25  just see if I can help you out here.  This is 214a.  Do you see   02:41:14

United States District Court

CARL FERRER - Direct

| | |
|---|---|
| 1 | the date on it? | 02:41:28 |
| 2 | A.    Yes.   January 31, 2014. |
| 3 | Q.    And then looking at 214, does that have a different date? |
| 4 | A.    Yes.   January 29, 2014. |
| 5 | Q.    All right. | 02:41:48 |

1    the date on it?                                              02:41:28

2    A.    Yes.   January 31, 2014.

3    Q.    And then looking at 214, does that have a different date?

4    A.    Yes.   January 29, 2014.

5    Q.    All right.                                             02:41:48

6             MR. RAPP:  Move to admit 214 and 214a.

7             MS. BERTRAND:  Objection.  Hearsay and I would ask

8    the Court require the Government to proffer under hearsay rules

9    what the basis is for this exhibit's admission.

10             THE COURT:  Overruled and Exhibit 214 and 214a are   02:42:05

11   admitted and may be published.

12             And then after you go through this exhibit, we'll

13   take our afternoon break.

14             MR. RAPP:  Very well.

15             (Exhibit Numbers 214 and 214a were admitted into     02:42:24

16   evidence.)

17   BY MR. RAPP:

18   Q.    Let's just look at 214 and 214a.  Just on 214, page four,

19   can you explain to the jury what the image on this page

20   represents?                                                 02:42:45

21   A.    So this --

22   Q.    I just took it off for you.  Let's go back.  Can you tell

23   us?

24   A.    Yes.  That's an image that was deleted.  And in this

25   administrative view, an administrator could restore or remove  02:43:06

United States District Court

CARL FERRER - Direct

1    that image and then hit "update."                              02:43:14

2    Q.   All right.  Can you explain what this page is?

3    A.   This page is capturing the customer info right in here

4    (Indicating) and the IP and how much they paid.

5    Q.   All right.  And what does this page demonstrate?        02:43:36

6    A.   This page shows that the transaction was approved and

7    there's a card ref.  That's kind of an internal way for us to

8    find the credit card number if we needed it.

9    Q.   Okay.  This page?

10   A.   Once again, it's the same as the last page.  It's just   02:43:58

11   probably a different date because it's another invoice and the

12   invoices are storing transactions for a $12 ad and this is all

13   the customer data here.

14   Q.   And this?

15   A.   One again, transaction is approved, card ref, which is our  02:44:23

16   way of finding a credit card number.

17   Q.   This page, page nine for the record?

18   A.   It's another invoice, same customer data, what they paid.

19   Q.   All right.  Is this similar information?

20   A.   It is.  There's a card ref.  That's the card that they are  02:44:56

21   using.

22   Q.   All right.  Does this have similar information in terms of

23   payment?

24   A.   It's more information about payments.  All the same

25   information.                                                  02:45:09

United States District Court

CARL FERRER - Direct

```
 1   Q.   And then going to 214a, does this have the similar type of      02:45:10
 2   information?  Stopping on this page, can you interpret this for
 3   us?
 4   A.   So this was another image that was deleted on this ad.
 5   It's different than the previous image.                             02:45:29
 6   Q.   Same information in this posting, same information in this
 7   posting as 214 and 214a?
 8   A.   Yes.
 9   Q.   214a has the same information, administrative data as 214?
10   A.   Yes.                                                           02:45:56
11   Q.   All right.
12            MR. RAPP:  That does it for those two postings.
13            THE COURT:  All right.  Members of the jury, we'll be
14   on our afternoon recess.  Be prepared to come back in to the
15   courtroom at promptly on the hour and we will resume for the       02:46:06
16   remainder of the day.
17            Please all rise for the jury.
18            (Jury departs at 2:46.)
19            THE COURT:  I'll actually give you another
20   five-minute leeway.                                                02:46:34
21            MS. BERTRAND:  So, Your Honor, we're coming back at
22   3:05?
23            THE COURT:  Yes.
24            MS. BERTRAND:  Thank you.
25            (Recess at 2:46; resumed at 3:07.)                        02:46:42
```

United States District Court

64
CARL FERRER - Direct

```
 1          THE COURT:  Okay.  Let's go ahead and have the jury     03:07:39
 2  in.
 3          All rise for the jury.
 4          (The jury enters at 3:08.)
 5          THE COURT:  All right.  Please be seated.               03:08:58
 6          You may continue.
 7          MR. RAPP:  Thank you, Your Honor.
 8          Madam Clerk, if you could put 214 back up on the
 9  screen since it's been admitted.
10          So Mr. Ferrer, is 214 and 214a the same person in the   03:09:35
11  posting.
12          MS. BERTRAND:  Objection.  Calls for speculation.
13          THE COURT:  I think he can look at the two exhibits
14  and determine for himself and state an opinion as to whether or
15  not he believes they are the same person.                      03:09:58
16  BY MR. RAPP:
17  Q.  Do you know if they are?
18  A.  It's the same -- in my opinion, it's the same user.  They
19  use the same email address.  They have the same payment data,
20  same IP address.                                               03:10:14
21  Q.  Are you familiar with postings in 214 and 214a aside from
22  the fact that you've now said they were on Backpage.com?
23  A.  Yes, I am.
24  Q.  How is it that you are familiar with these two postings in
25  214 and 214a?                                                  03:10:35
```

United States District Court

CARL FERRER - Direct

1   A.    This poster -- the person posted in this ad was in a          03:10:41

2   Nicholas Kristof column in the "New York Times."

3   Q.    How do you know that?

4   A.    Because we looked it up and we found the information and

5   found information from the Kristof broadcast to find this user.   03:11:04

6   Q.    And what caused you to do that?

7   A.    Nicholas Kristof.

8              MR. FEDER:  Objection, Your Honor.  401, 403.

9   Hearsay.

10             MS. BERTRAND:  And 404(b).                               03:11:27

11             THE COURT:  Overruled as to all.

12  BY MR. RAPP:

13  Q.    Let's break this down.  You've mentioned two things.  When

14  you say a Nicholas Kristof column, can you explain that?

15  A.    He ran a column --                                           03:11:38

16             MR. FEDER:  Same objections.

17             THE COURT:  Overruled.

18             THE WITNESS:  In his column he discussed how a

19  juvenile was prostituted and then how they were able to recover

20  this juvenile by finding the person on Backpage.                  03:11:54

21  BY MR. RAPP:

22  Q.    And -- all right.  And you also mentioned a broadcast.

23  What does that have to do with 214 and 214a?

24             MS. BERTRAND:  Objection.  Relevance.  Hearsay,

25  hearsay within hearsay.                                           03:12:18

United States District Court

CARL FERRER - Direct

1        THE COURT:  Well, it's leading and I'll sustain the       03:12:20

2   objection.

3   BY MR. RAPP:

4   Q.   I'm now showing you 1909a.  Do you see that on your

5   screen?                                                        03:12:44

6   A.   Yes, I do.

7   Q.   Now going to the second page.  Do you recognize this

8   email?

9   A.   Yes, I do.

10  Q.   And do you recognize who the email is being sent to within  03:13:09

11  Backpage?

12  A.   The email is from here at the bottom from Liz McDougall to

13  Patria Melia and above Patria Melia is the producer at ABC News

14  Nightline.

15  Q.   All right.  And who is this email ultimately forwarded to?  03:13:35

16  A.   So it's from Liz McDougall and it's sent to Carl Ferrer,

17  Tamara Nickel, Joye Vaught, and Andrew Padilla.

18  Q.   All right.  And does the email from the producer at

19  Dateline, does it cause you or somebody within Backpage to look

20  at the postings in 214 and 214a?                               03:14:15

21        MS. BERTRAND:  Objection.  Leading.

22        THE COURT:  Sustained.

23        MR. FEDER:  And 401 and 403.

24        THE COURT:  Overruled.

25  \\\

United States District Court

CARL FERRER - Direct

1    BY MR. RAPP:                                                          03:14:26

2    Q.   What does it cause you to do?

3    A.   The victim that's referenced in the media story, we want

4    to find those records and so we can do our standard operating

5    procedure of when was the ad posted, by who, what payment data    03:14:35

6    was gathered, did we send a NCMEC report so we dig out all of

7    that information and then we make a PDF of it.

8             MR. RAPP:  Move to admit 1909a.

9             MS. BERTRAND:  Objection.  Hearsay, Sixth Amendment,

10   *Crawford* and Rule 106 rule of completeness.                       03:15:03

11            MR. FEDER:  401 and 403, too.

12            THE COURT:  Overruled as to all.  It may be admitted

13   and published.

14            (Exhibit Number 1909a was admitted into evidence.)

15   BY MR. RAPP:                                                        03:15:16

16   Q.   All right.  Can you read what the producer at ABC News

17   informs Liz McDougall?

18            MS. BERTRAND:  Objection to reading to the jury.

19            THE COURT:  Sustained.  He can describe the email and

20   if you wish, let the jurors read the email.                        03:15:50

21   BY MR. RAPP:

22   Q.   Can you summarize the message from the Nightline producer

23   to Liz McDougall?

24   A.   Can I have a moment?  I just want to make sure I'm

25   accurate.                                                          03:16:03

United States District Court

CARL FERRER - Direct

1   Q.   Sure?                                                      03:16:03

2          MS. BERTRAND:   Also objection as to lack of personal

3   knowledge as to what this reporter is requesting or intending.

4          THE COURT:   Overruled.

5          THE WITNESS:   So ABC is doing a story on Nicholas       03:16:21

6   Kristof, "A Path Appears" where he was able to recover a

7   juvenile prostitute that had been posted on Backpage in front

8   of her parents.   And so that's why we are looking up the

9   listings to see what data that we have.   And that's what this

10  mail is about.                                                  03:16:51

11  BY MR. RAPP:

12  Q.   And why -- if you know, why is the email sent to you, Joye

13  Vaught, and Andrew Padilla?

14  A.   Why did Liz email -- why did Liz McDougall send the email

15  to myself, Tamara Nickel, Joye Vaught and Andrew Padilla, was    03:17:12

16  to give us a heads-up.

17  Q.   Okay.   All right.   I just wanted to go back for a minute

18  to 212 and that has been admitted and 212a.

19          I believe your testimony was this was on a mobile

20  device?                                                         03:18:06

21  A.   Yes.

22  Q.   What does this reply "click here" mean?

23  A.   If you click reply, if you click "click here," it opens up

24  a box for you to be able to email this poster.   And then the

25  email is sent to them through kind of like an anonymous         03:18:26

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | mechanism. | 03:18:30 |
| 2 | Q.   Who would be sending that email? | |
| 3 | A.   Johns. | |
| 4 | Q.   All right.   During this same time frame, into 2014, did | |
| 5 | you continue to have any issues with banking? | 03:19:01 |
| 6 |            MS. BERTRAND:  Objection.   Leading. | |
| 7 |            THE COURT:  Overruled. | |
| 8 |            THE WITNESS:  Yes. | |
| 9 | BY MR. RAPP: | |
| 10 | Q.   All right.   Let's look at 869.   Do you recognize this? | 03:19:14 |
| 11 | A.   Yes, I do. | |
| 12 | Q.   What is it? | |
| 13 | A.   It's an email from myself to Jed Brunst, Nathan Kopecky, | |
| 14 | and Scott Spear. | |
| 15 | Q.   All right.   And what's the subject matter of this email? | 03:19:42 |
| 16 | A.   The subject matter is Werther/PrivatBank. | |
| 17 | Q.   All right.   And what is the date of this email? | |
| 18 | A.   The date of the email is January 22, 2014. | |
| 19 | Q.   All right. | |
| 20 |            MR. RAPP:  Move to admit United States 869. | 03:20:10 |
| 21 |            THE COURT:  Yes.   It may be admitted. | |
| 22 |            (Exhibit Number 869 was admitted into evidence.) | |
| 23 |            MR. RAPP:  And request it be published. | |
| 24 |            THE COURT:  Yes, it may be published. | |
| 25 | \\\ | |

United States District Court

70

CARL FERRER - Direct

1  BY MR. RAPP:                                                              03:20:28

2  Q.   Let me take you to some point in this email.  What do you

3  say here that's highlighted?

4  A.   "We need to get these docs signed this week."

5  Q.   What docs are you referring to?                                     03:20:38

6  A.   So these are the final agreements for the second bank.

7  Those would be in the attachments.

8  Q.   And you reference a bank here and I believe we've referred

9  to this before.  What is this in reference to?

10  A.   So that's Borgun.  We had the one bank through              03:20:57

11  emerchantpay but emerchantpay can get us a second bank so we

12  can load balance.

13  Q.   All right.  And then here you reference an urgency.  What,

14  if any, urgency is occurring during this time period?

15  A.   I'm sorry.  Could you say that again?                              03:21:17

16  Q.   This urgency here?

17  A.   Yeah.  I'm stating that I had problems with Litle because

18  we're reducing our transactions to them before they terminate

19  us on international charge-backs, so we're getting a lot of

20  charge-backs internationally.                                           03:21:44

21  Q.   And why are you letting Mr. Spear and Mr. Brunst know

22  this?

23          MR. FEDER:  Objection.  Relevance.  403, 404(b).

24          THE COURT:  Overruled.

25          THE WITNESS:  Because they are my bosses and they          03:21:55

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | won't sign -- they are the ones that sign the agreements and | 03:21:59 |
| 2 | vet the agreements and I just do the leg work. | |
| 3 | BY MR. RAPP: | |
| 4 | Q.   All right.  Let's look at Exhibit 177.  What is this? | |
| 5 | A.   This is an email from Jed Brunst to Joe at Backpage, | 03:22:26 |
| 6 | that's Joe Kaiping who is our CTO.  Cc'd is Scott Spear, Carl | |
| 7 | Ferrer, Nathan Kopecky and the subject is website Technologies | |
| 8 | v. Backpage, vendors, audits, risk assessment, email. | |
| 9 | Q.   And when is this email sent? | |
| 10 | A.   It's sent March 10, 2014. | 03:22:56 |
| 11 |         MR. RAPP:  Move to admit 177. | |
| 12 |         MR. FEDER:  Same. | |
| 13 |         THE COURT:  Overruled.  It may be admitted and | |
| 14 | published. | |
| 15 |         (Exhibit Number 177 was admitted into evidence.) | 03:23:03 |
| 16 | BY MR. RAPP: | |
| 17 | Q.   And we were talking earlier about Website Technologies. | |
| 18 | What, if anything, does this email have to do with Website | |
| 19 | Technologies? | |
| 20 | A.   I can sum this up without reading it.  It is that we don't | 03:23:22 |
| 21 | want to use the Backpage.com email address, especially if | |
| 22 | you're dealing with vendors and getting audits and risk | |
| 23 | assessments.  So we're asking Jed Brunst may we use | |
| 24 | websitetechnologies.com for an email address. | |
| 25 | Q.   And why do you have to get Mr. Brunst's approval from | 03:23:50 |

United States District Court

CARL FERRER - Direct

1   changing the name from Backpage to Website Technologies?          03:23:53

2   A.   He set up Website Technologies to handle payroll, 401(k)

3   and to do leases so he wants to ensure that its reputation is

4   protected, not affiliated with Backpage.

5   Q.   All right.  Let's look at 178.  What is this?               03:24:16

6   A.   Email from Jed Brunst sent on April 3, 2014.  It's sent to

7   Nathan Kopecky, Carl Ferrer, Kate Obermiller, which is Jed's

8   assistant, Scott Spear.  Subject, move from U.S. Bank.  And

9   then an attachment.

10  Q.   All right.  And is this April of 2014?                      03:24:51

11  A.   Yes.

12              MR. RAPP:  Move to admit and publish 178.

13              THE COURT:  Yes, it may be admitted and published.

14              (Exhibit Number 178 was admitted into evidence.)

15  BY MR. RAPP:                                                     03:25:10

16  Q.   All right.  Let me just ask you about a few things in

17  this.  Can you read this line here?

18  A.   Yes.  This is, "By May 1 we will have to be completely out

19  of US Bank."

20  Q.   What did you take that to mean?                             03:25:25

21  A.   The company is being thrown out of U.S. Bank.

22  Q.   And then what he does say in the next line?

23  A.   "We will move all banking under Website Technologies at

24  BMO," Bank of Montreal.

25  Q.   And what did you take that to mean?                         03:25:48

CARL FERRER - Direct

A.   You will need to -- we need to get the deposits    03:25:51

redirected.  The funds that are going to US Bank we've got to

now redirect them to BMO to a different company, Website

Technologies.

Q.   All right.  And then down here does he give Nathan Kopecky    03:26:07

any instructions?

A.   Yes.  Yes.  "Nathan, please coordinate all banking changes

thru Kate.  Do not call BMO or USB directly.  Any questions

please call me or Kate.  Thanks."

Q.   All right.  And what did you take that to mean?    03:26:38

A.   It's very difficult to get a bank account and you don't

need people who don't understand how sensitive this issue is

calling up a bank and saying something they shouldn't have said

so Jed is dealing with setting up bank accounts, not Nathan

Kopecky.    03:27:00

Q.   All right.  And let's look at 178a.  And do you recognize

this?

A.   Yes.  Well, hold on.

        Oh, yes, it was an attachment on the email.  Okay,

thank you.  I needed to verify.    03:27:34

Q.   And just to go back to 178, which is in evidence, and ask

to be published, just so we're clear, there's an attachment and

was this attachment sent as part of the email in 178?

A.   Yes.

Q.   And why is this attachment being sent to you?    03:28:12

United States District Court

CARL FERRER - Direct

1    A.   Jed is sending us the attachment that is essentially                03:28:16

2    giving us a deadline to leave U.S. Bank.

3    Q.   All right.

4              MR. RAPP:  Move to admit 178a.

5              THE COURT:  Yes.  It may be admitted and published.            03:28:28

6              (Exhibit Number 178a was admitted into evidence.)

7    BY MR. RAPP:

8    Q.   And we don't need to read the entire thing but can you

9    read the portion that's highlighted?

10   A.   "In accordance with your Deposit Account Terms and                  03:28:44

11   Conditions, please be advised that we have elected to close

12   your account with us."

13   Q.   All right.  And then let's look at 763.  Do you recognize

14   this email?

15   A.   Yes.                                                                03:29:16

16   Q.   Who is this email from?  How do you recognize it?

17   A.   It's from Jed Brunst.  It's to Carl Ferrer, Jim Larkin,

18   and it was sent on May 6, 2014, at 2 o'clock and it's

19   comments -- the subject line is:  Comments and a long term biz

20   plan.                                                                    03:29:40

21             MR. RAPP:  Move to admit United States 763 and

22   request permission to publish.

23             THE COURT:  Yes, it may be admitted and published.

24             (Exhibit Number 763 was admitted into evidence.)

25   \\\

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | BY MR. RAPP: | 03:30:02 |
| 2 | Q.   Do you know why Mr. Brunst is sending you this email? | |
| 3 | A.   He's asking me to give more detail on the different | |
| 4 | revenue opportunities and why they might be successful. | |
| 5 | Q.   All right.  Let me just highlight one.  Do you see that | 03:30:17 |
| 6 | there? | |
| 7 | A.   Yes. | |
| 8 | Q.   What is that? | |
| 9 | A.   We've added video to Backpage ads and we're getting a lot | |
| 10 | of use.  There's a lot of traffic.  A lot of plays on video on | 03:30:29 |
| 11 | Backpage adult ads. | |
| 12 | Q.   Can you explain that to the jury?  In other words, how is | |
| 13 | video being used in any of the categories? | |
| 14 | A.   Yes. | |
| 15 | Q.   What category are you using this in? | 03:30:52 |
| 16 | A.   We had it in all categories but it was only effective in | |
| 17 | terms of getting used in Adult. | |
| 18 | Q.   And any particular category within Adult or all categories | |
| 19 | within Adult? | |
| 20 | A.   Female Escorts was the primary category. | 03:31:13 |
| 21 | Q.   And what did you take Mr. Brunst saying to monetize the | |
| 22 | video?  What did you take that to mean? | |
| 23 | A.   He's asking how could we make money from these videos? | |
| 24 | Right now it's free. | |
| 25 | Q.   And how about this portion of the email, what does that | 03:31:43 |

United States District Court

CARL FERRER - Direct

1   refer to?                                                        03:31:45

2   A.   It's paywall/subscription, so we could offer a premium

3   service where if a user -- a consumer of content subscribers

4   and pays that they could see premium content that other

5   consumers couldn't see.  So, for example, videos with nudity or   03:32:04

6   images that had been removed by moderators could be part of a

7   paywall subscription.

8   Q.   All right.  Do you know why that Mr. Brunst is trying to

9   find other streams of revenue?

10  A.   There are very aggressive revenue projections for the       03:32:30

11  company.  The company is just growing.  Despite all of these

12  banking problems, it continues to grow in revenue.  So I later

13  learn why.  I didn't know at the time but I later came to learn

14  why.

15  Q.   All right.  We'll come back to that.                        03:32:49

16          As of May of 2014, how is Backpage doing, if you

17  know, in terms of revenue?

18  A.   It's doing fantastic.

19  Q.   I believe we look at an email exchange between you and

20  Mr. Spear where you were asking him about revenue for 2013.  Do   03:33:16

21  you remember that email?

22  A.   I do, 130 million annual.

23  Q.   All right.  And is that increasing as you get into 2014?

24  A.   Yes.

25  Q.   Let's look at Exhibit 181.  Do you see that email?          03:34:19

United States District Court

77
CARL FERRER - Direct

1    A.    Yes, I do.                                                          03:34:31

2    Q.    Do you recognize the email address?

3    A.    Yes.  The email is from Joye Vaught.

4    Q.    And who is it being sent to?

5    A.    It's being sent to Eden at Backpage, Kelli at Backpage,           03:34:43

6    Sara.  And these are moderators that work for Backpage.

7    Q.    And is Mr. Padilla on this email as well?

8    A.    Yes.  He's copied.

9    Q.    And what is the subject?

10   A.    The subject is:  Ads With Links Group 42414.                      03:35:07

11   Q.    All right.  And in fairness, you're not on this email?

12   A.    I am not.

13   Q.    Are you familiar with the context of this email?

14   A.    I'm familiar with the content in terms of the filters

15   needed to be carefully used.                                           03:35:50

16   Q.    All right.

17          MR. RAPP:  Move to admit 181.

18          MR. EISENBERG:  Objection.  Lack of foundation.

19          MS. BERTRAND:  Foundation.

20          THE COURT:  Lay some more foundation, Mr. Rapp.                  03:36:00

21   BY MR. RAPP:

22   Q.    Do you recognize the email of Joye Vaught?

23   A.    Yes, I do.

24   Q.    Was she working at Backpage in April of 2014?

25   A.    She was working at Backpage and we're not including the           03:36:14

CARL FERRER - Direct

1  last name any more in email addresses.  That's why it's just                      03:36:17

2  joye@backpage.com.

3  Q.   And why were you not including the last name in 2014?

4  A.   It's about protecting reputation of the moderators and

5  identity.                                                                          03:36:33

6          MR. RAPP:  Move to admit 181.

7          MS. BERTRAND:  Same objection as to foundation.  The

8  witness has testified he has some knowledge about the links but

9  he's not testified he's got any actual knowledge about the

10 discussion in this email.                                                          03:36:47

11         THE COURT:  I think, Mr. Rapp, you can lay some more

12 foundation as to content.

13 BY MR. RAPP:

14 Q.   All right.  Can you explain the reference to the filter

15 term?                                                                              03:36:59

16 A.   You're going to -- this is a procedure that Joye set up to

17 monitor and delegate work to the staff that pertains to the

18 Strip Term From Ad feature of the filter terms.

19         MR. RAPP:  All right.  Move to admit 181.

20         MS. BERTRAND:  Same objection.  Lack of foundation as    03:37:34

21 to personal knowledge or even how he knows this is something

22 Ms. Vaught has set up.

23         THE COURT:  I guess, Mr. Rapp, as to the exhibit,

24 maybe the problem is that the issue is a 401 issue with

25 foundation.                                                                        03:37:59

United States District Court

CARL FERRER - Direct

1           MR. RAPP:  Okay.                                      03:38:02

2           MS. BERTRAND:  Your Honor, we're having a hard time

3  hearing the Court, too, when it's speaking.  It's just been

4  hard to hear you.

5           THE COURT:  Oh.  I'm sorry.  Can you hear me?       03:38:12

6           MR. RAPP:  I can hear you.

7           THE COURT:  Thank you.

8  BY MR. RAPP:

9  Q.   So can you explain in 2014 why Ms. Vaught is involved in

10  the strip filter terms, why is she giving direction to        03:38:29

11  moderators?

12          MS. BERTRAND:  Objection.  Calls for speculation.

13  Lack of foundation as to knowledge.

14          THE COURT:  Sustained.

15  BY MR. RAPP:                                                  03:38:42

16  Q.   Well, did Ms. Voight answer to Mr. Padilla?

17  A.   Yes, she does.

18  Q.   And who does Mr. Padilla answer to?

19  A.   Mr. Padilla answers to me and this email is about a

20  solution that I've asked Mr. Padilla to do.                   03:39:00

21          MR. EISENBERG:  Objection, Your Honor.  This email is

22  not in evidence and he's testifying substantively about it.

23          MS. BERTRAND:  Join.

24          THE COURT:  Well, I think as to foundation, Mr. Rapp

25  is entitled to ask foundational questions but Mr. Ferrer should  03:39:19

United States District Court

80
CARL FERRER - Direct

1   not offer them himself.                            03:39:23

2          So I think that's the problem, Mr. Rapp.

3          MR. RAPP:  Move to admit 181.

4          MS. BERTRAND:  Same objections as to --

5          THE COURT:  Overruled.  181 may be admitted.   03:39:39

6          (Exhibit Number 181 was admitted into evidence.)

7          MR. RAPP:  And request permission to publish.

8          THE COURT:  It might be published.

9   BY MR. RAPP:

10   Q.  All right.  Without further adieu, in just looking at this   03:39:56

11   email, what is the direction Ms. Vaught, if any, is giving to

12   her moderation staff?

13   A.  She's telling these moderators that are on the

14   distribution list for an email address

15   adswithlinks@backpage.com and which means when the moderators   03:40:11

16   send in their links for the day, they go into that in box and

17   then these three moderators are supposed to go through that in

18   box and just verify that the links in the ads are actually

19   going to porn or sex for money or, you know, sites that have

20   extreme nudity.  So it's a way of sort of monitoring what links   03:40:38

21   people are putting in the postings.

22   Q.  And why are you monitoring those links?

23   A.  It's all about improving the user experience.  We have

24   been attacked sometimes by people posting viruses ads that will

25   pop up a video player and download a virus.  So we're   03:41:02

CARL FERRER - Direct

1   monitoring links.  And if we find a bad link, we'll create a        03:41:06

2   filter term for that bad link and then that link will be

3   automatically stripped out.

4   Q.   Do you strip out the links even if they have links to sex

5   for money?                                                          03:41:33

6   A.   Yes.

7   Q.   All right.  Now let's go to 1049.  Do you recognize United

8   States 1049?

9   A.   Yes, I do.

10  Q.   How do you recognize this?                                     03:42:09

11  A.   The email is from Nathan Kopecky at Backpage.  He's

12  working with me in Dallas.  He's the CFO of Backpage that's now

13  reporting to Jed Brunst.

14  Q.   All right.  And what is the subject of this email?

15  A.   The subject of the email is:  After Jed call                   03:42:27

16  BP presentation-Nathan June 23, 2014 PowerPoint.

17  Q.   All right.  And what's the purpose of this PowerPoint?

18  Why is Mr. Kopecky providing this PowerPoint, if you know, to

19  you and Mr. Brunst?  Well, it was sent to me so I received it

20  and I'm thinking it has to do with either the revenue -- it has    03:43:01

21  to do with revenue projections, maybe the plan and how we're

22  going to grow revenue.  I would have to see the PowerPoint?

23  Q.   All right.  Why don't we have a look?

24  A.   Yes.  I remember.

25  Q.   Do you recognize it now?                                       03:43:43

United States District Court

CARL FERRER - Direct

1   A.   Yes, I do.   I worked on this PowerPoint with Nathan          03:43:44

2   Kopecky.

3   Q.   Do you recall why you worked on this PowerPoint with

4   Nathan Kopecky?

5   A.   Jed wanted us to create a PowerPoint that explained all of  03:43:58

6   the revenue opportunities for Backpage and the projections on

7   revenue, where revenue was coming from and, you know, kind of

8   projected growth.   I later learned that this was to sort of set

9   the value of the company.

10  Q.   All right.                                                  03:44:22

11           MR. RAPP:   Move to admit 1049 and 1049b.

12           THE COURT:   Yes.   They may be admitted and published.

13           MR. PANCHAPAKESAN:   Objection to 106 to the extent

14  this is only part of the PowerPoint.

15           THE COURT:   Which part are you objecting to, 1049 or    03:44:45

16  1049b?

17           MR. PANCHAPAKESAN:   1049b.

18           THE COURT:   Is it a complete set, Mr. Rapp?

19           MR. RAPP:   It's the entire PowerPoint.

20           THE COURT:   It says 17 pages.   Is that the completed?   03:44:56

21           MR. RAPP:   Yes.

22           THE COURT:   Overruled.

23  BY MR. RAPP:

24  Q.   I'm just going to talk about a couple of those.

25           MR. PANCHAPAKESAN:   Your Honor, it's actually not.      03:45:09

United States District Court

CARL FERRER - Direct

```
 1    The entire PowerPoint is 23 pages.                        03:45:10
 2              THE COURT:  Well --
 3              MR. RAPP:  I think there's six slides missing.
 4    There's two slides removed for the reasons that we've provided
 5    for other PowerPoints.                                    03:45:44
 6              THE COURT:  All right.  Overruled.
 7              (Exhibit Number 1049b was admitted into evidence.)
 8    BY MR. RAPP:
 9    Q.   So just looking at 1049, is this often what we call the
10    transmission email?                                       03:46:01
11    A.   Yes.
12    Q.   And so just looking at -- and this is the attached
13    PowerPoint?
14    A.   Yes, it is.
15    Q.   And so let's look at slide six.  What is this slide    03:46:22
16    entitled?
17    A.   This is the key performance metrics.
18    Q.   And just looking at the top chart or bar graph, as they
19    like to call it, what does this show?
20    A.   This shows page views in visits and visits in millions  03:46:49
21    from the first quarter of 2008 to quarter 1 of 2014 and the
22    page uses are in millions.
23    Q.   Have they increased from 2008 to 2014?
24    A.   It looks like about 10-fold.
25    Q.   All right.  And then can you interpret this bottom bar    03:47:16
```

United States District Court

CARL FERRER - Direct

1    graph for the jury?                                          03:47:22

2    A.   Yes.  This would be transactions, the number of paid

3    statements or paid posting from 2008 Q1 to 2014 Q1.  They

4    continued to grow.  They did slow down in 2014 and that's

5    because we allowed people to purchase credits.  So instead of   03:47:45

6    having -- like right up in here.  Instead of having one

7    transaction, they can buy $50 worth of credits and that would

8    reduce the number of transactions.

9    Q.   Can you explain to the jury what buying credits means?

10   A.   So buying credits was a way that we would eventually use   03:48:05

11   so people could send us money orders and then we would give

12   them credits.  But its initial purpose was to reduce the number

13   of the credit card fees and the number of transactions so that

14   people would buy $50 worth of credits instead of ten $5 ads.

15   If they buy ten $5 ads, well, that's 10 transactions which is a   03:48:29

16   lot more -- expensive and also sort of raises our volume too

17   much.

18   Q.   Let's look at slide seven.  Can you interpret this part of

19   the slide?

20   A.   Yes.  Jed wanted to have a report showing revenue by the   03:49:06

21   major markets so New York, California, Texas, dominate.

22   Q.   Arizona is not in the --

23   A.   Arizona is right there (Indicating).

24   Q.   Let's go back to slide six here just for a minute.  Now,

25   can you interpret this what we now call a pie chart?          03:49:51

United States District Court

CARL FERRER - Direct

1    A.    Yes.   This pie chart is an attempt to create that veneer          03:49:59
2    of a general classified site when it shows 47 percent of the
3    ads posted as being in jobs but we know the vast, vast majority
4    of those postings are feeds.

5          And so this is rather deceptive, too, that Adult          03:50:21
6    Entertainment is only showing at 4 percent ads.   Well, that's
7    because people use moved to the top and we've talked about that
8    earlier.   They don't need to post a new ad.   They just keep
9    moving the same ad to the top over and over again.

10         So ads by category breakdown helped us sort of reduce          03:50:41
11   that impression that Backpage is a prostitution only website.
12   Q.    Okay.   And then what does this tell you?
13   A.    Well, transactions by category breakdown, that kind of
14   kills the veneer of a general classified site because it's 91
15   percent of the transactions are in Adult.          03:51:13
16   Q.    And within the Adult, what's the category that -- based on
17   your experience with Backpage as of 2014, what's the category
18   within Adult?
19   A.    Category within Adult with the majority of the traffic is
20   Female Escorts.          03:51:35
21   Q.    And then let's just look at one more here.   What about
22   this slide entitled User Experience, Consumer.   Can you
23   interpret this slide for the jury?
24   A.    This slide sort of captures why Backpage was easy to use
25   and simple, at least when it comes to posting.   You know, this          03:52:08

United States District Court

CARL FERRER - Direct

1    area down in here talks about the posting for the advertiser.          03:52:14

2    We just -- posting form, fill in your information and then post

3    and you had to verify an email address.  And then on top here,

4    this is the consumer making it very easy to get to content.

5           Now, what we don't show on here is where people              03:52:39

6    normally go to get content.  We've got the category Dallas

7    furniture for sale.  There's not a lot of furniture for sale in

8    Dallas but you can see you click a category and then you're

9    immediately looking at listings.

10          So no delay, no banner ads jumping out at you.  It's        03:52:56

11   a fast user experience.

12   Q.   All right.  But do you know why, in putting this

13   PowerPoint together, that these categories are used as opposed

14   to the Adult category?

15   A.   Yes.  It was a pattern of practice for us to try to have      03:53:22

16   that general classified veneer.  Another example of that would

17   be we'll show the Jobs ad count here but we won't show the ad

18   count in Adult because that is tens of thousands or more of

19   ads.

20          So using -- using non-adults in our PowerPoints was         03:53:49

21   just something that was beneficial in terms of the narrative.

22   Q.   Why were you asked to put together this PowerPoint by

23   Mr. Brunst?

24   A.   At the time I didn't know really why but later I was

25   approached that since they have been unsuccessful on trying to    03:54:14

United States District Court

CARL FERRER - Direct

1   sell the company, that they were going to consider selling it          03:54:21

2   to me and that this PowerPoint essentially was to increase the

3   purchase price, show the value of the site.

4   Q.   Okay.  But you were involved in preparing this PowerPoint?

5   A.   Yes.  I helped raise the purchase price for the                   03:54:44

6   transaction that occurred in April of 2015.

7   Q.   Do you know if there was any effort during this time

8   period of 2014 to sell Backpage to anybody else?

9   A.   I just remember the -- at this time period there's no one

10  else that I know of.                                                   03:55:12

11  Q.   All right.  Let's look at 1984.  Do you recognize 1984?

12  A.   I do.

13  Q.   How do you recognize it?

14  A.   It's a Google Analytics report, referral traffic for the

15  month of June and it shows the sites that are sending Backpage         03:55:44

16  traffic.

17  Q.   And is this at the time that you're now having to pay

18  Google Analytics to provide you these reports?

19  A.   Yes.

20           MR. RAPP:  Move to admit 1984.                                03:56:06

21           THE COURT:  Yes.  It may be admitted and published.

22           (Exhibit Number 1984 was admitted into evidence.)

23           MR. RAPP:  Thank you.

24  BY MR. RAPP:

25  Q.   So what is the time period for this report?                      03:56:24

United States District Court

CARL FERRER - Direct

1  A.   June 1 through June 30.                                            03:56:26

2  Q.   And does it tell you the websites that provide the largest

3  referral traffic?

4  A.   Yes, it does.

5  Q.   We haven't talked about The Erotic Review in a while but        03:56:45

6  is there still referral traffic coming from The Erotic Review?

7  A.   Yes.  In the month of June, 586,604 users came from The

8  Erotic Review.  It's actually even more.

9  Q.   Why do you say it's even more?

10  A.   Well, if you look at sessions and if you look at users.        03:57:09

11  Q.   Let me see if I can capture that here.  I think you

12  were --

13  A.   This is sessions and this is users and what that means

14  under The Erotic Review, during the month of June, 1.9 million

15  sessions, meaning a user clicked on The Erotic Review link and    03:57:36

16  came to Backpage.  And this number is unique users, 586,604.

17  So it's an incredibly large number.

18  Q.   And what about the other -- The Erotic Review is the top

19  from this site but what about the other sites underneath The

20  Erotic Review?                                                     03:58:07

21  A.   Well, these other three sites are also escort review

22  sites.

23  Q.   All right.  And are they also providing referral traffic

24  to Backpage during this time period?

25  A.   They are.  The best way to determine what kind of site you    03:58:27

United States District Court

CARL FERRER - Direct

1  are is to look at where the traffic is coming from, the          03:58:31

2  referral report.

3  Q.   Okay.  Let's look at 1989.  What is this?

4  A.   This is a December 2014.  It's the same type of report on

5  referral traffic from Google Analytics.                          03:59:03

6  Q.   So the last one we look at, do you recall the date?

7  A.   June 2014.

8  Q.   This is approximately six months later?

9  A.   Yes.

10          MR. RAPP:  All right.  Move to admit 1989.             03:59:15

11          THE COURT:  Yes.  There's a -- yes, it may be

12  admitted.  There's a noted discrepancy in your exhibit list

13  description.  It says March 2014.

14          (Exhibit Number 1989 was admitted into evidence.)

15          MR. RAPP:  Move to publish.                            03:59:55

16          THE COURT:  Yes.  1989 may be admitted and published.

17          MR. RAPP:  Thank you.

18  BY MR. RAPP:

19  Q.   And so just quickly here, this is in December.  What month

20  is this for?                                                    04:00:10

21  A.   December 2014.

22  Q.   And going down here to the top sites, referral sites, what

23  do we see?

24  A.   You see the top four referral sites are prostitution

25  review sites.                                                   04:00:31

United States District Court

90

CARL FERRER - Direct

1   Q.    What is this site for, number 10?                          04:01:01

2   A.    That's also The Erotic Review but it's their mobile view.

3   Q.    Okay.  What is that -- what does that mean?

4   A.    It means that if someone was on a mobile phone, they may

5   be directed to this URL which would give it different view of   04:01:19

6   the content.  It would be easier to read the content on a

7   mobile phone.

8   Q.    And is this a review from The Erotic Review that is

9   something new or has this been in place for a while, if you

10  know?                                                            04:01:46

11          MS. BERTRAND:  Objection.  Leading.

12          THE COURT:  Overruled.

13          THE WITNESS:  It's new but I think they have been

14  working on it for a few months and it really is indicative of

15  what's happening to the entire industry.  Things are going to   04:02:00

16  move towards mobile.

17          MR. RAPP:  All right.  Let's look at 1120.

18  BY MR. RAPP:

19  Q.    Do you recognize this email?

20  A.    Yes, I do.                                                 04:02:21

21  Q.    How do you recognize this email?

22  A.    I sent this email to Jed Brunst, Scott Spear, and Nathan

23  Kopecky and Jim Larkin with the subject line Chase is blocking

24  JetPay on August 20, 2014.

25          MR. RAPP:  Move to admit 1120.                           04:02:41

United States District Court

CARL FERRER - Direct

1          THE COURT:  Yes, it may be admitted and published.      04:02:43

2          (Exhibit Number 1120 was admitted into evidence.)

3  BY MR. RAPP:

4  Q.   What are you telling Jed Brunst and Scott Spear in this?

5  A.   I'm telling them Chase is blocking us again with JetPay.    04:02:59

6  We had it working.  We were directing transactions to a bank in

7  Liechtenstein using a U.S. processor.

8          Anyway Chase started blocking JetPay now.  They were

9  blocking emerchantpay.  We got it to work for five months and

10  the only solution is more -- another bank agreement.           04:03:24

11  Q.   And so can you interpret this sentence here?

12  A.   The solution is more MIDs.  MID is code for merchant

13  account IDs.  It means we need another bank to give us a credit

14  card processing agreement so that we can conceal the

15  transaction from the issuing bank that is blocking our         04:03:54

16  transactions.

17  Q.   What do you mean conceal from the issuing bank that is

18  blocking your transactions?

19  A.   So if you get a credit card from a bank, that's called an

20  issuing bank.  They issue the credit card.  So in this case    04:04:12

21  Chase issues the credit card to their customer -- I'm sorry.  I

22  forgot the question.  It's the end of the day.

23  Q.   For both of us.  What do you mean that you are concealing

24  this from the issuing bank?  What did you mean by that?

25  A.    Yes.  So we've had a different billing descriptor but     04:04:36

United States District Court

92

CARL FERRER - Direct

 1   eventually Chase has figured it out and they start blocking so          04:04:43
 2   we just have to change again.   Constantly add new payment
 3   channels so that Chase won't know that this transaction is
 4   coming from Backpage.com.
 5   Q.   And why don't you want them to know that it's coming from        04:05:00
 6   Backpage.com?
 7   A.   Because when they know it, they block it.
 8   Q.   And you referenced some cost in that.   Can you explain
 9   that?
10   A.   This is how much revenue is coming in from Chase, 12,000       04:05:25
11   per day.   That's the potential loss in revenue so there's no
12   delay.   We really need to get these other agreements and I
13   list, you know, five other banks or solutions that we can work
14   on.   And I'm saying that's urgent because Scott Spear likes to
15   take his time vetting these agreements.                              04:05:53
16   Q.   Why do you come -- do you come to learn why Scott Spear
17   takes time vetting the agreements?
18   A.   He wants the banks to --
19          MR. FEDER:   Objection.   Hearsay.   Speculation.
20          THE COURT:   He can answer if he knows.   Wait.   Let me       04:06:11
21   just make an inquiry.
22          Juror 15, do you need to have a break?
23          JUROR 15:   I just need to go to the restroom.
24          THE COURT:   Let's stand in recess and we'll excuse
25   the jurors and we'll just stand in recess for a brief moment.        04:06:25

United States District Court

CARL FERRER - Direct

1   Give you about five or ten minutes and you can all -- all the      04:06:31

2   jurors will have to go back into the jury room.

3            (Jury departs at 4:06.)

4            THE COURT:  We'll check on them in about seven

5   minutes.                                                           04:07:07

6            MR. PANCHAPAKESAN:  Your Honor, I wanted to deal with

7   Exhibit 1049b, the PowerPoint that was redacted just briefly.

8            THE COURT:  What is it?

9            MR. PANCHAPAKESAN:  So 1049b is a PowerPoint, I think

10  the Government indicated that they removed a slide concerning       04:07:47

11  the Communications Decency Act.  1049a is the actual attachment

12  and there's several additional slides.  Only one of them, slide

13  19, deals with the CDA.

14           But there's others, slide 18, slide 20, and then 21

15  through 23 which do not concern the CDA.  22, for example, is       04:08:21

16  an organizational chart.  20 is -- reflects law enforcement

17  cooperation.  It's a similar slide to other slides that are in

18  evidence.  And then slide 18 deals with terms of use and

19  moderation.  So I think for the sake of completeness as to this

20  business record, we think those slides ought to come in.           04:08:48

21           THE COURT:  Mr. Rapp?

22           MR. RAPP:  First of all, it's not a business record.

23  They don't maintain PowerPoints --

24           MR. LINCENBERG:  I can't hear.

25           MR. RAPP:  It's not a business record, these             04:09:07

United States District Court

CARL FERRER - Direct

1   PowerPoints, so that doesn't apply.  It's not 106, all right.      04:09:08

2   These are PowerPoints.  This is not a statement that puts

3   something into context.  And he's already testified --

4        THE COURT:  No.  The question really is, why are

5   these slides omitted?  Quickly.                                     04:09:22

6        MR. RAPP:  I think they are omitted because they are

7   not relevant to what the Government is presenting on this.  And

8   if it's fodder for cross-examination, they are free to bring in

9   those slides and cross-examine him about those slides.

10        THE COURT:  Well, are they self-serving statements?         04:09:48

11        MR. RAPP:  The whole PowerPoint is deceptive and

12   false.  So I'm not even offering this PowerPoint for the

13   truthfulness of it.  I'm offering it as a veneer, a smoke

14   screen, a falsity.  So they keep throwing out 106 as if that

15   has something to do with the PowerPoint.  It doesn't.  They can   04:10:16

16   bring in those slides.  They are going to be able to

17   cross-examine him.  Go ahead.  Ask him about these slides that

18   are omitted.

19        THE COURT:  Well, the other concern I have is you

20   have 1049a and 1049b.  You did not introduce 1049a.  You          04:10:31

21   introduced -- and it was admitted as 1049b and at that time you

22   said there were only two slides removed.  So there's a

23   confusion point there.  Figure it out and let me know in five

24   minutes.

25        MS. BERTRAND:  Well, Your Honor, if the Government is        04:10:52

CARL FERRER - Direct

1    saying --                                                            04:10:53

2              THE COURT:  I'm going to take a break, Ms. Brunst,

3    (sic) and so I'll let him figure it out and if he can respond.

4              MS. BERTRAND:  Okay.  Thank you.

5              COURTROOM DEPUTY:  All rise.                                04:11:01

6              (Recess at 4:11; resumed at 4:17.)

7              THE COURT:  Okay.  Let's not spend any more of the

8    jury's time on this issue because it's already been admitted

9    and we can take it up at the end of the day.

10             Let's have the jury in.  Thank you.                        04:17:51

11             All rise for the jury.

12             (Jury enters at 4:18.)

13             THE COURT:  That includes the gallery.

14             All right.  Thank you.

15             You may be seated.  And the record will reflect the        04:18:54

16   presence of our jury back.  And, again, don't ever hesitate to

17   let me know if you need a break.  We all do.

18             And so let's continue, Mr. Rapp.

19             MR. RAPP:  Thank you, Your Honor.

20             Can I show the witness on the screen 872?                  04:19:10

21             THE WITNESS:  Yes.

22   BY MR. RAPP:

23   Q.   Who is this is -- is this an email exchange between you

24   and Mr. Brunst?

25   A.   Yes.  It's from Jed Brunst to me on October 1, 2014.           04:19:23

United States District Court

CARL FERRER - Direct

1  Q.   And what's the subject matter?                                    04:19:28

2  A.   Kate, do you have the Corp. docs for PostFaster LLC?

3         MR. RAPP:  Move to admit 872.

4         THE COURT:  Yes.  872 is admitted and it may be

5  published.                                                             04:19:41

6         (Exhibit Number 872 was admitted into evidence.)

7         MR. RAPP:  Thank you.

8  BY MR. RAPP:

9  Q.   So there's this email exchange between you down here

10 between two other individuals.  One is with Cereus Properties           04:19:59

11 and one is with Backpage.  Can you explain what you're giving

12 them direction on?

13 A.   Yes, I'm asking I need the corporate docs for PostFaster

14 LLC.  We want to use to it try to get a domestic bank to

15 handle -- domestic meaning U.S. Bank -- to do credit card               04:20:33

16 transactions for PostFaster.

17 Q.   All right.  So are you still using banks outside of the

18 United States?

19 A.   Correct.  We don't have any U.S. banks.

20 Q.   All right.  So what is -- you've referenced this                   04:20:56

21 PostFaster previously.  What is this PostFaster domestically

22 that you want, I guess from this email, to use?

23 A.   We don't have any U.S. banks for credit card processing so

24 we need the corporate docs to show the UBO or the ultimate

25 beneficiary owner for the corporation the LLC PostFaster.               04:21:24

United States District Court

CARL FERRER - Direct

1   Q.   And then what -- related to that, what are you telling        04:21:32
2   Mr. Brunst here?
3   A.   "Jed, please send me the postfaster llc corp docs.  I'm
4   going to share them with Chesapeake bank and the plan is to get
5   a domestic thru them for postfaster.  They are interested."      04:21:49
6   Q.   Why are you asking Mr. Brunst to send you these docs?
7   A.   Because he has the formation documents.  He created the
8   corporation.
9   Q.   All right.  Can you explain that?  Mr. Brunst created the
10  corporation.                                                      04:22:15
11  A.   Well, I should say he did or his staff did, created -- he
12  has the corporate docs.  I obviously don't have them.
13  Q.   Why don't you have them?
14  A.   Because I'm not the owner --
15  Q.   All right.                                                   04:22:30
16  A.   -- of the company.
17  Q.   And so if you -- are you trying to get PostFaster to do
18  credit card processing?
19  A.   Yes.  We bought the URL postfaster.com and we built the
20  site and it's really just Backpage with a different look and      04:22:48
21  feel, different logo but no adult and no dating.
22  Q.   As you go into 2015, do you set up or are certain
23  corporations set up to facilitate credit card processing?
24  A.   In what year?
25  Q.   2015.                                                        04:23:30

United States District Court

CARL FERRER - Direct

1   A.   Yes.

2   Q.   Can you tell us what they are?

3   A.   The time frame is sometime after July 2015.

4   Q.   No.  This would be in early 2015.

5   A.   I'm sorry.  End of the day.  Can you give me the question

6   again?

7   Q.   Let me show you something that might help you.  Let's look

8   at 1122.

9   A.   Oh.  Yes.

10  Q.   Do you recognize this?

11  A.   Yes, I recognize it.

12  Q.   All right.  How do you recognize it?

13  A.   This is an email between Jed and myself.  We are creating

14  corps in Europe to make an acquisition of a site in Australia

15  and I'm also, in the subject line, giving him a stripe

16  confirmed on VISA MasterCard, approved.

17          MR. RAPP:  Move to admit 1122.

18          THE COURT:  Yes, it may be admitted and published.

19          (Exhibit Number 1122 was admitted into evidence.)

20  BY MR. RAPP:

21  Q.   So this is an email that's a couple of pages.  Let's start

22  on three so just to orientate yourself.  Do you see that, the

23  page three of 1122?

24  A.   Yes.

25  Q.   And then going to page two of 1122, what information are

United States District Court

CARL FERRER - Direct

1   you providing these individuals down here regarding banking?   04:25:25

2   A.   Well, I've got a to-do list here.  This week we're setting

3   up trucker jobs, pet seeker, they are all versions of

4   PostFaster to use Stripe as a credit card processor.

5   Q.   And why are you doing that?   04:25:55

6   A.   Just to diversify, just -- well, it's a lifeboat strategy

7   for credit card processing.

8   Q.   And when you say it's a lifeboat strategy for credit card

9   processing, what do you mean by that?

10  A.   It's a strategy that we discussed in management meetings.   04:26:16

11  We even used that term, "lifeboat strategy."  It's, like, if

12  something happens to the credit card processing, where could we

13  direct customers to go.

14  Q.   And when you say where can we direct customers, what

15  customers are you talking about?   04:26:36

16  A.   Those customers that post in Female Escorts, prostitutes.

17  Q.   All right.  And why are you doing that?  Why are you

18  having this lifeboat strategy for the customers of Female

19  Escorts to go somewhere if the processing is shut down?  Why

20  are you doing that?   04:26:59

21  A.   Because if they can't post on, let's say, a Backpage site,

22  we've run out of credit card processing, we can direct them to

23  PostFaster and there they can buy credits and the credits they

24  buy in PostFaster will automatically appear under Backpage so

25  we can manage their ad through PostFaster.  But if they want to   04:27:20

United States District Court

CARL FERRER - Direct

1   post an adult add on Backpage without any credit cards, they          04:27:23

2   buy credits on PostFaster, then they go to Backpage and the

3   credits are there.

4   Q.   Okay.  And can you explain this down here?

5   A.   "AMEX customers can prepay on postfaster and use their          04:27:41

6   credits to post on any site."

7   Q.   Is that what you're referring to?

8   A.   That's what I said, yes.

9   Q.   Okay.  Now going up at the top here, this is top of page

10  two, what are you referring to here?                                 04:28:03

11  A.   "Get the processing agreements since we are a start up it

12  should be easy to be approved (as long as UBO does not flag

13  me)."

14        Well, what's the date of this email?

15  Q.   We're going to the first page so it's down here.              04:28:29

16  A.   Yes.  I know what this --

17  Q.   All right.  So can you explain this?

18  A.   So we're making an acquisition, this is about PostFaster.

19  But this is right around the time that we're going to be

20  creating a company in order to -- in Europe that purchases a       04:28:52

21  site that has mainly prostitution revenue called Cracker.  And

22  Jed Brunst worked with me on that, set up that company.  In

23  fact, they loaned me $2.7 million.

24  Q.   Let's just stop right there.  Who loaned you?

25        MR. FEDER:  Objection.  Relevance, 401, 403.                 04:29:16

United States District Court

CARL FERRER - Direct

1          THE COURT:  Lay some foundation, Mr. Rapp.                    04:29:19

2  BY MR. RAPP:

3  Q.   So explain this -- what is Cracker?

4  A.   So Cracker is a -- it's, like, a Craigslist in Australia

5  but it wasn't successful in competing with e-Bay and like      04:29:30

6  Backpage, it made most of its revenue from prostitution.

7  Q.   All right.  So why are you buying this website?

8  A.   I had heard from someone that it was for sale and I spoke

9  with Jim Larkin.  He said, well, let's see if we can buy it.

10 So I called them and the price started at eight million but     04:29:54

11 Jed, through Jed's help, because the site was primarily adult

12 and there probably weren't a lot of buyers.  We were able to

13 get it down to --

14         MS. BERTRAND:  Objection.  Move to strike.

15 Speculation.                                                     04:30:15

16         THE COURT:  The jury will disregard the last portion

17 of the statement starting with there probably weren't a lot of

18 buyers.

19 BY MR. RAPP:

20 Q.   You know what, let's move on beyond this Cracker for a      04:30:33

21 minute.  Let's talk about this.  Can you explain this Ad Tech

22 Group, BV?

23 A.   Yes, I can.  For bank applications, PostFaster, LLC,

24 should be held by Ad Tech Group BV with me as the UBO.  But I

25 don't think we can afford to wait.                               04:30:56

CARL FERRER - Direct

1    So -- what it means, that there's going to be a

2    transaction some day in the future where I am the UBO, the

3    ultimate business owner.  But for now I'm not the UBO, and so

4    the banking applications have to be signed by one of the

5    owners.

6    Q.   And one of the owners being whom?

7    A.   Jed Brunst, Scott Spear, or Michael Lacey.

8    Q.   All right.  And then are you asking Mr. Brunst in this

9    email of January 8, 2015, or the other way around, are you

10   giving Mr. Brunst some answers to certain questions?

11   A.   Yes.  I'm answering his questions in this email.

12   Q.   All right.  And let's just look at this one.  What is this

13   question and answer that you're giving Mr. Brunst?

14        MR. FEDER:  Objection.  401, 403.  Hearsay.

15        THE COURT:  Overruled.

16        THE WITNESS:  He asked, "What entities owns the new

17   BV?"  BV is a Dutch version of an LLC.  They call them BVs.

18   And then I answer," I thought CF HOLDINGS and CF ACQUISITION I

19   believe."

20   BY MR. RAPP:

21   Q.   And what does that stand for?

22   A.   It's the companies that were created as holding companies

23   that would ultimately would hold Cracker and eventually

24   Backpage.

25   Q.   All right.  Let's look at 1124.  Do you recognize this?

CARL FERRER - Direct

1    A.   Yes.                                                        04:32:52

2    Q.   How do you recognize this?

3    A.   It's an email that I'm sending to Jed Brunst on Nathan's

4    goals for 2015, sent January 22, 2015.

5    Q.   And why are you sending this email?                         04:33:13

6    A.   Why am I sending it to Jed?

7    Q.   Yes.

8    A.   Well, I want to add a goal.

9    Q.   All right.

10         MR. RAPP:  Move to admit 1124.                             04:33:26

11         THE COURT:  Yes.  It may be admitted and published.

12         (Exhibit Number 1124 was admitted into evidence.)

13   BY MR. RAPP:

14   Q.   All right.  I just want to draw your attention to this up

15   here.  What are you telling Mr. Brunst about AMEX here?         04:33:48

16   A.   We're in the process of talking to AMEX.  We might lose

17   AMEX.  And I'm afraid if I talk to AMEX too much, I risk being

18   added to some kind of list where they don't do business with

19   any of these people that are owners.  That's what I mean by

20   UBO filters.                                                    04:34:27

21   Q.   All right.  And why are you concerned that that might

22   happen if you talk to them too much?

23   A.   Well, they have no tolerance for prostitution ads.

24   Q.   AMEX?

25   A.   AMEX.                                                      04:34:47

CARL FERRER - Direct

1   Q.   How, sir, do you know that?                                    04:34:48

2   A.   Because I did have conversations with AMEX and they made

3   that clear to me.

4   Q.   All right.  Okay.  Let's look at --

5        THE COURT:  Well, I think before you move on, we're        04:35:02

6   beyond the 4:30 time period that we've told the jurors that we

7   would hold trial and so we will finish for today.

8        And members of the jury, again, just remember the

9   admonition not to come to any conclusions or to do any research

10  or discuss any of the matters in the trial so far.  Just simply   04:35:20

11  have a pleasant evening.

12       I would like all jurors to be present prior to at

13  least, you know, try to get here no later than about ten to

14  nine so that we can all start right at 9 o'clock so we can

15  maximize our day.                                                  04:35:39

16       All right.  With that, please all rise for the jury

17  as they leave.

18            (Jury departs at 4:35.)

19       THE COURT:  All right.  The record will reflect the

20  presence of counsel and clients.  The witness has stepped off    04:36:42

21  the witness stand and the jury has gone home.

22       Remind me again what was the exhibit number that we

23  were discussing, Mr. Panchapakesan.

24       MR. PANCHAPAKESAN:  Your Honor, it's 1049a is the

25  actual attachment and I believe it's -- the Government put in    04:37:00

United States District Court

CARL FERRER - Direct

1  1049b.                                                                04:37:03

2          THE COURT:  Yes, 1049a was not admitted.   1049b was.

3  And okay.

4          So, Mr. Rapp, what is the Government's explanation of

5  the differences in a and b?                                           04:37:21

6          MR. RAPP:  So slides 18 through 23 are not part of b.

7  Just to short-circuit this, slide 19 makes a reference to the

8  CDA.  We don't have an objection to including 18, 20, 21, 22,

9  23 as part of -- as part of b and we can make that happen.

10         THE COURT:  Is there an objection to that,                    04:37:59

11 Mr. Panchapakesan?

12         MR. PANCHAPAKESAN:  Your Honor, I would just state

13 for the record that we think the slide regarding the CDA ought

14 to come in but we understand the Court's prior rulings in that

15 respect.                                                              04:38:09

16         In terms of the way this comes in, I just want to

17 make sure that the Court and defense counsel get sort of a

18 revised copy of what is now in evidence.

19         THE COURT:  Yes.  And the jury -- we should ensure

20 that the exhibit is perfected for the jury in that way,               04:38:23

21 Mr. Rapp.

22         So I'll overrule the objection consistent with the

23 prior order.  19 will come out.  So you will amend 1049b to

24 include all but slide 19 and that will go to the jury.

25         MR. RAPP:  Just one brief matter.  The defense was            04:38:46

United States District Court

CARL FERRER - Direct

1    good enough to provide us the exhibits they intend on using          04:38:48
2    with Mr. Ferrer.  We're in 2015.  We go to 2018.  I don't know
3    how much longer he's going to be, but it's possible that he
4    could be turned over to the defense tomorrow.
5         We have some issues with many of their exhibits for a          04:39:02
6    variety of reasons.  Some just based on previous court orders.
7    We are filing something tonight that catalogs their exhibits
8    and articulates what our issue is.  And so at some point we
9    would like to take this up before they commence their
10   cross-examination.                                                   04:39:29
11        THE COURT:  Well, I think you know best about when
12   that's going to occur so when you say you're filing something,
13   are you filing it now?  Has it been filed?  Are you going to
14   give it to me late tonight and expect me to look at everything
15   and the exhibits while we're in trial tomorrow?  What is your       04:39:49
16   timing like?
17        MR. RAPP:  Well, we're filing it tonight and we're
18   not expecting the Court to look at it.  I'm just sort of
19   forecasting that we would like this -- we would like to have a
20   hearing with the Court on it before cross-examination is            04:40:01
21   commenced.
22        THE COURT:  Well, the difficulty I see with that is,
23   number one, I can't predict, you can't predict how it's going
24   to go tomorrow.  Number two, I think we can certainly set aside
25   4:30 to 5 p.m. tomorrow to go through that.                          04:40:20

CARL FERRER - Direct

1          MR. RAPP:  Very well.                                    04:40:24

2          THE COURT:  And that, again, assumes that none of

3   those exhibits are going to come in straight away with argument

4   and so on.

5          So I think that's how we'll proceed.  And then to the   04:40:33

6   extent we need to continue that conversation, we can do that

7   after the jury leaves on Friday.

8          All right.  Any further other issues that we need to

9   take up?

10         All right.  Hearing none, then we are adjourned.        04:40:50

11         COURTROOM DEPUTY:  All rise.

12         (Whereupon, these proceedings recessed at 4:40 p.m.)

13                    *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

1        C E R T I F I C A T E                                04:40:54

2

3        I, ELAINE M. CROPPER, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of      04:40:54

6   Arizona.

7

8        I FURTHER CERTIFY that the foregoing pages constitute

9   a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled    04:40:54

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control, and to the best of

13  my ability.

14

15       DATED at Phoenix, Arizona, this 20th day of              04:40:54

16  September, 2023.

17

18

19

20                              s/Elaine M. Cropper             04:40:54

21                              _____

22                              Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                              04:40:54

                    United States District Court