**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

United States of America,       )
                                )    No. 2:18-cr-00422-DJH
            Plaintiff,          )
                                )
            vs.                 )       Phoenix, Arizona
                                )       September 21, 2023
Michael Lacey, et al.           )       8:57 a.m.
                                )
            Defendants.         )
_____ )


**BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**TRIAL - DAY 10 - A.M. SESSION**</u>

Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2

   For the Government:
3      UNITED STATES ATTORNEY'S OFFICE
       By:  **Mr. Kevin M. Rapp, Esq.**
4           **Mr. Peter S. Kozinets, Esq.**
            **Mr. Andrew C. Stone, Esq.**
5           **Ms. Margaret Wu Perlmeter, Esq.**
       40 North Central Avenue, Suite 1200
6      Phoenix, Arizona 85004
       kevin.rapp@usdoj.gov
7      peter.kozinets@usdoj.gov
       andrew.stone@usdoj.gov
8      margaret.perlmeter@usdoj.gov

9  For the Government:
       UNITED STATES DEPARTMENT OF JUSTICE
10     By:  **Mr. Austin Berry, Esq.**
       1301 New York Avenue, NW, 11th Floor
11     Washington, DC 20005
       austin.berry2@usdoj.gov

12

   For the Defendant Michael Lacey:
13     LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
       By:  **Mr. Paul J. Cambria, Jr., Esq.**
14     42 Delaware Avenue, Suite 120
       Buffalo, NY 14202
15     pcambria@lglaw.com

16

   For the Defendant Scott Spear:
17     FEDER LAW OFFICE, P.A.
       By:  **Mr. Bruce S. Feder, Esq.**
18     2930 East Camelback Road, Suite 160
       Phoenix, AZ 85016
19     bf@federlawpa.com
       - and -
20     KESSLER LAW OFFICE
       By:  **Mr. Eric Walter Kessler, Esq.**
21     6720 N. Scottsdale Road, Suite 210
       Scottsdale, AZ 85253
22     eric.kesslerlaw@gmail.com

23

24

25

                    UNITED STATES DISTRICT COURT

```
 1   For the Defendant John Brunst:
         BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
 2       LINCENBERG & RHOW, P.C.
         By:  Mr. Gopi K. Panchapakesan, Esq.
 3            Mr. Gary S. Lincenberg, Esq.
         1875 Century Park E, Suite 2300
 4       Los Angeles, CA 90067
         gpanchapakesan@birdmarella.com
 5       glincenberg@birdmarella.com

 6
     For the Defendant Andrew Padilla:
 7       DAVID EISENBERG, P.L.C.
         By:  Mr. David S. Eisenberg, Esq.
 8       3550 North Central Avenue, Suite 1155
         Phoenix, AZ 85012
 9       david@deisenbergplc.com

10
     For the Defendant Joye Vaught:
11       JOY BERTRAND, ESQ., L.L.C.
         By:  Ms. Joy M. Bertrand, Esq.
12       P.O. Box 2734
         Scottsdale, AZ 85252
13       joy@joybertrandlaw.com

14                          I N D E X
15   EXHIBIT NO.                                     PAGE:
```

```
16   1125      Email to Brunst, "Bank partner", 01/25/2015,    9
               DOJ-BP-0002710215  DOJ-BP-0002710217
17
     1546      Victim #7  Backpage Ads, 03/19/2013,            15
18             USAO-BP-0024349

19   215       Victim #10  Backpage Ads, 01/31/2015,           18
               DOJ-BP-0004719379- DOJ-BP-0004719389
20
     215a      Victim #10 Backpage Ads 11/23/14,               18
21             DOJ-BP-0004719354- DOJ-BP-0004719369

22   217       Victim #12  Backpage Ads, 01/31/2015,           23
               DOJ-BP-0004719390- DOJ-BP-0004719400
23
     217a      Victim #12  Backpage Ads, 01/29/2015,           23
24             DOJ-BP-0004719370- DOJ-BP-0004719378
```

```
25
```

| 1 | **EXHIBIT NO.** | | **PAGE:** |
|---|---|---|---|
| 2 | 216 | Victim #11  Backpage Ads 02/04/2015, DOJ-BP-0004719401- DOJ-BP-0004719407 | 26 |
| 3 | | | |
| | 216a | Victim #11  Backpage Ads, 02/18/2015 DOJ-BP-0004719408- DOJ-BP-0004719415 | 26 |
| 4 | | | |
| 5 | 489a-1 | Clip from Exhibit 489-a | 31 |
| 6 | 489a-2 | Clip from Exhibit 489-a | 31 |
| 7 | 489a-3 | Clip from Exhibit 489-a | 31 |
| 8 | 1213 | Email from Brunst to Ferrer, "Fwd: Backpage update slides", 02/05/2015, DOJ-BP-0002710247  DOJ-BP-0002710248 | 63 |
| 9 | | | |
| 10 | 875 | Email from Brunst, "info for hsr filing", 02/24/2015, DOJ-BP-0002710431 | 64 |
| 11 | | | |
| | 792 | Emails between Brunst and Spear, "MC", 04/01/2015 DOJ-BP-0004601462 - DOJ-BP-0004601463 | 65 |
| 12 | | | |
| 13 | | | |
| | 469 | Emails between Ferrer and Hyer re Backpage.com customers who use American Express, 04/21/2015-04/22/2015 DOJ-BP0004900005- DOJ-BP-0004900008 | 68 |
| 14 | | | |
| 15 | | | |
| 16 | 471 | Email re disabling American Express charges adult category payments, 04/30/2015 DOJ-BP-0003410608- DOJ-BP-0003410612 | 71 |
| 17 | | | |
| 18 | 884 | Email, "Business Plan and Succession Plan", 04/10/2015, DOJ-BP-0002711084 | 68 |
| 19 | | | |
| | 884a | Attachment, Succession Plan Final, DOJ-BP-0002711085 | 72 |
| 20 | | | |
| 21 | 1670 | Email from Ferrer to Brunst, Spear, "Nice Friday", 04/18/2015, DOJ-BP-0002711108 | 73 |
| 22 | | | |
| | 877 | Email from Brunst, "Final forecast and loan calculations", 04/22/2015 DOJ-BP-0003405975 | 75 |
| 23 | | | |
| 24 | | | |
| | 878 | Emails, "Classified Solutions Ltd  phone Number", 06/05/2015, DOJ-BP-000271136 | 76 |
| 25 | | | |

```
 1   EXHIBIT NO.                                                PAGE:

 2
     1674     Email to Ferrer, Hyer, Padilla, "Re:              79
 3            VISA is dead at 2pm Monday. Dallas time.",
              07/03/2015, DOJ-BP-00
 4
     880      Email from Ferrer, "Fwd: Site 1 gear",            80
 5            07/27/2015, DOJ-BP-0003695241 -
              DOJ-BP-0003695242
 6
     881      Email from Brunst, "call next Wednesday",         82
 7            08/14/2015, DOJ-BP-0003620886

 8   1995     Google Analytics Report showing Referrals        84
              to Backpage.com from top 10 referring sites
 9            covering 06/01/2015  06/30/2015,
              USAO-BP-037382  USAO-BP-037383
10
     767      Email to Vaught, "March training doc",           85
11            06/29/2015 USAO-BP-0015563

12   767a     Document named March training Doc,               85
              DOJ-BP-0001401908
13
     886      Emails, "Just need to update our files",         91
14            10/07/2015 DOJ-BP-0002711451
              DOJ-BP-0002711453
15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

<u>**P R O C E E D I N G S**</u>

(Proceedings commence at 8:57 a.m.)

THE COURT:  Good morning.  Please be seated.  And I know yesterday I told you, Mr. Rapp, that I would have some time at 4:30 to go through your filed objections, and I didn't realize I have a 5:30 appointment across town.  I can give you about 15 minutes at the end of the day if you wish to take that up.  But beyond that, do you have a sense that Mr. Ferrer will be completed with his direct testimony this morning or this afternoon?

MR. RAPP:  It's hard to say.  I am hopeful.  I am going to try to move as quickly as I can.  We are in 2015 and it goes to 2018.  So...

THE COURT:  Okay.  Let's just see how we're looking by the afternoon break, and then maybe I can take a glance.  And I have looked at some of the descriptions of what the government has filed.  And I will again, just in terms of the description, and I have not looked at the specific exhibits, but I will tell you that adhering to the Court's order on the motions in limine, nothing related to any sort of amicus briefs or other District Court opinions are relevant here, and so I would admonish defense counsel from even bringing that information in, and that's pursuant to the Court's prior order.

Again, I haven't looked at the exhibits that are at

1    the bottom of page 2 of the government's filing that start with

2    5030, but I can tell you just at least in the description that

3    those items are not coming in up through page 3 at 23, and it

4    would be a violation of the Court's order on its motions in

5    limine.                                                                08:59:21

6            And so do pay attention and look closely at what

7    you're introducing.  Make sure that it lines up with the

8    Court's prior orders.

9            And let's go ahead and have the jury in.  Can we have

10   Mr. Ferrer?                                                            08:59:34

11           MR. LINCENBERG:  Excuse me, Your Honor, this is

12   Gary Lincenberg.  Your Honor, with regard to the objections, we

13   got it about 9:30 or 10:00 o'clock last night --

14           THE COURT:  As did I.

15           MR. LINCENBERG:  -- and we'd like to file a response.         08:59:49

16   And so in terms of any hearing, we would suggest doing it maybe

17   Friday either before or after court.

18           THE COURT:  That's fine with me.  We can set aside

19   time on Friday afternoon to do that, but I didn't -- like I

20   said, I didn't look at the specific exhibits that you're             09:00:08

21   intending to offer, but I will say that it's a nonstarter just

22   in terms of the description or the title of the exhibit.  So do

23   be mindful of that.

24           I'm not interested, Mr. Lincenberg, really in

25   relitigating the issue that I settled in the Motion in Limine        09:00:28

```
 1   order regarding other cases, other litigation that are not this

 2   case.

 3           MR. LINCENBERG:  We understand.  I think that one of

 4   the big ticket items that we will be discussing is what doors

 5   were opened on various documents and so forth.          09:00:45

 6           THE COURT:  All right.  So and to that end then, you

 7   will not introduce any of those opposed exhibits until we have

 8   addressed them.  All right.  We are bringing the jury in.

 9                    (Jury is present)

10           THE COURT:  Good morning, ladies and gentlemen.  I   09:02:16

11   hope everyone had a good evening fresh and ready to go.  We

12   have our witness on the witness stand.

13           Mr. Rapp, you may continue.

14           MR. RAPP:  Thank you, Your Honor.

15           Madam clerk, thank you so much.               09:02:27

16   CARL FERRER,

17   (Witness previously sworn.)

18                CONTINUED DIRECT EXAMINATION

19   BY MR. RAPP:

20   Q.  When we last talked yesterday, the subject matter was   09:02:33

21   Postaftr, Mr. Ferrer, do you remember that?

22   A.  Yes, I do.

23   Q.  Can you explain to the jury what Cracker is?

24   A.  So Cracker is a classified site that's in Australia that,

25   like Backpage, was predominantly prostitution.         09:02:59
```

1    Q.  All right.  And on your screen, what do you see on your

2    screen, sir?

3    A.  An e-mailed from myself to Jed Brunst, Nathan Kopecky, and

4    the subject is "Bank partner."

5    Q.  What date is this e-mail?                                    09:03:20

6    A.  Date of the e-mail is January 25th, 2015.

7            MR. RAPP:  Move to admit United States 1125.

8            MR. LINCENBERG:  No objection.

9            THE COURT:  It may be admitted and published.

10       (Exhibit No. 1125 was admitted.)                              09:03:38

11   BY MR. RAPP:

12   Q.  So have you had a chance to review this e-mail?

13   A.  I have.

14   Q.  And what -- what are you telling Mr. Brunst in this e-mail

15   about Cracker?                                                   09:03:54

16   A.  That we need to create a clone of Backpage called

17   cracker.com with a different owner, a different UBO, with a

18   Dutch Board of Directors signing the agreement in order to get

19   payment channels.

20   Q.  Could you just remind the jury what UBO is?                  09:04:19

21   A.  The ultimate business owner.  When you sign a credit card

22   processing agreement, they don't want to know the director or

23   an employee.  They want to know who is getting the financial

24   benefits of this company.

25   Q.  And with Cracker, who was?                                   09:04:36

1   A.  Well, we had just purchased Cracker and the company gave me

2   $2.7 million to make that purchase and put that site on with me

3   as the UBO.

4   Q.  All right.  Can you explain why, when you say the ownership

5   lent you a couple million dollars to acquire Cracker, can you          09:05:00

6   explain why that was the case?

7   A.  The company needed to, because we're using European banks,

8   we need --

9          MR. LINCENBERG:  I am going to object.  This calls for

10  speculation.                                                          09:05:16

11         THE COURT:  You can lay some foundation, Mr. Rapp.

12  BY MR. RAPP:

13  Q.  You just referenced European banks, what does Cracker have

14  to do with your efforts to obtain European banks for

15  processing?                                                           09:05:32

16  A.  It would significantly -- the acquisition of Cracker would

17  significantly increase the number of transactions outside of

18  the U.S., which is really important to European banks, and they

19  only want to give you processing agreements if you have some

20  non-U.S. transactions.                                                09:05:51

21  Q.  All right.  And what role, if any, did Mr. Brunst have in

22  this acquisition of Cracker?

23  A.  He helped enormously on the negotiation of the price and

24  the setup of different shell companies to hold Cracker.

25  Q.  All right.  And then just one question regarding this             09:06:14

1   e-mail to Mr. Brunst, what did you mean by this that I have

2   highlighted there?

3   A.  We're going to lose AMEX soon.  I'm having conversations

4   with AMEX.  I'm guided on those conversations on what to talk

5   to AMEX about, and I haven't been successful in keeping them.          09:06:40

6   They are going to terminate us.

7   Q.  All right.  And the termination of AMEX for processing,

8   does that pose any problem for Backpage?

9   A.  Yes.  AMEX is an extremely popular credit card or payment

10  card.                                                                  09:07:02

11  Q.  All right.  I want to move to a different subject and ask

12  you about the affiliate program, and we were -- we discussed in

13  your testimony this relationship with super posters, can you

14  distinguish the super poster relationship from an affiliate

15  program?                                                               09:07:25

16  A.  So the affiliate program is a chance for users to get paid

17  for promoting the Backpage website, except on Backpage it's

18  sort of morphed into more of a rebate program where you could

19  get 10 percent back on your purchases of Backpage if you signed

20  up for an affiliate.                                                   09:07:46

21  Q.  All right.  And did you yourself become involved in some

22  fashion in the affiliate program?

23  A.  I did.  I had to study the affiliate program closely, and I

24  signed up for various sites in order to understand how the

25  affiliate business worked, and then I took that knowledge to         09:08:04

1    build an affiliate program for the company, and I did have

2    accounts set up with various dating sites and I was paid as an

3    affiliate.

4    Q.  Can you explain that part of it, the fact that you set up

5    dating sight and were paid for?                                    09:08:22

6    A.  Well, if you signed up for an affiliated program on a

7    dating site, they would give you some code that you could put

8    into an ad.  And then if you ran that code in an ad, anyone who

9    went to that ad, clicked that link, cookies downloaded.  And

10   then if that user were to sign up for that dating site          09:08:47

11   subscription plan, then you get paid.  That's how -- it's very

12   similar to the Backpage program that we, the affiliate program.

13   Q.  All right.  And how long were you personally involved in an

14   affiliate program that you just described?

15   A.  Yeah, I was involved in it 2009 through 2012, and then I    09:09:11

16   decided to sell it to my brother and my brother signed up for a

17   Backpage affiliate program, and ultimately he had to get paid.

18   And the company asked me about him, and he had to fill out a

19   1099 to get paid because he was getting reimbursed 10 percent

20   from the Backpage affiliate program for the ads that he was     09:09:43

21   posting on Backpage that were promoting other dating sites.

22   Q.  All right.  And when you say "the company," you had, you

23   talked to somebody at the company, who is -- did you talk to

24   anybody specifically in upper management or ownership about his

25   involvement in an affiliate program?                            09:10:04

1   A.  Yes.  I was asked about it by Scott Spear and I said it's

2   my brother and we need to pay him, and he agreed.

3   Q.  Just to be clear, this affiliate program that you were

4   involved in that ended in 2012, who was paying you, was it

5   Backpage or some other company?                              09:10:23

6   A.  It's other -- other companies.  It's not Backpage.

7   Q.  Okay.  All right.  We spoke yesterday about a conversation

8   you had with Mr. Spear where you discussed the possibility of

9   shutting down the adult site, do you recall that discussion?

10  A.  Yes.  We had the discussion in his office, and then we     09:10:45

11  decided to commiserate over a beer at a bar, I think on

12  Jefferson or Washington, one of the two streets.

13  Q.  All right.  Did you -- in 2015, did you have a similar

14  discussion with Mr. Brunst?

15  A.  I did.  I had that discussion with Mr. Brunst.  We had      09:11:03

16  e-mails back and forth, and then we had a discussion in San

17  Francisco about could the site survive without -- with us

18  shutting down the adult section, and what kind of revenue would

19  there be, and we both concluded that, well, it still would make

20  $20 million, and we could still get good salaries based on      09:11:27

21  that.

22  Q.  All right.  But when you say "salaries," you were salaried

23  at Backpage?

24  A.  Yes, I was an employee, salaried and had a bonus plan.

25  Q.  But Mr. Brunst, what was his -- do you have any idea what   09:11:43

1   his compensation was?

2   A.  I only know that -- I don't know his compensation.  It's

3   just that he's an owner with a, I believe 6 percent ownership.

4   Q.  All right.  Following that conversation, did the -- well,

5   when you say $20 million could be generated, from what

6   categories during this discussion was -- what categories would

7   remain if you shut down the adult section?

8   A.  So that discussion was a plan that, well, if we had to do

9   what Craigslist had done, we keep dating, we keep therapeutic

10  massage, and then the escorts that are posting with us now,

11  many of them will migrate to dating, to therapeutic massage.

12  They won't put in -- we limit the language even more, like no

13  pricing in personals, but in the end they will still pay for

14  ads and it's still a $20 million business and profitable.

15  Q.  All right.  I want to show you, for your eyes only, 1546.

16  Do you see that on your screen, sir?

17  A.  Yes.

18  Q.  Can you recognize this document?

19  A.  Yes, that's a Backpage posting on Tuesday, March 9th, 2013.

20  Q.  How is it, sir, that you can tell that this is a Backpage

21  posting?

22  A.  I can tell by the bread crumb at the top of the page, which

23  has the name of the site, Backpage.com, the section, Portland

24  Adult Entertainment, and the category, Portland Escorts.  I can

25  also say that this is a Backpage posting because there is a

1   Report Ad button on the upper right-hand side, and the Reply

2   click here, which is the way to e-mail this client.

3           Finally, I can tell by the posting I.D. and the city,

4   which is at the bottom of the ad.

5           MR. RAPP:  Move to admit 1546.                        09:14:04

6           MS. BERTRAND:  Objection, Your Honor, best evidence

7   rule.  This is not the original as indicated by other markings

8   on the document, and markings that have not been redacted.

9           THE COURT:  Is there another version?

10          MR. RAPP:  This is the only version we have.          09:14:20

11          THE COURT:  Overruled.

12      (Exhibit No. 1546 was admitted.)

13          MR. RAPP:  Request permission to published.

14          THE COURT:  Yes, it may be published.  It is admitted

15  and it may be published.                                      09:14:30

16  BY MR. RAPP:

17  Q.  All right.  So you were discussing some of the things on

18  this document that indicated that this was from Backpage, can

19  you just circle the -- go through the areas on this that

20  demonstrate this is from Backpage, and go ahead and use the   09:14:53

21  touch screen?

22  A.  Yes.  There is the bread crumb trail here; the Report Ad

23  feature here; the anonymous e-mail feature here, that's where

24  you can click here and then send an e-mail; the posting I.D. is

25  here.  There's another feature too.  We have the age of the   09:15:16

1    escort here, and large picture, something that we had on our

2    postings.

3    Q.  All right.  And right here there's a couple of stars and

4    some terms, and one of them says, "Recent & Actual Pics," is

5    that something that you would observe in Backpage's postings?       09:15:52

6    A.  Yes.

7    Q.  What did you come to learn was the importance of that?

8    A.  These -- these are -- the consumer, Johns, want to see what

9    the escort looks like, so they don't want stock photos.  They

10   don't want photos of generic people pulled off other Internet      09:16:18

11   sites.

12   Q.  Okay.  And then there's this other term "Independent," did

13   you come to learn what that meant within the context of

14   posting?

15   A.  "Independent" means not affiliated with an agency or does       09:16:33

16   not have a pimp.

17   Q.  All right.  And then also there's this line here, do you

18   see that?

19   A.  "I'm Well Reviewed, Super Cute, Petite, Busty."

20   Q.  With the respect to the "I'm Well Reviewed," what, if           09:17:00

21   anything, did that indicate to you based upon your experience

22   with the website?

23   A.  It's suggesting to Johns that they go ahead and look up her

24   reviews, and they could find her review by either using her

25   name and searching in the city, or her phone number.               09:17:17

1  Q.  All right.  Let's move on to Exhibit 215, do you see 215,

2  is it a multiple page document?

3  A.  Yes, it is.

4  Q.  I'll go back to the first page in a minute, but can you

5  tell me what this is in looking at these documents?          09:17:44

6  A.  Yes.  This is the ad that's been created into a pdf with

7  admin access, and it's also including the object editor data

8  like the invoice.

9  Q.  Is this a Backpage ad?

10 A.  Yes, it is.                                               09:18:06

11 Q.  And how is it that you can tell it is?

12 A.  Because this is a Backpage ad because it has that mobile

13 look, and we were moving towards mobile, and that means that

14 the images come first and the text goes below.  So you can kind

15 of see that it's changed.  The view of this ad is no longer    09:18:25

16 like a desktop view.  It's a view on how the ad would look on

17 mobile.

18 Q.  All right.  And I will also show you 215a.

19 A.  Yes.

20 Q.  Is this -- is this the first sheet of 215a?               09:18:40

21 A.  Yes, it is.

22 Q.  And is this also a Backpage ad?

23 A.  It is also a Backpage ad.  It's got the admin data, so it's

24 printed up with someone from Backpage who had administrative

25 access.  It also has some of the new features that we added at  09:19:02

1   this time line.  Like there's a Previous and Next button that

2   was completely new that we had added.  It's up here underneath

3   the bread crumb.

4   Q.  It hasn't been published, but let me do that.  Can you tell

5   whether 215 and 215a are the same person?                    09:19:23

6   A.  They appear to be so.

7   Q.  All right.  And in terms of the description on the first

8   page, do they appear to have similar, the similar type

9   descriptions, whatever you call this thing on the front, the

10  advertisement?                                               09:19:49

11  A.  The title.

12  Q.  The title, I guess.  Thank you.

13  A.  Yes, it appears similar.

14  Q.  Okay.

15          MR. RAPP:  Move to admit 215 and 215a.              09:19:55

16          MS. BERTRAND:  Objection; relevance -- not relevance,

17  hearsay.

18          THE COURT:  Overruled.  It may be admitted.  215 and

19  215a, and it may be published.

20      (Exhibit No. 215 and 215a were admitted.)               09:20:08

21  BY MR. RAPP:

22  Q.  Just looking at this, can you just tell the jury what date

23  this was posted?

24  A.  This ad is posted Saturday, January 31, 2015.

25  Q.  And going to the next page, how many images will be allowed 09:20:27

1    in 2013?

2    A.  I think this was -- was it 2013 or 2015?

3    Q.  Oh, I'm sorry.  Thank you.  It's only Thursday.  Thank you.

4    2015?

5    A.  I believe up to 12 images.                                      09:20:58

6    Q.  All right.  And this data, what would this tell you?

7    A.  It's the payment data that you're looking at that we

8    capture when a payment is successful.

9    Q.  All right.  And then let's look at 215a, a different date.

10   A.  Yes Sunday, November 23rd, 2014.                                09:21:33

11   Q.  Okay.  Is there anything about the images that strike you

12   in terms of where the photos were taken?

13        MS. BERTRAND:  Objection; calls for speculation as to

14   where these were taken.

15        THE COURT:  Sustained.                                         09:22:03

16   BY MR. RAPP:

17   Q.  Well, I'll come back to that.  So in this one, 215a, was

18   there an image that was deleted?

19   A.  Yes, there was an image deleted.  It was --

20   Q.  Okay.  And what would be the reason for the image to be         09:22:25

21   deleted?

22   A.  The image is deleted because it's just too much of a butt

23   shot on a hotel bed mattress.

24   Q.  All right.  And then --

25        MS. BERTRAND:  Your Honor, objection to that.  We              09:22:44

1    don't know where this was taken.  We don't know if it was in a

2    hotel.

3            THE COURT:  He is testifying as to what he observed on

4    the photos, so I will overrule it.

5    BY MR. RAPP:                                                    09:22:57

6    Q.  So wait a minute, I think I -- I didn't catch what you

7    said.  What did you say about where you believe the photo was

8    taken?

9    A.  It's in a hotel, in a hotel.  That picture is a person

10   that's on a hotel bedspread, in my opinion.                    09:23:15

11   Q.  Okay.  And were you ever alerted in any type of meetings

12   you had with NCMEC or Polaris or even with your own safety and

13   security person, Mr. Nigam, were you ever alerted to the fact

14   that some of these images were taken in hotel rooms?

15           MS. BERTRAND:  Objection; leading.                     09:23:54

16           THE COURT:  Sustained.

17           MS. BERTRAND:  And relevance.

18           THE COURT:  Overruled.  Overruled as to relevance, but

19   sustained as to leading.

20   BY MR. RAPP:                                                   09:24:06

21   Q.  Okay.  What information, if any, did you receive during

22   training about where images of posters were taken?

23           MR. EISENBERG:  Objection, Your Honor, it's not

24   compound.  It's just --

25           THE COURT:  Overruled.                                 09:24:28

1          THE WITNESS:  I recall Liz McDougall wanting us to

2    eliminate all pictures that showed the person --

3    BY MR. RAPP:

4    Q.  Let me stop you there.  What about with, if any other of

5    the meetings that you had with these NGOs --                        09:24:51

6          MR. FEDER:  I'm going to object.  He was answering the

7    question.  He was cut off.

8          THE REPORTER:  I'm sorry, who is --

9          MR. FEDER:  Bruce Feder.  Sorry.

10         THE REPORTER:  Can you please state that again?               09:25:05

11         THE COURT:  Restate your objection.

12         MR. FEDER:  He was cut off.  We'd like to hear the

13   completion of his answer.

14         THE COURT:  Yes.  I think in fairness, Mr. Rapp, you

15   asked what, if any, training did he receive or --                   09:25:16

16         MR. FEDER:  He's talking about Liz McDougall.

17         MR. RAPP:  I'll withdraw the question.  Let me show

18   you another exhibit that's in -- that's in evidence, 104.

19   BY MR. RAPP:

20   Q.  Do you remember this exhibit, this is in evidence, do you       09:25:38

21   remember this Document 104 that you received from

22   Simrin Hooper?

23   A.  Yes, I remember this document.  It's a to-do list after our

24   NCMEC and Polaris meetings.

25   Q.  And was -- did this document, did it go to Scott Spear?         09:25:58

UNITED STATES DISTRICT COURT

1    A.  Yes, it did.

2    Q.  And did the document have this attachment to it?  Do you

3    remember this attachment?

4    A.  Yes, I do.

5    Q.  And did this attachment give you some recommendations?          09:26:19

6    A.  It gave us multiple recommendations.

7    Q.  And was one of the recommendations, did they alert you to

8    keywords?

9    A.  Yes.

10   Q.  And was one of the keywords that they alerted to you in        09:26:40

11   postings, you and Mr. Spear, I might add, "New In Town"?

12   A.  Yes, that was alerted to us.

13   Q.  And as a matter of fact, let me go back.  And does this

14   posting in 215, and 215a, what does it indicate in the title?

15   A.  "New In Town."                                                 09:27:22

16   Q.  Let's go to 217.

17        MR. RAPP:  This is for the witness' eyes only, madam

18   clerk.

19   BY MR. RAPP:

20   Q.  Do you recognize 217 as a posting from Backpage?              09:27:54

21   A.  Yes, I do.

22   Q.  All right.  Does it have multiple pages?

23   A.  Yes, it does.

24   Q.  And does it have administrative data?

25   A.  It does.  That means it's printed out by an administrator.    09:28:15

1    Q.  And does it also have a deleted image?

2    A.  It does have a deleted image.

3              MR. RAPP:  Move to admit 217.

4              MS. BERTRAND:  Objection; hearsay, and objection to

5    any upcoming interpretation of this ad.  It speaks for itself.      09:28:32

6              THE COURT:  Overruled as to -- the Exhibit 217, 217a

7    may be admitted and published, and I will reserve ruling

8    depending on what Mr. Rapp asked about the ad.

9              MR. RAPP:  Request permission to publish.

10             THE COURT:  Yes.                                          09:28:57

11             MR. RAPP:  Thank you.

12             (Exhibit 217 and 217a were admitted.)

13   BY MR. RAPP:

14   Q.  And so here is the administrative data?

15   A.  Yes.                                                            09:29:19

16   Q.  And the text?

17   A.  The text of the ad is below the images, yes.

18   Q.  All right.  And in this ad, is there a deleted image?

19   A.  There is.

20   Q.  And where it says, "Keep deleted," "Restore," "Removed,"       09:29:43

21   can you explain that to the jury?

22   A.  So that gave the administrator an option to, you could

23   update the ad and restore it, or you could update it and

24   permanently remove it.  Right now the ad is deleted, but it

25   could be restored.                                                 09:30:06

Q.  All right.  And can you tell from the ad what -- what was

violative of the terms applying to images?

A.  Yes.  It appears to be too much of a butt shot again.

Q.  All right.  Can you tell for 217, going back to the first

page, can you tell what market this is in?

A.  This ad is in Phoenix.

Q.  All right.  And how can you tell that?

A.  You could tell by this right here.  The city is right there

and right here.

Q.  All right.  And then let's go to 217a.  And does this,

before I move on, does this also have a reference to "New In

Town"?

A.  Yes, it does, in the ad title.

Q.  Just so I am clear, I did move in 217a -- no, let's look at

217a quickly.  Is this similar?

A.  Yes, it is.

Q.  All right.  Let's just get to the administrative data.  Do

the images look familiar?

A.  Yes.  This is a Backpage posting printed out in admin.

Q.  Do the images look similar to 217?

A.  They do.

       MR. RAPP:  All right.  Move to admit 217a.

       MS. BERTRAND:  Objection; hearsay.

       THE COURT:  I may be mistaken, but I thought it was

admitted.

```
 1              MR. RAPP:  I thought too.  Just being careful.

 2              COURTROOM DEPUTY:  He only moved 217.  We were working

 3       on 215 and 215a.

 4              THE COURT:  It may be admitted.  Objection is

 5       overruled.                                              09:32:55

 6          (Exhibit No. 217a was admitted.)

 7       BY MR. RAPP:

 8       Q.  Let's go quickly to 217a, can you tell what market this one

 9       is in?

10       A.  Yes.  This market is in Inland Empire.              09:33:08

11       Q.  Do you know, from Ferrer, where the Inland Empire is in

12       California?

13       A.  It's a major metro area outside of Los Angeles.

14       Q.  Was -- is this an example of somebody who is posting in two

15       different markets?                                      09:33:53

16       A.  Yes.

17       Q.  All right.

18              MR. RAPP:  I'm now showing you -- for the witness'

19       eyes only.

20       BY MR. RAPP:                                            09:34:03

21       Q.  216, do you see that?

22       A.  Yes, I do.

23       Q.  Is this also a Backpage ad?

24       A.  Yes, it is.

25       Q.  And how can you tell?                               09:34:15
```

```
1   A.  It's the mobile view, once again, where the pictures are

2   huge.  They are on top.  It's also an ad that was printed out

3   by an administrator because it contains the, like the e-mail

4   address and payment information.

5            MR. RAPP:  Move to admit 216 and publish.              09:34:39

6            MS. BERTRAND:  Objection; hearsay.

7            THE COURT:  Overruled.  It may be admitted.

8       (Exhibit No. 216 was admitted.)

9   BY MR. RAPP:

10  Q.  Let's look quickly at 216a.  Does that appear also, is that  09:34:52

11  a Backpage ad?

12  A.  Yes, it's the same individual, but now posted in Fort

13  Collins, Colorado.

14           MR. RAPP:  Move to admit 216 and 216a.

15           MS. BERTRAND:  Objection; hearsay.                      09:35:10

16           THE COURT:  Overruled.  It may be admitted and

17  published.

18      (Exhibit No. 216 and 216a were admitted.)

19  BY MR. RAPP:

20  Q.  And what date was this posted on?                           09:35:19

21  A.  The ad is posted Wednesday, February 4th, 2015.

22  Q.  All right.  Can you interpret this language for the jury

23  here?

24  A.  "The ad is not live," status expired, which means that the

25  ad has -- it's probably been live for at least 45 days and      09:35:44
```

1   naturally expired.

2           MS. BERTRAND:  Objection; speculating.  Your Honor,

3   objection; speculation; move to strike.

4           THE WITNESS:  I can be more accurate.

5           THE COURT:  Overruled.                           09:35:58

6   BY MR. RAPP:

7   Q.  What are you basing that on?  What are you basing on the

8   fact that you think it's expired?

9           THE REPORTER:  Speak into the mic, please.

10          THE COURT:  Can you say that again?              09:36:12

11  BY MR. RAPP:

12  Q.  Why is it that you believe it's expired after 45 days?

13  A.  It was a setting that we could set into the category.  So

14  we had varied the settings on occasion, sometimes 30 days,

15  sometimes 45 days, but the default is 45 days.  So it had run  09:36:28

16  for 45 days and the ad had not -- the ad had not been community

17  removed.  It had not been removed by the user.  It just

18  naturally expired.

19          Now, this URL would still resolve, if you weren't

20  directed to the URL, so, you know, if the URL is appearing on a  09:36:50

21  prostitution review site, it will still resolve and take the

22  user to this page.

23  Q.  Can you explain "resolve"?

24  A.  "Resolve" means if you click the link you're going to go to

25  the page, and it was deliberately built that way so that       09:37:05

1  prostitution review sites would want to link to Backpage

2  because the ads that appeared in female escorts, even if they

3  were expired, would still resolve for the user.  They would

4  still be able to come to the ad and see the ad even if it was a

5  year old, even if it was two years old, if they clicked a link          09:37:28

6  that was on a prostitution review site.  That's why

7  prostitution review sites liked that Backpage and linked to

8  Backpage.

9  Q.  All right.  Let's go to, again, there's a reference here to

10 the "REAL PICS," is that something that you would see in                09:38:06

11 Backpage postings?

12 A.  It's a very common content that's in Backpage postings.

13 Q.  And why?

14        MS. BERTRAND:  Objection; calls for speculation as to

15 why a poster would say something in an ad.                              09:38:25

16        THE COURT:  Sustained.

17 BY MR. RAPP:

18 Q.  Well, did you come to learn, based on your now ten, over

19 ten years with the site, as to what, why the real pics would be

20 important?                                                             09:38:43

21        MS. BERTRAND:  Same objection, Your Honor.

22        THE COURT:  Overruled.

23        THE WITNESS:  Yes, and I believe it's 14 years that I

24 ran the site.  It's something that Johns wanted, real pics.

25 They didn't want photos just taken from the Internet, generic          09:38:58

1    photos.

2    BY MR. RAPP:

3    Q.  All right.  And is this an example of photos that were

4    deleted?

5    A.  Yes.                                                    09:39:13

6    Q.  Going on to 216a, is this -- can you tell if this is the

7    same individual?

8    A.  It appears to be the same individual.

9    Q.  And often -- did you often encounter this regarding

10   solicitation prostitution in ads?                          09:39:46

11   A.  Yes, that was common in the text of ads, and sometimes it

12   was text in an image that was attached to the ad.

13   Q.  And what did you come to learn was the reason this was

14   included in the ad?

15        MS. BERTRAND:  Objection, Your Honor, he cannot        09:40:06

16   testify as to what someone's specific intent in their speech.

17   He can talk in generalities, but not about this particular

18   speaker.

19        THE COURT:  Sustained.

20   BY MR. RAPP:                                                09:40:18

21   Q.  Did you see that periodically in ads, that same type of

22   suggestion or representation?

23   A.  Yes, frequently, actually.

24   Q.  All right.  Okay.  I now want to talk about the way the

25   site looked in 2015.  And so, well, first of all, are you    09:41:06

```
1   familiar with the way the site looked in 2015?
2   A.  I am.  I am approving the design changes by the developers
3   in advance and when they are made live.
4   Q.  All right.  And do you, in your capacity from 2004 to now
5   that we are in 2015, on occasion, do you review the site?     09:41:45
6   A.  Every day.
7   Q.  All right.  And in preparation for your testimony, have you
8   looked at three excerpts from the site that are brief videos of
9   the site?
10  A.  I have.                                                   09:42:11
11  Q.  And are those three videos, do they -- are they -- do they
12  accurately portray the way the site not only looked, but
13  functions in 2015?
14  A.  Yes, it does accurately reflect the site for that date.
15  Q.  And I am showing -- and have you reviewed United States    09:42:35
16  489a1, 2 and 3?
17  A.  I have.
18          MR. RAPP:  Move to admit those three excerpts.
19          MS. BERTRAND:  Your Honor, I don't have them on our
20  screen, I don't think.  I am not -- I am not seeing that      09:42:49
21  exhibit.  Did we jump ahead and I was writing?  But I am not
22  sure what exhibit this is we're looking at.
23          THE COURT:  Let me get some clarification.  Excuse me,
24  489, 489a, 489a-1, 2, 3 through 6?
25          MR. RAPP:  Yes.                                        09:43:19
```

1          THE COURT:  I'm not sure what exactly you're moving to

2     admit.

3          MR. RAPP:  I'm moving to admit 489a-1-2-3.

4          MS. BERTRAND:  Objection; lack of foundation; hearsay;

5     potential relevance.                                         09:43:34

6          THE COURT:  Overruled.

7          MR. RAPP:  All right.

8          THE COURT:  So a-1, a-2, a-3 may be admitted and

9     published.

10         MR. RAPP:  Thank you.                                   09:43:58

11       (Exhibit No. 489a-1, a-2, a-3 were admitted.)

12    BY MR. RAPP:

13    Q.  Mr. Ferrer, can you explain what the jury is seeing on

14    their screen?

15    A.  This video going to Backpage Sacramento.  They are       09:44:11

16    searching on Google, they are finding it, they are clicking it,

17    they are in the Sacramento site, clicking escorts.  They are

18    going to click through this disclaimer.

19    Q.  So just so we're clear, who, is it somebody going on the

20    site or is it somebody posting on the site?                  09:44:36

21         MS. BERTRAND:  Your Honor, objection.  I don't know

22    that there is foundation for this witness to say who even is

23    doing this video, and I renew the hearsay objection.  He didn't

24    create this.

25         THE COURT:  Sustained.  Lay some more foundation,        09:44:52

1    Mr. Rapp, with regard to that last question.

2    BY MR. RAPP:

3    Q.  All right.  So what does this demonstrate?  Does this

4    demonstrate somebody, a user or a poster?

5            MS. BERTRAND:  Same objection.                        09:45:13

6            THE COURT:  Sustained.  If he can answer what it

7    demonstrates in his mind.

8    BY MR. RAPP:

9    Q.  What does this demonstrate?

10   A.  This demonstrates how the site looked on March 6, 2015.   09:45:25

11   It's how it looked, how it operated, in Sacramento.

12   Q.  Okay.  Now, just looking at this screen here, can you

13   explain what the jury is seeing on the left, my left side of

14   the screen?

15   A.  So on the left-hand side you're seeing that the ads are   09:45:51

16   sorted by date here, Friday, March 6th.  The newest ads are on

17   top, and this is the number of ads that are coming through at

18   this time.  You can see it's quite a few ads for Friday,

19   March 6th, and they are being posted in Sacramento.

20           And there's two ways the site is making money.  One is  09:46:15

21   users are posting or they are paying to move their ad to the

22   top of the listing, and the other way is the sponsor ads over

23   here that they pay a premium fee for.

24   Q.  All right.  Let's look at these just so they understand,

25   this one quickly.  Is this a sponsor ad?                      09:46:35

1  A.  Yes, that's a sponsor ad.

2  Q.  All right.  And then is this also a sponsor ad?

3  A.  That is a sponsor ad that the company was donating to

4  Children of the Night.

5  Q.  Did they allow them to put this ad on their -- wait a          09:46:59

6  minute, when you say -- who -- who was paying for the sponsor

7  ad or donating for the sponsor ad?

8  A.  Children of the Night is an organization, and we had

9  donated this sponsor space for them, but we're really not

10 working with NCMEC anymore as much, so we're working perhaps    09:47:20

11 with children -- we're working with Children of the Night more.

12 So we give them this space.  It's anchored.  It's always going

13 to be on the second -- it's always going to be the second

14 sponsor ad on the right, and so they gave me the ad text.

15         MR. CAMBRIA:  I object to this as not being            09:47:43

16 responsive.  The question was, who donated this.

17         THE COURT:  Yes, and I think that's been answered

18 sufficiently.

19         Move on, Mr. Rapp.

20 BY MR. RAPP:                                                     09:47:53

21 Q.  So if I understand, Backpage donated to have this sponsor

22 ad placed on the website?

23 A.  Right.  We donated this space and they gave me the ad text.

24 I created it.

25 Q.  All right.  And when you say "they" or "we donated," is     09:48:10

UNITED STATES DISTRICT COURT

1    there anybody specifically that you discussed this sponsor ad

2    with?

3    A.   Jim Larkin.  He wanted this done.

4    Q.   All right.  And where it says, "Tired of turning tricks?"

5    Do you have any idea what that means?                            09:48:31

6    A.   Yes.

7    Q.   What does that mean?

8    A.   This organization is focusing on juvenile prostitutes and

9    they are reaching out to them and telling them that if you're

10   "Tired of turning tricks?  Pimps don't care.  We do.  Call this 09:48:49

11   800 number, and they would get phone calls and then provide

12   services.

13   Q.   And then the other sponsor ad here?

14   A.   There's another sponsor ad.  They pay a premium for this

15   sponsor ad.  Their ad is also --                                09:49:16

16          MS. BERTRAND:  Objection, Your Honor, nonresponsive,

17   move to strike.  The question was, is this another banner ad?

18          THE COURT:  Sustained.

19   BY MR. RAPP:

20   Q.   Can you explain the nature of this particular banner ad?   09:49:26

21   A.   We called them sponsor ads, actually, and the nature of the

22   sponsor ad is that you could have your listing appear on the

23   left and have your listing appear on the right as a sponsor ad.

24   It's highlighted in yellow.  If you click that link, it will go

25   directly to the posting.                                        09:49:51

1   Q.  All right.  Now, what does this show?

2   A.  This shows the -- the consumer going to more ads on the

3   site, just clicking more listings, going to the ad.

4           MS. BERTRAND:  Objection, Your Honor, as to

5   "consumer."  I don't -- we can talk about this, but --                 09:50:23

6           THE COURT:  Overruled --

7           MS. BERTRAND:  -- I think that's inaccurate.

8           THE COURT:  Well --

9           MR. RAPP:  Maybe I can address that.

10          THE COURT:  I am going to overrule the objection,            09:50:37

11  Mr. Rapp.

12  BY MR. RAPP:

13  Q.  What did you mean -- what did you mean by "consumer"?

14  A.  I meant the consumer's user experience.  This is a

15  demonstration of how the site operated and how it looked on           09:50:49

16  March 6th, 2015.

17  Q.  And then you see the date of the posting where, here?

18  A.  I see it there, and it's also in the screenshot down here.

19  Q.  Okay.  In terms of the number of images in March of 2015,

20  how many images were allowed on a particular posting?                 09:51:47

21  A.  We increased that number from four to eight to 12, so the

22  number was going up.  I believe it was up to 12 at this time.

23  It could be eight.  I think it was eight.  That's the number

24  that I'm seeing.

25  Q.  And so I just want to pause on this particular one, do you        09:52:21

1    see this up here?

2    A.  Yes, I do.

3    Q.  Where it said "seeking reviews," what, if anything, did

4    that mean to you?

5              MS. BERTRAND:  Objection, Your Honor, same speculation     09:52:36

6    as to what this specific speaker intended with their speech.

7    He's --

8              THE COURT:  Overruled.  As to -- the question was,

9    what it mean to you.  What, if anything, did it mean to you?

10   So overruled.                                                        09:52:51

11             THE WITNESS:  So "seeking reviews" means that this

12   user wants Johns to post reviews in the prostitution review

13   sites.

14   BY MR. RAPP:

15   Q.  And --                                                          09:53:07

16   A.  That usually means she's going to give a good experience.

17             MR. CAMBRIA:  Objection, Your Honor, not responsive.

18             MS. BERTRAND:  Objection to relevance.  The quality of

19   the experience is not relevant.

20             THE COURT:  Sustained.                                     09:53:29

21   BY MR. RAPP:

22   Q.  All right.  So we've looked at some Google Analytics

23   reports, do you remember those exhibits?

24   A.  Yes.

25   Q.  And do you recall what the top four referral sites were on       09:53:40

1  the Google Analytics reports that we've seen?

2  A.  Yes.

3  Q.  And can you tell the jury, just remind the jury what those

4  sites were?

5  A.  The Erotic Review, U.S. Sex Guide, eccie, I might be          09:53:56

6  missing one, maybe Naughty Reviews.  There is another one.

7  Q.  All right.  Fair enough.  And so when when you would see a

8  posting that referenced a review, did it have something to do,

9  based on your experience with the referral sites that were,

10 that detailed the referral traffic on the Google Analytics      09:54:30

11 report?

12          MS. BERTRAND:  Objection.  Same objection.  Only the

13 speaker can tell us what their intention was with their words.

14          THE COURT:  I think the question is confusing,

15 Mr. Rapp.  If you can shorten the question, perhaps it won't     09:54:46

16 draw an objection, but I will sustain.

17 BY MR. RAPP:

18 Q.  What does "seeking reviews" on a posting mean to you in

19 your position at Backpage?

20          MS. BERTRAND:  Same objection.                          09:55:02

21          THE COURT:  Overruled.

22          THE WITNESS:  "Seeking reviews" means you want to have

23 a review on the prostitution review site, and you want it to be

24 a good review, which means it will be a good experience.

25 BY MR. RAPP:                                                     09:55:17

1    Q.  All right.  With respect to in-call and out-call available,

2    what, if anything, did that mean to you?

3           MS. BERTRAND:  Same objection as to what is meant by a

4    specific speaker's speech.

5           THE COURT:  Well, the question was:  What did it mean          09:55:30

6    to you?  So overruled.

7           THE WITNESS:  In-call means the prostitute, you need

8    to go to the prostitute.  Out-call means the prostitute comes

9    to you.

10          MS. BERTRAND:  Your Honor, objection move to strike as          09:55:44

11   to the description of someone as a prostitute.

12          THE COURT:  Overruled.

13   BY MR. RAPP:

14   Q.  And just highlighting a particular portion, what did this

15   mean to you based upon your experience in reviewing postings on       09:56:09

16   Backpage?

17          MR. FEDER:  401, 403, hearsay, speculation.

18          THE REPORTER:  Is that Mr. Feder?

19          THE COURT:  Yes, it was Mr. Feder.  Overruled..

20          THE WITNESS:  "I do not offer $40, $50, $60 specials"          09:56:30

21   means that she's not going to offer a quickie service,

22   30 minutes or less type of service.

23          MS. BERTRAND:  Same objection as to the intention

24   behind this ad.

25          THE COURT:  Overruled.  I think he can testify based           09:56:49

1  on his experience, his knowledge, his 15 years in the company

2  seeing these ads, so on and so forth.  I think that foundation

3  has been laid sufficiently, Ms. Bertrand.

4          Let's move forward, Mr. Rapp.

5          MR. RAPP:  Yes, ma'am.                                09:57:04

6  BY MR. RAPP:

7  Q.  On this one, pause it for a minute.

8          THE COURT:  When you say "this one," Mr. Rapp, can you

9  identify the exhibit?

10         MR. RAPP:  For the record, this is 49 -- 48 --          09:58:23

11  489a-1, and this is one of the postings on March 6th, 2015.

12  BY MR. RAPP:

13  Q.  My question is, this portion of the posting, what, if

14  anything, did this mean to you?

15  A.  $300 for an hour, $200 for a half hour, $125 for          09:58:48

16  15 minutes.

17  Q.  Based on your experience with the website and reviewing it,

18  what, if anything, did that mean to you?

19         MS. BERTRAND:  Same objection.

20         THE COURT:  Overruled.                                 09:59:09

21         THE WITNESS:  15 minutes means it's a quickie; it's

22  oral sex.

23         MS. BERTRAND:  Objection, Your Honor, there is no way

24  to know from this what service is going to happen in 15 minutes

25  to the extent it's a 15-minute service.                      09:59:22

1          THE COURT:  Sustained.

2          MS. BERTRAND:  Your Honor, I'd ask to make a record.

3    That as we sit here in silence, the government appears to just

4    be going through posts and clicking on them and perusing them.

5          THE COURT:  What is --                              10:00:05

6          MS. BERTRAND:  That's what I just ask.  I am sorry.

7          THE COURT:  Sorry, what are you making a record or --

8          MS. BERTRAND:  Yes, please, I'd ask that a record be

9    made on that.

10         THE COURT:  Is there a question, Mr. Rapp?          10:00:16

11         MR. RAPP:  I'm just showing the website.

12         THE COURT:  All right.

13   BY MR. RAPP:

14   Q.  All right.  I now want to show you 489a-2.  Can you explain

15   to the jury what they are seeing here?                    10:00:51

16   A.  This is the posting process.  You pick a category and then

17   you're going to click through these posting rules pages.  This

18   poster is posting in the escorts category.

19   Q.  All right.  And this portion of it, who would see this step

20   one on the website, on this part of the website, who would see  10:01:19

21   this?

22   A.  So this is the individual posting an ad in the female

23   escorts category.  So this --

24   Q.  And so --

25         MR. FEDER:  Object as to 106.  He's skipping the steps  10:01:43

```
1    and as a result it's out of context.
2            THE COURT:  Sorry, skipping steps?
3            MR. FEDER:  Steps of going through the site.
4            THE COURT:  Yes, Mr. Rapp, go ahead and go through
5    the -- if you're going to do that with the exhibit as you did      10:02:00
6    the previous exhibit, you can maintain that process.
7    BY MR. RAPP:
8    Q.  What steps are being missed here?
9            THE COURT:  Well, my understanding is Mr. Feder
10   believes that there are pages that are being skipped.              10:02:17
11           MR. FEDER:  Age verification, things like that.
12           MR. RAPP:  Well, wait a minute.  Let me just go
13   through this so everybody is clear.
14   BY MR. RAPP:
15   Q.  Let's just start with the top, what does this say, what        10:02:32
16   does this tell somebody going on to post an ad?
17   A.  Step one, write ad.
18   Q.  Then when you're done with step one, what do you do?
19   A.  Then you would preview the ad.  I don't understand where
20   there is a missing step.                                           10:02:59
21   Q.  All right.  Well, let's just go step by step here so there
22   is no -- what is this, what would you write in this box here,
23   this yellow box on your screen?
24           MR. EISENBERG:  Your Honor, excuse me, if we're going
25   step by step, I think we ought to go back to the very              10:03:13
```

```
 1    beginning.  We didn't linger on that first slide or whatever it
 2    is.
 3             THE COURT:  All right.  Yes, Mr. Rapp, we will proceed
 4    in that way.
 5             MR. RAPP:  Judge, it's a video.                        10:03:27
 6    BY MR. RAPP:
 7    Q.  Does this show -- if somebody was going to go post an ad,
 8    is this the steps they would take in posting an ad?
 9             MR. EISENBERG:  Your Honor, sorry, has the Court
10    overruled my objection?  I believe we should go back to the     10:03:42
11    beginning.
12             THE COURT:  Yes, I did say, Mr. Rapp, you should go
13    back to the beginning of the exhibit and let's take this one, I
14    guess, video shot at a time as you did the previous exhibit.
15    BY MR. RAPP:                                                    10:04:10
16    Q.  What is this?
17    A.  Picking a category, then they are going to the posting
18    rules page, and then hit continue.
19    Q.  Let's go through the posting rules.  This is the posting
20    rules that somebody posting an ad would see?                    10:04:23
21    A.  Yes.
22    Q.  All right.  And let's just go, for example, to the first
23    bullet point, what is the first posting rule that somebody
24    posting an ad would have to review?
25    A.  "I will not post obscene or lewd and lascivious graphics or 10:04:44
```

1  photographs which depict genitalia, actual or simulated sexual

2  acts or naked images."

3  Q.  All right.  What is the second bullet point of the posting

4  rules?

5  A.  "I will not post any solicitation directly or encoded          10:05:01

6  fashion for any illegal service, including exchanging sexual

7  favors for money or other valuable consideration."

8  Q.  And what else did a prostitute posting on the site, what

9  else would they have to agree to in the posting rules?

10  A.  "I will not post any material on the site that exploits       10:05:24

11  minors in any way."

12  Q.  And fourth?

13  A.  "I will not post any material on the site that in any way

14  constitutes or assist in human trafficking."

15  Q.  And the last one?                                             10:05:41

16  A.  "I am at least 18 years of age or older and not considered

17  to be a minor in my state of residence."

18  Q.  All right.  Just so we're clear here, is there any -- does

19  the person posting have to show up anywhere to acknowledge

20  these rules, provide any I.D., anything to a human person other  10:06:04

21  than just agreeing on this site that they are -- that they will

22  comply with these rules?

23          MS. BERTRAND:  Objection --

24          MR. FEDER:  Objection; relevance and First Amendment.

25          MS. BERTRAND:  -- leading and compound by, in fact,      10:06:28

```
 1    there are three or four.
 2             THE COURT:  Yes, it is leading, Mr. Rapp.
 3    BY MR. RAPP:
 4    Q.  What would a poster have to do to comply with these terms?
 5    A.  They could click "Continue" and they would arrive on the        10:06:40
 6    posting form.
 7    BY MR. RAPP:
 8    Q.  When you said "Continue," do you mean the blue?
 9    A.  This button right here, they just click "Continue."
10    Q.  All right.  And just so we're clear, by pressing that           10:07:05
11    "Continue" button, does that in some way demonstrate that they
12    are acknowledging these posting rules?
13    A.  It does state:  You agree.  I guess when you click
14    "Continue" you're agreeing, but it didn't seem as though it was
15    followed much.                                                      10:07:33
16    Q.  All right --
17             MR. FEDER:  Objection; move to strike.
18             MS. BERTRAND:  Objection.
19             THE COURT:  Sustained.  The jury will disregard the
20    last portion.                                                       10:07:41
21             MR. FEDER:  It seems to be a common thread.  Please
22    advise the witness to stop it.
23             THE COURT:  Mr. Feder, the jury will disregard all
24    after "agreeing."
25             And again, Mr. Ferrer, just listen to the question and    10:07:54
```

1    answer it if it calls for a yes or no, and then Mr. Rapp can

2    follow up.

3              THE WITNESS:  Yes, Your Honor.

4    BY MR. RAPP:

5    Q.  So now we've jumped ahead to the "Write Ad" portion, is          10:08:06

6    that the portion that comes after clicking "Continue"?

7    A.  Yes, after clicking "Continue" you go to step one, "Write

8    Ad."

9              MR. EISENBERG:  Your Honor, excuse me, we left out in

10   the previous screen yet another warning.                            10:08:27

11             THE REPORTER:  Mr. Eisenberg, speak into the mic.

12             MR. EISENBERG:  I'm sorry.  There was a red banner

13   that we didn't address in the previous screen.

14             THE COURT:  Well, I think Mr. Rapp can ask questions

15   about his exhibit as he wishes to, and you can follow up on          10:08:50

16   cross-examination.

17             Mr. Rapp, please proceed.

18   BY MR. RAPP:

19   Q.  Thank you.  So we're at the -- now what happens when you

20   come here to step one, what would somebody do?                       10:09:04

21   A.  Well, now you would create the ad, step one, "Write Ad."

22   So you're going to fill out the title of your ad.

23   Q.  That's where you put the title of the ad?

24   A.  Yes.

25   Q.  So for example, we've looked at some exhibits earlier this       10:09:31

1   morning, and we talked about that title of the ad that said,

2   "New In Town," do you remember that?

3   A.  Yes.  This is where they would put in "New In Town" if they

4   were using that ad text.

5   Q.  All right.  And then once you put the title in, what goes          10:09:49

6   here in the description portion?

7   A.  So here they would write the prices, descriptions of

8   themselves, any other kind of information that would help their

9   ad be successful.

10  Q.  All right.  And then down here, what type of information --        10:10:18

11  what type of personal information would you have to provide

12  after you wrote the description?

13  A.  You would have to put in your age, and then your e-mail

14  address, and you'd have to put it in twice.

15  Q.  Why do you put it in twice?                                        10:10:49

16  A.  Just to confirm that you put in the correct e-mail address

17  because a link is going to get made, e-mailed to them to manage

18  their ad.

19  Q.  All right.  We've talked a little bit in your testimony

20  about this notion of "Move to the top" and auto repost, where         10:11:09

21  does that fit in here?

22  A.  So "Move to the top" is not going to be an option here

23  because it's a new ad, but auto repost, it's featured below.

24  You see at the bottom "Ad video"?

25  Q.  Yes.                                                              10:11:33

1    A.  Then there is "Ad photos," and then you could pick auto

2    repost, but "Move to the top" is an ad that has already been

3    created that you would just click a link and pay again, and

4    then the ad's posting date is refreshed so it appears on the

5    top of the listings.                                          10:11:53

6    Q.  And just to pick up, what's down here, can you explain the

7    display options?

8    A.  This is a feature where if you wanted to show the links to

9    your other postings you would click this.  But if you were

10   posting for many other people, well, then you may not want     10:12:16

11   to -- you may not want to have this clicked.  You would unclick

12   it.

13   Q.  Can you explain that to the jury?

14   A.  Like Dollar Bill, Somad, Sean Kim in New York City posted

15   thousands of ads so they wouldn't want this feature to be       10:12:33

16   clicked.

17   Q.  And why wouldn't they?

18   A.  Because then it would --

19          MR. FEDER:  Speculation.

20          THE COURT:  Sustained.                                   10:12:43

21   BY MR. RAPP:

22   Q.  Wait a minute, how long had you been working with the super

23   posters, Dollar Bill, Somad, Sean Kim, how long had you been

24   working for them?

25   A.  Since 2006 right up in this site's closure.                 10:12:57

UNITED STATES DISTRICT COURT

```
1    Q.  Did you have any discussions with them about how they would

2    go about posting their ads?

3    A.  Yes.

4    Q.  And is one of the -- did you learn from those discussions

5    and in those relationships, why they wouldn't want to click          10:13:20

6    this option?

7            MR. FEDER:  Hearsay.

8            THE COURT:  Overruled.

9            THE WITNESS:  Yes.  They told me.

10   BY MR. RAPP:                                                          10:13:32

11   Q.  All right.  And why was that?

12   A.  We --

13           MR. FEDER:  Hearsay.

14           THE COURT:  Overruled.

15           THE WITNESS:  Why is because if you went to an                10:13:38

16   individual ad and it had links to a thousand postings, well,

17   then it wouldn't look independent.

18   BY MR. RAPP:

19   Q.  Why was that important to look independent?

20           MR. FEDER:  Hearsay.                                          10:13:50

21           THE COURT:  He can answer, in his opinion.

22           THE WITNESS:  In my opinion, Johns are not looking for

23   prostitutes working for an agency.  They are looking for

24   independents, and you often saw "independent" in a lot of

25   postings as kind of like a selling feature.                          10:14:14
```

UNITED STATES DISTRICT COURT

1    BY MR. RAPP:

2    Q.  All right.  And so now where would you put your images?

3    A.  So the images are further below.

4    Q.  All right.  Is it below where it says "Add video"?

5    A.  It is.  It's below, it's below "video."                        10:14:38

6    Q.  And we've talked a little bit about the video, and so is

7    this something that was present on Backpage at its inception or

8    is this something that came later on?

9    A.  It came later on as mobile phones became very popular and

10   people had a video camera in their hand, and it was a very        10:15:04

11   popular feature.

12   Q.  All right.  And so the moderators like Mr. Padilla and

13   Ms. Vaught and the people who worked underneath them, can you

14   explain to the jury how they would go about moderating the

15   videos in the postings?                                           10:15:27

16   A.  So we had individuals moderating videos, but you would have

17   to watch the entire video and you really couldn't catch up, and

18   there was just so much videos coming in that it became very

19   impractical to moderate the videos.

20   Q.  All right.  Did there come a time where you ceased to         10:15:48

21   moderate the videos?

22   A.  There was continued moderation, but it would be spotty

23   because you never knew during the video when they might sneak

24   in nudity or a sex act.

25   Q.  All right.  Let's look at Exhibit 489-3.  Now, can you        10:16:09

1    explain what we're looking at here?

2    A.  So this is gallery view.  It's a development that we added

3    to the female escorts category.  It's something that porn sites

4    and dating sites were doing.  Instead of looking at a text

5    heavy page, you looked at pictures, which made it easier to          10:16:52

6    shop.

7    Q.  All right.  And so when you say it's "easier to shop," what

8    do you mean by that?

9    A.  So if you're looking for a particular type of individual,

10   you could see her pictures, and then you could put your mouse        10:17:17

11   over that picture and then it will cycle through all of the

12   pictures for that particular posting.

13   Q.  And can you explain what this portion of the gallery view

14   is where it has the series of numbers to ten?

15   A.  Yes.  If you -- so you're on page 1, then you could go to        10:17:40

16   page 2 would be another 30 ads, go to page 3, another 30 ads,

17   and so forth.  So there's just hundreds of ads posted.  These

18   are all on March 6th around 8:00 a.m. in the morning, and you

19   go through these postings and sort it with the newest ad first.

20   Hundreds of postings per day in Sacramento.                         10:18:11

21   Q.  So are we to understand if you're on one, this is the first

22   gallery that you would see if you went to the gallery view?

23   A.  Yes.  If you click gallery view, you would be on page 1 of

24   female escorts in the gallery view.

25   Q.  And you have talked about the "Move to the top," can you        10:18:35

1    explain how the "Move to the top" fits in with this, with this

2    series of numbers here?

3    A.  So the -- your ad will stop getting calls if it gets buried

4    in page 3, page 4.

5    Q.  What about page 10?                                              10:18:59

6    A.  It's so buried.  The -- I found that users were posting,

7    buying "Move to the top" so that they could remain on page 1

8    and make their phone ring and make appointments.

9    Q.  All right.  And they paid additional monies for that to

10   happen?                                                             10:19:23

11   A.  They did.  They paid the full rate of the ad again, and

12   when they paid they --

13          MR. EISENBERG:  Objection, Your Honor, it's not

14   responsive.  It was a narrative.

15          THE COURT:  Sustained.                                       10:19:35

16          THE WITNESS:  I apologize, Your Honor.

17   BY MR. RAPP:

18   Q.  When you are saying -- I think it might be my fault.  When

19   you are saying, "when they paid," could you go -- can you

20   finish that statement?  What did that mean "when they paid" as     10:19:47

21   it affected the placement of their posting?

22   A.  So when they pay the full $10 in this category, the ad

23   moves back to the top by refreshing the post, posting date to

24   today's date and the current time.  Since the ads are sorted by

25   date, it will go to the top where it gets just maximum             10:20:17

```
 1   exposure.
 2            MR. EISENBERG:  Objection, Your Honor.
 3            MS. BERTRAND:  Join.
 4            THE COURT:  Overruled.
 5   BY MR. RAPP:                                            10:20:29
 6   Q.  All right.  Let's -- so does this show now if you saw where
 7   the hand click, that's now going to the second one, is this
 8   what they would see in the second gallery?
 9   A.  Yes.  This is the view of the ads in the second page, still
10   on March 6th, and now we're on the third page.  This is the     10:20:57
11   fourth page.  This is the fifth page.  These are ads that are
12   on March 5th.
13   BY MR. RAPP:
14   Q.  And that's the day before the first page?
15   A.  Yes.                                                 10:21:42
16   Q.  And all of these ads have gone in March of 2015 have gone
17   through some level of moderation?
18            MS. BERTRAND:  Objection; calls for speculation as to
19   what ads have been moderated.
20            THE COURT:  Sustained.                          10:22:09
21   BY MR. RAPP:
22   Q.  Do you know?
23   A.  Yes, these ads were moderated.
24            MS. BERTRAND:  Same objection.
25            THE COURT:  Overruled.                          10:22:15
```

1    BY MR. RAPP:

2    Q.  So in one of the ads it shows genitalia, any explanation

3    how that got through the moderation?

4    A.  It happened, and users could edit their post at any time.

5    Q.  And what do you mean by that, they could edit at any time?   10:22:34

6    A.  So the ad might have past moderation, and then they go into

7    their management edit link, they click that and then they

8    change the pictures.

9    Q.  All right.

10   A.  And the ad goes into a queue, but we just have so many ads   10:22:48

11   that we're not getting to the edited ads queue.

12   Q.  And is the Sacramento market that we're looking at, the

13   gallery view, how would you compare Sacramento market to, for

14   example, the Phoenix market?

15         MS. BERTRAND:  Objection, Your Honor, vague as to   10:23:11

16   compare, compare what?

17         THE COURT:  Sustained.

18   BY MR. RAPP:

19   Q.  How would you compare it in terms of the volume of

20   postings?   10:23:18

21   A.  The Phoenix market is larger.

22   Q.  Would the Phoenix market have more postings on any given

23   day than Sacramento?

24   A.  That's my recollection.  The market generated more money

25   than Sacramento.   10:23:33

```
 1   Q.  All right.  Okay.  So in March of 2015, did Michael Lacey
 2   own this website?
 3   A.  Yes.
 4   Q.  Did Scott Spear own this website?
 5   A.  Yes.                                                        10:24:02
 6   Q.  Did this Chief Financial Officer of Backpage.com have an
 7   ownership interest in this website?
 8   A.  Yes, Jed Brunst.
 9   Q.  And was Andrew Padilla and Joye Vaught on March 6th, 2015,
10   were they in charge of the moderation for the website?         10:24:23
11   A.  Yes.
12   Q.  All right.
13           MR. RAPP:  Going onto a different area.  Happy to keep
14   going, Judge, if you want to take a break.
15           THE COURT:  No, you can forge ahead for a few more      10:24:40
16   minutes.
17           MR. RAPP:  Sure.
18   BY MR. RAPP:
19   Q.  Now, what happened in April of 2015?
20   A.  In April of 2015 there was a transaction that put the      10:24:51
21   Backpage assets under my name.
22   Q.  Can you explain how that came about?
23   A.  We had numerous meetings with Jed Brunst, Jim Larkin,
24   Michael Lacey, where we came up with a plan to have Backpage
25   owned by a Dutch entity, and that they would put the company in 10:25:20
```

1  my name, and then I would have a note to pay them principal and

2  interest for $600 million.

3  Q.  Where did those discussions about you purchasing

4  Backpage.com, where did those discussions take place?

5  A.  We had numerous meetings in Amsterdam.                    10:25:48

6  Q.  All right.  What was the reason that the meetings took

7  place in Amsterdam?

8  A.  The reason why the meetings took place in Amsterdam is

9  that's where we had -- we created Ad Tech BV to buy Cracker in

10 January, so that's -- that was the -- decided would be the sort  10:26:12

11 of new corporate office.

12 Q.  All right.  And so did everybody in Phoenix and Dallas move

13 to Amsterdam?

14 A.  No one moved to Amsterdam.

15 Q.  When you say the "corporate office" in Amsterdam, what --   10:26:31

16 can you describe what it was?

17 A.  Well, I'm trying to remember the org chart.  It's extremely

18 confusing.  There were a lot of companies set up in order to

19 hide the ownership, so --

20 Q.  Why were they trying to hide the ownership?             10:26:58

21 A.  Reputational risk, you know, so we wanted it to appear that

22 it was owned by a Dutch entity.

23 Q.  All right.  And do you recall what the name of the Dutch

24 entity was?

25 A.  Well, let's start, let's see, we had Ad Tech BV.  That was  10:27:15

held by a holding company that was then held by -- there was

another company in Curacao.  It would be helpful if we had the

org chart up.  Even I have a hard time explaining it.

Q.  All right.  But in any event, can you explain how the

actual transaction was consummated?          10:27:45

A.  Yes, there were hundreds of pages of documents that were

signed in early April that ultimately put the company in my

name, and then I was -- I was tasked -- my job description

didn't change.

Q.  What do you mean by that?  What do you mean your job          10:28:15

description, you just bought the company?

A.  Well, I would continue to draw a salary that was

negotiated.

Q.  Who would pay the salary, who decided what salary was to be

paid?          10:28:30

A.  So this was negotiated with the owners through their agent.

Q.  All right.

A.  They had a broker that I had to deal with, and there was no

negotiation on the price.

Q.  All right.  Why wasn't there a negotiation on the price?          10:28:46

A.  In fact, the price just kept going up.

Q.  What did the price start at?

A.  Like, I believe it was hundreds of millions less.  The

price went up to 600 million.  Then they were -- the agent told

me the owners were concerned that they were selling it for too          10:29:05

1  cheap and that they wanted to add a provision that would allow

2  them to make up to a hundred million more if the site continued

3  on the path of success.

4  Q.  All right.  And how successful, we talked about 2012 and

5  '13 and '14, how successful was the company in March or in          10:29:24

6  April rather of 2015?

7  A.  Well, it was very successful, record revenue profits, and

8  we hadn't had the credit card apocalypse happen yet, so revenue

9  was good.

10 Q.  All right.  And so when you say your -- what were your        10:29:48

11 duties after the sale was consummated?

12 A.  My duties were the same that I had as an employee.  In

13 fact, I had the same responsibilities as an employee, and I had

14 to sign an Employment Agreement.

15 Q.  You had to sign an Employment Agreement with whom?           10:30:13

16 A.  It was part of the transaction documents that, you know, I

17 couldn't have any other employment; I would only do this job.

18 I also could not open up bank accounts without their

19 permission.

20 Q.  Without whose permission?                                    10:30:33

21 A.  Without the owners', the real owners' permission.

22 Q.  Which were?

23 A.  They like to refer to themselves as the sellers or the

24 bankers.

25 Q.  All right.  And but you had to sign an employment contract   10:30:47

1    with the owners.  And just so we are clear for the record, who

2    are the owners?

3    A.  So the owners are Scott Spear, Jed Brunst, Michael Lacey,

4    Jim Larkin.

5    Q.  All right.                                                    10:31:02

6         THE COURT:  Mr. Rapp, I think we should take our

7    morning break now.

8         MR. RAPP:  Yes, ma'am.

9         THE COURT:  Members of the jury, please remember the

10   admonition.  We will stand in our morning recess for about       10:31:12

11   20 minutes.  So be prepared to come in at ten to the hour, and

12   just have a pleasant break.  All right.  We will stand at

13   recess.  Please all rise for the jury.

14                    (Jury is not present.)

15                    (Recess taken at 10:32 a.m.)                     10:32:06

16              (Proceedings reconvened at 10:54 a.m.)

17        THE COURT:  All right.  Let's go ahead and have the

18   jury in.

19        MR. STONE:  Your Honor, would you indulge me for

20   30 seconds to correct the record on the exhibits?                10:54:12

21        THE COURT:  Yes.

22        MR. STONE:  So just a slight confusion on the three

23   videos, 489a.  The correct exhibit is 489a-1.  On your exhibit

24   list before you is 489-a1.  It's not the best naming system,

25   I'll admit, but what I've done is sent an e-mail to all the      10:54:35

```
 1    parties and the Court that puts 489a-1, a-2 and a-3 to the back

 2    of the exhibit list.  Those were the three videos that were

 3    admitted.

 4              THE COURT:  So they are something different than this

 5    a1, a2, a3?                                                      10:54:53

 6              MR. STONE:  Yes, Your Honor.

 7              THE COURT:  And defense counsel had prior --

 8              MR. STONE:  Yes, Your Honor, we sent those video clips

 9    to the defense counsel on Sunday.

10              THE COURT:  Okay.  All right.  Let's move forward.     10:55:08

11              MR. STONE:  Thank you, Your Honor.

12                        (Jury is present)

13              THE COURT:  All right.  Please be seated.  And the

14    record will reflect the presence of our jury.

15              And Mr. Rapp, please continue.                        10:56:16

16    BY MR. RAPP:

17    Q.  When we broke, Mr. Ferrer, you had just bought the website,

18    April 2015.

19    A.  Yes.

20    Q.  After you bought the website, what types of changes as the  10:56:29

21    new owner could you make to the website?

22    A.  I could make, you know, obviously cosmetic changes, user

23    experience changes, but there were many changes that I could

24    not make.

25    Q.  Like what, for example?                                     10:56:50
```

1    A.  Well, I couldn't change the nature of the business.  I

2    couldn't shut down a category.  To shut down the adult section

3    would have been a major change in the nature of the business,

4    and I was forbidden.

5    Q.  What about banking, what could you do in that regard?                    10:57:09

6    A.  With the transaction, I was able to sign bank agreements,

7    but I needed to get permission in advance on what the banking

8    strategy was, what banks we intended to sign, and I had regular

9    meetings and briefings that would, to Jim Larkin and his agent,

10   about the continual efforts that we were having in banking.  So   10:57:42

11   I could sign an agreement, but I had to tell them which banks

12   and get their permission.

13   Q.  All right.  So just so we're clear, there's the merchant

14   bank and the treasury bank, are we talking about both banking?

15   A.  We're talking about both.  We had lost our treasury           10:58:02

16   banking.  We kept getting kicked out of banks and we were

17   having to open up new banks with new corporate names.

18        MS. BERTRAND:  Your Honor, objection, move to strike

19   as nonresponsive.  I believe this was a yes or no answer

20   question.                                                          10:58:19

21        THE COURT:  Well, the question was, "So just so we're

22   clear, there's the merchant bank and the treasury bank, are we

23   talking about both banking?"

24        It's unclear.

25   BY MR. RAPP:                                                       10:58:35

UNITED STATES DISTRICT COURT

```
1    Q.  Let's just take merchant banking so the jury is clear.

2    Where were you on merchant banking on April of 2015?

3    A.  At the time of the transaction?

4    Q.  Yes.

5    A.  Well, we were relatively stable.  We had low balanced our        10:58:49

6    merchant banking, which is credit card processing, with

7    multiple European banks.

8    Q.  All right.  And then what about the treasury bank?

9    A.  The treasury banks were also relatively stable at that

10   time, however, we soon got notice that, you know, BMO was going      10:59:12

11   to terminate our account.

12   Q.  And now, so you bought it for 600 million?

13   A.  Correct.

14   Q.  And I believe, you've already testified to this, but just

15   so we're clear, do you write them a check for 600 million?          10:59:36

16   A.  I did not write them a check for 600 million.  I had a

17   payment plan with 7 percent interest.

18   Q.  All right.  And so what was the payment plan?  What did you

19   have to pay, for example, on a monthly or quarterly basis?

20   A.  Well, I recall the first payment was 11 million per month.      10:59:59

21   Subsequent payments were 8 million a month.  I was able to make

22   the payments for about three months.

23   Q.  All right.  And so where did you send those payments?

24   A.  So those payments went to Cereus Properties, which was

25   where I was directed to send the payments.                          11:00:26
```

UNITED STATES DISTRICT COURT

Q.  Who directed you to send the payment to Cereus Properties?

A.  Jed Brunst.

Q.  All right.  And what, if anything, did you know about Cereus Properties?

A.  What I know of Cereus Properties is that it's a company that is in Phoenix, Arizona held by Jim Larkin and Michael Lacey, Jed Brunst, Scott Spear.

Q.  All right.  And so going forward, out of the owners that you've identified, is there -- is there one owner that you dealt with regarding not only the sale, but the payments after the sale?

A.  Yes, there is.

Q.  And so just to be clear on the month, who is it?

A.  Jed Brunst.

Q.  Okay.  And to be clear, the money that you're paying on a monthly basis, what is the source of that money?

A.  That $8 million payment, the source of that money is the revenue that's coming from Backpage operations.

Q.  Yeah.  And where is the majority of that money being generated from Backpage?

A.  Like before the transaction, the majority of the funds are coming from the adult section, especially the female escorts section.

Q.  All right.  Let's just look at a few e-mails here.  You have 1213 on your screen?

11:00:41
11:01:15
11:01:37
11:02:04
11:02:23

1    A.  Yes, I do.

2    Q.  What is it?

3    A.  This is an e-mail from Jed Brunst to myself.  The

4    attachment is "BP Sale of Business Summary Draft."  The subject

5    is "backpage update slides," and it's sent on February 5th,          11:02:42

6    2015.

7              MR. RAPP:  Move to admit.  Request admission to

8    publish.

9              MR. LINCENBERG:  No objection.

10             THE COURT:  Yes, it may be admitted and published.          11:02:55

11             (Exhibit 1213 was admitted.)

12   BY MR. RAPP:

13   Q.  All right.  So what is Mr. Brunst telling you in this

14   e-mail with the subject in the attachments, what is he telling

15   you here?                                                            11:03:12

16   A.  He's telling me about a couple of months before the final

17   transaction that "here is the final structure."  It's kind of

18   like the organizational plan on the number of companies to be

19   opened up, created.

20   Q.  Let's look at 875.  All right.  Is this an e-mail?  What is      11:03:34

21   this?

22   A.  This is an e-mail from Jed Brunst to Carl Ferrer, sent on

23   February 24th, 2015.  It's "info for hsr filing."

24             MR. RAPP:  Move to admit and publish 875.

25             MR. LINCENBERG:  No objection.                            11:04:13

1          THE COURT:  Yes, it may be admitted and published.

2          (Exhibit No. 875 is admitted)

3    BY MR. RAPP:

4    Q.  What is Mr. Brunst telling you in this e-mail?

5    A.  He is stating, "Carl, can you please compile a zip file          11:04:27

6    containing all the presentations you have for backpage?

7    Include the confidential memorandum (teaser) as well.  Also

8    anything you have which discusses the competition."

9    Q.  Do you know why he's seeking this information?

10   A.  Well, I believe there are two reasons.          11:04:47

11   Q.  All right.  What are they?

12   A.  Well, the first is in the subject line, it might be "info

13   for the hsr filing,"  And the second is the final price hasn't

14   been nailed down, and it keeps going up and, you know, I think

15   he's looking for that zip file that contains all of the          11:05:09

16   presentations on opportunities for revenue growth on Backpage.

17   Q.  All right.  Are these some of the PowerPoints that we've

18   looked at, not the PowerPoints that presented at NCMEC or

19   Polaris, but some of these business oriented PowerPoints that

20   we've looked at?          11:05:31

21   A.  Yes

22   Q.  Let's look at 792.

23          MR. LINCENBERG:  There will be no objection to this

24   either, Your Honor.

25   BY MR. RAPP:          11:05:52

```
1    Q.  So e-mail between and you Mr. Brunst?
2    A.  Yes.
3            MR. RAPP:  Move to admit and publish.
4            THE COURT:  Yes, it may be admitted and published.
5        (Exhibit No. 792 was admitted.)                        11:06:02
6    BY MR. RAPP:
7    Q.  Down here, are you on April 1st of 2015, are you informing
8    Mr. Brunst of something?
9    A.  I am.  I'm letting him know that Mastercard is
10   investigating.  They are digging into Backpage transactions,  11:06:24
11   and that's not good.
12   Q.  All right.  And do you come to learn why they are digging
13   into, as you put it, Backpage transactions?
14           MR. LINCENBERG:  Your Honor, only objection that there
15   should be a little more foundation as to where he learned this 11:06:48
16   from.
17           THE COURT:  Well, he can first answer:  Do you learn
18   why?  And answer yes or no, and Mr. Rapp can follow up.
19           THE WITNESS:  I'm sorry, what was the question?
20           MR. RAPP:  Yeah, I lost track too.  Could you read    11:07:13
21   back my last question?
22           (Record read.)
23   BY MR. RAPP:
24   Q.  Yes.
25   A.  It was the usual reason.  They are --                    11:07:37
```

1          MR. LINCENBERG:  I think the question was:  Did you

2    come to learn?

3          THE COURT:  Yes, that is the question.  It's a yes or

4    no answer, Mr. Ferrer, excuse me.

5          THE WITNESS:  I knew already.                           11:07:53

6    BY MR. RAPP:

7    Q.  How did you know?  How did you know?

8    A.  'Cause we already experienced this with the loss of our

9    U.S. banks.  We were going through it again.  Mastercard,

10   reputational risk, we are going to lose banks.              11:08:08

11   Q.  All right.  And what do you tell him here about Mastercard

12   risk?

13   A.  So I tell Jed Brunst:  Paul Palluchi is the top guy at

14   Mastercard for risk.  Trent suggests Paul will be buying ads on

15   our site with his card and then tracking down the transaction, 11:08:30

16   which could go through any one of our five banks or two

17   processors.  He will then threaten the processor banks with

18   fines.

19   Q.  And so could you explain that concern to the jurors?

20   A.  Well, the concern is the company -- we're going to lose   11:08:49

21   Mastercard, we are going to lose Visa again, just like we did

22   with the U.S. banks.  Now they are going after the European

23   banks.  Mastercard really has this big hammer that they can hit

24   the banks with if they don't comply with their wish to cancel

25   someone, terminate someone.  They will issue fines or threaten  11:09:10

them to be terminated from Mastercard, so it's a no-win for the

bank.  They always terminate when Mastercard or Visa tell them

to.

Q.  All right.  And then looking at Mr. Brunst's response to

you, what does he say to you?                                    11:09:30

A.  "Didn't we go down the Mauritius path once and the banks

had the same issue with our content?  Do we have a bank that we

know will take the transaction?"

Q.  What did you take that to mean from Mr. Brunst?

A.  Well, I had given him some options where we could secure    11:09:48

banking, and I think I suggested Asia because that's what the

consultant had recommended.

        Not sure I answered your question.

Q.  I think you did.  What did you take him to mean when the

banks had the same issues with our content, what did you take    11:10:09

that to mean?

A.  It's the content in the adult section, female escorts in

particular.

Q.  All right.  Let's look at 469.  Do you see this e-mail

here?                                                            11:10:38

A.  Yes.

Q.  And is this from somebody at Backpage?

A.  Yes, it is.  It's from Stefan at Backpage who --

Q.  And is Mr. Hyer also on this e-mail?

A.  Yes, he is.                                                  11:10:54

1    Q.  All right.

2            MR. RAPP:  Move to admit 469.

3            THE COURT:  Yes, it may be admitted and published.

4        (Exhibit No. 469 was admitted.)

5    BY MR. RAPP:                                                    11:11:08

6    Q.  Let's start with page 4.  Wait a minute.  Can you explain

7    what is going on here, what you're getting noticed of?

8    A.  Well, this is an e-mail that we're going to send to users

9    who are unable to make a transaction on the site.  In this case

10   AMEX has dropped us.                                            11:11:36

11   Q.  And what are you going to tell users who are unable to use

12   AMEX on the site?

13   A.  Well, they can't use AMEX to post in the female escorts

14   category, but as I say here:  You can purchase credits using

15   AMEX 'cause we were able to do that for a little while with     11:11:59

16   AMEX, or you can purchase credits using AMEX on this site,

17   Postfastr, and you can also send us a money order.  We will add

18   credits to your account, notify you upon receipt of your money

19   order or mailing address below.

20   Q.  Now, let's go to the first page.  Is this the message here  11:12:33

21   that you would send to somebody attempting to use AMEX on your,

22   on the website for posting?

23   A.  Yes.

24   Q.  All right.  Is this -- this whole, the credits, is that

25   something that you would use for a posting or for a "Move to     11:13:05

UNITED STATES DISTRICT COURT

the top," or how would you use it?

A.  So the "Move to credits" allowed users to put a prepaid

balance in their account, and that would allow them to post new

ads or "Move to the top," or buy a sponsor ad.

Q.  Okay.  And did you have to do something -- so these changes

that you make, who are you informing of these, these changes,

regarding the credits and the money orders, are you informing

anybody of this?

A.  This is a -- we are -- yes, it's a banking crisis, and I'm

informing the ownership, or former ownership.

Q.  All right.  When you say "the ownership," can you identify

who those would be?

A.  Jed Brunst, Jim Larkin, little bit to Scott Spear, not as

much.

Q.  And in what way are you informing them?

A.  Well, I'm -- we're going through regular agendas of what is

going on in banking, and losing AMEX is like losing 15 to

20 percent of our revenue if users can't find a different

payment channel, so it's a really significant difficulty.

Q.  All right.  We have looked at some agendas previously in

your testimony.  Sometimes they were in relation to these

budget meetings; right?

A.  Yes.

Q.  And so now you own the website, are you continuing to have

meetings with the ownership?

1    A.  So I'm having meetings with the ownership.  I'm like flying

2    to the hotel in San Francisco, Vitale, and then we're having

3    meetings where the agenda is all about banking.

4    Q.  All right.  Since you now own it, do you know why you're

5    continuing to meet with them?                                    11:15:24

6    A.  Well, I have to get permission from them to do things, and

7    Jim Larkin and I, we'd like to talk to one another and discuss

8    what the challenges are.  We had so many conversations that

9    their agent said:  You need to stop talking to Larkin,

10   otherwise this transaction looks like a sham.                    11:15:55

11   Q.  All right.  And did you -- did you continue to talk to him

12   going forward after April of 2015?

13   A.  We did.  I did, but there was usually an intermediary

14   present, or an agent.

15   Q.  Just quickly, let's look at 471, for your eyes only, do you  11:16:21

16   recognize this document?

17   A.  Yes, I do.

18   Q.  And how do you recognize this document?

19   A.  So this is a task in a program we call Mantis that we use

20   to communicate to the developers on work that they should do to  11:16:40

21   the site.

22   Q.  Okay.  And what -- what does this particular message to the

23   developers have to do with what's going on with the payment

24   processing in April of 2015?

25   A.  Disable the AMEX charges for the adult categories.           11:17:01

```
 1              MR. RAPP:  Move to admit 471 and publish.

 2              THE COURT:  Yes, it may be admitted and published.

 3              (Exhibit No. 471 is admitted.)

 4   BY MR. RAPP:

 5   Q.  Why are you doing this?  Why are you informing the              11:17:26

 6   developers of this change in this -- in this document?

 7   A.  Because this is the change that I had negotiated with AMEX

 8   after consulting, can't remember if it was Don Moon or

 9   Jed Brunst, but I consulted and got advice on how to handle

10   AMEX, and so this is the -- this is the compromise, but it was     11:17:59

11   only a temporary compromise.  You could still buy credits.  You

12   could still buy credits with AMEX.  You could still use AMEX in

13   other categories, but you couldn't use AMEX to post an adult

14   ad.

15   Q.  Just so the jury is clear, did you have some way that you      11:18:22

16   could use AMEX that ultimately would allow you to post in the

17   female escort section?

18   A.  Yes, you just buy credits and then pay for your ad in the

19   female escorts with credits.

20   Q.  Do you know if AMEX knew that was taking place?                11:18:48

21   A.  They figured it out within a month, and it was over.

22   Q.  All right.  Let's just look quickly at eight, for your eyes

23   only, 884, do you recognize this?  Do you recognize this

24   e-mail?

25   A.  Yes.  This e-mail is from Nathan Kopecky.  It's to            11:19:21
```

1    Jim Larkin, Jed Brunst, Scott Spear and myself.  It's the

2    business plan and succession plan.  It was a requirement with

3    the transaction that we provide Jim Larkin, Jed Brunst,

4    Scott Spear, who would take over in the event that one of the,

5    like myself or Dan Hyer or Joe Kaiping was no longer with the          11:19:50

6    company, so we needed a succession plan.

7    Q.  Why, since they have now sold it, why -- did you learn why

8    they wanted to have some kind of a succession plan in place?

9    A.  Well, they -- they really are monitoring the business very

10   closely, and in case I leave they know who is going to take         11:20:21

11   over.

12   Q.  All right.  Let's just look -- and is there an attachment

13   with this succession plan laid out?

14   A.  Yes, there's an aggressive five-year business plan.

15   Q.  And does it have a succession plan of who would take over       11:20:35

16   particular positions?

17   A.  Yes, it does.

18           MR. RAPP:  Move to admit 884 and 884a, publish.

19           THE COURT:  Yes, it may be admitted and published.

20           (Exhibit Nos 884 and 884a were admitted.)                   11:20:55

21   BY MR. RAPP:

22   Q.  Just so the jury knows, we are referring to where it says

23   Mr. Brunst, Mr. Larkin and Mr. Spear on it?

24   A.  Yes.

25   Q.  And you --                                                      11:21:03

```
 1   A.  Yes, I am also on it.
 2   Q.  And then 884a, and so at this time who was -- who was
 3   running moderation, who was in charge of moderation?
 4   A.  Andrew Padilla.
 5   Q.  All right.  And who was going to take over that position in   11:21:23
 6   the event something happened to Mr. Padilla?
 7   A.  Joye Vaught.
 8   Q.  All right.  And why was it that Joye Vaught would succeed
 9   Andrew Padilla in this position?
10   A.  She's the most logical choice due to her knowledge and   11:21:45
11   experience.
12   Q.  In moderation?
13   A.  In moderation.
14   Q.  Let's look at 1670, do you recognize this?
15   A.  Yes, I do.   11:22:10
16   Q.  Who is this from?
17   A.  The e-mail is from myself.
18   Q.  To?
19   A.  To Jed Brunst, Scott Spear.
20   Q.  And on what date?   11:22:26
21   A.  It's sent on April 18th, 2015.
22          MR. RAPP:  Move to admit and publish.
23          THE COURT:  Yes, 1670 is admitted and may be
24   published.
25          (Exhibit No. 1670 was admitted.)   11:22:38
```

```
1    BY MR. RAPP:

2    Q.  Is this before the sale or after the sale?

3    A.  So this is shortly after the sale.

4    Q.  Okay.  And what are you telling them, what are you telling

5    the two owners, Mr. Brunst and Mr. Spear?                        11:22:52

6    A.  I'm telling them:  Gross revenue, 591,000, that's a single

7    day.  "The net is going to be 25k less due to refunds for fraud

8    and currency conversion.

9         You will see 'Nearby ad' launched with over 1100

10   nearby transactions.  This has the potential to grow a lot.      11:23:15

11   See attached."

12   Q.  And then what do you tell them about the "Buy Credits" in

13   the r sites, what does that mean?  Can you interpret that for

14   the jury?

15   A.  Yes.  "We also launched 'Buy Credits' in the 'r' sites:      11:23:29

16   See buy credits link in footer."  Then I got the link to

17   Postfastr.  The r sites are, pet seeker, rent seeker.  There

18   might have been another seeker, and certainly Postfastr, and so

19   we are trying to create a bunch of different domains that

20   people could purchase credits, but if you bought credits on the  11:23:55

21   r sites, they would automatically appear in Backpage.

22   Q.  All right.  And could you use those for female escorts?

23   A.  In the r sites you couldn't buy an ad in female escorts,

24   but if you bought the credit on Postfastr or pet seeker or

25   trucker jobs, that was the other one, then you could go to       11:24:17
```

UNITED STATES DISTRICT COURT

1    Backpage and your credits were there and then you could post
2    the ad in female escorts.
3    Q.  Let's look at 877.  Is this an e-mail -- who is this an
4    e-mail from?
5    A.  This e-mail is from Jed Brunst.                          11:24:52
6    Q.  And who is it to?
7    A.  It's to Nathan Kopecky and Kate Obermiller of Cereus
8    Properties, and myself.
9    Q.  What is the subject matter?
10   A.  The subject matter is "final forecast and loan          11:25:13
11   calculations/covenants/amortization."
12          MR. RAPP:  Move to admit and request permission to
13   publish.
14          THE COURT:  Yes, 877 is admitted and may be published.
15      (Exhibit No. 877 was admitted.)                          11:25:27
16   BY MR. RAPP:
17   Q.  All right.  What is Mr. Brunst telling Nathan Kopecky with
18   you copied on it?
19   A.  Well, he's saying:  This is final.  Please look it over and
20   if you have any questions please call.  We are closing today.  11:25:51
21   I will sweep.
22          And I guess I misspoke earlier.  The actual
23   transaction is on February 22nd, so "We are closing today."
24   That means the transaction is going to occur.  I will sweep
25   from Bank of Montreal account, "all cash over 1 million and we  11:26:09

 1  can true up any additional excess with the working capital

 2  reconciliation due in 30 days.  Kate will confirm with you the

 3  amount taken, ie (BMO cash plus Spirit cash less outstanding

 4  checks minus one million).  I am headed to the attorneys in

 5  about an hour or so call me on my cell if you need to.          11:26:36

 6  Jed Brunst."

 7  Q.  Let's be clear, what is the date of the sale?  Does that

 8  refresh your recollection as to the actual date of the sale?

 9  A.  Yes.  The actual date of the sale is April 22, 2015.

10  Q.  Let's look at 878.  Is this a -- what is this?             11:27:10

11  A.  So this is an e-mail from Jed Brunst sent on June 5th, 2015

12  to Carl Ferrer.  The subject line is, "Classified Solutions,

13  Ltd. - phone number.  Attachments:  0630-001."

14  Q.  Is there another e-mail to you at the bottom that causes

15  you to e-mail that up to Mr. Brunst?                           11:27:46

16  A.  Yes.  I'm receiving an e-mail from emerchantpay.

17          MR. RAPP:  Move to admit 878 and request permission to

18  publish.

19          THE COURT:  Yes, it may be admitted and published.

20      (Exhibit No. 878 was admitted.)                            11:28:02

21  BY MR. RAPP:

22  Q.  Let's go down here.  Can you just explain what information

23  you're receiving?

24  A.  So Hristov is in Bulgaria and works for emerchantpay, and

25  he's telling me Borgun, which is a bank in Iceland, "require a  11:28:27

UNITED STATES DISTRICT COURT

1   'change form' to be signed off for any changes concerning the

2   account.  According to the company documents John Brunst is

3   still the director of the contractual entity, hence I've put

4   his name as a signatory.  I hope this is not a problem and you

5   can get him to sign (and put a date)."                                    11:28:49

6   Q.  And do you send that up to Mr. Brunst?

7   A.  Yes, I do.

8   Q.  And why is Mr. Brunst continuing to be the signatory on

9   this, for this entity?

10  A.  Because when we opened up that account with emerchantpay,              11:29:07

11  he was the signatory, and he was the managing director of the

12  European company he set up in order to get that bank, Borgun.

13  That European is Classified Solutions Ltd.

14  Q.  Why, again, are you using those banks?

15  A.  So when you get a European processor to handle                        11:29:34

16  transactions, you have to -- you need to have either a genuine

17  European company or a shell company.

18  Q.  All right.  And then in this, you make a reference to a

19  billing descriptor, can you explain that to the jury?

20  A.  So to have some kind of meaningful presence, the banks want           11:29:57

21  to have a phone number and they want the billing descriptor to

22  be very unique, so we're going to have to find a UK phone

23  number with a -- to add to the billing descriptor for the

24  transaction.

25  Q.  All right.  And then does Mr. Brunst get back to you?  Does           11:30:25

1    he -- does he sign that document and send it back to you?

2    A.  Yes, he signs it and writes, "here ya go."

3    Q.  So now, I think you alluded to this, but what happens in

4    July of 2015?

5    A.  In the first week of July in 2015 I'm having lunch with the          11:30:52

6    credit card processor, one of them, who informs me that

7    Mastercard and Visa are terminating our accounts.

8    Q.  Okay.  Do you come to learn why they are terminating your

9    accounts?

10   A.  I do.  There was pressure put on them.  They didn't want to         11:31:21

11   be involved in content that was affiliated with prostitution.

12   We would lose all of our credit card accounts because of it.

13   Q.  Okay.  And let's just look at 16 -- hold on.  Let's look at

14   1674.  Now, do you see that on your screen?

15   A.  Yes, I do.                                                          11:32:10

16   Q.  What is it?

17   A.  It's a message from Wil Gerken.  It's a developer we've

18   contacted with in Tucson, Arizona.  It's sent July 3rd, 2015.

19   It's sent to me and copied Dan Hyer, Andrew Padilla,

20   Joe Kaiping, and the subject line, "Visa is dead at 2 p.m.           11:32:33

21   Monday, Dallas time."

22          MR. RAPP:  Okay.  Move to admit 1674.  Request

23   permission to publish.

24          THE COURT:  Yes.  Yes, it may be admitted and

25   published.                                                             11:32:50

1      (Exhibit No. 1674 was admitted.)

2    BY MR. RAPP:

3    Q.  And so once you had these issues with Visa, what, if

4    anything, did you have to do with the developer, the person

5    managing the servers?                                          11:33:11

6    A.  I communicated with him to make the sites free, including

7    "Move to the top."  I think I'm indicating here, "Go ahead and

8    make Australia free today," but we're just going to go free if

9    we don't have credit cards.

10   Q.  All right.  So how -- how can you sustain the website if   11:33:38

11   everything is for free?

12   A.  I cannot sustain the website if there's no Mastercard or

13   Visa at this time.  We're going to go from showing a profit to

14   a loss, and I've only made three months worth of payments and I

15   am going to be in default on the transaction.                  11:34:05

16   Q.  Okay.  And so in the three months that you, since you

17   purchased the website, how much have you paid Mr. Spear,

18   Mr. Lacey and Mr. Brunst?

19   A.  I believe it was 11 million on the first payment.  The

20   second payment was 8 million.                                  11:34:27

21        MR. LINCENBERG:  I am going to object.  The question

22   is, I think, misleading.  Payment was to an entity owned by

23   four individuals.

24        THE COURT:  Overruled.  I think there was prior

25   testimony as to who those individuals were, so you may answer   11:34:44

1    the question.

2    BY MR. RAPP:

3    Q.  I think when you left off, you said you made one payment,

4    and I believe your testimony was $11 million, but what was the

5    May and June payments?                                    11:34:57

6    A.  Second month's payment, 8 million.  Third month's payment,

7    8 million.

8    Q.  All right.  Let's look at 880.  Now, do you see that on

9    your screen?

10   A.  Yes.  Yes, I do.                                      11:35:26

11   Q.  And what is it?

12   A.  It's a message from myself sent on July 27th, 2015 to

13   Jed Brunst, Nathan Kopecky.  Subject line is "Site 1 gear."

14   Q.  Is there an e-mail below that causes you to send this to

15   Nathan Kopecky and Jed Brunst?                            11:35:57

16   A.  Yes.  I need to get approval on a capital request to buy

17   servers for Amsterdam.

18   Q.  Okay.

19          MR. RAPP:  And move to admit 880.

20          THE COURT:  Yes.  It may be admitted and published.  11:36:16

21      (Exhibit No. 880 was admitted.)

22   BY MR. RAPP:

23   Q.  And so are these the -- are these the equipment or the

24   computers that you need to buy down here?

25   A.  Yes.                                                  11:36:37

UNITED STATES DISTRICT COURT

Q.  And why do you need to buy them?

A.  'Cause we're setting up a data center in Amsterdam called Switch.  We want our content to all come out of Amsterdam instead of U.S. servers.  It's a company strategy.

Q.  Why is that the strategy?

A.  This is part of that those e-mails.  If you might recall the lifeboat strategy, the Plan B strategy.  If servers are seized, domains are seized, we'll be in a better position if the content served from Amsterdam.

Q.  All right.  And so you now own in July of 2015, you own the website, so can you explain why you are e-mailing Mr. Brunst?

A.  I am part -- as part of the agreement in the transaction, I'm required to get approval to buy anything that's not in the budget.  This is not in the budget.

Q.  All right.  And can you just explain what the cap request for nearly $300,000 is?

A.  That's the standard language that I would use in communicating with Jed.  Whenever we'd make a purchase that was over $500, we normally had to fill out a capital request form, so that's why I'm using the word "cap request."

Q.  Is that something that you had to do before you bought the website?

A.  Yes.  I had to do it before I bought the website.  We absolutely need to do it now because we're having a lot of downtime on the Backpage servers.

11:36:56

11:37:20

11:37:52

11:38:20

11:38:40

```
 1   Q.  All right.  Let's go to 881.  Do you recognize this?

 2   A.  Yes.  It's an e-mail from Jed Brunst on August 14th, 2015,

 3   to Carl Ferrer, copied Jim Larkin.  "Subject:  Call next

 4   Wednesday."

 5            MR. RAPP:  Move to admit 881.                    11:39:07

 6            THE COURT:  May be admitted.

 7        (Exhibit No. 881 was admitted.)

 8   BY MR. RAPP:

 9   Q.  Do you know why Jed Brunst is sending you this e-mail in

10   August of 2015?                                           11:39:26

11   A.  Yes.

12   Q.  Why?

13   A.  Backpage is having cash flow problems, credit cards have

14   left the site in July, and we need -- we need a strategy so

15   we're going to come up with that strategy, Jim Larkin, Jed   11:39:45

16   Brunst and myself.

17   Q.  All right.  So it shut down in July.  We are now in August,

18   how -- is any money coming in to Backpage?

19   A.  We're trying to get reserves.  These are balances that are

20   held by the credit card processors.  They still have payments  11:40:14

21   coming to us from prior months, so we're trying to collect what

22   we call the receivables.

23   Q.  Okay.

24   A.  And that's the cash that we're using.  And then in this

25   meeting we're just going to talk about the various payment   11:40:33
```

channel alternatives to get around what I call the credit card

apocalypse or Armageddon.

Q.  All right.  And you have this meeting with Mr. Brunst and

Mr. Larkin to discuss this?

A.  Numerous meetings, numerous phone calls.  Everything is                      11:40:50

about payments.  It's all that I work on right now is payments

'cause it's an existential threat.  The company is going to

fold if we don't find a solution.

Q.  Was there any discussion about getting some type of credit

to, a credit line, to help you get through this time period?                     11:41:16

A.  They didn't offer credit, but they did tell me that I

should -- that they would give me a forbearance agreement and

they would use forbearance agreements a lot.

Q.  All right.  Can you explain to the jury what a forbearance

agreement is?                                                                    11:41:39

A.  So the forbearance agreement would come, would state you

don't have to make any payments on the U.S. debt or interest.

We'll just let that loan accumulate, but you can go ahead and

just pay us interest payments.  So maybe don't make principal

payments; just make interest payments.                                          11:42:00

Q.  Okay.  Did there come a time where you couldn't make the

8 or $11 million monthly payment?

A.  Yes.  I was in default after three months of having the

site in my name.

Q.  Did they discuss with you about just taking the site back?                  11:42:23

```
1    A.  They did not.

2    Q.  Let's look at 1995, and we've seen this before, what is it?

3    A.  So this is the referral traffic once again.

4    Q.  Okay, and for what month?

5    A.  For June 2015.                                              11:42:58

6    Q.  All right.

7            MR. RAPP:  Move to admit 1995, publish.

8            THE COURT:  Yes, it may be admitted and published.

9        (Exhibit No. 1995 was admitted.)

10   BY MR. RAPP:                                                   11:43:20

11   Q.  So just so you orientate the jury, when did the credit

12   cards shut down?

13   A.  The credit cards shut down that first week in July of 2015.

14   Q.  And how was the referral traffic for June of 2015?

15   A.  Well, this report shows that it's very good.              11:43:42

16   Q.  All right.  And so can you sort of interpret some of these

17   numbers for the jury?

18   A.  Yes.  The Erotic Review, which is the number one

19   prostitution review site, has 1,746,000 people coming to the

20   site, to Backpage, in the month of June, and then you can see  11:44:16

21   U.S. Sex Guide, another prostitution review site, eccie, it's

22   another prostitution review site, and Erotic Post Reviews is

23   yet another one.  So the top four referring site are

24   prostitution review sites.

25   Q.  All right.  Let's look at 767.  Do you recognize the       11:44:42
```

1   individuals on this e-mail?

2   A.  I recognize Joye Vaught as the sender of the e-mail.

3   Q.  All right.  Do you recognize the recipient?

4   A.  I don't, but she appears to work for Backpage.

5   Q.  The website you own.  Let's look at just quickly 767a, do   11:45:22

6   you recognize this attached document?

7   A.  Yes.

8   Q.  How do you recognize it?

9   A.  We've -- we've reviewed this document, I believe.

10   Q.  All right.  And what is the document?   11:45:52

11   A.  It's -- it's sort of moderation guidelines and suggestions.

12   Q.  All right.

13         MR. RAPP:  Move to admit 767 and the attachment, 767a.

14         MS. BERTRAND:  Objection; hearsay; lack of foundation

15   as to both documents.   11:46:19

16         THE COURT:  Overruled.  It may be admitted and

17   published.

18     (Exhibit No. 767 and 767a was admitted.)

19   BY MR. RAPP:

20   Q.  And what does -- what is this employee at Backpage telling   11:46:34

21   Joye Vaught?

22         MS. BERTRAND:  Objection, Your Honor.  The document

23   speaks for itself.  It's three sentences.

24         THE COURT:  Sustained.

25   BY MR. RAPP:   11:46:47

```
 1   Q.  Well, does this, the document that's attached, have
 2   anything to do with training?
 3             MS. BERTRAND:  Objection; lack of foundation as to his
 4   knowledge.
 5             THE COURT:  He can speak to the content, if he knows.        11:46:56
 6   BY MR. RAPP:
 7   Q.  Do you know?
 8   A.  Yes, it has a March training document.
 9   Q.  All right.  Let's take a look at that.  And so what is the
10   training for the moderators in June of 2015?                          11:47:19
11             MS. BERTRAND:  Objection, Your Honor, leading.  There
12   is no foundation, and foundation.  There is no evidence that
13   this was ever given as training.
14             THE COURT:  Well, overruled as to that, but I think
15   lay some foundation for it, Mr. Rapp.                                 11:47:40
16   BY MR. RAPP:
17   Q.  Well, Mr. Ferrer, can you speak to moderation in June of
18   2015?
19   A.  Yes.  Moderation is continually changing, and in June of
20   2015 there's -- there are certain rules, and it's guidelines         11:48:01
21   that need to be communicated to the numerous moderators, not
22   just the ones working at home or in the Dallas office, but we
23   have a lot of moderators working under the Philippines now, and
24   so Joye's job at this time is really to supervise the
25   moderation efforts occurring.                                        11:48:30
```

1   Q.  All right.  And in the wake of the, as you call it, the

2   credit card apocalypse, what, if anything, was done regarding

3   staffing levels at Backpage as a result of that?

4   A.  With the reduction of cash coming into the company, I

5   communicated to the owners, and there was an agreement that we          11:49:03

6   would lay off moderators that were working out of Phoenix at

7   home and in the U.S., and in Dallas, and that we would seek

8   moderation from a company overseas.

9   Q.  Okay.  And then you had to -- when you say "the owners,"

10  who are you referring to when you had to get permission to lay          11:49:38

11  off moderation staff?

12  A.  That would be Jed Brunst, Scott Spear, Michael Lacey,

13  Jim Larkin.  It's a material change in the business, such a big

14  change.

15          MS. BERTRAND:  Objection, Your Honor, nonresponsive;            11:50:00

16  move to strike.  He was simply asked:  Who are the owners?

17          THE COURT:  Sustained.  The jury will disregard the

18  "material change" and thereafter.

19  BY MR. RAPP:

20  Q.  And so laying off the moderation staff, I think you made a          11:50:13

21  comment that, can you explain what change, if any, that had?

22  A.  I recall 70 some employees lost their jobs.

23  Q.  All right.  But -- so we just looked at the website in

24  March of 2015, you know those videos we were looking at, who

25  was moderating the content that was coming in to the various            11:50:36

```
1    markets?

2            MS. BERTRAND:  Objection.  Objection, Your Honor,

3    vague as to who is moderating.

4            THE COURT:  Overruled.

5            THE WITNESS:  Who was moderating the content at this        11:50:53

6    time frame, what was the time frame?

7    BY MR. RAPP:

8    Q.  The time frame after the layoffs.

9    A.  After the layoffs?

10   Q.  Yes.                                                           11:51:08

11   A.  We added a company call Avion in the Philippines, and we

12   had just eventually hired hundreds of people to work there at

13   $500 a person.

14   Q.  $500 a day?

15   A.  No, a month.  You could get a full-time employee working        11:51:27

16   out of the Philippines for $500 a month.  It's an incredible

17   bargain.

18           MS. BERTRAND:  Your Honor, objection to the

19   commentary.  Move to strike as nonresponsive.

20           THE COURT:  Sustained.                                      11:51:43

21   BY MR. RAPP:

22   Q.  Well, was that a good deal?

23   A.  The average cost of a U.S. employee would be, with

24   benefits, $5,000, so it's one-tenth the cost.

25   Q.  All right.  And were they moderating all the markets in the     11:51:57
```

1    United States that Backpage had a presence or had a market?

2    A.  Yes.  They were moderating the U.S. markets and being

3    overseen by supervisors working from Dallas, by Joye Vaught,

4    Andrew Padilla.

5    Q.  And just looking at this attachment sent to Joye Vaught          11:52:24

6    about training, just a couple things, what is, in terms of

7    moderation, what is being communicated to the moderators here

8    where I have highlighted?

9           MS. BERTRAND:  Objection, Your Honor, misstates the

10    testimony.  There is no evidence that this has ever been           11:52:41

11    distributed to anybody beyond Ms. Vaught.

12           THE COURT:  Overruled.

13           MR. FEDER:  Foundation too, Judge, as to whether or

14    not --

15           THE COURT:  Wait.  Wait.  Wait.                             11:52:54

16           MR. FEDER:  -- distributed.

17           THE COURT:  I was speaking, Mr. Feder.

18           He can answer as to what is being communicated in the

19    e-mail.  I'll sustain the objection with regard to that.

20           Mr. Feder, what is your objection?                         11:53:15

21           MR. FEDER:  My understanding from reading this, it's a

22    draft, therefore, it's irrelevant unless it was distributed

23    and --

24           THE COURT:  Well, if it was written by Ms. Vaught and

25    he has supervision over her and she's describing whatever her      11:53:29

```
 1   communication was to be, it can come in in that form.
 2           MS. BERTRAND:  Your Honor --
 3           THE COURT:  Mr. Rapp, please continue.
 4           MS. BERTRAND:  Your Honor, objection.  Ms. Vaught
 5   didn't write the e-mail.  It's to Ms. Vaught; not from her.     11:53:43
 6           THE COURT:  Sorry, it is to Ms. Vaught, yes, so she
 7   received the e-mail.
 8           So go forward, Mr. Rapp.
 9           MR. RAPP:  Thank you, Your Honor.
10           THE COURT:  I misspoke.  So the jury will, again, use    11:53:53
11   your own recollection of what the evidence is.  Don't let me
12   misstate that in any form.
13           All right.  Mr. Rapp.
14   BY MR. RAPP:
15   Q.  And just where I've highlighted, where I have highlighted,   11:54:05
16   could you read that?
17   A.  Yes.  "were not trying to Bust them, were are not getting
18   Stricter.  We are just trying to stop the worst of the worst."
19   Q.  All right.  And then down here, what is being communicated
20   to Ms. Vaught?                                                   11:54:26
21   A.  When browsing -- "when browsing please clean up the front
22   page-law enforcement rarely goes past page 2."
23   Q.  All right.  Let's look at --
24           MS. BERTRAND:  Your Honor, I renew my objection to
25   this exhibit.  Move to strike it and the testimony as there's   11:54:53
```

```
 1    been no evidence this was ever distributed to anybody --
 2              THE COURT:  Overruled.
 3              MS. BERTRAND:  -- beyond Ms. Vaught.
 4    BY MR. RAPP:
 5    Q.  Let's look at 886, and this is a two-page document, do you          11:55:20
 6    see that there?
 7    A.  Yes, I do.
 8    Q.  And are you familiar with this document?
 9    A.  Yes, I am.
10    Q.  How are you familiar with this document?                            11:55:38
11    A.  This document has to do with communications with a
12    representative of BMO bank.
13    Q.  All right.  And who is this e-mail, at least the top part
14    of it, who is this e-mail between?
15    A.  It's from Jed Brunst.  It's to Carl Ferrer.                         11:56:02
16    Q.  All right.
17    A.  Sent on --
18    Q.  Sent on what date?
19    A.  October 7th, 2015.
20              MR. RAPP:  Move to admit 886.                                 11:56:19
21              THE COURT:  Yes.  It may be admitted and published.
22         (Exhibit No. 886 was admitted.)
23    BY MR. RAPP:
24    Q.  Let's look at this page for a minute.  Is this the second
25    page?                                                                   11:57:00
```

1    A.  Yes, it is.

2    Q.  And so can you explain what's going on to the jury, what's

3    going on on the second page of this, and specifically some of

4    the writing is in blue, some of it is in black?

5    A.  Yes.  BMO bank wants to know where Website Technologies is          11:57:16

6    getting their revenue from, and so this e-mail, near the top of

7    the second e-mail, talks about where the wires are coming from.

8    It's a bank Frict in Liechtenstein.  And then we also use a

9    whole bunch of different URLs that we're getting the money

10   from, but that's really not truthful.  The money is really          11:57:52

11   coming from Cracker and Backpage.

12   Q.  All right.  Let's just stop for a minute.  The portion in

13   blue, who writes the portion in blue?

14   A.  Jed is sending that to BMO, Ilona Nicholls.

15   Q.  And why is he sending it to BMO?          11:58:21

16   A.  Because they write, "We see that we are receiving a number

17   of wires from overseas," companies from Iceland and

18   Liechtenstein.  "We would like to know who are the clients that

19   are paying through these two companies."

20   Q.  Do you know why, given this e-mail, they are asking those          11:58:47

21   questions?

22   A.  They are asking that question because they have an

23   obligation, banks do, to know their customers and know where

24   the revenue is coming from.

25   Q.  All right.  Is Mr. Brunst being forthcoming in this e-mail          11:59:05

1    to BMO?

2              MR. LINCENBERG:  Objection; foundation.

3              THE COURT:  Sustained.

4    BY MR. RAPP:

5    Q.  Well, the you've read his answers here in blue, is he          11:59:22

6    being -- based on his answers, are they accurate?

7    A.  No, they are deceptive.

8    Q.  Why are they deceptive?

9    A.  Because we're including a bunch of URLs just to distract

10   the bank when the primary revenue is coming from either           11:59:48

11   Backpage.com or Cracker.com.

12   Q.  All right.  And when you say "distract," what do you mean

13   by that?

14   A.  Well, we're listing sites that we've done licenses with so

15   that we can list a whole bunch of newspapers, a bunch of family   12:00:10

16   friendly sounding URL like pet seeker, rent seeker, with the

17   hope that they will just read this quickly.

18   Q.  All right.

19             THE COURT:  Mr. Rapp, are you moving to another

20   exhibit?                                                          12:00:37

21             MR. RAPP:  I am.

22             THE COURT:  Well, I think we are just past the noon

23   hour, so we will stop for our lunch break.

24             Members of the jury, just remember the admonition and

25   be present so you can come in to the trial precisely at           12:00:45

1   1:00 p.m., so be there at about five till.  Please all rise for

2   the jury.

3        (Proceedings concluded at 12:01 p.m.)

1

2                      **C E R T I F I C A T E**

3

4           I, HILDA E. LOPEZ, do hereby certify that I am duly

5    appointed and qualified to act as Official Court Reporter for

6    the United States District Court for the District of Arizona.

7           I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 22nd day of

13   September, 2023.

14

15

16                              s/Hilda E. Lopez_____

17                              HILDA E. LOPEZ, RMR, FCRR

18

19

20

21

22

23

24

25