2:18-cr-00422-DJH, September 21, 2023 P.M.

1           **UNITED STATES DISTRICT COURT**            12:00:59

2           **FOR THE DISTRICT OF ARIZONA**

3              _____

4

| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | 12:00:59 |
| vs. | ) | |
| | ) | 2:18-cr-00422-DJH |
| Michael Lacey, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | September 21, 2023 |
| | ) | 12:57 p.m. |
| _____ | ) | |

10                                                12:00:59

11

12      **BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**

13         **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

14            JURY TRIAL - DAY 10 P.M.

15                                                12:00:59

16

17

18

19

20                                                12:00:59

21  Official Court Reporter:

22  **Elaine Cropper, RDR, CRR, CCP**
     Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, SPC 35

23  Phoenix, Arizona  85003-2151
     elaine_cropper@azd.uscourts.gov

24

25  Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared by Computer-Aided Transcription    12:00:59

2:18-cr-00422-DJH, September 21, 2023 P.M.

1

<u>I N D E X</u>

TESTIMONY

WITNESS                        Direct   Cross   Redirect   Recross

Government's Witnesses

 CARL FERRER                       8

<u>E X H I B I T S</u>

| Number | | Ident | Rec'd |
|--------|--------------------------------------------------|-------|-------|
| 1 | Email from Lacey to Becker, 07/29/2016 | 85 | |
| 198 | Email from Moderator to Vaught re no longer removing ads for GFE, 01/28/2016 | 57 | 60 |
| 199 | Email between Moderators re GFE ads, 03/09/2016 | 61 | 62 |
| 218 | Victim #13 - Backpage Ads, 08/13/2015 | 41 | 42 |
| 220 | Victim #15 - Backpage Ads, 05/18/2015 | 39 | 41 |
| 221 | Victim #16 - Backpage Ads, 08/15/2015 | 44 | 44 |
| 500 | Emails between Brunst and BDO Consulting re Backpage's financial forecast, 11/11/2015 | 17 | 19 |
| 763 | Email from Brunst to Ferrer and Larkin, "Comments on long term biz plans", 05/06/2014 | 64 | |
| 783 | Email from Brunst, "Frick wire received today", 08/08/2016 | 81 | 81 |
| 882 | Emails from Brunst, "Re: Customer Credit Transfer", 08/17/2015, | 44 | 45 |
| 885 | Email from Brunst, "Fwd: Responses to AML Request", 10/06/2015 | 8 | 9 |
| 892 | Emails from Brunst, "May interest statement attached", 05/17/2016 | 71 | 72 |

United States District Court

2:18-cr-00422-DJH, September 21, 2023 P.M.

1                    **E X H I B I T S** (Continued)                    12:00:59

2    Number                                          Ident   Rec'd

3    894     Emails from Brunst, "Fwd:                  73    74
             collections", 06/21/2016
4

5    897     Email from Brunst, "Re: Another            78    79    12:00:59
             alternative to banks", 08/03/2016

6    1214    Email from Brunst to Ferrer, "loan         14    15
             modification-interest only for
7            October", 10/21/2015

8    1217    Emails from Padilla, Vaught to Avion,      24    25
             "Adult Moderation Feedback"
9

10   1219    Email from Vaught to Avion, "restored      31    32    12:00:59
             images 11/10/15", 11/10/2015

11   1221    Email from Brunst, "Re: November           48    49
             Financials And Interest Request"
12

13   1224    Email from Vaught to Avion, "Review        53    54
             1/15/16", 01/15/2016

14   1226    Email from Vaught to Avion, "VERY          62    63
             important note about the video inbox",
15           02/19/2016                                            12:00:59

16   1229    Emails from Brunst and Ferrer, "Bank       75    76
             Frick Bank accounts", 07/27/2016
17

18   1230    Email from Brunst to Ferrer, Larkin,      80    80
             "Frick", 08/08/2016

19   1235    Email from Brunst, "my email address",     83    83
             10/19/2016
20                                                                 12:00:59

21   1237    Email from Brunst to Ferrer, "bonus",    106   107
             02/20/2017

22   1238    Email from Brunst to Ferrer, "call       107   108
             Monday", 03/30/2017
23

24   1481    Summary Exhibit - Annual Revenue for      96
             Business Entities

25                                                                 12:00:59


                    United States District Court

2:18-cr-00422-DJH, September 21, 2023 P.M.

1     **E X H I B I T S** (Continued)                                        12:00:59

2     Number                                         Ident   Rec'd

3     1587a  Redacted version of Exh 1587             101

4     1817   Emails between Vaught and moderator,      34      35
             "removal request for Children of the
5            Night 072215", 07/22/2015                                       12:00:59

6     1819   Emails from Padilla and Vaught to         65      66
             Avion, "Allowed Terms", 03/25/2016
7
      1820   Email from Vaught, "AVPH", 08/04/2016     67      69
8
      2000   Google Analytics Report showing          22      22
9            Referrals to Backpage.com from top 10
             referring sites covering 11/01/2015 –
10           11/30/2015                                                      12:00:59

11    2045   Email from Ferrer to Lacey, Larkin,       84      84
             Brunst, Spear, "Fwd: Organization
12           Chart V1.0"

13

14                        **RECESSES**

15                                             Page    Line                  12:00:59

16    (Recess at 2:35; resumed at 2:55.)        57      8

17

18

19

20

21

22

23

24

25

                    United States District Court

2:18-cr-00422-DJH, September 21, 2023 P.M.

1                    **A P P E A R A N C E S**                          12:00:59

2

For the Government:
3              **KEVIN M. RAPP, ESQ.**
               **PETER S. KOZINETS, ESQ.**
4              **ANDREW C. STONE, ESQ.**
               **MARGARET WU PERLMETER, ESQ.**
5              U.S. Attorney's Office                                    12:00:59
               40 N, Central Ave., Ste. 1800
6              Phoenix, AZ  85004-4408
               kevin.rapp@usdoj.gov
7              peter.kozinets@usdoj.gov
               andrew.stone@usdoj.gov
8              margaret.perlmeter@usdoj.gov

9              **AUSTIN M. BERRY, ESQ.**
               U.S. Department of Justice
10             Child Exploitation and Obscenity Section                 12:00:59
               1301 New York Ave., NW, 11th Fl.
11             Washington, D.C.  20005
               austin.berry2@usdoj.gov
12
               **DAN G. BOYLE, ESQ.**
13             Special Assistant U.S. Attorney
               312 N. Spring St., Ste. 1400
14             Los Angeles, CA  90012
               daniel.boyle2@usdoj.gov
15                                                                       12:00:59

16   For the Defendant Michael Lacey:
               **PAUL J. CAMBRIA, JR., ESQ.**
17             Lipsitz Green Scime Cambria, L.L.P.
               42 Delaware Ave., Ste. 120
18             Buffalo, NY  14202
               pcambria@lglaw.com
19

20   For the Defendant Scott Spear:                                      12:00:59
               **BRUCE S. FEDER, ESQ.**
21             Feder Law Office, P.A.
               2390 E. Camelback Road, Ste. 160
22             Phoenix, AZ  85016
               bf@federlawpa.com
23
               **ERIC W. KESSLER, ESQ.**
24             Kessler Law Office
               6720 N. Scottsdale Rd., Ste. 210
25             Scottsdale, AZ  85253                                     12:00:59
               eric.kesslerlaw@gmail.com

                      United States District Court

2:18-cr-00422-DJH, September 21, 2023 P.M.

1          **A P P E A R A N C E S** (Continued)                    12:00:59

2

  For the Defendant John Brunst:
3          **GOPI K. PANCHAPAKESAN, ESQ.**
           **GARY S. LINCENBERG, ESQ.**
4          Bird Marella Boxer Wolpert Nessim Drooks
  Lincenberg & Rhow, P.C.
5          1875 Century Park E. Ste. 2300                            12:00:59
           Los Angeles, CA  90067
6          gpanchapakesan@birdmarella.com
           glincenberg@birdmarella.com
7

  For the Defendant Andrew Padilla:
8          **DAVID S. EISENBERG, ESQ.**
           David Eisenberg, P.C.
9          3550 N. Central Ave., Ste. 1155
           Phoenix, AZ  85012
10         david@deisenbergplc.com                                   12:00:59

11 For the Defendant Joye Vaught:
           **JOY MALBY BERTRAND, ESQ.**
12         Joy Bertrand, Esq., L.L.C.
           P.O. Box 2734
13         Scottsdale, AZ  85252-2734
           joy@joybertrandlaw.com

14

15

16

17

18

19

20

21

22

23

24

25

                    United States District Court

2:18-cr-00422-DJH, September 21, 2023 P.M.

| | |
|---|---|
| 1 | **P R O C E E D I N G** | 12:00:59 |

1                        **P R O C E E D I N G**                    12:00:59

2          (The defendants are present and out of custody.)

3          (Court was called to order by the courtroom deputy.)

4          (Proceedings begin at 12:57.)

5          THE COURT:  Okay.  We'll go check on the jury.    12:57:42

6    Before we bring the jury, just one note.

7          Oh, no.  That's okay.  Mr. Ferrer can remain in.

8          Do you wish to file a response to what the Government

9    filed last night?  I'm going to give you until nine tomorrow to

10   do that.                                                  12:57:59

11         MR. LINCENBERG:  Your Honor, I was just alerted.  I

12   think there's other counsel who are drafting something up and

13   we'll get it out.  If there was going to be a hearing, I wanted

14   the Court to have the opportunity to receive it.  I think it

15   will probably be filed, you know, sometime this evening.    12:58:11

16         THE COURT:  Okay.  That's fine.

17         MR. LINCENBERG:  Thank you.

18         Okay.  Let's bring in the jury.

19         All rise for the jury.

20         (Jury enters at 1:00.)                              01:00:14

21         THE COURT:  All right.  Please be seated.  The record

22   will reflect the presence of our jury, Mr. Ferrer is on the

23   witness stand.

24         While it is on my mind, members of the jury, you will

25   recall that next week we are only in trial three days.  We have    01:01:05

United States District Court

8

CARL FERRER - Direct

1  to vacate the courtroom for a special proceeding.  And so I    01:01:08

2  would ask that you consider and let Liliana know tomorrow if

3  you would be available to start at 8:45 and to reduce our lunch

4  to about 45 minutes and then resume again until 4:30.  That is

5  to make up for some of that lost time from the week prior that    01:01:33

6  we were vacant and then on Friday.

7          And so I think with that adjustment, we'll be able to

8  be back on our full schedule.

9          So, again, think about that.  See if it works with

10  your schedule and let Liliana know.    01:01:49

11          As well, tomorrow I'd like to forge ahead, as we did

12  last Friday, until 12:30 or roughly thereabouts.  And, again,

13  do let me know if that conflicts with any of your prior

14  arrangements and we can take that up tomorrow.

15          All right.  With that, Mr. Rapp, if you could    01:02:16

16  proceed.

17          MR. RAPP:  Thank you, Your Honor.

18          (CARL FERRER, a witness herein, was previously duly

19  sworn or affirmed.)

20          MR. RAPP:  Madam Clerk if you could put United States   01:02:25

21  885 on the screen there.

22          **DIRECT EXAMINATION** (Continued)

23  BY MR. RAPP:

24  Q.   Mr. Ferrer, do you see that there on your screen?

25  A.   Yes, I see it.    01:02:33

United States District Court

9

CARL FERRER - Direct

1   Q.   What is it?                                              01:02:35

2   A.   It's an email from Jed Brunst to Carl Ferrer and Nathan

3   Kopecky and it's sent on Tuesday, October 6, 2015.

4            MR. LINCENBERG:  There's no objection, if it helps

5   Mr. Rapp expedite.                                            01:02:54

6            MR. RAPP:  Move to admit and publish.

7            THE COURT:  Yes.  It may be admitted and published.

8            (Exhibit Number 885 was admitted into evidence.)

9   BY MR. RAPP:

10  Q.   Now let's just go to the second page so you can orientate   01:03:09

11  yourself to this.  You see the second page?

12  A.   Yes, I do.

13  Q.   Okay.  All right.  So can you just take a look at it,

14  Mr. Ferrer?

15  A.   Yes.  Yes, I am familiar with this email.               01:03:55

16  Q.   How are you familiar with this email?

17  A.   Because Jed Brunst sent it to me so that I could keep the

18  story straight.

19  Q.   And when you say "keep the story straight," what, sir, do

20  you mean?                                                     01:04:15

21  A.   Well, this is what he had sent to BMO a while back about

22  Website Technologies' business and I need this information

23  because BMO is now inquiring about Website Technologies again.

24  And I believe I need to use this email to help formulate the

25  response.                                                     01:04:43

United States District Court

CARL FERRER - Direct

1   Q.   And just so we understand, is the email below where it     01:04:47

2   says from Jed Brunst to this Colette LaKoma at BMO, can you --

3   if you know, can you explain who wrote what in this email?

4   A.   Yes, I can.

5   Q.   All right.                                                  01:05:08

6   A.   So the answers to the question are in caps.  The question

7   is from the bank, BMO.

8   Q.   And are they -- is the question in lower case?

9   A.   And the question is in lower case, correct.

10  Q.   Can you just start where it says "Hi Kate" and read down   01:05:30

11  this first page?  We'll move over to the second page.

12  A.   "Hi Kate.  Our AML unit has come back asking a few more

13  questions as it relates to Camarillo, Website Technologies, and

14  Backpage.com."

15  Q.   What is your AML, do you know what that is?                01:05:56

16  A.   Anti-money-laundering unit.

17  Q.   All right.  Can you go on?

18  A.   "Could you please provide a response to the following

19  inquiries:  Website Technologies, LLC.  Please explain their

20  business; a computer programming service business.  What types  01:06:13

21  of programming services?  Who are their customers?"

22  Q.   All right.  And so then is it your testimony that the

23  capital that is in all caps, is that something Mr. Brunst

24  wrote?

25  A.   Yes.                                                       01:06:31

United States District Court

CARL FERRER - Direct

Q.   What does he write?

A.   "WT," which is Website Technologies, "IS A SERVICE COMPANY
THAT PROVIDES MANAGEMENT AND ADMINISTRATIVE SERVICES (IE
MANAGEMENT, IT DEVELOPMENT AND MAINTENANCE, BILLING AND
COLLECTION AND MARKETING) TO BACKPAGE.COM, UNIVISION AND OTHER
INDEPENDENT 3rd PARTY LICENSEES OF THE BACKPAGE.COM
TECHNOLOGY."

Q.   Is that an accurate description?

A.   It's accurate in terms of what the company is set up for
to handle IT development and maintenance.  It's inaccurate that
it's including Univision which, while technically accurate, has
little or no revenue, as do the other independent third-party
licenses.

Q.   All right.  And then what is the question and answer?

A.   "Do they have a website for their business?  If so, please
provide.  If not, Why?  How do they obtain new customers?"

Q.   And then what does Mr. Brunst say in response to that?

A.   "THERE IS NO WEBSITE FOR" Website Technologies.  Website
Technologies "CUSTOMERS INCLUDE BACKPAGE.COM AND OTHER DIRECT
LICENSEES OF A 'WHITE LABEL' VERSION OF THE BACKPAGE.COM
PLATFORM AND TECHNOLOGY."

Q.   All right.  How about that?  Is that accurate?

A.   Well, it's correct that there is no website for Website
Technologies and it's somewhat correct in that Website
Technologies has got some licenses on software to its own

United States District Court

CARL FERRER - Direct

1   company -- and it owns Backpage.com.  So I think it's -- it's a       01:08:31

2   way of sort of distancing yourself from Backpage.com in that,

3   well, we're just providing a license.  So in that way, it's

4   inaccurate because it's the same company.

5   Q.   All right.  And then what's the next, the third bullet          01:08:48

6   point, what's the question?

7   A.   "How is Website Technologies LLC related to Camarillo

8   Holdings LLC and Backpage.com?  What is the hierarchy of these

9   businesses?  Who are the beneficiary owners of these LLCs?"

10  Q.   And Mr. Brunst's response?                                      01:09:10

11  A.   Mr. Brunst responds, "WT AND BACKPAGE.COM WERE SOLD IN

12  THEIR ENTIRETY TO AN UNRELATED THIRD PARTY IN APRIL 2015 AND

13  ARE UNRELATED TO CAMARILLO HOLDINGS AS OF THAT DATE.   JIM

14  LARKIN AND MIKE LACEY HAVE NO OWNERSHIP INTEREST IN EITHER

15  BACKPAGE.COM OR WEBSITE TECHNOLOGIES."                               01:09:37

16  Q.   How about that?  Is that accurate or not?

17  A.   It's not accurate.

18  Q.   Why is it not accurate?

19  A.   Well, they are the real owners.  I'm the nominal owner.

20  Q.   I know.  Are you an unrelated third party?                      01:09:55

21  A.   Well, yes, I am the unrelated third party in this so, I

22  mean, it's accurate in that way but it's really a nominal

23  ownership that I have.  The real owners and the real financial

24  beneficiaries continued to be Jim Larkin and Michael Lacey and

25  the other owners.                                                    01:10:20

United States District Court

CARL FERRER - Direct

1    Q.   And how about this last bullet point?                    01:10:23

2    A.   Where was I?

3    Q.   I think we're on to page two.

4    A.   Okay.  Page two.

5    Q.   Where it says Camarillo Holdings?                        01:10:33

6    A.   Camarillo Holdings, LLC.  "Please explain the nature of

7    the business."

8    Q.   All right.  And what's the question?

9    A.   Read the next question?

10   Q.   Yes.                                                     01:10:49

11   A.   "Please explain the relationship between Website

12   Technologies LLC, and Camarillo Holdings LLC?  Did Camarillo

13   Holdings LLC sell Backpage.com to James Larkin and Mike Lacey."

14   Q.   And what is Mr. Brunst's answer?

15   A.   "CAMARILLO HOLDINGS CURRENTLY OWNS NO OPERATING          01:11:09

16   BUSINESSES. IT DOES MANAGE AND LEASE OFFICE SPACE AND HOLDS AND

17   COLLECTS ON SEVERAL ACCOUNTS/NOTES RECEIVABLE RELATED TO THE

18   SALE OF ITS PRINT PUBLISHING BUSINESS IN 2013 AND THE SALE OF

19   BACKPAGE.COM AND WEBSITE TECHNOLOGIES IN APRIL 2015."

20   Q.   How about that?  Is that accurate?                       01:11:36

21   A.   Well, yes, it is accurate in that it is collecting the

22   interest payments from the sale of Backpage.com and Website

23   Technologies.

24   Q.   Why is Mr. Brunst responding to the bank as opposed to you

25   in October of 2015?                                           01:12:03

14

CARL FERRER - Direct

1   A.   Well, Mr. Brunst deals with the banking of the company and   01:12:10

2   so if you look at the first part of the company where he says

3   Kate left the company?  Kate Obermiller is his assistant.

4   Q.   All right.  But why aren't you -- you're the owner of

5   Backpage.  Why are you not responding to BMO?   01:12:32

6   A.   This is above my pay grade.

7   Q.   Is there any disclosure -- is BMO a treasury bank or a

8   merchant bank?

9   A.   It's a treasury bank.

10   Q.   All right.   01:13:00

11   A.   It's where the deposits -- they receive deposits.

12   Q.   Is there any disclosure to BMO about these entities where

13   you've set up in Europe?

14   A.   Not that I know of.

15   Q.   All right.  Let's look quickly at 1214.  Looking at 1214,   01:13:20

16   is this an email from Jed Brunst to you?

17   A.   Yes.  It's an email from Jed Brunst to me.

18        MR. LINCENBERG:  There will be no objection to 1214

19   or 1214a.

20        MR. RAPP:  I'm just going to admit 1214.  And move to   01:13:58

21   admit and publish?

22        THE COURT:  Why don't you lay some foundation first

23   for it?

24        MR. RAPP:  Judge, I don't believe there's an

25   objection to it.   01:14:10

United States District Court

15

CARL FERRER - Direct

| | |
|---|---|
| 1 | THE COURT:  Well, I still need to evaluate. | 01:14:12 |
| 2 | MR. RAPP:  Okay. |
| 3 | BY MR. RAPP: |
| 4 | Q.   This an email from Jed Brunst to you? |
| 5 | A.   Yes, it is. | 01:14:21 |
| 6 | Q.   And what is the subject of it? |
| 7 | A.   The subject line is:  Loan modification-interest only for |
| 8 | October. |
| 9 | Q.   All right.  Do you recall getting this email from |
| 10 | Mr. Brunst? | 01:14:30 |
| 11 | A.   It was sent to me on Wednesday, October 21, 2015. |
| 12 | MR. RAPP:  Move to admit and publish. |
| 13 | THE COURT:  Yes.  It may be admitted and published. |
| 14 | (Exhibit Number 1214 was admitted into evidence.) |
| 15 | BY MR. RAPP: | 01:14:42 |
| 16 | Q.   So we had talked about the difficulties you had in making |
| 17 | the monthly payments back after the sale; right? |
| 18 | A.   Yes.  I'm in default on the fourth month. |
| 19 | Q.   And let's just remind the jury, when did the sale take |
| 20 | place? | 01:15:05 |
| 21 | A.   So the sale is in April of 2015.  We make three payments, |
| 22 | lose credit cards and after three payments, I'm unable to make |
| 23 | additional payments. |
| 24 | Q.   And now we're in October of 2015.  Are you still having |
| 25 | difficulty -- are you still having difficulty making payments? | 01:15:25 |

United States District Court

16

CARL FERRER - Direct

1  A.   Yes.  At this time frame, we're having difficulty.                    01:15:32

2  Q.   All right.

3          And how much are you -- are you paying anything to

4  Mr. Spear, Mr. Lacey, and Mr. Brunst?

5  A.   You're asking whether there were payments made in August,            01:15:51

6  September, I don't think so.  There may have been.  But going

7  forward we're going to have -- paying just the interest only.

8  Q.   Is that what is being discussed in this email?

9  A.   Yes.  It's being discussed.  The interest-only payments

10 and I believe it's also talking about a possible reduction in          01:16:25

11 principal.

12 Q.   All right.  And just drawing your attention here, is that

13 what you're referring to, "interest only"?

14 A.   Yes.

15 Q.   And with respect to this (Indicating), what does                    01:16:42

16 Mr. Brunst say regarding what's going on with the company?

17 A.   Mr. Brunst writes, "These revisions should give you lots

18 of running room to grow the business back without worrying

19 about a large fixed monthly note payment."

20 Q.   And what did you take that to mean?                                  01:17:05

21 A.   We owed them -- I owed -- I owed Brunst -- I owed Cereus

22 Properties 8 million a month.  We're not able to make that

23 payment.  So by going to interest only, that gives us -- they

24 are telling me it gives me a chance to figure out alternative

25 payment solutions.                                                       01:17:33

United States District Court

17
CARL FERRER - Direct

1  Q.   And then going forward, do you recall if you just made        01:17:36
2  interest payments for a time period?
3  A.   Yes.
4  Q.   And what were the interest payments?  I think you've
5  discussed the principal and interest payments before the credit   01:17:48
6  cards but what was the ballpark amount of the interest payments
7  going forward?
8  A.   Well, there were interest payments on the U.S. note and
9  interest payments on the non-U.S. note.  I don't recall the
10 exact figure but it was in the millions.                          01:18:08
11 Q.   Let's look at 500.  Do you see this email?
12 A.   Yes, I do.
13 Q.   Is this an email from Mr. Brunst?
14 A.   Yes, it is.
15 Q.   Is it on November -- when -- what's the date?                 01:18:47
16 A.   The email was sent Wednesday, November 11, 2015.
17         MR. LINCENBERG:  Your Honor.  I'm going to object to
18 these questions on a lack of foundation.
19         THE COURT:  I think that's what Mr. Rapp is doing.
20         MR. LINCENBERG:  But he's just reading from an email      01:19:05
21 that this witness is not a part of and has no foundation.
22         THE COURT:  Lay some foundation, Mr. Rapp.
23 BY MR. RAPP:
24 Q.   Do you recognize Mr. Brunst's email address?
25 A.   Yes, I do.                                                    01:19:18

United States District Court

CARL FERRER - Direct

1    Q.   And we have looked at some previous emails of Mr. Brunst.    01:19:18

2    Is this a change in his email address?

3    A.   This is his new -- newer email address,

4    cereusproperties.com.

5    Q.   And in terms of the recipient, did you come to learn that    01:19:34

6    some type of a consulting company was involved with Mr. Brunst?

7    A.   Yes.   BDO.   The same company that was handling the taxes

8    for Backpage.com.

9    Q.   All right.

10           MR. RAPP:   Move to admit 500.    01:20:00

11           MR. LINCENBERG:   Objection.   No foundation.

12           THE COURT:   Lay a little the bit more foundation, Mr.

13   Rapp.

14   BY MR. RAPP:

15   Q.   All right.   Well, so have you -- have you reviewed this    01:20:16

16   email?

17   A.   Yes.

18   Q.   Without discussing the substance of it, do you recognize

19   the context of it?

20   A.   The content.    01:20:39

21   Q.   The context.   The context.

22   A.   Oh.   The contact?

23   Q.   The context.

24   A.   Oh.   The context.   Sorry.   Yes, I recognize the context.

25   They are talking about upgrade features.    01:20:53

United States District Court

CARL FERRER - Direct

1   Q.   All right.                                                        01:20:57

2              MR. RAPP:  Move to admit 500.

3              MR. LINCENBERG:  Your Honor, reviewing an email when

4   it's shown with a prosecutor in preparation for trial, this

5   does not establish foundation.  This was similar with exhibits    01:21:08

6   that we dealt with yesterday so we object.  No foundation.

7              MS. BERTRAND:  Join.

8              THE COURT:  Overruled.  It is admitted and it may be

9   published under 801(d)(2)(E).

10             (Exhibit Number 500 was admitted into evidence.)       01:21:37

11  BY MR. RAPP:

12  Q.   All right.  Can you read the email that Mr. Brunst is

13  responding to down here?

14  A.   Yes.  "Jed, I wanted to run a couple of questions by you

15  regarding the forecast.  The level of expenses as a % of          01:21:55

16  revenue seem to be significantly higher compared to the

17  historical levels, while the revenue levels are lower.  The

18  expense levels as a % of revenues are also different if we were

19  to compare them to the original forecast."

20  Q.   All right.  Let's just stop there.  And then what is the     01:22:17

21  response that Mr. Brunst has to that?

22  A.   Jed Brunst responds, "I think you need to disregard the

23  model to looks at expenses as a % of revenue.  The BP business

24  expense model is largely made up of fixed or semi-variable

25  expenses that will change only modestly as revenue changes.       01:22:40

CARL FERRER - Direct

1    Per the revised projection, the operating margin does not        01:22:46

2    increase over time."

3    Q.   I think you misstated that.

4              MR. CAMBRIA:  He did.

5              THE WITNESS:  "Per the revised projection, the         01:22:57

6    operating margin does increase over time (expenses as a % of

7    revenue decline) but the business needs to support a

8    dramatically increased volume of content and users as the

9    result of ads becoming free to post.  Customers now only pay

10   for premium upgrade features such as 'move to the top' and      01:23:21

11   'auto repost'.  Because of these business model changes (ie all

12   of these ads are now free to post), ad volume has increased

13   dramatically requiring more hosting (storage, bandwith etc) and

14   way more moderation.  Expenses over the projection period have

15   been reduced (by $45MM) but margins will never return to the    01:23:40

16   previous levels unless a highly automated global payment option

17   (like Visa) is available allowing for free ads to become paid

18   ads."

19   BY MR. RAPP:

20   Q.   Now, you're not on this email?                             01:23:58

21   A.   I am not on the email.

22   Q.   You understand what he's talking about?

23   A.   I do.

24   Q.   Why are you in a position to understand what Mr. Brunst is

25   communicating to BDO?                                           01:24:16

United States District Court

CARL FERRER - Direct

1    A.    Well, I'm -- I'm the nominal owner.  BDO is handling the          01:24:20

2    taxes for Backpage but they are raising a concern to Jed Brunst

3    that the Backpage business is significantly different than it

4    was in the past.

5             Now with the loss of credit cards, ads are free,            01:24:39

6    revenue is down substantially and expenses are up

7    significantly.  So Jed is explaining that to BDO.

8    Q.    All right.  Does he disclose in this email the credit

9    cards, AMEX and other credit cards blocking their use for

10   Backpage postings?                                                   01:25:10

11   A.    He alludes to it when he says:  We'll never return to

12   previous prefers levels unless a highly automated global

13   payment option like Visa is available.

14   Q.    All right.  Does he reference "move to the top" and "auto

15   repost"?                                                             01:25:31

16   A.    Yes, he does.  Here and here (Indicating).

17   Q.    And what is he -- what do you take him to mean by that,

18   having been with the company for as long as you have?

19   A.    I'm very much aware of the business at this time.  Ads are

20   free to post but we're sorting the paid ads to the top.  So if      01:25:55

21   a user makes a purchase like a "move to the top" or buys an

22   "auto repost," then their ad will go to the top of the listings

23   and that means they will get more phone calls than if the ad

24   was buried.  So that's what he's saying, is that the ads are

25   free and many users don't need to pay any more; but if they do,    01:26:23

United States District Court

CARL FERRER - Direct

1    they are buying a "move to the top" or an "auto repost"                01:26:34
2    upgrade.
3    Q.    In what category?
4    A.    The majority of this revenue is in Female Escorts.
5    Q.    Now, let's look at one more exhibit.  This is 2000 on your       01:26:55
6    screen.  What is it?
7    A.    This is another Google Analytics referral traffic report,
8    November 2015.
9                MR. RAPP:  Move to admit and publish.
10               THE COURT:  Yes.  It maybe admitted and published.        01:27:22
11               (Exhibit Number 2000 was admitted into evidence.)
12   BY MR. RAPP:
13   Q.    What are the top four referral sites in November of 2015?
14   A.    The top four being ussexguide info is now number one,
15   eccie number two, eroticpostreview is number three.                   01:27:46
16   Theeroticreview.com has fallen to number four.
17   Q.    Any explanation for that?  They always seemed to be on
18   top, The Erotic Review.
19   A.    Yes.
20               MS. BERTRAND:  Objection.  Calls for speculation.         01:28:06
21   BY MR. RAPP:
22   Q.    Do you have an explanation?
23               THE COURT:  What was the objection?
24               MS. BERTRAND:  Speculation and foundation.  Thank
25   you.                                                                  01:28:13

United States District Court

CARL FERRER - Direct

```
 1          THE COURT:  Sustained.                          01:28:16
 2   BY MR. RAPP:
 3   Q.    Do you know why?
 4   A.    Yes, I know why.
 5   Q.    Why?                                             01:28:19
 6   A.    We weren't working closely with The Erotic Review any
 7   more.  There are no links on The Erotic Review, direct links
 8   to -- The Erotic Review direct links were not on Backpage.
 9   They were just the review IDs.  So it's obvious The Erotic
10   Review is no longer making Backpage links a priority in their  01:28:40
11   reviews.  Other websites are taking that spot.
12   Q.    And what do you know by the ussexguide?
13   A.    It's another prostitution review site.  I don't know
14   anything more than that.
15   Q.    And let's go down to number five.  What is number five?  01:29:12
16   A.    Number five is evilempire.com.
17   Q.    What do you know about evilempire.com?
18   A.    That's a -- what's the date here?  That's a company-owned
19   domain and it is serving Backpage content.  It has I believe
20   nothing but adult ads.  It's another domain -- it's another one  01:29:49
21   of those putting the content into different domains, lifeboat
22   strategy.
23   Q.    Okay.  And when you say just has adult content, can you
24   explain that?  Does it have the same categories, for example,
25   in its Adult section that Backpage.com has?                01:30:15
```

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | A.   It's a clone of Backpage.com.  It just has a different | 01:30:23 |
| 2 | look and feel and has different categories.  There's no expense | |
| 3 | in managing this content; it's just being repurposed on another | |
| 4 | domain as a way to spread traffic across multiple websites. | |
| 5 | Q.   And so were you receiving any revenue from Evil Empire? | 01:30:53 |
| 6 | A.   I don't recall any revenue.  I think when you went to | |
| 7 | post, you were just navigated right to Backpage but I'm not | |
| 8 | sure of that. | |
| 9 | Q.   All right.  Let's look at 1217.  Let's go to page three | |
| 10 | and let me see if I can make this make sense. | 01:31:48 |
| 11 |         So what exhibit are you looking at here?  Well, | |
| 12 | you're looking at 1217.  What is this? | |
| 13 | A.   This is an email from Joye Vaught to different moderators | |
| 14 | working in the Philippines, copy to Andrew Padilla, sent on | |
| 15 | Friday, November 6, 2015.  It's adult moderation feedback. | 01:32:56 |
| 16 | Q.   All right.  And you have, I believe just this morning, | |
| 17 | spoke of a moderation being handled for Backpage.com outside of | |
| 18 | the United States.  Is this what you're referring to? | |
| 19 | A.   Yes. | |
| 20 | Q.   And where is this based? | 01:33:26 |
| 21 | A.   This is in Laoag City, which is the northern Philippines. | |
| 22 | Q.   And at this point, what is Joye Voight's position with | |
| 23 | respect to that moderation team in the Philippines? | |
| 24 | A.   She's supervising their activity. | |
| 25 | Q.   So can you explain what that involves?  Explain what that | 01:33:57 |

United States District Court

CARL FERRER - Direct

1   involves?                                                    01:34:00

2   A.    She's training the moderators, reviewing their actions,

3   giving them instructions when they need them, and she's

4   delivering the current Backpage moderation policy and

5   communicating that to the Philippines and they, in turn,      01:34:22

6   communicate it to many other workers.

7         MS. BERTRAND:  Your Honor, I'm going to object as to

8   how Mr. Ferrer knows what Ms. Vaught is doing with the company.

9         THE COURT:  Overruled.

10        MR. RAPP:  Move to admit 1217.                          01:34:42

11        MS. BERTRAND:  Objection.  Hearsay, lack of

12  foundation, relevance.

13        THE COURT:  Overruled.  I think there was sufficient

14  foundation for it this morning in terms of Mr. Ferrer's

15  knowledge of what she was doing, supervising and so on.       01:34:56

16        MR. RAPP:  And request permission to admit.

17        THE COURT:  Yes.  It may be admitted and may be

18  published.

19        (Exhibit Number 1217 was admitted into evidence.)

20  BY MR. RAPP:                                                  01:35:20

21  Q.    And so starting over here, can you read what Ms. Vaught is

22  telling starting here?

23  A.    Yes.  "Hi Joella.  We reviewed a lot of the work done by

24  Avion today and so far it looks pretty good.  There were a lot

25  of false positives, though."                                 01:35:38

United States District Court

CARL FERRER - Direct

1    Q.   Can I stop you?  Do you know in the moderation game, given          01:35:42
2    your position, what a false positive is?
3            MS. BERTRAND:  Your Honor, objection to the
4    terminology, moderation game.
5            THE COURT:  Sustained.                                           01:35:52
6            Rephrase.
7    BY MR. RAPP:
8    Q.   All right.  In the moderation world, what is -- how about
9    this:  In moderation at Backpage.com, what does false positives
10   mean?                                                                    01:36:07
11   A.    False positives means that an ad was removed or the image
12   was removed or some action was taken on the ad when it wasn't
13   necessary.
14   Q.   And then what does she say?
15   A.   "Please make sure everyone has a copy of the terms list           01:36:25
16   and sticks to those words.  I'm seeing a lot of removals for
17   innocuous terms like exotic, erotic, sensual, ecstasy,
18   toe-curling, delicious, mistress, those are just some examples.
19   I'll try to give you more each day.
20           "When they come across something they aren't sure of,           01:36:50
21   and is not on the list, they should click the red 'report ad'
22   button and approve the ad.  That should prevent a lot of false
23   positives."
24   Q.   All right.  And then this is the second page on my right.
25   How does she conclude?                                                   01:37:08

United States District Court

CARL FERRER - Direct

1   A.   "Also, please advise that if they see any of the words at

2   the bottom of the list they should click the red 'report ad'

3   button as well."

4   Q.   And then coming over -- back to the email on the left,

5   what does she say to this person?

6   A.   "Hello again, Joella.

7        "Here is a list of words that seem to be confusing

8   the moderators today.  Fulfill.  2Girl.  Freaky.  'Cum and get

9   it.'  'Cum to you.'  Anything with cum in it.  Nuru.  SS next

10  to a price.  Top.  Toys, 'I have toys.'

11       "Ads with these words should not be deleted, their

12  not on the list.  Thank you, Joye."

13  Q.   Okay.  And so were the terms changing over time?

14  A.   Well, yes, terms were changing over time but now that the

15  site is free, we're going backwards on moderation a bit.  We're

16  focused more on banking.

17  Q.   All right.  Is there an example of a term that you've gone

18  back, to in your words, among the list of terms that Ms. Vaught

19  is communicating to the moderation team?

20       MS. BERTRAND:  Your Honor.  Objection.  I don't

21  believe this -- foundation has been laid as to what Mr. Ferrer

22  actually knew about the specifics of moderation at this time.

23  He just said he was spending most of his time on banking.

24       THE COURT:  I will sustain the objection just because

25  the question is confusing.

01:37:11
01:37:26
01:37:53
01:38:27
01:38:47
01:39:15

CARL FERRER - Direct

```
 1              And so perhaps rephrase the question, Mr. Rapp.           01:39:17
 2    BY MR. RAPP:
 3    Q.   So for moderation in November of 2015, are there -- have
 4    there been any changes in moderation since the credit cards
 5    have blocked Backpage transactions?                                 01:39:40
 6    A.   Yes.  I'm aware of some changes.
 7    Q.   What are those changes?
 8              MS. BERTRAND:  Your Honor, objection.  There's no
 9    foundation as to how he's aware of these changes.
10              THE COURT:  Sustained.                                    01:39:55
11    BY MR. RAPP:
12    Q.   Are you the -- at least on paper, are you the owner of the
13    business?
14    A.   I am and the Moderation Department supervisors work right
15    outside my office.                                                  01:40:06
16    Q.   And do you have some kind of supervisory obligations with
17    respect to moderation?
18    A.   Yes.
19    Q.   All right.  And so as of November of 2015, has moderation
20    changed in the wake of the credit card block back in July of       01:40:26
21    2015?
22              MS. BERTRAND:  Your Honor, objection.  Vague as to
23    what time period we're talking about for changes, if it's from
24    July or when.
25              THE COURT:  Well, he can answer the question as of        01:40:44
```

United States District Court

CARL FERRER - Direct

1   November 2015 if moderation has changed.                    01:40:46

2           THE WITNESS:  Yes, moderation as changed.  We're

3   backing up on moderation.  The number of ads getting posted,

4   because they are free, is so significant and such a workload

5   that we had to buy additional servers.  So some terms are being   01:41:07

6   re-allowed.

7           MR. RAPP:  Okay.

8   BY MR. RAPP:

9   Q.   And then let's go to page one.  So this is also 12-17.

10  Who is this email, who is this -- who is the sender at the top?  01:41:48

11  A.   So it's from Andrew Padilla.  It's to a moderator in the

12  Philippines, Joella.  It's copied to Joye at Backpage and then

13  several other moderators in the Philippines.

14  Q.   Okay.  And what does Mr. Padilla say to this moderator?

15  A.   "Hi everyone.  I was reviewing deleted ads and the crew    01:42:20

16  seems to be doing a great job catching bad stuff.  Here are a

17  few removals that I restored.  Some only needed pics removed."

18          And then he lists a number of URLs.  Do you need me

19  to state their ad titles?

20  Q.   Yes.                                                     01:42:44

21          MS. BERTRAND:  Your Honor.  Objection.  I don't think

22  it's necessary to read in the ads.  They are in the record via

23  the exhibit and the jury can see them.  They have been

24  published to them.

25          THE COURT:  Are these ads in the -- are they a         01:43:00

United States District Court

CARL FERRER - Direct

1  separate exhibit, Mr. Rapp?                                          01:43:02

2          MR. RAPP:  No.  This is -- the links are just in this

3  exhibit.

4          THE COURT:  So I'm sorry.  When you say "ads," what

5  do you mean?                                                         01:43:13

6          MS. BERTRAND:  I mean the links here.  We don't need

7  to read the links into the record.  The links are right there

8  for the jury to see and review.

9          THE COURT:  Well, he can answer about what the links

10 are.                                                                 01:43:24

11 BY MR. RAPP:

12 Q.   Well, how about just for at the time about the whole

13 Backpage.com and the city, how about just read what the nature

14 of the link -- the nature of the ad is?

15 A.   The ad title November 14 to November 16                         01:43:41

16 smothering-spanking-smoking-training-degradation-discipline-dom

17 ination-torture.

18 Q.   All right and then the next one?

19 A.   New-new-a-tasteful-Xrated-treat-jewel-100-real-pics-seduct

20 ion-awaits.                                                          01:44:01

21 Q.   And the next one?

22 A.   Call-upay-only40 and then their phone number,

23 347-984-3041.

24 Q.   And then the next one?

25 A.   Let-two-goddesses-worship-your-divine-masculinity.              01:44:18

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Q.   Next one? | 01:44:25 |
| 2 | A.   Top-of-the-line-soft-caramel-beautiful-hands. | |
| 3 | Q.   All right.  And the next one? | |
| 4 | A.   Minot-come-enjoy-and-sensual-massage-with-some-toyplay. | |
| 5 | Q.   All right.  That's good enough.  Then what does | 01:44:43 |

Mr. Padilla say at the bottom?

7   A.   "Please congratulate the crew for me.  I think they are

8   doing a tremendous job keeping up with the volume and removing

9   the bad guys."

10  Q.   Okay.  Let's move on to 1219.  Yes.  1219.  So do you   01:45:17

11  recognize who this email is from?

12  A.   Yes.  It's from Joye Vaught.

13  Q.   And is the email, is it multiple pages?

14  A.   Yes.

15  Q.   How many pages is it?   01:45:38

16  A.   16.

17  Q.   And does it have images?

18  A.   Yes, lots of images.

19  Q.   All right.  Going back to 1219 -- and just like the

20  previous emails, is Joye Vaught sending this email to the   01:46:01

21  moderation team?

22  A.   She is.  She's emailing the managers for the moderation

23  team in the Philippines.

24          MR. RAPP:  Move to admit 1219 and publish.

25          MS. BERTRAND:  Objection. relevance.  Foundation.   01:46:21

United States District Court

32

CARL FERRER - Direct

1   Hearsay.  Both as to the transmission document and to the          01:46:25

2   photos that follow.

3           THE COURT:  Overruled and 1219 may be admitted and

4   published.

5           (Exhibit Number 1219 was admitted into evidence.)       01:46:36

6           MR. RAPP:  Thank you, Your Honor.

7   BY MR. RAPP:

8   Q.   And so what is Joye Vaught telling the moderation team in

9   the Philippines?

10          MS. BERTRAND:  Judge, the document has two              01:46:53

11   sentences -- three sentences.  The document speaks for itself.

12   It doesn't need to be read to the jury.

13          THE COURT:  Well, let's give the jury a few seconds

14   to read the document.

15   BY MR. RAPP:                                                   01:47:09

16   Q.   While they are doing that, let me just ask you --

17          THE COURT:  Well, let's give them a moment to read it

18   and then you can ask him something once they are finished.

19          MR. RAPP:  All right.

20   BY MR. RAPP:                                                   01:47:30

21   Q.   Is Ms. Vaught telling the team to delete memberships or

22   restore images?

23   A.   She's telling them --

24          MS. BERTRAND:  Judge, objection.  It says what it is

25   and it's leading.                                              01:47:47

United States District Court

CARL FERRER - Direct

```
 1          THE COURT:  Well, sustained as to leading but he can    01:47:51

 2   ask the question.  He can ask a rephrased question I should

 3   say.

 4   BY MR. RAPP:

 5   Q.   How about this:  What is she trying to communicate to the  01:47:58

 6   staff?

 7          MS. BERTRAND:  Same objection.  Lack of foundation.

 8   He doesn't know what she's saying if he's not on the email.

 9   There's no foundation that he knows what this is about.

10          THE COURT:  Overruled.                                  01:48:14

11          THE WITNESS:  Once again, Avion has false positives.

12   They are receiving images that they shouldn't and that Joye is

13   communicating the images that should be restored.

14   BY MR. RAPP:

15   Q.   And is the rest of the email a series of --               01:48:30

16   A.   It's a lot of images of scantily clad people.

17          MS. BERTRAND:  Objection as to depictions.  The

18   images are for the jury to determine.  They are entered into

19   the record.

20          THE COURT:  Sustained and the jury --                   01:48:46

21          MS. BERTRAND:  Move to strike as to "scantily clad."

22   Sorry.

23          THE COURT:  Sustained and the jury will disregard the

24   witness's answer to the last question.

25   \\\
```

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | BY MR. RAPP: | 01:48:55 |
| 2 | Q.   All right.  Let's just move through the images. | |
| 3 |      All right.  Let's move to 1817.  Do you see that on | |
| 4 | your screen, sir? | |
| 5 | A.   Yes, I do. | 01:49:56 |
| 6 | Q.   And let me see if I can get this to work correctly.  I'm | |
| 7 | showing on your screen an email.  Do you recognize who is | |
| 8 | sending this email? | |
| 9 | A.   Yes, I do.  It's Joye Vaught. | |
| 10 | Q.   What date is she sending this email? | 01:51:05 |
| 11 | A.   She is sending it Wednesday, July 22, 2015. | |
| 12 | Q.   And is -- do you recognize somebody else on the email? | |
| 13 | A.   Yes.  Andrew Padilla. | |
| 14 | Q.   And are they responding to somebody in moderation? | |
| 15 |      MS. BERTRAND:  Objection.  Calls for speculation. | 01:51:34 |
| 16 | Lack of foundation. | |
| 17 |      THE COURT:  Overruled. | |
| 18 |      THE WITNESS:  Yes.  The email's sent to Lauren. | |
| 19 | She's a moderator in Dallas. | |
| 20 |      MR. RAPP:  Move to admit 1817. | 01:51:51 |
| 21 |      MS. BERTRAND:  Objection.  Relevance.  Hearsay, | |
| 22 | foundation. | |
| 23 |      THE COURT:  Overruled.  It may be admitted and | |
| 24 | published. | |
| 25 |      (Exhibit Number 1817 was admitted into evidence.) | 01:52:00 |

United States District Court

35

CARL FERRER - Direct

1    BY MR. RAPP:                                                          01:52:05

2    Q.   All right.  Starting down where it's highlighted at the

3    bottom of this email chain, can you read what Mr. Padilla is

4    saying and it goes on to the next page here on my right?

5    A.   Yes.  Starting here (Indicating)?                               01:52:20

6    Q.   Yes, sir.

7    A.   "Let's handle this round-robin.

8         Help@ should research whatever they can find based on

9    these two accounts and two attachments.  We're only look for

10   info specifically related to the girl in the attachments.          01:52:41

11        "Shawn:  404 all of the ads when Ashley/Lauren give

12   you all the clear.

13        "Ray:  Request a Google removal for the ads in the

14   attachment when Shawn is done."

15   Q.   Are that two links here?                                        01:53:02

16   A.   Those are links to user accounts?

17   Q.   And then up above, what does Lauren say to -- in response

18   to Andrew?

19   A.   "Hi there.  Andrew, I attached all the info I could find

20   on the user.                                                        01:53:28

21        "Shawn, you can go ahead and 404 the ad on the

22   account wwet38@yahoo.com.

23   Q.   All right.  And what does Joye say here in response to

24   that email?

25   A.   "Hi, you guys normally send out evil empire and" -- let me     01:53:58

CARL FERRER - Direct

1   reread that, please.                                            01:54:06

2            "Hey do you guys normally send out evil empire and

3   naked city links when you reply to cops?

4            "If you do, can you stop?  We own those sites too."

5   Q.   Okay.  And so if you recalled, we just looked at a Google   01:54:21

6   Analytics report that I believe was in Exhibit 2000.  Do you

7   remember that?

8   A.   Yes.

9   Q.   And it was the fifth site on the Google analytic report?

10  A.   Yes.                                                        01:54:46

11  Q.   And I asked you some questions about it?

12  A.   Yes.

13  Q.   Can you just remind the jury so they can link it up.  What

14  is the Evil Empire?

15  A.   Evil Empire is the Backpage adult content that is put on a  01:54:57

16  different domain with a different look and feel but it's the

17  same website as Backpage.

18  Q.   All right.  And so here, Joye Vaught is telling them not

19  to send the Evil Empire links to the cops.  Do you see that?

20  A.   Yes.                                                        01:55:23

21  Q.   Do you know why she is telling them not to send that to

22  the cops?

23            MS. BERTRAND:  Objection, Your Honor.  Calls for

24  speculation unless he was party to this conversation or asked

25  her himself why she did it, I don't believe he has the personal  01:55:37

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | knowledge to speculate as to her thoughts. | 01:55:41 |
| 2 | THE COURT:  Sustained. | |
| 3 | MS. BERTRAND:  Speculation objection. | |
| 4 | THE COURT:  Objection is sufficient, Ms. Bertrand. | |
| 5 | BY MR. RAPP: | 01:55:52 |
| 6 | Q.   Mr. Ferrer, did there come a time where -- you have | |
| 7 | testified that previously when you would receive subpoenas, you | |
| 8 | would send postings to law enforcement? | |
| 9 | A.   Yes.  We would send a sheet that showed links to postings | |
| 10 | on other websites to law enforcement. | 01:56:21 |
| 11 | MR. EISENBERG:  Objection, Your Honor.  Nonresponsive | |
| 12 | to the question.  It's "Yes" or "No." | |
| 13 | THE COURT:  Sustained.  Everything after "yes" is | |
| 14 | stricken. | |
| 15 | BY MR. RAPP: | 01:56:36 |
| 16 | Q.   Well, first, when you received the subpoena, did you send | |
| 17 | postings in response to those subpoenas to law enforcement? | |
| 18 | A.   Yes. | |
| 19 | Q.   Did there come a time where you also sent links to other | |
| 20 | sites where these postings were found to law enforcement? | 01:57:02 |
| 21 | A.   Yes, we did.  It was a matter of -- we did it on a regular | |
| 22 | basis. | |
| 23 | MR. EISENBERG:  Objection, Your Honor.  It's beyond a | |
| 24 | yes-or-no answer. | |
| 25 | THE COURT:  Sustained.  Again, the jury will | 01:57:18 |

United States District Court

CARL FERRER - Direct

1    disregard everything after "yes."                                    01:57:20

2    BY MR. RAPP:

3    Q.    Well, why did you do that?

4    A.    I was asked by the owners to set up a program where the

5    staff would regularly send links to other sites for a subpoena    01:57:27

6    so we would send the subpoena and then links to where those ads

7    appeared on other sites.

8    Q.    All right.  When you say "the owners," who among the

9    owners is giving you this direction?

10   A.    This is coming from Jim Larkin.                               01:57:47

11   Q.    All right.  And why would you send these -- why would you

12   send these links to these other sites to law enforcement?

13   A.    Two reasons.

14   Q.    All right.

15   A.    One was to create the impression of being generally          01:58:06

16   helpful to law enforcement as for a PR reason.  The second was

17   for them to send subpoenas to other websites and perhaps not

18   just exclusively attack Backpage in the media.

19   Q.    What did you know, based on your experience, about these

20   other sites that you were sending to law enforcement?  What did   01:58:45

21   you know about those sites?

22   A.    Almost all of those sites were just scrapes of content

23   that had been on Backpage and just repurposed on other website

24   domains similar to like we had with Evil Empire or

25   nakedcity.com.                                                     01:59:11

United States District Court

39

CARL FERRER - Direct

1    Q.   All right.  And then, lastly, what does Joye Vaught say up      01:59:20

2    here?

3    A.   Joye writes, "It's no problem, just wanted to make sure

4    that we weren't sending that info to cops too!

5         "Also, Ashley did the same thing you did with the      01:59:38

6    searches but she didn't reply all with got it.  She only sent

7    it to Andrew.

8         "Let's the 3 of us meet tomorrow morning at 10am to

9    talk about a couple improvements in help@.  Thank you, Joye."

10   Q.   All right.  Let's look at Exhibit 220.  Do you see that on      02:00:18

11   your screen?

12   A.   Yes, I do.

13   Q.   Do you recognize it?

14   A.   Yes, I do.

15   Q.   How do you recognize it?      02:01:03

16   A.   This is an ad that was made into a PDF.  Ad -- the user

17   that made this ad had administrative access so information like

18   the email address, the IP address is in this ad.

19        MS. BERTRAND:  Objection, Your Honor.  Nonresponsive.

20   It doesn't say how he knows and doesn't say how he knows.  He      02:01:26

21   just describes the ad.

22        THE COURT:  Yes.

23        Mr. Rapp, you can lay some more foundation.

24        MR. RAPP:  Okay.

25   \\\

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | BY MR. RAPP: | 02:01:37 |
| 2 | Q.   Have you seen ads like this before? | |
| 3 | A.   Yes, I have. | |
| 4 | Q.   And how have you seen these ads? | |
| 5 | A.   I've seen these ads over my course of my career and I | 02:01:45 |

1   BY MR. RAPP:                                                02:01:37

2   Q.   Have you seen ads like this before?

3   A.   Yes, I have.

4   Q.   And how have you seen these ads?

5   A.   I've seen these ads over my course of my career and I   02:01:45

6   specifically am familiar with this ad because it is the mobile

7   view.  And one of the unique things with this ad is, at this

8   time frame, we added a hamburger in the upper left hand screen.

9   You see that little three horizontal lines.  We call it the

10  hamburger.                                                   02:02:10

11  Q.   All right.  Let's look at a couple more pages here.  Are

12  the images consistent with what you see on Backpage?

13  A.   Yes.

14  Q.   And is there administrative data?

15  A.   There is the standard administrative data box.          02:02:30

16  Q.   Okay.  All right.

17          MR. RAPP:  Move to admit 220.

18          MS. BERTRAND:  Same objections as to foundation and

19  hearsay.

20          THE COURT:  Overruled.                               02:02:44

21          MR. RAPP:  And request permission to publish.

22          THE COURT:  Yes, it may be published.

23          COURTROOM DEPUTY:  And it's admitted.

24          THE COURT:  Yes.  It's admitted.  I overruled the

25  objection.                                                   02:02:54

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | (Exhibit Number 220 was admitted into evidence.) | 02:02:54 |
| 2 | BY MR. RAPP: | |
| 3 | Q.   All right.   When was this posting done? | |
| 4 | A.   May 18, 2015. | |
| 5 | Q.   Okay.  And you referenced a hamburger and I believe you | 02:03:07 |
| 6 | were testifying that during a certain time frame, they added | |
| 7 | that.  Can you tell us about that? | |
| 8 | A.   Yes.   This is common.   You'll see this on mobile views. | |
| 9 | If you click the hamburger, that is when you'll get to see some | |
| 10 | options to log into your account, post an ad, those kind of | 02:03:31 |
| 11 | things. | |
| 12 | Q.   All right.  And let's just go through the images quickly. | |
| 13 | Do you know what it means to update ad here? | |
| 14 | A.   Yes.   You could remove -- this posting -- this image has | |
| 15 | been removed and if you wanted to add it back, you could select | 02:04:14 |
| 16 | that radio button and then hit "update." | |
| 17 | Q.   Let's go back to the first page.  What market is this in? | |
| 18 | Can you tell? | |
| 19 | A.   This is in Fort Worth, Texas. | |
| 20 | Q.   Okay.  All right.  Now looking at Exhibit 218, do you see | 02:04:34 |
| 21 | that on your screen? | |
| 22 | A.   Yes, I do. | |
| 23 | Q.   Do you recognize it? | |
| 24 | A.   Yes, I do. | |
| 25 | Q.   How do you recognize it? | 02:05:05 |

United States District Court

42

CARL FERRER - Direct

1    A.    It's a Backpage posting.  I can tell by the bread crumb on        02:05:08

2    the upper left-hand side, the posting date, the reply button

3    for anonymous emails, and the links to other ads by the closer

4    at the bottom of the page.

5    Q.    All right.                                                          02:05:29

6                MR. RAPP:  Move to admit 218.

7                MS. BERTRAND:  Objection.  Foundation.  Hearsay,

8    relevance.

9                THE COURT:  Overruled.

10               MR. RAPP:  And request permission to publish.                02:05:41

11               COURTROOM DEPUTY:  Yes.  It may be published.

12               (Exhibit Number 218 was admitted into evidence.)

13   BY MR. RAPP:

14   Q.    And what market is this in?

15   A.    This is in Inland Empire.                                          02:05:57

16   Q.    And I think you testified previously to another posting

17   that was in the Inland Empire but where -- if you know where it

18   is?

19   A.    Inland Empire I believe is west of the Los Angeles metro

20   area, maybe south.  Let me just say it's somewhere near Los              02:06:13

21   Angeles.

22   Q.    And what date was this posted on?

23   A.    It's posted on Thursday, August 13, 2015.

24   Q.    Would this posting during this time frame, would it have

25   cost to post this ad, if you know?                                       02:06:40

United States District Court

CARL FERRER - Direct

1   A.   Thursday, August 13.   It may not have unless they chose to     02:06:44

2   buy a "move to the top" or "auto repost."

3   Q.   All right.   And in terms of the moderation during this

4   time frame, is this after you had to lay off moderation staff?

5   A.   Yes.   This is after we've laid off our U.S. moderation     02:07:18

6   staff and we've gone free.   So a lot more ads.

7   Q.   Okay.   So does this is ad have a reference to oral sex in

8   it?

9             MS. BERTRAND:   Objection.   Calls for speculation.   He

10  has no direct knowledge of what's going on in this ad other     02:07:47

11  than what's stated.

12            THE COURT:   Sustained.

13  BY MR. RAPP:

14  Q.   All right.   Could you read from here to here (Indicating)?

15            MS. BERTRAND:   Your Honor, it's in front of the jury.     02:08:11

16  They can read it.

17            THE COURT:   Yes.   That is the case, Mr. Rapp.   The

18  jury can take a moment to read it.

19            Continue, Mr. Rapp.

20  BY MR. RAPP:     02:08:43

21  Q.   All right.   Let's go to the next page of 218.   We have

22  been talking about buy credits.   Is there anything in this ad

23  that suggests that you could purchase your posting by buying

24  credits?

25  A.   Yes, there is.     02:09:15

United States District Court

44

CARL FERRER - Direct

1   Q.   All right.  And where is that?                          02:09:20

2   A.   It's here.  You can buy credits and this opens up a

3   revenue opportunity.

4   Q.   All right.  Let's now go on to Exhibit 221.  Do you

5   recognize Exhibit 221?                                       02:09:49

6   A.   Yes.

7   Q.   And how do you recognize it?

8   A.   It's a Backpage posting printed out in administrative

9   view.  It's in August 15, 2015, so it has the hamburger up in

10  the upper left-hand side.                                    02:10:07

11  Q.   And what market is this in?

12  A.   This is posted in Detroit.

13  Q.   All right.  Let's go to the next page and so do you

14  recognize this as a Backpage posting?

15  A.   I do.                                                   02:10:30

16          MR. RAPP:  Move to admit United States 221.

17          MS. BERTRAND:  Objection.  Hearsay, foundation,

18  relevance.

19          THE COURT:  Overruled.  221 may be admitted and

20  published.                                                   02:10:43

21          (Exhibit Number 221 was admitted into evidence.)

22  BY MR. RAPP:

23  Q.   All right.  Let's go to 882.  Do you see that exhibit?

24  A.   Yes, I do.

25  Q.   How do you recognize the exhibit?                       02:12:04

United States District Court

CARL FERRER - Direct

1   A.   The email is from Jed Brunst.  It's sent on August 17,     02:12:07

2   2015, to myself.

3   Q.   Okay.  And the subject matter?

4   A.   Subject matter is:  Customer credit transfer-notice to

5   receive.                                                           02:12:28

6            MR. RAPP:  Move to admit 882.

7            MR. LINCENBERG:  No objection.

8            THE COURT:  It may be admitted and published.

9            (Exhibit Number 882 was admitted into evidence.)

10  BY MR. RAPP:                                               02:12:46

11  Q.   And so just going up to the top here, do you know the

12  context of this email that you're exchanging with Mr. Brunst?

13  A.   Yes.

14  Q.   What is it?

15  A.   Well, he's asking if I've been able to open a new bank for  02:13:09

16  AMEX and money order deposits because we're struggling to --

17  we're taking money orders.  They are getting mailed to us to

18  buy credits.  We need a bank.

19  Q.   All right.  So is this -- when you take money orders, is

20  this in August of 2015?                                02:13:29

21  A.   Yes.

22  Q.   And can you explain that to the jury, how you had to

23  transition to accepting money orders?

24  A.   At this time in August 17, we've -- we're asking customers

25  to mail us money orders.  So they would go to 7-Eleven or the  02:13:52

United States District Court

CARL FERRER - Direct

1    Post Office and then mail us a money order.  They would come        02:13:56
2    in.  We would organize the checks, apply the credits to the
3    user's account and then deposit those money orders.  And some
4    days were $70,000 a day coming in on money orders.
5    Q.   And were you continuing to, during this time period just      02:14:24
6    to make interest payments to Mr. Brunst, Mr. Spear, and
7    Mr. Lacey?
8    A.   Yes.  At this time it's -- in fact, I'm not even sure.
9    August 17, 2015 I may not have been making any payments.  I
10   think the interest payments maybe start in October.               02:14:44
11   Q.   And can you interpret this information down here?  Are you
12   familiar with this information?
13   A.   Yes, I'm familiar.
14   Q.   How are you familiar with this information?
15   A.   Well, this is the bank in Iceland that had terminated us     02:15:07
16   and we were able to get them to send funds that they owned the
17   company and we sent them to the BMO Harris bank.
18   Q.   Okay.  And can you explain this here, this -- what appears
19   to be some type of an address of Website Technologies?
20   A.   Yes.  That address, that is the address of the company       02:15:39
21   called Classified Solutions, LTD, that Jed Brunst had opened
22   up.  So it has kind of like an office location and that is the
23   address.  That's not Website Technologies.  That's Classified
24   Solutions but Classified Solutions contracted with the bank in
25   Iceland, Borgun.                                                  02:16:10

United States District Court

CARL FERRER - Direct

1   Q.   Borgun?                                                    02:16:13

2   A.   What's that?

3   Q.   The Borgun Bank?

4   A.   I believe it's Borgun Bank, yes.

5   Q.   And so just so the jury can understand what's going on,    02:16:20

6   where is this address?  Where is this address for not Website

7   Technologies but I believe you said --

8   A.   Classified Solutions, LTD.

9   Q.   -- Classified Solutions?

10  A.   We had to make sure the users wouldn't mail their money    02:16:49

11  orders to that address because in our terms of use we would say

12  "not for mail correspondence."  There's nobody there.

13  Q.   All right.  But where is it?  Do you know?

14  A.   Oh.  It's in -- it's somewhere in the UK.

15  Q.   All right.  And is there anybody from Backpage at this     02:17:09

16  office on a daily basis?

17  A.   There's -- no.

18  Q.   And so when you would receive these money orders, who

19  would the money orders be made out to?

20  A.   It depended on the bank account that we wanted them        02:17:37

21  deposited.

22  Q.   And can you tell the jury about that?

23  A.   Well, we had a company called Posting Solutions.  So then

24  we would open up a bank with the company Posting Solutions and

25  then deposit the checks under Posting Solutions.  And there was  02:17:55

United States District Court

CARL FERRER - Direct

1  another name prior to and it escapes me right now.  But when          02:18:01

2  that bank account dropped us, we had to tell all users, "Don't

3  send us a check in that name.  Send it in this name, Posting

4  Solutions."

5  Q.   All right.  And just so we understand this, once the money       02:18:18

6  orders would come to Backpage, how would you get them into the

7  bank?

8  A.   There was a team of I believe six people who would take

9  over the conference room and, wearing gloves, open envelopes

10 and sort the money orders.  Sometimes we were mailed cash.          02:18:42

11 Q.   Sometimes you were mailed cash?

12 A.   Yes.  And then organize them for a deposit.  And usually

13 Monday was an extremely busy day because you had the mail for,

14 you know, Saturday, Monday, you had multiple days and so there

15 were times when it was over $100,000 in money orders being         02:19:07

16 deposited.

17 Q.   Did you ever advise the posters to make the money order

18 out to Backpage?

19 A.   No.  We would not advise them because we didn't have a

20 bank called Backpage so we wouldn't be able to deposit them.       02:19:31

21 Q.   All right.  Let's look at 1221.  Do you recognize this?

22 A.   Yes.

23 Q.   And who is it from?

24 A.   It's from Jed Brunst.

25 Q.   And who is it to?                                                02:20:00

United States District Court

CARL FERRER - Direct

1  A.    It's to Nathan Kopecky and I am copied along with Jim                02:20:02

2  Larkin and Susan Boswell.

3  Q.    All right.  And what is the subject of this email?

4  A.    The subject is:  November Financials and Interest Request.

5            MR. RAPP:  Move to admit 1221.                                  02:20:20

6            THE COURT:  Yes.  It may be admitted and published.

7            MR. RAPP:  Thank you.

8            (Exhibit Number 1221 was admitted into evidence.)

9  BY MR. RAPP:

10 Q.    Well, it's actually not you.  Who is this Nathan Kopecky?           02:20:35

11 A.    So Nathan Kopecky was the CFO working from the Dallas

12 office.

13 Q.    All right.  And did you hire Mr. Kopecky?

14 A.    Both Jed Brunst and I hired Nathan Kopecky because Nathan

15 is going to be reporting to Jed Brunst.                                   02:21:00

16 Q.    Explain that to the jury.

17 A.    I wasn't able to just hire my own CFO.  Of course I'm

18 probably not qualified.  But, second, the person needs to

19 report to Jed Brunst who is the overall CFO.  So if we both

20 agreed, then we'll hire him and so we agreed on Nathan.  We had          02:21:27

21 to go through a recruiter.

22 Q.    All right.  But that's before the sale; right?

23 A.    Yes.  We had hired -- oh, that's right.  We had

24 actually -- that's right.  I misspoke.  Before the sale, this

25 hire is more by Jed and me agreeing that, yeah, he seems like a          02:21:47

United States District Court

CARL FERRER - Direct

1    good guy.                                                          02:21:54

2    Q.   All right.  But then after the sale, do you come to learn

3    that Mr. Kopecky is providing information to Mr. Brunst?

4    A.   That is his -- that's what he's supposed to do, provide

5    the financials, yes.                                               02:22:13

6    Q.   All right.  And so here what is he telling Mr. Brunst?

7    A.   "Jed, see attached for November's financials.

8             "In regards to interest, we are requesting that you

9    grant us until the first week of January to make November's

10   interest payment and then allow 30 days until the next payment.   02:22:35

11   This will allow funds to build without inhibiting our

12   operational needs.  We can discuss further if you like in terms

13   of what we have in the bank currently."

14   Q.   And what is Mr. Brunst's response where he includes you on

15   the email?                                                        02:23:04

16   A.   "By my simple calculations you should be able to pay

17   November interest before" December 31 "so I would like that to

18   happen.  December interest can then be paid on" January 31.

19   Thereafter, interest can be paid one month in arrears until you

20   are caught up (ie paying the current months interest at the end  02:23:23

21   of the current month).  So, I think we will add a sweep feature

22   that allows BP to remain no more than $1 million in cash at the

23   end of the month until we are concurrent."

24   Q.   Let's just stop there.  What do you know, if anything,

25   about this sweep feature that he's referring to?                  02:23:44

CARL FERRER - Direct

1   A.   So if we had two million in the account, he could just          02:23:49

2   take out that one million and leave one million.   In other

3   words, whatever excess cash that he feels Backpage doesn't need

4   to operate, they could take.

5   Q.   All right.   And then what else does he say?                     02:24:08

6   A.   "There is no need for BP to carry a large cash balance.

7   When you cumulate cash at the rate of 200K a day."

8   Q.   Are you receiving 200,000 in cash per day during this time

9   frame?

10  A.   What was the time frame, November?   Well, it seems a           02:24:40

11  little aggressive but he may be right and the business was

12  starting to come back.   We were finding alternatively payment

13  channels but we still viewed Jed as an aggressive bill

14  collector and we wish he would give us more space.

15  Q.   All right.                                                       02:24:56

16           MR. LINCENBERG:   Your Honor, I'm going to object to

17  the "we."   No foundation.

18           THE COURT:   Sustained.

19  BY MR. RAPP:

20  Q.   Well, how do you view it?                                        02:25:10

21  A.   I felt like he was aggressive bill collector and he needed

22  to give us more space.

23  Q.   All right.   And why did you believe that he needed to give

24  you more space?

25  A.   Because it just seemed with Backpage there was always          02:25:24

United States District Court

CARL FERRER - Direct

1   another disaster around the corner.  I don't know what it is                          02:25:27
2   but it's coming and, you know, we need the reserves to make
3   payroll.
4   Q.   At this time are you still -- are you still trying to find
5   merchant banks outside of the United States?                                          02:25:40
6   A.   I think at this time we're looking at banks in Asia.
7   Q.   All right.  And why are you looking at banks in Asia?
8   Just so we're clear.  Is this a treasury bank or a merchant
9   processing bank?
10  A.   This would be merchant processing and it's sort of the                           02:25:59
11  more risk -- reputational risk a company has in credit card
12  processing, it gets kicked out of the U.S.  It goes to Europe.
13  It gets kicked out of there and then it tries to find
14  processing in Asia and we did secure some banks in China,
15  Malaysia.                                                                             02:26:22
16  Q.   And how did that go?
17  A.   They were criminals.  They didn't give us our money.
18         MS. BERTRAND:  Objection to the -- objection to the
19  description of criminals regarding these banks.
20         THE COURT:  Sustained.                                                         02:26:37
21         The answer will be stricken.  The jury will
22  disregard.
23  BY MR. RAPP:
24  Q.   When you say they didn't give you your money, can you
25  explain that?                                                                         02:26:46

United States District Court

CARL FERRER - Direct

1  A.   They ripped us off.   They owed us money.   Millions of    02:26:47

2  dollars went to these Payment Solutions in Asia and other

3  places and then they just stopped paying us.

4  Q.   Did you have any recourse?

5  A.   No.   We didn't have any recourse and I'll tell you, it was    02:27:06

6  parts of the receivable that Jed Brunst would ask me to go

7  through and try to collect.   And, you know, with Jed Brunst's

8  instructions, I called guys in Malaysia and threatened to take

9  them to court and, you know, for all practical purposes, they

10 just ignored me.    02:27:24

11 Q.   All right.   Let's look at 1224.   Do you recognize this

12 email?

13 A.   Yes, I do.

14 Q.   Is this -- are we now in 2016?

15 A.   We are.    02:28:14

16 Q.   And who is this email from?

17 A.   The email is from Joye Vaught.

18 Q.   Do you know who it's going to?

19 A.   It's going to Darwin Arquillo.

20 Q.   And who else is copied on this?    02:28:36

21 A.   Jessie Frichtel and Andrew Padilla.

22 Q.   All right.

23          MR. RAPP:  Move to admit 1224.

24          MS. BERTRAND:   Objection.   Hearsay, relevance.

25 Foundation.    02:28:53

United States District Court

CARL FERRER - Direct

1          THE COURT:  Foundation, Mr. Rapp, lay some more.        02:28:56

2   BY MR. RAPP:

3   Q.   All right.  What's the date of this email?

4   A.   So the date is Friday, January 15, 2016.

5   Q.   And what was Ms.-- what was Joye Vaught's role at Backpage   02:29:16

6   in January of 2016?

7   A.   She's -- she reports to Andrew Padilla.  She's one of the

8   supervisors of the Moderation Department and she's overseeing

9   the moderation in the Philippines of which means she's

10  communicating to Darwin who is -- I know Darwin and he's one of   02:29:42

11  the managers of the Philippines.

12  Q.   All right.  Did you have occasion to in your capacity at

13  Backpage to go to the Philippines and observe the moderation

14  staff?

15  A.   I did.  I worked out of the Philippines moderation staff   02:29:59

16  office and I met with Darwin personally.

17          MR. RAPP:  All right.  Move to admit 1224.

18          MS. BERTRAND:  Objection, Your Honor.  Same

19  objections as to foundation.  Mr. Ferrer is not a party to this

20  email.                                                           02:30:14

21          THE COURT:  Overruled.

22          MR. RAPP:  Request permission to publish.

23          THE COURT:  Yes, it may be published.

24          (Exhibit Number 1224 was admitted into evidence.)

25          THE COURT:  And once you go through this email we'll   02:30:28

United States District Court

CARL FERRER - Direct

1   take our afternoon break, Mr. Rapp.                           02:30:30

2   BY MR. RAPP:

3   Q.   Then I'll make it quick.  What is this email about?

4            MS. BERTRAND:  Objection.  Lack of foundation as to

5   this person's actual knowledge of what is going on in this    02:30:42

6   email.

7            THE COURT:  Overruled.

8            Mr. Rapp, continue.

9   BY MR. RAPP:

10  Q.   All right.  Can you just -- is this a two-page email?     02:30:49

11  A.   Yes, it is.

12  Q.   And do you recognize what's on the email?

13  A.   I do.  I do recognize it, yes.

14  Q.   And what are these?

15  A.   These are links to Backpage ads that you could see in     02:31:14

16  administrative view and it shows the moderator that made the

17  mistake of approving the ad and then it shows the terms that is

18  the problem that should have resolved it in the ad not being

19  approved.

20  Q.   All right.  So like, for example, here, what was the      02:31:27

21  problem?  Can you interpret that?

22  A.   The ad had BBJ.

23  Q.   All right.  And then is there another one?

24  A.   There's another ad for BBJ.

25  Q.   And this one?                                             02:32:01

United States District Court

CARL FERRER - Direct

```
1    A.    Full service-in picture.                                02:32:03

2    Q.    Let's go to page two.   This one?

3    A.    The term Greek.

4    Q.    All right.   This one?

5    A.    Sex act in picture.                                     02:32:33

6    Q.    This one?

7    A.    Bareback.

8    Q.    And so what is Joye Vaught telling Darwin about these

9    links, these various links with the term that violates the

10   moderation standard?                                          02:33:09

11          MS. BERTRAND:   Your Honor, objection.   It's two

12   sentences.   The jury has probably already read them.

13          THE COURT:   Well, I think Mr. Rapp can just ask him

14   what is she conveying about the links.

15   BY MR. RAPP:                                                  02:33:20

16   Q.    What is she conveying to the -- to her moderation team?

17   A.    "I'll send these over every once in a while with some

18   examples of violations that were missed by the crew.   Please

19   share them and use them for retraining as needed."

20          MR. RAPP:   All right.                                 02:33:41

21          THE COURT:   All right.   Members of the jury, let's

22   take our afternoon recess.   Just remember the admonition and be

23   ready to come in at five to the hour.   2:55.

24          Please all rise for the jury.

25          (Jury departs at 2:33.)                                02:33:52
```

United States District Court

CARL FERRER - Direct

1        THE COURT:  All right.  It's a fine point, Mr. Rapp,    02:34:23

2   but I did want to make just one observation.  I looked at

3   Government's Exhibit 1217 and in the list, it's titled November

4   5, 2015, but the actual exhibit header email is November 6 and

5   Mr. Ferrer's testimony was November 6.  So just a fine point I    02:34:46

6   just wanted to make that notation for the record.

7        MR. RAPP:  All right.  Thank you, Your Honor.

8        (Recess at 2:35; resumed at 2:55.)

9        (Court was called to order by the courtroom deputy.)

10        THE COURT:  All right.  Let's go's check on jury.    02:55:49

11        All rise for the jury.

12        (Jury enters at 2:56.)

13        THE COURT:  All right.  Please be seated.

14        And the record will reflect the presence of the jury

15   and the witness is on the witness stand.    02:57:13

16        And Mr. Rapp, please continue.

17        MR. RAPP:  Thank you.

18   BY MR. RAPP:

19   Q.   Let me show the witness Exhibit 198.  Do you see that on

20   your screen, 198?    02:57:59

21   A.   Yes, I do.

22   Q.   What is it?

23   A.   It's an email from Christopher at Backpage to Joye at

24   Backpage and Tyeshia at Backpage.

25   Q.   When was this email sent?    02:58:18

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | A.   It was sent on Thursday, January 28, 2016. | 02:58:19 |
| 2 | Q.   And what was Ms. Vaught's role in the company on January | |
| 3 | 28, 2016? | |
| 4 | A.   She's a moderation supervisor. | |
| 5 | Q.   All right.  And do you recognize who Christopher at | 02:58:33 |
| 6 | Backpage is? | |
| 7 | A.   He's probably a moderator but I don't. | |
| 8 | Q.   All right.  But does he have an @backpage.com email | |
| 9 | address? | |
| 10 | A.   He has an email address at Backpage.com. | 02:58:48 |
| 11 | Q.   Move to admit 198. | |
| 12 |         MS. BERTRAND:  Objection.  Hearsay, lack of | |
| 13 | foundation, the witness says he doesn't recognize the sender. | |
| 14 |         THE COURT:  Well, foundation, Mr. Rapp. | |
| 15 | BY MR. RAPP: | 02:59:12 |
| 16 | Q.   What is the substance of the email? | |
| 17 |         MS. BERTRAND:  Objection to testifying to the | |
| 18 | substance of the document before it's been admitted. | |
| 19 |         THE COURT:  Well, he can review the document and see | |
| 20 | if he can lay some foundation. | 02:59:21 |
| 21 |         Mr. Rapp, please. | |
| 22 | BY MR. RAPP: | |
| 23 | Q.   Without getting into the details of this email, what is | |
| 24 | the subject matter of this email? | |
| 25 |         MS. BERTRAND:  Same objection. | 02:59:32 |

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | THE COURT:  Sustained. | 02:59:34 |
| 2 | BY MR. RAPP: | |
| 3 | Q.   What is Joye Vaught's role at Backpage in January? | |
| 4 | MS. BERTRAND:  Objection.  Asked and answered. | |
| 5 | THE COURT:  Sustained. | 02:59:54 |
| 6 | BY MR. RAPP: | |
| 7 | Q.   Does she frequently send emails to her moderation staff? | |
| 8 | A.   Yes. | |
| 9 | MS. BERTRAND:  Objection.  Leading. | |
| 10 | THE COURT:  Overruled. | 03:00:00 |
| 11 | THE WITNESS:  Yes.  She does. | |
| 12 | BY MR. RAPP: | |
| 13 | Q.   And do they send emails to her? | |
| 14 | A.   Yes, they do. | |
| 15 | Q.   And is the subject matter of those emails, do they have to | 03:00:09 |
| 16 | deal with moderation? | |
| 17 | A.   They do have to deal with moderation. | |
| 18 | Q.   And does that include terms and images? | |
| 19 | A.   It does include terms and images. | |
| 20 | Q.   And without getting into the specific substance of this | 03:00:33 |
| 21 | email, does the term that is being discovered, does it have any | |
| 22 | significance to you since you've been at this website since | |
| 23 | 2004? | |
| 24 | MS. BERTRAND:  Objection.  Leading and lack of | |
| 25 | foundation as to what's going on with this email with this | 03:00:50 |

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | sender who is not Ms. Vaught. | 03:00:54 |
| 2 |              THE COURT:  Overruled. | |
| 3 |              THE WITNESS:  We're making some changes to the | |
| 4 | website, moderation rules.  Like I testified earlier, adding | |
| 5 | back terms, especially since so many postings have these terms. | 03:01:11 |
| 6 | And this email is one of those terms that we're now going to | |
| 7 | allow. | |
| 8 | BY MR. RAPP: | |
| 9 | Q.   Okay.  And I just want to take you back a number of years. | |
| 10 | Do you remember an email exchange where -- that involved GFE? | 03:01:30 |
| 11 | Do you remember that exhibit? | |
| 12 |              MS. BERTRAND:  Your Honor, leading.  And this exhibit | |
| 13 | has not been admitted yet.  Move to strike. | |
| 14 |              MR. RAPP:  I'm not talking about this exhibit. | |
| 15 |              THE COURT:  Well, I'll sustain. | 03:01:46 |
| 16 |              And Mr. Rapp, move on. | |
| 17 |              MR. RAPP:  Okay.  Move to admit 198. | |
| 18 |              MS. BERTRAND:  Same objections.  Lack of foundation. | |
| 19 |              THE COURT:  Overruled.  It's admitted under | |
| 20 | 801(d)(2)(D). | 03:02:03 |
| 21 |              (Exhibit Number 198 was admitted into evidence.) | |
| 22 |              MR. RAPP:  And request permission to publish, Your | |
| 23 | Honor. | |
| 24 |              THE COURT:  And (E).  I'm sorry.  Yes, it's admitted | |
| 25 | and may be published. | 03:02:13 |

United States District Court

CARL FERRER - Direct

1    BY MR. RAPP:                                                      03:02:15

2    Q.   What is christopher@backpage.com, what is he telling Joye

3    Vaught?

4    A.   Christopher writes, "As far as I am aware we were no

5    longer removing ads for GFE.  I only saved this specific        03:02:29

6    example, but I have seen multiple of avad removed ads where it

7    appears that GFE was the removal cause."

8    Q.   And just looking at this link, do you know what the market

9    is that they are referring to?

10   A.   Raleigh, Raleigh-Durham.                                    03:02:57

11   Q.   All right.  And was there a different standard for GFE

12   previously in moderation?

13   A.   Yes.  GFE was not allowed.

14   Q.   Why wasn't it allowed?

15   A.   Because it was associated with prostitution.                03:03:14

16   Q.   But now in 2016 it is allowed?

17   A.   Yes.

18   Q.   I'm now showing the witness 199.

19   A.   All right.

20   Q.   And who is sending this email?                              03:03:41

21   A.   It's from cody@backpage.  She's one of the moderators.

22   Q.   And does -- is Mr. Padilla on this email?

23   A.   Yes, he is.

24   Q.   And does the subject matter of the email involve at least

25   this term GFE?                                                   03:04:10

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | A.   Yes, it does. | 03:04:12 |
| 2 | MR. RAPP:  Move to admit 199. | |
| 3 | THE COURT:  Yes.  It may be admitted. | |
| 4 | (Exhibit Number 199 was admitted into evidence.) | |
| 5 | MR. RAPP:  And request permission to publish. | 03:04:18 |
| 6 | BY MR. RAPP: | |
| 7 | Q.   And what is Cody telling these other page employees? | |
| 8 | A.   "Andrew and I talked about the GFE thing, going forward we | |
| 9 | will not be removing ads for GFE or any variation of GFE.  If | |
| 10 | you have any questions please let me know." | 03:04:46 |
| 11 | Q.   All right.  Looking at 1226.  All right.  Who is this | |
| 12 | email from? | |
| 13 | A.   This email is from Joye Vaught? | |
| 14 | Q.   And who is it to? | |
| 15 | A.   It's to Darwin Arquillo, Jessie Frichtel, Joy Nagasangan. | 03:05:12 |
| 16 | Q.   Are those part of the moderation team that she supervised? | |
| 17 | A.   Yes. | |
| 18 | Q.   How do you know that? | |
| 19 | A.   Well, I know that -- I've met Darwin personally.  I've | |
| 20 | also met Joe Nagasangan and Von Nagasangan.  They are the | 03:05:42 |
| 21 | owners of Avion, the company in the Philippines. | |
| 22 | MR. RAPP:  All right.  Move to admit 1226 and | |
| 23 | publish. | |
| 24 | THE COURT:  Yes.  It may be admitted and published. | |
| 25 | (Exhibit Number 1226 was admitted into evidence.) | 03:05:58 |

United States District Court

CARL FERRER - Direct

1   BY MR. RAPP:                                                        03:06:07

2   Q.   So what is Joye Vaught telling Darwin?

3   A.    "Darwin, please pass this along to the video moderators:

4        "The video moderators should only work on the **U.S.**

5   **Adult** folder on the left side of the inbox.  It looks like they   03:06:18

6   have been working in the main inbox for the last few days.

7   Please remind them not to work in the main inbox at all.  The

8   rules are different for U.S. and those are the only ones that

9   we want to moderate."

10  Q.   All right.  And so can you explain what Joye Vaught is       03:06:36

11  talking about when it comes to video moderators?  What do you

12  know about that?

13       MS. BERTRAND:  Objection.  Calls for speculation as

14  to what the speaker intended to say.

15       THE COURT:  Well, he can answer the last question,          03:06:52

16  what do you know about that.

17       THE WITNESS:  What I know is that videos take forever

18  to moderate and we're getting lots of them.  And so Joye is

19  setting a priority to let's just focus on moderating the U.S.

20  adult videos and ignore the rest of the world.                    03:07:12

21       MS. BERTRAND:  Your Honor, objection.  Move to

22  strike.  Nonresponsive and lacks foundation as to Ms. Vaught

23  setting any type of policy or agenda.

24       THE COURT:  Well, the jury will disregard all after

25  he says "we're getting lots of them" and the remainder will be    03:07:36

United States District Court

CARL FERRER - Direct

1    stricken.                                                              03:07:44

2    BY MR. RAPP:

3    Q.   When you say you're getting lots of video, can you explain

4    that?

5    A.   We run reports where we see video plays.  We can count the    03:07:53

6    reports and it's -- once again, just like that hockey stick on

7    revenue, it's the same way.  We're seeing lots of plays on

8    video and users are posting a lot of video and we have

9    terabytes of video data.

10   Q.   And how do you go about moderating the video?                 03:08:20

11   A.   So our process was not very sophisticated.  You just had a

12   link and you click the link and it went to an email inbox.  You

13   click the link in the email inbox of a new video posted.  You

14   play the video.  You look for any problems.  That's why we

15   separated it into different boxes.  The U.S. box is the         03:08:41

16   priority because that's where we wanted to focus our

17   moderation.

18   Q.   All right.  And just showing you quickly 763.  This is in

19   evidence.  Do you see that there?

20   A.   Yes.                                                          03:09:02

21             MR. RAPP:  Request permission to publish 763.

22             THE COURT:  It's in evidence?

23             MR. RAPP:  Yes.

24             THE COURT:  Yes.  It may be published.

25   \\\

United States District Court

CARL FERRER - Direct

1   BY MR. RAPP:                                                    03:09:22

2   Q.   This is an email we saw from Jed Brunst where he's talking

3   about monetizing video.   Does this have to do with the video

4   that is being -- posters are putting in their ads?

5   A.   Yes.   It has to do with the videos being posted primarily   03:09:35

6   in the Female Escorts ads.

7   Q.   All right.   Let's look at 1819.   Is this an email?

8   A.   Yes, it is.

9   Q.   And can you tell me how many pages it is?

10  A.   It's four pages.                                           03:10:10

11  Q.   All right.   Let's look start on page four.   Do you see

12  some terms on page four?

13  A.   Yes, I see four terms.

14  Q.   And then let's look at page three.   Do you recognize the

15  email, who is sending this email?                              03:10:32

16  A.   Yes.   The email is from Joye Vaught.

17  Q.   And who is she sending the email to?

18  A.   She's sending the email to the crew at Avion in the

19  Philippines.

20  Q.   And what date is she sending the email?                   03:10:48

21  A.   She's sending it to -- on Saturday, November 14, 2015.

22  Q.   And what is the subject of the email?

23  A.   Allowed Terms.

24  Q.   All right.

25       MR. RAPP:   Move to admit 1819.                           03:11:09

United States District Court

CARL FERRER - Direct

1          MS. BERTRAND:  Objection.  Hearsay, foundation.          03:11:12
2   Mr. Ferrer is not included on this email it does not appear.
3   Lack of personal knowledge.

4          THE COURT:  Overruled.

5          MR. RAPP:  And request permission to publish.          03:11:28

6          THE COURT:  Yes.  It may be published.

7          (Exhibit Number 1819 was admitted into evidence.)

8   BY MR. RAPP:

9   Q.   What is Joye Vaught telling the moderation team in this

10  email?                                                         03:11:42

11         MS. BERTRAND:  Objection.  The document speaks for

12  itself as to what is being told.

13         THE COURT:  Sustained.

14  BY MR. RAPP:

15  Q.   All right.  Well, at least is she giving them direction on  03:11:53

16  what terms can be allowed?

17         MS. BERTRAND:  Objection.  Leading and the document

18  speaks for itself.

19         THE COURT:  Overruled.

20         You can answer the question as to what you believe        03:12:08

21  that email to relate.

22  BY MR. RAPP:

23  Q.   What is this email related to with respect to the

24  moderation team in the Philippines?

25  A.   This email relates to the terms that the moderation team   03:12:21

United States District Court

CARL FERRER - Direct

1  in the Philippines sometimes removing and that it's kind of --    03:12:28

2  we're going backwards on moderation so we're allowing more of

3  these terms in like cum, C-U-M.

4  Q.   Okay.  Let's look at --

5         MR. CAMBRIA:  It's not here.    03:12:55

6  BY MR. RAPP:

7  Q.   Let's look at page two of 19 just to put it in context.

8  So does one of the moderators respond to Joye Vaught?

9         MS. BERTRAND:  Objection.  Leading.  The document

10  speaks for itself as to who responds.    03:13:17

11         THE COURT:  Sustained.

12  BY MR. RAPP:

13  Q.   Well, what does Joye Vaught say to the moderator?

14         MS. BERTRAND:  Same objection.  The document speaks

15  for itself.  It's two sentences.    03:13:31

16         THE COURT:  It does.

17         Mr. Rapp, we can let the jury -- in order to avoid

18  the objection, we'll let the jury read the email.  So just put

19  it up there for a few minutes and let them review it.

20  BY MR. RAPP:    03:14:00

21  Q.   All right.  Let's go to Exhibit 1820.  Who is this an

22  email from?

23  A.   This is an email from Joye Vaught.

24  Q.   To who?

25  A.   To Darwin Arquillo.    03:14:26

United States District Court

68

CARL FERRER - Direct

1   Q.   And what's the date of this email?                                      03:14:29

2   A.   It's sent Thursday, August 4, 2016.

3   Q.   All right.  And what is the subject matter of this email?

4            MS. BERTRAND:  Your Honor, objection.  The document

5   has not been admitted yet.                                                   03:14:44

6            THE COURT:  Sustained.

7   BY MR. RAPP:

8   Q.   Is this -- is Joye Vaught giving mod -- a moderator

9   direction in this email?

10           MS. BERTRAND:  Objection.  Leading and goes to the                   03:14:56

11  substance of the email.

12           THE COURT:  Sustained.

13           MR. RAPP:  Move to admit 1820.

14           MS. BERTRAND:  Objection.  Hearsay, lack of

15  foundation.  Mr. Ferrer does not appear in this email.                       03:15:06

16           THE COURT:  Well, Mr. Rapp, just lay a little bit

17  more foundation as to the exhibit and you can --

18  BY MR. RAPP:

19  Q.   Okay.  Who is the exhibit from?

20  A.   So the exhibit is from Joy Vaught.                                       03:15:22

21  Q.   And how do you know that?

22  A.   Because her email address is Joye, with an E,

23  @backpage.com.

24  Q.   Do you know at least one of the recipients?

25  A.   I know -- I know that Darwin, I've met Darwin personally                 03:15:41

United States District Court

CARL FERRER - Direct

1    in the Philippines.  He is one of the managers in the          03:15:47

2    Philippines who will take direction from Joye and then

3    communicate to it the moderators working in Laoag.

4    Q.   All right.  And when does this -- when does this email

5    change take place?                                             03:16:05

6    A.     Thursday, August 4, 2016.

7              MR. RAPP:  All right.  Move to admit 1820.

8              MS. BERTRAND:  Same objections, Your Honor.

9              THE COURT:  Overruled.  I view it as an 8036 record

10   and it may and admitted under 801(d)(2)(D).                    03:16:38

11             MR. RAPP:  All right.  And permission to publish.

12   Thank you.

13             THE COURT:  Yes.

14             (Exhibit Number 1820 was admitted into evidence.)

15   BY MR. RAPP:                                                   03:16:49

16   Q.   And I'll just draw your attention to this paragraph.  What

17   does Ms. Vaught tell Darwin?

18   A.    "I was looking over the report for the AVPH moderators.

19   Can you ask them not to use the phrase 'promoting sex' they

20   should say 'adult ad 'instead.  There is a big difference."    03:17:11

21   Q.   All right.  Now, we had talked previously in your

22   testimony about these feeds.  Do you remember that?

23   A.    Yes.

24   Q.   And did you ever receive these feeds outside of the United

25   States?                                                        03:17:34

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | A.   Did we ever receive the feeds from outside the United | 03:17:36 |
| 2 | States? | |
| 3 | Q.   Yes. | |
| 4 | A.   Yes. | |
| 5 | Q.   Where did you receive feeds outside the United States | 03:17:45 |
| 6 | from? | |
| 7 | A.   We received most of the feeds from a company in India. | |
| 8 | Q.   All right.  Do you remember the name of company? | |
| 9 | A.   I remember the name of the developer. | |
| 10 | Q.   Okay.  Who was the developer? | 03:18:01 |
| 11 | A.   It was -- I remember the first name of the developer. | |
| 12 | Q.   Well, let me see if I can show you a document to refresh | |
| 13 | your recollection.  This is just for the witness's eyes only. | |
| 14 | Does that refresh your recollection? | |
| 15 | A.   I'm looking at that.  I want to make sure that I -- that's | 03:18:26 |
| 16 | who we received the invoice from.  I worked with a different | |
| 17 | individual. | |
| 18 | Q.   All right.  Was it a company based in India? | |
| 19 | A.   It was, yes. | |
| 20 | Q.   And what was the nature of the feeds? | 03:18:44 |
| 21 | A.   So we were looking -- it was a non-adult content that we | |
| 22 | could import, as I testified before, to increase the ad count | |
| 23 | in our categories that were not Adult. | |
| 24 | Q.   And did you pay for that feed? | |
| 25 | A.   We didn't pay for the feeds but we had to pay to have the | 03:19:05 |

United States District Court

CARL FERRER - Direct

1  feeds normalized and that is what this developer did in India                03:19:08

2  and his company, is that they would take feeds and put them in

3  a format that would be compatible for Backpage to import.

4  Q.   And how much did it cost to, in your words, normalize the

5  feeds?                                                                       03:19:33

6  A.   Well, it was a cost per feed so it would vary based on the

7  number of feeds but it was somewhere between five grand and

8  seven grand.  It would vary.

9  Q.   Okay.  Let's look at 892 for the witness's eyes only.

10      All right.  Do you recognize this?                                      03:20:03

11  A.   Yes.

12  Q.   How do you recognize it?

13  A.   It's an email from Jed Brunst.  It's sent on Tuesday, May

14  17, 2016.  It's sent to Michael Gage who is the new CFO in

15  Dallas.                                                                     03:20:24

16  Q.   All right.

17  A.   And I am copied on the email.

18  Q.   Let's sort of keep track of all of this.  Who was the CFO

19  prior to Michael Gage?

20  A.   Nathan Kopecky.                                                        03:20:35

21  Q.   All right.  And how is Michael Gage hired?

22  A.   Michael Gage -- so Nathan resigned.  I talked to a credit

23  card processor in Dallas who recommended -- when I told him I

24  really needed a CFO and it was going to be really hard to hire

25  one, given the circumstances, and he recommended Michael Gage                03:20:56

United States District Court

CARL FERRER - Direct

1  who happened to be available.  And then Michael Gage met the --    03:20:58
2  well, I don't think they met in person.  They had a phone call
3  with Jed Brunst.
4  Q.   All right.
5        MR. RAPP:  Move to admit 892 and request permission    03:21:15
6  to publish.
7        THE COURT:  Yes, it may be admitted and published.
8        (Exhibit Number 892 was admitted into evidence.)
9  BY MR. RAPP:
10 Q.   What is Mr. Brunst telling you here.    03:21:31
11 A.   "we are extending the forbearance for an additional 3
12 months under the same terms so yes we are still operating under
13 the current forbearance and you should continue to make excess
14 cash payments.  Once you agree to the numbers I sent yesterday
15 we can finish the forbearance and execute."    03:21:48
16 Q.   All right.  And then what does Mr. Brunst tell you up
17 here?
18 A.   "Mike and Carl, you're receivables continue to increase.
19 This is killing your cash flow and I question a significant
20 portion as collectible.  Whats the turnover in days and what    03:22:12
21 can you do to reduce it?"
22 Q.   What did you take that to mean?
23 A.   I've got to call these companies that are not sending us
24 the money they owe us and try to collect it.  That's point one.
25 Point two is that we had extended $100 worth of credit or a    03:22:45

CARL FERRER - Direct

1   thousand dollars worth of credit to posters on Backpage if they    03:22:49
2   had a history of spending hundreds of dollars with us over
3   several months.
4   Q.   Why did you do that?
5   A.   Because we needed to build that alternative payment          03:23:09
6   channels, so one way to do that was to essentially give users
7   credit and then wait for their money order to come in.
8   Q.   All right.  And how successful was that?  Did you do that?
9   A.   It was enormously successful.  After we got rid of the
10  initial batch of bad debt, 90 percent some of users would pay     03:23:26
11  us even when we extended free credit.
12  Q.   All right.  Were you looking during this time period for
13  other payment options?
14  A.   Always looking.
15  Q.   Okay.  Let's look at 894.  Do you recognize this exhibit?    03:23:53
16  A.   I do.
17  Q.   How do you recognize this exhibit?
18  A.   It's an email from Jed Brunst sent Tuesday, June 21, 2016,
19  to myself with the subject line:  Collections.
20  Q.   And let's look at page two here.  And who else is on this    03:24:30
21  one-page email?
22  A.   Jim Larkin.
23           MR. RAPP:  All right.  Move to admit 894.
24           THE COURT:  Yes.  It may be admitted and published.
25           (Exhibit Number 894 was admitted into evidence.)        03:24:52

United States District Court

74

CARL FERRER - Direct

```
 1   BY MR. RAPP:                                                    03:25:00

 2   Q.   And what is Mr. Brunst telling Mr. Larkin here?

 3   A.   "Carl is making lots of calls to the wayward processors.

 4   I believe about 2-3 million is uncollectable due to bad/crooked

 5   processors and accounts Carl has extended credit to."          03:25:14

 6   Q.   Let me just stop you there.  What does he mean by that?

 7   What did you take that to mean?

 8   A.   Those are the Backpage users, primarily posting the paid

 9   ads, which of course is Adult and mainly Female Escorts.  Those

10   who are getting the credit.                                     03:25:32

11   Q.   All right.

12   A.   And some are paying us.

13   Q.   All right.  And then what does he say?

14   A.   "He did collect $1.9" million "in early June from two

15   accounts and he expects significant improvement by the end of  03:25:48

16   June.  He and Mike are due to give me an update on Monday next

17   week."

18   Q.   And then what does Mr. Brunst say?

19   A.   Jed Brunst writes, "Monday meetings, but they also need to

20   hire someone in Amsterdam who's principal job will be          03:26:18

21   collections and monitoring.  Banking issues also need to be

22   resolved.  They also need to eliminate bad revenue.  It's a

23   multi pronged answer and it may take 30 days to fully

24   implement.  I will facilitate the meetings getting on a

25   schedule and ask for copies on the Monday morning updates."     03:26:38
```

United States District Court

CARL FERRER - Direct

1    Q.   And then looking down here, what was his reference in the        03:26:47
2    lower email to crooked processors, what did you take that to
3    mean?

4    A.   So these were processors like, for example, there was a
5    bank in China that just wasn't going to send us our funds          03:26:59
6    despite running credit card processing funds from them.  And I
7    say they are crooked because sometimes the billing
8    descriptor -- well, it would change.  It would say, like,
9    fashion mall or, you know, a store in China under the billing
10   descriptor.                                                         03:27:20

11           So they are really crooked processors.

12   Q.   All right.  Let's look at 1229.  Do you recognize this
13   email?

14   A.   Yes, I do.

15   Q.   How do you recognize it?                                       03:27:46

16   A.   It's from Jed Brunst to myself with a different email
17   address, one of my other email addresses.

18   Q.   All right.  Is there a reason why you're now using a
19   different email address?

20   A.   Backpage.com is toxic as an email address.  Ad Tech B.V.,      03:28:06
21   much more generic.  Nobody knows what Ad Tech BV is.

22   Q.   All right.  And there's an email below your email.  Let's
23   just look at the second page.  Do you recognize at least who
24   the email is from?

25   A.   I do recognize the email, where the email is from.  I've       03:28:39

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | met with these individuals in Amsterdam. | 03:28:44 |
| 2 | Q.   All right.  And are they with a certain bank? | |
| 3 | A.   They are with a bank in Liechtenstein, Bank Frick. | |
| 4 | Q.   Can you tell us about Bank Frick?  How is it that you have | |
| 5 | email exchanges with this Bank Frick? | 03:29:03 |
| 6 | A.   Bank Frick is one of our merchant banks handling credit | |
| 7 | card processing.  And so they are holding large amounts of our | |
| 8 | reserves.  They are a difficult bank.  Money goes in.  It's | |
| 9 | hard to get the money out of Liechtenstein. | |
| 10 | Q.   All right.  And then so -- | 03:29:25 |
| 11 | MR. RAPP:  Move to admit 1229. | |
| 12 | THE COURT:  Yes.  It may be admitted and published. | |
| 13 | (Exhibit Number 1229 was admitted into evidence.) | |
| 14 | BY MR. RAPP: | |
| 15 | Q.   And what are you communicating to Mr. Brunst? | 03:29:45 |
| 16 | A.   "Unbelievable.  This will take a long time to answer.  It | |
| 17 | sounds like another month. | |
| 18 | "Time to move future deposits: | |
| 19 | "GG and UA need to deposit to bank where we can | |
| 20 | access funds. | 03:30:04 |
| 21 | "I'll look for a place to move cracker transactions | |
| 22 | to bank that gives us access to funds.  My meeting with Frick | |
| 23 | will not be nice. | |
| 24 | "The bank situation seems uglier every day." | |
| 25 | Q.   Can you explain what message you're trying to give | 03:30:23 |

United States District Court

CARL FERRER - Direct

1    Mr. Brunst here?                                                 03:30:25

2    A.    I'm telling Mr. Brunst that we're using Bank Frick as both

3    a merchant and a treasury bank so the funds from credit card

4    processing with Frick are going into that account and it's

5    difficult for us to get it out of Bank Frick.  We need to find   03:30:44

6    another bank but this situation is just -- it's almost

7    impossible to find a bank.

8    Q.    And then what does Mr. Brunst tell you?

9    A.    Well, Mr. Brunst tells me, "We have no choice but to

10   comply.  I wonder if this isn't coming from one of their          03:31:08

11   correspondent banks.  Anyway, you should have all the info."

12          And I know what this means.

13   Q.    What did you take to it mean?

14   A.    They were going to try to take $5 million that Bank Frick

15   is holding onto and we're going to send it directly to a bank     03:31:31

16   held by Cereus Properties.  But in order to do that, we have to

17   go through a long list of compliance things.  And I think if we

18   go to the second email, we can see a lot of the compliance

19   tasks.

20          MR. RAPP:  Madam Clerk, if we could put that up on          03:31:59

21   the screen, please.

22   BY MR. RAPP:

23   Q.    Just going through this email, is this email coming from

24   Bank Frick?

25   A.    Yes.                                                          03:32:14

United States District Court

CARL FERRER - Direct

1   Q.   And without reading the entirety of the email, what are       03:32:15
2   they telling you you need to do?
3   A.   These are all compliance-oriented questions, who owns what
4   company and, you know, give us who is the UBO and what company
5   owns the other company and it's -- like I said in the email,       03:32:40
6   it's going to take us a month to answer.
7   Q.   And do you know what's causing this trouble with Bank
8   Frick?  Do you know?
9   A.   My opinion was this is a one-way bank.  You give them the
10  money but you can't get the money out and it takes forever.         03:33:01
11  They delay, delay, delay.  We do eventually get these funds but
12  it took many requests and Jed Brunst even asking that I hire a
13  lawyer and threaten them.
14  Q.   And did you do that?
15  A.   That would be one sure way to never get those funds out of     03:33:21
16  Liechtenstein.
17  Q.   Right.  So you decided not to do that?
18  A.   I thought it was not a good strategy.
19  Q.   All right.  Let's look at 897.  Do you recognize this
20  email?                                                              03:33:44
21  A.   It's an email from Jed Brunst sent Wednesday, August 3,
22  2016, to Carl Ferrer.   Subject:   Another alternative to banks.
23  Q.   All right.
24          MR. RAPP:  Move to admit 897.
25          THE COURT:  Yes.  It may be admitted and published.        03:34:01

United States District Court

CARL FERRER - Direct

1                 (Exhibit Number 897 was admitted into evidence.)          03:34:02

2      BY MR. RAPP:

3      Q.   And what do you tell Mr. Brunst down here?

4      A.    "We have an account with crypto capital.

5                 "There is also another company in switzerland" called   03:34:20

6      wb21.

7      Q.   And then what does Mr. Brunst tell you in response to

8      that.

9      A.    Mr. Brunst writes, "the Swiss one looks good but they

10     don't list Bitcoin as a currency the except.  What transactions  03:34:40

11     will they process?  Good news on crypto.  Did you meet with

12     Frick yet?  Still waiting on the wire to get straightened out

13     and sent."

14     Q.   What did you take this to mean when he's referencing

15     bitcoin and crypto?                                              03:34:57

16     A.   At this time we're adding bitcoin, we're -- people are

17     starting to post and pay with bitcoin and we need some way to

18     turn bitcoin into fiat or U.S. dollars or Euros and we can do

19     that with Crypto Capital.

20     Q.   And how are you -- are you still making payments to        03:35:29

21     Mr. Brunst and Mr. Spear and Mr. Lacey?

22     A.    I'm making I believe interest payments and I might

23     possibly be making some principal payments on the small loan in

24     Europe but for the large loan, the one that is over $500

25     million in the U.S., I don't believe we're making any principal  03:35:51

CARL FERRER - Direct

1   payments, just interest payments.                                   03:35:56

2   Q.   Can you estimate how much you were making during this time

3   frame?

4   A.   Yes.   I would say the business is around -- do you mean

5   year to date, up to August of 2016?                                 03:36:15

6   Q.   Yes.

7   A.   So it's not the full year.   Approximately maybe 50

8   million.

9   Q.   50 million.   Let's look at 1230.   Do you recognize this?

10  A.   Yes, I do.                                                      03:36:42

11  Q.   What is it?

12  A.   This is an email from Jed Brunst sent on August 8 to

13  Michael Gage, myself, and copied Jim Larkin and the subject

14  line:   Frick.

15  Q.   You're copied on this email?                                    03:37:04

16  A.   It's sent to me.

17  Q.   And who else is copied?

18  A.   Jim Larkin, Scott but it's also sent to Michael Gage.

19           MR. RAPP:   Move to admit 1230.

20           THE COURT:   Yes, it may be admitted and published.        03:37:21

21           (Exhibit Number 1230 was admitted into evidence.)

22  BY MR. RAPP:

23  Q.   What is Mr. Brunst telling you?

24  A.   "You need to insist Frick share with you their

25  correspondence with the other bank asking why the hold up.   I      03:37:35

United States District Court

CARL FERRER - Direct

```
1   am not convinced Frick isn't playing us so you should dig deep    03:37:38
2   with them and get to the bottom.  You should fire up Piper and
3   get them to send a letter stating that the wire is for the
4   payment of debts owed, that they have intimate knowledge of,
5   the transactions resulting in debt, companies and UBO's          03:37:52
6   involved and that there is nothing that should prevent this
7   wire from going thru smoothly.  This process was started 5
8   weeks ago and it shows no signs of ending."
9   Q.   When you said that Mr. Brunst was suggesting you get a
10  lawyer to go after the Frick bank, is this email, does that      03:38:18
11  sort of reference that?
12  A.   Yes, it -- Piper is who we would fire up to send a letter.
13  Q.   All right.  Let's look at 783.  Do you recognize this?
14  A.   Yes, I do.
15  Q.   And is this an email below from Mr. Brunst and then above    03:38:58
16  from Mr. Gage?
17  A.   Yes, it is.
18  Q.   And does Mr. Gage send it to Mr. Brunst and are you also
19  copied on it?
20  A.   I am copied on it, yes.                                      03:39:18
21            MR. RAPP:  Move to admit 783.
22            THE COURT:  Yes, it may be admitted.  And published.
23            (Exhibit Number 783 was admitted into evidence.)
24  BY MR. RAPP:
25  Q.   What is Mr. Brunst informing you below?                     03:39:32
```

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | A.   Mr. Brunst's writes, "It just appeared in our account | 03:39:39 |
| 2 | today.   Total USD 5,005,733." | |
| 3 | Q.   All right.   And can you just explain what that means? | |
| 4 | A.   This went into their account at Cereus Properties.   So it | |
| 5 | never stopped at an account that Website Technologies had or | 03:40:03 |
| 6 | any of the European companies.   That's why it took so long. | |
| 7 | The other reason why it takes a long time is a European bank | |
| 8 | needs to use a US corresponding bank in order to send the | |
| 9 | transactions and $5 million -- | |
| 10 | MS. BERTRAND:   Objection.   Objection.   Nonresponsive. | 03:40:28 |
| 11 | Move to strike. | |
| 12 | MR. RAPP:   It is responsive. | |
| 13 | THE COURT:   Yes.   Mr. Ferrer, the question was can | |
| 14 | you just explain what that means.   The prior answer you gave | |
| 15 | was the appearance of 500 thousand dollars. | 03:40:44 |
| 16 | MR. RAPP:   Let me just break it down. | |
| 17 | BY MR. RAPP: | |
| 18 | Q.   Why does this $5 million wire go right to Cereus | |
| 19 | Properties?   That's the question.   Why does it go directly to | |
| 20 | them rather than to some other account? | 03:41:05 |
| 21 | A.   Because we don't have -- we're struggling with bank | |
| 22 | accounts.   It's such a big number.   It's going to have a lot of | |
| 23 | problems getting through AML from banks, the anti-money | |
| 24 | laundering. | |
| 25 | Q.   And why are you struggling with banking? | 03:41:25 |

United States District Court

Case 2:18-cr-00422-DJH   Document 1814   Filed 09/22/23   Page 83 of 115
83

CARL FERRER - Direct

| | |
|---|---|
| 1 | A.   It's very difficult for us to find a U.S. Bank.  And if we | 03:41:33 |
| 2 | had a U.S. Bank receive $5 million from a bank in |
| 3 | Liechtenstein, we wouldn't keep that U.S. Bank long. |
| 4 | Q.   All right.  Let's look at 1235.  Do you recognize this |
| 5 | email? | 03:42:06 |
| 6 | A.   Yes, I can. |
| 7 | Q.   All right.  And who is this email from? |
| 8 | A.   This email is from Jed Brunst. |
| 9 | Q.   And who is it to? |
| 10 | A.   It's to another new email address of mine, | 03:42:24 |
| 11 | carl.ferrer@protonmail.com. |
| 12 | Q.   All right.  And so are these different email addresses? |
| 13 | A.   Yes.  Yes, it's different. |
| 14 | Q.   All right.  But going forward, do you exchange emails with |
| 15 | Mr. Brunst at this new email address? | 03:42:50 |
| 16 | A.   Yes, I exchange emails with Jed Brunst at this email |
| 17 | address.  It's a ProtonMail email address. |
| 18 |           MR. RAPP:  Move to admit 1235. |
| 19 |           THE COURT:  It may be admitted and published. |
| 20 |           (Exhibit Number 1235 was admitted into evidence.) | 03:43:08 |
| 21 | BY MR. RAPP: |
| 22 | Q.   At this point in the latter part of 2016, do you switch to |
| 23 | ProtonMail? |
| 24 | A.   Yes.  We -- our communications now are on a more secure |
| 25 | email server.  These are communications with the people | 03:43:32 |

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | holding -- receiving the interest and principal payments. | 03:43:38 |
| 2 | Q.   And can you explain to the jury what ProtonMail is? | |
| 3 | MS. BERTRAND:  Objection.  Lacks foundation. | |
| 4 | THE COURT:  Overruled. | |
| 5 | THE WITNESS:  ProtonMail is an email service provider | 03:43:53 |
| 6 | that would be difficult to -- for the Government to subpoena. | |
| 7 | BY MR. RAPP: | |
| 8 | Q.   All right.  Were you receiving subpoenas during this time | |
| 9 | period? | |
| 10 | A.   Yes. | 03:44:09 |
| 11 | Q.   Let me show you 2045.  Do you recognize this email | |
| 12 | exchange? | |
| 13 | A.   This email is from myself using my Backpage email address | |
| 14 | to Michael Lacey and the subject is Organization Chart Version | |
| 15 | 1.0 and I have attachments, Organization Chart 5.8.13. | 03:44:51 |
| 16 | Q.   All right.  And who else is on -- there's two emails here. | |
| 17 | Who is on the -- who are you sending the email to below? | |
| 18 | A.   I'm sending the email to Jim Larkin, Michael Lacey, Jed | |
| 19 | Brunst, Scott Spear. | |
| 20 | MR. RAPP:  And move to admit 2045. | 03:45:22 |
| 21 | THE COURT:  Yes.  It may be admitted and published. | |
| 22 | (Exhibit Number 2045 was admitted into evidence.) | |
| 23 | BY MR. RAPP: | |
| 24 | Q.   Up above here, what are you telling Mr. Lacey? | |
| 25 | A.    I write, "Whoops.  I sent this to your old email address." | 03:45:43 |

United States District Court

CARL FERRER - Direct

1   Q.   And do you recognize Mr. Lacey whose email address in the          03:45:51

2   recipient?

3   A.   Yes.  It's sent to Michael Lacey's new email address.

4   Q.   All right.  This is actually -- we have been talking in

5   2016.  But this is back when?                                          03:46:10

6   A.   2013.

7   Q.   All right.  And how do you, sir, recognize Mr. Lacey's

8   email address?

9   A.   Because I've had correspondence with him with that email

10  address.                                                               03:46:27

11  Q.   And the mgl@ -- I don't know that but how do you know --

12  what does the mgl stand for?

13  A.   I'm not positive.  I could guess.  It's pretty common.

14          MR. CAMBRIA:  Object to the guessing.  Speculation.

15          THE COURT:  Sustained.                                         03:46:54

16  BY MR. RAPP:

17  Q.   But in any event, is this an email change that you had

18  with Mr. Lacey?

19  A.   I have exchanged email addresses with -- or I've exchanged

20  emails with Michael Lacey, with that email address.                    03:47:01

21  Q.   All right.  I'm now showing you Exhibit 1.  Do you see

22  that on your screen?

23  A.   Yes.

24  Q.   And do you see that same email address within Exhibit 1?

25  A.   Yes, I do.                                                        03:47:32

CARL FERRER - Direct

 1              MR. RAPP:  Move to admit Exhibit 1, pages one through    03:47:36

 2    six.

 3              MR. CAMBRIA:  Your Honor, I've only seen one page

 4    here.

 5              THE COURT:  Me, too.                                     03:47:48

 6              MR. CAMBRIA:  I need to see the whole exhibit.

 7              MR. RAPP:  Sure.  There.  There.  There.

 8              MR. CAMBRIA:  It's too quick for me to absorb the

 9    information.  Here we go.  Thanks.

10              THE COURT:  Is there a question, Mr. Rapp?              03:49:42

11              MR. RAPP:  Yes.  Move to admit Exhibit 1, all six

12    pages.

13              MR. CAMBRIA:  I object to that, Your Honor.

14    Foundation, first of all.  I don't see this witness on here.

15    What I've heard so far is that he says he can identify an email  03:49:59

16    address.  There's a lot more to this more than an email

17    address.

18              THE COURT:  Sustained.

19              MR. RAPP:  Judge, I would draw your attention to

20    document 1212, pages.                                            03:50:10

21              THE COURT:  Well, the witness -- lay some foundation

22    as to 401.

23              MR. RAPP:  It's already -- the Court has already

24    ruled on this.

25              THE COURT:  On this particular exhibit?                03:50:26

United States District Court

87
CARL FERRER - Direct

1        MR. RAPP:  Yes.                                    03:50:27

2        MR. CAMBRIA:  Not on Exhibit 1.  Is that what you're

3   talking about?  Exhibit 1?

4        THE COURT:  I don't recall a prior ruling on this

5   particular Exhibit, Mr. Rapp.                           03:50:43

6        MR. RAPP:  Judge, I would just ask you to look at --

7        THE COURT:  Well, I think, though, for purposes of

8   the jury, you should lay some foundation for the exhibit.

9        MR. RAPP:  Well, the Court has already ruled on this

10  exhibit.                                                03:51:08

11       MR. CAMBRIA:  That's not my recollection.  Exhibit 1,

12  I don't recall that.  All I know is with regard to foundation,

13  this witness can't identify any of this.  All he's saying is

14  here's an email address he claims he used in the past.

15       MR. STONE:  Your Honor, we have the pages.  Happy to    03:51:29

16  approach and give it to the Court.

17       THE COURT:  Tell me what the pages are.

18       MR. STONE:  It's document 1212, pages 18 and 19.

19  Starts at the bottom of page each.

20       MR. CAMBRIA:  The witness has no connection to this    03:52:16

21  document.

22       THE COURT:  Well, I see the prior ruling but, again,

23  Mr. Rapp, I think it's appropriate to lay some foundation for

24  the background of the exhibit.

25       MR. RAPP:  He's just going to identify the email        03:52:34

United States District Court

CARL FERRER - Direct

1    address, that's it.                                          03:52:35

2         MR. CAMBRIA:  That's what we object to.

3         MR. RAPP:  This goes to the same ruling as to any

4    email address that a witness can identify.

5         THE COURT:  Well, yes, but what is it about?  See,      03:52:49

6    that's the problem that I have.  So you're putting it before

7    the jury.  So I think they should have some context.  I think

8    it meets the requisite hurdles pursuant to the document 1212.

9    Foundation, I think all he said is he recognized the email

10   address.                                                     03:53:17

11        MR. RAPP:  That would be enough.  That's enough.

12   He's identified the email address.

13        THE COURT:  Well, I will admit the exhibit but

14   without any context, I don't know what --

15        MR. RAPP:  He's just going to read it.                  03:53:38

16        THE COURT:  I don't know what the jury is supposed to

17   make it of it, Mr. Rapp.

18        MR. CAMBRIA:  If I might Your Honor, there's no

19   foundation here.  Just because he can identify an email address

20   doesn't provide any foundation as to the contents of the       03:53:49

21   various pages here.

22        THE COURT:  And that's the struggle I'm having.  You

23   know, you are sort of going backwards with the exhibit.  The

24   exhibit can -- let's move on to another exhibit and we can let

25   the jury continue to hear whatever else you have.            03:54:08

United States District Court

CARL FERRER - Direct

1    MR. RAPP:  Okay.                                    03:54:17

2  BY MR. RAPP:

3  Q.    Mr. Ferrer, what were the profits for Backpage.com in

4  2016, ballpark?

5  A.    2016, I would say somewhere around 100 million.   03:54:28

6  Q.    All right.  Now, I just want to ask you some questions

7  about some specific entities.  What is Posting Solutions?

8  A.    Posting Solutions was another shell company similar to,

9  like, Website Technologies, very generic sounding company that

10 we could open bank accounts with.                      03:55:05

11 Q.    What did it specifically do?

12 A.    It was used to open up a banking account and for money

13 orders to be made in the name of Posting Solutions and then

14 those money orders would be deposited into the bank account.

15 Q.    All right.  And so you've talked about money orders.  How   03:55:27

16 were funds received to Posting Solutions?  Was it always just

17 money orders?

18 A.    It was mainly money orders.  There's a chance it could

19 have been some other things like ACH.  We had some ACH.

20 Q.    Do you know where the money deposited into Posting   03:55:50

21 Solutions, where it came from?

22 A.    It mainly came from users paying for credits on their

23 Backpage account and those credits were being mainly used to

24 post female escorts ads.

25 Q.    All right.  Now, we have talked about Website      03:56:16

United States District Court

CARL FERRER - Direct

1   Technologies.  What specifically did Website Technologies do?        03:56:22

2   A.   Website Technologies, it held leases, its name was used

3   for leases, another generic name.  We used it a little bit for

4   email domains for some developers but not for most of the

5   company and it was used for payroll.  So checks would be given    03:56:48

6   to employees with the name Website Technologies, Website

7   Technologies.

8   Q.   How did Backpage money flow through Website Technologies?

9   A.   So payments from credit card processors when we have them

10  or had them.  I'm trying to think of anything else.  The          03:57:19

11  transfers of money from, like, Posting Solutions, banks, to

12  Website Technologies.  So funds we had, finding a bank

13  through -- finding a bank was a real challenge for us.  So if

14  we couldn't get it with Website Technologies, we would get it

15  with Posting Solutions.                                           03:57:51

16  Q.   The money that went to Website Technologies, where did it

17  come from?

18  A.   The money that went to Website Technologies, where did the

19  funds come from?

20  Q.   Yes.  Where did it emanate from?                             03:58:06

21  A.   It came from postings in the Female Escort section

22  primarily.

23  Q.   What was Cereus Properties?

24  A.   Cereus Properties was the company that was owned by

25  Michael Lacey, Jim Larkin, Jed Brunst, Scott Spear.               03:58:25

United States District Court

CARL FERRER - Direct

1  Q.   And if you know, what did Cereus Properties do?                    03:58:31

2  A.   Cereus Properties collected the interest and debt payments

3  from the $600 million loan.

4  Q.   And so can you just explain how Backpage money went to

5  Cereus Properties?  We've looked at some emails but can you          03:58:50

6  explain for the jury so they have an understanding of that?

7  A.   So payments would be made to Cereus Properties and we made

8  those payments from U.S. banks and European banks.  We would

9  make a payment on the interest or the principal of the loan

10 that was for Europe and then interest payments for the loan in      03:59:15

11 the U.S., the big loan for $500 million.  So those payments

12 could come from any number of banks because we had -- we tried

13 to have banking spread out around the world.

14 Q.   All right.  But the money that went to Cereus Properties,

15 what was the source of that money?                                   03:59:40

16 A.   The source of that money was the prostitution ads posted

17 on Backpage and/or Cracker.

18 Q.   All right.  And you have referenced this entity Ad Tech

19 B.V.  But can you explain to the jury exactly what that is?

20 A.   So Ad Tech B.V. is the main company in Europe and at times      04:00:08

21 50 percent of the revenue would get credited to Ad Tech B.V.

22 The other half being the U.S. company Website Technologies.  So

23 there's two companies mainly, Website Technologies in the U.S.

24 and Ad Tech B.V. in Europe, but they are both serving U.S.

25 customers at times.                                                  04:00:40

United States District Court

CARL FERRER - Direct

1  Q.   Okay.  And just so we're clear, what was its ultimate          04:00:41

2  purpose?  What was the ultimate purpose of Ad Tech BV?

3  A.   The purpose of Ad Tech B.V. was to be in Europe, to get

4  European banks to handle European processing.  And also it was

5  a strategy to -- it was a strategy that was set up after the     04:01:07

6  sale to avoid having to pay U.S. taxes on revenue in European

7  banks.

8  Q.   All right.

9         MR. FEDER:  Objection.  404(b).

10        THE COURT:  Overruled.                                       04:01:33

11        MR. FEDER:  Objection.  404(b).

12        THE COURT:  Yes.  Overruled.

13 BY MR. RAPP:

14 Q.   How did the Backpage money flow through Ad Tech B.V.?

15 A.   Processors would send payments to Ad Tech B.V.'s bank         04:01:47

16 accounts.  Some of those bank accounts were, like, in the Czech

17 Republic, for example, and then funds from the Czech Republic

18 would then be paid to Cereus Properties.

19 Q.   All right.  And the money that was deposited into Ad Tech

20 B.V. what was the source of that money?  Where did it come        04:02:17

21 from?

22 A.   So the source of that money is both U.S. and non-U.S.

23 postings in the Adult section, primarily Female Escorts.

24 Q.   All right.  And then would Backpage money flow from

25 Website Technologies to Cereus Properties?                        04:02:44

United States District Court

CARL FERRER - Direct

1    A.    Yes.                                                          04:02:52

2    Q.    Why?

3    A.    If we had funds deposited into any bank account at Website

4    Technologies, we would then make payments to the sellers from

5    there.   But I have to tell you, there's just so many banks --      04:02:59

6    we went through so many of them it's hard to keep them all

7    straight, especially with the many different companies that we

8    had.

9    Q.    Would Backpage money flow from Ad Tech B.V. to Cereus

10   Properties?                                                         04:03:14

11   A.    Yes.

12   Q.    Why?

13   A.    A user could pay for a post on Backpage.   They may use a

14   European bank.   It would go -- the funds would then be

15   deposited into our Ad Tech B.V. account in Czech Republic and       04:03:37

16   then sent to Cereus Properties.   So it could be a U.S. poster

17   buying credits; but if they use a European bank, those funds

18   will end up being transferred from, like, a bank in the Czech

19   Republic to Cereus Properties.

20   Q.    And what was the purpose to go from Ad Tech B.V. to Cereus    04:04:08

21   Properties?

22   A.    It was to make interest and principal payments on the

23   smaller note.

24   Q.    All right.   Now at some point did Backpage begin accepting

25   cryptocurrency for purchasing ads on Backpage?                      04:04:28

United States District Court

CARL FERRER - Direct

1    A.    Yes.                                                          04:04:32

2    Q.    Why?

3    A.    It was a very good alternative payment channel that could

4    bypass the merchant banking.

5    Q.    And when did that happen?                                     04:04:45

6    A.    I think we start exploring that option before the credit

7    card apocalypse in July of 2015 but we had it on before then,

8    but after that date it became very important.

9    Q.    Did you use a certain company?

10   A.    Well, we started with Coinbase but that didn't last long     04:05:17

11   and eventually we went to GoCoin.

12   Q.    All right.  And can you explain to the jury how it worked

13   using the GoCoin or some form of cryptocurrency?

14   A.    Yes.  So we had an option when you came to the payment

15   page that you could click bitcoin and there comes up, like, an     04:05:46

16   address that you have a bitcoin address that you can send the

17   funds.  Those funds would go to a service provider for, like,

18   GoCoin.  They would collect the coin.  They would turn it into

19   cash at, like, a bank in Singapore and then the cash would get

20   wired to a Backpage bank account.                                  04:06:18

21   Q.    All right.  And just looping back to Ad Tech B.V. just for

22   a minute, what is your best estimate of the percentage of money

23   in the Ad Tech B.V. account that came from Backpage users in

24   the United States?

25   A.    And the time frame?                                          04:06:45

United States District Court

CARL FERRER - Direct

1   Q.   How about from July 2015 forward?

2   A.   It's the majority.  65 percent is an estimate.

3   Q.   Okay.  Now, we have talked about gift cards earlier in

4   your testimony but when did you start accepting gift cards?

5   A.   The gift card solution was sometime after July 2015 when

6   we lost credit cards. I would say we probably added gift cards

7   2016, maybe early 2016.

8   Q.   And at some point did you come to learn that it was

9   discovered that Backpage was accepting gift cards?

10  A.   Yes.  It was news coverage that you could use a gift card

11  to pay for a female escort's ad and it broke in the *Dallas*

12  *Morning News*, a paper that's in the same city as the Dallas

13  office.

14  Q.   All right.  I have one more question regarding revenue.  I

15  want to show you Exhibit 14 --

16        Well, I want to ask you some questions about revenue.

17  Are you familiar with the revenue at Backpage from 2013 on to

18  2018?

19  A.   Yes, I'm familiar with the P&Ls.

20  Q.   And how are you familiar?

21  A.   How familiar?

22  Q.   Yes.

23  A.   I would receive them monthly.  They were part of the

24  budget process and I received the annual P&Ls.  So I'm aware of

25  the revenue and as an employee, I'm accountable to that bottom

04:06:46

04:07:18

04:07:48

04:08:21

04:09:05

04:09:18

CARL FERRER - Direct

1   line profit number.

2   Q.   All right.  Just to remind, were you in budget meetings

3   where revenue was discussed?

4   A.   I'm in budget meetings usually in December.

5   Q.   All right.  I want to show you Exhibit 1481.  Do you see

6   this exhibit on your screen?

7   A.   Yes, I do.

8   Q.   And I'm only interested in the top part of this, 1481, and

9   my question is this:  For the years in this exhibit, is the

10  revenue, based on your experience, accurate?

11           MS. BERTRAND:  Objection, Your Honor.  Has this been

12  put into evidence?

13           THE COURT:  I don't think he has moved for its

14  admission.  So what's the objection?

15           MS. BERTRAND:  Well, the objection would be lack of

16  foundation and hearsay.  There's no indication of who wrote

17  this, what Mr. Ferrer's involvement was in this.  There's no

18  header or footer on it.  It's just a chart.

19           THE COURT:  Mr. Rapp, lay some foundation for the

20  exhibit.

21  BY MR. RAPP:

22  Q.   Well, I'm not even asking you the contents of it.  I'm

23  just asking you the simple question --

24           MS. BERTRAND:  Same objection.  He can't testify

25  about the substance of something if it hasn't been admitted.

United States District Court

04:09:25

04:09:36

04:09:57

04:10:16

04:10:35

04:10:46

97
CARL FERRER - Direct

1      THE COURT:  Okay.  Don't speak over the objection and    04:10:50

2  don't speak over Mr. Rapp.

3      MS. BERTRAND:  I apologize.

4      THE COURT:  My understanding is you were rephrasing

5  your question.                                              04:10:59

6      MR. RAPP:  Yes.

7      THE COURT:  All right.  Go forward.

8      MS. BERTRAND:  I'm sorry about that, Judge.

9  BY MR. RAPP:

10  Q.  I'm not asking what's in it.  I'm asking you is it     04:11:04

11  accurate.

12      MS. BERTRAND:  Same objection.

13      THE WITNESS:  Yes.

14      THE COURT:  Overruled.

15      THE WITNESS:  Yes.  It's accurate, both the revenue     04:11:12

16  and the company names.

17      THE COURT:  I'm sorry, Mr. Rapp.  I lost track.  What

18  exhibit number was that?

19      MR. RAPP:  This is 1481, Judge, and this will come up

20  later in testimony with another witness.                   04:11:30

21  BY MR. RAPP:

22  Q.  What happened to the Adult section of Backpage in January

23  of 2017?

24      MS. BERTRAND:  Objection.  Leading.

25      THE COURT:  Overruled.                                  04:11:57

United States District Court

CARL FERRER - Direct

1        THE WITNESS:  In January of 2017, prior to the                    04:12:00

2   meeting with the Senate where we were going to have to testify

3   before the PSI committee, the decision was made to remove the

4   Adult section.

5   BY MR. RAPP:                                                            04:12:21

6   Q.   Okay.  Who was that decision -- was that decision yours?

7   A.   No.

8   Q.   When that decision was made, what happened to the Adult

9   postings, based on your experience, what happened to them?

10  A.   They migrated to Personals.  Almost overnight.                     04:12:43

11  Q.   Did that impact revenue?

12  A.   A little but not much.

13  Q.   This has come up before.  Did you learn that you were --

14  Backpage was being investigated by a committee with the United

15  States Senate?                                                          04:13:18

16        MR. FEDER:  Objection.  Relevant, 403, hearsay.

17        MS. BERTRAND:  And leading.

18        THE COURT:  Sustained as to leading.

19  BY MR. RAPP:

20  Q.   Did you learn that you were being investigated --                  04:13:39

21        MS. BERTRAND:  Same objection.

22        MR. FEDER:  Same.

23  BY MR. RAPP:

24  Q.   -- about this?

25        THE COURT:  Sustained.                                            04:13:49

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | BY MR. RAPP: | 04:13:49 |
| 2 | Q.   Did you learn that you were being investigated in the | |
| 3 | latter part of 2016 and 2017 by a non-law enforcement entity? | |
| 4 | MS. BERTRAND:  Same objection. | |
| 5 | MR. FEDER:  Same. | 04:14:08 |
| 6 | THE COURT:  Sustained as to leading. | |
| 7 | BY MR. RAPP: | |
| 8 | Q.   Well, do you know why the Adult Escort section migrated to | |
| 9 | the Personals when it was shut down? | |
| 10 | A.   Yes.  I was very much a part of that. | 04:14:32 |
| 11 | Q.   All right.  And going back to 2007 were there instances | |
| 12 | where you learned that female escort postings were actually in | |
| 13 | the Personal section? | |
| 14 | MS. BERTRAND:  Objection.  Leading. | |
| 15 | THE COURT:  Overruled. | 04:14:59 |
| 16 | THE WITNESS:  Yes.  It was very common for escorts to | |
| 17 | also post in Personals.  It was -- | |
| 18 | MR. FEDER:  Objection.  Beyond the scope. | |
| 19 | MS. BERTRAND:  Move to strike. | |
| 20 | THE COURT:  Overruled. | 04:15:14 |
| 21 | BY MR. RAPP: | |
| 22 | Q.   Do you remember the question? | |
| 23 | A.   I thought I answered.  But, yes, it was common for users | |
| 24 | who were posting in Female Escorts to post additional ads in | |
| 25 | Personals or just post in Personals because it was cheaper. | 04:15:29 |

United States District Court

CARL FERRER - Direct

1   Q.   Did you come to learn in January of 2017 that a report          04:15:39

2   prepared by the United States Senate and Backpage.com was

3   issued?

4            MS. BERTRAND:   Objection.   Leading.

5            MR. FEDER:   401, 403, hearsay.                             04:15:53

6            THE COURT:   Sustained.   Sustained as to leading.   Ask

7   a non-leading question.

8   BY MR. RAPP:

9   Q.   Did you learn about a report in January of 2017?

10           MS. BERTRAND:   Same objection.                             04:16:03

11           MR. FEDER:   Same.

12           THE COURT:   Overruled.

13           THE WITNESS:   Yes.   We received a report from the

14  U.S. Senate.   It was very lengthy.

15           MS. BERTRAND:   Objection.   Move to strike.                04:16:18

16  Nonresponsive.

17           THE COURT:   The jury will disregard "it was very

18  lengthy."

19  BY MR. RAPP:

20  Q.   How long was it?                                                04:16:27

21  A.   Well, if you counted the appendix, it was in the hundreds

22  of pages.

23           MR. FEDER:   Same.   Move to strike.

24           THE COURT:   Sustained and -- yes.   I'll allow the

25  striking of that last statement as irrelevant, the length of        04:16:47

CARL FERRER - Direct

| 1 | the report. | 04:16:55 |
| 2 | BY MR. RAPP: | |
| 3 | Q.   All right.  Did you read the report? | |
| 4 | A.   Yes, I did. | |
| 5 | Q.   Did you come to learn this report was publicly available? | 04:17:00 |
| 6 | A.   Yes, it was. | |
| 7 | Q.   Can you tell me what was the report about? | |
| 8 | MS. BERTRAND:  Objection.  Hearsay. | |
| 9 | MR. CAMBRIA:  403. | |
| 10 | MR. FEDER:  403. | 04:17:23 |
| 11 | MR. CAMBRIA:  And 401. | |
| 12 | THE COURT:  Sustained. | |
| 13 | BY MR. RAPP: | |
| 14 | Q.   I'm showing you 1587a.  Is this the report? | |
| 15 | A.   This is the report. | 04:17:46 |
| 16 | Q.   And did this report, did it investigate the moderation | |
| 17 | practices of Backpage? | |
| 18 | MS. BERTRAND:  Objection.  Irrelevant.  Calls for | |
| 19 | hearsay. | |
| 20 | MR. CAMBRIA:  And leading and 403. | 04:18:05 |
| 21 | THE COURT:  I'll sustain the leading objection. | |
| 22 | BY MR. RAPP: | |
| 23 | Q.   What parts of Backpage did it investigate? | |
| 24 | MS. BERTRAND:  Objection.  Calls for hearsay. | |
| 25 | MR. CAMBRIA:  And 401, 403. | 04:18:18 |

United States District Court

CARL FERRER - Direct

1          MR. RAPP:  It's notice.                                    04:18:20

2          THE COURT:  Well, again, here, members of the jury,

3   the exhibit is not --

4          You're not intending to admit the exhibit, Mr. Rapp?

5          MR. RAPP:  I was thinking about it.                        04:18:32

6          THE COURT:  All 100 or whatever pages of it?

7          MR. RAPP:  I don't believe it is 100 pages and

8   we've -- it has been redacted.  I believe it's approximately 53

9   pages.

10         MS. BERTRAND:  Object to the redactions, Rule 106.         04:18:52

11         MR. CAMBRIA:  And hearsay.

12         THE COURT:  Let's lay foundation without leading

13  questions with regard to what Mr. Ferrer understood the report

14  to be if he read it just simple, direct questions, non-leading,

15  Mr. Rapp.                                                         04:19:09

16  BY MR. RAPP:

17  Q.   Did you read the report?

18  A.   I read the report, yes.

19  Q.   Was the report accurate?

20         MS. BERTRAND:  Objection.  Speculation.                    04:19:16

21         MR. CAMBRIA:  Foundation.

22         THE COURT:  Sustained.

23  BY MR. RAPP:

24  Q.   Well, did the report investigate Backpage?

25         MS. BERTRAND:  Objection.  Leading.  Hearsay.              04:19:30

United States District Court

CARL FERRER - Direct

1        MR. EISENBERG:  Same 403.                                   04:19:35

2        THE COURT:  Sustained as to leading.

3        Ask a non-leading question, Mr. Rapp, or you're going

4   to get the continuing objection.

5   BY MR. RAPP:                                                     04:19:49

6   Q.   Did you read the report?

7   A.   I did read the report.

8   Q.   All right.  Did the report discuss moderation?

9        MS. BERTRAND:  Objection.  Leading.  Hearsay.

10       THE COURT:  Overruled.                                      04:20:02

11       THE WITNESS:  Yes, it discussed moderation.

12  BY MR. RAPP:

13  Q.   All right.  You have testified the last two weeks on

14  moderation.  How would you characterize Backpage's moderation?

15       MR. CAMBRIA:  That's objected to.                           04:20:26

16       MS. BERTRAND:  Objection.  Speculation.  Vague as to

17  characterize.  Relevant.

18       MR. RAPP:  It's a non-leading question.

19       MR. FEDER:  And an improper expert opinion.

20       THE COURT:  Overruled as to that.                           04:20:40

21       Well, the question was, how would you characterize

22  Backpage's moderation.  Given this witness's days of testimony

23  in this area, he's qualified to answer the question as to how

24  he characterizes it, so overruled.

25       MS. BERTRAND:  Your Honor, object also as to him            04:21:11

CARL FERRER - Direct

1  giving a final conclusion.  That's really in the province of          04:21:13

2  the jury.

3          THE COURT:  He can characterize as to his opinion.

4  The jury is the fact-finder ultimately.  This witness is

5  qualified to answer the question as to his opinion.                   04:21:25

6          Overruled.

7          You may answer.

8          THE WITNESS:  It was a sham to preserve revenue

9  growth, not remove prostitution ads or block prostitution

10 advertisers.                                                          04:21:40

11 BY MR. RAPP:

12 Q.   Did the report that the Senate -- did they analyze

13 moderation at Backpage?

14         MR. CAMBRIA:  Objection.  Calls for hearsay and 403,

15 401.  Confrontation.                                                  04:21:57

16         MS. BERTRAND:  And relevance as to what any Senate

17 findings are.

18         THE COURT:  What was the time period again, Mr. Rapp?

19         MR. RAPP:  January 2017.

20         THE COURT:  Overruled.                                        04:22:16

21         THE WITNESS:  Yes, the report from the Senate

22 accurately characterized the shortcomings in Backpage's

23 moderation.

24 BY MR. RAPP:

25 Q.   Did the Senate report know about the relationship Backpage       04:22:29

United States District Court

CARL FERRER - Direct

1  had with The Erotic Review?                                              04:22:38

2              MR. EISENBERG:  Objection.  Calls for a conclusion.

3              MR. CAMBRIA:  And foundation.

4              THE COURT:  Sustained.

5  BY MR. RAPP:                                                             04:22:45

6  Q.  Well, in reading the report, did they identify The Erotic

7  Review as having a link relationship with Backpage?

8              MR. EISENBERG:  Objection.  Hearsay.

9              MR. FEDER:  Leading, 401.  403.  Hearsay.

10             MS. BERTRAND:  Relevant.                                      04:23:06

11             THE COURT:  Overruled as to relevant.  Sustained as

12 to leading.

13 BY MR. RAPP:

14 Q.  Did the Senate report, did it detail the relationship that

15 Backpage had with super posters?                                         04:23:30

16             MS. BERTRAND:  Objection.  Leading.  Hearsay.

17 Relevance.

18             MR. CAMBRIA:  403 and a political, not a judicial

19 body.  Irrelevant.

20             THE COURT:  Overruled, Mr. Cambria.                           04:23:46

21             You may answer.

22             THE WITNESS:  The question again?

23             MR. RAPP:  Can you help us out?

24             (The following question was read:  Did the Senate

25 report, did it detail the relationship that Backpage had with            04:24:15

United States District Court

CARL FERRER - Direct

1   super posters?)                                              04:24:15

2           THE WITNESS:  It didn't detail the relationship with

3   super posters.  It did not.

4   BY MR. RAPP:

5   Q.   All right.  Did it detail the relationship with The Erotic   04:24:20

6   Review?

7   A.   It did not.

8   Q.   Let's look at -- so after the report came out, the Senate

9   report, did you receive a bonus?

10  A.   After the report came out, did I receive a bonus?          04:25:18

11  Q.   Yes.

12  A.   Yes, I would have received my annual bonus in January of

13  2017.

14  Q.   All right.  Let me just show you 1237.  Do you see this on

15  your screen?                                                   04:26:01

16  A.   Yes, I see it.

17  Q.   What is this?

18  A.   This is an email from Jed Brunst sent using his ProtonMail

19  email address to me and the subject is Bonus and the date is

20  Monday, February 20, 2017.                                     04:26:21

21          MR. RAPP:  Move to admit 1237.

22          MS. BERTRAND:  Objection.  Relevance.

23          THE COURT:  Lay some more foundation so we can make a

24  401 determination.

25  \\\

United States District Court

CARL FERRER - Direct

1   BY MR. RAPP:                                                    04:26:41

2   Q.   You're the owner.  You're still the owner of Backpage in

3   February 2017?

4   A.   I'm the owner but I need to get permission.

5   Q.   All right.  Who do you need to get permission from?    04:26:52

6   A.   In this email, Jed Brunst, I need to get permission to get

7   the bonus.

8            MR. RAPP:  All right.  Move to admit 1237.

9            MS. BERTRAND:  Objection.  Relevant.

10           THE COURT:  Overruled.  It may be admitted and       04:27:08

11  published.

12           MR. RAPP:  Thank you.

13           (Exhibit Number 1237 was admitted into evidence.)

14  BY MR. RAPP:

15  Q.   Now let's show you 1238.                                  04:27:21

16           THE COURT:  This will be your last exhibit, Mr. Rapp.

17           MR. RAPP:  Yes, ma'am.

18  BY MR. RAPP:

19  Q.   Who is this email from?

20  A.   It's an email from Jed Brunst to myself.                  04:27:35

21  Q.   All right.  And when did you receive this email?

22  A.   I received it on Thursday, March 30, 2017.

23  Q.   And what is, basically, the subject of it?

24  A.   The subject is:  Call Monday.

25  Q.   All right.  And is this related to?                       04:27:59

United States District Court

CARL FERRER - Direct

1  A.   It is related to payments.                                    04:28:08

2            MR. RAPP:  Move to admit 1238.

3            THE COURT:  Yes.  It may be admitted and published.

4            (Exhibit Number 1238 was admitted into evidence.)

5  BY MR. RAPP:                                                       04:28:21

6  Q.   And what is Mr. Brunst telling you?

7  A.   Mr. Brunst writes:  "Carl, Dan" -- and that's not Dan

8  Hyer, it's a different Dan.

9  Q.   All right.

10 A.   "Carl, Dan and I would like to have a call with you Monday  04:28:33

11 to talk thru your cash position.  After that conversation we

12 would like to add in Chris Kempel to talk further about"

13 bitcoin "best practices ie. security, debit cards, wallets,

14 etc.

15          "I am open from noon on so pick a time and I will       04:28:50

16 coordinate with Dan.  Thanks."

17            THE COURT:  All right.  Members of the jury, we're at

18 4:30, 4:29 technically, but we will finish for the day.

19          Just remember the admonition and be prepared to come

20 in tomorrow promptly at nine.  And I know I asked you a lot of   04:29:14

21 questions before.  I asked you to consider a number of things.

22 But for tomorrow's purposes, the main question, and you can let

23 Liliana know in the morning, if you can duplicate last Friday's

24 schedule where we stayed until 12:30.  And then if you know by

25 tomorrow whether or not you're able to come in next week for     04:29:37

CARL FERRER - Direct

```
 1   the three days that we have at 8:45 and take a 45-minute lunch    04:29:41
 2   rather than a one-hour lunch and then end at 4:30.  So let
 3   Liliana know if you can do that on any or all of those three
 4   days that we're in trial next week.
 5           All right.  So please all rise for the jury as they       04:30:00
 6   leave.
 7               (Jury departs at 4:30.)
 8           THE COURT:  All right, as per usual, remain in the
 9   courtroom, those who are in the gallery, so that the jurors can
10   head home uninterrupted.                                          04:30:39
11           Let me go back to that Exhibit Number 1, Mr. Rapp.
12           MR. RAPP:  Yes, ma'am.
13           THE COURT:  Well, ruling from the prior court is the
14   exhibit is admissible but as with my orders on exhibits, there
15   has to be foundation laid.  In other words, whether it be         04:31:09
16   through this witness or some other witness.  That document
17   essentially was -- I understand how it was produced.  I
18   understand that there was a prior ruling that it was
19   admissible.  But up to that point, we had not had any testimony
20   about what the status of Mr. Lacey was.                           04:31:36
21           MR. RAPP:  Yeah.
22           THE COURT:  And we had no -- there was no background
23   for it.  There was no foundation, in other words, in which the
24   Court or the jury could put context together.  So I don't know
25   if Mr. Ferrer is the witness to bring that exhibit in or if       04:31:52
```

United States District Court

CARL FERRER - Direct

```
 1   there's somebody else.  But I do see that the prior Court and I   04:31:55
 2   would agree it is admissible and it's admissible under 8012(a)
 3   but, again, the problem is foundation.  The foundation can't
 4   come after the exhibit is admitted.  The foundation should
 5   have -- the exhibit should have some context.  And just        04:32:24
 6   throwing out an exhibit that talks about find me an account
 7   somewhere is out of context.  So that's the problem I have.
 8          So you can think about it overnight and you can try,
 9   try again and if you can, you know -- again, either through
10   this witness or some other witness, we can move forward in that  04:32:47
11   way.
12          MR. RAPP:  Well, just a couple of points.  One is
13   it's relevant because he's charged with two counts related to
14   this 16.5 --
15          THE COURT:  I'm not arguing about that.  I'm arguing     04:33:00
16   about the foundation that has to be laid in order to receive
17   the exhibit through this witness.
18          MR. RAPP:  That's been established.  Because he's
19   identified the email address.  There's no question as to the
20   authenticity of it.                                             04:33:18
21          THE COURT:  I understand that.  I understand that.
22          MR. RAPP:  So it's relevant.  It's authentic.  As a
23   matter of fact, I just showed -- he could identify the email
24   address without me showing the other exhibit, but I did that so
25   that it could show that he actually did receive this.  He       04:33:34
```

United States District Court

CARL FERRER - Direct

1  actually received email exchanges with Mr. Lacey at that email  04:33:41

2  address.  I just put that in as sort of icing on the cake but

3  that -- now that he can identify the email address, it comes in

4  unless the Court wants me to go into what pressure Mr. Lacey

5  was receiving during that particular time frame.  I'm happy to  04:34:00

6  go into that if you think that is relevant as a motive for

7  wiring $16.5 million out of the country.

8          THE COURT:  And that's the part of the linkage that I

9  think that there has to be foundation in the record.  Each one

10  of these exhibits has to be in the furtherance of the  04:34:22

11  conspiracy.  Again, this email without that context, without

12  that foundation, it doesn't make any sense because you just

13  leap into an exhibit which does meet the other hurdles but the

14  foundational part of it, the background part of it.

15          MR. RAPP:  I can go into that.  They were under  04:34:46

16  investigation and all of that.  Just on that same note, I would

17  like to -- I would like to be heard on Exhibit 2042.  I had

18  that up on the screen.

19          THE COURT:  I don't see it.

20          MR. RAPP:  So on that same score, Judge, we attempted  04:35:21

21  to move this email in through Mr. Ferrer.  He obviously

22  identified Mr. Brunst's email address so he could authenticate

23  the email.  The Court's ruling was sustained the objection on

24  just 401.

25          THE COURT:  It's the same contextual problem that you  04:35:44

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | have.  There has to be some -- at least some backdrop before | 04:35:48 |
| 2 | you admit the exhibit. | |
| 3 | MR. RAPP:  Right. | |
| 4 | THE COURT:  So it might be authentic.  It might meet | |
| 5 | 901 but I think if this witness can lay some -- I mean, go into | 04:35:58 |
| 6 | some background of what's going on in May of 2012. | |
| 7 | MR. RAPP:  We did.  This was the CNN -- this was | |
| 8 | during the CNN exposé and that Backpage was receiving a lot of | |
| 9 | pressure.  And so this is just an email from Mr. Brunst to some | |
| 10 | of these other individuals.  And as you all know, the Backpage | 04:36:27 |
| 11 | pressure has reached red hat.  You know, we believe it's | |
| 12 | relevant for that purpose.  It's an acknowledgment by | |
| 13 | Mr. Brunst about the pressure, the public reputational pressure | |
| 14 | Backpage is receiving because of the Female Escort section as, | |
| 15 | you know, the defense -- | 04:36:52 |
| 16 | THE COURT:  That's your testimony.  So you have to | |
| 17 | have your witness testify to that. | |
| 18 | MR. RAPP:  I did have that testimony.  We -- we | |
| 19 | admitted the CNN report, the fact that Backpage and CNN were | |
| 20 | going back and forth with letters and, you know, a national | 04:37:10 |
| 21 | broadcast of CNN during this same time frame. | |
| 22 | And so that's our argument, our argument as to why | |
| 23 | it's relevant.  I could loop back and -- | |
| 24 | THE COURT:  Try it again. | |
| 25 | MR. RAPP:  All right. | 04:37:29 |

United States District Court

CARL FERRER - Direct

1          THE COURT:  All right.  And just for counsel's    04:37:31

2     awareness, so if you're going to file your opposing response to

3     the Government's filing last night, I understand that is going

4     to be done tonight and so I would suggest that you plan on

5     staying and meeting at 1:15 on what we can get through tomorrow    04:37:48

6     afternoon.

7          All right.

8          MS. BERTRAND:  Your Honor, I have a family

9     responsibility tomorrow later in the afternoon.  I need to

10    leave about 2:30.    04:38:01

11         THE COURT:  Well, we can get through however much we

12    can get through.  Otherwise, we'll have to retake it up at 4

13    o'clock on Monday.

14         MR. CAMBRIA:  Will there be an opportunity to address

15    this Exhibit 1.  The question is can I lay my objections on --    04:38:15

16    my additional objections on Exhibit 1 in the morning.

17         THE COURT:  Well, yes.  If you wish but I think Mr.

18    Rapp is going to try to bring it in and if he's unsuccessful,

19    you can raise an objection.  But if you have some other

20    objection to it beyond what the Court has already ruled on    04:38:39

21    document 1212 that has not already been put before the Court, I

22    think you've lost the time to object to that particular exhibit

23    in any event.

24         MR. CAMBRIA:  Well, he's been talking.  I haven't had

25    a chance to do that.  But, for example, what they handed me    04:38:57

United States District Court

CARL FERRER - Direct

1    here, there's a sheet that I don't believe they intend to          04:38:59

2    introduce which talks about a privilege log with Becker and

3    grand jury subpoena and so on.  That wouldn't have anything to

4    do with it.

5            The other thing is, aside from the foundation, is        04:39:12

6    that we have not waived the lawyer-client relationship and

7    these are communications between lawyer and client.  If and

8    when we do, you know, relinquish those, and that would be a

9    different story, but this is a conversation between Becker --

10           THE COURT:  We read document 1212 and make your           04:39:33

11   objection but be very aware of what is in that document, what

12   you've already --

13           MR. CAMBRIA:  I am aware of what's in the document.

14   I'm saying we have not waived the lawyer-client relationship.

15           THE COURT:  All right.  I do have to leave.  Thank        04:39:45

16   you.

17           COURTROOM DEPUTY:  All rise.

18           (Whereupon, these proceedings recessed at 4:39 p.m.)

19                        *  *  *  *  *

20

21

22

23

24

25

                    United States District Court

1           C E R T I F I C A T E                                    04:39:48

2

3           I, ELAINE M. CROPPER, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of       04:39:48

6    Arizona.

7

8           I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled    04:39:48

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control, and to the best of

13   my ability.

14

15          DATED at Phoenix, Arizona, this 21st day of             04:39:48

16   September, 2023.

17

18

19

20                          s/Elaine M. Cropper                     04:39:48

21                          _____

22                          Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                  04:39:48

                    United States District Court