1

**UNITED STATES DISTRICT COURT**


**FOR THE DISTRICT OF ARIZONA**


_____


| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | September 26, 2023 |
| Michael Lacey, et al. | ) | 8:51 a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |




**BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**TRIAL - DAY 12 - A.M. SESSION**






Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2

For the Government:
    UNITED STATES ATTORNEY'S OFFICE
3
    By:  **Mr. Kevin M. Rapp, Esq.**
4
        **Mr. Peter S. Kozinets, Esq.**
        **Mr. Andrew C. Stone, Esq.**
5
        **Ms. Margaret Wu Perlmeter, Esq.**
    40 North Central Avenue, Suite 1200
6
    Phoenix, Arizona 85004
    kevin.rapp@usdoj.gov
7
    peter.kozinets@usdoj.gov
    andrew.stone@usdoj.gov
8
    margaret.perlmeter@usdoj.gov

9   For the Government:
    UNITED STATES DEPARTMENT OF JUSTICE
10
    By:  **Mr. Austin Berry, Esq.**
    1301 New York Avenue, NW, 11th Floor
11
    Washington, DC 20005
    austin.berry2@usdoj.gov
12

For the Defendant Michael Lacey:
13
    LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
    By:  **Mr. Paul J. Cambria, Jr., Esq.**
14
    42 Delaware Avenue, Suite 120
    Buffalo, NY 14202
15
    pcambria@lglaw.com

16

For the Defendant Scott Spear:
17
    FEDER LAW OFFICE, P.A.
    By:  **Mr. Bruce S. Feder, Esq.**
18
    2930 East Camelback Road, Suite 160
    Phoenix, AZ 85016
19
    bf@federlawpa.com
    - and -
20
    KESSLER LAW OFFICE
    By:  **Mr. Eric Walter Kessler, Esq.**
21
    6720 N. Scottsdale Road, Suite 210
    Scottsdale, AZ 85253
22
    eric.kesslerlaw@gmail.com

23

24

25

```
 1   For the Defendant John Brunst:
         BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
 2       LINCENBERG & RHOW, P.C.
         By:  Mr. Gopi K. Panchapakesan, Esq.
 3            Mr. Gary S. Lincenberg, Esq.
         1875 Century Park E, Suite 2300
 4       Los Angeles, CA 90067
         gpanchapakesan@birdmarella.com
 5       glincenberg@birdmarella.com

 6
     For the Defendant Andrew Padilla:
 7       DAVID EISENBERG, P.L.C.
         By:  Mr. David S. Eisenberg, Esq.
 8       3550 North Central Avenue, Suite 1155
         Phoenix, AZ 85012
 9       david@deisenbergplc.com

10
     For the Defendant Joye Vaught:
11       JOY BERTRAND, ESQ., L.L.C.
         By:  Ms. Joy M. Bertrand, Esq.
12       P.O. Box 2734
         Scottsdale, AZ 85252
13       joy@joybertrandlaw.com

14
```

**I N D E X**

| **PLAINTIFF WITNESS:** | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
|---|---|---|---|---|
| CARL FERRER  (cont.) | 6 | | | |

**E X H I B I T S**

| **EXHIBIT NO.** | | **PAGE:** |
|---|---|---|
| 536 | Email from Ferrer to Spear and Hyer, "Recommendation to grow sites more Aggressively (draft)", 03/16/2007, USAO-BP-0002453  USAO-BP-0002454 | 85 |
| 6212 | 09.13.05 Email from C. Ferrer to S. Spear re: Sex for money ad strip-out DEFENSE 024805 | 98 |

**EXHIBIT CONT.**
**EXHIBIT NO.**                                         **ADMITTED:**

6063     08.01.10 Email from S. Spear to C. Ferrer      103
         and Andrew Padilla re: *"ad in Minneapolis"*
         and moderation not acceptable
         DEFENSE 023098

UNITED STATES DISTRICT COURT

<strong>P R O C E E D I N G S</strong>

(Proceedings commence at 8:51 a.m.)

THE COURT:  All right.  Please be seated.  Let's go ahead and have the jury in, and the witness.  Yeah, please bring the witness in.

MR. RAPP:  Judge, can I make a couple brief points. We've received about 40 additional exhibits very late last night that the defense intends to introduce on cross-examination.  Many of those exhibits fall into the same categories that we discussed yesterday, and so for that reason we would ask that we not go into those exhibits today until we have a meaningful chance to put our objections on the record.

The other thing is, I don't know what's going on up here, but I understood that we had to be at the podium.  I get it if defense attorney wants to use the easel, but I'm not seeing that.  So until that comes into play, I would ask, because he's awfully close to this witness.

THE COURT:  Yes, I think that's appropriate.  I have instructed all counsel to speak from the podium for purposes of our court reporter, as well as the jury.  That's where the microphones are.  I understand that you're using a lapel mic often, but nevertheless do speak from the podium, and I can't see that easel.

MR. FEDER:  Nothing on it.

1    THE COURT:  When you write on it there is going to be

2  something on it, presuming you do, I can't see it, so you'll

3  have to move it in front of Liliana.

4    And no exhibit will be introduced that the government

5  hasn't yet at least reviewed.                              08:53:13

6    All right.  Let's bring the jury in.

7    MR. LINCENBERG:  The government --

8    THE COURT:  We don't know who is speaking.  My court

9  reporter doesn't.

10    MR. LINCENBERG:  This is Mr. Lincenberg.  With regard  08:53:30

11  to Mr. Rapp's objection, the government added many exhibits

12  during the course of the Ferrer examination that were not

13  provided to the defense several days in advance.  We didn't

14  object because we looked at them and we were able to deal with

15  them, so the Court should --                               08:53:47

16    THE COURT:  We have our jury coming in.  Thank you.

17                    (Jury is present)

18    THE COURT:  All right.  Please be seated.  Welcome

19  back, members of the jury.  I hope you had a restful weekend

20  and ready to start anew.  Not quite quarter to the hour, but we  08:54:54

21  got five minutes on the clock.

22    And so I did want to mention to you, because I think

23  everyone is sort of monitoring, at least we are here in the

24  United States Courthouse, this potential for a Federal

25  government shutdown, and so we have been assured here in the  08:55:13

1    U.S. courts that we have sufficient funding to at least get us

2    through a couple of weeks regardless of whatever the

3    congressional action may be.  So that tells me that because

4    we're on -- we're not in trial next week, that if for some

5    reason there has been no agreement, we will have court the          08:55:33

6    following week unless you hear otherwise, and so do keep that

7    in mind.  We'll try to keep on our schedule at least for the

8    period that we have funding, and so just to ease your minds.

9           All right.  We have our witness on the stand.

10   Mr. Feder, you may continue your cross-examination.                 08:55:56

11   CARL FERRER,

12   (Witness was previously sworn.)

13          MR. FEDER:  Thank you.  Is this mic at the right

14   level?

15          THE COURT:  You can actually pull that closer to you         08:56:05

16   and it will be even better.

17                    CONTINUED CROSS-EXAMINATION

18   BY MR. FEDER:

19   Q.  Good morning.

20   A.  Good morning.                                                    08:56:15

21   Q.  Mr. Ferrer, have you ever responded to an ad from Backpage?

22   A.  I believe so.  I've sold a car.

23   Q.  Sorry, what?

24   A.  I believe I responded to ads.

25   Q.  In other words, went out and met one of the posters?            08:56:41

1    A.  Went out and met a poster?

2    Q.  Yes.

3    A.  No.  I really, you know, I sold a car on Backpage.

4    Q.  Well, why don't we make it exclusive to the adult section,

5    have you ever responded to an adult ad where you went out and          08:57:07

6    met the poster?

7    A.  No, I have not.

8    Q.  I assume that would mean that you've never had sexual

9    relations with any poster that advertised in the adult section

10   on Backpage; correct?                                                  08:57:22

11   A.  That's correct.

12   Q.  Can you hear me okay?

13   A.  I can.

14            THE REPORTER:  A little soft-spoken.

15            COURTROOM DEPUTY:  I put it up.  I am putting it up.          08:57:50

16            MR. FEDER:  Better?  Not better.  Better?  Can you

17   hear?  Can everybody hear me?

18   BY MR. FEDER:

19   Q.  You've been shown a lot of e-mails the last couple weeks;

20   right?                                                                 08:58:18

21   A.  Yes.

22   Q.  Would you say that was a primary or the primary way of

23   communicating among the people at Backpage, notwithstanding

24   that you were in the same office or not?

25   A.  Yes, we -- well, we used the e-mail a lot.                         08:58:32

UNITED STATES DISTRICT COURT

Q.  I mean, we've all gotten kind of lazy.  Sometimes when

we're in court, lawyers will talk to each other on their phones

instead of walking 5 feet and talking to them in person.  So

you, similarly at Backpage, everybody did the convenient thing

and talked on the -- talked on e-mail; right?                      08:58:53

A.  Yes, we used e-mail.

Q.  You've testified that you pled guilty April 6th of 2018,

true?

A.  Yes.

Q.  And had you talked to any prosecutor or any FBI agent about   08:59:14

pleading guilty before April 6, 2018?

A.  There was a proffer just before I went to do my plea.

Q.  Same day or a different day before?

A.  Same day.

Q.  But other than what you just said, before April 6, 2018,      08:59:49

you had never met or talked to any prosecutor or FBI agent

about pleading guilty to the crimes that you've pled guilty to;

correct?

A.  I did not.

Q.  Had your lawyers prior to that date been talking to the       09:00:10

prosecutors about some kind of plea?

        MR. RAPP:  Objection, to the extent it calls for

privileged communications.

        THE COURT:  Sustained.  He can answer yes or no.

        THE WITNESS:  I wanted to shut down the site; do the      09:00:28

1    right thing.

2    BY MR. FEDER:

3    Q.  This is a yes or no answer, Mr. Ferrer, had your lawyers,

4    to your knowledge, been talking to the prosecutors about some

5    kind of plea before April 6th, 2018?                          09:00:45

6            MR. RAPP:  Same objection.

7            THE COURT:  He can answer yes or no.

8            THE WITNESS:  Yes.

9    BY MR. FEDER:

10   Q.  For how long?                                             09:00:56

11           MR. RAPP:  Same objection.

12           THE COURT:  Overruled, if he confines his answer.

13           THE WITNESS:  I don't know.

14   BY MR. FEDER:

15   Q.  Well, 2017.                                               09:01:08

16   A.  No.

17   Q.  When, if you remember, in 2018?

18           MR. RAPP:  Again, objection to the extent this is

19   based upon a conversation between his attorney as privileged.

20           THE COURT:  Mr. Ferrer can answer, if he knows, based 09:01:33

21   on his own personal knowledge.

22           THE WITNESS:  I believe it was in February when I had

23   decided to shut down the site that I have my lawyers begin

24   talking to the government.

25   BY MR. FEDER:                                                 09:01:59

1    Q.  And your lawyers at that time were who?

2            MR. RAPP:  Objection; relevance.

3            THE COURT:  Sustained.

4    BY MR. FEDER:

5    Q.  Since your lawyers began talking to the prosecutors in          09:02:16

6    February of 2018, have you been paying your lawyers with your

7    own money or money that is the proceeds of money you made at

8    Backpage?

9    A.  It's from the Backpage proceeds.

10   Q.  And to your knowledge, as we sit here today, how much have      09:02:42

11   those lawyers been paid?

12   A.  I really don't -- I do not know.

13   Q.  Surely you have an estimate, don't you?

14   A.  I don't know.

15   Q.  You don't know if it's been millions of dollars, hundreds       09:03:02

16   of thousands of dollars, $5, no information whatsoever?

17   A.  Well, obviously I know it's not -- it's more than $5.

18   Q.  Okay.  Let's try this out, how about over $100,000?

19   A.  Yes.

20   Q.  How about over a million dollars?                               09:03:30

21   A.  I don't think so.

22   Q.  Well, the lawyers that you had at least are San Francisco

23   based; right?

24   A.  Yes.

25   Q.  And are they still?                                            09:03:48

```
 1            MR. RAPP:  Objection; relevance.

 2            THE COURT:  Sustained.

 3  BY MR. FEDER:

 4  Q.  Do you still have a lawyer named Nanci Clarence?

 5            MR. RAPP:  Objection; relevance.          09:04:01

 6            THE COURT:  Sustained.

 7  BY MR. FEDER:

 8  Q.  Is one of your lawyers present in court today?

 9  A.  Yes.

10  Q.  What's his name?                               09:04:08

11  A.  Jonathan Baum.

12  Q.  Is he a San Francisco-based lawyer?

13            MR. RAPP:  Objection; relevance.

14            THE COURT:  Sustained.

15  BY MR. FEDER:                                      09:04:17

16  Q.  Did you -- when you decided that you were going to look to

17  get some kind of deal with the government in February of 2018,

18  did you, you or your lawyers, notify the lawyers over to my

19  left?

20            MR. RAPP:  Objection; relevance.          09:04:47

21            THE COURT:  Sustained.

22  BY MR. FEDER:

23  Q.  When -- in April of 2018 you began talking to the

24  prosecutors; right?

25  A.  Yes.                                            09:05:02
```

```
 1   Q.  And you had many conversations with them; correct?
 2   A.  I did.  I had agreed to cooperate.
 3   Q.  Have you had any conversations with the prosecutors after
 4   April 24th of 2020?
 5   A.  Yes.                                                        09:05:25
 6   Q.  How many -- I know it might be difficult to give an exact
 7   number, I am talking about give me an estimate.
 8   A.  It's just many.
 9   Q.  A hundred?
10   A.  I don't think it was a hundred, but it was a lot.          09:05:38
11   Q.  About 50 to 100?
12   A.  Maybe 36 to maybe 30.
13   Q.  Well, 36 is a pretty exact number, is that a number that
14   sticks out for you?
15   A.  Well, I'm going to say -- "many" is the answer that is     09:06:00
16   best, but if you want a range, well, it's difficult for me.
17   Many is --
18   Q.  A range would be --
19   A.  A couple of dozen.
20           THE COURT:  Don't speak over one another, please.     09:06:18
21   BY MR. FEDER:
22   Q.  Sorry, Mr. Ferrer, continue.  Sorry, finish your answer.
23   A.  It's been -- this case has been going on since 2018.  There
24   was stops for Covid.  There are thousands and thousands of
25   exhibits, so there were several proffers and meetings to go    09:06:39
```

over the exhibits.

Q.  And therefore, since April 24th of 2020, how many, in your

estimate, how many more proffers, meetings, discussions about

your potential testimony have there been since that date?

          MR. RAPP:  Objection; asked and answered.                    09:07:14

          THE COURT:  Sustained.

BY MR. FEDER:

Q.  Is the range 30 to 50 more, is that a fair estimate?

          MR. RAPP:  Objection; asked and answered.

          THE COURT:  Sustained.                                       09:07:25

BY MR. FEDER:

Q.  And were -- where did these meetings take place?

          MR. RAPP:  Objection; relevance.

          THE COURT:  Sustained.

BY MR. FEDER:                                                          09:07:42

Q.  Were any of these meetings, any of these discussions

tape-recorded?

A.  I don't -- I do not know.

Q.  As far as you know not; correct?

A.  Correct.                                                           09:07:59

Q.  You've never listened to a tape-recorded meeting or

discussion that you had with the prosecutors or the agents,

true?

A.  Yes, that's true.

Q.  Have you ever made any tape-recordings of any meetings that   09:08:16

```
1    you had with the defendants?

2    A.  No, I have not.

3    Q.  Has anybody on your behalf done that in -- let me be

4    specific, in February of 2018?

5    A.  No, not to my knowledge.                                    09:08:45

6    Q.  These meetings that you've had, some of them took place in

7    Texas, some of them took place in California, some of them took

8    place here; right?

9              MR. RAPP:  Objection as to relevance, and there is no

10   question.                                                        09:09:08

11             THE COURT:  Sustained.  Rephrase, Mr. Feder.

12   BY MR. FEDER:

13   Q.  If you had a meeting -- sorry, strike that.

14             You have lawyers, you have lawyers in Texas, you have

15   lawyers in California; right?                                     09:09:28

16             MR. RAPP:  Objection; relevance.

17             THE COURT:  Sustained.

18   BY MR. FEDER:

19   Q.  Wherever these meetings were, either the prosecutors and

20   the agents or your lawyers and you were flying to have these      09:09:43

21   meetings?

22             MR. RAPP:  Objection; relevance.

23             THE COURT:  Sustained.

24   BY MR. FEDER:

25   Q.  Had there been a tape-recording we would have had an exact    09:09:55
```

```
 1    rendition of what you said and what was said to you and how you

 2    said everything; correct?

 3    A.  Well, I had a chance to review the proffers to make sure

 4    that they were accurate.

 5    Q.  But an exact rendition of whatever you said and how you          09:10:21

 6    said it would have been much more accurate had there been

 7    tape-recordings of these meetings and conversations?

 8            MR. RAPP:  Objection; asked and answered.

 9            THE COURT:  Sustained.

10    BY MR. FEDER:                                                        09:11:01

11    Q.  In preparing for your testimony last week, this week,

12    actually, how many weeks have you been testifying?  This is the

13    third week; right?

14    A.  Yes, I think so.

15    Q.  In preparing for your testimony the last two weeks, plus        09:11:12

16    this week, what have you reviewed to prepare yourself?

17    A.  I've reviewed the exhibits; I've reread the Jencks.

18    Q.  When you say "the Jencks," have you read anything, any

19    correspondence between e-mail written, whatever, between your

20    lawyers and the prosecutors or the agents?                          09:11:51

21            MR. RAPP:  Objection; relevance.

22            MR. FEDER:  Under Rule 612 it's very relevant, Judge.

23            THE COURT:  Well, I would suggest a rephrasing of the

24    question because you ask about correspondence between e-mail

25    written, whatever, I think the whatever is a little bit broad,      09:12:18
```

1    so be more specific.

2    BY MR. FEDER:

3    Q.  In preparing for your testimony the last two weeks and this

4    week, have you reviewed any correspondence between the

5    prosecutors to my right and your lawyers?                          09:12:35

6            MR. RAPP:  Objection; relevance.

7            THE COURT:  He can answer yes or no.

8            THE WITNESS:  The -- I have correspondence with my

9    attorney.  I don't have e-mail correspondence with the

10   prosecutors.                                                       09:12:57

11   BY MR. FEDER:

12   Q.  Maybe you misunderstood my question.  Have you reviewed any

13   correspondence between your lawyers and the prosecutors?

14   A.  Regarding?

15   Q.  Regarding your desire to become a government witness in        09:13:16

16   exchange for the things, the benefits that you have received?

17   A.  The only e-mails that I can recall is where an agent might

18   be copied confirming a meeting time and place, and that's it

19   for e-mails.

20   Q.  So there have been no correspondence, at least to your         09:13:43

21   knowledge, between your lawyers and the government prior to

22   April 6th of 2018 discussing what you want to do and what

23   you're willing to give and what they are willing to give for

24   you in order for you to plead guilty April 6th, is that what

25   you're saying?                                                     09:14:07

1   A.  I -- could you repeat that again?

2          MR. FEDER:  Could you read it back to him, please.

3   Thanks.

4          (Record read.)

5          THE WITNESS:  No, I'm not saying that.  My attorneys          09:14:41

6   are communicating with the government.

7   BY MR. FEDER:

8   Q.  Has there been any communications in writing that you

9   looked at in preparation for today's or the last couple of

10  weeks' testimony?          09:14:59

11  A.  I haven't had any, no, I don't believe so.

12  Q.  You've never -- have you ever read any of those

13  correspondence --

14  A.  Correspondence?

15  Q.  -- between the prosecutors and your lawyers prior to          09:15:11

16  April 6th, 2018?

17          MR. RAPP:  Objection; asked and answered.

18          THE COURT:  Sustained.

19  BY MR. FEDER:

20  Q.  To your knowledge, is there any writings between your          09:15:28

21  lawyers and the prosecutors before April 6th, 2018, discussing

22  your plea, or to your knowledge was it all verbal?

23          MR. RAPP:  Objection to the extent it calls for him to

24  discuss privileged communications.

25  BY MR. FEDER:          09:15:44

```
 1    Q.  It's a yes or no answer.
 2            THE COURT:  I think it's a compound question.
 3    BY MR. FEDER:
 4    Q.  Have you seen any written communications between your
 5    lawyers and the prosecutors?                                    09:16:02
 6            MR. RAPP:  Objection; foundation and relevance.
 7            THE COURT:  Sustained.
 8    BY MR. FEDER:
 9    Q.  So in your preparation for today's testimony and the last
10    couple of weeks, you reviewed what you characterize as Jencks   09:16:22
11    materials?
12    A.  Yes.
13    Q.  What is that?
14    A.  It's -- it's like the proffers.  It's the proffers.
15    Q.  What's a proffer?                                           09:16:40
16    A.  Well, I didn't really know until I started this process,
17    but that's when you agree to cooperate and then you talk about
18    the business.
19    Q.  Okay.  And the -- those proffers are all in writing; right?
20    A.  Yes.                                                        09:17:12
21    Q.  And you've had -- you've been given the opportunity to
22    review those proffers, right, and correct them?
23    A.  I did, yes, I was.
24    Q.  And have any of the 30 to 50 additional conversations that
25    you had with prosecutors or agents since April 24th of 2020     09:17:30
```

```
1   been reduced to writing?

2   A.  I -- I don't know, and first I want to correct that number

3   to be more like 30 or less because I'm really comfortable with

4   saying there's many meetings.

5   Q.  Okay.  So of those 30 or less meetings, have any of those        09:17:59

6   meetings been reduced to writing?

7   A.  I don't know.

8   Q.  Have you read any?

9   A.  No.

10  Q.  None; right?                                                    09:18:18

11  A.  Correct.

12  Q.  So you've had 30 or less meetings since December of, can't

13  remember this date, sorry, April of 2020, that you indicate are

14  not reduced to writing, and you just remember what was said

15  during those meetings?                                              09:18:44

16  A.  These meetings are going over tens of thousands of e-mails.

17  This company was started in 2004 to 2018.  It's a company that

18  generated a half billion dollars.  There's a ton of e-mails,

19  there's a ton of exhibits, and so we went through it by year,

20  individual exhibits.                                               09:19:16

21  Q.  But that's what you also discussed with the prosecutors and

22  the agents from April 6th, 2018, until April of 2020, and those

23  discussions were reduced to writing; right?

24  A.  What was the time frame?  What was that time frame again?

25  Q.  April '18 to April of '20.                                      09:19:38
```

```
 1   A.  April '18 to April '20, April '20, those conversations were
 2   in writing, yes.
 3   Q.  But none of the ones after that were in writing; right?
 4   A.  There may have been.  I'm not familiar with all the dates.
 5   Q.  Mr. Ferrer, all I'm trying to get at is what has been          09:20:01
 6   reduced to writing to see if we have everything of that nature.
 7   A.  I don't think -- I don't remember reviewing any Jencks
 8   material that was after, let's say, April 2020.  So I don't
 9   remember all of the dates.
10   Q.  So you had 30 or less meetings after April of 2020 that       09:20:26
11   have not been reduced to writing, true?
12   A.  Once again, there were many meetings to go over the
13   exhibits.
14   Q.  How much time would you say you spent with the prosecutors
15   or the agents since April of 2020 up until you started your      09:20:45
16   testimony a couple of weeks ago?
17   A.  Many hours.
18   Q.  100, 1000, 5000, 10,000?
19   A.  I didn't prepare for this by doing an analysis and trying
20   to calculate the exact number of hours.                          09:21:16
21   Q.  Please give me your best estimate.
22   A.  I'm not being uncooperative, but the best estimate I can
23   give you is many hours.
24   Q.  Does that mean more than 1000 hours?
25   A.  Definitely less than 1000 hours.                              09:21:34
```

```
 1   Q.  And just to be clear, the money, the Backpage money that's

 2   being used to pay your lawyers for the last five years, have

 3   you been -- have you been paying those bills or has somebody

 4   else been paying those bills?

 5   A.  So the balance that's being used to pay my lawyers,                    09:21:59

 6   whatever is left over will be forfeited.

 7   Q.  Have you been writing the checks, Mr. Ferrer, to your

 8   lawyers or somebody else?

 9   A.  I'm not writing the checks.

10   Q.  Who is?                                                                09:22:32

11   A.  It's like a prepaid account.  Like a -- I forget the --

12   Q.  A retainer?

13   A.  It's really not a retainer, but, yes.  You're the lawyer,

14   you know the terms better than I do.

15   Q.  Sometimes, yes.                                                        09:22:54

16   A.  There is a balance, and when this case is over, whatever is

17   left I have agreed to forfeit.

18   Q.  And that balance is in your lawyer's trust account, is that

19   what you're saying?

20   A.  Yes.                                                                   09:23:13

21   Q.  And you don't know how much it is?

22   A.  I don't.

23   Q.  And you don't know how much has been charged; right?

24   A.  I haven't been paying very close attention to it, no.  That

25   said, I do get billings, but I just really don't look at them.            09:23:34
```

UNITED STATES DISTRICT COURT

1   Q.  Okay.  Do you know what the hourly rate is?

2   A.  I don't.

3   Q.  Well, you've identify Mr. Baum who is sitting here today.

4   There was another person with you the last couple of weeks, was

5   that a lawyer for you too?                                      09:24:07

6   A.  Yes.

7   Q.  What's his name?

8   A.  First, Tahir, and then I can't recall his last name.

9   Q.  Also a San Francisco based?

10          MR. RAPP:  Objection; relevance.                        09:24:21

11          THE COURT:  Sustained.

12  BY MR. FEDER:

13  Q.  And do you know their hourly rate?

14  A.  I don't recall.

15  Q.  Mr. Baum was representing you before April of 2018, right   09:24:38

16  along with Nanci Clarence.

17          MR. RAPP:  Objection; asked and answered.

18          THE COURT:  Overruled.

19          THE WITNESS:  Yes.

20  BY MR. FEDER:                                                   09:24:51

21  Q.  And what was the hourly rate that they were being paid

22  prior to that time?

23  A.  I don't recall.

24  Q.  Has the hourly rate changed from before plea in April of

25  2018 to after?                                                  09:25:06

1    A.  I don't know.

2    Q.  I can give you a bunch of dates.  I can give you one at a

3    time, but in order to save time let me try to give you the

4    dates of the Jencks materials that we have and you tell me if

5    that sounds about right, okay?                                09:25:38

6    A.  Okay.

7    Q.  April 5th of '18, April 7th -- 17 of '18, May 10th of '18,

8    July 23rd of '18, July 26th of '18, December of '18, February

9    of '19, May of '19, December of '19, April of '20.

10   A.  Did you say April is in 2020?                             09:26:05

11   Q.  April 24, 2020.

12   A.  Okay.

13   Q.  All right.

14   A.  That sounds right.  So apparently there was one that was

15   transcribed for 2020, and I misspoke earlier.  I thought they  09:26:19

16   were all.

17   Q.  I don't think you did.  We have been talking about April of

18   2020 and you said that was the last written one.

19   A.  Yep.

20   Q.  And when you reviewed those Jencks materials, you also     09:26:42

21   talked about documents and exhibits that have been used in this

22   trial; right?

23   A.  Yes.

24   Q.  They would show you things.  You would say:  Yeah, I

25   remember that; no, I don't remember that; yeah, that's what    09:26:58

| 1 | happened; that didn't happen.  All those things; right? |
| 2 | A.  We did go through the exhibits, and I am -- I was very |
| 3 | familiar with most of them because my name is on them. |
| 4 | Q.  Similarly, since April of 2020 when you had these 30 or |
| 5 | less meetings with the prosecutors and agents, you did about |
| 6 | the same thing.  You talked to them about what happened, what |
| 7 | these exhibits mean, what they don't mean, and things like |
| 8 | that, true? |
| 9 | A.  That's, you know, once again, if I said "30," I don't |
| 10 | believe that's accurate.  Many meetings.  And then what was |
| 11 | your question? |
| 12 | Q.  We talked about the same kinds of things that you had in |
| 13 | the meetings that were reduced to writing? |
| 14 | A.  That's correct.  We went through the exhibits. |
| 15 | Q.  Are you aware of any reason why those new meetings were not |
| 16 | reduced to writing so that you could review them before you |
| 17 | testify? |
| 18 | A.  I do not know. |
| 19 | Q.  Is it fair to say that in February of 2017, sorry, February |
| 20 | of 2018 your lawyers were already in communication with the |
| 21 | prosecutors in order for you to make a proffer and make some |
| 22 | kind of deal? |
| 23 | MR. RAPP:  Objection; asked and answered. |
| 24 | THE COURT:  Sustained. |
| 25 | BY MR. FEDER: |

09:27:23

09:27:43

09:28:01

09:28:46

09:29:02

1   Q.  You testified, Mr. Ferrer, that you attended a meeting in

2   February of 2018 with some of these defendants and their

3   lawyers telephonically, do you remember that testimony?

4   A.  You know, I do remember that testimony, and I can tell you,

5   I don't think we reached out to -- I didn't have my lawyers                09:29:36

6   reach out to the government until after that meeting, after

7   February 18th meeting.

8   Q.  So it's not February as you just testified.  Now it's when,

9   March of --

10  A.  Well, it's still February, but that meeting was            09:29:52

11  February 18th, and I have a distinct memory of that meeting and

12  it was at that meeting -- it was after that meeting I came to

13  the conclusion that I really, maybe the best thing for me to do

14  is to shut down the site.

15  Q.  So you weren't spying on the defendants and their lawyers    09:30:23

16  in February of 2018?

17          MR. RAPP:  Objection.  Objection; argumentative.

18          THE COURT:  Overruled.  He can answer.

19          THE WITNESS:  I definitely was not spying with them.

20  I just told them I couldn't do this anymore, and that they       09:30:39

21  wanted to pay them in cash --

22  BY MR. FEDER:

23  Q.  Mr. Ferrer --

24  A.  Okay.

25  Q.  -- last week we had a nice conversation about what I hoped    09:30:46

```
 1   you could do for me, and that is if the answer can be a yes or

 2   no, or I don't know, that you would do that, and you said okay;

 3   right?

 4   A.  Yes, but I'm going to still answer truthfully.

 5   Q.  This is a yes or no answer.                          09:31:03

 6        THE COURT:  And he answered the question, and so let's

 7   move forward.

 8        And Mr. Ferrer, just listen to the question.  And as I

 9   instructed you with Mr. Rapp, just answer the question asked,

10   and I am sure Mr. Rapp will come back if there's anything that  09:31:18

11   needs to be clarified.

12        THE WITNESS:  Yes, Your Honor.

13        THE COURT:  All right.  Mr. Feder, please move

14   forward.

15   BY MR. FEDER:                                           09:31:28

16   Q.  You testified that, well, you testified that before you

17   went to work for the New Times in like the mid-1990s that you

18   had worked, sorry, you were working for the Dallas Observer, is

19   that what you said?

20   A.  Yes.                                                09:32:21

21   Q.  And that was a New Times weekly newspaper?

22   A.  Yes, it was.

23   Q.  And before that what kind of work did you do?

24   A.  Ad salesman really selling ads.

25   Q.  For what kinds of companies?                        09:32:36
```

```
1    A.  I used to work for the Milwaukee Journal Group.

2    Q.  Sorry.

3    A.  Let me do it chronologically.  I started my career working

4    for the Milwaukee Journal Group.  It's a newspaper.

5    Q.  Spell it for me, if you could.  I don't know how --          09:32:56

6    A.  Milwaukee.

7    Q.  Milwaukee like Wisconsin?

8    A.  Journal Group.

9    Q.  And when was that, from when to when?

10   A.  19 -- hold on.                                               09:33:11

11   Q.  Just an estimate is good?

12   A.  I would say approximately in the '80s.

13   Q.  For roughly how long?

14   A.  Eight, eight to ten years.

15   Q.  And you were in -- you were selling ads?                     09:33:34

16   A.  Yes.

17   Q.  Okay.  Then what, or then where?

18   A.  So then I went to work for a free daily newspaper in Aspen,

19   Colorado.

20   Q.  That's a step up.  Aspen Colorado, a newspaper?              09:33:52

21   A.  It's a free daily paper.

22   Q.  Like the New Times except daily?

23   A.  Daily, yes.

24   Q.  And what did you do there?

25   A.  I was the general manager.                                   09:34:09
```

UNITED STATES DISTRICT COURT

```
 1   Q.  Aspen is not a very big place.  I assume you were kind of

 2   the everything for everything?

 3           MR. RAPP:  Objection; relevance.

 4           THE COURT:  Sustained.

 5   BY MR. FEDER:                                                09:34:23

 6   Q.  Did you sell ads?

 7   A.  No, I managed salespeople.

 8   Q.  What kinds of ads did the Aspen paper have?

 9   A.  Out -- a lot of restaurant hospitality employment.

10   Q.  Any adult?                                               09:34:50

11   A.  No adult.

12   Q.  How about the Milwaukee Journal, any adult?

13   A.  No adult.

14   Q.  Okay.  Aspen, Colorado, when does that end?

15   A.  That ended in 1996.  I went to start with the Dallas     09:35:06

16   Observer.

17   Q.  And until 2004 you worked for an alternative newspaper or

18   weekly; right?

19   A.  No.

20   Q.  No?  Wasn't the Backpage newspapers considered alternative  09:35:38

21   newspapers, sorry, not Backpage, the New Times?

22   A.  Yeah, I just -- since 1996 I started working for

23   alternative newspapers; not 2004.

24   Q.  Sorry, I misspoke.  In 1996 to 2004 you worked for a New

25   Times alternative newspaper; right?                         09:36:11
```

```
 1   A.  Yes, I did.
 2   Q.  And with them you had a lot of experience with classified
 3   print ads; right?
 4   A.  I did.
 5   Q.  And with those there was a bright-line rule about              09:36:25
 6   everything goes except sex for money; right?
 7   A.  No.  The rule wasn't as, was not a bright line in the
 8   paper.
 9   Q.  Okay.  They had striptease ads, true?
10   A.  They had striptease ads, yes.                                  09:36:49
11   Q.  Massage?
12   A.  Yes.
13   Q.  Escort?
14   A.  Yes, they did.
15   Q.  And those kinds of ads have always been part of the           09:37:03
16   alternative newspaper culture; right?
17   A.  Those types of ads been part of the culture.  Those ads in
18   escorts would sometimes have sex for money terms.
19   Q.  Like F-U-C-K for a hundred dollars, or are you talking
20   about the suggestive words that we've been talking about for     09:37:32
21   the last couple of weeks?
22   A.  I would say suggestive words like "Greek."
23   Q.  But you have to, I mean, in order to know what "Greek"
24   might mean, you got to know that language; right?
25   A.  Yeah, I'd agree you would have to know the language.  Some    09:37:50
```

```
 1    terms like BBBJ is another example of the language.
 2    Q.  And as long as it wasn't F-U-C-K for a hundred dollars, it
 3    was kind of an anything-goes atmosphere; right?
 4    A.  Well, it would -- the rules would constantly change.
 5    Q.  Can you answer that with a yes or no, Mr. Ferrer?          09:38:25
 6    A.  It wasn't an anything-goes, so the answer is no.
 7    Q.  When you began Backpage, and you were a founder of
 8    Backpage; right?
 9    A.  I was the project manager.  I often used the title
10    "founder" for marketing purposes, but I wasn't an owner.      09:39:21
11    Q.  I didn't ask you if you were an owner.  I asked you if you
12    were a founder.
13    A.  If you look up the definition of "founder" it implies
14    ownership, and I just want to make that clear.
15    Q.  Have you ever testified under oath, Mr. Ferrer, that you   09:39:36
16    were a founder?
17    A.  Could you ask that again?
18    Q.  Yes.  Have you ever testified under oath that you were a
19    founder?
20    A.  I don't know if I used that title.  I used a lot of       09:39:51
21    different titles.
22    Q.  Have you ever used the term "founder" in any regard that
23    you're aware of?
24    A.  For marketing e-mails, yes.  For PR purposes.
25    Q.  Are you saying that that's not true even though you did it? 09:40:06
```

UNITED STATES DISTRICT COURT

```
1    A.  I'm sorry.  I don't understand that question.
2    Q.  I'm saying if you put it in marketing, if you put it in
3    marketing materials, but it wasn't, it just wasn't true?
4    A.  We put it in marketing materials because --
5    Q.  Yes or no, Mr. Ferrer?                                      09:40:33
6    A.  Well, it depends on what your exact definition of "founder"
7    is.
8    Q.  Depends on what --
9    A.  It can't be true -- exaggeration.
10   Q.  Define the difference between, in your mind, exaggeration   09:40:52
11   and untruth?
12          MR. RAPP:  Objection; relevance.
13          THE COURT:  Sustained.
14   BY MR. FEDER:
15   Q.  Does "exaggeration" mean a little but untrue, but not a lot 09:41:10
16   of untrue?
17          MR. RAPP:  Same objection.
18          THE COURT:  Sustained.
19   BY MR. FEDER:
20   Q.  When Backpage started and you were, sorry, what's your --   09:41:27
21   what's the title that you are using?
22   A.  So when Backpage started, my title -- the company -- the
23   title the company wanted me to use was sales and marketing
24   director of Backpage.
25   Q.  When Backpage started, I mean, this was your idea, wasn't   09:41:48
```

1   it?

2   A.   It was an idea that Jim Larkin and I came up with together

3   because he had sent me to San Francisco to figure out how to

4   compete with Craigslist.

5   Q.   And then when you came back you pitched Backpage; right?        09:42:06

6   A.   I said I pitched that we had to build a solution to compete

7   with Craigslist, and he had the name Backpage.com already

8   purchased that we could use.

9   Q.   Well, Backpage already belonged to New Times 'cause it was

10  the Backpage of all of the New Times weekly newspapers; right?     09:42:28

11  A.   It was, but they also had a domain Backpage.com.  They all

12  did.

13  Q.   And you wanted to complete with Craigslist because, like a

14  lot of newspapers around the country, New York Times,

15  Washington Post, everybody, they were getting pounded by          09:42:50

16  Internet sales and the advertising was going away for the

17  newspapers; right?

18  A.   That's, yes, I agree with that.

19  Q.   And Craigslist was, I don't know, were they the biggest in

20  that market?                                                      09:43:13

21  A.   Are you speaking in San Francisco?

22  Q.   No, in the country.

23          MR. RAPP:  Objection as to foundation.  What are we

24  talking about?

25          THE COURT:  Sustained.                                    09:43:24

```
 1    BY MR. FEDER:
 2    Q.  If you know?
 3            MR. RAPP:  Same objection.
 4            THE COURT:  Sustained.
 5    BY MR. FEDER:                                        09:43:33
 6    Q.  How would you characterize the market position of
 7    Craigslist in 2004?
 8    A.  Craigslist in 2004 was the rapidly growing general
 9    classified site, and it was making -- having a financial impact
10    on newspapers.                                       09:43:57
11    Q.  Who had the most ads in or around 2004, if you know?
12            MR. RAPP:  Objection; foundation, and vague.
13            THE COURT:  Sustained.
14    BY MR. FEDER:
15    Q.  What kinds of things did Craigslist advertise?   09:44:21
16    A.  They had a job section, housing section, services, general
17    merchandise for sale.
18    Q.  How about adult?
19    A.  Adult personals.
20    Q.  Were they the only website in the country at that point in  09:44:46
21    time in 2004 who had an adult website --
22            MR. RAPP:  Objection.
23    BY MR. FEDER:
24    Q.  -- section of a website --
25            MR. RAPP:  Objection; foundation.          09:44:57
```

```
 1              THE COURT:  Sustained.
 2   BY MR. FEDER:
 3   Q.  -- to your knowledge?
 4              MR. RAPP:  Same objection.
 5              THE COURT:  Sustained.                       09:45:02
 6   BY MR. FEDER:
 7   Q.  When you went to San Francisco, what did you do there?
 8              MR. RAPP:  Objection; foundation; and relevance.
 9              THE COURT:  Sustained.  Lay a little foundation; time
10   frame.                                                 09:45:24
11   BY MR. FEDER:
12   Q.  You testified about two minutes ago that the request of
13   Mr. Larkin you went to San Francisco to check out Craigslist to
14   see if Backpage should start something like that, true?
15   A.  True.                                              09:45:36
16   Q.  And then what did you do in San Francisco?
17              MR. RAPP:  Objection; vague.
18              THE COURT:  Sustained.
19              MR. FEDER:  Sorry, did you --
20              THE COURT:  I sustained it.                 09:45:59
21              MR. FEDER:  Oh.
22   BY MR. FEDER:
23   Q.  What did you do in regard to learning about Craigslist and
24   how it might be applied to Backpage?
25   A.  Well, the sales staff was -- informed me how competitive   09:46:10
```

```
 1   Craigslist was, how Craig Newmark didn't like anyone
 2   prospecting from his site, but they had no other leads so they
 3   had to use Craigslist, and I helped create customer lists for
 4   the salespeople to be able to call prospects.
 5   BY MR. FEDER:                                            09:46:52
 6   Q.  Mr. Newmark didn't want people prospecting, what does that
 7   mean?
 8   A.  In his Terms of Use he didn't like people calling his
 9   clients and trying to convince them to run ads elsewhere.
10   Q.  Well --                                              09:47:14
11   A.  So he would personally --
12          THE COURT:  Don't speak over one another, please.  He
13   was still finishing his answer.
14   BY MR. FEDER:
15   Q.  I thought you were finished.                         09:47:23
16   A.  He would personally call.  He would call me.
17   Q.  What, sorry, what do you mean he would call you?
18   A.  He would call me and say, "Stop having your salespeople
19   call my ads and try to convince them to run with your paper."
20   Q.  And then at some point you started obtaining the Craigslist  09:47:41
21   ads that were on Google and reached out to those advertisers
22   that way; correct?
23   A.  Yes, that's correct.
24   Q.  And Google had all of the Craigslist ads on it?
25          MR. RAPP:  Objection; foundation.                 09:48:00
```

1          THE COURT:  Sustained.

2     BY MR. FEDER:

3     Q.  To your knowledge, Mr. Ferrer, did Google have all of the

4     Craigslist adult ads on it?

5          MR. RAPP:  Again, foundation as to when.          09:48:09

6          THE COURT:  Sustained.

7     BY MR. FEDER:

8     Q.  Starting in 2004.

9     A.  Not all, but some, yes.

10    Q.  Thousands, tens of thousands?          09:48:24

11    A.  Lots of ads would be indexed by Google and you could find

12    them in the cache.

13    Q.  C-A-C-H-E, cache?

14    A.  In the Google cache, yes.

15    Q.  You could find pretty much all or many of the ads from any          09:48:42

16    website in that cache; right?

17    A.  Once again, "all" is an overstatement.  It depends on when

18    the search engine went to the site and crawled, so many.

19    Q.  In the cache at Google, is it fair to say that in 2004

20    there were billions of adult ads?          09:49:08

21         MR. RAPP:  Objection; relevance.

22         THE COURT:  Sustained.

23    BY MR. FEDER:

24    Q.  If you wanted to find adult ads, Google was a good place to

25    go in 2004, true?          09:49:25

```
 1    A.  Google had a lot of adult ads indexed in their search

 2    engine, yes.

 3    Q.  And would they have like ads from Facebook there?

 4           MR. RAPP:  Objection; relevance.

 5           THE COURT:  Sustained.                              09:49:53

 6    BY MR. FEDER:

 7    Q.  Twitter?

 8           MR. RAPP:  Same objection.

 9           THE COURT:  Sustained.

10    BY MR. FEDER:                                             09:50:03

11    Q.  As soon as Backpage began, Backpage ads were also in the

12    Google cache; right?

13    A.  Yes.

14    Q.  Adult and every other category; correct?

15    A.  Yes.                                                  09:50:20

16    Q.  Google is kind of like a vacuum cleaner that vacuums up

17    information so that people can go to that site and others like

18    Bing to search out what they want to search out?

19           MR. RAPP:  Objection; relevance and vague.

20           THE COURT:  Sustained.                             09:50:36

21    BY MR. FEDER:

22    Q.  When you started, sorry, when Backpage started before --

23    strike that.

24           What was the comparative size of Backpage to

25    Craigslist from say 2004 to 2008?                         09:51:13
```

UNITED STATES DISTRICT COURT

A.  I always felt we were one-thirtieth the size because
Craigslist had so much traffic in other categories, like in all
categories.

Q.  In comparison to 2004 to 2010 in the adult section, what
was the distinction between Craigslist and Backpage?                    09:51:48

A.  Well, that's a long range period of time.

Q.  Fair.  Let's bring it down.  It would be a two-year
increments, would that be good?

A.  Yes, that's more helpful.

Q.  '04 to '06.                                                          09:52:04

A.  Backpage's -- you're asking for the comparison to
Craigslist in just Adult; right?  In 2004 we're just getting
started, pretty insignificant, but now in 2006 we are making
inroads.  This is when we were taking ads from Craigslist, just
putting them on to Backpage.  What am I going to say,            09:52:36
one-thirtieth, well, worse than that, one-sixtieth of
Craigslist, but that's an estimate because I really don't know
the amount of billion, the billions of pageviews that
Craigslist gets by section or category.  I could understand if
by Backpage, but -- so what I'm giving you is just an estimate.  09:53:04

Q.  Wasn't that -- as part of your job, wasn't that kind of
something that you paid attention to to see where you kind of
fit in regard to Craigslist, your main competitor?

A.  Yeah.  So I am basing my comparison maybe on, well, I am on
ad count.  When Backpage started, didn't have much ad count, so  09:53:24

we're really focused on, as I said, stealing the ads off

Craigslist, putting that content into female escorts.  So 2004

we're really insignificant, but we've been at it for two years

in 2006, so we're starting to make inroads.

Q.  And by '06 you're about one-sixtieth?                    09:53:51

A.  That's a real general estimate, one-fiftieth.

Q.  '06 to '08?

A.  '08.

Q.  Yeah, let's just say by '08, what fraction would you give?

A.  I'm very comfortable with saying that we're one-thirtieth    09:54:18

of Craigslist at that time.

Q.  And by the time Craigslist claims to shut down their Adult,

in 2010, what percentage are you of their adult ads?

A.  Well, now they don't have adult ads.

Q.  Immediately prior to them closing down?                    09:54:43

A.  Just prior?

Q.  Yeah.

A.  Well, we've been at it for many years, so we're doing

better than one-thirtieth.

Q.  Okay.  From -- in your capacity as the, whatever your    09:55:01

position was, did you look at other sites and language that

they used and the images that they used in their ads, the adult

ads, sorry?

        MR. RAPP:  Objection as to foundation.  When?

BY MR. FEDER:                                                   09:56:25

```
 1    Q.  Starting in -- let's start with '06.
 2    A.  In '06 did I look at other websites?
 3    Q.  Sure.
 4    A.  Yes.
 5    Q.  Fair to say, I think you've already testified to this a          09:56:42
 6    little bit, but fair to say that it was pretty explicit; right?
 7              MR. RAPP:  Objection; vague; foundation.
 8              THE COURT:  Sustained.
 9    BY MR. FEDER:
10    Q.  How would you characterize it, Mr. Ferrer?                       09:56:56
11              MR. RAPP:  Same objection.
12              THE COURT:  I think the fairness comes to the other
13    websites.
14              MR. FEDER:  Okay.
15    BY MR. FEDER:                                                        09:57:04
16    Q.  Other than Craigslist, why don't you tell the Court what
17    other sites you would like to to see to give you an idea of
18    what your comparisons were?
19              MR. RAPP:  Objection; relevance.
20              THE COURT:  I'll sustain it only as to vagueness           09:57:20
21    again.
22    BY MR. FEDER:
23    Q.  As to the adult ads and how explicit they were, what other
24    sites did you look at in the 2006 time period?
25              MR. RAPP:  Objection; relevance.                          09:57:41
```

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  I can't recall other sites because I
 3     think at that time frame we're just focused on Craigslist
 4     adult.  I mean, we're going through his erotic services
 5     category.                                                    09:58:02
 6     BY MR. FEDER:
 7     Q.  So you're not scraping ads off of Google for any other site
 8     at that point in time?
 9     A.  We are getting some other ads from some employment sites,
10     some general merchandise sites, but it's really just to put    09:58:25
11     some fluff in these other categories.  The real marketing
12     effort is coming through leads at Craigslist erotic services.
13     Q.  So fair to say the only adult ad that you are scraping off
14     of Google are from Craigslist and no other site even though
15     there's hundreds or thousands of them available?             09:58:54
16              MR. RAPP:  Objection to counsel testifying.
17              THE COURT:  Sustained.
18     BY MR. FEDER:
19     Q.  How many other comparable sites in the '06 arena had adult
20     ads like Craigslist and Backpage that were available on Google? 09:59:10
21              MR. RAPP:  Objection; relevance; and vague.
22              THE COURT:  Overruled.
23              THE WITNESS:  So there are some other sites.  There
24     are sites like Erosguide, but it's kind of a different
25     demographic because those escorts were very, very expensive,   09:59:39
```

1    and the demographic that the Backpage marketing team focused on

2    was more like Craigslist, so we didn't use Eros as a lead

3    source.

4    BY MR. FEDER:

5    Q.  No other sources at that time frame?                          09:59:58

6    A.  Sometimes you could go to The Erotic Review and you could

7    find links to websites, other websites, but there were a number

8    of them, or the person in The Erotic Review might have their

9    own website so that -- that became also a lead.

10   Q.  That's all there was available to you on Google in the 2006  10:00:30

11   time frame, or the ones that you just named?

12   A.  No, there's other sites, but I was giving you sort of

13   the -- just telling you Craigslist erotic services is the

14   dominant, dominant lead site.  There are -- there are other

15   sites.  We competed against a site called CityVibe.  That site  10:00:54

16   had a number of prostitutes posting.

17   Q.  CityVibe still around?

18            MR. RAPP:  Objection; relevance.

19            THE COURT:  Sustained.

20   BY MR. FEDER:                                                    10:01:23

21   Q.  Were the CityVibe ads available to Backpage on Google?

22            MR. RAPP:  Objection.

23   BY MR. FEDER:

24   Q.  In 2006.

25            MR. RAPP:  Okay.  Withdraw the objection.               10:01:33

```
 1              THE COURT:  You may answer, Mr. Ferrer.

 2              THE WITNESS:  I think so.  I mean, they would be

 3     indexed by the search engine.

 4     BY MR. FEDER:

 5     Q.  In the adult section of Backpage -- strike that.  Was the      10:02:15

 6     adult section of Backpage like Craigslist as far as the

 7     categories?

 8              MR. RAPP:  Objection; foundation.  When?

 9              THE COURT:  Sustained.

10     BY MR. FEDER:                                                      10:02:29

11     Q.  2006.

12     A.  Yes.

13     Q.  And there are a number of legal sex acts that were

14     available on that, on -- on both Craigslist and Backpage sites

15     in or around 2006?                                                 10:03:00

16              MR. RAPP:  Objection; foundation.

17              THE COURT:  Sustained.

18     BY MR. FEDER:

19     Q.  Massage is legal, true, during the 2006?

20     A.  Massage is legal.                                              10:03:14

21     Q.  Pole dancing?

22     A.  What was that?  Sorry.

23     Q.  Pole dancing?

24     A.  Pole dancing is legal.

25     Q.  Movies with individuals having sex legal?                      10:03:30
```

1   A.   Porn?

2   Q.   Yes.

3   A.   I believe so; most porn.

4   Q.   You could hire somebody to come clean your house in the

5   nude?                                                                    10:03:51

6           MR. RAPP:   I'm going to object if he's asking this

7   witness for some type of legal conclusion on a particular act.

8           MR. FEDER:   Not asking him that.

9           MR. RAPP:   Well --

10          THE COURT:   Overruled.                                          10:04:04

11          THE WITNESS:   The question was nude housekeeping?

12  BY MR. FEDER:

13  Q.   Sure.

14  A.   Well, I presume legal.

15          THE COURT:   Well, again, you weren't asked for a legal          10:04:19

16  conclusion, Mr. Ferrer.

17          THE WITNESS:   I guess -- Your Honor, I guess I don't

18  understand the question after the objection.

19  BY MR. FEDER:

20  Q.   As far as you know, I'm not asking you for a legal                  10:04:34

21  conclusion, but as far as you know, if somebody wanted to

22  advertise on Backpage in 2006 to come pleasure themself, you

23  would hire somebody to do that in front of you; right?

24          MR. RAPP:   Objection; relevance; foundation and legal

25  conclusion.                                                             10:05:05

1          THE COURT:  The witness may answer if he knows.

2          THE WITNESS:  I know that we had some nude

3    housecleaning ads, but I don't know about the pleasuring

4    yourself part.

5    BY MR. FEDER:                                          10:05:26

6    Q.  What about hiring two people to come have sex with each

7    other, is that something that could be advertised on Backpage?

8          MR. RAPP:  Objection; foundation, and same legal

9    conclusion objection.

10          THE COURT:  Overruled.                          10:05:48

11          THE WITNESS:  Could you ask the question again?  I

12    apologize, but it's --

13          MR. FEDER:  Read it back.

14          THE WITNESS:  -- complicated.

15          THE COURT:  I think it would be appropriate at this    10:06:06

16    point to lay some just foundation in terms of what your time

17    frame you're speaking about, if you're talking about Craigslist

18    or talking about Backpage, talking about other websites,

19    Mr. Feder.  I think that would be helpful.

20    BY MR. FEDER:                                          10:06:23

21    Q.  2006 Backpage, could somebody advertise on Backpage in the

22    adult section to have two people come and have sex with each

23    other?

24    A.  Would I -- I can tell you what we -- I'm not sure what

25    you're asking.  What about that, are you saying is it possible    10:06:51

```
 1   to do that?
 2   Q.  Sure.
 3             MR. RAPP:  Object to speculation.
 4             THE COURT:  Sustained.
 5   BY MR. FEDER:                                            10:07:01
 6   Q.  Unless the ad says, "F-U-C-K for a hundred dollars," you've
 7   testified that your belief that, sorry, your belief that it's a
 8   prostitute is the way the women dress?
 9             MR. RAPP:  Objection; compound question.
10             THE COURT:  Sustained.                         10:07:58
11   BY MR. FEDER:
12   Q.  Have you -- strike that.
13             You have testified that the way you can tell the ad
14   advertises a prostitute is based on the way they dress;
15   correct?                                                 10:08:16
16   A.  That could be one factor, but there are others.
17   Q.  I'm going to get to that.  And words that are suggestive;
18   correct?
19   A.  Correct, coded words.
20   Q.  Anything else?                                       10:08:38
21   A.  Yes.
22   Q.  What?
23   A.  Well, if they had links to The Erotic Review where you
24   could read reviews specifically about sex acts that they are
25   having with Johns for money.  You could also -- the fact that  10:08:54
```

48

```
 1   they are posting on Backpage, and my knowledge of Backpage over
 2   this long period of time, and the fact that there were over
 3   20,000 prostitution investigations on the site in the category
 4   of female escorts can give you the assumption that they are
 5   prostitutes.                                                   10:09:31
 6   Q.  Every single one?
 7   A.  Well, I can't say every single one.
 8   Q.  Well, 20,000 investigation in relation to the amount of ads
 9   there were on the escort section of Backpage, sorry, strike
10   that.                                                          10:09:50
11        Are you talking about 20,000 from '04 to '18?
12   A.  Yes.
13   Q.  How many ads do you think there were from 2004 to 2018 on
14   Backpage in the female escort section in that time frame,
15   billions?                                                      10:10:11
16   A.  I'm comfortable with millions.
17   Q.  Eight figures, nine figure millions?
18   A.  There were millions of postings.
19        MR. FEDER:  Could you bring up Exhibit 19 and 19a?
20   That looks like the wrong one.  How about 311?  This is already 10:11:00
21   admitted.
22   BY MR. FEDER:
23   Q.  Mr. Ferrer, you see where it says -- sorry, this is for the
24   adult section; right?
25   A.  Yes, I see it on the screen.                               10:11:28
```

1    Q.  On one day.

2    A.  What was your question?

3    Q.  Is this the adult section for one day, March 22, 2010 to

4    March 22, 2010; right?

5    A.  So this is for one day and it's breaking down the content          10:11:42

6    by the adult section.

7    Q.  Well, except that under search engines there is a number of

8    visits too, aren't there?

9    A.  Yes, there are.

10   Q.  And far eclipse the referring sites, which included The           10:12:03

11   Erotic Review; right?

12   A.  We did extremely well --

13   Q.  That's a yes or no.

14   A.  What was your question again?  I'm sorry.

15   Q.  The visits from search engines far eclipse the visits from        10:12:21

16   referring sites on Exhibit 311; correct?

17   A.  I believe search engines are about one-third of the

18   traffic, yes.

19        MR. FEDER:  Would you go back to the overall exhibit,

20   please?  Sorry, just show 311.  There we go.  Thanks.                 10:12:38

21   BY MR. FEDER:

22   Q.  And on that single day there are a million seven; is this

23   right?

24   A.  On that day there were 1.7 million visits, yes.

25   Q.  And so over the course of 2004 to 2018 visits to the female       10:13:10

1   escorts, you're still going to say millions or are you going to

2   say billions?

3   A.  Well, this report is about pageviews looking at ads.  This

4   isn't about the ad count or the number of ads.  When I said

5   millions, you asked me how many ads were posted during that

6   period of time.  This would be when someone is looking at the

7   ads in the female.

8   Q.  By 2018, how many markets was Backpage where they have

9   female escort ads?

10          MR. RAPP:  Objection; vague and foundation.  Where?

11  BY MR. FEDER:

12  Q.  For the United States.

13          MR. RAPP:  Good.

14          THE WITNESS:  You asked how many markets on Backpage

15  had the escort category?

16  BY MR. FEDER:

17  Q.  Yes.

18  A.  I believe we were in at least 400 cities and those cities

19  would have all had the escort category.

20  Q.  And they -- those markets included pretty much every big

21  city in the United States, plus a lot of small ones?

22  A.  Yes, a lot of small ones too.

23  Q.  And so 20,000 investigations next to millions, maybe tens

24  of millions of ads on the Backpage female escorts, it's a

25  pretty small percentage, wouldn't you say?

1    A.  I think --

2    Q.  Yes or no?

3    A.  No, I think it's a lot of -- a lot of subpoenas.

4    Q.  You've brought up TER, your testimony quite frequently was

5    that TER was the secret sauce for ads on Backpage; right?          10:15:44

6    A.  See -- TER was the secret sauce to grow the adult section

7    on Backpage.

8    Q.  And you were asked on a number of occasions and answered on

9    a number of occasions how in various investigations and in

10   various newspaper articles, et cetera, that you didn't tell        10:16:18

11   them about TER, remember that testimony?

12   A.  Yes, we didn't.

13            MR. FEDER:  Could we bring up Exhibit 1835?

14   BY MR. FEDER:

15   Q.  Do you remember this exhibit that was admitted?                10:16:53

16   A.  Yes, I do remember this exhibit.

17   Q.  And this was a 2007 e-mail --

18   A.  Yes.

19   Q.  -- talking about The Erotic Review as being in, as of 2005,

20   in New York Magazine as the consumer reports of escorts?           10:17:16

21   A.  Yes.  This is the e-mail that has the ad text for the ad

22   that I created to run on Backpage.

23   Q.  These newspapers, these magazines, these television

24   stations had these headlines and articles and programs about

25   The Erotic Review in 2005, 2006, 2007.  Sorry.  Is this            10:17:45

1    published?

2           THE COURT:  I have it as admitted.  Am I wrong?

3           COURTROOM DEPUTY:  It is admitted.

4           THE COURT:  Yes, you may publish it.

5    BY MR. FEDER:                                          10:18:18

6    Q.  Is this e-mail in 2007, Mr. Ferrer, that lists all these

7    places where TER was being talked about in the 2005-2007 time

8    frame?

9    A.  Yes.

10   Q.  Is it really your testimony that nobody knew about TER or   10:18:36

11   that were TER on your site?

12          MR. RAPP:  I'm going to object to that.  It's vague

13   and confusing as to "nobody knew."

14          THE COURT:  Sustained.

15   BY MR. FEDER:                                          10:18:57

16   Q.  Well, you know what Playboy magazine is?

17   A.  Yes.

18   Q.  Was that a -- to your knowledge, did a lot of -- was that

19   published all over the country?

20   A.  Yes.                                               10:19:16

21          MR. RAPP:  Objection; foundation.

22          THE COURT:  Sustained.

23   BY MR. FEDER:

24   Q.  To your knowledge, was it available on newsstands in every

25   major city in the country in 2007?                     10:19:27

```
 1              MR. RAPP:  Objection; foundation and relevance.
 2              THE COURT:  Sustained.
 3   BY MR. FEDER:
 4   Q.  Is it your testimony that the police, the law enforcement
 5   that did these 20,000 investigations over the course of        10:19:43
 6   Backpage didn't know about TER?
 7   A.  I really don't know what law enforcement was thinking or
 8   what sites or tools they are using for their investigations.
 9   Q.  Is it credible to you, Mr. Ferrer, that law enforcement
10   looking into prostitution wouldn't know about TER given all of 10:20:18
11   the available information that's contained in this e-mail?
12              MR. RAPP:  Objection; foundation and relevance.
13              THE COURT:  Sustained.
14   BY MR. FEDER:
15   Q.  Did any law enforcement person of these 20,000 ads or      10:20:34
16   20,000 subpoenas that you've talked about, did they ever
17   mention, hey, I didn't know about TER.  If I had known that,
18   that would have been different?
19   A.  When I said they didn't know, did TER?
20   Q.  Yes or no, Mr. Ferrer?                                      10:20:52
21              MR. RAPP:  I'll object to the extent it doesn't call
22   for a yes or no answer.
23              THE COURT:  Sustained.  It did not, Mr. Feder.  You
24   can rephrase.
25   BY MR. FEDER:                                                  10:21:11
```

1    Q.  Did any law enforcement officer during this, in any of

2    these 20,000 subpoenas that you received, did they ever mention

3    TER to you?

4    A.  I -- no, I don't think so.

5    Q.  Did they ever ask you about any information about TER?          10:21:30

6    A.  No.  Other sites, but not TER.

7    Q.  Did they ever ask you to give them any information about

8    your relationship with TER?

9    A.  No.

10   Q.  When you -- you testified around the country on behalf of       10:21:53

11   various United States Attorneys' Office and their cases, did

12   any of those prosecutors when they were preparing you ever ask

13   you about TER?

14   A.  They never asked.  We never disclosed.  I never disclosed.

15   Q.  Did they ever ask you about it?                                 10:22:12

16          MR. RAPP:  Objection; asked and answered.

17          THE COURT:  Sustained.

18   BY MR. FEDER:

19   Q.  Did you ever read any of these articles that are in this

20   e-mail, sorry, any of these articles?                              10:22:29

21   A.  I did not.

22   Q.  When you were communicating with TER, did Scott Spear or

23   anybody else to my left ever go and meet with Mr. Elms or

24   anybody else from TER?

25   A.  No.                                                            10:22:59

```
 1   Q.  To your knowledge, did they ever talk to Mr. Elms or

 2   anybody else at TER other than you and Mr. Hyer?

 3   A.  No, just --

 4   Q.  Just you?

 5   A.  -- just me.                                              10:23:11

 6   Q.  Were there ever -- was anybody else ever included on any of

 7   the e-mail communications that you had with TER other than

 8   Mr. Hyer?

 9   A.  I can't -- I can't recall any e-mail where they may have

10   been included.  Possibly Jess Adams who works for Scott Spear.  10:23:42

11   Q.  Jess Adams was only there for about a year or two; right?

12   A.  Maybe a little longer.

13   Q.  Okay.  And then in or around starting 2010, 2011 you were

14   told that TER ads needed to be banned from Backpage; right?

15   A.  TER ads?                                                 10:24:24

16   Q.  TER references in Backpage ads.

17   A.  We negotiated on that with individuals and settled on just

18   removing the links, but not the review I.D.s.

19   Q.  But without TER or some abbreviation of TER next to a link,

20   somebody would have to know about TER to even know what that   10:24:52

21   number was; right?

22   A.  Yes, that's true.

23   Q.  And you had numbers on your various ads about -- there was

24   an ad number that was administrative to Backpage, true?

25   A.  There are various numbers.  The only six digit number that  10:25:14
```

```
 1    would be possible is a review I.D. in the female escorts
 2    category.
 3    Q.  How many digits was that?
 4    A.  The Erotic Review, review I.D.s were almost always, I
 5    believe, six digits.
 6    Q.  What about the administrative number that Backpage put on
 7    its ads?
 8    A.  Oh, the -- you're saying the post I.D. numbers?
 9    Q.  Yes.
10    A.  That's in a different section.  That's not --
11    Q.  How many digits, Mr. Ferrer?
12    A.  But it could be six digits.
13    Q.  So without the TER on the ad itself, there's a number of
14    numbers on your ads; right?
15    A.  Numbers like prices.
16    Q.  I'm sorry.
17    A.  You said -- the question was, how many -- are there numbers
18    in your ads?  There are, like prices --
19    Q.  Right.
20    A.  I am sorry?
21    Q.  Strike that.
22            MR. FEDER:  Could we see 73, and could this be
23    published?
24            THE COURT:  Yes.
25    BY MR. FEDER:
```

10:25:40

10:25:51

10:26:11

10:26:22

10:27:16

```
1    Q.  See number nine on the screen, Mr. Ferrer?

2    A.  Yes, I do.

3    Q.  Now, it was your decision to wait until January, wasn't it?

4    A.  No, it was not.

5    Q.  But you were told by Mr. Spear and by Hemu and others to         10:27:26

6    kill TER; right?

7    A.  We had an agreement after that meeting --

8    Q.  Yes or no?

9    A.  -- to do it January 1st.

10   Q.  You were told to kill TER, true?                                 10:27:42

11   A.  Yes, on January 1st.

12   Q.  So that was somebody else's decision?

13   A.  Yes, it is.

14   Q.  Is there an e-mail to that effect?

15   A.  I don't know.                                                    10:27:59

16          MR. FEDER:  Could I see BFCF, number 103, 1-0-3, BFCF

17   103?

18          THE COURT:  I'm sorry, what is -- what exhibit number

19   are you --

20          MR. FEDER:  Impeachment exhibit.                             10:29:05

21          THE COURT:  Is this a government exhibit?

22          MR. FEDER:  It's my exhibit.

23          THE COURT:  Is it a marked exhibit?

24          MR. FEDER:  I'm sorry, it's my exhibit.

25   BY MR. FEDER:                                                        10:29:36
```

```
 1   Q.  Could you scroll down?  Do you recognize this sworn
 2   declaration, Mr. Ferrer?
 3   A.  Yes, I do.
 4   Q.  Scroll up a little bit, please.  Paragraph six through
 5   eight.                                                       10:30:00
 6            THE COURT:  It's jumping around a bit.
 7            MR. FEDER:  I'm sorry.  Paragraph six through eight.
 8   BY MR. FEDER:
 9   Q.  Do you see this declaration is dated September of --
10            THE COURT:  Don't ask a question until the exhibit is  10:30:23
11   settled, okay, because it's been bouncing all over on my screen
12   at least.
13            MR. FEDER:  All right.
14            THE COURT:  Are you fixed on this page?
15   BY MR. FEDER:                                                10:30:30
16   Q.  Let me know when you're ready.
17            THE COURT:  You may ask a question.
18   BY MR. FEDER:
19   Q.  Do you recall this declaration that you made in September
20   of 2016?                                                     10:31:39
21   A.  Yes, I do.
22   Q.  And you made this declaration under penalty of perjury?
23   A.  Yes.
24   Q.  And did you say in this declaration that Backpage stopped
25   advertising its services on TER in 2009?                     10:32:04
```

1  A.  Yes.

2  Q.  And that you -- Backpage terminated the referrals in 2010?

3  A.  Terminated the referrals in 2010?  I don't even really know

4  what that means.  Sorry.

5  Q.  Isn't that what it says, Mr. Ferrer?                          10:32:33

6        THE COURT:  Stop.  Don't talk over one another.  Let

7  him finish and then you can ask a question.

8  BY MR. FEDER:

9  Q.  Your testimony is that this sworn declaration that you

10  signed in 2016, that you don't understand what, quote,          10:32:44

11  terminated the referrals in 2010 means, end quote?

12  A.  This -- this is --

13  Q.  That's a yes or no answer, Mr. Ferrer.  You either

14  understand it or you don't.

15  A.  This is much more complicated.  You can't terminate a       10:32:59

16  referral.  Somebody can come to your site any time from any

17  other site.  What this is saying is that we terminated

18  referrals, and the only -- it's got to mean it's about the

19  banner ads.  That's why it's complicated.

20  Q.  But that's what it says; right?                             10:33:18

21  A.  That's what it says, yes.

22  Q.  Okay.  And you dispute what it says even though you signed

23  this sworn declaration in September of 2010?

24  A.  I'm saying it could have been more clear and it should have

25  been.                                                           10:33:33

1    Q.  And then it says in late -- did you say in late 2010 and

2    early 2011 Backpage.com banned TER numbers and links to TER

3    reviews from adult ads on Backpage.com and added TER and

4    related terms as banned terms to its automated filtering

5    system?                                                          10:33:58

6    A.  Once again, that's what it states, but it could have been

7    more clear.

8    Q.  Are you saying that it was untrue?

9    A.  What I'm saying is, is that the terms "TER" were filtered

10   out and banned, and the links were removed, but the numbers,   10:34:14

11   just a straight six digit number, they were still in the ads.

12   Q.  So this was untrue?

13   A.  I'm saying is, is that it could have been more clear.  It

14   is true that the terms "TER" are removed, so it doesn't say

15   "TER" and the number, so "TER" is gone, and the links are gone. 10:34:40

16   Q.  Mr. Ferrer, when you bought Backpage in April of 2015, did

17   you resume in any way doing business with TER?

18   A.  No.

19   Q.  Is TER still in existence as we sit here today?

20          MR. RAPP:  Objection; relevance.                         10:35:12

21          THE COURT:  Sustained.  And with that, Mr. Feder,

22   we'll go ahead and take our morning 20-minute break, and the

23   jury will, again, remember the admonition not to come to any

24   conclusions or discuss the case, but just to enjoy the

25   20 minutes that you have this morning for your recess.          10:35:32

```
 1                Please all rise for the jury.
 2                      (Jury is not present.)
 3           THE COURT:  All right.  We will stand in recess.
 4           MR. FEDER:  Have you issued any orders in regard to
 5    our hearing yesterday?                                    10:36:13
 6           THE COURT:  No, I have not.  I am still reviewing some
 7    things.
 8                (Recess was taken at 10:36 a.m.)
 9         (Proceedings reconvened at 11:00 a.m.)
10           MR. RAPP:  Judge, Judge, I just have one small matter, 11:00:18
11    and I think Mr. Ferrer can be here for this.  I just noticed
12    when the defense is identifying an exhibit, he refers to it in
13    front of the jury as impeachment.  This last exhibit, it's on
14    our exhibit list.  So I mean, it's fine, but I think
15    impeachment in front of the jury is a little bit confusing, you 11:00:37
16    know.  It has different meanings to people.  If he wants to
17    have some kind of naming convention for it that suggests that
18    it's not on any of the exhibit lists and it should be
19    categorized as such, I think there's a way to do that without
20    referring to it as impeachment.                           11:00:57
21           THE COURT:  Fair point.  You can rephrase.
22           MR. FEDER:  Fair enough.
23           THE COURT:  Please be seated.
24           MR. FEDER:  Judge, you've been sustaining relevance
25    objections to questions to Mr. Ferrer about other sites, and -- 11:01:09
```

UNITED STATES DISTRICT COURT

1    sorry.

2              (Mr. Ferrer leaves the courtroom.)

3              MR. FEDER:  It's relevant from a standpoint of good

4    faith for there to be testimony about what other sites were

5    doing as to their intent, and I am not sure what the basis of

6    the Court sustaining of those objections is, but that's the

7    relevance of it, and --

8              THE COURT:  It's the manner in which you ask the

9    question, Mr. Feder.  The questions are often vague.  They

10   don't specify a time frame.  You ask about essentially global

11   websites.  And so there's a substantial number of reasons why I

12   sustained the objection.

13             Pay attention to the question and the way you ask it.

14   And in some of these instances Mr. Ferrer can't conceivably

15   answer, I don't think anybody could, unless you lay some

16   foundation for the specifics of what you're talking about.

17             MR. FEDER:  Notwithstanding my mistakes, Judge, on

18   some of the questions that the Court has sustained the

19   objection to, the only objection has been relevance, and the

20   Court has sustained it.  That's what my record is for.

21             THE COURT:  I will look at it and I will revisit my

22   rulings on your areas of concern.

23             Since we're already delayed with our jury, I will say

24   upon reviewing, Mr. Panchapakesan, I think you posed what I

25   believe is, is this exhibit from Mr. Ferrer, it's got a stamp

11:01:51

11:02:08

11:02:28

11:02:42

11:03:07

on it, Exhibit 28, I can't recall now the precise exhibit
number that you were -- you made reference to.  It is the
e-mail on July 21st, Tuesday, to a Trent Voigt regarding the
Visa and Mastercard with the Dart reference in it forwarding
the complaint.                                              11:03:48

        Do you recall what number that exhibit was?

        MR. PANCHAPAKESAN:  Yes, Your Honor, one moment.

        THE COURT:  I will permit you to show this to the
witness as a refreshing exhibit, but I'm not going to let you
admit this exhibit because of the multiple Dart references, the  11:04:10
Dart complaint, the other issues at this point.

        Well, we'll see how it goes.  You can move for
admission at the appropriate time, and I will reserve my ruling
on that point.

        And I think it's consistent with what the Court has  11:04:34
previously held in terms of the question before the jury as to
whether or not these are prostitution ads and, therefore, if
they are not, if they find that they are not, then possibly
having a First Amendment protection.

        The only concern I have is perhaps there should be a  11:05:02
redaction regarding this Dart complaint, which is item number
one, but beyond that you can probe that area.

        All right.  Let's have the jury in.

        MR. PANCHAPAKESAN:  For the record, it's 6025.

        THE COURT:  6025?                                    11:05:29

```
 1              MR. PANCHAPAKESAN:  That's right, Your Honor.

 2              THE COURT:  All right.  Let's go ahead and have the

 3    jury in.

 4              (Jury is present.)

 5              All right.  Please be seated.                          11:06:22

 6              Mr. Feder, you may continue.

 7              MR. FEDER:  Could we see Exhibit 907?  Wrong one.

 8    Sorry.  645.  Also wrong one.  Sorry about that.

 9    BY MR. FEDER:

10    Q.  Mr. Ferrer, on April 6th of 2018 you pled guilty to a       11:07:52

11    variety of things; right?

12              MR. RAPP:  Objection; asked and answered.

13              THE COURT:  Sustained.

14              MR. FEDER:  Judge I haven't asked him anything about

15    the plea; not one question.                                     11:08:08

16              THE COURT:  Well, the question is:  "you pled guilty

17    to a variety of things; right?"

18    BY MR. FEDER:

19    Q.  In prior testimony, Mr. Ferrer, do you recall repeatedly

20    calling the process of taking words out of escort and other     11:09:56

21    adult service ads as being sanitizing them?

22    A.  Yes.

23    Q.  "Sanitize," what does "sanitize" mean to you as far as a

24    definition is concerned?  Does it mean to clean?

25    A.  It does.                                                    11:10:23
```

```
 1   Q.  And under Section 230 of the Communications Decency Act --
 2            MR. RAPP:  Objection.
 3            MR. FEDER:  -- sanitizing --
 4            MR. RAPP:  Objection.  Move to strike.
 5            THE COURT:  Sustained per the Court's prior order,     11:10:38
 6   Mr. Feder.  The jury will disregard the question.
 7   BY MR. FEDER:
 8   Q.  Isn't the process of moderation the same sanitizing that
 9   you're talking about?
10   A.  Well, it depends --                                        11:10:54
11   Q.  Yes or no?
12   A.  -- what kind of moderation process you have.  The
13   moderation process we had wasn't to prevent, block, ban posters
14   violating our rules.  We would edit the text, or even in the
15   most egregious example, allow them to remove their ad, but then 11:11:16
16   we would allow them to post again.
17   Q.  We're back to our little problem, Mr. Ferrer.  I'm going to
18   try to ask you questions that hopefully will be a yes and no
19   answer for you, okay?
20   A.  Okay.                                                      11:11:35
21   Q.  And I don't want you to editorialize.  If you can answer it
22   with a yes or no.
23            MR. RAPP:  I'm going to object to that.  He was
24   answering the question, not editorializing.
25            MR. FEDER:  It was a yes or no question.              11:11:45
```

```
 1              THE COURT:  Let's move forward.
 2   BY MR. FEDER:
 3   Q.  The process of moderation by definition is to edit ads;
 4   right?
 5   A.  No, there could be other purposes for moderation, like        11:12:00
 6   remove ads or possibly even ban the user from ever posting
 7   again.
 8   Q.  Those are all possibilities, so there's the deletion of the
 9   ad meaning the ad is deleted; right?
10   A.  Yes.  Yes.                                                     11:12:19
11   Q.  Backpage did that during the time that you were operating
12   it; correct?
13   A.  At times, yes.
14   Q.  They banned -- when you say "banned," what do you mean
15   "banned"?                                                          11:12:31
16   A.  Well, banned would be --
17   Q.  Ban a user?
18   A.  Can I explain what I mean by "ban"?
19   Q.  No.  You mean ban a user?
20              THE COURT:  Let me stop you there.  Mr. Feder, you      11:12:41
21   just asked him:  What do you mean by ban?  He was answering,
22   and then you cut him off.
23              MR. FEDER:  I'm following it up by, do you mean ban
24   the user?
25              THE COURT:  As part of the original question?          11:12:53
```

```
 1              MR. FEDER:  That's what I thought it was.

 2              THE COURT:  No, it was not.  So re-ask the question.

 3              MR. FEDER:  Sure.

 4              THE COURT:  Listen to the question and wait for it to

 5    be completely finished.                                        11:13:02

 6    BY MR. FEDER:

 7    Q.  Does the word "ban" mean to ban a user or ban a word or ad?

 8              MR. RAPP:  Objection as to foundation; vague.

 9              THE COURT:  Overruled.

10              THE WITNESS:  So you could do both.  You could ban a   11:13:13

11    word or you could ban a user, and you would ban that user by

12    their e-mail address or their credit card number or their phone

13    number that was in the ad text.

14    BY MR. FEDER:

15    Q.  And certain users were banned for repeated violations of    11:13:28

16    your Terms of Use; right?

17    A.  No.

18    Q.  Never?

19    A.  No.  Users would be banned primarily for charge-backs or

20    using credit cards unauthorized.  Rarely would they be banned   11:13:41

21    for violating the content rules.

22    Q.  When you say "rarely," let me ask it again.  Were users

23    ever banned permanently because of repeated violations of the

24    Terms of Use?

25    A.  There were --                                               11:14:05
```

Q.  Yes or no?

A.  Yes, there were some users banned for violating the Terms of Use.

Q.  And in the context of an ad, does "ban" mean permanently get rid of that one particular ad?                    11:14:18

A.  Yes, and let the others stay live.

Q.  And if there are other ads from the same poster advertising whatever we want to call it, does "ban" mean getting rid of all of their potential ads?

A.  Rarely.  Very rarely.  If they used stolen credit cards,     11:14:40 yes, they could lose all their ads.

Q.  But sometimes just for repeated violations of the Terms of Use, true or not true?

A.  Sure, there are times, yes.

Q.  But moderation itself means essentially Backpage's rules     11:15:06 being followed and you controlling what is on the site, yes or no?

A.  Yes, very much.  We were controlling what should be on the site.

Q.  And that would include ads that were, in Backpage's          11:15:32 opinion, illegal on its face?

            MR. RAPP:  Objection; foundation.

            THE COURT:  Sustained.

BY MR. FEDER:

Q.  In 2004, Mr. Ferrer, could moderation mean banning an ad     11:15:53

```
 1   because of its explicit sex terms?
 2   A.  In 2004 there was no moderation for banning any ads that
 3   had explicit sex terms.
 4   Q.  Moderation in itself began 2006?
 5   A.  I think, yes, mainly the images.                          11:16:26
 6   Q.  And that was when Mr. Spear imposed his Playboy --
 7   A.  Yes, the Playboy Hustler standard.
 8   Q.  -- standard of images?
 9   A.  Yes.
10   Q.  So in other words, Playboy centerfold, but not Hustler,   11:16:44
11   more egregious; right?
12   A.  Correct.
13   Q.  And is "sanitized" your word or is that something that you
14   were suggested you say?
15   A.  Well, it was a synonym that we would use.  We would use    11:17:05
16   "clean up" also, very common, "clean it up."
17   Q.  Edit?
18   A.  Yes, "edit" is one of the processes.
19   Q.  Moderate it?
20   A.  Edit it, moderate it, but don't ban it if it's a good user  11:17:23
21   that's paying the company money.
22   Q.  Mr. Ferrer, did I ask you --
23   A.  You asked --
24           THE COURT:  All right.
25           THE WITNESS:  So the definition of "moderation" can    11:17:36
```

1   mean banning, but it's truthful.  I want to be truthful that we

2   didn't ban paid users if they violated the Terms of Use.

3   BY MR. FEDER:

4   Q.  Is it fair to say, Mr. Ferrer, that since your plea in 2018

5   when you've met with the prosecutors, that you have been          11:17:57

6   preparing your testimony?

7   A.  Since 2018 I, as part of my cooperation agreement, I knew I

8   was going to have to testify.

9   Q.  And you've been given the questions that would be asked and

10  your proposed answers?                                            11:18:20

11  A.  Given the questions, no.

12  Q.  In other words, you discussed with the prosecutors what

13  questions you would be asked and what answers that you would

14  give; right?

15  A.  They would ask me questions and then I would give them the    11:18:35

16  answers, the truthful answers.

17  Q.  And those --

18  A.  They wouldn't give me the answer.

19  Q.  Those questions never changed; right?

20  A.  No.  Those questions changed all the time depending on the    11:18:48

21  exhibit.

22  Q.  And your answers have always been the same in the last five

23  years; right?

24  A.  Yes.

25  Q.  Nothing has ever been suggested like using the word           11:19:04

1   "sanitize" or "steal," nothing like that?

2   A.  No.

3   Q.  When you pled guilty in April of 2018, do you have a

4   recollection of what you were facing if you did not plead

5   guilty?                                                          11:20:14

6           MR. RAPP:  Objection; to the extent it calls for

7   privileged communication.

8           THE COURT:  Sustained.  So long as it -- Mr. Ferrer

9   can answer as to his understanding.

10          THE WITNESS:  I'm sorry, what was the question again?   11:20:36

11          MR. FEDER:  Please read it back to him.

12          (Record read.)

13          THE WITNESS:  I do have a recollection that it was

14   substantial, but I don't recall exactly the details.

15   BY MR. FEDER:                                                   11:21:54

16   Q.  These defendants are charged with one count of conspiracy

17   regarding the Travel Act that has a mandatory --

18          MR. RAPP:  Objection.  He's testifying.

19          THE COURT:  Sustained.

20   BY MR. FEDER:                                                   11:22:03

21   Q.  Do you know what the maximum sentence is for a conspiracy

22   regarding the Travel Act?

23          MR. RAPP:  Objection; relevance and foundation.

24          THE COURT:  Sustained.

25   BY MR. FEDER:                                                   11:22:12

1   Q.  Were you facing five years maximum for a conspiracy to

2   violate the Travel Act?

3            MR. RAPP:  Objection; relevance, and also what is on

4   the -- what is on this paper?  I can't see it.

5            THE COURT:  Well, you can stand up and look at it,                11:22:26

6   Mr. Rapp, but sustained as to relevance.

7            MR. RAPP:  Well, to the extent that this is not in

8   evidence, I would object.  I can't see really what it is that

9   'cause he's standing in front of it, but if it's not in

10  evidence, it can't be shown to a jury.                                     11:22:43

11           THE COURT:  Sustained.  Mr. Feder --

12           MR. FEDER:  Is the Court not going to allow me to talk

13  about his incentives?

14           THE COURT:  You may move forward.

15  BY MR. FEDER:                                                              11:22:56

16  Q.  Have you ever read the indictment?

17  A.  Yes.

18  Q.  There are roughly -- do you understand there is roughly 99

19  counts?

20  A.  Yes.                                                                   11:23:20

21  Q.  And --

22  A.  Well, you know what, I might have misspoke.  I don't know

23  how many counts are there.

24  Q.  Do you understand that the maximum penalty for a violation

25  of conspiracy to violate the Travel Act has a maximum sentence            11:23:33

1    of five years?

2          MR. RAPP:  Objection to the relevance of this whole

3    line of questioning, and also as to foundation with respect to

4    the indictment.

5          THE COURT:  Well, he can answer the question if he          11:23:48

6    understands the what the maximum penalty is, but -- so he can

7    answer the question if he knows.

8          THE WITNESS:  I don't know.  I had my attorneys handle

9    all of this.

10   BY MR. FEDER:                                                     11:24:12

11   Q.  So you have no idea as you sit here today what punishment

12   you could have faced if you had been indicted and convicted?

13   A.  I don't know the specifics.  I just, as I said earlier,

14   knew that --

15         MR. RAPP:  Objection.  If -- objection to the extent      11:24:37

16   this calls for some type of privileged communication as the

17   basis of his knowledge.

18         MR. FEDER:  It's -- there is no question about

19   privilege here.

20         THE COURT:  You may answer the question based on your      11:24:50

21   own knowledge, Mr. Ferrer.

22         THE WITNESS:  Well, my knowledge came from my attorney

23   who said it.

24         THE COURT:  All right.  Ask your next question.

25   BY MR. FEDER:                                                     11:25:08

```
 1    Q.  Your plea is to one count of conspiracy with a maximum

 2    penalty of five years in prison; correct?

 3    A.  Yes.

 4    Q.  And in exchange for the limitation of five years maximum,

 5    you have agreed to help the government as you have been doing      11:25:26

 6    the last couple of weeks; correct?

 7    A.  I have agreed to testify truthfully.

 8    Q.  And in exchange for your testimony, your understanding of

 9    your arrangement with the prosecutor is that they will bring

10    your cooperation to the attention of the sentencing judge;        11:25:49

11    right?

12    A.  Correct.

13    Q.  And your hope is that if you do well in their opinion they

14    will recommend no incarceration; right?

15    A.  I'm hopeful, correct, but there are no promises.              11:26:07

16    Q.  But if everything that you said on the stand was untrue,

17    but the government was satisfied with your testimony, you could

18    still get the sentence that you are hoping you get, which is

19    probation?

20         MR. RAPP:  Okay.  Well, that's -- objection; compound;       11:26:40

21    confusing and speculative.

22         THE COURT:  Sustained.  Sustained as to compound.

23    Sustained as to confusing.

24         MR. FEDER:  We'll try again.

25    BY MR. FEDER:                                                     11:26:56
```

UNITED STATES DISTRICT COURT

1    Q.  So your understanding is the prosecutors are going to bring

2    their satisfaction with your testimony to the attention of the

3    sentencing judge; right?

4           MR. RAPP:  Objection; asked and answered.

5           THE COURT:  Sustained.                                11:27:12

6    BY MR. FEDER:

7    Q.  And if everything that you've said from the stand isn't

8    true, and they still bring that understanding to the sentencing

9    judge, you would get what you hope to get; right?

10          MR. RAPP:  Okay.  Objection.  That's confusing and     11:27:26

11   it's also speculative.

12          THE COURT:  Well, he can answer as to what he hopes to

13   get.

14          MR. FEDER:  Okay.

15          THE WITNESS:  So there were two questions there, I      11:27:36

16   believe.  Could I -- could you tell me again the question?

17   BY MR. FEDER:

18   Q.  If you don't tell the truth, but that's brought to the

19   attention of the sentencing judge, positively you'll still get

20   the benefit you hope for?                                     11:27:59

21   A.  No.  If I don't tell the truth I would not get that

22   benefit.

23   Q.  Whether or not you are telling the truth is completely up

24   to the prosecutor, isn't it?

25   A.  No, it's really up to me.  I mean, I --                   11:28:14

Q.  It's completely up to the prosecutor what they tell the

sentencing judge; right?

A.  I'm not really familiar with the process.  It's something

that my attorney handles.

Q.  And if they -- if the prosecutors are not satisfied with          11:28:40

your testimony, even if completely true, then they don't have

to bring your cooperation to the attention of the sentencing

judge?

        MR. RAPP:  Okay.  That's -- objection, confusing and,

again, just speculating on the hypothetical.                          11:28:59

        THE COURT:  Sustained as to confusing, Mr. Feder.

BY MR. FEDER:

Q.  It's completely up to the discretion of the prosecutors,

what, if anything, they bring to the attention of the

sentencing judge; right?                                              11:29:16

A.  I'm not familiar with the legal process, how it works.

Q.  Your understanding is they have complete discretion to

advocate for you with the sentencing judge or not; right?

A.  I -- it's my complete understanding, yes.  I'm hopeful

that, you know, that if I testify truthfully, that the                11:29:51

prosecutors will make a recommendation.

Q.  But that's their decision, the prosecutor's decision

whether or not what you have done for them is worthy of a

recommendation to the sentencing judge or not; right?

A.  I suppose so.  I'm not exactly certain.                           11:30:12

```
1   Q.  Truthful or untruthful; correct?
2           MR. RAPP:  Objection; vague.
3           THE COURT:  Sustained.
4   BY MR. FEDER:
5   Q.  And as part, also part of your plea, your agreement with      11:30:32
6   the government, you have been allowed to keep certain assets;
7   is that right?
8   A.  Yes.
9   Q.  Assets that were purchased with money that you made from
10  Backpage?                                                          11:30:51
11  A.  No.
12  Q.  No.  So your testimony is that nothing that you have been
13  allowed to keep by the government was paid for in any way by
14  Backpage proceeds?
15  A.  No.  You had asked earlier a different question and I'm        11:31:07
16  saying that the house that I was allowed to keep was purchased
17  without Backpage money.
18  Q.  What about the house that was purchased for your now
19  ex-wife, wasn't Backpage money used for that?
20  A.  Well, I gave up any ownership in that house as part of this    11:31:30
21  plea deal.
22  Q.  But your wife has been able to keep it; right?
23  A.  Well, I think so.  Well, she was able to keep it, yes.
24  Q.  And that house was paid for with Backpage money that you
25  made; right?                                                       11:31:58
```

```
 1    A.  Some funds were commingled.  I would say that some funds

 2    were Backpage funds.

 3    Q.  How much is that house worth today, if you know?

 4    A.  Well, I don't know.  She sold the house.

 5    Q.  For how much, if you know?                                    11:32:20

 6            MR. RAPP:  Objection; relevance and then foundation.

 7            THE COURT:  Sustained.

 8    BY MR. FEDER:

 9    Q.  Did you purchase a Mercedes automobile right before you

10    entered into this plea?                                          11:32:33

11    A.  I did.  That's the Mercedes now with a hundred thousand

12    miles on it.

13    Q.  Five years ago how many miles on it did it have when you

14    bought it?

15    A.  I think it was like the year-old model, so a couple         11:32:48

16    thousand, maybe 1000 miles.

17    Q.  How much did you pay for that?

18    A.  I don't remember the number, the exact number.

19    Q.  Give us an approximation, if you can?

20    A.  I'm going to say something around 60,000 or less.            11:33:08

21    Q.  That was paid for with money that you made at Backpage?

22    A.  Yes.

23    Q.  Still have that car?

24    A.  I do.  It's the car with the 100,000 miles on it.

25    Q.  And have you been allowed, according to your agreement with  11:33:29
```

UNITED STATES DISTRICT COURT

```
 1  the government, to keep any other assets?
 2  A.  Yes.
 3  Q.  What?
 4  A.  The retirement account for those funds that were pre-2004.
 5  Q.  How much is that?                                              11:33:54
 6  A.  The pre-2004 funds would probably be -- I don't know the
 7  exact number.
 8  Q.  No idea?
 9  A.  Well, you're asking for the pre-2004 numbers, and I would
10  have to run a report or --                                        11:34:15
11  Q.  How much is it worth today, Mr. Ferrer?
12  A.  What's that?
13  Q.  How much is that retirement fund worth today?
14  A.  That probably, probably, well, somewhere under 600,000.
15  Q.  And is it the same retirement fund that you had before 2004   11:34:36
16  as the one that you had going forward to 2018?
17  A.  Is it the same fund?
18  Q.  Yes.
19  A.  Yeah, it's the 401(k).
20  Q.  That you made contributions to and Backpage and the New       11:34:55
21  Times made contribution to from 1996 to 2018?
22  A.  Yes.
23  Q.  And it's your testimony that only the monies that were in
24  the retirement fund before 2004 you are being allowed to
25  retain?                                                           11:35:20
```

80

```
 1    A.   Yes.
 2    Q.   And that's -- it was 600,000, or its present value is
 3    600,000?
 4    A.   Present, but that's total amount, and that account -- I
 5    don't know how to -- I -- I don't know what the 2004 portion      11:35:37
 6    value would be today.
 7    Q.   Before April of 2018 you had a lot of contact with law
 8    enforcement agents and officials; right?
 9    A.   Yes, I did.
10    Q.   You testified on behalf of the government and three federal   11:36:08
11    trials around the country?
12    A.   No.  Four.
13    Q.   Four.  Minnesota, Florida, Tennessee, is there another one?
14    A.   No Tennessee.
15    Q.   Florida and Minnesota is right then; right?                   11:36:33
16    A.   Yes.
17    Q.   And then you talked to police officers, FBI agents, et
18    cetera, all the time during that period; right?
19    A.   Yes, I did.
20    Q.   Did you ever tell one of those people that you were doing    11:36:49
21    something wrong?
22    A.   No, I did not.
23    Q.   Did they ever tell you that you were doing something wrong
24    when they asked for your assistance?
25              MR. RAPP:  Objection as to foundation.                   11:37:08
```

1          THE COURT:  Yes, sustained.

2   BY MR. FEDER:

3   Q.  In the four instances where you went to testify for

4   Assistant United States Attorneys around the country in their

5   trials, did any of them ever tell you and those -- strike that.        11:37:25

6          In -- when you testified for the Assistant United

7   States Attorneys around the country, all four of the times was

8   in regard to an ad or ads that you gave them to support their

9   prosecution of a pimp or something like that; right?

10  A.  Yes.                                                              11:37:50

11  Q.  And those ads, did any of those ads to your knowledge or

12  memory have TER on them?

13  A.  I don't recall the ads.

14  Q.  Did they go -- before you testified under oath for them,

15  did they go through what your, what their questions would be         11:38:07

16  and what they hoped your answers would be?

17  A.  They did -- they did tell me that these were the questions

18  they were going to ask about the exhibits.

19  Q.  They wanted to prepare you for your testimony, what to

20  expect; right?                                                       11:38:27

21  A.  Yes.

22  Q.  Did any of those prosecutors ever say:  Hey, this is --

23  this is a prostitution ad.  You're doing something illegal?

24  A.  I didn't hear it from the prosecutors, but I did hear it

25  from some of the agents.                                             11:38:46

```
 1   Q.  The agents that were connected to the U.S. attorneys or
 2   somebody else?
 3   A.  Yes, I remember a law enforcement officer in Jacksonville
 4   telling me that he's not going to fault the site for making
 5   money off of prostitution.  Anyway, it was an uncomfortable      11:39:07
 6   conversation.
 7   Q.  Did they -- because of that, when you were on the stand
 8   under oath testifying against a citizen, didn't the prosecutor
 9   bring up that you're violating the law?
10   A.  No.  They focused just on the content of the records.        11:39:32
11   Q.  So they just ignored what you claim this agent told you?
12         MR. RAPP:  Objection; foundation.  It's not clear that
13   the prosecutor knows about this conversation.
14         THE COURT:  Sustained.
15   BY MR. FEDER:                                                    11:39:49
16   Q.  Was the agent that you just talked about in with you and
17   the prosecutor when he or she was preparing you to testify?
18   A.  No.
19   Q.  Did that -- to your knowledge, did that agent testify in
20   that same trial?                                                 11:40:04
21         MR. RAPP:  Objection; relevance.
22         THE COURT:  Sustained.
23   BY MR. FEDER:
24   Q.  To your knowledge, did that agent testify that Backpage was
25   doing something illegal?                                         11:40:14
```

```
 1              MR. RAPP:  Objection; relevance.
 2              THE COURT:  Sustained.
 3    BY MR. FEDER:
 4    Q.  Okay.  We are talking about Jacksonville, anywhere else
 5    where somebody, either the prosecutor or the agent regarding      11:40:32
 6    that case said anything to you about illegality of Backpage?
 7    A.  No.
 8    Q.  And in those instances they -- you traditionally were
 9    asked:  Well, what's Backpage, right, when you testified?
10    A.  Yes, they would ask me that question.                         11:41:04
11    Q.  And you would describe it; right?
12    A.  I would.  I would describe the site like Craigslist.
13    Q.  As legal as a legal site, right, as legal ads?
14    A.  I wasn't commenting about the legality of the ads.
15    Q.  Well, but, I mean, you know, you've testified a number of     11:41:24
16    times here about what you didn't tell various law enforcement
17    people and journalists and that stuff, you could have said when
18    they gave you that oath to tell the truth, the whole truth and
19    nothing but the truth, and they asked you about Backpage, the
20    whole truth would have been that Backpage is illegal; right?      11:41:44
21    A.  It would have been more transparent for me to say that
22    Backpage has a lot of content that has sex for money.
23    Q.  But you didn't?
24    A.  I did not.
25              MR. FEDER:  Could I see Exhibit 536?                     11:42:59
```

```
1    BY MR. FEDER:
2    Q.  Are you familiar with this e-mail, Mr. Ferrer?
3              THE COURT:  Is there a question, Mr. Feder?
4              MR. FEDER:  I asked him if he was familiar, and he
5    hasn't answered.                                            11:44:34
6              THE WITNESS:  I am sorry.
7    BY MR. FEDER:
8    Q.  Maybe I didn't hear it.
9    A.  I didn't hear it.  What did you ask me?
10   Q.  Are you familiar with this e-mail?                      11:44:41
11   A.  Oh, yes, I am, and I appreciate the time 'cause I reviewed
12   it.
13   Q.  Okay.  And is this an e-mail you recall sending to
14   Mr. Spear and Mr. Hyer in March of 2007?
15   A.  Yes.                                                    11:44:58
16   Q.  Is this accurate?
17   A.  Well, it's a long e-mail, and I'm -- I gave it a perusal.
18   I think it's mainly accurate.
19             MR. FEDER:  Can I see page 2?
20   BY MR. FEDER:                                               11:45:37
21   Q.  What is spam?
22   A.  So spam is like business opportunities posted in the job
23   section, or that's the main type of spam.  Sometimes it's like
24   job sites trying to promote themselves and then posting lots of
25   ads.                                                        11:46:04
```

1    Q.  Is it people that have one type of business trying to put

2    that in to an inappropriate category?

3    A.  It's like -- it's not real jobs being posted in jobs.  It's

4    business opportunities, which usually are scams.

5           MR. FEDER:  Move for the admission of this                    11:46:26

6    Exhibit 536.

7           MR. RAPP:  No objection.

8           THE COURT:  Yes, it may be admitted.

9           MR. FEDER:  And published.

10          THE COURT:  Yes, it may be published.                         11:46:37

11          (Exhibit 536 was admitted.)

12   BY MR. FEDER:

13   Q.  Was this a plan or projection by you to Mr. Spear and

14   Mr. Hyer about how to grow Backpage?

15   A.  This is a summation of a plan with my conversations with         11:46:53

16   Scott and Dan that I crystalized it and put it into an

17   actionable plan.

18   Q.  Doesn't say anything about aggregation being illegal or

19   improper; right?

20   A.  I think we use another, so --                                    11:47:14

21   Q.  It's a yes or no.

22   A.  It doesn't use the word "aggregation" here, but what I was

23   saying is --

24   Q.  Go ahead.  Finish your answer.

25   A.  It uses another euphemism.  I consider an aggregation a          11:47:28

```
1    euphemism.  Optimized.

2    Q.  Okay.  Is there anything that's inaccurate in this?

3    A.  Well, it does reflect what was going on at the time the

4    transition from print to online.

5    Q.  That was kind of a complex thing back then; right?          11:47:58

6    A.  Complex what?

7    Q.  It was a complex process to go from print, being a print

8    person to being an Internet person?

9    A.  It was a difficult transition many could not make.

10   Q.  Because the Internet was, at least even in 2007, is still   11:48:16

11   somewhat new and everybody was kind of trying to feel their

12   way, true?

13   A.  Yes, it was a transition for print to go online.

14   Q.  And when you were looking to help build Backpage, wasn't it

15   part of your job to go and look at other sites and look at what  11:48:43

16   other sites were doing to build their ad counts?

17   A.  Yes, I studied the competition.

18   Q.  And that included Craigslist, but was not exclusive to

19   Craigslist; right?

20   A.  Correct.                                                     11:49:01

21   Q.  And they were doing roughly the same thing that you hoped

22   to do at Backpage, true, insofar as growing their sites?

23   A.  I think we all shared the same goals of growing content and

24   revenue.

25   Q.  What is SEO?                                                 11:49:20
```

UNITED STATES DISTRICT COURT

```
1   A.  So SEO is like the slide that you showed earlier, showed
2   the number of searches coming in from Google, so we would
3   optimize search engines so that keywords would bring up
4   content.
5           So for example, if you're searching for escorts in       11:49:45
6   Phoenix, Phoenix Backpage would show up first.  That was the
7   goal with SEO.
8   Q.  SEO stands for search engine optimization?
9   A.  Yes.
10  Q.  And in order to attract more viewers from Google, there's     11:50:02
11  all kinds of ways of trying to use SEO to optimize those views;
12  right?
13  A.  That's correct.
14  Q.  So, for instance, with some lawyers who advertise, they
15  have SEO experts helping them to try to bring people to their     11:50:24
16  legal site; right?
17          MR. RAPP:  Objection; relevance.
18          THE COURT:  Sustained.  Sustained.
19          MR. FEDER:  Oh, I'm sorry.
20  BY MR. FEDER:                                                     11:50:53
21  Q.  One of the primary goals of Backpage was to bring as many
22  eyeballs to your site; right?
23  A.  That's correct.
24  Q.  And if they came to eyeball one category, then the hope was
25  that they would also look what also was available and buy         11:51:09
```

```
 1   something there, true?
 2   A.  That's true.
 3   Q.  So the more content you could get on your site, the better
 4   your, what is it called on Google, your value or your profile?
 5   A.  Your ranking.                                              11:51:30
 6   Q.  Your ranking.
 7   A.  Yeah.  You would have better page rank with more content.
 8   Q.  And that's the goal of most websites is to get more and
 9   more people to come look at their site so that they could buy
10   whatever is being sold, true?                                  11:51:48
11   A.  Yes, it's true, and Google is very important.
12   Q.  And Google has what are called algorithms and that stuff on
13   how they rank your site?
14   A.  They do, and we knew how to or I knew how to help Backpage
15   do better in SEO.                                              11:52:13
16   Q.  And free ads, even though they are free, that's a way of
17   getting eyeballs to the site; right?
18   A.  Well, it's a way of getting content to the site so that it
19   would be indexed by the search engines.
20   Q.  Does Google aggregate?                                     11:52:47
21          MR. RAPP:  Objection; relevance and foundation.
22          THE COURT:  Sustained as to both.
23   BY MR. FEDER:
24   Q.  Every site aggregates, don't they, at the beginning?
25          MR. RAPP:  Same objection.                              11:53:02
```

```
 1              THE COURT:  He can answer, if he knows.
 2              THE WITNESS:  Well, I don't know about every site.  I
 3   can say that some sites do stuff their site with ads from
 4   competitors with the hope that it will be indexed by Google.
 5   BY MR. FEDER:                                                        11:53:47
 6   Q.  Was Backpage taking, in order to optimize the site, were
 7   they taking ads from the New Times?
 8              MR. RAPP:  Objection; relevance.
 9              THE COURT:  Overruled.
10              THE WITNESS:  Yes.  Backpage was originally designed     11:54:06
11   to help the print ads in the papers, so we would import them,
12   but we quickly learned the content is worthless for the most
13   part.  Doesn't come with pictures.
14   BY MR. FEDER:
15   Q.  Were you -- weren't you using the aggregation models that       11:54:40
16   you saw Craigslist and Google using?
17   A.  I don't know about Craigslist's aggregation, so I have no
18   idea, and Google's aggregation is in a separate category.  It's
19   a search engine.  It doesn't take the whole content of the
20   page.  It only shows a portion, and then you got to click it        11:55:12
21   and then you go to that website.  But for us you use the term
22   "aggregation," I refer to it as stealing ads.  We would take
23   the entire ad and put it on the site, so there would be no
24   reason to go to the other site where we got it from.
25   Q.  Mr. Ferrer, in a number of exhibits the names of some           11:56:53
```

```
 1  people have come up that you have identified as agents or
 2  representatives, do you remember that testimony?
 3  A.  You know, I'm having difficulty hearing you.
 4  Q.  Oh, okay.  Better?
 5  A.  Oh, much better.                                         11:57:12
 6  Q.  There have been a number of exhibits shown to you where
 7  there was some names on there that you have identified as
 8  agents or representatives of Backpage; right?
 9  A.  Yes.
10  Q.  One of them is Steve Suskin.  Do you remember him?       11:57:33
11  A.  Yes, I do.
12  Q.  He's not an agent or representative of Backpage.  He was a
13  lawyer for Backpage; right?
14  A.  Yes.
15  Q.  He was in-house general counsel; right?                  11:57:45
16  A.  He was a lawyer for Village Voice Media who did some work
17  for Backpage.
18  Q.  And he had an office at least that he could use at 12th
19  Street and Jefferson; right?
20  A.  He did.                                                  11:58:01
21  Q.  And he did a number of things regarding both entities;
22  right?
23          MR. RAPP:  Objection; vague, and the Court's previous
24  ruling.
25          THE COURT:  Sustained as to vague, but Mr. Ferrer can 11:58:13
```

UNITED STATES DISTRICT COURT

1   answer if he -- rephrase the question.

2   BY MR. FEDER:

3   Q.  Sure.  He was cc'd or e-mailed in regard to a number of

4   actions Backpage was going to do or had done; right?

5          MR. RAPP:  Objection; vague.                    11:58:37

6          THE COURT:  Sustained.

7   BY MR. FEDER:

8   Q.  What was it that would make you send an e-mail to

9   Mr. Suskin either directly or as a cc?

10          MR. RAPP:  Objection; relevance.               11:58:56

11          THE COURT:  Sustained.

12  BY MR. FEDER:

13  Q.  Then there was another person that you've mentioned named

14  Sam Fifer; right?

15  A.  Yes.                                               11:59:20

16  Q.  Is he an agent or representative or an outside lawyer?

17  A.  He is an outside lawyer.

18  Q.  With a large firm that has its main office in Chicago?

19          MR. RAPP:  Objection; counsel is testifying, and then

20  relevance.                                             11:59:36

21          MR. FEDER:  I'm cross-examining him with direct

22  questions.

23          THE COURT:  Well, he can answer if he knows.

24          THE WITNESS:  Yes, he's with a large firm.

25  BY MR. FEDER:                                          11:59:47

UNITED STATES DISTRICT COURT

```
 1    Q.  It used to be Sonnenschein, et cetera, et cetera, and now

 2    it's a large national firm called Dentons; right?

 3              MR. RAPP:  Objection; relevance.

 4              THE COURT:  Sustained.

 5    BY MR. FEDER:                                              12:00:05

 6    Q.  And there was another agent and representative that's on

 7    some of the exhibits and that you've identified in your direct

 8    examination named Elizabeth McDougall; right?

 9    A.  Yes.

10    Q.  And she used to be the lawyer for Craigslist?          12:00:20

11              MR. RAPP:  Objection; relevance.

12              THE COURT:  Sustained.

13    BY MR. FEDER:

14    Q.  She started working at Backpage February of 2012?

15    A.  I believe that's correct, yes.                        12:00:39

16    Q.  And she was to take over the supervision of, among other

17    things, moderation; right?

18              MR. RAPP:  Objection; relevance.

19              THE COURT:  Overruled.  He can answer, if he knows.

20              THE WITNESS:  Well, she had other tasks, but     12:01:00

21    moderation, guiding us on moderation was one of those tasks.

22    BY MR. FEDER:

23    Q.  And she implemented a number of changes to moderation;

24    right?

25    A.  She did.                                              12:01:15
```

```
 1              MR. RAPP:  Objection; relevance.
 2              THE COURT:  Overruled.
 3    BY MR. FEDER:
 4    Q.  And she remained in the employ of Backpage until pretty
 5    much the termination; right?                                    12:01:31
 6    A.  Yes.  Yes.
 7    Q.  After the sale in 2015 from some of the folks to my left to
 8    you; right?
 9    A.  Yes, she was still with Backpage.
10    Q.  What about somebody named Mark Sableman?                     12:02:23
11              MR. RAPP:  Objection; foundation; vague; relevance.
12              THE COURT:  Sustained.
13    BY MR. FEDER:
14    Q.  Was he one of the agents or representatives that you've
15    referred to?                                                    12:02:39
16              MR. RAPP:  Same objection.
17              THE COURT:  He can answer the question if he knows.
18              THE WITNESS:  I vaguely recall him.  I worked closer
19    with Liz McDougall.  I remember e-mails from Sam Fifer, but I
20    don't think I received an e-mail direct from Sableman.          12:03:08
21    BY MR. FEDER:
22    Q.  How about Don Moon, was he an agent and representative of
23    Backpage or a lawyer or both?
24    A.  What was the question again?  Sorry.
25    Q.  What about Don Moon, do you recognize that name?            12:03:26
```

UNITED STATES DISTRICT COURT

1    A.  Don Moon?

2    Q.  Don Moon.

3    A.  Yes.

4    Q.  Have you identified him as a representative of Backpage?

5    A.  He was a Board member of Village Voice Media.                    12:03:36

6    Q.  Also a lawyer and former prosecutor in Arizona; right?

7            MR. RAPP:  Objection; relevance.

8            THE COURT:  Sustained.

9    BY MR. FEDER:

10   Q.  He was a lawyer?                                                12:03:50

11           MR. RAPP:  Same objection.

12           THE COURT:  Sustained.

13           MR. FEDER:  Judge, I'm about to move into another

14   area.

15           THE COURT:  We're going until 12:30.                        12:04:17

16           MR. FEDER:  Thanks.

17   BY MR. FEDER:

18   Q.  Mr. Ferrer, how would you characterize your relationship

19   with Scott Spear while you were at Backpage?

20   A.  So while I was with Backpage he was my manager.  He had         12:05:10

21   certain strengths, like detail.  He could lay out the budgets,

22   and he also had some relationships with other alternative

23   newspapers that were very helpful in Backpage selling licenses.

24   Q.  Well, he was -- at one time he began and was the president

25   of the alternative newspaper organization in the United States;    12:05:43

```
1    right?
2              MR. RAPP:  Objection; relevance.
3              MR. FEDER:  It relates to what he just said.
4              THE WITNESS:  Did you ask me if he was president?
5    BY MR. FEDER:                                              12:05:59
6    Q.  Yes.
7    A.  I don't know that, but that seems plausible.
8    Q.  And you also described him as a micromanager; right?
9    A.  Scott required a lot of details and a plan.
10   Q.  But you knew that his employment was a variety of roles in    12:06:14
11   New Times until 2012 and a variety of roles in Backpage until
12   2015; right?
13   A.  Did he -- so what time frame are -- can we break that into
14   two questions?  I'm sorry.  You're asking about time frames.  I
15   know that his -- he had other tasks.                       12:06:41
16   Q.  Well, when you were at the, that paper in Texas in 1995,
17   '96 until 2004, did you know Mr. Spear?
18   A.  I knew of Mr. Spear.  He was the, like 900 personals expert
19   that we were running in the paper.
20   Q.  He was also all over the country doing various things for    12:07:08
21   all of the newspapers that New Times owned until 2012; right?
22   A.  Well, we were talking about 1996, and I would just say at
23   that time it was above my pay grade.  I don't know what he was
24   doing for the other papers.
25   Q.  Did he ever come to Dallas and did you ever meet him?   12:07:29
```

1   A.  He did.  He did come to Dallas and we did have meetings.

2   Q.  And somebody that has a lot of jobs has to be a

3   micromanager in order to be able to juggle everything; right?

4            MR. RAPP:  Objection; foundation; vague.

5            THE COURT:  He can answer if he can, in his opinion.        12:07:53

6            THE WITNESS:  Well, I'm familiar with the jobs that he

7   did that would involve me.  Like at that time when he came to

8   meet me in Dallas, he was really focused on trying to get money

9   for links that appeared on the web, and I guess that was a

10  little later.                                                       12:08:19

11  BY MR. FEDER:

12  Q.  That wasn't really my question, Mr. Ferrer.

13  A.  And I forgot.

14  Q.  The simple question about needing to be a micromanager when

15  you have a lot of jobs.  That's kind of a yes or no answer,        12:08:29

16  don't you think?

17  A.  Well, I think, no, if you have a lot of jobs, you don't

18  want to be a micromanager.  You like offload it.  I was

19  surprised.

20  Q.  Okay.  Did you get along with Mr. Spear?                       12:08:41

21  A.  I enjoyed working with Mr. Spear.  There were at times we

22  had some pretty big arguments.  At times I felt like we were a

23  married couple that had arguments.

24  Q.  Well, he was always trying to, not trying, he was always

25  demanding that the Backpage site be cleaned up and run right;      12:09:10

```
 1   right?

 2   A.  That's not true.

 3   Q.  And he was always telling you, you got to do something, and

 4   you thought he was unreasonable; right?

 5   A.  What time frame and what context are we talking about?        12:09:26

 6          MR. FEDER:  Can we see Exhibit 6212?

 7   BY MR. FEDER:

 8   Q.  Please take a look at that e-mail of September 13, 2005.

 9          THE COURT:  Defense exhibit?

10          MR. FEDER:  It is.                                        12:10:00

11   BY MR. FEDER:

12   Q.  Tell me when you're done.

13          MS. BERTRAND:  Your Honor, what exhibit is this?

14          THE COURT:  I don't know.  Mr. Ferrer knows -- sorry,

15   Mr. Feder knows.                                                 12:10:27

16          MR. FEDER:  I'm sorry.  I didn't hear.

17          THE COURT:  She's asking you what exhibit it is.

18          MR. FEDER:  Oh, I'm sorry.  6212.

19          MS. BERTRAND:  Thank you.

20          THE WITNESS:  I'm sorry, are you waiting on me?          12:11:17

21          MR. FEDER:  I am.

22          THE WITNESS:  I read the document.

23   BY MR. FEDER:

24   Q.  Are you familiar with the ad?

25   A.  With the e-mail?                                            12:11:28
```

1    Q.   Yeah.

2    A.   I am familiar with the e-mail, and humor doesn't --

3    Q.   That's a yes or no.

4    A.   I am familiar with it.

5    Q.   Is it from you to Mr. Spear?                          12:11:35

6    A.   Yes.  It's my reply to Mr. Spear trying to be funny.

7    Q.   Oh.

8              MR. FEDER:  Move to admit 6212.

9              MR. RAPP:  No objection.

10             THE COURT:  Yes, it may be admitted.             12:11:55

11             (Exhibit 6212 was admitted.)

12   BY MR. FEDER:

13   Q.   So at the bottom it's relating to this article about

14   Craigslist.  Mr. Spear is going --

15             JUROR 16:  Excuse me, I'm sorry, not hearing.  Sorry.   12:12:07

16             MR. FEDER:  Not hearing?

17             COURTROOM DEPUTY:  That was Juror 16.

18   BY MR. FEDER:

19   Q.   He's telling you to clean up the site this week; right?

20   A.   Yes, he is.                                           12:12:23

21   Q.   And you, comedian that you are, you are going, "It's

22   already clean.  We have no ads saying 'sex for money.'"

23   A.   No, that's not the part where I am trying to be funny.  The

24   part that I am trying to be funny on is about "Hal run the

25   sting for me?"  Hal used to be the president of the New Times,   12:12:40

```
1   and I told Spear about how he used to --

2           MR. FEDER:  Relevance; move to strike; beyond the

3   scope of the question.

4           MR. RAPP:  Wait a minute.

5           THE COURT:  Overruled.                            12:12:54

6           THE WITNESS:  Hal Smith used to use massage therapists

7   that gave happy endings that would place ads on Backpage, and

8   they would come to the counter and tell them to stop talking

9   about that, so that's what I'm joking about.  And it's

10  already --                                                12:13:15

11          MR. FEDER:  Move to strike.

12          THE COURT:  All right.  Mr. Ferrer, you've finished

13  explaining.

14          Now you can ask your next question, Mr. Feder.

15          MR. FEDER:  Move to strike.                       12:13:23

16          MR. RAPP:  I would object to that.

17          THE COURT:  Overruled.  Ask your next question.

18  BY MR. FEDER:

19  Q.  So was your answer, "It's already clean.  We have no ads

20  saying 'sex for money'" true at that time?               12:13:37

21  A.  At this time we have little or no content.  We're just

22  launching the site.  It's mainly print ads, and the ads are not

23  saying, blow job, $50.  That's what I'm telling him, and that

24  I'm not being funny on.  That I'm telling the truth.  But

25  remember, it's 2005.  We don't hardly have any ads in the site. 12:13:57
```

1   We just launched.

2   Q.  Your prior -- wasn't your prior testimony that this was a

3   time when there was overt sex for money ads over the Internet,

4   including Backpage?

5   A.  That would pick up in 2006 and '7.  In 2004, we launched in    12:14:11

6   2004, and then we're adding cities, adding licenses and we're

7   importing mainly print ads.  So there's not a lot.  And we're

8   talking about, you know, we're only in a handful of markets, a

9   handful, not like Backpage today.

10  Q.  Backpage today?                                                12:14:41

11  A.  I mean, not -- I'm sorry.  It is getting close to lunch.

12  Backpage in April of 2000, or I should say March of 2018.

13  Q.  How about Exhibit 20?

14  A.  I'm familiar with this e-mail.

15  Q.  And when you say, "copy Spear so he knows I am being nice,"    12:15:45

16  what does that mean?

17  A.  What that means is that we had partnerships.  Well, we had

18  these -- Minneapolis, we own the paper, and there's an

19  administrator in Minneapolis who is not being helpful in the

20  growth of Backpage because I find out, you know, that he really   12:16:12

21  wanted to sabotage it.  So he only set the ads to expire, like

22  the ads would expire in seven days, but Backpage ads are

23  supposed to run 45 days or longer, and then stay expired.  He

24  would hard delete them.

25          So I'm being nice.  I'm copying Scott saying, you          12:16:33

```
 1   know, we should fire this guy, but I'm not -- I'll be nice.  We
 2   are not going to fire him.  Here's his problematic behavior.
 3            MR. FEDER:  Please bring up Exhibit 19.  Wrong one.
 4   Sorry.  551.
 5            THE WITNESS:  I see the e-mail and I am familiar with    12:17:36
 6   it.
 7   BY MR. FEDER:
 8   Q.  From you to Mr. Spear, cc Mr. Suskin --
 9   A.  Yes.
10   Q.  -- in February of '08?                                       12:18:01
11   A.  Yes.
12            MR. FEDER:  Move to admit.
13            THE COURT:  I thought it was already admitted.
14            MR. FEDER:  Sorry.  Okay.
15            THE COURT:  Am I right, Liliana?                         12:18:14
16   BY MR. FEDER:
17   Q.  Did you do these things, Mr. Ferrer, that you indicate in
18   this exhibit?
19   A.  Let's see.
20   Q.  Did you implement them?                                      12:18:23
21   A.  Yes.  Well, hold on a second.  Yes, we did these.
22   Q.  So you, in compliance with the posting rules, nothing that
23   suggested or implied an exchange of sexual favors for money?
24   A.  Yes.
25   Q.  You did that?                                                12:19:02
```

1    A.  Well, we would do this later.  This is kind of a do-list.

2    Step three was done, but this is the to do-list and we would do

3    that.

4    Q.  Was step one done?

5    A.  Eventually step one was done.                                12:19:16

6    Q.  Step two, you put some posting rules on there, Terms of Use

7    too, along with the Terms of Use?

8    A.  We did something like that in step two.

9    Q.  And fair to say that you were continually, you meaning

10   Backpage, modifying the posting rules in and Terms of Use to     12:19:42

11   get stricter and stricter over the years?

12   A.  There were modification in the Terms of Use, but I wouldn't

13   describe that as stricter.  That's my opinion, but Scott made

14   those changes.  And then the posting rules, we would eventually

15   remove those.                                                    12:20:15

16   Q.  When was that?

17   A.  Those would be the posting rules on top of the ad posting

18   form, and it's some time after 2012.

19   Q.  When Liz McDougall was in control of moderation?

20   A.  We had to -- we had to remove them because --                12:20:41

21   Q.  That's just a yes or no answer.

22   A.  Yeah.  When, well, I'm guessing that it's around 2012 we

23   had to remove them because it turned out --

24   Q.  Mr. Ferrer, please just answer my question.

25   A.  Yes.                                                         12:21:00

```
 1    Q.  Did it happen after Liz McDougall took over control of
 2    moderation, yes or no?
 3    A.  I think so.  I'm not certain around that time line.
 4    Q.  She began her work in February of 2012; right?
 5    A.  Correct, but I'm basing it on trying to figure out -- there    12:21:19
 6    was an impetus that caused us to have to remove them, and I am
 7    trying to remember the time to get to the right time, but if I,
 8    I would say, I believe it's 2012.
 9    Q.  All I asked you for was a yes or no, and you've given it to
10    me.  Okay.  Thank you.                                            12:21:45
11    A.  Okay.
12          MR. FEDER:  Would you bring up 6063?  6-0-6-3.  Let me
13    know when you're ready.
14          THE WITNESS:  Yeah, I am familiar with it.
15    BY MR. FEDER:                                                     12:22:48
16    Q.  This was another instance or an instance where Mr. Spear
17    was very unhappy with what was getting through on the Backpage
18    website; right?
19    A.  Yes.
20          MR. FEDER:  Sorry, move to admit and publish.              12:22:59
21          MR. RAPP:  No objection.
22          THE COURT:  Yes, it may be admitted and published.
23       (Exhibit No. 6063 was admitted.)
24    BY MR. FEDER:
25    Q.  First of all, at the bottom, that's what Mr. Spear wrote;     12:23:15
```

UNITED STATES DISTRICT COURT

```
 1   right?
 2   A.  Yes.
 3   Q.  And then the rest of the e-mail was between you and
 4   Mr. Padilla talking about what Mr. Spear had been angry about;
 5   right?                                                        12:23:35
 6   A.  No, I replied to Mr. Spear; copied Andrew Padilla.
 7   Q.  And you say there, "Answer:  This user should be banned for
 8   90 days"; right?
 9   A.  Yes.
10   Q.  Did you ban them for 90 days?                             12:24:02
11   A.  I can't recall, but that was -- that was the company policy
12   at the time to give them temporary bans.
13   Q.  Did one temporary ban and then another temporary ban turn
14   into a permanent ban, or no?
15   A.  For some egregious users, it could be.                    12:24:26
16   Q.  Or they would just get tired of getting banned on Backpage
17   and go to some other site?
18           MR. RAPP:  Objection; foundation; relevance.
19           THE COURT:  Sustained as to foundation.
20   BY MR. FEDER:                                                 12:24:47
21   Q.  You've already testified that there were users, advertisers
22   that were currently banned; right?
23   A.  There were users that were banned.
24   Q.  Was 90 days for the first offense, was that common or was
25   that a policy?                                                12:25:05
```

1    A.  You know, I don't think it was a hard policy.  I'm

2    suggesting to Mr. Spear that this is what we should do.  This

3    would teach the user a lesson and then they can come back to

4    post.

5    Q.  Where is that in this e-mail?                          12:25:30

6    A.  Well, it's the e-mail sent to Spear, and then I'm writing,

7    "This user should be banned for 90 days the right to use html."

8    What that means is that --

9    Q.  Mr. Ferrer, where does it say you ban him for 90 days and

10   then he can come back?                                     12:25:50

11   A.  Well, that's what would happen on the 91st day.

12   Q.  So it doesn't say that?

13   A.  To me it was common sense.

14   Q.  And you're saying that you didn't make the policy about

15   90 days or whatever time period it was going to be for banning? 12:26:06

16   A.  I am suggesting -- I'll telling -- I'm suggesting this to

17   Mr. Spear.

18   Q.  Is there somewhere on this e-mail or elsewhere that you

19   recall where Mr. Spear had to okay you banning somebody for

20   90 days, or was that your authority?                       12:26:27

21   A.  Well, I am using the word, "This user should." It's a

22   suggestion to Spear on these are the things that we could do.

23   Q.  So your testimony is that Mr. Spear had to authorize that?

24   A.  I sought Mr. Spear's opinion and often he shared it with

25   me.                                                        12:26:56

1   Q.  And then you controlled it or he controlled it at least as

2   to banning for 90 days?

3   A.  Do I control it or does he control it?

4   Q.  Well, you had a lot of authority to operate Backpage;

5   right?                                                                    12:27:20

6   A.  Yes, I did.

7   Q.  Jim Larkin, Scott Spear and the rest of them, since they

8   had other things they were doing, they had you, since you knew

9   about advertising, operating this site; right?

10  A.  They were keenly interested in Backpage's success, numerous    12:27:34

11  management meetings, lots of e-mails, and like I said --

12  Q.  Did that not appear to be a yes or no answer?

13  A.  It didn't appear to be a yes or no answer.

14       THE COURT:  Well, let's -- I think we are all getting

15  hungry or something at this point, so we'll take our afternoon    12:27:51

16  lunch recess for 45 minutes.

17       Members of the jury, we are on a more expedited lunch,

18  I guess you would say, and so be prepared to come back in the

19  courtroom at 1:15 and we can resume, and just remember the

20  admonition and just enjoy your lunch.                             12:28:11

21       Please all rise for the jury.

22              (Jury is not present.)

23       THE COURT:  Please be seated.  Let me make one

24  clarification in case I did not make it clear.

25  Mr. Panchapakesan, regarding Exhibit 6025, you cannot introduce   12:29:01

1    the Dart case.  To the extent he can, the witness can answer

2    his understanding of what occurred if that comes to be, if he

3    has a recollection, but nothing regarding the case itself can

4    come in.

5            Now --                                                    12:29:26

6            MR. LINCENBERG:  Your Honor, to clarify on that, if I

7    may, the Court is not saying we can't reference Sheriff Dart.

8            THE COURT:  Oh, no, and I clarified that yesterday.

9    It's part of the record yesterday.  Now, let me say this:  I'm

10   going to give you a warning regarding any mention of the CDA or   12:29:45

11   230, and if any counsel asks a question about definitions or

12   the meaning of CDA or 230 of this witness, I may begin to issue

13   an Order to Show Cause.

14           There have been two opinions issued by the Court

15   regarding the relevance of Section 230 to this case.  I have     12:30:11

16   admonished counsel numerous times, and I'm beyond the point now

17   of doing so, and so if any counsel blatantly violates the

18   Court's order, brings out the CDA, I may start issuing those

19   orders to show cause.

20           All right.  With that --                                 12:30:42

21           MR. LINCENBERG:  Your Honor, can I please have one

22   minute for a point I was trying to raise earlier?  At the

23   beginning of the day Mr. Rapp objected to Mr. Feder using

24   exhibits that were on a list that he got yesterday.  The Court

25   should be aware that throughout the course of the direct         12:30:59

1    examination of Mr. Ferrer there were a number of exhibits that

2    were not on the list that had been earlier provided to the

3    defense.  We didn't raise it with the Court because it happens.

4    We rolled with it.

5         And Mr. Rapp, I did mention it informally to Mr. Rapp,    12:31:18

6    and he said, well, they are on the exhibit list, and but I

7    just -- I think that what is sauce for the goose should be

8    sauce for the gander.  And we're working over the weekend.

9    There's always going to be exhibits that counsel are looking at

10   as they are looking over things and adding, and I don't think    12:31:36

11   Mr. Feder should be penalized in that regard if they are on the

12   exhibit list.

13        THE COURT:  The difference there, as I understood it,

14   and I read what you said earlier, is you had an opportunity to

15   review those exhibits before they were introduced, and the    12:31:51

16   difference was that you stated on the record earlier that you

17   understood that they had not, and that's the difference.

18        So to the extent that they have an opportunity to

19   review an exhibit that you're giving to them at the eleventh

20   hour, they have the opportunity to look at it.    12:32:10

21        MR. LINCENBERG:  Who said that --

22        THE COURT:  I'm talking, Mr. Lincenberg.  Again, the

23   problem is I don't want to have an argument in front of the

24   jury where we have sidebars.  We have to tiptoe around issues

25   before they are offered for introduction.  I don't want to get    12:32:26

1    into that.  That's not the method that this court employs.  I

2    maximize the use of this jury.

3          To the extent they have not seen the exhibit and they

4    were recently produced, I will give them an opportunity to do

5    that before they are introduced, as I have you.                    12:32:44

6          So we're at lunch.

7          COURTROOM DEPUTY:  All rise.

8          (Recess was taken at 12:32 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                                    **C E R T I F I C A T E**

4

5          I, HILDA E. LOPEZ, do hereby certify that I am duly

6    appointed and qualified to act as Official Court Reporter for

7    the United States District Court for the District of Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13         DATED at Phoenix, Arizona, this 27th day of

14   September, 2023.

15

16

17                                s/Hilda E. Lopez_____

18                                HILDA E. LOPEZ, RMR, FCRR

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT