UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, ) | |
| ) | No. 2:18-cr-00422-DJH |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | Phoenix, Arizona |
| Michael Lacey, et al., ) | September 26, 2023 |
| ) | 1:16 p.m. |
| Defendants. ) | |
| _____ ) | |

**BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL - DAY 12**

**(P.M. SESSION)**


Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Government:
    UNITED STATES ATTORNEY'S OFFICE
    By:  **Mr. Kevin M. Rapp, Esq.**
         **Mr. Andrew C. Stone, Esq.**
         **Mr. Peter Shawn Kozinets, Esq.**
         **Ms. Margaret Wu Perlmeter, Esq.**
         **Mr. Daniel G. Boyle, Esq.**
    40 North Central Avenue, Suite 1800
    Phoenix, Arizona  85004-4408
    kevin.rapp@usdoj.gov
    peter.kozinets@usdoj.gov
    andrew.stone@usdoj.gov
    margaret.perlmeter@usdoj.gov
    - and -
    UNITED STATES DEPARTMENT OF JUSTICE
    By:  **Mr. Austin Berry, Esq.**
    1301 New York Avenue NW, 11th Floor
    Washington, DC  20005
    austin.berry2@usdoj.gov

For the Defendant Michael Lacey:
    LIPTSITZ GREEN SCIME CAMBRIA, LLP
    By:  **Mr. Paul J. Cambria, Esq.**
    42 Delaware Avenue, Suite 120
    Buffalo, New York  14202
    pcambria@lglaw.com

For the Defendant Scott Spear:
    KESSLER LAW OFFICE
    By: **Mr. Eric Walter Kessler, Esq.**
    6720 North Scottsdale Road, Suite 210
    Scottsdale, Arizona  85253
    eric.kesslerlaw@gmail.com
    - and -
    FEDER LAW OFFICE, PA
    By:  **Mr. Bruce S. Feder, Esq.**
    2930 East Camelback Road, Suite 160
    Phoenix, Arizona  85016
    bf@federlawpa.com

<pre>
1                    A P P E A R A N C E S (Cont'd)

2   For the Defendant John Brunst:
         BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
3        By:  Mr. Gopi K. Panchapakesan, Esq.
              Mr. Gary S. Lincenberg, Esq.
4              Mr. Ariel A. Neuman, Esq.
         1875 Century Park E, Suite 2300
5        Los Angeles, California  90067
         gpanchapakesan@birdmarella.com
6        glincenberg@birdmarella.com
         aneuman@birdmarella.com

7
    For the Defendant Andrew Padilla:
8        DAVID EISENBERG, PLC
         By:  Mr. David S. Eisenberg, Esq.
9        3550 North Central Avenue, Suite 1155
         Phoenix, Arizona  85012
10       david@deisenbergplc.com

11  For the Defendant Joye Vaught:
         JOY BERTRAND, ESQ, LLC
12       By:  Ms. Joy Malby Bertrand, Esq
         P.O. Box 2734
13       Scottsdale, Arizona  85252-2734
         Joy@joybertrandlaw.com

14

15

16

17

18

19

20

21

22

23

24

25

                     UNITED STATES DISTRICT COURT
</pre>

1                       **I N D E X**

2     <u>WITNESSES FOR THE GOVERNMENT:</u>                        <u>PAGE</u>

3     Carl Ferrer
              Cross-Examination (Cont'd) by Mr. Feder          7
4             Cross-Examination by Mr. Cambria              102

5

6                         <u>EXHIBITS</u>

7     <u>NO.</u>          <u>DESCRIPTION</u>                            <u>REC'D</u>

8     5618         06.06.12 Email from Det. Scott Manz,        50
                   Baltimore County, MD to help@backpage.com
9                  DEFENSE 017223

10
      5653         08.20.12 Email from Rachel Ballard, ASA,    51
11                 Montgomery County, MD to help@backpage.com
                   DEFENSE 017258
12
      6047         03.20.08 Email from Diana Fraser, VVM. To   86
13                 C. Ferrer and Backpage team re: "REVISED
                   Adult Policy, Process for Backpage.com"
14                 DEFENSE 023012-023014

15
      6141         05.25.09 Email between J. Larkin, S. Pear   98
16                 and C. Ferrer re: "Adult Abuse Abatement"
                   (Carl's plan) DEFENSE 023899-023900
17
18    6219         12.22.11 Letter from VVM to Hemu re         57
                   Termination of Working Relationship
19                 DEFENSE 024383

20
      7000         BFCF 116                                    11
21

22

23

24

25

                      UNITED  STATES  DISTRICT  COURT

1                       **P R O C E E D I N G S**

2              (Proceedings commence at 1:16 p.m.)

3              (Jury not present at 1:16 p.m.)

4              THE COURT:  Before we bring the jury in, I do want to

5    just say, Mr. Feder, yesterday you asked about admitting          13:17:06

6    Exhibits 5618, 5653, and you also indicated 5638.  I'll let you

7    introduce 5618 and 5653, but not 5638, because that didn't

8    relate to your -- your reason for introducing those two

9    exhibits.

10             MR. FEDER:  I'm sorry, Judge.  Give that to me again.    13:17:41

11             THE COURT:  5618.

12             MR. FEDER:  5653 but not 5683?

13             THE COURT:  Not 5638.  5618 and 5653.

14             The -- the Exhibit 5079, the McKenna case, is not

15    going to be admitted.  And --                                    13:18:08

16             MR. FEDER:  Not even the part about the --

17             THE COURT:  No.  Nothing about any verbiage in the

18    case at all.  It's irrelevant.

19             MR. FEDER:  Okay.  Okay.

20             THE COURT:  Okay.  Let's have the jury in.              13:18:21

21             MR. FEDER:  Before -- Judge, before you do that,

22    number 1, just so there's no misunderstanding, the government

23    has had the defense exhibits, with the exception of very few,

24    for just as long as or about as long as we've had theirs.  So

25    there's no exhibits that are being admitted that are surprises   13:18:41

1    here.  We may not have designated them in time for Mr. Ferrer,

2    but these exhibits have been out there for a long time.

3              THE COURT:  Well, that's the problem.  The Court

4    specifically ruled that you would turn over the

5    exhibits three days and three days prior to the projected       13:18:59

6    witness testifying.  That was the rule that I implemented.

7              MR. FEDER:  Judge --

8              THE COURT:  I extended it from 48 hours, and I reduced

9    it from somebody wanted it in seven days in advance.  And so --

10   so to the extent that they were not produced within that time    13:19:16

11   period, then I'll permit the government to examine them.  Okay?

12             Let's have the jury in.

13             THE COURT:  All right.  All rise for the jury.

14             (Jury present at 1:20 p.m.)

15             THE COURT:  All right.  Please be seated.               13:20:37

16             Welcome back, members of the jury.

17             And I will say many, many, many years ago, when I

18   started in government service, I remember we were only

19   permitted a 30-minute lunch break.  I wondered how we ever got

20   through.  Anyways, welcome back.  And we have our witness on     13:20:51

21   the stand.

22             You may continue, Mr. Feder.

23             MR. FEDER:  Thanks.

24             Could we see BFCF 67?

25             THE COURT:  I'm not sure I have an exhibit --

```
 1              MR. FEDER:  I think that may be an exhibit that the
 2    government put in, but I --
 3              THE COURT:  BFCF?
 4              MR. FEDER:  This is -- this is -- this is the word I'm
 5    not allowed to use.
 6              THE COURT:  Okay.  Let me -- what is the number?  67?
 7              MR. FEDER:  Yes.
 8              MR. RAPP:  Could -- just for the record, if -- if
 9    there is a corresponding government exhibit --
10              MR. FEDER:  We'd be happy --
11              MR. RAPP:  -- if we could just have that number.
12              MR. FEDER:  Is there?
13              MR. RAPP:  No.  I'm asking.  I don't know what it is.
14              MR. FEDER:  The question is I don't know.
15              THE COURT:  Okay.  There -- there's a bit of a
16    confusion.  I thought you were referring to Government's
17    Exhibit 67.  You have -- you have a 67 somewhere in here?
18              MR. FEDER:  In the -- how about this?  In the Bruce
19    Feder exhibits as opposed to the general exhibits.
20                      CROSS-EXAMINATION (Cont'd)                    13:21:02
21    BY MR. FEDER:
22    Q.  Mr. Ferrer, can you tell me if you've seen this before?
23    A.  I have seen this document.
24    Q.  And this was the kind of back-channel communication called
25    Mantis that was -- that was through Desert Net?            13:23:48
```

UNITED STATES DISTRICT COURT

1    A.   Yes.

2    Q.   And on that -- that back channel was for you and some of

3    the other employees?

4    A.   Yes.

5    Q.   This is in -- this is in regard to April 3rd of 2008.  You      `13:23:58`

6    were talking to somebody at Desert Net about what you needed to

7    do?

8    A.   Yes.  I'm scheduling a task for the developers.

9    Q.   And in regard to that, there is some statement that says,

10   quote, "I am under pressure to clean up Phoenix's adult        `13:24:33`

11   content."

12          Do you see that?

13   A.   Yes, I do.

14   Q.   That pressure came from Mr. Spear and maybe others; right?

15   A.   I -- at the -- the pressure came from -- this may have been   `13:24:44`

16   watching Craigslist getting attacked.  So we knew we're next,

17   so we're -- that's the pressure.

18   Q.   Mr. -- Mr. Ferrer, I'm talking about a person.  It says, "I

19   am under pressure to clean up Phoenix's adult content."

20          Was that pressure from a person named Scott Spear and   `13:25:07`

21   Jim Larkin?

22   A.   Yes.

23   Q.   And then in response to that, your response to -- is,

24   "Well, deleting ads and dealing with charge-backs is messy,

25   they will just repost and I get nowhere.  It is better to block   `13:25:30`

```
 1    terms, although we will play Whac-A-Mole, but this is better
 2    than deleting ads, charge-backs, refunds, and support inquiries
 3    from deletion."
 4           Right?
 5    A.  Correct.                                                    13:25:44
 6    Q.  You were told by Mr. Spear and others to clean up the site
 7    and delete ads --
 8           MR. RAPP:  Objection.  Foundation.
 9    BY MR. FEDER:
10    Q.  -- right?                                                   13:25:53
11           THE COURT:  Overruled.
12           THE WITNESS:  Delete ads, but do not increase
13    charge-backs.  So this is a solution.
14    BY MR. FEDER:
15    Q.  No.  Your complaint was that you didn't want to delete ads  13:26:06
16    because that would be messy because of the charge-backs.
17           Isn't that what's being said there?
18    A.  That's -- that's exactly what's being said there.  And the
19    charge-backs are really critical because we had the standard
20    half of 1 percent.                                              13:26:23
21    Q.  Isn't that what you are saying there?
22           Yes or no?
23    A.  That's what I'm saying.
24    Q.  Notwithstanding what Mr. Spear and maybe Mr. Larkin told
25    you about wanting the site to be cleaned and ads to be deleted, 13:26:35
```

1    your solution is something different; right?

2    A.  No.  This is a solution that's been discussed with

3    Mr. Larkin and Scott Spear.  They're very much aware that

4    global filter's in place.  It's already operating.  This is

5    about reducing it to just a city, like Phoenix.                    13:26:54

6    Q.  That's in no email, what you just said; right?

7    A.  That's in what?

8    Q.  That is -- that appears in no email that you have seen,

9    correct, where you and Mr. Spear and Mr. Larkin are talking

10   about what you just said?                                          13:27:12

11   A.  I think it may be in emails, along with management agendas,

12   talking about global filter.  The filter's been built.  It's

13   been stripping out terms before this task was scheduled.  This

14   is an enhancement to the task.

15          MR. FEDER:  Please show him BFCF 116.                       13:27:30

16          Let me see the second page, if I could.

17   BY MR. FEDER:

18   Q.  Are you familiar with this also, which is --

19   A.  One moment.

20   Q.  -- on Desert Net on Mantis?                                    13:27:58

21   A.  I'm familiar with it.  It's another task that I've

22   scheduled for Desert Net.

23          MR. FEDER:  Move to admit.

24          MR. RAPP:  No objection.

25          THE COURT:  It may be admitted and published.               13:28:22

11

```
 1              (Exhibit 7000 admitted into evidence.)
 2    BY MR. FEDER:
 3    Q.  See where it says Scott and Hemu at the middle of the first
 4    page?
 5    A.  Yes.                                                          13:28:44
 6              MR. FEDER:  And then skipping down, where it says,
 7    "They both want me to," if you could highlight that whole
 8    thing.
 9              THE WITNESS:  "To stop having expired ads resolve."
10              You want me to read the whole paragraph?               13:29:13
11    BY MR. FEDER:
12    Q.  No.  I think the jury can read it.
13              This is, again, Mr. Spear and now Hemu, your safety
14    expert, telling you what they want and your commentary about
15    what it is you think of that and what you're going to do about  13:29:28
16    it; right?
17              MR. RAPP:  That's an objection to compound question.
18              THE COURT:  Sustained.
19    BY MR. FEDER:
20    Q.  This is your -- a -- this is a request or an order to you    13:29:42
21    of what to do from Hemu and Scott; right?
22    A.  I'm --
23    Q.  "They both want me to stop."
24    A.  They -- they both want to stop having the expired ads
25    resolve.                                                         13:30:06
```

```
 1   Q.  And, I'm sorry.  Before we go on, Mr. Nogatu, who is -- who
 2   is he?
 3   A.  So he's the CEO of SSP Blue.
 4   Q.  Also a lawyer and former prosecutor?
 5           MR. RAPP:  Objection.  Relevance.
 6           THE COURT:  Sustained.
 7   BY MR. FEDER:
 8   Q.  Also board -- a -- on the board of NCMEC?
 9   A.  Yes.
10           MR. RAPP:  Objection.  Foundation.
11           THE COURT:  Sustained.
12   BY MR. FEDER:
13   Q.  Are you aware that Mr. Nogatu was on the board of NCMEC?
14   A.  Yes.
15           MR. RAPP:  Objection.  Relevance.
16           Objection.  Relevance.
17           THE COURT:  Overruled.
18           He can answer if he was aware.
19   BY MR. FEDER:
20   Q.  Yes?
21   A.  Yes, I was.
22   Q.  Were you aware that he is a former federal sex crimes
23   prosecutor?
24           MR. RAPP:  Objection.  Foundation.  Relevance.
25           THE COURT:  Sustained.
```

13:30:23

13:30:32

13:30:41

13:30:48

13:30:56

1    BY MR. FEDER:

2    Q.  So your response to -- when you make the comment, "they

3    both want me to stop having expired ads resolve," your response

4    is then, "yet."

5           You thought Mr. Spear and Hemu and others had stupid          13:31:13

6    ideas sometimes; right?

7    A.  This idea was stupid.  They wanted --

8    Q.  Yes or no, Mr. Ferrer?

9    A.  Yes, this idea would have been stupid.

10   Q.  And then over to the second page at the top, that's your         13:31:31

11   comment; right?

12   A.  I -- I don't know.  I'd need to --

13   Q.  Well, is there anybody else writing on this Mantis

14   communication than you?

15   A.  Yes.  Desert Net is writing on this communication.              13:31:56

16   Q.  Do you think that's Mr. Gerken, Wil Gerken, who operates

17   Desert Net, or is that you?

18   A.  That could be any developer.  I'm just asking where's

19   the -- by the way, is it on page 1?

20   Q.  Page 2.  Top --                                                 13:32:14

21   A.  Page 2?

22   Q.  It's on the screen, and now highlighted.

23           MR. RAPP:  Right.  But you have -- the entire document

24   isn't on the screen.

25           MR. FEDER:  Is it possible to put page 1 -- here.  We       13:32:30

UNITED STATES DISTRICT COURT

```
 1    got both pages.  There we go.

 2            THE WITNESS:  Yeah.  I can see it now.

 3    BY MR. FEDER:

 4    Q.  Isn't that at the top from you, and then it skips down to a

 5    third of the page where it goes, "Thanks, Carl?                    13:32:49

 6    A.  Yeah.  "Thanks, Carl," is from Desert Net.

 7    Q.  So at the top, isn't that you saying those things?

 8    A.  That is me, yes.

 9    Q.  And BTW, I assume, means by the way?

10    A.  It does.                                                       13:33:06

11    Q.  Mr. Ferrer, during your direct examination, you were asked

12    a number of questions about an organization of State Attorney

13    Generals; right?

14    A.  Yes.

15    Q.  And that they had written to you, to Mr. Fifer representing   13:33:33

16    Backpage, about what they wanted, right, or what they thought?

17    A.  I'm sorry.  Could you -- I just missed that question.

18    Q.  You testified on direct about the Attorney Generals'

19    organization and the communications between Backpage and its

20    lawyer, Mr. Fifer, and the Attorney Generals; right?             13:34:03

21    A.  Yes.

22    Q.  And they suggested some things that they would like; right?

23    A.  They did.

24    Q.  They complained about some things that they didn't like;

25    right?                                                            13:34:18
```

```
 1   A.  Yes.
 2   Q.  And you testified that there was a response; right?
 3   A.  Yes.
 4   Q.  And you've seen those responses; right?
 5   A.  I have.                                                   13:34:34
 6        MR. FEDER:  Could the witness be shown 487.  Regular
 7   Exhibit 487.
 8   BY MR. FEDER:
 9   Q.  Have you seen that before?
10   A.  I don't -- I don't know.                                 13:35:14
11   Q.  Well, you've testified that you've reviewed the -- pretty
12   much the file in this case, and this is a September 23, 2011,
13   letter to the National Association of Attorneys General?
14        MR. RAPP:  Objection.  Misstates the evidence as to
15   vague, "file in this case."                                  13:35:36
16        THE COURT:  I'm sorry.  What was the objection,
17   Mr. Rapp?
18        MR. RAPP:  The objection misstates the evidence about
19   he's testified to reviewing the file in the case.  It's vague.
20   I don't know what case he's talking about.                   13:35:55
21        THE COURT:  Yes.  Sustained.
22        MR. FEDER:  With all due respect, Judge, numerous
23   emails that this man's never seen have come into evidence --
24        THE COURT:  You can ask the question.
25        ///
```

1    BY MR. FEDER:

2    Q.   You talked about a response -- responses by your --

3    Backpage's lawyers to various correspondence from the National

4    Association of Attorneys General; right?

5    A.   Yes.                                                          13:36:19

6    Q.   This is one of them; right?

7    A.   I -- this looks like a response.  I just don't recall it.

8    Q.   Well, it's from SNR Denton, Mr. Fifer's law firm in

9    Chicago; right?

10        MR. RAPP:   Objection.  This document isn't in            13:36:33

11   evidence.

12        MR. FEDER:   Move it into evidence.

13        MR. RAPP:   Objection.  Hearsay.

14        THE COURT:   Sustained.

15        MR. FEDER:   Is that going to be the Court's rulings to  13:36:43

16   the entirety of the other correspondence -- the responsive

17   correspondence by Backpage to the Attorney Generals?

18        THE COURT:   Well, with regard to this exhibit,

19   sustained.

20        MR. FEDER:   All right.  Why don't you show the -- the  13:36:56

21   witness Exhibit 51 -- 5019.

22   BY MR. FEDER:

23   Q.   Have you seen this before?  This is, again, another

24   response by Sam Fifer to the Attorney Generals Association.

25   A.   Could I see the additional pages?                          13:37:31

```
 1   Q.   Sure.

 2   A.   Thank you.

 3   Q.   Have you had an opportunity to read the five-page response?

 4   A.   Yeah, just skim through it.

 5   Q.   Okay.  Have you seen this before?                          13:37:58

 6   A.   I believe I've seen it.

 7   Q.   Matter of fact, you helped provide some of the facts to

 8   Mr. Fifer -- or some of the documents to Mr. Fifer in order to

 9   prepare -- prepare this; right?

10   A.   Exactly.  The content that's in it I'm familiar with.      13:38:14

11            MR. FEDER:  Move for the admission of 5019.1.

12            MR. RAPP:  Objection.  Hearsay.

13            THE COURT:  Sustained.

14   BY MR. FEDER:

15   Q.   When the Attorney Generals' organization wrote to Backpage, 13:38:34

16   Backpage wrote back to the Attorney Generals' organization;

17   right?

18            MR. RAPP:  Objection.  Asked and answered.

19            THE COURT:  He can reanswer.

20            MR. RAPP:  And foundation, too.                        13:38:47

21            THE COURT:  Well, yes.  I think, Mr. Feder, you can

22   lay some foundation for the question and then reask the

23   question.

24   BY MR. FEDER:

25   Q.   Starting in around 2009 through 2011, there was an exchange 13:38:55
```

UNITED STATES DISTRICT COURT

1    of correspondence between the Attorney Generals' organization

2    for various states and Backpage through its attorney, Sam

3    Fifer; right?

4    A.  Yes.

5    Q.  And that exchange of correspondence was some things that          13:39:13

6    the State Attorney Generals would like, and the response from

7    Backpage was, here's what we can do and here's what we're

8    willing to do; right?

9    A.  Yes.

10   Q.  So those letters didn't go unresponded to?  Backpage did          13:39:30

11   respond to them; right?

12            MR. RAPP:  Objection.  Asked and answered.

13            THE COURT:  Sustained.

14            MR. FEDER:  Could the witness be shown Exhibit 5994-2?

15   BY MR. FEDER:                                                          13:40:20

16   Q.  Are you familiar with this, Mr. Ferrer?

17   A.  Yes, I am.

18   Q.  This is the 17-page written plea agreement that you entered

19   in Arizona in regard to your agreement to plead guilty to one

20   count of conspiracy; right?                                           13:40:36

21   A.  Yes.

22   Q.  And as part of that plea agreement, there was a second

23   part, and that is Exhibit 5994-1?

24            MR. FEDER:  Could we see that?

25            ///

1   BY MR. FEDER:

2   Q.  Is that also a part of your plea agreement that's dated

3   April 5 of 2018?

4   A.  Yes.

5          MR. FEDER:  Move for the admission of 5994-1 and 2.          `13:41:05`

6          MR. RAPP:  I'll object.  It has -- it is riddled with

7   hearsay and a lot of other things that will be confusing.  But

8   he certainly can ask questions about it.

9          THE COURT:  I -- and I'm a bit confused, Mr. Feder.

10  You referred first to 5994-1, and this is an addendum to it.  I   `13:41:28`

11  see.  Okay.

12         Well, and it -- it's problematic, too, because it's a

13  sealed document.  So unless you show me something other than --

14  you can ask him questions about the content of some of it, but

15  I'm not going to permit its admission at this point.          `13:41:54`

16         MR. FEDER:  I believe his has been unsealed as of the

17  time of the indictment.  Which, of course, it would have to be

18  in any regular criminal case.

19         THE COURT:  Is that -- is that your understanding,

20  Mr. Rapp?          `13:42:10`

21         MR. RAPP:  5994 is unsealed, but I don't believe

22  5994 -- 5994-2 is, but not 5994-1.  It certainly was unsealed

23  for the limited purpose of our Rule 16 obligations and Brady

24  obligations for the defense, but not on the public record.

25         THE COURT:  And so I'm sustaining the objection on the   `13:42:43`

```
 1   previously stated grounds with regard to what is currently on
 2   the screen, 5994-1.
 3           And, again, with respect to 5994-2, you can ask him
 4   questions about it, but it is confusing and --
 5           MR. FEDER:  A pleading?                              13:43:08
 6           THE COURT:  -- as hearsay.
 7           Yes.  Yes.
 8           You can ask him questions about it --
 9           MR. FEDER:  Sure.
10           THE COURT:  -- Mr. Feder.                            13:43:15
11   BY MR. FEDER:
12   Q.  Page 1-2, do you see where it says Roman Numeral I, Plea?
13   A.  Yes.
14   Q.  And you --
15           MR. FEDER:  Would you scroll to the second page?     13:43:26
16   BY MR. FEDER:
17   Q.  Do you see where you're going to plead guilty to something
18   called an information of conspiracy; right?
19   A.  Yes, on page 1.
20   Q.  And then on the top of page 2, it says it's punishable by a  13:43:42
21   fine of $250,000, imprisonment of five years maximum, or both?
22   A.  Yes, it says that.
23   Q.  And you've seen this document before; right?
24   A.  I have.
25   Q.  Oh, you signed it.  I mean, is that -- don't you think?   13:44:08
```

```
 1   A.  I believe I have.  I'd have to see additional pages.
 2           MR. FEDER:  Scroll to the end, please.
 3           I'm sorry.  There we go.  One more.
 4   BY MR. FEDER:
 5   Q.  Is that your signature there on four -- on April 5 of 2018,    13:44:26
 6   Mr. Ferrer?
 7   A.  Yes, it is.
 8   Q.  And on the following page, is it also signed by your two
 9   lawyers, Nancy Clarence and Jonathan Baum, same date?
10   A.  Yes.                                                          13:44:42
11           MR. FEDER:  Could you scroll to the beginning again,
12   please?
13           Thank you.
14           And down into agreements, paragraph 3.
15           Could you scroll forward?                                 13:45:01
16   BY MR. FEDER:
17   Q.  You are agreeing that you're going to not be punished more
18   than five years; right?
19           MR. RAPP:  Objection.  Asked and answered.
20           THE COURT:  Sustained.                                    13:45:28
21   BY MR. FEDER:
22   Q.  And in exchange for that, you are keeping all of the
23   documents -- the assets that we've talked about; right?
24           MR. RAPP:  Again, we -- objection.  Asked and
25   answered.                                                         13:45:40
```

1          THE COURT:  Sustained.

2          MR. FEDER:  Could you scroll down a little bit

3    further?

4    BY MR. FEDER:

5    Q.  And paragraph E, you're -- you've also pled guilty to some          13:45:57

6    crimes in Texas and California; right?

7    A.  Correct.

8    Q.  And if you get any time anywhere, according to

9    subparagraph E, it'll be in a federal facility; right?

10         MR. RAPP:  It's -- he's misstating --          13:46:33

11         Withdrawn.

12   BY MR. FEDER:

13   Q.  Yes?

14         THE COURT:  You may answer.

15         THE WITNESS:  Yes.          13:46:43

16         MR. FEDER:  Could you scroll further?

17   BY MR. FEDER:

18   Q.  And, also, if you get prison in federal court, in prison in

19   state court, that any sentences would be served what's called

20   concurrently, meaning at the same time; right?          13:47:07

21   A.  Yes.

22   Q.  And then at the top of page 5, where it's --

23   subparagraph H, it says you will make a full accounting of all

24   your assets in which you, the defendant, has any legal or

25   equitable interest; is that right?          13:47:31

UNITED STATES DISTRICT COURT

1    A.  Yes.

2    Q.  And did you disclose to the prosecutors the house that your

3    wife got?

4    A.  Yes, I did.  I gave up all claims to that house.

5    Q.  Well, it was hers through a divorce, wasn't it?          13:47:49

6    A.  No.  The -- we were still married when I made this plea

7    deal.  We divorced later.

8    Q.  And then you -- and then you transferred the -- released --

9    you agreed to have her get the house in the divorce

10   proceedings; right?                                          13:48:17

11   A.  I did not agree to that.  I agreed that I would -- that I

12   had forfeited any interest in that house to the government.  I

13   have no interest in it.

14   Q.  To your knowledge, Mr. Ferrer, has the government made any

15   claim on that house that your ex-wife now has sold?          13:48:34

16   A.  I'm -- I do not have any knowledge of that.

17   Q.  It hasn't been discussed with you; right?

18   A.  The government hasn't discussed with me --

19   Q.  Nobody else has?

20   A.  -- what they're doing.                                   13:48:51

21          MR. RAPP:  Objection.  Foundation.  Relevance.

22   BY MR. FEDER:

23   Q.  You went --

24          THE COURT:  Overruled.

25          ///

```
 1   BY MR. FEDER:
 2   Q.  You went through a divorce proceeding; right?
 3   A.  Yes.  Well, yes, we went through a divorce.
 4   Q.  Like most divorces, you discussed the division of assets;
 5   right?                                                          13:49:12
 6   A.  Correct.
 7   Q.  And is it your testimony that you didn't discuss who was
 8   going to get the house and whether or not if your wife got it
 9   that she was going to be able to get it free and clear?
10   A.  When I did the divorce with her --                         13:49:23
11   Q.  Yes or no?
12   A.  -- the -- what was your complicated question again?
13   Q.  That you didn't have any discussion with your wife about
14   whether or not if she got the house in the divorce she would
15   get it free and clear?                                         13:49:37
16          MR. RAPP:  Well, I'm going to object on -- I don't
17   know if this involves privileged communications.  It's
18   confusing.
19          MR. FEDER:  I didn't know the prosecutors can assert
20   marital privilege on behalf of their witness.  So I object to  13:49:51
21   that.
22          THE COURT:  Well, rephrase the question, Mr. Feder.
23   BY MR. FEDER:
24   Q.  Did you discuss with your now ex-wife that she would get
25   the house free and clear in the divorce?                       13:50:08
```

1          MR. RAPP:  Objection.  Foundation and relevance.

2          THE COURT:  Well, sustained as to relevance.

3          MR. FEDER:  I'm sorry?

4          THE COURT:  Sustained as to relevance.  Let's move on.

5    BY MR. FEDER:                                                    13:50:19

6    Q.  At the bottom of page 5, paragraph -- it's paragraph 4, and

7    it's A, 4A.

8    A.  Yes, I see it.

9    Q.  Where it says that the -- that part of this agreement is

10   going to be that the federal prosecutors are not going to       13:50:49

11   prosecute you for any other offenses committed by the defendant

12   and known to the United States in connection with this matter?

13   A.  That's what it says.

14   Q.  That meant that they weren't going to prosecute you for any

15   money laundering charges; right?                                13:51:09

16   A.  Well, I'm not sure what it means.  I really had my

17   attorneys handle this.

18   Q.  That means that you're not -- that you were not going to be

19   charged with conspiracy to commit money laundering; right?

20          MR. RAPP:  Objection.  Foundation.                       13:51:28

21          THE COURT:  Sustained.

22          Lay some foundation, Mr. Feder.

23   BY MR. FEDER:

24   Q.  Did you discuss -- strike that.

25          Were you aware, Mr. Ferrer, that there was a             13:51:38

1    possibility of charges regarding conspiracy to commit money

2    laundering?

3              MR. RAPP:  Objection to the extent it calls for

4    privileged communications as its basis.

5              THE COURT:  I will stain -- sustain the objection.  If    13:51:56

6    he has an independent knowledge of it.  But otherwise if it

7    involved attorney communications, then he should not answer.

8    BY MR. FEDER:

9    Q.  Other than through your attorneys, did you talk to the

10   prosecutors about what they were going to give you and not give    13:52:14

11   you?

12             MR. RAPP:  Objection.  Foundation and hearsay.

13             THE COURT:  Well, I think it's confusing as to "give

14   you or not give you."

15   BY MR. FEDER:                                                      13:52:26

16   Q.  Did you have any discussions with any prosecutor or any

17   federal agent regarding the terms of your plea agreement?

18   A.  No.

19             MR. FEDER:  Could you pull up 6166?  And scroll

20   through it so Mr. Ferrer can see it.                               13:52:51

21             THE COURT:  How long is the exhibit?

22             MR. FEDER:  I'm sorry?

23             THE COURT:  How long is this exhibit?

24             MR. FEDER:  You know what?  I don't know.

25             THE COURT:  Well, give him --                            13:53:08

```
 1              MR. FEDER:  Pretty long.

 2              THE COURT:  Give him at least a couple minutes to

 3   review it.

 4              MR. RAPP:  It's 11 pages, Judge.

 5              THE COURT:  Give him some time to review the exhibit.   13:53:14

 6   BY MR. FEDER:

 7   Q.  Tell me when you're ready, Mr. Ferrer.

 8   A.  Okay.  I've -- well, hold on.

 9         Okay.

10   Q.  Was this the plea proceeding where you entered a plea of   13:53:56

11   not -- I'm sorry -- of guilty in this court?

12   A.  I believe it is.

13              MR. FEDER:  And could you -- could you start at the

14   beginning, please?  Please scroll forward.

15   BY MR. FEDER:                                                 13:54:20

16   Q.  Were both your lawyers, Ms. Clarence and Mr. Baum, there

17   with you?

18              THE COURT:  Stop, stop, stop, stop.  Whomever has the

19   cell phone on or recording on, please turn it off or leave.

20         You may continue.                                       13:54:35

21              THE WITNESS:  I'm sorry.  What was the question?

22   BY MR. RAPP:

23   Q.  Were both Mr. Baum and Ms. Clarence, your lawyers, with you

24   at the time you entered this plea?

25   A.  I -- yes, they were.                                      13:54:47
```

```
 1              MR. FEDER:  Could you scroll forward a bit?  Thank
 2    you.
 3    BY MR. RAPP:
 4    Q.  Does it say that your -- was part of your understanding was
 5    that your sentencing's going to be delayed potentially for a      13:55:11
 6    long time?
 7    A.  Yes.  It states that.
 8    Q.  And the reason for that delay, is that so the prosecutors
 9    can bring to the attention of the sentencing court what they
10    believe the extent of your cooperation has been?                  13:55:28
11    A.  I'm -- I'm not sure it's -- can you point to me where it
12    states that?
13    Q.  I'm not talking about the -- the transcript.  I'm talking
14    about what your understanding was.
15              MR. RAPP:  Well, object to the extent that his          13:55:46
16    understanding is based upon communications with his attorneys
17    as his basis for the understanding.
18    BY MR. FEDER:
19    Q.  Okay.  Let me try it this way:  See on page 4, line 15?
20    A.  Yes.                                                          13:56:06
21    Q.  It says, "All right.  Let me just tell you as well we
22    talked about delaying your sentencing.  Your sentencing could
23    be delayed for some time.  I don't know about other" -- "I
24    don't know about other individuals.  I don't know if there's
25    other cases.  The only point I'm bringing up for you is this      13:56:20
```

1  cooperation could go on for some time.  This is not just a

2  90-day provision.  Do you understand?"

3          Do you see that?

4  A.  Yes, I do.

5  Q.  You were there for that; right?                        13:56:33

6  A.  Yes, I was.

7          MR. FEDER:  Please scroll down.  Please scroll --

8  BY MR. RAPP:

9  Q.  At the top of page 6, line 2, do you see where it says,

10 quote, "Now, number 1, you're agreeing that, as I said, your   13:57:00

11 sentence might be deferred for quite a while until your efforts

12 to cooperate have been completed.  And that's decided by the

13 United States Government.  So, again, that could be some time.

14 They may need you potentially even for a trial quite a ways

15 away from today, and your sentencing gets deferred.  They make  13:57:22

16 those requests."

17          See that?

18 A.  I do see it.

19 Q.  You were there when that was said to you in front of a

20 federal district court judge?                               13:57:34

21 A.  Yes.  And it's been -- it was five years ago, so it's

22 helpful to see it on paper.

23 Q.  And you haven't read this transcript since then?

24 A.  I -- no.  I don't think I have.  No, I have not.

25 Q.  When you were preparing to testify here, you didn't go    13:57:54

1    through your plea agreement, the cooperation addendum, and the

2    transcript of your plea with the prosecutors?

3    A.  I did not go through -- in preparation for the trial --

4    Q.  Yes.

5    A.  -- are you saying?                                          13:58:12

6         Well, I don't think we went through the cooperation

7    agreement.

8    Q.  You didn't get prepared to be questioned about the plea

9    agreement that you entered in this case by the prosecutors when

10   you were practicing what was going to happen at the trial over  13:58:32

11   the last five years?

12   A.  I recall --

13        MR. RAPP:  Objection.  This is a confusing compound

14   question.

15        THE COURT:  It is, Mr. Feder.  There were three           13:58:43

16   subsets of questions posed in your previous question, and I

17   think you need to be a little bit more refined in whatever it

18   is you're trying to ask Mr. Ferrer.

19   BY MR. RAPP:

20   Q.  In the last five years, Mr. Ferrer, have you discussed     13:58:58

21   these documents, meaning the plea agreement and the cooperation

22   agreement, with the prosecutors?

23   A.  As to this cooperation agreement, I don't recall discussing

24   it with them.  As to the plea agreement, I do.

25   Q.  Were you told by the prosecutors that the likelihood would 13:59:22

```
 1   be that the plea agreement that you entered would come up at
 2   the very least in cross-examination?
 3            MR. RAPP:  Objection.  Relevance.
 4            THE COURT:  Overruled.
 5            THE WITNESS:  I was asked to review exhibits, and I        13:59:45
 6   believe this was one of -- not this one, but the plea agreement
 7   was one.
 8   BY MR. FEDER:
 9   Q.  Is it your testimony that you've never seen the transcript
10   of your change of plea until today?                               13:59:54
11            MR. RAPP:  Objection.  This is not the change of plea.
12            MR. FEDER:  This is the change of plea --
13            MR. RAPP:  No.
14            MR. FEDER:  -- proceeding.
15            MR. RAPP:  Objection.  This is not the change of plea    14:00:04
16   proceeding.
17            THE COURT:  Let me see the title of the transcript
18   page.
19            I'm going to -- and with regard to that question,
20   Mr. Feder, it's been asked and answered.                          14:00:16
21   BY MR. RAPP:
22   Q.  When you were preparing to --
23            THE COURT:  Well, there's still an outstanding
24   objection.
25            MR. FEDER:  Oh.                                          14:00:36
```

```
 1          THE COURT:  It does appear to be the plea proceeding.
 2  I don't know what --
 3              (The Court and the courtroom deputy confer.)
 4          MR. RAPP:  There's two parts.  This is not the change
 5  of plea.  This is a -- an addendum -- a transcript of the        14:00:44
 6  addendum to the plea proceeding.
 7          THE COURT:  Scroll down to the next page.  The next
 8  one.
 9          Ah, yes.  Sustained as to that.
10          MR. FEDER:  Okay.                                        14:01:06
11  BY MR. RAPP:
12  Q.  Have you ever seen this transcript before?
13  A.  I don't recall seeing this transcript.
14          THE COURT:  Is this a different transcript, Mr. Feder?
15          MR. FEDER:  This appears to be -- without going into    14:01:22
16  the gory details, this appears to be the separate plea
17  agreement proceedings that followed the general plea agreement
18  proceeding, if you know what I mean.
19          THE COURT:  I do, but I -- I'm asking you, is this the
20  same transcript that has been on the screen for some time?      14:01:38
21          MR. FEDER:  Yes.
22          THE COURT:  Okay.  So he's been asked and answered
23  that question about whether he's seen the transcript three
24  times now, so I think we can move on.
25          MR. FEDER:  Okay.                                        14:01:51
```

```
 1   BY MR. FEDER:
 2   Q.  But I just -- I mean, I want to make it clear.  I want to
 3   be sure I'm clear.  You did not prepare to be asked questions
 4   about your plea during the last five years in preparing for
 5   your testimony with the prosecutors?                            14:02:06
 6           MR. RAPP:  Objection.  Asked and answered.
 7           THE COURT:  Sustained.
 8           MR. FEDER:  Could you bring up BFCF 74?
 9   BY MR. RAPP:
10   Q.  And, Mr. Ferrer, could you take a moment to look through   14:02:39
11   this, specifically pages 22 and 23 and 42 and 40 -- through 45.
12           Ready?
13   A.  Ready.
14   Q.  And this was a federal trial in Florida?
15   A.  Yes, it is.                                                 14:03:47
16   Q.  And on page 23 of that, when you were asked by the
17   prosecutor, "QUESTION:  Are there certain types of content that
18   Backpage.com does not allow on the website," your answer was,
19   "We don't" -- "we have a term of use throughout this site and
20   we put up warnings and disclaimers on different pages depending 14:04:12
21   on the section.  For example, we don't allow biz opps
22   employment" -- "employment.  We don't allow people under the
23   age of 18 posting in adult.  Specifically in escorts, we forbid
24   any posting that is a sex act for money exchange or any
25   explicit pictures of genitalia."                               14:04:34
```

```
 1              Do you see that?
 2  A.  Yes, I do.
 3  Q.  Was that true at that time?
 4  A.  That's the company line, the posting rules.
 5  Q.  Was that true at that time?                          14:04:46
 6              You were under --
 7  A.  That's what it says --
 8  Q.  -- oath --
 9  A.  That's what it says on the website.
10  Q.  -- at the time, Mr. Ferrer.                          14:04:52
11  A.  That's what it says on the website.
12  Q.  You are under oath in this proceeding; right?
13  A.  Correct.
14  Q.  Was that true when you testified under oath in 2000 --
15  June 29, 2010, in a Florida District Court just like this one?  14:05:05
16  A.  It's -- and I'm answering the question when I say it's what
17  we had in the posting rules, but that doesn't mean it's not
18  happening on the site.
19  Q.  Let me -- let me read it again.
20              MR. RAPP:  Well, no.  I would object to asked and  14:05:24
21  answered.  He's answered the question.
22              MR. FEDER:  He hasn't answered the question.
23              THE COURT:  Well, you can reask the question --
24              MR. FEDER:  Thank you.
25              THE COURT:  -- and see if he can answer.      14:05:33
```

UNITED STATES DISTRICT COURT

```
 1   BY MR. RAPP:
 2   Q.  You said to a federal jury in front of a federal district
 3   court judge under oath to a federal prosecutor, quote,
 4   "Specifically in escorts, we forbid any posting that is a sex
 5   act for money exchange or any explicit pictures of genitalia,"    14:05:49
 6   end quote.
 7        Did you say that?
 8   A.  I did say it.  And it is true that we forbid it.
 9   Q.  It -- did you -- you're -- let's break it down before
10   there's a compound objection.                                     14:06:04
11        Did you say that under oath?
12   A.  I did say it.
13   Q.  Was it true when you said that?
14   A.  It is true that it's forbidden by the terms of use and the
15   posting rules.                                                    14:06:16
16        MR. FEDER:  Could you go -- scroll to 40 -- pages 42
17   and 45?  I'm sorry.  Actually, scroll backwards, if you could,
18   to maybe 21.
19   BY MR. FEDER:
20   Q.  Page 21, lines 8 through 11.                                  14:06:48
21        Do you see where those lines are?
22   A.  Which lines?
23   Q.  Where it says, "QUESTION:  What do you do for a living?"
24   A.  Yes.
25   Q.  And your answer was, "I am the" -- "I'm an employee of       14:06:59
```

```
 1  Village Voice Media.  Village Voice Media owns Backpage.com.  I
 2  am the site founder and director of Backpage.com."
 3          Do you see that?
 4  A.  I do.
 5          MR. RAPP:  Oh, there is a question?  Objection.        14:07:14
 6          THE COURT:  Well --
 7          MR. FEDER:  If I can ask the question.
 8          THE COURT:  He just asked if he saw it, and he said, I
 9  do.
10          MR. RAPP:  I didn't hear that.                          14:07:25
11          THE COURT:  So ask your next question, Mr. Feder.
12  BY MR. FEDER:
13  Q.  When you said, "I am the site founder," was that a true
14  statement under oath?
15  A.  It's an exaggeration, but I qualified it with "and          14:07:34
16  director."
17  Q.  Oh, let's break that down.
18          First of all, are you saying that you are or are
19  not -- I'm sorry.  Strike that.
20          Are you saying that at this time, June 29, 2010, that   14:07:50
21  you were or were not the site founder?
22  A.  I'm using the language "site founder."  I would use that
23  title on occasion.  But within the company, as an employee, I'm
24  a director.
25          MR. FEDER:  Move to strike the answer as nonresponsive  14:08:11
```

1  up -- after when he says, "I'm a founder."

2        THE COURT:  Overruled.

3  BY MR. FEDER:

4  Q.  Were you a site founder or not?

5  A.  I was a -- to me, founder means owner, and I'm not an          14:08:32

6  owner.

7  Q.  So that was untrue?

8  A.  It is an exaggeration.

9  Q.  What's the difference between --

10 A.  Because I'm not an owner.          14:08:48

11 Q.  -- an exaggeration and a falsehood, Mr. Ferrer?

12 A.  Well, I qualified it as a director.  And I should have just

13 went with director.  So I say founder and director.

14 Q.  "And" means you're both a site founder and a director;

15 right?          14:09:06

16 A.  It means I like to in marketing emails refer to myself as a

17 founder.  But within the company it's pretty clear I don't own

18 it and that I'm a director.

19 Q.  What's the difference, in your mind, between an

20 exaggeration and a falsehood?          14:09:23

21 A.  What --

22        MR. RAPP:  Objection.  Asked and answered.

23        MR. FEDER:  He didn't answer it.

24        THE COURT:  He did not answer it.

25        You can answer, Mr. Ferrer.          14:09:28

```
1              THE WITNESS:  I should have clarified.  I could have
2   been more clear.
3   BY MR. FEDER:
4   Q.  What's the difference between an exaggeration and a
5   falsehood, in your mind, Mr. Ferrer?  Or we could --          14:09:37
6   A.  The problem here is that "founder" has interchangeable
7   uses.
8   Q.  Mr. Ferrer, listen to my question.
9   A.  I'm an employee.
10  Q.  Listen to my question.                                    14:09:55
11              In your mind, what is the difference between an
12  exaggeration and a falsehood?
13  A.  Well, they both technically could be false.  One seems more
14  egregious than the other.
15  Q.  And your characterization of this falsehood is it's not a  14:10:11
16  big one; right?  Not a big lie?
17  A.  My characterization is that I'm trying to make myself sound
18  important, and I shouldn't be doing that.  That I'm a director
19  at Backpage.
20  Q.  So this is a little lie in your mind, not a big one?       14:10:32
21  A.  I should have been more clear.
22  Q.  So this is a little lie in your mind, not a big one?
23  A.  I'm exaggerating my self-importance.
24  Q.  So this is a little lie, not a big one in your mind?
25              THE COURT:  All right.  Let's move on.             14:10:49
```

1        MR. RAPP:  Objection.  Asked and answered.

2        MR. FEDER:  He won't answer the question.

3        THE COURT:  Let's move on, Mr. Feder.

4        MR. FEDER:  Could we go to page 42 through 45?  You

5   were on page 40.                                          14:11:45

6        I'm sorry.  Where's -- what happened to 43 and 44?

7   BY MR. FEDER:

8   Q.  On page 43, line 5, did the prosecutor ask you, "And

9   they'll pay you your ten bucks?"

10  A.  That's what it states.                                14:12:28

11  Q.  That's what the cost of the ad in question in this federal

12  criminal proceeding was; right?

13  A.  Yes.

14  Q.  And then it goes to a question, "And you have no knowledge

15  of necessarily who that was who posted the ad, right?"     14:12:44

16        And you said, "Correct"; right?

17  A.  Yes.

18  Q.  And then the question was, "And we've already established

19  that you don't know the truth of what's in the ad.  Do you have

20  any knowledge of whether or not whoever it is who posted this  14:13:03

21  ad, whether they knew what was true and what was false?"

22        And you said, "Could you restate that?"

23        And then it said, "We don't know who it was at the

24  keyboard typing this information in"; right?

25        And then at the bottom of the page, it says,  we --   14:13:27

UNITED STATES DISTRICT COURT

1          THE COURT:  I'm sorry, Mr. Feder.  Are you asking him

2     the question, because --

3          MR. FEDER:  Yes.

4     BY MR. FEDER:

5     Q.  Is that -- is all of that true, your answer there?          14:13:33

6     A.  Yes.

7     Q.  And at the bottom of page 43, going on to page 44:

8          "QUESTION:  We -- we meaning -- I'm sorry, we

9          being Backpage, they don't know the source of the

10         information for the person that you're identified          14:13:52

11         as the user; right."

12         And your answer was, "Correct.  Backpage does not

13    know the location of the computer or who's on the computer."

14         Right?

15    A.  That is my answer, yes.          14:14:06

16    Q.  Is that true?

17    A.  I state, "Backpage does not know the location of the

18    computer or who's on the computer.  We don't know who's on the

19    computer, and we don't have an exact location."

20    Q.  And then skipping down further on page 44 to line 14,          14:14:27

21         "QUESTION:  Now, there were photographs of two

22         different women in that advertisement; right?

23         "ANSWER:  Yes."

24         Is that what you said?

25    A.  That's what I said, yes.          14:14:45

```
 1   Q.        "QUESTION:  Do you know if either of these women is
 2        Sarah Barcham.
 3             "ANSWER:  No."
 4             Right?
 5   A.   Correct.                                              14:14:55
 6   Q.        "QUESTION:  Have you ever met her?
 7             "ANSWER:  I have not.
 8             "QUESTION:  Have you ever seen a picture of her?
 9             "ANSWER:  I have not."
10             MR. RAPP:  There are other questions here.       14:15:05
11   BY MR. FEDER:
12   Q.         "QUESTION:  Do you have no knowledge" -- "so you
13        have no knowledge whether or not she actually is shown in
14        any of these photographs?"
15             Your answer was?                                 14:15:13
16   A.   "Correct."
17   Q.   Was that all true?
18   A.   Yes, it's true.
19   Q.   So in a given ad, you don't know whether the pictures are
20   the same as the poster that made the ad; right?            14:15:31
21   A.   I'm sorry.  What was that question again?
22   Q.   When there's an ad in Backpage like the one in this, you
23   don't know who's advertising, do you?
24             MR. RAPP:  Objection.  Foundation.
25             THE COURT:  Sustained.                           14:15:47
```

1  BY MR. FEDER:

2  Q.  You don't know if the photos that are submitted are to the

3  person that's posting or somebody else or taken off the

4  Internet from some PhotoShop place; right?

5              MR. RAPP:  Same objection.                      14:16:06

6              THE COURT:  Well, he can answer, if he can, yes or no.

7              THE WITNESS:  One more time.  Your -- sorry.

8  BY MR. FEDER:

9  Q.  When you get an ad -- when you got this ad in this

10  transcript for this proceeding and this prosecution, the      14:16:21

11  photograph, the images that were sent with the ad, you have no

12  idea if they are connected at all to the poster; right?

13  A.  That's correct.

14  Q.  They could be somebody else?  They could be taken off the

15  Internet from some site?  They could be anything; right?      14:16:43

16  A.  Correct.

17  Q.  And that applies to all ads on all of Backpage for all of

18  the years?

19  A.  Yes.  It's a user-generated content site.

20  Q.  All you do is sell them space.  "Them" meaning posters.   14:17:00

21  You sell them a space to put their ad for ten bucks; right?

22  A.  Right.

23              MR. FEDER:  Could you show him BFCF 82?  I'm sorry.

24  78.

25              ///

UNITED STATES DISTRICT COURT

```
 1   BY MR. FEDER:
 2   Q.  Do you remember this case where you testified in federal
 3   district court in Minnesota?
 4   A.  Yes, I do.
 5   Q.  Also in 2010, September?                                    14:17:40
 6   A.  I'm sorry.  Say that again.  Someone coughed and I --
 7   Q.  Also in September of 2010?
 8   A.  Yes.
 9           MR. FEDER:  Could you scroll to page 105?
10           That's not right, actually.                             14:17:58
11           Could you scroll through this, please?
12           I think I got the wrong page number.  If you could go
13   back to the start, I'm sorry, and scroll down a page or two.
14   Go to page 105.
15           This may not be the complete transcript from what I     14:18:39
16   can see.  We'll see.  Is there a page 105?
17           UNIDENTIFIED SPEAKER:  No, there's not.
18           MR. FEDER:  Okay.  All right.  Sorry about that.
19           Could you bring up Exhibit 835?  And this was, I
20   believe -- no, it was not admitted.                            14:20:10
21   BY MR. FEDER:
22   Q.  Remember this email, Mr. Ferrer?
23   A.  Yes, I do.
24   Q.  This was an email from a lawyer named Steven Ross of Akin
25   Gump to Liz McDougall, among others, in July of 2016, and then 14:20:31
```

1   and then forwarded from Liz McDougall to Don Moon and you

2   July 11, 2016?

3   A.  Yes.

4   Q.  And this was the article that was written in the Wall

5   Street Journal that you testified about?                    14:20:53

6   A.  Yes.

7          MR. FEDER:  We move for the admission of this exhibit.

8          MR. RAPP:  Objection.  Hearsay.

9          THE COURT:  Sustained.

10         MR. FEDER:  Judge, I'm afraid I misplaced the number   14:22:06

11  of the exhibits that you said were admissible.

12         THE COURT:  5618.

13         MR. FEDER:  I'm sorry.  5- --

14         THE COURT:  5618.  5653.

15         MR. FEDER:  Could you bring up 5618?                   14:22:33

16  BY MR. FEDER:

17  Q.  Do you remember you testified earlier last week about some

18  sheriff or law enforcement person from Montgomery County,

19  Maryland, complaining about Backpage?

20  A.  Yes.                                                      14:23:02

21  Q.  Showing you what's been marked as Exhibit 5618.

22         Do you recognize that?

23  A.  I -- I recognize it's a -- an email to help@backpage.

24  Q.  You've seen this before, or at least you would have had

25  access to it?                                                 14:23:24

```
 1   A.  There were a lot of exhibits, some similar to this one.  I
 2   can't recall this exact one, though.
 3           MR. FEDER:  Move for the admission of 5618.
 4           MR. RAPP:  Well, I'll -- objection.  Foundation.  He
 5   hasn't said he's -- he's familiar with this.
 6           MR. FEDER:  Same kind of foundation that the Court
 7   previously ruled.
 8           THE COURT:  You can lay some foundation so that
 9   there's no confusion by the jury of the content of the email.
10   BY MR. FEDER:
11   Q.  What is the email address help@backpage.com?
12   A.  It's an email address that law enforcement could email
13   subpoenas.
14   Q.  And this email is from a law enforcement person from
15   Baltimore County, Maryland?
16   A.  Yes, it is.
17   Q.  And when -- it was sent to the help Backpage --
18   help@backpage.com site -- or, I'm sorry -- email address?
19   A.  Yes.
20   Q.  And it appears that -- as though it was relating to some
21   subpoenas that were sent to -- by Baltimore County to Backpage
22   to get some information?
23   A.  This email's related to the subpoena, but it's about ads on
24   other sites, on other websites.
25   Q.  That people at Backpage, maybe you, maybe others, actually
```

14:23:41
14:23:52
14:24:11
14:24:25
14:24:46

```
 1   went above and beyond the call of duty to the subpoena.  They

 2   not only addressed the subpoena and the information in it, but

 3   they went to other independent sites looking for information to

 4   help the police?

 5   A.  Yes, but it was a public relations stunt.                    14:25:01

 6   Q.  Did I ask you whether or not it was a public relations

 7   stunt?

 8   A.  Well, it wasn't --

 9   Q.  Yes or no, Mr. Ferrer?  Did I ask you that question?

10   A.  It wasn't helpful --                                         14:25:14

11   Q.  Did I ask you that question?  That's another yes-or-no

12   question.

13           Did I ask you a question about a public relations

14   stunt?

15   A.  Could you --                                                 14:25:25

16   Q.  Yes or no?

17   A.  Could you ask me the question again?

18           MR. FEDER:  Read it back, please.

19           (Record read.)

20   BY MR. FEDER:                                                    14:25:58

21   Q.  Yes or no?

22           MR. RAPP:  I'm going to object.  It's just a confusing

23   compound question.

24           THE COURT:  Sustained.

25           Clarify it if you can, Mr. Feder, or break it down       14:26:11
```

```
 1    into smaller parts.
 2            MR. FEDER:  Sure.
 3    BY MR. FEDER:
 4    Q.  You've read this ad -- I'm sorry -- this email; right?
 5    A.  Yes.                                                           14:26:20
 6    Q.  And this is a Detective Manz from Baltimore County,
 7    Maryland; right?
 8    A.  Yes, it is.
 9    Q.  Sent June 6th of 2012; right?
10    A.  Correct.                                                       14:26:35
11    Q.  And the subject line says, "Ads on other sites related to
12    your subpoenas, Baltimore County 052912"; right?
13    A.  Not exactly.
14    Q.  That's not what it says?
15    A.  You read it incorrectly.                                      14:26:53
16    Q.  Oh.  Let me try it again:  "Re:  Ads on other sites related
17    to your subpoenas, Baltimore County 052912."
18    A.  Correct.
19    Q.  And then it said --
20            MR. RAPP:  Oh, the -- objection.  The exhibit's not       14:27:13
21    in.
22    BY MR. FEDER:
23    Q.  Is this a email to your help@backpage.com site regarding
24    subpoenas that were sent to Backpage for information?
25    A.  This is an email regarding ads on other sites related to      14:27:36
```

```
 1   the subpoena.
 2   Q.  That people at Backpage helped find; right?
 3   A.  I wouldn't call it help.
 4   Q.  I'm sorry?
 5   A.  It was a misdirection.  Misleading.  Some of the          14:28:04
 6   information on there wasn't very useful.
 7   Q.  Where are you reading that, Mr. Ferrer?
 8   A.  Well, you asked me if it was helpful, and I indicated
 9   that --
10   Q.  Stop.                                                     14:28:17
11          This is an email thanking Backpage; right?
12   A.  Yes, it does.
13   Q.  And it related to Backpage finding some ads on other
14   websites with the same phone numbers in your earlier subpoenas
15   attached; right?                                              14:28:40
16   A.  That's what it says.
17   Q.  And this was an email where the staff at Backpage, in
18   addition to having complied with that subpoena, went out
19   searching for other ads in other websites that would connect to
20   the same phone numbers from that earlier subpoena; right?      14:29:02
21   A.  That's -- that is what it says.
22          MR. FEDER:  Move to admit.
23          MR. RAPP:  Well, so there's attachments to this email
24   that it references, and I would -- we would like the complete
25   email plus the attachments.                                   14:29:20
```

1           MR. FEDER:  It doesn't say anything about attachments

2      on it.

3           I'm sorry.  The earlier subpoenas.  We don't have the

4      earlier subpoenas.  But that's not --

5           THE COURT:  Well, I don't -- I don't know what          14:29:34

6      Mr. Rapp is referring to --

7           MR. FEDER:  He wants to see this --

8           THE COURT:  -- so --

9           MR. FEDER:  I'm sorry.  Go ahead.

10          THE COURT:  Can I speak --                               14:29:41

11          MR. FEDER:  Sure.

12          THE COURT:  -- Mr. Feder?

13          MR. FEDER:  No problem.

14          THE COURT:  I don't know what Mr. Rapp is referring to

15     in terms of an attachment to this email or this exhibit.  To  14:29:46

16     the extent that it's an incomplete exhibit, then I would

17     suggest that I at least get to see the completed exhibit before

18     it gets admitted.

19          Otherwise, if there's no objection to the admission,

20     Mr. Rapp, you can bring forward whatever the completed exhibit  14:30:11

21     is.

22          MR. RAPP:  Judge, this isn't one of our exhibits.  I

23     don't --

24          THE COURT:  No, it is not.

25          MR. RAPP:  I don't know where it came from.  It          14:30:19

1    doesn't have one of our Bates number or any Bates number, only

2    the defense Bates.

3              THE COURT:  Yes --

4              MR. RAPP:  So I don't know --

5              THE COURT:  And it was as we discussed earlier, it is          14:30:26

6    a defense exhibit, 5618, as we've discussed earlier today.

7              MR. RAPP:  All right.  I don't have an objection.

8              THE COURT:  All right.  It may be admitted.  It may be

9    published.

10             (Exhibit 5618 admitted into evidence.)          14:31:05

11   BY MR. FEDER:

12   Q.  Detective Manz -- or Officer Manz from Baltimore County,

13   Maryland, is thanking Backpage for its assistance; right?

14   A.  That's what it says.

15   Q.  And is -- they're thanking them for the help in going to          14:31:17

16   other websites to see if they can find the phone numbers that

17   were -- that was in the subpoena that Backpage responded to;

18   right?

19   A.  He's thanking them for the document that was sent to him.

20   Q.  And the Backpage person, whoever he or she is, is saying,          14:31:35

21   hey, these other ads that we went out and found for you may be

22   related to your investigation; right?

23   A.  That's what it says.

24   Q.  And at least Officer -- Detective Manz from Baltimore

25   County, Maryland, in 2012, they were thankful to Backpage;          14:31:57

```
 1    right?
 2    A.   That is the -- they are thankful.
 3              MR. FEDER:  Could you pull up 5- --
 4              This has been admitted?  Okay.
 5              I'm sorry.  5653.                              14:32:14
 6    BY MR. FEDER:
 7    Q.   This is an email from a law enforcement person in
 8    Montgomery County, Maryland, in 2012 August; right?
 9    A.   Yes, it is.
10    Q.   And it relates to a re, quote, "Ads on other cites related   14:32:36
11    to subpoena, Montgomery County 080812 Post 7761833"; right?
12    A.   Correct.
13    Q.   And this is from -- I'm sorry.  Do you recognize this
14    email?
15    A.   I do.                                              14:33:06
16    Q.   Is help Backpage -- @backpage.com an email address you're
17    familiar with?
18    A.   It's an email address that I'm familiar with.
19              MR. FEDER:  Move for the admission of 5653.
20              MR. RAPP:  No objection.                      14:33:25
21              THE COURT:  It may be admitted and published.
22              (Exhibit 5653 admitted into evidence.)
23    BY MR. FEDER:
24    Q.   This is kind of similar to the last one we looked at;
25    right?                                                  14:33:35
```

```
 1   A.  It appears to be.
 2   Q.  Where a subpoena was sent to Backpage, they responded with
 3   the information that the law enforcement people requested, and
 4   then, without being asked, went out and looked for more
 5   information regarding the ad in question to help law          14:33:54
 6   enforcement; right?
 7   A.  Without being asked by law enforcement.
 8   Q.  Fair to say there's a lot of law enforcement people in this
 9   country prior to the time Backpage was closed that thought that
10   Backpage was the most helpful --                              14:34:17
11         MR. RAPP:  Objection.
12   BY MR. FEDER:
13   Q.  -- online service provider?
14         MR. RAPP:  Objection.  Foundation.  Relevance.
15         MR. FEDER:  If he knows.                                14:34:24
16         THE COURT:  Sustained.
17   BY MR. FEDER:
18   Q.  If you know, Mr. Ferrer, weren't there a number of emails
19   from law enforcement people all over the country indicating
20   that Backpage was the most helpful website in regard to getting  14:34:37
21   ads to law enforcement and also helping them independently?
22         MR. RAPP:  Objection.  Well, it's confusing.  It's a
23   compound question.
24         THE COURT:  Sustained as to the form of the question.
25         ///
```

```
 1   BY MR. FEDER:
 2   Q.  Weren't there a lot of commentary from law enforcement that
 3   Backpage was the most helpful website?
 4          MR. RAPP:  Objection.  Foundation.  Relevance.
 5          THE COURT:  I think just in terms of the context,          14:35:06
 6   Mr. Feder, just lay some foundation.
 7          MR. FEDER:  I'm sorry?
 8          THE COURT:  Just lay some foundation.
 9          MR. FEDER:  Okay.
10   BY MR. FEDER:                                                    14:35:13
11   Q.  You're familiar with the hundreds or thousands of letters
12   from law enforcement that were sent to Backpage thanking them
13   for their assistance?
14   A.  We actively solicited feedback.
15   Q.  I don't think I asked that.                                  14:35:26
16   A.  I'm familiar with it.
17   Q.  Are you familiar with letters?
18          That's a yes-or-no answer.
19   A.  I'm familiar with numerous emails thanking us for the
20   records.                                                         14:35:38
21   Q.  And did some of those emails say that Backpage was the most
22   helpful media website in regard to helping law enforcement?
23   A.  I don't know if I can recall "the most helpful," but
24   generally they would state that we're very helpful.
25          THE COURT:  You've got about three more minutes before    14:36:01
```

```
 1   we take our afternoon break, Mr. Feder.

 2            MR. FEDER:  Okay.

 3   BY MR. FEDER:

 4   Q.  You testified about Mr. Nogatu leaving Backpage during your

 5   direct examination.                                            14:36:52

 6            Do you remember that?

 7            MR. RAPP:  I'm going to object because I'm not sure

 8   that's the right -- I think I know who he's talking about, but

 9   that's not the right name.

10   BY MR. FEDER:                                                  14:37:05

11   Q.  Let's just shorten it to Hemu.

12            Do you remember your testimony about Hemu leaving?

13   A.  Yes.

14   Q.  Didn't everybody call him Hemu?

15   A.  Yes.                                                       14:37:14

16   Q.  It's kind of an odd name?

17   A.  What's that?

18   Q.  It's kind of an odd name?

19   A.  It's an Indian name.  He probably wouldn't call it odd.

20   Q.  Okay.  Fair enough.                                        14:37:28

21            (Microphone feedback.)

22            THE COURT:  I think it must be time for our break.

23   That's the warning shot, I think.  All right.

24            Members of the jury, we'll stand in recess for

25   20 minutes.  Be ready to come in on the hour.                  14:37:44
```

```
 1            And, again, I remind you of your admonition.

 2            Please all rise for the jury.

 3            We are back at 3:00 o'clock.

 4            (Jury not present at 2:38 p.m.)

 5            THE COURT:  I wanted to -- just regarding these new      14:38:15

 6   exhibits, Mr. Feder, and I suspect some of you will have, the

 7   way that we'll have these renumbered is if it's not listed on

 8   your exhibit list at the moment and you're using them for the

 9   purposes Mr. Feder used these new exhibits, 67 and 116 and so

10   on, let Liliana state what the exhibit number will be marked    14:38:43

11   as, because she will start them in the 7- -- whatever that 7000

12   category is at the end of your list.

13            So pause for a moment.  If it's a new exhibit, she'll

14   identify it and she'll state what the number is, so the jury's

15   not confused, and counsel are not confused, and I'm not         14:39:08

16   confused.

17            Okay.  We'll stand in recess.

18            THE COURTROOM DEPUTY:  And, Judge, can we put on the

19   record that 116 is now 7000?

20            THE COURT:  Okay.  Yes.  And 1- --                      14:39:18

21            THE COURTROOM DEPUTY:  The --

22            THE COURT:  BFCF 67 was the first one.

23            THE COURTROOM DEPUTY:  116.

24            THE COURT:  And 116.

25            67 was the first one.                                   14:39:29
```

UNITED STATES DISTRICT COURT

```
 1              THE COURTROOM DEPUTY:  But it wasn't admitted.

 2              THE COURT:  Oh, yes.  It wasn't admitted.

 3              116 is 7000.

 4              THE COURTROOM DEPUTY:  Yes.

 5              (Recess from 2:39 p.m. to 3:01 p.m.)              14:39:40

 6              (Jury not present at 3:01 p.m.)

 7              THE COURT:  All right.  Let's have the jury in.

 8              All rise for the jury.

 9              (Jury present at 3:02 p.m.)

10              THE COURT:  All right.  Please be seated.       15:02:56

11              All right.  The record will reflect the presence of

12      the jury.  The witness is on the stand.

13              Mr. Feder, you may continue.

14              MR. FEDER:  Thanks.

15              Madam Court Reporter, can you tell me what the last  15:03:05

16      question was, or answer?

17              (Record read.)

18              MR. FEDER:  True.

19              Could the witness be shown 6219?

20              MS. BERTRAND:  Mr. Feder, can you speak up a little  15:03:47

21      bit?

22              MR. FEDER:  I'm sorry.

23              MS. BERTRAND:  Perfect.

24              6219.  Testing one, two, three.

25              ///
```

```
1   BY MR. FEDER:
2   Q.  Mr. Ferrer, are you familiar with this letter?
3   A.  I am not.
4   Q.  Is it on Village Voice Media stationery?
5   A.  Yes.                                                     15:04:11
6   Q.  Is that familiar to you?
7   A.  This stationery is familiar to me.
8   Q.  See at the bottom where there are CCs to you and Scott
9   Spear?
10  A.  I do.                                                    15:04:25
11  Q.  A letter dated December 22, 2011, to Mr. Hemanshu Negam?
12  A.  Yes, it is.
13          MR. FEDER:  Move for the admission of 6219.
14          MR. RAPP:  No objection.
15          THE COURT:  It may be admitted and published.       15:04:42
16          (Exhibit 6219 admitted into evidence.)
17  BY MR. FEDER:
18  Q.  So it's fair to say, Mr. Ferrer --
19          MR. FEDER:  And -- I'm sorry.  Is this published?
20  Yes, it is.                                                  15:04:52
21          THE COURT:  Yes.
22  BY MR. FEDER:
23  Q.  Fair to say, Mr. Ferrer, that almost immediately after
24  Mr. Negam's contract with Backpage ended regarding moderation
25  practices, Liz McDougall was hired as of February of 2022 -- 15:05:03
```

1   2012; right?

2        MR. RAPP:  Objection.  Compound question.

3        THE COURT:  Sustained.

4   BY MR. FEDER:

5   Q.  This exhibit indicates that Mr. Negam's one-year contract          15:05:22

6   was terminated in late December 2011; right?

7   A.  Yes, it does.

8   Q.  Ms. McDougall began her moderation control in February of

9   2012.

10       You've already testified to that; right?                         15:05:41

11  A.  Yes.

12  Q.  And they were going from one lawyer to another lawyer, both

13  of whom were familiar with moderation practices?

14       MR. RAPP:  Objection.  Court's previous order.  Move

15  to strike it.                                                         15:06:00

16       THE COURT:  He can answer the question, if they're

17  going from one person to another.

18       THE WITNESS:  That answer is not a yes-or-no answer.

19  BY MR. FEDER:

20  Q.  Okay.  Let me break it down for you.                             15:06:12

21       Hemu made a lot of suggestions to Backpage; right?

22  A.  He did.

23  Q.  Some of which were accepted; right?

24  A.  Some were.

25  Q.  Some were not?                                                   15:06:29

1    A.   Correct.

2    Q.   Some were implemented later during Ms. McDougall's reign;

3    right?

4    A.   I'd have to know the specific task you're referring to.

5    I'm not sure.                                                    15:06:45

6    Q.   When Ms. McDougall came in, she changed the moderation

7    practices almost immediately in 2012; right?

8    A.   She did make some changes.

9    Q.   Well, basically she stopped this stripout process where

10   words would be taken out; right?                                 15:07:03

11   A.   That was the part she objected to the most, yes.

12   Q.   So she implemented a program where either the ad was

13   accepted as it came in or it wasn't published; right?

14   A.   It's more complicated than that.

15   Q.   Whatever her policies were, Mr. Ferrer, they continued at   15:07:25

16   Backpage until she left in 2018; right?

17   A.   Liz involved in a moderation was in itself very moderated.

18   We -- we --

19   Q.   You --

20   A.   -- didn't do many things she requested.                    15:07:47

21   Q.   Did I ask you some kind of question that would allow the

22   answer that you're trying to give?

23   A.   No.

24   Q.   Was it a yes-or-no answer?

25   A.   You asked whether she was involved in moderation through    15:07:55

```
1    2018.  And I'm telling you that she was sidelined a good

2    portion of it because --

3    Q.  Was she there until 2018?

4    A.  She was there.

5    Q.  Was one of her job duties to handle moderation?          15:08:07

6    A.  It was definitely not handle moderation.  That is

7    definitely not the case here.

8    Q.  Control?  Implement?

9    A.  Early on she had suggestions on moderation that we could

10   pick and choose.                                              15:08:25

11   Q.  You testified earlier -- and this is going to be the start

12   of a discussion.

13          You've testified earlier that when you purchased

14   Backpage in April of 2015 your duties really didn't change;

15   right?                                                        15:08:47

16   A.  Correct.

17   Q.  Your assertion was that the owners continued to control

18   every aspect of Backpage and you were just a mere employee;

19   right?

20   A.  They -- they handled the policy and strategy.            15:09:01

21   Q.  Was there anything in the contract for sale that you and

22   the owners signed that said that the old owners, slash, now

23   creditors had any control whatsoever over moderation?  Anything

24   in writing?

25   A.  There is some in writing, but it talks about how I'm not  15:09:28
```

```
 1    able to change the nature of the content or the nature of the
 2    website.
 3    Q.  Okay.  Anything else?
 4    A.  There's -- yes.
 5    Q.  Did it mention the word "moderation," "edit," or anything   15:09:47
 6    like that, this contract that we're talking about?
 7    A.  I -- I don't think it mentioned the word "moderation."
 8             MR. FEDER:  Could you bring up BFCF 83, page 71?
 9    BY MR. FEDER:
10    Q.  This was the federal district court case that you testified 15:10:37
11    in in Jacksonville, Florida, in August of 2011?
12    A.  Yes, it is.
13             MR. FEDER:  I'm sorry.  I need to go back.  This is
14    page 74.  I need page 71.
15    BY MR. FEDER:                                                   15:11:13
16    Q.  Page 71, you took an oath to tell the truth; right?
17    A.  Yes.
18    Q.  Same oath that you took two weeks ago, last week, whatever,
19    when you started testifying; right?
20    A.  Yes.                                                        15:11:32
21    Q.  And after the hellos, how are yous, the prosecutor,
22    Mr. Heavener, asked you, "How are you employed?"
23             What was your answer then, Mr. Ferrer?
24    A.  Then, "I am the vice president of Backpage.com.  I run the
25    website."                                                       15:12:01
```

```
 1   Q.  Was that true then?
 2   A.  I'm the main project manager of the website.
 3   Q.  Was that true then?
 4   A.  Yes.  I run the website --
 5   Q.  Let me --                                          15:12:15
 6   A.  -- for the owners.
 7   Q.  Were you the vice president of Backpage.com?
 8   A.  I think I got a title.  The titles were continually
 9   changing.
10   Q.  Well, on August 22, 2011, when you testified under oath   15:12:26
11   that you are the vice president of -- the vice president of
12   Backpage.com, was that true?
13   A.  It -- yes.
14   Q.  And same date, under oath, did you also testify, "I run the
15   website"?                                             15:12:46
16         Yes or no?
17   A.  I did.
18   Q.  Did you -- was that true?
19   A.  I am one of the -- yes.  I am the manager.
20   Q.  And you equate, "I run the website," to "I'm a manager"?   15:12:56
21   A.  Yes.  When I say, "I run the website," that gives the
22   impression, like, there's not a hundred other people that are
23   actually doing the work.  I'm the manager of a hundred-and-some
24   people, and I report to the owners.
25   Q.  Well, you're supervising those hundred people, aren't you?   15:13:17
```

```
1    A.   What's that?
2    Q.   You were supervising those 100 people, except the owners?
3    A.   Yes.  I delegated moderation and marketing to others.
4    Q.   When you supervise a hundred people, that usually means I
5    run the website, doesn't it?                                        15:13:35
6    A.   Well, I'm just saying that it gives the impression like
7    it's me just running the website.  It's -- it's much more
8    complicated than that.  I just gave a very simple answer.
9    Q.   This was a big company, and you were running it, and that's
10   how you testified; right?                                           15:13:53
11   A.   That's what --
12             MR. RAPP:  Objection.  Asked and answered.
13             THE COURT:  Sustained.
14             MR. FEDER:  Would you scroll forward, please?
15   BY MR. FEDER:                                                       15:14:16
16   Q.   According to this, in 2011 you had over 400 cities, three
17   countries; right?
18   A.   Yes.
19             MR. FEDER:  Could you scroll forward?
20   BY MR. FEDER:                                                       15:14:44
21   Q.   There was a question that said, "And, sir, how does
22   Backpage make money?"
23             What was your answer?
24   A.   "We charge for the postings in adult and personals.  We
25   also charge for people to have a premium position, like sponsor    15:14:55
```

```
1   ads or auto reposting.  So it's a lot of $1 and $5 charges."
2   Q.  And all transactions are prepaid with credit card, right,
3   according to this transcript?
4   A.  Yes.
5          MR. FEDER:  Could you scroll forward?  Further scroll.    15:15:18
6   And further scroll.
7          And I think that's it.  Thanks.
8   BY MR. FEDER:
9   Q.  Mr. Ferrer, do you recall testifying about some
10  correspondence with and visits to the mayor of Seattle,        15:16:25
11  Mr. McGinn, I believe his name was?
12  A.  Yes, I do.
13  Q.  And then you had some -- another meeting or two with a
14  State Attorney General named McKenna?
15  A.  No, not McKenna.                                           15:16:42
16  Q.  One of his assistants?
17  A.  Yes.
18  Q.  Paula Selois?
19  A.  Yes.
20  Q.  And their complaint was that Backpage needs to get age     15:16:50
21  verification?
22  A.  The mayor or the AG?
23  Q.  Both.
24  A.  I recall the mayor focused on the age verification.
25  Q.  And was age verification financially or location-wise      15:17:12
```

UNITED STATES DISTRICT COURT

1   possible?

2   A.   To have people come to an office and show their ID to

3   verify that they're the ones posted in the ad would have been

4   prohibitively expensive.

5   Q.   Kind of ridiculous, because how many people that want to          15:17:41

6   get on the Internet to post an ad for any reason are going to

7   get in their car, drive to an office to post an ad and show an

8   ID; right?

9   A.   I agree with you.

10  Q.   So the mayor was asking you something that was ridiculous,        15:17:55

11  probably designed to stop the website; right?

12  A.   Yes.

13  Q.   So there was a good reason why you didn't agree to do that,

14  because it was crazy.  It was ridiculous; right?

15  A.   I did not agree with the idea, but I thought the concern          15:18:18

16  had some validity.

17  Q.   Well --

18  A.   But I didn't like the solution that was posed --

19  Q.   If you --

20  A.   -- so I posed a different solution.                               15:18:32

21  Q.   According to your testimony right before this, you said

22  that -- that in '11 there was 400 cities in the United States

23  where people were posting ads; right?

24  A.   Correct.

25  Q.   In order to implement Mayor McGinn's great idea, you would        15:18:45

UNITED STATES DISTRICT COURT

1    have had to have -- assuming they had -- all of the states had

2    a similar idea, you would have had to have opened a physical

3    office in every of those 400 cities; true?

4    A.  If we followed the McGinn plan.  But, like I said, there

5    was another solution that I posed to him.                        15:19:07

6              MR. FEDER:  Could you show the witness -- I think it's

7    6180.

8    BY MR. FEDER:

9    Q.  See what's on your screen, Mr. Ferrer?

10   A.  I do.                                                         15:19:47

11             MR. FEDER:  And could you scroll -- I think it's

12   toward the end.  Not that far to the end.

13   BY MR. FEDER:

14   Q.  Right after you talked to Mayor McGinn and the

15   representative of Attorney General McKenna, one of them or both  15:20:13

16   was able to get the Washington legislature to pass a law.

17             MR. RAPP:  Objection.  Irrelevant.  Court's previous

18   ruling.

19             THE COURT:  Sustained.

20             MR. FEDER:  Okay.                                       15:20:31

21   BY MR. FEDER:

22   Q.  You signed an affidavit dated June 4th of 2012 regarding

23   some issues in Washington state; right?

24   A.  No.

25   Q.  You didn't?                                                   15:20:47

1    A.  I did -- did, but you have the wrong date.

2    Q.  Is that your signature?

3    A.  You said June 4th.

4    Q.  Oh, I'm sorry.  June 3rd, 2012.

5    A.  Yes.                                              15:21:03

6    Q.  So --

7    A.  Yes, I did.

8    Q.  You signed an -- an -- what is it, an affidavit or a

9    declaration?

10          MR. RAPP:  I'm going to object.  This is not the 6180   15:21:09

11   that we have of the defense witnesses -- or defense exhibits.

12   This is a wrong exhibit.

13          THE COURT:  What number was this exhibit?

14          MR. FEDER:  I got it down as 6180.  And that's what it

15   says on the screen but --                             15:21:42

16          MR. RAPP:  This is not the version we -- you have

17   given us.

18          THE COURT:  Look at what you gave to the government.

19   Make sure it matches.

20          MR. FEDER:  Well, let's look at -- I mean, maybe we     15:22:00

21   compare.  Let's look at BFCF   88.

22   BY MR. FEDER:

23   Q.  Does that look to be the same document, Mr. Ferrer?

24   A.  Yes.  I've seen this document.

25   Q.  Also signed on June 3rd of 2000 -- excuse me -- 2012?     15:22:58

```
 1    A.  Yes, that's when I signed it.
 2            MR. FEDER:  And if you could scroll up a page or so.
 3    BY MR. FEDER:
 4    Q.  This was also signed under oath?
 5            Well, under penalty of perjury at least; right?        15:23:29
 6    A.  Yes.
 7            MR. FEDER:  Scroll one more page, please.
 8    BY MR. FEDER:
 9    Q.  Paraphrasing paragraph 17, did you say under oath that it
10    would be an impossible burden for Backpage and other websites   15:24:10
11    and online service providers to have the identification
12    procedures that were being demanded?
13    A.  There -- you're paraphrasing what item?  17?
14    Q.  Yep.
15    A.  Yes.  I didn't write this, but I did sign it.               15:24:31
16            MR. FEDER:  Could you scroll down to paragraph 18?
17    I'm sorry.  Yeah, paragraph 18.  Thanks.
18            I'm sorry.  18, not 19.
19    BY MR. FEDER:
20    Q.  If there was a law --                                      15:25:20
21            MR. RAPP:  Okay.  I'm going to object to that --
22            THE COURT:  Sustained.
23            MR. RAPP:  -- hypothetical and admonish counsel.
24            MR. FEDER:  I'm sorry.  Did you rule?
25            THE COURT:  I sustained the objection.                  15:25:37
```

UNITED STATES DISTRICT COURT

```
1              MR. FEDER:  Oh, okay.
2     BY MR. FEDER:
3     Q.  Looking at paragraph 18, line 6, quote, "We have no way to
4     know what prosecutors may consider to be postings" --
5              MR. RAPP:  Judge, I'm going to object to this.          15:26:04
6     Counsel knows that this is -- the Court's previous ruling
7     applies to this entire document.
8              MR. FEDER:  Not true.  And I think this is highly
9     relevant sworn testimony about the most important issues in
10    this case.                                                        15:26:22
11             THE COURT:  Well, you were offering it for a different
12    reason, Mr. Feder.
13             MR. FEDER:  I'm offering it for what he said about
14    what he's testified to, including the identification
15    procedures, among other things.                                  15:26:39
16             MR. RAPP:  Yes.
17             THE COURT:  Well, because this relates to a prior
18    order of the Court, I'm not going to permit it to be admitted.
19    I'm not going to permit any reference to the subject matter of
20    it.                                                               15:26:55
21             MR. FEDER:  Well, all I want to do is read a couple of
22    statements by Mr. Ferrer under oath about implicit offers of
23    sexual contact.
24             MR. RAPP:  Yes.  But, Judge, our objection is that the
25    statements are within the context of what the Court has          15:27:11
```

1    previously ordered.

2              THE COURT:  And that's the problem, Mr. Feder.  It is

3    in preparation of that particular issue.  So let's move on.

4              MR. FEDER:  Just so I'm clear and the record is clear,

5    what's the objection?  Is it hearsay or relevance?                    15:27:35

6              THE COURT:  No.  The objection is pursuant to the

7    Court's prior order yesterday, the clarification of it

8    yesterday, and previously --

9              MR. FEDER:  Okay.

10             THE COURT:  -- with regard to the subject matter of        15:27:48

11   this declaration.

12             MR. FEDER:  All right.  Excuse me.

13             Could you bring up 5888 and soon-to-be 5889 and 5890?

14   BY MR. FEDER:

15   Q.  First of all, the affiliate programs that you've already        15:28:46

16   testified to were pretty much over by 2012; right?

17   A.  The Backpage affiliate program ended sometime in 2012.

18   Q.  Okay.  However, you've also testified about you becoming an

19   affiliate of Backpage; right?

20   A.  Not me.  Like my brother be an affiliate for -- he was          15:29:13

21   posting ads on Backpage.

22   Q.  Well, weren't you -- you, yourself, originally posting

23   Backpage -- ads on Backpage?

24   A.  I did.  But then it got to be too much, and I gave it to my     15:29:32

25   brother.

Q.  Well, looking at Exhibit 5888, in 2012 -- this is a -- your

1040 IRS -- you made 552,224 as wages at Backpage; right?

A.  Correct.

Q.  But you also made business income of $1,209,202 that was

separate from Backpage; right?                                      15:30:07

A.  Yes.  None of that --

Q.  And that was from the affiliate program that you were

involved with; correct?

A.  Many affiliate programs with other websites not related to

Backpage.                                                          15:30:23

Q.  Well, in 2012, you've at least testified before that you

were a founder and a vice president of Backpage.  You weren't

some minimum wage employee; right?

A.  I was not a minimum wage employee.

Q.  You owed a duty of loyalty to Backpage to work full time;   15:30:41

right?

A.  Yes, I -- well --

Q.  Yes or no?

A.  I can say that the owners would ask me to do that.

Q.  The owners asked you to become an affiliate of some --      15:31:01

posing under some other site putting ads on Backpage and

getting money from Backpage to these other sites that is

syphoned to you?

A.  No.  I'm saying that as a condition of the sale I had to

shut down side businesses --                                    15:31:21

UNITED STATES DISTRICT COURT

```
 1   Q.  Oh --
 2   A.  -- in 2015.
 3   Q.  -- so you're saying that somewhere in writing the owners of
 4   Backpage said You could have some side businesses in addition
 5   to the wage, salary, bonuses that you were getting from          15:31:36
 6   Backpage to make twice as much of what you were making in 2012?
 7             MR. RAPP:  Objection.  Relevance.
 8             THE COURT:  Well, I'll sustain an objection as to a
 9   compound and confusing question, Mr. Feder.
10   BY MR. FEDER:                                                     15:31:55
11   Q.  Did you understand the question, Mr. Ferrer?
12   A.  No.
13   Q.  Okay.  Let's try it this way:  In 2012 you made more than
14   twice as much as you were paid by Backpage working an affiliate
15   program; right?                                                  15:32:15
16   A.  I did on my --
17   Q.  Yes or no?
18   A.  Well, I wouldn't call it an affiliate program.  It's an
19   affiliate business that involves multiple websites that are not
20   Backpage.                                                        15:32:30
21   Q.  Okay.  Did you receive any money from Backpage as an
22   affiliate, directly or indirectly, in 2012?
23   A.  No.  I -- I know that my brother signed up for the
24   affiliate program because Scott Spear approved it.
25   Q.  Did -- did you not hear my question?                         15:32:52
```

UNITED STATES DISTRICT COURT

```
 1   A.  Well, I did, but it's --

 2   Q.  And it's a yes or a no.

 3           Did you make any money from Backpage as an affiliate,

 4   directly or indirectly, in 2012?

 5   A.  It is not a yes or no.                          15:33:03

 6   Q.  Did you make any money from Backpage in 2012 --

 7   A.  I didn't --

 8   Q.  -- other than your wages?

 9   A.  -- make any money from the Backpage affiliate program in

10   2012.                                               15:33:15

11   Q.  You did not?

12   A.  I did not.

13   Q.  Okay.  Did your brother make any money?

14   A.  I believe -- well, I don't know if it was in 2012, but

15   there was a time when he filed a 1090 -- a W-4 so he could get  15:33:25

16   a 1099.  And I'm not sure what year, but it would have been

17   prior -- it could have been 2012.  It might have been prior.

18   Q.  You taught your brother how to work the affiliate program;

19   right?

20   A.  I -- I taught him the business, yes.            15:33:48

21   Q.  Did he give you any of the money that he received as an

22   affiliate?

23   A.  He did.

24   Q.  All right.

25   A.  And that's -- that's this money.  Yes.          15:33:56
```

UNITED STATES DISTRICT COURT

```
 1   Q.  A million dollars -- over a million dollars?
 2   A.  Yes.
 3   Q.  How much did he make?  If you know.
 4   A.  I don't know, but he did well.
 5   Q.  More than 1,209,000?                              15:34:12
 6           MR. RAPP:  Objection.  Relevance.
 7           THE COURT:  If he can answer.
 8           THE WITNESS:  I don't know.  I don't recall what he
 9   made.
10   BY MR. FEDER:                                         15:34:24
11   Q.  Well, you taught him the business, so to speak.
12           Did you have a written contract as to who got what?
13   A.  It's my brother.  Nothing in writing.
14   Q.  What was the agreement?
15   A.  You run the business.                             15:34:36
16   Q.  And?
17   A.  You got to pay me for a while, and then you --
18   Q.  How much?
19   A.  -- own the business.
20   Q.  What percentage?                                  15:34:47
21   A.  I don't recall the exact percentage.  There was a
22   percentage, but I just don't recall.
23   Q.  Less or more than 50 percent, Mr. Ferrer?  Of the --
24   A.  I don't know.
25   Q.  Huh?                                              15:35:02
```

```
 1    A.  I don't know.

 2    Q.  You don't know.  Okay.

 3            Did you ever, you, yourself, in your name ever sign up

 4    as an affiliate in Backpage -- for Backpage?  I'm sorry.

 5    A.  I did not.                                                    15:35:26

 6    Q.  Did you sign up in any other name?

 7    A.  Yes.

 8    Q.  What was that name?

 9    A.  Wait.  I'm sorry.  Did you say did I sign up under another

10    name?                                                            15:35:34

11    Q.  Yes.

12    A.  I thought you meant another website.  I misspoke.

13            No, I didn't sign up with Backpage's affiliate program

14    in another name.

15    Q.  So you went to other websites like Backpage?                 15:35:43

16    A.  No.  It's different than Backpage --

17    Q.  Well --

18    A.  -- but other websites.

19    Q.  Which ones?

20    A.  Adult Friend Finder.                                         15:35:57

21    Q.  What's that?

22    A.  It's a subscription-based dating site.

23    Q.  Dating or something more, to your knowledge?

24    A.  It's a -- well, it's not match.com.

25    Q.  Okay.  I guess we can use our imagination, huh?              15:36:21
```

UNITED STATES DISTRICT COURT

```
 1            Any others?
 2   A.   Fling.
 3   Q.   Who?
 4   A.   Fling.
 5   Q.   Fling?                                              15:36:36
 6   A.   Fling.
 7   Q.   Fling, like F-L-I-N-G?
 8   A.   Yes.
 9   Q.   What's that?
10   A.   It's a competitor of Adult Friend Finder.          15:36:43
11   Q.   Is Adult Friend Finder still in business?
12            MR. RAPP:  Objection.  Relevance.
13            THE COURT:  Sustained.
14   BY MR. FEDER:
15   Q.   And if you know, how big is Adult Friend Finder --  15:36:57
16            MR. RAPP:  Same objection.
17   BY MR. FEDER:
18   Q.   -- as of 2012?
19            MR. RAPP:  Same objection.
20            THE COURT:  Sustained as to relevance.          15:37:04
21   BY MR. FEDER:
22   Q.   So you went to Adult Friend Finder and asked them to put
23   ads on Backpage?
24   A.   You wouldn't -- I didn't ask them.  That's not how it
25   works.                                                  15:37:21
```

1    Q.  I'm sorry?  You what?

2    A.  No.  That's not how it works.

3    Q.  How did it work?

4    A.  Just like Backpage would sign up for an affiliate program.

5    And you get some code.  You get a specific code that when --        15:37:35

6    that'll have a link that will generate a cookie so that when

7    someone clicks that link, it generates a cookie.  And should

8    that user subscribe, you get a commission.

9    Q.  Did Adult Friend Finder at your behest or -- at your behest

10   put any ads on Backpage for which Backpage paid them?            15:38:03

11   A.  Well, Adult Friend Finder didn't put any ads.

12   Q.  Who paid you the million -- well, who paid the overall

13   amount of money to you and your brother from which you received

14   over a million dollars in 2012?

15   A.  Who paid?                                                    15:38:26

16   Q.  Who paid?

17   A.  Well, I recall the two sites, Adult Friend Finder and

18   Fling.

19   Q.  Okay.  And neither of them were putting ads on Backpage, to

20   your knowledge?                                                  15:38:42

21   A.  They weren't putting ads on Backpage.

22   Q.  Was anybody?

23   A.  I put some ads for adult friend finder on the forums.

24   Q.  What forums?

25   A.  Backpage had forums.                                         15:38:58

Q.  Forgive me for being a little ignorant, but you ask, or
whatever the phrase would be, Adult Friend Finder to put their
ad of some type on a Backpage forum?
A.  Yeah, but there's no asking.  It's not an ask-type
situation.                                                    15:39:23
Q.  Okay.  You just do it by going to their site and trying it
out; right?
A.  Sign it up.
Q.  Right?
A.  Right.                                                    15:39:31
Q.  And then in exchange for Adult Friend Finder putting their
ad on a Backpage forum, Backpage pays Adult Friend Finder?
A.  No.
Q.  Or if somebody comes to Backpage and clicks on Adult Friend
Finder and they get money out of it, then does Backpage pay you  15:39:52
or Adult Friend Finder?
A.  I'm confused.
Q.  So am I.  Maybe you can illuminate.
        How did you make a million two and change in 2012 from
being an affiliate connected to Backpage?                     15:40:10
A.  My brother posted ads.
Q.  On Adult Friend Finder?
A.  Yeah.  He signed up for Backpage affiliate program.  He
bought ads; posted them on Backpage.  There's nothing that
restricts my -- from -- my brother from signing up for the    15:40:26

1    Backpage affiliate program.  There's no clause in there that

2    says no family members allowed.  So he was able to get

3    commission for posting ads on Backpage.

4    Q.  In any writing anywhere, Mr. Ferrer, did you ever tell

5    Jim Larkin that you made a million dollars in 2012 over and          15:40:45

6    above what Backpage was paying you?

7    A.  No, I never told him the amount.

8    Q.  Did -- you told him that -- that you were doing this?

9    A.  I told him I had side businesses.  Larkin and I, we've

10   known each other for many, many years.  In fact, he even gave       15:41:05

11   me leads on some of my SCO consulting businesses, friends of

12   his.

13   Q.  SCO is very different than what you are talking about,

14   isn't it?

15   A.  It is very different.                                           15:41:20

16   Q.  Okay.  Do you have any written document anywhere that shows

17   that Jim Larkin, Scott Spear, Jed Brunst, Mike Lacey knew that

18   you were making this kind of money as an affiliate to Backpage

19   in 2012?

20   A.  I don't think there's any document that shows the amount of     15:41:40

21   money.

22   Q.  What about the fact of being an affiliate where you can

23   make money?  Any writing whatsoever?

24   A.  I think the document is more like the employment agreement

25   in 2015 when they told me I could not have any side businesses.     15:41:55

UNITED STATES DISTRICT COURT

1   Q.  So we have your word that you had some kind of agreement

2   with Jim Larkin only, right, that you could have side

3   businesses?

4   A.  Well, once again, I've said -- I've explained it that we

5   had --                                                         15:42:16

6   Q.  We have --

7   A.  -- other posted ads.  Scott Spear was aware of it.

8   Q.  We have your word that Jim Larkin and Scott Spear were

9   aware of it; right?

10  A.  Well, I also submitted my tax returns to Jed Brunst.  And  15:42:28

11  if he went through my tax returns, he would have --

12  Q.  When was that?

13  A.  -- been aware of it.

14          2016.

15  Q.  Okay.                                                      15:42:41

16  A.  I was required to give him my tax returns.

17  Q.  After the sale; right?

18  A.  After the sale.  But then the request for the tax returns

19  went -- went all the way back.

20  Q.  Do you have anything in writing from Scott Spear -- from   15:42:57

21  Scott Spear or you to Scott Spear showing that he knew anything

22  about your little side business here?

23  A.  I think there's an email about -- from Jess Adams saying,

24  Scott Spear wants to know who your brother is.

25  Q.  Okay.  Anything else?                                      15:43:18

1    A.   That's all I can recall.

2    Q.   That would probably be because there's a suspicion raised

3    when they see another Ferrer being paid as an affiliate, don't

4    you think?

5              MR. RAPP:  Objection.  Speculation.                    15:43:33

6              THE COURT:  Sustained.

7              MR. FEDER:  He's testified that he knows all about,

8    that he was intimately involved in the management of Backpage,

9    finances, and everything else, for the last two weeks.

10             MR. RAPP:  He's still asking him to speculate.          15:43:46

11             THE COURT:  Sustained.

12   BY MR. FEDER:

13   Q.   You didn't talk to Scott Spear about that question, did

14   you?

15   A.   About what question?                                        15:43:58

16   Q.   About your brother being on the Backpage books as getting a

17   lot of money?

18   A.   I talked to my brother about posting.  I talked to Scott

19   Spear about my brother posting, but I didn't tell him about the

20   amount of money.                                                 15:44:16

21   Q.   Anything in writing to that effect, Mr. Ferrer, or just

22   your word?

23   A.   No.  I think there's an email from Jess Adams.

24   Q.   Okay.  All right.

25             MR. FEDER:  Could you show the witness 5889?           15:44:25

1          I'm sorry.  If 5888 is -- no, we don't want it.

2    There's no reason to admit it.

3          5889.

4    BY MR. FEDER:

5    Q.  Do you see that exhibit there, Mr. Ferrer?                    15:44:57

6    A.  You said 589 [sic].  I'm looking at 588 [sic].

7    Q.  Yeah.  It should be 5889, although the 2013 1040 is on the

8    right side of the screen.

9          MR. RAPP:  Okay.  Well, he -- I'm going to object.

10   This document isn't in evidence.  He certainly can ask           15:45:18

11   questions and refresh his recollection, but it's not in

12   evidence.

13   BY MR. FEDER:

14   Q.  Have you ever seen this 1040 2013 from you?

15         THE COURT:  Well, let me -- let me -- I was reflecting      15:45:33

16   on what Mr. Rapp was saying and looking at the exhibit.

17         Mr. Feder, just wait for my ruling.

18         MR. FEDER:  I'm sorry.

19         THE COURT:  I guess I'm confused.  I didn't hear him

20   move for the admission of 5889.  I thought he was only showing   15:45:49

21   it to Mr. Ferrer.

22         MR. RAPP:  I believe he's only showing it to him, but

23   now he's reading from it.

24         THE COURT:  Yes.  I'll sustain with regard to that,

25   Mr. Feder.                                                       15:46:00

```
 1              MR. FEDER:  Okay.
 2              THE COURT:  You can move forward.
 3    BY MR. FEDER:
 4    Q.  Did you file a tax return to the federal government in
 5    2013?                                                          15:46:05
 6    A.  Yes, I did.
 7    Q.  Is 5889 a copy of -- a copy of that?
 8    A.  Yes, it is.
 9    Q.  And at the bottom -- does it have a U.S. Attorney number on
10    it in the bottom right-hand corner?                            15:46:23
11    A.  Yes, it does.
12    Q.  So they've seen these, too; right?
13    A.  What's that?
14    Q.  The government has seen these, too; correct?
15    A.  I'm not sure the process.                                  15:46:33
16    Q.  Have you ever talked to any prosecutor about the money that
17    you made in the affiliate program in these years?
18    A.  Yes, I did.
19    Q.  Okay.  In 2013, how much money from wages and salary did
20    you report?                                                    15:46:55
21    A.  In 2013, I earned 692,397.
22    Q.  And how much did you report for business income separate
23    and apart from wages and salary?
24    A.  There's two -- two lines there.  Just line 12; right?
25              887,285.                                             15:47:20
```

1   Q.  Is this your share with your brother of the affiliate

2   business?

3   A.  Yes.

4   Q.  And that was -- so this is roughly half of -- about

5   comparable to what you made from your work at Backpage as its          15:47:43

6   founder and vice president?

7   A.  It is.

8            MR. FEDER:  And then if the witness could be shown

9   5890.

10  BY MR. FEDER:                                                          15:48:08

11  Q.  And is this your 1040 IRS federal income tax return for

12  2014?

13  A.  Yes, it is.

14  Q.  Could you tell the jury how much you made from Backpage in

15  that year, according to this document?                                 15:48:21

16  A.  911,825.

17  Q.  And how much you made from outside business income?

18  A.  1,031,949.

19  Q.  By 2012, terms like GFE and PSE at least were supposed to

20  have been forbidden in Backpage; right?                                15:49:14

21  A.  By 2012, yes.

22  Q.  When you became the owner in 2015 and after, did you do

23  something to say, let's bring back GFE and PSE, or did that

24  just happen?

25  A.  I do recall that we did let GFE back in.                           15:49:38

UNITED STATES DISTRICT COURT

1    Q.   Okay.  And almost immediately after Liz McDougall took over

2    moderation, she wrote a letter to Dollar Bill saying, bye-bye;

3    right?

4    A.   Yes, she did.

5    Q.   No more business with Backpage; right?                          15:50:14

6    A.   Correct.

7    Q.   And that stayed that way; right?

8    A.   Yes.

9    Q.   And there were no more super posters after 2012, right, at

10   least during her watch?                                             15:50:29

11   A.   No.  There were other super posters.

12   Q.   You're claiming that she knew about it?

13   A.   I don't know.  The other super poster, Sean Kim, he

14   continued to post.  He took all of Dollar Bill's business.

15   Q.   Are you saying that she knew about that?                       15:50:51

16          MR. RAPP:  I'm going to object to this.  He's asking

17   him to speculate what she knew.  There's a lot that goes into

18   that.

19          THE COURT:  Sustained.

20   BY MR. FEDER:                                                       15:51:07

21   Q.   Do you know whether or not Liz McDougall knew that there

22   was a new super poster on Backpage after she told Dollar Bill

23   no more?

24          MR. RAPP:  Same objection.

25          THE COURT:  Sustained.                                       15:51:19

```
 1   BY MR. FEDER:
 2   Q.  Did you ever have any conversation with her about that?
 3           MR. RAPP:  Same objection.
 4           THE COURT:  Sustained.
 5           MR. FEDER:  Could we see 6047?                    15:52:23
 6   BY MR. FEDER:
 7   Q.  Have you ever seen this before, Mr. Ferrer?
 8   A.  I have.
 9   Q.  It's an email from a person named Diana Fraser of Village
10   Voice Media to you, Mr. Hyre and Mr. Spear and a number of   15:52:53
11   other people, Steve Suskin; right?
12   A.  Correct.
13   Q.  And this is in March of 2008?
14   A.  Yes, it is.
15           MR. FEDER:  Move for the admission of 6047.       15:53:09
16           MR. RAPP:  No objection.
17           MR. FEDER:  Would you publish, please?
18           THE COURT:  Well, let me rule.
19           MR. FEDER:  Oh, I'm sorry.
20           THE COURT:  I'm still looking at it.              15:53:23
21           Yes, it may be admitted, and it may be published.
22           (Exhibit 6047 admitted into evidence.)
23   BY MR. FEDER:
24   Q.  Who was Diane -- who is Diana Fraser?
25   A.  So Diana Fraser was the HR director for all of Village  15:53:34
```

UNITED STATES DISTRICT COURT

```
1    Voice Media.
2    Q.  And this was basically a -- an adult policy being sent out
3    to the supervisors to have all new employees become familiar
4    with the policies of Backpage as it pertains to adult and
5    otherwise, and then to sign it?                               15:54:01
6    A.  It's got the employee handbook and the adult advertising
7    policy, correct.
8    Q.  And indicating that they and everybody is what's called an
9    at-will employee?
10   A.  Yeah.  I'm -- I don't -- oh, I see it there, under 1c.    15:54:16
11   Q.  1c?
12   A.  Yes.
13   Q.  1c?
14   A.  Yes.
15   Q.  And so every employee that came to Backpage had to        15:54:26
16   acknowledge that -- that what they were allowed to do and not
17   to do; right?
18   A.  That's right.  I -- at will.
19   Q.  Well, at will is -- means somebody can be hired and fired
20   at the will of the employer.  That's what the Arizona law is;  15:54:45
21   right?
22   A.  Correct.
23   Q.  Okay.  That's got nothing to do with employees had to sign
24   a document saying, I know what the rules are and I'm going to
25   follow them.                                                   15:54:56
```

```
 1   A.  Yeah.  I just -- I've -- I didn't -- I don't know why

 2   there's three items here.  Like the at-will clause, I -- is

 3   that a clause or is that a document?  I know that there's two

 4   documents, the handbook and the adult advertising policy.  And

 5   they did have to sign it, but some employees refused to sign          15:55:12

 6   it.

 7   Q.  Okay.  Thank you.

 8         MR. FEDER:  Can I see 6198?

 9   BY MR. FEDER:

10   Q.  Are you familiar with this?                                       15:55:57

11   A.  I've -- one moment.

12         Yes, I am.

13   Q.  And this was basically a -- it's a email from Jim Larkin to

14   a number of other people, including you, indicating that as of

15   February 21 of 2012 --                                                15:56:23

16         MR. RAPP:  I'm going to object to him reading until

17   it's admitted.

18         THE COURT:  Sustained.

19         MR. FEDER:  Move to admit.

20         MR. RAPP:  It's hearsay.  Objection.                            15:56:33

21         THE COURT:  Sustained.

22   BY MR. FEDER:

23   Q.  Have you ever seen this before, Mr. Ferrer?

24   A.  Yes.  I'm -- it was emailed to me, too.

25   Q.  Are all of the email addresses on this the ones that you're       15:56:45
```

```
 1   familiar with, including Jim Larkin and Carl Ferrer?
 2   A.  I'm familiar with these email addresses.  Scott Spear's is
 3   wrong.  Scott Spear's email address is wrong.
 4   Q.  Because it doesn't have a dot --
 5   A.  Exactly.                                                    15:57:06
 6   Q.  -- before the com?
 7   A.  Yes.
 8   Q.  Okay.  Maybe he didn't get it.
 9   A.  What's that?
10   Q.  I said maybe he didn't get it.                              15:57:11
11   A.  I don't think he got it.
12   Q.  Okay.  But you did; right?
13   A.  I -- my email address is correct, so I -- I must have got
14   it.
15            MR. FEDER:  Move to admit.                             15:57:23
16            MR. RAPP:  Objection.  The -- the emails aren't the
17   problem.  It's hearsay.
18            THE COURT:  Sustained.
19            MR. FEDER:  With all due respect, Judge, we've had
20   hundreds of emails in the same category that were allowed in   15:57:33
21   that were not hearsay.  This is not for the truth of the
22   matter, just to show notice.
23            THE COURT:  I sustained the objection, Mr. Feder.
24            MR. FEDER:  6173, please.  Not that one.
25            How about 5961?                                       15:58:30
```

UNITED STATES DISTRICT COURT

1    BY MR. FEDER:

2    Q.   Are you familiar with this, Mr. Ferrer?

3    A.   I'm familiar with this email.

4    Q.   Is that an email for Liz McDougall?

5    A.   Yes, it is.                                              15:58:56

6    Q.   Is that an email from Liz McDougall to you in July of 2012?

7    A.   Yes.

8    Q.   Does this look to be something -- is this something that

9    you received?

10   A.   Yes, I received this email.                              15:59:10

11          MR. FEDER:  Move to admit 5961.

12          MR. RAPP:  Same objection as to the previous one.

13          THE COURT:  Are there --

14          MR. FEDER:  I'm sorry?

15          THE COURT:  Are there more pages to this?              15:59:43

16          MR. FEDER:  Not that I know of.  But if you notice,

17   Judge, in the bottom right-hand corner, there's a government

18   Bates number.

19          THE COURT:  Okay.  I'll sustain the objection.

20          MR. FEDER:  How about 5324?                            16:00:15

21          MS. BERTRAND:  Mr. Feder what was that number?

22          MR. FEDER:  53 --

23          MS. BERTRAND:  Sorry.  That was Joy Bertrand.  I

24   didn't mean to startle you.

25          MR. FEDER:  5364.                                      16:00:33

UNITED STATES DISTRICT COURT

```
 1              MS. BERTRAND:  Sorry.
 2              MR. FEDER:  Definitely not this one.
 3              How about 1766a?
 4              Is this already in evidence?  Liliana?  Yes?
 5              THE COURTROOM DEPUTY:  Correct.                    16:01:22
 6              MR. FEDER:  Thank you.
 7  BY MR. FEDER:
 8  Q.  This was an exhibit shown to you by the government during
 9  your direct.
10              Do you remember it?                               16:01:35
11  A.  Yes, I do.
12  Q.  Is there anything about the picture that indicates to you
13  that this must be a prostitute?
14  A.  No.
15  Q.  Anything about the content, the terms in this ad, that   16:01:49
16  indicate to you that this must be a prostitute?
17  A.  Well, I don't see a price.
18  Q.  Right.  Is that a disqualifier?
19  A.  No.  It just means the price -- the price could be coming
20  in a negotiation.                                            16:02:20
21              MR. FEDER:  Scroll down and see if there's anything
22  more here.  Or scroll and --
23  BY MR. FEDER:
24  Q.  So is this a prostitution ad, in your opinion?
25  A.  It's the -- well, it's in -- because I know the Dollar Bill  16:02:29
```

UNITED STATES DISTRICT COURT

```
 1   psychoroundup blog.  And if --
 2   Q.  Mr. Ferrer --
 3           MR. RAPP:  He's answering the question.
 4           MR. FEDER:  No.  He's answering how he wants to
 5   answer, but he's not answering yes and no, which is what the      16:02:50
 6   question is.
 7           THE COURT:  Well, the question was, "So is this a
 8   prostitution add, in your opinion?"
 9           He can answer yes or no.
10           THE WITNESS:  Yes.                                         16:03:03
11   BY MR. FEDER:
12   Q.  Show us where on this ad it indicates this is a prostitute.
13           I'm sorry.  Strike that.
14           Did you ever go out and meet this woman, assuming it
15   is a woman?                                                        16:03:21
16   A.  No, I did not meet Sophie.
17   Q.  Did you talk to her on the phone?
18   A.  I did not talk to her on the phone.
19   Q.  Did you do any research on her?
20   A.  I didn't create this ad.                                       16:03:35
21   Q.  Is "very classic" -- I'm sorry.  Let's go to the top.
22           Is "totally amazing French beauty," is that a
23   prostitution ad?
24           I'm sorry.  Is that a suggestive phrase for a
25   prostitution ad?                                                  16:03:58
```

UNITED STATES DISTRICT COURT

```
 1   A.  I've seen that phrase in other ads that have sex for money

 2   in them, or I should say coded sex language.

 3   Q.  How about this one, the one we're talking about?

 4   A.  Have I --

 5   Q.  Is that "totally amazing French beauty," is that a          16:04:17

 6   suggestive term for a prostitute?

 7   A.  By itself, I would not say that it is by itself.

 8   Q.  All right.  So far the picture isn't that way and "totally

 9   amazing French beauty."

10          How about "with perfect 36Ds-32"?  Is that a            16:04:36

11   prostitution term, or terms?

12   A.  It's -- "perfect 36Ds" by itself is not sex for money.

13   Q.  32.  Is that the age --

14   A.  Yes.

15   Q.  -- in your opinion?                                        16:05:03

16   A.  Yes, it is.

17   Q.  Does that mean she's really 15?

18   A.  What?

19   Q.  You don't know; right?

20          THE COURT:  He asked you --                             16:05:18

21          THE WITNESS:  Correct.

22          THE COURT:  He asked you to repeat the question,

23   Mr. Feder.

24          MR. FEDER:  Okay.

25          ///
```

UNITED STATES DISTRICT COURT

```
1    BY MR. FEDER:

2    Q.  Do you know if this photo is of Sophie?

3    A.  There's no way to know.

4    Q.  I'm sorry?

5    A.  There's no way to know.  I don't know.          16:05:34

6    Q.  How about "very classic and classy French beauty"?

7            Is that a prostitution suggestive term, or string of

8    terms?

9    A.  We can go through the whole ad above, and it's not

10   suggestive of prostitution.                          16:05:57

11   Q.  Nothing is?

12   A.  It's below.

13   Q.  Right.

14   A.  It's the link below that makes it suggestive of

15   prostitution.  "For my review" --                    16:06:05

16   Q.  I'm talking about --

17   A.  -- "on the Dollar Bill psychoroundup blog."

18   Q.  Okay.  It's true that you can't tell -- well, first of all,

19   unless it says -- an ad says a sex -- a specific sex act for

20   money, how do you tell if it's a legal sex act that you can pay  16:06:30

21   for versus an illegal sex act that you -- that's -- that's

22   not -- not legal when you have a bunch of suggestive terms?

23   A.  And your question was, how do I tell --

24   Q.  How do you tell what the act is unless it says

25   "intercourse"?                                        16:06:59
```

UNITED STATES DISTRICT COURT

A.  Well, often coded words like "quickie," "full service," you

know, "blow your mind," "toe curling," you're able to, you

know -- and terms like BBBJ, you know.

Q.  Aren't there some cologne ads that talk about toe curling?

          MR. RAPP:  Objection.                                16:07:31

          THE WITNESS:  Well --

          MR. RAPP:  Speculation.

          THE COURT:  Well, if he's -- he can answer if he's

heard of one.

BY MR. FEDER:                                                  16:07:40

Q.  You're just guessing; right?

A.  I've been employed since 1996 dealing with adult ads.  I've

seen the language and the terms.  And since my employment with

Backpage in 2004 --

          MR. FEDER:  Object to going beyond the scope of the  16:08:00

question.  Ask for a yes or a no instead of the propaganda.

Move to strike.

          MR. RAPP:  I'm going to object and move to strike

that.

          THE COURT:  Well, the question was, Mr. Ferrer,      16:08:15

"You're just guessing; right?"

          And that was to the prior question about, "Aren't

there some cologne ads that talk about toe curling?"

          So you can respond to that question.

          THE WITNESS:  So you asked whether I'm guessing.  I'm 16:08:30

UNITED STATES DISTRICT COURT

```
 1    making an educated guess, yes.
 2             MR. FEDER:  Give me a moment.
 3             THE COURT:  Mr. Feder?
 4             MR. FEDER:  Yeah.  I'm sorry, Judge.  There's one
 5    thing I want to find that I'm not finding.                    16:10:33
 6             THE COURT:  Members of the jury, while Mr. Feder looks
 7    for what he's looking for, if you need to stand up and stretch,
 8    you can certainly do so.
 9             MR. FEDER:  How about 6050?
10             THE COURT:  Did she hear you?                         16:11:41
11             MR. FEDER:  I said I need 6050.
12             I'm sorry.  1.  Here we go.
13             This is in evidence?  This is in evidence?  It's not?
14    Okay.
15             THE COURT:  I'm sorry.  This is your exhibit?         16:12:07
16             MR. FEDER:  Yes.
17             THE COURT:  6050-1.
18             MR. FEDER:  Good question; good answer.  It's not in
19    evidence.
20    BY MR. FEDER:                                                 16:12:15
21    Q.  Have you ever seen this ad, this email, Mr. Ferrer?
22    A.  Yes, I have.
23    Q.  Is this an ad -- an email from you to Mr. Spear in May of
24    2009?
25    A.  It is.                                                    16:12:34
```

| | |
|---|---|
| 1 | MR. FEDER:  If you could scroll down. |
| 2 | BY MR. FEDER: |
| 3 | Q.  Was this, in part, you asking for more employees to be |
| 4 | hired? |
| 5 | A.  Yes. |
| 6 | Q.  And Mr. Spear, as he pretty much always did, approved more |
| 7 | hires if it would help to keep the site clean? |
| 8 | MR. RAPP:  Objection.  Objection.  Counsel's |
| 9 | testifying. |
| 10 | MR. FEDER:  It's a leading question on |
| 11 | cross-examination, Judge. |
| 12 | THE COURT:  Well, I guess just clarify that it was |
| 13 | a -- a question.  It's not necessarily a completed question, |
| 14 | Mr. Feder, so go ahead and re- -- rephrase it. |
| 15 | MR. FEDER:  Please read the question again. |
| 16 | (Record read.) |
| 17 | BY MR. FEDER: |
| 18 | Q.  Yes?  No?  I don't know? |
| 19 | A.  Yes, he would generally approve more moderators. |
| 20 | MR. FEDER:  How about 6141? |
| 21 | BY MR. FEDER: |
| 22 | Q.  Have you ever seen this email? |
| 23 | A.  Yes, I have. |
| 24 | Q.  Correct emails, as you can tell? |
| 25 | A.  Yeah, from what I can tell. |

Timestamps in right margin:
- Line 5: 16:12:53
- Line 10: 16:13:12
- Line 15: 16:13:31
- Line 20: 16:14:09
- Line 25: 16:14:54

```
 1   Q.  And this was in May of 20- -- I'm sorry -- 2009
 2   preliminarily from you to Scott Spear about your new adult
 3   abusement -- I'm sorry -- adult abuse abatement idea; right?
 4   A.  Yes.  Well, I drafted a plan because I was asked to come up
 5   with one.                                                        16:15:25
 6   Q.  And when you sent it to Mr. Spear, he sent it on to
 7   Mr. Larkin in this same email chain, and they both thought it
 8   was great; right?
 9   A.  They both agreed with the plan.
10   Q.  Well, Scott said, "This is well thought out" --             16:15:47
11           MR. RAPP:  Wait a minute.  It's not in evidence.
12           MR. FEDER:  Move to admit.
13           MR. RAPP:  No objection.
14           THE COURT:  Yes, it may be admitted, and it may be
15   published.  That way -- make it a little bit bigger for the     16:16:00
16   jurors, please.
17           (Exhibit 6141 admitted into evidence.)
18           MR. FEDER:  Scroll down, please.
19   BY MR. FEDER:
20   Q.  In 2009, were -- were you getting 5,000 ads a day,          16:16:17
21   according to this?
22   A.  I believe that would be 5,000 new ads.  That wouldn't count
23   the ads that were already posted and then being reposted or
24   moved to the top.
25   Q.  Is this --                                                  16:16:39
```

UNITED STATES DISTRICT COURT

```
 1   A.  This would be new ads.
 2   Q.  -- only in Phoenix or everywhere?
 3   A.  I'm sorry?
 4        THE COURT:  Okay.
 5   BY MR. FEDER:                                        16:16:45
 6   Q.  Only in Phoenix or everywhere?  If you know.
 7   A.  I'm -- I'm not sure.  It -- I doubt if it's -- no, it's not
 8   Phoenix.  It's got to be -- it's not everywhere.  It might be
 9   the U.S.
10   Q.  Was this adult content abuse abatement program implemented  16:17:02
11   by you?
12   A.  This is a plan -- hold on.
13   Q.  I think that calls for a yes or a no, don't you -- or an I
14   don't know, don't you think?
15   A.  Well, implemented is kind of a loaded word, because I think 16:17:29
16   I have to schedule development with the developers to build the
17   queues.
18   Q.  Well, let me --
19   A.  And then I got to have people operate the queues.
20   Q.  -- ask it a different way.                       16:17:41
21        Did you try to implement this program after Mr. Spear
22   and Mr. Larkin said, good job, go ahead?
23   A.  Definitely once I got the go-ahead, we began putting much
24   more effort towards moderation.
25   Q.  Okay.  But did you then tell Mr. Hyre, we're not doing      16:18:00
```

1    this?

2    A.  Specifically what, this whole plan?

3    Q.  Yeah.  Did you write an email separately to Mr. Hyre that

4    said, we're not -- we're not going to do this?

5    A.  Well, I'm certain I wrote an email that says it needs to be    16:18:31

6    implemented thoughtfully and deliberately, which is what Jim

7    Larkin asked me to do.  And "thoughtfully" means don't let it

8    disrupt the revenue.

9    Q.  That was you to Mr. Hyre; right?

10   A.  No.  Jim Larkin, the CEO, if you scroll back up to the       16:18:47

11   other page, says, "I agree we should implement this

12   immediately, thoughtfully and deliberately."

13            So that means don't be reckless, and don't be throwing

14   the baby out with the bath water again.

15   Q.  Okay.                                                        16:19:08

16   A.  Careful.

17   Q.  That's you reading into this?

18   A.  Well --

19   Q.  Yes or no?

20   A.  -- that's -- that's my opinion of the mission that he is     16:19:16

21   informing me.  Be thoughtful about the implementation.

22   Q.  So you had a conversation with him independent of this

23   email, with Jim Larkin?

24   A.  I -- with this email?

25   Q.  Yeah.                                                        16:19:38

1  A.  I had many independent conversations about moderation with

2  Mr. Larkin shortly after this email.

3  Q.  Did he then write you an email and say, don't let this

4  interfere with our making money; right?

5  A.  Yes, he did send me that email, to not throw the baby out          16:19:52

6  with the bath water.  And then we had meetings -- we had a

7  meeting with Scott Spear that we cannot let the moderators kill

8  this business.

9  Q.  Similar to the ideas that were given or planted on you from

10  the Seattle mayor.  There were certain things that just weren't     16:20:11

11  feasible; right?

12  A.  Certain things that are not feasible/practical, right.

13  Q.  Like any business.

14  A.  What?

15  Q.  Like any business.                                              16:20:29

16        I mean, just so we're clear, do you -- is there

17  anything wrong with a business making money if their product is

18  legal?

19        MR. RAPP:  Objection.  Relevance.  Speculation.

20        THE COURT:  Sustained.                                        16:20:42

21        MR. FEDER:  I'm sorry, Judge?

22        THE COURT:  Sustained.

23        MR. FEDER:  Thank you.

24        If you'll give me one moment, Judge, I may be done.

25        I think that's it.  Thank you.                                16:22:04

```
 1              THE COURT:  All right.  Thank you, Mr. Feder.

 2              We're going to maximize at least the five minutes.  I

 3    think there's someone who can ask at least a couple of

 4    questions so we can start.

 5              Who's -- who's the --                                    16:23:45

 6              MR. CAMBRIA:  I'm capable of that, Your Honor.

 7              THE COURT:  Mr. -- okay.  Mr. Cambria, you may begin.

 8              MR. CAMBRIA:  There we go.

 9                        CROSS-EXAMINATION

10    BY MR. CAMBRIA:                                                    16:23:58

11    Q.  Good afternoon, sir.

12    A.  Good afternoon.

13    Q.  I think you've indicated to us that you were interviewed a

14    number of times by people with the prosecution office; correct?

15    A.  Yes.                                                          16:24:35

16    Q.  And they generated some reports, did they not?

17    A.  Yes.

18    Q.  And you had the opportunity to review those reports and to

19    either affirm that they got the notes right as to what you said

20    or tell them that they should correct them because they were     16:24:54

21    not accurate; true?

22    A.  I'm not sure if I affirmed, but we did send corrections,

23    some errors that we had found.

24    Q.  Well, you had an opportunity to review the reports that

25    they made after they interviewed you to see whether or not they  16:25:13
```

1  were accurate?

2  A.  Correct.

3  Q.  All right.  And you reviewed them, and where you thought

4  that they were not accurate, you said so?

5  A.  We -- they were lengthy.  I did my best to find any          16:25:26

6  mistakes.

7  Q.  Okay.  And did you then -- if they revised them, did they

8  then give them to you to review after they were revised?

9  A.  Yes.

10  Q.  Okay.  Now, have you reviewed them recently?              16:25:50

11  A.  Yes, I have.

12  Q.  Okay.  So your background.  Before you were involved with

13  Backpage, the online platform here, you were in the print media

14  business; is that true?

15  A.  Yes.                                                     16:26:12

16  Q.  And your specialty was ads?

17  A.  It was ads, yes.

18  Q.  And those ads typically were on the back pages of the

19  newspaper; correct?

20  A.  No.  The back page in the newspaper was something new for  16:26:22

21  me.  That was part of the Dallas Observer.  My specialty was

22  ads in the back of the paper, not the specific back page.

23  Q.  Okay.  Eventually you said that you and Jim Larkin

24  developed the idea of Backpage.  You were sent off to talk to

25  Craig -- Craig Newmark from Craigslist; is that correct?      16:26:49

A.  I was sent to San Francisco to try to compete with
Craigslist.

Q.  Okay.  And you reviewed the Craigslist setup, if you will?

A.  I did.

Q.  Okay.  And when you were with the print -- you worked with    16:27:07
print newspapers for ads originally; true?

A.  Yes.

Q.  Okay.  And in the print field, someone could call in, and
let's say they were going to do an ad for a car.  They, meaning
the advertiser, would supply all the information for the ad,    16:27:30
would they not?

A.  Yes.  But often the sales rep would suggest add, you know,
additional text and help them write the ad.

Q.  Yeah.  Certain things like, is it a two-door; a four-door?
Is it a convertible?  Is it black?  Is it white?    16:27:52

        Something like that?

A.  Yes, because you made more money per word.  So there was
always a selling effort to sell a lot of words.

Q.  Always a gimmick, huh?  Always a gimmick.  Okay.

        So now, for example, if somebody called in and they    16:28:06
said, I'd like to purchase ad space for a '58 Chevy 348 with
triple carburetors, and, however this car was only driven on
every other Sunday by Miss Daisy, they could do that; right?

A.  Yes.

Q.  Okay.  And you'd print the ad with all those various words    16:28:28

1  in there; true?

2  A.  Correct.

3  Q.  All right.  And if it turned out, however, that when

4  somebody responded to the ad the car was just a 283 Chevy, not

5  a 348, it only had a two-barrel, and basically it was                16:28:48

6  misleading, then the newspaper itself that sold them the ad

7  wouldn't be responsible for that, would they?

8  A.  I don't -- you know cars very well, I can tell.

9  Q.  I'm sorry?

10  A.  You know cars very well.  And, no, we didn't think the          16:29:10

11  newspaper should -- "we" meaning, you know, where I worked in

12  the newspaper, we didn't think we were liable for if they put

13  the --

14  Q.  Well --

15  A.  -- if the car turned out to be different.                       16:29:23

16  Q.  And the only way that someone would be able to determine if

17  the ad was false is if they responded to it; correct?

18  A.  Correct.

19  Q.  They'd have to go out and look and see if it's a 348, 283,

20  triples, deuce, whatever.  That's what they'd have to do;          16:29:44

21  correct?

22  A.  Yes.

23  Q.  All right.  And it -- it's not the -- the paper itself that

24  you worked for.  When somebody called in an ad, they didn't go

25  out and say:  Well, wait.  Before we're going to post that ad,     16:29:58

1   we're going to go out and verify the information that you are

2   asking us to put in an ad.

3          That's not how it works, is it?

4          MR. RAPP:  Objection as to relevance, the foundation.

5          What's the time period, and what does the newspapers          16:30:12

6   have to do with this?

7          MR. CAMBRIA:  It's generally speaking, Your Honor, how

8   ads work.  That's what I'm asking him about.  He has

9   experience, so I think he can answer those questions.

10         MR. RAPP:  All right.  These are newspaper ads, not          16:30:25

11  Backpage.

12         MR. CAMBRIA:  We're going to get to the next step

13  here.

14         THE COURT:  Yes.

15         MR. RAPP:  Same objection as to relevance of this as          16:30:32

16  to Backpage.

17         THE COURT:  If you can remember my ruling --

18         MR. CAMBRIA:  Oop.  Sorry?

19         THE COURT:  If you can remember my ruling in the

20  morning, I'll give you a little leeway.  I'll overrule the          16:30:40

21  objection.

22         And so we are at 4:30, and it's time to release our

23  jury for the evening.

24         I -- again, I will remind you of the admonishment not

25  to discuss, come to any conclusions, research or anything of          16:30:57

UNITED STATES DISTRICT COURT

1    the like regarding the case.

2          And, again, let's aim for an 8:45 a.m. start.  We'll

3    try to go with the same schedule.  Depending on if we start at

4    8:45, we may take a little bit earlier lunch, but a 45-minute

5    lunch nevertheless.                                          16:31:17

6          And so we'll ask our jury to -- to depart the

7    courtroom, and so please all rise for the jury.

8          (Jury not present at 4:31 p.m.)

9          THE COURT:  All right.  Let me -- let us -- let the

10   jurors depart uninterrupted.                                 16:31:58

11         And there are two matters.  That's right.

12         Last Friday, Mr. Rapp, you had indicated that there

13   were two individuals that you wanted to call out of order.  I

14   asked you to give me the rationale for that, why -- why they

15   were making that request.  And I hadn't seen that.  I have the  16:32:19

16   identity of the two witnesses, but I don't know what the reason

17   for that request is.

18         MR. RAPP:  Right.  These -- these are two witnesses

19   from NCMEC who had made vacation plans when we had the previous

20   schedule, when we were starting in early August.  And then when  16:32:40

21   the COVID situation came up, we lost a couple more days.  But

22   they had scheduled a prepaid vacation around that schedule, and

23   so now they're sort of interrupted because of that.

24         And that -- that's -- that's the reason, frankly.  We

25   just wanted to -- we have them here in town.  We wanted to take  16:33:05

```
1   them out of order to accommodate that -- that vacation that
2   they had --
3              THE COURT:  When --
4              MR. RAPP:  -- paid for.
5              THE COURT:  When is their vacation?                    16:33:13
6              MR. RAPP:  I believe that their vacation starts next
7   week.  And it's a lengthy vacation.  It goes the whole month of
8   October.
9              THE COURT:  And you said it's prepaid?
10             MR. RAPP:  Yes.  I believe that they have paid for     16:33:25
11  accommodating animals, and I think that they have hotels
12  prepaid and -- and all of that.
13             THE COURT:  All right.  What's the response?
14             MR. RAPP:  It's October 6th to the 30th is their
15  vacation.                                                        16:33:46
16             THE COURT:  What's the -- what's the government -- or,
17  I'm sorry -- what's the defense position?
18             MS. BERTRAND:  A couple points, Your Honor.
19             First, we -- we object to this interruption of the
20  defense's cross-examination.  If they were concerned about      16:33:58
21  inconveniencing these witnesses, then they could have
22  interrupted their own direct of Mr. Ferrer and not interrupted
23  the defense's.  They've had Mr. Ferrer on the stand for a long
24  time.  They could have easily broken it up.
25             Second of all -- this is the second of three that I   16:34:16
```

UNITED STATES DISTRICT COURT

1    can think of -- there's no indication as to why both of them

2    need to testify.  They're both from NCMEC, and there's no

3    indication that Ernie Allen can't testify, who they're also

4    calling from NCMEC.  So this is starting to get somewhat

5    cumulative.                                                        16:34:34

6         And I'd also note, going back to the first one,

7    they've proffered no receipts, travel information, anything.

8    Simply they're going on vacation.  Whereas, you know, we've had

9    to be clear with the Court and proffer when we have prepaid

10   trips, Court conflicts, et cetera.                                 16:34:49

11        And, lastly, I'll just note for the record -- I

12   learned this this afternoon on the afternoon break -- NCMEC's

13   counsel's sitting in the gallery, and they now intend to be

14   bringing in representatives of NCMEC.  And I find that really

15   problematic.  We -- the Court has ordered that witnesses not be   16:35:06

16   present during testimony and during the back and forths with

17   the lawyers.  That's why Mr. Ferrer's had to go in and out.

18   And now we find out -- it was not told to us.  It happened to

19   be my client recognized counsel for NCMEC sitting in the back.

20        So, for all those reasons, I don't think the Shehans       16:35:26

21   should be testifying -- need to be testifying.  And if they

22   are, the government should have worked this into their own

23   direct examination and not interrupted the defense.

24        MR. RAPP:  Well, look, the -- the delays in this case

25   have been occasioned by everything unrelated to the United        16:35:47

States:  Jurors issues; defense issues.  And so we have -- we

have made -- they have made accommodations, and so we would

like to put them on the stand.

        With respect to them being cumulative, they're

testifying to different meetings.  One had a meeting with

Mr. Lacey and Mr. Spear.  The other had a meeting with Mr. -- a

series of meetings with Mr. Moon and Mr. Ferrer.  And so

they're -- they're testifying to different things.

        With respect to their counsel being here, the

counsel's not a witness.  The counsel -- this is -- the counsel

can be in court.

        And so that -- that's our ask.  I don't know how long

their cross-examination is going to go.  We have three days

this week.  We're going to keep them here until we can get them

on the stand.

        THE COURT:  Well, how long is the examination going to

take of these two NCMEC witnesses?

        MR. RAPP:  I don't think my examination is going to be

that lengthy.  The one testimony is going to be the discrete

event on March 1st when he was present presenting a PowerPoint

to Mr. Spear and Mr. Lacey.

        And then with respect to Ms Shehan, she is going -- we

are not going through every single meeting that they had with

with Mr. Moon and Mr. Ferrer.  There's -- she's simply going to

sort of just summarize those meetings and the recommendations

UNITED STATES DISTRICT COURT

1    that she made to Backpage.

2          THE COURT:  Well --

3          MS. BERTRAND:  If I may, Your Honor?

4          THE COURT:  Go ahead.

5          MS. BERTRAND:  First, for the government to say these          16:37:30

6    were in any way defense-generated delays, Jim Larkin killed

7    himself.  None of us had anything to do with that.  And then

8    Scott Spear got COVID.  Again, unless they're going to allege

9    someone of us, like, got a tissue paper full of COVID and got

10   it over his face --                                              16:37:48

11         THE COURT:  All right.  I'm going to stop you there.

12         MS. BERTRAND:  -- and then --

13         THE COURT:  It's the end of the day.

14         MS. BERTRAND:  And --

15         THE COURT:  Be civil.                                      16:37:53

16         MS. BERTRAND:  They've known about this for a while.

17   They've brought it up as they were wrapping up their direct

18   afterward:  After we learned about this on Sunday; after we've

19   begun our cross.  They had plenty of time to raise this with

20   the Court and talk about scheduling.  It is unfair, and it's    16:38:09

21   untimely to bring it up and interrupt the defense's

22   cross-examination.

23         THE COURT:  And I would say, Mr. Rapp, that the

24   problem here, there are a couple issues I see.  Number 1,

25   witnesses are going to be inconvenienced in any trial.          16:38:31

UNITED STATES DISTRICT COURT

112

1  Number 2, it is the case that you had Mr. Ferrer on for a

2  number of days, and you could have asked to present these

3  witnesses out of order during that time period.  Here what is

4  going to happen is we now then have witnesses out of order who

5  every one of these defense counsel are going to want to                16:38:58

6  cross-examine.

7          And so I -- I hate to break it to them, but I think

8  we're -- we're going to have to have them disrupt their plans.

9  And if things can speed along, then maybe there will be a

10  different outcome.  But I'm going to deny the request.          16:39:26

11          MR. RAPP:  Very well.  Thank you.

12          THE COURT:  Now, I want to -- I do want to make a

13  record with regard to this exhibit.  I don't recall what the

14  number was.  Oh, it's 50 -- no, no.  That's not it.  In any

15  event, it was a purported impeachment exhibit.                  16:39:43

16          And, Mr. Feder, I don't -- I, frankly, don't recall

17  the statement that was being impeached, but the introduction of

18  this declaration of Mr. Ferrer in which he is declaring

19  statements about SB 6251 in the McKenna case, that is why I

20  sustained the objection, because it directly relates -- the     16:40:22

21  testimony that you were trying to elicit from him were

22  responses to SB 6251.

23          And so that's why I sustained the objection.  So

24  that's -- I just wanted to clarify the record as to why I

25  sustained the objection.                                        16:40:46

```
 1          MR. FEDER:  Let me clarify, however, Judge, because I

 2     think the colloquy between yourself and I was that I would

 3     avoid mentioning the statute and just get the impeachment that

 4     was generic to Mr. Ferrer that impeaches much or all of his

 5     prior testimony, his prior inconsistent statements that go to     16:41:04

 6     the heart of the case.

 7          And that's what I said at the time, and I'll -- I'll

 8     say it again.  If we -- I mean, I think I could have other

 9     counsel bring it up.  We'll, you know, redact parts of it to

10     make sure that it doesn't mention --                               16:41:20

11          THE COURT:  You're not going to redact parts of this

12     declaration that is, you know, I don't know how many pages, ten

13     plus whatever the attachments are, because his statements

14     relate to SB 6251.  And so that is why I -- I am laying the

15     record.  It's Mr. Feder's objection -- I'm sorry -- his          16:41:44

16     witness, and so I don't necessarily want to hear from every

17     counsel with regard to the exhibit that he proffered.

18          MR. LINCENBERG:  Well, I -- so is the Court not going

19     to let me be heard on this point?

20          THE COURT:  Are you going to try to introduce this           16:42:04

21     declaration?

22          MR. LINCENBERG:  It's not a matter of introducing the

23     document.  Mr. Feder specifically pointed to paragraph 19,

24     which was direct impeachment.

25          THE COURT:  He can -- no, I'm not going to let you do        16:42:14
```

1    that because Mr. Feder is his own counsel.

2             MR. LINCENBERG:  Well, this affects me as well.

3             THE COURT:  He laid the cross-examination.  He knows

4    what he was intending to elicit from the witness.  So that is

5    why it's not appropriate, Mr. Lincenberg, for you to come in                16:42:28

6    and back-chair Mr. Feder on this particular issue, because you

7    don't know what was in his mind in that examination.

8             MR. LINCENBERG:  I know what evidence was excluded,

9    and I want to know if I'm going to be able to go into this.

10            THE COURT:  No, not into this declaration, unless                   16:42:45

11   there is something other that changes, because his statements,

12   again, are in reference to this proposed state legislation and

13   the litigation.

14            MR. LINCENBERG:  That's not correct.  If the Court

15   looks at paragraph 19 of that declaration, which Mr. Feder was              16:43:02

16   pointing to, where Ferrer says it's impossible to determine

17   what is an implicit offer of commercial sex, that is a prior

18   inconsistent statement, which is clearly admissible under

19   801(d).  It doesn't matter what the proceeding was about.

20            THE COURT:  What was the prior statement that he made?            16:43:22

21            MR. LINCENBERG:  The statement that he's made in his

22   testimony is talking about determining all of these ads --

23            THE COURT:  No.

24            MR. LINCENBERG:  The prior statement --

25            THE COURT:  No.  What's his statement?  You point to             16:43:31

UNITED STATES DISTRICT COURT

```
 1   me his statement in the transcript --
 2            MR. LINCENBERG:  Yeah.
 3            THE COURT:  -- and provide that to me tonight.
 4            MR. LINCENBERG:  The statement --
 5            THE COURT:  Give me the precise paragraphs, and I will   16:43:40
 6   look at it in context of paragraph 19.  But as it was put
 7   forward here, those statements that he made were with respect
 8   to this state legislation.
 9            Okay.  Now, anything further to be discussed on any
10   other topic from the government?                                 16:43:59
11            MR. RAPP:  Not from the United States, no.
12            THE COURT:  From the defense?
13            MS. BERTRAND:  No.  Thank you.
14            THE COURT:  All right.  Mr. Cambria, you'll be ready
15   to go at 8:45?                                                   16:44:07
16            MR. CAMBRIA:  I was born ready.
17            THE COURT:  And I will say that you brought a smile to
18   my face when you talked about Miss Daisy, one of my favorite
19   movies.
20            THE COURTROOM DEPUTY:  All rise.                         16:44:26
21            (Proceedings conclude at 4:44 p.m.)
22                            ---oOo---
23
24
25
```

UNITED STATES DISTRICT COURT

1

2

3

4                      **C E R T I F I C A T E**

5

6          I, CATHY J. TAYLOR, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 26th day of

15   September, 2023.

16

17

18                              /s/Cathy J. Taylor
                                _____
19                              Cathy J. Taylor, RMR, CRR, CRC

20

21

22

23

24

25

UNITED STATES DISTRICT COURT