rafficGary S. Lincenberg *(admitted pro hac vice)*
   glincenberg@birdmarella.com
Ariel A. Neuman *(admitted pro hac vice)*
   aneuman@birdmarella.com
Gopi K. Panchapakesan *(admitted pro hac vice)*
   gkp@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant John Brunst

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CASE NO. 2:18-cr-00422-PHX-DJH |
| Plaintiff, | **DEFENDANT JOHN BRUNST'S MOTION TO SEEK ADMISSION OF BRUNST'S TESTIMONY RE: STATE OF MIND** |
| vs. | |
| Michael Lacey, et al., | |
| Defendants. | |

3895279.4

Defendant John Brunst respectfully seeks Court approval to testify as to his state of mind during the defense case.  Mr. Brunst files this motion because the anticipated testimony would violate prior Court Orders.  If the Court intends to preclude such testimony, Mr. Brunst likely would not testify at trial.

## I.     PROFFERED TESTIMONY

Counsel proffers that Mr. Brunst likely would testify, among other things, to the following:

- Mr. Brunst rarely met with counsel who advised Backpage on the lawfulness of Backpage's adult advertising and rarely met with counsel who had handled litigation relating to the adult advertising.

- Nevertheless, Mr. Brunst learned about such counsel's advice and litigation positions.  This sometimes came orally or in writing from Mr. Larkin.  On occasion, Mr. Brunst heard it from attorneys Don Moon, Liz McDougall, and Steve Suskin.  On occasion, Mr. Brunst saw a written legal memorandum.  For example, Mr. Brunst saw a legal memorandum prepared by attorney Mark Sableman (a partner at Thompson Coburn) in late 2010 regarding protections afforded to Backpage under the First Amendment and the Communications Decency Act.  Advice like this—that Backpage's adult ad section was protected by both the First Amendment and the Communications Decency Act—was the subject of Mr. Ferrer's interviews with Government counsel during his pre-trial interviews (*see, e.g.*, 04/05/18 MOI at ¶¶ 67, 88; 04/17/18 MOI at ¶¶ 142, 145).  Mr. Brunst's testimony on this subject is relevant for several reasons: (i) it shows that the banks have long been aware of and communicating about Backpage's adult ads; (ii) the attorney advice and statements from Mr. Larkin gave Mr. Brunst a good faith belief that the business was operating lawfully; (iii) Bank of Montreal's ("BMO") continued banking with the company throughout the relevant time period gave Mr. Brunst comfort that BMO was satisfied that the business was operating lawfully; and (iv) it counters any

suggestion by the Government that Mr. Brunst was hiding things about Backpage's adult ads from banks.

- While Mr. Brunst was not involved in the litigation and government investigations involving Backpage's adult section, he generally monitored these issues.  While he played almost no role in the litigation, as the CFO, he tracked litigation because: (i) he was aware of the legal expenses of attorneys representing Backpage; (ii) the auditors sought representation letters from counsel as to risks posed by litigation; and (iii) legal complaints and adverse decisions (the legal decisions as to Backpage were generally all favorable) could impact the valuation of the company, the willingness of investors to invest and banks to lend, and other financial issues.  Mr. Brunst relied on favorable court decisions, in particular the *McKenna* and *Dart* decisions (but also other Backpage and Craigslist decisions), in believing that he could continue to serve in good faith as CFO of the holding company and perform any parent-level duties related to Backpage.  Indeed, if Judge Posner had delivered the opposite opinion in 2015—and determined that Sheriff Dart was justified in his actions because Backpage was operating unlawfully—Mr. Brunst would not have continued to do business with Backpage.  Indeed, the majority of the Travel Act and money laundering counts charged against Mr. Brunst occurred during and after the *Dart* litigation.

- Though Mr. Brunst never dealt with state Attorneys General, District Attorneys, and local law enforcement, he was generally aware that some state law enforcement attacked Backpage.  He was also aware that none ever succeeded in their legal threats or actions, which gave him further comfort that the company's compliance efforts and legal advice were sound.

- Mr. Brunst was contemporaneously aware of the federal grand jury investigation in the District of Washington.  Again, while he was not involved in dealing with litigation counsel or legal strategy, he monitored it from the perspective of the

CFO.  He learned that the Washington United States Attorney declined to seek an indictment and that there was no legal basis to do so. This further validated Mr. Brunst's belief that Backpage was operating lawfully.

- Mr. Brunst contemporaneously became aware of the California criminal charges against Ferrer, Larkin, and Lacey in 2016-17.  Again, that a California judge granted a motion to dismiss these charges gave Mr. Brunst further comfort that Backpage was operating in compliance with the law.

- Mr. Brunst was not involved with Backpage's ad moderation compliance function.  But Mr. Brunst was comforted by the fact that Backpage employed a former sex crimes prosecutor (Hemu Nigam) and later hired Craigslist's outside counsel (Liz McDougall) to oversee this compliance function.  Neither Mr. Nigam nor Ms. McDougall ever advised Mr. Brunst of criticisms of the compliance function.

- Don Moon is a former county attorney for La Paz County, Arizona, and a highly successful attorney in Arizona with a First Amendment background.  Mr. Moon served on the Board of Directors of the holding company (Village Voice Media Holdings [VVMH]).  He played a large role in advising the company on legal issues and working with outside counsel.  As set forth in Ferrer's interview memoranda, he frequently advised the company that Backpage's operations were protected by the First Amendment.  Mr. Brunst did not have a lot of direct interaction with Mr. Moon, but was familiar with Mr. Moon's advice on the First Amendment (sometimes presented by Moon to banking partners) and on other occasions learned the same through Mr. Larkin.

- The Government polluted the jurors' minds with evidence that even the United States Senate investigated Backpage.  The Court has precluded the defense from pointing out that a central reason for the Senate hearings was to try to pass new legislation targeted at Backpage's publication of adult advertising (because no then-existing federal law provided a basis for criminal liability).  That certain

members of Congress and congressional witnesses were complaining that current laws did not reach Backpage gave Mr. Brunst more comfort that the business was operating lawfully under the laws at that time.  On March 21, 2018, Congress passed a new law based on two bills, FOSTA (Allow States and Victims to Fight Online Sex Trafficking Act) and SESTA (The Stop Enabling Sex Traffickers Act).  The new law, which targeted Backpage.com, expanded federal criminal liability for facilitating sex trafficking and also purported to eliminate Section 230 as a defense for companies like Backpage.  Though the Court cut off counsel's cross-examination of Ferrer as to this part of his motivation to cut a deal, the passage of this law clearly was one of Ferrer's motives for pleading guilty and shutting down the business.  He knew it would at least be more difficult, if not impossible, to continue to operate Backpage once the new law took effect later in 2018.

- Mr. Brunst dealt regularly with the holding company's financial auditors, Deloitte and BDO.  As part of their duties, the auditors assessed contingent liabilities, including any legal exposure facing the company (both civil and criminal) and whether any such legal exposure could call into question the company's ability to continue as a going concern.  Mr. Brunst advised the auditors of the names and contact information of litigation counsel so that the auditors could address any legal questions directly to counsel.  Auditors do extensive due diligence.  No auditor ever told Mr. Brunst that they believed Backpage was unlawfully facilitating prostitution or engaging in money laundering.  No auditor ever refused to take payment from funds generated by Backpage.  And when Deloitte withdrew from further work for Backpage, Mr. Brunst was advised that it did so for reputational reasons.

- Mr. Brunst was aware that Ferrer repeatedly gave declarations and testified under oath in defense of attacks on Backpage's adult section.  At no time did Ferrer tell Mr. Brunst that Ferrer testified falsely.  Ferrer expressed a confidence

in the righteousness of Backpage's legal position.  This gave Mr. Brunst comfort that Backpage was operating lawfully and addressing legal issues how they should be addressed—in the courts.

- Mr. Brunst had periodic meetings, calls, and emails with various bank representatives, including representatives of BMO and US Bank, that were referenced in Ferrer's testimony.  Mr. Brunst was at all times transparent with them, answering their questions about Backpage's adult section, and connecting them to others at the company, including Ferrer and attorneys, where others were in a better position to answer their questions.

- In response to an inquiry, Brunst forwarded the Mark Sableman legal memo to the BMO in 2010.  *See* Exhs. 5507 and 5508.  The Court sustained the Government's objection to admission of the exhibits.

- He also forwarded the response from VVMH CEO Larkin (Exhibit 616) to BMO.  (The Court allowed the prosecution to redact this out and instead introduce Exhibit 616a, thereby precluding the jurors from hearing that Mr. Larkin was representing that the website was "clearly lawful.")  Mr. Brunst would testify that Mr. Larkin's email was consistent with what Mr. Larkin told him on multiple occasions.  Over the years, Mr. Larkin made similar reassuring statements in the context of litigation, attacks by Attorney Generals, grand jury investigations, and the advice that Larkin received from counsel.  Mr. Larkin told Mr. Brunst to focus on his work—"stay in your swim lane"—and let the lawyers, Board of Directors, and Larkin address the legal challenges.

Based on the Court's rulings to date, it appears that most, if not all, of this testimony would be precluded.

Yet, at the same time, the Court has allowed the government to introduce *ad nauseum* the irrelevant and highly inflammatory opinions of religious institutions and other NGOs, a New York Times editorialist, and Hollywood celebrities, among others, regarding their views on Backpage, including that the site be shut down.  None of this evidence was

tethered to any specific advertisement, defendant, or prostitution business enterprise.  Most of this purported "notice" evidence never even came to Mr. Brunst's attention.  Nor would any rational CFO of a business base his or her actions on the uninformed lay opinions of individuals and organizations that have agendas adverse to the business.  Instead, what a rational CFO would do is look to what federal courts and attorneys with First Amendment expertise were saying about the legality of Backpage's operations.

Indeed, we proffer that Dennis Chookaszian,[1] Brunst's expert on the role of a CFO, would testify regarding the "functions" a CFO performs "in a corporate setting, including what is and is not required of a CFO in assessing allegations that a company or one of its subsidiaries has engaged in unlawful conduct."  Dkt. 500 at 4; Dkt. 1081 at 19 ("The Court agrees this testimony is relevant and useful specifically as to Defendant Brunst for the jury to understand his role in the overall corporate structure.  The testimony of Mr. Weil will be limited to describing what a CFO does, his role and obligations, but Mr. Weil will be precluded from providing testimony about what Mr. Brunst may have done in the context of this case or anything about his state of mind.").   In other words, Mr. Chookaszian intends to lay out for the jury—without getting into the specifics of what Brunst may or may not have done in this case—the ways in which a CFO gains comfort with the legality of a business, including with respect to challenged industries like an online platform for adult content.  Unsurprisingly, Chookaszian would testify that a CFO is better served by relying on rulings from federal judges and attorney advice than the musings of editorialists, media companies, and religious institutions and other NGOs.

But if Brunst cannot testify to his good faith reliance on statements from attorneys and court opinions, then he will not testify in his own defense.  Nor would he put on testimony

---

[1]   Mr. Chookaszian is a professor at the University of Chicago's Booth School of Business.  He is the former chairman of the Financial Accounting Standards Advisory Council, former chairman and CEO of CNA Insurance Companies, and regularly teaches courses in corporate governance and the role of the CFO.  Earlier this year, after the passing of Brunst's originally designated expert, Roman Weil, Brunst informed the Government that Mr. Chookaszian would be serving as Brunst's expert.

1  from Mr. Chookaszian, if neither Brunst nor his expert can speak to the fact that the role of

2  a CFO involves the very things that Brunst did relative to litigation, court opinions, and

3  attorney advice concerning Backpage.  Brunst therefore moves the Court to permit him to

4  testify to this proffered testimony.

5  **II.     ARGUMENT**

6       **A.     Brunst's Reliance on Court Opinions Played a Central Role in His State**

7            **of Mind.**

8            **1.     *Backpage v. Dart***

9       Mr. Brunst relied on the decision in *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230

10  (7th Cir. 2015).  From the filing of the indictment and through the trial of this case, the

11  Government has put at issue the actions of the major credit card companies, the effect

12  those actions had on Backpage and Defendants, and Backpage's response.  This has been

13  a focal point of the Government's case against Brunst.  At least 71 of the Government's 98

14  substantive counts in the indictment took place *after* the Dart letters were sent out, and the

15  *Dart* litigation commenced in July 2015.

16       While the Government seeks to use the credit card cancellations as "notice" to

17  Brunst that ads on Backpage were illegal, the Seventh Circuit Court of Appeals' decision

18  in *Dart* provided Mr. Brunst with notice to the contrary.  As the Court knows, following

19  threatening letters sent by Sheriff Tom Dart to Visa and MasterCard, within days, those

20  credit card companies ceased doing business with Backpage.  Backpage sued Dart and

21  ultimately secured an injunction before the Seventh Circuit.  More than any other event

22  from 2004 to 2018, Brunst relied on the *Dart* opinion in guiding his actions going forward.

23       In *Dart*, the Seventh Circuit held the following:

24  • "The Sheriff of Cook County, ***Tom Dart, has embarked on a campaign***

25       ***intended to crush Backpage's adult section – crush Backpage***, period, it seems

26       – by demanding that firms such as Visa and MasterCard prohibit the use of their

27       credit cards to purchase any ads on Backpage, since the ads might be for illegal

28       sex-related products or services, such as prostitution. ***Visa and MasterCard***

*bowed to pressure from Sheriff Dart* and others by refusing to process transactions in which their credit cards are used to purchase *any* ads on Backpage, *even those that advertise indisputably legal activities*." *Id.* at 230 (emphasis added).

- "[W]hile [Dart] has a First Amendment right to express his views about Backpage, a public official who tries to shut down an avenue of expression of ideas and opinions through 'actual or threatened imposition of government power or sanction' *is violating the First Amendment*." *Id.* (quoting *American Family Association, Inc. v. City & County of San Francisco*, 277 F.3d 1114, 1125 (9th Cir.2002)) (emphasis added).

- The Court extensively detailed the threatening nature of the Dart letter, observing that "[u]pon receipt of the letter MasterCard forthwith stopped allowing its credit cards to be used to purchase ads anywhere on Backpage's website.  Visa followed suit. *So the threats had worked*.  And so just two days after Dart's letter was sent, the Cook County Sheriff's Office was able to (and did) issue a triumphant press release captioned 'Sheriff Dart's Demand to Defund Sex Trafficking Compels Visa and MasterCard to Sever Ties with Backpage.com.' Notice 'demand,' not request; notice 'compels,' not persuades; notice 'sever ties,' not 'refuse to make payments for ads in the adult section of the Backpage website.'" *Id.* at 229 (emphasis added).

- The Court rejected and openly mocked a declaration submitted by Martin Elliot, an executive of Visa, who claimed that "at no point did Visa perceive Sheriff Dart to be threatening Visa." *Id.* at 233 ("But what would one expect an executive of Visa to say?  'I am afraid of the guy?'  'He is in effect calling me an accomplice of a criminal organization (Backpage), and I'm afraid he might pull strings to get me investigated and even prosecuted by any one of several federal or state agencies?'").  Indeed, Judge Posner observed that Visa employees dealing with Dart acknowledged that the "subtle messages [Dart's

1    office has] been sending us . . . could easily be taken for **blackmail**." *Id.*

2    (emphasis added).

3    Each of these portions of the *Dart* opinion—relied on by Brunst—directly counters

4 any purported "notice" the Government asks the jury to infer from the credit card

5 terminations.

6    Critically, in holding that Dart had violated Backpage's First Amendment rights, the

7 Court found:

> 8    The district judge remarked "that the majority of the advertisements [in Backpage's adult section] are for sex"—but a majority is not all. ***and not all***
> 9    ***advertisements for sex are advertisements for illegal sex***. There is no estimate of how many ads in Backpage's adult section promote illegal
> 10    activity; we just gave examples of some that do not.

11 *Id.* at 234 (emphasis added).

12    This portion of the *Dart* opinion directly contradicts Ferrer's trial testimony and

13 undermines the Government's central claim: that escort ads are synonymous with illegal

14 prostitution ads.  Ultimately, the Seventh Circuit enjoined Dart from further interfering

15 with Backpage's relationships with financial institutions.  *Id.* at 239.  Brunst relied on this

16 opinion written by one of the most respected (conservative) jurists of our time and formed

17 an impression that: (1) the major credit card companies terminated their relationships with

18 Backpage in response to illegal and unconstitutional threats from law enforcement;

19 (2) Backpage's First Amendment rights were violated by Dart; and (3) even if a majority

20 of the ads on Backpage are for sex—as the government alleges here—that does not mean

21 those ads were for *illegal* sex.

22    The Government has thrown up smoke and mirrors in response to *Dart*.  They seek

23 to impugn the Seventh Circuit's ruling by claiming that the facts underlying the opinion

24 have changed in light of their indictment.  Not only is that immaterial to Mr. Brunst's good

25 faith defense, but it also is flat wrong.  Sheriff Dart's evidence in that case essentially

26 mirrored the Government's evidence here, including:

27    • Allegations regarding "sponsored ads," an "affiliate program," and reciprocal

28        links.  Exh. 5902 at 480, 491 (Dart's appendix on appeal).

- A New York Times op-ed written by Nicholas Kristoff, entitled "Where Pimps Peddle their Goods." *Id*. at 352.

- An affidavit from the National Association of Attorneys General, attaching the letters the Government has put into evidence here. *Id*. at 352, 386-426.

- An Affidavit from Staca Shehan (NCMEC). *Id*. at 352.

- Affidavits from local law enforcement officers on the Government's witness list here.

- Allegations regarding certain forms of payment, including virtual currency ("The Backpage Defendants accept Bitcoin because they know that such payments are largely untraceable and therefore attractive to traffickers and other predators."). *Id*. at 480-81.

In other words, in issuing its ruling, the Seventh Circuit was relying on a record that tracks the Government's indictment and evidence at trial in the instant case. Further, the Supreme Court denied certiorari in *Dart*, and the opinion remains good law.[2]

The current state of the record in this trial is that in 2015 there was a "credit card Armageddon" triggered by Dart. The Government wants the jury to believe that this would put Brunst on notice of an illegality even though the Court in *Dart* validated Backpage's position on allegations nearly identical to those here, and excoriated Sheriff Dart for doing what he did to ruin Backpage's business. Moreover, for evidence to be

---

[2]    In 2018, after pleading guilty and reversing his story, Ferrer was sanctioned by the District Court. This does nothing to negate **Brunst's reliance** in 2015 on the *Dart* opinion. Moreover, the Seventh Circuit recently affirmed the continuing vitality of *Dart*. *See Webber v. Armslist LLC*, 70 F.4th 945 (7th Cir. 2023) ("[I]n *Backpage.com, LLC v. Dart*, this court considered whether a county sheriff violated the First Amendment by threatening credit card companies with criminal prosecution as accomplices to illegal activity being advertised on an online forum. This court . . . not[ed] that under ordinary understandings of culpable assistance of wrongdoers, entities that know the information's content do not become liable for the poster's words. We therefore expressed doubt that the online forum could be held liable for aiding and abetting a crime just because they were aware that users had posted ads for illegal conduct. We acknowledged, however, that the CDA did not immunize the online forum from federal criminal liability.") (internal citations omitted).

11

admissible as to a defendant's state of mind, the evidence need not be "legally controlling" or provide a complete defense to the charged crime.  Dkt. 1643 at 11.  It must only tend to show the defendant's state of mind at the time of the alleged charges.  That is plainly the case as to Brunst's reliance on *Dart*, as the vast majority of the charges against Brunst occurred after the litigation was commenced.

Indeed, while trying to keep out the fact that Defendants are immunized from criminal liability under state law by Section 230, the Government has elicited testimony from prior state prosecutors that Backpage was violating their state laws.  The Court has prohibited the defense from correcting this smear campaign.  The Court has also allowed testimony regarding the Senate PSI committee hearing and report, but precluded the defense from getting into the motivations of that committee, namely to pave the way for the passage of FOSTA/SESTA, which amended the CDA.  A juror could easily be "confuse[d]" by the Government's presentation of such evidence and be misled into believing that what a State AG or Senate committee believed about Backpage is "legally controlling" here.  Dkt. 1643 at 11.  But the Court allowed such evidence in on the basis that these prior investigations were not-for-the-truth "notice" to Defendants that there were illegal ads for prostitution on the site.  The plain language of Judge Posner's opinion in *Dart* contradicts the inferences that one would draw from the Government's evidence in this regard.

### B.   Other Court Cases Guided Brunst.

Brunst also relied on other cases like *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1268 (W.D. Wash. 2012), in which Backpage successfully challenged the constitutionality of a proposed law in Washington that would criminalize the knowing publication of "explicit or implicit" offers for sex.  Here, the Government seeks to apply the Travel Act much like the Washington statute that a federal court found unconstitutional *under the First Amendment* because:

> [A] publisher who receives notice that content *might* be illegal would have no incentive to ensure that such content is *in fact* illeeal. Rather, the rational choice in such a scenario is to remove the content as quickly as possible,

1    whether or not it constitutes protected speech.

2    *Id.* at 1278 (emphasis in original).

3          This federal court opinion was monumental, and Brunst familiarized himself with it

4    at the time.  Brunst's reliance on this opinion is highly relevant, given the recent testimony

5    from state and local cops who have admitted that there is no probable cause for

6    a prostitution arrest on the face of an advertisement, *even if* (as Detective Murry and other

7    cops have testified) the advertisement has express sex for money language.  There has

8    been no trial testimony—nor could there be any testimony—that Defendants *knew* each of

9    the fifty charged ads was for illegal prostitution before the ads were published or while

10   they were live on the website.  Indeed, there has been no testimony that Brunst even saw

11   any ad on Backpage before it was published, let alone one of the fifty charged ads.  What

12   the *McKenna* court presciently observed is that the First Amendment presents a roadblock

13   to criminal liability "in a regime"—like the one the Government seeks to impose here—"in

14   which such liability is triggered only by notification or knowledge that 'illegal' content is

15   available on an actor's website."  *Id*.  Brunst relied on this language, which directly

16   undermines the inferences the Government seeks to draw from its core evidence that

17   Defendants merely were "on notice" that some ads published on the site led to prostitution

18   transactions.  *Id*. at 1279 ("[W]here an online service provider publishes advertisements

19   that employ coded language, a reasonable person could believe that facts exist that do not

20   in fact exist: an advertisement for escort services may be just that.").

21         **C.**    **Brunst's Good Faith**

22         Brunst's role was not to manage Backpage attorneys (whether in-house or outside

23   counsel).[3]  Brunst was not aware of whether counsel opined on the specific ads or wire

24   transfers charged in the indictment.  As previously noted, he is not asserting an advice of

25   counsel defense.  His level of knowledge of such advice and court opinions is generally set

26   forth above and was generally for the purpose of answering questions raised by investors,

27    

28     [3]   Brunst did regularly deal with transactional counsel on other issues.

financial institutions, and auditors.  This advice was often provided to him by Larkin and others involved in the management of Backpage.  For example:

- As Ferrer testified, Brunst was not part of Backpage's moderation efforts.  But he understood that the company had hired (1) Hemu Nigam, a former state and federal prosecutor who prosecuted sex and internet crimes, and (2) Liz McDougall, a former partner at Perkins Coie who had represented Craigslist, to oversee the company's moderation practices.

- As Ferrer testified, Brunst was not consulted on the State AG response letters.  But he understood that the company had retained Samuel Fifer, a partner at Dentons and First Amendment expert, to address the State AGs' concerns.

- During regular meetings with BMO from 2006 to 2014, Don Moon, a Backpage in-house attorney and VVMH board member, or another lawyer, was sometimes present to address questions from the banks regarding legal issues facing the company.

- Brunst also relayed such advice to financial institutions, as reflected in Exhibits 5507 and 5508 (a legal opinion letter sent to BMO in October 2010), which the Court precluded Defendants from asking Ferrer about.

Brunst's reliance on (1) the company's hiring of counsel to address legal matters facing Backpage and (2) his relaying of this advice to financial institutions in a non-privileged context tends to negate the Government's assertions that Brunst (1) knowingly entered into a conspiracy with Ferrer and others and (2) acted dishonestly and deceptively in his dealings with financial institutions.

## III.   CONCLUSION

For the foregoing reasons, Brunst seeks permission to testify in his own defense regarding his good faith, as set forth above.

1  DATED:  October 20, 2023

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

Gary S. Lincenberg
Ariel A. Neuman
Gopi K. Panchapakesan
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.


By:        */s/ Gary S. Lincenberg*
                    Gary S. Lincenberg
          Attorneys for Defendant John Brunst

BRUNST MOTION TO SEEK ADMISSION RE: STATE OF MIND TESTIMONY