UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | NO. 2:18-cr-00422-DJH |
| v. | ) | |
| | ) | Phoenix, Arizona |
| Michael Lacey, et al., | ) | October 12, 2023 |
| | ) | 1:11 p.m. |
| Defendants. | ) | |

BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL DAY 17
P.M. SESSION

Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

```
 1                    A P P E A R A N C E S

 2   For the Plaintiff:
          UNITED STATES ATTORNEY'S OFFICE
 3        By:  Kevin M. Rapp, Esq.
               Andrew C. Stone, Esq.
 4             Peter Shawn Kozinets, Esq.
               Margaret Wu Perlmeter, Esq.
 5        40 North Central Avenue, Suite 1800
          Phoenix, Arizona 85004-4408
 6

 7   For the Defendant Michael Lacey:
          LIPTSUTZ GREEN SCIME CAMBRIA, LLP
 8        By:  Paul J. Cambria, Jr. Esq.
          42 Delaware Avenue, Suite 120
 9        Buffalo, New York  14202

10   For the Defendant Andrew Padilla:
          DAVID EISENBERG, PLC
11        By:  David S. Eisenberg, Esq.
          3550 North Central Avenue, Suite 1155
12        Phoenix, Arizona 85012

13   For the Defendant Scott Spear:
          KESSLER LAW OFFICE
14        By:  Eric Walter Kessler, Esq.
          6720 North Scottsdale Road, Suite 210
15        Scottsdale, Arizona 85253
          - and -
16        FEDER LAW OFFICE, PA
          By:  Bruce S. Feder, Esq.
17        2930 East Camelback Road, Suite 160
          Phoenix, Arizona 85016
18

19   For the Defendant John Brunst:
          BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
20        By: Gary S. Lincenberg, Esq.
               Gopi K. Panchapakesan, Esq.
21        1875 Century Park E, Suite 2300
          Los Angeles, California 90067
22

23   For the Defendant Joye Vaught:
          JOY BERTRAND, ESQ, LLC
24        By:  Joy Malby Bertrand, Esq.
          P.O. Box 2734
25        Scottsdale, Arizona 85252-2734
```

UNITED STATES DISTRICT COURT

1                          *I N D E X*

2

3    **GOVERNMENT WITNESS:**                                    **PAGE**

4    Lin Howard
     Continued Direct Examination by Mr. Stone..................4
5    Cross-Examination by Mr. Cambria..........................15

6    Eric Murry
     Direct Examination by Ms. Perlmeter.......................23
7    Cross-Examination by Ms. Bertrand.........................93

8

9                          *EXHIBITS*

10   **EXHIBIT**                                              **RECEIVED**

11   NO.     DESCRIPTION

12   1971    TER Provider Profile with phone number              57
             matching ad in Exhibit 1546, USAO-BP-0037319 –
13           USAO-BP-0037320

14   1971a   Review of "Rachel" dated August 2013                57
             USAO-BP-0037317
15
     1971b   Search Result for phone number from ad in           57
16           Exhibit 1546

17   1953    TER Provider Profile with phone number matching     77
             ad for Count 30 and Count 33, USAO-BP-0037245 –
18           USAO-BP-0037246

19   1953a   Review of "Candy" dated October 2016                77
             USAO-BP-0037244
20

21   2044    PDF screenshot of the Backpage home page and        83
             attached ad DOJ-BP-0004874598 – DOJ-BP-0004874624
22

23

24

25

```
 1                      P R O C E E D I N G S
 2   (Whereupon the proceedings began at 1:11 p.m.)
 3              THE COURT:  All right, let's have -- well, we
 4   haven't called our next witness.  Let's have the jury in.
 5              All rise for the jury.
 6              (Jury in at 1:11 p.m.)
 7              THE COURT:  All right, please be seated.
 8              The record will reflect the presence of the jury;
 9   and, Mr. Stone, you may call the next witness.
10              MR. STONE:  Thank you, your Honor, and the United
11   States calls Lin Howard.
12              THE COURT:  Ma'am, please come forward and be sworn.
13              COURTROOM DEPUTY:  Please raise your right hand.
14   (Witness is sworn.)
15              COURTROOM DEPUTY:  Can you please step over to the
16   witness stand and be sure to speak into the microphone.
17                      DIRECT EXAMINATION
18   BY MR. STONE:
19   Q.   Good afternoon, ma'am.
20   A.   Hi.
21   Q.   Could you please introduce yourself to the jury?
22   A.   My name is Lin Howard.
23   Q.   Ms. Howard, where do you live?
24   A.   I live in Phoenix, Arizona.
25   Q.   How long have you lived in Phoenix, Arizona?
```

01:11p  5
01:12p 10
01:13p 15
01:13p 20
01:13p 25

1    A.   I've lived there since 1998.

2    Q.   And, ma'am, what do you do for a living?

3    A.   I work in a bank.

4    Q.   And do you work in banking?

01:13p  5    A.   Yes, in banking.

6    Q.   How long have you worked in banking?

7    A.   I've been in banking for over thirty years.  Twenty-five

8    years have been in -- I've been in bank operations and with a

9    couple of years in bank audit.

01:14p  10   Q.   All right.  You mentioned bank operations.  What's that

11   generally?

12   A.   So bank operations would be any process or activity that

13   a bank uses to service customers and to manage or control

14   transactions.  So some examples of that would be account

01:14p  15   opening, accepting deposits, issuing credit and debit cards,

16   on-line and mobile banking as well as -- as well as loans.

17   Q.   You mentioned you've been in banking for over thirty

18   years -- about thirty years?

19   A.   Yes.

01:14p  20   Q.   Educational background?

21   A.   I went back later in life to college and received a

22   bachelor's in computer information systems from DeVry

23   University in 2003.

24   Q.   And, ma'am, how old are you?

01:15p  25   A.   Sixty-five.

1  Q.    In November 2016 where did you work?

2  A.    I Worked for Arizona Bank & Trust.

3  Q.    And what was your title at Arizona Bank & Trust?

4  A.    It was Senior Vice President, Senior Operations Manager.

01:15p  5  Q.    As the Senior Vice President and Senior Operations

6  Manager what were some of your duties?

7  A.    So pretty much my duties would be -- could consist of

8  anything that would keep the bank up and running but a couple

9  of items was I ensured that the bank was compliant with

01:15p  10  regulatory -- was in compliance with regulatory laws, updated

11  policies and -- updated policies and procedures.  I performed

12  self audits.

13       Eventually I became the go-to person for bank staff with

14  regard to answering questions or solving problems and was

01:16p  15  often asked to review activity on customer accounts.

16  Q.    Okay.  And when did you start working at Arizona Bank &

17  Trust?

18  A.    In April of 2011.

19  Q.    Did you -- where did you work, from home or some

01:16p  20  location?

21  A.    No, I started out working at our Chandler office and then

22  I switched over to the office -- our Camelback office, which

23  is at 20th Street and Camelback.

24  Q.    Was that a bank branch?

01:16p  25  A.    That was a bank -- a branch, yes, correct.

1    Q.    And when you worked for Arizona Bank & Trust after you

2    moved from Chandler, you worked at this location on Camelback?

3    A.    Correct.

4    Q.    How many employees did that bank branch that was located

01:16p  5    on Camelback Avenue, how many employees worked there?

6    A.    We would typically have between 20 to 25 employees.

7    Q.    As part of your duties at Arizona Bank & Trust would you

8    ever meet with banks' customers or clients?

9    A.    It would be on occasion.  It wasn't my primary duty to

01:17p 10    meet with bank customers.

11    Q.    So you would do it, but not very often?

12    A.    Correct.

13    Q.    Under what circumstances would you meet with the bank's

14    clients?

01:17p 15    A.    I would meet with a bank client if there was a question

16    or an issue that any of the other team members couldn't

17    resolve themselves.  They would call me.

18    Q.    Did you have on occasion to meet with a bank client named

19    Michael Lacey?

01:17p 20    A.    Yes, I did.

21    Q.    Did you know if Michael Lacey was a client at Arizona

22    Bank & Trust in November 2016?

23    A.    He was a former client.

24    Q.    How about in November of 2016?

01:17p 25    A.    Pardon, I'm sorry?

```
         1   Q.   In November of 2016 was he a bank client?

         2   A.   I'm sorry.  Yes, he was a bank client.

         3   Q.   And you met with Mr. Lacey?

         4   A.   I did.

01:18p   5   Q.   Are you -- if he was in the courtroom today, would you be

         6   able to identify him?

         7   A.   I believe so.

         8   Q.   Okay.  Could you please do so?

         9   A.   It's hard for me to see.

01:18p  10   Q.   Could you stand up?

        11   A.   Mr. Lacey, he's behind in that row.  He has a dark

        12   glasses.  He's kind a behind you and has a black and white --

        13   or, excuse me, a blue-and-white checkered shirt.

        14        MR. STONE:  Your Honor, let the record reflect a

01:18p  15   positive identification.

        16        THE COURT:  It may so reflect.

        17        MR. STONE:  Thank you.

        18   BY MR. STONE:

        19   Q.   All right.  Let's focus now on the meeting that you had

01:18p  20   with Mr. Lacey, okay.  Do you know when that occurred?  Do you

        21   remember when it occurred?

        22   A.   November of 2016.

        23   Q.   All right.  And about how long did the meeting last?

        24   A.   The meeting took place -- it was approximately 30 to 45

01:18p  25   minutes in its entirety.
```

```
 1   Q.   Where did the meeting take place?

 2   A.   It was at our Camelback branch location in the front

 3   conference room.

 4   Q.   The branch where you worked?

01:19p  5   A.   Yes, correct.

 6   Q.   Who was in the meeting?

 7   A.   Mr. Lacey, myself and a co-worker named Abron Viegas,

 8   Mr. Viegas.

 9   Q.   Abron Viegas?

01:19p 10   A.   Mr. Viegas.

11   Q.   Who was Mr. Viegas?

12   A.   He was our Senior Vice president, Senior Commercial

13   Lender.

14   Q.   For Arizona Bank & Trust?

01:19p 15   A.   Yes, correct.

16   Q.   At the time was Mr. Lacey a client of the bank?

17   A.   He was at the time, yes.

18   Q.   Okay.  And what was the purpose of the meeting?  Why were

19   you meeting with him?

01:19p 20   A.   We were meeting -- Mr. Lacey wanted to open two bill pay

21   accounts, as he called them, checking accounts, and there was

22   a woman -- her first name is Jean.  I don't remember what her

23   last name was.  She lived in California, and he wanted to add

24   her as a signer on those two accounts along with him.

01:20p 25   Q.   Okay.  You mentioned a signer on the two accounts; is
```

1  that right?

2  A.   Yes.

3  Q.   What does that mean?

4  A.   It just means that it was a joint account.  She would

01:20p 5  have full rights to the accounts just as if it was him doing

6  any kind of transactions.

7  Q.   So this individual named Jean could access the account?

8  A.   Correct.

9  Q.   All right.  You remember this meeting?

01:20p 10  A.   I do.

11  Q.   All right.  You just testified that it occurred in

12  November 2016 and it lasted only 30 to 45 minutes.  Well, let

13  me ask you, did you ever meet with Mr. Lacey again or was it

14  just this one meeting?

01:20p 15  A.   I think it was just this one meeting, as I recall.

16  Q.   Okay.  One meeting 30 to 45 minutes almost seven years

17  ago.  How is it that you're able to remember the meeting?

18  A.   Because at the start of the conversation there was a

19  topic that was very unusual and something that I'd never been

01:21p 20  asked about before.  So it definitely has stuck with me.

21  Q.   You mentioned it was an unusual topic; is that right?

22  A.   Correct, yes.

23  Q.   Was it an unusual topic that Mr. Lacey brought up?

24  A.   Yes.

01:21p 25  Q.   What was it?

1    A.    So he started the conversation by asking us if we knew

2    how assets were seized and how assets were protected.  He

3    further went on to state that he had an attorney named John

4    Becker who had indicated that there were some places around

01:21p  5    the world -- and he mentioned the Cook Islands in which assets

6    were protected from seizure and then he also mentioned Nevis

7    Island.

8        He continued on by saying that he wanted to make it clear

9    that he wasn't looking to avoid paying taxes, that he had a

01:22p 10    BDO he directed to make sure that all taxes were paid and no

11    tax shelters were taken, but he was looking to see about

12    moving a percentage of his assets offshore in order to protect

13    them from government seizure.

14    Q.    All right, I want to just break that down a little bit.

01:22p 15        You mentioned that Mr. Lacey told you that he had heard

16    that there were places overseas to send money where it could

17    be protected from seizure; is that right?

18    A.    Correct.

19    Q.    And those places were -- I think you said Nevis and the

01:22p 20    Cook Islands?

21    A.    Yes, correct.

22    Q.    Do you know anything about Nevis and the Cook Island?

23    A.    I know what their reputation is.

24    Q.    What's their reputation?

01:23p 25    A.    That they're --

```
 1              MR. CAMBRIA:  Object.

 2              THE COURT:  Mr. Cambria, what was your objection?

 3              MR. CAMBRIA:  Foundation and relevance.

 4              THE COURT:  Well, sustained as to foundation and

01:23p  5    we'll continue on.

 6    BY MR. STONE:

 7    Q.   All right.  At this point 2016 you spent over 25 years in

 8    banking; is that right?

 9    A.   Correct.

01:23p 10    Q.   And it was it during the course of your time working in

11    the banking industry that you learned about the reputation for

12    Nevis and the Cook Islands?

13    A.   Yes.

14    Q.   Okay.  And what was it?

01:23p 15    A.   That they were tax havens and money laundering.

16    Q.   All right.  Mr. Lacey -- you testified Mr. Lacey told you

17    a lot of things during this meeting?

18    A.   Yes.

19    Q.   Did you -- well, let me ask you this:  How long did that

01:23p 20    part of the meeting last?

21    A.   That part of the meeting was -- was very quick.  I think

22    it was no more than five minutes.

23    Q.   Did you say anything in response?

24    A.   Yes, he was told that that was a subject matter that the

01:24p 25    bank could not assist him with.
```

UNITED STATES DISTRICT COURT

1    Q.    What happened after that initial conversation that you

2    had with Mr. Lacey?

3    A.    Because he was there originally for those two account

4    openings, I went ahead and obtained the information and

01:24p  5    signatures that I needed and left the conference room to

6    direct the front line staff to get his accounts opened; and

7    then I also recall that there was a cashier's check, I think,

8    that was prepared for him, but I don't have the details of

9    that.  That I don't remember.  I just remember a cashier's

01:24p  10    check.

11    Q.    Okay.  You mentioned the purpose of the meeting was to

12    open up these two accounts?

13    A.    Yes.

14    Q.    And is that what you helped him do --

01:24p  15    A.    Yes.

16    Q.    -- at the conclusion of this meeting?

17    A.    Yes.

18    Q.    And you testified earlier that it was unusual for a bank

19    client to talk in this manner.  Had this ever happened before

01:25p  20    during your years of banking?

21    A.    No.

22    Q.    And why did you find it unusual?

23    A.    I just was -- just was shocked by the conversation.  I'd

24    never been asked that before.  Just -- it just didn't feel

01:25p  25    right.

```
  1  Q.   You had mentioned something in your testimony about a
  2  BDO, that that was something Mr. Lacey told you, correct?
  3  A.   Yes.
  4  Q.   Do you have any idea what "BDO" is?
01:25p  5  A.   No, I don't know; but I believe he mentioned New York.
  6  Q.   And that was related to what he was telling you about not
  7  taking tax breaks or something about tax shelters; is that
  8  right?
  9  A.   Yes, that's correct.
01:25p 10  Q.   All right.  How did the meeting end?
 11  A.   The meeting just ended when I gave him the -- his
 12  cashier's check and the paperwork that he -- that he needed.
 13  Q.   Okay.  No further conversation -- you didn't have any
 14  further conversation with Mr. Lacey?
01:26p 15  A.   No.
 16  Q.   All right.  After the meeting did you do anything --
 17  well, strike that.
 18       After the meeting, did you tell anyone at the bank about
 19  it?
01:26p 20            MR. CAMBRIA:  Object.
 21            THE COURT:  What's the objection?
 22            MR. CAMBRIA:  Telling somebody after the meeting.
 23  What's the relevance of that?
 24            THE COURT:  Overruled.
01:26p 25            MR. CAMBRIA:  To review it and bolster it?
```

1            MR. STONE:  I can ask it a different way.

2   BY MR. STONE:

3   Q.   What did you do after the meeting?

4   A.   I went to my boss, the bank president, and let him know

01:26p   5   of the conversation.

6   Q.   Why?

7   A.   Because, again, I was shocked being asked that.  Have

8   never in my years in banking had anybody discuss anything like

9   that with -- with me.  I was suspicious why it was being

01:27p  10   brought up and it made me very uncomfortable and I wanted to

11   make sure my boss knew.

12   Q.   At some point after this meeting did the bank -- Arizona

13   Bank & Trust decide to end its relationship with Mr. Lacey?

14   A.   We did, yes.

01:27p  15   Q.   Why?

16   A.   We just determined that he wasn't the type of customer

17   that we wanted and we ended the relationship.

18   Q.   Okay.

19            MR. STONE:  Just a moment, Your Honor.

01:27p  20            (Counsel confer.)

21            MR. STONE:  Nothing further.

22            THE COURT:  Mr. Cambria.

23                       CROSS-EXAMINATION

24   BY MR. CAMBRIA:

01:27p  25   Q.   Afternoon.

1   A.   Good afternoon.

2   Q.   Mr. Lacey, that was the first time that you met him?

3        Was that the first time you met him?

4   A.   I believe so, yes, sir.

01:27p  5   Q.   Okay.  And, first of all, he made it clear to you that

6   he --

7             MR. CAMBRIA:  What am I doing here?

8             THE COURT:  It's interference -- yes.

9             MR. CAMBRIA:  All right, hand signals.

01:28p  10  BY MR. CAMBRIA:

11  Q.   This was the first time that you met him, correct?

12  A.   Yes.

13  Q.   All right.  And he indicated to you that he had an

14  attorney, Mr. Becker?

01:28p  15  A.   Yes.

16  Q.   All right.  And what he asked was:  Was there a way for

17  him to protect his assets from seizure, correct?

18  A.   Yes.

19  Q.   All right.  And he didn't say that he was trying to

01:28p  20  conceal his assets, did he?

21  A.   No.

22  Q.   Pardon?

23  A.   No.

24  Q.   "No."  And so next he said to you that he wasn't in any

01:28p  25  way trying to avoid paying taxes on these assets, correct?

1    A.    Correct.

2    Q.    And so in order to pay taxes on assets, you would have to

3    reveal those assets or disclose those assets so you could pay

4    taxes on them, correct?

01:29p  5    A.    I would think.

6    Q.    Well --

7    A.    Possibly, yes.

8    Q.    Yeah, okay.  You would agree with me, would you not, that

9    someone can have an investment outside of the United States

01:29p 10    and it is legal to do so, correct?

11    A.    It can be and it cannot be.

12    Q.    I'm sorry?

13    A.    It can be both ways.

14    Q.    Okay.  But it can be legal, correct?

01:29p 15    A.    I don't have enough information but, yes, it can be.

16    Q.    Okay.  Well, you have the information enough to know that

17    there is a way to do it legally and, of course, there's always

18    a way to do something illegally; would you agree with that?

19    A.    Both ways, yes.

01:29p 20    Q.    All right.  So now are you familiar with the procedure

21    for having a legal investment offshore?

22    A.    No.

23    Q.    How long you say you've been in banking?

24    A.    I've been in banking over thirty years.

01:30p 25    Q.    Thirty years.  Have you ever heard of an FBAR?

1          MR. STONE:  Object to the foundation.

2          THE COURT:  Overruled.

3   BY MR. CAMBRIA:

4   Q.   Have you ever heard of an FBAR?

01:30p  5   A.   No.

6   Q.   Well, with regard to -- let's assume I wanted to open up

7   an account in Canada.  I would have to file documentation,

8   would I not, with United States authorities?

9   A.   I don't know.  I've never dealt with -- our bank was

01:30p  10  local.  I haven't dealt with international.

11  Q.   Well, how could you make a judgment, then, as to whether

12  or not having an offshore account would be legal or not legal?

13  A.   I'm just conveying the conversation.

14  Q.   So you're not -- you don't have the knowledge necessary

01:30p  15  to make that judgment; is that what you're saying?

16  A.   There's different -- there's different circumstances.  I

17  don't -- I don't know.

18  Q.   All right.  Well, have you ever heard of the fact that if

19  somebody has an account outside the United States, they file a

01:31p  20  form with the Department of Treasury called an FBAR, foreign

21  banking -- I forget the acronym here.

22         THE COURT:  You remembered the acronym, just forgot

23  the --

24         MR. CAMBRIA:  Foreign bank account report.

01:31p  25         MR. STONE:  Objection, asked and answered.

```
 1              THE COURT:  Sustained.
 2  BY MR. CAMBRIA:
 3  Q.   You've never heard of a foreign bank account report?
 4              MR. STONE:  Same objection.
 5              THE COURT:  Sustained.
 6              MR. CAMBRIA:  Okay.
 7  BY MR. CAMBRIA:
 8  Q.   Now, did you know that day that he was in your bank was
 9  there any sort of hold on his money, government lien,
10  judgment, anything like that?
11  A.   Not that I recall.
12  Q.   All right.  And so he was, as far as you knew, free to do
13  whatever he needed to do with his money, correct?
14  A.   As far as I know.
15  Q.   All right.  And he never said to you, "Hi, I just met you
16  today for the first time.  Can you tell me how to commit a
17  crime?"  He didn't do that, did he?
18  A.   Those words were not used.
19  Q.   No.  All he said was:  Here's my situation.  I have
20  assets and I'd like to protect those assets from government
21  seizure; and he asked you and you couldn't give him an answer,
22  correct?
23  A.   Correct.
24  Q.   All right.  And, however, after that meeting was over,
25  you closed his accounts, correct?
```

01:31p (line 5)
01:31p (line 10)
01:32p (line 15)
01:32p (line 20)
01:32p (line 25)

LIN HOWARD - CROSS-EXAMINATION BY MR. CAMBRIA                    20

1    A.    Yes.

2    Q.    And you closed his lawyer's account also, didn't you,

3    Becker?

4    A.    Yes.

01:32p    5    Q.    Mr. Becker wasn't even there, was he?

6    A.    No, he was not.

7    Q.    All right.  So the bank decided we're just gonna close

8    his account, a person that wasn't there and you never talked

9    to, correct?

01:32p    10    A.    Correct.

11    Q.    All right.  So, now, you do -- from your background in

12    banking, you do agree, do you not, that if the correct

13    procedure is filed, that a person can have an account that's

14    not located in the United States; you agree with that?

01:33p    15    A.    There are other circumstances that go -- go along with

16    that.  There's more to it, such as source of funds and other

17    things.

18    Q.    But all I'm saying to you is:  You do agree there is such

19    a procedure and that kind of account can be legally

01:33p    20    accomplished, correct?

21    A.    There are some accounts that can be, yes.

22    Q.    If the rules are followed, correct?

23    A.    Yes.

24    Q.    Right.  Did the Government ever show you what we've

01:33p    25    identified here as Exhibit 1, an e-mail trail by Mr. Lacey

1  with his attorneys involving this account that they're talking

2  about?

3  A.    No.

4  Q.    No.   Did they ever inform you or in any way advise you

01:34p  5  that they have in their possession written documentation from

6  Mr. Lacey telling his attorneys to file all appropriate

7  documents with regard to his accounts?

8           MR. STONE:  Objection.

9           MR. CAMBRIA:  Did they tell you that?

01:34p  10           MR. STONE:  Objection, foundation.  He's testifying.

11           THE COURT:  Sustained.

12           MR. CAMBRIA:  I asked her if they told her that.

13           What foundation do I need for that, Your Honor?

14           Was she told that?

01:34p  15           THE COURT:  I sustained the objection.

16           MR. CAMBRIA:  All right.

17           THE COURT:  Don't argue with me, Mr. Cambria.

18           MR. CAMBRIA:  I'm sorry?

19           THE COURT:  Don't argue -- let's not get in a back

01:34p  20  and forth, okay?

21           MR. CAMBRIA:  No, I understand who the boss is here,

22  believe he.

23  BY MR. CAMBRIA:

24  Q.    All right.  So at no time did they disclose all the

01:34p  25  paperwork that they have with regard to Mr. Lacey's accounts?

1        MR. STONE:  Same objection.

2        THE COURT:  Sustained.

3  BY MR. CAMBRIA:

4  Q.   Have they provided you with any information as to what he

01:35p  5  did regarding reporting or not reporting to the Department of

6  the Treasury every account that he had outside the United

7  States?

8        MR. STONE:  Same objection.

9        THE COURT:  Sustained.

01:35p 10  BY MR. CAMBRIA:

11  Q.   In any event, do we agree that at no time did he ask you

12  to help him conceal anything, correct?

13  A.   Correct.

14  Q.   That's it, thank you.

01:35p 15        THE COURT:  Thank you.

16        Ms. Bertrand?

17        MS. BERTRAND:  Nothing on behalf of Ms. Vaught.

18        THE COURT:  Mr. Lincenberg?

19        MR. LINCENBERG:  No.

01:35p 20        THE COURT:  Mr. Feder?

21        MR. FEDER:  No, thanks.

22        THE COURT:  Mr. Eisenberg?

23        MR. EISENBERG:  No, Your Honor, thank you.

24        THE COURT:  Is the --

01:35p 25        MR. STONE:  No redirect.  No redirect, Your Honor.

1          THE COURT:  All right.  And may the witness be

2     released from the subpoena?

3          MR. STONE:  Yes, your Honor.

4          THE COURT:  All right.  No objection by the defense?

01:36p    5          MR. CAMBRIA:  No, Your Honor.

6          THE COURT:  All right.  Ma'am, thank you for your

7     testimony.  You may step down and you are free to go.

8          THE WITNESS:  Thank you.

9          THE COURT:  All right, the Government may call its

01:36p   10     next witness.

11          MS. PERLMETER:  The United States calls Detective

12     Eric Murray.

13          COURTROOM DEPUTY:  Please raise your right hand.

14     *(Witness is sworn.)*

01:36p   15          COURTROOM DEPUTY:  Thank you.  Please step over to

16     the witness stand and be sure to speak into the microphone.

17          THE WITNESS:  Certainly.

18          MS. PERLMETER:  May I begin?

19          THE COURT:  Yes.

01:36p   20                    DIRECT EXAMINATION

21     BY MS. PERLMETER:

22     Q.   Good afternoon, detective.  Could you please introduce

23     yourself to the jury and spell your first and last name.

24     A.   Certainly.  Good afternoon, everyone.  My name is

01:37p   25     Detective Eric Murray.  First name is E-r-i-c.  Last name is

ERIC MURRY - DIRECT EXAMINATION BY MS. PERLMETER          24

```
      1   M-u-r-r-y.
      2   Q.   Where do you work, detective?
      3   A.   I'm a detective with the Phoenix Police Department.
      4   Q.   And do you live here in the valley?
01:37p 5   A.   Yes, I do.
      6   Q.   Let's go through your history with the Phoenix Police
      7   Department.  Can you tell us when you joined and walk us
      8   through the different units you have served in through the
      9   years.
01:37p 10  A.   Certainly.  I got hired on with the police department in
      11   December of 1996.  I went to about a four-month police academy
      12   at which time I was assigned to a patrol unit responding to
      13   just regular calls for service.  Five years later I tested for
      14   a position with the Vice Enforcement Unit, and I've been there
01:38p 15  ever since?
      16   Q.   Okay.  So have you been a detective in the Vice Unit
      17   since roughly about 2002?
      18   A.   Yes, ma'am.
      19   Q.   And how old are you, detective?
01:38p 20  A.   I'm 49.
      21   Q.   Let's talk about your service in the Vice Unit.  What is
      22   the primary function of the Vice Unit?
      23   A.   We primarily deal with any prostitution-related crimes.
      24   Q.   Are you a member of any task forces?
01:38p 25  A.   I am.
```

1    Q.    And what is this?

2    A.    I'm a member of the FBI Human Trafficking Task Force.

3    Q.    And what is a "task force"?

4    A.    Task force is basically just a coordination between,

01:38p  5    like, local and federal police officers.  Just kind of joining

6    forces to act as, like, a force multiplier having more assets

7    available for -- for both sides.  We assist the FBI and the

8    FBI assists us.

9    Q.    And is it fair to assume you have received training on

01:39p 10   how to be a law enforcement officer?

11   A.    Yes, ma'am.

12   Q.    Now, I don't -- can you just briefly summarize the

13   training that you have received?

14   A.    Certainly.  During the police academy, of course, you

01:39p 15   learn how to perform the role of basic police investigations,

16   interviewing witnesses, interviewing suspects, accurately

17   writing reports, things like that.  Then once I got to the

18   Vice Enforcement Unit I received probably additional training

19   at that point.

01:39p 20   Q.    Okay.  So you've received some training specific on how

21   to conduct vice-related investigations?

22   A.    Yes, ma'am.

23   Q.    Okay.  In your capacity as a detective, do you work in an

24   undercover capacity?

01:39p 25   A.    I do.

```
 1   Q.   What does that mean to work undercover?

 2   A.   Basically, we just try to conceal our identity as police

 3   officers.  Just act like a normal person would act when we're

 4   in an undercover capacity.

 5   Q.   So does that mean you're wearing not your police uniform,

 6   not driving your police vehicle?

 7   A.   Correct.  So it would be a plainclothes position.

 8   Q.   Is that something that you commonly do in the Vice Unit?

 9   A.   Yes, it is.

10   Q.   Are you familiar with a website called Backpage.com?

11   A.   Yes, I am.

12   Q.   And are you aware that it went off line in roughly 2018?

13   A.   Yes.

14   Q.   Okay.  Prior to that, what was Backpage like or what was

15   it about?

16   A.   I use Back --

17            MS. BERTRAND:  Objection, vague and as to time.

18            THE COURT:  Sustained.  Maybe lay some more

19   foundation, Ms. Perlmeter.

20            MS. PERLMETER:  Okay.

21   BY MS. PERLMETER:

22   Q.   In your work as a vice detective did you encounter the

23   website Backpage.com?

24   A.   Yes, I did.

25   Q.   And in what period of years or time can -- or how long
```

Timestamps in left margin: 01:40p at lines 5, 10, 15, 20, 25.

1   was Backpage part of your work as a police officer?

2   A.   I would say roughly, maybe, 2013 through about 2018.

3   Q.   Was there an event in your career that caused you -- or

4   was there, like, something that happened in investigations

01:41p  5   that caused you to use Backpage in working your cases?

6   A.   Well, things kind of moved on-line, I would say, at some

7   point.

8          MR. CAMBRIA:  Object, Your Honor.  It's a "yes" or

9   "no" answer.

01:41p 10          THE COURT:  Well, technically that is correct.  So

11   he can answer "yes" or "no."

12          THE WITNESS:  Yes.

13   BY MS. PERLMETER:

14   Q.   And what was that?

01:41p 15   A.   A lot of advertisements moved on-line.  When I very first

16   got to the Vice Unit the Internet wasn't so prolific, and we

17   would have to go to, you know, almost like little -- I'll say

18   other sources for obtaining escort ads; and then once the

19   Internet kinda got going there were a couple websites that

01:42p 20   used kinda, like, on-line classifieds, basically, and there

21   were escorts on there.  So it was kind of a central location

22   where we would go to find advertisements for escorts.

23   Q.   Okay.  Was there another website that you used in

24   investigations prior to Backpage?

01:42p 25   A.   There was a website called Craigslist that we used often.

```
 1   Q.   At some point did your investigations move away from

 2   Craigslist and go to Backpage?

 3             MS. BERTRAND:  Objection, leading.

 4             THE COURT:  Sustained.

 5   BY MS. PERLMETER:

 6   Q.   Was there a point in time when your investigations

 7   relating to Craigslist stopped?

 8   A.   Yes.

 9             MS. BERTRAND:  Objection, leading.

10             THE COURT:  Sustained.

11   BY MS. PERLMETER:

12   Q.   Did you investigate crimes on Craigslist for a period of

13   time?

14   A.   Yes, I did.

15   Q.   And did you continue to do so throughout your career in

16   law enforcement?

17   A.   No, ma'am.

18   Q.   Okay.  And what happened?

19   A.   There was a period of time when Craigslist stopped access

20   to their escort section or adult section.

21   Q.   And after that happened, where did your investigations

22   turn to?

23   A.   Primarily Backpage.

24   Q.   Okay.  And what types of investigations are we talking

25   about when we're talking about your work including involving
```

01:42p (line 5)
01:42p (line 10)
01:43p (line 15)
01:43p (line 20)
01:43p (line 25)

1  Backpage?

2  A.   Well, primarily I would use Backpage for investigations

3  that would involve, like, escorts.  We would do sometimes

4  hotel operations where we would call females out to our hotel

01:43p 5  to see if they were acting as prostitutes and we have female

6  detectives that would place ads on --

7  Q.   So I don't mean to cut you off.  Let me redirect you.

8       Were you using the website primarily for

9  prostitution-related investigations?

01:44p 10 A.   Oh, yes, ma'am.

11            MS. BERTRAND:  Leading.

12            THE COURT:  Overruled.

13 BY MS. PERLMETER:

14 Q.   And was there a particular section on Backpage that you

01:44p 15 would focus your investigations on?

16 A.   They had an adult section.

17 Q.   Okay.  Have you had an opportunity to look at ads on the

18 adult section of Backpage since Craigslist -- since you

19 stopped using Craigslist until the website went down in 2018?

01:44p 20 A.   Yes, ma'am.

21            MS. BERTRAND:  Objection, compound question.

22            THE COURT:  Overruled.

23            THE WITNESS:  Yes, ma'am.

24 BY MS. PERLMETER:

01:44p 25 Q.   Can you tell us how many ads you may have observed or

1   looked at in the adult escort section over the years?

2   A.   That would be very difficult to put a number on.  I would

3   say a lot.  There were -- there were lots of ads on-line.

4   Q.   In your capacity as an officer, how were you able to tell

01:44p  5   when an ad in the escort section could be for prostitution?

6        MS. BERTRAND:  Objection, speculation.

7        THE COURT:  Overruled.

8        THE WITNESS:  I would say that primarily it would be

9   the section of Backpage that it was placed under.  If it was

01:45p 10  in, like, the escort section, then I would assume that would

11  be an advertisement for prostitution.

12  BY MS. PERLMETER:

13  Q.   Are there other factors?

14  A.   There are.

01:45p 15  Q.   And what are they?

16  A.   I would say, like, the wording of the ad, the --

17  sometimes they use emojis that would indicate that there would

18  be some sort of sex involved, things like that.

19  Q.   Can you give an example of an emoji that you believe

01:45p 20  suggests sex?

21  A.   Well, sometimes they would use the -- it's like little

22  water droplets, almost like a squirting emoji.  I would take

23  that to mean that it was, like, ejaculation.  Sometimes they

24  would use like a ying yang symbol, indicating like a 69 sexual

01:46p 25  position.  Fruit emojis, things like that.

1  Q.   How about the photos, would you consider the photos at

2  all in your evaluation on whether an ad could be an ad for

3  prostitution?

4  A.   Absolutely.

01:46p  5  Q.   And why was that?

6  A.   Sometimes they would be posing quite provocatively,

7  wearing lingerie or just posing provocatively.

8  Q.   You had mentioned that you also considered the words of

9  the ad.  What are certain words that you have seen throughout

01:46p  10  your time as a detective that would suggest that an ad is for

11  prostitution?

12  A.   Well, sometimes they would use kind of like industry

13  terms or abbreviations for sex acts.  Sometimes they would say

14  that their ads are reviewed, which means that they've kind

01:46p  15  have had other customers.  So those would kind of indicate to

16  me that it was prostitution related.

17  Q.   What are some examples of the industry terms for

18  prostitution?

19  A.   Well, GFE, which stands for girlfriend experience; and

01:47p  20  sometimes they would use other abbreviations like BBBJ, which

21  would be a bareback blow job, which is oral sex on a male

22  without a condom.  Sometimes they would put in, like, sexual

23  positions, CG, things like that, for cowgirl.

24  Q.   Have you seen references that are for money without

01:47p  25  actually saying an explicit dollar amount?

 1          MR. EISENBERG:  Objection, leading.

 2          THE COURT:  Sustained.

 3   BY MS. PERLMETER:

 4   Q.   How was -- how was money conveyed in the context of a

01:47p  5   Backpage ad on the adult or escort section?

 6          MR. EISENBERG:  Objection, leading.

 7          THE COURT:  Overruled.

 8          THE WITNESS:  Sometimes the person posting the

 9   advertisement would say things like a donation or roses or

01:48p 10   hearts or anything similar to that would indicate that it's --

11   that it's money that they're asking for.

12   BY MS. PERLMETER:

13   Q.   Well, based on your training and experience, detective,

14   in relation to the website Backpage.com, what did the term

01:48p 15   "escort" mean to you?

16          MS. BERTRAND:  Objection --

17          MR. EISENBERG:  Object, relevance.

18          MS. BERTRAND:  -- speculation.

19          THE COURT:  Overruled.  It's based on his experience

01:48p 20   and training since -- I think he said he started in Vice in

21   2002 so he may answer.

22          THE WITNESS:  In the terms of Backpage it would mean

23   prostitution.

24   BY MS. PERLMETER:

01:48p 25   Q.   So let me shift a little bit.  Let's go back to what you

1    were starting to tell us about, some of the operations that

2    you and your unit conducted when investigating prostitution

3    offenses.

4              MS. BERTRAND:  Objection, relevance as to "other

01:48p  5    investigations."

6              MS. PERLMETER:  I haven't asked the question yet.  I

7    was directing the witness that I was changing topics.

8              THE COURT:  It is a fair point and she can give him

9    that heads up, so I'll overall the objection.

01:49p 10              MR. CAMBRIA:  And 404(b), Your Honor.

11              THE COURT:  Overruled.

12              Ms. Perlmeter.

13    BY MS. PERLMETER:

14    Q.   Can you give us examples of investigations that you

01:49p 15    participated in involving Backpage?

16    A.   Certainly.

17              MR. CAMBRIA:  404(b), Your Honor.

18              MS. BERTRAND:  And vague as to "involving Backpage."

19              THE COURT:  Well, I'll sustain the objection as to

01:49p 20    vagueness.  Overrule as to Mr. Cambria's objection.  So you

21    can restate it.

22              MS. PERLMETER:  Sure.

23              THE COURT:  A new question, Ms. Perlmeter.

24    BY MS. PERLMETER:

01:49p 25    Q.   Detective, did you conduct hotel operations involving

UNITED STATES DISTRICT COURT

1    Backpage.com?

2    A.    Yes, I did.

3    Q.    Tell us about that.

4    A.    Well, my specific role would typically be to search

01:50p  5    Backpage and find girls that were advertising in the Phoenix

6    area, and I would call or text them to see if they were

7    available to come out to my hotel.

8         We also had female detectives who would sometimes post

9    advertisements in an undercover capacity advertising their

01:50p 10    services to try to do john -- like john enforcement, which is

11    the customer of a prostitute.  So they would do john

12    enforcement waiting for the customer to call them, and then

13    they would direct them to our hotel.

14    Q.    Okay, so let's break that down a bit.  So you said that

01:50p 15    you would call girls that -- whose ads you saw on Backpage?

16    A.    Right.  Call or text them, yes.

17    Q.    And then you would try to set up a -- what would you try

18    to do with them, set up a meeting or something else?

19    A.    Yes.  I would see if they're available tonight and see if

01:50p 20    they were available to come out to my hotel, and then I would

21    just give them the address to the hotel and wait for them to

22    show up.

23    Q.    And is this you working in an undercover capacity posing

24    as a john?

01:51p 25    A.    Yes, ma'am.

1    Q.   In what section of Backpage are you choosing to call --

2    what section of Backpage are you looking at when you decide

3    which girls you want to call?

4    A.   I would generally look in the escort section.

01:51p  5    Q.   And what would happen?  You make arrangements to meet

6    with a girl at your hotel --

7              MR. EISENBERG:  Objection, Your Honor --

8              MS. PERLMETER:  -- and then what happens next?

9              MR. EISENBERG:  Excuse me, ma'am.

01:51p 10              Objection, it's leading.

11              MS. BERTRAND:  Also objection to the use of the term

12    "girl."

13              THE COURT:  Well, overruled as to that.

14              Sustained as to Mr. Eisenberg's.  You started asking

01:51p 15    a question what would happen, and then you stated the leading

16    phrase.

17    BY MS. PERLMETER:

18    Q.   What would happen after you contacted -- I want to use

19    the words that you used.  You had testified that you would

01:51p 20    call girls so I want to use your words.

21         So what would happen after you called girls who had

22    posted on Backpage?

23    A.   She would come out to the hotel room where I directed

24    them to and I'd invite them in, and we'd have a conversation

01:52p 25    at which point I would attempt to arrange a prostitution

1   agreement with them.

2   Q.   Okay.  And then the second thing you mention is that your

3   unit would also create ads on Backpage -- undercover ads on

4   Backpage?

01:52p  5   A.   Yes.

6   Q.   Okay.  Were those created by your colleagues, your female

7   colleagues?

8   A.   Yes, ma'am.

9   Q.   And did you have an opportunity to see them?

01:52p  10  A.   I have seen them, yes.

11  Q.   Okay.  How are those ads -- how are the undercover ads --

12  how do they look in comparison to ads that were posted in the

13  escort section?

14  A.   They look very similar.  I know from -- from talking to

01:52p  15  them that they've told me that they have tried to --

16          MS. BERTRAND:  Objection, hearsay.

17          THE COURT:  Sustained.

18  BY MS. PERLMETER:

19  Q.   Operationally, what was the strategy that the Vice Unit

01:53p  20  employed in creating these undercover ads?

21          MS. BERTRAND:  Objection, vague as to "strategy."

22          THE COURT:  Well, I guess we can have Ms. Perlmeter

23  define what she means by "strategy."

24  BY MS. PERLMETER:

01:53p  25  Q.   How did you and your colleagues decide how an undercover

1    ad would look that you wanted to post on Backpage or that your

2    unit wanted to post on Backpage?

3    A.    They tried to mimic other advertisements that were on

4    Backpage to make them look similar.

01:53p  5    Q.    So was it, like, a copy and paste?

6    A.    It wasn't a copy and paste, no, but they would just make

7    them try to look similar.

8    Q.    Why would -- why did your unit want the undercover ads to

9    look similar to other ads in the adult escort section on

01:53p  10   Backpage?

11   A.    Well, again, because the female detectives are working in

12   if an undercover capacity.  So they're trying to mimic the --

13   the other escorts on there and not try to look like a -- like

14   a law enforcement ad.

01:53p  15   Q.    So when the female detectives would post advertisements,

16   are they posing as the prostitute themselves?

17   A.    Yes.

18   Q.    And where would this undercover ad -- in what section

19   would it be posted?

01:54p  20   A.    They would generally post it in the escort section.

21   Q.    And when in time would the detectives post the undercover

22   ad?

23   A.    Well, if we know in advance that there is an upcoming

24   hotel operation, they would often try to post ads immediately

01:54p  25   for, like, a future date.

ERIC MURRY - DIRECT EXAMINATION BY MS. PERLMETER          38

1    So, in other words, if we know in a month from now that

2    there's a hotel operation coming up, oftentimes they try to

3    post ads like right then and maybe subsequent ads leading up

4    to that hotel operation just to -- just to make it look --

01:54p  5    give it a little bit more legitimacy if someone were to search

6    for that ad, that it wouldn't be the very first time that that

7    ad was posted.  There was a little bit of history.

8    Sometimes they would post it in other states just to make

9    it look like the girl was traveling just in case someone were

01:55p 10    to search for that ad.

11    Q.   Okay.  And is this to make it -- to minimize the fact the

12    ad was a law enforcement ad?

13    A.   Yes.

14    Q.   So for the -- and so how would you assist your female

01:55p 15    colleagues when they would post an undercover ad and receive

16    responses?

17    A.   My role typically would be to kind of listen in on the

18    conversation and provide officer safety.  Be ready to react in

19    case things didn't go smoothly in the room with the female

01:55p 20    detective.

21    Q.   Okay.  So in your experience, the johns that appeared to

22    meet with the female detectives posing as prostitutes, what

23    were they seeking?

24    A.   Some sort of sex or oral sex.

01:55p 25    Q.   In relation to your investigations related to Backpage,

what were the individuals involved in the postings trying to

convey?  Like what were they trying to sell and purchase?

A.   I'm sorry, are you talking about our undercover

detectives?

01:56p   Q.   Yes.

A.   Yes, they were trying to -- to advertise sexual services.

Q.   And is that -- the responses that the department received

in response to those ads, were they consistent with what you

guys were trying to sell?

01:56p   A.   Yes.

MR. EISENBERG:  Objection.  It's open ended, broad

based.

THE COURT:  Well, I thought you were going to say

asked and answered and I was going to sustain.

01:56p   MR. EISENBERG:  Asked and answered.

THE COURT:  Okay, sustained.

MR. CAMBRIA:  Asked and answered.

MS. BERTRAND:  Join the Court in its objection.

THE COURT:  Sustained.

01:56p   BY MS. PERLMETER:

Q.   Detective, did you ever serve subpoenas or search

warrants on Backpage for records related to your prostitution

investigations?

A.   Yes, I did.

01:56p   Q.   And did Backpage comply and provide you with records

```
 1  requested?
 2  A.   They did.
 3  Q.   In doing so, did you consider Backpage to be a law
 4  enforcement partner?
 5  A.   No, I would not consider them a law enforcement partner.
 6  Q.   How come?
 7  A.   Because the services that were being advertised on their
 8  website were illegal services.
 9  Q.   In your law enforcement experience have you come across
10  individuals who make a living by selling others for sex?
11            MR. EISENBERG:  Objection --
12            MS. BERTRAND:  Objection.
13            MR. EISENBERG:  -- relevance.
14            THE COURT:  Sustained.
15  BY MS. PERLMETER:
16  Q.   Are you familiar with the term "pimp"?
17            MS. BERTRAND:  Objection, relevance.
18            THE COURT:  Overruled.
19            THE WITNESS:  Yes, ma'am.
20  BY MS. PERLMETER:
21  Q.   And what is a pimp?
22  A.   The pimp is someone that prostitutes, typically other
23  women, is in charge of them and generally collect their money.
24  Q.   I'm sorry, could you speak into the microphone.  I didn't
25  hear you, and I think someone coughed behind me so. . .
```

01:57p 5
01:57p 10
01:57p 15
01:57p 20
01:57p 25

```
 1   A.   Certainly.  It's basically someone that is -- that is in
 2   charge of prostituting generally women, collecting their
 3   money, things like that.
 4   Q.   And what is a john?
 5   A.   The john is the customer of a prostitute.
 6   Q.   And then there would also be girls who could be serving
 7   as prostitutes for the pimp?
 8             MS. BERTRAND:  Objection to the use of the term
 9   "girls."
10             THE COURT:  Overruled.
11             THE WITNESS:  Yes, ma'am.
12             MS. PERLMETER:  I'm sorry?
13             THE WITNESS:  Yes, ma'am.
14   BY MS. PERLMETER:
15   Q.   And are you familiar with the term "bottom"?
16   A.   Yes.
17   Q.   What is a "bottom" in prostitution context?
18   A.   Well, in the -- sort of say the hierarchy of prostitution
19   there's the pimp, who's at the top, and then there's what's
20   called the bottom, and then there's all the other females.
21        So the bottom is generally the one that has oftentimes
22   been with the pimp for the longest amount of time, the most
23   trusted.
24             MS. BERTRAND:  I'm going to object to this line of
25   questions and answers.  It has nothing to do with any of the
```

01:58p  5
01:58p 10
01:58p 15
01:58p 20
01:59p 25

UNITED STATES DISTRICT COURT

```
 1   charges set forth in the indictment.
 2            THE COURT:  Overruled.
 3   BY MS. PERLMETER:
 4   Q.   And in your investigations have you seen these different
 5   roles being carried out in prostitution-related businesses?
 6            MR. EISENBERG:  I'll object, Your Honor, as to the
 7   relevance of this with respect to this case.
 8            THE COURT:  Overruled.
 9            THE WITNESS:  Yes, I have seen that.
10   BY MS. PERLMETER:
11   Q.   And what does Backpage -- how does Backpage play a part
12   in these prostitution businesses?
13   A.   Well, it gives them a place to advertise the prostitution
14   services.
15   Q.   All right.  I'm going to switch gears and I want to ask
16   you some questions about The Erotic Review.
17        Are you familiar with the website The Erotic Review?
18   A.   Yes, I am.
19   Q.   What is it?
20   A.   The Erotic Review is like a -- like an on-line review
21   site for -- for escorts or prostitutes where customers would
22   go to the website and they would post reviews of the girls
23   talking about their interaction that they had with the girl.
24   Q.   Okay.  Do you mean the men would post about the
25   interaction they had with the girl?
```

01:59p  5
01:59p 10
01:59p 15
01:59p 20
02:00p 25

         1   A.   Yes.

         2   Q.   Okay.  Have you observed the presence of The Erotic

         3   Review on Backpage ads in the escort section?

         4   A.   Yes, I have.

02:00p   5   Q.   Can you explain how you have observed TER or The Erotic

         6   Review on ads in the escort section?

         7   A.   I've seen ads that will straight up say, "See my review

         8   on TER."  Sometimes they'll just use words like "well

         9   reviewed," which to me would mean that they have reviews on

02:00p  10   TER 'cuz that was pretty much the main escort review website.

        11   Q.   Have you been on -- in doing your investigations, have

        12   you had a chance to go on The Erotic Review website yourself

        13   and observe it?

        14   A.   Yes, I have.

02:01p  15   Q.   What does it look like?

        16        MS. BERTRAND:  Objection, relevance and hearsay and

        17   lack of foundation.

        18        THE COURT:  Well --

        19        MS. BERTRAND:  And vague.

02:01p  20        THE COURT:  -- I think she's laid sufficient

        21   foundation.  So I'm going to overrule the objection as to that

        22   and as to vagueness.

        23        MS. BERTRAND:  Relevance.

        24        THE COURT:  He may answer.

02:01p  25        Overruled as to hearsay, I'm sorry.

1           THE WITNESS:  I'm sorry.

2           MS. PERLMETER:  You can answer.

3           THE COURT:  The question, sir, was what does it look

4    like?

02:01p   5           THE WITNESS:  It was a website where there were

6    various, like, drop down boxes and people could go to this

7    website and put in whatever location they're looking for, what

8    type of individual they're looking for as far as, like, age or

9    body type or they could even put in sexual services to see

02:02p  10   which providers were providing specific sexual services.

11   BY MS. PERLMETER:

12   Q.   Did you use The Erotic Review to assist you in your

13   prostitution-related investigations?

14   A.   Yes.

02:02p  15   Q.   What time frame?  When did you do that?

16   A.   I would say probably from about 20 -- 2013, maybe, until

17   -- until about 2018 probably.

18   Q.   Okay.  So from 2013 until 2018, which is when the website

19   went off-line.

02:02p  20          So why would you use The Erotic Review --

21          THE COURT:  Is that a question?

22          MS. PERLMETER:  -- in your investigations?

23          THE COURT:  I'm sorry, was that a question?

24          You sort of said something and then you --

02:02p  25          MS. PERLMETER:  Yeah.

BY MS. PERLMETER:

Q.   So just to confirm, the time frame in which you used The Erotic Review for your investigations was 2013 to 2018?

A.   Yes, approximately.

02:03p   Q.   And why would you use The Erotic Review?

A.   I would use it as -- as a resource for me.  If I were going to be, let's say, calling out a female to my hotel room or if I was going into a massage parlor, say, I would search the phone number generally in the advertisement that I was

02:03p   contacting to see if they had some reviews posted on there; and the people that were posting the reviews would sometimes put in the details section -- they would talk about how -- how the female operated.  You know, they would talk about things like --

02:03p          MS. BERTRAND:  Objection.  Hearsay, relevance.

          THE COURT:  Sustained.

          You can ask another question, Ms. Perlmeter.

BY MS. PERLMETER:

Q.   So did the information that you received from The Erotic

02:04p   Review about the female you were interested in meeting help you with how you wanted to operationally plan your case?

A.   Yes, sometimes it did.

Q.   Okay.  And why did it do -- why was it helpful?

A.   It would just give an indication of how the -- the female

02:04p   was operating.

1    Q.    And would you operationally choose to engage in certain

2    tactics based on the information you viewed?

3    A.    Yes.

4    Q.    Are you familiar with the term "cop check" or "law

02:04p  5    enforcement check"?

6    A.    Yes.

7    Q.    What does that mean?

8    A.    Basically, that's just a screening process that the

9    prostitute would use to try to determine if you're a police

02:04p 10   officer by like -- sometimes they would come in and give you a

11   hug and just kind of feel around to see if you have any

12   weapons or recording devices.

13          MS. BERTRAND:   Your Honor, objection as to the

14   relevance to this case.

02:05p 15          THE COURT:   Sustained.

16          MS. BERTRAND:   Move to strike.

17   BY MS. PERLMETER:

18   Q.    Did you see references to --

19          THE COURT:   And the answer may be stricken and the

02:05p 20   jury will disregard.

21   BY MS. PERLMETER:

22   Q.    Did you see references to "cop checks" in The Erotic

23   Review related to Backpage ads that you were looking at in

24   investigations?

02:05p 25   A.    Yes.

1          MS. BERTRAND:  Objection, same objection.

2          THE COURT:  Overruled.

3   BY MS. PERLMETER:

4   Q.   Have you also posed as a john and written reviews on The

02:05p  5   Erotic Review for -- for a prostitute?

6          MR. EISENBERG:  Objection, relevance.

7          THE COURT:  Overruled.

8          THE WITNESS:  I have posted a review for one of my

9   female colleagues.

02:05p 10   BY MS. PERLMETER:

11   Q.   Yeah, so was it a female colleague who was posing as a

12   prostitute?

13   A.   Yes.

14   Q.   Okay.  And why would you write a review for a undercover

02:05p 15   ad that was being posted on Backpage?

16   A.   Again, just to kind of make her ad look more legitimate

17   and less more like a law enforcement ad in case someone were

18   to search for that phone number on TER, that there would be a

19   review from an alleged customer.

02:06p 20   Q.   So I want to move forward to what you -- did you do

21   anything in this case specifically at the request of the case

22   agents?

23   A.   Yes, I did.

24   Q.   Okay.  Did they ask you to do a few things?

02:06p 25   A.   Yes, they did.

1    Q.   What did they -- what did the case agents in this case

2    ask you to do?

3    A.   I was asked to create an undercover TER account and

4    purchase a VIP membership to the account in an attempt to

02:06p  5    conduct searches of various phone numbers that were related to

6    the investigation to see if there were reviews on there.

7    Q.   Okay.  Taking a step back, what is the case agent?

8    A.   The case agent is just the individual or sometimes

9    individuals who are in charge of the whole investigation.

02:07p 10    Sometimes these cases are quite large and there's lots of --

11    lots of people involved.  So they're the person that would be

12    in charge of everything.

13    Q.   Okay.  And have you served as the case agent in

14    investigations that you have run over the years?

02:07p 15    A.   Yes, I have.

16    Q.   Okay.  So in the undercover The Erotic Review account you

17    were asked to create, you mentioned you were asked to purchase

18    a undercover VIP membership?

19    A.   Yes.

02:07p 20    Q.   What is that?

21    A.   On the TER website there is free access to just certain

22    portions of it.  It's somewhat limited information that you

23    can obtain from that, but if you want further details for a

24    particular review you need a VIP membership that would then

02:07p 25    unlock access to additional details of the escort interaction

1  or prostitution interaction.

2  Q.   All right, so we'll come back to that.

3       What was the other thing the case agents asked you to do

4  in this case?

02:08p  5  A.   They asked me to attempt to post an ad on Backpage, an

6  undercover ad on Backpage to see if there were any sort of

7  terms that would get screened.

8  Q.   Okay.  All right, so let's circle back to the undercover

9  TER account that you created.  When did you work with the case

02:08p  10  agents on this part of the investigation?

11  A.   I believe it was February of 2017.

12  Q.   Okay.  Was it -- I'm talking about the TER portion of it.

13  A.   I misspoke on that, I do apologize.  So that was -- that

14  was this year.  I think it was May of this year.

02:09p  15  Q.   And were you provided information from the case agents,

16  like e-mails and phone numbers?

17  A.   Yes.

18  Q.   Okay.  And then have you since reviewed Backpage ads that

19  are in conjunction with this investigation?

02:09p  20  A.   Yes.

21  Q.   And are the e-mails and phone numbers that you were asked

22  to search connected with the Backpage ads?

23            MS. BERTRAND:  Objection, leading.

24            THE COURT:  Sustained.

02:09p  25            MR. CAMBRIA:  Excuse me, is the date May 2023?

1          THE COURT:  That's what I heard.

2          MR. CAMBRIA:  That's interesting.

3          THE COURT:  I sustained the objection, go ahead.

4    BY MS. PERLMETER:

02:09p 5   Q.   How were the e-mails and the phone numbers you were asked

6    to search connected with Backpage?

7          MR. FEDER:  Objection, foundation.

8          THE COURT:  I'll overrule as to foundation, but I

9    just think the form of the question --

02:10p 10         MS. PERLMETER:  Sure.

11         THE COURT:  -- should be rephrased.

12   BY MS. PERLMETER:

13   Q.   Have you looked at -- have the case agents provided you

14   with certain Backpage ads to review?

02:10p 15  A.   Yes.

16   Q.   And have the ads that you have reviewed, did they contain

17   the e-mails and phone numbers that you were asked to search?

18   A.   Yes.

19   Q.   Okay.  And as you were searching, did you do anything to

02:10p 20  document what you were doing?

21   A.   Yes, I did.

22   Q.   What did you do?

23   A.   I did like a -- it's like a PDF screen print that just

24   records the information that's on the computer screen.

02:10p 25  Q.   Detective, I'm showing you what's been marked as Exhibit

```
 1   1546.  It's already been admitted so if it could be shown to
 2   the jury as well.  Do you see it?
 3            THE COURT:  No, nothing's happening yet.
 4   BY MS. PERLMETER:
 5   Q.   Do you see the exhibit?
 6   A.   As soon as I get my glasses on I will.
 7   Q.   And, detective, the hard copies of each exhibit we will
 8   be discussing are also on the table to your left or --
 9   A.   Okay.  Yes, I do see it, ma'am.
10   Q.   Is this an ad that you have reviewed with the case
11   agents?
12            MS. BERTRAND:  I just want to pause.
13            Has this been previously admitted?
14            THE COURT:  Yes.
15            MS. PERLMETER:  Yes.
16            MS. BERTRAND:  Okay, sorry.
17            THE WITNESS:  Yes, ma'am.
18   BY MS. PERLMETER:
19   Q.   Where was this ad posted and on what date?
20   A.   This was posted on Tuesday, March 19th, 2013, in the
21   Portland escort section.
22   Q.   Is there anything in this ad that suggests it is an ad
23   for prostitution?
24            MS. BERTRAND:  Objection, speculation.  And also
25   Rule 16, no notice as to an expert.
```

02:11p  5
02:11p 10
02:11p 15
02:11p 20
02:12p 25

1           THE COURT:  Overruled.  Overruled as to both.

2           THE WITNESS:  There are -- I'm sorry, rephrase -- or

3    restate it, please.

4    BY MS. PERLMETER:

02:12p 5    Q.   Are there any -- are there any aspects of this ad that as

6    an investigator would lead you to believe are indicative of

7    prostitution?

8    A.   Yes, ma'am.

9    Q.   What are they?

02:12p 10   A.   Well, first off, that it's in the escort section.  That

11   would be the first indicator.  She's also talking about how

12   she's well reviewed.  She's describing her body.  The photos

13   are provocative, especially the one in the bottom photo where

14   she appears to be topless and she's covering up her breasts.

02:13p 15   Q.   And did this ad also include a phone number?

16   A.   Yes, it did.

17   Q.   Okay.  Have you seen instances where phone numbers appear

18   like they do here, where there's a combination of numbers and

19   words?

02:13p 20   A.   Yes.

21   Q.   Okay.  And then did you run any searches in TER of the

22   phone number in this ad?

23   A.   Yes, I did.

24   Q.   Okay.  And before we move on, who is the -- what is the

02:13p 25   name that's being used in this ad?  Who does the person

ERIC MURRY - DIRECT EXAMINATION BY MS. PERLMETER        53

1   identify themselves to be?

2   A.   The name in this ad is Rachel.

3   Q.   Next I'd like to show just for the witness' eyes only

4   Exhibit 1971b.

02:14p  5        MS. BERTRAND:  Your Honor, objection as to relevance

6   and hearsay looking at this exhibit.

7             THE COURT:  Well, I'll overrule but instruct

8   Ms. Perlmeter to do -- lay some foundation for the exhibit.

9   BY MS. PERLMETER:

02:14p 10   Q.   Did you take the phone number in Exhibit 1546, Rachel's

11   ad, and type it into The Erotic Review website?

12            MS. BERTRAND:  Objection, leading.

13            THE COURT:  Sustained.

14   BY MS. PERLMETER:

02:14p 15   Q.   Detective, are -- are you reading something?  I don't --

16   A.   I'm sorry, yes, I'm looking at your exhibit.

17   Q.   Okay.  Can I ask you a question, and then I'll have you

18   review the exhibit.

19   A.   Yes, ma'am.

02:14p 20   Q.   Okay.  Did the agents ask you to take any information

21   from Rachel's ad and input it into TER?

22   A.   Yes.

23   Q.   What information was that?

24   A.   It was the phone number from the advertisement.

02:15p 25            MR. FEDER:  Foundation.

ERIC MURRY - DIRECT EXAMINATION BY MS. PERLMETER                54

          1              THE COURT:  Overruled.

          2     BY MS. PERLMETER:

          3     Q.   What information was that?

          4     A.   It was the phone number from the advertisement.

02:15p    5     Q.   So when you entered the phone number from Rachel's ad

          6     into TER, what happened?

          7     A.   It came up with a search result for that phone number

          8     search.

          9     Q.   And as part of the exercise that you were going through,

02:15p   10     did you document -- did you document what you were seeing as

         11     you went through the process?

         12     A.   Yes, I would do that PDF print, which is basically just a

         13     screen print.

         14     Q.   A screen printout, okay.  So did you capture what you --

02:15p   15     what you saw after you entered the phone number into The

         16     Erotic Review?

         17     A.   Yes.

         18     Q.   Okay.  If you could take a look at Exhibit 1971b.

         19          Do you recognize it?

02:15p   20     A.   Yes, I do.

         21     Q.   What is it?

         22     A.   This is the -- the result of that search on The Erotic

         23     Review for that phone number.

         24     Q.   Then what did you do next?

02:16p   25     A.   I then clicked on the search result which opened up a new

                       UNITED STATES DISTRICT COURT

ERIC MURRY - DIRECT EXAMINATION BY MS. PERLMETER          55

1   screen which was like the profile page of that individual.

2   Q.   Okay.  Did you take a screen capture or a PDF printout of

3   what you saw?

4   A.   Yes, I did.

02:16p  5   Q.   So I'm showing you Exhibit 1971 for the witness' eyes

6   only.  Do you recognize this?

7   A.   Yes, I do.

8   Q.   What is that?

9   A.   It's the -- it's the profile page for that search result

02:16p 10   of Rachel.

11   Q.   So did you get to this exhibit by clicking on the link in

12   1971b?

13   A.   Yes, I did.

14   Q.   And then did you click on a link in this exhibit that

02:17p 15   then brought you to a third page?

16   A.   Yes.

17   Q.   What did you do?

18   A.   There's a review listed on there.  I clicked on that

19   review which brought up the details of that reviewer.

02:17p 20   Q.   I'm showing you for just the witness 1971a.

21       Do you recognize this?

22   A.   Yes, I do.

23   Q.   What is this?

24   A.   This is the PDF screen printout of the particular review

02:17p 25   for Rachel.

1   Q.   Okay.  So are these the screen captures or the printouts

2   that you created from The Erotic Review related to Rachel's

3   ad, which is Exhibit 1546?

4   A.   Yes.

02:17p   5          MR. CAMBRIA:  Objection, I don't think he said he

6   created these.

7          THE COURT:  Yes, he did -- well, the jury can

8   determine what they heard, but I thought he said he made a PDF

9   of them.

02:17p   10          MR. CAMBRIA:  That's different than creating them.

11   That's maybe discovering, copying.  Creation is different.

12          THE COURT:  All right.  Well, Ms. Perlmeter, you can

13   rephrase.

14   BY MS. PERLMETER:

02:18p   15   Q.   I'm not suggesting that you wrote the ad or created the

16   profile, but did you essentially take a picture using your

17   computer of what you saw?

18   A.   Yes.

19   Q.   Okay.

02:18p   20          MS. PERLMETER:  United States moves Exhibits No.

21   1971, 1971a and b into evidence.

22          MS. BERTRAND:  Objection, rank hearsay.

23          MR. CAMBRIA:  And foundation.

24          THE COURT:  Overruled --

02:18p   25          MR. CAMBRIA:  That's why I asked the question about

 1    creation, Your Honor.

 2              THE COURT:  Overruled as to foundation.  Overruled

 3    as to hearsay.  It may be admitted and it may be published.

 4              *(Exhibit Nos. 1971, 1971a and 1971b admitted in to*

02:18p  5    *Evidence.)*

 6    BY MS. PERLMETER:

 7    Q.   Okay.  Let's go back to 1971b, if we could please show

 8    this.  Detective, is this the search page or the results page

 9    that you -- well, what is this?  Why don't you tell us what

02:19p 10    this is.

11    A.   This is -- this is the result of searching the phone

12    number in that ad that we had just seen.  This is the first

13    thing that would come up on the results of that.

14    Q.   Okay.  And the result is in a particular name?

02:19p 15    A.   Yes, Rachel.

16    Q.   Okay.  Is that consistent with the ad that is Exhibit

17    1546?

18    A.   Yes.

19    Q.   Okay.  And where -- what's the location for this?

02:19p 20    A.   Portland.

21    Q.   Okay.  And then did you -- if you touch the screen, you

22    can indicate, but did you click somewhere that then brought

23    you to the next page?

24    A.   I can just touch the screen.

02:19p 25    Q.   If you touch the screen it makes a mark.

1   A.   If you click in this area there, it links to the profile

2   page.

3   Q.   So is this the profile page -- this is Exhibit 1971.  Is

4   this the profile page?

02:20p   5   A.   Yes, it is.

6   Q.   So tell us what this is.  Let me zoom in.  Can you

7   explain the information that you see in a profile page?

8           MS. BERTRAND:  Your Honor, how is any of this

9   relevant in terms of this woman's description, her physical

02:20p   10   attributes?  How is any of this relevant to any --

11           THE COURT:  He's describing how he used the page,

12   what happened when he clicked on it.  I think that's the

13   relevance at this juncture.

14           MR. CAMBRIA:  It's not related.

02:20p   15           THE COURT:  So I'm assuming that that's an objection

16   and so overrule it.

17           I'm sorry, Mr. Cambria?

18           MR. CAMBRIA:  It's not related to the charges, Your

19   Honor.

02:20p   20           THE COURT:  Overruled.

21   BY MS. PERLMETER:

22   Q.   Do you see information on the profile page that is

23   consistent with the information contained in the Backpage ad

24   that is Exhibit 1546?

02:21p   25   A.   Yes.

1   Q.   What information is consistent?

2   A.   The name, Rachel; the location, Portland, and the phone

3   number.

4   Q.   And in general, when you get to this screen, a profile,

02:21p  5   what types of information do you see?  Are there categories?

6   A.   There are categories.  It talks basically about what

7   services this particular provider provides.  She does incall

8   and outcall.  She provides services of escort massage, S & M,

9   delivered as promised; and then if you scroll down, there's

02:21p 10   additional information talking about her particular

11   appearance --

12          MS. BERTRAND:  Same objections as to relevance and

13   hearsay.

14          THE COURT:  Overruled.

02:21p 15   BY MS. PERLMETER:

16   Q.   Okay.  So there's an appearance section where the

17   reviewer can leave information on how the prostitute

18   physically appeared?

19   A.   Yes.

02:22p 20   Q.   What's the next section?

21   A.   Services that the provider offers.

22   Q.   So for Rachel what sexual -- what sexual services did she

23   offer according to the reviewer?

24   A.   Sex and a blow job with a condom and kissing without

02:22p 25   tongue.

ERIC MURRY - DIRECT EXAMINATION BY MS. PERLMETER          60

```
 1   Q.   And is there information about how much the prostitute
 2   charges?
 3   A.   Yes.
 4   Q.   And so there's a section for that?
 5   A.   Yes, ma'am.  In this particular instance it was fifteen
 6   minutes for one hundred dollars.
 7   Q.   And in the final section, does it indicate whether or not
 8   there are any reviews for this prostitute?
 9   A.   Yes, it does.
10   Q.   And in this case were there any?
11   A.   There was one review posted, yes.
12   Q.   And when was this review posted?
13   A.   August of 2013.
14   Q.   Okay.  And then did you do something on this part of the
15   page that would take you to the next page?
16   A.   Yes, ma'am.  If you click -- right where it says August
17   of 2013, if you click on that, it then links to the actual
18   review itself.
19   Q.   All right.  So I --
20        MS. BERTRAND:  Same objection as to hearsay and
21   relevance.
22        THE COURT:  Overruled.
23        MR. FEDER:  Sorry, and foundation.
24        THE COURT:  Overruled.
25   BY MS. PERLMETER:
```

02:22p (lines 5, 10)
02:23p (lines 15, 20, 25)

1    Q.    All right.  So I'm showing you Exhibit 1971a.

2          Is this the review?

3    A.    Yes, ma'am.

4    Q.    Okay.  And are there two sections, general details and

02:23p  5    juicy details?

6    A.    Yes, ma'am.

7    Q.    And when was this review posted?

8    A.    August of 2013.

9    Q.    Is there information -- I don't want you to read the

02:23p 10    entire text, but are there portions of the review that tell

11    you that this individual engages in prostitution?

12    A.    Yes, ma'am.

13    Q.    What are those?

14    A.    He's describing the interaction where they're talking

02:24p 15    about sexual positions.  It says, "We did mish and then

16    cowgirl.  I was ready to get it over so at that point I

17    popped," meaning he ejaculated.

18    Q.    What are -- what does "mish" mean?

19    A.    It just stands for missionary position, sex.

02:24p 20    Q.    Okay.  All right, I want to move on to another exhibit.

21          Did you look at other Backpage ads as provided to you by

22    the case agents?

23    A.    Yes, ma'am.

24    Q.    Okay.  So I'm going to call up Exhibit 228, which has

02:24p 25    already been admitted.  If you want to look at it on the

1    screen or if you want to pull a hard copy?

2    A.    Yeah, I have to look at it closer up.  Okay, thank you.

3    Q.    Have you had an opportunity to review it?

4    A.    Yes, ma'am.

02:25p  5    Q.    Okay.  Is this an ad that the agents asked you to run a

6    search of?

7    A.    Yes.

8    Q.    What about this ad suggests that it is an ad for

9    prostitution?

02:25p 10            MS. BERTRAND:  Objection, calls for speculation.

11            THE COURT:  Overruled.

12            THE WITNESS:  On the very top line she's describing

13   Nuru.  She's also talking about GFE and using the term incall

14   only.

02:25p 15   BY MS. PERLMETER:

16   Q.    And is there something in this ad that suggests there may

17   be a review on The Erotic Review?

18   A.    Yes, ma'am in the body of it it says that she's highly

19   reviewed on TER and then lists a six digit number.

02:25p 20   Q.    And what is the date of this ad and what is the city it

21   was posted in?

22   A.    The date of the ad is Thursday, February 1st, 2018 and

23   it's in the Las Vegas massage section.

24   Q.    Okay.  Now, I'd like to show you just for the witness,

02:26p 25   witnesses eyes only, Exhibit 1967.

1      Do you recognize this detective?

2   A.   Yes, I do.

3   Q.   What is it?

4   A.   It's a PDF screen print of a profile page for Lissa or

02:26p   5   Annalise.

6   Q.   Is it related to Exhibit 228 that we just looked at the

7   Backpage ad?

8   A.   Yes.

9   Q.   How did you get leer what information from its Backpage

02:26p  10   ad did you take to enter into TER that got you to 1967?

11   A.   The phone number is the same in the ad and TER number is

12   also the same.

13   Q.   And did you also scroll to the bottom to see if there are

14   any reviews?

02:27p  15   A.   Yes.

16   Q.   And are there any?

17   A.   There are.

18   Q.   Did you click on a link and then create the next --

19   create a screenshot of what you saw next?

02:27p  20   A.   Yes, ma'am.

21   Q.   I'm showing you 1967b for the witness' eyes only.  What

22   is this?

23   A.   This is a PDF screen print of the -- one of the reviews

24   for Lissa or Annalise.

02:27p  25   Q.   And did you create this -- this screenshot by doing a --

1   making it a PDF?

2   A.   Yes, I did.

3   Q.   Okay.  Then I'd like to show you 1967a.  Do you recognize

4   this?

02:27p   5   A.   Yes, I do.

6   Q.   What is that?

7   A.   This is the actual review of Lissa or Annalise.

8   Q.   Okay.  Is it another review?

9   A.   It's -- yes this is another review from the ad or from

02:28p   10   the TER results rather.

11   Q.   And did you create -- sorry, I didn't mean to talk over

12   you.

13   A.   I'm sorry.

14   Q.   Did you create this PDF file?

02:28p   15   A.   Yes, I did.

16        MS. PERLMETER:  United States moves Exhibits No.

17   1967 -- or 1967a and b into evidence --

18        MS. BERTRAND:  Objection --

19        MS. PERLMETER:  -- as well as 1967.

02:28p   20        MS. BERTRAND:  -- relevance -- or, excuse me,

21   hearsay.  There is no way they can a lay a foundation saying

22   what happened in these reviews happened.

23        THE COURT:  Well, overrule as to foundation.

24   Overruled as to relevance.

02:28p   25        Exhibits 1967, 1967a and B may be admitted.

1          MS. BERTRAND:  Defense has also made a hearsay

2    objection.

3          THE COURT:  Yes, overruled as to that.

4          MR. CAMBRIA:  I'm sorry, what was the date of this?

02:28p  5          MS. BERTRAND:  That was February 2018.

6          MR. CAMBRIA:  2018?

7    BY MS. PERLMETER:

8    Q.   Detective, I'd like to go back before I go back to those

9    new exhibits let's go back to the Backpage ad briefly Exhibit

02:29p 10    228.

11   A.   Yes.

12   Q.   I'd like to direct your attention to the title.  You had

13   talked about best GFE you had talked about GFE and incall.

14        Does "Nuru" mean anything to you?

02:29p 15   A.   Yes, it does.

16   Q.   What is that?

17   A.   It's a massage term meaning where the person providing

18   the massage would get naked and then rub their body on the

19   naked patron.

02:29p 20   Q.   I'm going put the ad back up.  I just wanted to ask you

21   who the person -- what the person's name on the ad was?

22   A.   Lissa.

23   Q.   Okay.  So going to 1967, can you explain to the jury what

24   this is here?

02:30p 25   A.   This is the profile page for Lissa or Annalise.

ERIC MURRY - DIRECT EXAMINATION BY MS. PERLMETER                66

1   Q.   And is there information in this profile that is

2   consistent with the information in the Backpage ad?

3   A.   Yes.

4   Q.   What is that information?

02:30p  5   A.   The name Lissa is the same.  The location is the same and

6   the TER number is the same and the phone number.

7   Q.   Lissa is spelled a little bit differently Lissa

8   L-i-s-s-a?

9   A.   Yes.

02:30p  10  Q.   Is there a section for Lissa's appearance?

11  A.   There is.

12  Q.   And is there a section for the services that Lissa

13  offers?

14  A.   There is.

02:31p  15  Q.   And what services are those?

16  A.   She is offering nude massage, sex and blow job without a

17  condom.

18  Q.   Then scrolling down the page are there any other services

19  that she offers that are indicative of prostitution?

02:31p  20  A.   Yes, you can touch her on the inside of her pussy.

21  Q.   Does that mean -- do you know that to mean vagina?

22  A.   Yes.

23  Q.   Okay.  And does she -- does this review provide

24  information about the cost of Lissa's services?

02:31p  25  A.   It does.

1    Q.    What are they?

2    A.    For an incall it would be two hundred dollars, out call

3    would be three hundred dollars.

4    Q.    And is Lissa reviewed?

02:31p 5    A.    She is.

6    Q.    And how many reviews does she have?

7    A.    22.

8    Q.    Okay.  And did you -- out of the 22 did you select two of

9    the reviews to capture your work on this case?

02:32p 10    A.    Yes.

11          MS. BERTRAND:  Your Honor I'm going to renew my

12    objection as to relevance.  Some of the reviews here are from

13    2019, 2022, '23 well after Backpage was closed.

14          THE COURT:  Well, I will overrule the objection.

02:32p 15    BY MS. PERLMETER:

16    Q.    I'm showing the witness 1967a.  Is this one of the

17    reviews for Lissa?

18    A.    Yes.

19    Q.    And when was this review posted?

02:32p 20    A.    January 2018.

21    Q.    When was Lissa's advertisement posted on Backpage, if I

22    could refer you back to Exhibit 228, if you don't mind using

23    the hard copy?

24    A.    It was February 1st, 2018.

02:32p 25    Q.    So this review was posted one month before the ad on

1    Backpage was posted?

2    A.   Yes.

3    Q.   Okay.  All right.  Going back to 1967a, does this review

4    also have two sections, general details and juicy details?

02:33p  5    A.   It does.

6    Q.   Okay.  Are there -- is there any information -- I don't

7    want you to read allowed the entire section, but are there any

8    words or phrases in the review that are indicative of

9    prostitution?

02:33p 10    A.   Yes.

11    Q.   What are they?

12    A.   They're talking about donation and then they're

13    describing some sexual terms of BBBJ, CG, DATY, talking about

14    grabbing his penis, and they talk about fifteen minutes of --

02:34p 15    Q.   You mentioned DATY.  What does that mean?

16    A.   It stands for dining at the Y.

17    Q.   And what does that mean in the concept of prostitution?

18    A.   That would be describing oral sex performed on a female.

19    Q.   Detective, this is 1967b.  Is this the other review that

02:34p 20    you captured?

21    A.   Yes.

22    Q.   And when was this review posted?

23    A.   This is March of 2018.

24    Q.   Okay.  So this is one month after the ad on Backpage was

02:34p 25    posted?

1   A.   Yes.

2   Q.   About one month.  Are there any phrases in this review

3   that are indicative of prostitution?

4   A.   In this one, the term "incall."   Again, the BBBJ, CG,

02:35p   5   RCG.  These are -- these are describing sexual activity.

6   Q.   What is "CG" and "RCG"?

7   A.   Cowgirl and reverse cowgirl, sexual positions.

8   Q.   Okay.  I want to go back to Lissa's ad one more time

9   here.  Where was this ad posted?

02:35p  10   A.   Las Vegas, Nevada, in the Las Vegas massage section.

11   Q.   Okay.  Now, detective, I want to show you a different

12   Backpage ad.  Did you also -- did you review a Backpage ad --

13   two ads that were similar to each other?

14   A.   Yes.

02:35p  15        MS. BERTRAND:  Your Honor, before we go forward,

16   we've been at this for some time.

17        THE COURT:  I was going to give her about three more

18   minutes and take our break.

19        MS. BERTRAND:  Okay.

02:36p  20        THE COURT:  Do you need to do it immediately?

21        MS. BERTRAND:  I can wait three minutes.

22        THE COURT:  All right.

23        MS. BERTRAND:  Thank you.

24   BY MS. PERLMETER:

02:36p  25   Q.   All right.  I'm showing you Exhibit 1721, which has

1   already been admitted.  Going to the second page, is this

2   another Backpage age that the case agents asked you to review?

3   A.   Yes.

4   Q.   Okay.  Tell us when it was posted and in what city.

02:36p  5   A.   It was posted Monday, November 14th, 2016, in the Boston

6   escort section.

7   Q.   And is there anything in this ad that leads you to

8   believe that it's an ad for prostitution?

9   A.   Yes, ma'am.

02:36p 10   Q.   What are those things?

11   A.   Well, first of all, there's the section that it's posted

12   in the escort section.  They're describing in the text of it a

13   body-to-body massage, and then the pictures are -- are

14   provocative.

02:37p 15   Q.   Can you see what this says down here?

16   A.   Yes, I can.  It says GFE.

17   Q.   And is that another prostitution term?

18   A.   Yes, it is.

19   Q.   Did you take note of the phone number in this ad?

02:37p 20   A.   I did.

21   Q.   Okay.  And it ends in 3162?

22   A.   It does.

23   Q.   All right.  Next I'd like to show you --

24         MS. PERLMETER:  I'm gonna go in to another Backpage

02:37p 25   ad that's been admitted, if that's okay?

```
 1              THE COURT:  Two minutes.

 2              MS. PERLMETER:  Okay.

 3    BY MS. PERLMETER:

 4    Q.   I'm showing you 172, which has been admitted.

 5         Detective, do you recognize this exhibit?

 6    A.   I do.

 7    Q.   Is this another Backpage ad that you reviewed?

 8    A.   It is.

 9    Q.   All right.  Are there -- when was this ad posted and in

10    what market?

11    A.   Thursday, November 24th, 2016, in the Boston escort

12    section.

13    Q.   Okay.  And are there any terms or indicators in this ad

14    that would lead you to believe that it's an ad for

15    prostitution?

16    A.   Yes.

17    Q.   What are they?

18    A.   Again, there's GFE.

19              MR. FEDER:  I'm sorry, excuse me.

20              Foundation, hearsay.

21              THE COURT:  Overruled.

22              MR. FEDER:  Improper expert testimony.

23              THE COURT:  Overruled.

24              THE WITNESS:  There's GFE and describes full Nuru,

25    and the pictures themselves are provocative.
```

02:37p (line 5)
02:38p (line 10)
02:38p (line 15)
02:38p (line 20)
02:38p (line 25)

1    BY MS. PERLMETER:

2    Q.    And is there a phone number in this ad as well?

3    A.    There is.

4    Q.    And is it the same phone number that was in exhibit --

02:38p   5    the Backpage ad that is Exhibit 1721?

6    A.    Yes.

7    Q.    And the phone number ends in 3162?

8    A.    Yes, ma'am.

9    Q.    Okay.  And did you perform a search on The Erotic Review

02:39p  10    using this phone number?

11    A.    Yes.

12    Q.    Okay.

13            THE COURT:  I'm sorry, what was this Exhibit

14    No. again?

02:39p  15            MS. PERLMETER:  It was 1721 and 1723.

16            THE COURT:  All right.  Members of the Jury, we are

17    at the point where we should have our afternoon break.  We'll

18    have our usual 20-minute break.  Do be prepared to come back

19    into the courtroom sharply at 3:00, and as I promised we will

02:39p  20    get you out at 4:15.  And so just remember the admonishment

21    and please all rise for the jury.

22            (Jury out at 2:40 p.m.)

23            THE COURT:  And the witness may step down.

24            And let me just state and Mr. Cambria has -- he's

02:40p  25    gone.  Well, maybe the colleagues of Mr. Cambria, he seemed a

1   little bit perplexed when the dates -- date range of 2018 came

2   about; and if counsel will remember, the charges in the

3   Indictment run through on or about April 2018, and so I think

4   to the extent that he makes those comments allowed, they're

02:40p   5   not objections, I think he should refrain from doing so and

6   let's be on recess.

7          MR. STONE:  Your Honor, before the jury comes back,

8   can we just be heard on the witness issue after the break?

9          THE COURT:  Yes.

02:41p  10          MR. STONE:  Thank you.

11          (Recess taken at 2:41 p.m.)

12          (Back on the record at 2:53 p.m.)

13          MR. STONE:  Your Honor, real quick.

14          THE COURT:  Oh, I'm sorry, yes, you wanted to --

03:01p  15          MR. STONE:  So when the United States planned out

16   our week with witnesses, it looks like we misjudged by about a

17   half a day.  Obviously, we've now disclosed three additional

18   witnesses, but they were within the 72-hour window.

19          We're not sure if this witness will take the rest of

03:02p  20   the day, but if he doesn't we have two witnesses ready to go,

21   the summary witness Quoc Thai and then Jessika Svengard; and

22   because we were within the 72 hours for both, we talked to

23   defense counsel and we gave them the option of who they would

24   like to us call next if there's a witness that's needed today.

03:02p  25          For tomorrow we have lined up Jessika Svengard,

 1    Brian Griffen and Quoc Thai.  We would call Brian Griffen and

 2    Jessika Svengard first because they are both from the East

 3    Coast.  One's from Massachusetts.  The other is from the

 4    southeast.  We'd like to get them on and off.  They are

03:02p  5    quicker witnesses, and then Quoc Thai would go third if we get

 6    to him tomorrow; but for today we're giving the defense the

 7    option on which witness, Jessika Svengard or Quoc Thai, they

 8    would like us to call.

 9            THE COURT:  And have they agreed?

03:03p 10            MS. BERTRAND:  We would prefer that Mr. Thai go this

11    afternoon if that even becomes --

12            THE COURT:  Yes, I think that's probably iffy

13    because we're at 3:05 now and she's -- I don't know how much

14    more of her examination she has of this witness and we're

03:03p 15    going to permit a cross-examination, of course.  So I think

16    that will take us through the end of the day.

17            MR. STONE:  And it very well might.  I'm just trying

18    to be above board, Your Honor.

19            THE COURT:  All right, yes.  Okay, thank you,

03:03p 20    appreciate it.  Okay, let's bring the witness to the witness

21    stand.

22            All rise for the jury.

23            (Jury in at 3:04 p.m.)

24            THE COURT:  Come to order and all rise for the jury.

03:05p 25            All right, please be seated.  The record will

ERIC MURRY - DIRECT EXAMINATION BY MS. PERLMETER          75

 1   reflect the presence of the jury and the witness is prepared

 2   to testify; and, Ms. Perlmeter, you may continue.

 3   BY MS. PERLMETER:

 4   Q.   Good afternoon again.

03:05p   5   A.   Good afternoon, ma'am.

 6   Q.   When we left off, we had discussed two Backpage ads,

 7   Exhibit 1721 and 1723, and you had just told the jury that the

 8   phone numbers associated -- the telephone -- it's the same

 9   number associated with both ads?

03:05p  10   A.   Yes.

11   Q.   Did you take the phone number and input it into The

12   Erotic Review's website?

13   A.   Yes, I did.

14   Q.   And what happened?

03:05p  15   A.   It came up with a search result for that phone number.

16   Q.   And then did you -- did you generate The Erotic Review

17   profile for that result?

18   A.   Yes.

19   Q.   And then did you capture it in a PDF format like you did

03:05p  20   with the others?

21   A.   Yes, I did.

22   Q.   I'm showing -- I'd like to show the witness for his eyes

23   only Exhibit 1953.  Can you see it on your screen or are you

24   looking at the hard copy?

03:06p  25   A.   I'm going to look at the hard copy if it's okay.

ERIC MURRY - DIRECT EXAMINATION BY MS. PERLMETER          76

```
          1   Q.   Okay.

          2   A.   Okay.

          3   Q.   Do you recognize this exhibit?

          4   A.   Yes, I do.

03:06p    5   Q.   What is it?

          6   A.   This is a profile page for Candy on The Erotic Review.

          7   Q.   And is this the result that you received when you

          8   searched the telephone number ending in 3162?

          9   A.   Yes.

03:06p   10   Q.   And then did you click on any part of this document to

         11   generate another document?

         12   A.   Yes, I did.

         13   Q.   What did you do?

         14   A.   I clicked under the review section.  There's a particular

03:06p   15   review that I clicked on, which opened up the actual review.

         16   Q.   I'm showing the witness for his eyes only Exhibit 1953a.

         17        Do you want to look on the screen or do you want to look

         18   at the hard copy?

         19   A.   This one I can look on the screen.

03:07p   20   Q.   Do you recognize this?

         21   A.   I do.

         22   Q.   What is it?

         23   A.   This is the review for Candy.

         24   Q.   And is this what you saw when you clicked on the link

03:07p   25   from the prior exhibit?
```

1   A.   It is.

2   Q.   And then did you create the PDF printout for this

3   exhibit?

4   A.   Yes, I did.

03:07p  5          MS. PERLMETER:  United States moves into evidence

6   Exhibits 1953 and 1953a.

7          MS. BERTRAND:  Objection, hearsay, foundation.  This

8   is clearly being offered for the truth of the matter asserted.

9          THE COURT:  Overruled.

03:07p 10          MS. PERLMETER:  And permission to publish to the

11  jury.

12          THE COURT:  Yes, it may be published.

13          COURTROOM DEPUTY:  And it's admitted, too?

14          THE COURT:  Both of -- I'm sorry, 1953 and 1953a may

03:08p 15  be admitted and published.

16          *(Exhibit No. 1953 and 1953a admitted in to*

17  *Evidence.)*

18          MS. BERTRAND:  Your Honor, an additional objection

19  as to cumulative.

03:08p 20          THE COURT:  Overruled.

21  BY MS. PERLMETER:

22  Q.   Do you see the exhibit?

23  A.   Yes, I do.

24  Q.   Okay.  Is this the TER profile you generated after

03:08p 25  entering the phone number ending in 3162?

ERIC MURRY - DIRECT EXAMINATION BY MS. PERLMETER          78

1    A.   Yes, this is the result of that.

2    Q.   Let me zoom in.  Is there information in this profile

3    that is consistent with the information in the Backpage ads

4    that we looked at, the two ads that are 1721 and 1723?

03:08p  5    A.   Yes, the phone number is the same and they're both from

6    Massachusetts.

7    Q.   Now, does it contain information about the prostitute's

8    appearance?

9    A.   Yes.

03:08p  10    Q.   Does it also contain information about services that the

11    prostitute offers?

12    A.   Yes, it does.

13    Q.   Which sexual acts does this particular prostitute offer?

14           MS. BERTRAND:  Same objection, hearsay.

03:09p  15           THE COURT:  Overruled.

16           THE WITNESS:  This talks about sex, blow job with a

17    condom, touching on the outside of the vagina.  That's about

18    it.

19    BY MS. PERLMETER:

03:09p  20    Q.   Is there information about the cost of service?

21    A.   There is.

22    Q.   And what is that information?

23    A.   This was 60 minutes for $160.

24    Q.   Okay.  Does this prostitute have any reviews?

03:09p  25    A.   Yes, she has one review.

ERIC MURRY - DIRECT EXAMINATION BY MS. PERLMETER          79

1    Q.   And is it from -- when was that review posted?

2    A.   October 2016.

3    Q.   And did you click on the link to generate another

4    document?

03:09p 5  A.   Yes, I did.

6    Q.   I'm showing you 1953a.  Is this the review that you

7    created -- or that you captured after clicking on the link?

8    A.   It is.

9    Q.   And when was this review posted?

03:10p 10 A.   October 2016.

11   Q.   And is there a "General Details" section and a "Juicy

12   Details" section?

13   A.   There is.

14   Q.   Okay.  Can you go ahead and read "The Juicy Details"

03:10p 15 portion of this review?

16   A.   The whole thing?

17   Q.   Yes, please.

18   A.   Yes, ma'am.  (Reading) I am finding this to be a pattern

19   with the Asians on a certain page.  The pics are not real.

03:10p 20 The person on the phone with good English is not the person in

21   the room.  Two call system, get to the hotel, get room number.

22   Room is in a rundown joint.  I walk in.  She does the LE

23   frisk/hug.  She goes to the restroom and I drop the money on

24   the desk.  I strip and -- I think he means "jump" -- jump into

03:11p 25 bed.  She comes out and looks for the money, then starts to

1   strip...actually -- I think he's probably trying to say

2   "pretty" sexy.  Jumps into bed and starts rubbing my back.

3   Pretty lame but A for effort.  Then I feel the massage move

4   down to the boys and I figure it's time to turn.  Start with a

03:11p 5   CBJ and then move to doggie, followed by standing doggie, and

6   then cowgirl and finished up with missionary.  Gave her a

7   pretty good workout.  Afterwards, I was trying to go for round

8   two, but she made it clear that it's a one and done situation.

9   I would probably visit but since it's one and done, I would

03:11p 10  opt for 30 minutes next time.

11  Q.   What parts of The Juicy Details are indicative of

12  prostitution?

13  A.   Pretty much the whole thing.  It's describing the whole

14  prostitution interaction.  They're talking about the hotel

03:12p 15  room.  They're talking about the LE frisk and hug and then

16  talking about sexual positions that they did.

17  Q.   What is "LE frisk/hug"?

18  A.   That would be -- again, it's the screening process that

19  the female uses where she would generally give you a hug and

03:12p 20  kinda feel around to see if you have any kind of weapons or

21  recording devices.  Maybe she might grab or attempt to grab

22  our genitals.  Sometimes she'll expose a body part and want us

23  to touch them, things like that.

24  Q.   Is that the cop check you were talking about earlier?

03:12p 25  A.   It is.

1  Q.   And what does it mean toward the end of the review where

2  it says she made it clear that it's one and done?

3  A.   He's indicating that he wanted to have -- he wanted to

4  ejaculate twice, but in this particular instance she's saying

03:13p 5  that it's just one time only.

6  Q.   All right.  Detective, moving away from TER, I'd like to

7  talk to you the about the other task that the case agents

8  asked you to do in this case.

9  A.   Okay.

03:13p 10  Q.   Do you recall what that was?

11  A.   I do.

12  Q.   What did they ask you to do?

13  A.   I was asked to attempt to place an advertisement on

14  Backpage.

03:13p 15  Q.   And when did you do this?

16  A.   That was in February of 2017.

17  Q.   And what was the objective behind placing an ad on

18  Backpage?

19  A.   Just to see if there were any sort of screening -- terms

03:13p 20  that would be screened out of an ad.

21  Q.   So is this different than the other undercover ads you

22  talked about previously where you were trying to elicit

23  responses?

24  A.   Correct, we were not trying to elicit a response.

03:14p 25  Q.   So tell me what you did and tell me how you documented

1   your work.

2   A.   Basically, I just went to Backpage.com and I went to the

3   particular section where I was posting an ad and I took

4   screenshots of each step as I went through to document the --

03:14p  5   what it looked like to the process of placing an ad.

6   Q.   I'd like to show the witness for his eyes only Exhibit

7   No. 2044.

8   A.   Yes.

9   Q.   Do you see that?

03:14p  10  A.   I do.

11  Q.   You recognize it?

12  A.   I do.

13  Q.   What is it?

14  A.   This is a PDF screenshot of the Backpage -- home page

03:14p  15  Backpage, the whole --

16  Q.   It's multiple pages so let me just scroll through

17  quickly.

18  A.   Okay.

19  Q.   Are these the screenshots that you created documenting

03:15p  20  the work that you did when posting a Backpage ad?

21  A.   It is.

22          MS. PERLMETER:  Move to admit Exhibit 2044 into

23  evidence.

24          THE COURT:  Yes, it may be admitted.

03:15p  25          MS. BERTRAND:  Well, objection, relevance.

 1          THE COURT:  Overruled, it may be admitted and

 2  published.

 3          (Exhibit No. 2044 admitted in to Evidence.)

 4  BY MS. PERLMETER:

03:15p  5  Q.   So, detective, let's start from the beginning and then

 6  we'll move through each slide as you discuss what you were

 7  doing.

 8  A.   Okay.

 9  Q.   So what is -- this is the first slide.  What does this

03:15p 10  capture?

11  A.   This is capturing the initial page on Backpage.  This is

12  what it looked like.

13  Q.   And is that in February 2017?

14  A.   Yes.

03:16p 15  Q.   What marketplace are you in?

16  A.   I'm in the Phoenix, Arizona, section.

17  Q.   And in what section of Backpage are you intending to

18  place this ad?

19  A.   In the dating section under the women seeking men.

03:16p 20  Q.   Why not post in the female escort section in adult?

21  A.   At this time it was -- it was unavailable.  It was -- it

22  was shut down.  You can see on the -- on the slide under the

23  adult section each of them is labeled "censored."

24  Q.   Okay.  What does this page -- what is this page?

03:16p 25  A.   This is just a disclaimer page.  So once you click on

ERIC MURRY - DIRECT EXAMINATION BY MS. PERLMETER

1    that -- on the previous slide you click on the "women seeking

2    men."  This disclaimer comes up and I clicked on "agree."

3    Q.   Does that take you to the third page?

4    A.   It does.

03:16p   5    Q.   And what is this?

6    A.   This is the Phoenix women seeking men section and how it

7    looked on that day, on February 9th.  So each of those -- each

8    of those lines is a separate advertisement in that section.

9    So I clicked on the very top.  It says "Post Ad."  So I

03:17p  10    clicked on "Post Ad."

11    Q.   So you clicked here where I'm placing this red circle?

12    A.   Yes, ma'am.

13    Q.   And that takes you to the next slide?

14    A.   Yes.

03:17p  15    Q.   And what did you do here?

16    A.   I -- they were asking what section I wanted to post the

17    ad in so I clicked on "dating."

18    Q.   And did that take you to the next slide?

19    A.   It did.

03:17p  20    Q.   And then were you asked to choose a category here?

21    A.   I was.  I clicked on the "women seeking men."

22    Q.   And were you asked to choose a location?

23    A.   I was.  I clicked on Phoenix.

24    Q.   And then what happened?

03:17p  25    A.   This screen popped up with the "Posting Rules," and I

ERIC MURRY - DIRECT EXAMINATION BY MS. PERLMETER                    85

1    clicked on "Continue."

2    Q.    And what is this page?

3    A.    And from here they're asking to sign in with an account,

4    and if you don't have an account you can -- you can set one

03:18p  5   up, but I had already created one.

6    Q.    Okay.  So did you sign in with your undercover account?

7    A.    I did.

8    Q.    Okay.  And what is -- what are we looking at here with

9    step one?

03:18p  10        Do you need a break?

11   A.    No, sorry, thank you.

12        So this is just where you would actually write out the

13   details of the ad.  The title line up top is where you would

14   see kind of on that -- on one of the previous pages that we

03:18p  15   saw where they listed several different ads, each one of those

16   would display in the title section.

17        So you would -- you would type a little bit of something

18   in the title and then give some further details in the

19   description section.

03:18p  20   Q.    So what did you type?

21   A.    In the title section I typed in some emojis and "BlOnDe

22   HoTtie," and then in the description I typed in, "Hello boys!

23   I'm a fun size treat that is up for just about anything.  Give

24   me a call and I'll be your candy girl.  100% independent.

03:19p  25   Never rushed!!  Young and ready for you!!" and I used the

ERIC MURRY - DIRECT EXAMINATION BY MS. PERLMETER                    86

 1   undercover name of Ashley and then I provided a phone number.

 2   Q.   And why did you spell out your phone number with a

 3   combination of numbers and words?

 4   A.   Again, I was trying to just mimic other advertisements

03:19p  5   that I had seen on Backpage and I had seen that a lot where

 6   individuals would -- would type out or spell out some of the

 7   digits.

 8   Q.   And what did you mean by 100 -- what were you trying to

 9   convey by using "100% independent"?

03:19p 10   A.   Basically, that I was working for myself.  I didn't have

11   an agency that I working for and there's no pimp involved.

12   Q.   And then further down do they give you options or were

13   there things that you could enter?

14   A.   Yes, I put in my age of eighteen.

03:20p 15   Q.   And continuing on, were there areas where you could

16   choose options?

17   A.   Yes, this slide a showing kind of like a -- almost

18   upgrades that you could pay for and I clicked on "Phoenix."

19   It was free, but you could also choose to pay an additional

03:20p 20   dollar to post in other cities or you could also choose --

21   right above that you could choose the length of time where it

22   would upgrade the ad to the top of the -- top of the listings.

23   One hour would be $2.00 in this instance, and I believe they

24   had some other time frames that cost a little bit more money.

03:21p 25   Q.   So what does this mean move to the top every hour for the

ERIC MURRY - DIRECT EXAMINATION BY MS. PERLMETER          87

```
      1   -- what happens if you select this option?

      2   A.   Basically, again, on that list of ads with the title in

      3   there where they're just the one line, it would move your ad

      4   up to the top of the ads.

03:21p 5        So when someone logs on to the website, yours would be at

      6   the top of the list of ads that would be seen rather than just

      7   eventually get buried down at the end because each new ad that

      8   comes in gets posted at the top, and eventually it just gets

      9   knocked down.

03:21p 10  Q.   And then did you click "Continue" at the bottom of

     11   this?

     12   A.   Yes.

     13   Q.   Okay.  Then were you given -- what's going on here?

     14   A.   In this slide I'm showing that I put a picture in the ad,

03:22p 15  and it was a pictures shown of a white female and that would

     16   be embedded in the ad.

     17   Q.   And then these next couple of slides, 15 and 16, are they

     18   -- they're kind of small.  Can you see or do you want to refer

     19   to the hard copy?

03:22p 20  A.   No, I can see them probably better on here.  It's the --

     21   it's the "Terms" and the other slide is the "Privacy"

     22   agreement.

     23   Q.   Were these just things that you needed to read and

     24   acknowledge to move on?

03:22p 25  A.   Yes.
```

 1   Q.   Okay.  All right.  Now we're back on "Step 1: Write Ad"?

 2   A.   Right.  So once you click through there, it gives you the

 3   option to edit the ad if you choose to.  So I did -- I added

 4   some additional information on here and I put in some -- some

03:23p  5   times and dollar amounts and I used the term "greek xtra."

 6   Q.   So I see here that you wrote "15 min QV $60"?

 7        What is "QV"?

 8   A.   "QV" stands for quick visit.

 9   Q.   And then what is "greek"?

03:23p 10   A.   Greek would be anal intercourse.

11   Q.   And then you go to "Step 2"?

12   A.   Yes.

13   Q.   What happened here?

14   A.   This is showing that there was an error message that I

03:23p 15   had received, and it says there was an error that had occurred

16   while posting the ad.

17   Q.   Were you told what exactly was wrong with your ad?

18   A.   No, it didn't say what was wrong.  It just says that

19   there's an error and then it gave an e-mail address if I

03:24p 20   wanted some additional information.

21   Q.   And was this part of the exercise that you were doing?

22   Were you trying to see if -- if errors would appear?

23   A.   Correct.

24   Q.   Okay.  So what did you do at this point?

03:24p 25   A.   I then removed the term "greek xtra" and there was

1   another error message, same as before.  So then I removed

2   the --

3   Q.   Hang on hang on one second.

4   A.   Okay, sorry.

03:24p 5   Q.   Thanks.  Okay, so you got your first "Oops" message

6   and you removed "greek xtra," and then you tried to resubmit?

7   A.   Correct.

8   Q.   And then did you receive another oops message?

9   A.   I did.

03:24p 10   Q.   Okay.  What are we looking at here?

11   A.   This is just the little reCAPTCHA where you click on it

12   to show you're not a robot because I had then resubmitted the

13   advertisement.  I took out the time and money in this slide,

14   and I replaced it with "bbbj avail, but xtra."

03:25p 15   Q.   Okay.  So at this point you removed the time and money

16   references.  You've removed "greek" and you've inserted

17   "bbbj"?

18   A.   Correct.

19   Q.   Okay.  And what are we looking at here?

03:25p 20   A.   This is the review section.  It gives -- basically

21   gives you a preview of what the ad is going to look like

22   before you actually place it.  It's just kinda giving you like

23   a final approval, and then I clicked up top.  It says "Place

24   Ad Now."

03:26p 25   Q.   So is this like the final step?

1   A.    This is like the final, like, approval from the person

2   who's posting an ad to make sure you like the way it looks,

3   make sure everything is spelled properly and that this is --

4   this is what you want to go live.

03:26p 5   Q.    Okay.  And then what happened after that?

6   A.    This little pop-up appeared.  It's the reCAPTCHA to prove

7   you're not a robot.

8   Q.    And then were you eventually able to place the ad?

9   A.    Yes.

03:26p 10   Q.    Is that what it's telling you when it says "All Done"?

11   A.    Yep, this is the confirmation that your ad is going to

12   be -- going to be posted and it gives you the options

13   there where you can "click here" to view it or post another

14   ad.

03:26p 15   Q.    And is -- and what are we looking at here?

16   A.    This is the ad itself on -- on Backpage.

17   Q.    So is this how it would appear if someone were to

18   publicly log -- go to the website, what was available to the

19   public?

03:27p 20   A.    Yes.  If they would click on that title, the "BlOnDe

21   HoTtie," this is the ad that would then pop up and appear.

22   Q.    Okay.  And the "bbbj" did -- was allowed and went

23   through?

24   A.    Correct.

03:27p 25   Q.    And then there's an e-mail?

ERIC MURRY - DIRECT EXAMINATION BY MS. PERLMETER                91

```
 1   A.   Yes, this is just an e-mail from Backpage to my

 2   undercover e-mail account just verifying and letting me know

 3   that the posting is live.

 4   Q.   So this is what you received to your undercover account

 5   after the ad went live?

 6   A.   Yes.

 7   Q.   And if you wanted to view your ad, are there -- is there

 8   any way to get there from this e-mail?

 9   A.   It gives you the option to -- to move it to the top or

10   delete it.  So you could click on the little hyperlink there.

11   I don't know if it takes you to, like, the actual posting

12   itself or if it just takes you to, like, kinda that edit

13   section.

14   Q.   I see.  So it's giving you another opportunity to upgrade

15   to move to the top?

16   A.   Correct.

17   Q.   And what is this?

18   A.   This is just a full-page printout of the advertisement

19   that was on Backpage.

20   Q.   Detective Murray, I'm scrolling up to the e-mail and I'm

21   going to highlight this.  Do you see where it says "Posting

22   Solutions"?  "For upgrades, such as move to the top, mail your

23   check or money order to:"?

24   A.   Yes, I do.

25   Q.   Are you familiar with it?
```

03:27p 5

03:28p 10

03:28p 15

03:28p 20

03:29p 25

ERIC MURRY - DIRECT EXAMINATION BY MS. PERLMETER                92

1   A.    With the -- with the company?

2   Q.    Well, have you seen this in --

3   A.    Oh, yes, I saw this on the e-mail.

4   Q.    Okay.

03:29p   5   A.    Yes.

6   Q.    Detective, do you have any idea why it says to mail a

7   check or money order to Posting Solutions when you are posting

8   an ad on Backpage?

9         MS. BERTRAND:  Objection, calls for speculation.

03:29p  10         THE COURT:  Sustained.

11   BY MS. PERLMETER:

12   Q.    Do you know?

13   A.    I don't know.

14   Q.    Detective, wrapping up here, after the adult section

03:30p  15   closed down on Backpage, did you conduct any

16   prostitution-related investigations on Backpage in the other

17   sections, like women seeking men?

18   A.    Yes.

19         MS. PERLMETER:  Nothing further, your Honor.

03:30p  20         THE COURT:  All right.  Who from defense counsel is

21   going to cross-examine?

22         Ms. Bertrand?

23         MS. BERTRAND:  Yes, I'm going to start.  I don't

24   know if my colleagues will also have cross, but I'm gonna

03:30p  25   start this afternoon.

```
        1                       CROSS-EXAMINATION

        2     BY MS. BERTRAND:

        3     Q.    Good afternoon, detective.

        4     A.    Good afternoon, ma'am.

03:30p  5     Q.    I believe you stated in talking with the Government that

        6     you started in Vice around 2002; is that correct?

        7     A.    Yes.

        8     Q.    That was before on-line advertising had really taken off;

        9     is that fair?

03:31p 10     A.    That is correct.

       11     Q.    I believe you mentioned in an interview with the

       12     Government from some years ago that before the proliferation

       13     of Internet advertising, back in the day you would actually

       14     use print publications to conduct your escort investigations;

03:31p 15     is that fair?

       16     A.    That is correct.

       17     Q.    So, for example, here in the Valley one of them was

       18     Bachelor Beat?

       19     A.    Yes.

03:31p 20     Q.    And that was a -- as I recall, kinda like a free

       21     publication you'd find at, like, Circle K and stuff; is that

       22     fair?

       23     A.    Yeah, it almost looked like a small newspaper.

       24     Q.    And in Bachelor Beat you could find escort ads, correct?

03:31p 25     A.    Yes.
```

ERIC MURRY - CROSS-EXAMINATION BY MS. BERTRAND

1  Q.   And I'm asking out of curiosity, other kinds of ads, too,

2  like strip tease, massage?

3            MS. PERLMETER:  Objection, relevance.

4            THE COURT:  Overruled.

03:32p  5            THE WITNESS:  I -- I believe there were.  It's --

6  it's going back -- going back a -- a few years for sure but,

7  yeah, I think there were -- there were other things other than

8  just strictly escort ads.

9  BY MS. BERTRAND:

03:32p 10  Q.   Any other publications in Bachelor Beat that you recall?

11            MS. PERLMETER:  Objection, relevance.

12            THE COURT:  Overruled.

13            THE WITNESS:  There was a -- there was a

14  magazine-type thing called Play Time that we had used.

03:32p 15  BY MS. BERTRAND:

16  Q.   That was like another local publication?

17  A.   Yeah, you would generally pick it up at the door of

18  various strip clubs around town.

19  Q.   That explains why I've never seen it, okay.

03:32p 20       And before on-line advertising there was -- there was

21  escort advertising but, generally, in your -- in your

22  experience what was the most common way for prostitution to

23  occur?

24            MS. PERLMETER:  Objection, foundation.

03:33p 25            THE COURT:  Overruled.

1        THE WITNESS:  Well, it -- I guess it kinda depends

2    on which type of prostitution you're talking about.

3    BY MS. BERTRAND:

4    Q.   All right.  Well, what distinctions about prostitution do

03:33p  5    you make?

6    A.   Well, there's -- for instance, like, if you're talking

7    about, like, the escorts and, like, a hotel operation versus

8    street prostitution.

9    Q.   Okay.  You and I probably know the difference, but why

03:33p 10    don't you explain to our jury the difference between those two

11    kinds of prostitution.

12    A.   Certainly.  Again, like the hotel operation would be kind

13    of like what I talked about before where it would be an

14    undercover operation where the detectives would be either

03:33p 15    posing as a customer or posing as a prostitute trying to

16    entice the other party.

17        And then street prostitution would be just the

18    individuals that are walking out on the street as prostitutes.

19    Q.   And when about do you think that on-line advertising for

03:34p 20    escorts really took off, in your experience?

21    A.   That's -- that's a tough question to answer.  I've been

22    there a while so I -- the time frame is pretty loose, but I

23    would say maybe like 2012, 2013, something like that.

24    Q.   That's when, in your testimony, on-line advertising for

03:35p 25    escorts and sex work took off?

1  A.   Well, as best I can recall.  Again, it's -- it's been a

2  while but it was -- it was sometime around that time frame,

3  yes.

4  Q.   With regards to investigations, how many arrests just in

03:35p  5  general terms do you think you've made in your career?

6  A.   Oh, wow.

7  Q.   I'm sure it's a big number.

8  A.   Yeah.  I mean, that -- again, that would be very hard to

9  put a number on.  It's 26, almost 27 years of law enforcement.

03:35p 10  Q.   Figure what?

11  A.   Conservatively, I'd say over a thousand.

12  Q.   Arrests?

13  A.   Yes.

14  Q.   And you've been trained at the Arizona POST?

03:35p 15  A.   Yes, ma'am.

16  Q.   And certified Arizona POST?

17  A.   Yes, ma'am.

18  Q.   As part of your training are you trained as to what the

19  -- what the level of proof is you need for arrest?

03:36p 20  A.   Probable cause.

21  Q.   And probable cause is relatively a low standard; would

22  you say?

23          MS. PERLMETER:  Objection, relevance, calls for a

24  legal conclusion.

03:36p 25          THE COURT:  I can't hear you.

1          MS. PERLMETER:  Objection, relevance and calls for a

2   legal conclusion.  He's not a lawyer.

3          THE COURT:  Sustained.

4   BY MS. BERTRAND:

03:36p  5   Q.   Can we agree that probable cause is what you need to

6   arrest?

7   A.   Yes.

8   Q.   How many trials have you chaired?

9   A.   I'm sorry, say that again.

03:36p 10   Q.   How many trials have you chaired?

11          MS. PERLMETER:  Objection, relevance.

12          THE COURT:  Well, I think I'll sustain the

13   objection, but I'm not sure what you mean by "chaired."

14   BY MS. BERTRAND:

03:36p 15   Q.   How many trials have you been a case agent for?

16          MS. PERLMETER:  Objection, foundation.

17          THE COURT:  Well, I guess you can lay some

18   foundation.

19          MS. BERTRAND:  I thought he testified -- I'm sorry,

03:37p 20   Your Honor, I thought he did testify that he'd been the case

21   agent in cases.

22          THE COURT:  Well, you can lay some foundation.

23   BY MS. BERTRAND:

24   Q.   Have you been the case agent for any investigations?

03:37p 25   A.   Yes, I have.

 1    Q.    Have you been the case agent for any cases that have gone

 2    to trial?

 3    A.    Yes.

 4    Q.    How many?

03:37p  5    A.    That's a much lower number.  It would be very difficult

 6    to put a number on that, too.

 7              MS. PERLMETER:  Objection as it causes the witness

 8    to speculate.

 9              THE COURT:  Well, maybe Ms. Bertrand can narrow some

03:37p 10    of the time frame and it will help him along.

11    BY MS. BERTRAND:

12    Q.    In the time you've been a detective on Vice are, how many

13    trials have you been the case agent for?

14    A.    It's a guess but --

03:37p 15    Q.    Well, give us --

16              MS. PERLMETER:  Objection, calls for speculation if

17    he's guessing.

18              THE COURT:  Sustained.

19    BY MS. BERTRAND:

03:38p 20    Q.    Can you estimate.

21              MS. PERLMETER:  "Estimate" is the synonym for

22    "guess."

23              THE COURT:  And I would agree with that,

24    Ms. Bertrand.

03:38p 25    BY MS. BERTRAND:

1    Q.    So, Detective, sitting here today you don't --

2              THE COURT:  Sustained.

3              MS. BERTRAND:  Okay.

4    BY MS. BERTRAND:

03:38p 5   Q.   Sitting here today, you don't know how many trials you've

6    sat on?  More than one as a case agent?

7    A.    More than one, yes.

8    Q.   Less than 10?

9    A.    No, it's more than 10.

03:38p 10  Q.   More than 20?

11   A.   I would say it's more than 20.

12   Q.   More than 25?

13   A.   I would say it's more than 25.

14   Q.   More than 50?

03:38p 15  A.   I don't know.

16             MS. PERLMETER:  Objection, calling for speculation.

17   The witness is hesitating.

18             THE COURT:  Sustained, Ms. Bertrand.  Let's move

19   forward.

03:38p 20             MS. BERTRAND:  Okay.

21   BY MS. BERTRAND:

22   Q.   Somewhere over 25, correct?

23   A.   Yes, ma'am.

24   Q.   And at trial it's a standard higher than probable cause,

03:39p 25  correct?  It's reasonable doubt?

ERIC MURRY - CROSS-EXAMINATION BY MS. BERTRAND

1   A.   Yes, ma'am.

2   Q.   You mentioned two different kinds of sting operations

3   that you've participated in.  The first is one where -- I'm

4   going to be speaking in generalities, but where the men, the

03:39p  5   male agents, pose as customers of prostitutes, correct?

6   A.   Correct.

7   Q.   And in those is it -- is it your testimony that you would

8   find the targets of your investigation using on-line

9   advertising?

03:39p  10       MS. PERLMETER:  Objection, foundation.

11       MS. BERTRAND:  He testified to these regarding his

12   investigations with the Government.

13       THE COURT:  Well, I'll overrule.

14       MS. BERTRAND:  Go ahead, detective.

03:40p  15       THE WITNESS:  Yes, I would use on-line resources.

16   BY MS. BERTRAND:

17   Q.   Backpage being one, right?

18   A.   Yes.

19   Q.   Craigslist being another?

03:40p  20   A.   Yes.

21   Q.   The Erotic Review being another?

22   A.   I used it during the investigations, yes.

23   Q.   Did you use it as the primary site for your

24   investigations, like your starting point?

03:40p  25   A.   No, I would usually go to Backpage.

1    Q.    And in the undercover operations of undercover johns

2    seeking prostitutes, when you contacted the target you would

3    have a phone conversation -- and I'm gonna assume with her.  I

4    know it's a generalization, but for ease of conversation here

03:41p  5    you'd speak with her, correct?

6    A.    Either a phone or a text message.

7    Q.    And were those phone calls recorded?

8    A.    Sometimes they were, sometimes they weren't.  Technology

9    had kinda gotten better towards the end.  So now phone calls

03:41p 10    are made, but now it's kind of all gone to text messages.

11    Q.    And in those initial conversations, be they by text or

12    phone, you would discuss what with the target?

13    A.    I would generally just -- it was very simple.  I would

14    just -- oftentimes if I were sending a text message, for

03:41p 15    example, I would just say, "I saw your advertisement.  Are you

16    available"?

17    Q.    Uh-huh.

18    A.    "Come to my hotel," or something like that.  Similar

19    conversation over the -- over the telephone.  I would just

03:41p 20    call them and say, "Hey, I saw your ad.  Are you available."

21    Q.    Would you, in those initial phone calls or text messages,

22    discuss the terms of the arrangement?

23    A.    I would -- I would get a price for sure, about how much

24    she was going to charge.

03:42p 25    Q.    Would you get a quote for what the service will be?  Did

1   she specify what you guys were gonna do when you met up?

2   A.   Oftentimes I really didn't ask over the phone or text

3   message.  Sometimes I would, but generally not.  I'd rather

4   have them just come meet me in person and then we can discuss.

03:42p  5   Especially if the phone call wasn't recorded, then I would

6   definitely want to continue that conversation in person so

7   that it would be recorded.

8   Q.   So let's say she agrees to meet up with you.  Did you say

9   -- I might have misunderstood you.  Did you say you'd be at a

03:42p  10  hotel for these arrangements?

11  A.   Yeah, it could be -- it could be in a hotel or sometimes

12  even it would be just like what's called a "car date," where

13  we would go and pick the girl up and put her in the car.

14  Q.   Be in the car, right.

03:43p  15       Now, when you would meet up with the woman at a hotel or

16  in a car, would you start recording the encounter then?

17  A.   Yes.

18  Q.   And why would you record the encounter?

19  A.   Just for evidentiary purposes.

03:43p  20  Q.   And what would you want to capture in those recordings as

21  part of this investigation?

22  A.   The agreement that we would come up with for sex for

23  money.

24  Q.   The agreement being how much she's going to charge,

03:43p  25  correct?

ERIC MURRY - CROSS-EXAMINATION BY MS. BERTRAND          103

1  A.   Yes.

2  Q.   And for what kind of conduct, correct?

3  A.   Correct.

4  Q.   And that conduct under the Arizona Revised Statutes has

03:43p  5  to be specific to constitute prostitution, correct?

6  A.   Correct.

7  Q.   In your -- I'm doing the math in my head standing here so

8  sorry -- 21 years on vice -- are we at 21 years?

9  A.   Yes, ma'am.

03:44p 10  Q.   Have you ever placed a woman under arrest based only on

11  what's in her ad on-line?

12  A.   Yes.

13  Q.   And did that -- describe that arrest.

14  A.   There are various -- there's a -- there's a city code

03:44p 15  that requires someone who's posting an ad to have their escort

16  bureau number posted in that advertisement.

17  Q.   So the arrest that you would make based only on an ad was

18  due to a lack of having her escort license number in the ad;

19  is that fair?

03:45p 20  A.   Yes.

21  Q.   So that would be a -- an arrest for a city violation

22  regarding a regulatory issue, not for prostitution, fair?

23  A.   Correct, that would not be a prostitution arrest.

24  Q.   Well, let's talk -- since you brought it up, let's talk

03:45p 25  about those escort licenses.  Phoenix licenses escorts,

ERIC MURRY - CROSS-EXAMINATION BY MS. BERTRAND

1    correct?

2    A.    They do.

3    Q.    Are you familiar with the process to get an escort

4    license?

03:45p 5    A.    Generally.

6    Q.    You have to fill out an application, right?

7    A.    Yeah, they would have to go to City Hall in the licensing

8    department and they would fill out an application, just

9    general information about themselves and if they've ever been

03:45p 10   convicted of a crime.

11        I don't know if there's a section about warrants or

12   something like that, but just basically they're talking about

13   themselves and their criminal past basically.

14   Q.    Fingerprints, maybe?

03:46p 15   A.    I don't know.

16   Q.    Okay.

17   A.    I don't know the answer to that.

18   Q.    Okay.  And does having a criminal history actually

19   preclude you from being an escort, if you know?

03:46p 20   A.    Yes.  If you have been arrested for prostitution, I think

21   it's within like the previous five years, if I'm not mistaken,

22   then you would not be able to get approved for a license.

23   Q.    And you have to pay a small fee to get your license,

24   right?

03:46p 25   A.    I -- I would imagine so.  I think so.

ERIC MURRY - CROSS-EXAMINATION BY MS. BERTRAND                105

1  Q.   And then if you -- if you survive this, you know, less

2  than rigorous review, you can work as an escort in Phoenix,

3  right?

4  A.   Yeah.

03:46p  5  Q.   And Phoenix also licenses escort bureaus, correct?

6  A.   Right.

7           MS. PERLMETER:  Objection, relevance.

8           THE COURT:  Overruled.

9           MS. BERTRAND:  Correct?

03:47p 10           THE WITNESS:  Correct.

11  MS. BERTRAND:

12  Q.   And escort bureaus also have to submit an application, if

13  you know?

14  A.   Yeah, they do.

03:47p 15  Q.   Do you know what the definition under the Phoenix city

16  code for an escort bureau is?

17  A.   I couldn't quote it to you off the top of my head, but

18  basically it's just someone that arranges the interaction

19  between an escort and the customer.

03:47p 20  Q.   And there's other types of adult entertainment that

21  Phoenix also licenses, correct?  You'd be familiar with that

22  as a Vice offer, right?

23  A.   Yeah.

24  Q.   Have you done undercover work in, say, cabarets?

03:47p 25           MS. PERLMETER:  Objection, relevance.

UNITED STATES DISTRICT COURT

ERIC MURRY - CROSS-EXAMINATION BY MS. BERTRAND

```
 1              THE COURT:  I'll give Ms. Bertrand a little leeway
 2  but --
 3              THE WITNESS:  I have.
 4              THE COURT:  So overruled.
03:48p  5  BY MS. BERTRAND:
 6  Q.   You said you have?
 7  A.   I have, yes.
 8  Q.   And do you know what the City of Phoenix definition of an
 9  "adult cabaret" is?
03:48p 10  A.   If you're gonna ask me to recite it, I can't.
11  Q.   Well, it's funny.  It's such a weird word.  Cabaret
12  always makes me think of, like, show tunes and I know that's
13  not what it's meant here.  Is it -- it would be like a
14  nightclub, right?
03:48p 15  A.   Yeah, like a strip club.
16  Q.   So cabarets are strip clubs?
17  A.   Yeah.
18  Q.   And sometimes prostitution happens at strip clubs, right?
19  A.   I have made arrest for prostitution in strip clubs.
03:48p 20  Q.   Phoenix also licenses adult arcades?
21              MS. PERLMETER:  Objection, relevance.
22              THE COURT:  Overruled.
23              MS. BERTRAND:  Correct?
24              THE WITNESS:  Correct.
03:48p 25  BY MS. BERTRAND:
```

ERIC MURRY - CROSS-EXAMINATION BY MS. BERTRAND

1   Q.   What are those, if you know?

2   A.   Those are businesses where a customer can go in and pay

3   money to go watch a pornographic movie.  They also have, like,

4   little booths that the customers can go in and you put money

03:49p   5   into a machine and you can watch a little clip of a

6   pornographic movie.

7   Q.   I think in other generations we called those peepshows or

8   something like that.  Sound right?

9   A.   That might be before my time.

03:49p   10   Q.   And Phoenix, if you know, also licenses adult hotels?

11   A.   They do.  I don't know if they still do or not.  I know

12   they were trying to not renew those permits for a while

13   but. . .

14   Q.   What are those so the jury knows what we're talking about

03:50p   15   here?

16   A.   That would be a hotel that you could pay by the hour to

17   rent a room.

18   Q.   And different from the arcades, Phoenix also licenses

19   adult theaters, correct?

03:50p   20   A.   Yeah.

21          MS. PERLMETER:  Objection, relevance.

22          THE COURT:  I'll sustain.

23   BY MS. BERTRAND:

24   Q.   In any of these other institutions like cabarets, strip

03:50p   25   clubs, prostitution also can happen at those, correct?

ERIC MURRY - CROSS-EXAMINATION BY MS. BERTRAND                108

1    A.    Yeah, yes.

2    Q.    And what is -- if you know sitting here -- and if you

3    don't know, I don't mean to put you on the spot.  Do you know

4    what the definition of "prostitution" is in Arizona?

03:50p  5    A.    I couldn't recite it for you but, basically, it's just

6    exchanging sex for -- for money or any other form of

7    consideration.

8    Q.    Well, how does -- how do the Arizona Revised Statutes

9    define "sex" in the context of prostitution, if you recall?

03:51p 10              MS. PERLMETER:  Objection, calls for a legal

11    conclusion.  The Court will instruct the jury to the

12    applicable law at the end of this trial.

13              THE COURT:  Sustained.

14              MS. BERTRAND:  Your Honor, I'd like to make an offer

03:51p 15    of proof about that, if I may?

16              THE COURT:  I'll sustain the objection for now and

17    you can revisit it later.

18              MS. BERTRAND:  Okay.

19    BY MS. BERTRAND:

03:51p 20    Q.    Do you know that Arizona Revised Statutes specifically

21    define what constitutes sex in the context of prostitution?

22    A.    Yes, it would define sexual intercourse, I believe.

23    Q.    And striptease itself with no touching is not

24    prostitution, correct?

03:51p 25              MS. PERLMETER:  Objection, calls for a legal

1   conclusion.  The Court will instruct the jury on the relevant

2   law at the end of the case.

3          MS. BERTRAND:  He's a certified law enforcement

4   officer and makes these arrests.

03:52p  5          THE COURT:  Well, don't argue the objection.  Let me

6   rule.  Let me consider it, Ms. Bertrand.

7          Well, the question was asked in the context of do

8   you know that A.R.S. specifically defines.  So he can say

9   "yes" or "no" if he knows.

03:52p 10          MS. BERTRAND:  I think there might be a mixup about

11  what the question was.  I asked if striptease is illegal.

12          I just want to make sure we're talking about the

13  same question, Judge.

14          THE COURT:  I stand corrected.  The question is --

03:52p 15  well, it was asked in this fashion:  And striptease itself

16  with no touching is not prostitution, correct?

17          And I'll sustain the objection.  So ask a new

18  question.

19  BY MS. BERTRAND:

03:53p 20  Q.   Have you ever made a prostitution arrest based only on a

21  striptease?

22  A.   No.

23          MS. PERLMETER:  Objection.

24          THE COURT:  Overruled, the answer will stand.

03:53p 25  BY MS. BERTRAND:

1    Q.    You mentioned that there was a migration to -- I believe

2    you mentioned that there was a change to Backpage from

3    Craigslist at some point.

4          Do you recall that?

03:53p  5    A.    Yes.

6    Q.    Do you know whether or not prostitution advertising

7    continued on Craigslist after it shut its adult section down?

8    A.    I don't know.

9    Q.    Did you ever use Craigslist after it shut its adult

03:53p 10    section down?

11   A.    No.

12   Q.    How many subpoenas do you believe you sought from

13   Backpage in your time at Phoenix Police Department Vice?

14   A.    That also would be tough to put a number on because we --

03:54p 15         MS. PERLMETER:   I'll object based on speculation.

16   The witness is hesitating.

17         THE COURT:   Sustained.

18   BY MS. BERTRAND:

19   Q.    Have you sought in your time at Phoenix Vice more than

03:54p 20   ten subpoenas from Backpage?

21   A.    I would say "yes."

22   Q.    You would say "yes"?

23   A.    I would say "yes."

24   Q.    Have you sought more than 20 subpoenas from Backpage in

03:54p 25   your time at Phoenix Vice?

1  A.   I don't know the answer to that.  I'm -- I'm really not

2  trying to be difficult --

3  Q.   Okay.

4  A.   -- I promises but --

03:55p  5  Q.   And I'm not trying --

6  A.   -- they were generally used for kind of the bigger cases.

7  Like we wouldn't use those -- we wouldn't subpoena Backpage

8  just if we were doing a hotel operation and we saw a girl, we

9  arrested her for prostitution.  We would generally not

03:55p 10  subpoena that, but if it was a big -- bigger case like a pimp

11  case or something like that, we would subpoena Backpage to try

12  to get information on who placed the ads.

13  Q.   All right.  And in your time with Phoenix Vice did

14  Backpage ever balk at giving you a subpoena response?

03:55p 15  A.   No.

16  Q.   Did you ever have an occasion -- and the answer may be

17  "no."  I'm asking out of curiosity.

18       Did you ever have an occasion to contact Backpage about

19  an emergency?

03:55p 20  A.   No, not that I recall.

21  Q.   Did you ever need a representative of Backpage to testify

22  in assistance with one of your investigations?

23  A.   No, I did not.

24       MS. BERTRAND:  Your Honor, I'm sensitive as to time

03:56p 25  and the clock's to my back.  So do you mind if I -- I don't

ERIC MURRY - CROSS-EXAMINATION BY MS. BERTRAND

1   want to be rude and check the time.

2          THE COURT:  Yes, you have some time.

3          MS. BERTRAND:  Okay.

4          THE COURT:  We'll go to 4:15.

03:56p   5          MS. BERTRAND:  All right, thank you.

6          Would someone flag for me when I have like five

7   minutes left.

8          THE COURT:  I'll let you know.

9          MS. BERTRAND:  Okay.  Thank you, Your Honor.

03:56p  10          THE COURT:  The jury will let us know.

11          MS. BERTRAND:  Yeah, death stares, yes.

12   BY MS. BERTRAND:

13   Q.   Let's talk about the other kind of sting operation that

14   you talked about with the Government where Phoenix Police

03:56p  15   Department is actually posting ads on Backpage.

16   A.   Okay.

17   Q.   Did -- and you were with the task force, right?

18   A.   Yes, ma'am.

19   Q.   So that task force allows you to work throughout the

03:57p  20   Valley, right?  You're not stuck in Phoenix?

21   A.   Correct.

22   Q.   Have you worked outside of the valley?

23   A.   I've gone up to Flagstaff to assist with an arrest up

24   there but generally it's -- generally it's in the Valley.

03:57p  25   Q.   So with these it's a little different, right, because

UNITED STATES DISTRICT COURT

ERIC MURRY - CROSS-EXAMINATION BY MS. BERTRAND                113

1    you're writing -- you're actually drafting and creating an ad,

2    right, or your colleagues are?

3    A.    Yes, my colleagues are.

4    Q.    And they put in the ad language that appears consistent

03:57p  5    with other ads in the area, correct?

6    A.    Correct.

7    Q.    And that's so it doesn't stand out and look like it's

8    cops writing the ad, right?

9    A.    Correct.

03:57p  10   Q.    They post a photo in the ad, correct?

11   A.    Yes.

12   Q.    Where do they get the photos?

13   A.    Oftentimes they would be from just other ads --

14   Q.    Of other women?

03:58p  15   A.    -- posted on-line.  More recently we have actually gotten

16   contracts with models to use their photos.

17   Q.    When did you change to using contracts with models?

18   A.    A few years ago.

19   Q.    But before then you just used other women's ads?

03:58p  20   A.    Yes.

21   Q.    Did you use the undercover officers' faces in the ads?

22   A.    Not that I've ever seen.

23   Q.    Did you use the faces of other women in these ads?

24   A.    The ones that I saw they generally would try to avoid

03:58p  25   using, like, a full face shot.  Sometimes there would be,

UNITED STATES DISTRICT COURT

1   like, half a face or something like that; but we would try to

2   conceal their identity and just use more of, like, a torso

3   shot or something like that.

4   Q.   Did you ever have trouble with the Backpage moderation

03:59p   5   getting your ad through?

6   A.   I guess I'm not --

7           MS. PERLMETER:  Objection, foundation.

8           THE COURT:  Sustained.  I think he's --

9   BY MS. BERTRAND:

03:59p  10   Q.   You've assisted in these investigations, correct?

11   A.   I have.

12   Q.   Have you assisted in the posting of the undercover

13   prostitution ad on Backpage?

14   A.   No.

03:59p  15   Q.   You just were kind of around in the periphery?

16   A.   No -- yeah, the -- my female colleagues would be the ones

17   actually posting the ads.

18   Q.   Did you ever hear of an occasion where their ad didn't go

19   through, much like your ad got bounced?

03:59p  20   A.   Not -- not that I can recall.

21   Q.   You just don't have a recollection of something like

22   that?

23   A.   Yeah, I don't -- I don't recall.  There -- there could or

24   it could have not.  I don't know.

03:59p  25   Q.   And so in those ads the undercover officer is -- is

ERIC MURRY - CROSS-EXAMINATION BY MS. BERTRAND                    115

1   posing as a prostitute or an escort, correct?

2   A.   Correct.

3   Q.   You usually post it in escorts, not in other sections,

4   right?

04:00p  5   A.   I'm sorry, say that again.

6   Q.   You usually were posting these undercover ads in escorts,

7   correct?

8   A.   Oh, yes.

9   Q.   Not in -- I know yours was in dating, but that's because

04:00p  10   the adult section had gone down, right?

11   A.   Yeah, and my female colleagues did the same thing.  When

12   the adult section went down, they would just post in the

13   dating.

14   Q.   And to be clear about these hotel investigations, you

04:00p  15   would rent a couple of rooms at a hotel, right?

16   A.   Yes.

17   Q.   And the undercover -- the woman, undercover officer,

18   posing as the prostitute would be in a room, right?

19   A.   Yes.

04:00p  20   Q.   And the target -- the responder to the ad would be told

21   to come to the hotel room, right?

22   A.   Correct.

23   Q.   And the hotel room is either audio and/or video recorded,

24   correct?

04:01p  25   A.   Yes.

ERIC MURRY - CROSS-EXAMINATION BY MS. BERTRAND                116

1   Q.   And before then -- let me back up.  When the responder is
2   contacting the undercover officer, those calls are also being
3   recorded, correct?
4   A.   Again, it was -- it was similar to my experience where
04:01p 5   earlier on, no.  Now, yes.
6   Q.   With the earlier investigations, did you have a scrivener
7   taking down what was being said if it wasn't being recorded?
8   A.   It would be up to the individual detective to document
9   her own stuff.
04:01p 10   Q.   That was sometimes the practice you used to get
11   everything down that was happening, correct?
12   A.   Yes, she would -- she would document her conversation if
13   it wasn't recorded.
14   Q.   Okay.  So let's jump ahead now, sorry about that.
04:01p 15        We get to the hotel.  The responder shows up at the
16   hotel.  Knocks on the door, right?
17   A.   Correct.
18   Q.   She answers the door, correct?
19   A.   Correct.
04:02p 20   Q.   Says, "Come on in," right?
21   A.   Yes.
22   Q.   And at this point no arrest is being made, right?
23   A.   Correct.
24   Q.   He comes in, right?
04:02p 25   A.   Yeah.

1    Q.    "Come on in," and there's some discussion about what's

2    gonna happened in the hotel room, right?

3    A.    Correct.

4    Q.    And it's only when the responder agrees to something that

04:02p 5    is sex under the Arizona statutes for money that an arrest

6    happens, correct?

7    A.    Yes.

8    Q.    And at that point you and your colleagues bust in and

9    arrest him, right?

04:03p 10    A.    Correct.

11            MS. BERTRAND:  Ms. Ellig, could you please show the

12    witness and the courtroom -- this has already been an

13    exhibit -- Exhibit 218.

14    BY MS. BERTRAND:

04:03p 15    Q.    Detective, understanding this came from a different

16    jurisdiction, have you ever seen this ad in preparation for

17    this case?

18    A.    No, ma'am, I don't believe I have.

19    Q.    I'll give you a moment to take a look at it, okay?

04:03p 20    A.    Okay.

21    Q.    And you see there in the middle of her paragraph where

22    she says 80 for head, 120 for hooking up without head, 150 for

23    hooking up with head.  Do you see that there?

24    A.    Yes, I do.

04:04p 25    Q.    Those statements could be interpreted as suggesting money

ERIC MURRY - CROSS-EXAMINATION BY MS. BERTRAND

1    for sexual conduct, correct?

2    A.    Correct.

3    Q.    Have you seen ads like this run in the Phoenix area with

4    similar verbiage?

04:04p    5    A.    Yeah.

6    Q.    Have you ever, other than for the violation of not

7    posting your escort license number, arrested someone simply

8    for posting an ad with that type of verbiage in it?

9    A.    I have not.

04:04p    10    Q.    Let's talk about The Erotic Review.  I think you

11    mentioned that in assisting your colleagues in posting these

12    on-line prostitution ads that -- and correct me if I'm wrong.

13        What I heard was that one of the things you did to help

14    was you would actually go into The Erotic Review and write

04:05p    15    reviews?

16    A.    Right.

17    Q.    And is it fair to say that those reviews looked like some

18    of the reviews you talked about today?

19    A.    Yes, and I think it was only one time I did it.  You're

04:05p    20    talking about multiple reviews, but I think there was only one

21    time that I can recall, just to be clear.

22    Q.    Where did you learn today that?  Who taught you how to do

23    that?

24    A.    Just -- again, just mimicking other -- well, who taught

04:05p    25    me how to do it?

ERIC MURRY - CROSS-EXAMINATION BY MS. BERTRAND                119

1    Q.    Yeah.

2    A.    I guess I just figured it out myself.  I just went to the

3    website and followed along with -- with what seemed proper.

4    Q.    Went for the ride?

04:05p  5    A.    Yeah.

6    Q.    And did you have other colleagues doing the same thing

7    once you kinda figured this out, that you'd post your on-line

8    reviews, she'd be doing her part and you'd be back on TER

9    like, "Best night of my life"?

04:05p 10    A.    I don't -- I don't know the answer to that.  I don't know

11    if any other detectives did that.  Again, I just did it the

12    one time.  So it's not something we really did, like,

13    regularly.

14    Q.    That you know of?

04:06p 15    A.    That I know of, correct.

16    Q.    That was pretty smart.

17    A.    Well, thank you.

18    Q.    Yeah, good job.  And when it comes to TER, do you have --

19    I mean, you've talked about kind of interpreting the language

04:06p 20    in those ads.  Do you also have familiarity with the people

21    who posted the reviews in TER?  Have you ever met someone who

22    wrote the TER reviews?

23    A.    No, not that I know of.

24    Q.    Not that you know of, right.  No one's told you they did

04:06p 25    it.  They might have been that guy, but not that you know?

ERIC MURRY - CROSS-EXAMINATION BY MS. BERTRAND                     120

 1   A.   It's quite possible and probably probable even that I did

 2   run in to them, but they're not talking about it.

 3   Q.   Well, 'cuz -- right.  So how do you confirm that

 4   whatever's written in TER even happened?

04:07p  5   A.   How do I confirm it?

 6   Q.   Yeah.

 7           MS. PERLMETER:  Objection, calls for speculation.

 8           MS. BERTRAND:  Well --

 9           THE COURT:  Sustained.

04:07p 10   BY MS. BERTRAND:

11   Q.   Have you ever confirmed that something that was posted in

12   a TER review actually happened?

13   A.   No.

14   Q.   And is it fair to say that TER's presence on Backpage

04:07p 15   shifted in the time Backpage existed?

16   A.   I'm not sure I understand the question, I'm sorry.

17   Q.   It may not have been a good question, so I'll try again.

18       Was there a time on Backpage where TER actually had,

19   like, banner ads advertising TER?

04:07p 20   A.   I -- I'm sorry, I don't remember.  There may have been

21   but again --

22   Q.   Okay.

23   A.   -- it's been a bit.

24   Q.   Long time ago.  Totally, okay.  If you don't know, you

04:08p 25   don't know.

ERIC MURRY - CROSS-EXAMINATION BY MS. BERTRAND                    121

1    A.   There may have been ads on there for TER.  I don't

2    recall, I'm sorry.

3    Q.   Do you recall in investigating those on-line

4    advertisements at some point being able to actually just go

04:08p  5    into a link to TER on an advertisement?

6    A.   I'm sorry, I don't recall that.

7    Q.   So your best recollection is just kind of these coded T

8    with a "3" and whatever and then a number, "Reviewed.  Check

9    out my reviews," within Backpage ads, fair?

04:08p 10    A.   Yeah, or -- or like in the examples we saw earlier.

11    Sometimes it would even say "reviewed on TER" or TER and a

12    number, things like that.

13    Q.   But it was -- it was in the face of the ads that TER

14    would be mentioned, right?

04:09p 15    A.   Correct.

16    Q.   There was no -- no hidden place you had to go on Backpage

17    to find the mention of TER, right?

18    A.   No.

19    Q.   Have you ever arrested someone based on the reviews she

04:09p 20    received on TER?

21    A.   No.

22    Q.   I don't mean for quality.  I mean for the conduct?

23    A.   No, ma'am.

24         MS. BERTRAND:  Your Honor, I might be about to

04:09p 25    change topics, which I can do.  I just -- I'm sensitive to

ERIC MURRY - CROSS-EXAMINATION BY MS. BERTRAND                    122

1    time, and I know my colleagues also will have questions of

2    this detective.

3              THE COURT:  All right.  Well, I'll give you some

4    latitude -- or more or less I'll give the jury some additional

04:10p  5    grace.

6              Members of the Jury, since we are at that

7    transitional point we will end for the day, and I remind you

8    of the admonition.  Now, I inquired of Liliana as to the start

9    time tomorrow and as you recall, with exception, we have been

04:10p  10   coming in at 8:45 -- excuse me -- yeah, 8:45 and ending at

11   12:30.  I was inclined to have a 9:00 a.m. start unless

12   there's vehement objection and go through 12:30.

13             So if I see someone who raises their hand that

14   opposes a 9:00 a.m. start and going through 12:30 tomorrow,

04:11p  15   now is the chance to raise that hand and I see none.

16             So we will start at 9:00 and go through 12:30

17   tomorrow.  So with that, remember the admonishment not to come

18   to any conclusions.  We still have more witnesses to hear

19   from, and don't conduct any research or discuss the matter

04:11p  20   with anyone or amongst yourselves.  Just enjoy the evening,

21   and please all rise for the jury.

22             (Jury out at 4:11 p.m.)

23             MS. BERTRAND:  May I step back from the podium?

24             THE COURT:  Yes.

04:11p  25             MS. BERTRAND:  Thank you.

```
 1              THE COURT:  I just want to make sure that I
 2    understand what we are doing tomorrow.  We have additional
 3    cross-examination by Ms. Bertrand and others, and then we are
 4    on to witness Thai Quoc?
 5              MR. STONE:  No -- no, Your Honor.
 6              THE COURT:  Oh, okay.
 7              MR. STONE:  We -- because nobody else was called
 8    today, our intention tomorrow will be to call Jessika Svengard
 9    and then Brian Griffen because they've come from a long ways
10    away to be here, and they should be shorter witnesses and we'd
11    like to get them on and off so they can go home.
12              THE COURT:  And then do you have -- because they're
13    shorter witnesses, although, you know, we have a short day
14    tomorrow, do you have someone on standby in case we need to
15    start?
16              MR. STONE:  Then Quoc Thai.  The summary witness
17    will go.  So we are set tomorrow.
18              THE COURT:  Okay, Quoc Thai.  I reversed the name.
19    Okay, thank you.
20              And have you informed my courtroom deputy as to the
21    exhibits used for him?
22              MR. STONE:  Yes, your Honor.
23              THE COURT:  Okay, thank you.
24              All right.  Anything other from the Government that
25    needs to be covered?
```

04:12p (lines 5, 10)
04:13p (lines 15, 20, 25)

ERIC MURRY - CROSS-EXAMINATION BY MS. BERTRAND                    124

1          MR. RAPP:  Yes, Judge.  You did not release

2     Mr. Ferrer from his subpoena.  Obviously, this issue regarding

3     the impeachment exhibit was pending.  The Court has now

4     resolved that issue, and we are just wondering if he is now

04:13p 5     released from the subpoena?

6          THE COURT:  Well, let me ask defense counsel.

7          Does anyone have an objection of releasing

8     Mr. Ferrer from his subpoena?  Seeing no -- or hearing no

9     objection then --

04:13p 10          MR. FEDER:  I don't know that I can agree to that.

11          THE COURT:  Okay.  And do you think that maybe he --

12     you may recall him?

13          MR. FEDER:  I don't want to say we're going to, but

14     I don't want to say that we're not going to.

04:14p 15          THE COURT:  Okay.  Well, at this juncture we'll keep

16     him on subpoena and on standby for possible recall.

17          MR. RAPP:  Very good.

18          THE COURT:  I will also ask tomorrow that the

19     defense counsel inform the Court and the Government as to any

04:14p 20     modification to its 150 some-odd witnesses that are listed on

21     the witness list.  So please give me an updated witness list

22     and please share that with the Government as well, because it

23     sounds like -- or it looks like we are moving fairly rapidly

24     now and I want to be prepared for next week, what may occur.

04:14p 25          All right.  So with that, we stand in recess until

ERIC MURRY - CROSS-EXAMINATION BY MS. BERTRAND

1    tomorrow at 9:00.

2    *(Whereupon the proceedings concluded at 4:14 p.m.)*

UNITED STATES DISTRICT COURT

1                        *REPORTER'S CERTIFICATION*

2

3                I, TERI VERES, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6                I FURTHER CERTIFY that the foregoing pages

7    constitute a full, true, and accurate transcript of all of

8    that portion of the proceedings contained herein, had in the

9    above-entitled cause on the date specified therein, and that

10   said transcript was prepared under my direction and control.

11               DATED at Phoenix, Arizona, this 24th of

12   October, 2023.

13
                                    ____s/Teri Veres____
14                                  TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25