UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Phoenix, Arizona |
| Michael Lacey, et al., | ) | October 24, 2023 |
| | ) | 1:01 p.m. |
| Defendants. | ) | |
| _____ | ) | |


**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL - DAY 23**

**(P.M. SESSION)**


Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2    For the Government:
          UNITED STATES ATTORNEY'S OFFICE
 3        By:  Mr. Kevin M. Rapp, Esq.
               Mr. Andrew C. Stone, Esq.
 4             Mr. Peter Shawn Kozinets, Esq.
               Ms. Margaret Wu Perlmeter, Esq.
 5        40 North Central Avenue, Suite 1800
          Phoenix, Arizona  85004-4408
 6        kevin.rapp@usdoj.gov
          peter.kozinets@usdoj.gov
 7        andrew.stone@usdoj.gov
          margaret.perlmeter@usdoj.gov
 8        - and -
          UNITED STATES DEPARTMENT OF JUSTICE
 9        By:  Mr. Austin Berry, Esq.
          1301 New York Avenue NW, 11th Floor
10        Washington, DC  20005
          austin.berry2@usdoj.gov
11
      For the Defendant Michael Lacey:
12        LIPTSITZ GREEN SCIME CAMBRIA, LLP
          By:  Mr. Paul J. Cambria, Esq.
13        42 Delaware Avenue, Suite 120
          Buffalo, New York  14202
14        pcambria@lglaw.com

15    For the Defendant Scott Spear:
          KESSLER LAW OFFICE
16        By: Mr. Eric Walter Kessler, Esq.
          6720 North Scottsdale Road, Suite 210
17        Scottsdale, Arizona  85253
          eric.kesslerlaw@gmail.com
18        - and -
          FEDER LAW OFFICE, PA
19        By:  Mr. Bruce S. Feder, Esq.
          2930 East Camelback Road, Suite 160
20        Phoenix, Arizona  85016
          bf@federlawpa.com
21

22

23

24

25
```

1                    **A P P E A R A N C E S (Cont'd)**

2    For the Defendant John Brunst:
         BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
3        By:   **Mr. Gopi K. Panchapakesan, Esq.**
               **Mr. Gary S. Lincenberg, Esq.**
4        1875 Century Park E, Suite 2300
         Los Angeles, California  90067
5        gpanchapakesan@birdmarella.com
         glincenberg@birdmarella.com
6        aneuman@birdmarella.com

7    For the Defendant Andrew Padilla:
         DAVID EISENBERG, PLC
8        By:   **Mr. David S. Eisenberg, Esq.**
         3550 North Central Avenue, Suite 1155
9        Phoenix, Arizona  85012
         david@deisenbergplc.com
10
     For the Defendant Joye Vaught:
11       JOY BERTRAND, ESQ, LLC
         By:   **Ms. Joy Malby Bertrand, Esq**
12       P.O. Box 2734
         Scottsdale, Arizona  85252-2734
13       Joy@joybertrandlaw.com

14

15

16

17

18

19

20

21

22

23

24

25

                   UNITED  STATES  DISTRICT  COURT

1                        I N D E X

2    SUMMARY OF COURT PROCEEDINGS:                    PAGE

3    Proceedings Outside the Presence of the Jury        6
     Proceedings Outside the Presence of the Jury       40
4    Proceedings Outside the Presence of the Jury       92
     Motion for Mistrial                                93
5    Proceedings Outside the Presence of the Jury       96

6

7    WITNESSES FOR THE GOVERNMENT:                    PAGE

8    Grant Snyder
             Direct Examination by Mr. Eisenberg        13
9            Cross-Examination by Mr. Berry             33
             Redirect Examination by Mr. Eisenberg      63
10           Cross-Examination (Cont'd) by Mr. Berry   100
     John R. Becker
11           Direct Examination by Mr. Cambria          66
             Cross-Examination by Mr. Stone            106
12           Redirect Examination by Mr. Cambria       132

13

14                       EXHIBITS

15   NO.      DESCRIPTION                             REC'D

16   5516     Jan. 2017 Binghamton Trust                78
              DEFLACEY 000012-000030
17
     5540     03.07.18 Letter from J. Becker to IRS on   79
18            behalf of M. Lacey, Requesting Extension
              to File Certain Business Income Tax,
19            Information, and Other Returns
              DEFLACEY000008
20
     5541     2018 M. Lacey FinCEN Form 114 for year     83
21            2017 DEFLACEY000031-000038

22   5542     2018.09.05 J. Becker Docs                  85
              DEFENSE 011886-011933
23

24

25

                  UNITED STATES DISTRICT COURT

**EXHIBITS (Cont'd)**

| NO. | DESCRIPTION | REC'D |
|-----|-------------|-------|
| 5545 | 2019 M. Lacey FinCEN Form 114 for year 2018<br>DEFENSE 006183-006184 | 89 |
| 5546 | 2020 M. Lacey FinCEN Form 114 for year 2019<br>DEFENSE 006186-006187 | 89 |
| 6264 | Email from Lacey to Becker, 07/29/2016<br>Becker 02057 (Page 30) | 77 |

UNITED STATES DISTRICT COURT

1                    **P R O C E E D I N G S**

2          (Court was called to order by the courtroom deputy.)

3          (Proceedings reconvene at 1:01 p.m.)

4          (Jury not present at 1:01 p.m.)

5          THE COURT:  All right.  Please be seated.          13:01:55

6          And we have our jurors in place, but let me -- let me

7    just tell you that over the break period, I looked at this

8    Exhibit 5507 entitled Why Village Voice Media's Backpage.com

9    Service Does Not Create Liability.

10         And I'm -- I guess a point of clarification,          13:02:21

11   Mr. Feder.  This was authored by attorneys Mark Sableman and

12   Anthony Blum, but you kept referring to another attorney.  And

13   I'm -- I'm kind of confused about that.  You were -- you were

14   speaking about someone that is not an author, Mr. Suskin, of

15   this memo.                                                  13:02:52

16         MR. FEDER:  We were talking about two different

17   things, Judge.  One is what you're looking at, Sableman.

18   Another is a fellow named Steve -- Steve Suskin, who is general

19   counsel for New Times and then Backpage.

20         THE COURT:  Okay.  All right.  That clarifies that   13:03:05

21   question.  So I was confused about that.

22         Now, what I would say about this Sableman exhibit,

23   that at page 23, there is an analysis about whether Backpage is

24   engaged in protected speech.  And I would say that is relevant,

25   but everything above that is not.  And so to the extent you    13:03:39

1   wish to use this as an exhibit in a redacted form, removing

2   everything up to Section 3 of the memorandum, then you can ask

3   your client, or anyone can ask their client, about their

4   awareness of this concluding information about First Amendment

5   protection.  And, of course, the government's able to ask the          13:04:26

6   defendants about what -- well, I should cav- -- there's a

7   caveat there in terms of the defendants' understanding of what

8   prompted this.

9        And -- and I don't know, Mr. Feder, if you were

10  intending to call either Mr. Sableman or Mr. Blum.  And if not,        13:04:57

11  then your clients, if they're going to testify about the

12  content or their awareness of the content and the conclusions

13  of it, then they need to be somehow aware of what was asked of

14  those counsel in this particular instance.  But I'm not going

15  to permit the exhibit to go back to the jury, because it's            13:05:22

16  replete with legal analysis, which is going to lead to

17  confusion.

18       You know, of course, the government can ask questions

19  about the ultimate conclusions.

20            MR. STONE:  Your Honor.                                      13:05:38

21            THE COURT:  Yes.

22            MR. STONE:  Just one point of clarification, is it

23  still seems like we're missing a key component here, because

24  this 31-page memo by Mr. Sableman is clearly advice of counsel.

25  I mean, this is --                                                     13:05:54

 1              THE COURT:  It is.

 2              MR. STONE:  This is just a memo from an attorney

 3      saying what you're doing is legal.  But what's really needed

 4      and which hasn't been proffered and certainly if defendants

 5      proffer this information, it would be, you know, one of the          13:06:03

 6      four elements that Your Honor has referred to time and time

 7      again, is what information was shared with these attorneys --

 8              THE COURT:  Right.

 9              MR. STONE:  -- before they made these legal

10      conclusions?                                                         13:06:15

11              If they weren't told, for example, about the

12      reciprocal link program at The Erotic Review, then their --

13      their advice isn't reliable and it's not relevant.  And so --

14              THE COURT:  Well --

15              MR. STONE:  -- we would need to understand that, I           13:06:26

16      think, Your Honor --

17              THE COURT:  And I --

18              MR. STONE:  -- before it comes in.

19              THE COURT:  I completely agree.  I'm not letting the

20      defendants in using this exhibit leapfrog those additional          13:06:32

21      criteria.

22              So to the extent that you can -- you're bringing in

23      the author, either Sableman or Blum, about this, then they can

24      testify about what they were asked only with respect to

25      Section 3, not the other information.                               13:06:55

1        And to the extent that your clients are relying upon

2   any portion of this memorandum, and I'm only going to limit you

3   to what's in Section 3, then they, too, have to put forward

4   some foundational testimony about what they understood the

5   question to be that was given to counsel.                    13:07:22

6        MR. LINCENBERG:  Your Honor?

7        THE COURT:  Yes.

8        MR. LINCENBERG:  So in regard to this exhibit, we

9   sought to introduce it on cross of Ferrer as an attachment to

10  an email that went to BMO.  It's, I think, 5507, 5508.  And, as  13:07:37

11  I recall, 5508 is the email from Brunst to BMO.

12       The Court did not permit me to go into it.  We would

13  move into evidence 5507 in the redacted form that the Court

14  just noted, meaning let Section 3 go back to the jury.  It

15  negates the government's claim that information was being      13:08:11

16  withheld from BMO.

17       THE COURT:  No.  I'm not going to permit it to go back

18  to the jury.  I just said that.  You can use it in your

19  examination of your witness, but I'm not going to let the

20  exhibit, even in a redacted form, go back to the jury because  13:08:27

21  it is inclusive of legal arguments that are not relevant.

22       I'm only suggesting that as -- with respect to

23  knowledge of -- or their belief, good-faith belief, that they

24  were First Amendment protected in their activity, that's what

25  this relates to, not anything else.                          13:08:50

1          The government is also free to ask any of the

2     individuals who relied on this whether or not they were aware

3     that Backpage pled guilty.  They can also delve into what the

4     ultimate conclusion was at paragraph -- at the -- the ultimate

5     concluding paragraph at paragraph 3.                          13:09:11

6          So there -- there -- just be mindful that there are

7     other bits of information in this analysis that will be

8     relevant to the case as well.

9          So that's how we will proceed.

10          Let's have the jury in.                                 13:09:28

11          MR. STONE:  Your Honor, just a final point of

12     clarification.  Do I understand Your Honor correctly that it's

13     not coming in at all until there's a proffer about what

14     information was shared with the attorneys?

15          THE COURT:  Yes.                                        13:09:37

16          MR. STONE:  Okay.

17          MR. KESSLER:  Your Honor, again a point --

18          THE COURT:  Who's speaking?

19          MR. KESSLER:  This is Eric Kessler.

20          A point of clarification.  You mention page 23.         13:09:48

21     That's where Section Roman Numeral III begins.

22          THE COURT:  Yes.

23          MR. KESSLER:  It has six or seven subparts, A, B, C,

24     and so forth.  Are you allowing in the entire section, Roman

25     Numeral III?                                                 13:10:02

1     THE COURT:  Well, now that you mention that, I think

2  that the information related to the Missouri statute is

3  probably not relevant.  That actually may be in the previous

4  section.  But, in any event, I'm not going to permit you to

5  mark it as an exhibit to go back to the jury, so --          13:10:52

6     MR. KESSLER:  I understand that, but in terms of

7  examining Mr. Sableman, were he to testify, is the entire Roman

8  Numeral III section permissible?

9     THE COURT:  Well, let -- give me some time.  When is

10  he scheduled to testify?                                     13:11:07

11     MR. FEDER:  We're just hearing this, like, now, Judge.

12  I don't know.  This is my answer.

13     THE COURT:  But you asked for it to be admitted, so I

14  don't know how else you were going to get it admitted if he

15  wasn't supposed to testify.                                  13:11:25

16     MR. FEDER:  Well, as -- as indicated, we tried to get

17  it in through Mr. Ferrer, and it was introduced and shown --

18  and I think shown to him, and then the Court denied its

19  admission.  I think, you know, I would reiterate what

20  Mr. Lincenberg said and ask that it be admitted through       13:11:43

21  Mr. Ferrer in pertinent part.

22     THE COURT:  No.  It's not going to go back to the jury

23  for all the reasons I've just stated.

24     So I guess you'll tell me at the end of the day when

25  Mr. Sableman is going to testify.                            13:11:58

```
 1            MR. CAMBRIA:  Could I --

 2            THE COURT:  Let's bring the jury in.

 3            MR. CAMBRIA:  Could I make one comment?

 4            THE COURT:  Is it necessary right now?

 5            MR. CAMBRIA:  It is, because I just wanted to say that    13:12:09

 6    we would have also demonstrated that that memo went to

 7    Mr. Lacey.

 8            THE COURT:  I'm sorry.  That the memo was what?

 9            MR. CAMBRIA:  That went to Mr. Lacey, that he

10    was copied on that memo from Mr. Sableman.  So he had knowledge    13:12:19

11    of it, is what I'm saying.

12            THE COURT:  All right.  All right.  Let's have the

13    jury in.

14            Can we have the witness stand by the podium?

15            THE WITNESS:  Oh.                                          13:13:19

16            THE COURT:  All rise for the jury.

17        (Jury present at 1:13 p.m.)

18            THE COURT:  All right.  Please be seated.

19            And welcome back, members of the jury.  Everyone looks

20    refreshed and ready to go.  And so I hope everyone had a           13:13:57

21    pleasant long -- longer than anticipated weekend.  And, as we

22    ended on last Friday morning, the government, I'll remind you,

23    had rested its case-in-chief.  And so now we move to the

24    defendants' case-in-chief.

25            And so please call your first witness.                     13:14:19
```

UNITED STATES DISTRICT COURT

 1          MR. EISENBERG:  Your Honor, the defendants call Grant

 2     Snyder.

 3          THE COURT:  Mr. Snyder, please come forward to my

 4     courtroom deputy and be sworn.

 5          THE COURTROOM DEPUTY:  Please raise your right hand.      13:14:30

 6      (GRANT ALLAN SNYDER, a witness herein, was duly sworn or

 7     affirmed.)

 8          THE COURTROOM DEPUTY:  If you'd go ahead and step over

 9     to the witness stand, please.

10          THE COURT:  Sir, please be seated.  Thank you.          13:14:54

11          And, Mr. Eisenberg, you may begin when you're ready.

12          MR. EISENBERG:  Thank you, Your Honor.

13                     DIRECT EXAMINATION

14     BY MR. EISENBERG:

15     Q.  Sir, would you tell the jury your name?                  13:15:01

16     A.  Grant Allan Snyder.

17     Q.  Mr. Snyder, what community do you live in?

18     A.  Woodbury, Minnesota.

19     Q.  And are you currently employed?

20     A.  I am.                                                    13:15:12

21     Q.  How are you employed, sir?

22     A.  I'm the vice president of operations and outreach for a

23     local nonprofit.

24     Q.  What does that local nonprofit do?

25     A.  We provide about 8,000 meals a week for people that are  13:15:21

GRANT SNYDER - DIRECT EXAMINATION

14

1 struggling with homelessness and provide other forms of support

2 to our first responders and other folks in that community.

3 Q.  And the funding for that group that -- that you work for,

4 where does it come from?

5 A.  Oh, 95 percent of our funding is fee-for-service to --          13:15:41

6 through contracts with shelters, drop-in centers, things like

7 that.  We also receive some state-level grants under the

8 youth -- Homeless Youth Act and the ESG, and then also through

9 private donation.

10 Q.  Sir, how long have you been involved with that?             13:16:00

11 A.  Since approximately April of 2018.

12 Q.  And is anyone else in your family involved in it?

13 A.  My wife is the executive director and my direct boss.

14 Q.  Prior -- I'm sorry?  Okay.

15       Prior to the time that you went with this group, where    13:16:17

16 did you work?

17 A.  Well, up until July 28th of this year, I was a commander

18 with the Minneapolis Police Department.

19 Q.  What rank is commander?

20 A.  Commander is approximately the rank of a captain.             13:16:30

21 Commanders command divisions, whereas lieutenants command

22 units.

23 Q.  And how long had you worked for the police department?

24 A.  Approximately 27 years.

25 Q.  Which department is this, sir?                                13:16:44

GRANT SNYDER — DIRECT EXAMINATION

A.   The Minneapolis Police Department.

Q.   Starting with the time that you began, would you briefly
explain to the jury the career path that you took and the work
that you did.

A.   In 2000 -- I'm sorry, in 1996, I was recruited out of          13:16:59
graduate school.  I became a patrol officer in the City of
Minneapolis Fourth Police Precinct answering 911 calls.  In
approximately December of 1999, I became a street crimes
officer working, again, in the Fourth Precinct.  And in 2023,
approximately, I became a surveillance officer for our           13:17:24
strategic operations team.

       Later in 2007, I was promoted to sergeant and moved
over to an FBI task force as a surveillance sergeant.  In 2011,
I transferred to the child abuse unit.  And in November of
2011, I started our juvenile human trafficking program, where I  13:17:45
remained until April 1st of 2018.

       On April 1st of 2018, I started our department's
homeless outreach unit.  And I remained there until I became a
lieutenant in September of 2019, at which point I took over our
homeless outreach unit as lieutenant.  I was the lieutenant of   13:18:07
our hiring and recruitment program, our chaplains.  I remained
there until the end of 2020, when I moved over to the Fourth
Precinct as a patrol supervisor and administrative lieutenant
for the Fourth Precinct.  And then in August of 2022, I became
the commander of the community outreach bureau.                  13:18:31

1   Q.  Sir, in the course of your service with the police

2   department, did you concentrate in a particular area, such as a

3   human trafficking, prostitution, that sort of thing?

4   A.  I did.  From approximately the time that I went to the --

5   the street crimes unit in 1999, I was focused at that point on          13:18:48

6   liveability issues, which related to prostitution, promotion of

7   prostitution.  We hadn't heard the word human trafficking back

8   then.  And when I went -- moved over to the -- the FBI task

9   force in 2007, I started working human trafficking and

10  promotion of prostitution.  That's why I was brought over          13:19:12

11  there, to support an ongoing public corruption -- public

12  corruption case that the FBI was doing.  And then in 2011, I

13  started our human trafficking program, or juvenile human

14  trafficking program.

15  Q.  You mentioned a term "promotional prostitution."          13:19:29

16          Did I hear that right?

17  A.  Yes.

18  Q.  What does that mean?

19  A.  Promotional prostitution is that someone other than the

20  individual themself is -- is promoting them in prostitution, is          13:19:39

21  either causing, coercing, or providing any kind of material

22  support or means by -- through which that, you know,

23  facilitates the prostitution act.

24  Q.  Such as a pimp?

25  A.  Such as a pimp.          13:19:57

GRANT SNYDER — DIRECT EXAMINATION                    17

1    Q.  You mentioned, sir, that you were recruited out of

2    university or college?

3    A.  Out of -- out of graduate school at the University of

4    Minnesota.

5    Q.  Okay.  So you have an undergraduate degree?          13:20:08

6    A.  At that point I did, yes.

7    Q.  In what?

8    A.  It was a bachelor of individualized studies with a focus on

9    human sexuality.

10   Q.  And -- go ahead.                                     13:20:16

11   A.  My area of interest was the ubiquity and function of

12   human -- I'm sorry -- of prostitution in every recorded human

13   society in history.

14   Q.  And was that at the University of Minnesota?

15   A.  It was.                                              13:20:29

16   Q.  And then you said you have graduate work or degree?

17   A.  I did -- I did two years of graduate work there, and then

18   later on I returned to graduate school and got a master's of

19   theology.

20   Q.  Where did you get your master's in theology?         13:20:42

21   A.  Northwestern.

22   Q.  All right.  So, now, in the course of your work, sir, did

23   you have -- were you connected with law enforcement units or

24   groups outside of the Minneapolis Police Department?

25   A.  Yes.                                                 13:20:59

```
 1    Q.  All right -- go ahead.
 2    A.  We were -- well, certainly through the FBI task force, we
 3    had a, you know, jurisdiction that well exceeded the boundaries
 4    of the city and the state.  When I took over our juvenile human
 5    trafficking program and -- well, started our juvenile human
 6    trafficking program, we developed partnerships not just in the
 7    Twin Cities area, but in the neighboring states and in other
 8    states around the country.
 9    Q.  So it sounds like you had a multistate oversight in terms
10    of what you were looking at, human trafficking?
11    A.  Yeah.  I mean, I had involvement in case work that was
12    going on in other places, yes.
13             THE COURT:  Mr. Snyder, can I ask you just to slow
14    down a little bit.  You're really taxing our court reporter,
15    who's trying to keep up with you, very, very fast cadence of
16    speech.  But just take a breath a little bit and then slow
17    down.
18             THE WITNESS:  Absolutely, Your Honor.
19             THE COURT:  Thank you.
20             THE WITNESS:  It's not the first time I've heard that.
21             THE COURT:  Okay.  Thank you.
22    BY MR. EISENBERG:
23    Q.  And how about any other associations, such as International
24    Association of Human Trafficking?
25    A.  I'M the -- one of the vice presidents in charge of
```

13:21:13

13:21:27

13:21:41

13:21:52

13:22:03

GRANT SNYDER — DIRECT EXAMINATION

19

1   community connections and relationships through the

2   International -- or for the International Association of Human

3   Trafficking Investigators.  That relationship dates back to

4   approximately 2012.

5   Q.  And do you have any association or connection, or did you,    13:22:19

6   with the United States Marshal's office?

7   A.  I was a specially deputized U.S. Marshal.  I can't remember

8   the exact date, but it was in or around the 2008 or 2009 period

9   when I was part of the ATF task force.

10  Q.  Now -- I'm sorry.  I'm going to ask you about your role in    13:22:37

11  training others.  Okay?

12          Would you tell the jury the -- the types of training

13  that you've given to other people and who it was connected

14  with, that sort of thing.

15  A.  Sure.  I provided training under a number of different        13:22:54

16  grants originally that was focused on things like human

17  trafficking investigations, both preliminary and advanced human

18  trafficking investigation; victim management, trauma, informed

19  care, and interviewing victims.

20          We -- I also provided surveillance training, technical    13:23:14

21  surveillance education, undercover operations.  I conducted a

22  number of undercover operations, and myself, and so we -- we

23  provided curriculum that was oriented toward introducing people

24  to what trauma-informed, victim-centered undercover operation

25  would look like that wouldn't further traumatize or injure       13:23:39

UNITED STATES DISTRICT COURT

GRANT SNYDER – DIRECT EXAMINATION

20

```
1    victims that were already being exploited.
2            And things like individual officer wellness to follow,
3    online extrapolation and exploitation of sources.
4    Surveillance.  Physical and mobile surveillance.  And a variety
5    of other things that I'm probably forgetting right now.          13:24:02
6    Q.  Mr. Grant, again, I think if you could talk just a little
7    slower.  Okay?  All right.  Thank you, sir.
8            So did there come a time in your career when you did,
9    you, yourself, did prostitution investigations?
10   A.  Yes.  For the greatest portion of the time that I was in --  13:24:21
11   was a sworn officer, I participated in one way or another.
12   Q.  And in the course of doing that, did you consult
13   advertisements with respect to leads, if you will?
14   A.  I did.
15   Q.  Now, before -- you did have an association with Backpage;     13:24:39
16   is that correct?
17   A.  Yes.
18   Q.  Before we get to that, would you describe how you in your
19   police work would do an investigation of prostitution
20   through -- initiated through an ad.                               13:24:53
21   A.  So the -- the traditional way of doing work investigating
22   prostitution was to engage in contact with a person that was
23   suspected to be engaged in prostitution, attempt to obtain an
24   offer of sex for money, and then make an arrest of the
25   individual, which was typically, in my experience, women,        13:25:21
```

1    although it's by no means is only women, and then use that

2    hammer, if you would, of arrest and potential prosecution to

3    encourage cooperation.

4           That we found to be very problematic for a number of

5    reasons, not limited to that it further traumatizes people that    13:25:39

6    are already experiencing some form of trauma.  And so we try

7    to --

8           MR. BERRY:  Objection, Your Honor.  Testifying in the

9    narrative.

10          THE COURT:  Sustained.                                      13:25:53

11   BY MR. EISENBERG:

12   Q.  Sir, what did you -- can you complete the way that you

13   would go about conducting an investigation.

14   A.  We would use leads, online ads in some cases, to make

15   contact with individuals that may or may not have been involved    13:26:08

16   in prostitution or being exploited, and then assess whether or

17   not they were -- they needed help, were willing to accept our

18   assistance or the assistance of victim advocates that we

19   typically took with us.  Try and build a relationship and

20   rapport with that individual.  And never arrested people that      13:26:26

21   were themselves involved in prostitution.

22   Q.  Now, Mr. Grant, would you -- in the cases where you were

23   initiating your investigation through an ad, would you arrest

24   someone on the basis of the ad alone?

25   A.  No.                                                            13:26:47

GRANT SNYDER - DIRECT EXAMINATION

22

```
 1    Q.  Why not?
 2    A.  Well, because the ad was -- was a lead.  It provided a
 3    potential starting point, but a very early starting point.  And
 4    there was no assurance that the individual, if there was a
 5    photo depicted, was even the individual that we would have          13:27:05
 6    contact with.
 7    Q.  Right.  Now, in the course of doing your investigations,
 8    would you consult Backpage?
 9    A.  Yes.
10    Q.  And would you look on Backpage for advertisements?            13:27:18
11    A.  I did.
12    Q.  And would you post your own advertisement in -- on
13    Backpage?
14    A.  I would when I was doing undercover reverse stings.
15    Q.  For, sir?                                                     13:27:32
16    A.  When I was doing reverse sting operations.
17    Q.  Oh, reverse sting.  What's the reverse sting?  I think the
18    jury may know, but, please, just --
19    A.  A reverse sting, which is where we were targeting the
20    buyers of sex, again, largely men, who were seeking to pay for   13:27:44
21    sex with women, and we would post an ad and, in fact, it was
22    not a 15- or 16-year-old woman.  It was me, which is an
23    alarming thing to have to deal with.
24    Q.  So let's get the time frame in terms of your using Backpage
25    or looking at Backpage ads.  When did you start and when did     13:28:09
```

UNITED STATES DISTRICT COURT

GRANT SNYDER - DIRECT EXAMINATION

23

```
1   you finish?

2   A.  So I started dealing with Backpage ads the earliest I

3   remember in 2007 when I moved over to what was then an ATF

4   force that FBI was a part of.  And we started working on,

5   again, ads that were relevant to the prostitution in this        13:28:27

6   public corruption case.

7   Q.  So when you posted your own ads, tell the jury your

8   experience with what happened to those ads.

9   A.  Well, there was a -- a process that they would go through

10  when we posted an ad called moderation.  And many of the ads,    13:28:48

11  if we were too explicit, if there was any excess nudity, or if

12  we made references to age, the ads would not post.  They would

13  be blocked.  And we would have to go back to square one and try

14  again.

15  Q.  Would you try to repost that ad?  And, if so, what           13:29:09

16  happened?

17  A.  If -- if I removed problematic language, which often was a

18  guess, because I wasn't search -- sure in most cases what was

19  causing it, we would go back and try again.  And, you know, we

20  would have to use different, you know --                         13:29:28

21  Q.  Terms?

22  A.  -- terms, different wording.

23  Q.  How would you know an ad had been blocked?

24  A.  It would never show up.

25  Q.  But you knew that you actually put the ad in?               13:29:39
```

UNITED STATES DISTRICT COURT

1   A.  Yes.

2   Q.  Did you pay for it?

3   A.  Yep.

4   Q.  Did there come a time, sir, when you had contacts, physical

5   contacts with personnel at Backpage?                          13:29:52

6   A.  Yes.  I had numerous --

7   Q.  Okay.

8   A.  -- phone calls in particular, email contact, and later on a

9   few physical face-to-face contacts with people.

10  Q.  Let's talk about the phone calls.  I'm not going to ask you  13:30:05

11  what was said on either side of -- well, I'm going to ask you

12  this:  Why did you call?

13  A.  Well, in the early stages it was to try and figure out why

14  our ads weren't being posted or to get more information if

15  there was, you know, like an ad that I was trying to get a     13:30:22

16  return on or trying to find out more information.  So in the

17  early days, it was trying to obtain information pursuant to an

18  investigation.

19  Q.  And in the early days, when you were calling to find out

20  whether -- why an ad had been taken down or why it hadn't been  13:30:37

21  posted, did you find out the reason?

22  A.  No.

23  Q.  You just -- it was gone?  The ad was gone?

24  A.  Yeah.

25  Q.  Okay.  Later on did there come a reason or other reasons    13:30:47

 1   why you called Backpage?

 2   A.   There were times when we would have an exigent

 3   circumstance, where we needed a response right away.  And if it

 4   was at a time when the -- when the -- the U.S. Attorney -- the

 5   U.S. Attorney?  I'm sorry -- the District Attorney's Office,      13:31:08

 6   the Hennepin County Attorney's Office was closed, I was not

 7   going to be able to get a subpoena signed.  So it rose to a

 8   point where we would have to contact somebody to get an exigent

 9   response.

10   Q.   Okay.  Let me ask you this:  What kind of information did     13:31:20

11   you need in order -- in an exigent time frame, what -- what

12   kind of information did you want to get?

13   A.   Well, I was looking in particular at -- I wanted to know if

14   there was an email account, if there was another phone number

15   associated with it, as many of the phones on those ads were      13:31:41

16   burner phones and later Google Voice, which really didn't go to

17   anything specifically.  IP addresses later on were helpful and

18   required additional investigation.  Later on, as we got more

19   sophisticated, we looked at ad history and where the postings

20   were.                                                            13:31:58

21   Q.   And did you -- I'm sorry, sir.  Did you get that

22   information back from Backpage?

23   A.   I did.

24   Q.   Who at Backpage did you -- did you talk with?

25   A.   Well, the -- the -- there were a number of people over      13:32:07

UNITED STATES DISTRICT COURT

1    time.  I talked to somebody named Carl.  I think his last name

2    is Ferrer.

3    Q.  That's one.  Can you think of others?

4    A.  I talked to Liz McDougall on several occasions.

5    Q.  Okay.                                                    13:32:23

6    A.  I talked to Andrew Padilla.

7    Q.  Okay.

8    A.  And there's a woman named Joye.  I can't -- I apologize.  I

9    can't remember.

10   Q.  Might her last name be Vaught?  If you remember.          13:32:31

11   A.  Yes.

12   Q.  Thank you.

13        And were they responsive to your requests?

14   A.  In the early stages, when I was dealing with Carl, it -- it

15   was pretty unresponsive.  We didn't -- we didn't receive a lot  13:32:42

16   of support, in my experience.  What we got back was either

17   delayed or it wasn't -- it wasn't particularly effective.  It

18   didn't have all the information.  Later on, there was a -- a

19   process where the returns evolved, both in terms of the

20   expediency --                                                13:33:07

21        MR. BERRY:  Objection.  Testifying in the narrative,

22   Your Honor.

23        THE COURT:  Sustained.

24   BY MR. EISENBERG:

25   Q.  What happened later on?                                  13:33:11

```
 1    A.  The -- the ads became -- or the returns became more

 2    efficient.  They were provided faster, and they had more

 3    information.

 4    Q.  Let me ask you then about Andrew Padilla.  Was he

 5    responsive to your needs?                                    13:33:24

 6    A.  He was.

 7    Q.  What times of the day or evening did you call Mr. Padilla?

 8    A.  Well, I mean, throughout the -- the day, during

 9    business hours, there wasn't a lot of cause to call.  It was

10    typically after hours, in the evenings.  Sometimes late at   13:33:41

11    night if we were working a case.

12    Q.  Were you able to get ahold of him --

13    A.  I was.

14    Q.  -- each time?

15         With respect to Ms. Vaught, when did you contact her,   13:33:50

16    the time of day?

17    A.  I think the majority of conversations I had with her were,

18    like, in the after midnight range.

19    Q.  And how long did it take them to get back to you with the

20    information that you were looking for?                       13:34:04

21    A.  Again, generally speaking, it was very fast.

22    Q.  Were you able to use it?

23    A.  Pardon me?

24    Q.  Were you able to use the information?

25    A.  I was.                                                   13:34:13
```

GRANT SNYDER — DIRECT EXAMINATION

28

1   Q.  You were able to -- well, okay.  Withdrawn.

2          And what about Ms. McDougall?  Was she responsive?

3   A.  Yeah.  Liz helped us to sort of identify those areas where

4   we could be more collaborative and provide what was needed

5   legally to be able to get a return.  She was also primarily          13:34:32

6   interested in what specifically we were looking for that would

7   make our job more effective.

8   Q.  Now, did there come a time, sir, when Ms. McDougall came to

9   Minneapolis?

10  A.  There was, yeah.  She came, I think, in 2016.                     13:34:52

11  Q.  Did she meet with you?

12  A.  She met with me, an HSI agent, a couple other local

13  investigators at the U.S. Attorney's Office.

14  Q.  And what was the purpose of that meeting?

15  A.  It was to discuss, again, ongoing collaboration,                 13:35:05

16  specifically were there questions we had, how we could provide

17  them feedback that would help them to give us a better return

18  that would be -- that would lead us to more effective outcomes

19  on our cases and things like that.

20  Q.  Would you say it was helpful?                                    13:35:23

21  A.  It was very helpful.

22  Q.  Now, I want to ask you about one more type of contact.  I

23  think you testified that you did get -- you would from time to

24  time need a subpoena; is that correct?

25  A.  Yes.                                                             13:35:43

UNITED STATES DISTRICT COURT

```
 1   Q.  And would you give subpoenas or have them delivered to
 2   Backpage?
 3   A.  We would -- I would typically get my own subpoenas signed,
 4   and then I would send them myself.
 5   Q.  All right.  But then, nonetheless, they did go to Backpage?    13:35:54
 6   A.  Yes.
 7   Q.  And who did you look to for the response to the subpoena?
 8   A.  Again, it -- I think I sent them -- I can't remember what
 9   the email was.  It may have been records@backpage.com --
10   Q.  All right.                                                     13:36:12
11   A.  -- but I knew that there was a limited number of people
12   that were responding.  And, generally, it was -- it was either
13   Andrew or Joye.
14   Q.  Okay.  Now, in the course of your work, sir, did you also
15   look at other ad sites, if you will, besides Backpage?            13:36:25
16   A.  Yeah.
17           MR. BERRY:  Objection, Your Honor.  Relevance.
18           THE COURT:  Well, overruled.  The answer -- the
19   question has been answered.
20           And you can ask a new question, Mr. Eisenberg.            13:36:37
21   BY MR. EISENBERG:
22   Q.  Let me ask it this way, sir:  Did you need information from
23   those websites --
24   A.  I did.
25   Q.  -- the other ones?                                            13:36:47
```

UNITED STATES DISTRICT COURT

1    And did you attempt to contact personnel with respect
2    to those other websites or sites?
3    A.  In the beginning, we did.
4    Q.  And was -- were they responsive?
5    A.  No.                                                    13:37:00
6    Q.  What happened as time went on?  You just didn't try
7    anymore?
8         MR. BERRY:  Objection to this line of testimony
9    regarding other companies that are not on trial here today.
10        THE COURT:  Sustained.                                13:37:10
11   BY MR. EISENBERG:
12   Q.  Now, there same a time, sir, when Backpage shut down; is
13   that correct?
14   A.  Yes, sometime in early 2018.
15   Q.  And when it shut down, how did that impact your ability to  13:37:30
16   conduct your operations?
17        MR. BERRY:  Objection.  Relevance.  Outside the scope
18   of the indictment.
19   BY MR. EISENBERG:
20   Q.  Well, how about --                                     13:37:46
21        THE COURT:  Well, so I'm going to overrule.  He can
22   answer.
23   BY MR. EISENBERG:
24   Q.  Go ahead, sir.  How did it affect your investigations?
25   A.  Well, we had to relearn a new -- where the -- where the ads  13:37:55

```
 1   were being posted, attempt to rebuild relationships that we'd
 2   relied upon to get a return, utilize different sources of
 3   information that we -- other than what we had been relying up
 4   until that point.
 5   Q.  And was it as effective as what you were getting from        13:38:19
 6   Backpage?
 7   A.  No.
 8   Q.  I also want to ask you about conferences in the course of
 9   your work.
10           You've -- you've attended conferences, I take it?       13:38:30
11   A.  Yes.
12   Q.  And did there come a time, sir, when you saw or met with
13   Ms. Vaught at a conference?
14   A.  Yes.  I believe I met with her in -- I think it was
15   New Orleans.  There was a conference, and we had a booth for     13:38:43
16   IHTI, the International Association of Human Trafficking
17   Investigators, there.  And I met her.
18   Q.  And for what purpose did you -- did you meet her?
19   A.  Well, we were excited and interested that a representative
20   from Backpage was available to answer questions.  Part of what  13:39:04
21   we do at the International Association of Human Trafficking
22   Investigators is to create connections so that we can get
23   information that's relevant right from the source.  And this
24   seemed like a good opportunity.
25   Q.  All right, sir.  Thank you very much.                        13:39:19
```

UNITED STATES DISTRICT COURT

1       With respect to the ads that you were looking at on --

2    on Backpage or -- well, we'll leave it at Backpage -- what were

3    you particularly looking for in terms of whether it would

4    further your investigation?

5    A.  Well, in the first case we were looking for specific things          13:39:36

6    that would lead us to a person we were looking for.  For

7    example, if somebody from child protection, if we got a

8    referral or a parent had called and said, my runaway daughter,

9    I heard she's posting online, here's a photo of her, here's the

10   name that she's using, those would be things that we would          13:39:57

11   search for.

12   Q.  Uh-huh.

13   A.  We would also search for phone numbers, because phone

14   numbers are something that we could track.

15       Beyond that, it was -- it was sort of how the ad          13:40:06

16   itself felt.  Was there anything that gave us a lead to look

17   into that?

18   Q.  All right.  Sir, and when you look at an ad -- let's talk

19   about the picture first, or the photo.

20       Did these ads have photos?          13:40:23

21   A.  Most -- the vast majority of them did.

22   Q.  And can you tell on the basis of the photo the age of the

23   person who was in the photo?

24   A.  Not in my experience.

25   Q.  Could you tell and did there come a time, sir, when you          13:40:34

```
 1    found that the person in the photo wasn't even the person that

 2    was connected with the ad?

 3    A.   Yes.  That became pretty common knowledge, that many of the

 4    photos that were posted were pirated photos generally from

 5    another region of the U.S.                                      13:40:51

 6    Q.   And, sir, the language in the ads, what were you -- what

 7    were you looking for with respect to the language?

 8    A.   Well, again, first and foremost, we were looking for any

 9    indication that would give us a reason to think that this ad

10    involved prostitution.  The ads tended to not provide direct     13:41:06

11    evidence of that.

12    Q.   And so that's why you had to continue your investigation?

13    A.   Yeah.  The ad was a starting point for us.

14    Q.   Okay.  Thank you.

15         MR. EISENBERG:  Your Honor, that's all I have.              13:41:21

16         THE COURT:  Who is examining the witness?

17         MR. BERRY:  Me.  Austin Berry, Your Honor.

18         THE COURT:  All right.  Please come forward.  And when

19    you were ready.

20                      CROSS-EXAMINATION                              13:41:41

21    BY MR. BERRY:

22    Q.   Good afternoon, Mr. Snyder.

23    A.   Good afternoon, sir.

24    Q.   We've talked a couple of times now; correct?

25    A.   Yes, sir.                                                   13:42:02
```

UNITED STATES DISTRICT COURT

 1   Q.  And you are retired; correct?

 2   A.  Happily so, sir.

 3   Q.  Last time I talked to you, last -- or I guess before today,

 4   last week you were on vacation with your family in Kentucky?

 5   A.  I was, sir.                                            13:42:16

 6   Q.  All right.  Are you being paid to be here today, sir?

 7   A.  No.

 8   Q.  Okay.  Were you subpoenaed to come here today?

 9   A.  I was.

10   Q.  Would you have come here without a subpoena?          13:42:26

11   A.  No.

12   Q.  So you are here because a subpoena was issued, and you're

13   abiding by that subpoena; is that correct?

14   A.  Yes, sir.  I've never ignored a subpoena in my life, and

15   I'm not going to start now.                               13:42:38

16   Q.  You're not going to duck subpoenas; right?

17   A.  No.

18   Q.  They're -- they're the law.  You got to comply with them;

19   correct?

20   A.  Yes, sir.                                             13:42:45

21   Q.  You're not volunteering anything that the subpoena doesn't

22   require you to come here and do; correct?

23   A.  Correct.

24   Q.  When were you first contacted by the defense?

25   A.  In August of this year.                               13:42:53

 1   Q.  Okay.  How did they contact you?

 2   A.  I got a voicemail, I believe, from a private investigator

 3   working for the defense team.

 4   Q.  Okay.  Do you remember who that was?

 5   A.  Andi.  I think last name is Murphy.          13:43:11

 6   Q.  Okay.  And you said you got a voicemail.  Did you have any

 7   other -- did you call that person back?

 8   A.  I did.

 9   Q.  Did you leave a message?

10   A.  I don't recall.                               13:43:24

11   Q.  Did you talk to that person at that time?

12   A.  I did.

13   Q.  Do you know if that conversation was recorded or anything?

14   A.  I have no idea.

15   Q.  Have you had any communications with anybody on the defense  13:43:34

16   side, and that includes Mr. Eisenberg, any of the defendants,

17   this Andi Murphy from Murphy Investigations, anybody associated

18   with the defense, have you had any written communications with

19   them since they first reached out to you?

20   A.  Yeah.  I mean, written to the extent if you consider text  13:43:51

21   messages written.

22   Q.  I do.

23   A.  The majority of the communication, I think with Ms. Murphy,

24   was through text messages.

25        I believe I sent an email to Mr. Kessler's email   13:44:04

1    address, for which I didn't initially receive a response, but

2    then some travel discussion and hotel arrangements were made

3    through, I think, Mr. Kessler's associate.

4    Q.  Okay.  And what was the nature of the text messages between

5    you and the defense investigator?                                13:44:27

6    A.  Largely discussion about when I would be available.  In the

7    initial stage, would I be available to talk with the attorneys

8    on the defense team?  Would I be willing to do so?  And then

9    later on, housekeeping things, about, you know, when I would --

10   you know, did I receive a subpoena, when I would be here, that   13:44:58

11   came much later.

12          There was a long period of time that there was no

13   communication, from August until, you know, maybe last week,

14   so ...

15   Q.  Right.  In any of the meetings that you had with any of the  13:45:10

16   defense team, and, again, that means everybody on the defense

17   side, not a -- necessarily an attorney, were any notes taken at

18   any of those meetings, to your knowledge?

19   A.  The meeting that I had with them yesterday was the only

20   face-to-face up until that point that I had had.  And I guess I  13:45:36

21   wasn't paying attention.  I assumed people were taking notes.

22   Q.  You -- did you review those notes at all?

23   A.  No.

24   Q.  Okay.  Was any recording made of that meeting at all?

25   A.  No idea.                                                     13:45:55

1    Q.   To your knowledge, there wasn't?

2    A.   I have -- no, I don't know.

3    Q.   Okay.  You certainly didn't make one?

4    A.   No.

5    Q.   Okay.  Was there any report drafted about that meeting, to      13:46:03

6    your knowledge, that you've reviewed?

7    A.   No.

8    Q.   Did you prepare anything at the request of the defense?

9    A.   The only thing that I did was review, I think, a series of

10   ads on a Dropbox file that they sent to me late last week or        13:46:26

11   last weekend.

12   Q.   So you reviewed a series of ads?  Is that what you said?

13   A.   Yes, sir.

14   Q.   They provided you a link to a Dropbox file that had some

15   ads in it?                                                          13:46:49

16   A.   Yes.

17   Q.   Okay.  Do you know how many ads there were?

18   A.   There was maybe eight to ten ads.  And that's a guess.  And

19   then there was some other documents that looked like either a

20   subpoena return or -- not that.  Something else.  I can't           13:47:19

21   really recall what they were.  But I didn't review those with

22   any great, you know, concentration.  I reviewed the ads

23   themselves.

24   Q.   Okay.

25            MR. BERRY:  Your Honor, at this time, the United           13:47:36

GRANT SNYDER - CROSS-EXAMINATION                    38

 1    States moves for the production of these text messages and

 2    emails between the defense and the witness under Rule 26.2 that

 3    have not been provided to the United States.

 4            In addition to that, the United States moves for the

 5    production of these ads and other documents under 612 that says          13:47:50

 6    that we are entitled to look at anything that was used to

 7    look -- refresh the -- the witness's memory and should be

 8    produced at the hearing for inspection.

 9            MR. EISENBERG:  Your Honor, with respect --

10            THE COURT:  Please stand.                                        13:48:09

11            MR. EISENBERG:  I'm sorry.

12            THE COURT:  Please stand.

13            MR. EISENBERG:  With respect to the text messages, I

14    don't believe that -- that we have them.  But they were not

15    substantive, and we didn't keep them.                                    13:48:19

16            With respect to what he was -- he was reviewed or has

17    been shown the other day, I'm not aware of the fact that I have

18    to produce that for the government under Rule 612, but we can

19    produce it.

20            THE COURT:  All right.  I'm going to order the                   13:48:36

21    production of whatever you may have in terms of text

22    messages --

23            MR. EISENBERG:  All right.

24            THE COURT:  -- and the ads that were shown to the

25    witness.                                                                 13:48:47

```
 1              MR. EISENBERG:  We can do the ads today, Your Honor.

 2              THE COURT:  Yes.

 3              MR. BERRY:  And apparently some other documents, some

 4   unspecified documents that he reviewed, although not in great

 5   detail.  Everything that was provided in that Dropbox file.       13:48:57

 6              THE COURT:  Yes, it should be produced, Mr. Eisenberg.

 7              MR. EISENBERG:  We will, Your Honor.

 8              MR. BERRY:  Your Honor, that's necessary for me to

 9   continue my examination of this witness.  That's why we asked

10   for the stuff in advance.                                         13:49:06

11              Could I ask the witness if he has a copy of these text

12   messages that the defense failed to produce?

13              THE COURT:  Certainly.  Certainly.

14   BY MR. BERRY:

15   Q.  Do you have those text messages, sir?                         13:49:17

16   A.  I -- on my phone.

17   Q.  You do have them --

18   A.  Yes.

19   Q.  -- available for me to review on a break?

20              THE COURT:  All right.  Mr. Berry, let's go ahead and   13:49:23

21   let the jury have a bit of a respite while we address this

22   issue.

23              Members of the jury, again, please continue to keep an

24   open mind.  There's some legal issues that I must address with

25   counsel, as you've had a highlight of, but, in any event,         13:49:39
```

```
 1   please just continue to remember the admonition.  We'll call
 2   you back, and I promise you it won't be any more than
 3   ten minutes.
 4           Please all rise for the jury.
 5       (Jury not present at 1:49 p.m.)                        13:49:53
 6           THE COURT:  Sir, you may step down.
 7           Yes, you may step down and wait in the witness room.
 8           MR. BERRY:  May I step out with the witness and review
 9   his phone?
10           THE COURT:  Not just yet.                          13:50:23
11           MR. BERRY:  All right.
12           THE COURT:  Please be seated.
13           Counsel, I will remind you that the government last
14   week renewed its request for the long-standing production of
15   26.2 material.  We now have the situation where if you have not 13:50:35
16   produced anything and you're going to call a witness, and
17   Mr. Berry or his co-counsel go through this line of
18   questioning, that you're going to be left with -- the jury's
19   going to be left with an impression that you've got something
20   to hide.  And I don't think that's anything that anyone wants. 13:50:59
21           MR. EISENBERG:  Well, Your Honor, let me --
22           THE COURT:  Well, no.  Let me -- let me be very clear.
23   You need to go back and ask your investigators and your
24   witnesses whether or not they've been shown material.  And if
25   it falls under Rule 26.2 or 612, produce it before they get on 13:51:21
```

UNITED STATES DISTRICT COURT

 1    the stand to avoid this problem.

 2              I'm going to take a very limited break.  Mr. Berry can

 3    go back and confer with whatever it is that -- that is on this

 4    witness's phone, and be diligent at producing whatever other

 5    material he reviewed in advance of his testimony.          13:51:44

 6              And -- and let me just be clear.  Whatever these ads

 7    are that he reviewed obviously was going to be relevant to his

 8    testimony, and so they are permitted to look at it.

 9              And so with that, we'll stand in recess.

10              MR. EISENBERG:  May I be heard, Your Honor?        13:52:04

11              THE COURT:  You may.  You may make a record.

12              MR. EISENBERG:  Thank you.

13              Rule 26.2 has nothing to do with the production of

14    ads, nothing to do with the production of anything other than a

15    statement made by the -- by the witness.  He has made no        13:52:14

16    statements that fall within the ambit of 26.2.

17              THE COURT:  We don't know that because --

18              MR. EISENBERG:  I'm --

19              THE COURT:  -- nothing has been produced.

20              MR. EISENBERG:  I've -- Your Honor, I -- with all due    13:52:25

21    respect, I'm an officer of the Court.  I know what a statement

22    is.  I can read that rule.  And I can assure the Court and

23    counsel for the government there has been no statement that

24    this man has given.  He has not incorporated a statement.

25    There's nothing that has been recorded.  There has nothing that    13:52:43

1    he has reviewed and said that this is my statement.  It does

2    not exist.

3            With respect to documentation that he has seen, I'm

4    not sure that Rule 612 actually provides that.  But if the

5    government wants to look at it, I will take a look and -- and        13:53:00

6    determine whether we can produce it right now.

7            THE COURT:  The problem is --

8            MR. EISENBERG:  Frankly -- I'm sorry, Your Honor.

9    I've been called to task here, and I don't think it's right.  I

10   have not had any production of any statement.  There is none       13:53:13

11   that I know of.

12           And this type of argument and examination is a little

13   bit unfair.  I am so sorry, Your Honor, but that's the way I

14   feel about it.

15           THE COURT:  Well, let me just clarify, Mr. Eisenberg.      13:53:28

16   I'm talking about you and your co-counsel.  And I'm talking

17   about --

18           MR. EISENBERG:  Well --

19           THE COURT:  -- any witness who's going to be called,

20   not just this witness.                                             13:53:42

21           So if you stand by your statement --

22           MR. EISENBERG:  I do.

23           THE COURT:  -- that no witness -- wait.  Don't argue

24   with the Court.  You may argue to the Court.

25           MR. EISENBERG:  Yes, Your Honor.  I'm going to --          13:53:54

UNITED STATES DISTRICT COURT

43

```
 1            THE COURT:  Now, let me just say if anyone is aware
 2   that any pending witness that is going to be called has
 3   produced a statement, has made a statement, it needs to be
 4   turned over.  These obligations and requests have been ongoing
 5   since the beginning of the first trial two years ago --        13:54:13
 6            MR. EISENBERG:  Your Honor --
 7            THE COURT:  -- and -- and so, please, that's how we
 8   are going to operate.  And to the -- to the argument that this
 9   is un- -- an unfair line of questioning, it's exactly the same
10   line of questioning that other defense counsel have gone        13:54:31
11   through with the prosecutor's witnesses.  So I'm going to
12   permit it, but --
13            MR. EISENBERG:  Respectfully, Your Honor --
14            THE COURT:  Don't start with respectfully, because if
15   you're going to argue with the Court, I'm not going to have it. 13:54:47
16   We have a jury waiting.  I've told Mr. Berry to go back and
17   meet with the witness and look at his text messages.  And we're
18   going to come back and reconvene.
19            THE COURTROOM DEPUTY:  All rise.
20       (Recess from 1:55 p.m. to 2:02 p.m.)                        13:55:03
21            THE COURT:  What is the issue?
22            MR. EISENBERG:  Well, there's two, Your Honor.  One is
23   Rule 612 does not give the government the authority to demand
24   what has been shown the witness.  If that were true, every time
25   one of the government's witnesses was debriefed and prepared    14:02:24
```

```
 1   for trial in this case, every single document that that person

 2   saw should have been given to us.  And in my case, Your Honor,

 3   I've never seen them.  And I know some of those witnesses

 4   have -- were prepped just before they got on the witness stand.

 5   Now, why it's different here, I don't know.                        14:02:45

 6        Secondly, with respect to the rule itself, it says,

 7   "This rule gives an adverse party options when a witness uses a

 8   writing to refresh memory."

 9        None of what he was shown was used to refresh anything

10   on his part.  They were simply ads that were shown to him.  He    14:03:01

11   did not testify about them.  And so they are not produceable

12   the way I read Rule 612.

13        And I think that's the way it's worked for the

14   government.  Should be the same way it works for me, Your

15   Honor.                                                            14:03:16

16        THE COURT:  Well, it is true he didn't testify about

17   the ads, so let me get to the 26.2 text messages.

18        Where are we on that?

19        MR. EISENBERG:  I have no problem if the government

20   wants to look at them, Your Honor.  They're not substantive.      14:03:28

21   I'm not even sure why those are a matter to be produced.

22        THE COURT:  Well, we don't -- yeah, we don't know what

23   that back and forth was about.  So, all right.  So where --

24   where is the witness?

25        MR. EISENBERG:  Well, I -- he must be in the witness         14:03:42
```

Case 2:18-cr-00422-DJH   Document 1928   Filed 10/26/23   Page 45 of 140

1   room, Your Honor.

2        He has said -- has indicated to me that he wants his

3   own attorney.  I'm not sure that that's necessary.  I'll talk

4   to him and see whether that can be -- whether he wants that.

5   If he does, of course, he may.  But I have no understanding or        14:03:57

6   no reason to get involved with that.  But let me talk to him

7   and see if we could smooth this out.

8        THE COURT:  Well, let me ask you this question:  Why

9   can't whomever it was that he was texting back and forth with,

10  one of your investigators, why can't they produce those text        14:04:14

11  messages?

12       MR. EISENBERG:  We can do that as well, Your Honor.

13       THE COURT:  And so why can't we do that now?

14       MR. BERRY:  I think Mr. Eisenberg said a little bit

15  ago that they were not preserved, which is why I asked --        14:04:24

16       MR. EISENBERG:  Well --

17       MR. BERRY:  -- if he didn't preserve them, then maybe

18  the witness had them.

19       MR. EISENBERG:  I don't have any.  And whether my

20  investigator still has them, I don't know.  I --        14:04:33

21       THE COURT:  Is your investigator here?

22       MR. EISENBERG:  Yes, she is, Your Honor.

23       Do you still have them?

24       THE COURT REPORTER:  I can't hear.

25     (Discussion held off the record.)        14:04:46

 1           MR. EISENBERG:  Yeah, she's -- we'll be able to get

 2     them together, Your Honor.

 3           THE COURT:  Well, now the dilemma is we have a jury

 4     waiting, and we're waiting for production to continue the

 5     testimony.                                                      14:04:58

 6           Mr. Berry, are there other areas that you can go into

 7     with this witness who is now --

 8           MR. BERRY:  There certainly are, but I would like to

 9     see these before the end of my examination.  I mean, this was

10     just -- this was just the beginning.  I was trying to get into  14:05:12

11     it.  But it's part of what would direct my examination of him,

12     is to understand what he possibly said previously that he made

13     a -- if he made a statement in these messages that would

14     influence the flow of my examination.  That's why we've asked

15     for this stuff to be produced in advance.  And that's the point  14:05:28

16     of this, so there's not a delay at trial, which is exactly what

17     we were anticipating, which is why we consistently asked for

18     it.

19           THE COURT:  Well, here's what we're going to do,

20     because we have the jury waiting:  You're going to go into      14:05:40

21     whatever areas you can possibly go into on your

22     cross-examination of the witness.

23           MR. BERRY:  Yes, ma'am.

24           THE COURT:  He will await -- you will await the

25     production by the defense of whatever these text messages are.  14:05:51

1    And if we have to hold him over for subpoena purposes to

2    reexamine, then we'll do that.

3            But go through your cross-examination.  And if you

4    need to ask for additional time to examine the witness, then he

5    can step down.  We'll hold him on subpoena, and then we can          14:06:10

6    recall him tomorrow or later this afternoon, if it's necessary.

7            MR. BERRY:  Thank you.

8            THE COURT:  All right.  So let's bring the witness in,

9    and let's have the jury come back.

10           MR. LINCENBERG:  Your Honor, at the break can I have a        14:06:27

11   minute?  I'd like to bring a mistrial motion when the Court has

12   a minute at the break.

13           THE COURT:  Sure.

14           MR. LINCENBERG:  Should I do it now --

15           THE COURT:  No.                                               14:06:39

16           MR. LINCENBERG:  -- or wait for a break?

17           THE COURT:  You ask for a minute.  You always take

18   ten.

19           So let's bring the jury in.

20           MR. EISENBERG:  Your Honor, before they come in, I           14:06:45

21   have a suggestion as well.

22           THE COURT:  Yes, Mr. Eisenberg.

23           MR. EISENBERG:  Will Your Honor look at these text

24   messages to determine whether they're even substantive or they

25   should be turned over?                                               14:06:55

 1              THE COURT:  I'm happy to do that.  Produce them now,

 2      please.

 3              All right.

 4              MR. EISENBERG:  Okay.  Thank you.

 5              THE COURT:  Sir, please come forward and take your          14:07:02

 6      seat.

 7              Oh, you're going to rise in a moment anyway, sir.

 8      Thank you.  You might as well stand.

 9              All rise for the jury.

10          (Jury present at 2:07 p.m.)                                    14:07:41

11              THE COURT:  All right.  Please be seated.

12              The record will reflect the presence of the jury.  The

13      witness is on the witness stand.

14              Mr. Berry, you may continue.

15              MR. BERRY:  Thank you, Your Honor.                         14:08:11

16      BY MR. BERRY:

17      Q.  All right, Mr. Snyder, we're back.  We were asking

18      questions about communications with defense, things like that.

19      I just want to move into your -- your human trafficking

20      investigation experience that you testified about.               14:08:23

21              So first and foremost, you're wearing a shirt right

22      now with a logo.  What is it?

23      A.  It's International Association of Human Trafficking

24      Investigators.

25      Q.  And what is that?                                             14:08:32

A.  Oh, it's a collaboration, if you will.  It's a nonprofit

ran out of Knoxville.  Started in Clearwater.  Run by Jeremy

Lewis, who is a former human trafficking investigator from

the -- I think it's Pima County down there.  I can't remember

exactly.  And we conduct trainings.  We started just doing,                14:08:50

like, one a year, and now we do up to, like, four or five a

year in different parts of the country and internationally.

We've gone to Canada and places like that.

Q.  And you're -- in your direct examination, you were asked

some questions about when you started utilizing Backpage in           14:09:10

your human trafficking investigation.

        Do you recall that?

A.  Yes, sir.

Q.  And if we could just for a second, let's unpack what you

mean when you use the word "human trafficking," because you           14:09:23

would agree with me that has sort of a broad meaning and there

are different subparts to that.

        Would you agree with that?

A.  I do agree with that.

Q.  Okay.  So when we talk about human trafficking that you           14:09:36

investigated, were you investigating people like labor

trafficking, people being forced to work in the back of a -- a

food shop or a massage parlor or something like that?

A.  I participated in a number of cases that could have been

charged as labor trafficking cases, but I was not a specialized       14:09:56

```
 1    labor trafficking investigator, as many people are.
 2             MR. EISENBERG:  Object to this line of questioning,
 3    Your Honor, because it doesn't relate to the allegations in the
 4    indictment.
 5             MR. BERRY:  Your Honor --                          14:10:12
 6             THE COURT:  I think with respect to -- well, no.  I'll
 7    overrule at this point.
 8    BY MR. BERRY:
 9    Q.  Okay.  So you -- you've done some labor trafficking.  But,
10    for the most part, your career focused on the part of human    14:10:26
11    trafficking that involved sex for money; correct?
12    A.  Correct.
13    Q.  That was previously or earlier in your career would have
14    been just strictly referred to as some form of prostitution;
15    correct?                                                    14:10:41
16    A.  Promotion of prostitution most likely.
17    Q.  But prostitution was involved; correct?
18    A.  Yes.
19    Q.  But when you use that term, you're talking more about
20    investigations of people who were exchanging sex for money with 14:10:53
21    some additional coercive element; correct?
22    A.  Correct.
23    Q.  In fact, your background or your -- the bulk of your career
24    did not focus on just straight prostitution investigations.
25    Was that fair to say?                                       14:11:11
```

 1   A.  I -- I'm uncomfortable saying yes to that, even though I

 2   was called a human trafficking investigator because we all

 3   claim that mantel.  Much of what -- I mean, but for

 4   prostitution, there wouldn't be sex trafficking.  So I

 5   considered myself a subject matter expert in prostitution as          14:11:31

 6   well.

 7   Q.  And, in fact, there came a time where folks in law

 8   enforcement, you included, took a more victim-centered approach

 9   and started using a somewhat more victim-centric term to say

10   human trafficking rather than calling a victim of human              14:11:48

11   trafficking a prostitute; correct?

12   A.  Correct.

13   Q.  And so when we were talking about these words, I want to

14   make sure we understand where we are in that language.

15        Am I using the language the way you're used to?               14:11:59

16   A.  I think so.

17   Q.  Okay.  If I don't, if you would, please correct me about

18   that.

19        So that being said, you -- you testified on direct

20   that you started using Backpage in your human trafficking,          14:12:11

21   prostitution-related investigations in approximately 2007; is

22   that correct?

23   A.  Yes.  That was not a human trafficking investigation back

24   then.

25   Q.  That was the public corruption one I think you said --          14:12:25

```
 1   A.  Correct.

 2   Q.  -- correct?

 3          And it had a prostitution element to it; correct?

 4   A.  Yes, sir.

 5   Q.  So your very first exposure to Backpage in an investigation    14:12:31

 6   involved prostitution; is that right?

 7   A.  I think so.  I think I knew about Backpage before that, but

 8   I had not had opportunity to really -- as a street crimes

 9   officer, I wasn't working in the online environment.  I was

10   working on the streets.                                            14:12:50

11   Q.  I understand.  But that was your first investigation where

12   you utilized Backpage in some capacity, right, or it was

13   involved in some way?

14   A.  As far as I can recall.

15   Q.  All right.  And that was a prostitution case; correct?  Or     14:12:58

16   prostitution investigation related to the public corruption?

17   A.  Yes.

18   Q.  All right.  And we don't have to go into the details of

19   that.  I'm sure it's very interesting, but we'll keep moving.

20          So you start in 2007.  Do you continue to utilize          14:13:11

21   Backpage in your human trafficking, prostitution-related

22   investigations up through and until April of 2018?

23   A.  Yes.

24   Q.  For all those years, you were using Backpage in those

25   investigations?                                                    14:13:25
```

```
1    A.   Yes.
2    Q.   Were you using Backpage's furniture section?
3    A.   No.
4    Q.   Were you using their buy/sell/trade section?
5    A.   Not that I recall.                                    14:13:37
6    Q.   You were using their female escorts or escorts section for
7    the most part; isn't that correct?
8    A.   Yes.  I think there was some other locations in there, but
9    they weren't -- they had to do with connections between people.
10   Q.   Like women seeking men, vice versa?                   14:13:53
11   A.   That's a -- that's one, yeah.
12   Q.   Okay.  And they all had similar type ads of these folks
13   offering what might appear to be prostitution; correct?
14   A.   Yes, to some extent.
15   Q.   Okay.  So from 2007 to 2018, that's where your -- your work 14:14:06
16   focuses in Backpage; correct?
17   A.   I mean, it was one of the places I was.  But, yes.
18   Q.   And that's what we're here to talk about, so that's what
19   I'm going to --
20   A.   Okay.                                                 14:14:20
21   Q.   -- ask you questions about.  Okay?
22        Do you understand?
23   A.   I think so, yes.
24   Q.   So you testified also that after Backpage shut down in
25   early 2018, it affected those investigations in some meaningful 14:14:32
```

UNITED STATES DISTRICT COURT

                                                                54

 1   sense; correct?

 2   A.  Yes.

 3   Q.  So isn't it true that after April of 2018, you could not

 4   find prostitution-related ads or human trafficking victims on

 5   Backpage anymore?                                              14:14:53

 6   A.  Correct.

 7   Q.  It was all done, wasn't it?

 8   A.  As far as I know, yes.

 9   Q.  Okay.  But from 2007-2018, a good source for that; correct?

10   A.  Correct.                                                   14:15:04

11   Q.  And you testified on direct that some of the specific

12   things you were looking for in your investigation were if Child

13   Protective Services or there was talk about a runaway or

14   something like that, and phone numbers, that you would utilize

15   that information and go on Backpage to try to locate these --   14:15:28

16   these kids; correct?

17   A.  Well, the only information -- I was only interested in the

18   HT part of it.  So runaways that were not suspected of

19   participating in, you know, human trafficking or sex

20   trafficking wouldn't come my way.  So, yes, to the extent that  14:15:47

21   that's all I looked at.

22   Q.  In your experience, are runaways at risk of being human --

23   human trafficked?

24   A.  Yes.

25          MR. EISENBERG:  Objection, Your Honor.  It's            14:15:58

```
 1   irrelevant to these charges.
 2           THE COURT:  Sustained.
 3   BY MR. BERRY:
 4   Q.  Now, when you talked about exigent circumstances earlier,
 5   you were talking about instances in which you're investigating    14:16:17
 6   a human trafficking case of some kind; correct?
 7   A.  Yes.
 8   Q.  Is that a yes?
 9   A.  Yes.
10   Q.  Sorry.  She can't get the head nods.                          14:16:28
11   A.  Sorry.
12   Q.  So you're investigating some human trafficking incident;
13   correct?
14           And you've already established that that usually has
15   some sort of sex trafficking prostitution element; correct?       14:16:37
16   A.  I apologize.  Can you repeat that question?  It had a bunch
17   of pieces to it.
18   Q.  That's completely fair.
19           So we've established that most of your investigations
20   involve human trafficking; correct?                               14:16:49
21   A.  Yes.
22   Q.  And that when we say human trafficking in the context of
23   your career, we're generally talking about sex trafficking and
24   prostitution; correct?
25   A.  Correct.                                                      14:16:58
```

GRANT SNYDER - CROSS-EXAMINATION
56

```
 1    Q.  So when you have an exigent circumstances situation in one
 2    of your investigations, it had something to do with a
 3    sex-trafficking event that is urgent; is that correct?
 4    A.  Yes, although unconfirmed at this point.  Yes.
 5    Q.  But that's part of your investigation; correct?          14:17:17
 6    A.  Correct.
 7    Q.  And so you're reaching out to Backpage because, once again,
 8    Backpage is a source for something to do with prostitution and
 9    sex trafficking in your investigation --
10          MR. EISENBERG:  Objection --                           14:17:32
11    BY MR. BERRY:
12    Q.  -- correct?
13          MR. EISENBERG:  -- to the characterization of "once
14    again," Your Honor.  Counsel's testifying.
15          THE COURT:  Overruled.                                 14:17:38
16          THE WITNESS:  Can you repeat the question, sir?
17    BY MR. BERRY:
18    Q.  I'm going to ask the court reporter to do that one this
19    time.  I try not to do that.  I apologize.
20       (Record read.)                                            14:18:05
21          THE WITNESS:  Correct.
22    BY MR. BERRY:
23    Q.  Let me ask you about whether you are aware that Backpage
24    utilized something called a strip ad filter.
25          Are you familiar with that at all?                     14:18:39
```

UNITED STATES DISTRICT COURT

1    A.  No.

2    Q.  Are you aware of whether Backpage would remove the most

3    obvious sex-act-for-money language when people posted ads?

4            MR. EISENBERG:  Again, Your Honor, I'm sorry.  I

5    object to the characterization "most obvious."                     14:18:56

6            It's also argumentative.

7            THE COURT:  Well, I'll sustain.

8            And Mr. Berry can rephrase as to what he means by "the

9    most obvious."

10            MR. BERRY:  Thank you, Your Honor.  Let's -- let's ask   14:19:12

11    the witness.

12    BY MR. BERRY:

13    Q.  What are some obvious sex-for-money terms that you're

14    familiar with in your investigations?

15    A.  Well, reference generally to either the word "sex" or to    14:19:23

16    specific acts generally and common street parlance that

17    describe different sex acts would be one indication of that.

18    GFE is one example.  Girlfriend experience would be potentially

19    related to something like that.

20            I mean, there's other, you know, indications that I     14:19:52

21    think -- other wording that are escaping me right now.  But

22    typically those were sort of that explicit.  Sometimes it's

23    acronyms, you know, that would refer to a specific sex act that

24    I'm apprehensive to describe.

25    Q.  Why are you apprehensive?                                    14:20:16

 1   A.  Because we have a mixed jury of wonderful people, and I

 2   would hate to -- my wife wouldn't be happy with me talking that

 3   way in front of women.

 4   Q.  Fair enough.

 5        Some of these words are -- are explicit or indicative          14:20:26

 6   of explicit sex acts; correct?

 7   A.  Correct.

 8   Q.  And that's what's making you uncomfortable about actually

 9   talking about them here in open court; correct?

10   A.  Yes.                                                            14:20:41

11   Q.  Not the kind of thing we normally say in polite company?

12   A.  Correct.

13   Q.  Okay.  But GFE is one that you're familiar with; correct?

14   A.  Correct.

15   Q.  Are you aware of Back- -- I think you did testify that         14:20:48

16   you're aware of Backpage's moderation practices in some way;

17   correct?

18   A.  Only to the extent that I was on the receiving end of it.

19   Yes.

20   Q.  Are you aware of any relationship between Backpage and The     14:21:00

21   Erotic Review?

22   A.  No.

23   Q.  Are you aware that they would pay The Erotic Review money

24   to put links on their review site?

25   A.  No.  I was unaware of that.                                    14:21:15

                                                                    59

```
 1    Q.  Are you aware of any relationship between Backpage and
 2    people called super posters?
 3    A.  No.
 4    Q.  Are you aware of Backpage's aggregation methods?
 5    A.  No.                                                    14:21:29
 6    Q.  Are you aware of whether Backpage went over to Craigslist,
 7    when it was still around doing this stuff, and took those ads
 8    and put them on Backpage?
 9            MR. FEDER:  Objection.  Relevance.
10            MR. LINCENBERG:  Objection.                        14:21:43
11            MS. BERTRAND:  Goes beyond the scope of direct.
12            MR. LINCENBERG:  This goes to credibility.
13            THE COURT:  Wait.  Wait.  I thought I heard -- is it
14    Mr. Feder?
15            MR. FEDER:  Relevance.                             14:21:54
16            THE COURT:  And then?
17            MS. BERTRAND:  Goes beyond the scope of direct.
18            THE COURT:  Overruled as to both.
19    BY MR. BERRY:
20    Q.  You can answer.                                        14:22:06
21            Would you like me to ask that one again?
22    A.  Yeah, would you ask that question again, please.
23    Q.  You bet.
24            Are you aware of whether Backpage took ads from
25    Craigslist and put them on Backpage?                      14:22:14
```

```
 1            MR. FEDER:  Same objection.

 2            THE COURT:  Overruled.

 3            THE WITNESS:  I'm unaware of that.

 4  BY MR. BERRY:

 5  Q.  Okay.  Are you aware of any meetings between any of the      14:22:23

 6  owners of Backpage and people at the National Center For

 7  Missing and Exploited Children?

 8            MR. EISENBERG:  Objection as to the relevance of this,

 9  Your Honor.

10            MS. BERTRAND:  And counsel's testifying.  Different     14:22:33

11  objection.

12            THE COURT:  I'll sustain.

13  BY MR. BERRY:

14  Q.  Are you aware of any meetings between Backpage and people

15  at Polaris?                                                      14:22:40

16            MR. EISENBERG:  Same objections, Your Honor.

17            MS. BERTRAND:  Same objection.

18            THE COURT:  Well, sustained.

19  BY MR. BERRY:

20  Q.  Are you aware of any documentaries about prostitution on     14:22:46

21  Backpage?

22            MR. EISENBERG:  Same objections, Your Honor.

23            MS. BERTRAND:  Same objection.

24            THE COURT:  He can answer if he's aware.

25            THE WITNESS:  I'm not aware.                           14:22:53
```

                                                                61

```
 1    BY MR. BERRY:
 2    Q.  Do you have Netflix?
 3              MS. BERTRAND:  Objection, Your Honor.  Argumentative.
 4              THE COURT:  Overruled.
 5              THE WITNESS:  I apologize.  Can you restate the        14:23:00
 6    question?
 7    BY MR. BERRY:
 8    Q.  I'm sorry.  Do you have Netflix?
 9    A.  I do.
10    Q.  Are you familiar with the documentary called I Am Jane Doe?  14:23:04
11              MS. BERTRAND:  Objection.  Goes beyond the scope of
12    direct.  Relevance.  And he has said he is not familiar with
13    documentaries.
14              MR. EISENBERG:  And it's also argumentative, Your
15    Honor.                                                          14:23:21
16              THE COURT:  Overruled.
17              THE WITNESS:  I am aware of that documentary, but I've
18    never seen it.
19    BY MR. BERRY:
20    Q.  Thank you.                                                  14:23:26
21              Would you say that Backpage was your number 1 ally in
22    law enforcement?
23    A.  No.
24    Q.  Were they a good resource?
25    A.  Yes.                                                        14:23:38
```

1   Q.  Would you say that -- who was a better partner in your

2   human trafficking investigations, Backpage or NCMEC?

3   A.  I mean, NCMEC because of what they did.

4   Q.  If you owned a website like Backpage, what would you do

5   with it?                                                            14:24:05

6           MR. EISENBERG:  Objection, Your Honor.  Relevance.

7           THE COURT:  Sustained.

8           MR. BERRY:  Just one second, Your Honor.

9   BY MR. BERRY:

10  Q.  Sir, are you familiar with the Senate investigation report   14:24:29

11  of Backpage?

12          MR. EISENBERG:  Objection.  Again, Your Honor, it has

13  nothing to do with this witness's testimony.  It doesn't go to

14  credibility.

15          THE COURT:  Overruled.                                    14:24:41

16          THE WITNESS:  I'm not.

17  BY MR. BERRY:

18  Q.  And do you know Sergeant Byron Fassett of the Dallas Police

19  Department?

20  A.  I do.                                                         14:24:50

21  Q.  How do you know him?

22  A.  I've had numerous conversations with Byron.  I attended one

23  of his early trainings.

24          MR. BERRY:  No further questions, Your Honor.

25          THE COURT:  All right.  Mr. Eisenberg.                    14:25:21

 1                MR. EISENBERG:  Yes, Your Honor.

 2                     REDIRECT EXAMINATION

 3   BY MR. EISENBERG:

 4   Q.  Mr. Snyder, you said that Backpage was a good resource?

 5   A.  Yes, sir.                                              14:25:37

 6   Q.  How was it a good resource?

 7   A.  By being expeditious in their responses; complete in giving

 8   us what we requested; by consulting when we had questions; by

 9   moderating the posts, to the extent that they could, I think;

10   by supporting the ongoing investigations; and later training   14:26:06

11   with law enforcement.

12   Q.  Now, you said moderation, to the extent that they could.

13           What did you mean by that?

14   A.  Well, I mean, I think that many of the ag- -- ads

15   themselves were quite vague and were difficult to ascertain    14:26:22

16   what was truly going on.  And I think that -- that they made an

17   appropriate effort, in my opinion, based on my experience and

18   on my ads themselves being taken down when I tried to post

19   undercover ads.

20   Q.  What sort of words -- when the -- when your ads were taken  14:26:48

21   down, do you know why?

22   A.  Yes.

23   Q.  Why?

24   A.  I would post references to age in referring to somebody as

25   young.  Any explicit or even veiled references to sexual       14:27:02

1    activity, those sorts of things, generally got our ads pulled.

2    That sort of thing.

3    Q.  Did you ever put GFE into an ad?

4    A.  I didn't because I tended to see those ads up for a short

5    period of time, and then they'd disappear.                          14:27:22

6    Q.  And you're talking about up on Backpage?

7    A.  Correct.

8    Q.  Okay.  You were asked by counsel for the government whether

9    you were -- you've been paid to come to testify?

10   A.  Yeah.                                                            14:27:36

11   Q.  Do you mean -- let me put this in this context:  You don't

12   mean that you're getting paid, money's being given to you; is

13   that correct?

14   A.  I wasn't sure exactly what that reference was, but the

15   truth is I'm not being paid by anybody to be here.                  14:27:51

16   Q.  But your expenses are being covered?

17   A.  Correct.

18   Q.  Your flight and hotel?

19   A.  Yes.

20   Q.  Okay.  Thank you.                                               14:27:59

21           MR. EISENBERG:  Thank you, Your Honor.

22           THE COURT:  Is the government seeking to reserve the

23   witness?

24           MR. BERRY:  Yes, Your Honor.

25           THE COURT:  All right.  Sir, your testimony is             14:28:08

UNITED STATES DISTRICT COURT

```
 1   complete for this afternoon, but I'm going to hold you to the
 2   subpoena until further notice.  And so it shouldn't be too much
 3   longer, but there may be an opportunity for you to come back
 4   and testify further.  So just be a little patient with us, all
 5   right.  So you may stand down.                                    14:28:29
 6           Call your next witness.
 7           Watch your step.  Thank you.
 8           MR. CAMBRIA:  Your Honor, we're calling John Becker.
 9           He's out there somewhere.
10           THE COURT:  Sir, please come forward and be sworn.        14:29:55
11           MR. CAMBRIA:  I notice the podium is where it should
12   be, Your Honor.
13           MR. EISENBERG:  Because I put it there.
14           MR. BECKER:  Up here?
15           THE COURTROOM DEPUTY:  Right.                             14:30:09
16           MR. CAMBRIA:  She's going to swear you in first.
17           THE COURTROOM DEPUTY:  Here in front of the boxes,
18   please.
19           Please raise your right hand.
20       (JOHN R. BECKER, a witness herein, was duly sworn or
21   affirmed.)
22           THE COURTROOM DEPUTY:  If you'd please step over to
23   the witness stand and take a seat.
24           THE WITNESS:  Thank you.
25       ///
```

JOHN BECKER - DIRECT EXAMINATION

```
 1                      DIRECT EXAMINATION
 2   BY MR. CAMBRIA:
 3   Q.  Good afternoon.
 4   A.  Good afternoon.
 5   Q.  Can you state your name please, first and second.    14:30:35
 6   A.  First name John, middle initial R, last name Becker.
 7   Q.  Is there a microphone close to you there?
 8   A.  Okay.
 9   Q.  There you go.
10   A.  Okay.                                                 14:30:46
11   Q.  And, Mr. Becker, how are you employed?
12   A.  I'm an attorney.
13   Q.  And where are you located?
14   A.  My office is in North Scottsdale.
15   Q.  And what's your educational background?              14:30:53
16   A.  I have a JD from Arizona State University College of Law,
17   and I have a master's in tax from New York University.
18   Q.  And what sort of law do you practice, if you have a
19   concentration area?
20   A.  My practice is a trust and estates practice.  I do estate  14:31:15
21   planning and estate and trust administration.
22   Q.  All right.  Did there come a time that you did some work
23   for Michael Lacey?
24   A.  Yes.
25   Q.  And what sort of work was that?                       14:31:32
```

UNITED STATES DISTRICT COURT

JOHN BECKER - DIRECT EXAMINATION

67

1    A.   I was engaged to do estate planning for Mr. Lacey.

2    Q.   And what did that entail?

3    A.   That entailed preparing basic estate planning documents for

4    him, making sure that his affairs were structured so that his

5    assets went where he wanted them to go upon his passing.  Also      14:31:49

6    some planning for incapacity.

7    Q.   And did there come a time when he came to you regarding a

8    banking situation that he had?

9    A.   Yes.

10   Q.   And what was that?                                             14:32:08

11   A.   In my engagement of doing estate planning for Mr. Lacey,

12   Mr. Lacey conveyed to me that his banking accounts were being

13   closed.

14   Q.   And what did he ask you to do in that regard?

15   A.   He asked me to consider whether there were any other           14:32:24

16   structures to place his funds.

17   Q.   And did you give him some advice?

18   A.   Yes, I did.

19   Q.   And what was that?

20   A.   I explained to him that I do not do any type of               14:32:36

21   international estate planning, there are other individuals that

22   do, but that he may want to look into a structure where the

23   accounts are outside of the United States in order to keep them

24   open and from being closed.

25   Q.   By banks?                                                     14:32:53

UNITED STATES DISTRICT COURT

JOHN BECKER - DIRECT EXAMINATION

68

1    A.   Yes.

2    Q.   All right.  And did you advise him for another step?

3    A.   As part of doing our estate planning, we did a transaction,

4    which is allowed in the Internal Revenue Code under Code

5    Section 2702, and it's called a grantor retained annuity trust.    14:33:12

6    Q.   And what's --

7    A.   It's a --

8    Q.   -- that?

9    A.   It's a structure where Mr. Lacey transfers assets into the

10   trusts and the trusts pay him annuities in return.    14:33:23

11   Q.   Okay.  And did you -- you said that you weren't an expert

12   in -- in investments where domestic banks wouldn't be able to

13   just close accounts.

14        Did you refer him to someone who you felt had that

15   expertise.    14:33:41

16   A.   Yes, I did.

17   Q.   And who was that?

18   A.   Jacob Stein, who is based in Los Angeles.

19   Q.   And did -- did you and Mr. Lacey visit Mr. Stein?

20   A.   Yes, we did.    14:33:53

21   Q.   And, as a result of that, was some advice given as to an

22   appropriate way to solve the problem of domestic banks closing

23   his accounts?

24        MR. STONE:  Objection.  Calls for hearsay.

25        THE COURT:  Sustained.    14:34:10

JOHN BECKER - DIRECT EXAMINATION
69

```
 1            MR. CAMBRIA:  No.  I asked whether or not advice was
 2   given.  I didn't ask what it was yet at this point, Your Honor.
 3            THE COURT:  He can answer yes or no then.
 4            MR. CAMBRIA:  There you go.
 5            THE WITNESS:  Yes.                                    14:34:19
 6   BY MR. CAMBRIA:
 7   Q.  All right.  Thank you.
 8            And, as a result of that, did you take any steps then
 9   to effectuate that advice, if you will?
10   A.  I worked with Mr. Stein in the establishment of a trust in  14:34:29
11   Hungary, but it was Mr. Stein that had created the trust, and
12   he was the contact person.
13   Q.  Okay.
14   A.  I was interfacing with --
15   Q.  Did Mr. Lacey pick a particular place to do it, or was he  14:34:50
16   given some options?
17   A.  He was given options.
18   Q.  All right.  And did you advise him further as to how to
19   carry out his original goal?
20   A.  Yes.                                                       14:35:07
21   Q.  And what was that?
22   A.  My advice was that if he was going to structure an account
23   overseas, he has to comply with all of the disclosures required
24   by the Treasury Department.  Not only does he have to provide
25   all the disclosures, he must report the income on his tax      14:35:22
```

UNITED STATES DISTRICT COURT

1    return.

2    Q.  Okay.  And did you take steps to accomplish that?

3    A.  Absolutely.

4    Q.  All right.  And did -- eventually did the funds that he was

5    discussing come into your possession or under your control?     14:35:41

6    A.  They were -- the funds were already under my control.

7    These trusts that I established are -- or Mr. Lacey

8    established, these grantor retained annuity trusts, were

9    required to make the distributions to Mr. Lacey.  And so I was

10   required, as trustee, to make that distributions to him.        14:36:01

11          The problem was that -- the ongoing problem was there

12   was no place to put those funds in a domestic account.  And so

13   at the same time that this trust arrangement was being created

14   in Hungary, Mr. Lacey wanted to transfer the funds to that

15   account.                                                         14:36:22

16   Q.  All right.  And this was pursuant to the advice of you and

17   this other attorney --

18   A.  Yes.

19          MR. STONE:  Objection.

20   BY MR. CAMBRIA:                                                  14:36:29

21   Q.  -- as to how to do it legally?

22          MR. STONE:  Objection.  Calls for hearsay.

23          THE COURT:  Sustained.

24          MR. CAMBRIA:  He's here.

25          THE COURT:  You're also incorporating this other         14:36:35

```
 1   person.
 2           MR. CAMBRIA:  I'll restate it, and we'll make it
 3   easier.
 4   BY MR. CAMBRIA:
 5   Q.  And did you then advise him of, in your opinion,          14:36:40
 6   appropriate ways to legally create this trust and comply with
 7   the reporting requirements?
 8           MR. STONE:  Objection.  Leading.
 9           THE COURT:  Sustained.
10   BY MR. CAMBRIA:                                               14:36:54
11   Q.  Okay.  What did you advise him to do?
12   A.  I advised him that whatever structure was done outside the
13   United States, everything had to be done correctly.  And he was
14   a stickler for it.  He stated to me multiple times it has to be
15   done correctly.                                               14:37:10
16           MR. STONE:  Objection to the narrative.
17           THE COURT:  Sustained.
18           Sir, yes or no.
19           MR. CAMBRIA:  I'm sorry?
20           THE COURT:  I'm going to instruct the witness simply  14:37:16
21   to ask -- answer the question asked.  Okay?
22           MR. STONE:  Move to strike.
23           MR. CAMBRIA:  Thank you.
24           MR. STONE:  Move to strike that last answer.
25           THE COURT:  It will be stricken, and the jury will    14:37:26
```

```
 1    disregard.
 2              MR. CAMBRIA:  Okay.
 3    BY MR. CAMBRIA:
 4    Q.  Did you ever receive a communication from Mr. Lacey about
 5    the reporting requirements?                                    14:37:35
 6              MR. STONE:  Objection.  Calls for hearsay.
 7              THE COURT:  Well, he can answer yes or no, but --
 8              THE WITNESS:  Yes.
 9    BY MR. CAMBRIA:
10    Q.  Okay.  Now, Mr. Becker, have you had an opportunity to     14:37:44
11    review an email exchange between you and Mr. Lacey, copies of
12    which I provided to you?
13    A.  Yes.
14    Q.  All right.
15              MR. CAMBRIA:  And Exhibit 1, please.  Government      14:38:08
16    Exhibit 1.  Could you put up for the -- well, it's in evidence.
17              Can you put up, please, on the screen for everyone
18    Becker 02058 under Exhibit 1.  Government Exhibit 1.
19         (The Court and the courtroom deputy confer.)
20              MR. STONE:  This particular page is not in evidence. 14:38:41
21              THE COURT:  Yes.  This isn't in evidence, Mr. Lacey --
22    I'm sorry -- Mr. Cambria.  This is not in evidence.
23              MR. CAMBRIA:  I'm sorry?
24              THE COURT:  This -- this particular page is not part
25    of that --                                                     14:38:53
```

1    MR. CAMBRIA:  Yes, it is.

2    THE COURT:  -- Exhibit 1.

3    Not as it was admitted.

4    MR. CAMBRIA:  Yes.  You -- you admitted this for me.

5    This was a 106 situation, and the government agreed to it.          14:39:01

6    MR. STONE:  I think we're -- not to interject, but --

7    MR. CAMBRIA:  Pardon?

8    THE COURT:  There was a page that was not included.

9    MR. CAMBRIA:  That's the one.  This was included.

10   This was the one that I objected to, and they agreed.          14:39:16

11   THE COURT:  All right.  Let's resolve the issue, but

12   by my recording, by my courtroom deputy's recording, it's not

13   part of the exhibit that was introduced and admitted.

14   MR. CAMBRIA:  Actually, it's 02058.

15   THE COURT:  I don't -- I don't know what you're          14:39:42

16   referring to.  That number means nothing to me, Mr. Cambria.

17   MR. CAMBRIA:  You --

18   MR. STONE:  Your Honor, if I may.  This is page 3 of

19   Exhibit 1.  Pages 3 and 4 were admitted.  The other pages were

20   not.  So it looks like we're on the correct page now.          14:39:54

21   THE COURT:  All right.

22   MR. CAMBRIA:  Yeah.  There isn't -- on the copy that I

23   have, it doesn't -- would you pull up page 3, then, please.

24   THE COURT:  Yes.  Give me a -- give my courtroom

25   deputy a moment --          14:40:05

74

```
 1              MR. CAMBRIA:  Here it is.
 2              THE COURT:  Mr. Cambria, give my courtroom deputy a
 3    moment to confer with your staff --
 4              MR. CAMBRIA:  Very good.
 5              THE COURT:  -- who is --                              14:40:13
 6              MR. CAMBRIA:  This is -- yeah.
 7              THE COURT:  -- working the --
 8              MR. CAMBRIA:  The exhibit that's up now is what I'm
 9    looking for.
10              THE COURTROOM DEPUTY:  Okay.                          14:40:33
11              THE COURT:  All right.  Now, this is the exhibit.
12              MR. CAMBRIA:  On the left.
13              THE COURT:  All right.
14              THE COURTROOM DEPUTY:  Okay.
15              THE COURT:  Yes.                                      14:40:40
16              MR. CAMBRIA:  Okay.
17              THE COURT:  It may be published.
18    BY MR. CAMBRIA:
19    Q.  Do you see that, sir, the page on the left?
20    A.  Yes.                                                       14:40:45
21    Q.  All right.  And the email of 1/23/2017?
22    A.  Yes.
23    Q.  Okay.  And do you see the entry at -- it says at the top --
24    the one that at the top starts with a phone number?
25              Do you see that on that page?                        14:41:09
```

UNITED STATES DISTRICT COURT

```
 1    A.  Yes.
 2    Q.  All right.  The bottom of that page is -- appears to be an
 3    email from Mr. Lacey of 2/21/17.
 4           Do you see that?
 5    A.  Yes.                                                          14:41:22
 6    Q.  Could you read that, please.
 7    A.  Yes.  "John, do you or Jacob Stein do the reporting to
 8    government on money that was moved?  Michael Lacey."
 9    Q.  And so Mr. Lacey was asking you who's going to be
10    responsible for doing the necessary reporting on a trust like    14:41:38
11    this; correct?
12           MR. STONE:  Objection.  Leading.
13           THE COURT:  Sustained.
14    BY MR. CAMBRIA:
15    Q.  Well, that's what it says, doesn't it?                       14:41:48
16           THE COURT:  Well, that was a leading question,
17    Mr. Cambria.  I sustained the objection.
18           MR. CAMBRIA:  All right.
19    BY MR. CAMBRIA:
20    Q.  This particular quote that you read says that he's asking    14:41:59
21    you, "Do you or Jacob Stein do the reporting to the
22    government"; correct?
23    A.  Yes.
24    Q.  And did you respond?
25    A.  Yes.                                                         14:42:10
```

 1    Q.   And what'd you say?

 2    A.   I said in a -- the response is here.

 3              Do you want me to read it --

 4    Q.   Sure.

 5    A.   -- or do you want me to paraphrase it?                    14:42:15

 6              Okay.  I don't -- I don't see the response on the

 7    screen.

 8              MR. CAMBRIA:  Let's see.  Could you pull up -- it

 9    would be the prior page.  At the bottom it says 30, but it's an

10    email of 2/21/2017 at 11:45 a.m.                               14:42:51

11    BY MR. CAMBRIA:

12    Q.   All right.  Do you see that on your screen?

13    A.   Yes.

14    Q.   All right.  And -- and what's your response?

15    A.   "I believe Jacob" --                                     14:43:07

16              MR. STONE:  Your Honor, I don't think this page is in

17    evidence.  No objection if he -- if Mr. Cambria wants to move

18    this in, though.

19              THE COURT:  Well, let's --

20              MR. CAMBRIA:  My understanding was the entire        14:43:18

21    Exhibit 1 was in evidence, Your Honor.  I remember at the time

22    we had an issue about a page, and then we resolved it.

23              THE COURT:  No.  Well, that doesn't coincide, I think,

24    with my memory.  And so what you can do is you -- if you wish

25    to ask questions about this page of the exhibit, have it       14:43:34

 1    remarked.  And then if you wish to move for its introduction,

 2    apparently there's not going to be an objection.

 3            MR. CAMBRIA:  Very good.

 4    BY MR. CAMBRIA:

 5    Q.  Do you remember this particular email?                    14:43:46

 6    A.  Yes.

 7    Q.  All right.  And it was between you and Mr. Lacey?

 8    A.  Yes.

 9    Q.  And it was 2/21/2017 at 11:45 a.m.?

10    A.  Yes.                                                       14:43:59

11            MR. CAMBRIA:  All right.  I move this into evidence,

12    Your Honor.  It's identified on it at the moment as

13    Becker 02057, which is part of Exhibit Number 1.  And it -- at

14    the bottom it says page 30.

15            THE COURT:  All right.  We -- we will use that 0205 as  14:44:19

16    an identifier, but the exhibit number will change to coincide

17    with the exhibit list just to avoid any confusion.

18            MR. CAMBRIA:  That's fine.

19            THE COURT:  All right.  So it may be admitted.  It may

20    be published.                                                 14:44:41

21            (Exhibit 6264 admitted into evidence.)

22    BY MR. CAMBRIA:

23    Q.  Could you read what it says there, please.

24    A.  Yes.

25    Q.  First of all, who is speaking?                            14:44:44

 1   A.  It is my email to Michael Lacey.

 2   Q.  All right.  And what are you saying?

 3   A.  "I believe Jacob Stein will receive the information needed

 4   for the report, and your accountants will prepare it from the

 5   information he furnishes."                                        14:44:58

 6   Q.  All right.  Now, to your knowledge, were those reports

 7   filed?

 8   A.  Yes.

 9   Q.  And --

10        MR. CAMBRIA:  First of all, if we could go to             14:45:19

11   Exhibit 5516, please.

12   BY MR. CAMBRIA:

13   Q.  Now, I'm showing you Exhibit 5516.

14        Do you re -- recognize that?

15   A.  Yes.                                                        14:45:37

16   Q.  And what is that?

17   A.  It's the trust that was established on the Hungarian law to

18   hold the monies.

19        MR. CAMBRIA:  Move that in evidence, Your Honor.

20        MR. STONE:  No objection.                                 14:45:49

21        THE COURT:  It may be admitted, and it may be

22   published.

23        (Exhibit 5516 admitted into evidence.)

24        MR. CAMBRIA:  May we have Exhibit 5540, please.

25        ///

```
 1    BY MR. CAMBRIA:

 2    Q.  Now, showing you Exhibit 5540, do you recognize that?

 3    A.  Yes.

 4    Q.  And what is that?

 5    A.  That is my letter to the Internal Revenue Service          14:46:15

 6    accompanying a Form 7004, which is an extension of time in

 7    order to file one of the required income tax returns or

 8    reporting returns for this account.

 9    Q.  All right.  And who requested that extension?

10    A.  I did.                                                     14:46:34

11    Q.  All right.  That wasn't Mr. Lacey who requested that?

12    A.  No.

13    Q.  No.  All right.

14            MR. CAMBRIA:  I move that into evidence, please.

15            MR. STONE:  No objection.                              14:46:43

16            THE COURT:  Yes, 5540 may be admitted.  It may be

17    published.

18            (Exhibit 5540 admitted into evidence.)

19            MR. CAMBRIA:  Thank you.

20            Exhibit 5541, please.                                  14:46:54

21            THE COURT:  Are you going to give the jury some time

22    to at least examine the exhibit, Mr. Cambria?

23            MR. CAMBRIA:  I'm sorry, Your Honor?

24            THE COURT:  Are you going to give the jury at least

25    some time to examine the exhibit?                              14:47:04
```

UNITED STATES DISTRICT COURT

```
 1              MR. CAMBRIA:  Oh, of course.
 2              THE COURT:  Because you just sort of flashed it up
 3    there --
 4              MR. CAMBRIA:  I'm sorry.
 5              THE COURT:  -- then moved swiftly --            14:47:09
 6              MR. CAMBRIA:  I apologize.
 7              THE COURT:  -- on.
 8              MR. CAMBRIA:  I apologize.  I'm in my own little world
 9    here.  I'm sorry.
10              Okay.  Thank you.                               14:47:47
11              Exhibit 5541, please.
12    BY MR. CAMBRIA:
13    Q.  Mr. Becker, do you see this, and do you recognize it?
14    A.  I see it, and I recognize it.
15    Q.  And what is it?                                      14:48:01
16    A.  It's a report -- Report of Foreign Bank and Financial
17    Accounts.
18    Q.  And do you -- how are you familiar with this?
19    A.  It's one of the required filings to report the account to
20    the federal government.                                  14:48:19
21    Q.  Okay.  And did you -- are you -- you're familiar with this,
22    and was it filed?
23    A.  I'm familiar with it, and it was filed.
24    Q.  All right.  And what does it accomplish, or what is it
25    supposed to accomplish?                                  14:48:34
```

```
 1   A.  It's supposed to -- it's required under the Internal

 2   Revenue Code, and it is a -- it puts the government on notice

 3   that a U.S. taxpayer has established a foreign account.

 4   Q.  All right.  And there are several pages to this.  On those

 5   pages, is someone identified in connection with the account?      14:49:00

 6          MR. CAMBRIA:  It would be easier.  I move this -- Your

 7   Honor, I move to admit this into evidence.

 8          MR. STONE:  Your Honor, the only objection is

 9   foundation as to how this witness knows about this particular

10   document.  There appears to be some other attorney who's listed    14:49:30

11   on this one.

12   BY MR. CAMBRIA:

13   Q.  How do you know about this --

14          THE COURT:  Well --

15   BY MR. CAMBRIA:                                                     14:49:36

16   Q.  -- document?

17          THE COURT:  Let me sustain first.

18          And now you could ask --

19          MR. CAMBRIA:  Thank you.

20          THE COURT:  -- how do you know?                             14:49:40

21          MR. CAMBRIA:  Thank you.

22   BY MR. CAMBRIA:

23   Q.  How do you know?

24   A.  Because I'm the person that made sure it got filed.  I may

25   not have filed it, but I made sure it got filed.                   14:49:46
```

JOHN BECKER - DIRECT EXAMINATION

82

```
 1    Q.  Okay.  So you're familiar with the document?
 2    A.  Yes.
 3              MR. CAMBRIA:  All right.  I move this into evidence,
 4    please.
 5              THE COURT:  Can he just explain how he knows it got          14:49:57
 6    filed?
 7              MR. CAMBRIA:  Certainly.
 8    BY MR. CAMBRIA:
 9    Q.  How do you know that, sir?
10    A.  Because the first one, I reached out to the attorney, Edwin        14:50:01
11    Hsu, that -- he's one of my former students, and I said to him
12    that we need to get this FBAR filed.  It's the first time.  I
13    don't have experience filing the FBAR.  I don't do this type of
14    work.  Would you please take care of it.
15              And he and I embarked on it and got it filed.               14:50:19
16              MR. STONE:  Object to the answer because it's hearsay.
17    It's an out-of-court statement.
18              THE COURT:  Sustained.
19              MR. CAMBRIA:  All right.
20              THE COURT:  That was my -- that was my error.  That          14:50:27
21    was an objection made to me, so I'm going to sustain my own
22    objection on myself.
23              MR. CAMBRIA:  Own objection.
24              THE COURT:  So, Mr. Cambria, you can move on.
25              MR. CAMBRIA:  Thank you so much.                             14:50:39
```

UNITED STATES DISTRICT COURT

1    BY MR. CAMBRIA:

2    Q.  So you're familiar with this document, and you've indicated

3    you're familiar with the fact that it was filed?

4    A.  Yes.

5    Q.  All right.  And you're familiar with the contents of it?          14:50:46

6    A.  I -- you know, I didn't file it.  I didn't prepare it, but

7    I -- I know what the contents are, yes.

8    Q.  All right.

9            MR. CAMBRIA:  I move it into evidence, Your Honor.

10           MR. STONE:  Same objection on foundation.                      14:50:59

11           THE COURT:  Overruled.  It may be -- it may be

12   admitted.  It may be filed.

13           (Exhibit 5541 admitted into evidence.)

14           MR. CAMBRIA:  Thank you.

15   BY MR. CAMBRIA:                                                        14:51:07

16   Q.  Does this particular document, which was -- goes to -- went

17   to the government, does it identify individuals and any other

18   information regarding this trust?

19   A.  I believe it does.

20           MR. CAMBRIA:  And if you could go to the second page,         14:51:22

21   please.

22   BY MR. CAMBRIA:

23   Q.  As you look at the second page, is Mr. Lacey identified?

24   A.  Yes.

25   Q.  Okay.                                                             14:51:37

1      MR. CAMBRIA:  Can you go to the next page, please.

2  And then -- actually, one, two -- four page -- it's -- it's

3  called page 7 of 7.  Would you go to that, please.

4  BY MR. CAMBRIA:

5  Q.  Well, right now on the screen is page 3 of 7.                14:52:05

6       Do you see that?

7  A.  Yes.

8  Q.  All right.  And now it's page 7 of 7.

9       Do you see that?

10  A.  Yes.                                                        14:52:12

11  Q.  All right.  And is there information there concerning

12  who -- well, what's the information that's on that sheet?

13  Let's put it that way.

14  A.  It's the preparer's information.  It's Edwin's information.

15  Q.  Okay.  And so does this document identify Mr. Lacey and the  14:52:32

16  particular trust?

17  A.  I believe it does.

18  Q.  And it was filed, to your knowledge, with the government?

19  A.  Yes.

20  Q.  All right.                                                   14:52:46

21      MR. CAMBRIA:  Could we go to -- I don't know if I'm

22  making these things happen here -- 5542, please.

23  BY MR. CAMBRIA:

24  Q.  Now, do you see this letter?

25  A.  Yes.                                                         14:53:07

1    Q.  Can you identify what this letter is?

2    A.  Yes.  It's my letter to the Internal Revenue Service that

3    accompanied one of the required filings for this account.  It

4    is the first year.  So it's 2017.  This is the form I -- that

5    we -- I got the extension on that you showed me previously.        14:53:24

6    And so that extension related to this form.  So this form was

7    timely filed based on the extension.

8               MR. CAMBRIA:  Move this into evidence, Your Honor.

9               MR. STONE:  No objection.

10   BY MR. CAMBRIA:                                                    14:53:39

11   Q.  And --

12              THE COURT:  Well, let me -- you asked me to do

13   something, Mr. Cambria.  Let me do it.

14              It may be admitted.  It may be published.

15              (Exhibit 5542 admitted into evidence.)                  14:53:47

16              MR. CAMBRIA:  May I note that I've actually given the

17   Court a direction?  Very good.  Thank you.

18              THE COURT:  I somehow think sometimes you wish to just

19   do it alone.

20              MR. CAMBRIA:  It would be --                            14:54:01

21              THE COURT:  And I'm sure all counsel wish that as

22   well.

23              MR. CAMBRIA:  That's a dream of all lawyers, Your

24   Honor.

25              THE COURT:  All right.  Let's move forward.             14:54:06

```
 1    BY MR. CAMBRIA:
 2    Q.  Now, this particular exhibit, you notice there's several
 3    pages to it.
 4           Can you tell us what these pages --
 5           MR. CAMBRIA:  Could you flip to the next page, please.   14:54:16
 6    BY MR. CAMBRIA:
 7    Q.  All right.  Can you tell us what information is on this
 8    first page, just generally?
 9    A.  This is the IRS Form 3520-A -- it's one of the two forms
10    that need to get filed.  This one's captioned Annual            14:54:31
11    Information Return of Foreign Trust With a U.S. Owner.  And
12    it's going to show information about the foreign trust.  It's
13    going to show information about the U.S. owner.
14           MR. CAMBRIA:  Can you flip to the next page, please.
15    BY MR. CAMBRIA:                                                 14:54:49
16    Q.  And, again, can you tell us what's on this page?
17    A.  It's part of the annual disclosure.  This page is
18    reflecting the income and expenses of the trust, and it's also
19    showing a balance sheet for the trust.
20    Q.  Okay.  And page 3?                                          14:55:04
21    A.  More information about the trustee.
22    Q.  And page 4?
23    A.  Primarily blank, but both page 3 and page 4 have been
24    signed by the Hungarian trustee, which is required.
25    Q.  All right.  And was there -- at least to your knowledge,    14:55:23
```

UNITED STATES DISTRICT COURT

```
 1    was there some reason why this particular investment in this

 2    place was suggested by Stein?

 3              MR. STONE:  Object to hearsay.

 4              THE COURT:  Sustained.

 5              MR. CAMBRIA:  Okay.                              14:55:47

 6              Would you pull up 5543, please.

 7    BY MR. CAMBRIA:

 8    Q.  And can you tell us, Mr. Becker, what this is?

 9    A.  Yes.

10    Q.  Okay.  What is it?                                    14:56:03

11    A.  It is the transmittal letter for the Form 3520-A.

12              MR. CAMBRIA:  And I move this into evidence.

13              THE COURT:  And I think we've already seen this one.

14              MR. STONE:  I agree.  I think it's the first page of

15    5542, so it's duplicative.                               14:56:23

16              MR. CAMBRIA:  All right.

17              THE COURT:  So it -- so it is a duplicate,

18    Mr. Cambria.

19              MR. CAMBRIA:  Right.  I'll --

20              THE COURT:  You can use it if you want to because it's  14:56:32

21    already been admitted, but --

22              MR. CAMBRIA:  I'll move in -- I'll move to the next

23    one, Your Honor.

24              5544.

25        ///
```

JOHN BECKER - DIRECT EXAMINATION
88

```
 1   BY MR. CAMBRIA:
 2   Q.  Do you see that?
 3   A.  Yes.
 4   Q.  All right.  What's that?
 5   A.  We've seen this one already.                      14:56:52
 6   Q.  Okay.  And what follows from that?  Have we seen that also?
 7           THE COURT:  We're only seeing the one page,
 8   Mr. Cambria.
 9           MR. CAMBRIA:  Right.  The next page, please.  It has a
10   3520-A up on the corner.                              14:57:12
11           THE WITNESS:  Yes.
12   BY MR. CAMBRIA:
13   Q.  All right.  And that is what?
14   A.  That is the -- the initial filing on this a -- this trust
15   account.  And so the first filing was for this year.  14:57:22
16   Q.  Okay.
17           MR. CAMBRIA:  And 5545, please.
18   BY MR. CAMBRIA:
19   Q.  What's that?
20   A.  It's another of the FBARs or another one of the required  14:57:36
21   annual filings on behalf of the account.
22   Q.  Okay.
23           MR. CAMBRIA:  Move that into evidence, please, Your
24   Honor.
25           THE COURT:  Is there an objection?            14:57:52
```

UNITED STATES DISTRICT COURT

Case 2:18-cr-00422-DJH   Document 1928   Filed 10/26/23   Page 89 of 140

```
 1            MR. STONE:  No objection.  Sorry, Your Honor.

 2            THE COURT:  Yes, it may be admitted, and it may be

 3   published.

 4            (Exhibit 5545 admitted into evidence.)

 5            MR. CAMBRIA:  Okay.  5546.                              14:58:00

 6   BY MR. CAMBRIA:

 7   Q.  Again, do you recognize this?

 8   A.  Yes.

 9   Q.  What is it?

10   A.  It's another of the annual FBARs or required filings on    14:58:16

11   behalf of this account.

12   Q.  Okay.

13            MR. CAMBRIA:  Move that into evidence, please.

14            MR. STONE:  No objection.

15            THE COURT:  Okay.  It may be admitted.  It may be      14:58:26

16   published.

17            (Exhibit 5546 admitted into evidence.)

18            MR. CAMBRIA:  5548.

19            THE WITNESS:  Same thing.  It's a part of the annual

20   filings.                                                        14:58:39

21   BY MR. CAMBRIA:

22   Q.  Okay.  So the question, then, is, did you advise Mr. Lacey

23   as to all of the required procedural steps to legally file

24   information on a trust that's not within the United States?

25            MR. STONE:  Objection.  Leading and compound.          14:59:07
```

```
 1              THE COURT:  Sustained.
 2    BY MR. CAMBRIA:
 3    Q.  Okay.  What did you advise him?
 4    A.  I advised him -- not to the specifics as to the actual
 5    filings.  I advised him it needed to be -- we needed to satisfy     14:59:17
 6    all of the U.S. filing requirements, and I advised him that we
 7    need to report all of -- he needs to report all of the income
 8    on his individual income tax return.
 9    Q.  All right.  And did he make any statement about taxes or
10    paying taxes to you?                                                 14:59:35
11              MR. STONE:  Objection.  Calls for hearsay.
12              THE COURT:  Sustained.
13    BY MR. CAMBRIA:
14    Q.  All right.  In any event, in your opinion, was the trust
15    that was filed and created in Hungary in any way concealed from     14:59:47
16    the United States of America taxing authorities?
17              MR. STONE:  Objection.  Relevance.  Calls for some
18    sort of legal conclusion.
19              THE COURT:  Sustained.
20              MR. CAMBRIA:  I think he's qualified to make that          15:00:03
21    judgment.
22              THE COURT:  Sustained.
23              MR. CAMBRIA:  Thank you.
24    BY MR. CAMBRIA:
25    Q.  In any event, did you inform Mr. Lacey that all the legal       15:00:10
```

1    procedures had been followed to correctly file this lawfully?

2    A.  Yes.

3              MR. STONE:  Objection.  Leading.

4    BY MR. CAMBRIA:

5    Q.  And --                                              15:00:23

6              THE COURT:  Sustained.

7    BY MR. CAMBRIA:

8    Q.  And from what you've reviewed, were all of those

9    requirements complied with?

10             MR. STONE:  Same objection.                   15:00:30

11             THE COURT:  Sustained.

12   BY MR. CAMBRIA:

13   Q.  Well, you knew what the requirements were, did you not?

14   A.  Yes.

15   Q.  All right.  Were they all filed?                    15:00:37

16   A.  Yes.

17   Q.  I mean, were they all complied with?

18   A.  Yes.

19             MR. CAMBRIA:  That's all I have.

20             THE COURT:  All right.  Members of the jury, it's just  15:00:43

21   beyond 3:00 o'clock -- or it is 3:00 o'clock by one of my

22   clocks, in any event, and so we will stand on our afternoon

23   break.  And be prepared to come back into the courtroom at

24   3:20.  Just remember the admonitions.

25             Please all rise for the jury.                 15:01:03

1        And, sir, you may step down.

2        THE WITNESS:  Thank you.

3    (Jury not present at 3:01 p.m.)

4        THE COURTROOM DEPUTY:  Sir, you can go ahead to the

5    witness room.                                                    15:01:36

6        THE COURT:  All right.  For purposes of the record,

7    the added page to Government's Exhibit Number 1 is now

8    Exhibit 6264.  6264.

9        And, Mr. Lincenberg, you wanted two minutes.

10       MR. LINCENBERG:  One minute.                                 15:01:53

11       THE COURT:  I'm sorry.  One minute.

12       MR. LINCENBERG:  Your Honor, government counsel was

13   permitted to grandstand for show in front of the jury to leave

14   an unfounded suggestion that defense counsel did something

15   improper and was hiding something.  In my 38 years, I've never  15:02:08

16   seen a prosecutor allowed to get away with that.

17       This Court -- and -- and the prosecutor knows that

18   arguments like this are things that the Court does not want in

19   terms of having argumentative objections and the like.  They

20   should be held at sidebar or outside the counsel -- the        15:02:27

21   presence of the jury.  And it was done intentionally, and it's

22   left an incurable impression.  It came in on the defendant's

23   first witness.  It creates an incurable impression of defense

24   counsel misconduct.  The Court then recessed the matter, which

25   I believe although it heightened the potential significance of  15:02:46

1    it, and we move for a mistrial.

2            THE COURT:  All right.  Mr. Berry.

3            MR. BERRY:  Yes, Your Honor.

4        I certainly disagree with the characterization of

5    grandstanding and making some show of it.  I believe the record          15:03:03

6    will reflect that what I did was turn to the Court after laying

7    some foundation regarding 26.2 and 612 and asked the Court to

8    move the Court for the production of statements complying with

9    those two rules.

10           I don't believe that I did anything that would even          15:03:23

11   remotely go beyond the bounds of that, the way Mr. Lincenberg

12   has suggested it.  It was something that certainly could have

13   been avoided if the defense had actually produced this stuff

14   any number of the times that we had asked pretrial before the

15   production of those 26.2 statements.  Indeed, it sounds like          15:03:42

16   Mr. Eisenberg has not even reviewed those statements at this

17   point because he didn't have them.  His investigator has.  And

18   we would ask you to deny the motion.

19           MR. EISENBERG:  May it please the Court, Your Honor?

20           THE COURT:  Yes.          15:04:00

21           MR. EISENBERG:  612 does not support what the

22   government is asking.  They're just --

23           THE COURT:  Well, no.  I don't want to hear a

24   relitigation about the 612 and the disclosures.

25           MR. EISENBERG:  Well --          15:04:11

```
 1              THE COURT:  I'm concentrating on the motion that's
 2    before me.
 3              So do you have anything related to the motion?
 4              MR. EISENBERG:  That -- this is the one under
 5    Rule 26.2 then, the production of text messages is the way I      15:04:20
 6    think we're at.
 7              THE COURT:  No.  Mr. Lincenberg just made a motion --
 8              MR. EISENBERG:  Oh, the motion.  I'm sorry.
 9              THE COURT:  -- to dismiss.  That's what I'm talking
10    about.                                                           15:04:32
11              MR. EISENBERG:  I'm sorry.  I join in it, Your Honor.
12              THE COURT:  Well, I will say this, that Mr. Eisenberg
13    also provided argument before the Court related to the lack of
14    production.  And -- and, quite frankly, I mean, defense counsel
15    are not on trial.  It's your clients.  And my sense is that the  15:04:55
16    frustration here is that counsel have -- at least with regard
17    to this witness haven't produced anything.  And I want to
18    remind counsel that 612(a)(2) also provides that the Court can
19    order the production of that material before the witness
20    testifies.                                                       15:05:24
21              And, as I recall, those orders have already been
22    issued.  And that is why it caught my ire, because this is not
23    new to anyone.  These witnesses aren't new to anyone.  And for
24    there not to be a production of what is relied upon and to hear
25    for the first time that there were text messages that went      15:05:49
```

1    between investigators, and so on and so forth, it's concerning.

2    It leaves a picture that counsel have not complied with

3    disclosure obligations that have been previously ordered by the

4    Court.

5              And so I don't find that there's showing of prejudice        15:06:05

6    as to the clients.  It may leave a puzzling question in the

7    jury's mind about, well, you know, what's -- what's going on in

8    terms of providing statements and so on?

9              And -- and it is fair to say that this Court has

10   always had an ongoing procedural rule that you do not argue        15:06:33

11   matters like this in front of the jury.  But it happened, and I

12   don't think it rises to the level of a motion to dismiss the

13   charges.

14             So let's move forward.  Make sure those productions

15   are had.  And this includes whatever the communications are        15:06:59

16   that is going on between investigators and subpoenaed defense

17   witnesses.  You better be talking to them about whatever those

18   conversations are or were.

19             And so let's stand in recess.

20             THE COURTROOM DEPUTY:  All rise.

21             THE COURT:  Who's the next --

22             MR. EISENBERG:  Your Honor, I have --

23             THE COURT:  Who is the next witness after this

24   gentleman?

25             MR. EISENBERG:  Your Honor, I have the packet --        15:07:47

```
1          THE COURT:  Yes.

2          MR. EISENBERG:  -- the text messages.

3          THE COURT:  You may approach and bring those.

4          Who is the next witness after this gentleman?

5          When I come back, please let me know who the next          15:07:53

6   witness is.

7      (Recess from 3:07 p.m. to 3:25 p.m.)

8          THE COURTROOM DEPUTY:  All rise.

9          THE COURT:  Let me just tell you what -- let me just

10  tell you what it is that I provided.                              15:25:58

11         I looked at the -- the texts that were produced.  The

12  majority of them were, indeed, related to -- they were related

13  to arrangements, flight arrangements, hotel, time of meeting.

14         I provided to both Mr. Berry and Mr. Eisenberg what

15  I've found to be related to the testimony, and so you can let    15:26:21

16  me know whether or not Mr. Berry wishes to recall the witness.

17  But you should probably do so sooner rather than later.

18         MR. BERRY:  Yes, Your Honor.

19         Thank you so much for -- for doing that, providing

20  those.  That's exactly what we needed to see.                    15:26:35

21         Yes, I would like to briefly take him back on cross.

22  What I would propose is I believe that Mr. Cambria, while he

23  passed, he has requested that he have an opportunity to ask two

24  more questions of Mr. Becker.  I believe he said two.  I won't

25  hold him to it.  Just a couple more questions of Mr. Becker      15:26:54
```

1    before he properly passes.

2         And then so what I would like to do is let him do

3    that, properly pass, and before Mr. Stone starts his

4    cross-examination, I would like to bring back Mr. Snyder, knock

5    that out.  It will be very brief.  And then pull him off, let        15:27:08

6    him get home, and then we can put Mr. Becker back on and

7    complete however far we get.

8         Are we going to 4:30?

9         THE COURT:  4:30.

10        MR. BERRY:  4:30.  Yes.                                          15:27:21

11        THE COURT:  All right.  Let's proceed in that way.

12        So, Mr. Cambria, you can ask your two questions.

13   Let's bring the witness back and call the jury in.

14        MR. FEDER:  Judge, before we do that, given that the

15   door has been opened, and we're making a request right now for     15:27:37

16   all --

17        THE COURT:  I'm sorry.  We have a -- we have a witness

18   in the room.  Mr. Feder, we're bringing the jury in.  You can

19   make your statement, or whatever, at the end of the day when I

20   release the jury.                                                    15:27:48

21        Sir, you may resume your seat.

22        And let's bring the jury in.

23        All rise for the jury.

24     (Jury present at 3:28 p.m.)

25        THE COURT:  All right.  Please be seated.                       15:28:56

1           And, Mr. Cambria, you may continue.

2           MR. CAMBRIA:  Thank you, Your Honor.

3    BY MR. CAMBRIA:

4    Q.  Mr. Becker, I just have a couple more questions.

5           Did you at -- were you the one who physically                    15:29:10

6    collected the funds and then transferred them for the trust?

7    A.  Yes.

8    Q.  All right.  And was there any particular way you did that?

9    A.  Yes.

10   Q.  How was that?                                                        15:29:25

11   A.  There were five separate trusts that distributions needed

12   to be made to Mr. Lacey.  I needed to wire those to the trust

13   company in Hungary.  Rather than doing five wires, I

14   transferred all those funds into my IOLTA, my law firm account.

15   And once they were in the law firm account, I did a single wire     15:29:46

16   to Hungary.

17   Q.  All right.  And that was your decision?

18   A.  Yes.

19   Q.  All right.  And, as a result of these transfers, and so on,

20   were your bank accounts closed?                                         15:29:59

21   A.  Yes.

22           MR. STONE:  Object.

23           THE COURT:  All right.

24           MR. CAMBRIA:  That's all.

25           THE COURT:  At this juncture, Mr. Berry, do you wish            15:30:07

UNITED STATES DISTRICT COURT

```
 1    to reserve time to recall the prior witness?
 2            MR. BERRY:  Yes, Your Honor.  We would like to delay
 3    our cross-examination of Mr. Becker and recall Mr. Snyder.
 4            THE COURT:  Yes.  Mr. Becker, at this point, because
 5    we have a witness who needs to get out of town, I've permitted    15:30:21
 6    government counsel some time to reexamine him so that he can
 7    leave by the end of today.  So I'm going to ask you to remain
 8    under oath.  You may step down, step out of the courtroom, and
 9    then we'll bring you back in.
10            THE WITNESS:  Okay.                                        15:30:40
11            THE COURT:  All right.  Thank you.
12            THE WITNESS:  Thank you, Your Honor.
13            THE COURT:  All right.  Mr. Berry.  I'm sorry.  Call
14    the witness.
15            MR. BERRY:  It's not my witness.                           15:30:48
16            THE COURT:  Recall --
17            MR. BERRY:  It's -- we're recalling Grant Snyder,
18    please.
19            THE COURT:  Yes, please.
20            MR. BERRY:  Your Honor, I've just been provided            15:30:57
21    another document.  Just one second, please.
22            THE COURT:  Sure.  Certainly.
23            All right.  Sir, you may resume the witness chair.  I
24    will remind you that you still remain under oath for this
25    continuation of your testimony.  Thank you.                       15:31:15
```

```
 1            THE WITNESS:  Copy that, Your Honor.

 2        (GRANT SNYDER, a witness herein, was previously duly sworn

 3    or affirmed.)

 4                  CROSS-EXAMINATION (Cont'd)

 5    BY MR. BERRY:                                              15:31:28

 6    Q.  Good afternoon, Mr. Snyder.  Thanks for coming back.

 7            Earlier in the beginning of your testimony when I was

 8    asking you questions, I was asking you about communications

 9    that you had with any member of the defense team.

10            Do you recall that?                                15:31:44

11    A.  I do.

12    Q.  And you acknowledged that there were some text

13    communications.

14            Do you remember that?

15    A.  Yes.                                                   15:31:52

16    Q.  Okay.  Do you recall that when you had those text

17    communications with the defense team, they had forwarded you an

18    email with the links to those ads that you talked about;

19    correct?

20    A.  Yes.                                                   15:32:07

21    Q.  And that you responded by text about your review of those

22    ads.

23            Do you recall that?

24    A.  I think so, yes.

25    Q.  Okay.  Do you recall that, among other things, that you   15:32:21
```

1    said in the text messages, you reviewed those ads and said,

2    "While others have direct effort" -- "while others have direct

3    references to sex for money," that you were talking about your

4    review of those ads.

5        Do you recall that?                                         15:32:44

6    A.  I remember saying something like that, but it was in the

7    context of a larger thought.

8    Q.  Sure.  Let me just show this to you.

9        MR. BERRY:  May I approach the witness, Your Honor?

10       MR. EISENBERG:  Has this been marked?                       15:32:54

11       MR. BERRY:  I'm not going to move it into evidence.

12       MR. EISENBERG:  It should be marked.

13       THE COURT:  It should be marked, and we can assign it

14   a number.

15       But you may go ahead and show the witness.                  15:33:03

16       MR. BERRY:  Sure.

17       Do we want -- Your Honor, would you like me to mark

18   everything that was provided to me or just the --

19       THE COURT:  Whatever -- whatever it is you're going to

20   use.                                                            15:33:17

21       MR. BERRY:  Sure.

22       THE COURT:  So let's -- let's proceed in that way, and

23   Liliana will assign it a number.

24       MR. BERRY:  Okay.  Thank you.

25       MR. EISENBERG:  Can I see it?                               15:33:26

GRANT SNYDER - CROSS-EXAMINATION (Cont'd)

102

```
 1            MR. BERRY:  Sure.

 2            THE COURTROOM DEPUTY:  Counsel, can we number that

 3   7001?

 4            MR. BERRY:  We -- absolutely.  I'm happy to do it that

 5   way.  What I was suggesting is we're doing these types of        15:34:01

 6   exhibits in the 3000 series, and so I thought I would put a

 7   3000 number on it.  But I'll do whatever the Court prefers.

 8            THE COURTROOM DEPUTY:  Okay.  Then that would be 3011.

 9            MR. BERRY:  Yes, ma'am.

10            Now I don't know what the order is, but I'll do it      15:34:24

11   this way.

12            3011?  Is that what you said?

13            THE COURTROOM DEPUTY:  Correct.

14            MR. BERRY:  Thank you.

15            May I approach the witness?                             15:34:35

16            THE COURT:  Yes, you may.

17            THE WITNESS:  Where do you want me to start reading?

18   BY MR. BERRY:

19   Q.  Just whenever you're done, tell me, and I'll turn it.

20   A.  I'm sorry.  Can you pull that back?  Okay.                   15:35:00

21            Okay.

22   Q.  That's it.

23   A.  Okay.

24   Q.  Now having had an opportunity of what's been marked as

25   Government's Exhibit 3011, does that refresh your memory?        15:35:24
```

UNITED STATES DISTRICT COURT

1   A.  Yes.

2   Q.  And do you recall now that in your text messages you were

3   talking about how the ads that you reviewed were maybe

4   suspicious and have elements we would find, but there's a great

5   range of ads there with some being particularly vague or benign    15:35:47

6   while others have direct references to sex for money?

7   A.  Yes.

8   Q.  Do you recall that?

9   A.  I do recall that.

10          MR. BERRY:  Thank you.  No further questions, Your    15:35:58

11   Honor.

12          THE COURT:  All right.  Sir, may the witness be

13   released from subpoena?

14          MR. EISENBERG:  May I have a recross, Your Honor?

15          MR. BERRY:  I object to that, Your Honor.    15:36:08

16          THE COURT:  No.  And so I'm going to deny that

17   request, Mr. Eisenberg, given the procedure that we went

18   through --

19          MR. EISENBERG:  Your Honor --

20          THE COURT:  -- for the limited purpose of the document    15:36:21

21   that was just shown to the witness.

22          MR. EISENBERG:  May I?

23          THE COURT:  And so with that, sir, may he be released

24   from subpoena, Mr. Eisenberg?

25          MR. EISENBERG:  I need a sidebar, Your Honor.  It'll    15:36:33

1    only be brief.

2          THE COURT:  Come forward.

3       (Sidebar discussion begins on the record.)

4          MR. EISENBERG:  Just -- just so I understand, Your

5    Honor, I won't be able to redirect him on the information that    15:36:54

6    is both beginning and after that portion of the email that was

7    just offered by the government and refreshed his recollection.

8          The reason why I'm concerned about this is that -- and

9    I understand about the emails not being produced until just

10   now.  Frankly, that would be part of a cross-examination, and I    15:37:17

11   would be able to redirect on it.  I don't see why at this point

12   in time there's any difference.

13         And I will say this, Your Honor:  I'll repeat it, and

14   at the risk of being repetitious, but we've gotten no text

15   messages from any witness from the government, even though they    15:37:42

16   have been demanded.  And I'd be very surprised if they're

17   just -- they just don't exist.

18         I am sorry for not having produced these earlier.  I

19   don't want to interrupt the flow of the trial.  But I really

20   take -- I really take -- I can't really find the word, Your    15:37:57

21   Honor, for this sort of procedure.  And I don't mean to be

22   disrespectful to the Court.  I didn't mean it if I was perhaps

23   a little bit exercised, but that's -- that's -- that's where I

24   come out on this.

25         I think it leaves a misimpression in the jury's mind    15:38:16

UNITED STATES DISTRICT COURT

1    as to what's in the total context of those two or three text

2    messages.  That's my record.

3           MR. BERRY:  Your Honor, if the procedure had been

4    complied with pursuant to your orders, what would have happened

5    is I would have had those messages before I started my          15:38:34

6    cross-examination.  The way it was done, because it was not

7    produced, I didn't have an opportunity to do that.  And so

8    Mr. Eisenberg is correct.  He would have been able to do that

9    if he had complied with this Court's order about the production

10   of those messages in the first place, in addition to the fact   15:38:48

11   that he has represented to the Court that I've engaged in some

12   sort of histrionic demonstration about something where it

13   turned out there was, in fact, relevant messages subject --

14   related to the subject matter of his testimony.

15          So I would object to him having a second opportunity       15:39:03

16   to redirect given the fact that he failed to comply with this

17   Court's order regarding the production of those messages in the

18   first place.

19          THE COURT:  All right.  Well, I don't want to continue

20   the ongoing argument about --                                    15:39:14

21          MR. BERRY:  Sure.

22          THE COURT:  -- lack of production.  What I just heard

23   on the permitted cross-examination was related directly to

24   those two pages of text message in which he looked at the

25   advertisements, which you offer -- have already probed and       15:39:29

```
 1    which you have sufficiently examined him on.  I don't see the

 2    necessity to reopen for any other questions.  So at this

 3    juncture, I'm not going to permit it.

 4            All right.  Let's go forward.

 5            MR. KESSLER:  Can we ask if he's released?              15:39:45

 6            THE COURT:  Yeah.  I just did.

 7            MR. EISENBERG:  Okay.  No objection.

 8        (End of sidebar discussion.)

 9            THE COURT:  All right.  Sir, is there an objection to

10    having -- by the government to having the witness released from  15:39:57

11    subpoena?

12            MR. BERRY:  No, Your Honor.

13            THE COURT:  All right.  Sir, thank you for your

14    testimony.  You are released from your subpoena.  You are free

15    to go.                                                          15:40:04

16            THE WITNESS:  Thank you, Your Honor.

17            THE COURT:  Watch your step there.

18            All right.  Let's have Mr. Becker back in.

19            Sir, you may resume the witness chair.  Thank you.

20            THE WITNESS:  Sure, Your Honor.                         15:40:29

21                     CROSS-EXAMINATION

22    BY MR. STONE:

23    Q.  Good afternoon, sir.

24    A.  Good afternoon.

25    Q.  Sir, we met before; correct?                               15:40:42
```

```
 1    A.  I apologize.  I do not recall.

 2    Q.  That's fair.  Do you recall having a meeting with -- at the

 3    U.S. Attorney's Office --

 4    A.  Yep.

 5    Q.  -- in July 2018?                                              15:40:52

 6    A.  Yes.

 7    Q.  That was a meeting attended by prosecutors and agents;

 8    correct?

 9    A.  Yes.

10         MR. STONE:  Can the witness be shown what has been         15:41:05

11    marked as Exhibit 3007, please.

12    BY MR. STONE:

13    Q.  Sir, while that's being -- while that exhibit's being given

14    to you, I have a few questions that I'll move forward with.

15    Okay?                                                            15:41:26

16    A.  Yes.

17    Q.  When were you first contacted by the defense about your

18    testimony today?

19    A.  I do not recall.

20    Q.  You remember being contacted, though?                       15:41:33

21    A.  Yes.

22    Q.  And who contacted you?

23    A.  I believe it was Mr. Cambria, but I can't recall for sure.

24    Q.  And you don't remember when?

25    A.  I do not.                                                    15:41:47
```

1   Q.  Do you know how he communicated -- how he contacted you?

2   Over the phone?  Email?

3   A.  I believe it would have been either phone or email.

4   Q.  Do you recall sending emails back and forth with

5   Mr. Cambria or Mr. Cambria's office?                          15:42:04

6   A.  Oh, yes.

7   Q.  How -- how many?  Can you estimate?

8   A.  Maybe five, and they all dealt with the trial date or

9   scheduling.

10  Q.  Okay.  A couple of emails, perhaps, where they sent some  15:42:18

11  documents to you?

12  A.  I -- yes.

13  Q.  And were they some of the same documents that Mr. Cambria

14  showed you during your direct examination?

15  A.  Yes.                                                      15:42:32

16  Q.  Did you meet with Mr. Cambria or anyone else before

17  testifying today?

18  A.  Yes, I did.

19  Q.  Where did you -- did you -- was it an in-person meeting?

20  A.  Yes.                                                      15:42:46

21  Q.  When?

22  A.  Saturday morning.

23  Q.  Was that meeting recorded, if you know?

24  A.  No.

25  Q.  Were there any notes taken at that meeting?              15:42:54

1    A.  Not by me.

2    Q.  Did you notice any -- anyone else at the meeting taking

3    notes?

4    A.  No.

5    Q.  Nobody showed you any notes at the end of the meeting?          15:43:03

6    A.  No.

7    Q.  Before your testimony today, were you asked to prepare

8    anything?

9    A.  No.

10   Q.  And beyond the documents that were shown to you during your    15:43:15

11   direct examination, did the defense ask you to review anything

12   in preparation for your testimony today?

13   A.  No.

14   Q.  All right.  You have Exhibit 3007 in front of you, is that

15   right, sir?                                                         15:43:37

16   A.  I have the exhibit.  And I'll take your word as to what

17   number it is.  I'm sorry.

18   Q.  And -- well, there should be a --

19   A.  Let me get my glasses on --

20   Q.  -- a written number in the bottom --                           15:43:46

21   A.  Okay.

22   Q.  -- left-hand corner.

23   A.  I see it.  3007.

24   Q.  All right.  Excellent.

25           You received a subpoena from the United States             15:43:59

```
 1   Attorney's Office in December 2017, did you not, sir?
 2   A.  I believe so.
 3   Q.  You remember receiving a subpoena; correct?
 4   A.  I don't recall, to tell you the truth.
 5   Q.  Do you remember producing documents?                   15:44:11
 6   A.  Yes.
 7   Q.  You produced those documents in compliance with the
 8   subpoena that you received?
 9   A.  Apparently.  It's been six or seven years, so I just don't
10   remember.  I -- I assume it was -- it was a subpoena, and I --  15:44:23
11   I remember producing documents.  But I didn't go back and look
12   at anything, so I just assumed.
13   Q.  Fair.  You know what a subpoena is, though, don't you?
14   A.  Yes, I do.
15   Q.  A court order asking you to produce certain documents?    15:44:35
16   A.  Yes.
17   Q.  And here there was a subpoena asking you to produce certain
18   documents related to this transaction that you testified on
19   direct; correct?
20   A.  Yes.                                                     15:44:47
21   Q.  And you produced some documents?
22   A.  I did.
23   Q.  Would you have produced those documents without a subpoena?
24   A.  I believe -- I believe the documents were privileged, and
25   so I needed to get permission to release them.  So I needed to  15:45:01
```

```
 1   have a subpoena.  I needed to have some sort of determination
 2   that I could release them.
 3   Q.  Okay.  That wasn't quite my question, but I appreciate the
 4   answer.
 5          If the United States Attorney's Office hadn't issued    15:45:13
 6   you a subpoena, would you have produced documents to the United
 7   States Attorney's Office?
 8   A.  No.
 9   Q.  Why not?
10   A.  Privilege.                                                 15:45:23
11          MR. CAMBRIA:  Asked and answered.
12          THE COURT:  Overruled.
13   BY MR. STONE:
14   Q.  Well, you had certain non-privileged documents in your
15   possession, did you not?                                       15:45:31
16   A.  I'm not aware of any.
17   Q.  Well, for example, we looked at some letters that you sent
18   on behalf of Mr. Lacey.
19          That's not a privileged document; correct?
20   A.  I -- I -- with my clients, I treat everything as           15:45:41
21   privileged.  And so if somebody has an exception to the
22   privilege.
23          This is in litigation.  I do not do litigation.  I
24   don't know what is and is not privileged.  I just treat
25   everything as privileged and confidential.                     15:45:55
```

JOHN BECKER - CROSS-EXAMINATION

112

```
 1   Q.  I gotcha.
 2            MR. STONE:  One moment.
 3            May the witness be shown Exhibit 3009, please.
 4            Can I get a copy, too, please.
 5            THE WITNESS:  Thank you.  Oh.                          15:46:36
 6   BY MR. STONE:
 7   Q.  Do you have Exhibit 3009 in front of you, sir?
 8   A.  Yes, I do.
 9   Q.  And this is a declaration that you prepared; correct?
10   A.  I hired an attorney to prepare it for me.               15:46:49
11   Q.  Well, this is a declaration of statements that you made.
12   And on the page 3, you signed it under penalty of perjury;
13   correct?
14   A.  Yes, I did.
15   Q.  And on paragraph 12 -- do you see that, sir?            15:47:03
16   A.  Yes.
17   Q.  You wrote, "Through my counsel I agreed to produce
18   non-privileged documents subject to the subpoena."
19            Do you see that?
20   A.  Yes.                                                    15:47:17
21   Q.  Is that accurate?
22   A.  Yes.
23   Q.  "Thereafter my counsel" -- "counsel produced 2,775 pages of
24   responsive non-privileged documents."
25            That did I read that correctly?                    15:47:26
```

UNITED STATES DISTRICT COURT

1   A.  Yes.

2   Q.  And so those were documents that you produced because you

3   received a subpoena; correct?

4   A.  Yes.  Again, I apologize for the -- the time has just been

5   so long.                                                          15:47:38

6   Q.  No need to apologize.  That's why we have these documents

7   handy.

8        And those are pages that you would not have produced

9   unless you received the subpoena?

10        MR. CAMBRIA:  Your Honor, asked and answered.              15:47:47

11        THE COURT:  Sustained.

12        MR. STONE:  I'll move on.

13   BY MR. STONE:

14   Q.  Do you have a sense for what happens when you don't respond

15   to a subpoena?                                                   15:47:55

16        MR. CAMBRIA:  Objection.  Irrelevant.  He responded.

17        THE COURT:  Overruled.  He can answer if he knows.

18        THE WITNESS:  I believe --

19   BY MR. STONE:

20   Q.  Do you know?                                                15:48:06

21   A.  I believe you'd be sanctioned.

22   Q.  You'd get in trouble with the Court?

23   A.  Probably.

24   Q.  All right.  Now, let me just direct your attention back to

25   Exhibit 3007.  That's the memorandum of the interview for your  15:48:30

1   interview at the U.S. Attorney's Office.

2           Do you see that, sir?

3   A.  Yes.

4   Q.  And in that meeting, you discussed much of what you're

5   testifying about today.  Is that fair?                          15:48:47

6   A.  Yes.

7   Q.  Do you remember telling the agents and prosecutors at that

8   meeting that your client, Mr. Lacey, was having trouble finding

9   a bank to do business with?

10  A.  Yes.                                                         15:49:01

11  Q.  And you remember telling the agents and prosecutors that

12  Mike Lacey was looking to transfer his money overseas; correct?

13  A.  Yes.

14  Q.  All right.  And on direct examination, you testified about

15  a -- your IOLTA account; is that right?                         15:49:22

16  A.  Yes.

17  Q.  What's an IOLTA account?

18  A.  It's a law firm trust account.

19  Q.  What's the purpose of having a law firm trust account?

20  A.  It's to hold clients' monies and to protect clients'        15:49:35

21  monies.

22  Q.  And this was the account that you wired $16.5 million of

23  your client's money to Hungary; correct?

24  A.  I transferred my client's money into the account.  And from

25  the account, I wired it out.                                    15:49:53

1   Q.   So that's yes?

2   A.   Yes.

3   Q.   16.5 million went from your IOLTA account to this bank

4   account in Hungary; right?

5   A.   Yes.                                                          15:50:02

6   Q.   How many times a year do you wire millions of dollars of

7   your client's money from your IOLTA account to an overseas

8   account?

9           MR. CAMBRIA:   Objection.   Relevance.

10          THE COURT:   Overruled.                                    15:50:18

11          THE WITNESS:   On any given year?

12  BY MR. STONE:

13  Q.   Yes.

14  A.   Not very often.

15  Q.   Have you ever done it before, besides this one?              15:50:27

16  A.   Probably not.

17  Q.   And you've been an attorney for over 30 years; correct?

18  A.   Yes.

19  Q.   And you've been practicing in this realm of trusts and

20  estates for that entire time?                                      15:50:40

21  A.   Yes.

22  Q.   And this was the only time that you wired $16.5 million to

23  an overseas account --

24  A.   This is the only --

25  Q.   -- correct?                                                   15:50:50

```
 1   A.  -- time I wired exactly $16.5 million.  I have done other

 2   international wires that have been seven figures, but they were

 3   other types of transactions.

 4   Q.  Have you ever wired money to Hungary before?

 5   A.  No.                                                    15:51:08

 6   Q.  What about any country in Eastern Europe?

 7   A.  No.

 8   Q.  All right.  You remember that your client told you that the

 9   source of these funds were from Backpage; correct?

10   A.  No.  That's not correct.                               15:51:24

11   Q.  Well, let's take a look at Exhibit 3007 and see if we can't

12   refresh your recollection.

13   A.  Okay.

14   Q.  All right.  So first page, 1D?

15   A.  Yep.                                                   15:51:50

16   Q.  Do you see that?

17   A.  Yes.

18   Q.  It reads, "Lacey told Becker that the source of the

19   funds" --

20        MR. CAMBRIA:  Object.  Object to reading from this as  15:51:55

21   not a statement.

22        THE COURT:  Sustained.

23        MR. STONE:  Your Honor --

24   BY MR. STONE:

25   Q.  Sir, do you see that?                                  15:52:02
```

1    A.  Yes.

2    Q.  Does that refresh your recollection of what your client may

3    have told you?

4    A.  I don't recall saying this.  I recall saying that it was

5    from the sale of Backpage.  I don't know that I -- it was a --     15:52:11

6    specifically from the operation of the company.  I thought it

7    was from the sale of the company.

8    Q.  You understood it to be money from Backpage, though?

9    A.  Yes.

10   Q.  And the 16.5 million, you understood all that money to be     15:52:22

11   money from Backpage?  Whether it's from the sale or operations,

12   money from Backpage?

13   A.  Correct.

14   Q.  Okay.  When you were Mr. Lacey's attorney, did you do any

15   research into Backpage?                                           15:52:39

16   A.  No.

17   Q.  Did you ever look at the website?

18   A.  No.

19   Q.  So you never looked at the escort section of Backpage.com?

20   A.  Absolutely not.                                               15:52:55

21   Q.  Why do you say it like that, absolutely not?

22   A.  I read the New York Times, Wall Street Journal, Washington

23   Post.  I read those types of publications.  I don't need to be

24   spending my time reading Backpage.

25   Q.  Okay.  Well, you represent the owner of Backpage, or          15:53:07

JOHN BECKER - CROSS-EXAMINATION

118

1   someone who did own Backpage.  Fair?

2   A.  I read the -- read the New Times.

3   Q.  But my question was, you represented someone who owned

4   Backpage --

5   A.  Yes.                                                    15:53:19

6   Q.  -- isn't that true?

7   A.  Yes.

8   Q.  And in the time that you were Mr. Lacey's attorney, you

9   never looked at Backpage?  That's --

10  A.  No.                                                     15:53:26

11  Q.  -- your testimony?

12  A.  Not to my recollection.

13  Q.  You assist Mr. Lacey with other things, not just this

14  transfer to Hungary.  Fair?

15  A.  Yes.                                                    15:53:48

16  Q.  You assist him with checks that he sent out to former

17  employees?

18  A.  I assisted him with checks to former writers and editors

19  that he wanted to thank, yes.

20  Q.  Okay.  Those were $5,000 checks?                        15:54:03

21  A.  I don't recall the amounts.

22  Q.  Do you recall being several thousand dollars?

23  A.  I recall that they were under the annual exclusion, which

24  means those are the amounts that you can give without filing a

25  gift tax return.  And so they were under those amounts.  As to  15:54:21

UNITED STATES DISTRICT COURT

1   the specifics, I just don't recall.

2   Q.  What's the annual exclusion rate?

3   A.  Right now it's $17,000.  Back then, I think it was more

4   like 13- or $14,000.

5   Q.  So some -- some amount of money under that?        15:54:32

6   A.  Yes.

7   Q.  And who did you issue those checks to?

8   A.  I was given a list of former writers and editors for

9   various publications that Mr. Lacey has been involved with, and

10  those are the individuals I was told to write the checks to.  15:54:49

11  Q.  I want to show you what's been admitted into evidence as

12  Exhibit 1.

13          MR. STONE:  This doesn't want to work.

14  BY MR. STONE:

15  Q.  All right.  This is the exhibit that Mr. Lacey showed you  15:55:55

16  on direct?

17  A.  I believe so.  I can't see it.

18          MR. STONE:  0001-0004.

19  BY MR. STONE:

20  Q.  All right.  Now it's up.  Technical difficulties.       15:56:12

21  A.  Yes.

22  Q.  All right.  This is the email you've -- and you've seen

23  this before?

24  A.  Yes.

25  Q.  All right.  And this is an email from Mr. Lacey?         15:56:19

```
 1    A.  Yes.

 2    Q.  The bottom part reads, "To revisit for just a moment, I'm

 3    not interested in any tax avoidance.  I just want to put some

 4    assets in place where litigious parties, including government

 5    parties, cannot access my accounts."                           15:56:34

 6         Do you see that?

 7    A.  Yes.

 8    Q.  Was this in connection with this transaction that you wired

 9    from your IOLTA account to this bank account in Hungary?

10    A.  I don't understand the question.                           15:56:50

11    Q.  Well, does this refer to moving Mr. Lacey's money overseas?

12    A.  No.

13    Q.  It -- it doesn't?  You just --

14    A.  It doesn't say anything about overseas.

15    Q.  Well, you just answered questions on direct about how these 15:57:03

16    were emails from you and a Mr. Stein about potentially moving

17    money overseas.  No?

18    A.  Your question was, does this email reflect moving monies

19    overseas?  And the answer's no.

20    Q.  Okay.                                                      15:57:18

21    A.  What prompted this, though, was, you know, having the

22    discussion with Jacob Stein.  So this prompted setting up a

23    meeting with Mr. Stein.

24    Q.  You understood this to be your client's motivation in

25    sending the money; correct?                                   15:57:35
```

 1    A.  My client's motivation was for -- to place his monies in an

 2    account that won't be closed.

 3    Q.  And you see the -- the first line here, you know, the one I

 4    didn't read up top, "I think I'm ready to move forward with the

 5    visit to the L.A. lawyer was mentioned" -- "you mentioned who          15:57:48

 6    has expertise in offshore"?

 7    A.  Yes.

 8    Q.  So we're talking about the -- an offshore transaction here.

 9    No?

10    A.  I'm talking about referring to Mr. Stein, and Mr. Stein can       15:57:58

11    advise what -- how to structure it --

12    Q.  Okay.

13    A.  -- whether it was offshore, where it needs to be.

14    Q.  And -- I'm sorry.

15         And you understood the motivation was to put assets in          15:58:07

16    place where litigious parties, including government parties,

17    couldn't access your client's account; right?

18    A.  Couldn't close the accounts.  Yes.

19    Q.  Well, just going by the language here, it says "access my

20    accounts."  Fair?                                                     15:58:22

21    A.  Well, you have to ask Mr. Lacey.  He wrote it.

22    Q.  No.  I'm asking you, sir.  You're on the stand.

23    A.  Okay.

24    Q.  That language there from your client says "cannot access my

25    accounts," does it not?                                               15:58:30

1    A.  Yes.

2    Q.  All right.  And do you remember when this transfer occurred

3    in January of 2017?

4    A.  Yes.

5    Q.  Let me show you what's been marked and admitted into          15:58:46

6    evidence as Exhibit 1479.

7            Sir, can you see that on your screen?

8    A.  Yes.

9    Q.  It may be a little small, but are you able to see it?

10   A.  Put my glasses on.                                            15:59:20

11           Okay.

12   Q.  Now, I don't think you've seen this before, but does this

13   not show how the money moved from Mr. Lacey's accounts to your

14   IOLTA account and then to the account in Hungary?

15   A.  Did you preface this with have I seen this before?           15:59:42

16   Q.  It was a comment.  I don't think you've seen this --

17   A.  No.

18   Q.  -- before.

19   A.  No, I haven't.

20   Q.  But my question is, does this flowchart show how the money   15:59:48

21   moved from Mr. Lacey's accounts to your IOLTA account and into

22   the account in Hungary?

23   A.  Yes.

24   Q.  And this is accurate?

25   A.  I have no basis of knowing whether the account numbers are   16:00:01

1    accurate.  I think so, but I don't know.

2    Q.  Fair.  But in terms of -- not the account numbers, but how

3    the money flowed, you remember that this was how it went?

4    A.  Yes.

5    Q.  You testified on direct about how five different accounts        16:00:16

6    went all to your IOLTA account and then you wired that amount

7    of money over to Hungary?

8    A.  Yes.

9    Q.  And this was in January of 2017; right?

10   A.  Yes.                                                             16:00:35

11   Q.  All right.  So in terms of the FBARs that you testified to

12   on your direct examination with Mr. Cambria, those weren't

13   filed in 2017, were they?

14          Do you remember?

15   A.  The FBAR?                                                        16:01:00

16   Q.  The FBAR.  The --

17   A.  I --

18   Q.  The documents -- let me -- let me withdraw that question

19   and step back.

20          You testified as to certain documents that Mr. Lacey        16:01:10

21   filed that dealt with this transaction; correct?

22   A.  Correct.

23   Q.  And those were filed after this date that the money was

24   wired to Hungary, were they not?

25   A.  Correct.                                                         16:01:26

UNITED STATES DISTRICT COURT

JOHN BECKER - CROSS-EXAMINATION

124

```
 1    Q.  And I have the first date from the exhibits that
 2    Mr. Cambria showed to be filed on August 9th, 2018.
 3            Does that give -- do you have any reason to dispute
 4    that date?
 5    A.  No.                                                    16:01:36
 6    Q.  Did you ask for an extension before filing this -- this
 7    document with the IRS?
 8    A.  So the documents are required to be filed for the first
 9    year.  So they need to be filed in 2018, not 2017.  And in
10    2018, we extended them.  And so the FBAR was on extension, to  16:01:52
11    the best of my knowledge, and the other documents were on
12    extension.
13    Q.  Okay.  And what does "on extension" mean?
14    A.  The F- -- I believe the FBAR was on extension.  I'm not
15    positive.  I believe the FBAR was.  And the Form 3520 and the  16:02:06
16    Form 3520-A were on extension.
17    Q.  Okay.  But my question is, what does extension mean?
18    A.  Extension means you have additional time.  The
19    government -- it's an automatic extension.  The government
20    gives you an automatic period of time to file the reports.    16:02:19
21    Q.  Were you aware of the indictment that was filed in this
22    case?
23    A.  I know -- I know Mr. Lacey was indicted.  I don't know
24    when.
25    Q.  Did you read that indictment?                            16:02:35
```

UNITED STATES DISTRICT COURT

1   A.  No, not to my knowledge.

2   Q.  You don't -- if I told you that that indictment was issued

3   in April of 2018, no reason to dispute that?

4   A.  I have no reason.

5   Q.  But you haven't read it?                                    16:02:48

6   A.  No.

7   Q.  And then this first filing was August of 2018.  So roughly

8   four months after the indictment if the indictment did, in

9   fact, come down in April of 2018.  Fair?

10  A.  The filings were filed on time.                             16:03:04

11  Q.  So is that a yes?

12  A.  It's a -- so they were filed on time.  It was after

13  apparently the indictment.

14  Q.  Four months after the indictment.  Fair?

15  A.  They were filed on time.                                    16:03:18

16  Q.  Sir, I'm -- I think that's a pretty fair question that I'm

17  asking you.  It's yes or no.

18  A.  So, the best of my knowledge, if you said the indictment

19  was in April, we had a six-month extension to file things, and

20  so they were filed after that.                                  16:03:34

21  Q.  So, yes, it was four months after the indictment that the

22  FBAR was filed.  Yes?

23  A.  Apparently, yes.

24  Q.  Thank you.

25          All right.  You remember telling the agents and        16:03:42

1    prosecutors in that meeting in 2018 that after the Senate

2    issued their report, you had concerns?

3    A.  I believe I said that, yes.

4    Q.  Did you read the Senate report?

5    A.  No.                                                      16:04:03

6    Q.  So what were your concerns?

7    A.  Just that I don't like to have any transactions that are

8    going to have any type of hassle to them.  And so when somebody

9    tells me that the Senate's looking into Mr. Lacey or Backpage,

10   it just causes me concern.                                   16:04:21

11   Q.  Do you recall having one or more discussions with the

12   corporate security unit of Johnson Bank?

13   A.  Yes.

14   Q.  Do you remember asking Johnson Bank not to use your

15   client's, Michael Lacey's name with the wire transfers?       16:04:39

16   A.  Yes.

17   Q.  And you did so because his name was toxic; right?

18   A.  I did so because I did not want my accounts closed as well

19   as this new account closed.

20   Q.  Because his name was toxic?                              16:04:54

21   A.  Because apparently he has a history or somebody's closing

22   all of his bank accounts, and I don't want my accounts

23   associated with his name.  Yes.

24   Q.  And you wanted to preserve the relationship you have with

25   Primis Bank; right?                                          16:05:07

JOHN BECKER - CROSS-EXAMINATION

```
 1    A.   Yes.
 2    Q.   Do you remember telling the prosecutors and agents that
 3    Mr. Lacey withheld some information from you?
 4    A.   No.
 5    Q.   Take a look at Exhibit 3007.  I'm going to direct your          16:05:17
 6    attention to paragraph 7.
 7    A.   Okay.
 8    Q.   And there's Subparts A, B, C, and D.  I want you to just
 9    read those to yourself, please.
10    A.   Okay.                                                           16:05:33
11         Okay.
12    Q.   Does that refresh your recollection as to your client not
13    having told you some piece of information?
14    A.   I don't know anything about whether the file -- the charges
15    were refiled or not.  So he did not tell me.                        16:05:50
16    Q.   Okay.  If he had told you, would that have affected whether
17    or not you would have gone through with these transfers?
18         MR. CAMBRIA:  Object to relevance.  And there's no
19    foundation that he was -- that he asked Mr. Lacey anything.
20         THE COURT:  Overruled.                                         16:06:10
21    BY MR. STONE:
22    Q.   Do you need me to repeat the question?
23    A.   No.
24    Q.   Okay.
25    A.   Same issue as before when you asked me about the Senate        16:06:17
```

UNITED STATES DISTRICT COURT

JOHN BECKER - CROSS-EXAMINATION
128

1   committee.  Same thing.  I don't want the hassle.  I don't want

2   to be here on Tuesday afternoon engaging in this.  I don't want

3   the hassle.  I don't need the hassle.  And so, yes, it would

4   have changed my view on things.

5           And so unless the transaction was clean, I don't want        16:06:35

6   to participate in it.

7   Q.  Okay.

8   A.  I don't -- I don't need the hassle.

9   Q.  If -- so if he had told you this information, you wouldn't

10  have gone through with it.  That's what I'm hearing.              16:06:45

11  A.  Probably not.  I don't need the hassle.

12  Q.  All right.  Let's talk about this offshore account, this

13  account in Hungary.  Okay?

14          That -- that was not an account that your client would

15  own; right?                                                      16:07:12

16  A.  Correct.

17  Q.  Primis Bank was the trustee.  Primis Bank was this bank in

18  Hungary?

19  A.  Yes.

20  Q.  And then there -- there were beneficiaries to this trust     16:07:26

21  that -- but it wasn't your client; correct?

22  A.  Correct.

23  Q.  And you remember telling agents and prosecutors that

24  sending the money overseas was your client's decision.  It was

25  Michael Lacey's decision; right?                                 16:07:59

UNITED STATES DISTRICT COURT

1    A.   Yes.

2    Q.   Do you remember that it was his decision to open this

3    account in Hungary?

4    A.   Yes.

5    Q.   And you weren't sure why your client preferred Hungary as        16:08:06

6    to other countries, but ultimately it was his decision?

7    A.   He engaged with Mr. Stein in making that decision.  Yes.

8    Q.   His decision, though, ultimately.  No?

9    A.   His decision.

10   Q.   Did you ever have any conversations with Mr. Lacey about         16:08:28

11   Backpage's business practices?

12   A.   Not to my knowledge.

13   Q.   Were you made aware of Backpage's moderation practices?

14   A.   No.

15   Q.   Were you aware of Backpage's relationship with The Erotic        16:09:02

16   Review?

17   A.   I don't know what that means.

18   Q.   So, no?

19   A.   No.

20   Q.   Now, you mentioned you read the New York Times.  Did you         16:09:11

21   read any New York Times articles about Backpage?

22   A.   I believe I have.

23   Q.   Do you remember the subject matter?

24   A.   I do not.

25   Q.   How about any articles in the Wall Street Journal, another       16:09:25

```
 1   piece of paper you --

 2   A.  Yes.

 3   Q.  -- I believe you said you read?

 4        Have you read any articles in the Wall Street Journal

 5   about Backpage?                                              16:09:36

 6   A.  I believe I have but just don't recall.

 7   Q.  Okay.  Did you read -- recall reading an open letter from

 8   the Auburn Theological Seminary --

 9   A.  No.

10   Q.  -- about Backpage?                                       16:09:48

11   A.  No.

12   Q.  Your client tell you about any meetings he may have had

13   with NCMEC, the National Center for Missing and Exploited

14   Children?

15   A.  No.                                                      16:10:01

16   Q.  How about any meetings he or anyone else at Backpage may

17   have had with an organization called Polaris?

18   A.  No.

19   Q.  And what about Auburn Theological -- Theological Seminary?

20   Did he talk about any meetings he or others at Backpage may   16:10:13

21   have had?

22   A.  Not to my knowledge.

23        MR. STONE:  Just a moment, Your Honor.

24        All right.  Just a couple more questions, sir.

25        ///
```

```
 1   BY MR. STONE:
 2   Q.  When you talked about the checks that you were sending on
 3   behalf of Mr. Lacey to former employees, is that how you
 4   described it?
 5   A.  No.  Writers and editors.                                          16:10:55
 6   Q.  Okay.  Writers and editors.
 7         Do you recall when those checks went out?  Like what
 8   year?
 9   A.  I think 2016 or 2017.  2016, I think.
10   Q.  And do you have any idea why Mr. Lacey didn't just wire       16:11:08
11   this money, the 16.5 million, himself?  Why he had to use your
12   IOLTA account?
13   A.  They -- they ran trusts that I controlled.  I was the
14   trustee of these trusts that needed to make the distribution.
15   And so I suppose I could have written all these checks to       16:11:37
16   Michael Lacey and let Michael Lacey do the wire, but it's the
17   same problem.  He didn't have an account to put them into
18   because the banks were closing his accounts.
19         MR. STONE:  Okay.  Fair enough.
20         That's it, Your Honor.  Thank you.                          16:11:50
21         MR. CAMBRIA:  Your Honor, I'd like to redirect on the
22   new subjects that he raised.
23         THE COURT:  Well, we'll see.
24         MR. CAMBRIA:  Okay.
25         MR. STONE:  Redirect?                                        16:12:02
```

132

1          MR. CAMBRIA:  Yeah.

2                    REDIRECT EXAMINATION

3    BY MR. CAMBRIA:

4    Q.  Mr. Becker, did Mr. Lacey ever ask that there be an

5    extension for the filing of the FBAR?                        16:12:12

6    A.  No.

7    Q.  And you said it was automatic to get one.  You just ask for

8    it?

9    A.  The extension is automatic, yes.

10   Q.  Okay.  And hassle or not, was the trust, the way it was     16:12:23

11   created and the reporting, was it all legal?

12   A.  It was absolutely legal.  It was --

13   Q.  And --

14   A.  It was a solid transaction.

15   Q.  And the beneficiaries of the trust were who?              16:12:38

16   A.  I believe they're Mr. Lacey's two sons.

17   Q.  Okay.  Would you be upset if I didn't ask you another

18   question?

19   A.  You could ask me whatever.

20          MR. CAMBRIA:  That's all I have.                       16:12:57

21          THE COURT:  All right.  Is the witness released from

22   subpoena?

23          Mr. Cambria?

24          MR. CAMBRIA:  Yes, Your Honor.

25          MR. STONE:  Yes, Your Honor.                           16:13:05

1        THE COURT:  All right.  Sir, we thank you for your

2   testimony.  You are released from subpoena.  You may step down.

3        And watch your step going down.

4        THE WITNESS:  Okay.  Thank you, Your Honor.

5        THE COURT:  Thank you.                              16:13:14

6        THE WITNESS:  Thank you.

7        THE COURT:  Call your next witness.

8        MR. FEDER:  Judge, we had discussed earlier today that

9   we were going to break early and that we told you we only had

10  two witnesses, if I recollect.                           16:13:24

11       THE COURT:  Well, I didn't recall that.  I heard five.

12  So do you have a witness prepared?

13       MR. FEDER:  I do not on behalf of Mr. Spear.

14       MR. CAMBRIA:  The next one I have is tomorrow morning,

15  Your Honor.                                              16:13:45

16       THE COURT:  Well, members of the jury, apparently we

17  have miscommunication amongst the Court and counsel, all

18  counsel, as to the lineup of witnesses.  I thought we had one

19  more to go, but apparently -- and you never know when the

20  examination's going to end.  But, in any event, why don't we   16:14:05

21  stand in adjournment for the afternoon.  But, again, I do

22  remind you of the admonition not to come to any conclusions,

23  not to form an opinion about the matter, and to continue to

24  keep an open mind and not discuss the matter amongst yourselves

25  or anyone else.  And I will expect you here and ready to go   16:14:32

1      promptly at 9:00 a.m.

2              Please all rise for the jury.

3          (Jury not present at 4:14 p.m.)

4              THE COURT:  Please be seated.

5              I guess that answers the question as to why, when I          `16:15:17`

6      asked who the next witness was, no one responded.  I don't

7      recall being told there were only two witnesses available

8      today.  If you told me that, I don't remember it.  I thought

9      you had five witnesses who were identified that were ready to

10     go.          `16:15:40`

11             And so tomorrow, let's not have this problem.  Let's

12     have your witnesses ready to go.

13             And, Mr. Feder, before we took up the last witness,

14     you wanted to raise something.  I -- you may raise it now.  I

15     don't recall what it was.          `16:16:00`

16             MR. FEDER:  Given the government's request, we would

17     request --

18             THE COURT:  I don't know what the government's request

19     is that you're referring to.

20             MR. FEDER:  In regard to Mr. Snyder.  We would request          `16:16:08`

21     all emails, all texts, all any kind of communications that

22     either a government witness -- a government lawyer or a

23     government agent has had with any of their previous witnesses.

24             THE COURT:  Well, the problem with that overbroad

25     request, Mr. Feder, is that the request has already been made.          `16:16:27`

1   And, as we were shown here a moment ago, there were

2   conversations related to and opinions made about things that

3   this witness was shown.  And so that was the basis for my -- my

4   ruling and why I permitted Mr. Berry to reopen his

5   cross-examination.                                              16:16:59

6          And so if you can show me in the record where that was

7   done with other witnesses, I may entertain it.  But I'm not

8   going to order that it be done on that sort of a broad basis.

9          All right.  Mr. Berry, you -- you're standing there

10  ominously, so you must wish to pursue something.                16:17:16

11         MR. BERRY:  Thank you, Your Honor.

12         I know it's late.  I know we want to get going.  I had

13  asked for a few minutes before we started earlier today, and

14  then we didn't have that opportunity.  Now seems to be better.

15         I received an email today indicating that a member of    16:17:32

16  the press was seeking access to both admitted and nonadmitted

17  exhibits in this case.  And it's something that I have been

18  concerned about with regard to not all of the exhibits.  I'm

19  certainly in favor of -- of the public having a full access to

20  the courts as appropriate.  But specific exhibits, and in       16:17:54

21  particular the ads of the victims, not just the ones that

22  testified, but, for example, Cynthia Worthy, whose sister

23  testified about her ad, I believe that under the Crime Victim's

24  Rights Act, under 18, U.S.C., Section 3771, Subsection (a)(5),

25  which gives victims the right to protect their dignity and      16:18:20

1    privacy, that these ads, and the photos of them in particular,

2    should be sealed as part of the record and not be made

3    available to the public.

4         My -- my deep concern here is that if those ads were

5    to be produced to the public, they could then be posted back on      16:18:40

6    the Internet.  We had one of the victims who was extremely

7    worried about testifying and wanted us to close the courtroom

8    and make certain requests like that.  We ultimately talked her

9    down off that ledge about that issue and did not come to the

10   Court with that sort of a -- a serious request.                      16:19:03

11        But we think that this is a middle ground that would

12   be appropriate, and I would ask -- I'm happy to brief this

13   issue if the Court would like it.  What my request is right now

14   is for at least a temporary order sealing all of the exhibits

15   until we can identify the specific exhibits that contain those       16:19:20

16   photos of these victims, which the Court has already ruled they

17   are, in fact, victims and such that the CVRA does apply to

18   them.  So that's my -- my oral motion and request at this time.

19   And then we would ask the Court to unseal everything except

20   those specific exhibits that ultimately get identified.  I'm         16:19:41

21   just not in a position right now to rattle off each exhibit

22   number.

23        THE COURT:  Well, it -- it's -- it's a difficult

24   position for the Court to make even a temporary ruling, because

25   I don't know what the precise request was that was made to the       16:19:57

1  government.  And perhaps if I see what that precise request was

2  from any media outlet, then I could then look at it in

3  conjunction with the provision that you gave to me.  And I am

4  always happy to in some new area that pops up to receive

5  further briefing and do the defendants want an opportunity to          16:20:23

6  respond to that.

7          And so having this sprung on me without anything more,

8  I think I'll need whatever it is that the request is that was

9  provided to you.  You could submit that to my chambers.

10          MR. BERRY:  Yes, Your Honor.  I actually did forward          16:20:42

11  the email to your chambers email address when I requested

12  ten minutes before the session.  I -- I don't know if it didn't

13  get it.  I know we've had some other issues with getting

14  certain things to the chambers email account.  But I'm happy to

15  forward it again if it was not received, but I did forward that          16:20:57

16  directly.  And it was simply an email that I got blind copied

17  on from a reporter to the clerk's office here --

18          THE COURT:  Okay.

19          MR. BERRY:  -- requesting access to admitted and

20  nonadmitted exhibits.          16:21:09

21          THE COURT:  All right.  I will confer with my clerk's

22  office to determine what information they received or requests

23  they received as well when we adjourn.  And then why don't you

24  prepare a short briefing on that statute and the -- as it

25  relates to the request and your motion to seal.          16:21:29

```
 1              MR. BERRY:  I will.  Thank you, Your Honor.

 2              THE COURT:  And I appreciate that.

 3              MR. BERRY:  Thank you.

 4              THE COURT:  Anything further from the government?

 5              MR. BERRY:  Oh, yes.  We --                          16:21:37

 6              THE COURT:  Oh, you know, I actually have something

 7    for defense.

 8              Again I ask, who is the next witness?  Who's going to

 9    be ready at 9:00?

10              I thought you produced five --                      16:21:53

11              MR. CAMBRIA:  I --

12              THE COURT:  -- names, so who is going to be ready at

13    9:00, Mr. Cambria?

14              MR. CAMBRIA:  I believe witness --

15              THE COURT:  Can you turn on your microphone.  I'm    16:22:03

16    sorry.

17              MR. CAMBRIA:  Oh, I'm sorry.  I believe Dougherty

18    and -- and Strouse.

19              THE COURT:  That sounds like a law firm.  Dougherty.

20              MR. CAMBRIA:  Apparently there are a couple of other 16:22:29

21    witnesses, Your Honor, that I'm not familiar with, and I'm

22    getting a list now.  Dougherty and -- the two that I indicated,

23    but apparently there are a couple more from some other lawyers,

24    and I'm getting the names now.

25              Dougherty, not Strouse, Your Honor.  I'm told Strouse 16:23:21
```

UNITED STATES DISTRICT COURT

1   will be here Thursday.

2           THE COURT:  All right.

3           MR. CAMBRIA:  And she's telling me apparently what

4   other lawyers have names, what the names are.

5           THE COURT:  So we have one witness.  Who's the second?   **16:23:34**

6           MR. FEDER:  Potentially Stan Cook and Rick Yerman.

7           THE COURT:  Cook and -- and what was the other one?

8           MR. FEDER:  Yer- -- Y-E-R-M-A-N.  First name Rick.

9           THE COURT:  All right.

10          MR. BERRY:  These -- these are some of the names, Your   **16:23:57**

11  Honor, that were provided to us this morning when we were

12  sitting in Court that I mentioned.  And we still don't have any

13  designation of exhibits, if they are to be used at all.

14          MR. FEDER:  They're not.  There are none.

15          THE COURT:  Well, again, what I -- I -- the Court has   **16:24:09**

16  provided its procedure of disclosure to not only the Court of

17  the witnesses three days in advance, but to the government.

18  And this morning I heard there were a list of five.  And so

19  have your witnesses ready and prepared sharply at 9:00 a.m.

20          All right.  We are adjourned.   **16:24:44**

21          THE COURTROOM DEPUTY:  All rise.

22      (Proceedings adjourn at 4:24 p.m.)

23                      ---oOo---

24

25

1

2

3

4

5                    **C E R T I F I C A T E**

6

7        I, CATHY J. TAYLOR, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10       I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15       DATED at Phoenix, Arizona, this 26th day of October,

16   2023.

17

18

19                              /s/ Cathy J. Taylor
20                              Cathy J. Taylor, RMR, CRR, CRC

21

22

23

24

25

UNITED STATES DISTRICT COURT