UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) No. 2:18-cr-00422-DJH |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Phoenix, Arizona |
| Michael Lacey, et al., | ) October 25, 2023 |
| | ) 1:03 p.m. |
| Defendants. | ) |
| _____ | ) |

**BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL - DAY 24**

**(P.M. SESSION)**

Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Government:
    UNITED STATES ATTORNEY'S OFFICE
    By:  **Mr. Kevin M. Rapp, Esq.**
          **Mr. Andrew C. Stone, Esq.**
          **Mr. Peter Shawn Kozinets, Esq.**
          **Ms. Margaret Wu Perlmeter, Esq.**
    40 North Central Avenue, Suite 1800
    Phoenix, Arizona  85004-4408
    kevin.rapp@usdoj.gov
    peter.kozinets@usdoj.gov
    andrew.stone@usdoj.gov
    margaret.perlmeter@usdoj.gov
    - and -
    UNITED STATES DEPARTMENT OF JUSTICE
    By: **Mr. Austin Berry, Esq.**
    1301 New York Avenue NW, 11th Floor
    Washington, DC  20005
    austin.berry2@usdoj.gov

For the Defendant Michael Lacey:
    LIPTSITZ GREEN SCIME CAMBRIA, LLP
    By: **Mr. Paul J. Cambria, Esq.**
    42 Delaware Avenue, Suite 120
    Buffalo, New York  14202
    pcambria@lglaw.com

For the Defendant Scott Spear:
    KESSLER LAW OFFICE
    By: **Mr. Eric Walter Kessler, Esq.**
    6720 North Scottsdale Road, Suite 210
    Scottsdale, Arizona  85253
    eric.kesslerlaw@gmail.com
    - and -
    FEDER LAW OFFICE, PA
    By: **Mr. Bruce S. Feder, Esq.**
    2930 East Camelback Road, Suite 160
    Phoenix, Arizona  85016
    bf@federlawpa.com

1                    **A P P E A R A N C E S (Cont'd)**

2    For the Defendant John Brunst:
          BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
3         By:   **Mr. Gopi K. Panchapakesan, Esq.**
                **Mr. Gary S. Lincenberg, Esq.**
4         1875 Century Park E, Suite 2300
          Los Angeles, California  90067
5         gpanchapakesan@birdmarella.com
          glincenberg@birdmarella.com
6         aneuman@birdmarella.com

7    For the Defendant Andrew Padilla:
          DAVID EISENBERG, PLC
8         By:   **Mr. David S. Eisenberg, Esq.**
          3550 North Central Avenue, Suite 1155
9         Phoenix, Arizona  85012
          david@deisenbergplc.com
10
     For the Defendant Joye Vaught:
11        JOY BERTRAND, ESQ, LLC
          By:   **Ms. Joy Malby Bertrand, Esq**
12        P.O. Box 2734
          Scottsdale, Arizona  85252-2734
13        Joy@joybertrandlaw.com

14

15

16

17

18

19

20

21

22

23

24

25

4

1                        **I N D E X**

2    **SUMMARY OF COURT PROCEEDINGS:**                    **PAGE**

3    Proceedings Outside the Presence of the Jury          5
     Proceedings Outside the Presence of the Jury          69
4    Proceedings Outside the Presence of the Jury          73
     Proceedings Outside the Presence of the Jury          102
5    Rule 29 Motion                                        103

6

7    **WITNESSES FOR THE GOVERNMENT:**                     **PAGE**

8    Charles Strouse
             Cross-Examination (Cont'd) by Mr. Berry       16
9            Redirect Examination by Mr. Cambria           23
     Kimberly Mehlman-Orozco
10           Direct Examination by Ms. Bertrand            31
             Cross-Examination by Mr. Stone               54
11           Redirect Examination by Ms. Bertrand          98

12

13                       **EXHIBITS**

14   **NO.**        **DESCRIPTION**                        **REC'D**

15                          NONE

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | (Proceedings reconvene at 1:03 p.m.) |
| 3 | (Jury not present at 1:03 p.m.) |
| 4 | THE COURT:  All right.  Please be seated. |
| 5 | The record will reflect that the counsel are present |
| 6 | with their clients.  We do not have a witness on the stand. |
| 7 | There are a couple of matters I want to address. |
| 8 | Thank you. |
| 9 | So, Mr. Cambria, you had indicated that there is a |
| 10 | witness by the name of Strouse that you intend to call. |
| 11 | MR. BERRY:  That's who's on the stand right now. |
| 12 | THE COURT:  I'm sorry.  This witness? |
| 13 | MR. CAMBRIA:  Yes -- |
| 14 | THE COURT:  This is -- |
| 15 | MR. CAMBRIA:  -- that's the witness. |
| 16 | THE COURT:  This is the witness, Strouse? |
| 17 | MR. CAMBRIA:  Correct. |
| 18 | THE COURT:  It dawned on me, though -- we're beyond |
| 19 | the point now, but it dawned on me that he was never listed on |
| 20 | your original witness list.  And so I point out this fact |
| 21 | because the Court never had an opportunity to query the jury |
| 22 | during voir dire as to whether or not they knew this |
| 23 | individual.  And so here we are with Mr. Strouse on the stand. |
| 24 | He's testified for at least a half an hour. |
| 25 | And so I throw that back to counsel to determine |

13:03:16
13:04:17
13:04:31
13:04:45
13:05:12

6

whether or not there's something that needs to be done here

procedurally, because they had never been asked or the witness

has never been identified to them prior to being seated.

        MR. CAMBRIA:  Right.  I didn't realize he wasn't on

that original list, Your Honor.  I -- I'm floating in paper and    13:05:38

memories.  And maybe it's my advanced age, but I thought

that -- I thought that he had been disclosed.  I didn't know

that.

        MR. BERRY:  Your Honor -- and I apologize.  I had

intended to bring this to the Court's attention.  I knew -- I    13:05:55

had -- I had figured that out.  I'd gone back and looked at

lists.  And I was pretty confident that it had not been

disclosed, but I made the decision that what I was going to

tell the Court was that notwithstanding the fact that he has

not been disclosed, the United States is still prepared to    13:06:11

cross-examine him.

        I understand what you're saying about we should have

at least queried the jury potentially about him.  I think the

prejudice here is basically waived by the defendants, and the

United States is not seeking any kind of remedy in terms of,    13:06:24

like, striking his testimony or anything like that at this

point.  I think given the fact that he was a journalist in

Miami for all this time, I felt reasonably comfortable that it

was unlikely, unlike some of the other witnesses that may be

coming through.    13:06:41

1          So, as a matter of procedure, I think the Court could

2    certainly query the jury about that, but I think that might

3    create more problems than it solves.  And the real danger here,

4    of course, is, is there a prejudice to the defense.  And the

5    defense was the one who called him.  And so, therefore, there          13:06:55

6    should be no prejudice in that regard.  Or to the extent there

7    was any, they would have waived it, is my position.  But I'm

8    open to other suggestions.

9          THE COURT:  Well, you can -- you can make that

10   determination in terms of whether or not you're waiving any          13:07:13

11   potential prejudice that a juror or jurors may be familiar with

12   him, whether in person or in writing, and you can let me know

13   in a few minutes while you ponder that.

14         The second issue that I have is with regard to

15   Ms. Mehlman-Orozco, who is on your list for this afternoon.          13:07:40

16   And here I went back into the docket.

17         And, Mr. Feder, at -- at what's lodged as

18   Document 500, you present a proffer of what she's going to

19   testify to.  And these are the areas that you proffered:  The

20   effect of imposing liability on Backpage for advertisements          13:08:11

21   placed by third parties, that's one area; the utility of online

22   commercial advertisements to law enforcement in identifying and

23   rescuing victims of sex trafficking, the second area; sex

24   trafficking and/or prostitution, third area; causation or lack

25   thereof; the practice of Backpage, Craigslist, Facebook,          13:08:39

1    Google, and other Internet providers as such practices pertain

2    to these issues.

3            And I note in the prior order, Document 1081 that was

4    filed by the Court in October of 2020, the -- the previous

5    order basically says that the liability with regard to Backpage    13:09:14

6    is a -- I think there's a "sic" in there -- is a role for the

7    jury.  Second, it is not relevant to this case whether online

8    commercial advertising has some use in identifying and rescuing

9    victims of sex trafficking.  And so those are areas that you

10   cannot go into.    13:09:47

11           Now, then the Court goes further and says testimony

12   about the practices of Backpage may be relevant to -- to rebut

13   the government's expert testimony.  But here there have been no

14   government experts who have testified.

15           And then she -- the prior Court makes an observation    13:10:13

16   that there is vague -- vagueness as to then what is it that

17   this propounded expert's going to testify about.  And it goes

18   on to state that no testimony will be allowed as to the effect

19   of imposing liability on Backpage for advertisements placed by

20   third parties or any other policy testimony.    13:10:40

21           And then it further goes on to say -- because there

22   are vagaries there, and one of them that -- that I'll point out

23   is -- is this area about the practices of Backpage and other

24   Internet providers as such practices pertain to these issues.

25   But in that motion in limine, the proffer of her testimony, you    13:11:07

1    do not explain what those issues are.

2           And so I need to know what those issues are to

3    determine whether they are relevant.  I -- in reading it, I

4    assume you were talking about moderation and aggregation.  I

5    don't know because it's unclear.  And so I'm going to adhere to        13:11:33

6    the prior order.

7           And I guess with those restrictions, then, can you

8    give me a proffer as to what this witness is going to testify

9    to?  Because at this juncture, if she's called, then I'll be --

10   before she testifies, I think it -- the government would be        13:11:56

11   entitled to voir dire her.

12          MS. BERTRAND:  Your Honor, may I be heard?  I'm the

13   person assigned to that witness.

14          THE COURT:  It was assigned -- okay.  Yes.  I'm sorry.

15   I kept referring to Mr. Feder because he filed the original        13:12:08

16   motion.  And I looked at her CV, which was attached, as well.

17          So, yes, Ms. -- I'm sorry.  I didn't mean to ignore

18   you there.  I thought Mr. Feder was taking this.

19          MS. BERTRAND:  That's okay.  We're here now.

20          And, also, I've spoken a little bit to the government        13:12:20

21   about this.  I -- I have no interest or desire to go anywhere

22   even near the bounds, the outer bounds of the Court's order at

23   1081.

24          I would note that the -- the government was allowed to

25   elicit in its case-in-chief opinion testimony through its law        13:12:38

```
 1   enforcement witnesses and through Hyer and Ferrer regarding
 2   what you can and cannot tell from an online escort ad.  And
 3   that was allowed over objection for lack of notice as to an
 4   expert.  So that would be one area that I think we can address,
 5   is what you can and cannot tell from an online ad.
 6           I have no -- no plan to go near the what happened
 7   after Backpage shut down, has that had an impact on law
 8   enforcement, anything like that.  Obviously, if the government
 9   brings up anything like that in cross-examination, the --
10   that's on them.
11           But my proffer would be as follows:  That we cannot --
12   I believe that this expert will testify that you cannot assume
13   that prost- -- that escorting or any other type of commercial
14   sex work equals prostitution.  And that has been a theme of the
15   government's case from its opening statement forward.  This --
16   Ms. -- Dr. Mehlman-Orozco's CV shows she's well-qualified to
17   talk about that.
18           Next would be that historically -- and I don't plan
19   that this is going to be lengthy testimony -- historically
20   commercial sex has been advertised for centuries.  And she can
21   offer examples.  She actually has examples of blue books from
22   brothel guides, basically, from New Orleans.  I told her we're
23   not putting those on because they weren't disclosed, but
24   there's an example of brothel guides.
25           Today in Las Vegas, just outside of the casinos, you
```

13:13:10
13:13:34
13:13:57
13:14:21
13:14:42

```
1   can find what are called Tart, T-A-T-R -- T -- T-A-R-T cards
2   that are basically little business cards with suggestively
3   dressed woman and, you know, $50 special.  We don't know boo
4   from looking at that ad what -- what that tart card is, what
5   it's for.                                                        13:15:07
6        And then the last area that she would get into is
7   simply in her experience in responding to online ads, be they
8   on Backpage or other places, interviewing people who have
9   posted the ads, interviewing people who have responded to the
10  ads, responding to the ads herself, not as a customer but as a  13:15:30
11  researcher, that she can say you cannot assume that
12  prostitution will occur even based on a -- a very racy ad.  It
13  can be any number of possibilities going on in that ad.  And
14  until you're in the room talking with the other person, to the
15  extent there is another person, you don't know.                 13:15:56
16       That is the -- I just want to make sure I don't miss
17  anything, but that is what I anticipate she will testify to.
18       I'll also note, while we're talking about her
19  testimony, so the Court knows, after the Court issued its order
20  yesterday regarding disclosure of prior communication with      13:16:18
21  witnesses, I had to go through and redact email, but I have
22  turned over to the government prior correspondence that
23  Dr. Mehlman --
24            THE COURT:  Can I just interrupt one second?
25            MS. BERTRAND:  Sure.                                   13:16:34
```

1          (The Court and the courtroom deputy confer.)

2          MS. BERTRAND:  And I don't mind pending this

3   conversation, but I just want to let the Court know that I've

4   turned over both electronically and in print form redacted

5   correspondence where the expert is talking directly about                13:16:49

6   topics that may -- may touch on her potential testimony.  I did

7   not disclose scheduling and, like, here's where the courthouse

8   is, get here by 10:30, anything like that.  But substance I

9   have turned over to the government.

10         That -- that's where I see this going.  I don't expect     13:17:06

11  it to be lengthy testimony, but I certainly think it will be

12  helpful to the jury and pertain to issues that are the crux of

13  this case.

14         THE COURT:  Who is taking the witness?

15         MR. STONE:  I am, Your Honor.                              13:17:24

16         THE COURT:  Yes.

17         MR. STONE:  All right.  So just a couple points.

18         The disclosure -- okay.  So, as I understood -- let me

19  back up.

20         As I understood Ms. Bertrand's proffer, there were     13:17:41

21  three main areas that she was going to explore with this

22  witness:  One is what someone may be able to determine from an

23  online escort ad; two was historically commercial sex has been

24  advertised for centuries; and three was her response to certain

25  ads that had been posted.                                        13:18:02

1          I don't think that number 2, this historically

2    commercial sex has been advertised for centuries, is relevant.

3    I don't see on Doc. 500, page 6, which is this disclosure of

4    the topics that Dr. Mehlman-Orozco is going to testify about,

5    that that's included.  And even if it were, I -- it -- I don't     `13:18:25`

6    think it matters to the questions before this jury on whether

7    commercial sex has been advertised for centuries.  That's my

8    position on that.

9          The third category, this response to ads, that's

10   certainly not disclosed on Doc. 500.  And I don't quite know      `13:18:42`

11   what the relevance would be on that, but that seems to have --

12   that would have been a fairly straightforward disclosure.  And

13   that's not included, unless the argument is when you write sex

14   trafficking and/or prostitution in any topic, touching that

15   would be included.  But I think you need more under Rule 16,      `13:19:04`

16   certainly the new Rule 16.  The -- arguably, we were under the

17   old Rule 16 when this was -- when this occurred.

18         The first topic of what you can tell from an online

19   escort ad, I think that's likely fair game, and she could ask

20   questions about her opinion on this.  She's been -- as I         `13:19:23`

21   understand it, she's testified as an expert in other cases --

22   cases.  She's testified on behalf of Backpage in other cases.

23   So I think that would be fair to explore that.  And then

24   certainly the government would cross her on that topic.

25         But I think the topics 2 and 3 really shouldn't be         `13:19:39`

1    part of this witness's examination.

2         THE COURT:  Well, I will just say, because the

3    disclosure was vague as to what her testimony was, I was

4    inclined not to permit her to testify.  But it is true that the

5    government has put forth numerous witness testimony about law          13:20:07

6    enforcement opinions as to the ads that were placed, and

7    non-law enforcement opinions about those ads that were placed

8    on Backpage, which are the subject of the indictment.

9         So I -- I do believe that Ms. Mehlman-Orozco should be

10   permitted to testify about what you can or cannot tell from an         13:20:34

11   ad that has been placed on Backpage or that may be in -- in

12   evidence and that she can express whether or not you can assume

13   that prostitution occurs because of those advertisements.

14        I do find that it is going to be irrelevant and

15   confuse -- confusing as to any sort of historic content --            13:21:09

16   context with regard to prostitution ads, whether it be -- they

17   be etched on rock or on parchment, or now on the Internet.  I

18   think that's irrelevant.  And certainly I think her responding

19   to these ads, first of all, is kind of curious, but it's not

20   relevant.                                                             13:21:37

21        So she -- she can go into that limited area once you

22   lay the foundation for her background and expertise in the

23   area.

24        And so --

25        MS. BERTRAND:  Your Honor, if I may -- may I come up?           13:21:52

```
 1              THE COURT:  Yes.  Yes.

 2              MS. BERTRAND:  We need to still finish up with

 3    Mr. Strouse --

 4              THE COURT:  Yes.

 5              MS. BERTRAND:  -- but I would just ask before we put     13:22:03

 6    Dr. Mehlman-Orozco on the stand I have just two minutes to tell

 7    her what the parameters --

 8              THE COURT:  Yes.

 9              MS. BERTRAND:  -- of what the Court orders are so

10    things go smoothly --                                            13:22:16

11              THE COURT:  Yes.

12              MS. BERTRAND:  -- once she's up on the stand?

13              THE COURT:  Absolutely.  I appreciate that.  Fair.

14              MS. BERTRAND:  All right.  Thank you.

15              THE COURT:  Now, with regard to this witness who's on   13:22:22

16    the stand, Mr. Cambria, you called him as a witness --

17              MR. CAMBRIA:  Yes.

18              THE COURT:  -- and so I assume that you are waiving

19    any allegation of prejudice because we had not given the jury

20    an opportunity to know his identity before they were seated?     13:22:42

21              MR. CAMBRIA:  Correct.

22              THE COURT:  Ms. Bertrand?

23              MS. BERTRAND:  Correct.

24              THE COURT:  Mr. Lincenberg?

25              MR. LINCENBERG:  Yes, Your Honor.                       13:22:52
```

1          THE COURT:  Mr. Feder?

2          MR. FEDER:  Yes.

3          THE COURT:  Mr. Eisenberg?

4          MR. EISENBERG:  Yes, Your Honor.

5          THE COURT:  All right.  So the Court will not make the          13:23:00

6   inquiry of the jury.

7          All right.  With that, let's have the witness in, and

8   then we can bring the jury in.

9          Sir, you may resume the seat.

10          THE WITNESS:  Should I be standing?          13:24:02

11          THE COURT:  I'll tell you when.

12          THE WITNESS:  Okay.  All right.

13          THE COURT:  All rise for the jury.

14          I thought I heard them.

15      (Jury present at 1:25 p.m.)          13:25:34

16          THE COURT:  All right.  Please be seated.

17          And thank you for your patience, members of the jury.

18          The record will reflect the witness is on the witness

19   stand.

20          And, Mr. Berry, you may continue your examination.          13:26:09

21          MR. BERRY:  Thank you, Your Honor.

22                    CROSS-EXAMINATION (Cont'd)

23   BY MR. BERRY:

24   Q.  Good afternoon, Mr. Strouse.  When we left off before

25   lunch, we were talking a little bit about the $5,000 check that          13:26:23

CHARLES STROUSE - CROSS-EXAMINATION (Cont'd)                    17

1    you received.

2           Do you recall that?

3    A.  Yes, sir.

4    Q.  Okay.  And do you think that receiving that money affects

5    your credibility to be here to testify on behalf of Mr. Lacey?    13:26:37

6    A.  No, I don't think so.

7    Q.  Now, you're a professor of journalism; correct?

8    A.  Yes, sir.

9    Q.  So you're familiar with journalism ethics?

10   A.  Yes, sir.                                                     13:26:48

11   Q.  One of those ethics is to act independently; correct?

12   A.  Yes, sir.

13   Q.  And one of the ways that you can act independently is to

14   avoid conflicts of interest; correct?

15   A.  Yes, sir.                                                     13:27:02

16   Q.  And another way to act independently is to disclose

17   conflicts of interest that are unavoidable, because that

18   sometimes happens; correct?

19   A.  Yes, sir.

20   Q.  And so you want to disclose and for the purpose of           13:27:16

21   transparency; correct?

22   A.  Yeah.

23   Q.  Is that a yes?

24   A.  That's a yes, sir.

25   Q.  Okay.  So why didn't you disclose that $5,000 in your        13:27:25

CHARLES STROUSE - CROSS-EXAMINATION (Cont'd)                18

 1    direct exam?

 2    A.  Why didn't I disclose it what?  Please repeat.

 3    Q.  The $5,000 that the person who called you here to testify

 4    had paid you, why didn't you disclose that when Mr. Cambria was

 5    talking to you?                                          13:27:40

 6    A.  I'm not writing a story about this proceeding in any way.

 7    I haven't.  I won't.  I'm here.  And so it's not a journalistic

 8    thing.  Moreover, when you asked me about it, I disclosed it.

 9    So I think -- I don't think I hid anything.  I don't think I

10    was dishonest in any way.                                13:28:00

11    Q.  You didn't think it was important to bring up before?

12    A.  As I understand it, courts work where the -- you ask me

13    questions and I answer them, which is somewhat different than

14    if I'm a journalist and I'm asking you questions.

15    Q.  Fair enough.                                         13:28:16

16          One of the questions I asked you previously was about

17    your knowledge of the content of Backpage; correct?

18    A.  Correct.

19    Q.  And you testified that you were still at the Miami New

20    Times when Mr. Lacey left with Backpage and the papers went    13:28:30

21    with some other folks; right?

22    A.  Yes, sir.

23    Q.  In fact, you wrote about that on September 24th, 2012, in

24    the Miami New Times, didn't you?

25    A.  I -- I -- if I did, I don't remember.                13:28:42

```
 1   Q.  Okay.

 2   A.  But I --

 3   Q.  Do you have any reason to dispute the fact that you wrote

 4   something about how Lacey and Larkin had gone off with Backpage

 5   and were no longer part of the New Times?                        13:28:57

 6   A.  I don't remember that column.  If I did -- I mean, I've

 7   written roughly 10,000 pieces of journalism in my career, and I

 8   don't remember that one, no.

 9   Q.  Sure.

10          MR. BERRY:  May I approach the witness, Your Honor?       13:29:13

11          MR. CAMBRIA:  Do you have a copy for me?

12          MR. BERRY:  I do.

13          MR. CAMBRIA:  Thank you.

14          THE COURTROOM DEPUTY:  Staple it.

15          MR. BERRY:  It's on -- oh, sorry.  Yeah.                  13:29:29

16   BY MR. BERRY:

17   Q.  I'm showing you what's been marked as Government's

18   Exhibit 3002.

19          Do you see that, sir?

20   A.  Yes, sir.                                                    13:29:47

21   Q.  Do you recognize it?

22   A.  Yes, sir.

23          Well, do I recognize the logo of the paper and the

24   four paragraphs that I wrote as an intro to somebody else's

25   work?  Yeah.                                                     13:30:05
```

UNITED STATES DISTRICT COURT

```
 1    Q.  Do you recognize your own by line?

 2    A.  Yes, sir.

 3    Q.  It has your name on it; right?

 4    A.  Yep.

 5    Q.  So that you're the author of this; correct?          13:30:10

 6    A.  Yes, sir.

 7    Q.  To the public, to the world, this looks -- this is put out

 8    by the Miami New Times as something you said; correct?

 9    A.  Can I explain what this is or --

10    Q.  It's a yes-or-no question.                           13:30:25

11         Did you put it out under your by line?

12    A.  Yes.

13    Q.  And isn't that intended to inform the public of who wrote

14    it?

15    A.  To be, as you said, transparent, yes.                13:30:34

16    Q.  Okay.  Are you suggesting that you did not write it?

17    A.  Can I explain what this is?

18    Q.  I'm asking, are you saying to this jury that you did not

19    write this?

20    A.  I'm saying, yes, I wrote the four-paragraph intro to --    13:30:49

21    what you didn't print here was what this was about.  This was a

22    four-paragraph intro into a note.  And it says there was a

23    note -- note from corporate that follows.

24    Q.  Sure.  Okay.  I'm tracking you now.  I'm tracking you.

25         What your -- your complaint is that what I did not       13:31:08
```

```
 1   include was someone else's words?
 2   A.  Yes, sir.
 3   Q.  Right.  So I did not include Mr. Lacey and Mr. Larkin's
 4   words underneath the part that says "Mike and Jim's note";
 5   correct?                                                        13:31:24
 6   A.  Correct.
 7   Q.  But I did include your words; correct?
 8   A.  Yes, sir.
 9   Q.  All right.  So that's what I want to focus on, is your
10   words --                                                        13:31:32
11   A.  Okay.
12   Q.  -- okay?  You're on the stand.  That's who I want to talk
13   about right now.  Okay?
14        I'll give you a second to read it.  It looks like --
15   A.  Uh-huh.                                                     13:31:42
16   Q.  -- you're reading it right now.
17   A.  Okay.
18   Q.  Are you done?
19   A.  Yes, sir.
20   Q.  Okay.  Great.                                               13:32:23
21        I want to draw your attention to paragraph 3.
22   A.  Okay.
23   Q.  Okay.  It starts with, "The big news."
24        Do you see that?
25   A.  Uh-huh.                                                     13:32:34
```

1   Q.  What was the big news?

2   A.  Do you want me to read it?

3   Q.  Sure.

4   A.  "The big news in all of this is that Miami New Times and

5   New Times Broward Palm Beach" -- both of which I oversaw at the          13:32:44

6   time --

7   Q.  Let's stop there.  That's not what it says, does it?

8   A.  I'm sorry.  I was explaining that.

9           -- "will have nothing more to do with Backpage.com,

10  the much maligned website that has been accused of further" --          13:32:54

11  "furthering underage sex trafficking."

12  Q.  You wrote that?

13  A.  Yes.

14  Q.  All right.  And then in the final paragraph, the last

15  sentence, you start it, "But I look forward."                           13:33:09

16          Do you see that?

17  A.  Uh-huh.

18  Q.  What did you say there?

19  A.  "But I look forward to more of the award-winning work we

20  have done in South Florida without the baggage of this                  13:33:22

21  website."

22          MR. BERRY:  Pass the witness.

23          THE COURT:  Mr. Cambria?

24          MR. CAMBRIA:  Yeah.

25      ///

CHARLES STROUSE - REDIRECT EXAMINATION                    23

```
 1                    REDIRECT EXAMINATION
 2   BY MR. CAMBRIA:
 3   Q.  This makes reference to a note.  Were you responding to a
 4   note or commenting on a note?
 5            Do you see the bottom?                              13:33:50
 6   A.  Yes.
 7   Q.  Yeah.  Do you remember what the note was about?
 8   A.  Yes.
 9   Q.  What was that?
10            MR. BERRY:  Objection.  Hearsay, Your Honor.        13:33:56
11            MR. CAMBRIA:  Well, under 106, it seems to me, Your
12   Honor, he says this was a comment on a note, so we need to know
13   what the note is.
14            THE COURT:  Well, he can generally explain what his
15   understanding of the note was without -- well, it's not even   13:34:10
16   before him in terms of the content.  So I'll give you some
17   leeway.
18   BY MR. CAMBRIA:
19   Q.  Go ahead.
20            THE COURT:  And describe what the note was about.    13:34:21
21            THE WITNESS:  The note was about the guys who had
22   founded the paper separating from it.  And it was a lengthy
23   note.  There are four paragraphs that I wrote, and then there
24   was a lengthy note from them saying why they were leaving and
25   what exactly was happening.                                  13:34:39
```

UNITED STATES DISTRICT COURT

CHARLES STROUSE - REDIRECT EXAMINATION                    24

```
 1   BY MR. CAMBRIA:
 2   Q.  Okay.
 3   A.  Now the exact detail of that I don't remember because it
 4   was 11 years ago, but I -- you know, you do this kind of thing
 5   fairly often.  You get something from corporate.        13:34:48
 6           THE COURT:  All right.  So --
 7           THE WITNESS:  Okay.
 8           THE COURT:  -- you've answered the question.  Thank
 9   you.
10           THE WITNESS:  Okay.  Thank you.              13:34:55
11   BY MR. CAMBRIA:
12   Q.  Okay.
13   A.  Sorry.
14   Q.  With regard to -- you were asked about what you had read
15   concerning -- I'm making these things tweak here -- what you  13:35:05
16   had read concerning Backpage, if you'd read any articles, and
17   so on; correct?
18   A.  Yes, sir.
19   Q.  All right.  Do you remember you mentioned reading --
20   reading a Reason article?                            13:35:19
21   A.  Yep.
22   Q.  Do you remember what that was about?
23           MR. BERRY:  Objection, Your Honor.  This is going to
24   call for hearsay.
25           MR. CAMBRIA:  They introduced it and asked him about  13:35:28
```

UNITED STATES DISTRICT COURT

CHARLES STROUSE - REDIRECT EXAMINATION                25

```
 1    what he read.
 2           THE COURT:  Sustain the objection.
 3    BY MR. CAMBRIA:
 4    Q.  Well, do you remember what the government asked you as far
 5    as the other articles that you read -- that you read, or not?    13:35:44
 6    A.  What the government asked me about the other articles?
 7    Q.  Yeah.
 8    A.  He asked me where I read them and what content was, I
 9    think.  I don't remember exactly.  No.
10    Q.  Well, what was the content of the Reason article?            13:36:02
11           MR. BERRY:  Objection again.  Calling for hearsay.
12           MR. CAMBRIA:  They opened this door.
13           THE COURT:  Well, sustained.
14           MR. CAMBRIA:  My position is they opened --
15           THE COURT:  Well --                                       13:36:17
16           MR. CAMBRIA:  -- this door, Your Honor.
17           THE COURT:  -- and the government -- the jurors may
18    use their own recollection, but I'll sustain the objection
19    because he didn't remember.
20           MR. CAMBRIA:  Well, he --                                 13:36:30
21           THE COURT:  So --
22           MR. CAMBRIA:  -- didn't say he didn't remember, Your
23    Honor.
24           THE COURT:  Well, go ahead and ask him, and then we'll
25    see what happens.                                                13:36:38
```

```
 1              MR. CAMBRIA:  Okay.

 2              THE COURT:  How's that?

 3              MR. CAMBRIA:  The floor's not going to fall out here,

 4    is it?  Okay.

 5              THE COURT:  You keep accusing me of putting a trapdoor    13:36:45

 6    there.

 7              MR. CAMBRIA:  Yeah.  I -- let's see what happens.

 8    BY MR. CAMBRIA:

 9    Q.  Well, let's start this way generally:  Do you remember what

10    the Reason Article contained?                                      13:36:56

11    A.  I remember that the Reason article generally cleared --

12              MR. BERRY:  Objection.  That's a yes-or-no question.

13              THE COURT:  Sustained.

14              You can answer yes or no, sir.

15    BY MR. CAMBRIA:                                                    13:37:07

16    Q.  So you do generally remember what --

17    A.  Yes.

18    Q.  -- the article said?

19              All right.  And can you give us an indication as to

20    what the content was?                                              13:37:16

21    A.  My memory is that the article looked at the big picture and

22    declared that the prosecution was not really justified.

23              MR. BERRY:  Objection, Your Honor.  This is the --

24    precisely the hearsay that I was objecting to.

25              THE COURT:  Sustained.                                   13:37:37
```

UNITED STATES DISTRICT COURT

```
 1          The jury will disregard the last question -- excuse

 2    me -- the last statement.

 3          MR. FEDER:  Judge, just for the record, this is not

 4    for the truth but for something different.

 5          THE COURT:  It's Mr. Cambria's witness.                    13:37:52

 6          MR. CAMBRIA:  Yeah.  No, I agree with that, Your

 7    Honor.

 8          THE COURT:  All right.

 9          MR. CAMBRIA:  I'm just going step by step here.

10          THE COURT:  Go ahead.                                      13:38:00

11          MR. CAMBRIA:  And we're offering it for, you know,

12    what he -- they asked him about what things were you exposed

13    to, and so on.  I'm now asking him, and he identified this.  So

14    now I'm asking him what was the exposure.

15          THE COURT:  And he answered the question, so let's          13:38:16

16    move forward.

17    BY MR. CAMBRIA:

18    Q.  And so what -- what -- I'm sorry.  What was the exposure?

19          In other words, what were you exposed to in this

20    article information-wise?                                         13:38:24

21          MR. BERRY:  Objection, Your Honor.  Again, calling for

22    hearsay.

23          THE COURT:  Sustained.

24          He answered the question, so let's move on.

25          MR. CAMBRIA:  All right.                                    13:38:40
```

```
 1   BY MR. CAMBRIA:
 2   Q.  Did the -- was the article in contrast to the other
 3   articles they asked you about?
 4   A.  Yes.
 5   Q.  And was the article indicating that Backpage was --          13:38:54
 6           MR. BERRY:  Again, objection, Your Honor.  He's about
 7   to introduce hearsay in the content of his question.
 8           THE COURT:  Sustained --
 9           MR. CAMBRIA:  Okay.
10           THE COURT:  -- as -- as to the attempt.                  13:39:11
11           I'll ask you to be cautious and rephrase, Mr. Cambria.
12           MR. CAMBRIA:  All right.
13   BY MR. CAMBRIA:
14   Q.  So of the articles that they asked you about that you read,
15   this one -- was this one contrary to the others that they       13:39:28
16   referred to and asked you about?
17           MR. BERRY:  Objection.  Asked and answered.
18           THE COURT:  Overruled.
19           You may answer, sir.  Yes or no?
20           THE WITNESS:  Yes.                                       13:39:45
21   BY MR. CAMBRIA:
22   Q.  Okay.  You were asked about this check.  When did this
23   check happen?
24   A.  In the neighborhood of 2016, I believe is what --
25   Q.  All right.  So that was quite some time ago.                 13:40:03
```

CHARLES STROUSE — REDIRECT EXAMINATION
29

```
 1          All right.  And was it your understanding that you
 2   were the only one who received a check like this?
 3   A.  No, sir.
 4   Q.  We had some testimony from another witness that -- who had
 5   said they received --                                          13:40:26
 6          MR. BERRY:  Objection, Your Honor --
 7   BY MR. CAMBRIA:
 8   Q.  -- in this case --
 9          MR. BERRY:  -- in what Mr. Cambria is about to
10   introduce to this witness, who has not been able to watch the   13:40:31
11   testimony for a reason.
12          THE COURT:  Sustained.
13          MR. CAMBRIA:  Your Honor, I'm asking about something
14   that has been testified to in this case today.
15          THE COURT:  Well, you're restating testimony of a        13:40:41
16   witness, and --
17          MR. CAMBRIA:  I was going to ask him.
18          THE COURT:  -- and -- and it would be improper,
19   especially because the jury has to make that determination as
20   to what the witness testified to.                               13:40:51
21          So go ahead.
22          MR. CAMBRIA:  Okay.
23   BY MR. CAMBRIA:
24   Q.  Was it ever called to your attention that Mr. Lacey had
25   sent checks out to former writers and editors as a thank you    13:41:01
```

UNITED STATES DISTRICT COURT

1   for the years they've worked together?

2   A.  Could you repeat that?  I couldn't quite hear you.

3   Q.  I said, did it come to your attention that Mr. Lacey had

4   sent checks out to editors and writers he had worked with in

5   the past as a thank you?                                          13:41:19

6   A.  Yes.

7   Q.  And is that your understanding of the check you got?

8   A.  Yeah.

9   Q.  All right.  And the fact that you got that check, did that

10  influence the truth or not of what you were telling us here     13:41:39

11  today, what you testified to?

12  A.  In no way.

13          MR. CAMBRIA:  All right.  That's all.

14          Thank you.

15          THE COURT:  Thank you.                                    13:41:48

16          May the witness be excused from subpoena?

17          Mr. Cambria?

18          MR. CAMBRIA:  Yes, Your Honor.

19          THE COURT:  All right.

20          MR. BERRY:  No objection.                                 13:41:58

21          THE COURT:  All right.  Sir, we thank you for your

22  testimony.  You are excused from subpoena.  You may step down

23  and leave the courtroom.

24          THE WITNESS:  Thank you.

25          THE COURT:  All right.                                    13:42:06

1          The government may call its next witness.

2          And I'll give you two minutes, Ms. Bertrand.

3          MS. BERTRAND:  And it's -- it's been 22 years, but I'm

4     no longer with the government.

5          THE COURT:  I'm sorry.  Sorry.  My -- my error.          13:42:15

6          MS. BERTRAND:  That's okay.

7          THE COURT:  I may need that coffee after all.

8       (Brief pause.)

9          THE COURT:  Ma'am, please come forward and be sworn by

10    my courtroom deputy.                                          13:43:51

11         THE COURTROOM DEPUTY:  Please raise your right hand.

12      (KIMBERLY MEHLMAN-OROZCO, a witness herein, was duly sworn

13    or affirmed.)

14         THE COURTROOM DEPUTY:  Could you state your full name,

15    and spell your last name for the record.                     13:44:06

16         MS. MEHLMAN-OROZCO:  Dr. Kimberly Mehlman-Orozco.

17    M-E-H-L-M-A-N, hyphen, O-R-O-Z-C-O.

18         THE COURTROOM DEPUTY:  Please proceed to the witness

19    stand.

20         THE COURT:  Whenever you're ready to proceed,          13:44:26

21    Ms. Bertrand.

22         MS. BERTRAND:  Thank you, Your Honor.

23                        DIRECT EXAMINATION

24    BY MS. BERTRAND:

25    Q.  Good afternoon, Doctor.                                  13:44:33

                    UNITED STATES DISTRICT COURT

32

```
 1   A.   Good afternoon.

 2   Q.   Ma'am, would you please introduce yourself to us starting

 3   with your educational background.

 4   A.   So, as I mentioned to the court reporter [sic], my name is

 5   Dr. Kimberly Mehlman-Orozco.  I am a PhD-educated              13:44:44

 6   criminologist.  So I have a PhD in criminology, a master's

 7   degree in justice law in crime policy, and a bachelor's degree

 8   in administration of justice.

 9   Q.   Okay.  Where are your degrees from?

10   A.   George Mason University.                                   13:45:00

11   Q.   And what do you -- we'll come back to your education in

12   just a moment.

13        What do you currently do for a living?

14   A.   I am CEO of Break the Chain, which is a company that

15   provides expert witness testimony in criminal and civil trials 13:45:15

16   related to human trafficking predominantly across the country.

17   I also serve as executive director of Freedom Light, which is a

18   nonprofit that provides training and technical assistance to

19   businesses that are looking to combat trafficking.

20        THE COURT:  Ma'am, I'm going to ask you to be very         13:45:32

21   conscious of your cadence while speaking.  You are speaking

22   very quickly.  And so we have the court reporter here, and so I

23   want to make sure that we get everything that you're saying on

24   the record.  And just be mindful that you do speak very

25   quickly.                                                        13:45:50
```

1    THE WITNESS:  I apologize, Your Honor.  That's not the

2    first time I've heard that.  I'm from the east coast, so please

3    pardon that.

4    THE COURT:  Thank you.

5    BY MS. BERTRAND:                                          13:45:59

6    Q.  So with regard -- let's go back to your education.  Your --

7    your bachelor's degree was in?

8    A.  It's in administration of justice.  I graduated cum laude

9    with honors from George Mason University.

10   Q.  In general terms, what does a degree in administration of   13:46:12

11   justice entail?

12   A.  For all three degrees, just simply speaking, it's a degree

13   in criminology.  I am a criminologist, but my area of expertise

14   is in the commercial sex industry and sex trafficking.

15   Q.  What does it mean to be a criminologist?              13:46:32

16   A.  It's a type of social scientist who studies crime.  I'm

17   trained in qualitative and quantitative research methods.  So

18   conducting interviews, in -- in writing my books, in my

19   peer-review journal articles I've conducted qualitative

20   interviews with convicted traffickers, commercial sex         13:46:58

21   consumers, victims of trafficking, as well as consenting sex

22   workers.  So a lot of interviews as well as quantitative

23   research.  So evaluation of high-level statistics.  For

24   example, the FBI's Uniform Crime Report and things like that.

25   Q.  So for lay people, qualitative is more -- oops --       13:47:16

UNITED STATES DISTRICT COURT

```
 1   interviews, re- -- reading, research.  Quantitative is math.
 2   Fair?
 3   A.  I think that's a --
 4   Q.  Is that a --
 5   A.  -- fair description.                                    13:47:31
 6        So quantitative, you're trying to quantify a
 7   phenomenon.  You're looking at statistical data or information.
 8   So sort of the what of an issue; prevalence, incidents, things
 9   like that.
10        And with qualitative interviews, so conducting          13:47:44
11   in-depth interviews with people, you're looking at the why, so
12   why something might happen.
13   Q.  And your master's degree is also in administration of
14   justice?
15   A.  It's in justice law and crime policy, but, again, it's all  13:47:57
16   within the -- the field of criminology.
17   Q.  What was your master's research focused on?
18   A.  I believe at the time I was looking at crime -- incidents
19   of crime among foreign national populations.  Because when I
20   finished my master's program, as well with my PhD, there       13:48:20
21   weren't any -- any quantitative data collections on commercial
22   sex or sex trafficking, and my department was heavily
23   quantitative.  So the FBI had not yet had even a data point on
24   sex trafficking.  So there wasn't a quantitative data at the
25   time.                                                          13:48:39
```

1  Q.  When did you get your master's?

2  A.  My master's was conferred -- there -- I think at the end of

3  2009, and my PhD in 2012.

4  Q.  And for your PhD, did you have to write and defend a

5  thesis?                                                          13:48:53

6  A.  Yes.  A dissertation.

7  Q.  What was your dissertation on?

8  A.  It was on the 287(g) program, again, related to immigration

9  and crime.  Because at -- in 2012, there wasn't a quantitative

10 data point on sex trafficking.                                   13:49:07

11 Q.  So at some point you started studying sex working?

12 A.  So I took a number of graduate-level courses for -- to

13 confer my degrees.  For example, one of my courses during

14 graduate school was human smuggling and human trafficking

15 taught by Dr. Loui Shelley, who's another scholar that studies  13:49:28

16 sex work, sex trafficking, human trafficking.  So several of my

17 classes focused on that for my graduate-level coursework.  But

18 my research in the field, I would say, became more heavily

19 focused on trafficking after my graduation.

20 Q.  What year do you think you started really looking at        13:49:47

21 this -- this -- it's a broad area, but when did you start

22 looking at sex work?

23 A.  I would say I started looking at it in graduate school, so

24 in 2006.  But when I started to be more heavily focused, I

25 would say once the FBI released data on sex trafficking, which  13:50:04

KIMBERLY MEHLMAN-OROZCO - DIRECT EXAMINATION

1    was in 2013, and I think it was published in 2014.  So the

2    FBI's Uniform Crime Report had that first data point collected

3    in 2013 on sex trafficking.

4    Q.  And let's start with just an estimate.  How many

5    peer-reviewed publications do you have?                          13:50:26

6    A.  So some might consider my book peer reviewed because it was

7    reviewed by peers and published in an academic press.  It's

8    used to train law enforcement on how to identify trafficking.

9    But as far as peer-reviewed journal articles, I think maybe

10   four, two of which I was the sole author on.  So I would say   13:50:51

11   that might encompass peer-reviewed journal articles.

12   Q.  And those -- let's -- let's start with the -- the journal

13   articles.  In general terms, what were the topics of those

14   publications?

15   A.  So two of them are on human trafficking identification     13:51:10

16   among dentists.  So those were the co-authored articles.

17        But the other two, one was related to safe harbor

18   laws, specifically safe harbor laws where further -- there are

19   state laws that further decriminalize sex work for minors.  And

20   so it was looking after a safe harbor law was passed whether    13:51:36

21   minors continued to be arrested for prostitution.  So that's

22   one of the articles.

23        The other one was a peer-reviewed journal article that

24   published my in-depth qualitative interviews with convicted sex

25   traffickers, which is also published in my book, but it was a   13:51:51

 1    more in-depth scholarly piece.  And I think that was in The

 2    Journal of Trends in Organized Crime.  But I also actively

 3    serve as a peer reviewer for journals.

 4    Q.  We'll get to that.

 5         You mentioned that your -- your -- you have a book                    13:52:08

 6    that is used for law enforcement training?

 7    A.  Yes, ma'am.

 8    Q.  Would you please share the title of the book, and then

 9    we'll talk in more specifics.

10    A.  The title of the book is Hidden in Plain Sight:  America's             13:52:20

11    Slaves of the New Millennium.  That's the subtitle.  That's the

12    one that's used to train law enforcement on human trafficking

13    identification.

14    Q.  And have you written any other books?

15    A.  Yes.  I also have a book on terrorism.  I have a couple of             13:52:37

16    children's books that are related to exposing kids to the risks

17    of trafficking in a kid-friendly way.  And I'm working on my

18    third book that looks at the evolution of commercial sex in the

19    United States and intersection with sex trafficking.

20    Q.  Do you -- have you taught at the college level or higher?             13:53:03

21    A.  Yes.

22    Q.  All right.  Could you please describe -- describe for the

23    jury the type of coursework you have taught.

24    A.  I have taught courses at my alma mater, George Mason

25    University, as well as the number 1 ranked criminology school             13:53:21

1    in the country, which is University of Maryland College Park.

2          My courses include introduction to criminology or

3    introduction to criminal justice, race, and crime.  I had a

4    special topics course that I designed on foreign nationals in

5    crime that heavily focused on sex trafficking and smuggling,          13:53:39

6    similar to the courses that I've taken.  But I taught a number

7    of different courses.  And I think I did one directed study at

8    a PhD level, I think at Prescott College, and that was a sex

9    trafficking course.

10   Q.  What -- by "directed study," is that where someone's           13:53:58

11   working on their PhD and you're, like, their advisor?  Is

12   that -- or something like that?

13   A.  Sort of.  It's like an independent study.  So you don't

14   have a class, you don't have regular lectures, but you are

15   working with that person towards a publishable piece, for         13:54:14

16   example, or a thesis paper.

17   Q.  You mentioned that you -- you do peer review yourself.

18   Could you please explain that work, and then we'll talk about

19   for whom you've done that type of peer review.

20          What does that mean, to do peer review for journals?        13:54:33

21   A.  So to get an academic study published, you don't just

22   submit it to an editor.  Typically the editor will send it out

23   to a peer-review panel of other experts within the field on a

24   particular subject matter.  They give ratings, and they

25   basically state whether their recommendation is to publish the     13:54:52

UNITED STATES DISTRICT COURT

```
 1    piece, to do a revise and resubmit, or to reject it.

 2            And so editors will look for people who have

 3    experience in certain areas relevant to the subject matter

 4    that's being put forth.  I actively serve as a peer reviewer

 5    for The Journal of Human Trafficking.              13:55:10

 6    Q.  And what types of articles have you peer reviewed for that

 7    journal, if you recall?

 8    A.  Articles on human trafficking.

 9    Q.  Okay.  I guess -- I wasn't sure if there were, like,

10    specific --                                       13:55:24

11    A.  I did give you one example of which that is in print.  So

12    one example of which that did go to print was an article that

13    was put forth by researchers at Harvard University and the

14    Department of Homeland Security.  They were doing an evaluation

15    of their training protocols to see whether there was an   13:55:41

16    evidence base or whether there was information retained from

17    the Blue Campaign Training.  So I was a peer reviewer for that

18    study.  It is now in print as of 2023.  So that's a recent one.

19    Q.  Doctor, is this the first time you have testified in a

20    federal courtroom?                                13:56:05

21    A.  No, ma'am.

22    Q.  Can you give an estimate as to how many times you have

23    testified in a federal matter.

24    A.  At trial or during a Daubert hearing or been admitted?

25    Q.  Generally.  Let's just start with how many times you've  13:56:24
```

UNITED STATES DISTRICT COURT

1    testified, and then we'll break that down.

2    A.  So you only want federal, not state; correct?

3    Q.  If they're running together, we can just note that, but --

4    A.  Okay.  It's just hard for me to delineate because I do

5    civil and criminal, and there's federal and state.  And I would    13:56:42

6    say maybe a half dozen times.

7    Q.  Federal?

8    A.  Federal.

9    Q.  What about state courts?

10   A.  Also maybe a half dozen.  A lot of cases don't make it to     13:56:52

11   trial.

12   Q.  Uh-huh.

13   A.  So I didn't testify, but I might have been disclosed,

14   something like that.

15   Q.  And you mentioned a difference between what lawyers call a     13:57:01

16   Daubert, D-A-U-B-E-E -- D-A-U-B-E-R-T, hearing versus a trial.

17   But, in general terms, you kind of lump those together for the

18   half dozen times in federal court?

19   A.  Yes, ma'am.

20   Q.  Same thing in state court?     13:57:24

21   A.  Yes.

22   Q.  And in those times that you testified in federal court, was

23   that as an expert witness?

24   A.  Yes, ma'am.

25   Q.  Same thing in state court?  Was that as a expert witness?     13:57:41

1   A.   Yes, ma'am.

2   Q.   Are you on -- if you know, are you on any expert witness

3   panels?

4   A.   Yes.  I'm the only human trafficking expert admitted to the

5   Los Angeles -- sorry.  I'm going to try to speak slower.  I get          13:57:58

6   this every time I testify -- at the Los Angeles Superior Court

7   Panel of Experts.  I'm the only human trafficking expert, to my

8   knowledge, admitted to that panel since 2017, I believe.

9   Q.   When you have testified in federal court, whether it's in

10  a -- a pretrial hearing or in a trial, have you testified for          13:58:21

11  only one side or either side, prosecution and defense, or --

12  oops -- both?

13  A.   I typically --

14           MS. BERTRAND:  Bless you.

15           THE WITNESS:  Bless you.          13:58:38

16           I typically am retained by a prosecution, but I do

17  both.

18  BY MS. BERTRAND:

19  Q.   Do you do any other work for the United States Department

20  of Justice currently?          13:58:59

21  A.   Not currently, but I recently served as a peer reviewer for

22  the Office of Justice Programs National Institute of Justice

23  for grant proposals that were submitted by nonprofits.  So they

24  had contacted me to serve as a paid peer reviewer, I think,

25  last year.          13:59:20

1  Q.  And in what type of context were these nonprofits applying

2  for grants?

3  A.  I can't speak to specifics for privacy reasons --

4  Q.  Oh, okay.

5  A.  -- but, generally speaking, it were -- it was nonprofits,          13:59:34

6  law enforcement organizations, service providers that put forth

7  research proposals that they were seeking funding for looking

8  at human trafficking issues.

9  Q.  Thank you.

10       MS. BERTRAND:  At this point, Your Honor, I would like          13:59:50

11  to proceed treating Dr. Mehlman-Orozco as a -- as an expert.

12       THE COURT:  Is there an objection?

13       MR. STONE:  In what area?

14       MS. BERTRAND:  Human trafficking and prostitution.

15       MR. STONE:  No objection.                                        14:00:08

16       THE COURT:  Yes, she may be so treated.

17       MS. BERTRAND:  All right.  Thank you.

18  BY MS. BERTRAND:

19  Q.  All right.  We talked a little bit about the types of

20  research that you've done.  In conducting that research, have          14:00:18

21  you reviewed online commercial sex advertisements?

22  A.  Yes, ma'am.

23  Q.  Overall, in different forums, how many of these

24  advertisements do you think you've reviewed for your research?

25  A.  During the entirety of my career?                                 14:00:45

1   Q.  Yes.

2   A.  I couldn't quantify, but my estimation would be tens of

3   thousands, if not hundreds of thousands.

4   Q.  And have you had the opportunity in reviewing those

5   advertisements to also meet any of the people who placed the          14:01:06

6   advertisements?

7   A.  Yes, ma'am.

8   Q.  And what about meeting people who were responding to the

9   advertisements?

10  A.  Yes, ma'am.                                                       14:01:24

11  Q.  And as part of your research, have you responded to

12  advertisements?

13  A.  For research purposes, yes.

14  Q.  Okay.  Okay.  What types of advertisements have you

15  responded to for research purposes?                                   14:01:41

16  A.  Advertisements for erotic massage, for -- for things that

17  were a little bit more vague but in personal sections.  So in

18  personal sections, sending surveys, sending -- looking for

19  respondents.

20          So it's a methodology.  I know this might sound a             14:02:02

21  little odd, but when you're looking at clandestine populations,

22  like commercial sex consumers or commercial sex providers or

23  people who fall under that general umbrella, there is no

24  sampling frame for you to sample from.

25          So responding to the ads and collecting information is        14:02:21

KIMBERLY MEHLMAN-OROZCO - DIRECT EXAMINATION

1  a known methodology sometimes known as snowball sampling, where

2  you're looking for a seed, and they're referring you to others

3  for conducting qualitative research in the field, so ...

4  Q.  You've mentioned a phrase, and I want to make sure we all

5  understand what the -- the meaning is as you're using it.  You          14:02:39

6  mentioned "commercial sex."

7       When you use the phrase "commercial sex," what type of

8  conduct are you referring to?

9  A.  I think that the term "commercial sex" encompasses a myriad

10  or a wide variety of different sub-activities.  Some                     14:03:03

11  potentially consensual; some nonconsensual.  It can include

12  webcam girls.  It can include BDSM clubs.  It can include --

13  Q.  Let's go slow.  All right.

14       Webcam girls, like OnlyFans, thing likes that?

15  A.  It can be OnlyFans.  It can be other subscription-based             14:03:28

16  sites.  It can include a number of others.

17       If you want me --

18  Q.  Go ahead.

19  A.  -- to go through a list.

20  Q.  You said BDSM.  For those of us that don't work in this            14:03:38

21  world regularly, what is BDSM?

22  A.  Generally speaking, it's bondage/sadomasochism.  There are

23  clubs that cater to that that could be considered under the

24  umbrella of commercial sex work, an example of which -- as I

25  mentioned, I'm from the east coast.  The Crucible is a club            14:03:59

UNITED STATES DISTRICT COURT

1   that caters to BDSM and --

2            MR. STONE:  Your Honor, I object to the narrative.

3            THE COURT:  Sustained.

4   BY MS. BERTRAND:

5   Q.  What other types of conduct would fall under your          14:04:07

6   definition of commercial sex?

7   A.  Foot fetish pages.

8   Q.  What's that?

9   A.  It is where people can sell pictures of their feet.  They

10  can sell their socks.  They could sell their pantyhose.  They  14:04:23

11  can sell videos of their feet.

12           But the reason why it falls under that umbrella, it's

13  for titillation or sexually based arousal purposes and there is

14  a money exchange.

15  Q.  Okay.  What about, like, dancers/strippers?  Would that --  14:04:42

16  are those falling under commercial sex in your definition?

17  A.  Yes, it could be a dancer or stripper working at a club.

18  Dancer or stripper going out to an individual potentially for a

19  bachelor party.  Some travel.  There could be pornography as a

20  type of sex work.  They're all so different subtypes of         14:05:07

21  pornography, depending on whether it's produced pornography or

22  whether it's amateur or, quote/unquote, Gonzo pornography.

23           There are a number of different subtypes of commercial

24  sex activity that fall under that larger umbrella.

25  Q.  Massage?                                                    14:05:24

KIMBERLY MEHLMAN-OROZCO - DIRECT EXAMINATION

46

```
 1   A.   Absolutely.

 2   Q.   Erotic massage?

 3   A.   Erotic massage, yes.

 4   Q.   In your experience, Doctor -- well, let me -- let me

 5   rephrase that, please.                                     14:05:46

 6        In your research, did that include viewing commercial

 7   sex advertisements on Backpage.com?

 8   A.   Yes, ma'am.

 9   Q.   In what sections on Backpage.com did you, as part of your

10   research, review commercial sex advertising?               14:06:08

11   A.   What -- in what parts of my research?  So --

12   Q.   What parts of the Backpage.com did you go to to look at

13   ads?

14        I assume you weren't in automotive.

15   A.   No.                                                   14:06:27

16   Q.   All right.  Where were you?

17   A.   Again, from looking at a ad just high level, you cannot --

18        MR. STONE:  Objection.  Nonresponsive.

19        THE COURT:  Sustained.

20   BY MS. BERTRAND:                                           14:06:39

21   Q.   Just what sections of the Backpage did you go to for your

22   research?

23   A.   Body rubs.  I think one was related to parties and events.

24   One was related to personals.  And then prior to the shuttering

25   of the adult section, adult services section.              14:06:52
```

UNITED STATES DISTRICT COURT

KIMBERLY MEHLMAN-OROZCO - DIRECT EXAMINATION

47

```
 1   Q.  Just generally in the adult services section.  So that
 2   included escorts --
 3   A.  Yes.
 4   Q.  --  is that correct?
 5            Were you able as a researcher to determine whether or        14:07:06
 6   not -- well, let me --
 7            MS. BERTRAND:  I'm sorry, Judge.  Let me back up.
 8   BY MS. BERTRAND:
 9   Q.  Is prostitution a subsection, in your mind, of commercial
10   sex?                                                                  14:07:35
11   A.  No, not the way that I conceptualize it.
12   Q.  Okay.  So prostitution is --
13   A.  Oh, hold on.  What was the question again?  Sorry.  I think
14   I misheard.
15   Q.  That's okay.                                                      14:07:46
16            In your definition of commercial sex, is prostitution
17   a subsection of commercial sex?
18   A.  Yes.  Sorry.  Thank you.
19   Q.  Okay.  How do you define -- so we're all using the same
20   terms, how do you define prostitution?                               14:07:59
21   A.  Sexual intercourse or a sexual service in exchange for
22   money or something of value.
23   Q.  What do you con- -- what do you consider a sexual service?
24            Because we talked about the feet thing.  Would that be
25   a sexual service?                                                    14:08:16
```

UNITED STATES DISTRICT COURT

1        MR. STONE:  Your Honor, foundation and asking for

2   seemingly a legal conclusion.  The -- she is an expert.  She

3   can talk about this a little bit, but I don't think we should

4   get into the specifics.

5        THE COURT:  Sustained as to that last question,                14:08:29

6   Ms. Bertrand.

7   BY MS. BERTRAND:

8   Q.  And how many advertisements on Backpage.com in the adult

9   services section can you estimate you have reviewed in your

10  research?                                                             14:08:50

11  A.  Thousands is the best estimation.  Maybe tens of thousands.

12  Q.  In that research, view -- where you viewed these Back- --

13  I'm just going to limit it to Backpage for now -- did you have

14  occasion to ever meet the person posting the ad you reviewed?

15  A.  Not meet and interview.  Not on Backpage.                         14:09:18

16  Q.  Not on Backpage?

17  A.  On other commercial sites and advertisement forums.

18        THE COURT:  Just -- I'm sorry.  You just kind of

19  lowered your voice there.  I had a hard time hearing that.

20        THE WITNESS:  On other forums that were dedicated to           14:09:36

21  commercial sex.  So Evil Empire is -- is one where I did meet

22  and interview somebody who was advertised there.

23  BY MS. BERTRAND:

24  Q.  In your experience in reviewing the thousands, by your

25  estimate, ads on Backpage, were you, in your experience, able        14:10:01

1    to draw a conclusion about the service specifically being

2    offered in a specific ad?

3             MR. STONE:  Objection.  The question was vague and

4    compound.

5             THE COURT:  I'll sustain because she testified that          14:10:20

6    she reviewed thousands.  And so I -- I guess I think it merits

7    a little bit more probing --

8             MS. BERTRAND:  Okay.

9             THE COURT:  -- before you ask that question,

10   Ms. Bertrand.                                                         14:10:39

11   BY MS. BERTRAND:

12   Q.  How many escort ads did you review in reviewing the adult

13   services section of Backpage?

14   A.  I would say -- again, I don't have a -- a concrete number,

15   but it would be --                                                    14:10:53

16   Q.  Would you talk into the microphone.  Sorry.

17   A.  -- thousands, if not tens of thousands.

18   Q.  And that's over what time period?

19             You came out of graduate school in --

20   A.  I would say from -- oh, sorry.                                    14:11:04

21   Q.  Go ahead.  Go ahead.  No.

22   A.  I would say from maybe 2013 or '14 until 20- -- late 2017,

23   early 2018.

24   Q.  When -- did you stop when Backpage shut down?

25   A.  Yes, ma'am.  Well, actually, no, I didn't stop when              14:11:29

KIMBERLY MEHLMAN-OROZCO - DIRECT EXAMINATION

50

1    Backpage shut down, because there's the Way Back Machine.  So I

2    still reviewed ads for various cases that I worked on --

3    Q.  Okay.

4    A.  -- using the Way Back, which is an Internet archive.

5    Q.  Right.  So even after the website was shut down, you've          14:11:45

6    still seen ads that are part -- part of your research?

7    A.  Correct.

8    Q.  That are ads that were posted on Backpage?

9    A.  Correct.

10   Q.  And that includes ads in the escort section?                    14:11:56

11   A.  Correct.

12   Q.  In viewing those ads, have you ever, ever in viewing those

13   ads been able to include -- conclude from the face of the ad

14   alone what services are being offered in the ad?

15   A.  To conclude, no.                                                14:12:26

16   Q.  And why is that?

17   A.  Because the ads could be posted by a number of different

18   individuals.  And just because there's certain language in the

19   ad does not mean that it's actually being provided to make a

20   conclusion of that caliber.                                         14:12:50

21   Q.  In your experience researching, advertising for commercial

22   sex on Backpage, what have you seen are the potentials going on

23   behind the face of the ad?

24          MR. STONE:  Objection.  Vague.

25          THE COURT:  Sustained.                                       14:13:19

UNITED STATES DISTRICT COURT

BY MS. BERTRAND:

Q.  Well, let me ask it this way:  It's fair to say that in some instances those ads are offering prostitution; right?

        MR. STONE:  Objection.  Leading.

        THE COURT:  Sustained.                                    14:13:29

BY MS. BERTRAND:

Q.  What types of parties have you known to be placing the ads based on your research?

A.  It could be a sex worker.  It could be a pimp.  It could be a law enforcement officer.  It could be a researcher.  It could   14:13:51 be a graduate student.  I've worked on cases where it was a scammer looking to rob the people who were responding to the ad.  It could be a nonprofit that's doing outreach.  It could be a number of different entities.  It could be somebody engaging in survival sex during COVID -- the COVID pandemic.   14:14:15 Survival sex.  There was an uptick of people exchanging sexual --

        MR. STONE:  Objection.  Narrative.

        THE COURT:  Sustained.  And it's beyond the scope of this witness's testimony.                                     14:14:29

BY MS. BERTRAND:

Q.  You mentioned it could be nonprofits.  You've -- you've seen where nonprofits have posted ads in the escort section of Backpage?  That's your experience?

A.  Not only did they post the ads on Backpage, but they had it   14:14:50

KIMBERLY MEHLMAN-OROZCO - DIRECT EXAMINATION

52

```
 1    as a demonstration for law enforcement during trainings, which
 2    I participated in.  So I was part of trainings where there was
 3    a live demonstration of posting an ad on Backpage as part of
 4    the training to law enforcement.
 5    Q.  And you mentioned outreach.  What type of outreach work        14:15:14
 6    have you seen ads in the Backpage adult services section used
 7    for in your experience?
 8    A.  Organizations attempting to quantify the number of
 9    potential commercial sex consumers any given area by the number
10    of people responding to an ad.  I have seen nonprofits,            14:15:38
11    churches, task forces respond to the ads trying to offer
12    services and get people help potentially of the commercial sex
13    industry, if -- if that's what they're assuming based off of
14    the response.
15          But I've -- I've seen it both ways, them responding to       14:15:59
16    ads as well as posting ads.
17    Q.  Have you seen ads in your experience where they're trying
18    to basically get someone in the door?
19    A.  Yes.
20    Q.  Can you explain that to the jury, please.                      14:16:18
21    A.  So in the erotic massage industry, sometimes erotic -- or
22    sometimes massage parlors that do not provide erotic massages
23    will post an ad suggesting that they provide those services to
24    get male customers to come in, but once they come in, no sexual
25    service is provided.  So it's like a false advertisement, a        14:16:41
```

1    bait and switch.  They pretend like they're offering something,

2    but then they go in and no sexual service is provided.

3    Q.  Thank you.

4           MS. BERTRAND:  May I step back and just --

5           THE COURT:  Yes.                                        14:16:56

6           MS. BERTRAND:  -- consult with my colleagues quickly?

7           THE COURT:  Yes, you may.

8           MS. BERTRAND:  Thank you.

9    BY MS. BERTRAND:

10   Q.  Are you familiar with a website called The Erotic Review?    14:17:18

11   A.  Yes.

12   Q.  Or is it also known as TER?

13   A.  Yes.

14   Q.  As a researcher, what is The Erotic Review to you?

15   A.  It's a website that's used for commercial sex consumers to   14:17:30

16   post reviews of their alleged services procured.

17   Q.  In your experience as a researcher, do you know whether or

18   not those reviews can be treated as truthful?

19          MR. STONE:  Objection.  Vague.

20          THE COURT:  Overruled.                                   14:18:00

21   BY MS. BERTRAND:

22   Q.  Please answer.

23   A.  In my experience, sometimes noncommercial sex consumers

24   will post fake reviews in order to appear to be a commercial

25   sex consumer so that they can mine information from other        14:18:20

```
 1   posters, because obviously commercial sex consumers might be
 2   vigilant to law enforcement posing as a commercial sex
 3   consumer.  But if you have more reviews or it looks like you
 4   did patronize potential providers, there can be fake reviews
 5   posted on there as well.                                    14:18:39
 6           MS. BERTRAND:  Thank you.
 7           Your Honor, I have nothing further.
 8           THE COURT:  Mr. Stone.
 9           MR. STONE:  Thank you.
10                       CROSS-EXAMINATION                       14:18:49
11   BY MR. STONE:
12   Q.  Good afternoon, ma'am.
13   A.  Good afternoon.
14   Q.  All right.  So you asked -- or you answered a lot of
15   questions about commercial sex; right?                      14:19:46
16   A.  I don't know if I would say that's a lot.  I usually
17   testify for an entire day, so I wouldn't say too many.
18   Q.  Well, that's fair.  It's subjective.
19           You answered questions about commercial sex?
20   A.  Yes, I did.                                             14:19:59
21   Q.  And, in your view, commercial sex is a larger subset, and
22   prostitution makes up one piece of the commercial sex.
23           Is that what I understood?
24   A.  Yes, I would say so, the way that I conceptualize it.  And
25   obviously underneath that large umbrella of commercial sex, you 14:20:18
```

UNITED STATES DISTRICT COURT

KIMBERLY MEHLMAN-OROZCO - CROSS-EXAMINATION

55

1   have consenting sex, you have nonconsenting commercial sex.  So

2   I think that there are a number of ways that you can

3   conceptualize what might fit under there.

4   Q.  Okay.  You agree with me, though, that prostitution's

5   illegal in this country in almost -- well, every state except a        14:20:34

6   few parts in Nevada?

7   A.  Well --

8   Q.  Hold on.  You -- you don't agree with that?  That's yes or

9   no.  Yes or no on that one.

10  A.  It's not a yes or no, and I'm going to tell you why,              14:20:45

11  because Cy Vance in New York decriminalized prostitution.  So

12  it's technically not illegal, but -- or it's technically not

13  legal, but it is allowed and not enforceable.

14       So Cy Vance decriminalized it following a

15  recommendation from Amnesty International to decriminalize sex        14:21:07

16  work.  So my understanding, in New York City it is not

17  prosecuted, both erotic massage parlors and prostitution.

18       As well as -- as you had mentioned, there are some

19  counties within Nevada and -- and so on and so forth.

20  Q.  Okay.  You've written a number of articles; right?             14:21:26

21  A.  Yes.  I think several dozen or so.

22  Q.  And I've read -- read a few of those.

23       Decriminalized is not the same as being legal.  I

24  think I read that in one of yours.  Fair?

25  A.  Yes, that is fair, and that is correct.                         14:21:45

KIMBERLY MEHLMAN-OROZCO – CROSS-EXAMINATION

56

```
 1   Q.  So it can be illegal even though it's been decriminalized.
 2   Yes?
 3   A.  Yes, sir.
 4   Q.  So what this Cy Vance did in New York when he
 5   decriminalized it, it's still illegal.  That's your testimony?          14:21:59
 6         It may not be prosecutable, but it's illegal.  Fair?
 7   A.  My understanding is that it is decriminalized; and,
 8   therefore, my understanding is that in New York City still
 9   technically against the law, even though it is not enforced.
10   Q.  Okay.  So let's make it simple.  It's still illegal in              14:22:17
11   New York.  Yes?
12   A.  I think decriminalization is sort of a hybrid between
13   legality and illegality.
14         So I understand what you're trying to get me to commit
15   to.  But the way I conceptual it, as a social scientist, is            14:22:29
16   that there's -- it's a hybrid.
17   Q.  Okay.  Well, I think I've read where you talk about
18   decriminalizing doesn't mean it's illegal.
19         But let's just leave it there, because this all
20   happened after 2018, didn't it?                                        14:22:43
21   A.  Yes, sir, I believe it did.
22   Q.  All right.  And, ma'am, you're being paid to be here today;
23   right?
24   A.  Yes, sir, I am.
25   Q.  What's your hourly rate?                                           14:22:53
```

UNITED STATES DISTRICT COURT

KIMBERLY MEHLMAN-OROZCO - CROSS-EXAMINATION

57

1    A.  For this case or my typical hourly rate?

2    Q.  Well, I have an email where you are emailing your hourly

3    rate to the defense as $750 per hour; is that right?

4    A.  That is correct.

5    Q.  Okay.  That was in 2021.  Has it gone up since then?          14:23:10

6    A.  It has for civil cases.  But that's not what I'm being paid

7    in this case.

8    Q.  Okay.  But this is what you emailed as your rate, $750 per

9    hour?

10   A.  I believe so, yes.                                           14:23:21

11   Q.  And you generally require a minimum of, at least in cases

12   with this complexity, of like 160 hours.  Is that fair?

13   A.  It depends on how much discovery that I'm going to be

14   reviewing.  So that's what I estimated, not knowing how much

15   discovery or any documents that I'd be reviewing.               14:23:38

16   Q.  All right.  And so you told defense counsel to budget

17   between 120- and $150,000 for your work on this case.  Fair?

18   A.  As a -- an estimate, yes.

19   Q.  You've done other work on Backpage's behalf previously?

20   A.  Yes, I have.                                                 14:24:05

21   Q.  Were you -- were you involved in another matter?

22   A.  Civil matter, yes.

23   Q.  Were you paid for that matter?

24   A.  Yes, sir.

25   Q.  How much were you paid?                                      14:24:24

1   A.  I don't recall.

2   Q.  $20,000?

3   A.  Maybe.

4   Q.  $50,000?

5   A.  I don't recall.  Honestly.                              14:24:32

6   Q.  Okay.  More than 50,000?

7   A.  Again, I don't recall.  I mean, I can tell you what I'm

8   charging for civil cases now, but I don't remember the Backpage

9   matter, how many hours were billed or how much I was paid.

10  Q.  What are you charging now for civil cases?              14:24:49

11  A.  1,125 per hour, and I typically estimate up to 150 hours.

12  And so -- but usually it'll be under that.  So I try to bill

13  judiciously.  So I would say on average it's about 80 hours of

14  work to review discovery and produce a report.

15  Q.  So what's that, about 80 grand per case?                14:25:10

16  A.  80 to 100.

17  Q.  And what percentage of your income is made up as serving as

18  an expert witness or consultant?

19  A.  I would say for expert witness and consultant it's

20  100 percent, but not all consultancy is expert witness         14:25:26

21  testimony.  As I mentioned, I do training and technical

22  assistance for various businesses on how to combat trafficking.

23  Q.  Okay.  Fair.

24       All right.  I have one of your articles that I'd like

25  to -- for you to see.  And this is exhibit -- marked as         14:25:48

```
 1    Exhibit 3016.

 2            Do you have that before you?

 3    A.  Yes.

 4    Q.  Is this an article that you wrote?

 5    A.  Typically with the articles that I write -- where was this    14:26:27

 6    published?

 7            It depends on the publication.  But usually the

 8    majority of the substance is something I write, but the

 9    headline is typically authored by the editor.  So it depends on

10    where this one was published.                                     14:26:45

11    Q.  So is that a yes, this is an article you wrote?

12    A.  Yes.

13    Q.  I mean, it has your name on it, doesn't it?

14    A.  Yes, it does.

15    Q.  So fair that this is -- the language in this three-page        14:26:58

16    document is the language you wrote?  You wrote this?

17    A.  As I mentioned, it depends on who the publisher is.

18    Everything in the substance, in the text I can say that I wrote

19    it.  And maybe there was some edits here and there from the

20    editor.  But typically, depending on the publication -- for       14:27:26

21    example, USA Today, they rewrite my --

22    Q.  Okay.  I think --

23    A.  -- headline --

24    Q.  -- you're a little beyond my question.

25            But it -- so I just want to make clear that the           14:27:36
```

UNITED STATES DISTRICT COURT

```
 1    language in the body --
 2    A.  Yes.
 3    Q.  Let me modify that -- in the body is yours?
 4    A.  Yes.
 5    Q.  You wrote that?                                    14:27:44
 6    A.  Yes, sir, minus whether there were some minor edits from
 7    the editor.
 8    Q.  Okay.
 9    A.  But, yes, the large volume of it would be words that I
10    wrote.                                                 14:27:52
11    Q.  Fair enough.
12          And take a look at the first paragraph here, if you
13    would.
14          You reviewed it, ma'am?
15    A.  Yes, sir.                                          14:28:10
16    Q.  And this was written May 30th, 2017; correct?
17    A.  That's when it was published.
18    Q.  Yes, you're right.  Published on May 30th, 2017.  Written
19    sometime before.
20          That's --                                        14:28:22
21    A.  Yes.
22    Q.  -- fair enough; right?
23          Okay.  And you're -- you remember writing that for the
24    last seven years, sex workers and sex traffickers have posted
25    advertisements on the escort, adult, and dating sections of   14:28:34
```

UNITED STATES DISTRICT COURT

1    Backpage?

2            Do you remember writing that?

3    A.  I think what I wrote was --

4    Q.  If I can -- I think that's just yes or no.

5            Do you remember writing that?                    14:28:44

6    A.  That's not what the sentence says.

7            So if you want me to read the sentence --

8    Q.  Well --

9    A.  -- I'll read it.

10   Q.  -- why don't I read it.                             14:28:50

11           "For the last seven years, sex workers and sex

12   traffickers have posted advertisements on the escort, adult,

13   and dating sections of the website."

14           Now, there's a little bit more, but I'm not going to

15   read that.                                              14:29:03

16           Is that the sentence that you wrote?

17   A.  That is part of the sentence that I wrote.

18   Q.  Okay.  But you wrote those words; right?

19   A.  Yes.

20   Q.  All right.  So you knew that Backpage on the escort, adult,  14:29:11

21   and dating sections had advertisements from sex traffickers;

22   correct?

23   A.  Yes.

24   Q.  And from sex workers?

25   A.  Yes, sir.                                           14:29:27

KIMBERLY MEHLMAN-OROZCO - CROSS-EXAMINATION
                                                                              62

 1    Q.  And sex workers can be prostitutes; right?

 2    A.  They can be prostitutes.  They can be escorts.  They could

 3    be a number of things.  But that is correct.

 4    Q.  All right.  But your testimony to this jury is sex workers

 5    can be prostitutes when there's an exchange of a sex act for        14:29:44

 6    money; right?

 7    A.  Yes.

 8    Q.  All right.  And then you were asked questions from

 9    Ms. Bertrand about how it's hard to determine, in your opinion,

10    in looking at an ad whether that ad is for prostitution.           14:30:00

11          That was your testimony; right?

12    A.  Yes, sir, that is correct.

13    Q.  And you mentioned a few different people who could be

14    posting other than the prostitute; right?

15    A.  Yes, sir.                                                       14:30:13

16    Q.  You gave, like, a list?

17    A.  Yes, sir.

18    Q.  And it included law enforcement?

19    A.  Yes, sir.

20    Q.  Task forces?                                                    14:30:24

21    A.  Yes, sir.

22    Q.  People who were, I guess, within law enforcement.  They're

23    doing it as some sort of model to show others how to post an

24    ad?

25          I think you had some testimony on that.                      14:30:36

                    UNITED STATES DISTRICT COURT

KIMBERLY MEHLMAN-OROZCO - CROSS-EXAMINATION

1   A.  Nonprofit organizations that do training for law

2   enforcement.  Yes, sir.

3   Q.  Nonprofit organizations.  Okay.

4        But your testimony is that all of those ads that are

5   posted are posted to be like prostitution ads.  It's just that          14:30:47

6   some non-prostitutes were posting the ad?

7        Is that -- that's what -- is it -- is that my

8   understanding of your testimony?

9   A.  I'm not sure I'm understanding your question.

10  Q.  Okay.                                                               14:31:02

11  A.  And --

12  Q.  Let me give you a hypothetical.

13  A.  Okay.

14  Q.  Law enforcement posts an ad in the escort section of

15  Backpage.                                                               14:31:09

16  A.  Okay.

17  Q.  Why are they -- why are they posting an ad on the escort

18  section of Backpage?

19  A.  Likely to catalyze an investigation.

20  Q.  An investigation.  Investigation into --                           14:31:18

21  A.  Commercial sex.

22  Q.  -- people committing prostitution offenses, perhaps?

23  A.  Investigation into commercial sex consumers.

24  Q.  Okay.  And so when you're saying "commercial sex

25  consumers," you have to mean people who engage in or as johns          14:31:33

UNITED STATES DISTRICT COURT

KIMBERLY MEHLMAN-OROZCO - CROSS-EXAMINATION

64

1    who engage with prostitutes, because you just talked about

2    other parts of commercial sex not being illegal; right?

3    A.  Typically they refer to themselves as mongers or hobbyists,

4    but, yes.  You used the word johns, which can be used as well.

5    But persons who respond to commercial sex advertisements can        14:31:50

6    include an individual who might be trying to procure commercial

7    sex services, among a number of different other examples that I

8    provided earlier.

9    Q.  But law enforcement is not interested in someone who wants

10   to look at feet.  Isn't that fair?                                  14:32:04

11   A.  I'm not going to opine on what law enforcement might be

12   interested in.  They -- they could be.  I know that sometimes a

13   number of businesses do want persons who are into niche types

14   of sexual exchanges off of the platforms, but --

15   Q.  Okay.  I --                                                     14:32:23

16   A.  -- it's not elicited --

17            THE COURT:  Don't --

18            THE WITNESS:  -- potentially.

19            THE COURT:  Don't speak over one another, please.

20            MR. STONE:  I'm sorry, Your Honor.                         14:32:28

21   BY MR. STONE:

22   Q.  I just want to be clear here.  When you were giving the

23   example of the foot fetish to Ms. Bertrand, you were talking

24   about prostitution?

25            Because that's the only -- that's how I understand         14:32:38

UNITED STATES DISTRICT COURT

1   your last answer to make sense.  If law enforcement is

2   interested, it would involve a prostitution act; correct?

3   A.  I think you might be misunderstanding what I had stated.

4          Separate from law enforcement, somebody might post an

5   ad on a platform like that selling foot fetish pictures or          14:33:00

6   trying to initiate an exchange, for example, to catalyze a

7   sugar dating experience or to drive them to another website.

8          There are a myriad of different examples of why

9   someone might post on those subsections of the platform --

10  Q.  But --                                                          14:33:19

11  A.  -- but law enforcement certainly is one.

12  Q.  I understand that answer.

13         I think my question back to you was, law enforcement

14  wouldn't be interested in posting an ad for some sort of legal

15  foot fetish issue --                                                14:33:31

16         MS. BERTRAND:  Objection.

17  BY MR. STONE:

18  Q.  -- would they?

19         MS. BERTRAND:  Asked and answered.

20         THE COURT:  Overruled.                                       14:33:37

21  BY MR. STONE:

22  Q.  Do you understand my question, ma'am?

23  A.  Of whether law enforcement would post an advertisement for

24  foot fetish looking for people responding to a foot fetish ad?

25         I have not seen that, if that's the question, but --         14:33:48

KIMBERLY MEHLMAN-OROZCO - CROSS-EXAMINATION

66

```
 1    Q.  Well --
 2    A.  -- it's separate.
 3    Q.  -- hold on.  I think we're overcomplicating it.
 4    A.  Okay.
 5    Q.  You're an expert on sex trafficking?          14:33:55
 6    A.  Yes, sir.
 7    Q.  You know that law enforcement is interested in catching or
 8    finding and prosecuting those involved in sex trafficking
 9    offenses.  Fair?
10    A.  Among other things, yes.                       14:34:09
11    Q.  Okay.  Can you agree with me that they are interested in
12    people committing criminal acts?
13    A.  Yes, sir.
14    Q.  All right.  So when law enforcement posts an ad on the
15    escort section of Backpage, as you testified to on direct, it's   14:34:26
16    relating to a potential criminal act; right?
17    A.  It depends on the situation.  If you want to give me an
18    anecdote or an example.  But, yes, that can be a situation in
19    which law enforcement can post an advertisement.
20    Q.  In your review of Backpage in the adult section, did you   14:34:52
21    see any ads that you were able to determine were for legal
22    escort ads?
23    A.  Ostensibly from looking at an ad, it's not possible to
24    determine whether it's a legal escort or an illicit service --
25    Q.  Okay.                                          14:35:21
```

KIMBERLY MEHLMAN-OROZCO - CROSS-EXAMINATION

67

1   A.   -- or a fake ad to catalyze a robbery just from looking at

2   the ad alone.

3   Q.   All right.  Let's take a look at some ad titles.  I'm going

4   to show you what's been admitted as Exhibit 2046.  And so this

5   is from Backpage.com.                                                   14:35:44

6        Do you see that, ma'am?

7   A.   Yes, sir.

8   Q.   And you're familiar with this page?

9        You've reviewed thousands of ads on Backpage; right?

10  A.   Yes, sir.                                                          14:35:57

11  Q.   So this is very familiar to you?

12  A.   Yes, sir.  And it's from the Way Back Machine archive as

13  well.

14  Q.   Which is something you're also familiar with?

15  A.   Yes, sir, it is.                                                   14:36:04

16  Q.   And this is ads that are from Dallas, Texas, the escort

17  section of Backpage; correct?

18  A.   Yes.  That's what it appears to be, uh-huh.

19  Q.   Over here is an ad for The Erotic Review, which you're

20  familiar with; right?                                                  14:36:25

21  A.   It's a posting for The Erotic Review.  Yes, that's correct.

22  Q.   And you mentioned that that's a website that people use to

23  rate prostitutes and other sex workers; correct?

24  A.   Yes, sir.

25  Q.   And when -- you've looked at The Erotic Review; right?            14:36:41

UNITED STATES DISTRICT COURT

1    A.  Yes, sir.  Of course.

2    Q.  And it -- there's pages there that will inform the person

3    who's on the page the service that the escort provides; right?

4    A.  There is information that can describe what service might

5    be offered, yes.                                                              14:37:11

6    Q.  Well, in your review of The Erotic Review, you recall

7    seeing that it will have something that says "sex, yes," on The

8    Erotic Review web page?

9    A.  Yes, sir.  But if you've reviewed any commercial sex

10   consumer review forum, there often are multiple reviews by the    14:37:28

11   same alleged provider, and sometimes they will have one thing

12   checked while the others will say it's not checked so that

13   sexual services were not provided.  They will have differences

14   in description of the female provider.  For example, one

15   consumer potentially saying she has large breasts, while         14:37:47

16   another one saying they're small breasts.

17        There are oftentimes a lack of consistency across the

18   reviewers, and that's why there's not necessarily a reliability

19   determination of what's in there.  So even if it's checked off,

20   that doesn't necessarily mean that it's verified to be accurate  14:38:02

21   or true.

22        MR. STONE:  Your Honor, objection.  Nonresponsive.

23   Move to strike.  It was a yes-or-no question.

24        THE COURT:  Yes.  I'll sustain the objection and

25   strike the answer, and the jury will disregard.                  14:38:15

```
 1              I think, members of the jury, we are at a -- a good
 2    breaking point for our afternoon 20-minute break.  And, again,
 3    I will remind the jury of the admonition, to continue to keep
 4    that open mind and not to discuss the matter, conduct any
 5    research on any witness that has testified so far.  Just simply    14:38:35
 6    be ready to return into the courtroom in approximately
 7    20 minutes.  And, again, I beg your indulgence.  Once in a
 8    while we get carried away with other matters that we need to
 9    address, but I -- I will try to be close to that 20-minute mark
10    this time.                                                          14:38:56
11              So with that, please all rise for the jury.
12          (Jury not present at 2:38 p.m.)
13              THE COURT:  And, ma'am, you may step down.
14              THE WITNESS:  Do you want me to leave this here?
15              THE COURT:  Yes, please.                                  14:39:27
16              All right.  Please be seated.
17              Let me just make inquiry.  The next witness on -- on
18    the list that I have is Mr. Suskin.  And did you come to some
19    determination during the lunch hour or break, Mr. Stone, as to
20    whether or not the production of that disclosed information on      14:40:01
21    which he rendered that opinion was provided?
22              MR. STONE:  No, there hasn't been anything provided to
23    us, Your Honor.
24              MR. FEDER:  Judge, I emailed Mr. Stone half an hour
25    ago or so that we're not going to call Mr. Suskin based on the     14:40:17
```

```
 1   Court's ruling not only in the past, but I think this morning
 2   or early afternoon.
 3           THE COURT:  Okay.  I -- the only reason I asked was
 4   because I was going to suggest maybe permitting the government
 5   to voir dire him outside of the presence of the jury, but since
 6   you are no longer going to disclose him.
 7           So who is the next witness after this witness?
 8           MR. FEDER:  My understanding is this is the last
 9   witness.
10           THE COURT:  All right.  Okay.  Well, we'll see how
11   long we go and -- well, let me -- by my review, Mr. Stone,
12   you've only begun your -- well, I don't know.  I shouldn't
13   characterize it as you've only begun your cross-examination.
14           Do you have a rough estimate of how much longer you're
15   going to go?
16           MR. STONE:  Yeah.  15 minutes.
17           THE COURT:  Okay.  And then, Ms. Bertrand, redirect?
18           MS. BERTRAND:  Maybe 15, 20 minutes.  I don't think
19   it'll be lengthy.
20           THE COURT:  Okay.  So that puts us roughly at about,
21   I'd say, being generous, about quarter to 4:00.
22           And so the question, then, is if there are no other
23   witnesses and no other testimony, then do you have any other
24   witness that you intend to call --
25           MR. STONE:  No, Your Honor.
```

14:40:32

14:40:44

14:41:06

14:41:19

14:41:41

1        THE COURT:  -- in a rebuttal case?

2        MR. STONE:  No rebuttal case.

3        THE COURT:  All right.  So I want to be able to --

4        MR. BERRY:  Wait.

5        MR. STONE:  Oh, I guess, Your Honor, we were just        14:41:50

6   wondering if there had been an inquiry on whether the -- the

7   Court is going to ask the individual defendants whether they're

8   going to testify or not?

9        THE COURT:  Well, I guess when I -- that's technically

10  correct.        14:42:06

11        Why don't when we come back before -- after the break,

12  I'll ask you individually so that -- I know I told you that you

13  had overnight to discuss all of this and to let us know in the

14  morning, but given the status of the situation, I'll come in

15  before the jury comes in and ask that individual question.        14:42:23

16        So going back to my original question, no rebuttal

17  witness -- no rebuttal witness by the government?

18        MR. STONE:  Correct, Your Honor.

19        THE COURT:  All right.  So if there is no additional

20  testimony, including the defendants, then I want to be able,        14:42:39

21  then, to perfect those jury instructions, give you overnight to

22  look at those.  And I would suggest then reconvening at 9:00 in

23  the morning to go over that.  Possibly we will have those

24  perfected by the -- the noon hour, and we could have the jury

25  in.  We will still adhere to the half-day jury schedule on        14:43:16

1    Friday.

2            The only other alternative that I would pose to you is

3    that we release the jury for the remainder of the week, bring

4    them back in on Tuesday, and begin with instruction and then

5    closing argument.                                          14:43:35

6            So I leave you with those considerations.  You will

7    talk amongst yourselves and let me know what your decision is.

8    All right.

9            MR. STONE:  Your Honor, the only thing I'd put on the

10   record is that I talked to defense counsel about forfeiture,   14:43:49

11   and, as I understand it, they are electing to try the

12   forfeiture case, if it is necessary, to the jury.

13           THE COURT:  Well, and what would that consist of?

14           MR. STONE:  Well, it would -- the way it's been done

15   in my experience is that if there is a guilty verdict for any   14:44:06

16   of the counts that would then lead to a forfeiture, then Your

17   Honor would let the jury know that they're not quite done and

18   that the -- there will be some additional jury instructions

19   related to that.  There will be one, possibly two witnesses

20   from the government and a very short summation typically.      14:44:26

21           THE COURT:  Well, we're with- -- I think we're still

22   within our time frame to conclude the case and have them

23   deliberate.  And depending on how deliberations go.  Again,

24   their service ends on the 9th.

25           MR. STONE:  Yes.  Two weeks from tomorrow, I think,    14:44:58

1    Your Honor.

2            THE COURT:  Yes.  And so that should inform your

3    decision about how we proceed for the remainder of the week --

4            MR. STONE:  Yes.

5            THE COURT:  -- so --                                        14:45:12

6            MR. STONE:  And we would -- we would be for pushing

7    forward and -- and using the jury's time this week.

8            THE COURT:  All right.  So I'll leave you with those

9    considerations, and we'll return in 15 minutes.

10           THE COURTROOM DEPUTY:  All rise.                            14:45:24

11       (Recess from 2:45 p.m. to 3:03 p.m.)

12       (Jury not present at 3:03 p.m.)

13           THE COURTROOM DEPUTY:  All rise.

14           THE COURT:  Let's keep the witness in the witness room

15   for now.                                                           15:03:54

16           The record will reflect the presence of counsel and

17   clients without the jury present.

18           And so before the break I asked you to consider a

19   couple of things.  It's my understanding at this posture this

20   is the last witness.                                               15:04:10

21           And so, Mr. Cambria, is Mr. Lacey going to testify?

22           MR. CAMBRIA:  The answer's no, Your Honor.

23           THE COURT:  Ms. Bertrand, is Ms. Vaught going to

24   testify?

25           MS. BERTRAND:  No, madam.                                  15:04:23

```
 1              THE COURT:  Mr. Lincenberg, is Mr. Brunst going to
 2   testify?
 3              MR. LINCENBERG:  No, Your Honor.
 4              THE COURT:  Mr. Feder, is Mr. Spear going to testify?
 5              MR. FEDER:  No.                                          15:04:32
 6              THE COURT:  Mr. Eisenberg, is Mr. Padilla going to
 7   testify?
 8              MR. EISENBERG:  No, Your Honor.
 9              THE COURT:  All right.  Well, given that, this is how
10   I -- I think is the best course of procedure:  We'll finish      15:04:40
11   with this witness.  I'll release the jury.  I'll ask them to
12   reconvene tomorrow at 1:00 o'clock.  And at 1:00 o'clock, when
13   they come in, I will then have the defense rest its case, and
14   I'll ask for any rebuttal from the government, and then we can
15   proceed to reading them the instruction.  It's my recollection   15:05:16
16   from the final pretrial conference that you preferred them to
17   be instructed before the closing argument.
18              And in order to give us time tomorrow to finalize
19   those few objections that I've been provided -- the majority of
20   them are matters that I can take care of, but I want to make     15:05:41
21   sure that I have a clear record as to my determination to some
22   of the contested substantive instructions.  And so I will ask
23   counsel to come back to court tomorrow morning at 9:30 so we
24   can go through that process.  Hopefully it won't take but an
25   hour or so.  And then upon reading those instructions, I'll      15:06:07
```

KIMBERLY MEHLMAN-OROZCO - CROSS-EXAMINATION

75

```
 1    expect the government to go forward with its closing argument.
 2    And whether or not that starts at 3:00 o'clock or 2:30, be
 3    prepared to go to 4:30.  And if you need to come back on Friday
 4    morning, we'll continue that on Friday morning and see how far
 5    we go.  We'll reconvene next Tuesday with the continuation of      15:06:34
 6    the closing statements.  That's how we will proceed.
 7              In looking at the calendar, I wanted to make sure that
 8    we gave sufficient time for this jury to consider the matter,
 9    and, if necessary, then we would have to then have them
10    continue on for the forfeiture matter.  So that's, I think, a     15:06:52
11    very tight timeline for them so that they don't expire.
12              All right.  So --
13         MR. BERRY:  Your Honor, could I ask a question about
14    your practice whenever you go to give the jury instructions.
15    Is it Your Honor's practice that each juror will receive a copy   15:07:10
16    of those instructions to follow along with?
17              THE COURT:  Yes.
18         MR. BERRY:  Okay.  And will each one be able to take
19    that back into the deliberations room, or just one copy?
20              THE COURT:  We generally provide one copy.              15:07:22
21         MR. BERRY:  Okay.
22              THE COURT:  And --
23         MR. BERRY:  So they should be instructed that the
24    notes that they're taking on the copy that they're looking at
25    will not be available to them?                                    15:07:33
```

1          I just want to make sure I understand.

2          THE COURT:  That's correct, although I've never seen a

3   juror jot down notes.  But I'm busy reading the instructions,

4   so I don't know.  But I'll let them know that as well.

5          MR. BERRY:  Okay.                                          15:07:45

6          THE COURT:  Okay.

7          MR. LINCENBERG:  Your Honor?

8          THE COURT:  Yes.

9          MR. LINCENBERG:  Your Honor, the defense will be

10  renewing our Rule 29 motion, and it's our hope to get a          15:07:51

11  favorable ruling from the Court on all of it, or at least parts

12  of it.  And it will be helpful to have that ruling before we

13  put together our closings.

14         THE COURT:  Well, what I suggest you do, then, is be

15  prepared to make that motion.                                    15:08:14

16         Well, now, logistically what then happens is the jury

17  comes in, you close the case, and then I have to excuse them

18  again for you to make the -- the motion?  Is that what you're

19  saying?

20         MR. LINCENBERG:  Unless the Court wants to have it         15:08:34

21  deemed made now, which is at the close of the evidence.  And

22  we've extensively set forth our bases.  I don't think we need

23  more argument.  The Court -- if the Court has more questions --

24         THE COURT:  Well --

25         MR. LINCENBERG:  -- we would, of course, be prepared,      15:08:52

```
 1    but -- but I just want to bring this back on the Court's
 2    attention.
 3            THE COURT:  Well, the -- the rule is, as I understand
 4    it, as my practice has been, if I reserve the ruling, the
 5    ruling then relates to at the time -- the evidence at the --       15:09:08
 6    before the time the motion was made.  So if there's something
 7    in addition to that that you wish to argue, then I could
 8    suggest that you do it this afternoon.
 9            MR. LINCENBERG:  That's fine.  I can say on behalf of
10    Mr. Brunst there's no further arguments.  There's been no          15:09:29
11    further evidence.  And we'll renew it and submit.
12            But we just want to make sure that -- obviously, the
13    Court can reserve it and continue to reserve it.  We think
14    we've raised some pretty substantial matters.  Our hope would
15    be that the Court would be prepared to address some of it.         15:09:44
16            THE COURT:  Well, I'll let the counsel do that after
17    we release the jury.
18            All right.  So let's have the witness in.
19            Ma'am, please resume your seat.
20            All rise for the jury.                                      15:10:37
21        (Jury present at 3:11 p.m.)
22            THE COURT:  All right.  Please be seated.
23            The record will reflect the presence of the jury.  The
24    witness is on the witness stand.
25            Mr. Stone, you may continue.                               15:11:42
```

UNITED STATES DISTRICT COURT

```
 1              MR. STONE:  Thank you, Your Honor.
 2   BY MR. STONE:
 3   Q.  And we were discussing The Erotic Review before the break.
 4        Do you remember that?
 5   A.  Yes, sir.                                            15:11:48
 6   Q.  Are you aware of the relationship that Backpage.com had
 7   with The Erotic Review?
 8   A.  I believe I'm aware of the allegations related to an
 9   alleged relationship of some kind.
10   Q.  So is that a yes?                                     15:12:04
11   A.  I do not know the details of any relationship.  So, no, I
12   would not say I'm aware of any relationship.
13   Q.  So that's --
14   A.  I do --
15   Q.  So that's a no?                                       15:12:14
16        Just kind of one or two.  You can pick one.
17   A.  I'm aware of the allegations from the government on that
18   alleged relationship --
19   Q.  Okay.  So --
20   A.  -- so --                                              15:12:25
21   Q.  -- you're not aware of any of the details of the
22   relationship?
23   A.  Correct.  I'm not aware of what the government has been
24   able to prove in relation to that.
25   Q.  Okay.  So that's a no, you're not aware of the details of  15:12:37
```

1    the relationship?

2    A.  Other than what the allegations are.  Correct.

3    Q.  So you are not aware of the fact that Backpage was paying

4    The Erotic Review for a reciprocal link program --

5            MS. BERTRAND:  Objection.                               15:13:03

6    BY MR. STONE:

7    Q.  -- correct?

8            MS. BERTRAND:  Goes beyond the scope of direct.  This

9    is a closed cross jurisdiction.

10           THE COURT:  Overruled.                                  15:13:10

11           She may answer.

12           THE WITNESS:  I have not seen any evidence of any

13   payments related to -- from Backpage to The Erotic Review.  So

14   I've not reviewed any evidence in relation to that whatsoever.

15   BY MR. STONE:                                                   15:13:23

16   Q.  So that's a no?

17   A.  Do you want to state the question again just to be clear?

18   Q.  Yes.  And I'm going to -- I'm going to do my best --

19   A.  Sure.

20   Q.  -- to ask you short questions that are either yes or no.    15:13:32

21   If you can't answer yes or no, you can let me know that.  Okay?

22           And so my question is, you're not aware of the details

23   for this relationship between Backpage and The Erotic Review;

24   correct?

25   A.  Other than what is in the allegations, I am not aware of    15:13:51

 1    any details.

 2          And I understand that you would like me to answer a

 3    yes or no, but I'm trying to be as forthcoming as possible with

 4    my understanding.  So that's -- that's how I would like to

 5    answer.                                                          15:14:05

 6          THE COURT:  Well, I think, ma'am, having testified

 7    previously --

 8          THE WITNESS:  Yes.

 9          THE COURT:  -- listen to the question that's asked and

10    answer the question as it is asked.  You know, the -- you'll    15:14:13

11    have an opportunity to provide additional answers, but let's --

12    we're going to have this problem if that doesn't happen.  Okay?

13          So let's continue.

14          THE WITNESS:  Yes, ma'am.

15          THE COURT:  Bless you.                                    15:14:32

16          THE WITNESS:  Bless.

17          MS. BERTRAND:  Bless you.

18    BY MR. STONE:

19    Q.  All right.  So reciprocal links that were posted on the

20    Backpage site and The Erotic Review that allowed users to go    15:14:39

21    from one to the other, that's not a factor you are aware of;

22    correct?

23    A.  I --

24          MS. BERTRAND:  Objection.  Relevance.  Foundation.

25          THE COURT:  Sustained as to foundation.                   15:14:53

UNITED STATES DISTRICT COURT

```
 1    BY MR. STONE:
 2    Q.  Well, ma'am, you testified that you looked through
 3    thousands of ads; correct?
 4    A.  Thousands or tens of thousands, yes.
 5    Q.  Tens of thousands.                                    15:15:04
 6    A.  Yes.
 7    Q.  And that you were designated an expert in sex trafficking
 8    and prostitution, I believe; right?
 9    A.  Yes, sir.
10    Q.  And you are a professor at I think you said the number 1  15:15:15
11    ranked -- is it criminology school in the country?  University
12    of Maryland?
13    A.  Not -- not presently.  I've taught classes there --
14    Q.  Taught classes there --
15    A.  -- in the past.                                       15:15:29
16    Q.  -- at the number 1.
17         And does that relate to your testimony today in terms
18    of looking at ads on platforms like Backpage and The Erotic
19    Review?
20    A.  Does that relate to my --                             15:15:38
21    Q.  Does your teaching -- did you teach on that subject?
22    A.  On commercial sex advertisements?
23    Q.  Yes.
24    A.  In online review platforms, yes.
25    Q.  Okay.  So you're familiar with these platforms; right?  15:15:51
```

KIMBERLY MEHLMAN-OROZCO - CROSS-EXAMINATION

82

1   A.  Yes, sir.  I'm familiar with a number of different

2   platforms.

3   Q.  But you're not familiar of the fact that Backpage and The

4   Erotic Review were putting reciprocal links to move back and

5   forth -- for allowing the users to move back and forth from the          15:16:10

6   website; right?

7   A.  I am familiar with the fact that other websites post and

8   have advertisements --

9           MR. STONE:  Your Honor --

10          THE WITNESS:  -- on different websites.                           15:16:21

11          MR. STONE:  -- nonresponsive.  I move to strike.

12          THE COURT:  Sustained.

13          And the answer will be stricken as nonresponsive, and

14   the jury will disregard.

15   BY MR. STONE:                                                            15:16:38

16   Q.  Ma'am, what did you review before your -- your testimony

17   here today?

18   A.  In preparation for my testimony?

19   Q.  Yes.

20   A.  Nothing that I can recall.                                          15:16:49

21   Q.  The indictment in this matter?  Did you review that?

22   A.  No, I did not review that in preparation for my testimony

23   here today.

24   Q.  Have you review -- reviewed it before?

25   A.  Yes, in the past.                                                   15:17:03

1    Q.  Have you reviewed the Senate Report that was published

2    about Backpage?

3    A.  Yes, sir, I have.  Not in preparation for testimony today,

4    but in the past, just --

5    Q.  You have reviewed it?                                    15:17:13

6    A.  -- to clarify.

7            In the past, yes.

8    Q.  Let's look at Exhibit 2046.  We were looking at this before

9    the break.

10           MR. STONE:  Why don't we focus in on -- we'll focus in   15:17:27

11   on one of these ad titles.

12   BY MR. STONE:

13   Q.  Ma'am, do you see that?

14   A.  Yes, sir.

15   Q.  And that's language for an ad on Backpage; correct?        15:17:46

16   A.  Yes, sir.

17   Q.  And it reads, "All Day All Night until," and then it reads,

18   "Sweet Greek"; correct?

19   A.  Yes, sir.

20   Q.  Do you understand what Greek means?                        15:17:57

21   A.  Yes, sir.

22   Q.  Does it mean anal sex?

23   A.  It can.  It can also mean Greek related to Greece.  But in

24   this context, I would say it's suggestive that it's related to

25   anal sex.                                                     15:18:11

KIMBERLY MEHLMAN-OROZCO - CROSS-EXAMINATION

84

```
 1   Q.  In your expert opinion?
 2   A.  Possibly.
 3   Q.  This ad's talking about anal sex?
 4   A.  Again, based off of the context, it could be.  It could be
 5   a false advertisement for anal sex.  It could be an actual       15:18:21
 6   advertisement for anal sex.
 7          But within the realm of commercial sex exchanges, the
 8   term Greek is a known pseudonym for anal sex.
 9   Q.  And the 125, 100 until 3:00 a.m., you'd agree that's an ad
10   written -- in that ad -- in that title it's talking about some   15:18:45
11   exchange of money.  Fair?
12   A.  Possibly, yes.
13   Q.  And you testified before that you -- you can't know if this
14   is a prostitution ad because it could be a fake ad.  It could
15   be a fake prostitution ad; right?                                15:19:01
16   A.  It could be a fake prostitution ad --
17   Q.  Isn't that right?
18   A.  -- that's correct.
19   Q.  And so you can't know if this was a real prostitution ad or
20   a fake prostitution ad just by looking at it; right?             15:19:12
21   A.  Or if it's a prostitution ad at all.
22   Q.  Oh, so you don't agree in your expert opinion that this
23   language is indicative of prostitution?
24   A.  It's suggestive of possible prostitution.  But in the realm
25   of possibilities, there could be other possibilities as well.    15:19:30
```

KIMBERLY MEHLMAN-OROZCO - CROSS-EXAMINATION

85

1    Q.  Within the realm of possibility, there -- it could be for

2    something else?

3    A.  Potentially.

4    Q.  Why don't we move to another one of the ad titles.

5        Going down the page, do you see this ad title, ma'am?    15:19:46

6    A.  Yes, sir.

7    Q.  "Tight, Sweet, and Discrete.  $40.  30 minutes F/S

8    Specials."

9        And you know what F/S specials are; right?

10   A.  Within commercial sex exchanges, F/S can stand for full    15:20:08

11   service, which means vaginal intercourse or full intercourse.

12   Q.  Okay.  And so this is another ad title that's suggestive of

13   prostitution in your opinion; correct?

14   A.  Possibly.

15   Q.  Okay.    15:20:25

16   A.  But it could also be a fake ad.  So it could.  Again, the

17   language is suggestive of that.

18   Q.  I think my question was, this is suggestive?

19       And so you would agree with that; right?

20   A.  Yes --    15:20:36

21   Q.  But it --

22   A.  -- it could be suggestive.

23   Q.  It could be a fake prostitution ad?

24   A.  Correct.

25   Q.  And is your testimony that -- well, let me ask you this:    15:20:42

UNITED STATES DISTRICT COURT

```
 1   You know that Backpage was earning over $100 million a year?

 2           MS. BERTRAND:  Objection.  Relevance.

 3           THE COURT:  Overruled.

 4           MS. BERTRAND:  Foundation.

 5           THE WITNESS:  I don't recall the exact number of how         15:20:58

 6   much Backpage was earning --

 7   BY MR. STONE:

 8   Q.  Would it --

 9   A.  -- per year.

10   Q.  I'm sorry to inter- -- jump over you.                           15:21:03

11           Would it surprise you to learn that they were earning

12   over $100 million a year from the years 2013 through 2017?

13           MS. BERTRAND:  Same objection.  Relevance and

14   foundation.

15           THE COURT:  Well, you can -- I'll sustain as to             15:21:14

16   foundation.

17           MR. STONE:  Well, I'm just asking is she aware, Your

18   Honor.

19           Actually, you're right.  Let me rephrase.

20   BY MR. STONE:                                                      15:21:24

21   Q.  Are you aware that between the years 2013 and 2017 Backpage

22   earned over $100 million a year?

23           MS. BERTRAND:  Same objection.

24           THE COURT:  Overruled.

25           THE WITNESS:  I don't know how much they were earning       15:21:32
```

UNITED STATES DISTRICT COURT

KIMBERLY MEHLMAN-OROZCO - CROSS-EXAMINATION

```
 1   per year or how much they were earning on any given year.

 2   BY MR. STONE:

 3   Q.  Do you know the percentage of the revenue that was from

 4   adult ads?

 5           MS. BERTRAND:  Objection.  Goes beyond the scope.      15:21:44

 6   Relevance.  Foundation.

 7           THE COURT:  Overruled.  She's testifying as an expert

 8   in the area generally, so she can answer.

 9           THE WITNESS:  Could you rephrase your question or

10   repeat it, please.                                             15:21:58

11           MR. STONE:  Madam court reporter, could you repeat it,

12   please.

13       (Record read.)

14           THE WITNESS:  No, I do not.  I don't know offhand what

15   percentage.                                                    15:22:11

16   BY MR. STONE:

17   Q.  You don't know the percentage?

18   A.  No.

19   Q.  Is it, in your expert opinion, that -- well, I'll strike

20   that.

21           We are looking at Exhibit 2- -- 2046.  And there are

22   dozens of ads for any given day here.  Is that fair?

23   A.  In -- I can't see the full exhibit, but in my experience in

24   reviewing the platform, there can be dozens of ads posted on a

25   daily basis depending on the geography.                        15:22:51
```

KIMBERLY MEHLMAN-OROZCO - CROSS-EXAMINATION

88

1  Q.  And you looked at the website a lot and were fairly -- you

2  were very familiar with it; right?

3  A.  I would say that I was very familiar with it, yes.

4  Q.  And you were familiar that there could be upwards of a

5  couple thousand ads on -- for any given city on any given day;      15:23:05

6  right?

7  A.  Again, it depends on the geography, but, yes --

8  Q.  It could be?

9  A.  -- it's possible.

10        Sure.                                                         15:23:14

11 Q.  So lots -- lots of ads.

12        And it -- do you have a sense for how many of those

13 ads were actual prostitution ads and how many were these fake

14 ads that you've testified about?

15        MS. BERTRAND:  Objection.  Calls for speculation.           15:23:25

16        MR. STONE:  She's an expert, Your Honor.

17        THE COURT:  Overruled.

18        THE WITNESS:  No, because, as I testified to earlier,

19 it's not possible to discern from simply looking at the ad

20 which ones are fake, which ones are actual, which ones were put    15:23:37

21 up by law enforcement, which ones were put up by service

22 providers or researchers, for example.  Academics have

23 published peer-review journal articles if they're posting the

24 fake ads and responses to them.

25        So from looking at this, it's not possible from an           15:23:54

```
 1   empirical reliable perspective to determine what percentage
 2   were sex work, non-sex work, alleged sex work -- sex work or
 3   purported sex work.  It's not possible to determine.
 4   BY MR. STONE:
 5   Q.  Okay.  In looking at these ads, would you agree that they      15:24:08
 6   are suggestive of prostitution?
 7   A.  Do you want me to comment on one particular ad or --
 8   Q.  I just --
 9   A.  -- all of them?
10   Q.  I'd like you to answer my question, which is, in looking at     15:24:26
11   these ads on this exhibit, are these ads suggestive of
12   prostitution?
13   A.  And the answer to that is possibly, but I can't see the
14   full ad from this high-level listing.
15           So, for example, one says, "I'm lovely blonde Amanda        15:24:46
16   and I've got big, big boobs."
17           That in and of itself is not suggestive of sex work.
18   And I don't know what's inside of that advertisement.  I don't
19   know who responded to it.
20           So, again, from looking at the ad, I cannot discern         15:25:01
21   what is sex work or prostitution or non-sex work.  But some of
22   them, like the one you have highlighted, yes, it can be
23   suggestive -- suggestive of sex work.
24   Q.  In your experience, was Backpage making most of its money
25   off fake prostitution ads?                                         15:25:17
```

```
 1              MS. BERTRAND:  Objection.  Foundation.
 2              MR. STONE:  I'm laying foundation.  She's testified
 3     about fake prostitution ads.
 4              THE COURT:  Hold on.
 5              Sustain the objection, Mr. Stone.                    15:25:30
 6     BY MR. STONE:
 7     Q.  Well, in -- in your experience, had -- when you go through
 8     a website like Backpage.com, where there's pages and pages of
 9     these ads, is it your experience that half of them are fake
10     ads?                                                          15:25:56
11     A.  Again, as I had mentioned to you previously, you cannot
12     discern which one of them is fake or not fake.  And so it's not
13     quantifiable.  I cannot tell you if it's 50 percent or 75 or
14     90.  There are no reliable data for any expert to testify to on
15     the percentage of these ads that were fake or posted by a      15:26:16
16     non-sex worker versus a sex worker versus a prostitute versus a
17     trafficking victim.  That data does not exist.
18     Q.  Perhaps I misunderstood your direct examination where you
19     testified that you actually spoke with people who were posting
20     ads and went out and met people who had posted ads on Backpage. 15:26:35
21              Was that right?
22     A.  Yes, sir, that is correct.
23     Q.  And, in your experience for that, were over half fake ads?
24     A.  As I had described early on, there's a difference between
25     quantitative data, where you can quantify and give a           15:26:55
```

UNITED STATES DISTRICT COURT

1    percentage, versus qualitative data.

2             What you're describing is a qualitative interview, in

3    which case you cannot generalize and say what percentage.  It

4    would not be deemed reliable.  You do not have the power to

5    estimate a percentage based off of that.                    15:27:12

6             And so the way that you've asked that question is,

7    what percentage?  It's not possible to calculate using

8    qualitative data.

9    Q.  Got it.

10            So your testimony is that in looking at a Backpage    15:27:22

11   website, you can't tell what the ads are for prostitution or

12   how many of the ads are for prostitution?

13   A.  In looking at --

14   Q.  It's yes or no, ma'am.

15   A.  Could you repeat the question?                           15:27:38

16            I understand, but as an expert I -- sometimes it's not

17   possible.  So I don't -- if you want to repeat the question.  I

18   can't --

19   Q.  Sometimes it's not possible --

20   A.  It's not --

21   Q.  -- to answer yes or no?

22   A.  -- possible to answer yes or no.

23            THE COURT:  Okay.  Don't talk over one another,

24   please.

25            MR. STONE:  I'll ask it again, Your Honor.          15:27:52

```
 1    BY MR. STONE:
 2    Q.  Your testimony is that you don't know how many of these ads
 3    are prostitution ads?  Yes or no?
 4    A.  It is my testimony that it is not possible to calculate.
 5    So, no, I do not.                                              15:28:08
 6    Q.  Okay.  So you -- your testimony isn't all that helpful to
 7    the jury on this part, is it?
 8              MS. BERTRAND:  Objection.  Objection.  Argumentative.
 9              THE COURT:  Sustained.
10    BY MR. STONE:                                                  15:28:24
11    Q.  Let me just switch gears for a second, ma'am.
12              You've provided your definition of commercial sex
13    today; correct?
14    A.  Yes, sir.
15    Q.  And that's your understanding and your opinion; right?     15:28:32
16    A.  Of the overarching what commercial sex encompasses, yes.
17    That is a simplified explanation of it.
18    Q.  That's your opinion?
19    A.  Yes, sir.
20    Q.  And you understand that the Court will instruct the jury on 15:28:46
21    the law at the end of this case, do you not?
22    A.  Absolutely.
23    Q.  And it may be different from your definition; right?
24    A.  Yeah, I -- yes.  I understand that it may be different than
25    what my definition is.  And I understand what my role is as an 15:29:01
```

UNITED STATES DISTRICT COURT

1    expert witness.

2    Q.  All right.  Let's look at Exhibit 214, which has been

3    admitted.

4              MR. STONE:  And I ask that it be published.

5              THE COURT:  Yes, it may be published.          15:29:22

6    BY MR. STONE:

7    Q.  Ma'am, do you see this exhibit that's on your screen?

8    A.  Yes, sir.

9    Q.  And can you tell if that's a Backpage ad?

10   A.  Yes, it appears to be a Backpage ad.                 15:29:34

11   Q.  And your testimony is that you can't tell if this ad's for

12   prostitution; right?

13   A.  From the ad alone, no, it is not possible to discern and

14   confirm that this is a prostitution advertisement.

15   Q.  Because it could be a fake ad?                        15:29:51

16   A.  It could be a fake ad.

17   Q.  All right.  Let's look at 214a, which is admitted.

18              And is this a Backpage ad?

19   A.  Yes, it appears to be a Backpage ad as well.

20   Q.  And this is another ad that you cannot determine whether    15:30:06

21   it's an ad for prostitution?

22   A.  From looking at this ad alone, I cannot confirm whether it

23   is a verified ad for prostitution or not.

24   Q.  Because, again, it could be a fake ad?

25   A.  It absolutely could be a fake ad.                     15:30:22

KIMBERLY MEHLMAN-OROZCO - CROSS-EXAMINATION

94

```
 1   Q.  All right.  How about Exhibit 222, which is admitted?
 2          Is this a Backpage ad, ma'am?
 3   A.  It appears to be a Backpage ad, yes.
 4   Q.  And you can't determine if this ad is for prostitution;
 5   correct?                                                        15:30:42
 6   A.  In and of itself, no.  It does not appear that there's
 7   anything that can confirm or create a determinative opinion on
 8   whether this is a confirmed advertisement for prostitution or
 9   not.
10   Q.  Would there be anything that the ad could say that would    15:30:55
11   confirm that it's an ad for prostitution, in your opinion?
12   A.  In and of the ad itself, without corroboration from
13   external sources, no, I don't think there's anything that can
14   make a determinative conclusion.  And in my experience, that's
15   my understanding of why the ad in and of itself is not          15:31:28
16   typically actionable.
17   Q.  Okay.  So if there was an ad -- I'm going to give you a
18   hypothetical here, ma'am -- that read, I will give you sex for
19   $150, that ad in and of itself would not -- that language would
20   not be enough for you to determine whether that ad was for      15:31:51
21   prostitution?
22   A.  That language alone is not enough to determine it's an ad
23   for prostitution, especially considering that I have personally
24   worked on cases where the defendant posted ads like that and
25   ended up robbing people and not providing commercial sex        15:32:11
```

UNITED STATES DISTRICT COURT

 1  services.

 2  Q.  It was a fake prostitution ad in that case?

 3  A.  In that particular anecdotal example, yes, it was a fake

 4  ad.

 5  Q.  So there could be a web page -- or a website with a million    15:32:23

 6  ads, each one of them says $100 for sex, but in your opinion we

 7  wouldn't be -- we wouldn't know whether all those ads were for

 8  prostitution or not?

 9  A.  You would not.

10          MS. BERTRAND:  Objection.  Asked and answered, Judge.    15:32:41

11          THE COURT:  Overruled.

12          THE WITNESS:  So the question is, if there is a

13  website with 100 ads, I would not be able to determine whether

14  they were all fake or real based off of that itself?

15  BY MR. STONE:    15:32:55

16  Q.  Well, it -- close, but maybe I'll break it down because it

17  was a long question.

18          All right.  Here's another hypothetical for you,

19  ma'am.  All right?  Are you with me?

20  A.  I'm with you.    15:33:02

21  Q.  Website --

22  A.  Uh-huh.

23  Q.  -- has a million ads on it --

24  A.  Okay.

25  Q.  -- and each ad says $100 for sex.    15:33:06

1    A.   Okay.

2    Q.   Are you able to determine whether those are ads for

3    prostitution?

4         MS. BERTRAND:   Objection.   Speculation.   Hypothetical.

5    Lack of foundation.                                        15:33:17

6         THE COURT:   Overruled.   It's within her realm of

7    testimony.

8         THE WITNESS:   Again, I would not be able to conclude

9    whether each individual one was conclusive or whether it was an

10   ad for prostitution.                                       15:33:30

11        Now, if there were 100 million ads, is it likely --

12   more likely than not, based off of probabilities, that some of

13   them might be prostitution?   Yes, it is possible.   And it is

14   probable that some of them would be for prostitution.   And some

15   of them would be potentially for sugar dating, and some of them  15:33:46

16   would be fake, and some of them would be posted by law

17   enforcement, and some of them might be posted by victim service

18   providers.

19        So there's just a number of different hypotheticals

20   that could explain the posting of that ad, and from the ad    15:34:00

21   itself you would not be able to conclude one way or another.

22        MR. STONE:   All right.   Just a moment, Your Honor.

23   BY MR. STONE:

24   Q.   All right.   Just one more exhibit, ma'am.

25        This is Exhibit 218 that has been admitted.           15:34:37

1          MR. STONE:  So I'll ask that it be published.

2    BY MR. STONE:

3    Q.  All right.  And is this a Backpage ad?

4          MR. STONE:  Why don't you back up so she can see it.

5          THE WITNESS:  It's a bit cut off, but, yes, it appears       15:34:58

6    to be a Backpage ad.

7    BY MR. STONE:

8    Q.  Okay.  And then we'll zoom in on the language of the ad.

9          And in the middle it says, "I do half hour sessions

10   that vary in donation prices.  80 for head, $120 for hooking up     15:35:15

11   without head, and 150 for hooking up with head."

12         Do you see that?

13   A.  Yes, sir, I do.

14   Q.  So consistent with your testimony, this would be an ad that

15   you would not be able to determine was for prostitution?            15:35:29

16   A.  It absolutely could be an ad for prostitution, but there's

17   no way to determine one way or another.  It could also be a

18   fake ad.

19         Typically ads will also sometimes say these pictures

20   are true, because fraudulent pictures or pictures sourced from      15:35:43

21   other websites can be posted in ads that do not comport with

22   whoever the poster is.

23         So this could be an ad for prostitution for certain,

24   but there's no way to verify from the language in the ad

25   itself.                                                             15:36:00

KIMBERLY MEHLMAN-OROZCO - REDIRECT EXAMINATION          98

```
 1   Q.  But you can't say for certain; right?
 2   A.  Yes, sir.
 3          MR. STONE:  All right.  That's it, Your Honor.  Thank
 4   you.
 5          THE COURT:  All right.  Ms. Bertrand.                    15:36:12
 6                    REDIRECT EXAMINATION
 7   BY MS. BERTRAND:
 8   Q.  Doctor, what is your hourly rate in this case, if you know
 9   offhand?
10   A.  My recollection is that it was approved for 350 an hour.    15:36:40
11   That's $350.
12   Q.  Right.  Right.
13          You talked with the government about where
14   prostitution is legal, and you mentioned Nevada in some places?
15   A.  In some counties in Nevada.                                 15:37:04
16   Q.  Do you happen to know which counties in Nevada allow?
17          MR. STONE:  Objection.  Relevance.
18          THE COURT:  Sustained.
19   BY MS. BERTRAND:
20   Q.  But there are some counties in Nevada that allow it?       15:37:20
21   A.  Yes, ma'am.
22   Q.  You talked with the government at length about what you can
23   tell from the face of an ad.
24          They just passed you back to me; right?
25   A.  Yes, ma'am.                                                 15:37:51
```

KIMBERLY MEHLMAN-OROZCO - REDIRECT EXAMINATION
99

1    Q.  And so we're clear, for all we know, with any given ad,

2    before we have any background on the ad, for all we know it

3    could be for any number of purposes; correct?

4            MR. STONE:  Objection.  Leading.

5            THE COURT:  I'll overrule.                          15:38:09

6            THE WITNESS:  The question was for any number of

7    purposes?

8    BY MS. BERTRAND:

9    Q.  Sure.

10   A.  Correct.                                                15:38:16

11   Q.  In your experience, have you ever met a commercial sex

12   worker who was actually an escort?

13   A.  An escort as in somebody who is not providing sexual

14   services for money but just for their time?  Yes.

15   Q.  Have you known whether or not those escorts that you've met  15:38:39

16   advertised online?

17   A.  Yes.  I think that most escorts do in this day and age

18   advertise on -- online.

19   Q.  Is it -- you were talking with the government about The

20   Erotic Review.                                             15:39:27

21           What has been your experience with whether or not

22   posts regarding the same provider are consistent?

23           MR. STONE:  Objection.  Asked and answered, I think,

24   Your Honor.

25           THE COURT:  I'll overrule.                         15:39:50

UNITED STATES DISTRICT COURT

1          THE WITNESS:  It depends.  Oftentimes I would say it's

2     more often than not there is variation in a review of a

3     purported provider.  And by that I mean there might be

4     inconsistencies with the description of the provider, the

5     alleged service provided, the amount of money exchanged.          15:40:14

6          Sometimes providers will use the acronym YMMV, which

7     stands for your mileage may vary, which is indicative -- you're

8     making a face that you haven't heard of that one.

9     BY MS. BERTRAND:

10    Q.  I've never heard of that one.                                 15:40:33

11    A.  It's indicative of you might have different experiences

12    with this same person.  So, for example, one person could

13    patronize somebody who's claiming to provide an erotic massage

14    and no sexual services are exchanged, and another person might

15    receive F/S, or full service, and another person might receive   15:40:55

16    Greek.  And some of those services might be turned down for

17    various -- a variety of reasons.  But commercial sex providers

18    often exert their agency to choose what they will do and if

19    they will do something.

20         THE COURT:  I'm sorry, but I lost the question in that       15:41:15

21    narrative.  So let's ask --

22         MS. BERTRAND:  Let's have --

23         THE COURT:  -- a new question.

24         MS. BERTRAND:  -- the court reporter -- oh, okay.

25    Sorry.                                                            15:41:24

```
1              THE COURT:  Well, ask a new question.

2              And answer only the question asked, please.

3              THE WITNESS:  Okay.  I apologize.

4    BY MS. BERTRAND:

5    Q.  Would there be any relationship that Backpage had with      15:41:51

6    other sites like The Erotic Review that would change any of the

7    opinions you've offered today?

8    A.  As far as whether you can discern from an ad whether it is

9    sex work or not?  No.  It -- any relationship or exchange or

10   cross-posting does not change the -- do not -- does not change   15:42:20

11   those opinions.

12             MS. BERTRAND:  May I just check with my colleagues --

13             THE COURT:  Yes.

14             MS. BERTRAND:  -- please, just to make sure?

15             Your Honor, I have nothing further.  Thank you.        15:42:30

16             THE COURT:  Okay.

17             MS. BERTRAND:  I'd ask that this witness be excused.

18             THE COURT:  Yes.  May she be released from subpoena?

19             MS. BERTRAND:  Yes.

20             THE COURT:  Any objection?                             15:42:40

21             MR. STONE:  No objection, Your Honor.

22             THE COURT:  Ma'am.  Thank you for your testimony.  You

23   may step down.  You are excused.

24             THE WITNESS:  Thank you.

25             THE COURT:  All right.  Members of the jury, this is   15:42:50
```

1    our last witness of the day, and so you -- you have a early

2    dismissal.  And we will delay a start time for you tomorrow.

3    There are some procedural matters that I have to discuss that

4    may take a little bit of time, and I don't want you to be just

5    waiting around in the jury room.  And so I think we can get          15:43:13

6    everything done and ready for you to resume your chair, and if

7    you would be ready to come into court at 1:00 p.m. tomorrow

8    afternoon.  And we will continue on until the routine 4:30 p.m.

9    finish for the day.

10           And, again, it's vitally important for you to continue        15:43:39

11   to keep an open mind; not to make any determination, either

12   individually or collectively; to even discuss the matter

13   amongst yourselves, with your family members, or anyone else;

14   not to conduct any research about the people that we've heard

15   from or the places that have been discussed.  Just to continue       15:44:00

16   to keep that open mind until we have handed the case over to

17   you.

18           And so I'll expect you to be available and ready to

19   resume your seat at 1:00 p.m. tomorrow.

20           All rise for the jury.                                        15:44:13

21        (Jury not present at 3:44 p.m.)

22           THE COURT:  All right.  Again, I remind those who are

23   present in the courtroom to permit the jurors to leave

24   uninterrupted.  Do remain in the courtroom for a few

25   more minutes.                                                        15:44:54

```
1          And at this point -- let me clarify.  I may have
2    misspoke.  The start time tomorrow will be 9:30 for counsel,
3    and at that time we will hopefully perfect those final jury
4    instructions that are outstanding.  And because we are at the
5    posture where none of the defendants are going to testify,          15:45:19
6    there are no other witnesses, Mr. Lincenberg had an opportunity
7    to renew his Rule 29 motion.
8          Is there anyone else who wishes to be heard?
9          MR. FEDER:  On the Rule 29 or something different?
10         THE COURT:  On the Rule 29 right now.                          15:45:41
11         MR. EISENBERG:  Your Honor, if I may go forward --
12         THE COURT:  Yes.
13         MR. EISENBERG:  -- at this point?
14         I do renew my motion.  I'm not going to make any
15   further argument.  I don't think there was anything covered in      15:45:53
16   the government's -- I'm sorry -- in the -- yeah, since the
17   motion was made before that would cast any new light on it, on
18   my motion.
19         THE COURT:  All right.  Thank you, Mr. Eisenberg.
20         Mr. Feder?                                                     15:46:07
21         MR. FEDER:  Same as Mr. Eisenberg.
22         THE COURT:  You adopt his well-reasoned argument?
23         MR. FEDER:  As always.
24         THE COURT:  All right.  Yes, Ms. Bertrand.
25         MS. BERTRAND:  I join with my colleague,                       15:46:16
```

1    Mr. Eisenberg, as well.

2            THE COURT:  All right.  Thank you.

3            Mr. Cambria?

4            MR. CAMBRIA:  Yes, Your Honor.  What I had indicated

5    in the past, and also I think that with regard to Count 100 in        15:46:25

6    the face of the FBARs that are now in evidence and

7    unchallenged, that concealment issue has been resolved and that

8    for that -- for that reason, you know, we have alleged that

9    there wasn't sufficient evidence to go forward on any of the

10   counts, but clearly documentary evidence with regard to           15:46:52

11   Count 100.

12           And at some time today -- I'm still a little confused

13   about the schedule for summations vis-a-vis settling the

14   instructions.  I would like to be in a position to know the

15   final instruction before I start tuning up my summation.  And I       15:47:11

16   don't know how that logistically can happen with the schedule

17   that you've set from the standpoint for, you know, if we don't

18   resolve that until tomorrow, which apparently is the current

19   schedule.

20           THE COURT:  Can you come forward to the podium?  I'm         15:47:31

21   just having --

22           MR. CAMBRIA:  Certainly.

23           THE COURT:  -- a little bit of a difficulty.  It's a

24   bit of a strain.  You're --

25           MR. CAMBRIA:  I'm sorry about that, Your Honor.             15:47:39

```
 1          Anyway, obviously I would like to have the benefit of

 2   the final instructions before a -- you know, I put my summation

 3   together.  And it looks like, at least from what you're

 4   suggesting, that there's a potential that defense might sum up

 5   Friday or -- as opposed to simply putting -- do it all on         15:47:58

 6   Thursday -- do it all on Tuesday.  And this way we've got the

 7   instructions, if we could tune up our summations, and counsel

 8   can talk about making sure we don't repeat things that

 9   shouldn't be repeated, and all the rest of it.

10          THE COURT:  I'm -- I'm going to quote a description         15:48:21

11   that you gave me very early on.

12          MR. CAMBRIA:  Uh-oh.

13          THE COURT:  "I was born ready."

14          MR. CAMBRIA:  Oh, I didn't say -- I didn't say that,

15   Your Honor.                                                        15:48:34

16          THE COURT:  Oh, I have -- I think it's --

17          MR. CAMBRIA:  No, I did say that.  Oh, I agree I said

18   that, but I -- the final instructions are pretty critical to

19   which way I'm going to go.

20          THE COURT:  All right.  So let me then clarify for          15:48:47

21   you.  And I certainly -- the government can chime in here with

22   what -- my expectations may be higher than -- than they --

23   their own.

24          What -- because we need the morning to perfect those

25   final instructions.  I need to have time to do that myself.  I     15:49:09
```

1    want to make sure that you're able to make a record on those

2    objections.  I've got to have them ready in a perfected manner

3    so that the jury can follow along.  There are voluminous jury

4    instructions.  That's going to take a while.  I will then

5    permit the government to begin their opening [sic] argument.                15:49:32

6          You're all aware of the number of counts and the

7    amount of evidence.  I anticipate -- and correct me if I'm

8    wrong.  Maybe there's some super expeditious way that the

9    government intends to do this, but I anticipate roughly they

10   start their opening around 3:00 o'clock maybe, 2:30, whenever          15:49:56

11   we come back from a break.  Because this jury has been promised

12   to be released at 4:30, my guess is they'll have to continue

13   their closing argument Friday morning.

14         The length of the opening argument wasn't that lengthy

15   for the government, but I don't know who's making the                   15:50:22

16   summation, but how long you intend to go?  At least at this

17   point, I would think that you have an approximate length of

18   time.

19         MR. RAPP:  About an hour and a half.

20         THE COURT:  Hour?                                                  15:50:41

21         MR. RAPP:  Hour and a half to an hour and 45 minutes.

22   I mean, I really -- you're right.  There's 100 counts, but

23   we -- we are endeavoring to get through.  We just think there's

24   diminishing returns after a couple hours.

25         THE COURT:  You're right.  We have attention span                 15:51:03

1    issues of everyone.  My -- I always tell counsel that the

2    average opening argument should be no more than 20 minutes,

3    because after that you get a little fidgety from the jury.

4          But, in any event, so let's ballpark it at two hours.

5          MR. RAPP:  Fair enough.                                15:51:27

6          THE COURT:  So the defense should be ready to proceed

7    with their closing Friday.  And the reason why this is so is

8    because, as I mentioned before, we have that tight window of

9    time in which you're going to each individually make your

10   closing arguments, government's going to have an opportunity to   15:51:53

11   make their rebuttal close, and then we have the jury

12   deliberation time.  And depending on how that goes, then we

13   have the potential of the forfeiture matter.  And so that abuts

14   us right to the day that they're going to -- that their service

15   is to end and that we assured them that they would end.        15:52:21

16         And so certainly one of you will be ready by Friday.

17   You'll have those jury instructions in hand.  And so that's how

18   we will proceed.

19         All right.  So with that, be prepared to come in at

20   9:30.  And I will have my courtroom staff direct you to the    15:52:46

21   jury instructions that I am going to primarily focus on so

22   it'll hopefully shortcut that time as well.

23         MR. RAPP:  Judge, I just have a small housekeeping

24   matter.

25         In our -- in our trial brief that we filed before the   15:53:06

1  trial, we had requested that we be given the opportunity to

2  provide photographs of the witnesses to the jury as the trial

3  went along because of the length of the trial so they could

4  correlate the testimony with the -- with the particular

5  witness.  The Court wasn't inclined to allow us to do that,          15:53:28

6  which was fine.

7          Obviously, we -- we have taken pictures of these

8  witnesses, and we have -- we intend in our argument to have

9  those pictures, for example.  You know, obviously the postings

10 of the victims who testified to their postings, they look quite      15:53:44

11 different now, and so the jury should be, obviously, allowed to

12 recall which -- what the witness looked like on the stand.

13         And so we have that for all of our witnesses so they

14 can understand who it was who said what and -- and all that so

15 they can understand this evidence in a two-month trial with          15:54:03

16 nearly 2,000 exhibits.

17         With respect to the defendants, we have never obtained

18 their booking photos.  We have very vanilla driver's license

19 photos.  The same argument goes for them, so they can

20 understand it.  And, as the Court might recall, at some point        15:54:22

21 during this trial I think this jury didn't know who was who.

22 They -- they wanted to have them introduced again.

23         And so we would ask that we be able to use these very

24 vanilla photographs that are nothing more than driver's license

25 photographs -- they're not booking photos.  They're not in          15:54:40

1    jumpsuits.  There's not one of those things that you see in

2    booking photos -- so they can understand what -- what witness

3    is -- what defendant is saying something in a particular email

4    or in a particular meeting so the jury is not confused about

5    that.                                                             15:55:00

6              So that's -- that's our request.

7              MS. BERTRAND:  Your Honor, the defense objects to

8    which -- to the -- well, first of all, to the fact that they

9    continue taking pictures of witnesses after the Court told them

10   not to.  That's issue 1.                                          15:55:12

11             Second of all, the defendants are sitting right here.

12   And they didn't have that many witnesses.  It's not that hard

13   to keep track of them.  And what the jury wanted to be reminded

14   of is, frankly, what lawyers are assigned to whom, not that

15   they had trouble following along with the evidence or who's      15:55:29

16   who.  These have not been entered into evidence.  They're --

17   they're not evidence.  They -- they're not properly proffered

18   as what, demonstratives?

19             But I think the bigger -- I go back to the judge told

20   them -- this Court told them not to do it, and they did it       15:55:50

21   anyway.  And now they're coming to you and saying, let us use

22   it.

23             That's not okay.

24             THE COURT:  Well, let me -- let me just make a couple

25   observations.  This has been a very lengthy trial.  There have   15:56:03

been a number of witnesses who have testified.  The witnesses

that the government is proposing, I think, are those individual

people who appeared and testified that that was their ad.  And

even though the length of the -- the trial may tax the

witness's [sic] memory, I think if you can do a good enough job          15:56:36

at describing the witness on the witness stand -- this has been

a very attentive jury, and they have been very observant.

They've been taking notes.  And so my sense is they will have

recall, and I don't think the photographs are necessary.

        I made the observation when you proposed using the          15:57:09

photographs of the individual defendants in the beginning that

they looked like possible booking photographs.  And I apologize

that they were not, and they are obviously driver's license

photos.  And even so, I agree with Ms. Bertrand that the --

this jury has seen these individuals in court every day, and so          15:57:37

I don't think it's necessary to bring photographs forward in a

PowerPoint or any sort of fashion.  They can -- they can see

them for themselves.  And so I'm not going to permit it.

        All right.  So with that, then we will see you at

2:00 -- 2:30 -- 9:30 tomorrow morning.          15:57:58

        Wait.  All counsel meet with Liliana.  She's going to

give you the list of exhibits that have been admitted into

evidence.  She's going to require someone from the government

and every defense counsel to certify that what was admitted is

going back.  It's your signature, so make sure you do that.          15:58:22

UNITED STATES DISTRICT COURT

1    Meet with her in terms of those exhibits, and do so sooner

2    rather than later, especially if we're going to move towards

3    opening instructions.  In any event, I would say by tomorrow

4    after we let the jury go, you should make that your first

5    priority, because we're going to immediately send those back to        15:58:49

6    the jury.

7           All right.  With that, we will stand in recess until

8    9:30 tomorrow.

9           MR. FEDER:  And, Judge, would the Court entertain a

10   character witness jury instruction?                                     15:59:02

11          THE COURT:  Did you provide one?

12          MR. FEDER:  I have not provided one, but there -- the

13   character witness just testified today.  I can get you

14   something overnight.

15          THE COURT:  Share it with the government.  If you can           15:59:12

16   come to agreement, that's better.  If not, then I'll look at

17   it, but submit it no later than 7:00 o'clock this evening.

18          THE COURTROOM DEPUTY:  All rise.

19      (Proceedings adjourn at 3:59 p.m.)

20                            ---oOo---

21

22

23

24

25

```
1
2
3
4
5                    C E R T I F I C A T E
6
7           I, CATHY J. TAYLOR, do hereby certify that I am duly
8    appointed and qualified to act as Official Court Reporter for
9    the United States District Court for the District of Arizona.
10          I FURTHER CERTIFY that the foregoing pages constitute
11   a full, true, and accurate transcript of all of that portion of
12   the proceedings contained herein, had in the above-entitled
13   cause on the date specified therein, and that said transcript
14   was prepared under my direction and control.
15          DATED at Phoenix, Arizona, this 25th day of October,
16   2023.
17
18
19                           /s/ Cathy J. Taylor
20                           Cathy J. Taylor, RMR, CRR, CRC
21
22
23
24
25
```