Paul J. Cambria, Jr. (NY Bar No.1430909, admitted *pro hac vice*)
Erin McCampbell Paris (NY Bar No. 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:   (716) 855-1580
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Michael Lacey*

Gary S. Lincenberg (CA Bar No. 123058, *admitted pro hac vice*)
Ariel A. Neuman (CA Bar No. 241594, *admitted pro hac vice*)
Gopi K. Panchapakesan (CA Bar No. 279856, *admitted pro hac vice*)
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW PC
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110
glincenberg@birdmarella.com
aneuman@birdmarella.com
gpanchapakesan@birdmarella.com
*Attorneys for John Brunst*

Additional counsel listed on next page

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | NO. CR-18-00422-PHX-DJH |
| Plaintiff, | **DEFENDANTS' BRIEF IN SUPPORT OF DEFENDANTS' PROPOSED JURY VERDICT FORM ON FORFEITURE** |
| vs. | |
| Michael Lacey, *et al.*, | |
| Defendants. | |

Eric Kessler
KESSLER LAW GROUP
6720 N. Scottsdale Rd., Suite 210
Scottsdale, AZ  85253
Telephone: (480) 644-0093
eric@kesslerlawgroup.com
*Attorney for Scott Spear*

Bruce Feder (AZ Bar No. 004832)
FEDER LAW OFFICE PA
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: (602) 257-0135
bf@federlawpa.com
*Attorney for Scott Spear*

Defendants file the Defendants' Brief in Support of Defendants' Proposed Jury Verdict Form on Forfeiture, by and through their undersigned counsel. Several fundamental forfeiture principles support the Defendants' position that their request for the jury to determine the requisite nexus between the property and any crime of conviction also necessarily requires the jury to determine the amount of forfeiture for any asset the jury finds forfeitable. Indeed, it appears that the Government agrees with Defendants, as they have not objected to the inclusion of the phrase "and if so, how much of that property should be forfeited" in Defendants' proposed modified jury instruction No. 3. *See* Dkt. 1943 at 4.

First, it is well-settled that forfeiture is limited to the proceeds that a defendant obtained as a result of the crimes of conviction. In *Honeycutt v. United States*, 581 U.S. 443 (2021), the Supreme Court unanimously held that forfeiture under 18 U.S.C. § 853 "is limited to property the defendant himself actually acquired as the result of the crime." *Id.* at 454. The Ninth Circuit has extended this holding to other forfeiture statutes. *See, e.g.*, *United States v. Thompson*, 990 F.3d 680, 691 (9th Cir. 2021) ("To forfeit money from Thompson, the district court was required by Section 981 to find that the amount forfeited came to rest with him *as a result of his crimes*." (emphasis added)). Thus, there must be a determination as to what the defendant "actually acquired" as to each asset at issue. *Honeycutt*, 581 U.S. at 454.

Second, the Ninth Circuit limited forfeiture to the criminal proceeds received by a defendant even prior to *Honeycutt*. For example, in *United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997), the Ninth Circuit reversed a judgment of forfeiture entered against an ophthalmologist convicted of Medicare and insurance fraud. In that case, the government sought and obtained forfeiture of an entire bank account on the basis that proceeds of the crimes of conviction were deposited in the account. The Ninth Circuit rejected that type of forfeiture, recognizing that the "government, not the defendant, had the burden of showing the sources of all the moneys in the account" were the proceeds of crime in order to obtain forfeiture of the entire account, which the government had failed to do. *Id.* at 1293.

The jury's determination of the amount subject to forfeiture will be particularly important here, since the government's own exhibits demonstrate that it seeks to forfeit

3

numerous properties where it can trace only a very small portion of the asset to funds originating with Backpage. For example, the first page of the government's proposed forfeiture phase summary exhibit shows the government seeks to forfeit Michael Lacey's primary residence, valued at approximately $3,000,000, even though the government can establish that, at most, $112,461.58 in unspecified proceeds from Backpage may have been used to make mortgage payments.

Third, unless a company is a necessarily illegal enterprise, with no legitimate purpose whatsoever (*e.g.*, the Noriega drug cartel), the government must prove that the revenues of the company were the proceeds of crime, rather than the proceeds of legal business activities. For example, in *Rutgard*, the Ninth Circuit rejected the government's claim that an ophthalmologist's entire "practice was a fraud" and, therefore, that all revenue earned by the practice could be presumed to be the proceeds of crime during the forfeiture phase of the trial. *See Rutgard*, 116 F.3d at 1293. The Ninth Circuit held that the government failed to establish that the ophthalmologist's practice was an illegal company with no legitimate purpose for three reasons: (1) the government did not charge the company as a criminal enterprise under RICO, nor did it establish a conspiracy among the various employees of the practice who testified; (2) the government's own proof demonstrated that segments of the ophthalmologist's practice had nothing to do with fraud, such as treatments for glaucoma; and (3) the jury acquitted certain counts of the indictment and the Ninth Circuit reversed convictions on certain other counts. *See id.* at 1287-90. The government's failure to prove that each and every aspect of the practice was illegal meant that the government could not ask the jury to presume that all of the practice's revenues were criminal proceeds. Instead, the government was required to trace the revenue to the crimes of conviction.

Here, the government's proof at trial suffers from even greater infirmities. The government not only did not charge the case – or put on any proof at trial – that all content on Backpage.com was illegal or that all its revenues were criminal proceeds. Indeed, there is no dispute that Backpage had hundreds of millions of ads in non-adult sections. The Government's own exhibit, Exhibit 1480, shows that anywhere from 3% to 7% of revenue

earned came from the categories on the website other than adult, including ads for real estate, rentals, musicians, automotive, and more.

Additionally, this Court and the jury must presume that the publication of all content on Backpage.com was protected by the First Amendment, unless the government proved beyond a reasonable doubt that an ad "propose[d] an illegal transaction." The government introduced evidence about the content of the fifty charged advertisements, as well as some additional ads (or ad titles), but the government put on no proof regarding the millions of other adult ads posted on the Backpage.com over its 14-year time history or whether any of those ads proposed an illegal transaction (much less that *all* of them did so). Indeed, the Government only sought to prove the Travel Act's "business enterprise" requirement as to the 50 ads (eliciting testimony regarding the conduct of a pimp, that he had no other legitimate income, etc.). Ferrer's testimony that all Backpage.com escort ads were "prostitution ads" cannot provide a basis for the government to forfeit all revenues earned by Backpage.com. Ferrer's testimony plainly was unreliable for many reasons, including his own admission that he had looked at no more than tens of thousands of ads over 14 years on a website that had many millions of ads posted each year. Under the Court's instructions to the jury, Backpage.com's publication of an ad would not lose the protection of the First Amendment just because it was an ad associated with prostitution (or, in Ferrer's words, a "prostitution ad"). Rather the ad had to "propose[] an illegal transaction," which could be determined only by examining each ad. Moreover, prostitution is not a federal crime. The government is bound by the case it charged under the Travel Act, which requires a showing of specific intent to promote a business enterprise involved in prostitution.

In any event, on cross-examination Ferrer admitted that he was only making what he called an "educated guess" about whether adult ads on Backpage.com were associated with prostitution. Ferrer's guesses about ads he never saw, posted by people about whom he knew nothing, about is evidence of nothing—not proof beyond a reasonable doubt that every adult ad on Backpage.com over a 14-year time period in "proposed an illegal transaction." Law enforcement officers paid for sting ads on the website. Non-profit organizations paid for their

5

own sting ads on the website. Law enforcement officers testified that there was no probable cause to make an arrest based on the face of an ad alone (noting that the ad is the "first step"), even when considering one of the charged ads that contained "sex for money" language. In other words, the law enforcement officers testified that from the face of an ad they could not even determine that there was a "fair probability" that an ad was a solicitation of prostitution. *Kaley v. United States*, 571 U.S. 320, 338 (2014) ("Probable cause, we have often told litigants, is not a high bar: It requires only the 'kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'""). The defense's expert also testified that there are many lawful commercial sex activities and that it is impossible to know whether an ad was an ad for prostitution without meeting with the person who published the ad, even if an ad was suggestive of prostitution. For all these reasons, to forfeit property the government must prove, and the jury must determine, both that the Backpage.com revenues on which its proposed forfeitures are based were generated by ads whose publication was not protected by the First Amendment and that the property sought to be forfeited is traceable to Travel Act violations or a money laundering offense (and that the specified unlawful activity underlying such money laundering offenses *was a Travel Act violation*).

Fourth, the forfeiture of an entire asset (here, a residence or bank account) on the basis that some small amount of tainted funds was used to purchase or maintain a home or was deposited into a bank account would be a disproportionate penalty in violation of the Excessive Fines Clause of the Eighth Amendment as articulated by the Supreme Court. *See United States v. Bajakajian*, 524 U.S. 321, 337 (1998) ("If the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense, it is unconstitutional."). The Ninth Circuit has recognized that the Supreme Court's Excessive Fines Clause analysis applies to any forfeiture that is "tied to the commission of a crime." *See, e.g.*, *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1119 (9th Cir. 2004) (recognizing that any forfeiture, even a civil forfeiture, that is, among other things, "tied to the commission of a crime," is punitive and subject to excessive fines analysis); *United States v. Real Property 874 Gartel Dr.*, 79 F.3d 918, 924-25 (9th Cir. 1998).

Fifth, as a practical matter, only this jury can know and determine the appropriate amount of forfeiture the Defendants obtained as a result of any crimes of conviction. This jury heard evidence during the guilt-innocence phase of this trial. This same jury then will hear evidence concerning the nexus of any particular asset to the crimes of conviction. After hearing that evidence, and making the determination that a nexus exists between any particular asset and crime of conviction, only this jury would know what it had in mind in terms of the amount of the asset(s) at issue as proceeds of crime. For example, the jury could convict any Defendant on the Travel Act conspiracy having found that the government established an agreement to commit only one of the substantive Travel Act violations. Under that scenario, the government only would be entitled to forfeit the proceeds (if any) that a Defendant gained from Backpage.com's sale of ad space for that particular ad. Alternatively, the jury could convict any Defendant on the Travel Act conspiracy having found that the government established an agreement to commit all 50 substantive Travel Act violations. Under that scenario, the government would be entitled to forfeit the proceeds (if any) that a Defendant gained from Backpage.com's sale of ad space for all 50 of those ads. The Government continues to impermissibly seek to expand the charged Travel Act conspiracy beyond the 50 ads, contending that these ads are just "examples." But the law of the case is clear on this (Dkt. 946 at 13; Final Jury Instructions [Travel Act Conspiracy Charge]). And the Government's response – that *evidence* of alleged marketing practices from 2004 to 2018 is relevant – is a *non-sequitur*. There is a clear distinction between relevant evidence and the scope of the charged offenses.

In sum, only this jury will know the bases for a conviction and, as a result, only this jury is able to determine the amount of proceeds that a Defendant obtained "as a result of his crimes." *See, e.g.*, *Thompson*, 990 F.3d at 691. The same holds true for the money laundering conspiracy count. Simply put, this Court will not know what the jury found to be the crime of conviction for a conviction under either conspiracy charge and, thus, it will be impossible for this Court to determine the amount that could be forfeited by any particular Defendant.

Finally, it is not appropriate to fold the determination of the amount a Defendant must

7

forfeit as to any particular asset into ancillary proceedings. Ancillary proceedings are the proceedings by which courts resolve third-party claims to assets that are subject to forfeiture *after* the entry of a preliminary order of forfeiture. Rule 32.2(c) of the Federal Rules of Criminal Procedure ("Rule 32.2") sets forth the procedures for the assertion and resolution of third-party claims. *See United States v. Lazarenko*, 476 F.3d 642, 648 (9th Cir. 2007) (citing Rule 32.2 and explaining that "a court adjudicates a third party's interest in the forfeited property in an ancillary proceeding after concluding the criminal case and entering a preliminary order of forfeiture"). Indeed, "the purpose of the ancillary hearing is to resolve third party claims." *United States v. Arce-Padilla*, 981 F. Supp. 2d 852, 854-55 (D. Ariz. 2013) (citing *United States v. Cox*, 575 F.3d 352, 358 (4th Cir. 2009)). Thus, it would be improper under Rule 32.2 and controlling Ninth Circuit authority either to require a third party to litigate his or her interest in an asset before the Court determines that the asset will be forfeited or to inject the determination of the amount of any particular asset subject to forfeiture as a result of a defendant's crimes of conviction into the separate and distinct inquiry the court must undertake to resolve third-party claims.

For all these reasons, Defendants respectfully request that, in the event of a conviction, the jury make the determination of nexus for each asset, including the amount subject to forfeiture.

RESPECTFULLY SUBMITTED this 8th day of November, 2023,

                         Paul J. Cambria, Jr.
                         Erin McCampbell Paris
                         LIPSITZ GREEN SCIME CAMBRIA LLP

                         By:   /s/ Paul J. Cambria, Jr.
                                Paul J. Cambria, Jr.
                                Attorneys for Michael Lacey

*Pursuant to the District's Electronic Case Filing Administrative Policies and Procedures Manual (Jan. 2020) § II (C) (3), Paul J. Cambria hereby attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content, and have authorized its filing.*

Gary S. Lincenberg
Gopi K. Panchapakesan
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.

By:   /s/ Gary Lincenberg
     Gary Lincenberg
     Attorneys for John Brunst


Eric W. Kessler
KESSLER LAW OFFICE

By:   /s/ Eric W. Kessler
     Eric W. Kessler
     Attorneys for Scott Spear

Bruce Feder
FEDER LAW OFFICE, P.A.

By:   /s/ Bruce Feder
     Bruce Feder
     Attorneys for Scott Spear

On November 8, 2023, a PDF version of this document was
filed with Clerk of the Court using the CM/ECF System
for filing and for Transmittal of a Notice of Electronic
Filing to the to the CM/ECF registrants who have
entered their appearance as counsel of record

9