Gary S. Lincenberg *(admitted pro hac vice)*
    glincenberg@birdmarella.com
Ariel A. Neuman *(admitted pro hac vice)*
    aneuman@birdmarella.com
Gopi K. Panchapakesan *(admitted pro hac vice)*
    gpanchapakesan@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant John Brunst

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | CASE NO. 2:18-cr-00422-004-PHX-DJH |
| Plaintiff, | **DEFENDANT JOHN BRUNST'S OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT** |
| vs. | |
| Michael Lacey, et al., | Assigned to Hon. Diane J. Humetewa |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.  OBJECTIONS TO PART A (THE OFFENSE) .................................................................. 6

II. OBJECTIONS TO GUIDELINE CALCULATION ....................................................... 8

    A.    The PSR Wrongly Relies on the Loss Table in §2B1.1. ................................ 8

        1.    Conspiracy to Violate Travel Act (Count 1) ........................................ 8

        2.    Money Laundering Counts .................................................................. 9

            a.    Objection to Base Level Offense Calculation ........................... 9

            b.    Objections to Money Laundering Enhancements ................... 10

                (i)    Sexual Exploitation of a Minor .................................. 10

                (ii)    Sophisticated Money Laundering ............................... 11

    B.    A Leadership Enhancement Would Be Inappropriate Here. ......................... 12

    C.    Grouping of Counts / Applicable Offense Level ........................................... 13

III. OBJECTIONS TO RESTITUTION/FINES ................................................................. 13

    A.    There Is No Basis for the Government to Seek Restitution Against Brunst. ............................................................................................................. 13

    B.    The Fine Calculation Is Wrong. ..................................................................... 15

    C.    Costs of Prosecution Are Not Warranted Here. ............................................ 15

IV. THE PSR FAILS TO SUFFICIENTLY OUTLINE THE BASES FOR A DOWNWARD DEPARTURE. ................................................................................. 15

V.  OBJECTIONS TO TERMS OF RELEASE ................................................................. 17

VI. CORRECTIONS TO PERSONAL, FAMILY, AND FINANCIAL INFORMATION ............................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Backpage.com, LLC v. Dart*
   807 F.3d 229 (7th Cir. 2015) ................................................................................ 16

*Backpage.com, LLC v. McKenna*
   881 F. Supp. 2d 1262 (W.D. Wash. 2012) ............................................................ 16

*United States v. Charon*
   442 F.3d 881 (5th Cir. 2006) ................................................................................ 10

*United States v. Eyraud*
   809 F.3d 462 (9th Cir. 2015) ................................................................................ 14

*United States v. Munoz*
   233 F.3d 1117 (9th Cir. 2000) .............................................................................. 10

*United States v. Vasquez*
   No. 3:11-CR-00026-BR, 2012 WL 3011010 (D. Or. July 20, 2012), *aff'd*,
   540 F. App'x 623 (9th Cir. 2013) ......................................................................... 14

**Statutes**

18 U.S.C.
   § 371 ........................................................................................................................ 8
   § 1952 .............................................................................................................. *passim*
   § 1952(a)(3)(A) .................................................................................................... 15
   § 1956 ............................................................................................................. 10, 13
   § 1956(a)(1)(B) .................................................................................................... 15
   § 1956(a)(2)(B) .................................................................................................... 15
   § 1956(a)(3)(C) .................................................................................................... 15
   § 1957(b) .............................................................................................................. 15
   § 3553(a) .............................................................................................................. 15
   § 3663A ................................................................................................................ 13
   § 3663A(a)(2) ...................................................................................................... 14
   § 3664(e) .............................................................................................................. 14

**Other Authorities**

U.S. Const. amend. I ................................................................................................ 16

U.S.S.G. § 1B1.3 ........................................................................................................ 9

U.S.S.G. § 1B1.3(a)(1)(A) .................................................................................................. 9

U.S.S.G. § 2B1.1 ........................................................................................................... 8, 9

U.S.S.G. § 2B1.1(b)(1) .................................................................................................. 5, 8

U.S.S.G. § 2E1.2 ............................................................................................................ 8, 9

U.S.S.G. § 2G1.1 ................................................................................................................ 9

U.S.S.G. § 2S1.1 ................................................................................................................. 9

U.S.S.G. § 2S1.1(a) .......................................................................................................... 10

U.S.S.G. § 2S1.1(a)(1) ......................................................................................... 9, 10, 13

U.S.S.G. § 2S1.1(a)(2) ....................................................................................................... 9

U.S.S.G. § 2S1.1(a)(2) ..................................................................................................... 10

U.S.S.G. § 2S1.1(b)(1)(iii) ............................................................................................... 10

U.S.S.G. § 2S1.1(b)(3) ..................................................................................................... 11

U.S.S.G. § 2X1.1(a) ........................................................................................................... 8

U.S.S.G. § 3B1.1 .............................................................................................................. 12

U.S.S.G. § 3D1.2(b) ......................................................................................................... 13

U.S.S.G. § 3D1.2(c) ......................................................................................................... 13

U.S.S.G. § 3D1.2(d) ......................................................................................................... 13

U.S.S.G. § 5E1.5 .............................................................................................................. 15

Defendant John Brunst respectfully asserts the following objections to the April 15, 2024 Draft Presentence Investigation Report ("PSR"). *See* Doc. 2062 (later revised at Doc. 2078 to reflect the judgment of acquittal on the transactional money laundering counts).

In overview, the PSR (1) does not faithfully apply the Sentencing Guidelines ("Guidelines"), (2) mischaracterizes the trial record as to Brunst, (3) seeks certain economic remedies that are not available to the Government here, and (4) ignores certain factors—namely Brunst's good faith reliance on court opinions and non-privileged attorney advice—that would warrant a downward departure from the advisory range.

First, while Brunst agrees that the Travel Act conspiracy charge and money laundering counts of conviction should be grouped, the PSR improperly uses the Guidelines' Section 2B1.1(b)(1) "Loss Table" in calculating the offense level. This impermissibly sends the offense level into the stratosphere. Instead, the money laundering guidelines dictate that the guideline applicable to the underlying offense (violation of the Travel Act) should be used, which results in a total offense level of 16 rather than 43.

Second, the Offense Conduct section appears to come straight from indictment and/or FBI reports rather than the evidence at trial. For example, the PSR states that Brunst and Ferrer "coordinated on a nearly daily basis" and that Brunst was responsible for approving expenditures related to "prostitution marketing strategies" *despite contradictory evidence* on these points at trial. The PSR references murders of individuals who were advertised on Backpage even though (1) the Court properly excluded such material at trial, and (2) no charge against Brunst would render him responsible for these heinous third-party actions. In other words, the PSR treats this like a trafficking case despite the Court repeatedly stating that this is *not* a trafficking case.

Third, the PSR seeks certain economic penalties—including restitution and costs of prosecution—where no such remedies are provided for under the controlling statutes. The Travel Act and money laundering statutes are not included among the statutory list of crimes for which restitution is required. Further, the Government seeks restitution for,

among other things, depression and anxiety suffered by (i) individuals who were advertised on Backpage and (ii) parents and grandparents of individuals who were murdered, along with funeral costs.  The applicable statutes simply do not provide for restitution in this context; indeed, the DOJ's own manual regarding the restitution process states that losses for pain and suffering are not restitution-eligible.

Fourth, the PSR does not consider certain factors that would warrant a downward departure outside of the advisory range, namely Brunst's good faith reliance on court decisions and non-privileged attorney advice.  Even though this evidence was not admitted at trial, it nevertheless informs the nature and circumstances of the offenses for sentencing purposes.

I. **OBJECTIONS TO PART A (THE OFFENSE)**

The PSR grossly mischaracterizes Brunst's alleged role with respect to the day-to-day operations of Backpage.com, largely ignoring the proof at trial.  The PSR even cites highly prejudicial and irrelevant material that was precluded at trial.

**Paragraphs 13, 38, 44, and 58 (Budgets, The Erotic Review, and Payment Processing).**  The PSR wrongly states that "Brunst oversaw all budget decisions related to Backpage" (PSR, ¶ 13).  *See* Trial Tr., Doc. 1833 at 14:3-25 (Ferrer testifying that Brunst's role at the annual budget meeting was merely to look at expenses and revenue, and that the "main discussion" on Brunst's part would concern executive salaries).  Nor was Brunst involved in "approving expenditures related to internal prostitution marketing strategies including Backpage's strategic relationship with TER [The Erotic Review]."  PSR, ¶ 13.  Jess Adams, who managed the accounting process at Backpage with regard to TER, testified that it was Spear—not Brunst—who approved and signed checks paid to TER. Trial Tr., Doc. 1868 at 142:5-143:5.  Further, the only substantive reference to TER pertaining to Brunst is found in Trial Exhibit 23 (p. 3), a lengthy budget plan presented by Ferrer that merely states "we *struck* a deal" with TER.  In other words, there was no evidence that Brunst was involved in consummating or approving any deal with TER.

The PSR also incorrectly states that "Brunst coordinated with Ferrer on nearly a

daily basis to circumvent conventional credit card processing." PSR, ¶ 13. There simply was no evidence to this effect at trial. There was no evidence that Brunst ever interacted with a credit card company. The one credit card witness who testified (Mickey Hansen from AmEx) said that he never dealt with Brunst. Trial Tr., Doc 1922 at 19:25-20:3.

**Paragraphs 17-19, 31, and 77 (Internal Marketing Practices and Interactions with Law Enforcement / Other Third Parties).** Brunst was not involved in Backpage's marketing practices, including aggregation, moderation, and reciprocal link programs. He was not involved in interfacing with the public, government regulators, or law enforcement. *See* Trial Tr., Doc. 1832 at 87:23-93:16. Nor was there evidence presented at trial that Brunst watched the CNN piece regarding Backpage, discussed it with others, or was involved in the response.

**Paragraph 21 (Lacey's Personal Bank Account).** The PSR wrongly references Brunst with respect to an e-mail Lacey wrote regarding his personal accounts. Brunst was not indicted on Count 100 (the charge that concerned Lacey's Hungarian account). And there was no testimony at trial that Brunst had any involvement in Lacey's personal accounts.

**Paragraphs 109-117 (Criminal Conduct of Third Parties).** The PSR references alleged kidnapping, rapes, and murders. The Court precluded any reference to this third-party conduct during trial. *See* Doc. 1155 ("While evidence showing notice to Defendants that prostitutes were using its website is relevant and the evidence has some probative value, the potential prejudice against Defendants from the introduction of the evidence regarding the murders is quite high. If evidence of the details of the murders were introduced, it is likely to inflame the passions of the jurors against the Defendants ***or create confusion that Defendants are responsible for the murders***.") (emphasis added).

The indictment does not charge Mr. Brunst with responsibility for these criminal actions of third parties. Nor is there any evidence that he knew of this alleged conduct. The PSR makes no reference to Brunst in this context. *See* PSR, ¶ 122 ("This fact was also well known to Lacey, Larkin, Spear, and Ferrer," omitting any reference to Brunst in

connection with a quadruple murder in Detroit).

Yet, the "Justification" for the PSR's misguided approach to Brunst's recommended sentence is that "family members lost loved ones, all so the defendant and co-conspirators could live a lavish lifestyle." PSR at p. 49. While tragic, Brunst bears no responsibility for these murders.

**Paragraphs 133-134 (Sale of Backpage).** The PSR mischaracterizes payments on a loan tied to the sale of Backpage as money laundering. But the only testimony at trial regarding these payments was that (1) there were lawyers on both sides of the sale transaction, (2) a global accounting firm (BDO) was involved in structuring the transaction, and (3) these payments were loan payments on principal and interest made by Ferrer to the sellers of Backpage. *See* Trial Tr., Doc. 1814 at 91:1-13; Trial Tr., Doc. 1814 at 93:20-23; Trial. Tr., Doc. 1834 at 52:2-8.; Exh. 5427 (Loan Agreement referencing "Backpage US Operations" in the heading).

## II.     OBJECTIONS TO GUIDELINE CALCULATION

The PSR commits several significant errors as to the guideline calculation. First, it mistakenly relies on the Section 2B1.1(b)(1) "Loss Table" in calculating the applicable base offense level, rather than looking at the base offense level applicable to the Travel Act. Second, it seeks to apply certain enhancements tied to Brunst's alleged leadership role and the sexual exploitation of minors, which lack factual support. As discussed below, **the correct offense level here is 16**.

### A.     The PSR Wrongly Relies on the Loss Table in §2B1.1.

#### 1.     Conspiracy to Violate Travel Act (Count 1)

The PSR references the guideline as to conspiracy (§2X1.1(a)), but mistakenly states that the underlying offense tied to the 18 U.S.C. § 371 charge (Count 1) is money laundering. PSR, ¶ 160. Count 1 charged a conspiracy to violate the Travel Act. Under the Travel Act, the base level offense is 6 or the offense level applicable to the "other unlawful activity in respect to which the travel or transportation was undertaken." *See* §2E1.2. The Guidelines state: "[a]pply the greater of" the two measures. *Id*.

The Application Notes to §2E1.2 (Travel Act) state: "If the underlying conduct violates state law, the offense level corresponding to the most analogous federal offense is to be used." That offense is Promoting a Commercial Sex Act or Prohibited Sexual Conduct with an Individual Other than a Minor (§2G1.1). Under that guideline, the Base Offense Level is **14**. *Id.* at (a)(2).

### 2. Money Laundering Counts

#### a. Objection to Base Level Offense Calculation

Under §2S1.1(a), the Base Offense Level for money laundering is either:

(1) The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of §1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined; or

(2) **8** plus the number of offense levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds, ***otherwise*** (emphasis added).

Here, while Brunst was acquitted of the 50 substantive Travel Act counts, under the Government's theory of the case, he would be "accountable for the underlying offense" by virtue of the Travel Act conspiracy conviction, as the Guidelines define "Relevant Conduct" as "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." *See* § 1B1.3. Therefore, ***it is § 2S1.1(a)(1), not (b)(1), that governs here***. The Fifth Circuit Court of Appeals has explained why section (a)(1) applies in this context:

The two conditions under (a)(1) are: (1) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of § 1B1.3 (Relevant Conduct)); and (2) the offense level for that offense can be determined. U.S.S.G. § 2S1.1(a)(1). ***Alternatively, if the two specified conditions are not met, the second method is used***, which defines the base offense level as "8 plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds." *Id.* § 2S1.1(a)(2). The commentary to this guideline clarifies that (a)(2) applies to any case in which (1) the defendant did not commit the underlying offense, or (2) the defendant committed the underlying offense (or would be accountable for the underlying offense under § 1B1.3(a)(1)(A)), but the offense level for the underlying offense is impossible or impracticable to determine. *Id.* § 2S1.1 cmt. n. 3(A). ***Both conditions for (a)(1) are satisfied in this case***.

*United States v. Charon*, 442 F.3d 881, 887–88 (5th Cir. 2006) (emphasis added).

Critically, unlike other provisions of the Guidelines, §2S1.1(a) does not state, "apply the greater of" the two possible base offense levels.  As the "underlying offense" is the Travel Act, the base offense level is **14**, as noted above.[1]  Brunst does not dispute that a conviction under 18 U.S.C. § 1956 provides for a 2-point enhancement, increasing the offense level to **16**.

### b. Objections to Money Laundering Enhancements

### (i) Sexual Exploitation of a Minor

Section 2S1.1(b)(1)(iii) provides for a 6-level enhancement where the defendant "knew or believed that any of the laundered funds were the proceeds of, or were intended to promote . . . the sexual exploitation of a minor."  This enhancement plainly does not apply here.

First, the enhancement only applies where "subsection (a)(2) applies."  But, as discussed above, subsection (a)(1) (which references the offense level for the underlying offense, a violation of the Travel Act) governs here.  Second, the Court made clear such evidence was not even admissible.  Third, the Government's charges did not require the jury to find sexual exploitation of a minor.  There was no proof at trial that Brunst either (a) knew that any purportedly laundered funds were the result of sexual exploitation of a

---

[1] To the extent the Court were to proceed under §2S1.1(a)(2)—which it plainly should not do, given that the Guidelines specifically address the scenario at issue here—the PSR wrongly states that $500 million in funds were laundered.  PSR, ¶ 160.  The Government assumes—without a shred of evidence—that every ad posted on Backpage.com over a 14-year period was the result of a Travel Act violation.  But the only Travel Act violations the Government sought to prove were the 50 advertisements alleged in the Indictment.  There was no proof that any other specific ad on the site was for prostitution.  Nor does the $500 million figure even match up to the alleged transaction amounts in the indictment, which are a fraction of what the PSR claims.  *See United States v. Munoz*, 233 F.3d 1117, 1126–27 (9th Cir. 2000) ("This Court has held that a sentencing factor that has an extremely disproportionate effect on the sentence may require a district court to find that factor by clear and convincing evidence, rather than by a preponderance of the evidence.").

1 minor or (b) intended to promote such exploitation. Nor was there any evidence that any
2 particular alleged laundered funds were tied to any such exploitation.
3    And even as to the witnesses who were minors at the time of their advertisements,
4 (a) Brunst was acquitted of the substantive counts tied to those individuals, and (b) there
5 was no evidence that Brunst knew they were underage at the time those ads ran on the site.

       **(ii)  Sophisticated Money Laundering**

   Under the Guidelines, a finding of Sophisticated Money Laundering requires the use of fictitious entities, shell corporations, two or more levels of transactions/transfers "involving criminally derived funds that were intended to appear legitimate," or offshore financial accounts. §2S1.1(b)(3) (Application Notes). Here, the PSR's justification for the enhancement is belied by the trial record.

   First, the concealment and international promotional money laundering counts indisputably concerned loan payments by Ferrer to the sellers of Backpage. There was no evidence at trial that the sale or the associated loan payments were structured to conceal the source of funds or promote violations of the Travel Act. Instead, as discussed above and in Brunst's Rule 29 motion (Dkt. 2007), the sale was structured by highly respected lawyers and accountants, and the sale documents themselves noted that Backpage was being sold. That loan payments went from one entity to another, and Brunst was a shareholder of the latter entity and received shareholder distributions is not "sophisticated money laundering," but rather a typical corporate transaction. While the Court's Order on the Rule 29 motion discusses the role Website Technologies played, it does not discuss the purpose for transfers between Website Technologies and Cereus Properties, namely loan payments on the sale of Backpage, as Ferrer admitted at trial. As the CFO of the sellers (Cereus Properties), Brunst reasonably relied on the advice of respected lawyers and accountants that the structure of the sale and associated loan payments were lawful.

   Second, the only financial institution to testify was AmEx—its representative (Mickey Hansen) admitted that AmEx terminated Backpage as a merchant for "reputational" reasons, *i.e.*, the same reasons they do not allow their credit cards to be used

in the context of gambling, payday loans, and other challenged industries.  Trial Tr., Doc. 1922 at 20:16-21:2.  There was no testimony that any such institution made a determination Backpage was engaged in illegal conduct.  Nor was there evidence that seeking credit card processing in Europe is illegal or indicative of criminal conduct.  Further, there was no testimony that Brunst had any involvement in Backpage's acceptance of cryptocurrency for payment.

### B. A Leadership Enhancement Would Be Inappropriate Here.

The PSR recommends a 4-level leadership enhancement based on Brunst's roughly 6% ownership interest in Backpage's holding company and his role as CFO.  Brunst, however, was not an "organizer or leader" with respect to any criminal conspiracy here.

First, he had no role in the day-to-day management of the business, including the company's marketing strategies.  That is presumably why the jury acquitted him of the 50 substantive Travel Act counts.  Notably, the U.S. Sentencing Commission recently voted to "prohibit conduct for which a person was acquitted in federal court from being used in calculating a sentence range under the federal guidelines."[2]  Ferrer and Larkin managed the business' daily affairs—that is apparent from Ferrer's testimony and the e-mails admitted at trial.  As noted above, Brunst's involvement in the annual budget process was limited; his typical involvement would relate to salaries, or looking at overall revenue and costs.  *See* Trial. Tr., Doc. 1833 at 14:14-25.  Nor was Brunst interacting with credit card companies; Hansen of AmEx testified that he never dealt with Brunst.

Second, he was not a "supervisor of one or more other participants."  §3B1.1. (Application Notes).  There was no evidence at trial that Brunst supervised anyone.  None of the convicted Defendants, Ferrer, or Hyer reported to Brunst.  And, as a minority shareholder, Brunst had no formal corporate control over the company's decisions.

---

[2]  *See* https://www.ussc.gov/about/news/press-releases/april-17-2024#:~:text=%E2%80%95The%20bipartisan%20United%20States%20Sentencing,range%20under%20the%20federal%20guidelines.

### C. Grouping of Counts / Applicable Offense Level

Brunst agrees the counts of conviction should be grouped. The PSR states that grouping is appropriate under §3D1.2(d) of the Sentencing Guidelines (where the offense level "is determined largely on the basis of the total amount of harm or loss").

But grouping of these counts is also appropriate under §3D1.2(b) ("When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan."). The Application Notes to §3D1.2(b) provide the example of a defendant being convicted of "two counts of mail fraud and one count of wire fraud, each in furtherance of a single fraudulent scheme," which is akin to the structure of the indictment here.

Grouping is also appropriate under §3D1.2(c) ("When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts."). The money laundering guidelines reference the "underlying offense," here, a violation of the Travel Act. *See* §2S1.1(a)(1).

Section 3D1.3 provides that the offense level pertaining to the group be calculated with reference to "the highest offense level of the counts" in the group. Here, that offense level is **16**, as noted above (**14** for the base offense level, plus **2** for a conviction under 18 U.S.C. § 1956).

### III. OBJECTIONS TO RESTITUTION/FINES

### A. There Is No Basis for the Government to Seek Restitution Against Brunst.

The PSR wrongly asserts that restitution is mandatory in this case under 18 U.S.C. § 3663A. PSR, ¶ 199. That statute requires that the offense be of a certain nature *and* that there is "an identifiable victim or victims" who has "suffered a physical injury or pecuniary loss." *See id.* at (c)(1)(A) (specifying crimes of violence, offenses against property, offenses under the Controlled Substantive Act, offenses under the Anti-Doping Act, tampering with consumer products, and theft of medical products). The statute does not identify a violation of the Travel Act or money laundering as an offense that requires

restitution, which ought to end the inquiry.

Further, the PSR concedes that there is a lack of identifiable victims here, admitting that in some instances "restitution cannot be ascertained at this time," and that the "specific number of victims was unable to be determined."  PSR, ¶¶ 152-154.

Even assuming some kind of restitution were appropriate (it plainly is not), the Government bears the burden of establishing by a preponderance of the evidence "the amount of the loss sustained by a victim *as a result* of the offense."  18 U.S.C. § 3664(e) (emphasis added).  Further, "[t]he amount of restitution is limited to the victim's 'actual losses' that are a direct and proximate result of the defendant's offense."  *United States v. Eyraud*, 809 F.3d 462, 467 (9th Cir. 2015); *see* 18 U.S.C. § 3663A(a)(2) ("For the purposes of this section, the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.").

The Government cannot possibly meet its burden here.  The restitution sought appears to concern, among other things, (1) the depression and anxiety suffered by individuals who were advertised on Backpage and (2) the depression and anxiety suffered by parents or grandparents of individuals who were murdered, as well as related funeral costs.  PSR, ¶¶ 143-154.  While these are obviously sympathetic and heart-rending accounts, the Court is bound by the law.  None of these losses were "directly and proximately" caused by any crime of conviction, nor were these individuals "directly harmed" by any of Brunst's conduct in connection with the Travel Act or money laundering conspiracy convictions.

Further, the Department of Justice's own manual notes that "[l]osses for 'pain & suffering' are also ***not eligible*** for restitution."  *See* https://www.justice.gov/criminal/criminal-vns/restitution-process; *see also United States v. Vasquez*, No. 3:11-CR-00026-BR, 2012 WL 3011010, at *1 n.1 (D. Or. July 20, 2012),

*aff'd*, 540 F. App'x 623 (9th Cir. 2013) ("It is undisputed that the Court lacks authority to award restitution for noneconomic damages such as pain and suffering or emotional distress, and the government does not seek any such damages as restitution.").

### B. The Fine Calculation Is Wrong.

Any fine should be calculated using the correct offense level (16), as discussed above. The fine range for an offense level of 16 is $10,000 to $95,000.

### C. Costs of Prosecution Are Not Warranted Here.

The PSR cites §5E1.5 of the Guidelines, which provides that "[c]osts of prosecution shall be imposed on a defendant as required by statute." PSR, ¶ 199. But neither the Travel Act nor the money laundering statutes provide for such costs. *See* 18 U.S.C. § 1956(a)(1)(B), (a)(2)(B), (a)(3)(C); 18 U.S.C. § 1957(b); 18 U.S.C. § 1952(a)(3)(A).

## IV. THE PSR FAILS TO SUFFICIENTLY OUTLINE THE BASES FOR A DOWNWARD DEPARTURE.

The PSR states that the "probation officer identified no information concerning the offense or the offender which would warrant a departure from the advisory guideline range." PSR, ¶ 204. It later states, "it appears a downward variance may be warranted to account for the defendant's history and characteristics." *Id.*, ¶ 206. But the PSR fails to identify and analyze the factors in 18 U.S.C. § 3553(a). It also fails to acknowledge Brunst's good faith reliance on court opinions and attorney advice. And while this evidence was not admitted at trial, it nevertheless goes to the "nature and circumstances of the offense." *Id*. Brunst, in his role as CFO of Backpage's holding company, relied extensively on court opinions and attorney advice (including non-privileged advice) issued at the very times the Government asserts Brunst was put on notice by state attorneys general, non-profits, and media outlets regarding the nature of the Backpage website. *See, e.g.*, Doc. 1803 (Defendants' Response to Government's Objections to Admission of Evidence); Doc. 1879 (Brunst's Motion to Seek Admission of Brunst's Testimony Re: State of Mind).

While Brunst's sentencing memorandum will go into more detail, Brunst briefly

addresses these matters here, particularly in light of the Court's Order on the Rule 29 motion. In connection with Count 1 (Travel Act conspiracy), the Court observed that there was evidence that "Brunst knew the demand for Adult ads was especially high in proportion to Backpage's total business" and that "Backpage derived the majority of its revenues from its Female Escort section." Dkt. 2063 at 21. The Court also notes that the Defendants were on notice from various third parties that "a portion of Backpage's escort ads were in fact leading to prostitution offenses." *Id*. In other words, the Court found that Brunst was properly convicted of a conspiracy to violate the Travel Act—which requires the specific intent to facilitate business enterprises involved in prostitution—because he was on notice that some "portion" of the escort ads on Backpage.com resulted in prostitution. But this is precisely the type of "criminal liability by notice" framework that the U.S. District Court for the Western District of Washington in the *McKenna* case held violated the First Amendment. *See Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1278 (W.D. Wash. 2012) (observing that "a regime in which criminal liability is triggered only by notification or knowledge that 'illegal' content is available on an actor's website," would run afoul of the First Amendment). Brunst read and relied on that opinion, which gave him comfort that the website was operating legally in the face of public calls to shut it down.

The Court also held in connection with the concealment money laundering counts that the jury was not required to find Travel Act violations that formed the basis for the subject transactions, but rather merely that "the funds were proceeds from Backpage's sale of sex-for-money ads and that Defendants or their conspirators knew they were proceeds from sex-for-money ads." Dkt. 2063 at 45. But again, Brunst's purported knowledge in this respect was informed by Judge Posner's decision in *Dart*, where the Seventh Circuit Court of Appeals stated that "not all advertisements for sex are advertisements for illegal sex. There is no estimate of how many ads in Backpage's adult section promote illegal activity; we just gave examples of some that do not." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 234 (7th Cir. 2015). In other words, Brunst was advised by a federal appellate

court that a purported ad for sex is not necessarily illegal, let alone a Travel Act violation.

Brunst's reliance on these court decisions, along with non-privileged attorney advice shared with financial institutions regarding the potential liability facing the company (*e.g.*, Trial Exhs. 5507 and 5508), go directly to the "nature and circumstances of the offense" and warrant a downward departure outside of the advisory range.  The charges brought in this case reflect a novel application of the Travel Act—one that no court has previously considered.  Putting aside whether or not the Court found that this evidence was a defense to the charges, Brunst relied on the best information available to him at the time to inform his actions.  His good faith reliance on matters that informed his state of mind clearly warrants a significant downward departure and a sentence of probation.

## V. OBJECTIONS TO TERMS OF RELEASE

Brunst objects to the following terms of release:

- At his age, he should not be required to hold full-time employment (of at least 30 hours per week).  PSR, p. 51 (¶ 7).
- He should not be required to seek approval for purchases of over $500, particularly if any financial obligations, like any fines, have been satisfied. *Id.*, p. 53 (¶ 5).
- As noted above, there is no basis for the Government to seek restitution here. *Id.*, p. 53 (¶ 7).

## VI. CORRECTIONS TO PERSONAL, FAMILY, AND FINANCIAL INFORMATION

The following corrections should be made in the PSR:

- Paragraph 186:  The total amount of seized assets appears to exclude the seized BBVA Compass Account.  There are seven total seized accounts, currently valued at approximately $9,647,382.
- Paragraph 176: "Louis" should be "Lois."
- Paragraph 178:  "24 years" should be "29 years."
- Paragraph 178:  "The defendant has three grandsons and one granddaughter

who reside with Kelley" should read "The defendant has three grandsons and one granddaughter who reside with a family member of the mother."

Additionally, the following liabilities should be added:

- Estimated costs of appeal in this case: $500,000
- Brunst expects to incur further attorney's fees and costs in connection with outstanding civil litigation in Texas, Illinois, and Washington.
- Brunst estimates nearly $700,000 in taxes and expenses in connection with any sale and/or liquidation of real estate and investment accounts.

DATED: April 29, 2024          Respectfully submitted,

Gary S. Lincenberg
Ariel A. Neuman
Gopi K. Panchapakesan
Bird, Marella, Rhow,
Lincenberg, Drooks & Nessim, LLP


By:     */s/ Gary S. Lincenberg*
             Gary S. Lincenberg
       Attorneys for Defendant John Brunst