Gary S. Lincenberg *(admitted pro hac vice)*
 glincenberg@birdmarella.com
Ariel A. Neuman *(admitted pro hac vice)*
 aneuman@birdmarella.com
Gopi K. Panchapakesan *(admitted pro hac vice)*
 gpanchapakesan@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant John Brunst

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CASE NO. 2:18-cr-00422-004-PHX-DJH |
| Plaintiff, | **DEFENDANT JOHN BRUNST'S OBJECTIONS TO FINAL PRESENTENCE INVESTIGATION REPORT** |
| vs. | |
| Michael Lacey, et al., | Assigned to Hon. Diane J. Humetewa |
| Defendants. | |

3973269.1

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

I.      INTRODUCTION ................................................................. 5

II.      OBJECTIONS TO PART A (THE OFFENSE) ............................ 6

III.     OBJECTIONS TO GUIDELINE CALCULATION ..................... 10

     A.      The PSR Wrongly Relies on Acquitted Conduct. ........................ 10

     B.      The PSR Wrongly Relies on § 2G1.3 (Promoting a Commercial Sex Act with a Minor). ......................................................... 11

     C.      Brunst Did Not Engage in Sophisticated Money Laundering. ...................... 13

     D.      A Leadership Enhancement Would Be Inappropriate Here. ......................... 14

     E.      Applicable Offense Level ............................................................ 14

     F.      Brunst Is Probation-Eligible. ........................................................ 16

IV.     THE PSR FAILS TO SUFFICIENTLY ACCOUNT FOR MR. BRUNST'S GOOD FAITH. ........................................................................... 16

V.      OBJECTIONS TO FINANCIAL PENALTIES ......................... 18

     A.      There Is No Basis for the Government to Seek Restitution. ...................... 19

     B.      Potential Fines Have Been Addressed in the Settlement. ............................ 21

     C.      Costs of Prosecution Are Not Warranted Here. ............................................ 21

VI.     OBJECTIONS TO TERMS OF RELEASE .............................. 21

VII.    CORRECTIONS TO PERSONAL, FAMILY, AND FINANCIAL INFORMATION ........................................................................ 22

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Backpage.com, LLC v. Dart*
5     807 F.3d 229 (7th Cir. 2015)..................................................................... 16, 17

6

*Backpage.com, LLC v. McKenna*
7     881 F. Supp. 2d 1262 (W.D. Wash. 2012)................................................. 17, 18

8

*Nat'l Rifle Ass'n of Am. v. Vullo*
9     144 S. Ct. 1316 (2024) ..................................................................................... 16

*United States v. Boggs*
10     No. CR-05-80-GF-BMM, 2024 WL 3455843 ............................................... 11

11

*United States v. Eyraud*
12     809 F.3d 462 (9th Cir. 2015) .......................................................................... 20

13

*United States v. Hicks*
14     997 F.2d 594 (9th Cir. 1993)...................................................................... 19, 20

15

*United States v. Lucas*
16     101 F.4th 1158 (9th Cir. 2024) ...................................................................... 13

*United States v. McEnry*
17     659 F.3d 893 (9th Cir. 2011)........................................................................... 12

18

*United States v. Mendez–Perez*
19     607 F. App'x 39 (2d Cir. 2015) ...................................................................... 21

20

*United States v. Vasquez*
21     No. 3:11-CR-00026-BR, 2012 WL 3011010 (D. Or. July 20, 2012), *aff'd*,
      540 F. App'x 623 (9th Cir. 2013) ............................................................. 20, 21

22

*United States v. Whitney*
23     673 F.3d 965 (9th Cir. 2012) .......................................................................... 14

24

*Zeran v. Am. Online, Inc.*
25     129 F.3d 327 (4th Cir. 1997).......................................................................... 18

26

27

28

1

**Statutes**

2

18 U.S.C.

3      § 1952 ................................................................................................ *passim*
   § 1952(a)(3)(A) ................................................................................. 21

4      § 1956 ................................................................................................ 15
   § 1956(a)(1)(B) ................................................................................. 21

5      § 1956(a)(2)(B) ................................................................................. 21

6      § 1956(a)(3)(C) ................................................................................. 21
   § 1957(b) ........................................................................................... 21

7      § 3663 ................................................................................................ 19

8      § 3663A ............................................................................................. 19
   § 3663A(a)(2) ................................................................................... 20

9      § 3664(e) ........................................................................................... 20

10  **Other Authorities**

11  *https://www.gao.gov/assets/gao-21-385.pdf* ......................................... 8

12
*https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-*
13     *friendly-amendments/202405_RF.pdf* ......................................... 11

14  U.S.S.G.
   § 1B1.3 .............................................................................................. 11

15     § 2B1.1(b)(1) ............................................................................... 5, 10

16     § 2E1.2 .......................................................................................... 5, 11
   § 2G1.1 ..................................................................................... 5, 12, 13

17     § 2G1.3 ..................................................................................... 11, 12

18     § 2S1.1(a)(1) ..................................................................................... 15
   § 3B1.1 .............................................................................................. 14

19     § 3B1.1(c) ......................................................................................... 14

20     § 3D1.2(b) ........................................................................................ 14
   § 3D1.2(c) ........................................................................................ 15

21     § 4C1.1 .............................................................................................. 15
   § 5H1.1 .............................................................................................. 15

22     § 5H1.4 .............................................................................................. 15

23

24

25

26

27

28

## I. __INTRODUCTION__

Defendant John Brunst respectfully asserts the following objections to the July 29, 2024 Final Presentence Investigation Report ("PSR"). *See* Doc. 2119. Pursuant to the Court's Order ) (Doc. 2115), Brunst withdraws his prior objections to the draft PSRs. In overview, the PSR (1) does not faithfully apply the Sentencing Guidelines ("Guidelines"), (2) mischaracterizes the trial record as to Brunst, (3) seeks certain economic remedies that are not available to the Government here, and (4) ignores key factors—namely Brunst's good faith reliance on court opinions and non-privileged attorney advice—that would warrant a downward departure from the advisory range.

First, in light of Brunst's initial objections, the PSR—which applied Guidelines' § 2B1.1(b)(1) "Loss Table" in calculating the offense level—now acknowledges its manifest error in that regard. Nevertheless, the PSR still arrives at the same offense level. The Travel Act Guideline (§ 2E1.2), however, looks to "the offense level applicable to the underlying crime," here "Promoting a Commercial Sex Act" (§ 2G1.1), which carries a base offense level of 14. Inexplicably, the Government tags Brunst with three substantive Travel Act counts in which minors were advertised, despite the jury ***acquitting*** Brunst of these counts. The charged object of the Travel Act conspiracy was to "facilitate prostitution." The Government charged no offenses involving minors, and the Court instructed the jury that Brunst was not charged with any trafficking offense. Under these circumstances, the Court should decline the Government's invitation to nearly double the applicable base offense level by relying on uncharged offenses and acquitted conduct.

Second, the Offense Conduct section appears to come straight from the indictment and FBI reports rather than the evidence at trial. For example, the PSR states that Brunst and Ferrer "coordinated on a nearly daily basis;" but even Ferrer's hyperbolic testimony did not claim this. The PSR states that Brunst was responsible for approving expenditures related to "prostitution marketing strategies" despite contradictory evidence at trial. And the PSR references murders, rapes, and kidnappings of individuals who were advertised on Backpage even though (1) the Court properly excluded such material at trial and (2) no

charge against Brunst would render him responsible for these heinous third-party actions. The PSR treats this like a trafficking case despite the Court repeatedly stating that it is not.

Third, as to the proposed economic penalties, as the Court is aware (Doc. 2104), the parties have reached a financial settlement which, we are advised, will be approved soon by the Deputy Attorney General of the Department of Justice. As part of that settlement, the Government will not seek fines or forfeiture (or a forfeiture money judgment). The Government has also agreed to recommend to the DOJ to use any forfeited funds to satisfy (in whole or in part) any restitution order. In any event, restitution is not appropriate here under the controlling statutes and case law. The Travel Act and money laundering statutes are not included among the statutory list of crimes pertaining to restitution. Further, the PSR focuses on depression and anxiety suffered by individuals (and the families of these individuals) who were advertised on Backpage. However, as the Government acknowledges, restitution is not permitted for these alleged injuries. Doc. 2087 at 14.

Fourth, the PSR does not consider important factors that would warrant a downward departure outside of the advisory range. Brunst's good faith reliance on court decisions and non-privileged attorney advice clearly warrants a sentence far more lenient than a Guidelines sentence. Even though this evidence was not admitted at trial, for sentencing purposes there is no factor more important to an analysis of the nature and circumstances of Mr. Brunst's conduct.

## II.     OBJECTIONS TO PART A (THE OFFENSE)

Rather than looking to the evidence at trial, the PSR instead follows the simpler approach of regurgitating what the prosecutors presented in the indictment and related papers provided by the prosecutors. In doing so, the PSR grossly mischaracterizes Brunst's alleged role at Village Voice Media Holdings ("VVMH"). The PSR even cites highly prejudicial and irrelevant material that was precluded at trial. In doing so, the PSR does not provide an objective, third-party analysis.

**Paragraphs 14, 32, 39, 44, and 45 (Budgets, The Erotic Review, and Payment Processing).** The PSR wrongly states that "Brunst oversaw all budget decisions related to

Backpage" PSR, ¶ 14; *see* Doc. 1833 (Trial Tr.) at 14:3-25 (Ferrer testifying that Brunst's role at the annual budget meeting was merely to look at expenses and revenue, and that the "main discussion" on Brunst's part would concern executive salaries). Nor was Brunst involved in "approving expenditures related to internal prostitution marketing strategies including Backpage's strategic relationship with TER [The Erotic Review]." *Id.* Jess Adams, who managed the accounting process at Backpage with regard to TER, testified that it was Spear—not Brunst—who approved and signed checks paid to TER. Doc. 1868 (Trial Tr.) at 142:5-143:5. Further, the only substantive reference to TER pertaining to Brunst is found in Trial Exh. 23 (p. 3), a lengthy budget plan presented by Ferrer that merely states (buried in the report) that "we *struck* a deal" with TER. In other words, there was no evidence that Brunst was involved in the details of any deal with TER, including negotiating it, approving it, or monitoring it. The PSR also incorrectly states that "Brunst coordinated with Ferrer on nearly a daily basis to circumvent conventional credit card processing." PSR, ¶ 14. The falsity of this was easily shown by the undisputed evidence that Brunst never even interacted with a credit card company. The one credit card witness who testified said that he never dealt with Brunst. Doc 1922 at 19:25-20:3.

**Paragraphs 32, 59, 62-63, 78, 93, 96 (Internal Marketing Practices and Interactions with Law Enforcement / Other Third Parties).** Brunst was not involved in Backpage's marketing practices, including aggregation, moderation, and reciprocal link programs. That he was one of many copied on Google Analytics emails does not show criminal intent—there was no evidence Brunst even reviewed the reports. He was not involved in interfacing with the public, government regulators, or law enforcement. Doc. 1832 (Trial Tr.) at 87:23-93:16. Any presumed awareness of subpoena compliance served only to highlight that there was transparency with law enforcement by responsible management and counsel as to the content of the site. There was no testimony at trial that law enforcement was duped, or that Backpage's compliance was insufficient. Indeed, in a June 2021 Report to Congress, the U.S. Government Accountability Office stated: "According to a 2019 FBI document, the FBI's ability to identify and locate sex trafficking

1 victims and perpetrators was **_significantly decreased_** following the takedown of

2 backpage.com. According to FBI officials, this is largely because law enforcement was

3 familiar with backpage.com, and backpage.com was **_generally responsive_** to legal requests

4 for information." _See https://www.gao.gov/assets/gao-21-385.pdf_ at 21 (emphasis added).

5       Nor was there evidence presented at trial that Brunst had involvement with the

6 CNN piece or the response to it. Further, that presentations to potential buyers of Backpage

7 showed that 94% of the company's revenue came from adult advertisements (PSR, ¶ 93) is

8 the opposite of concealment—rather, the presentations show an openness about the content

9 on the website. Indeed, reputable firms that ultimately owned Backpage, like Goldman

10 Sachs, did extensive due diligence, were well aware of Backpage's adult content, and

11 chose to invest. When financial institutions pulled out, it was universally because of

12 reputational risk, not because of legal issues.

13       **Paragraph 22 (Lacey's Personal Bank Account).** The PSR wrongly references

14 Brunst with respect to an e-mail Lacey wrote regarding his personal accounts. Brunst was

15 not indicted on Count 100. And there was no testimony at trial that Brunst had any

16 involvement in Lacey's personal accounts.

17       **Paragraphs 108-118 (Criminal Conduct of Third Parties).** The PSR references

18 alleged kidnappings, rapes, and murders. The Court precluded any reference to this third-

19 party misconduct during trial. _See_ Doc. 1155 ("If evidence of the details of the murders

20 were introduced, it is likely to inflame the passions of the jurors against the Defendants **_or_**

21 **_create confusion that Defendants are responsible for the murders_**.") (emphasis added).

22 The indictment did not charge Mr. Brunst with responsibility for these criminal actions of

23 third parties. Nor is there any evidence that he knew of this conduct. The PSR makes no

24 reference to Brunst in this context. _See_ PSR, ¶ 113 ("This fact was also well known to

25 Lacey, Larkin, Spear, and Ferrer," omitting any reference to Brunst, for example, in

26 connection with a quadruple murder in Detroit). Yet, the "Justification" for the PSR's

27 approach to Brunst's recommended sentence is that "family members lost loved ones, all

28 so the defendant and co-conspirators could live a lavish lifestyle." PSR at p. 53. While

1  tragic, Brunst bears no responsibility for these third-party crimes.

2  **Paragraphs 22, 28, 29 133-134 (Sale of Backpage).** The PSR mischaracterizes

3  payments on a loan tied to the sale of Backpage as money laundering. But the only

4  testimony at trial regarding these payments was that (1) there were lawyers on both sides

5  of the sale transaction, (2) a global accounting firm (BDO) was involved in structuring the

6  transaction, and (3) these payments were loan payments on principal and interest made by

7  Ferrer to the sellers of Backpage. Doc. 1814 at 91:1-13; Doc. 1814 at 93:20-23; Doc. 1834

8  at 52:2-8.; Exh. 5427 (Loan Agreement referencing "Backpage US Operations" in the

9  heading). Further, Brunst did not maintain "significant operational control" over Backpage

10  (PSR, ¶ 29) following its sale. As Ferrer admitted at trial, Michael Gage (the former CFO

11  of one of Backpage's payment processors) became CFO of the company post-sale.

12  Doc. 1832 at 8:3-15. During this post-sale time period, Brunst was: (1) working closely

13  with the buyer of the *newspapers* (tied to the 2012 sale of those papers) on the

14  restructuring of that loan; (2) commissioning a major accounting firm to conduct

15  valuations of the company for estate and tax planning purposes for shareholders; and

16  (3) interacting with Backpage's *new* CFO (Gage) primarily in connection with payment

17  status on the loan. Indeed, in his interview with the Government, Gage said that he and

18  Brunst "talked about note payments and forbearance agreements" and that he understood

19  "Brunst to be the CFO of the ***seller's*** business."

20  **Paragraphs 120, 126-27, 132 (Money Laundering).** The PSR ignores that banks

21  and credit card companies terminated their relationships with Backpage for reputational

22  reasons, meaning that those institutions were fully aware of the nature of the content on the

23  site, belying the notion that Brunst concealed anything from those institutions. That

24  Backpage sought processing in Europe is not illegal or indicative of criminal intent—it is

25  common and proper for  a U.S. company to use a foreign payment processor that is more

26  comfortable with the nature of the business. Indeed, as Ferrer admitted at trial, Backpage

27  was disclosed in connection with all credit card and payment processing applications, and

28  the company did not and "couldn't lie" on the applications. Doc. 1833 at 52:16-53:17. As

1  to the e-mails between Patricia Weber, a payment processing consultant, and Ferrer, there

2  was no evidence that Brunst had any interactions with Weber or that any of her proposals

3  were carried out.

4  **III.   OBJECTIONS TO GUIDELINE CALCULATION**

5          The PSR commits several significant errors as to the Guideline calculation. First,

6  while the USPO now acknowledges it was a mistake to rely on the § 2B1.1(b)(1) "Loss

7  Table" in calculating the applicable base offense level (rather than looking at the base

8  offense level applicable to the Travel Act), the PSR seeks to achieve the same result by

9  relying on the Guideline regarding sex offenses concerning minors. Second, the PSR seeks

10  to apply certain enhancements tied to Brunst's alleged leadership role and sophisticated

11  money laundering, which lack factual support. As discussed below, **the correct offense**

12  **level here is 14**.

13          **A.      The PSR Wrongly Relies on Acquitted Conduct.**

14          The PSR states:

15          Based on the [Court's Rule 29] order, it is the Probation Office's
           determination any count in which the jury found at least one defendant guilty
16          of the conduct shall meet a preponderance of the evidence standard. This
           determination is based on the conclusion the conduct was jointly undertaken
17          criminal activity, and even if the specific defendant did not commit the
           specific act of the underlying count, the conduct was within the scope of the
18          jointly undertaken criminal activity, in furtherance of that criminal activity,
           and reasonably foreseeable in connection with that criminal activity.
19

20  PSR, ¶ 159.

21          The PSR goes on to state:

22          In addition, the Court concluded there was sufficient evidence under
           *Pinkerton* for a rational juror to find Lacey and **Brunst** guilty through acts of
23          one of their co-conspirators, namely Ferrer and Spear. Therefore, it is the
           Probation Office's assessment, based on a preponderance of the evidence,
24          Counts 1 through 18 qualify as jointly undertaken criminal activity that was
           within the scope of the activity, in furtherance of the activity, and reasonably
25          foreseeable within connection of the activity.

26  *Id.*, ¶ 160.

27          The PSR's leap of logic makes no sense. First, the jury was presented with a

28  *Pinkerton* instruction, and nevertheless acquitted Brunst of the substantive Travel Act

counts (counts 1 to 50). Second, there is nothing in the Court's Rule 29 Order that would suggest the Court "concluded there was sufficient evidence" for the jury to find Brunst guilty of Counts 1 to 18. That is literally the opposite of what the jury found. And the Court had no reason to revisit those acquittals in its Rule 29 Order as to Brunst. Third, the PSR takes an inconsistent approach in this regard. As to the money laundering charges, the PSR limits itself to the counts of conviction for Brunst, yet includes Travel Act counts as to which Brunst was acquitted. *Id*. at ¶ 167.

Further, the U.S. Sentencing Commission (USSC) recently adopted an amendment that prohibits a sentencing judge from considering acquitted conduct when calculating the applicable offense level. The amendment revises § 1B1.3 by adding new subsection (c), which provides that "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court unless such conduct also establishes, in whole or in part, the instant offense of conviction." *See* *https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202405_RF.pdf*. As noted by the USSC, "[t]his rule seeks to promote respect for the law, which is a statutory obligation of the Commission." *Id*. at 1. The USSC is also currently deciding whether to make the amendment retroactive. While the amendment is effective November 1, 2024, courts have begun to apply it retroactively anyway. *See, e.g., United States v. Boggs*, No. CR-05-80-GF-BMM, 2024 WL 3455843, at *2 (D. Mont. July 17, 2024) ("Though not effective until November 1, 2024, the Court deems it prudent to consider Boggs's argument as though the acquitted conduct amendment is applicable.").

As discussed in more detail below, the PSR does an end-run around the Travel Act count acquittals to artificially increase the offense level by relying on the Guideline that pertains to sex trafficking of minors.

**B.** **The PSR Wrongly Relies on § 2G1.3 (Promoting a Commercial Sex Act with a Minor).**

The Application Notes to § 2E1.2 (Travel Act) state: "If the underlying conduct violates state law, the offense level corresponding to the most analogous federal offense is

1  to be used." That offense is Promoting a Commercial Sex Act or Prohibited Sexual
2  Conduct with an Individual Other than a Minor (§ 2G1.1). Under that Guideline, the base
3  offense level is **14**. *Id.* at (a)(2). Instead, the PSR argues that "[t]he underlying offense
4  includes both adult and minor victims," seeking the application of both § 2G1.1
5  (Promoting a Commercial Sex Act) and § 2G1.3 (Promoting a Commercial Sex Act with
6  a Minor). PSR, ¶ 168.

7       As a matter of due process and fairness, the Court should reject this approach for
8  several reasons. First, as discussed above, Brunst was acquitted of each of the substantive
9  Travel Act counts on which the PSR relies in arguing for the application of § 2G1.3.
10  Second, the Travel Act guideline focuses on the "the offense level applicable to the
11  underlying crime," not on the alleged victims of the crime, which would result in the
12  imputation of uncharged crimes tied to those individuals. *See United States v. McEnry*, 659
13  F.3d 893, 897 (9th Cir. 2011) ("[I]t is not the defendant's underlying relevant conduct, but
14  the crime of conviction, that governs the selection of the appropriate guideline section.").
15  Third, the Superseding Indictment charges the Travel Act conspiracy as a conspiracy to
16  "facilitate prostitution." Dkt. 230, ¶ 196(a). There is no mention of facilitating the
17  prostitution (or trafficking) of minors. The Government did not charge any offenses
18  involving minors. Fourth, the Court advised the jury that Defendants are *not* charged with
19  sex trafficking, child sex trafficking, or facilitating those crimes. Doc. 1998 at 40. In effect,
20  the Government is now seeking to get the benefit of a more serious charge, without having
21  actually charged the crime or presented the charge to the jury. (Indeed, the Government's
22  repeated focus on minors during the first trial is precisely what caused the mistrial.)

23       Therefore, (1) there are no "pseudo counts" tied to Travel Act counts as to which
24  Brunst was acquitted, (2) there are not three separate "groups" tied to each of these counts
25  of acquittal (which artificially increases the offense level by three levels), and (3) the
26  requested enhancements that are specifically tied to § 2G1.3 (two levels for use of an
27  interactive computer service and two levels for a commercial sex act) do not apply, as
28

1  those enhancements are not included in § 2G1.1.[1]

2      **C.  Brunst Did Not Engage in Sophisticated Money Laundering.**

3      The PSR's justification for the enhancement is belied by the trial record. First, the

4  concealment and international promotional money laundering counts indisputably

5  concerned loan payments by Ferrer to the sellers of Backpage. There was no evidence at

6  trial that the sale or the associated loan payments were structured to conceal the source of

7  funds or to promote violations of the Travel Act. Instead, the sale was structured by highly

8  respected lawyers and accountants, and the sale documents themselves noted that

9  Backpage was being sold. That loan payments went from one entity to another, and Brunst

10  was a shareholder of the latter entity and received shareholder distributions, is not

11  "sophisticated money laundering." Rather, it is a typical, proper corporate transaction. As

12  the CFO of the sellers (Cereus Properties), Brunst reasonably relied on the advice of

13  respected lawyers and accountants that the sale and associated loan payments were lawful.

14      Second, the only financial institution to testify was AmEx—its representative

15  (Mickey Hansen) admitted that AmEx terminated Backpage as a merchant for

16  "reputational" reasons, *i.e.*, the same reasons they do not allow their credit cards to be used

17  in the context of gambling, payday loans, and other challenged industries. Doc. 1922 at

18  20:16-21:2. There was no testimony that any such institution made a determination that

19  Backpage was engaged in illegal conduct. Nor was there evidence that seeking credit card

20  processing in Europe is illegal or indicative of criminal conduct. Further, there was no

21  testimony that Brunst had any involvement in Backpage's acceptance of cryptocurrency

22  for payment, or that acceptance of such payment amounts to money laundering.

---

24  [1]  The Government's reliance on *United States v. Lucas*, 101 F.4th 1158 (9th Cir. 2024) is
25  misplaced. *See* Doc. 2107 n.8. *Lucas* concerned the standard of proof regarding a factual
  finding at sentencing concerning an *enhancement* within a given offense guideline; there,
26  whether the defendant possessed a semiautomatic firearm "capable of accepting a large
  capacity magazine." *Lucas,* 101 F.4th at 1164. Here, however, the central question is which
27  Guideline offense (§§ 2G1.1 or 2G1.3) applies in the first instance. There is no indication
  that the Ninth Circuit in *Lucas* intended for courts to supersede a jury's verdict as to the
28  offense of conviction.

D.      **A Leadership Enhancement Would Be Inappropriate Here.**

Brunst was not an "organizer or leader" with respect to any criminal conspiracy here. First, he had no role in the day-to-day management of the business, including the company's marketing strategies, reviewing ads, and dealings with NCMEC, State AGs, law enforcement, PR firms, and the press. Doc. 1832 at 87:23-93:16. Ferrer and Larkin managed the business' daily affairs—that is readily apparent from Ferrer's testimony and the e-mails admitted at trial. Brunst's involvement in the annual budget process was limited; his typical involvement would relate to salaries, or looking at overall revenue and costs. Doc. 1833 at 14:14-25. Nor was Brunst interacting with credit card companies; Hansen (AmEx) testified that he never dealt with Brunst.

Second, Brunst was not a "supervisor of one or more other participants." § 3B1.1. (Application Notes). There was no evidence at trial that Brunst supervised anyone. None of the convicted Defendants, Ferrer, or Hyer reported to Brunst. And, as a minority shareholder, Brunst by definition had no formal corporate control over the company's decisions. *See United States v. Whitney*, 673 F.3d 965, 975 (9th Cir. 2012) ("Under this circuit's clear articulation of § 3B1.1(c), even a defendant with an important role in an offense cannot receive an enhancement unless there is also a showing that the defendant had control over others. ***This renders conduct which may have been integral to the success of the criminal enterprise, or conduct that reflects a high degree of culpability, insufficient to support a leadership enhancement unless the defendant also exercised the requisite control over others***.") (emphasis added) (citations and quotation marks omitted).

E.      **Applicable Offense Level**

The PSR concedes that the Travel Act conspiracy and money laundering counts should be grouped.[2]  Section 3D1.3 provides that the offense level pertaining to the group

---

[2]   The grouping of these counts is also appropriate under § 3D1.2(b) ("When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan."). The Application Notes to § 3D1.2(b) provide the example of a defendant being convicted of "two counts of

1   be calculated with reference to "the highest offense level of the counts" in the group.

2   Further, Brunst is entitled to a downward adjustment of **2 levels** under § 4C1.1, because he

3   has no criminal history. The Government contends that the adjustment does not apply

4   where "the instant offense of conviction is . . . a sex offense." *Id*. at (a)(5). But the

5   Application Notes to the Guideline define "sex offense" with reference to certain chapters

6   of the federal criminal code; the Travel Act is not an offense contained within one of those

7   chapters. Therefore, <u>the offense level here is **14**</u> (the base offense level is **14**, plus **2** for

8   a conviction under 18 U.S.C. § 1956, minus **2** for the adjustment under § 4C1.1).

9        The Court should also consider a downward departure in light of Mr. Brunst's age

10  and health. Brunst is a cancer survivor with the ever present concern of a positive test in

11  the future. In March 2024, while passengers in an Uber, he and his wife were injured in

12  a major car accident. Mr. Brunst suffered five broken ribs, a broken sternum, a concussion,

13  and hand injuries. Through physical therapy and medical treatment for soft tissue damage

14  and hand injuries, he is gradually recovering but likely will never be the same. *See*

15  § 5H1.4. ("Physical condition or appearance, including physique, may be relevant in

16  determining whether a departure is warranted, if the condition or appearance, individually

17  or in combination with other offender characteristics, is present to an unusual degree and

18  distinguishes the case from the typical cases covered by the guidelines.").

19       Brunst's age is also a mitigating circumstance. *See* § 5H1.1 ("Age may be a reason

20  to depart downward in a case in which the defendant is elderly and infirm and where

21  a form of punishment such as home confinement might be equally efficient as and less

22  costly than incarceration."). A 72-year-old good man, with no prior criminal record, should

23  receive greater leniency.

24  _____

25  mail fraud and one count of wire fraud, each in furtherance of a single fraudulent scheme,"
    which is akin to the structure of the indictment here. Grouping is also appropriate under

26  §3D1.2(c) ("When one of the counts embodies conduct that is treated as a specific offense
    characteristic in, or other adjustment to, the guideline applicable to another of the

27  counts."). The money laundering guidelines reference the "underlying offense," here,

28  a violation of the Travel Act. *See* § 2S1.1(a)(1).

F.     **Brunst Is Probation-Eligible.**

The PSR wrongly states that "[s]ince the defendant will be sentenced at the same time to a sentence of imprisonment for the same or a different offense, the defendant is ineligible for probation." PSR, ¶ 232. The PSR assumes the conclusion, *i.e.*, that Brunst will be sentenced to a term of imprisonment. As the PSR acknowledges elsewhere, however, Brunst is eligible for probation as to each count of conviction. *Id.*, ¶ 230.

IV.     **THE PSR FAILS TO SUFFICIENTLY ACCOUNT FOR MR. BRUNST'S GOOD FAITH.**

Mr. Brunst relied in good faith on contemporaneous court decisions and guidance from counsel and the company's operational executives during his work at VVMH. The Government focused its case against Mr. Brunst on his dealings with financial and credit card companies that terminated their relationships with Backpage. In response to those terminations, Backpage sued the Cook County sheriff for illegally coercing credit card companies to terminate Backpage as a merchant. When the Seventh Circuit enjoined the sheriff, the court sent a clear message that Backpage was operating lawfully. In a strongly worded opinion by a revered, conservative Seventh Circuit judge in *Backpage v. Dart*, Judge Posner found that Sheriff Dart violated the company's First Amendment rights by coercing credit card companies to terminate their relationship with Backpage. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015) ("***The First Amendment*** forbids a public official to attempt to suppress the ***protected speech*** of private persons by threatening that legal sanctions will at his urging be imposed unless there is compliance with his demands.") (emphasis added).[3]

---

[3]     *Dart* remains good law, having recently been cited in the Supreme Court's opinion in *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 S. Ct. 1316 (2024) ("A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf . . . . *see also Backpage.com*, 807 F.3d, at 231 (holding that the First Amendment barred a sheriff from 'using the power of his office to threaten legal sanctions against . . . credit-card companies for facilitating future speech').").

Naturally, the *Dart* decision guided Mr. Brunst's actions. (Had the decision gone the other way, and been ignored by Brunst, no doubt it would have been the centerpiece of this prosecution.) The decision was consistent with what VVMH and Backpage's lawyers and executives were telling him. Mr. Brunst gained comfort that Backpage's operations were lawful and that the decision of credit card companies to refuse to continue doing business with Backpage was motivated by reputational, not legal concerns. At trial, the government's credit card company witness confirmed this.

Furthermore, this decision came on the heels of the Western District of Washington's decision in *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1268 (W.D. Wash. 2012). In *McKenna,* the court deemed unconstitutional a Washington state statute that criminalized the knowing publishing of commercial sex abuse of a minor. Despite allegations that "[m]any child prostitutes are advertised through online escort advertisements displayed on Backpage.com," including investigative work by the Seattle Police Department and the FBI that tied prostitution arrests to Backpage ads, the court held that the state criminal statute violated the First Amendment. *Id*. at 1267-68, 1275. The court observed that "a regime in which criminal liability is triggered only by notification or knowledge that 'illegal content' is available on an actor's website" runs afoul of the First Amendment. *Id*. at 1278. Yet this is indisputably the theory of criminal liability that forms the basis for Brunst's convictions here. *See* Dkt. 2063 at 21 (denying Rule 29 motion on the basis that Brunst was on notice that the demand for adult ads was high, that Backpage derived the majority of its revenues from its Female Escort section, and that a portion of Backpage's escort ads were leading to prostitution offenses).

Additionally, Mr. Brunst shared with financial institutions the legal advice being provided to the company. In 2010, Brunst forwarded to Bank of Montreal a non-privileged legal memo regarding the same principles that the court in *McKenna* would later endorse. *See* Trial Exh. 5507 at 23 ("[A]ny criminal liability for Village Voice would implicate serious First Amendment concerns. If Village Voice is held liable because some prostitutes use its service, it would have no choice but to severely self-censor its service to avoid

criminal liability. This would have the adverse effect of chilling protected speech and possibly even eliminating a forum for protected speech."); *compare McKenna*, 881 F. Supp. 2d at 1278 ("'Liability upon notice reinforces service providers' incentives to restrict speech and abstain from self-regulation.'  This is because a publisher who receives notice that content *might* be illegal would have no incentive to ensure that such content is *in fact* illegal. Rather, the rational choice in such a scenario is to remove the content as quickly as possible, whether or not it constitutes protected speech.") (quoting *See Zeran v. Am. Online, Inc.,* 129 F.3d 327, 333 (4th Cir. 1997)) (emphasis in original).

Had the Court allowed it, Mr. Brunst would have testified that he relied in good faith on these and other similar court decisions and legal analyses to guide his actions as CFO. *See* Dkt. 1879 (Mtn. to Seek Admission of Brunst's Testimony). These objections do not seek to relitigate the Court's exclusion of this evidence. However, these matters are relevant to sentencing. At trial, the Government argued that relevant facts were not fully disclosed to lawyers or courts. Whether or not that is true, there is no dispute that Mr. Brunst was not dealing directly with counsel on these matters. He did not know (and would not know) what facts were disclosed to counsel or whether they would have impacted the legal opinions. He simply knew that the company's executive decision-makers were spending millions of dollars seeking guidance from top-notch First Amendment, CDA, and compliance attorneys. He understood those attorneys to be skilled and honorable. And he saw court decisions validating their positions. These are strong circumstances warranting a downward departure and sentence of probation.

## V.    OBJECTIONS TO FINANCIAL PENALTIES

Brunst, Lacey, Spear, and Larkin's estate have a settlement in principle with the Government regarding their personal assets and the corporate assets subject to preliminary orders of forfeiture in the *Ferrer* and *Backpage* cases. The settlement was achieved in mid-June 2024 with the guidance of Magistrate Judge Jacqueline Chooljian (C.D. Cal.), who served as the settlement judge. Defendants worked expeditiously and around the clock to reach a settlement sufficiently in advance of the sentencing hearing. The settlement

agreement—which is signed by Defendants—has been provided to the USPO.[4] It is pending approval by the U.S. Deputy Attorney General, which Defendants understand to be imminent.

As part of the settlement, the Government has agreed not to seek any criminal fines or forfeitures (or forfeiture money judgments) against Brunst. And while the Government cannot agree to forego restitution, the Government has agreed that—to the extent any restitution is ordered—the government will submit a "restoration" request to the DOJ, seeking approval for the forfeited assets to satisfy any restitution order.

Mr. Brunst is giving up about two-thirds of his personal financial assets, and releasing his claims of indemnification and advancement as to the corporate assets. The settlement agreement releases sufficient funds to pay for attorney's fees for an appeal. All told, the Government is likely recoup roughly $200 million from Brunst, his co-defendants, the Larkin estate, and the corporate assets as to which the defendants are releasing their claims. Therefore, the Court should not issue any fines or forfeiture.

**A.** **There Is No Basis for the Government to Seek Restitution.**

In any event, there is no basis for restitution or a restitution hearing here. As the Ninth Circuit has held, "[a] federal court has no inherent power to order restitution . . . . The source of the court's power to order restitution is 18 U.S.C. § 3663." *United States v. Hicks*, 997 F.2d 594, 600 (9th Cir. 1993) (citations omitted). The PSR is simply wrong that restitution is *mandatory* under 18 U.S.C. § 3663A. PSR, ¶ 237. That statute requires that the offense be of a certain nature *and* that there is "an identifiable victim or victims" who have "suffered a physical injury or pecuniary loss." *See id*. at (a)(1) (requiring restitution "when sentencing a defendant convicted *of an offense described in subsection (c)*") (emphasis added); (c)(1)(A) (specifying crimes of violence, offenses against property, offenses under the Controlled Substantive Act, offenses under the Anti-Doping Act,

---

[4]   Government counsel provided the UPSO with a copy of the settlement agreement on June 24, 2022.

1   tampering with consumer products, and theft of medical products). The statute does not

2   identify a violation of the Travel Act or money laundering as an offense that requires

3   restitution, which ought to end the inquiry. Further, the PSR concedes that there is a lack

4   of identifiable victims here, admitting that "restitution cannot be ascertained at this time,"

5   and that the "specific number of victims was unable to be determined." PSR, ¶¶ 143-156.

6   Neither requirement of the restitution statute is met here.

7        *Even assuming* some kind of restitution were appropriate here (it plainly is not), the

8   Government bears the burden of establishing by a preponderance of the evidence "the

9   amount of the loss sustained by a victim *as a result* of the offense." 18 U.S.C. § 3664(e)

10  (emphasis added). Specifically, "[t]he amount of restitution is limited to the victim's

11  'actual losses' that are a direct and proximate result of the defendant's offense." *United*

12  *States v. Eyraud*, 809 F.3d 462, 467 (9th Cir. 2015); *see also* 18 U.S.C. § 3663A(a)(2)

13  ("For the purposes of this section, the term "victim" means a person directly and

14  proximately harmed as a result of the commission of an offense for which restitution may

15  be ordered including, in the case of an offense that involves as an element a scheme,

16  conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's

17  criminal conduct in the course of the scheme, conspiracy, or pattern.").

18       The Government cannot possibly meet its burden here. The PSR references

19  depression and anxiety suffered by individuals who advertised on Backpage and the family

20  members of those individuals. PSR, ¶¶ 143-156. None of this was "directly and

21  proximately" caused by any crime of conviction. Nor were these individuals "directly

22  harmed" by any of Brunst's conduct in connection with the Travel Act or money

23  laundering conspiracy convictions. *See also Hicks,* 997 F.2d at 600 ("[S]ection 3663

24  specifically authorizes the inclusion of the cost of counseling *only where the victim has*

25  *suffered a physical injury* in addition to the emotional injury giving rise to the need for

26  counseling"). Further, the Department of Justice's own manual notes that "[l]osses for

27  'pain & suffering' are also *not eligible* for restitution." *See*

28  *https://www.justice.gov/criminal/criminal-vns/restitution-process*; *see also United States v.*

*Vasquez*, No. 3:11-CR-00026-BR, 2012 WL 3011010, at \*1 n.1 (D. Or. July 20, 2012), *aff'd*, 540 F. App'x 623 (9th Cir. 2013) ("It is undisputed that the Court lacks authority to award restitution for noneconomic damages such as pain and suffering or emotional distress, and the government does not seek any such damages as restitution."). The does not intend to seek restitution for these alleged losses. *See* Doc. 2107 at 32.[5]

**B.     Potential Fines Have Been Addressed in the Settlement.**

Per the parties' settlement, the Government does not seek a fine here. Brunst respectfully requests that the Court not order one.

**C.     Costs of Prosecution Are Not Warranted Here.**

It is perplexing that the PSR continues to state that "[c]osts of prosecution shall be imposed on a defendant as required by statute." PSR, ¶ 236. Neither the Travel Act nor the money laundering statutes provide for such costs. *See* 18 U.S.C. § 1956(a)(1)(B), (a)(2)(B), (a)(3)(C); 18 U.S.C. § 1957(b); 18 U.S.C. § 1952(a)(3)(A). The Government agrees. Dkt. 2107 at 32.

## VI.     OBJECTIONS TO TERMS OF RELEASE

Brunst objects to the following terms of release:

- At age 72, he should not be required to hold full-time employment (of at least 30 hours per week). PSR, p. 56 (¶ 7).
- He should not be required to seek approval for purchases or financial obligations of over $500 (which presumably would include attorney's fees), particularly given that the contemplated forfeiture settlement should address Brunst's financial obligations in this case. *Id*., p. 57 (¶ 5).
- As noted above, there is no basis for the Government to seek restitution here. *Id*., p. 57 (¶ 7). In any event, the proposed financial settlement contemplates a recommendation from the Government that any restitution come from the forfeited funds.
- Brunst should not require pre-approval to speak with a "co-conspirator." The

---

[5]     The Government cites a ***single unpublished, out-of-circuit case*** for the proposition that restitution is mandatory under the Travel Act. Doc. 2107 at 33. But *United States v. Mendez–Perez*, 607 F. App'x 39 (2d Cir. 2015) says nothing of the sort. The court there had no occasion to determine whether the restitution order was proper; it simply vacated the imposition of a fine and remanded to the district court for "the limited purpose of resentencing as to the pecuniary aspects of the sentence." *Id*. at \*46.

trial is over. At this stage, the Defendants and their counsel need to coordinate their efforts on appeal.

**VII.     CORRECTIONS TO PERSONAL, FAMILY, AND FINANCIAL INFORMATION**

The following liabilities should be added:

- Estimated costs of appeal in this case:  $500,000
- Brunst expects to incur further attorney's fees and costs in connection with outstanding civil litigation in Texas, Illinois, and Washington.
- Brunst estimates about $260,000 in taxes and expenses in connection with any sale and/or liquidation of investment accounts that will be released by the Government pursuant to the parties' settlement.

DATED:  August 12, 2024               Respectfully submitted,

Gary S. Lincenberg
Ariel A. Neuman
Gopi K. Panchapakesan
Bird, Marella, Rhow,
Lincenberg, Drooks & Nessim, LLP

By:      */s/ Gary S. Lincenberg*
Gary S. Lincenberg
Attorneys for Defendant John Brunst