1  Gary S. Lincenberg (admitted pro hac vice)
       glincenberg@birdmarella.com
2  Ariel A. Neuman (admitted pro hac vice)
       aneuman@birdmarella.com
3  Gopi K. Panchapakesan (admitted pro hac vice)
       gpanchapakesan@birdmarella.com
4  BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
   DROOKS, LINCENBERG & RHOW, P.C.
5  1875 Century Park East, 23rd Floor
   Los Angeles, California 90067-2561
6  Telephone: (310) 201-2100
   Facsimile: (310) 201-2110
7
   Attorneys for Defendant John Brunst
8

9                **UNITED STATES DISTRICT COURT**

10              **FOR THE DISTRICT OF ARIZONA**

11

12  United States of America,              CASE NO. 2:18-cr-00422-004-PHX-DJH

13              Plaintiff,                  **DEFENDANT JOHN BRUNST'S
                                            SENTENCING MEMORANDUM**

14          vs.                            Assigned to Hon. Diane J. Humetewa

15  Michael Lacey, et al.,

16              Defendants.

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................ 2

      A.   Procedural Background ......................................................................... 2

      B.   Mr. Brunst's Educational and Professional Background ...................... 3

      C.   Mr. Brunt's Role at VVMH .................................................................. 3

      D.   Jed Brunst Is a Compassionate Man Who Has Led a Life of Sacrifice
           and Service for His Family. ................................................................. 5

           1.   Mr. Brunst Was a Good Father. .................................................. 5

           2.   Mr. Brunst's Extraordinary Care and Support for Family. ........ 6

           3.   Mr. Brunst Is a Man of Faith and a Giving Member of His
                Community. ................................................................................. 9

      E.   Mr. Brunst's Health Issues .................................................................. 9

III.  AN ANALYSIS OF THE STATUTORY SENTENCING FACTORS
      WARRANTS A SENTENCE OF PROBATION. .................................................. 10

      A.   History and Characteristics of Mr. Brunst (Section 3553(a)(1)).......... 10

      B.   The Nature and Circumstances of the Offense (Section 3553(a)(1))........... 10

           1.   Mr. Brunst Acted in Good Faith.................................................. 10

           2.   General Awareness That Prostitutes Advertised on Backpage
                Does Not Warrant a Sentence of Imprisonment.......................... 14

           3.   The Government Seeks an Unprecedented Application of the
                Travel Act That Congress Itself Acknowledged Is
                Inappropriate. ............................................................................. 15

      C.   The Guidelines Provide for an Offense Level of 14 (18 U.S.C.
           § 3553(4)). ........................................................................................... 16

      D.   The Government Seeks Severe Punishment in Comparison to Other
           Sentences for Similar Conduct (18 U.S.C. § 3553(a)(6)). ................... 17

      E.   The Remaining Sentencing Factors Counsel in Favor of Probation (18
           U.S.C. § 3553(a)(2)). .......................................................................... 17

      F.   Brunst and the Government Have Agreed to Resolve Any Financial
           Penalties............................................................................................... 19

IV.   CONCLUSION ................................................................................................ 19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Backpage.com, LLC v. Cooper*
    939 F. Supp. 2d 805 (M.D. Tenn. 2013)................................................................11, 15

*Backpage.com, LLC v. Dart*
    807 F.3d 229 (7th Cir. 2015).................................................................................11, 12

*Backpage.com, LLC v. Hoffman*
    No. 13-CV-03952 DMC JAD, 2013 WL 4502097 (D.N.J. Aug. 20, 2013)...............11

*Backpage.com, LLC v. McKenna*
    881 F. Supp. 2d 1262 (W.D. Wash. 2012).......................................................11, 12, 13

*Nat'l Rifle Ass'n of Am. v. Vullo*
    144 S. Ct. 1316 (2024).................................................................................................12

*United States v. Hansen*
    599 U.S. 762 (2023).............................................................................................17, 18

*United States v. Tavelman*
    650 F.2d 1133 (9th Cir. 1981)....................................................................................16

*Zeran v. Am. Online, Inc.*
    129 F.3d 327 (4th Cir.1997)........................................................................................13

**Statutes**

18 U.S.C.
    § 1591...........................................................................................................................16
    § 3553(4)......................................................................................................................16
    § 3553(a)(1)..................................................................................................................10
    § 3553(a)(2)..................................................................................................................17
    § 3553(a)(6)..................................................................................................................17

47 U.S.C. § 230..................................................................................................*passim*

**Other Authorities**

U.S. Const. amend. I..........................................................................................*passim*

U.S. Sentencing Commission Guidelines
    § 2G1.3........................................................................................................................16

# I.     <u>INTRODUCTION</u>

Jed Brunst is a quiet and caring man. He is a straight shooter who abides by rules. He's the type to slow down, rather than speed up, at yellow lights. At work, he adhered closely to the rules of accounting. At Village Voice Media Holdings (VVMH)[1] and the other media holding companies, Jed always reported to Mr. Larkin. Mr. Larkin always told Jed to "stay in your own lane" and let others handle their responsibilities. That is what Jed did.

Mr. Brunst is devoted to family. He raised six wonderful children and helped raise a grandson when one of his sons developed mental health issues. Jed has a close marriage with his wife Mary Ann and looks after her as she battles chronic medical conditions. Even with extended family, such as in-laws, Jed has always been the first to reach out to care for those in need. As he ages, he treasures spending time with his six grandchildren.

On top of his good character, there are several strong mitigating circumstances that the Court should consider. First, in his work, Mr. Brunst relied on the legal advice and court decisions conveyed to him. A CFO of a holding company often plays a role in ensuring that controls are in place—such as looking at whether the company has competent in-house and outside counsel to address legal issues. But it is not a CFO's job to manage legal risks arising from business operations. In the attached declaration, University of Chicago Professor Dennis Chookaszian explains this concept (**Exhibit C**). Professor Chookaszian is a world-renowned professor of corporate governance and an expert in the role of a CFO. His declaration makes clear that the role that Mr. Brunst played is consistent with the role that one would expect of a CFO.

With the growth of Backpage, legal challenges certainly grew. VVMH's CEO James Larkin, Board member and lawyer Don Moon, and outside counsel handled these legal issues. From what Brunst was told—and what he learned from the federal court cases

---

[1]     For simplicity sake, this brief will often use VVMH as a catch-all for the various entities, including Cereus Properties and Medalist Holdings, where Mr. Brunst was employed. Mr. Brunst was never employed by Backpage.

involving Backpage that struck down as unconstitutional state laws that mirror the way in which the Government has sought to apply the Travel Act here—Brunst believed that VVMH and its subsidiaries operated lawfully.

Second, Mr. Brunst did nothing to solicit the pimps, prostitutes, and adult entertainment businesses who advertised on Backpage. He never dealt with Dollar Bill or aggregators. He never reviewed any ad before it was posted. He performed accounting and banking-related work for a media holding company that ran classified ads in its newspapers long before Backpage came into existence. It is unfair to sentence Mr. Brunst as a sex trafficker.

Third, Mr. Brunst has reached an agreement with the Government to forfeit his ownership of, and claims to, millions of dollars of financial assets. This includes forfeiting his claims to the assets subject to the Preliminary Orders of Forfeiture in the *Backpage* and *Ferrer* cases. The parties have agreed that these assets are being relinquished in order to cover any fines, forfeitures, and forfeiture money judgments, as well as a restoration process should the Court order restitution. Brunst is informed that final Government approval of the settlement is imminent.

The Presentence Investigation Report (PSR) errs in recommending an offense level of 43 (Doc. 2119 at 52). The appropriate offense level is 14. *See* PSR Objections (Doc. 2123).

For compelling reasons, Brunst firmly believes in his innocence. He intends to appeal. Mr. Brunst is prepared to accept whatever the Court of Appeals decides. (Brunst Ltr.) But given that he is a man of such strong character who tried to perform his job in good faith, under these circumstances, and as set forth with detail and support below, Mr. Brunst respectfully requests a sentence of probation.

## II. BACKGROUND

### A. Procedural Background

The Government indicted this case in April 2018, seizing most of Mr. Brunst's investment and bank accounts. At around the same time, the California Attorney General

filed companion state criminal law charges against Ferrer, Larkin, and Lacey. Brunst was not charged in California. Nor was he summoned to testify by the Senate Permanent Select Committee on Investigations, whose work led to this indictment. And in the original indictment here, he was not charged with any of the Travel Act counts.

For the past six years, he has lived with the stain and distress of an indictment hanging over his head. For the first three years, he gathered his strength for a trial, only to see it result in a mistrial due to prosecutorial conduct. Two years later, on the eve of a second trial, he saw his former boss commit suicide. After trial, the jury reported it was hopelessly deadlocked. After receiving an *Allen* charge, the jury returned a verdict finding him guilty of conspiring to commit 50 Travel Act counts (along with related money laundering counts) while acquitting him of all 50 counts.

### B.  Mr. Brunst's Educational and Professional Background

Mr. Brunst is 72 years old. He grew up in Flossmoor, Illinois, just south of Chicago. In 1974, he graduated from the University of Illinois with a degree in accounting. He began working as an accountant while taking graduate coursework at the University of Chicago. Mr. Brunst began his career as an accountant with Coopers & Lybrand, then one of the Big Eight accounting firms. He later joined Allied Signal, a large, Illinois-based company in the aerospace, automotive, and engineering business. Work took him to Portland, Oregon, and then Phoenix. While working at a bank in Phoenix, he met Mr. Larkin, who was a client of the bank. In 1992, years before Backpage, Mr. Larkin recruited Jed to New Times, Inc. At its peak (2006 to 2013), New Times owned 18 newspapers.

### C.  Mr. Brunt's Role at VVMH

At VVMH (and its successor Medalist following the sale of the company's newspapers in 2013), Mr. Brunst served as CFO. His work focused on tax, financial acquisitions, investors, and banking. He did not perform operations work. He performed a traditional CFO role. *See* Chookaszian Decl. Into 2014, the company had major investors like Alta Communications (who held a 14% stake in the company, which owned

Backpage) and Goldman Sachs (who held a 38% stake). These blue-chip institutions performed due diligence and reviewed the compliance work of VVMH's subsidiaries. This also gave comfort to Mr. Brunst that VVMH was operating lawfully. At VVMH, Mr. Brunst had a stellar reputation for honesty and ethics.

As CFO of the holding company, Brunst tried to apply the highest ethical business standards. Over the years, he became aware of the controversies surrounding Backpage. While it was not his role to directly oversee litigation or the resolution of discussions with law enforcement (like State Attorneys General), he understood that in-house and outside attorneys were tasked with addressing these challenges. The role of the senior executives (like Mr. Larkin) and attorneys, coupled with favorable federal court rulings, led Brunst to believe that Backpage was operating lawfully. (Brunst Ltr.)

Each business unit (including Backpage) had its own business manager. He attended some high-level budget meetings, but a controller largely oversaw the budgeting process. Consistent with the role of a CFO, Brunst relied on their work. *See* Chookaszian Decl., ¶ 4 ("A CFO typically delegates significant responsibility to a controller at the corporate level and often to controllers or business managers for individual business units or subsidiaries."). And in dealing with investors and financial institutions, Brunst pointed them to legal opinions from respected outside attorneys. As Professor Chookaszian observes:

> To the extent investors and financial institutions have questions or concerns regarding legal or compliance matters, it is not the role of the CFO to deal with those issues. A CFO is generally not a lawyer and not qualified to comment on the legal and compliance matters. Instead, a ***CFO satisfies his duties by directing investors and financial institutions to the opinions of both internal and external counsel, on the subjects of concern. It is not the role of the CFO to assess whether these opinions of counsel are right or wrong or fully informed by the relevant facts***. A CFO does not have the experience or skill to make those determinations. Further, the investors and financial institutions are typically represented by their own internal and external counsel who conduct due diligence and manage legal risk for their clients.

*Id.*, ¶ 6 (emphasis added).

Qualified legal personnel were in place to address the legal challenges facing the

company. *Id.*, ¶ 9 ("Critically, a CFO does not manage the mitigation of legal risk facing the company, because a CFO generally does not have the training or skill to manage these matters. Fundamentally, a CFO's job in this regard is to ensure that qualified people – such as a general counsel or outside legal counsel – are engaged to manage these risks.").

### D. Jed Brunst Is a Compassionate Man Who Has Led a Life of Sacrifice and Service for His Family.

#### 1. Mr. Brunst Was a Good Father.

Mr. Brunst raised six children—four from a prior marriage and two with his current wife, Mary Ann Brunst. After separating from his first wife in 1987, Mr. Brunst was awarded sole custody of his four children—Michael, Kate, Kelley, and Matthew. (Kelley Brunst Ltr.) As a single father, Mr. Brunst raised his children while at the same time working to provide for them. Mary Ann Brunst writes of Jed's focus on his family:

> *I have witnessed Jed as a single father and then a father to all of our beautiful family. Jed is an amazing father and it was no easy task as a single dad, but he did it and did it amazingly well.*

(Mary Ann Brunst Ltr.)

From a young age, Mr. Brunst taught his children to be kind, to work hard, and to show empathy toward others. As his (now adult) children describe in their letters of support, they took their father's teachings to heart, leading lives of service and making meaningful and patriotic contributions to society.

- In 1999, when Kelley Brunst was only 13, her mother was diagnosed with colon cancer, passing away just three months later. Mr. Brunst "was a pillar of strength and a shock absorber for [her] grief." *Id.* Kelley is not sure she "would have survived that experience" without her father. *Id.* She says, "[t]ime and again, my father has set his needs aside and shown me what it means to care for another person." *Id.* That empathy "is partly what inspired [her] career as a registered nurse," following her graduation from ASU. *Id.* Her father taught her "an exceptional work ethic and how to stand up for [herself]," showing her "that there is strength in vulnerability and in accepting kindness, love and support from others

when [she] needs it."

- Kate Brunst is Mr. Brunst's eldest daughter. She graduated from ASU and now works on the East Coast for a large company that consults on military and other federal contracts. (Kate Brunst Ltr.) Kate writes that her dad "has always encouraged a strong work ethic, accountability, and independence, and he has led by example [her] whole life." *Id.*

- Michael Brunst is Mr. Brunst's oldest son. He has risked his life for his country for 29 years. He currently serves as the Command Master Chief at Naval Special Warfare Development Group.[2] Michael says he was "raised by a man who taught me to work hard, tell the truth and stand up for what you believe in." *Id.* Now a father to two young men, Michael has "a greater respect for what it takes to build strong young men that people can count on." *Id.* Michael writes that for the past 30 years, "[t]he man I call or text when I needed some wisdom, patience, or just reassurance" is his father. (Michael Brunst Ltr.) *Id.*

Michael Brunst, who has served his country honorably and has seen more combat than can be disclosed in a public letter, implores:

> *I have dealt with a lot of malevolent humans over 29 years, mainly overseas. I fancy myself a decent judge of character regardless of my biases and cultural differences. I have seen things I wish I never had and have been privy to conversations of powerful people that I wish I never heard. As a human that has seen many of the shortcomings of this world, I can only wholeheartedly deny what my father has been found guilty of as it is not his character.*

(*Id.*)

Mr. Brunst has six grandchildren (four in the Phoenix area and two on the East Coast) and hopes to spend his retirement years seeing them grow up.

### 2. Mr. Brunst's Extraordinary Care and Support for Family.

Mr. Brunst's responses to family challenges are telling of his character. His younger son, Matthew, suffers from addiction. Matthew lacked the capacity to raise his son. Jed and

---

[2] His missions are classified and cannot be discussed here.

Mary Ann stepped in to help. First, they took their grandson into their home. Then they searched for a caring couple to adopt him. They found a couple that could not get pregnant and wanted to adopt, arranged for the adoption of their grandson, and brought the new parents into the Brunst family: "We love them as family and they love us as family." (Mary Ann Brunst Ltr.) Jed's daughter Kelley describes his commitment to family:

> *In 2016, my brother Matthew and the mother of his children were stripped of their parental rights. My father and stepmother assumed care of my then-two-year-old nephew. He was not hitting his milestones and only spoke in one- or two-word sentences, which we learned was related to a hearing deficit stemming from a ruptured eardrum. Thanks to my father's diligence as his caretaker, [Jed's grandson] got the help he needed and is now thriving. Seeing my dad, then an empty nester, willingly "go back to the starting line," with a toddler impressed his selflessness upon me. It inspired me.*

(Kelley Brunst Ltr.)

Mary Ann has a son from a prior marriage, Scott, whom Jed adopted. Mary Ann writes: "Jed has taken on my son as his own from day one including . . . going to court to have him as a 'Brunst' forever and to this day they have an incredibly close father/son relationship." (Mary Ann Brunst Ltr.) As Scott writes, by providing stability and guidance, Jed has had a lasting impact on his life:

> *Prior to meeting Jed, I remember being a kid and wondering what it would be like to have a dad. My prayers were answered with him. He taught me what it meant to be a man. He taught me integrity, hard work ethic, doing the right thing, and keeping my word.*

(Scott Brunst Ltr.)

Scott writes of his depression and addiction, and how Jed helped him struggle through and overcome these challenges, which Scott "would not have been able to do without the support of his father." *Id.* Scott now has a productive career focused on helping others overcome addiction. Scott writes to the Court:

> *I am hoping you see it in your heart to grant lenience on Jed, as he his not just a great man, but by far the most principled man I have ever met. His presence in this world is a blessing and the world is better with him being able to impart his wisdom and big heart.*

(Scott Brunst Ltr.)

Jed and Mary Ann's youngest daughter, Sarah, "struggled with anxiety so severe that [she] could not leave the house." (Sarah Brunst Ltr.) She writes: "My dad never gave up on me and asked me every night if I would go on a walk with him. He made sure I never had to go through it alone and helped me shoulder that burden in whatever way he could. Without his persistence, I would not be where I am today." *Id.* For Sarah, Mr. Brunst is "everything I could've asked for in a father, and my greatest fear is losing him." *Id.* Karen Hughes, Mr. Brunst's sister-in-law, has also observed how Jed's guidance and empathy has helped Sarah blossom, and how Sarah is now struggling with the thought of what her father is going through. (Karen Hughes Ltr.) Sarah is slated to graduate from ASU later this year.

No one is more in need of Jed right now than Mary Ann. Jed is her rock. In 2018, when Mrs. Brunst's mother was diagnosed with pancreatic cancer, and her father had rapidly progressing dementia, Mr. Brunst effectively became a caretaker for his wife's parents. (Mary Ann Brunst Ltr.) He took his mother-in-law to her chemotherapy appointments. Or he would stay with his father-in-law when his mother-in-law was in the hospital. (*See also* Hughes, Rehm, and Herring Ltrs.) As Jed's sister-in-law writes: "Jed was an unwavering son-in-law to my parents. He was at each of their bedsides when they took their last breath." (Karen Hughes Ltr.) Mrs. Brunst's other sisters expressed the same gratitude for Mr. Brunst's selflessness:

- "Over the past 10 years, I've watched Jed and my sister Mary Ann selflessly care for our aging parents. There were many times when they rushed dad to the emergency room, [and] took mom to doctor and chemotherapy appointments." (Lynn Herring Ltr.)

- "When my mother was sick with pancreatic cancer and away at chemotherapy appointments, Jed would stay home with my dad [who had dementia] and keep him company. Or Jed would take my mom to chemotherapy and stay with her all day . . . . What he did for my parents I will be forever grateful [for]." (Donna Rehm Ltr.)

Mary Ann suffers from chronic health conditions. "She depends on Jed to assist her with doctor appointments and help her on days when she is bedridden due to her psoriatic arthritis and other autoimmune disorders." (Karen Hughes Ltr.) Mary Ann writes:

> *I too have some serious health issues that continue to be a challenge or have landed me in the hospital several times. Jed has never left my side and cared for me in such an incredibly loving way. I don't know what I would do without him, his care helping me and his love for me, he is my rock.*

(Mary Ann Brunst Ltr.) The Court may have observed Mary Ann's support for Jed during every day of the trial. Counsel observed it constantly over the past six years.

For 50 years, Mr. Brunst has been—and continues to be—the central figure of his family. He has shepherded his wife and children through their physical and emotional challenges. His steady, quiet, and attentive manner has been a healthy model for each of them.

### 3. Mr. Brunst Is a Man of Faith and a Giving Member of His Community.

Mr. Brunst has a "deep faith and does his daily [religious] study to keep that faith growing." (Mary Ann Brunst Ltr.) Over the years, he has regularly donated his time and money to the Pancreatic Cancer Action Network, Leukemia & Lymphoma Society, Wounded Warrior Project, St. Jude Children's Research Hospital, Phoenix Rescue Mission, and other charitable causes. (Karen Hughes Ltr.) Along with his friend Bob Mayfield, Mr. Brunst raises funds for the homeless, the community fire department, and education scholarships. He has volunteered as Treasurer for a local community board to prepare their financial reports to the Arizona Department of Revenue and IRS. Mayfield has worked with Jed on this community board and "observed Jed to be trustworthy and honest in all respects. (R. Mayfield Ltr.)

### E. Mr. Brunst's Health Issues

Mr. Brunst is a cancer survivor. He lives in fear of a positive test.

In March 2024, while passengers in an Uber, he and his wife were in a major car accident. Mr. Brunst suffered five broken ribs, a broken sternum, a concussion, and hand

injuries. Through physical therapy and medical treatment for soft tissue damage and hand injuries, he is recovering. Mary Ann likewise suffered serious injuries and is going through her own recovery process.

## III.    AN ANALYSIS OF THE STATUTORY SENTENCING FACTORS WARRANTS A SENTENCE OF PROBATION.

### A.    History and Characteristics of Mr. Brunst (Section 3553(a)(1))

As set forth above in detail, Mr. Brunst has led a life of uncommon decency. He has seen his family through thick and thin. Mr. Brunst has always put others before himself. He has led a law-abiding life, marked by helping others through family and charity. Today, his wife Mary Ann needs him more than ever.

### B.    The Nature and Circumstances of the Offense (Section 3553(a)(1))

The nature and circumstances of Mr. Brunst's conduct support a sentence of probation for three main reasons: (1) whether or not the Court was correct in precluding certain evidence of good faith at trial, that evidence is relevant at sentencing; (2) he should not be punished for the conduct of others; and (3) whether or not this theory of prosecution will withstand further legal scrutiny, its somewhat novel and unprecedented nature supports mitigation in sentencing. Thus, while Brunst understands that we will not persuade the Court that we are right on the legal issues, reviewing the facts is critical to determining an appropriate sentence.

#### 1.    Mr. Brunst Acted in Good Faith.

Mr. Brunst relied in good faith on contemporaneous court decisions and guidance from counsel and the company's operational executives during his work at VVMH. While the Court precluded this evidence, it is important to consider for sentencing purposes. Day in and day out, Brunst took comfort in the fact that, on behalf of the company, a slew of highly qualified attorneys dealt with legal compliance issues. This comfort was substantiated when courts dismissed challenges to Backpage, and the U.S. Attorney for the Western District of Washington determined that federal criminal charges were not warranted.

As to why DOJ previously rejected criminal charges, the Government argues that new information regarding that same time period was later discovered. The Government also notes that the prior court rulings did not involve the Travel Act. But these were cases in which federal courts struck down state laws that criminalized the publishing of ads for sex *in the very same manner* that the Government has sought to apply the Travel Act here, *i.e.*, through proof of coded and implicit language. Federal courts struck down each and every one of these laws under **the First Amendment** and the Communications Decency Act.[3] As such, Brunst believed in good faith that the public calls to shut down the website were not grounded in the law and did not provide "notice" of anything.

The Government focused much of its case against Mr. Brunst on his dealings with financial and credit card companies that terminated their relationships with Backpage. In response to those terminations, Backpage sued the Cook County sheriff for illegally coercing credit card companies to terminate Backpage as a merchant. When the Seventh Circuit enjoined the sheriff, the court sent a clear message that Backpage was operating lawfully. In a strongly worded opinion by a revered, conservative Seventh Circuit judge in *Backpage v. Dart*, Judge Posner found that Sheriff Dart violated the company's First Amendment rights by coercing credit card companies to terminate their relationship with

---

[3] *See Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1268 (W.D. Wash. 2012) ("[W]here an online service provider publishes advertisements that employ coded language, a reasonable person could believe that facts exist that do not in fact exist: an advertisement for escort services may be just that."); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 830 (M.D. Tenn. 2013) ("While prostitution may be illegal in Tennessee, the statute at issue here does not criminalize prostitution—it criminalizes the sale or potential sale of advertisements. [The State AG has] have made no showing that an adult analogue to Tenn. Code Ann. § 39–13–315 exists and is constitutional, rendering it illegal to sell or offer to sell advertisements in Tennessee that appear to encourage a commercial sex act with an adult."); *Backpage.com, LLC v. Hoffman*, No. 13-CV-03952 DMC JAD, 2013 WL 4502097, at *10 (D.N.J. Aug. 20, 2013) ("[T]he Act's definition of 'advertisement for a commercial sex act,' including any 'implicit offer' of sex for 'something of value,' is also likely impermissibly vague. Describing criminal conduct as anything that is 'implicit' is inherently vague, because it means '[n]ot directly expressed [and] existing [only] in[f]erentially' and 'fails to clearly mark the boundary between what is permissible and impermissible.'").

Backpage. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015) ("***The First Amendment*** forbids a public official to attempt to suppress the ***protected speech*** of private persons by threatening that legal sanctions will at his urging be imposed unless there is compliance with his demands.") (emphasis added).[4]

Put simply, in the face of "credit card Armageddon," Judge Posner told Mr. Brunst that the terminations were not "notice" that the site was being used for illegal purposes, but instead that the company's First Amendment rights had been violated. (Had the decision gone the other way, and ignored by Brunst, no doubt it would have been the centerpiece of this prosecution.)

Furthermore, this decision came on the heels of the Western District of Washington's decision in *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1268 (W.D. Wash. 2012). In *McKenna*, the court deemed unconstitutional a Washington state statute that criminalized the knowing publishing of commercial sex abuse of a minor. Despite allegations that "[m]any child prostitutes are advertised through online escort advertisements displayed on Backpage.com," including investigative work by the Seattle Police Department and the FBI that tied prostitution arrests to Backpage ads, the court held that the state criminal statute violated the First Amendment. *Id*. at 1267-68, 1275. The court observed that "a regime in which criminal liability is triggered only by notification or knowledge that 'illegal content' is available on an actor's website" runs afoul of the First Amendment. *Id*. at 1278. Yet this is indisputably the theory of criminal liability that forms the basis for Brunst's convictions here. *See* Dkt. 2063 at 21 (denying Rule 29 motion on the basis that Brunst was on notice that the demand for adult ads was high, that Backpage derived the majority of its revenues from its Female Escort section, and that a portion of

---

[4] *Dart* remains good law, having recently been cited in the Supreme Court's opinion in *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 S. Ct. 1316 (2024) ("A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf . . . . *see also Backpage.com*, 807 F.3d, at 231 (holding that the First Amendment barred a sheriff from 'using the power of his office to threaten legal sanctions against . . . credit-card companies for facilitating future speech')").

Backpage's escort ads were leading to prostitution offenses). Again, during the heart of the alleged conspiracy, a federal court told Brunst that he (and Backpage) could not be criminally liable merely because he was on "notice" that prostitution ads had been posted to the site.

Further, in fulfilling his role as CFO, Mr. Brunst shared with financial institutions the legal advice being provided to the company. *See* Chookaszian Decl., ¶ 6. In 2010, Brunst forwarded to Bank of Montreal a legal memo regarding the same principles that the court in *McKenna* would later endorse. *See* Trial Exh. 5507 at 23 ("[A]ny criminal liability for Village Voice would implicate serious First Amendment concerns. If Village Voice is held liable because some prostitutes use its service, it would have no choice but to severely self-censor its service to avoid criminal liability. This would have the adverse effect of chilling protected speech and possibly even eliminating a forum for protected speech."); *compare McKenna*, 881 F. Supp. 2d at 1278 ("'Liability upon notice reinforces service providers' incentives to restrict speech and abstain from self-regulation.' This is because a publisher who receives notice that content *might* be illegal would have no incentive to ensure that such content is *in fact* illegal. Rather, the rational choice in such a scenario is to remove the content as quickly as possible, whether or not it constitutes protected speech.") (quoting *See Zeran v. Am. Online, Inc.*, 129 F.3d 327, 333 (4th Cir.1997)) (emphasis in original).

Had the Court permitted it, Mr. Brunst would have testified that he relied in good faith on these and other similar court decisions and legal analyses to guide his actions as CFO. *See* Dkt. 1879 (Mtn. to Seek Admission of Brunst's Testimony). Again, this sentencing brief does not seek to relitigate the Court's exclusion of this evidence. However, these matters are highly relevant to sentencing, in particular the nature of Mr. Brunst's role at the company and the matters that guided his work. At trial, the Government argued that relevant facts were not fully disclosed to lawyers or courts. Whether or not that is true, there is no dispute that Mr. Brunst was not dealing directly with counsel on these matters. He did not know (and would not know) what facts were

disclosed to counsel or whether they would have impacted the legal opinions. He simply knew that the company's executive decision-makers were spending millions of dollars seeking guidance from top-notch First Amendment, CDA, and compliance attorneys. He understood those attorneys to be skilled and honorable. And he saw court decisions validating their positions. In doing so, he fulfilled his obligations as CFO. Chookaszian Decl., ¶¶ 6, 7, 9. These are strong circumstances warranting a sentence of probation.

### 2. General Awareness That Prostitutes Advertised on Backpage Does Not Warrant a Sentence of Imprisonment.

This sentencing should not be about the actions of pimps, prostitutes, and sex traffickers. Their actions are not the responsibility of a CFO of the parent of a classified ads company. Mr. Brunst never posted a Backpage ad, reviewed a Backpage ad before it was posted, consulted with any third party about their Backpage ads, moderated a Backpage ad, or interacted with anyone involved in any affiliate or reciprocal link program with Backpage. The pimps who posted ads as to the individuals who testified at trial have been prosecuted and incarcerated.

In its Rule 29 Order, the Court held that Brunst received "notice" from law enforcement, State AGs, non-profits, and media outlets that "a portion of Backpage's escort ads were in fact leading to prostitution offenses." Doc. 2063 at 21. The same could be said of many prominent social media platforms today. The CFO of Meta should not face imprisonment for content posted by third-party users of the platform simply because the CFO has general notice of the platform's misuse. *See, e.g.*, https://www.theguardian.com/news/2023/apr/27/how-facebook-and-instagram-became-marketplaces-for-child-sex-trafficking (despite cooperation with law enforcement and reports to NCMEC, Facebook and Instagram have become "major sales platforms for child trafficking," concluding that "[w]hilehttps://www.theguardian.com/technology/meta Meta says it is doing all it can, we have seen evidence that suggests it is failing to report or even detect the full extent of what is happening" and observing that the company's moderators were precluded from taking down a post "unless the language and content was really

obvious"); *see also Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 815 (M.D. Tenn. 2013) ("Another study published in early 2011 found that approximately 83 percent of prostitutes in New York City maintained a Facebook page to promote their services and that, as early as 2008, used that website to connect with 25 percent of their regular clients. The study's author predicted Facebook would become 'the leading online recruitment space' for prostitution.").

Indeed, while the Government points to the thousands of subpoenas Backpage received as evidence of criminal intent on the part of Brunst, the ***FBI itself believes the opposite***. *See* Doc. 2063 at 24 (describing Backpage's responses to subpoenas as a "façade"). In a June 2021 Government Accountability Office (GAO) Report to Congress entitled, "Sex Trafficking: Online Platforms and Federal Prosecutions," the GAO states:

> Separately, ***gathering evidence to bring cases against users of online platforms has also become more difficult***. According to a 2019 FBI document, ***the FBI's ability to identify and locate sex trafficking victims and perpetrators was significantly decreased following the takedown of backpage.com. According to FBI officials***, this is largely because law enforcement was familiar with backpage.com, ***and backpage.com was generally responsive to legal requests for information***.

Trial Exh. 5547[5] (emphasis added).

The responses to subpoenas that purportedly established criminal intent on Brunst's part are the very same responses that the FBI later admitted allowed it to track down wrongdoers, efforts that have "significantly decreased" because Backpage was shut down. *Id.* In other words, the government agency that investigated this case now concedes the social benefit that Backpage's law enforcement cooperation efforts produced, efforts that gave Brunst comfort *at the time* regarding the legality of the business.

### 3. The Government Seeks an Unprecedented Application of the Travel Act That Congress Itself Acknowledged Is Inappropriate.

In 2018, in passing the Allow States and Victims to Fight Online Sex Trafficking Act (FOSTA)—prompted by the Senate's investigation of Backpage—Congress stated ***just***

---

[5]    *Available here*:  https://www.gao.gov/assets/gao-21-385.pdf.

one month before the indictment was issued in this case:

> ***Importantly, current federal criminal law, which is unaffected by the CDA, presently lacks proper prosecutorial tools to combat these websites***. Though under 18 U.S.C. S 1591, a website may be held criminally liable for knowingly advertising sex trafficking, ***this knowledge standard is difficult to prove beyond a reasonable doubt. This is so because online advertisements rarely, if ever, indicate that sex trafficking is involved***. The advertisements neither directly nor implicitly state that force, fraud, or coercion was used against the victim, nor do they say that the person depicted being prostituted is actually under the age of 18. ***Because these indicia of knowledge of criminality are typically lacking in the advertisements, federal prosecutors usually cannot demonstrate beyond a reasonable doubt that the website operators knew that the advertisements involved sex trafficking. Further, general knowledge that sex trafficking occurs on a website will not suffice as the knowledge element must be proven as to a specific victim*** . . . . A new statute that instead targets promotion and facilitation of prostitution is far more useful to prosecutors.

H.R. REP. 115-572, at 5 (February 20, 2018), attached as **Exhibit A** at 5 (emphasis added).

Congress recognized that "general knowledge" that sex trafficking occurs on a website will not suffice in a prosecution under 18 U.S.C. § 1591 (sex trafficking), a statute that requires mere knowledge. How then could such "general knowledge" possibly form the basis for a legitimate Travel Act prosecution, ***which requires specific intent?*** *See United States v. Tavelman*, 650 F.2d 1133, 1138 (9th Cir. 1981). It is telling that in the over six years this case has been pending, the Government has never once cited a case applying the Travel Act in a manner consistent with its approach to liability here.

### C. The Guidelines Provide for an Offense Level of 14 (18 U.S.C. § 3553(4)).

As set forth in extensive detail in Brunst's PSR Objections, the appropriate offense level under the Sentencing Guidelines is 14. Doc. 2123. With no criminal history, that offense level correlates to a Guideline incarceration term of 15 to 21 months. The PSR improperly relies on Guidelines' § 2G1.3 (Promoting a Commercial Sex Act with a Minor) to reach an offense level of 43, when no such offense was charged, and Brunst was *acquitted* of the substantive Travel Act counts relating to ads involving minors. *Id.* at 10-13. Further, there are no mandatory minimums here; the Court is therefore free to issue a sentence of probation. *Id.* at 16.

### D. The Government Seeks Severe Punishment in Comparison to Other Sentences for Similar Conduct (18 U.S.C. § 3553(a)(6)).

18 U.S.C. § 3553(a)(6) acknowledges "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." The Government's anticipated sentencing request runs counter to the available data on sentencing outcomes. In the Sentencing Commission's 2023 Annual Report and Sourcebook ("Sourcebook"), out of 1,312 money laundering offenders, 138 (or 10.5%) received probation. **Exhibit B** (Table 13 to Sourcebook). Of course, many of the prison sentences presumably were for individuals with prior convictions, large-scale narcotics trafficking, major frauds, and the like. Out of 130 racketeering offenders (which encompasses the Travel Act under the Guidelines), 24 individuals (or 18.5%) received probation. *Id*. Likewise, many of those sentenced to terms of imprisonment were presumably organized crime figures.

In 2023, the mean and median sentence lengths for money laundering offenders (often large narcotics traffickers) were 63 and 36 months, respectively. *Id*. (Table 15 to Sourcebook). The mean and median sentence lengths for racketeering offenders were 32 and 24 months, respectively. *Id*. (Table 15 to Report). It is also very likely that almost none of these thousands of offenders conducted their business after repeated approval by judges.

### E. The Remaining Sentencing Factors Counsel in Favor of Probation (18 U.S.C. § 3553(a)(2)).

The sentencing goals outlined in 18 U.S.C. § 3553(a)(2) would be furthered by a sentence of probation. A "just punishment" here would <u>not</u> be one that equates Jed Brunst to sex trafficking operators. Mr. Brunst never committed any such crimes.

Further, given the continuing evolution of the Internet, courts are defining the contours of precisely what conduct is required to convict someone of facilitating another's crime while adhering to the strictures of the First Amendment. *See, e.g.*, *United States v. Hansen*, 599 U.S. 762, 771 (2023) ("Facilitation—also called aiding and abetting—is the provision of assistance to a wrongdoer with the intent to further an offense's commission,"

requiring "an intent to bring about a ***particular unlawful act***.") (emphasis added). There was no evidence that Brunst intended for a specific business enterprise to engage in a "particular unlawful act" through the publishing of a specific ad on the Backpage website. *Id*. Even the Government appears to readily concede this; indeed, the thrust of its case against Brunst was that he generally was "on notice" that the site was being misused by a portion of third-party users.

In a case that the previous Court made clear involves 50 distinct ads, Mr. Brunst was acquitted of all 50 substantive counts. *See* Dkt. 946 at 6, 18 (rejecting defendants' concern of a "boundless conspiracy," holding that defendants were "indicted for facilitating (via publishing ads) [prostitution business enterprises] on fifty distinct occasions," and that these "targeted instances enable each Defendant to plead an acquittal or conviction in future similar prosecutions and prepare to defend themselves at trial").[6] The conspiracy conviction was logically and evidentially inconsistent with these acquittals. It likely was the result of a deadlocked jury that reached a compromise verdict after being given an *Allen* instruction. While Mr. Brunst cannot here relitigate these issues from the standpoint of liability, they should be given serious weight at sentencing.

Any sentence here should likewise avoid sending a message that CFOs need to take a more active role in compliance functions outside of their domain. CFOs have a lot on their plates dealing with an extensive array of tax and financial regulations. They are not trained in compliance aspects of a business's operations. *See* Chookaszian Decl. A sentence should take into account Mr. Brunst's lack of operational or compliance duties in

---

[6]    Indeed, the final instructions given to the jury imply that the conspiracy charge was bounded by the 50 ads. *See* Dkt. 1998 (jury instructions) at 24 ("First, beginning in or around 2004, and ending on or about April 2018, ***there was an agreement between two or more persons to commit at least one Travel Act offense as charged in Counts 2-51 of the indictment . . . .***") (emphasis added). The Court in its Rule 29 Order appears to acknowledge that there was no evidence of a conspiracy tied to the 50 charged ads, as Brunst was acquitted of the 50 substantive counts. The Order diverges from Judge Brnovich's prior order on the scope of the Travel Act conspiracy, however, instead holding that the "conspiracy allegations were not specifically tied to the 50 ads." Dkt. 2063 at 20.

this area. This is particularly true where, as here, internet platforms and social media companies have distinct compliance and legal departments.

**F.** **Brunst and the Government Have Agreed to Resolve Any Financial Penalties.**

As part of an overall financial settlement agreement intended by the Government and Defendants to address alleged forfeiture, forfeiture money judgments, restitution, and fines, Mr. Brunst has agreed to forfeit substantial personal financial assets—roughly two-thirds of the funds seized by the Government. He has also agreed to release his claims to the assets subject to Preliminary Orders of Forfeiture in the *Backpage* and *Ferrer* actions. For a long time, Mr. Brunst has been open to such a settlement, which the Court should also consider as a mitigating factor.

Mr. Brunst has consented to use of the forfeited funds to pay those whom the Government alleges to be victims of the offenses of conviction, even though the crimes of conviction and alleged psychological injuries are not covered by the restitution statute. *See* Doc. 2123 at 19-21 (PSR objections). While there is no legal basis for restitution here, Brunst shares the Government's concern for these women. The financial settlement reached by the parties sets aside monies for them. (Brunst Ltr.)[7]

**IV.** **CONCLUSION**

For the past six years, Jed Brunst has lived under the cloud and stress of an indictment. With the verdict, Mr. Brunst's good name has been tarnished irrevocably. We respectfully submit that a sentence of imprisonment is neither required nor warranted for a man who has been acquitted of all 50 substantive Travel Act counts; who was not involved with pimps, prostitutes, or the marketing of them; who tried to perform his job in good faith; who has no prior criminal record; and who has done so much good for his family and community.

---

[7]   The 2023 Sourcebook also notes that no restitution or fine is ordered in over 60% of money laundering cases and nearly 70% of racketeering cases. **Exhibit B** (Table 16).

DATED:  August 19, 2024

Respectfully submitted,

Gary S. Lincenberg
Ariel A. Neuman
Gopi K. Panchapakesan
Bird, Marella, Rhow,
Lincenberg, Drooks & Nessim, LLP

By:  _/s/ Gary S. Lincenberg_
Gary S. Lincenberg
Attorneys for Defendant John Brunst