1

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | January 3, 2025 |
| Scott Spear and John Brunst, | ) | 1:31 p.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**RESTITUTION HEARING - DAY 1 - Pages 1-103**

Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Government:
      UNITED STATES ATTORNEY'S OFFICE
      By:  **Kevin M. Rapp, Esq.**
           **Peter S. Kozinets, Esq.**
           **Margaret Wu Perlmeter, Esq**
           **Joseph Franklin Bozdech, Esq.**
      40 North Central Avenue, Suite 1200
      Phoenix, Arizona 85004
      kevin.rapp@usdoj.gov
      peter.kozinets@usdoj.gov
      andrew.stone@usdoj.gov
      margaret.perlmeter@usdoj.gov

For the Defendant Scott Spear:
      FEDER LAW OFFICE, P.A.
      By:  **Bruce S. Feder, Esq.**
      2930 East Camelback Road, Suite 160
      Phoenix, AZ 85016
      bf@federlawpa.com

For the Defendant John Brunst:
      BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
      LINCENBERG & RHOW, P.C.
      By:  **Gopi K. Panchapakesan, Esq.**
           **Gary S. Lincenberg, Esq.** (Via Zoom)
      1875 Century Park E, Suite 2300
      Los Angeles, CA 90067
      gpanchapakesan@birdmarella.com
      glincenberg@birdmarella.com


Attorneys present for the victims:

For Victims 3 and 6:
DONNELLY, CONROY & GELHAAR, LLP
By:  **Emma Notis-McConarty,** Esq.
260 Franklin Street, Suite 1600
Boston, MA 02110

For Victims 3 and 6:
ROPES & GRAY
By:  **John T. Montgomery,** Esq.
Prudential Tower 800 Boylston Street
Boston, MA 02199-3600

<u>Attorneys present for victims - Continued</u>

For Victims 3 and 6:
ROPES & GRAY
By:  **Kate Tian**, Esq.  (Via Zoom)
1211 Avenue of the Americas
New York, NY 10036-8704

For Victims 4 and 5:
WOMBLE BOND DICKINSON
By:  **Stephen M. Bressler**, Esq.
          - and -
      **Andrew Jacobsohn**, Esq.
201 W. Washington Street, Suite 1200
Phoenix, AZ 85004

For Victim 8:
By:  **Christopher V. Parente**, Esq.  (Via Zoom)
CHERONIS & PARENTE, LLC
140 S. Dearborn Street, Suite 404
Chicago, IL 60603

For Victim 8:
By:  **Gina DeBoni**, Esq.  (Via Zoom)
ROMANUCCI BLANDIN LAW
321 North Clark Street, Suite 900
Chicago, IL 60654
gdeboni@rblaw.net

For Victim 1:
Joel Shapiro, Esq.

For Victim 10:
Abby Chin, Esq.

Also Present via Zoom:
Carrie Landau
Lois Lee
William Colovos, Esq.
Pricilla Harrison

I N D E X

**WITNESS:**                                                    **PAGE:**


**SHARON COOPER, M.D.**
Direct Examination by the Court                          15
Direct Examination by Ms. Notis-McConarty                33
Redirect Examination by the Court                        38
Cross-Examination by Mr. Landman                         41
Redirect Examination by the Court                        70
Cross-Examination by Mr. Landman                         73
Direct Examination by Mr. Rapp                           74

**CARRIE LANDAU**
Direct Examination by Mr. Rapp                           78
Direct Examination by the Court                          84
Redirect Examination by Mr. Rapp                         87
Cross-Examination by Mr. Panchapakesan                   89
Cross-Examination by Mr. Feder                           92
Redirect Examination by the Court                        92
Redirect Examination by Mr. Rapp                         94

**P R O C E E D I N G S**

 

   (Proceedings commence at 1:31 p.m.)

       THE COURT:  All right.  Please be seated.

       COURTROOM DEPUTY:  On record in case number CR 18-422,

as to Defendants 3 and 4, United States of America vs.

Scott Spear and John Brunst, on for restitution hearing.

       Could you please announce for the record.

       MR. RAPP:  Good afternoon.  Kevin Rapp, Peggy

Perlmeter, Peter Kozinets and Joseph Bozdech on behalf of the

United States.

       THE COURT:  Good afternoon.

       MR. FEDER:  Bruce Feder for Mr. Spear.

       THE COURT:  Good afternoon.

       MR. PANCHAPAKESAN:  Good afternoon, Your Honor,

Gopi Panchapakesan and Michael Landman on behalf of Mr. Brunst.

       THE COURT:  Good afternoon to all of you.  And let me

inquire as to any counsel that are appearing or at least are

listening through telephonic or other means, do we have anyone?

       MR. LINCENBERG:  Good afternoon, Your Honor,

Gary Lincenberg.

       THE COURT:  All right.  Good afternoon.

       MR. COLOVOS:  Your Honor, if I may, my name is

Bill Colovos.  I filed -- I'm Michigan P Number 3 434.  I am

not licensed to practice in your state or federal court.  I'm

```
 1   licensed to practice in the Eastern District of Michigan and
 2   the state of Michigan.  I've been an attorney since November of
 3   1985, and I never had a blemish on my record, but I wanted to
 4   let the Court know that I did send a pro hac vice motion.  I
 5   wasn't able to obtain a Certificate of Compliance or            13:33:10
 6   Certificate of Good Standing because the State Bar
 7   unfortunately said it takes about ten days when I called them
 8   now.
 9           So Your Honor, after talking with the victims'
10   representative Mr. Todd McKenney, victim witness specialist,    13:33:26
11   and earlier today we had a chat on video, the attorneys and the
12   prosecutor involved, I am certainly fully confident on behalf
13   of my client that I don't need to practice law in your court,
14   and I withdraw my motion for pro hac vice.  Thank you.
15           THE COURT:  All right.  Thank you.  Any other counsel?  13:33:52
16           MR. MONTGOMERY:  John Montgomery from the law firm of
17   Ropes & Gray in Boston.
18           MS. NOTIS-MCCONARTY:  I'm Emma Notis-McConarty from
19   Donnelly, Conroy & Gelhaar in Boston.  We are here on behalf of
20   Naiomy Figueroa and Destinee Ortiz.                             13:34:07
21           THE REPORTER:  I did not hear your name.
22           MS. NOTIS-MCCONARTY:  Emma Notis, hyphen, McConarty,
23   M-c-C-O-N-A-R-T-Y.
24           MR. JACOBSOHN:  Andrew Jacobsohn and Stephen Bressler
25   here on behalf of Breahannah Fox and Megan Lundstrom.           13:34:27
```

1          MR. PARENTE:  Chris Parente and Gina DeBoni for

2    Yvonne Ambrose who is the administrator of D.R.'s estate.

3          THE COURT:  All right.  Thank you.

4          MS. CHIN:  Your Honor, there's also Abby Chin from

5    Cooper Elliott.  We are here on behalf of the estate of Ella          13:34:50

6    Smiley.

7          MS. TIAN:  Your Honor, I'm Kate Tian from Ropes &

8    Gray, and I am here with John and Emma for the victims.

9          MR. SHAPIRO:  Joel Shapiro.  I am attorney for Victim

10   1.                                                                     13:35:14

11         MR. COLOVOS:  Your Honor, if I may, and I apologize, I

12   won't interrupt anymore, but I don't know I had put on the

13   record, Your Honor, the pro hac vice Bill Colovos was for

14   Priscilla Harrison whose daughter died, Cynthia Worthy.

15         THE COURT:  All right.  Thank you.                              13:35:31

16         All right. And anyone who is appearing virtually, if

17   you would please silence yourselves while we go through the

18   presentation, and only those who are under examination or

19   speaking to the Court may then unmute themselves.  That will

20   alleviate any sort of feedback.                                       13:35:57

21         Now, here the government makes 12 restitution requests

22   for 12 victims in this case under 18 U.S.C. 3663.  I'm going to

23   set some ground rules for counsel.  Each victim will be

24   referred to by the number associated in the government's sealed

25   chart, that's Document 2275.  That is because this is a public       13:36:27

proceeding and I think there is some information in the claims,

the documents supporting those claims, that should remain

private.  And I know that Mr. Spear, Mr. Brunst and

government's counsel are all aware of those victims as they are

enumerated in that chart.                                            13:36:58

     And to the extent that the representative counsel of

those victims wish to place something on the record, then I'd

ask the government's counsel to perhaps provide that chart to

them, and then have counsel for the victims' representatives of

the victims turn back those charts back to the government after  13:37:32

the close of the proceeding.

     It is the government's burden to show by a

preponderance of the evidence that each victim is entitled to

restitution, and that the restitution -- the restitution claims

are directly or proximately caused by Defendants Brunst and      13:37:56

Spear's conduct.

     So generally, as this is a continuation of sorts of

the sentencing proceeding, the courts do not adhere to strict

compliance with the Federal Rules of Evidence, and so this

court will not entertain objections such as foundation or        13:38:20

hearsay and the like.

     And remember, at all times that this court is the

determiner of the restitution claims, and so I ask you to pay

close attention to each of the claimed restitution amounts and

to develop, where it is necessary, that each of those claims     13:38:51

1    are directly or proximately caused by the defendants' conduct.

2              Now, fourth I want to say, as the government points

3    out in its reply, this court, upon the jury verdict, I've

4    already opined on the defendants' participation in the

5    conspiracy to commit Travel Act offenses.  That's also                    13:39:20

6    referenced in my prior order at Document 2063 and in my

7    comments during the sentencing of both Mr. Brunst and

8    Mr. Spear.  But I want to say, to the extent that one of the 12

9    victims who are making claims are not referenced in that order

10   or the verdict, I would possibly need further development of        13:39:54

11   the record, factual development of the record, as to their

12   involvement and whether that's the government's prerogative to

13   provide that either through a supplemental filing or through

14   investigator's testimony.

15             Finally, I will point out that I also note that the        13:40:20

16   government's reply agrees that certain restitution requests

17   cannot be awarded.  This particularly refers to, I believe,

18   Victims 1 and Victim 4.  So the Court will not consider those

19   claims, and counsel will not address it.  And so with those

20   principles in mind, please narrow the focus of your                 13:40:49

21   examinations accordingly.

22             All right.  Mr. Rapp, how would you like to proceed?

23             MR. RAPP:  Judge, just as a preliminary matter, we had

24   a status conference on Monday.  You directed myself and the

25   defense to meet and confer and see if we could narrow some of        13:41:05

1    these claims.  I want to let you know that we did do that a

2    couple times and just within the last hour.

3         THE COURT:  Can you speak into the microphone?

4         MR. RAPP:  Yes, ma'am.  Sorry.  I think we are at an

5    impasse basically on causation, and I don't think that we are          13:41:24

6    in a position to narrow the claims of those remaining of each

7    one of these claimants because we just, as you can tell from

8    our filings, just have a different view of causation, and we

9    lay that out in our reply and in our initial brief, and

10   obviously the defense takes issue with it in their filing.            13:41:53

11        So I just want the Court to know that we did endeavor

12   to try to come to some agreement to narrow how this proceeding

13   would play out.

14        MR. LANDMAN:  Your Honor, yes, we met and conferred.

15   The only -- and this is Michael Landman speaking on behalf of         13:42:15

16   Mr. Brunst.  The only additional piece I want to clarify is

17   that it's our position that under the law claimants are not

18   entitled to future lost income if they are living because the

19   statutory provision for lost income lost wages relates to

20   people who -- who suffered bodily injury, and the case law            13:42:40

21   indicates that that's only available for homicide victims who

22   no longer live and, therefore, of course, can't earn wages, and

23   we cite to the *Cienfuegos* case in our papers for that

24   proposition.

25        The government takes a contrary position relying on              13:43:02

1   the text in the statute, but as far as I'm aware, it hasn't

2   provided legal authority to support its proposition.

3          THE COURT:  Well, to be clear, Mr. Landman, I have

4   presided over numerous hearings, including post trial, so for

5   example, related to sexual abuse of a child, and so I think          13:43:31

6   there are some similarities that can be drawn related to then,

7   depending on the severity of the allegation that impacts or

8   impairs the ability of that individual to go forward in a

9   normal course of life, including employment, and some of those

10  things are considered.                                               13:44:07

11         So I will entertain -- and I myself will make a couple

12  of inquiries as to some of the supportive reports on the

13  claims, but at this point I'm not going to make any finding.

14  And I will certainly look at the cases you've cited, but I do

15  think there are some circumstances where the trauma associated      13:44:29

16  with victimization causes such an effect that the person then

17  becomes hampered from living a normal life.  And so the Court

18  has previously looked into those types of issues and indeed has

19  awarded restitution for certain expenses related to that, and

20  so thank you for the information, and we can move forward then.     13:44:53

21         MR. RAPP:  Just to forecast to the Court how we intend

22  to proceed is that we do have Dr. Cooper who is available to

23  testify this afternoon.  We have a second witness, a former FBI

24  agent Carrie Landau who was involved in the investigation of

25  the D.R. murder.  She is also available to testify.  Those are      13:45:19

1   our two witnesses, Judge.  We tried our best to work with the

2   claimants' representative to see who we could have available

3   today.  The balance of the witnesses would be on Monday.  Some

4   of those witnesses are not going to testify, and so we'll

5   advise the Court of that at the appropriate time.                    13:45:40

6           So at this point we would like to, since Dr. Cooper is

7   on the screen, we'd like to proceed with direct examination and

8   testimony, cross-examination of her.  And so just so the record

9   is clear, the representative for Victims 3 and Victim 6 will

10  conduct that examination.                                            13:46:09

11          THE COURT:  All right.  Anything further to be taken

12  up before we move to our witnesses?

13          MR. LANDMAN:  Nothing from Mr. Brunst.

14          THE COURT:  All right.  Thank you, Mr. Rapp, and let's

15  swear in the witness.                                                13:46:31

16          MS. NOTIS-MCCONARTY:  Hi, Your Honor.  My name is

17  Emma Notis-McConarty, and I am the representative for Victim 3

18  and Victim 6.

19          THE COURT:  Is it your intention to examine the

20  witness or are you turning this over, Mr. Rapp?                      13:47:00

21          MR. RAPP:  I am, Judge.  I think I alerted the judge

22  to, the Court, rather, to that on Monday that they are -- these

23  representatives are better versed with these witnesses.  They

24  wrote reports in support of their claims.  They've been

25  interacting with them.  They are, just frankly, in a better         13:47:20

```
1    position to conduct the examination.  And given the lower

2    standard of proof for a restitution hearing, we think it's

3    appropriate that they do that.

4              MR. LANDMAN:  Your Honor --

5              THE COURT:  Yes.                              13:47:34

6              MR. LANDMAN:  -- Your Honor, we -- it's our position

7    that it's the government's burden, and to the extent they are

8    putting forward private parties to advocate on the government's

9    behalf, we view them as part of the prosecution team.

10             THE COURT:  It is a somewhat unusual position.  I have  13:47:57

11   not had it done before.  Mr. Rapp, is this something that is a

12   usual course in a government's presentment of its case?

13             MR. RAPP:  Well, it's certainly -- when lawyers

14   represent victims, they can address the Court on the victims'

15   behalf.  This is a -- obviously, this case is a case of first   13:48:16

16   impression.  They have provided reports in support of their

17   claims.  These are the authors of those reports.  They have

18   interacted with them on the nature of their opinions, and so

19   they are -- they are better suited to go through the report and

20   highlight those areas that would be relevant for the Court to   13:48:46

21   consider on a claim such as this.

22             THE COURT:  Well, what I think -- what I think is the

23   better course, then, is I am going to examine the witness.  I

24   am going to inquire of certain areas in the reports.  And to

25   the extent that the victim's representative has clarifying      13:49:05
```

UNITED STATES DISTRICT COURT

1    comments, I'll permit that.  But I think, Mr. Rapp, I don't --

2    in all my time working with these victims' rights statutes and

3    presiding in this court over numerous victim-related cases, I

4    have not had an instance where the government has sort of

5    turned over its restitution request to private counsel.          13:49:33

6        I understand the law is that victims have a right to

7    be represented and their views expressed through themselves or

8    counsel, but I don't necessarily know that the government

9    should be turning over its obligation to private counsel.  And

10   so I will proceed in that way, and then I will permit          13:50:02

11   examination by defense counsel.  And then to the extent there

12   are clarifying comments that need to be made so that it

13   enhances my understanding of the claim, then I'll permit you to

14   do so.

15       I know my court reporter just asked you to again, once    13:50:22

16   again, spell your last name for the record and for her record.

17       MS. NOTIS-MCCONARTY:  Yes, Your Honor.  I'll be happy

18   to do so.  It's Notis, N as in "Nancy," O-T, as in "Tom," I-S

19   as "Sam," hyphen McConarty, M-c-C-O-N-A-R-T-Y.  Thank you, Your

20   Honor.                                                        13:50:48

21       THE COURT:  Thank you.

22       MR. FEDER:  For the record, Mr. Spear joins in what

23   Mr. Landman said.  Going forward, can it be assumed we join

24   unless we disavow?

25       THE COURT:  All right.  Thank you.                        13:51:01

─────Direct Examination of Sharon W. Cooper, M.D.─────

1          MR. FEDER:  Thanks.

2       (SHARON W. COOPER, M.D., a witness herein, was duly sworn

3    or affirmed.)

4          COURTROOM DEPUTY:  I think you're mute.  Can you

5    please unmute yourself?  We cannot hear you.                13:51:30

6          THE WITNESS:  I do.

7          COURTROOM DEPUTY:  Can you spell your full name and

8    spell it for the record.

9          THE WITNESS:  Yes.  My name is Dr. Sharon,

10   S-H-A-R-O-N, Cooper, C-O-O-P-E-R.                           13:51:43

11         THE COURT:  All right.  Thank you.  And good

12   afternoon.

13                      DIRECT EXAMINATION

14   BY THE COURT:

15   Q.  Now, I am going to just, in the interest of time, in    13:51:57

16   everyone's time, and so that defense counsel may examine you as

17   to both of your reports, let me clarify that I am going to

18   first begin with regard to enumerated Victim Number 3 and the

19   initials being N.F., and I have reviewed your developmental

20   forensic report in support of this individual's request.  Seems  13:52:36

21   like my mic -- sorry, I muted myself.  I have read your report

22   and there are a couple of matters that I wanted to ask you

23   about.

24         In particular, I'm going to turn to pages 21 through

25   22 of that report.  As I understand it, you conducted a      13:53:09

---

Direct Examination of Sharon W. Cooper, M.D.

1   personal interview of the victim, and in that interview you

2   asked about mental health issues, physical health issues,

3   issues related to background, education, upbringing, parental

4   involvement so on and so forth, and the victim gave you

5   detailed information as to those areas.                          13:53:49

6          Now, I want to understand in terms of this chart that

7   you developed and the associated annual cost for health care,

8   there are references to, I think it is the nih.gov website, and

9   explain to me how it is that you determined the annual cost of

10  these effects.  So, for example, you have the cost of rape, you   13:54:30

11  have the medical diagnosis of bipolar disorder, and costs

12  related to medication management, inpatient, outpatient and

13  emergency room care, and then you have, again, these listed

14  medical diagnoses with an associated cost.  So I have a couple

15  of questions related to the chart.                               13:55:10

16         The first question is, how have you determined that

17  each of these medical diagnoses is tied to the defendants'

18  conduct here?

19  A.  Thank you for asking that question, Your Honor.  What we

20  know about the adversities of different types of child           13:55:35

21  maltreatment and adolescent maltreatment is that the nature of

22  victimization has a tremendous impact upon the hypothalamic

23  pituitary adrenal axis.  The hypothalamic pituitary adrenal

24  axis is the part of our bodies that contributes to stress.  And

25  what we know now, which we learned in 19 -- in 1998, and        13:56:06

—Direct Examination of Sharon W. Cooper, M.D.—

1  research has progressed since 1998 to the present, we now know

2  that when victims, especially minors, but not just minors, when

3  victims have been abused and they have had the experience, and

4  I will use sex trafficking as the example since this is the

5  kind of case that we are talking about specifically, what we          13:56:38

6  know is that this derails the normal metabolism of the human

7  body.

8        The HPA, the hypothalamic pituitary axis, sends

9  cortisol down to the adrenal gland, which sits on top of the

10  kidney, as a means of hormonal control of the flight, fright       13:56:57

11  and fight reaction.  And what happens is that when a person is

12  victimized, these are the hormones that begin to be produced by

13  the brain.  Those hormones, once they pass through the adrenal

14  gland, give feedback to the brain.  And when abuses are

15  profound, the cortisol levels rise and rise and eventually        13:57:28

16  become reset in these patients.

17        What the literature has now helped us to understand,

18  and it started with the research that was done in the Kaiser

19  Permanente system in California, what we now understand very

20  well is that once you have been victimized significantly, and     13:57:52

21  especially if you've been victimized over a relatively

22  prolonged period of time, your cortisol level will rise and

23  will not come back to a normal level.  This causes diseases in

24  the human body.

25        The most common ones that we see are going to be            13:58:14

1    interpreted as psychological, but we now recognize that when

2    cortisol rises in response to victimization, it turns on

3    inflammatory reactions all over the body.

4            So for example, when we have patients that have been

5    victims and they have perhaps had concerns of gastrointestinal      13:58:39

6    discomfort, we know if you've been a victim, especially a

7    profound victim, sitting in our offices we can't just say,

8    "Well, just take some Pepto Bismol; it will be better."  These

9    are the kinds of patients who are more likely to have developed

10   peptic ulcer disease or ulcerative colitis, these disorders        13:59:01

11   that are autoimmune in nature.

12           And this field of medicine is ever increasing as far

13   as the research is concerned, and that is one of the reasons

14   why we pay attention very carefully to all of the different

15   symptoms that these patients are reporting.                        13:59:20

16           The patients don't have any knowledge that the

17   symptoms they are reporting may be related to their

18   victimization.  But we recognize that if in fact they have been

19   victims, and if they've been profoundly victimized, we expect

20   these patients to go on to have chronic disorders for the rest     13:59:37

21   of their lives.

22   Q.  And I guess, let me just follow up on something that is in

23   your report.  In your review of the studies, is there a

24   difference between victimization that does not include

25   preserved photographs or identification that essentially will      14:00:13

**Direct Examination of Sharon W. Cooper, M.D.**

1   withstand time versus victimization that may just be -- I say

2   "just" -- may be a physical act but that is not publicized?  Do

3   you follow the question?

4   A.   Yes, I do.  I believe I do, Your Honor.  Very often victims

5   do not disclose at first all of the different experiences that          14:00:47

6   they have had.  Many times, especially in sex trafficking

7   victimization, many times victims are overwhelmed by what is

8   happening to them, and -- and the literature on delayed

9   disclosure, which came out in 2020, by Child USA, has helped us

10  to understand now that the average age of disclosure, of sexual        14:01:11

11  abuse, for example, in the United States, is 52 years of age.

12        So we have these individuals who are children, abused

13  as children, who never told anybody.  But that wasn't just

14  research in the United States.  That's international research,

15  and I can certainly make that available to you.  I have entered       14:01:33

16  it as learned treatise information in other federal cases

17  regarding the delayed disclosure component.

18        When -- when a victim doesn't tell anybody what's

19  happened to them, it doesn't stop the high level of stress and

20  trauma that is going on in their body keeping their cortisol           14:01:54

21  levels elevated.  These are patients that are more likely to

22  develop high blood pressure, these are patients that are more

23  likely to develop kidney disease, especially gastrointestinal

24  diseases.  It's very common in these kinds of patients.  These

25  patients will have disorders that are not psychosomatic.              14:02:16

—Direct Examination of Sharon W. Cooper, M.D.—

1   That's the most important component.  And we are now in the

2   field of trauma medicine, not the trauma of a motor vehicle

3   accident, but psychological trauma medicine, we recognize and

4   anticipate that these patients are going to have a higher level

5   of dysfunction with respect to the human body.                    14:02:40

6        I'm on the board of Academy of Violence and Abuse,

7   which provides education in this area, both nationally and

8   internationally, and this organization was first begun after

9   the research that came out of the Kaiser Permanente system in

10  1998.  And I also sat on a certain working group assigned by    14:03:02

11  Attorney General Eric Holder on the fact that we needed to find

12  out about what was happening with children in adolescence who

13  had become victims of crime because at that point we didn't

14  understand that you may have been a victim of a crime, the

15  crime is over, justice has taken place, but you are very likely  14:03:27

16  to have major medical problems many times for the rest of your

17  life, and we didn't know that until the research came out of

18  the Kaiser Permanente system in 1998.

19  Q.  So to go back to my not well-developed question, what, if

20  anything, is different in the fact that in this case we have      14:03:55

21  preserved, for the lack of a better description, images on the

22  computer and that have the potential of being displayed over

23  and over again?

24  A.  Thank you very much for asking that question.  That is an

25  extreme -- that is an extremely, extremely important question.   14:04:24

———Direct Examination of Sharon W. Cooper, M.D.———

1   The research that helped us to understand the long-term victim

2   impact images that are on the Internet, abusive images that are

3   on the Internet, that we no longer call pornography anymore.

4   We call that child sexual abuse material now so that it's more

5   clear that what we are -- what we're talking about.  The term                14:04:47

6   "pornography," which is a legal term, infers voluntary

7   modeling.  But CSAM, or child sexual abuse material, is what

8   we're really talking about.

9        And I was on the international working group in 2017

10  that studied the long-term victim impact of a presence of these             14:05:05

11  images that are out there, and the term -- the document for

12  that research is called the Survivors' Survey.  It's nearly a

13  400-page document where more than 150 survivors carefully

14  reported more than a hundred questions about what was happening

15  to them knowing that these images are out there and how did                 14:05:35

16  that affect them.

17       I had the honor of speaking before the United Nations

18  last year on this very subject because child sexual

19  exploitation and child sexual abuse material is an

20  international, obviously an international phenomenon.  You                    14:05:51

21  can't withhold -- you can't hold it in the United States alone.

22  Those images can be everywhere.  They also are on the dark web.

23  They are also considered collector's items.  Offenders talk

24  with each other about what they want to see, and they trade

25  these types of contraband.  So when we have that kind of                     14:06:11

Direct Examination of Sharon W. Cooper, M.D.

1   situation, what we know is that these individuals, the

2   survivors, the subjects of these images, never feel safe.

3           I have been following, for example, a victim who was

4   victimized between the age of five and 11, images were made,

5   and she is now 39 years old, and she continues to be notified      14:06:35

6   by the National Center for Missing and Exploited Children of

7   additional people who have been arrested and have had her

8   images in their collections.  So this tells us how long this

9   goes on, and victims do not feel safe.

10          Furthermore -- furthermore, what we see is in the dark      14:07:00

11  web is the chatter and communication by offenders of how they

12  are continuing to stalk and try to locate these victims, saying

13  comments such as, "I think I know where she is now.  I am going

14  to see if she still enjoys it."  So these are victims that are

15  managed by the National Center for Missing and Exploited          14:07:32

16  Children, even though they are adults, because of the presence

17  of these images.

18  Q.  Let me move to a couple of other areas.  In the case of

19  Victim 3, or N.F., your report and the evidence indicates that

20  her image appeared on Backpage before she was an adult?           14:08:01

21  A.  Yes.

22  Q.  And approximately 15 years of age?

23  A.  That's correct.

24  Q.  Now, given that -- going back to the chart and your report,

25  there's an analysis with regard to a bipolar disorder, and how    14:08:23

—Direct Examination of Sharon W. Cooper, M.D.—

1  is it that you're able to connect the bipolar disorder, then,

2  to the conduct of being posted on Backpage?  It seems to me,

3  and I just say this for clarification purposes, it seems to me

4  that a bipolar disorder could have been a prior diagnosis

5  before age 15.                                                     14:09:02

6        So for example, I want to understand, in your report

7  are you stating that the bipolar disorder developed as a result

8  of the posting?

9  A.  Thank you, Your Honor, for that question.  Bipolar disorder

10 has become more and more common as far as general clinicians     14:09:22

11 are recognizing, and it usually is not evident very early in

12 childhood.  Generally speaking, you start to see symptoms of

13 bipolar disorder in their early adolescent years.  So when this

14 victim was obtained and began to be exploited in the manner

15 that she was, not only would she have developed anxiety, not     14:09:50

16 only would she have developed, and did, posttraumatic stress

17 disorder, not only did she also develop the issues associated

18 with depression, which can be very serious, because very often

19 they can slide into suicidality with adolescence, bipolar

20 disorder is most commonly going to present in the adolescent     14:10:14

21 years.  It's relatively rare in young children, but in the

22 adolescent years.

23        What we know is that patients who have complex

24 posttraumatic stress disorder, CPTSD, are going to present with

25 episodes of anxiety that causes patients to become out of        14:10:34

**Direct Examination of Sharon W. Cooper, M.D.**

1    control, and this can be so debilitating that mental health

2    providers will frequently diagnose them with a comorbid

3    diagnosis.  All the other diagnoses are still present, but also

4    will have the diagnosis of bipolar disorder.

5          We also recognize with complex PTSD, and this is found    14:11:00

6    in a study, patients have at times dissociation.  And so we

7    used to call that other things, but now we understand that

8    dissociative identity disorder is very common in complex PTSD.

9    It's no longer seen in psychosis or things of that nature.  We

10    now recognize and anticipate that these are going to be the    14:11:27

11    kinds of diagnoses that we see.

12          Bipolar disorder can also be precipitated in

13    individuals who have been profoundly violently treated.  We see

14    bipolar disorder -- I must admit that I have seen bipolar

15    disorder in a significant number of trafficking victims that I    14:11:49

16    have personally interviewed, written reports about, from Alaska

17    to Chicago, in many parts of the country, and we have to manage

18    these patients because they become so high strung that they

19    can't seek and successfully be employed.

20    Q.  I do want to ask you a couple of clarifying questions about    14:12:13

21    certain medical diagnoses on page 22.  In your opinion, in your

22    interview and in your research, can you connect the recurrent

23    epistaxis in N.F. to the conduct here?

24    A.  Oh, yes.  This recurrent epistaxis that she had are

25    recurrent nosebleeds.  We have to make sure, Your Honor, that    14:12:50

——**Direct Examination of Sharon W. Cooper, M.D.**——

1   this patient has not developed hypertension, which is secondary

2   to her complex PTSD, because you can begin to see nosebleeds in

3   patients that have hypertension and recurrent -- recurrent

4   epistaxis.

5         We are always wanting to know for sure, is this just a      14:13:12

6   phenomenon?  It's not common for patients to develop that at a

7   certain point in their lives.  Usually we start seeing children

8   having nosebleeds at young ages.  But if you have a patient who

9   is an adolescent or a young adult and they have begun to have

10  recurrent epistaxis, one of the things that we would want to      14:13:32

11  make sure of is that they don't have occult hypertension which

12  is causing them to have nosebleeds.  That can lead to the

13  patients coming in over and over again as an aspect of their

14  dysfunction and they end up having to have cauterization

15  procedures and other types of procedures in order to manage      14:13:54

16  those recurrent epistaxis episodes.

17  Q.  And so, let me see if I can bring you back to the

18  description.  So the reoccurring nosebleeds in this particular

19  victim began as a result of the other developed PTSD-related

20  symptoms?                                                        14:14:29

21  A.  Symptoms.  That is correct, Your Honor.  I don't know if

22  she had any nasal trauma.  I did interview this patient and she

23  did not give me a history of any nasal trauma that I'm aware

24  of, but there are -- there are -- and let me just look in

25  the -- in my report about this.  Okay.  So this patient began   14:14:46

—Direct Examination of Sharon W. Cooper, M.D.—

1    having epistaxis later in her life.  She didn't have this as a

2    young child.  She had a lot of chronic sinus infections and she

3    had the recurrent epistaxis for several years, in fact.  And

4    she had no medical evaluation.  She had no treatment.  She had

5    never been seen by an ENT doctor, and these symptoms support        14:15:18

6    the need probably for tonsillectomy and adenoidectomy.  It will

7    be necessary that she has an allergy evaluation and find out if

8    she has to have immunotherapy for this.

9         These symptoms occurred and significantly worsened

10   after she was being trafficked, and part of that can be related   14:15:41

11   to elevation of blood pressure.  When you start to have your

12   blood pressure for any of the types of domestic, or I should

13   call it minor violence, where individuals are strangled, where

14   individuals are beaten, where they have lots of facial trauma,

15   you're going to have much more of a recurrence of epistaxis in    14:16:06

16   circumstances like that, and eventually they will end up

17   needing someone to look at the patient carefully and consider

18   cautery, cauterization of those blood vessels.

19   Q.  And with regard to your chart, you give a very wide range

20   of costs associated to the recurrent nosebleeds from a low end    14:16:28

21   of 6000 to a high end of $17,000.  It's a pretty wide range.

22   A.  Yes.  That's because, Your Honor, I look in the literature,

23   in the medical literature, to determine.  The emergency room

24   visits and the hospitalizations will be the $6,000 range.  The

25   length of stay, the LOS of three days or so will be, you know,    14:16:56

Direct Examination of Sharon W. Cooper, M.D.

1    it will be relatively -- will be relatively minor, 6 or $7,000

2    in the hospital.

3          But on the other hand, if the patient has posterior

4    epistaxis, so the blood vessels in the back of the nose are the

5    cause of this continued bleeding, every time the patient's          14:17:17

6    blood pressure goes up, doesn't have to have rubbing of the

7    nose, patient just start having blood running out of their

8    noses, then they often have to have more significant ENT

9    intervention.  And notice that I mentioned the higher amount of

10   money, the $17,000, is where you are looking to see if these        14:17:40

11   patients are in fact having arterial bleeds as compared to

12   typical venous bleeds of epistaxis, and that's why I had to

13   include the absolute worst case scenario.

14         If you can see the last sentence on the chart, that's

15   when you have posterior epistaxis.  This is what is running        14:18:01

16   down the back of your throat and you don't know that -- you

17   don't know that you're having nosebleeds until you start

18   vomiting the blood up and then you realize an ENT will go in

19   with a scope and recognize that it's not the anterior vessels

20   that are bleeding, it's the posterior vessels.  So they won't       14:18:21

21   come dripping out of the nose.  They will go dripping down your

22   throat, and that's where you have to bring the patient into the

23   hospital for significant surgery.

24   Q.  The next entry is recurrent sinusitis, and you have, again,

25   reviewed records and interviewed the victim and you can connect     14:18:42

Direct Examination of Sharon W. Cooper, M.D.

1   this reoccurrence with the conduct?

2   A.   Recurrent sinusitis, Your Honor, can be something as simple

3   as, you know, allergies that you can have that.

4        On the other hand, though, what we know about trauma

5   is that these patients start to develop hypersensitivities,

6   especially when they have been victims of sex trafficking, and

7   have elevated cortisol levels.

8        In our organization, the Academy of Violence and

9   Abuse, there's a model that is on our website that talks about

10  coleva, C-O-L-E-V-A, which means the consequences of the

11  elevated cortisol levels associated with chronic trauma like

12  these victims have.  And I would say that trafficking victims

13  are the poster person for worst case scenarios of trauma.  Most

14  children may have had, you know, child maltreatment or

15  adolescents may have had child maltreatment, but when you are

16  being sexually assaulted eight, ten, 12 times a day, when you

17  are being beaten, strangled, so many things happen to

18  trafficking victims that they are, in my opinion, short of

19  being murdered, that they are the most traumatized, not

20  psychologically but physically traumatized types of patients

21  that we have.

22       And so when we see a patient that has recurrent

23  sinusitis, what that means is that this patient very likely has

24  developed an autoimmune reaction to what is going on.  And

25  again, if you have recurrent sinusitis, is you may very well

14:19:06

14:19:29

14:19:52

14:20:14

14:20:32

―Direct Examination of Sharon W. Cooper, M.D.―

1    end up having to have sinus surgery.  This is one of the

2    challenges that we have.

3         Some of the patients that I follow, Your Honor, are in

4    their late 30s now and they are some -- they are some of the

5    sickest patients that I have.  When we were at the United        14:20:50

6    Nations talking about this from other countries, there are

7    inpatients, in Sweden in particular, there are inpatient

8    settings just for victims of crime, just for victims of crime,

9    because they tend to be so much sicker and they need more than

10   mental health.  They have to have medical health.  You know,    14:21:16

11   mental health is medical health, but my point being that we

12   have to look at the patients very carefully.

13        So the sinus, endoscopic sinus surgery is expensive,

14   but it does require putting in a scope, cleaning out the

15   sinuses so that this patient can once again be much better as   14:21:32

16   far as their health is concerned.

17   Q.  And to be clear, this victim had not had that sort of

18   evaluation or medical diagnoses for that type of surgery?

19   A.  That is correct, Your Honor.  As we know, many victims --

20   there is a lot of feedback, so I am trying to make sure I       14:22:00

21   can -- that you're not hearing what I'm hearing.  Many of the

22   victims who end up being trafficked come from lower income

23   communities, come from families where they may have been in

24   foster care or may have had adversities that have caused them

25   to have difficulties already in their lives, and what we know   14:22:19

UNITED STATES DISTRICT COURT

—————Direct Examination of Sharon W. Cooper, M.D.—————

1    about that kind of patient is that they are almost -- they are

2    going to be lucky if they are on Medicade.  Many of these

3    patients are completely uninsured.  They just don't have any

4    health insurance at all.  And so when we see them at this point

5    in their lives, they have many medical problems that have never    14:22:37

6    been treated simply because they have been in circumstances

7    that are not cohesive enough to provide adequate care for them.

8    Q.  Moving to the next entry of anaphylaxis, you indicated that

9    you had not reached any conclusion about the impact of the

10   conduct related to this diagnosis, have you come to any    14:23:01

11   conclusion?

12   A.  I agree that I cannot say, "Because you were sold online

13   and trafficked you WILL develop bee sting anaphylaxis."  You're

14   born with bee sting hypersensitivity.  This is something you're

15   born with.  But if you have anaphylaxis, you'll get stung and    14:23:21

16   die.  So, therefore, I always would include a diagnosis because

17   it is a -- it is a potentially fatal diagnosis for a patient,

18   and that's exactly what happens.

19          Usually the subcutaneous immunotherapy over five years

20   is what would have happened when this child -- when this    14:23:42

21   individual was much younger, but now this is a patient that

22   would require very close allergy and immunology management.

23          We, you know, we have the special packs for these

24   types of patients, and we always make sure they carry them with

25   them wherever they go so that they can give themselves    14:24:04

UNITED STATES DISTRICT COURT

Direct Examination of Sharon W. Cooper, M.D.

1    epinephrine if they get stung by a bee because otherwise they

2    are going to die.

3    Q.  I want to move to the final page of your chart, and I want

4    to ask you the same questions with regard to the diagnosis of

5    polyarticular osteoarthritis, and as I --                        14:24:23

6    A.  Thank you.

7    Q.  -- and I want to just add a caveat.  As I recall, this

8    victim was extraordinarily thin at the time that I saw her.

9    A.  Right, she was, correct.

10   Q.  And so I want to understand the relationship between this   14:24:42

11   diagnoses and the conduct here, if there is.

12   A.  Thank you.  Thank you very much, Your Honor, for asking

13   that question.  Because we have really come to understand that

14   arthritis is one of those disorders that really can reflect

15   high stress.  What we know about arthritis and what the        14:25:06

16   literature tells us is that arthritis is frequently an

17   autoimmune type of diagnosis.  It is uncommon.  You may get an

18   arthritis if you fracture a joint and you just didn't have

19   good -- don't have good articulation of those bones and you may

20   have arthritis for that reason.                                 14:25:28

21        But much more commonly, when we are in the face of

22   maltreatment, the types of arthritis that we will see are going

23   to be autoimmune.  They are going to be the kinds of arthritis

24   that we would want to have a rheumatologist managing these

25   patients because they will have positive blood tests to show us 14:25:45

—Direct Examination of Sharon W. Cooper, M.D.—

1  that this is not just because I got twisted -- my wrist got

2  twisted or my elbow I injured.  Polyarticular arthritis is one

3  of the most common diagnoses associated with patients who have

4  PTSD, and this has become more apparent in the literature and

5  it causes us, therefore, to have to include evaluating patients

6  like these patients for these kinds of problems.

7         The thoracic and lumbar spine in particular, though, I

8  think, because I have seen this very significantly in

9  trafficking victims more so than victims in other types of

10 crimes against persons, I think that they have injuries, if not

11 microfracture, of the thoracic and lumbar spine, because when

12 you are being sexually assaulted multiple times a day, the

13 positioning of your body may very well foster overflexion of

14 the thoracic spine and the lumbar spine, and we -- we do

15 already know that if you are a victim of strangulation, which

16 is not an uncommon occurrence in sex trafficking, if you have

17 strangulation with shaking, you are at high risk for

18 microfractures of the C-spine.

19        The physician at Harvard -- there is a physician at

20 Harvard that helps us with these types of literature on what we

21 would call domestic violence injuries, but the point is that --

22 but the point is that when -- when there is shaking and

23 strangulation, as compared to just strangulation, not that that

24 is a "just," we have to get an MRI about a month later to look

25 for the healing of microfractures.  One of my patients has 17

14:26:10
14:26:32
14:27:01
14:27:22
14:27:47

**———Direct Examination of Sharon W. Cooper, M.D.———**

1    microfractures from recurrent strangulations.

2            So Your Honor, the -- if you have that kind of an

3    impact, you will more likely than not develop arthritis in

4    those joints.

5    Q.  All right.                                          14:28:10

6            THE COURT:  Mr. Rapp, do you have anything further?

7            MR. RAPP:  Will you allow the victim representative to

8    ask a few follow-up questions?

9            THE COURT:  Yes.

10           MS. NOTIS-MCCONARTY:  Thank you, Your Honor.  I will   14:28:33

11   keep this brief.

12                       DIRECT EXAMINATION

13   BY MS. NOTIS-MCCONARTY:

14   Q.  Good afternoon, Dr. Cooper.

15   A.  Good afternoon.                                     14:28:38

16   Q.  So can you talk a little bit, in your experience, how

17   online sex trafficking differs from, say, different kind of

18   trafficking such as walking the streets, and I know you spoke

19   earlier about the existence of those online images continuing,

20   but are there other differences or impacts that online sex     14:28:57

21   trafficking has versus more traditional, you know, walking down

22   the street type of sex trafficking?

23   A.  Yes.  I certainly can.  I just returned from Canada about a

24   month ago where I am on the board of the Canadian Center for

25   Child Protection who has done the lion's share of research on   14:29:22

Direct Examination of Sharon W. Cooper, M.D.

1   the long-term victim impact of images, and what we are seeing

2   is the chatter of ongoing threats to victims.  What we see is

3   that when these images are out there and they become

4   collector's items, these individuals who have them do not just

5   sit and look at these images.  They chat with each other and        14:29:48

6   talk about how can we find her.

7        In fact, I interviewed a victim that I have been

8   following for several years for a documentary, and when I came

9   from North Carolina to the west coast to interview her, to

10  videotape an interview with her, the FBI let me know that they      14:30:06

11  had had to emergently move her and her family three days

12  earlier because there was too much indication that someone on

13  the dark web had found out her actual address and was talking

14  with other individuals about, let's go and find her and rape

15  her again and see how much she likes it.                            14:30:28

16       This is a dynamic that many people don't know about,

17  but those of us who work in this area do know about, the fact

18  about these are always going to be frightening circumstance for

19  such survivors.

20  Q.  Okay.  Does online trafficking ever result in increased        14:30:46

21  frequency of rapes or sex trafficking encounters?

22  A.  Definitely it does.  When you -- because instead of being

23  on the street walking and someone just flags you down and says,

24  "You look like you're okay to me," when you have online

25  trafficking, you are going to be seeing individuals sometimes       14:31:08

―――Direct Examination of Sharon W. Cooper, M.D.―――

1    by the hour.  And so when that is the case, then you're going

2    to be expected to be sexually assaulted anywhere between ten,

3    12 or 15 times a day depending upon the trafficker and how much

4    money they want to make.

5            I was working in a case in Alaska where the pipeline,    14:31:29

6    the pipeline workers would come down at a certain time every

7    month because they got paid, and that was when the task force

8    for sex trafficking in Anchorage would become very, very active

9    because they had so many victims that were being trafficked at

10   that particular time of the month.  And individuals who are the    14:31:53

11   buyers know where to come, they know how to go online and they

12   especially go online to online ads that are advertising women

13   and girls and/or boys for sex for money.

14   Q.  And is there also an ability to reach a larger target of

15   potential buyers when there is online trafficking?    14:32:14

16   A.  Yes, there is.  When you are not being sold online, it's

17   word of mouth, and that takes a lot of time in getting things

18   all together.  On the other hand, when there's a picture of you

19   online and you are all made up and look a lot older than you

20   actually are and you're holding a Japanese fan that's made out    14:32:37

21   of $100 bills, which is very common kinds of ads that you see

22   on online classifieds, it's very easy for an individual to

23   understand the kind of secret codes.  "I like 150 roses," well,

24   that would be it's going to cost you a $150 in order to have

25   sex with me.  It's not really difficult to be able to figure    14:33:02

UNITED STATES DISTRICT COURT

—**Direct Examination of Sharon W. Cooper, M.D.**—

1    that out.  And I have worked with multiple task forces around

2    the United States and in some other countries where this has

3    become so very clear.

4         The Philippines in particular is a very bad location

5    where very young children are being marketed in this manner,    14:33:18

6    six, seven and eight-year-olds.

7    Q.  And how does the use of online currency or credit cards in

8    online trafficking impact victims?

9    A.  It just makes it that much easier.  That way a buyer

10   doesn't worry about getting beaten up or robbed when the victim    14:33:36

11   is delivered to them, or if the victim comes to them because

12   they have been given a hotel room number or they have been told

13   exactly where they are going to meet them.  They would prefer

14   to use credit cards with a different name for the company so

15   it's not so obvious that this is a sex trafficking exchange.    14:33:58

16   Q.  And how about, are there any increased dangers to victims'

17   physical health based on the online aspect of the trafficking

18   as opposed to being on the street?

19   A.  There is extremely significant or worse outcomes for

20   victims because the leading causes of death used to be    14:34:19

21   before -- before we had online trafficking, the leading cause

22   of death was homicide followed by suicide followed by HIV.  Now

23   the leading cause of death in sex trafficking is suicide, then

24   homicide, then HIV.  And this tells us that the fact that these

25   victims are being sold so ubiquitously, it seems as if it's    14:34:50

---Direct Examination of Sharon W. Cooper, M.D.---

1   very hard for them to be able to get out, and that is one of

2   the reasons that we have to, and try very hard, to get these

3   types of online shopping capabilities for human beings outside

4   of the United States so that we can at least try to protect our

5   citizens and our -- and our victims better.                     14:35:15

6   Q.  And during the times that Victim 3 and Victim 6 were

7   trafficked on Backpage, what was the most common marketplace

8   for online sex trafficking advertisements?

9   A.  Backpage was the most common.  In fact, I, and I stay aware

10  of the Polaris project, which is our national hotline for sex    14:35:40

11  trafficking survivors, and I monitor all of the documents, and

12  they were very clear, it's very clear in their information that

13  the most prevalent online site beyond compare, almost

14  80 percent of the traffic for exploitation of this manner was

15  on Backpage.                                                     14:36:06

16  Q.  Okay.  So turning to Victim 3 specifically, I just want to

17  touch briefly on the bee sting anaphylaxis that you spoke about

18  earlier, do you have an understanding of whether the cost of

19  that treatment were included in the restitution request for

20  Victim 3?                                                        14:36:21

21  A.  I'm aware that that has not been included in that

22  particular phenomena, right.

23  Q.  Okay.  And so for any preexisting conditions that Victim 3

24  or Victim 6 may have had, how would an experience of being

25  trafficked online result in a different outcome or different    14:36:38

UNITED STATES DISTRICT COURT

─ Redirect Examination of Sharon W. Cooper, M.D. ─

1   medical needs for a preexisting condition?

2   A.  What we know is that because of the toxic levels of

3   cortisol that occurs when these patients become so stressed as

4   one is in sex trafficking victimization, what we know is that

5   you may have an existing diagnosis, but once you become a          14:36:59

6   trafficking survivor, the severity of that diagnosis is more

7   likely than not to increase.  You will still have, however,

8   that diagnosis that preceded your having been a trafficking

9   victim.

10          MS. NOTIS-MCCONARTY:  I don't have any further             14:37:17

11   questions at this time, Your Honor.

12          THE COURT:  Let me just ask a question because I

13   hadn't intended -- I was trying to parse out Victim 3 from

14   Victim 6, I believe.

15                     REDIRECT EXAMINATION                            14:37:34

16   BY THE COURT:

17   Q.  With regard to Victim 6, if I can turn your attention to

18   Victim 6, can you clarify whether you've incorporated into the

19   cost of restitution or cost of continuing health care this

20   prior genetic disorder that this victim has?                      14:38:06

21   A.  Your Honor, most of the time -- most of the time the kinds

22   of survivors that I have evaluated have had poor medical care

23   in the beginning.  They haven't had good medical care even

24   though they may have medical diagnoses.  Many times these

25   survivors are impoverished, they have been in foster care, they  14:38:33

UNITED STATES DISTRICT COURT

Redirect Examination of Sharon W. Cooper, M.D.

1    have been sometimes homeless, they have had lots of

2    difficulties with respect to any kind of access to reasonable

3    health care.

4         So when you have a patient that has something like

5    distal arthrogryposis, one has to be mindful of the fact that

6    these patients will develop arthritis over time with that

7    particular diagnosis.  It's congenital contractures, the

8    fingers, the wrists, and sometimes the toes, and that's distal

9    arthrogryposis, as compared to proximal, which you have

10   contractures of the elbows or at the shoulders.  And so these

11   patients, when they walk around, they will not be able to fully

12   extend their fingers and they won't be able to write the way we

13   would normally see, et cetera.

14        One of the things that we are aware of is that there

15   is a niche unfortunately for trafficking victimization.  There

16   are those buyers who prefer to have victims that have something

17   visibly wrong with them, physically wrong with them.  They tend

18   to be far more sadistic with those particular types of victims.

19   And so the nature of being sold when you have a visible

20   disability is going to be much more likely associated with more

21   sadistic treatment when you are -- when you are presented to

22   someone.

23        These are the types of patients who will report that

24   they are angry when the patient arrives.  When the trafficked

25   person arrives they become angry.  They refer to them as trash,

UNITED STATES DISTRICT COURT

Redirect Examination of Sharon W. Cooper, M.D.

1   they denigrate them, and they are far more sadistic towards

2   these particular victims.

3         So whenever I see a patient that has some type of

4   congenital anomaly such as this, distal, that's just one of

5   many congenital anomalies, I already know that when they show     14:40:42

6   up to, after having been bought online, the risk for abuse is

7   going to be much worse for them.

8   Q.  And again, with regard to Victim Number 6, there's an entry

9   in the medical diagnosis of a refractive vision diagnosis, how

10  is that, if it is, tied to the conduct here?     14:41:13

11  A.  Your Honor, the refractive vision diagnosis is tied to

12  recurrent strangulation.  What we know -- what we know is that

13  when you are strangled repetitively, it increases the blood

14  pressure in the blood vessels above the point of strangulation,

15  and so sometimes you can see externally scleral hemorrhages on     14:41:39

16  the eye.  From the strangulation you'll see the bleeding in the

17  veins on the eyeball itself, the white part of the eye, but

18  also when you have a victim of recurrent strangulation, you

19  also can, it doesn't always happen, but you also can cause

20  increase pressure with respect to the blood vessels in the eye,     14:42:01

21  and for that reason this patient needs to have very careful

22  evaluation.

23         You know, as a clinician, as a clinician, I would be

24  referring a patient like this to a specialized ophthalmologist,

25  not just a routine ophthalmologist, because of the nature of     14:42:22

————Cross-Examination of Sharon W. Cooper, M.D.————

1  trauma that the patients have.

2          THE COURT:  All right.  Thank you.  Let me turn to

3  counsel for Mr. Brunst.  Mr. Landman, I assume you're going to

4  conduct the examination.

5          MR. LANDMAN:  Yes.  Yes, I will.                    14:42:47

6          THE COURT:  Please come forward.  Why don't we

7  continue up to 3:00 o'clock and we'll take a short recess.

8                      CROSS-EXAMINATION

9  BY MR. LANDMAN:

10  Q.  Good afternoon, Dr. Cooper.  My name --              14:43:34

11  A.  Good afternoon.

12  Q.  -- my name is Michael Landman.  I represent Mr. Brunst.

13  Where are you testifying from today?

14  A.  North Carolina.

15  Q.  Okay.  So late afternoon for you.                    14:43:49

16  A.  Yes.

17  Q.  So you are a pediatrician?

18  A.  I'm a developmental forensic pediatrician.

19  Q.  Does that mean you're Board certified in pediatrics?

20  A.  Yes, that's correct, and I did a fellowship in           14:44:09

21  developmental pediatrics, and I did training if forensic

22  pediatrics since 1980.

23  Q.  And you don't have a degree in psychology?

24  A.  Oh, no.  I am not a psychologist.

25  Q.  And you're not Board certified in psychiatry?        14:44:22

─Cross-Examination of Sharon W. Cooper, M.D.─

1    A.  No, I'm not a psychiatrist.

2    Q.  Not certified in orthopedics?

3    A.  No, I am not an orthopedic.  I am a developmental

4    pediatrician.

5    Q.  And.  So rheumatology, gynecology, ENT, pulmonology, fair     14:44:37

6    to say you're not Board certified in those specialties?

7    A.  No, I am not Board certified in any of those specialties,

8    but I know who to refer to when my patients should need that

9    type of care, and I refer very often.

10   Q.  You haven't referred any of the claimants in this case;     14:44:59

11   correct?

12   A.  No, I have not.

13   Q.  And you're not, because you're not certified in these

14   areas, I presume you're not purporting to be the claimant's

15   treating physician; correct?     14:45:13

16       THE COURT:  Let me stop you there.  Let's move forward

17   with regard to the specific restitution claims.  I already

18   indicated to Mr. Panchapakesan last or earlier this week that I

19   am not going to have anybody challenge the qualifications if

20   there has not already been that challenge made.  So let's move     14:45:32

21   forward.

22       MR. LANDMAN:  Thank you, Your Honor, and I am not

23   purporting to challenge her qualification.  I am just trying to

24   understand the -- you know, Your Honor asked some questions

25   about causation, and I am trying to understand the work that     14:45:47

Cross-Examination of Sharon W. Cooper, M.D.

1  she did in order to reach her conclusions.  And so for

2  Defendant Brunst, it's relevant whether she considers herself

3  to be a treating physician of these individuals or not.

4         THE COURT:  Well, I think in her report she states

5  clearly she is not.                                    14:46:09

6         MR. LANDMAN:  Okay.  I will move on.

7  BY MR. LANDMAN:

8  Q.  You haven't reviewed any medical diagnoses of these

9  claimants from any actual treating physicians; correct?

10 A.  No, there were no medical records that were made available   14:46:26

11 to me.  In fact, many of these patients only had symptoms of

12 what one could conclude was their diagnosis because they

13 haven't had that type of thorough medical care.

14 Q.  I think you testified that sometimes a possible reason for

15 lack of medical records is that someone was underinsured or not   14:46:45

16 insured as opposed to having Medicare or Medicade, do you

17 recall that testimony?

18 A.  Yes, I did.

19 Q.  And you're not aware of whether these claimants fall into

20 that category of being uninsured?                        14:47:01

21 A.  When I spoke to each of these individuals, they had -- to

22 my recollection, they had Medicade to my recollection.  I

23 didn't get their Medicade numbers.  I am a Medicade provider,

24 but I didn't get Medicade numbers because I wasn't interviewing

25 them for that reason.                                    14:47:25

Cross-Examination of Sharon W. Cooper, M.D.

1   Q.  So having Medicade, you would agree they have access to

2   medical care?

3   A.  They can have access to medical care.  If they -- if it's

4   available.

5   Q.  Now, fair to say that what you did was you took information      14:47:39

6   provided to you by the individuals just verbally; correct?

7   A.  What I did was I conducted a virtual medical evaluation

8   which entailed my obtaining a medical history.  So these

9   patients didn't just start talking to me.  I was the one asking

10  all of the questions of them so that I could better find out      14:48:05

11  what medical problems that they might have symptoms of.

12  Q.  And so you -- the bases -- you didn't review any -- they

13  didn't provide you any written paperwork, medical records or

14  any type of documents; correct?

15  A.  No, they -- no, they did not.      14:48:25

16  Q.  So the only information that you received from them was

17  what they verbally said to you during those interviews?

18  A.  The information that I received from them were specifically

19  responses to very specific questions I was asking them.  I was

20  asking them a very carefully -- a very careful review of      14:48:45

21  systems from headaches, vision, from the -- from the top of the

22  head to the toes of their feet because that's the kind of

23  review of systems we should do for patients who have been

24  victims of crime because very often the victim has been so

25  terrorized over time that they don't -- they don't even know      14:49:11

———Cross-Examination of Sharon W. Cooper, M.D.———

1    what to do.

2          So I try to be very calm with them and let them know

3    that I'm asking questions about how their health is so that we

4    can make sure that we can address anything that may be going on

5    with them.  I don't expect them to understand that they are

6    presenting with pathology.  That's my job to figure out.

7    Q.  How long was your interview with Claimant Number 3?

8    A.  My standard interview for these kinds of patients is about

9    90 minutes.

10   Q.  And fair to say for Claimant Number 3 it was about

11   90 minutes?

12   A.  Yes, that's correct.

13   Q.  And how about for Claimant Number 6?

14   A.  That would be about the same amount of time.

15   Q.  And both of those were conducted via Zoom presumably?

16   A.  Yes, they were.

17   Q.  Could you see the patient's face?

18   A.  Not always.  My experience in trafficking patients,

19   especially patients who have been sold online, is that they

20   will come on to the screen with me with their cell phone and

21   they will put the cell phone directed towards the ceiling

22   because they are ashamed and they don't want me to see them per

23   se, and they talk to me the whole time.

24          Many times -- this is the only type of patients that I

25   have, and I teach about these, these patients frequently go

Cross-Examination of Sharon W. Cooper, M.D.

1    into a closet to talk to me, and they often take their cell

2    phone, and direct the camera of the cell phone to the ceiling

3    because they are -- because of their guilt, self-blame and

4    shame.

5    Q.  Was anyone else present during these interviews?                    14:50:57

6    A.  No, and I wouldn't have wanted there to have been anyone

7    else present unless they want -- unless they felt they needed

8    someone to support them.

9    Q.  Did you record the interview?

10   A.  No, I did not record it, but I take copious notes as I          14:51:11

11   would if I were in an exam room.

12   Q.  And do you have electronic copies of those notes?

13   A.  I have collated those notes and put them into my report,

14   which is why the reports are so long.

15   Q.  You understand you were asked some questions by the Court        14:51:30

16   about causation, and I just want to go back to that.  You

17   understand the difference between correlation and causation;

18   correct?

19   A.  Yes, I do.

20   Q.  And you cite some reports in your expert report, and I am        14:51:45

21   focused on the article written by Lederer and Wetzel.

22   A.  Yes.  Yes.

23   Q.  And you would agree that that research is a research paper

24   on correlation, not causation; correct?

25   A.  That particular paper was published and is an excellent          14:52:10

Cross-Examination of Sharon W. Cooper, M.D.

1    paper.  It was based upon history.  Everything that --
2    everything that that particular paper reflected was based upon
3    history, the patients, these survivors reporting what had
4    happened to them and what their symptoms were.  And the purpose
5    of that particular report was to -- for us to recognize the                 14:52:32
6    high percentage of pathology in these patients.  It was a
7    follow to the research of Dr. Melissa Farley who did a similar
8    assessment of 900 patients in nine different countries, and
9    both of those bodies of literature were very similar with
10   respect to the ongoing nature of pathology, physical pathology,            14:52:57
11   associated with sex trafficking.
12   Q.  And you understand that article was a law review article
13   written by a lawyer and a law student; correct?
14   A.  Yes.  She is -- Laura Lederer is really an amazing person.
15   I know her, and she is truly an excellent person.  She sees                 14:53:20
16   these -- she has other individuals.  She is not the only person
17   who is talking to these patients.  She has other individuals
18   who are facilitating, kind of gathering of medical information
19   in order to put it all together, and it was very helpful
20   information for us to understand how sick these types of                    14:53:40
21   patients are going -- are more likely going to be.
22   Q.  And you say, "more likely going to be" because there was
23   not a -- that report didn't say that certain conduct was the
24   necessary cause of a certain harm.  This was a study more of
25   correlation rather than causation.  You would agree with me                 14:54:04

Cross-Examination of Sharon W. Cooper, M.D.

1    there?

2    A.  This is a study regarding a history that was provided of

3    sex trafficking victimization and the victims reporting to the

4    evaluators the specific symptoms that they were having.

5    Q.  And you mentioned the victims reporting symptoms, so you          14:54:24

6    understand this research was based on 107 questionnaires given

7    to individuals who previously engaged in prostitution?

8    A.  These were victims who had been trafficking victims.  There

9    is a difference between prostitution and sex trafficking.  Sex

10   trafficking is when you are a victim, and prostitution is the        14:54:50

11   exchange of sex for money, for money, for some type of benefit

12   to someone between two consenting adults.  That definition has

13   been very well provided for us in a document called the Garden

14   of Truth written by Melissa Farley, several other subject

15   matter experts in sex trafficking.                                   14:55:15

16          The difference between -- the difference between

17   prostitution and sex trafficking is that in sex trafficking

18   there is third-party control as compared to prostitution.

19   Q.  And going back to the article, you understand that these,

20   the lawyer and the law student's research, they didn't conduct       14:55:34

21   any medical examinations of these individuals; correct?

22   A.  Correct.  To my knowledge, I didn't see any evidence of

23   having referred them to a hospital or clinic, et cetera, for

24   further assessments.

25   Q.  Okay.                                                            14:55:53

Cross-Examination of Sharon W. Cooper, M.D.

1    A.  They may have done that, excuse me, they may have done

2    that, but that wasn't the purpose of this article.  This

3    article was to alert us that these patients have high

4    percentages of certain kinds of medical problems and,

5    therefore, we should be paying attention to that and looking      14:56:09

6    for that and referring these patients for better health care.

7    Q.  Did you -- so I take it during your examination of these

8    claimants you didn't speak with their parents?

9    A.  No, I did not.

10   Q.  You agree that a parent is someone you would typically       14:56:31

11   interview to get a fuller picture of a minor's health or the

12   condition of someone who is a minor at the time of the

13   victimization?

14   A.  If the parent is not an abusive parent, if the parent has

15   been deemed reasonable to be the caregiver of a victim like      14:56:55

16   this, many trafficking victims have been taken away from their

17   parents because there has been significant dysfunction in the

18   home of record, substance misuse, violence, parents who have

19   been in prison, et cetera.  And so if I had a family where

20   these victims were living, where they were living, I would       14:57:18

21   like -- would have liked to have spoken to that parent for

22   them, but many times trafficking victims are not in the custody

23   and care of their biological parents.

24   Q.  Okay.  And you didn't reach out to their parents or tried

25   to get in contact to their parents because these were            14:57:37

UNITED STATES DISTRICT COURT

————Cross-Examination of Sharon W. Cooper, M.D.————

1   situations where there was abuse in the home?

2   A.  I didn't reach out to their parents in part because I had

3   gotten the history of that, but I also evaluated these victims

4   when they were over the ages of 18.  So they were, from a

5   medical perspective, did not require having a parent or a          14:57:59

6   guardian to be able to obtain permission to speak with them.

7   Q.  And you -- but you agree that even if they have reached the

8   age of majority when you speak with them, that if a parent is

9   available and is, you know, not abusive and willing to help,

10  that they would have information about that person's childhood    14:58:25

11  that could be relevant to your report?

12  A.  That is true.  That could be relevant and I would ask the

13  permission of the patient if they wanted me to speak to their

14  parent and/or guardian because I have to show respect to the

15  patient when I'm conducting a medical evaluation.                 14:58:50

16  Q.  You take the position that the online nature of the sex

17  trafficking could cause additional harm, and you testified a

18  little bit about that earlier today, and I just want to focus

19  on two reasons that you cited.  So one was ongoing harm

20  associated with child sex abuse material remaining online, and   14:59:17

21  I think you cited to a situation where there was chatter on the

22  dark web that ultimately caused a victim to have to relocate

23  out of fear for his or her safety, do you --

24  A.  Yes.

25  Q.  -- do you recall that?  You're not --                        14:59:37

Cross-Examination of Sharon W. Cooper, M.D.

1   A.  Yes, I do.

2   Q.  -- you're not aware of that happening with respect to

3   Claimants Number 3 or Number 6; correct?

4   A.  That is correct.  I am unaware of that being a complication

5   in those two survivors.                                          14:59:52

6   Q.  And fair to say you're not aware of any images that remain

7   online with respect to those two claimants?

8   A.  I believe that the attorney for one of the victims had let

9   me know that there were images that were still somehow or

10  another available.  I usually don't try to trace that down.  I   15:00:18

11  could.  I worked for 17 years for National Center for Missing

12  and Exploited Children.  With respect to the issue of images,

13  that was my role there, and so I would be able to more likely

14  than not determine, but I am not -- I don't want to give these

15  victims the impression that I am trying to find their images.    15:00:38

16  It would destroy the sense of trust that those victims would

17  have with me, so I do not do that unless they ask me, can you

18  look and can you inquire, are my images still out there?

19  Q.  So you just don't know for this case and you provided the

20  reasons why you don't know?                                      15:01:00

21  A.  That's correct.

22          MR. LANDMAN:  This could be an appropriate time for a

23  break.

24          THE COURT:  Yes.  And again, counsel, narrow the focus

25  on the claims, the restitution claims that are made and          15:01:10

Cross-Examination of Sharon W. Cooper, M.D.

1  whatever you think the infirmity of the nexus of causation is

2  there.

3        And so we will be in about a 15-minute break.  Thank

4  you.

5        (Recess was taken at 3:01 p.m.)                        15:01:36

6    (Proceedings reconvened at 3:21 p.m.)

7        THE COURT:  And counsel, you may resume your

8  examination.

9        MR. LANDMAN:  Thank you, Your Honor.

10              CONTINUED CROSS-EXAMINATION                     15:22:03

11 BY MR. LANDMAN:

12 Q.  I'd like to turn to page 21 of your report, and if we can

13 pull it up for the witness.  I have it on my screen.  Thank

14 you.  Okay.

15        So here is the portion of your report where you list   15:22:31

16 the average lifetime costs of various diseases or conditions;

17 correct?

18 A.  Which report -- which report are we on?  Which victim?

19 Q.  This is Claimant Number 3, Exhibit 127.

20 A.  I don't have it as an exhibit number.  I apologize.  Is    15:22:58

21 this D.R. or N.F.?

22 Q.  N.F.

23 A.  Thank you very much.  And it's on page -- right.  Okay.

24 Q.  Okay.  And so starting -- starting from the top, you report

25 the average lifetime cost of rape to be 122,000, approximately  15:23:20

Cross-Examination of Sharon W. Cooper, M.D.

1    $122,000, are you -- you're aware that Claimant Number 3

2    indicated that she lost her virginity when she was raped by a

3    friend of her uncle?

4    A.  I believe that she did give me that information.

5    Q.  And you understand that she didn't meet the friend of her          15:23:50

6    uncle on Backpage.com; correct?

7    A.  I don't know if she did or did not meet that person on

8    Backpage; however, it is very important to understand this

9    lifetime cost per victim.  It is -- this particular research

10   has been a source of quite a bit of angst among professionals        15:24:11

11   in the field because, first of all, the victim is an adult.  It

12   is not speaking of a child victim or a minor victim.  It has

13   no -- there is no capability from this particular research or

14   the duplication of rapes.  And when you have a trafficking

15   victim, rape is going to occur anywhere from 10 to 14 times a         15:24:39

16   day or night, and so we don't have any other public health cost

17   analysis except for this one, and so we include it.  But you

18   can see why we would put the statement:  This cost as the

19   absolute minimum as N.F. was victimized many times, not just

20   once.                                                                 15:25:02

21   Q.  You are -- are you aware that Claimant Number 3 had

22   multiple sexual encounters before she was ever advertised on

23   Backpage.com?

24   A.  I do not know about multiple sexual encounters, and I do

25   not know whether or not those were -- were sexual encounters          15:25:19

UNITED STATES DISTRICT COURT

Cross-Examination of Sharon W. Cooper, M.D.

1  with peers versus sexual encounters with adults, which would

2  have been statutory rape, so I don't know that.

3  Q.  And I think you --

4  A.  The patient did not tell me that.

5  Q.  And that's a distinction you make, and I think in your          15:25:33

6  report you mention that one of the adverse childhood

7  experiences is sexual abuse of an adult or person at least five

8  years older than the child, is that what you're referring to?

9  A.  No, that's not what I was referring to.  I'm just referring

10  to the fact that most trafficking victims will have been          15:25:54

11  sexually assaulted multiple times, and so you really cannot

12  compare the cost of victimization of a trafficking victim with

13  this particular one time.  This is a one time event in a

14  person's life that this research reflects.

15  Q.  You reference --                                              15:26:15

16  A.  And it is --

17  Q.  -- you reference peers, that it matters whether someone was

18  sexually abused by a peer, and so that's what I am referring to

19  is it matters whether they were a peer or not goes to this

20  adverse childhood experience about whether you were sexually     15:26:31

21  abused by someone at least five years older at the time;

22  correct?

23  A.  I think I want to make -- I want your question to be a

24  little bit more clear.  I want it to be a little bit more

25  clear.  If a patient --                                          15:26:49

Cross-Examination of Sharon W. Cooper, M.D.

1    Q.  I can be -- yeah, I can repeat the question, Dr. Cooper.

2    Thank you, so I'll ask it a different way.

3            Do you agree that it is an adverse childhood

4    experience when an adult or person at least five years older

5    than the child touched or fondled the child's body in a sexual    15:27:03

6    way?

7    A.  The child is less than 18 years of age.  The five years

8    will not make a difference if the patient is over 18 years of

9    age, 18 or older.  So could you repeat, with that caveat, my

10   explanation of that caveat, could you ask me that question once    15:27:21

11   more, please?

12   Q.  Well, I think in my question I used the word "child," so

13   that presumes the person is under 18, but I will repeat the

14   question, which is, do you agree whether it's an adverse

15   childhood experience if an adult or person at least five years    15:27:35

16   older than the child ever touched or fondled the child's body

17   in a sexual way?

18   A.  That would be considered an adverse childhood experience,

19   yes.

20   Q.  And are you aware that Claimant 3 reported to the FBI that    15:27:48

21   she had an encounter with a 17-year-old boy when she was 12?

22   A.  Yes, I am aware of that.

23   Q.  And you're aware it was the subject of a criminal case

24   brought against the 17-year-old boy?

25   A.  I do not know the outcome of that criminal case.  I didn't    15:28:08

UNITED STATES DISTRICT COURT

Cross-Examination of Sharon W. Cooper, M.D.

1    see the outcome.

2    Q.  But you're aware there was a criminal case?

3    A.  Yes.  But I didn't see the outcome of that.

4    Q.  And you don't know the details of this adverse childhood

5    experience?                                                    15:28:23

6    A.  I don't know the details of that adverse childhood

7    experience, but it is clearly not relevant with respect to a

8    sex trafficking victimization, which is typically going to be

9    anywhere from eight to 12 sexual encounters and sexual assaults

10   a day.                                                         15:28:39

11   Q.  So your testimony is that Claimant Number 3's sexual

12   encounter with a 17-year-old boy when she was 12 has no impact

13   on her future physical or emotional condition?

14   A.  I did not say that.  I did not say that.

15   Q.  You agree with me that it does have an effect?            15:28:57

16            THE COURT:  Let's move forward, please.

17            MR. LANDMAN:  Okay.

18   BY MR. LANDMAN:

19   Q.  You don't know the extent to which the conditions that you

20   report in your report are related to sexual encounters or other 15:29:07

21   adverse childhood experiences that occurred before Claimant 3

22   was posted on Backpage.com?

23   A.  Could you repeat your question once more?  There's a thing

24   on my screen that distracted me.  I don't know why it's there.

25   Q.  Thank you.  I will remove that.  That's my fault.         15:29:33

UNITED STATES DISTRICT COURT

Cross-Examination of Sharon W. Cooper, M.D.

1    A.   Thank you.

2    Q.   So the question is you don't know whether the extent to

3    which any of the harms that you list in your report are related

4    to adverse childhood experience that occurred before Claimant 3

5    ever was posted on Backpage.com?                                    15:29:59

6    A.   This is for victim D.O.?

7    Q.   Victim N.F.

8    A.   Oh, sorry.  Okay.  Just a second.  I just want to look at

9    my report for a moment, if you don't mind.

10   Q.   Take your time.                                                15:30:17

11   A.   So I know from my report on page 8 that N.F. describes her

12   parents as very nurturing, but once she became a victim of

13   interfamilial child sexual abuse, she eventually left her home

14   and was a target for traffickers, and so there she said her

15   wellness and resilience were significantly negatively affected   15:30:40

16   after she had run away from home.

17            And so in answer to your question, she was in a -- in

18   a nurturing home, but an offender accessed her, sexually abused

19   her such that she ran away from home.

20   Q.   I will go back to my question.  You don't know the extent    15:30:59

21   to which her adverse childhood experiences prior to being

22   posted on Backpage.com contributed to the harm identified in

23   your report?

24   A.   I don't know what percentage, but there is no comparison to

25   having been sexually assaulted by an individual in her home and   15:31:22

**Cross-Examination of Sharon W. Cooper, M.D.**

 1    run away and then become a victim of a trafficker because the

 2    number of sexual assaults that victims of sex trafficking

 3    experience is extremely significant and far more -- far more

 4    problematic and traumatizing than perhaps even a one or two

 5    sexual encounters from a victim of an interfamilial family          15:31:49

 6    member.

 7    Q.  But you can't quantify that?

 8           THE COURT:  I think that's her testimony.

 9           THE WITNESS:  Well, I can --

10           MR. LANDMAN:  That she can't.  Okay.                          15:32:00

11    BY MR. LANDMAN:

12    Q.  You reported -- you mentioned that she -- she reported her

13    parents as very nurturing, have you done anything to verify

14    that statement?

15    A.  Yes.  No, this was part of her medical history.  All of the     15:32:13

16    information in this report is the same as a medical history

17    that we would have in a medical record.

18    Q.  Do you agree that it's common in child sex trafficking

19    cases for a child to be protective of their parents?

20    A.  No.  I would not necessarily agree with that because a          15:32:35

21    significant number of sex trafficking victims have run away

22    from home from abusive homes, so I could not make a generic

23    statement like that.

24    Q.  In fact, Claimant Number 3 did run away from an abusive

25    home; correct?                                                      15:32:52

Cross-Examination of Sharon W. Cooper, M.D.

1    A.  Her wellness -- I wrote her wellness and resilience were

2    significantly negatively affected after she had run away from

3    home.

4    Q.  And you understood that -- you understand that Claimant

5    Number 3 ran away from home prior to ever being posted on                    15:33:11

6    Backpage.com?

7    A.  I don't know the specifics of that.  When I spoke with

8    Claimant Number 3, I was speaking with her with respect to when

9    she was being trafficked outside of her home.  She did not give

10   me a history of interfamilial trafficking, and so I really        15:33:30

11   focused my questions for her with respect to after she was no

12   longer under the care of her family.

13   Q.  Okay.  So you didn't explore what interfamilial abuse she

14   might have suffered prior to being -- prior to running away?

15   A.  Only to know that it was not her parents who sexually          15:33:50

16   abused her when she explained to me about how it was that she

17   was -- that she had run away from home.

18   Q.  On page 7, I'd like you to turn to page 7 of your report.

19   This is the same claimant.

20   A.  Yes.                                                          15:34:13

21   Q.  And this just goes to your testimony that you're not sure

22   of the exact timing.  So on page 7 you write that Claimant

23   Number 3 became an adolescent runaway and subsequently was

24   exploited for sex.

25          Do you agree with that statement?                          15:34:30

**Cross-Examination of Sharon W. Cooper, M.D.**

1    A.  Let me look at it.  Roman numeral number one, and what I

2    said was the victim relayed that she had not experienced

3    diverse adverse childhood experience related to her parental

4    caregivers in her life, but instead she experienced chronic and

5    severe interfamilial child sexual abuse with additional child          15:34:54

6    sexual exploitation resulting in the production of sexual

7    explicit online imagery.

8            So this offender was not a parent.  This was an adult

9    family member who had done this.  That's the next sentence.

10   And this resulted in it becoming an adolescent runaway, and she       15:35:09

11   subsequently experienced sexual trafficking exploitation.  To

12   my knowledge, the individual, the offender who was an adult

13   family member, never, never posted this child's image on an

14   online classified ad encouraging people to buy her for sex.  As

15   far as I know, she never gave me that history.                        15:35:31

16   Q.  Are you aware that Claimant Number 3 was 14 when she first

17   got pregnant?

18   A.  I don't believe that I asked her how old she was when she

19   was pregnant, but let me just be sure.  No, it's not in my

20   report that she had been impregnated when she was 14.                 15:36:18

21   Q.  So your testimony is that you didn't inquire into the

22   circumstances of her teen pregnancy?

23   A.  I don't recall that we discussed her teen pregnancy except

24   that she did not tell me that the adult offender which caused

25   her to run away from home had been the person who impregnated         15:36:41

Cross-Examination of Sharon W. Cooper, M.D.

1  her.

2  Q.  So I am just trying to understand, did she not tell you

3  that she was impregnated as a teen, or did she tell you but you

4  just didn't further inquire into it?

5  A.  She did not tell me that she had been impregnated as a teen        15:36:57

6  by the adult offender that was in the home.

7  Q.  That's not my question, Dr. Cooper.  Did she --

8  A.  If I may finish my answer.

9  Q.  You may, but you haven't been -- I'd just like you to

10  answer the question.                                                  15:37:18

11        MR. LANDMAN:  And I appreciate if the Court's

12  indulgence --

13        THE COURT:  Well, I think -- I think the problem here

14  is my observation is this:  It seems to me that your questions

15  are trying to get the witness to quantify in a percentage or in       15:37:38

16  some fashion that amount of restitution that is listed to the

17  conduct of your client versus other episodes in her life, and

18  unless this witness, in her experience, can say that such a

19  study exists, I don't know that we're ever going to resolve

20  that question.                                                        15:38:21

21        And here, there's a method to Dr. Cooper's analysis in

22  determining what effects of the conduct of conviction resulted

23  in both Victim 3 and 6.  My sense is that it's a better use of

24  time in, and I said this to counsel on Monday, what is lacking

25  in the documentation from the government is, for example, I           15:39:10

—Cross-Examination of Sharon W. Cooper, M.D.—

1    don't take any issue with Dr. Cooper's or Dr. Keisel's report

2    in the general sense that victims who have been posted on

3    Backpage.com have developed traumas as a result of that,

4    psychological, emotional, which may come out in physical, a

5    physical illness, as Dr. Cooper has testified.  That to me          15:39:46

6    seems to be consistent, and I've seen that sort of evidence

7    before in other restitution requests.

8         What I don't have here, for example, with the

9    exception of I think one of these victims, is, for example, a

10   letter from a counselor that says:  I have seen victim so and     15:40:17

11   so for two years, and I may need to see them for approximately

12   four more years.  I've seen that person twice a month at the

13   cost of X.  I don't have that.  And I do have a certain

14   indication by a counselor who says, yes, I have provided

15   services for this particular person, but there is no associated   15:40:53

16   out-of-pocket cost or projected expenditure for future

17   treatment.

18        So I do believe that Dr. Cooper and Dr. Keisel in

19   their backgrounds have the qualifications to opine on the

20   effects of this kind of conduct on young adolescent women.  I     15:41:16

21   just have no, or minimal costs that I can say are attendant to

22   this kind of psychological counseling expense.  And that's the

23   struggle that I'm having here, and it's the government's burden

24   to produce that.

25        I can't say based on a victim's impact statement that       15:41:50

UNITED STATES DISTRICT COURT

—Cross-Examination of Sharon W. Cooper, M.D.—

1    says I have been traumatized, I got anxiety, and so on and so

2    forth, which may be the truth, but what are the costs

3    associated with addressing those issues?  Where is that

4    information, Mr. Rapp?  Can you point to any sort of exhibit

5    that provides that?                                          15:42:20

6            Secondly, with regard to the prediction of medical

7    expenses related to treatment of these types of itemized

8    diagnoses that Dr. Cooper includes in her report, I don't

9    necessarily know that I can, in listening to Dr. Cooper's

10   analysis, that I can award restitution costs unless I know, for  15:42:54

11   example, victim N.F. has undergone some of these procedures or

12   in fact is going to.  I can't -- so for example, I can't say

13   that, you know, she is going to have medication, if she is

14   going to see someone for management of bipolar disorder.  I

15   don't have the specificity that I need in order to make that  15:43:31

16   kind of award.  And let's assume that I make an award for that

17   type of treatment, what if the victim never receives it or

18   never seeks it out?

19           So that's the difficulty that I'm having.  And so if

20   you can narrowly focus.  If you wish to further examine       15:43:53

21   Dr. Cooper on some of these issues, I am happy to permit you to

22   do so, but I think at this point I need additional information.

23           MR. LANDMAN:  Your Honor, we have obviously a lot to

24   cover with Dr. Cooper that we could cover.  Some go to Your

25   Honor's point, which we, of course, agree with, and some go to  15:44:19

Cross-Examination of Sharon W. Cooper, M.D.

1    the existing evidence that Dr. Cooper didn't consider of harm,

2    adverse childhood experiences that these victims suffered

3    before they were ever posted on Backpage.com.

4            But given Your Honor's comments that the government,

5    and as I read your comments, that the government hasn't met its          15:44:39

6    burden, I am prepared to not continue questioning Dr. Cooper.

7    Unless and until the government meets its burden and the Court

8    has further questions, I would request the opportunity to

9    examine -- to finish my examination of Dr. Cooper.

10           THE COURT:  Well, I will permit you to finish your          15:44:59

11    examination of Dr. Cooper understanding what the missing pieces

12    are for me, but I don't think you're ever going to, unless Dr.

13    Cooper, she can correct me if I'm wrong, unless Dr. Cooper can

14    come up with some study or analysis that she or her colleagues

15    have conducted that say:  We can parse out percentage-wise what          15:45:23

16    the potential effects of victimization are.  And I don't think,

17    at least to my knowledge, there's such a study, and that you

18    can quantify, well, because this victim had a child molestation

19    experience before they were posted on Backpage that, therefore,

20    you know, ten percent of these findings don't apply to the          15:45:58

21    conduct.

22           I don't think there's such a study, Dr. Cooper, unless

23    you're aware of it.  But I think it's all of the combined lived

24    experiences that are then affected by the conduct here.  Sort

25    of you take the person as you find them.  It is sort of basic          15:46:20

UNITED STATES DISTRICT COURT

Cross-Examination of Sharon W. Cooper, M.D.

 1    tort law, right, you know, and the experiences are going to be

 2    different.

 3            So I mean, to the extent that you want to examine her

 4    on other areas, I think that's fine, but they should go to the

 5    heart of the Court's findings here with regard to restitution.    15:46:41

 6            MR. LANDMAN:  Thank you, Your Honor.  May I just have

 7    a brief moment to confer with co-counsel?

 8            THE COURT:  Yes.

 9            MR. LANDMAN:  Thank you, Your Honor.  Just a couple

10    more questions.                                                     15:47:36

11    BY MR. LANDMAN:

12    Q.  So Dr. Cooper, you testified about increased levels of

13    cortisol that could contribute to some of the health conditions

14    that these individuals faced, do you recall that testimony?

15    A.  Yes, I do.                                                     15:47:51

16    Q.  And you never tested these individuals to see if they in

17    fact have increased levels of cortisol?

18    A.  No, I did not test these individuals, but they would be

19    tested once they have access to medical care.

20    Q.  And so at this stage you don't know whether they have         15:48:07

21    increased levels?

22    A.  They have enough medical problems to almost report the fact

23    that there is increased medical levels.  And it is important to

24    be -- for me to be clear that, in fact, the annual direct cost

25    for the mental health component that the judge was referring to   15:48:28

—Cross-Examination of Sharon W. Cooper, M.D.—

1   is on the -- is, in fact, on the chart.  It is the very last

2   item on the chart, the complex PTSD annual cost of $3,060 to

3   $6,381.  And the bipolar disorder which you were referencing

4   also is included in this particular annual cost.  It's the

5   second diagnoses, the annual cost medical all care cost of          15:48:54

6   12,913 to $19,446 for her bipolar disorder.

7        So those two important and debilitating mental health

8   diagnoses are extremely important for us to be aware of because

9   that is going to make such a big difference in her long-term

10  care.                                                              15:49:17

11  Q.  And in order to properly diagnose someone with bipolar

12  disorder, that person would need to be evaluated by a licensed

13  physician psychiatrist; correct?

14  A.  Or a general medical officer can also make diagnosis of

15  bipolar disorder.  Yes, you can see that by a psychiatrist, but   15:49:36

16  also general GMOs or, sorry, that's the military term.  Medical

17  physicians who are internal medicine physicians and family

18  medicine doctors also make the diagnoses of bipolar disorder.

19  Q.  And that diagnosis would be after physical examination?

20  A.  After physical examination.  And many times in bipolar        15:50:00

21  disorders there is some questionnaires that patients have to

22  fill out that will facilitate their evidence with respect to

23  that particular diagnosis.

24  Q.  And just so the record is clear, you would agree that both

25  of these claimants experienced a number of ACEs prior to being    15:50:24

UNITED STATES DISTRICT COURT

Cross-Examination of Sharon W. Cooper, M.D.

1   advertised on Backpage.com; correct?

2   A.  That is very common in trafficking victimization.  You

3   frequently do see adverse childhood experiences, however, there

4   is no comparison with respect to the ACE impact when you

5   compare it to the type of experiences that they will have when    15:50:50

6   they are trafficked and are sexually assaulted on an average of

7   10, 10 to 12 or more times a day, five to seven days a week.

8   There is no comparison.

9   Q.  And just final question.  So has your testimony ever been

10  precluded in a case?                                              15:51:17

11  A.  Not to my knowledge.  Not that I'm aware of.

12  Q.  Okay.  So you're not aware of your testimony being

13  precluded and --

14          THE COURT:  Well, let me back up, it matters what kind

15  of testimony and what context.                                   15:51:34

16          MR. LANDMAN:  Okay.  Yes, I can go --

17  BY MR. LANDMAN:

18  Q.  Your testimony, similar to the subject matter that you're

19  testifying here today, you're not aware of -- did you offer

20  testimony in a case against Playboy, do you recall that?         15:51:50

21  A.  Not that I recall.

22  Q.  I'd like to just show the witness --

23          MR. LANDMAN:  The government has marked this as

24  impeachment Exhibit 202, and I provided copies to the Court.  I

25  will pull it up for the witness.                                 15:53:24

Cross-Examination of Sharon W. Cooper, M.D.

1          THE COURT:  2006 case.

2          MR. LANDMAN:  I believe that's correct.

3          THE COURT:  I am not going to entertain the question.

4          MR. LANDMAN:  Okay.

5    BY MR. LANDMAN:                                    15:53:37

6    Q.  How about are you familiar with an Eastern District of

7    Pennsylvania case in which you weren't allowed to testify about

8    specific victims because you didn't conduct sufficient inquiry

9    into the causes of their harm?  Do you recall a defendant by

10   the name of Williams?                             15:53:55

11   A.  Could you give me the first name of the defendant?

12   Q.  Yes.  Terrance Williams and Eric Hayes?

13   A.  That was an operation cross-country case where there was an

14   FBI diaspora of finding and rescuing as many trafficked minors

15   as possible, and the nature of the proceedings was in          15:54:23

16   Harrisburg, Pennsylvania, and the prosecutor asked me to be

17   prepared to speak about some of the aspects of victimization;

18   however, I had not been given the opportunity to interview any

19   of these particular victims to a reasonable degree, and so I

20   believe that that was the reason that I was not allowed to      15:54:50

21   testify.

22   Q.  And you have no information indicating that any of these

23   claimants are going to follow any treatment or diagnosis

24   suggestions that you provide in your report?

25   A.  In talking to these survivors, my approach is to let them   15:55:17

Cross-Examination of Sharon W. Cooper, M.D.

1    know that they should be concerned or they should not be

2    concerned.  I try to give them an education on the different

3    diagnoses that they may have.

4           And so, for example, the bipolar diagnosis in this

5    particular victim whose annual direct medical cost is high        15:55:39

6    because many times bipolar disorders require inpatient

7    management and outpatient management and emergency room

8    management, so that was one of the diagnoses that N.F. has.

9           I knew she had no money, but I would usually -- I

10   don't want to overwhelm the patient and make them feel that all   15:56:02

11   is lost or they will never have any finances to take care of

12   their medical care problems.  I do talk to them about

13   alternative means of payment such as Medicade and other types

14   of support that they may be able to get, but would probably

15   require a nurse case manager to facilitate those kinds of         15:56:24

16   options for them.

17          And so in answer to your question, I did not -- I do

18   not tell patients, "Let's just wait.  You're going to get money

19   to help you with these diagnoses."  What I tell patients is

20   that this is not just in your, and this is something that is      15:56:42

21   going to be important for you to try to pay attention to, and

22   let's hope that we can get some kind of insurance or some type

23   of coverage for you so that you can be treated appropriately.

24   Q.  And you haven't reviewed any medical records indicating

25   that they've actually followed that advice?                       15:57:02

```
 1    A.  No, I have not been provided any medical records.

 2              MR. LANDMAN:  No further questions.

 3              THE COURT:  Just a follow-up, Dr. Cooper.

 4                     REDIRECT EXAMINATION

 5    BY THE COURT:                                              15:57:15

 6    Q.  One of the questions that you were asked was the diagnosis

 7    of N.F. for bipolar disorder.  In your report it states N.F.

 8    has been diagnosed with bipolar disorder, was if from her --

 9    A.  Yes, ma'am.

10    Q.  -- was that from her self-report to you?                15:57:36

11    A.  Yes, ma'am, it was, and that is why -- sorry --

12    Q.  I was going to ask you --

13    A.  And that's why --

14    Q.  I was going to follow up.  Do you recall if she indicated

15    when that diagnosis was made or who made it?                15:57:52

16    A.  Let me take a look at my notes so that I can respond to

17    that correctly.  I apologize.  If I had my computer, I can just

18    search.  I could use the word search.  So I apologize.  It

19    takes me a little bit to go through here.  Okay.

20              On page 15 of 27, Your Honor, after number five in   16:00:29

21    exhibits, the paragraph, N.F. several components of complex

22    psychological trauma.  N.F. has had chronic depression since

23    her adolescent years, and I stated that her adolescent

24    pregnancy --

25              THE REPORTER:  Slow down, please.  Too fast.        16:00:52
```

1          THE COURT:  One second.  You need to slow down.

2          THE WITNESS:  I apologize.  Page 15 of 27.  It will be

3     in the -- it will be in the second paragraph after the number

4     five, at the top of the page.  This is where she provided me

5     with the history that she had had chronic depression since her

6     adolescent years.  That's the second line of that paragraph.

7     "N.F. stated that her adolescent pregnancy worsened her mental

8     health."  She may very well have had postpartum depression and

9     many of the other complications associated with that.  "She

10    reports difficulty with anger management as well and describes

11    herself as easily irritated.  N.F. reported having been

12    diagnosed with a generalized anxiety disorder, bipolar disorder

13    with recognizable mood swings, depression symptoms, and complex

14    PTSD."  And so it was for this reason that this medical history

15    was provided to me that in my -- in my chart at the end of the

16    report I included by the cost of care for bipolar disorder,

17    that's the second diagnosis just after cost of rape, and then

18    because we knew that she had complex posttraumatic stress

19    disorder, that was the very last thing on the table on page 22

20    of my report, the annual direct cost of $3,060 to $6,321

21    annually.

22    BY THE COURT:

23    Q.  Did you have an occasion to ask her whether or not she was

24    in counseling of any type?

25    A.  She was not in any counseling.  She didn't have the funds

UNITED STATES DISTRICT COURT

1    for counseling.  She had had -- initially when she was, at this

2    particular time when she was diagnosed with bipolar disorder

3    she was -- she had been diagnosed with both generalized anxiety

4    disorder bipolar depression and complex PTSD, but to my

5    knowledge when I evaluated her she had not been in inpatient                16:03:20

6    psychiatric care for some time.

7    Q.  You said for some --

8    A.  Most of these for some time.

9    Q.  You said for some time?

10   A.  Correct.                                                                16:03:36

11   Q.  Does that mean that she informed you that she had undergone

12   some sort of counseling or therapy at some point?

13   A.  When she was a teen it was after her adolescent pregnancy,

14   right, she said that was when her mental health got so much

15   worse, so she was still an adolescent at that particular time.             16:03:55

16   And when I saw this patient, she was -- she was -- she was --

17   she was 23.  She was 23 years old when this happened.

18   Q.  23?

19   A.  23 years old, yes, ma'am.

20   Q.  Thank you.                                                             16:04:20

21         MR. LANDMAN:  Just a couple follow-up.

22         THE COURT:  Yes.

23                        CROSS-EXAMINATION

24   BY MR. LANDMAN:

25   Q.  So just to summarize, you don't know when, what age she was           16:04:25

**———Direct Examination of Sharon W. Cooper, M.D.———**

1   when she was first diagnosed with bipolar disorder?

2   A.  I don't know exactly the age, no.

3   Q.  And you don't know if she ever received inpatient

4   treatment?

5   A.  I do not know that either.                              16:04:43

6   Q.  You testified that she didn't have the funds.  You agree

7   that Medicare will pay for counseling if there is a medically

8   necessary reason for such counseling?

9   A.  It depends.  Medicare is not always going to provide the

10  best care.  They will very often provide the least, the least   16:05:09

11  amount of support unless a patient gets into an inpatient

12  setting.  And unfortunately, in our country we have such a

13  paucity of mental health providers that it does take having a

14  nurse case manager to facilitate access to care especially in

15  the area of mental health diagnoses.                           16:05:34

16  Q.  Thank you, Dr. Cooper.

17         MR. LANDMAN:  No further questions.

18         THE COURT:  Mr. Feder, did you have any questions?

19         MR. FEDER:  Give me one moment, Judge.

20         No.  Thanks.                                            16:06:24

21         THE COURT:  All right.  Thank you.  Mr. Rapp, I guess

22  I'll give you an opportunity if you want to have any sort of

23  rebuttal clarification or anything of Dr. Cooper, otherwise I'm

24  inclined to release her.

25         MR. RAPP:  Just have one question.                     16:06:37

Direct Examination of Sharon W. Cooper, M.D.

1                    DIRECT EXAMINATION

2   BY MR. RAPP:

3   Q.  Dr. Cooper, there was some questions about whether or not

4   the two, D.O. and N.F., whether or not they had concerns about

5   their postings being available on the Internet, and I believe        16:06:53

6   your testimony was you didn't ask them that; is that right?

7   A.  That is correct, I did not.  I tend -- I tend to try to get

8   that information from other sources rather than the patient

9   themselves because sometimes the patients don't know that their

10  images have been downloaded, traded or possessed X number of         16:07:18

11  times.  We are able to get that kind of information sometimes

12  from the National Center for Missing and Exploited Children,

13  and especially if there is a federal investigator that's

14  monitoring the case.

15  Q.  And have you been treating survivors between the years of        16:07:34

16  2004 and 2018?

17  A.  I haven't treated them.  I evaluate them.

18  Q.  Evaluate?

19  A.  Because -- right.

20  Q.  And --                                                           16:07:45

21  A.  Yes.

22  Q.  And I believe your testimony was that of the numbers of

23  survivors of child sex trafficking that you evaluated, a large

24  portion of those were trafficked on Backpage.com, is that fair?

25  A.  No, that's not true.  For me -- that's not true for me.          16:08:08

Direct Examination of Sharon W. Cooper, M.D.

1   When I first started evaluating trafficking victims, they were

2   still being sold in strip clubs and, you know, sexually

3   oriented businesses, et cetera, and so a significant number of

4   cases that I testified in in the federal trials that I

5   testified in were not victims who were as yet on Backpage                16:08:28

6   initially.  Most of them were being sold even -- even some of

7   the patients as recently as 2017 were not necessarily being

8   sold on Backpage.  It has been later in the time that I have

9   been aware of the fact that more and more of my patients have

10  been victims of Backpage of Backpage exhibitions.                        16:08:57

11  Q.  And have those victims, I know that you had indicated that

12  you don't, you don't try to inquire about that, you try to find

13  these, that source of information from separate investigations

14  or from investigators, but did any of those --

15  A.  That's correct.                                                      16:09:22

16  Q.  -- did any of those victims express concern about the

17  existence of their postings being available on the Internet?

18  A.  Those victims who have had postings available on the

19  Internet have expressed concerns about that.  It causes them to

20  have -- the way that I write about it when I am speaking in               16:09:43

21  conferences is that they have what I refer to as a rational

22  paranoia, a rational paranoia, the fearfulness that someone is

23  going to recognize them and tell them that they recognize them

24  online.  This is the very same phenomenon that we see for

25  victims who have sexual abuse material what we used to call               16:10:06

**Direct Examination of Sharon W. Cooper, M.D.**

1   child pornography is now called child sexual abuse material,

2   CSAM.

3          And in fact, in the research in 2017 that I was part

4   of from the Canadian Center on Child Protection.  There is a

5   380-plus page report on how this affects survivors, and what          16:10:25

6   the research showed was that 70 percent of survivors express

7   being worried everyday that someone was going to recognize them

8   online, and 30 percent of the study populations, more than 150

9   is more than 150 survivors, 30 percent had been identified

10  online.                                                               16:10:52

11         So the fact that there are images out there is an ever

12  prevalent anxiety source of anxiety for survivors.

13  Q.  And in your experience, did you ever come to learn whether

14  or not johns, johns that we've been talking about that might

15  have had sex for money with N.F. and D.O., do you know if these      16:11:15

16  johns retained these postings in any fashion?

17  A.  I don't know about N.F. and D.O., but I know that there are

18  those buyers who developed a predilection for specific types of

19  victims and who will request those particular victims

20  repetitively, particularly if they have, you know, a specific,       16:11:39

21  a specific sexual fetish and they can enact that fetish with

22  that particular survivor.  I do know that we have seen that

23  phenomenon.

24         MR. RAPP:  Thank you.  I don't have anything else.

25         THE COURT:  All right.  Thank you.  May Dr. Cooper be         16:11:59

1    excused?  Any objection?

2          MR. RAPP:  Not from the United States, no.

3          MR. LANDMAN:  None from Mr. Brunst.

4          MR. FEDER:  No.

5          THE COURT:  All right.                          16:12:16

6          MR. FEDER:  Sorry, she can be excused.

7          THE COURT:  I was going to get that clarification.

8          Dr. Cooper, thank you for your testimony, or thank you

9    for sharing your Friday afternoon with us.

10         THE WITNESS:  Thank you so much, Your Honor.  Thank     16:12:30

11   you very much.  Take care.

12         THE COURT:  Do we have Kate Keisel?

13         MR. RAPP:  No, Judge, that expert is not going to

14   testify either today or Monday.  They are just going to submit

15   on their report that they have provided.                     16:12:43

16         THE COURT:  Who do we have, then, on the line?

17         MR. RAPP:  We have, I believe, Carrie Landau.  I

18   believe she is in the waiting room.  Can I talk about her just

19   for a moment?

20         THE COURT:  Yes.                                  16:12:58

21         MR. RAPP:  So Carrie Landau is associated with the

22   D.R. murder.  She was -- she's a former FBI agent who is

23   involved in that and she's -- we have noticed her testimony.

24   There is no report, not unlike the report that you've been

25   relying upon for Dr. Cooper.  This would be a direct       16:13:17

Direct Examination of Carrie Landau

1  examination showing the proximate cause of Backpage involved in

2  her murder.

3         The lawyer representing her was intended to conduct

4  that cross-examination.  The Court seems adverse to allowing

5  that to happen, and so I have not talked to this witness.  I          16:13:37

6  could stumble through some questions with her that they

7  provided me, or we could have her come on Monday in which case

8  we have no other witnesses, or we can allow them to conduct the

9  direct examination in a similar fashion that other

10 representative for D.O. and N.F. did.                                 16:13:59

11        THE COURT:  Mr. Rapp, given your experience, I think

12 you can stumble through the bear basic questions that you need

13 to have fleshed out, so let's continue in that way.

14     (CARRIE LANDAU, a witness herein, was duly sworn or

15 affirmed.)                                                            16:14:08

16                      DIRECT EXAMINATION

17 BY MR. RAPP:

18 Q.  Good afternoon, Ms. Landau.  I know you're appearing from

19 Chicago.

20 A.  Yes, I am actually in Iowa at the time, yes.                      16:14:46

21 Q.  And so can you just briefly provide us your law enforcement

22 background?

23 A.  Sure.  I just retired as an FBI agent in September of 2024.

24 I was working crimes against children, specifically human

25 trafficking, focusing on domestic minor sex trafficking for the      16:15:09

79

1    last 21 years of my law enforcement career.  Prior to that I

2    was working as a corrections officer, if you will, for Iowa

3    Department of Corrections, and the probation parole program

4    there --

5    Q.  All right.                                                  16:15:30

6    A.  -- for nine years prior.

7    Q.  In total, how long were you an FBI agent?

8    A.  21 years.

9    Q.  21 years.  And can you tell me the time frame that you

10   worked trafficking -- sex trafficking cases?                    16:15:41

11   A.  The entire time.

12   Q.  The entire -- your entire 21 years?

13   A.  Yes.

14   Q.  All right.  Can you talk about -- so during the time period

15   that you were investigating sex trafficking cases, did you      16:15:57

16   observe that sex trafficking had transitioned to the Internet?

17   A.  Yes.

18   Q.  And approximately when, ma'am, did you observe that?

19   A.  It was about, I would say, like 2006 or so, approximately.

20   We were seeing it much more so in the Chicagoland area around   16:16:27

21   2009.

22   Q.  And was there a particular website platform that you

23   observed being implicated in your sex trafficking cases?

24   A.  Yes.

25   Q.  What was that platform?                                     16:16:47

80

Direct Examination of Carrie Landau

1  A.  Backpage.com.

2  Q.  And can you -- can you put some type of a percentage on the

3  cases going forward from 2009 up until your retirement in this

4  arena how many of your cases implicated Backpage.com?

5  A.  I would say before around 2009 until 2018 it was around, I    16:17:06

6  would say, 80 percent.  We had a lot of just basic hotel

7  investigations that may not have led to the discovery of

8  Backpage ads, but for the most part we were able to determine

9  that there was some kind of Internet traction and in large part

10  about 80 percent with Backpage.com.    16:17:35

11  Q.  All right.  And in those cases, in addition just to the sex

12  trafficking, what type of danger violent crime did you observe

13  emanating from your investigations?

14  A.  It was -- it was very indicative of a lot of violence

15  related to guns, beatings, very reminiscent of domestic    16:18:03

16  violence, you know, partner violence, but in large part in the

17  Chicagoland area I focussed on the south suburbs of Chicago,

18  covered basically the midwest region, and it was very much a

19  lot of withholding and providing of drugs along with the

20  Backpage cases, to include a lot of just physical violence, a    16:18:31

21  lot of victims resulting in their death, overdoses and things

22  like that.  It was pretty substantial.

23  Q.  On just the two sides of posting on Backpage, you have a

24  pimp and then you have a john as the customer, did you observe

25  violence from both of those parties?    16:18:59

UNITED STATES DISTRICT COURT

Direct Examination of Carrie Landau

1   A.  Yes.  Yes.  I responded to 16 homicides during the time

2   that I was investigating sex trafficking all related to sex

3   trafficking.

4   Q.  All right.  Can you put a number on the cases that you

5   investigated involving sex trafficking that involve Backpage?    16:19:22

6   A.  I said about 80 percent from 2009 on, but I started in 2004

7   was my first sex trafficking case with the FBI, so I would say

8   about 80 percent.  I worked in large part on a violent crime

9   task force and worked with the Cook County Human Trafficking

10  Task Force, and so many of our investigations would stem from    16:19:52

11  tips that we received from different nongovernment

12  organizations, to include the Polaris Project, and so we would

13  conduct sting operations resulting in that, look for

14  advertisements online to locate victims, but also to facilitate

15  the reversals with the johns and things like that.               16:20:11

16          So we, from 2009 on, I mean, that is the absolute

17  100 percent website that we would be using in furtherance of

18  our investigations.

19  Q.  All right.  I want to turn your attention to the

20  investigation of the murder of D.R., were you involved in that    16:20:30

21  investigation?

22  A.  I was.  I was the lead case agent, yes.

23  Q.  Can you explain to the Court the circumstances surrounding

24  your involvement in that investigation?

25  A.  Yes.  On the date of D.R.'s murder, I was contacted by        16:20:47

Direct Examination of Carrie Landau

1    local police department regarding the initial investigation.

2    The south suburban major crimes task force responded to the

3    location of D.R.'s murder, and had just recently received

4    training related to sex trafficking by myself and my partner.

5    They reached out as a result of information that they found on      16:21:16

6    D.R.'s phone as well as on Backpage.com and were able to speak

7    to several witnesses to determine and found evidence related to

8    what appeared to be definitely prostitution and later

9    determined to be the trafficking of D.R.

10   Q.  All right.  And you actually obtained, at some point, the      16:21:40

11   postings that D.R. that was placed on Backpage on behalf of

12   D.R.?

13   A.  I did, and that's actually the initial way that we were

14   able to identify her by way of one of those postings.

15   Q.  Okay.  And were you also involved in the trial of D.R.'s of    16:22:01

16   both the john that murdered D.R. and also the pimp that was

17   posting D.R.?

18   A.  I was, yes.

19   Q.  And what was the outcome of those trials?

20   A.  The individual responsible for D.R.'s death was sentenced      16:22:27

21   in state court and linked to 38 years in prison.  The

22   individual who participated in the selling of D.R. via Backpage

23   was sentenced to 32 years in federal prison.

24   Q.  In the course of your investigation, did you determine how

25   D.R.'s postings were paid for?      16:22:52

Direct Examination of Carrie Landau

1    A.  I did, yes.

2    Q.  Can you tell us how that, well, how did you determine that?

3    What was the form of payment?

4    A.  The form of payment was bitcoin, and we were able to

5    determine that by way of subpoena process, search warrants for          16:23:08

6    bitcoin, and were able to track those advertisements and those

7    payments together on the date of postings related to the time

8    of purchase as well.

9    Q.  All right.  And just circling back to your career

10   investigating the sex trafficking cases, did you observe the            16:23:35

11   fact that the existence of Backpage, as you observed it, did it

12   make it easier for both johns and pimps to engage in

13   prostitution activity and profit from it?

14   A.  Yes, very much so, and it became commonplace.  It was

15   well-known and very reminiscent of, you know, you could sell a          16:24:05

16   lawnmower on Backpage.com.  The facilitating of posting

17   individuals on Backpage.com was even made easier by

18   conversations between traffickers and johns about how to get

19   those posts to the top of the page by ways of payment and

20   getting the advertisements more recognized, and so it made it           16:24:35

21   very easy for clients and customers to go to one central

22   location to facilitate either their habit or, you know, the

23   commodity that they were selling, and it became very clear that

24   the repeatable commodity of human beings was very lucrative.

25   And so we were able to not only see the increase in individuals         16:25:01

Direct Examination of Carrie Landau

1   on sale online, but also were able to just see a significant

2   increase in our cases based on that.  And under the guise of

3   escort services, however, it was, you know, every single day we

4   were getting tips about young girls, minor children sold on

5   Backpage.com.                                        16:25:27

6   Q.  And I think you referenced this move to the top, can you

7   sort of explain that and what benefit did it have and what cost

8   was associated with that?

9   A.  Yeah --

10          THE COURT:  Well, I think, let me stop you.  I don't   16:25:41

11  necessarily think that's going to aid the Court.  I think I

12  heard exhaustive testimony about that in the trial.  What I

13  am -- what I'm interested in really is, Mr. Rapp, remind the

14  Court the superseding indictment in which count D.R. was

15  referenced, if you recall.                           16:26:04

16          MR. RAPP:  D.R. is not referenced in four corners of

17  the indictment.

18                      DIRECT EXAMINATION

19  BY THE COURT:

20  Q.  All right.  And let me ask, then, the witness, there are   16:26:12

21  claimed restitution requests for items such as burial expenses

22  and things such as headstones and so on, and you referenced

23  that you were aware that the individuals who were convicted of

24  the murder were actually sentenced to a number of years by the

25  state court.  And if I heard you correctly, that the person who  16:26:51

UNITED STATES DISTRICT COURT

—Direct Examination of Carrie Landau—

1  actually posted D.R. on Backpage was sentenced to 32 years in

2  the Bureau of Prisons, is that -- did I get that correctly?

3  A.  Yes, I believe it was 32 years.

4  Q.  Now, related to that sentencing, are you aware if the Court

5  imposed a restitution order as to either of those two          16:27:20

6  individuals?

7  A.  I am not aware of that, no.  I am not sure.  It's not to

8  say that it wasn't.  I'm just not aware.

9         THE COURT:  Mr. Rapp.

10        MR. RAPP:  He was the prosecutor on the case.          16:27:46

11        It was joint and several.  Those were ordered as

12  restitution in those state criminal cases.

13        THE COURT:  And they were funeral costs.  Let me just

14  see if I can get a clarification.  In Document 2131, which is

15  referenced in your chart, Mr. Rapp, as to Victim 8, you refer   16:28:17

16  to it as Document 2129, Exhibit 1, pages 35 through 42, there

17  is a listing in that document under numeral -- number five out

18  of pocket and, if you know, were those out-of-pocket requests

19  for restitution, were those amounts imposed by the Court?

20        MR. RAPP:  By the state court.                          16:29:03

21        THE COURT:  Yes.

22        MR. RAPP:  I believe they were.  No, they weren't.

23        THE COURT:  They were not.  But you just said that

24  some of the funeral cost, the burial cost, headstone, which

25  here I have a request of $14,000.                              16:29:18

UNITED STATES DISTRICT COURT

Direct Examination of Carrie Landau

1       MR. PANCHAPAKESAN:  I can try to assist the Court if

2   you would allow.

3       THE COURT:  Well, let me see what Mr. Rapp has to say.

4       MR. PANCHAPAKESAN:  In connection with our pleadings,

5   this is Document 2280-4, which is Exhibit D to our initial          16:29:37

6   response, that's the judgment in the federal case against

7   Mr. McFee, and then on page, the last page of the document, the

8   total amount of restitution was $14,439.29, and so it's joint

9   and several between Mr. McFee and Mr. Hazely, and I believe

10  that was for funeral costs.  And then the prior exhibit in our     16:30:18

11  submission, Exhibit C, is the government's sentencing memo in

12  that case, and that's the full amount of restitution that they

13  sought there.

14      MR. RAPP:  So just to clarify, so that's not been

15  paid.                                                              16:30:44

16      THE COURT:  But there is a standing restitution

17  order --

18      MR. RAPP:  Right.

19      THE COURT:  -- by the state court as to two

20  individuals, at least as to, it sounds like it's very closely      16:30:51

21  aligned to the funeral and burial costs of D.R.

22      MR. RAPP:  Right.  But as the Court knows, we took the

23  position throughout that the pimps, in this case Mr. Hazley, is

24  a co-conspirator of Backpage just like all the pimps were

25  co-conspirators of Backpage.  The conspiracy could not, because    16:31:18

UNITED STATES DISTRICT COURT

—Redirect Examination of Carrie Landau—

1  they were promoting and facilitating prostitution, it could not

2  have been successful without Mr. Brunst and Mr. Spear actively

3  assisting the pimps in posting those ads, particularly for an

4  underage trafficking victim like D.R., which they knew about

5  from the series of meetings with NCMEC and what we heard during     16:31:48

6  the course of the trial.

7          So with respect to those expenses, they are for sure

8  should be held jointly and severely liable between themselves,

9  but certainly with this other federal 'cause these people are

10 in custody for 30 years paying, you know, $5 a month or            16:32:08

11 whatever.

12         THE COURT:  Let me ask if you have any further

13 questions of the witness?

14         MR. RAPP:  I just have one very sort of extraneous

15 question.                                                          16:32:26

16                   REDIRECT EXAMINATION

17 BY MR. RAPP:

18 Q.  Ma'am, you recall in the course of this investigation you

19 got assistance from Verizon and even Backpage in providing the

20 postings of D.R. to you to further your investigation?            16:32:39

21 A.  Yes, and not just in this case, but in several cases, yes.

22 Q.  All right.  And as a result of the assistance you gave

23 Mr. Ferrer this certificate that we're all sort of familiar

24 with.  Many prosecutors and people get them from the FBI that

25 sort of has this signature of whoever is the director at the       16:33:04

 1  time.

 2  A.  Yes.

 3  Q.  And you did that for Mr. Ferrer?

 4  A.  Yes, along with many others who provided assistance in the

 5  investigation.                                                    16:33:17

 6  Q.  But at the time you gave them, were you familiar with the

 7  details in the superseding indictment in this case involving

 8  Backpage's former relationship with the The Erotic Review, with

 9  the superposter strategy, their aggregating content from other

10  prostitution websites, and their money laundering strategies     16:33:38

11  that they have now been convicted of and engaged in, were you

12  familiar with any of that when you gave that certificate out?

13  A.  No, and it was years before.

14  Q.  All right.

15         MR. RAPP:  I don't have anything else.                    16:33:54

16         THE COURT:  Mr. Panchapakesan.

17         MR. PANCHAPAKESAN:  Thank you, Your Honor.

18         THE COURT:  Just so you know, counsel, because I'm

19  trying to get through this witness's testimony so she doesn't

20  have to reappear.                                                 16:34:08

21         MR. PANCHAPAKESAN:  I have five minutes at most, Your

22  Honor.

23                     CROSS-EXAMINATION

24  BY MR. PANCHAPAKESAN:

25  Q.  Good afternoon, Agent Landau.  My name is Gopi               16:34:17

─Cross-Examination of Carrie Landau─

1    Panchapakesan.  I represent Mr. Brunst.  Very briefly, and I'm

2    drawing on some of your prior testimony on other cases so

3    hoping to go through this quickly.

4            First, you would agree, Agent Landau, not all

5    prostitutes are being sex trafficked, fair?                16:34:34

6    A.  That's fair.

7    Q.  And there are -- there is something called an independent

8    sex worker, for example, meaning someone who works for

9    themselves, fair?

10   A.  Yes.                                                   16:34:50

11   Q.  Now, have you reviewed any of the trial testimony in this

12   case, the one that you're testifying in today?

13   A.  I have not, no.

14   Q.  And so you aren't familiar with my client Mr. Brunst's

15   particular offense conduct, is that fair?                  16:35:08

16   A.  That's fair.

17   Q.  And so sitting here today, you have no opinion as to

18   whether any of my client's conduct caused any particular

19   individual to be trafficked, is that fair?

20   A.  Yes, I have no knowledge of that.                      16:35:25

21   Q.  Now, if we could just briefly pull up exhibit, what's been

22   marked as Exhibit 104, this is the commendation request that

23   Mr. Rapp referenced.  And so Agent Landau, this is a May 10th,

24   2011, request for certificate from the FBI director that you

25   drafted; correct?                                          16:35:52

Cross-Examination of Carrie Landau

1   A.  Just looking at that real quick.

2   Q.  Sure.  Go ahead.

3   A.  Yes.

4   Q.  And this is a request for an FBI director commendation you

5   made in 2011 in connection with work that Backpage had done to          16:36:09

6   assist you with your investigations; correct?

7   A.  That's correct, yes.

8   Q.  And your request was approved and Backpage ultimately

9   received the commendation from Director Muller; correct?

10  A.  Yes.                                                               16:36:28

11  Q.  And, of course, at this point you had, I think, around

12  eight years of experience as an FBI agent and that experience

13  informed your decision to make this request; correct?

14  A.  Yes.

15  Q.  And then if you go down to the second page there's a blurb        16:36:42

16  at the bottom and you note, if you go back, you note Mr.

17  Ferrer's assistance.  At the end you say, "It is the

18  cooperation of people like Ferrer that make our investigation

19  and their facts presentable to the U.S. Attorney's office for

20  prosecution."  Do you see that?                                       16:37:04

21  A.  Yes.

22  Q.  So you testified on direct exam, Agent Landau, in 2009 you

23  started seeing prostitution cases in Chicagoland where the ads

24  were tied to Backpage; right?

25  A.  Yes.                                                              16:37:19

Cross-Examination of Carrie Landau

1   Q.  And I think you said something like 80 percent of the cases

2   were tied to ads on Backpage; right?

3   A.  Yes.

4   Q.  And it was that high in part because, as you note, Backpage

5   was cooperating with you to bring those individuals to justice,    16:37:31

6   fair?

7   A.  Backpage would answer our subpoenas and provide us with

8   information related to questions that we would ask on those

9   subpoenas, yes.

10  Q.  And those are part of the 80 percent of cases that you were    16:37:47

11  able to investigate and prosecute; right?

12  A.  Yes.

13  Q.  And at the time you wrote this in 2011 you were two years

14  into your investigations tied to Backpage ads; correct?

15  A.  Yes.                                                           16:38:06

16  Q.  And at least at the time based on what you wrote here --

17         THE COURT:  Let me -- let me ask Mr. Panchapakesan,

18  how does this relate to the factual discovery of the victim

19  D.R. related to the restitution hearing?

20         MR. PANCHAPAKESAN:  Well, it sort of --                     16:38:24

21         THE COURT:  I get the point.  I get it.

22         MR. PANCHAPAKESAN:  I can move on.  I think it goes to

23  causation based on the nature of the direct exam, but happy to

24  move on.

25  BY MR. PANCHAPAKESAN:                                              16:38:36

1   Q.  Just lastly, Agent Landau, you testified about D.R.'s

2   murder.  I don't think you testified of the date, am I correct,

3   that the date was December 24, 2016; is that right?

4   A.  That's correct.

5          MR. PANCHAPAKESAN:  I have no more questions.          16:38:53

6          THE COURT:  What was that date?

7          MR. PANCHAPAKESAN:  December 24th, 2016.

8          THE COURT:  Okay.  Thank you.  Mr. Feder.

9          MR. FEDER:  Can I ask my one question from here?  Can

10  I ask it from here?                                           16:39:10

11         THE COURT:  Yeah, please come up.

12                         CROSS-EXAMINATION

13  BY MR. FEDER:

14  Q.  Agent, you know nothing about Scott Spear or any

15  connection, if any, to D.R.'s homicide?                       16:39:21

16  A.  I do not.

17  Q.  You ever heard his name?

18  A.  No.

19                       REDIRECT EXAMINATION

20  BY THE COURT:                                                 16:39:36

21  Q.  I want to follow up on a question that Mr. Panchapakesan

22  asked you at the very beginning.  He asked you if you agreed

23  about the distinction between someone who is voluntarily

24  posting themselves or essentially engaging themselves in

25  advertisement for these purposes or those who are being       16:40:03

1   trafficked.  And question to that effect, in your investigation

2   into D.R.'s homicide, were you able to distinguish whether or

3   not there was a distinction in her being posted?  In other

4   words, was she doing this voluntarily or through a pimp or

5   something of that nature?                                   16:40:31

6   A.  Joseph Hazley was undoubtedly her pimp who posted her on

7   Backpage.com.  We had multiple witnesses to articulate that as

8   well as corroborated evidence related to IP addresses, cell

9   site data, et cetera, that brought a voice back to D.R. who

10  obviously could not testify to her own trafficking, however, it  16:40:59

11  was evident and he was found guilty in federal court.  He was

12  trafficking D.R. and was the individual who posted her.

13        We had multiple captured photographs of Joseph Hazley

14  standing at the bitcoin machine two blocks from his residence

15  posting the advertisements attributable to D.R. and many other  16:41:27

16  witnesses who were also trafficked by Joseph Hazley to

17  corroborate that information.

18        THE COURT:  All right.  Thank you.  All right.  May

19  the witness be excused?

20        MR. RAPP:  Just one last question.  I don't think this  16:41:41

21  is clear for the record.

22                    REDIRECT EXAMINATION

23  BY MR. RAPP:

24  Q.  Ma'am, how old was D.R.?

25  A.  D.R. was 16.                                            16:41:47

1         MR. RAPP:  I have no further questions.  She can be

2    dismissed.

3         THE COURT:  Yes.  All right.  Thank you for your

4    testimony, and you are dismissed.  All right.

5         THE WITNESS:  Thank you.                          16:41:59

6         THE COURT:  Given the late hour, we won't take anymore

7    testimony.  Who do you expect to appear, Mr. Rapp, on Monday?

8         MR. RAPP:  If I could just have a minute, Judge.  We

9    believe Smith and Gibson.  Gibson will testify and they are

10   economic economists.                                  16:42:39

11        THE COURT:  With regard to Mr. Smith's reports, I

12   think here too I also struggle with the concept of restitution

13   as it relates to the conduct of Mr. Spear and Mr. Brunst.  The

14   looming question for me is how do I have the authority to

15   impose a restitution order based on an economist's report of  16:43:15

16   what a victim may or may not do in the future?  Here his report

17   clearly outlines the different analysis much like a civil case

18   where I've seen cost of living experts provide, but here we do

19   have individuals who we know either have graduated from high

20   school, have either gone on to higher education, or who may or  16:43:54

21   may not be working, and it would be more helpful to understand

22   in the particular circumstance of these individuals where there

23   is some more concrete restitution claim related to their

24   individual circumstances.  That's the difficulty here because,

25   again, how is the Court to make the prediction as to what the   16:44:24

1  future of these victims is going to be like and how can I then

2  fashion a restitution order in that sense?  It seems to me that

3  the fund that the Department of Justice is establishing would

4  be the more suitable place to make those claims in sort of a

5  civil context.                                                    16:44:49

6        So I don't know at this point how useful Mr. Smith's

7  testimony is going to be to the Court in that regard unless

8  somebody can point me to the law that says I can consider those

9  types of things under the statute 36 -- 3664(a).  So and

10  because I have the benefit of the victims' representative        16:45:21

11  counsel here, I hope you understand my observation that while

12  you have made claims on your clients' behalf, some of those

13  claims lack support just in terms of what I can glean are

14  actual out-of-pocket losses or predicted losses.

15        I do think I have enough information on the record as      16:45:52

16  filed before the Court that victims and as I witnessed in the

17  testimony that was given have had traumas associated from being

18  posted.

19        I can then make the logical leap that, yes, certainly

20  counseling therapies would be necessary and would be helpful.    16:46:15

21  To the extent that you can provide me with documentation, and

22  indeed there are some, for example, insurance claims as to

23  Victim 1, but again, here too, I have a list of an explanation

24  of benefits from Kaiser Permanente, which certainly outline a

25  host of procedures, but I don't have a distinction in terms of   16:46:47

what those procedures are.  I don't have the associated code

references here.

        As I explained to Mr. Rapp on Monday, there are

appointments that were for lab procedures, things of that

nature, I don't know what that relates to, if that person had a        16:47:13

cold, I don't know.  So I need something more related to

counseling, psychological traumas.  There is in the exhibits,

for example, a letter from a therapist who says that they

provided treatment, but doesn't detail what number of

appointments have been had, what's the likelihood of future        16:47:47

appointments, what was the estimated cost associated.

        Certainly in other cases I've awarded restitution for

cost of transportation to and from these medical appointments,

costs of loss time off of work for having to undergo certain

treatments, but usually they provide some sort of a        16:48:12

documentation with that request.

        So I urge you to do some additional digging, follow up

with some of these individual treatment providers, if there

are, or provide some form of clear cost estimate as to the

treatments that are necessary.        16:48:41

        I can't keep the record open forever and I will be

inclined to give the victims' counsel additional time to follow

up with that, but I do think there's certainly a lot of gaps in

the information.  So if you wish to still call upon Stan Smith,

I would suggest that you follow up, Mr. Rapp, with some sort of        16:49:12

```
 1   case law in terms of my ability in a criminal case where

 2   restitution is being sought for this kind of life care request

 3   that you provide that to me as well.

 4           And then you mentioned David Gibson.  And David

 5   Gibson, remind me of who David Gibson is.                         16:49:34

 6           MR. RAPP:  David Gibson is for Victim 8.

 7           THE COURT:  Victim 8 I have as D.R.;  is that right?

 8           MR. RAPP:  Yes.

 9           THE COURT:  And what is the testimony?  Give me a

10   proffer of the testimony.                                         16:49:59

11           MR. RAPP:  It's similar to Smith, future earnings,

12   projected earnings.

13           THE COURT:  And who else do you have?

14           MR. RAPP:  That's it.

15           THE COURT:  So you don't anticipate calling Dr. Brett,    16:50:15

16   Jessica Donnelly or Sarah Helms?

17           MR. RAPP:  No.  No.

18           THE COURT:  All right.  Mr. Panchapakesan.

19           MR. PANCHAPAKESAN:  Your Honor, Mr. Rapp and I we

20   conferred earlier.  That was my understanding as well that it     16:50:42

21   would be Mr. Smith and Mr. Gibson, the economist, and we'll try

22   to keep those cross-examinations brief and tied to the report.

23   We do have a potential rebuttal witness.  We haven't decided

24   whether we are going to call her or not.  Dr. Lois Lee, she's a

25   sociologist psychologist to potentially rebut Dr. Cooper, but     16:51:04
```

UNITED STATES DISTRICT COURT

1    we're deciding whether her testimony is necessary.

2          THE COURT:  All right.  Well, notify the Court, if you

3    can, as soon as you come to that decision.  I have 10 a.m.

4    until the rest of the day to finish this, and then at that

5    point once the testimony is completed then, again, I will let        16:51:27

6    counsel know the extent to which I'll hold open the record

7    because, again, I need to come to some completion of this

8    matter.

9          MR. PANCHAPAKESAN:  On Monday are you anticipating,

10   after the testimony is in, argument from counsel?  I know          16:51:44

11   there's been plenty of briefing.

12          THE COURT:  I'll hear whatever argument you're ready

13   to provide at that point.  I'm not inclined to go beyond

14   Monday, though.

15          MR. RAPP:  Just so I understand, are you intending to      16:52:03

16   allow additional time to supplement these requests?  And if you

17   are, are you talking two weeks?

18          THE COURT:  I don't know yet.  I don't know.  You can

19   confer with the victims' representative counsels to see if it

20   is even feasible to get that kind of information.  Perhaps they     16:52:26

21   have asked their clients that and this is the most that can be

22   provided.  I don't want them to go and tug and pull, but they

23   have to be informed that I can only make a determination based

24   on a record that is supported, and I can't hold open the record

25   forever, and so I will come to some -- if you can meet, confer     16:52:52

1   with those who wish to make their views known and let me know

2   what, if any, additional time is necessary to gather the

3   information that I would be interested in having.

4           MR. RAPP:  Very well.

5           THE COURT:  Yes.                                    16:53:13

6           MR. LANDMAN:  Your Honor, just a brief housekeeping

7   matter, you know, as Your Honor indicated, the rules of

8   evidence don't apply at a restitution hearing, but I would just

9   move to admit some 302s of the claimants that related to Dr.

10  Cooper's testimony.  Dr. Cooper indicated she didn't review any  16:53:32

11  materials, so there is no reason to put those in front, but I

12  would like the Court to have these documents in considering the

13  causation element.  And this goes to Mr. Brunst's position that

14  in addition to the concerns that Your Honor indicated regarding

15  the inability to ever know whether these individuals are going   16:53:55

16  to need future treatment, and whether they are going to

17  actually seek future treatment, there is the causation element

18  on the front end where these individuals suffered various

19  different types of adverse childhood experiences.  That could

20  have contributed to the existing harm, and so I just want to     16:54:18

21  put those exhibits into the record, if I may.

22          THE COURT:  What are those exhibits?

23          MR. LANDMAN:  Those are Exhibits 108, 109, 121, and

24  126.

25          THE COURT:  I'll take a look at them and I will let      16:54:34

UNITED STATES DISTRICT COURT

1    you know whether they'll consider them on Monday.

2            MR. LANDMAN:  Thank you.

3            THE COURT:  Anything further, Mr. Rapp?

4            MR. RAPP:  This is just a last housekeeping.  At the

5    outset of the hearing today you indicated that Victims 1 and 4,        16:54:46

6    that their claims -- this goes to their claims regarding the

7    money the pimps made from the prostitution activity, you said

8    those would be, and we concede that, I just want to make sure

9    that the balance of their claims now, there might be other

10   reasons why the Court disregards, but the balance of those           16:55:09

11   claims we're still pursuing and we will have argument on that.

12   I didn't take that to mean that you've knocked them out

13   completely.

14           THE COURT:  Yes.  And as I mentioned, Mr. Rapp, with

15   regard to, I believe it is Victim 1, that is the -- that is the      16:55:26

16   probably the most complete documentation that the Court has,

17   but without explanation.  And so to the extent that there could

18   be clearer explanation of what those services were that were

19   received and distinguished from everything that's included

20   there from the service provider Kaiser Permanente, that would       16:55:53

21   be helpful to me, in any event.  So yes, you are correct, I am

22   not going to consider those other claims.  All right.

23           MR. RAPP:  Thank you.

24           THE COURT:  There being nothing further, then we are

25   adjourned.                                                          16:56:11

UNITED STATES DISTRICT COURT

1          (Proceedings concluded at 4:56 p.m.)

UNITED STATES DISTRICT COURT

1

2

3                       **C E R T I F I C A T E**

4

5            I, HILDA E. LOPEZ, do hereby certify that I am duly

6    appointed and qualified to act as Official Court Reporter for

7    the United States District Court for the District of Arizona.

8            I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13           DATED at Phoenix, Arizona, this 10th day of January,

14   2025.

15

16

17                            s/Hilda E. Lopez_____

18                            HILDA E. LOPEZ, RMR, FCRR

19

20

21

22

23

24

25